UNITES STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                              )
DENNIS DIMON,                                 )
Plaintiff,                                    )
                                              )
vs.                                           )          CIVIL ACTION NO. 05-11073 MEL
                                              )
METROPOLITAN LIFE                             )
INSURANCE COMPANY, KEMPER                     )
INSURANCE COMPANY,                            )
MORGAN STANLEY DW, INC., and                  )
MICHAEL B. LATTI, LATTI                       )
ASSOCIATES, LATTI & ANDERSON                  )
LLP,                                          )
        Defendants.                           )
_____)


**PLAINTIFF, DENNIS DIMON'S, MOTION FOR SUMMARY JUDGMENT AND
SUPPORTING MEMORANDUM OF LAW**

Plaintiff, Dennis Dimon ("Dimon), respectfully requests this court enter judgment as a
matter of law against Metropolitan Life Insurance Company ("Metropolitan"), Kemper Insurance
Company ("Kemper") and Michael B. Latti along with Latti Associates (together "Latti").
Please note that all exhibits are attached to Plaintiff's Statement of Undisputed Material Facts.

As reasons therefore, Dimon states as follows:

**CORPORATE BACKGROUND INFORMATION**

A significant portion of the events leading to this litigation took place in the 1981 – 1983.
At that time, the corporate parties were known by other corporate names.  The following is a list
of what the parties were known as in 1981 – 1983 and what they are referred to now:

Charter Security Life Insurance Company is now known as and referred to as Metropolitan Life
Insurance Company ("Charter Security/Metropolitan");

American Motorists Insurance Company is now known as and referred to as Kemper Insurance Company ("American Motorist/Kemper"); and

Latti Associates and Michael B. Latti are now known and referred to as Latti & Anderson.  For purposes of this brief all Latti parties are referred to as ("Latti Associates").

I.    **FACTS**

      The plaintiff has filed his Statement of Undisputed Material Facts separately.  Below for the court's convenience is a brief summary of those facts.  All references to citations has been omitted in the interest of saving time and space.

      In or about 1981, the Plaintiff, Dennis Dimon, was severely injured while serving as a member of the crew of the F/V JENNY C, resulting in the loss of his eye.   On or about February 4, 1983, following a trial in the United States District Court for the District of Rhode Island, a jury awarded the plaintiff $710,000.00 for his injuries against the defendant, F/V JENNY C, INC.  At all times throughout the litigation process and at trial Mr. Dimon was represented by Latti Associates operated under partner Michael B. Latti.

      Following the verdict the parties entered into a settlement agreement and appeared before the Honorable Judge Pettine for approval of the settlement.  Judge Pettine became quite concerned that the plaintiff, Dennis Dimon did not comprehend or understand the provisions of the settlement and discontinued the Settlement Conference.  To protect Mr. Dimon, Judge Pettine appointed Leonard Decof as Guardian Ad Litem to represent the interests of Mr. Dimon and report to the court the particulars of the settlement agreement.  On or about May 3, 1983, Mr. Decof reported to the Honorable Judge Pettine that the plaintiff was to receive a total settlement of $425,000.00 consisting of a lump sum payment of $250,000.00.  The remaining $175,000.00 to be used to fund an annuity guaranteed for 20 years which would *continue for the life of the*

*plaintiff*.  The annuity would pay the Plaintiff a set amount of $1,450.45 increasing each month

by 3%.  The plaintiff signed a General Release which fully set out the agreements reached in the

underlying personal injury claim and contained a description of the annuity for the benefit of the

plaintiff.  The general release noted that there was an "… annuity contract for my benefit with

Charter Security Life Insurance Company, to pay me One Thousand Four Hundred Fifty and

No/100 (1450.00) Dollars per month for one year following the execution of that contract and

thereafter, such monthly sum increased at the rate of three (3%) percent per year, compounded

annually, to be paid to me during the term of my life, and in no event for less than (20) years…"

At the time of the settlement, the plaintiff's life expectancy was calculated to be 49.7 years.

Furthermore, an April 8, 1983 proposal by Charter Security Life which is now Metropolitan Life

indicates that the annuity was to run into the 50th year.

On April 8, 1983, prior to the May 3, 1983 hearing before Judge Pettine, the defendant

Charter Security/Metropolitan completed a proposal for the benefit of Dennis Dimon.  The

proposal contained references to each year of the annuity starting in the second year and

proceeding to the 50th year or to the end of Mr. Dimon's life expectancy.  (See Id.)

The insurance carrier for the F/V JENNY C was the American Motorist Insurance

Company now known as the Kemper Insurance Company.  Kemper Insurance Company used

$175.000.00 of the money it was paying for settlement of the underlying personal injury case to

apply for an annuity contract with Charter Security Life (Metropolitan).  American

Motorist/Kemper Insurance was the applicant and owner of the annuity contract.  The issuing

company was the defendant, Charter Security Life Insurance Company now known as

Metropolitan Life Insurance Company.  After Mr. Noe signed the original Annuity Application a

new Annuity Application was produced with box numbers 14 and 15 filled in.  On Exhibit "D",

the Dimon's name is incorrectly spelled Diamon and Mr. Noe's signature appears at the bottom of the page under an "X" next to American Motorist Insurance Company.   On Exhibit "E", the Dimon's name is spelled correctly and Mr. Noe's signature appears in exactly the same area at the bottom of the page under an "X" next to American Motorist Insurance Company as it does in Exhibit "D".  After reviewing these two documents, Mr. Mensie the 30(b)(6) deponent of American Motorist/Kemper indicated a suspicion as the to signatures of Mr. Noe.

On or about June 17, 1983, Charter Security Life/Metropolitan through its Vice President Barbara Boehm signed and dated its Single Premium Deferred Annuity for the benefit of Dennis Dimon.  The first sentence of the Deferred Annuity states, "[w]e will pay a lifetime monthly income to the Annuitant if living on the Annuity Date."   It should also be noted that Option 2 Life Income was selected on the Deferred Annuity.  Option 2 is defined as "[E]qual monthly payments as long as the payee lives.  Attached to the Deferred Annuity was a Supplementary Agreement No. SC1126.  The Supplementary Agreement provides in part that the primary payee, Dennis Dimon shall receive, "[m]onthly payments in the amount of $1450.45, increasing 3% annually, commencing on June 6, 1983, for a period of 240 months certain and *life thereafter*."

