UNITES STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                          )
DENNIS DIMON,                             )
Plaintiff,                                )
                                          )
vs.                                       )          CIVIL ACTION NO. 05-11073 MEL
                                          )
METROPOLITAN LIFE                         )
INSURANCE COMPANY, KEMPER                 )
INSURANCE COMPANY,                        )
MORGAN STANLEY DW, INC., and              )
MICHAEL B. LATTI, LATTI                   )
ASSOCIATES, LATTI & ANDERSON              )
LLP,                                      )
        Defendants.                       )
_____)

**PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

**<u>CORPORATE BACKGROUND INFORMATION</u>**

A significant portion of the events leading to this litigation took place in the 1981 – 1983.

At that time, the corporate parties were known by other corporate names.  The following is a list

of what the parties were known as in 1981 – 1983 and what they are referred to now:


Charter Security Life Insurance Company is now known as and referred to as Metropolitan Life

Insurance Company ("Charter Security/Metropolitan");


American Motorists Insurance Company is now known as and referred to as Kemper Insurance

Company ("American Motorist/Kemper"); and

Latti Associates and Michael B. Latti are now known and referred to as Latti & Anderson.  For purposes of this brief all Latti parties are referred to as ("Latti Associates").

STATEMENT 1        In or about 1981, the Plaintiff, Dennis Dimon, was severely injured while serving as a member of the crew of the F/V JENNY C, resulting in the loss of his eye.

STATEMENT 2        On or about February 4, 1983, following a trial in the United States District Court for the District of Rhode Island, a jury awarded the plaintiff $710,000.00 for his injuries against the defendant, F/V JENNY C, INC.

STATEMENT 3        At all times throughout the litigation process and at trial Mr. Dimon was represented by Latti Associates operated under the authority and partner Michael B. Latti.

STATEMENT 4        Following the verdict the parties entered into a settlement agreement and appeared before the Honorable Judge Pettine for approval of the settlement.

STATEMENT 5        Judge Pettine became quite concerned that the plaintiff, Dennis Dimon did not comprehend or understand the provisions of the settlement and discontinued the Settlement Conference.

STATEMENT 6        To protect Mr. Dimon, Judge Pettine appointed Leonard Decof as Guardian Ad Litem to represent the interests of Mr. Dimon and report to the court the particulars

of the settlement agreement.  (See copy of May 3, 1983 hearing before Judge Raymond J.

Pettine, attached as Exhibit "A" specifically at pages 1-8.)


STATEMENT 7        On or about May 3, 1983, Mr. Decof reported to the Honorable Judge

Pettine that the plaintiff was to receive a total settlement of $425,000.00 consisting of a lump

sum payment of $250,000.00.  The remaining $175,000.00 was used to fund an annuity which

was guaranteed for 20 years which would *continue for the life of the plaintiff*.  The annuity would

pay the Plaintiff a set amount of $1,450.45 increasing each month by 3%.  (See copy of May 3,

1983 hearing before Judge Raymond J. Pettine, attached as Exhibit "A" specifically at pages 1-8

emphasis added.)


STATEMENT 8        Present at the hearing of the Guardian Ad Litem were representatives of

American Motorists/Kemper (Slater Allen), the plaintiff and Roger Hughes of Latti Associates.


STATEMENT 9        The plaintiff signed a General Release which fully set out the agreements

reached in the underlying personal injury claim and contained a description of the annuity for the

benefit of the plaintiff.  (See copy of General Release attached as Exhibit "B".)


STATEMENT 10       The general release noted that there was an "… annuity contract for my

benefit with Charter Security Life Insurance Company, to pay me One Thousand Four Hundred

Fifty and No/100 (1450.00) Dollars per month for one year following the execution of that

contract and thereafter, such monthly sum increased at the rate of three (3%) percent per year,

compounded annually, to be paid to me during the term of my life, and in no event for less than

(20) years…" (See copy of General Release attached as Exhibit "B".)


STATEMENT 11        At the time of the settlement, the plaintiff's life expectancy was calculated

to be 49.7 years.  (See copy of May 3, 1983 hearing before Judge Raymond J. Pettine, attached

as Exhibit "A" specifically at pages 1-8.)


STATEMENT 12        Based on plaintiff's life expectancy, Charter Security/ Metropolitan

completed a proposal for a Life Annuity 20 Year Certain.  (See copy of Charter Security/

Metropolitan proposal dated April 8, 1983 attached as Exhibit "C".)


STATEMENT 13        The Charter Security/Metropolitan proposal contains references to each

year of the annuity from the 2nd year to the 50th year.  (See copy of Charter Security/

Metropolitan proposal dated April 8, 1983 attached as Exhibit "C".)


STATEMENT 14        The Charter Security/Metropolitan proposal is dated April 8, 1983 which

is prior to the May 3, 1983 hearing in front of Judge Pettine.


STATEMENT 15        The insurance carrier for the F/V JENNY C was the American Motorist

Insurance Company now known as the Kemper Insurance Company.


STATEMENT 16        Kemper Insurance Company used $175.000.00 of the money it was paying

for settlement of the underlying personal injury case to apply for an annuity contract with

Charter Security Life (Metropolitan).  (See copy of May 3, 1983 hearing before Judge Raymond J. Pettine, attached as Exhibit "A" specifically at pages 1-8.)

STATEMENT 17        American Motorist/Kemper Insurance was the applicant and owner of the annuity contract.  The issuing company was the defendant, Charter Security Life Insurance Company now known as Metropolitan Life Insurance Company.  (See copy of Annuity Application Signed by John Noe attached as Exhibit "D".)

STATEMENT 18        After Mr.  Noe signed the original Annuity Application a new Annuity Application was produced with box numbers 14 and 15 filled in.  (See copy of Annuity Application with Box numbers 14 and 15 filled in attached as Exhibit "E" and See copy of October 10, 1983 letter from John Noe to Robert Ligouri attached as "Exhibit "F".)

STATEMENT 19        On Exhibit "D", the Dimon's name is incorrectly spelled Diamon.  (See copy of Annuity Application Signed by John Noe attached as Exhibit "D")

STATEMENT 20        On Exhibit "D", Mr. Noe's signature appears at the bottom of the page under an "X" next to American Motorist Insurance Company.  (See copy of Annuity Application Signed by John Noe attached as Exhibit "D".)

STATEMENT 21        On Exhibit "E", the Dimon's name is spelled correctly.  (See copy of Annuity Application with Box numbers 14 and 15 filled in attached as Exhibit "E".)

STATEMENT 22        On Exhibit "E", Mr. Noe's signature appears in exactly the same area at the bottom of the page under an "X" next to American Motorist Insurance Company as it does in Exhibit "D".  (See copy of Annuity Application with Box numbers 14 and 15 filled in attached as Exhibit "E".)

STATEMENT 23        Mr. Mensie the 30(b)(6) deponent of American Motorist/Kemper indicated a suspicion as the to signatures of Mr. Noe.  (See Deposition Transcript of Mr. Mensie pgs. 247-248 attached as Exhibit "G".)

STATEMENT 24        The annuity applied for and accepted by Judge Pettine provided monthly payments commencing on or about June 5, 1983 guaranteed for 240 months (20 years) *life thereafter*.  (See copy of May 3, 1983 hearing before Judge Raymond J. Pettine, attached as Exhibit "A" specifically at pages 1-8 emphasis added.)

STATEMENT 25        On or about June 17, 1983, Charter Security Life/Metropolitan through its Vice President Barbara Boehm signed and dated its Single Premium Deferred Annuity for the benefit of Dennis Dimon.  (See Single Premium Deferred Annuity attached as Exhibit "H".)

STATEMENT 26        At some point after Mr.  Noe from American Motorist/Kemper signed the Annuity Application on Behalf of American/Motorist a new Annuity Application was produced with box numbers 14 and 15 filled in.  (See copy of Annuity Application with Box numbers 14 and 15 filled in attached as Exhibit "E" and See copy of October 10, 1983 letter from John Noe to Robert Ligouri attached as Exhibit "F")

STATEMENT 27        On or about June 17, 1983, Charter Security Life/Metropolitan through its Vice President Barbara Boehm signed and dated its Single Premium Deferred Annuity for the benefit of Dennis Dimon.  (See Single Premium Deferred Annuity attached as Exhibit "H".)

STATEMENT 28        The first sentence of the Deferred Annuity states, "[w]e will pay a lifetime monthly income to the Annuitant if living on the Annuity Date."  (See Id. Page 1.)

STATEMENT 29        The Deferred Annuity had as its selection Option 2 Life Income.  (See Id. Page 1.)

STATEMENT 30        Option 2 of the Deferred Annuity is defined as "[E]qual monthly payments as long as the payee lives.  (See Id. Page 8.)

STATEMENT 31        Attached to the Deferred Annuity was Supplementary Agreement No. SC1126.  See Id. Page 10.)

STATEMENT 32        The Supplementary Agreement provides in part that the primary payee, Dennis Dimon shall receive, "[m]onthly payments in the amount of $1450.45, increasing 3% annually, commencing on June 6, 1983, for a period of 240 months certain and *life thereafter*." (See Id. emphasis added.)

STATEMENT 33        On or about July 14, 1983, Charter Security Life/Metropolitan, through its Vice President Barbara Boehn, informed the agent, Dean Witter Reynolds now Morgan Stanley

that a clerical error had been made on the annuity contract and that the contract should have read for 240 months, (20 years) rather than for life with a guarantee of 20 years.  This letter was also copied to Latti & Associates.  (See copy of letter from Barbara Boehm of Charter Security Life to Dean Witter Reynolds dated July 14, 1983, attached as Exhibit "I").

STATEMENT 34     On or about August 12, 1983, Kemper Insurance Company, through its employee, John Noe, sent a letter to Dean Witter Reynolds indicating that the annuity applied for was to provide payments for 240 months certain (20 years), and life thereafter for a single premium of $175,000.00.  This letter was copied to Barbara Boehm as Vice President of Charter Security/Metropolitan  and  Latti and Associates.  (See August 12, 1983 letter from John Noe to Dean Witter Reynolds, attached as "Exhibit "J").

STATEMENT 35     Mr. Noe's correspondence dated August 12, 1983 indicated to all parties copied that there was a General Release and the settlement was approved by Judge Pettine of the United States District Court for the District of Rhode Island.   (See August 12, 1983 letter from John Noe to Dean Witter Reynolds, attached as "Exhibit "J").

STATEMENT 36     On or about August 12, 1983 representatives of American Motorist/Kemper and Latti Associates were on notice that Charter Security/Metropolitan was attempting to change the agreed upon and approved settlement from 240 months certain (20 years), and life thereafter to 240 months (20 years) only.  (See August 12, 1983 letter from John Noe to Dean Witter Reynolds, attached as "Exhibit "J").

8

STATEMENT 37    On or about September 26, 1983, Charter Security/Metropolitan informed American Motorist/Kemper of the clerical error.  This letter was copied to Latti Associates.  (See September 26, 1983 letter from Robert Ligouri of Metropolitan Life to John Noe of Kemper, attached as Exhibit "K").

STATEMENT 38    The information contained in the September 26, 1983 letter from Charter Security/Metropolitan American Motorist/Kemper indicated that "the option indicated on the supplementary contract originally sent to Dean Witter Reynolds on June 17, 1983 for delivery to Kemper's office was incorrectly typed as 240 months certain and life thereafter annuity instead of 240 months only."  (See September 26, 1983 letter from Robert Ligouri of Metropolitan Life to John Noe of Kemper, attached as Exhibit "K".)

STATEMENT 39    Following the September 26, 1983 letter, Mr. Noe of American Motorist/Kemper wrote to Charter Security/Metropolitan indicating that when he signed the contract, section 14 and 15 of the application were blank.  This letter was also copied to Latti Associates.  (See a copy of two annuity applications attached as Exhibits "C & D" and See also copy of October 10, 1983 letter from John Noe to Robert Ligouri attached as Exhibit "L").

STATEMENT 40    On or about October 14, 1993, Charter Security Life through their Vice President, Barbara Boehm indicated that they were going to supply Kemper Insurance Company with a supplementary contract which indicated the new and unilaterally changed provisions which included only 240 months certain and not life thereafter.  See copy of October 14, 1983 letter from Barbara Boehme to John Noe attached as Exhibit "M").

STATEMENT 41        Some time after the October 14, 1983 letter from Charter

Security/Metropolitan to American Motorist/Kemper, Kemper informed Metropolitan that it was

going to reject and return the supplementary agreement.  The letter from Kemper from John Noe

states that it was sent on October 12, 1983[1].  This letter was also copied to Latti Associates.  (See

copy of October 12, 1983 letter from John Noe to Barbara Boehme attached as Exhibit "N").


STATEMENT 42        At no time after May 3, 1983 did Charter Security/Metropolitan seek

approval of the United States District Court District of Rhode Island for their proposed change to

the settlement agreement.


STATEMENT 43        At no time after May 3, 1983 did Charter Security/Metropolitan seek

approval of Judge Pettine for their proposed change to the settlement agreement.