On or about July 14, 1983, Charter Security/Metropolitan Life through its Vice President, Barbara Boehm, informed the agent, Dean Witter Reynolds now Morgan Stanley that a clerical error had been made on the annuity contract and that the contract should have read for 240 months, (20 years) rather than for life with a guarantee of 20 years.  Ms. Boehm's letter was also copied to Latti & Associates.  On or about August 12, 1983, Kemper Insurance Company, through its employee, John Noe, sent a letter to Dean Witter Reynolds indicating that the annuity applied for was to provide payments for 240 months certain (20 years), and life thereafter for a single premium of $175,000.00.  This letter was copied to Barbara Boehm as Vice President of

Charter Security and Latti and Associates. Mr. Noe's August 12, 1983 correspondence indicated to all parties copied that there was a General Release and that the settlement was approved by Judge Pettine of the United States District Court District of Rhode Island.

On or about September 26, 1983, Charter Security/Metropolitan informed American Motorist/Kemper of the clerical error. This letter was copied to Latti Associates. The information contained in the September 26, 1983 letter from Charter Security Life to Kemper indicated that "the option indicated on the supplementary contract originally sent to Dean Witter Reynolds on June 17, 1983 for delivery to Kemper's office was incorrectly typed as 240 months certain and life thereafter annuity instead of 240 months only." Following the September 26, 1983 letter, Mr. Noe of Kemper wrote to Metropolitan Life indicating that when he signed the contract, section 14 and 15 of the application were blank. On or about October 14, 1993, Charter Security Life through their Vice President, Barbara Boehm indicated that they were going to supply Kemper Insurance Company with a supplementary contract which indicated the new and unilaterally changed provisions which included only 240 months certain and not life thereafter. Some time after the October 14, 1983 letter from Metropolitan to Kemper, Kemper informed Metropolitan that it was going to reject and return the supplementary agreement. The letter from Kemper from John Noe states that it was sent on October 12, 1983, however, it is in response to an October 14, 1983 letter and therefore, not an accurate date. It should be noted that this letter was also sent to Latti and Associates.

During this period of time after the annuity was ratified by Judge Pettine of the District Court of Rhode Island, the plaintiff, Dennis Dimon, was not advised of the proposed changes, nor was the Court or the GAL.

## II.    <u>LAW AND ARGUMENT</u>

<u>DIMON IS A "WARD OF THE ADMIRALTY"</u>

In 1920 Congress extended a right of action to *any* seaman who suffered personal injury in the course of his employment by establishing what is commonly referred to as the Jones Act. *See* <u>Merchant Marine Act</u>, ch. 250, 41 Stat. 1007 (1920), 46 U.S.C. App. § 688.  The Jones Act is an extension to seamen of all rights and remedies provided to railway workers by the Federal Employer's Liability Act ("FELA").  *See* 46 U.S.C. App. § 688 (". . . and in such action all statutes of the United States modifying or extending the common law right or remedy in cases of personal injury to railway employees shall apply . . .") *and* FELA, codified at 45 U.S.C. §§ 51-60.  In the current litigation **it is undisputed that Dimon was and is a Jones Act Seaman**.

Even before the Jones Act and as far back as 1872, it has been held that "[l]egislation for the benefit of seamen is to be construed liberally in their favor."  *See* <u>Doyle v. Huntress</u>, 419 F.3d 3 (1st Cir. 2005) *quoting* <u>McMahon v. United States</u>, 342 U.S. 25, 27 (1951), *see also* <u>Isbrandtsen Co. v. Johnson</u>, 343 U.S. 779, 782 (1952) ("Whenever congressional legislation in aid of seamen has been considered here since 1872, the Court has emphasized that such legislation is largely remedial and calls for liberal interpretation in favor of the seamen."). Therefore, pursuant to Congress and the U.S. Supreme Court, this court has a duty to consider the law applicable to these matters in <u>Dimon's</u> favor.

The notion that seamen are the favored children of the judiciary has been re-enunciated by the U.S. Supreme Court and all of the circuits time and again regarding countless situations and each time has favored seamen above all others.  Our First Circuit has recently continued this entrenched tradition by holding that, "[T]he maritime law by inveterate tradition has made the ordinary seaman a member of a favored class.  He is a 'ward of the admiralty.'"  *See* <u>Doyle</u> at 9

*quoting* Isbrandsten at 782-783.  That language originated in Warner v. Goltra where the U.S. Supreme Court stated that "He is a 'ward of the admiralty,' often ignorant and helpless, and so in need of protection against himself as well as others.  The master, on the other hand, is able in most instances to drive a bargain for himself, and then when the bargain is made, to stand upon his rights."  *See* 293 U.S. 155, 162 (1934).

In 1957, the U.S. Supreme Court, in one historical breath, summarized the history of the FELA and eliminated any remaining doubt that may have existed regarding the great burden placed upon employers when in Rogers Justice Brennan, speaking for the Court, stated:

> [The FELA] was enacted because the Congress was dissatisfied with the common-law duty of the master to his servant.  The statute supplants that duty with the far more drastic duty of paying damages for injury or death at work due in whole or in part to the employer's negligence.  The employer is stripped of his common-law defenses and for practical purposes the inquiry into these cases today rarely presents more than the single question whether negligence of the employer played any part, however small, in the injury or death which is the subject of the suit.  The burden of the employee is met, and the obligation of the employer to pay damages arises, when there is proof, even though entirely circumstantial, from which the jury may with reason make that inference.  *See* Rogers v. Missouri Pacific R.R. Co., 352 U.S. 500, 507-508 (1957).

As evidenced by the incorporation of the FELA, the Jones Act is *remedial in nature* and was enacted as a means of providing *liberal* recovery for injured mariners.  *See* Kernan v. American Dredging Co., Inc., 355 U.S. 426, 432 (1958).  Rogers and Kernan require that any "proof, even though entirely circumstantial, from which a jury may with reason make [an] inference" in Dimon's favor, opens the door to "providing *liberal* recovery" – a door this court is obligated to step through if a prior court-sanctioned seaman's settlement is to be protected.

Dimon respectfully requests this court to review this case with his status as a "ward" of this court in mind.  It is with this status in mind that the underlying proceedings led to a jury award.  It is with this status in mind that the judge, wary of Dimon's lack of comprehension and illiteracy, appointed a Guardian *Ad Litem*.

THE STANDARD FOR SUMMARY JUDGMENT APPLICABLE TO JONES ACT SEAMEN

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).