STATEMENT 44        At no time after May 3, 1983 did American Motorist/Kemper seek

approval of the United States District Court District of Rhode Island Charter

Security/Metropolitan's proposed change to the settlement agreement.


STATEMENT 45        At no time after May 3, 1983 did American Motorist/Kemper seek

approval of Judge Pettine for Charter Security/Metropolitan's proposed change to the settlement

agreement.

---

[1] It appears that this correspondence is not dated correctly as it is dated Ocotober 12, 1983 and is clearly in response
to an October 14, 1983 correspondence.

<u>STATEMENT 46</u>     At no time after May 3, 1983 did American Motorist/Kemper seek to enforce the agreement that was approved by Judge Pettine of the United States District Court District of Rhode Island even after they were aware that Charter Security/Metropolitan was attempting to and did in fact change the agreement.

<u>STATEMENT 47</u>     At no time after May 3, 1983 did Latti Associates attempt to enforce the settlement agreement in the United States District Court District of Rhode Island even though they were copied on four letters regarding Charter Security/Metropolitan's intention so severely change the agreement.

<u>STATEMENT 48</u>     At no time after May 3, 1983 did Latti Associates attempt to enforce the settlement agreement by appearing before Judge Pettine in the United States District Court District of Rhode Island even though they were copied on four letters regarding Charter Security/Metropolitan's intention so severely change the agreement.

<u>STATEMENT 48</u>     At no time after the May 3, 1983 hearing did Charter Security/Metropolitan inform Mr. Dimon of the attempted changes to his settlement agreement.

<u>STATEMENT 48</u>     At no time after the May 3, 1983 hearing did American Motorist/Kemper inform Mr. Dimon of the attempted changes to his settlement agreement.

<u>STATEMENT 48</u>     At no time after the May 3, 1983 hearing did Lattie Associates inform Mr. Dimon of the attempted changes to his settlement agreement.

Respectfully submitted,
For the plaintiff,
By his attorneys,


/s/  David B. Kaplan
DAVID B. KAPLAN, BBO #258540
BRIAN KEANE, BBO #656717
**THE KAPLAN/BOND GROUP**
88 Black Falcon Avenue, Suite 301
Boston, Massachusetts 02210
(617) 261-0080

Dated: January 2, 2007

> I hereby certify that a true copy of the above document was served upon each attorney of record by ECF on January 2, 2007.
>
>   _/s/Brian Keane_____

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

DENNIS J. DIMON          )

          vs.            )              C.A. 81-0063

JENNY C., INC.           )

PROCEEDINGS HELD ON MAY  3, 1983 IN THE ABOVE-CAPTIONED CASE
IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE
ISLAND BEFORE SENIOR JUDGE RAYMOND J. PETTINE.

APPEARANCES:

ROGER E. HUGHES, JR., ESQUIRE--------FOR THE PLAINTIFF

GUY WELLS, ESQUIRE------------------FOR THE DEFENDANT

W. SLATER ALLEN, ESQUIRE

JEROME B. SPUNT, ESQUIRE

1        <u>MORNING SESSION, MAY 3, 1983</u>

2        THE COURT:  I realize the plaintiff is not here,

3    but I have such an exacting schedule today, I just got

4    to keep on time, or otherwise, everything's going to fall

5    all along the line.  So, I think we better just go ahead.

6    All right, Mr. Decof, would you mind taking the stand

7    and giving a report to the Court please?

8        MR. DECOF:  Yes, your Honor.

9        THE COURT:  We may have to have this typed.

10  <u>L E O N A R D</u>  <u>D E C O F</u>  was duly sworn.

11       THE COURT:  All right.  Would you be kind enough to

12   trace the history of this case, as you understand it,

13   starting with my first contact with you and placing it

14   on the record?

15       MR. DECOF:  Yes, your Honor.  On April 20, 1983

16  I received a telephone call from Senior Judge Pettine

17  asking me if I would be willing to serve as a guardian

18  ad litem in a case which was somewhat disturbing to him.

19  He told me basically that the case was an admiralty case,

20  a Jones Act  case, in which the plaintiff was a seaman who

21  got injured, had lost an eye, that he had received a

22  verdict which totaled more than $700,000 before a jury,

23  that the parties had agreed to a settlement, and that

24  at a hearing before the Court, the plaintiff responded

25  to questioning from his attorney as to whether or not he

1.    understood he would have no more right of action against
2     anyone, if he accepted the settlement, but that when the
3     Court put some questions to him, he failed to understand
4     the questions or failed to reply to them in a way which
5     showed that he understood and more disturbing, informed
6     the Court that he was unable to read.  He couldn't read
7     the release, and because he was unable to read, the Court
8     felt that a guardian ad litem should be appointed to
9     report back to the Court as to whether or not this
10    plaintiff was capable of understanding the consequences
11    of the settlement and asked me if I would be willing to
12    undertake this task.

13         I instructed the Court that I had one matter pending
14    with one of the attorneys involved.  I didn't know if it
15    would be a conflict or not, and that I would discuss that
16    with the attorney involved, see if he had any objection.
17    And I did.  I discussed it with the attorney involved.
18    He had no objection.  He felt there was no conflict.  I
19    felt there was no conflict.  It was just a matter where
20    we were on opposite sides of the case; and I, therefore,
21    instructed the Court that I would be willing to undertake
22    this task.  My understanding was that none of the
23    attorneys had any objection to my appointment as guardian
24    ad litem; and I, therefore, told Judge Pettine that I
25    would undertake this task.

1    Do you want me to continue further, Judge?

2    THE COURT:  Yes.

3    MR. DECOF:  Following that, on April - I informed

4    the Court on April 22, 1983 that I would undertake -

5    accept the Court's appointment as guardian.  On April 25,

6    1983, I held my first conference with the attorneys

7    involved, Roger  Hughes, Slater Allen, Guy Wells, and

8    with the plaintiff, Dennis Dimon, his wife, Cathy Dimon,

9    and his mother, Mrs. Louis Dimon.

10    I outlined to all of the parties, all of the

11    attorneys, what I understood my function to be, that my

12    function was to review the file, to review the basic

13    facts of the case, and to assess the posture of the

14    case so that I could inform the plaintiff of all of the

15    ramifications of the settlement and determine that he

16    understood what he was doing, if he agreed to accept the

17    settlement.

18    In order to be able to do this, I instructed all

19    the parties that it was not my function to evaluate the

20    case.  It had not yet been heard on the motion for new

21    trial or on the defendant's motion to limit liability

22    under Section 183 of the 46 U.S. Code.  But I told all

23    the parties it was not my function to evaluate the case,

24    but I would inform the plaintiff of all of the various

25    options, and I had to know the background of everything

1    that was happening so that I could make sure he was aware

2    of all of the ramifications.  I accordingly --

3        THE COURT:  What's on your mind, Mr. Allen?

4        MR. ALLEN:  Your Honor, may the record now show

5    that the plaintiff is in court?

6        THE COURT:   Yes.  All right.

7        MR. DECOF:  I accordingly did some research on

8    46 U.S. Code 688 and 46 U.S. Code 183.  After the first

9    conference that I had, all of the parties understood the

10   position that I was in, and the plaintiff understood.

11   I was careful to inform the plaintiff that the Court

12   wanted me to do this, to make sure that he was protected,

13   and that he understood the nature, the full nature, of

14   everything that he was doing.

15       Subsequent to that, I requested the following

16   documents from the attorneys, and I did receive all

17   these documents, and I did review them:  The complaint

18   in the case, the answer in the case, the interrogatories

19   to the jury, the medical reports concerning the plaintiff,

20   the deposition of Dr. Levin who was the plaintiff's

21   opthamologist, the insurance policies of the Kemper and

22   the Home, the expenditures of the Home Insurance Company

23   for maintenance, counsel fees, and so forth itemized,

24   financial statements of the vessel the Jenny C, the

25   school records of the plaintiff, the psychological reports

of the plaintiff, the appraisal of the Jenny C, the
structured settlement proposal, the general releases,
the application for annuity which was made for the
plaintiff, and I'll explain all these, and the release
of the defendant, Jenny C, from the notice provisions of
the plaintiff with reference to seizure of the vessel.
Plaintiff's attorneys had properly filed a notice which
prevented the Jenny C being sold so that it could be
seized to satisfy a judgment, if that became necessary.

I did receive all of these documents, and I reviewed
them all at length.  I also reviewed and researched the
plaintiff's and defendant's memorandum concerning the
motion to limit liability of the defendants under 46 U.S.
Code 183 (a), and I did this not  so that I could make
a decision on it, but so that I could inform the plaintiff
of the significance of it, and I came to an opinion
myself as to whether or not the limit of liability
would - whether the defendants would be successful.

In researching this, I did determine that the
defendants properly and timely set this up in their
answer so that defense wasn't necessary, but my opinion
was, and I informed the plaintiff of this later on,
that the plaintiff would probably prevail on this issue
because I felt that under 183 (a) there was privity or
knowledge in the sense that under the cases, Coryell

1    v. Phillips. And Peace and various other cases, the Clevedo

2    and especially the China Union Lines case, that the

3    condition that the plaintiff complained of which

4    made the vessel unseaworthy was something which the

5    owner knew about or if he had inspected properly

6    would have found out.

7        I state this because I want to inform the Court

8    that I informed the plaintiff that I thought he would

9    prevail on this, and he understood this, and he still

10   wants to take the settlement.

11       Now, following my research I had further conferences

12   with the various attorneys, and I had a meeting, another

13   meeting in my office on April 28, 1983 with Dennis Dimon,

14   the plaintiff, Cathy Dimon, his wife, his mother,

15   Mrs. Dimon, and Roger Hughes, his attorney.  In the

16   intervening days, I had determined what the present value

17   of the structured settlement was by consultations with

18   actuaries, and I had also determined the availability of

19   annuity policies.  The settlement, as it was agreed upon,

20   provided for a payment, a cash payment, of $250,000; and

21   in addition to that, a structured settlement of $1450.45

22   per month guaranteed for 20 years but which would continue

23   for the life of the plaintiff.  The plaintiff, by the

24   way, was born on December 9, 1959.  His life expectancy

25   is 49.7 years, and he is married, and he has two children.

1   Now, this structured settlement would -- The structured

2   payments would increase by three percent each year, and

3   I instructed the plaintiff in the second conference that

4   we had that this three percent per year was not - did not

5   keep up with the cost of living index which ordinarily

6   raises seven percent per year.  He understood this, and

7   his mother, who is an intelligent woman, understood it,

8   and in fact, she immediately replied to me, but that

9   they had the advantage that there would be no income tax

10  paid, and all this money he received would be tax free.

11      At any rate, in - I questioned Mr. Hughes carefully

12  about the present value of this structured portion of

13  the settlement because there are many different present

14  values.  I know from my experience that different

15  discount rates can be used and different companies will

16  give different amounts for the same amount of money.

17  Mr. Hughes had told me that when the settlement was

18  originally offered, I think he acted with care and exper

19  by the way in this matter, when the - or his office

20  did, when the settlement was originally offered, the

21  structured settlement, Mr. Hughes asked the defendants

22  what it was costing them to pay for this structured

23  settlement, and they told him $175,000.  He then asked

24  that they allow him the $175,000, and his office would

25  purchase an annuity policy for the plaintiff on the market

at the best rate that they could get it; and I checked out the annuity policy and found that this is a very solid and good return for $175,000 with reference to the stature of the company that's involved. I did find out and I instructed the plaintiff and his wife and mother and Mr. Hughes, that it was possible to get a little bit higher payments for the same $175,000, as a matter of fact, rather than $1450.45 per month for the first year, they could possibly get payments of up to as high as $1550 a month but that this - these would be with a company that was not quite as highly rated as the company that's being used. They understood this, and their choice was to have the security of the company that was that was used.

And so, the opinion that I came to, after consultations with the experts, was that the $175,000 was th present value, a fair present value, of the settlement the structured portion of the settlement, and that the annuity purchased for it was a good solid annuity with a solid company at market rates.

Now, I instructed the plaintiff and his wife and mother when we met with them that the verdict was $710,000 and he understood that, the contributory negligence was found to be - comparative negligence, 12 and 1/2 percent with 8 and 1/2 percent interest for two years. The total

1    came to $720,650.  The -- I determined from the insurance

2    policies from Mr. Allen and from Mr. Wells that there

3    were two insurance companies involved here. The Home

4    Indemnity which was the primary carrier had originally

5    $100,000 coverage, and under the provisions of the policy,

6    they had paid certain payments out for maintenance of

7    the plaintiff and for attorneys' fees and so forth which

8    brought - which under the policy could be deducted from

9    their coverage, and therefore, brought the amount that

10   they had available to contribute to the settlement down

11   to roughly $76,000.

12        The -- Mr. Allen -- That was the Home Indemnity.

13   And Mr. Allen's company, the American Motors, Kemper,

14   had a limit of liability of $400,000.  So, between the

15   two insurance companies, there was $476,000 available

16   for contribution to the settlement.