Traditionally, the burden is on the moving party to ""show[]" – that is, point[] out to the district court – that there is an absence of evidence to support the nonmoving party's case."  *See* Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  And, if the moving party is successful in "showing" an absence of evidence in support of the non-movant's case then the judge should consider whether reasonable persons presented with the same facts and inferences could, after applying the proper legal standard, differ as to their opinions based thereon – if so, then it is a question for the jury – if not, then it is a question for the judge.  McDermott International, Inc. v. Wilander, 498 U.S. 337, 356 (1991), *see also* Villanueva v. Wellesley College, 930 F.2d 124, 128 (1st Cir. 1990).  However, where an injured mariner is involved *ala* Rogers and Kernan, all facts and reasonable inferences are to be viewed with *preference* given to the seaman, i.e. in Dimon's favor.

BRIEF INTRODUCTION

The matter brought to the court for summary judgment is quite simple:

- A jury awarded $710,000.00 to Dimon

- Subsequent to the jury award and on May 4, 1983, the parties agreed to $250,000.00 cash and an annuity for life with twenty years guaranteed to be paid at a rate of $1,450.45 per month with a guaranteed increase of 3 percent per *annum*.

- The agreement was approved by:

    o Dimon,
    o The court-appointed Guardian Ad Litem ("GAL"), and
    o The court;

- More than two months later, on July 14, 1983, Metropolitan, without Plaintiff's, GAL's, or the court's consent, unilaterally altered the agreement <u>grossly</u> in their favor;

- The Defendants allowed twenty years to pass and then <u>surprised</u> Plaintiff by enforcing the unilaterally-altered agreement.


<u>Where the Defendants' negligence is easily identified, the math involved is *even simpler*</u>:

- The Jury awarded:              $710,000.00.

- The parties subsequently agreed to: $250,000.00 cash and an annuity for life with twenty years guaranteed to be paid at a rate of $1,450.45 per month with a guaranteed increase of 3 percent per *annum* for 596.4 months.

- The alteration forced:          A cap of 240 months certain – NOT LIFE.


Clearly, 240 months is more favorable to the Defendants than the 596.4 months originally agreed to.  And just as clearly, 240 months could not be *more contrary* to Dimon's interests.[1]  Therefore, <u>NO</u> collection of eight reasonable individuals will weigh the evidence now before the court towards <u>any</u> outcome other than:

1. The Defendants' each had actual notice of Metropolitan's improper alteration.

2. The Defendants' did not approach Dimon, GAL, or the court because <u>none</u> would have assented.

---

[1] It should be noted that Dimon took the settlement in lieu of the full and superior jury award out of concern for the vessel owner's livelihood.  Where the vessel's policy may have been limited to the value of the vessel, the vessel could have been seized from the owner and sold at action.  *See* May 3, 1983 Hearing Transcript at 18, Exhibit A.

3. Because 240 months ≠ 596.4 months (@ 3% compounded annually), 240 months is <u>not</u> the agreement that was prepared, presented to and approved by Dimon, GAL and the court.

4. 240 months is <u>grossly</u> contrary to Dimon's interests and would rob him of 356.4 months (@ 3% compounded annually).

5. Because Dimon, GAL and the court did not consent to the revised agreement, it is unenforceable as a matter of fact and law and Dimon is entitled to the lump sum present value payment of all future shortfalls and attorneys fees and either double or treble damages, as this court may find, pursuant to M.G.L. Ch. 176D and 93A.

<u>APPLICABLE LAW</u>

As argued *infra,* the law applicable to this matter is set forth in the United States Code, the General Laws of the Commonwealth of Massachusetts, and the Uniform Commercial Code.

<u>THE UNIFORM COMMERCIAL CODE</u>

<u>Obligation of Good Faith</u>

"[The] basic principle running throughout the Uniform Commercial Code . . . is that in commercial transactions [like the one negotiated here between Metropolitan, Latti and Kemper,] good faith is required in the performance and enforcement of all agreements or duties." *See* Carol L. Chomsky, <u>Selected Commercial Statutes</u>, *Official Comment* on U.C.C. § 1-304, 47-48 (West 2005). Though a failure to perform or enforce in good faith won't support an independent cause of action, it does constitute a breach of the contract in question. *See* <u>Id</u>. at 48. As

discussed *infra*, each Defendant has failed to perform and enforce their agreement and its associate duties.

<u>Liberal Administration of Remedies</u>

"The remedies provided by the U.C.C. must be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed . . ." *See* U.C.C. § 1-305(a).  The purpose of this section is to 1) "negate the possibility of unduly narrow or technical interpretation of remedial provisions"; 2) limit compensatory damages to compensation, leaving consequential, special and penal damages for review pursuant to applicable statutes outside of the U.C.C.; and 3) "reject any doctrine that damages must be calculated with mathematical accuracy [– they must be] proved with whatever definiteness and accuracy the facts permit, but no more."  *See* <u>Commercial Statutes</u>, *Official Comment* on U.C.C. § 1-305 at 48.

<u>FRAUD, FORGERY AND DECEIT</u>

The Annuity Application was signed on May 4, 1983.  At the time it was signed, Items 9, 14 and 15 were intentionally left blank.  On or about July 14, 1983, well after Dimon had signed the annuity contract, Metropolitan changed the terms of that contract *grossly* in their favor by adding content to Items 9, 14 and 15, allegedly forged Kemper's signature by way of copying it to the fraudulent document and, in so doing, all of the above converted Item 12 into a fraudulent statement.[2]  *See* SUF No.s 18, 19.  At no time subsequent to that date did Dimon EVER agree to the alterations made to Items 9, 14 or 15 nor did he AT ANY TIME agree to "replace or change any existing life insurance or annuity contract" as queried in Item 12.  <u>And</u>, until the money stopped coming, was not aware that anything was amiss.

---

[2] Item 12, which reads "Will this annuity replace or change any existing life insurance or annuity contract?", was originally marked "No."  This mark remained the same after the fraudulent additions were made to Items 9, 14, and 15.

Black's Legal Dictionary (8th ed. 2004) defines the following terms in the manner set forth *infra*:

**Fraud**   An intentional perversion of truth for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to him or to surrender some legal right.   A false representation . . . by conduct . . . or by that which should have been disclosed, which deceives and is intended to deceive another so that he shall act upon it to his legal injury.   Any kind of artifice employed by one person to deceive another.   [*citing to*] Goldstein v. Equitable Life Assur. Soc. of U.S., 160 Misc. 364, 289 N.Y.S. 1064, 1067 [(1936)].

**Forgery**  1. The act of fraudulently making a false document or altering a real one to be used as if genuine <the contract was void because of the seller's forgery**>**. -- Also termed false making. • Though forgery was a misdemeanor at common law, modern statutes typically make it a felony.