17        I also requested financial statements concerning

18   the defendant, Jenny C, so that I could advise the

19   plaintiff as to his possibility of collecting any excess

20   against the defendant.  And Mr. Spunt who represents the

21   Jenny C Incorporated, which is a Rhode Island corporation,

22   furnished me financial statement and a certificate of

23   his that that - this was an accurate financial statement.

24   As a matter of fact, he furnished me a - copies of the

25   corporate tax return of the corporation, Jenny C

Corporation, which revealed that the only asset of the corporation was this vessel; and the vessel, I also asked for and received an appraisal by a maritime expert of the value of this vessel, and the value was some $105,000.

The tax -- I'm sorry. I thought I heard something. The tax return of the defendant, Jenny C, showed that this vessel was carried on the books at about - if you give me one moment.

(P A U S E)

The tax return indicated - corporate tax return of the Jenny C Inc. on schedule L indicated that the depreciable asset which was the vessel was carried on the books at $105,855, and less accumulated depreciation carried on the books at $62,705. I advised the defendant - rather, the plaintiff of this; and in our conference, I advised the plaintiff also of the supplementary proceedings process and what would happen if he sustained his judgment through appeal and proceeded to try to get execution against the vessel. The plaintiff very promptly stated to me that he didn't want to go against the owner of the vessel who was a Mr. Gary Champlin. He said he was very friendly with the Champlin family. They've been very nice to him, and he said - I can quote him verbatim, he wouldn't want to take away anybody's livelihood, and he was very strong about this.

1    I discussed the plaintiff's medical history at

2    length with him and his personal history.  He went to

3    the South Rose Elementary School to the sixth grade.  He

4    went to South Kingstown Junior High School to the eighth

5    grade at which time he left, and he went to work.  His

6    subjects were shop, woodworking, machine shop, so forth,

7    English, Science, Math.  He failed everything in the

8    eighth grade excepting Mathematics, and he stated to me

9    that he got an A in Math.  He couldn't pass anything

10   which required reading because he was unable to read.

11   I asked from his mother his psychological records,

12   and she presented me with this folder which have rather

13   voluminous records of psychological testing and reports

14   by the South Kingstown School Department, by Dr. Denhoff

15   of the Child Development Center, by Madeline Sullivan

16   who's a school psychologist, there are various educational

17   evaluations, various test forms.  And I reviewed these.

18   These revealed that the plaintiff, Dennis Dimon, has

19   average intelligence.  His I.Q. on a verbal scale was 87

20   which is dull normal.  His -- On a performance scale,

21   his I.Q. was 110 which is high average.  And on his

22   overall full scale I.Q. was 98 which is listed as average.

23   And all of the psychologists and doctors state  that it

24   is average.

25   Dr. Denhoff found that the plaintiff had a cerebral

dysfunction and integrative language disturbance.
Various other psychologists have found things in this area
which would mean he had a perceptual handicap.  His
mother has stated to me, although the records don't
state this in these words, but his mother has stated to
me that when she took him to the University of Rhode
Island for testing, they told her that he had borderline
dyslexia.  And the sum and substance of all of these
reports were that he is a person who has average intel-
ligence but has a dysfunction with reference to reading,
and he has not been able to learn to read, and that's
why he gave so much concern to this Court.

I did find in talking with him that he understood
readily the things that I said to him; and as he was -
he was much better than average in Mathematics as his
school records show.

Now, when I had the conference with the plaintiff,
his mother, and his - and his wife, I spoke with him
first while the attorney was present, and then I asked
the attorney to leave, and I told everybody that I wanted
to be able to state to the Court that I talked with the
plaintiff and his mother and his wife outside the
presence of his attorney so that he could reply to my
questions with no pressure, with no fear of embarassing
anybody.  I asked him if he was satisfied with the

services that the attorneys performed, and he said that
he was. I asked him if he had any complaints or any
questions that he wanted to raise with me. At this time,
his mother had one question. She was of the understanding
that after the settlement was made, that the insurance
company would still pay for some cosmetic surgery to
Dennis' left eye. I called in Mr. Hughes, and he stated
categorically this was not so, that once this was done,
there was no more comeback against the company. I --
Dennis stated that he understood this. I told him that
from what I had gathered this surgery could cost five to
$10,000. Asked him if he understood this. He said he
did, and he still wanted to go forward with the settlement.

Again, speaking with him outside the presence of
his attorney, I discussed the settlement sheet, and the
attorney's fees. Now, the plaintiff had originally
signed an agreement with the attorney's firm for a
one-third contingent fee. And by the way, I asked why
this firm in Boston was selected, and the plaintiff's
mother told me that she had - she looked for an admiralty
firm, a firm that specializes in admiralty. She talked
with a number of people in the area who had cases, found
out that this was a good firm. I say this to the Court
because it was a sophisticated choice that was made.
This is an admiralty firm. I know them to specialize in

this, and they're very familiar with the admiralty work.

The one-third contingency fee had been agreed to, and this fee would have come out to a little bit more than the $141,485.47 that the attorneys are charging. But they had agreed with Dennis that he would receive out of the $250,000 in cash $100,000. So, they modified their fee down by several hundred dollars in order to allow $100,000 balance to come to the plaintiff. So that of the $250,000 up front, once the attorneys' costs are reimbursed to them for medical records, depositions, and witness fees and so forth, and these costs were quite modest, I thought, for a case of this size, and Dr. Levin's bills were paid, and the attorney's fees of $141,485.47 which were modified down from $141,666.66 were deducted, the total bills and expenses came to $150,000, and the plaintiff will receive $100,000 in cash. Although it has no part of this case, the plaintiff understands that there is an IRS lien of $4679.35 which he will have to pay from his proceeds which will bring his proceeds down to $95,320.65.

I advised the plaintiff and his family of the pros and cons. I told them that they had a judgment in excess of $700,000, that once the settlement of $425,000 was accepted, there would be no comeback whether there were further hospitalizations or whatever. I discussed with

the plaintiff Dr. Levin's resume of his condition which states that, in effect, that he has a tearing eye which will always be subject to infection, that he will need one or two more operations, that he has some problems with depth perception which could make it difficult or dangerous to work with sharp objects at close range; and asked him how he was doing. He told me he has been working on another vessel since the accident, and he intends to continue working as a fisherman.

I told him that there would be a hearing in which Judge Watson would decide whether or not the liability in this case would be limited to the value of the vessel, and that although I hadn't researched it as carefully as I'm sure the Judge would, that my opinion, after my research, was that he would prevail on this because of what I said before, the privity or knowledge that could be attributed to the owner of the vessel.

I also told him what the appeal process was. I advised him, in my opinion, as to how long an appeal would take before the First Circuit, and the outside possibility of appeal to the United States Supreme Court.

The main thing I want to state to the Court is that he understood what I was saying to him, and I took care to point out the down side or the dark side of all the settlement so that he could make an informed judgment,

and he told me that this structured settlement is more
money than he has ever earned as a fisherman, and he
will still be able to work as a fisherman.  I asked him
what he was going to do with the $100,000, and he stated
to me that he was going to buy a house for himself and
his family, he was going to make a modest down payment,
that he had a modest house near the University of Rhode
Island he was going to buy for $77,000, he was going
to make a small down payment, and get a mortgage and put
the rest of it in the bank.  He also wanted very much
the annuity because that would be something that would
keep coming to him and would be a guarantee against his
spending the money in an improvident way.

The earnings that he had made as a fisherman
reported on his income tax in 1980 were roughly $11,000,
in 1979 roughly $8,000, and in 1982 roughly $12,000.  So,
the amount he is receiving on the settlement is more than
he has ever earned as a fisherman.

I went over the copy of the settlement sheet with
the plaintiff in detail, and he told me he had already
gone over it with his attorneys, and he understood it
and was satisfied with all the expenses and the legal
fees.

I determined one other thing, your Honor, well,
several other things, but what's important here is I

asked about whether or not there were any hospital liens,

Blue Cross liens, or subrogation of any kind which would

take away from the amount of money that would be coming

to the plaintiff; and I determined that there is no Blue

Cross, there is no hospitalization, there's no subrogation

of any kind so that this sum of $95,320.65 he will have

net to him after he pays the Internal Revenue lien.

One final thing I found out from Mr. Hughes that

the price or the terms of this annuity which he has

gotten a commitment for will change on May 6, 1983.  We

can't tell whether the terms will be better or they will

be worse.  The -- Mr. Hughes got an opinion from the

insurance people that they will probably be worse.  This

is because of the fluctuating interest rates.  But if

the contract -- excuse me.  I think I said May 6, 1983.

If the contract is purchased on or before May 6, 1983,

then that amount that I have discussed with the Court

will be available.

In sum, your Honor, I did not attempt to advise

the plaintiff one way or another whether he should accept

this settlement.  The plaintiff is an adult.  I understood

my function to be to determine whether or not he understood

the terms of the settlement.  I think that I exercised

an excess of caution and went maybe farther than I had

to, but I wanted to do this, to go into the plaintiff's

1    background, to go into the law of the case so that I

2    could tell him what, in my opinion, would be all the

3    downside risks of the settlement and make sure that he

4    understood these; and although I wasn't in any attempt

5    trying to evaluate the prospects on appeal, I did want

6    to tell him what could happen, that he could prevail on

7    the motion to limit liability, that he could prevail on

8    the motion - I thought he probably would prevail on that,

9    that he could prevail on the motion for new trial, that

10   he could prevail on appeal, and he could come out with a

11   judgment in excess of $700,000 plus accumulated interest;

12   and he understood this. I also told him the possibilities

13   on the other side. The -- That -- And if he did want -

14   prevail on his judgment, that all he could get from the

15   companies would be some $476,000 and would then have to

16   proceed against the corporation the vessel at forced

17   sale, might bring anywhere from fifty to $100,000. He

18   would still come up short.

19        But as I said, he was very adamant about the fact

20   that he did not want to go against the corporation. He

21   did not want to deprive Mr. Champlin of his right to earn

22   a living. And the bottom line is that, in my opinion,

23   he understood the things that I was saying to him despite

24   the fact that he has this reading disability and cannot

25   read - can't read the releases or whatever. He is aware

of what's happening, and it is his choice and his free choice to accept this settlement.

THE COURT:  Any questions of Mr. Decof?

MR. ALLEN:  No, your Honor.

MR. HUGHES:  No, your Honor.

THE COURT:  All right, no questions.  Let me say this, Mr. Decof, I certainly appreciate what you've done for this Court.  I must be candid and say I didn't quite know what my jurisdiction was in this matter. Counsel requested that I take it upon myself to evaluate the settlement offer, and I really still don't know whether that's within the jurisdiction of the Court; but I've assumed the responsibility for whatever it's worth.

To begin with, I place on the record I consider the report that you have just rendered an exhaustive report detailing every element of the case which was done in a highly professional manner and could only be done of a man of your caliber and your experience in this area of the law.  Certainly, I think we ought to place on the record that Mr. Decof is a leading member of the Rhode Island Bar and who has, in addition, an enviable reputation that extends well beyond the State. It would not be inappropriate for me to ask you to submit to the Court - I don't want to give you added work, but if you have one, I would think you have one all made up,

20

1    a curriculum vitae of yours that's all typed.  I would

2    like to --

3            MR. DECOF:  Yes, your Honor, be happy to do that.

4            THE COURT:  I would like to file your curriculum

5    vitae with the records of this case so that if it's

6    ever reviewed, they'll know the kind of person who has

7    rendered this report.

8        Now, also, I want to straighten out your fee at

9    this time.  Are you prepared to state what your fee is?

10           MR. DECOF:  Yes, your Honor.  I notified the parties

11   that the Court had instructed me to present a bill for

12   my services in rendering this report, and my original

13   understanding was that this would be paid by the

14   plaintiff.  However, Mr. Allen and Mr. Wells advised

15   that their insurance companies will pay this fee so that

16   the plaintiff will - will not have any more money coming

17   out of his area of settlement.  I told Mr. Allen roughly

18   what my fee would be last Friday.  But I have prepared

19   a bill which did not include this morning, but it came

20   to 18.5 hours at $150 an hour which is, I think, a

21   reasonable fee, and this Court has held to be a reason-

22   able fee.  It's less than I ordinarily charge per hour,

23   which comes to $2775.

24           THE COURT:  Okay.

25           MR. DECOF:  We have another hour that came here.

1    I'm not going to make an issue out of that.

2        THE COURT:  Well, since they asked for this hearing,

3    I feel at liberty to say I order that that fee be paid

4    and be part of this order of the Court; and I assume

5    that will be paid in 48 hours, and not 48 months.

6        MR. ALLEN:  Your Honor, probably take about a week

7    to get it back from New York.

8        THE COURT:  Well, let's say within one week, all

9    right?  All right, I feel every avenue has been explored

10   to insure that this plaintiff has the capacity and does

11   indeed understand this settlement.  Certainly, we can

12   say that he's made an informed judgment to accept the

13   offer; and as far as the Court is concerned, I can do no

14   more than say he apparently knows what he is doing, and

15   which is about as far as the Court can go. I do not

16   believe you expected the Court to go any further than that.