     2. A false or altered document made to look genuine by someone with the intent to deceive <he was not the true property owner because the deed was a forgery**>**. -- Also termed fake.

     3. Under the Model Penal Code, the act of fraudulently altering, authenticating, issuing, or transferring a writing without appropriate authorization. [] Model Penal Code § 224.1(1).

     'While it is true that there is a distinction between fraud and forgery**,** and forgery contains some elements that are not included in fraud, forgeries are a species of fraud.  In essence, the crime of forgery involves the making, altering, or completing of an instrument by someone other than the ostensible maker or drawer or an agent of the ostensible maker or drawer.' 37 C.J.S. Forgery § 2, at 66 (1997).

     4. **double forgery**.  A draft having a forged payor signature and a forged indorsement.

**Deceit**   1. The act of intentionally giving a false impression.

     2. A false statement of fact made by a person knowingly or recklessly . . . with the intent that someone else will act upon it.

     3. A tort arising from a false representation made knowingly or recklessly with the intent that another person should detrimentally rely on it

     'The tort of deceit consists in the act of making a wilfully false statement with the intent that the plaintiff shall act in reliance on it, and with the result that he does so act and suffers harm in consequence.  . . . There are four main elements in this tort: (1) there must be a false representation of fact; (2) the representation must be made with knowledge of its falsity; (3) it must be made with the intention that it should be acted on by the plaintiff, or by a class of persons which includes the plaintiff, in the manner which resulted in damage to him; (4) it must be proved that the plaintiff has acted upon the false statement and has sustained damage by so doing.'  *See* R.F.V. Heuston, Salmond on the Law of Torts 387 (17th ed. 1977).

   Pursuant to the above definitions, Metropolitan's acts of 1) adding terms to a previously-executed contract under the guise of a "scrivener's error", 2) allegedly transferring Kemper's signature to that new document, and 3) failing to notify Dimon (as an owner of the annuity), the GAL and/or the court of unilaterally-changed terms that run contrary to even a shadow of what was so laboriously negotiated and approved by Dimon, the GAL and the court, were <u>clear exhibitions</u> of Fraud, Forgery and Deceit respectively.

STATUTE OF LIMITATIONS

Plaintiff is well within the Applicable Statutes of Limitations

---

### Timeline for Tolling the Statute(s) of Limitations

- Original agreement was life based upon a of 49.7 year expectancy.

- Performance began on May 5, 1983 by way of the first payment made.

- Actual breach occurred on June 5, 2003 at the conclusion of the 20th year and when the 241st payment was due but not received – Dimon's first awareness of a problem was when the money stopped coming.

- Dimon filed suit on May 23, 2005.

- **May 23, 2005 – June 5, 2003 = 1 year, 13 days** – well under any of the applicable statutes of limitations.

---

The Federal Doctrine of Fraudulent Concealment Tolls the Applicable Statutes of Limitations

Although Massachusetts General Law sets forth the applicable statutes of limitations, it is well-settled that "under federal law, equitable tolling is applied to statutes of limitations 'to prevent unjust results or to maintain the integrity of a statute', courts have taken a narrow view of equitable exceptions to limitations periods." *See* Salois v. Dime Sav. Bank of New York, FSB, 128 F.3d 20, 25 (1st Cir. 1997) *quoting* King v. California, 784 F.2d 910, 915 (9th Cir. 1986) *and citing to* Earnhardt v. Puerto Rico, 691 F.2d 69, 71 (1st Cir. 1982). "[E]quitable tolling of a federal statute of limitations is '**appropriate only when the circumstances that cause a plaintiff to miss a filing deadline are out of his hands**.'" *See* Id. (emphasis added) *quoting* Heideman v. PFL, Inc., 904 F.2d 1262, 1266 (8th Cir.1990), *cert. denied*, 498 U.S. 1026, 1991). Here, Dimon was not made aware of ANY problems regarding the originally agreed-to lifetime annuity until a contractual breach occurred on June 5, 2003 (when they stopped paying him), and was not made aware of the circumstances related thereto until receipt of the proofs of

Defendants' deception.  Thus, "the circumstances that caus[ed] plaintiff to miss [the 2, 3, 4 and 6 year statutes of limitations[3] were entirely] out of his hands."

"The federal doctrine of fraudulent concealment operates to toll the statute of limitations '**where a plaintiff has been injured by fraud and 'remains in ignorance of it without any fault or want of diligence or care on his part**.'"  See <u>Salois</u>, 128 F.3d at 25 (1st Cir. 1997) (emphasis added) *quoting* <u>Holmberg v. Armbrecht</u>, 327 U.S. 392, 397 (1946) *quoting* <u>Bailey v. Glover</u>, 88 U.S. (21 Wall.) 342, 348 (1874); *see also* <u>Maggio v. Gerard Freezer & Ice Co.</u>, 824 F.2d 123, 127 (1st Cir. 1987).  As stated by the U.S. Supreme Court in <u>Holmberg</u>, this is true even "though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party."  *See* <u>Holmberg</u>, 327 U.S. at 397 *citing to* <u>Bailey</u>, 88 U.S. (21 Wall.) at 348; <u>Exploration Co. v. United States</u>, 247 U.S. 435 (1918) *and* <u>Sherwood v. Sutton</u>, 5 Mason 143, 21 F.Cas. 1303, 1307 (C.C.N.H. 1828) (the court would violate a sound rule of law, if it permitted the defendant to avail himself of his own fraud).

The <u>Holmberg</u> Court made it <u>quite clear</u> that where "want of due diligence by the plaintiff may make it unfair to pursue the defendant", "it [is] unfair" to bar Plaintiff's appeal to equity because of "a mere lapse of time" where Defendants' fraudulent conduct prevented the Plaintiff from being diligent in the first place – "**equity will not lend itself to such fraud and historically has *relieved* from it.**"  *See* <u>Id</u>. at 396 (emphasis added).

<u>"For [Dimon] to be successful in [his] argument, [the court] must determine that</u>:

'(1)    sufficient facts were [not] available to put a reasonable [[owner]] in [[Dimon's]] position [i.e. "dull normal"] on inquiry notice of the possibility of fraud, and

---

[3] **2 years for Misrepresentation related to an annuity** (M.G.L. ch. 175, § 181), **3 years for general torts** (M.G.L. ch. 260, § 2A) **and legal malpractice** (M.G.L. ch. 260, § 4), **4 years for consumer protection actions** [93A and 176D] (M.G.L. ch. 260, § 5A), and **6 years for contracts** (M.G.L. ch. 260, § 2).