17   Am I correct?

18       MR. ALLEN:  Yes, your Honor.

19       THE COURT:  Okay.  I might just add that there was

20   some thought originally when I first saw this man as to

21   whether or not he had the capacity to handle $100,000 in

22   cash money which would be turned over to him.  That

23   certainly is a lot of money.  I do not believe it's

24   within the province of this Court to try - even attempt

25   to impress a trust upon it.  He knows what's he's doing.

1    He's an adult.  He's married, and I can only hope that

2    they use discretion because once that money's gone, it's

3    gone forever.  It better be used wisely and carefully.

4        All right, I thank you very much, and I thank you

5    again, Mr. Decof.  I certainly appreciate the responsi-

6    bility that you assumed, and I must say again as usual

7    you did it magnificently.

8        MR. DECOF:  Thank you, your Honor.

9            (A D J O U R N E D)

10           * * * * * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2          I, Joseph A. Fontes, Official Court Reporter for the

3    United States District Court for the District of Rhode Island,

4    appointed pursuant to the provisions of Title 28, United States

5    Code, Section 753, do hereby certify that the foregoing is a

6    full, true and correct transcript of proceedings had in the

7    within-entitled and numbered cause on the date hereinbefore

8    set forth; and I do further certify that the foregoing

9    transcript has been prepared by me or under my direction.

10

11

12

13                          _Joseph A. Fontes_
                            (Court Reporter)
14

15

16

17

18

19

20

21

22

23

24

25

## GENERAL RELEASE

Dennis Jay Dimon, now or formerly of the Town of Charlestown, State of Rhode Island, in consideration of the payment of Two Hundred Fifty Thousand and No/100 ($250,000.00) Dollars and the establishment of a fully paid annuity contract for my benefit with Charter Life Insurance Company, to pay me One Thousand Four Hundred Fifty and No/100 ($1,450.00) Dollars per month for one year following the execution of that contract and thereafter, such monthly sum increased at the rate of three (3%) percent per year, compounded annually, to be paid to me during the term of my life, and in no event for less than twenty (20) years, the receipt whereof is hereby acknowledged, do hereby remise, release, and quitclaim unto Jenny C. Inc. all and any such claims, rights, choses, and actions of every manner and kind which I have ever had, which I have now, or which I may have in the future from the beginning of the world to the date of these presents more specifically, without limiting the generality hereof all and every claim arising out of an injury suffered by me aboard the fishing vessel Jenny C. owned by Jenny C. Inc. on January 24, 1981, and all my rights, claims, and choses asserted or involved in the complaint or libel filed in the United States District Court for the District of Rhode Island under the name and style Dennis Jay Dimon vs. Jenny C. Inc., civil action No. 81-0063.



Exhibit
#10
9-8-06    JB

K-0063

I understand the nature and extent of my injury and that I will never be cured. I understand that this is a full and final settlement. I further certify that this release is fully understood by me and is entirely satisfactory.

IN WITNESS WHEREOF, Dennis Jay Dimon has set his hand this *19th* day of April, 1983.

THIS IS A FINAL RELEASE.

_Dennis Jay Dimon_
Dennis Jay Dimon

On April 19, 1983 I read the above two pages to the plaintiff and explained its contents to him.

Roger E. Hughes
LATTI ASSOCIATES

K-0064

# THIS IS A GENERAL RELEASE

**WARNING — READ CAREFULLY** every word printed or written on both sides of this paper. By signing this paper **YOU AGREE** to give up every right against all the parties and vessels mentioned in this paper which you ever had, you now have, or you may in the future have because of any matter or anything which ever happened from the beginning of the world up to the time you sign this paper.

I, ...................................................................................... Age ...................
<span>(Write your own name and age)</span>

Married or Single ...................... Address ..................................................

in exchange for the sum of ...........................................................................

Dollars and .......... Cents ($ .............. ) lawful money of the United States of America

which I have received, do hereby ................................................ and forever
<span>(Write the word "release" to show that you know what you are doing)</span>

discharge

heirs, executors, administrators, successors and assigns, and all his or their vessels and in particular the

and the owners, operators, agents, charterers, masters, officers, and crews, of said vessels of each and every right or claim which I now have, or may hereafter have, because of any matter or thing which happened before the signing of this paper; and particularly, but not only because of

## THIS IS A RELEASE

I know that in signing this release I am taking the risk that I may have other injuries, illnesses or disabilities that I do not now know of from the particular occurrence described above of from some other occurrence before the signing of this paper. I also know that I am taking the risk that the injuries, illnesses or disabilities I do know of may be or may turn out to be worse than they now seem to me or to the doctors I have seen. I take all these risks. I know I am giving up the right to any further money. I am satisfied.

I understand and agree that the money paid to me now is received by me in full settlement and satisfaction of all claims and demands whatsoever.

The following is to be filled in by the Claimant himself in his own handwriting, if he can write.

1. Have you read this paper?    A. ...........................................................
   <span>(Write here either "Yes" or "No")</span>

2. Has this paper been read to you?    A. ..............................................
   <span>(Write here either "Yes" or "No")</span>

3. Do you know what this paper is that you are signing?    A. ..................
   <span>(Write here either "Yes" or "No")</span>

4. What is this paper which you are signing?    A. .................................

5. Do you know that signing this paper settles and ends **EVERY RIGHT AND CLAIM YOU HAVE FOR DAMAGES AS WELL AS FOR PAST, PRESENT AND FUTURE MAINTENANCE, CURE, AND WAGES?**    A. ...............................................
   <span>(Write here either "Yes" or "No")</span>

THEREFORE, I am signing my name near the seal to show that I understand and mean everything that is written by or for me on this paper.

I am signing this of my own free will.    ............................, 19 .........

 # THIS IS A RELEASE 

**Claimant, if he wishes to sign, should write his name upon the words "THIS IS A RELEASE" immediately above.**

### Certificate of Witnesses

We, the undersigned, do hereby certify that the Release on the reverse side of this paper was executed in our presence and that said Claimant acknowledged that...............fully
<span style="font-size:smaller">(he or she)</span>
understood its contents and meaning and executed the same as...............free act and deed
<span style="font-size:smaller">(his or her)</span>
and for the sole consideration therein expressed.

Witness our hands and seals on the day, month and year aforesaid.

. . . . . . . . . . . . . . . . . . . . . . . . . . . (Seal) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
<span style="font-size:smaller">(Name)</span>                                                                      <span style="font-size:smaller">(Address)</span>

. . . . . . . . . . . . . . . . . . . . . . . . . . . (Seal) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
<span style="font-size:smaller">(Name)</span>                                                                      <span style="font-size:smaller">(Address)</span>

. . . . . . . . . . . . . . . . . . . . . . . . . . . (Seal) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
<span style="font-size:smaller">(Name)</span>                                                                      <span style="font-size:smaller">(Address)</span>

### Acknowledgment Before Notary Public or Commissioner of Deeds

State of . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . }
                                                                                       } ss. :
County of . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . }

On the date of the execution of the Release on the reverse side of this paper before me personally came said Claimant, known to me to be the individual described in and who executed this Release, and acknowledged that. . . . . . . .fully understood its contents and meaning and duly
<span style="font-size:smaller">(he or she)</span>
executed the same as. . . . . . . free act and deed and for the sole consideration therein expressed.
<span style="font-size:smaller">(his or her)</span>

(Seal Required)                          . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### Certificate of Interpreter

I hereby certify that the Release on the reverse side of this paper was executed in my presence by said Claimant and that I correctly and accurately translated the entire Release from the English language into the mother tongue of said Claimant and. . . . . . acknowledged
<span style="font-size:smaller">(he or she)</span>
that . . . . . .fully understood its contents and meaning and executed the same as . . . . . . .free
<span style="font-size:smaller">(he or she)</span>                                                                      <span style="font-size:smaller">(his or her)</span>
act and deed and for the sole consideration therein expressed.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
<span style="font-size:smaller">INTERPRETER</span>

Address. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### Certificate of Person Who Reads Release to Claimant

I hereby certify that before the Release on the reverse side of this paper was executed by the Claimant, I correctly read the entire Release to the Claimant and . . . . . . acknowledged
<span style="font-size:smaller">(he or she)</span>
that. . . . . . .fully understood its contents and meaning.
<span style="font-size:smaller">(he or she)</span>

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Address. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .



**DEAN WITTER REYNOLDS INC.**
One Boston Place, Boston, MA 02108   Telephone (617) 722-3500

April 8, 1983

PROPOSAL BY

CHARTER SECURITY LIFE INSURANCE COMPANY

OF NEW JERSEY

FOR A

LIFE ANNUITY 20 YEAR CERTAIN

UNDER A STRUCTURED ANNUITY SETTLEMENT

OF $1,450.45 PER MONTH FOR THE FIRST

YEAR AND IT WOULD INCREASE 3%

PER YEAR AS FOLLOWS:

```
2ND  YEAR . . . . . . . . . . . . . . . . . . . . . . . . . . . .$1,493.96
3RD  YEAR . . . . . . . . . . . . . . . . . . . . . . . . . . . .$1,538.78
4TH  YEAR . . . . . . . . . . . . . . . . . . . . . . . . . . . .$1,584.95
5TH  YEAR . . . . . . . . . . . . . . . . . . . . . . . . . . . .$1,632.49
6TH  YEAR . . . . . . . . . . . . . . . . . . . . . . . . . . . .$1,681.47
7TH  YEAR . . . . . . . . . . . . . . . . . . . . . . . . . . . .$1,731.91
8TH  YEAR . . . . . . . . . . . . . . . . . . . . . . . . . . . .$1,783.87
9TH  YEAR . . . . . . . . . . . . . . . . . . . . . . . . . . . .$1,837.39
10TH YEAR . . . . . . . . . . . . . . . . . . . . . . . . . . . .$1,892.51
20TH YEAR . . . . . . . . . . . . . . . . . . . . . . . . . . . .$2,543.37
30TH YEAR . . . . . . . . . . . . . . . . . . . . . . . . . . . .$3,418.08
40TH YEAR . . . . . . . . . . . . . . . . . . . . . . . . . . . .$4,593.61
50TH YEAR . . . . . . . . . . . . . . . . . . . . . . . . . . . .$6,173.43
```

*(handwritten annotations:)* $180,518.96 — $448,567.52 — $808,947.85 — $1,293,867.57 — $1,944,151.67

**APPLICATION**

:e Black Ink

CHARTER SECURITY LIFE INS    .NCE COMPANY, NEW YORK , 720 FII    AVENUE, NEW YORK, N.Y. 10019

. Name of Annuitant (please print)    ☒ Male    ☐ Female

Dennis J. Diamon

:. Date and Place of Birth

12/9/59  So. Kingstown, RI

3. Residence (No., Street, City, State and Zip Code)

Laurel Lane, West Kingston, RI  02892

4. Business Address (Include Name of Employer)

5. Mail Notices to  ☐ Residence    ☐ Business    ☐ Owner

6. Social Security No.    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

⬤ Owner (If other than Proposed Annuitant)

Name:    American Motorists Insurance Co.

Relationship:

Address:

Social Security Tax Payer I.D. No.    36-0727430

☐ Contingent Owner

8. Beneficiary and Relationship

Primary:    Katerine I. Diamon

Contingent:    Jessica I. Diamon – Daughter
Rebecca Lee Diamon – Daughter

9. Type of Contract  Single Premium Deferred Annuity

10. Single Premium Amount    $ 175,000.

11. Maturity Age    ☐ 65    ☐ 70½    ☐ Other: Immediate
6/15/83

12. Will this annuity replace or change any existing life insurance or annuity contract? ☐ Yes    ☒ No

(If yes, give name of company, policy number, and plan of life insurance or annuity.)

13. Is this contribution for a tax qualified plan? ☐ Yes ☒ No

If so, contract will be issued with a limitation on transferability to conform with IRS regulations. (Check appropriate box for type of qualified plan.)

☐ I.R.A. Rollover    ☐ Corporate pension
☐ T.S.A. Exchange         or profit sharing plan
☐ H.R. 10 Exchange  ☐ Terminal Funding
☐ H.R. 10             ☐ Other

14. Special Requests

15. Amendments and Corrections (For Home Office use only)

Exhibit
# 2
9-1-06  JB

The undersigned represent(s), to the best of his (her) knowledge and belief, that the foregoing statements and answers are complete, true, and correctly recorded and agree(s) to be bound by all statements and answers made or to be made in this application. The undersigned further expressly agree(s) as follows:

1. This application and any policy issued in consequence thereof shall constitute the entire contract. No agent is authorized to make or modify contracts, to waive any of the Company's rights or requirements or to bind the Company by making or receiving any promise, representation or informa-

tion, unless the same be in writing, submitted to the Company, and made a part of such policy.

2. Acceptance of any contract(s) issued on the basis of the application shall constitute a ratification and acceptance of any change, correction, addition or amendment noted by the "Company" in the "Amendments and Corrections" section above, except that in those jurisdictions where it is required any change in amount or benefits shall require a written consent by the Proposed Annuitant and by the Applicant if other than the Proposed Annuitant.