(2)   [Dimon] exercised due diligence in attempting to uncover the factual basis underlying [the] alleged fraudulent conduct.'  *See* <u>Salois</u>, 128 F.3d at 25-26 *quoting* <u>Maggio</u>, 824 F.2d at 128.

<u>Taking each element in turn, as stated *supra*</u>:

**FIRST**: A "reasonable owner in Dimon's position" is "[verbally] dull normal . . . [with] a cerebral dysfunction and integrative language disturbance . . . which [means] he had a <u>perceptual</u> handicap."  *See* Transcript of GAL at 11-12, Exhibit A (emphasis added).  Therefore the ambiguous letter alleged to have been sent to Dimon on September 24, 1999 (*see* "AMBIGUITIES", *infra*) – which, if true, <u>was the first communication ever sent to him from Metropolitan</u> – could not possibly constitute the requisite "inquiry notice" where no jury could possibly find that Dimon, who is "perceptually handicapped" and "unable to read" (*see* <u>Id</u>. at 11), could possibly have understood its contents.

Had Metropolitan complied with its contractual obligation to send Dimon a "statement" "as of each contract anniversary on or before the Annuity date" (*see* Annuity at 7, Exhibit H), and if Metropolitan, *knowing* his several handicaps, had ensured that such statement was communicated in a manner in which he understood, Dimon may have been said to be on notice. This is particularly true where the agreed-upon statement would have communicated the monthly values and, depending upon one's interpretation of the language therein, would have provided notice of a termination date at least ten years prior thereto.  *See* <u>Id</u>.  Though the court and GAL (understandably) failed to foresee the Defendants' trickery and therefore did not provide for ongoing assistance of a GAL should the instant circumstances ever occur – <u>20 years later</u> – Dimon should not be made to suffer that which he cannot understand that has been waged upon him by those of a far superior bargaining position.

15

Dimon was not *actually* made aware of an <u>actual breach</u> *until the money stopped coming*, June 5, 2003.  Without any knowledge of the Defendants' fraud that took place in 1983, Dimon was not "reasonably on inquiry notice of the possibility of fraud."  Even a man deemed perceptually handicapped and verbally dull normal grasps the reality of a payment stopped after <u>twenty years of a check arriving on or about the same day each month</u>.  Further, "sufficient facts" to establish the "possibility of fraud" were not made available to Dimon until he was able to retain the undersigned in September 2004 and counsel was able to elicit the appropriate documentation – some of which was not made available by the parties until well after suit was filed and in some instances, only on the eve of deposition.

**<u>SECOND</u>**: As soon as the money stopped coming, Dimon conformed to the requisite reasonable "due diligence" in his "attempt to uncover the fraud and the factual basis underlying it."  As stated *supra*, Dimon hired the undersigned and proceeded with litigation within a very reasonable and short amount of time.


Even if the Commonwealth's tolling laws were to apply in this matter, "the state doctrine of fraudulent concealment is not entirely different from the federal doctrine which . . . applies even if there are 'no ⋯ efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party.'"  *See* <u>Maggio</u>, 824 F.2d at 131 *citing to* <u>Cook v. Avien, Inc.</u>, 573 F.2d 685, 694 (1st Cir. 1978) *quoting* <u>Bailey</u>, 88 U.S. (21 Wall.) at 348.  <u>Maggio</u> is particularly useful as it discusses the proper application of Mass.Gen.Laws Ch. 260, § 12 which provides as follows:

> **§ 12. Fraudulent concealment; commencement of limitations**
> If a person liable to a personal action fraudulently conceals the cause of such action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action.  *See* Mass.Gen.Laws Ch. 260, § 12.

In addition, and of great import to the instant matter, "[w]here a fiduciary relationship exists between plaintiff and defendant . . . mere failure to reveal information may be sufficient to constitute fraudulent conduct for the purposes of section 12." *See* <u>Maggio</u>, 824 F.2d at 130-131 *citing to* <u>Jenkins v. Jenkins</u>, 15 Mass.App.Ct. 934, 444 N.E.2d 1301, 1303 (1983) *and* <u>Burns v. Massachusetts Institute of Technology</u>, 394 F.2d 416, 419 (1st Cir. 1968) ("Breach of the resulting duty of disclosure is a substitute for the active fraud normally required to constitute fraudulent concealment within [section 12].").  Each of the Defendants had an undisputed fiduciary duty to make such "revelations" to Dimon, the GAL and the court.

<u>Contracts and Accrual</u>

"Massachusetts law provides that '[a]ctions of contract ⋯ shall ⋯ be commenced only within six years next after the cause of action accrues.'"  *See* <u>Salois</u>, 128 F.3d at 25 *quoting* MASS.GEN.LAWS Ch. 260, § 2.  "Accrual" occurs "at the time of the plaintiff's injury, or, in the case of a breach of contract, at the time of the breach."  *See* <u>Id</u>. *citing to* <u>Cambridge Plating Co., Inc. v. Napco, Inc.</u>, 991 F.2d 21, 25 (1st Cir. 1993) (discussing Massachusetts law).  Application of the Appellate Court's <u>Salois</u> analysis (*see* <u>Salois</u>, 128 F.3d at 25) places Dimon's cause of action accrual against all Defendants except Metropolitan at the time he signed the original Release, April 19, 1983 (*see* Exhibit B) and against Metropolitan at the time he signed the Annuity Contract, May 4, 1983 (*see* Exhibit E).

The Tort of Misrepresentation and Negligence *per se*

The Statute of Limitation for the Tort of Misrepresentation related to the fraudulently altered annuity is set forth by M.G.L. Ch. 175, § 181 which states that "the holder of an annuity . . . may recover . . . in an action brought within two years after the date of issue. . ."

See Mass.Gen.Laws Ch. 175, § 181 which states in pertinent part:

> No company, no officer or agent thereof . . . shall make, issue, circulate or use, or cause or permit to be made, issued, circulated or used, any written or oral statement misrepresenting the terms of any . . . annuity . . . issued or to be issued by any company, or the benefits or privileges promised thereunder. No company, no officer or agent thereof . . . shall make to any person . . . holding any annuity . . . any written or oral misrepresentation or misleading representation in respect to the terms, benefits or privileges of . . . any annuity . . . or any written or oral incomplete or misleading comparison of any such policy or contract or of any of the terms, benefits or privileges thereof with . . . any of the terms, benefits or privileges thereof, in order to induce or which tends to induce such person to lapse, forfeit or surrender the . . . contract held by him, or to alter or convert it into, or to exchange it for, any other such policy or contract. Whoever violates any provision of this section shall be punished by a fine of not more than one thousand dollars or by imprisonment for not more than six months.
> * * *
> [T]he holder of any annuity . . . who was induced to procure it by any action in violation of this section by an officer or agent of the company issuing or executing it may recover from such company . . . in an action brought within two years after the date of issue thereof.