Dated at _____ this ____ day of _____ 19 ___

Signature of
Annuitant _____

Applicant if other    X  AMERICAN MOTORISTS INSURANCE
than Annuitant

By  John L. Moe – HOME OFFICE CLAIM
Signature and Title

Agent Signature (1)    Code

Please Print Name of Agent (1)

Agent Signature (2)    Code

Please Print Name of General Agency

AP-109    Please Print Name of Agent (2)
1/80

General Agent Code    K-0107

08/24/2006 17:17 IFAX Fax_Center@dbr.com → Fax Center ☐008/016
AUG.24.2006    4:13PM    CIAPCIAK AND ASSOCIATES PC    NO.433    P.8

Black Ink    83A08153

**CHARTER SECURITY LIFE INSURANCE COMPANY, NEW YORK, 720 FIFTH AVENUE, NEW YORK, N.Y. 10019**

ANNUITY APPLICATION

| Name of Annuitant (please print)   ☒ Male   ☐ Female | 9. Type of Contract  Single Premium Deferred Annuity |
|---|---|

Dennis J. Dimon

| | 10. Single Premium Amount   $ 175,000. |
|---|---|

Date and Place of Birth

12/9/59  So. Kingstown, RI

| 11. Maturity Age   ☐ 65  ☐ 70½  ☒ Other:  Immediate |
|---|
| 6/15/83 |

Residence (No., Street, City, State and Zip Code)

Laurel Lane, West Kingston, RI  02892

Business Address (Include Name of Employer)

12. Will this annuity replace or change any existing insurance or annuity contract? ☐ Yes  ☒ No
(If yes, give name of company, policy number, and plan of life insurance or annuity.)

Mail Notices to ☐ Residence   ☐ Business   ☐ Owner

Social Security No.  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

Owner (if other than Proposed Annuitant)

Name:  American Motorists Insurance Co.

Relationship:

Address:

Social Security Tax Payer I.D. No.  36-0727430

☐ Contingent Owner

13. Is this contribution for a tax qualified plan? ☐ Yes  ☒ No
If so, contract will be issued with a limitation on transferability to conform with IRS regulations. (Check appropriate box for type of qualified plan.)

☐ I.R.A. Rollover        ☐ Corporate pension
☐ T.S.A. Exchange        or profit sharing plan
☐ H.R. 10 Exchange       ☐ Terminal Funding
☐ H.R. 10                ☐ Other

14. Special Requests   Immediate Annuity
20 yr. Certain . 3% increase .
$175,000 = 1450.45 per month
first year.

Beneficiary and Relationship:

Primary:  Katerina I. Dimon

Contingent:  Jessica I. Dimon - Daughter
Rebecca Lea Dimon - Daughter

15. Amendments and Corrections (For Home Office use only)

Quote Number  50113

undersigned represent(s), to the best of his (her) knowledge belief, that the foregoing statements and answers are complete, true, and correctly recorded and agree(s) to be bound by statements and answers made or to be made in this application. The undersigned further expressly agree(s) as follows:
This application and any policy issued in consequence of shall constitute the entire contract. No agent is authorized to make or modify contracts, to waive any of the Company's rights or requirements or to bind the Company by making or receiving any promise, representation or information.

tion, unless the same be in writing, submitted to the Company, and made a part of such policy.
2. Acceptance of any contract(s) issued on the basis of this application shall constitute a ratification and acceptance of any change, correction, addition or amendment noted by the Company in the "Amendments and Corrections" section above, except that in those jurisdictions where it is required any change in amount or benefits shall require a written consent by the Proposed Annuitant and by the Applicant if other than the Proposed Annuitant.

at Syracuse NY this 4th day of May 19 83

[signature]    621-61
Agent Signature (1)    Code

[signature]
Please Print Name of Agent (1)

Agent Signature (2)    Code

Please Print Name of Agent (2)

Signature of Annuitant  [signature]

Applicant if other than Annuitant X [signature]

By [signature]
Signature and Title

Dean Witter Reynolds
Please Print Name of General Agency

000010

Exhibit #3  6-7-06 JB

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

COPY

DENNIS DIMON,                          )
                                       )
              Plaintiffs,              )
                                       )
                                       )  C.A. No:  05-11073 WGY
         vs.                           )
                                       )
METROPOLITAN LIFE INSURANCE,           )
KEMPER INSURANCE COMPANY,              )
MORGAN STANLEY DW, INC.,               )
MICHAEL B. LATTI, LATTI                )
ASSOCIATES, and LATTI &                )
ANDERSON LLP,                          )
                                       )
              Defendants.              )

The telephonic deposition of **WILLIAM R. MENSIE**, called by the Defendant Metropolitan Life Insurance for examination, pursuant to Notice, and pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Joanne M. Brogan, a Certified Shorthand Reporter and a Notary Public in and for the County of Cook and State of Illinois, at One Kemper Drive, Long Grove, Illinois, on Thursday, 7th day of September, 2006, at the hour of 9:00 o'clock a.m.

247

```
1     K-0019.

2          A    Yes, sir.

3          Q    The settlement agreement, correct?

4          A    Yes.

5          Q    Who would have filled that out?

6          A    It appears to me this was filled out by

7     Charter.

8          Q    Now, for this annuity contract, the Charter

9     Security Life annuity contract, it was Kemper's money

10    from the excess coverage for the Point Judith Fishermen's

11    Association, it was actually Kemper's money, the $175,000

12    from that policy of insurance, that went to fund this

13    annuity, correct?

14         A    It was money paid out by Kemper is my

15    understanding, yes.

16         Q    And as a matter of fact, Kemper became part

17    owner of that annuity contract, correct?

18         A    That was my understanding, yes.

19         Q    You testified, and I just wanted to follow up

20    with you, you were actually adjusting this claim on

21    behalf of the specific claim that we're here for today on

22    behalf of Kemper, correct?

23         A    Correct.

24         Q    You testified yesterday you were talking about
```

1    Mr. Noe, and we were referring to some of the documents

2    of the letters going back between Charter Security, Mr.

3    Noe, and you said that -- the testimony was that

4    something looked unusual to you with regard to Mr. Noe's

5    signature. Can you elaborate for me what you meant by

6    that?

7        A    The -- I was being asked to compare certain

8    documents. It was the application and the signatures

9    that while one was clear, the other was not. However,

10   just the lines just struck me as suspect in that, you

11   know, how often do people sign documents in the same

12   space which it appeared to me; and as I testified, I'm

13   not a handwriting expert or anything, but it just struck

14   me as odd to see that the signatures appeared to be

15   matched up; and I think the inference was that he had

16   signed both documents at different times.

17       Q    You also yesterday in regard to talking about

18   the changes that were made by Charter, you described

19   those changes as unilateral or that they did something

20   unilaterally. What did you mean by that?

21       A    Well, the fact that they took it upon

22   themselves to modify a contract that they had issued and

23   abide by the terms that they had framed versus that which

24   had been represented to the court that existed, and the

NY



Charter Security Life Insurance Company (New York)
720 Fifth Avenue · New York, New York 10019

| .975 | 14 | 7.49 | 19 | 5.97 | 24 |
| 9.80 | 15 | 7.10 | 20 | 5.75 | 25 |

### OPTION 2.  LIFE INCOME*

We will pay a lifetime monthly income to the Annuitant if living on the Annuity Date. The basis for this amount of income is explained in this contract.

Unless you make an alternate election, we will make the first monthly payment on the Annuity Date; payments after the first will be on that same date of the month as long as the Annuitant lives. Unless you make an alternate election, we guarantee 120 monthly payments; they will be continued to the Beneficiary if the Annuitant dies before receiving them. Payments will be made by check to the Annuitant or Beneficiary. We reserve the right to require proof that the payee is living on payment dates.

We will pay the benefit explained in this contract if the Annuitant dies before the Annuity Date. It will be paid to the Beneficiary when we receive acceptable proof of death.

The Beneficiary and Owner are as named in the application if not later changed.

Notice of ten-day right to examine contract: This contract may be cancelled within ten days after its receipt. The steps to follow are:

Return the contract with a written notice to us or to the agent through whom you purchased the contract. If you return the contract directly to us, use the address of our Home Office shown on the top of this page. If return is through the agent, obtain a receipt.

We will return all payments made for this contract after we receive it. As soon as the contract is delivered or mailed to us, it will be deemed void from its beginning.

Read this contract carefully. It is a legal contract between you and us.

Secretary                                             President

## SINGLE PREMIUM DEFERRED ANNUITY

Monthly Life Annuity With Ten Years Certain Payable At Annuity Date
Benefit in Event of Death is Payable Prior To Annuity Date
Optional Life Annuities at Annuity Date— Optional Annuity Date
Non-Participating



Exhibit
#11
9-8-06 JB

K-0010

# TABLE OF CONTENTS

Item                                                                    Page No.

Face Page ...................................................... 1
Schedule Page .................................................. 3
Table of Guaranteed Contract Values ........................... 4
Definitions ................................................... 5
General Provisions
    Basis of Contract ......................................... 5
    Entire contract; changes .................................. 5
    Premium payment ........................................... 5
    Issue date ................................................ 5
    Incontestability .......................................... 5
    Misstatement of age or sex ................................ 5
    Ownership ................................................. 6
    Change of ownership ....................................... 6
    Assignment ................................................ 6
    Beneficiary ............................................... 6
    Conformance to statutes ................................... 6
Interest Rates
    Declared Interest Rate .................................... 6
    Guaranteed Interest Rates ................................. 6
Joint Annuitant
    Definition ................................................ 6
    Annuity Date .............................................. 6
    Deferral of Annuity Date .................................. 6
    Benefit In Event of Death ................................. 6
    Separate Annuities ........................................ 6
Non-Forfeiture Provisions
    Accumulation Value ........................................ 7
    Cash surrenders ........................................... 7
    Benefit in Event of Death ................................. 7
    Annual statement of values ................................ 7
    Normal settlement; annuity date ........................... 7
    Change in annuity option or date .......................... 7
    Benefits payable to beneficiary ........................... 7
    Minimum payments .......................................... 7



Settlement Options
    Option 1, limited payments ................................ 8
    Option 2, life income ..................................... 8
    Option 3, joint life income with two-thirds to survivor ... 8
    Rate basis ................................................ 8
    Settlement option tables .................................. 9

K-0011

NY

# DEFINITIONS

This is what we mean when we use these words or phrases:

"We," "us" and "our" refer to Charter Security Life Insurance Company (New York).

"You" and "yours" refer to the Owner named in the application.

The "Accumulation Interest Rate" is the annual effective interest rate which we use to credit interest to the Single Premium less any Partial Surrenders.

The "Accumulation Value" is the value of the contract before the charge, if any, for withdrawing funds.

The "Annuitant" is the person who is to receive annuity payments.

The "Beneficiary" receives the benefits, if any, due at the Annuitant's death.

A "Contingent Owner," if named, becomes the Owner if the Annuitant survives the Owner.

"Contract Years" are measured from the Issue Date.

The "Declared Interest Rate" is the Accumulation Interest Rate which we declare and guarantee for the Effective Period.

The "Effective Period" is the period during which the Accumulation Value will accrue interest at the Declared Interest Rate.

The "Owner" owns and controls this contract.

A "Partial Surrender" is a surrender of part of the Accumulation Value.

The "Surrender Charge" is the charge for withdrawing funds. It is equal to the Surrender Charge Percentage times the amount of Accumulation Value surrendered. The Surrender Charge Percentages are shown on the Schedule Page. Refer to NONFORFEITURE PROVISIONS; the Surrender Charge applies only under certain conditions.

The "Surrender Interest Rate" is the Declared Interest Rate below which the Surrender Charge is waived for 60 days. Refer to NONFORFEITURE PROVISIONS.

The "Surrender Value" is the Accumulation Value less the Surrender Charge.

"Survivo" refers to the continued life of a person or legal existence of an entity other than a person.

# GENERAL PROVISIONS

BASIS OF CONTRACT: This contract is issued on the basis of the application and receipt of the Single Premium payment in advance.

ENTIRE CONTRACT; CHANGES; This contract, the attached application, and any endorsements make up the entire contract. All statements in the application are representations and not warranties.

No agent can change this contract or waive any of its terms. Changes can be made only by written endorsement signed by one of our officers.

PREMIUM PAYMENT: The Single Premium payment for this contract was paid in advance. If the check or other instrument is not honored for payment, this contract is deemed void from the beginning.

ISSUE DATE: This contract takes effect on its Issue Date which is shown on the Schedule Page.

INCONTESTABILITY: This contract is incontestable from its issue date.

MISSTATEMENT OF AGE OR SEX: We will require proof of age before we make payments to the Annuitant or any Beneficiary. If age or sex is misstated, we will pay the amount due at the true age or sex. In case of age or sex correction after payments start, we will:

(1) In case of underpayment, pay the full amount due the payee with the next payment due.