Though Dimon, to date, has only sought civil damages in the instant action, the research related to this motion for summary judgment has led to the revelation that not only is Dimon entitled to a finding of negligence *per se* against (at least) Metropolitan for violation of a criminal statute (*see* M.G.L. 175, § 181 allowing for a $1,000 fine and six months imprisonment that this court may find and charge *sua sponte*).

## THE DEFENDANTS EACH HAD A SEPARATE DUTY TO INFORM DIMON OF METROPOLITAN'S FRAUD

Our First Circuit has stated that "[w]here the agreement is made, as here, under the eyes of the court, it is a most solemn undertaking, requiring the lawyers, as officers of the court, to make every reasonable effort to carry it through to a successful conclusion." *See* Warner v. Rossignol, 513 F.2d 678, 682 (1st Cir. 1975) *citing to* Langlois v. Langlois, 5 App.Div.2d 75,

169 N.Y.S.2d 170 (1957).    NONE of the Defendants carried Dimon's court-sanctioned settlement annuity "through to a successful conclusion."

Latti

Latti began in tepid water by having an illiterate, dull-normal Jones Act Seaman sign a substandard release.  The original court did not seem to be aware that Latti had Dimon sign an inappropriate release.  *Compare* Dimon's release, Exhibit B with a proper Seaman's Release, Exhibit B.  Even a cursory overview reveals that the seaman's release is an instrument drafted with a ward of the admiralty in mind whereas the release Dimon signed is an average summary of a settlement.  Dimon was lucky that the court was shrewd and skeptical of his condition and the form Latti had him sign.  The "upside": though inadequate as a seaman's release, Latti's "summary" is <u>clear</u> evidence of the parties original, and therefore, binding intent.    More importantly, it is a memorialization of <u>DIMON'S</u> intent.

Based upon the settlement memorialized in the release, Latti negotiated with Kemper, the GAL, Metropolitan and the court in the formation of the final settlement which included the annuity now in dispute.  *See* May 3, 1983 Hearing at 1-8, Exhibit A.  Latti was subsequently put on actual notice of Metropolitan's fraudulent act by receipt of Kemper's letters disputing Metropolitan's fraudulent changes.    *See* Letters, Exhibits J, K, L, N.    Pursuant to the Massachusetts Rules of Professional Conduct[4], they had a legal and fiduciary duty to inform the court and their client of Metropolitan's fraudulent acts and the need to challenge the same on his behalf.  *Inter alia*, Rule 1.4 requires an attorney to "keep a client reasonably informed" and "comply with reasonable requests for information."  Between July and November 1983, Latti and, upon information and belief, Mr. Latti himself, were put on actual notice by way of several letters that communicated Metropolitan's fraudulent changes of the agreement *grossly* in their

---

[4] *See, inter alia*: Rules 1.4 (Communication) *and* 5.1 (Responsibilities of a Partner or Supervisory Lawyer).

favor and to Dimon's <u>substantial</u> detriment.  *See* Id.  Though Latti claims that they never received said several letter, it is undisputed that the U.S. Post Office is highly reliable and also <u>undisputed</u> that Latti expended no more effort in safeguarding his client's rights than he did in having him sign a proper release.  *Doing nothing* fails to satisfy the "every reasonable effort" expected in the First Circuit.

Latti failed each of their duties by their omission to act in ANY way on Dimon's behalf.

<u>Kemper</u>

Kemper negotiated with Latti, the GAL, Metropolitan and the court in the formation of the settlement that included the annuity now in dispute.  *See* May 3, 1983 Hearing at 1-8, Exhibit A.  Kemper was put on actual notice of Metropolitan's fraudulent act and even wrote several letters disputing Metropolitan's fraudulent changes.  *See* Letters, Exhibits J, K, L, N.  Despite the letters and despite the allegation that Metropolitan forged Kemper's signature on the altered document (*see* Mensie Deposition Transcript at 247-248, Exhibit G),  Kemper failed their legal and fiduciary duty to inform the court of Metropolitan's fraudulent acts and the need to challenge the same.  Here, *doing a little and then nothing at all* also fails to satisfy the "every reasonable effort" expected in the First Circuit.

<u>Metropolitan</u>

Metropolitan negotiated with Latti, the GAL, and the court in the formation of the settlement that included the annuity now in dispute. *See* May 3, 1983 Hearing at 1-8, Exhibit A. They prepared several documents during these negotiations over a long period of time – each of which referred to, named (some titled) and clearly intended a lifetime annuity.  *See* Exhibits A, B, C, D, H.  They prepared a payment schedule based upon Dimon's 49.7 year life expectancy and submitted all documentation to the GAL and the court for close scrutiny and approval.  *See*

Exhibits A at 1-8 and C.  Most importantly, Metropolitan had an absolute fiduciary duty of disclosure to Dimon, the owner of the annuity.  It is not enough that they merely copied Latti as there was no agreement in force, express or implied, that would have led a reasonable person in Metropolitan's position to believe that Dimon had consented to all communications for the next 49.7 years to go through his *civil litigation attorney* who was not a *financial planner, investment advisor*, or any other form of fiduciary where such a presumption <u>backed by paper</u> may have been warranted.  In addition, as an owner of the annuity Dimon is *owed* such a communication. Here, *a fraudulent breach* coupled with an intentional omission, fails to satisfy the "every reasonable effort" expected in the First Circuit.