(2) In case of overpayment, deduct the amount due us from future payments; deductions will be spread over the payment period.

GI    PROVISIONS
(Continued)

**OWNERSHIP:** You have all rights under this contract during the Annuitant's lifetime, subject to:

(1) the rights of any assignee of record with us;

(2) the rights of any irrevocable Beneficiary;

(3) any restricted ownership endorsement;

(4) the change of ownership provision.

**CHANGE OF OWNERSHIP:** During the Annuitant's lifetime, you may name a new Owner. If you are a natural person other than the Annuitant, you may name or change a Contingent Owner. A Contingent Owner becomes Owner only by surviving you.

Notice of the change must be sent to our Home Office; it must be signed and dated by you. We are not liable for any actions we take before we receive and file the notice at our Home Office.

Change of ownership:

(1) voids any Contingent Ownership;

(2) does not affect the Beneficiary.

**ASSIGNMENT:** You may assign all rights, privileges and benefits provided by this contract. We are not bound by an assignment until we receive and file a signed copy at our Home Office. We are not responsible for the validity of assignments.

**BENEFICIARY:** You may change the Beneficiary during the Annuitant's lifetime; an irrevocable Beneficiary may be changed only by that Beneficiary's written consent. Notice of the change must be sent to our Home Office; it must be signed and dated by you. It takes effect on the date it is signed. We are not liable for any actions we take before we receive and file the notice at our Home Office.

A Beneficiary's interest is effective if that Beneficiary:

(1) survives the Annuitant by 15 days; or

(2) survives until we receive proof of the Annuitant's death.

We will pay the proceeds in this order unless this contract is assigned at the time of the Annuitant's death:

(1) We will pay the designated Beneficiaries who survive the Annuitant.

(2) If no Beneficiary survives, we will pay the Annuitant's estate.

No Beneficiary can change your previous choice of a settlement option.

To the extent permitted by law, no payment we make will be subject to the claims of any creditors.

**CONFORMANCE TO STATUTES:** Any annuity, Surrender Value or benefit in event of death payable under this contract is not less than the minimum benefit required by any statute of the state in which this contract is delivered.

## INTEREST RATES

**DECLARED INTEREST RATE.** We declare an Accumulation Interest Rate, and Effective Period, on the Issue Date. They are shown on the Schedule Page. Prior to the expiration of the Effective Period, we will declare a new Accumulation Interest Rate and Effective Period. We will notify you of declared Accumulation Interest Rates and effective periods in writing.

**GUARANTEED INTEREST RATES:** We guarantee that the Accumulation Interest Rates will be at least as great as the Guaranteed Interest Rates shown on the Schedule Page.

## JOINT ANNUITANT

If you designate two persons as joint annuitants in the application, these rules will be in effect:

**Definition:** The term "Annuitant" means the joint annuitants or the survivor of them, as the case may be.

**Annuity Date:** The Annuity Date will be:

(1) the Contract Anniversary following the 65th birthday of the older joint annuitant; or

(2) ten years from the Issue Date if the issue age of the older joint annuitant is more than 55 Years; or

(3) the date specified in the application.

**Deferral of Annuity Date:** The Annuity Date may not be deferred to a date beyond the 85th birthday of the older joint annuitant.

**BENEFIT IN EVENT OF DEATH:** We will not pay any benefit upon the death, before the Annuity Date, of the first of the joint annuitants to die. Instead, the contract will remain in force as to the surviving joint annuitant. If one joint annuitant dies before the Annuity Date, the latest permitted Annuity Date will become the 85th birthday of the remaining joint annuitant or, if later, ten years after the Issue Date. If both joint annuitants die before the Annuity Date, we will pay the benefit to the Beneficiary.

**Separate annuities:** At your request, we will apply the Accumulation Value to provide separate annuities for each joint annuitant, if both are living on the Annuity Date. You must make this request in writing at least 30 days before the Annuity Date. For this purpose, you must specify a division of the Accumulation Value into two portions. These portions may but need not be of equal size. You must specify the annuity option for each joint annuitant. You are not required to choose the same annuity option for both joint annuitants.

In addition to these three options, you may choose any other form of annuity agreed upon by us.

Except with our consent, settlement options will not be available to:

(1) an assignee; or

(2) any other than a natural person receiving proceeds in his or her own right

Page 6

ACCUMULATION VALUE: The Accumulation Value at any time is the Single Premium you paid, less any Partial Surrenders and Surrender Charges, accumulated at the Accumulation Interest Rates.

CASH SURRENDERS: You may surrender all or part of the Accumulation Value before annuity payments begin.

We have a Surrender Charge in effect for the first seven years after the Issue Date, but only if:

(1) there is more than one surrender within a Contract Year, or

(2) the surrender exceeds the Allowable Portion of the Accumulation Value. The Allowable Portion is shown on the Schedule Page.

On the first surrender in a Contract Year, the Surrender Charge applies only to the amount in excess of the Allowable Portion of the Accumulation Value.

If an Accumulation Interest Rate is less than the Surrender Interest Rate, you may surrender this contract without a Surrender Charge provided you notify us within 60 days of the effective date of the Accumulation Interest Rate. After 60 days, any Surrender Charge in effect will be reinstated. However, you will not forfeit your right to surrender this contract without a Surrender Charge should a future Accumulation Interest Rate be below the Surrender Interest Rate.

If you surrender the entire Accumulation Value, the amount we pay you, added to any prior amounts we paid you for Partial Surrenders, will not be less than the Single Premium you paid us.

We may defer payment of cash surrenders for not more than six months.

BENEFIT IN EVENT OF DEATH: We will pay the Accumulation Value to the Beneficiary if:

(1) the Annuitant dies before the Annuity Date; and

(2) you have not specified a settlement option.

The amount paid will be the Accumulation Value as of the date of death accumulated at the Accumulation Interest Rate to the date of payment by us. It will be paid when we receive acceptable proof of death. No Surrender Charge will apply.

ANNUAL STATEMENT OF VALUES: As of each contract anniversary on or before the Annuity Date, we will send you a statement which shows the:

(1) Accumulation Value; and

(2) Surrender Value; and

(3) Monthly life annuity with ten years certain which can be provided on the Annuity Date by the current Accumulation Value; and

(4) Declared Interest Rate.

NORMAL SETTLEMENT; ANNUITY DATE: The Accumulation Value will be used to provide a life annuity as shown on the Schedule Page if:

(1) the Annuitant is living on the Annuity Date; and

(2) you have not made an alternate election.

The Annuity Date will be:

(1) the contract anniversary following the Annuitant's 85th birthday; or

(2) ten years from the Issue Date if the Issue Age is more than 55 years; or

(3) the date specified in the application.

CHANGE IN ANNUITY OPTION OR DATE: You may defer the Annuity Date; deferral may not be to a date beyond the Annuitant's 85th birthday. After five years from the Issue Date, you may:

(1) Advance the Annuity Date (but not to a date earlier than the date of the request); or

(2) elect to begin payments under a settlement option.

Written request must be made:

(1) during the Annuitant's lifetime;

(2) at least 30 days before the Annuity Date; and

(3) at least 30 days before any settlement option date.

BENEFITS PAYABLE TO BENEFICIARY: During the Annuitant's lifetime, you may choose a settlement option rather than a lump sum death benefit. The Beneficiary may make this choice after the Annuitant's death if:

(1) you have not done so; and

(2) payments have not begun.

MINIMUM PAYMENTS: We will not make periodic payments of less than $20.00; for lesser amounts due, we will change the frequency of payments. This provision applies to payments we make to the Annuitant or to any Beneficiary.

K-0014

# SETTLEMENT OPTIONS

If you elect an annuity option by death, surrender or annuitization, the Accumulation Value of this contract may be applied under any of the options set forth below, provided that:

(1) In the event of surrender, the option is elected on or prior to the surrender date.

(2) In the event of death, the option is elected within 30 days of the date on which we notify the Beneficiary that proceeds are payable.

At the time payments under a settlement option begin, we will pay the greater of

(1) the amount guaranteed under this contract; or

(2) the amount that would be provided by the application of the Accumulation Value to purchase a single premium immediate annuity offered by us to the same class of annuitants, or

(3) an amount determined by more favorable rates which we then offer.

**OPTION 1, LIMITED PAYMENTS:** Equal payments for a set time, not more than 30 years. Any excess interest we declare will be paid yearly.

**OPTION 2, LIFE INCOME:**
**LIFE ANNUITY.** Equal monthly payments as long as the payee lives.

**WITH CERTAIN PERIOD.** Equal monthly payments for five, ten, or twenty years (the certain period), as elected, and thereafter for the remaining lifetime of the payee.

**WITH INSTALLMENT REFUND.** Equal monthly payments until the sum of such payments equals the proceeds settled under this option (at which time the installment refund period ends) and thereafter for the remaining lifetime of the payee.

**OPTION 3, JOINT LIFE INCOME WITH TWO-THIRDS TO SURVIVOR:** Payment of equal monthly (or less frequent) installments during the joint lifetime of the payee and another person. After the death of either the payee or the joint payee, the amount of each installment shall be reduced to two-thirds of the original amount settled and payments shall continue during the entire remaining lifetime of the survivor.

**Rate basis:** The monthly installments guaranteed under this contract are based on:

(1) the 1937 Standard Annuity Table,

(2) 3½% interest, and

(3) age nearest birthday.

## SETTLEMENT OPTION TABLES

### GUARANTEED MONTHLY INSTALLMENTS UNDER OPTIONS 1, 2 OR 3
(Monthly installments are shown for each $1,000 of net proceeds applied.
The ages shown are ages nearest birthday when the first monthly installment is payable.)

#### OPTION 1.   INSTALLMENTS FOR A SPECIFIED PERIOD

| Years | Installment | Years | Installment | Years | Installment | Years | Installment | Years | Installment | Years | Installment |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | $84.65 | 6 | $15.35 | 11 | $9.09 | 16 | $6.76 | 21 | $5.56 | 26 | $4.84 |
| 2 | 43.05 | 7 | 13.38 | 12 | 8.46 | 17 | 6.47 | 22 | 5.39 | 27 | 4.73 |
| 3 | 29.19 | 8 | 11.90 | 13 | 7.94 | 18 | 6.20 | 23 | 5.24 | 28 | 4.63 |
| 4 | 22.27 | 9 | 10.75 | 14 | 7.49 | 19 | 5.97 | 24 | 5.09 | 29 | 4.53 |
| 5 | 18.12 | 10 | 9.83 | 15 | 7.10 | 20 | 5.75 | 25 | 4.96 | 30 | 4.45 |