<u>CONTRACT REFORMATION</u>

<u>The True Intent of the Parties</u>

Though the court may, under the proper circumstances, reform a contract, "[u]nder Massachusetts law, a written contract may be reformed if its language 'does not reflect the true intent of both parties.'"  *See* <u>OneBeacon America Ins. Co. v. Travelers Indem. Co. of IL</u>, 465 F.3d 38, 41 (1st Cir. Oct. 6, 2006) *citing to* <u>Polaroid Corp. v. Travelers Indem. Co.</u>, 414 Mass. 747, 610 N.E.2d 912, 917 (1993), *see also* <u>Berezin v. Regency Sav. Bank</u>, 234 F.3d 68, 72 (1st Cir. 2000), *and* <u>John Beaudette, Inc. v. Sentry Ins. A Mut. Co.</u>, 94 F.Supp.2d 77, 142-43 (D.Mass. 1999).  **It is clear and indisputable that the "true intent of both parties" was to settle the case for and establish an annuity for life based upon an expectancy of 49.7 years.**

"[W]hile 'intention' . . . is frequently a question for the trier of fact, it is not always so." *See* <u>Warner</u>, 513 F.2d at 682 *citing to* e.g., <u>Perper v. Danford</u>, 63 A.2d 773 (1949) *and* cf., <u>Wiggin v. Sanborn</u>, 161 Me. 175, 210 A.2d 38 (1965).  Similar to <u>Warner</u>, the undisputed terms of the *only* settlement approved by Dimon, the GAL, the court and signed by Dimon preclude

any reasonable interpretation that either the "Life Income" agreement was anything other than an immediate and final substitute for Dimon's then pending action or that Metropolitan's fraudulent alteration of the terms were what the parties had originally intended. "Moreover, the cases give strong support to the presumption that **a settlement agreement, however labeled, will not bar recourse to the original cause of action in the event that defendant repudiates or commits a breach of the terms of the agreement**." *See* Warner, 513 F.2d at 682 *citing to* Pacheco v. Delgardo, 46 Ariz. 401, 52 P.2d 479 (1935); Whitfield v. Whittington, 34 Del.Ch. 34, 99 A.2d 196 (1953); Wilson v. Bogert, 81 Idaho 535, 347 P.2d 341, 345-46 (1959); Zager v. Gubernick, 205 Pa.Super. 168, 208 A.2d 45, 49 (1965) *and* Shield Co. v. Williamson, 355 S.W.2d 811 (1962).

Mutual Mistake

That Metropolitan later decided that it preferred a term of only 240 months does not excuse their unilateral and fraudulent alteration of the contract nor does it rise to the level of "mutual mistake."

"Massachusetts courts have referenced the approach to mutual mistake articulated in the Restatement (Second) of Contracts." *See* OneBeacon America Ins. Co. v. Travelers Indem. Co. of IL, 465 F.3d 38, 41 (1st Cir. October 6, 2006) *citing to e.g.*, Nissan Autos. of Marlborough, Inc. v. Glick, 62 Mass.App.Ct. 302, 816 N.E.2d 161, 165 (2004) *and* Howell v. Glassman, 33 Mass.App.Ct. 349, 600 N.E.2d 173, 175 (1992).

The OneBeacon court summarizes the applicable principles of The Restatement as follows:

> Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties as to the contents or effect of the writing, the court may at the request of a party reform the writing to express the agreement, except to the extent that rights of third parties such as good faith purchasers for value will be unfairly affected. *See* Id. *citing to* Restatement (Second) of Contracts § 155 (2006).

In the present action, THERE IS NO EXTRINSIC EVIDENCE signifying that Dimon, the GAL or the court that approved the contract, intended anything other than what the four corners of the ORIGINAL and unadulterated contract stated.  In addition, all of the discussions, meetings, hearings and proposals leading up to the contract's formation, acceptance and execution also ONLY confirm the clear intent of the parties memorialized in an unambiguous contract.  "The critical limitation in a contract reformation case is the burden of proof: to be entitled to reformation, a party must 'establish that the undisputed material facts fully, clearly, and decisively show[] a mutual mistake.'  *See* <u>OneBeacon</u>, 465 F.3d at 41 *quoting* <u>Polaroid Corp.</u> <u>v. Travelers Indem. Co.</u>, 414 Mass. 747, 610 N.E.2d 912, 918 (1993) *see also* <u>Lordi v. Lordi</u>, 443 Mass. 1006, 820 N.E.2d 813, 814 (2005).

"Although '[t]he classic case for reformation' is when the mutual mistake can be traced to a typo or transcription error, **a scrivener's error is not a prerequisite for reformation**.  *See* <u>Id</u>. *quoting* E. Allan Farnsworth, <u>Farnsworth on Contracts</u> § 7.5 (2001).

Throughout these proceedings, Metropolitan has referred to their fraud as a "Scrivener's Error."  *See* Metropolitan Letter Dated July 14, 1983, Exhibit I (the "clerical error" quoted therein is synonymous with "scrivener's error").

> <u>The definition of that term is</u>:
> **doctrine of scrivener's error.**  A rule permitting a typographical error in a document to be reformed by parol evidence, if the evidence is precise, clear, and convincing.  *See* Black's Law Dictionary (8th ed. 2004).

Though mutual mistakes justifying a contract's reformation may arise from the parties' inattention, (*see*, e.g., <u>Polaroid</u>, 610 N.E.2d at 917 (discussing mistaken omission of a pollution exclusion from policies)) such appears to be the scrivener's error urged by Metropolitan, which claims that it had intended the term of the annuity to be "240 months only."  *See* Exhibit I.  <u>This</u> <u>was no "typo."</u>  Where the somewhat sloppy misspellings of the Dimons' names may properly be

considered "typos" (*see* Exhibit D) the same certainly cannot be said regarding the <u>life annuity's</u> terms that were:

1.  <u>negotiated at length as a life term,</u>

2.  <u>proposed by Metropolitan as a life term,</u>

3.  <u>reviewed and approved by the GAL and the court as a life term</u>, and

4.  <u>signed for and received by all parties as a life term</u>

5.  <u>on a contract titled "Life Income"</u>

6.  – all of the above set to the tune of a life expectancy of 49.7 years.

The life expectancy would never have been estimated or drafted into a "Life Income" agreement if "life" were not intended and "240 months (*20 years*) only" were.  No jury shall be able to conclude other than a "Life Income" was extensively bargained for and <u>expressly intended</u> by ALL parties and ratified by the court.

Finally, lacking mutual mistake, our First Circuit has held as recently as last month that reformation is normally only "appropriate where the language somehow fails to express the actual intention of the parties and is conformed merely to reflect their actual intent or, where the contents have been fraudulently misrepresented by one party, to conform the contract to the terms conveyed to the defrauded party."  *See* <u>Broadley v. Mashpee Neck Marina, Inc.</u>, 2006 WL 3759312 (1st Cir. Dec. 22, 2006) *citing to* Restatement (Second) Contracts §§ 155, 166 *and* 2 <u>Farnsworth on Contracts</u> § 7.5.  Here, where the defrauded party is Dimon, and where ALL facts and inferences point to "Life Income" as the undisputed original intent of the parties, any reformation conducted by this court should be in his favor.