#### OPTION 2.   LIFE INCOME*

| Issue Age Male | Issue Age Female | Life | 5 Years Certain | 10 Years Certain | 20 Years Certain | Installment Refund | Issue Age Male | Issue Age Female | Life | 5 Years Certain | 10 Years Certain | 20 Years Certain | Installment Refund |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 34 | 39 | 4.11 | 4.10 | 4.08 | 4.00 | 3.98 | 59 | 64 | 6.56 | 6.45 | 6.15 | 5.28 | 5.78 |
| 35 | 40 | 4.16 | 4.15 | 4.13 | 4.04 | 4.03 | 60 | 65 | 6.74 | 6.62 | 6.28 | 5.31 | 5.90 |
| 36 | 41 | 4.21 | 4.20 | 4.18 | 4.08 | 4.07 | 61 | 66 | 6.93 | 6.79 | 6.41 | 5.35 | 6.03 |
| 37 | 42 | 4.27 | 4.26 | 4.23 | 4.12 | 4.12 | 62 | 67 | 7.13 | 6.97 | 6.55 | 5.39 | 6.16 |
| 38 | 43 | 4.33 | 4.32 | 4.29 | 4.16 | 4.16 | 63 | 68 | 7.35 | 7.16 | 6.69 | 5.43 | 6.29 |
| 39 | 44 | 4.39 | 4.38 | 4.34 | 4.21 | 4.21 | 64 | 69 | 7.57 | 7.36 | 6.83 | 5.47 | 6.44 |
| 40 | 45 | 4.45 | 4.44 | 4.40 | 4.26 | 4.27 | 65 | 70 | 7.81 | 7.56 | 6.98 | 5.51 | 6.59 |
| 41 | 46 | 4.52 | 4.51 | 4.47 | 4.30 | 4.32 | 66 | 71 | 8.06 | 7.79 | 7.12 | 5.54 | 6.75 |
| 42 | 47 | 4.59 | 4.58 | 4.53 | 4.35 | 4.37 | 67 | 72 | 8.33 | 8.03 | 7.27 | 5.57 | 6.91 |
| 43 | 48 | 4.67 | 4.65 | 4.60 | 4.40 | 4.43 | 68 | 73 | 8.62 | 8.26 | 7.42 | 5.60 | 7.08 |
| 44 | 49 | 4.75 | 4.73 | 4.67 | 4.45 | 4.49 | 69 | 74 | 8.92 | 8.52 | 7.58 | 5.63 | 7.26 |
| 45 | 50 | 4.83 | 4.81 | 4.75 | 4.50 | 4.56 | 70 | 75 | 9.24 | 8.78 | 7.73 | 5.65 | 7.46 |
| 46 | 51 | 4.92 | 4.89 | 4.82 | 4.56 | 4.62 | 71 | 76 | 9.59 | 9.06 | 7.88 | 5.67 | 7.66 |
| 47 | 52 | 5.01 | 4.98 | 4.90 | 4.61 | 4.69 | 72 | 77 | 9.95 | 9.34 | 8.03 | 5.69 | 7.86 |
| 48 | 53 | 5.10 | 5.07 | 4.99 | 4.66 | 4.76 | 73 | 78 | 10.33 | 9.63 | 8.18 | 5.70 | 8.08 |
| 49 | 54 | 5.20 | 5.17 | 5.07 | 4.72 | 4.84 | 74 | 79 | 10.74 | 9.94 | 8.32 | 5.71 | 8.32 |
| 50 | 55 | 5.31 | 5.27 | 5.17 | 4.77 | 4.91 | 75 | 80 | 11.19 | 10.27 | 8.46 | 5.72 | 8.56 |
| 51 | 56 | 5.42 | 5.38 | 5.26 | 4.83 | 4.99 | 76 | 81 | 11.66 | 10.59 | 8.60 | 5.73 | 8.81 |
| 52 | 57 | 5.54 | 5.49 | 5.36 | 4.89 | 5.08 | 77 | 82 | 12.15 | 10.93 | 8.73 | 5.73 | 9.09 |
| 53 | 58 | 5.66 | 5.61 | 5.46 | 4.94 | 5.17 | 78 | 83 | 12.67 | 11.27 | 8.86 | 5.74 | 9.37 |
| 54 | 59 | 5.79 | 5.73 | 5.56 | 5.00 | 5.26 | 79 | 84 | 13.25 | 11.63 | 8.97 | 5.74 | 9.67 |
| 55 | 60 | 5.93 | 5.87 | 5.67 | 5.05 | 5.35 | 80 | 85 | 13.85 | 11.99 | 9.08 | 5.75 | 9.98 |
| 56 | 61 | 6.08 | 6.00 | 5.79 | 5.10 | 5.45 | 81 | 86 | 14.49 | 12.36 | 9.18 | 5.75 | 10.32 |
| 57 | 62 | 6.23 | 6.14 | 5.90 | 5.15 | 5.56 | 82 | 87 | 15.17 | 12.74 | 9.28 | 5.75 | 10.66 |
| 58 | 63 | 6.39 | 6.29 | 6.02 | 5.21 | 5.67 | 83 | 88 | 15.92 | 13.11 | 9.36 | 5.75 | 11.03 |

#### OPTION 3.   JOINT AND TWO-THIRDS TO SURVIVOR*

Age of Other Payee.

Age of Annuitant (Male, age on first line. Female age on second line).

| M | F | 55 60 | 56 61 | 57 62 | 58 63 | 59 64 | 60 65 | 61 66 | 62 67 | 63 68 | 64 69 | 65 70 | 66 71 | 67 72 | 68 73 | 69 74 | 70 75 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 55 | 60 | $5.59 | $5.65 | $5.71 | $5.78 | $5.84 | $5.91 | $5.98 | $6.05 | $6.11 | $6.18 | $6.25 | $6.32 | $6.39 | $6.46 | $6.53 |
| 56 | 61 | 5.59 | 5.65 | 5.72 | 5.78 | 5.85 | 5.92 | 5.99 | 6.06 | 6.13 | 6.20 | 6.27 | 6.34 | 6.42 | 6.49 | 5.56 | 6.64 |
| 57 | 62 | 5.65 | 5.72 | 5.78 | 5.85 | 5.92 | 5.99 | 6.07 | 6.14 | 6.21 | 6.29 | 6.36 | 6.44 | 6.51 | 6.59 | 6.67 | 6.74 |
| 58 | 63 | 5.71 | 5.78 | 5.85 | 5.92 | 6.00 | 6.07 | 6.14 | 6.22 | 6.30 | 6.37 | 6.45 | 6.53 | 6.61 | 6.69 | 6.77 | 6.85 |
| 59 | 64 | 5.78 | 5.85 | 5.92 | 6.00 | 6.07 | 6.15 | 6.23 | 6.30 | 6.38 | 6.47 | 6.55 | 6.63 | 6.71 | 6.80 | 6.88 | 6.96 |
| 60 | 65 | 5.84 | 5.92 | 5.99 | 6.07 | 6.15 | 6.23 | 6.31 | 6.39 | 6.47 | 6.56 | 6.64 | 6.73 | 6.82 | 6.90 | 6.99 | 7.08 |
| 61 | 66 | 5.91 | 5.99 | 6.07 | 6.14 | 6.23 | 6.31 | 6.39 | 6.48 | 6.56 | 6.65 | 6.74 | 6.83 | 6.92 | 7.01 | 7.11 | 7.20 |
| 62 | 67 | 5.98 | 6.06 | 6.14 | 6.22 | 6.30 | 6.39 | 6.48 | 6.57 | 6.66 | 6.75 | 6.84 | 6.94 | 7.03 | 7.13 | 7.22 | 7.32 |
| 63 | 68 | 6.05 | 6.13 | 6.21 | 6.30 | 6.38 | 6.47 | 6.56 | 6.66 | 6.75 | 6.85 | 6.94 | 7.04 | 7.14 | 7.24 | 7.34 | 7.44 |
| 64 | 69 | 6.11 | 6.20 | 6.29 | 6.37 | 6.47 | 6.56 | 6.65 | 6.75 | 6.85 | 6.95 | 7.05 | 7.15 | 7.25 | 7.36 | 7.47 | 7.57 |
| 65 | 70 | 6.18 | 6.27 | 6.36 | 6.45 | 6.55 | 6.64 | 6.74 | 6.84 | 6.94 | 7.05 | 7.15 | 7.26 | 7.37 | 7.48 | 7.59 | 7.70 |
| 66 | 71 | 6.25 | 6.34 | 6.44 | 6.53 | 6.63 | 6.73 | 6.83 | 6.94 | 7.04 | 7.15 | 7.26 | 7.37 | 7.49 | 7.60 | 7.72 | 7.84 |
| 67 | 72 | 6.32 | 6.42 | 6.51 | 6.61 | 6.71 | 6.82 | 6.92 | 7.03 | 7.14 | 7.25 | 7.37 | 7.49 | 7.61 | 7.73 | 7.85 | 7.97 |
| 68 | 73 | 6.39 | 6.49 | 6.59 | 6.69 | 6.80 | 6.90 | 7.01 | 7.13 | 7.24 | 7.36 | 7.48 | 7.60 | 7.73 | 7.85 | 7.98 | 8.11 |
| 69 | 74 | 6.46 | 6.56 | 6.67 | 6.77 | 6.88 | 6.99 | 7.11 | 7.22 | 7.34 | 7.47 | 7.59 | 7.72 | 7.85 | 7.98 | 8.11 | 8.25 |
| 70 | 75 | 6.53 | 6.64 | 6.74 | 6.85 | 6.96 | 7.08 | 7.20 | 7.32 | 7.44 | 7.57 | 7.70 | 7.84 | 7.97 | 8.11 | 8.25 | 8.39 |

*Figures for ages not shown will be furnished on request.

K-0016

## GENERAL PROVISIONS

### 1. DEFINITIONS:

The following terms are defined solely for the purpose of interpreting and administering this Agreement:

TRANSMISSION, shall mean maturity of a policy as a result of, (a) the death of the Insured, or (b) endowment, or (c) surrender of such policy for its cash value, or (d) final amounts payable after termination of Family Income payments.

NET PROCEEDS, when applicable to the termination date, shall be the net amount payable under a policy on the termination date, excluding, however, any unearned premiums paid in advance thereunder.

NET PROCEEDS, when applicable to any time other than the termination date, shall be the single sum which equals (a) the then commuted value of the remainder of the death benefit of a policy containing a Family Income provision, or (b) the then commuted value of any installments certain not yet due under Options A or B, or (c) the amount then held under Options C or D, including any unpaid accrued interest thereon, as the case may be.

CHILDREN, if not designated by name, shall include only the lawful and legally ado d sons and daughters of the primary payee and not grandchildren or other descendants. This classification is available only the primary payee was the Insured hereunder.

BY REPRESENTATION shall mean succeeding, by reason of the death of a parent, to net proceeds which would have been apportioned to or further held for such parent, had he lived.

ESTATE OF SURVIVOR shall mean the executors or administrators of the last survivor of the payees designated in preceding Sections of the same Table.

OPTION shall mean the corresponding Option appearing in the policy under the heading "Optional Modes of Settlement" to be attached hereto. If the policy does not contain said "Optional Modes of Settlement", this Agreement shall constitute a request to add hereto "Optional Modes of Settlement" corresponding to that contained in policies which the Company is now issuing.

POLICY shall mean annuity contract when such wording is applicable; and masculine pronouns shall include the feminine.

### 2. PAYMENTS UNDER A TABLE:

(a) If there is more than one Table, each Table shall be considered separately in construing the provisions of this Agreement.

(b) Payment of the net proceeds under a Table shall be in accordance with the first Section thereof in which there is a payee surviving, and at the death of the last survivor of the payees designated in such Section, payment of any remaining net proceeds shall be in accordance with the next succeeding Section in which there is a then surviving payee, and so on from Section to Section until payment shall have been made of the entire net proceeds under such Table.

(c) In order to be entitled to receive payments provided for him under a Section, a payee must be living on their respective due dates.

(d) If a Section of a Table designates two or more payees but does not designate as payees by representation the children of deceased children of the primary payee, payment of net proceeds under such Section shall be as follows:

If such Section does not provide for division of net proceeds into separate shares, such payees who are living at the time of each payment shall share the payments and such Section and such shares shall be equal unless otherwise expressly provided therein:

If such Section provides for division of net proceeds into separate shares, one such share, payable as provided in such Section, shall be for each such payee who is living at the death of the last survivor of the payees designated in preceding Sections, and such shares shall be equal unless otherwise expressly provided therein. At the subsequent death of a payee designated in such Section, any net proceeds then held for such payee shall be paid to any then surviving payees of such Section in single sums proportionate to their original shares.

(e) If a Section of a Table designates as payees by representation the children of deceased children of the primary payee, payment of net proceeds under such Section shall be as follows:

Net proceeds at the death of the last survivor of the payees designated in preceding Sections shall be divided into equal separate shares, one share, payable as provided in such Section, for each then surviving designated child of the primary payee, if any, and one share, payable in equal single sums, to the then surviving children, if any, of each deceased designated child of the primary payee;

At the subsequent death of a child of the primary payee, any net proceeds then held for such child shall be paid in equal single sums to his then surviving children, if any, otherwise such net proceeds shall be divided into equal separate shares, one share, payable in one sum, to each then surviving designated child of the primary payee, if any, and one share, payable

### 3. PRIVILEGES:

(a) If a payee designated in a Section of a Table is given in such Section a privilege of withdrawal or commutation, such payee may, subject to any limitations with respect thereto stated in such Section and upon written notice to the Insurance Company accompanied by this Agreement, make withdrawals in amounts of not less than $100.00 each from any net proceeds held for him in such Section under Options C or D, or, as the case may be, elect to receive the commuted value of any installment certain or share therein payable to him in such Section under Options A or B, but under Option B only if the right to installments for life has expired with the primary payee.

Wherever the following appear herein.............. they shall be read as:

| | |
|---|---|
| Option A | Option 3 |
| Option B | Option 4 |
| Option C | Option 1 |
| Option D | Option 2 |

K-0017

(b) If a primary payee designated in Section 1 of a Table is given in such Section the privilege of substituting payment under another Option:

The amount to be applied under each other Option shall be the net proceeds held for such payee in Section 1 at the time such privilege is exercised, but such privilege shall not be available when such net proceeds are less than $1,000.

A primary payee may make only one such substitution, and must be by written notice accompanied by this Agreement.

## 4. OPTION PAYMENTS ALTERED OR TERMINATED:

After thirty full years following the termination date of a policy, no Option payments shall be made under any Section of a [illegible] or placed at the death of the last survivor of the primary payees designated in Section 1 shall be less than $1,000, then such share shall be immediately paid in one sum. If net proceeds held for a payee under Option C be reduced by withdrawals to less than $1,000, then such net proceeds shall be immediately paid in one sum.

If the Option payments for the fractional part of a year shall amount to less than $10.00 each, the Company will pay at such intervals as will make each payment amount to at least $10.00. If a Section of a Table provides for Option D installments and the sum of one year's tabular installments shall be less than 5% of the net proceeds applied under that Option, then the Company shall increase each such tabular installment by the amount necessary to achieve such percentage, any provision of said Option for a different percentage notwithstanding.

## 5. RELIANCE ON AFFIDAVITS:

Before permitting or taking any action provided by this Agreement which is contingent upon the death or survival of any payee, the Company shall be furnished with due proof thereof. As to any facts relating to any payee, including dates of birth and death, and identity, the Company may rely upon any affidavit or other written evidence deemed satisfactory to it, and is hereby released from all liability in relying and acting upon the statements contained therein.