ALL AMBIGUITIES AND REASONABLE DOUBTS RELATED TO THE CONTRACT'S
LANGUAGE OR CONSTRUCTION MUST BE DECIDED IN DIMON'S FAVOR

"If any reasonable doubt existed concerning the parties' intention, the contract should be construed against the authority which drafted it." S*ee* Mass. Turnpike Auth. v. Perini Corp., 349 Mass. 448, 454, 208 N.E.2d 807 (1965) *citing to* Bowser v. Chalifour, 334 Mass. 348, 352, 135 N.E.2d 643 (1956).  This is not a new concept.  *See* Thompson v. Phenix Ins. Co. of Brooklyn, 136 U.S. 287 (**1890**).  In Thompson, the U.S. Supreme Court held that where an agreement either requires interpretation or is "fairly susceptible of two different constructions, the one will be adopted that is most favorable to the insured."  *See* Id.  The Court went further by adding that "This rule, recognized in all the authorities, is a just one, *because those instruments are drawn by the **company***."  *See* Id. (emphases added) *citing to* First Nat. Bank v. Hartford Fire Ins. Co., 95 U. S. 673, 679 (1877) ("It is its language which the court is invited to interpret, and it is both reasonable and just that its own words should be construed most strongly against itself.").

The U.S. Supreme Court, in First Nat. Bank, reasoned that "The company cannot justly complain of such a rule.  Its attorneys, officers, or agents prepared the [contract of insurance] for the purpose, we shall assume, both of protecting the company against fraud, and of securing the just rights of the assured under a valid contract of insurance."  *See* Id.

Notwithstanding the problems associated with the fraudulently-altered annuity contract, the letter dated September 24, 1999 lacks any identifying marks that would alert the reasonable seaman in Dimon's diminished shoes, where the checks were still coming in every month like "clockwork", to think that the letter was anything more than notice that the "240 month certain" period would end as scheduled on May 5, 2003 and that the "life thereafter" portion would ensue from then.  To the extent that the September 24 letter served to notify Dimon, such notification

as worded falls clearly within the U.S. Supreme Court's "susceptibility of two different constructions" test set forth in <u>Thompson</u> that requires this court to adopt the construction most favorable to Dimon – that it did not serve as the requisite notice that would have caused Dimon to believe that there had been a breach, fraud, or any other manner of the trickery now known to have been played upon him.

<u>THE DEFENDANTS' JOINT AND SEVERAL LIABILITY</u>

Since all signatories <u>except Dimon, GAL and the court</u> received notice that Metropolitan had changed the agreement, and since each, therefore, had actual knowledge that neither Dimon, GAL or the court had been copied on the several communications and since none acted to either dispute the change or to get Dimon, GAL and the court's consent – <u>ALL</u> are joint and severally liable in this action.


**III.    <u>CONCLUSION</u>**

As stated *supra*, our First Circuit has ruled that "[w]here the agreement is made, as here, under the eyes of the court, it is a most solemn undertaking, requiring the lawyers, as officers of the court, to make every reasonable effort to carry it through to a successful conclusion."  *See* <u>Warner</u>, 513 F.2d at 682.  NONE of the Defendants carried Dimon's court-sanctioned settlement annuity "through to a successful conclusion."

As made clear by the evidence presented both here and in Dimon's Statement of Undisputed Facts, the Defendants have individually, jointly and severally taken unfair advantage of Dimon, who, as a seaman, is this court's "ward."  In accordance with our First Circuit's ruling in <u>Doyle v. Huntress</u>, this court has a duty to treat Dimon "with favor" for, in addition to his inclusion in the class deemed "ignorant and helpless, and so in need of protection against himself

as well as others", this court must also take into account his "perceptual handicap" and intellectual status of "dull normal."  That such a ward, after being granted the protections of a court approval, was ever taken advantage of should cause any "reasonable person" <u>and this court</u> GREAT incense.

Through Fraud, Forgery, Deceit and a general failure to comply with any and all requisite duties be they legal, ethical, or human, the Defendants have caused Dimon to suffer a great financial loss, severe anxiety and have forced him into the present litigation in violation of M.G.L. Ch. 176D.  In light of the evidence and law set forth herein and the M.G.L. Ch. 93A, § 9 letters Dimon sent Kemper and Metropolitan on December 7, 2006, by the time this motion is ripe for adjudication, this court will have all the tools necessary to rule on a plethora of violations, either on the pleadings or *sua sponte*.

Quite basically, and as set forth *supra*, since there are no genuine issues as to any material facts, Dimon is entitled to a judgment as a matter of law against all Defendants on all counts inclusive of those set forth *supra* that may be added by way of a Rule 15(b) amendment to conform to the evidence.  *See* Fed.R.Civ.P. 15(b).[5]

Therefore, since the absence of evidentiary support for the Defendants' case would not lead reasonable persons presented with the same facts and inferences to differ as to their opinions, this matter, in its entirety, is a question for the judge.  *See* <u>McDermott</u>, 498 U.S. at 356 *and* <u>Villanueva</u>, 930 F.2d at 128.

---

[5] "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings . . . as may be necessary to cause them to conform to the evidence . . ."  *See* Fed.R.Civ.P. 15(b).

IV.    **DAMAGES**

Where a Defendant has purchased a "settlement annuity" and then breaches that annuity, the injured party may be made whole, not by the purchase of yet another annuity, but by a lump sum present value payment of all future shortfalls along with payment of any reasonable attorneys' fees allowed by statute.  *See* <u>Massie v. U.S.</u>, 226 F.3d 1318, 1322 (Fed. Cir. 2000).

Therefore, Dimon may collect the lump sum present value payment of all future shortfalls and attorneys fees with either double or treble damages, as this court may find, pursuant to M.G.L. Ch. 176D and 93A.  Upon satisfaction of the thirty-day rule associated with the above-referenced 93A Letters, Dimon shall seek to amend his Complaint to add a count under M.G.L. Ch. 93A and 176D.  In addition, Dimon shall seek to include, pursuant to Fed.R.Civ.P. 15(b) *supra*, additional counts for claims raised here as well as a count for General Maritime Law Punitive Damages.

Respectfully submitted,


  /s/Brian Keane_____
DAVID B. KAPLAN, B.B.O. No. 258540
BRIAN KEANE, B.B.O. No. 656717
THE KAPLAN/BOND GROUP
88 Black Falcon Avenue, Suite 301
Boston, MA 02210
(617) 261-0080

I hereby certify that a true copy of the above document was served upon each attorney of record by ECF on January 2, 2007.


  /s/Brian Keane_____