## 6. EFFECT OF CHANGES OF BENEFICIARY AND EXERCISE OF PRIVILEGES UNDER THIS AGREEMENT:

If allowed by the statutes of the state of residence, the primary payee may, without the consent of a secondary payee, (a) change the designation of contingent beneficiaries, and (b) freely exercise the privileges contained in Section 1 of any Table herein. In the absence of an enabling statute, the consent of the secondary payee (s) shall be required for the exercise of all such rights.

## 7. PAYMENT TO MINORS:

Any proceeds due and payable to any minor payee hereunder shall be paid to the legally appointed guardian of such minor except to the extent that provision is made by statute for payment directly to a minor.

Dated    CHARTER SECURITY LIFE INSURANCE COMPANY (NY) this    SEVENTEENTH

day of    JUNE    , 1983

CHARTER SECURITY LIFE INSURANCE COMPANY
(NEW YORK)

REGISTRAR

VICE PRESIDENT

## SUPPLEMENTARY AGREEMENT

### (No. SC1126 )

Due to termination, as of __May 5,__ __19__ __83__ of Policy No(s) __83A08153__ ........ issued
by          Charter Security Life Insurance Company (New York)          on the life of __Dennis J. Dixon__ .........
the undersigned hereby requests that the aggregate net proceeds payable under said pol     (s) as of the termination date be paid
to the payees designated in, and in the order and manner provided in, the following Tabl     Tables and in the General Provisions
of this Agreement.

The undersigned surrenders said policy(s) to the Insurance Company and, concurrently herewith, revokes any beneficiary designa-
tion and any election of settlement heretofore made under the said policy(s).

| PAYEES | MANNER OF PAYMENT | PRIVILEGES |
|---|---|---|
| TABLE I | | |
| SECTION ONE - PRIMARY PAYEE | | |
| Dennis Dixon<br>Laurel Lane<br>West Kingston, RI 02892 | Monthly payments in the amount of $1,450.45, increasing 3% annually, commencing on June 6, 1983, for a period of 240 months certain and life thereafter. | |
| SECTION TWO-CONTINGENT PAYEE | | |
| Katherine T. Dixon, Wife | In the same manner as the Primary Payee, for the period certain. | |

(SEE OTHER SIDE FOR ANY COMPANY ENDORSEMENTS)

SUP-100

K-0019

# Charter Security Life Insurance Company (New York)

### ENDORSEMENT

This amendment is attached to and forms part of the policy.

The Annual Statement of Values provision on Page 7 is hereby amended as follows:

The words "As of each contract anniversary" are replaced with the words "At least once each year".



President

RA-104E1
4-84



**Charter
Security
Life**

Charter Security Life Insurance Company (New York)
720 Fifth Avenue
New York, New York 10019
Telephone 212-397-2250

CERTIFIED MAIL RETURN RECEIPT REQUESTED

July 14, 1983

Mr. Kurt Snyder
Dean Witter Reynolds
111 E. Onondaga Street
Syracuse, New York  13202

RE:  Dennis Dimon
Policy #83A08153
NSC 1126

Dear Kurt:

As outlined in our telephone conversation, due to a clerical error
the option indicated on the above supplementary contract for Dennis
Dimon was incorrectly typed as 240 months certain and life thereafter
instead of 240 months only.

Enclosed is a new contract correctly stating the option elected.  Please
be advised that the former contract mailed to Robert Foley is null and
void.  I would appreciate it if you will return that contract to my
attention.

Thank you for your cooperation and again, my apologies for this oversight

Sincerely,

Barbara Boehm, Vice President
Policyowner Service Department

BAB:aw

Enc.



EXHIBIT

3

000021

A Member of Charter Insurance Group, Inc.



Lumbermens Mutual Casualty Company • American Motorists Insurance Company
American Manufacturers Mutual Insurance Company • American Protection Insurance Company

Long Grove, IL 60049 · 312|540-2000

August 12, 1983

Mr. Robert A. Foley
Dean Witter Reynolds, Inc.
One Boston Place
Boston, Massachusetts  02108

Dear Mr. Foley:

DENNIS DIMON
CHARTER SECURITY POLICY NO: 83 A 08153
OUR FILE NO: 399 LM 106125-Z

I received the replacement policy issued by Charter
Security Life Insurance Company (New York) changing
the terms of the annuity from 240 months certain and
life thereafter to 240 months certain only.

I am advised by Mr. Hughes of Lattie Associates that your
quotation was to provide an annuity which would pay
$1,450.45 per month for the first year increasing annually
at a rate of 3% compounded annually for 240 months certain
and life thereafter for a single premium of $175,000.
This was the benefit to be provided under the terms of a
general release and settlement agreement approved by
Judge Pettine of the United States District Court for the
District of Rhode Island.

The agreed upon premium was paid and a policy issued which
is now in the files of the contract owner, American Motorists
Insurance Company, providing benefits required by the release,
settlement agreement and court order. I consider the original
annuity contract valid and enforceable and will retain it
in our files.



EXHIBIT

4



RECEIVED

★ AUG 17 1983 ★

B. BOEHM

000021

Mr. Robert A. Foley
August 12, 1983
-2-

I intended to return the replacement contract issued by
Barbara Boehm of Charter Security, but it was lost with
my briefcase on August 11, 1983.


Very truly yours,

AMERICAN MOTORISTS INSURANCE COMPANY


John L. Noe
Home Office Claim

JLN:bw

cc:   Ms. Barbara Boehm
      Vice President
      Charter Security Life Insurance Company
      (New York)
      720 Fifth Avenue
      New York City, New York   10019

      Mr. Roger Hughes
      Lattie Associates, Attorneys
      30-31 Union Wharf
      Boston, MA  02109





**Charter Security Life**

Charter Security Life Insurance Company (New York)
720 Fifth Avenue
New York, New York 10019
Telephone 212-397-2350

September 26, 1983

Mr. John L. Noe
Home Office Claim
American Motorists
Insurance Company
Long Grove, Illinois 60049



EXHIBIT

5

Re:  Dennis Dimon - Policy No. 83 A 08153
     Your File No. 399 LM J06125-Z

Dear Mr. Noe:

I am in receipt of your letter to Barbara Boehm, Vice President of Charter Security Life Insurance Company (New York ("CSL(NY)"), regarding the annuity policy (Policy No. 83 A 08153) issued by CSL(NY) to Dennis Dimon.

According to information you received from Mr. Hughes of Lattie Associates, Robert Foley of Dean Witter Reynolds, Inc., allegedly offered to provide Mr. Dimon with a CSL(NY) annuity which would pay $1,450.45 per month for the first year increasing annually at a rate of 3% compounded annually for 240 months certain and life thereafter based on a single premium of $175,000.00.

Contrary to the information you received from Mr. Hughes, there is nothing to indicate that anything other than a single premium immediate annuity with a 20 year (i.e., 240 months) certain period was applied for. As you can see from the attached copy of Mr. Dimon's application, which American Motorists Insurance Company signed as applicant, a 20 year certain policy was applied for. I have also attached for your reference, a copy of a quotation sheet from CSL(NY) to Mr. Foley which clearly shows that CSL(NY)'s quote was based on the issuance of a certain period annuity without a life option. As previously explained by Ms. Boehm in her letter to Mr. Kurt Snyder of Dean Witter Reynolds dated July 14, 1983 (see enclosed copy), the option indicated on the Supplementary Contract originally sent to Dean Witter Reynolds on June 17, 1983 for delivery to your office was incorrectly typed as a 240 month certain and life thereafter annuity instead of 240 months only. Again, on behalf of CSL(NY), I apologize for this oversight.

000027

A Member of Charter Insurance Group, Inc.

Mr. John L. Noe
Page 2
September 26, 1983


Based on the foregoing, CSL(NY) guarantees to continue to
pay Mr. Dimon under the terms of his policy a $1,450.45 monthl·
annuity during the first policy year, which will increase
annually at a rate of 3% compounded annually for 240 months
certain. No·payments will be made beyond the expiration of th：
240 month period. Accordingly, the original Supplementary
Contract mailed to Robert Foley and in your possession is null
and void. I would appreciate your returning that contract to：

               Barbara Boehm
               Vice President
               Policyowner Service Department
               Charter Security Life
               Insurance Company (New York)
               720 Fifth Avenue
               New York, New York 10019

By copy of this letter, I am instructing Ms. Boehm to sen l
to your attention a correct copy of the Supplementary Contract
for Dennis Dimon which you stated was lost with your briefcase on
August 11, 1983.

If I can be of any further assistance in this matter, ple ise
do not hesitate to contact me at the above address.

                         Very truly yours,



                         Robert Liguori
                         Counsel

RL/spf
Enclosures

cc:  Ms. Barbara Boehm

     Mr. Robert A. Foley
     Dean Witter Reynolds, Inc.
     One Boston Place
     Boston, Massachusetts 02108

     Mr. Roger Hughes
     Lattie Associates, Attorneys
     30-31 Union Wharf
     Boston, MA 02109

000026

KEMPER GROUP

Lumbermens Mutual Casualty Company • American Motorists Insurance Company
American Manufacturers Mutual Insurance Company • American Protection Insurance Company

Long Grove, IL 60049 · 312/540-2000

October 10, 1983

RECEIVED
OCT 13 1983
B. BOEHM

Mr. Robert Liguori, Counsel
Charter Security Life Insurance
    Company (New York)
720 Fifth Avenue
New York, New York   10019

Dear Mr. Liguori:

DENNIS DIMON
CHARTER SECURITY POLICY: 83A08153
OUR FILE NO: 399 LM 106125-Z

In reply to your September 26, 1983, Sections 14 and 15
of the application that I signed were blank.  The entries
now appearing were filled in after I returned the signed
application.

The original annuity policy received was for a term of
240 months certain and life thereafter as ordered and
agreed upon between Mr. Hughes and Mr. Foley.  Your agent,
Mr. Foley further confirmed this to me by telephone in
April, 1983.  May I suggest you contact him to verify
this?

I intend to retain the original policy in our files and
consider it to be valid and enforceable.

Very truly yours,

AMERICAN MOTORISTS INSURANCE COMPANY

John L. Noe
Home Office Claim

JLN:ml

EXHIBIT
6

cc: Mr. Robert A. Foley
    Dean Witter Reynolds, Inc.
    One Boston Place
    Boston, MA  02108

    Mr. Roger Hughes
    Latti Assoc., Attorneys
    30-31 Union Wharf
    Boston, MA  02109

cc: Ms. Barbara Boehm
    Vice President
    Policyowner Service Dept.
    Charter Security Life
        Insurance Co. (New York)
    720 Fifth Avenue
    New York, NY  10019

000029



Charter Security Life Insurance Company (of New York)
720 Fifth Avenue
New York, New York 10019
Telephone 212-397-2350

October 14, 1983

Mr. John L. Noe
Home Office Claim
American Motorists Insurance Company
Long Grove, IL 60049

                Re:  Dennis Dimon
                      Contract No.  83A08153
                      Your File No.  399LM10612 -Z

Dear Mr. Noe:

As was indicated in Mr. Robert Ligouri's letter of September 26, 1983, we are
enclosing a corrected Supplementary Contract in regards to Mr. Dimon's Single
Premium Immediate Annuity. This contract has been updated to reflect monthly
payments for a period of 240 months only.

Please see that the original Supplementary Contract, which was mailed to
Robert Foley, is returned to me, as that contract is no longer valid.

Please accept our apologies for any inconvenience this matter has caused you.

                Sincerely,

                Barbara Boehm, Vice President
                Policyowner Service Department

BAB/cg

Enclosure

**EXHIBIT**

tabbies

8

000023

A Member of Charter American Group, Inc.

  

Lumbermens Mutual Casualty Company • American Motorists Insurance Company
American Manufacturers Mutual Insurance Company • American Protection Insurance Company

Long Grove, IL 60049 · 312/540-2000

October 12, 1983

Ms. Barbara Boehm, Vice President
Policyowner Service Department
Charter Security Life Insurance Company (New York)
720 Fifth Avenue
New York, New York  10019

Dear Ms. Boehm:

RE:  DENNIS DIMON
     CONTRACT NO. 83408153
     OUR FILE NO. 399 LM 156125 Z

In reponse to your October 14, 1983 I reject and return
herewith the Supplementary Agreement and General Provisions
attached thereto. The original annuity policy will be re-
tained in the files of American Motorists Insurance
Company and considered valid and enforceable.

Very truly yours,

AMERICAN MOTORISTS INSURANCE COMPANY

John L. Noe
Home Office Claims

JLN/lz

cc:  Mr. Roger Hughes
     Latti  Associates, Attorneys
     30-31 Union Wharf
     Boston, MA  02109

cc:  Mr. Robert A. Foley
     Dean Witter Reynolds, Inc.
     One Boston Place
     Boston, MA  02108



EXHIBIT

7