# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS (BOSTON)

| | |
|---|---|
| DENNIS DIMON <br>        Plaintiff <br><br>    v. <br><br> MICHAEL B. LATTI, LATTI <br> ASSOCIATES, LATTI & ANDERSON <br> LLP, METROPOLITAN LIFE <br> INSURANCE COMPANY, KEMPER <br> INSURANCE COMPANY, and <br> MORGAN STANLEY DW, INC., <br>        Defendants | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )     Civil Action No. 05-11073-MEL |

## MEMORANDUM OF LAW OF
## DEFENDANT KEMPER INSURANCE COMPANY IN SUPPORT OF
## ITS MOTION FOR SUMMARY JUDGMENT

Timothy O'Driscoll (Admitted Pro Hac Vice)
Kevin L. Golden (Admitted Pro Hac Vice)
DRINKER BIDDLE & REATH LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996
(215) 988-2700

Local Counsel
Kevin Murphy
Anthony B. Fioravanti
YURKO & SALVESEN, P.C.
One Washington Mall, 11th Floor
Boston, MA 02108-2603
(617) 723-6900

Attorneys for Defendant,
Kemper Insurance Company

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES ...................................................................................................... ii

I.      INTRODUCTION ......................................................................................................... 1

II.     FACTS ........................................................................................................................... 1

        A.      Settlement Of The Underlying Personal Injury Action ...................................... 1

        B.      The Purchase And Issuance Of The Annuity ...................................................... 4

        C.      Charter Security's Subsequent Attempt To Change The Terms Of The
                Annuity ................................................................................................................ 5

        D.      Plaintiff Files The Instant Lawsuit ..................................................................... 7

III.    LEGAL ARGUMENT .................................................................................................. 8

        A.      Legal Standard .................................................................................................... 8

        B.      Choice Of Law .................................................................................................... 9

        C.      Plaintiff's Claims Against Kemper Are Time-Barred ...................................... 10

                1.      Plaintiff's Claim Against Kemper For Breach of Contract Is Time-
                        Barred .................................................................................................... 10

                2.      Plaintiff's Claim Against Kemper For Negligent Misrepresentation
                        Is Time-Barred ...................................................................................... 11

        D.      Plaintiff Cannot Establish The Requisite Elements Of His Claims Against
                Kemper .............................................................................................................. 12

                1.      Plaintiff Cannot Establish The Requisite Elements Of A Claim
                        Against Kemper For Breach Of Contract ............................................. 12

                2.      Plaintiff Cannot Establish The Requisite Elements Of A Claim
                        Against Kemper For Negligent Misrepresentation ............................... 14

IV.     CONCLUSION ........................................................................................................... 15

# TABLE OF AUTHORITIES

## CASES

Page

*Anderson v. Liberty Lobby,*
477 U.S. 242 (1986)................................................................9

*Barbour v. Dynamics Research Corp.,*
63 F.3d 32 (1st Cir. 1995)........................................................8

*Brennan v. Hendrigran,*
888 F.2d 189 (1st Cir. 1989).....................................................8

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)................................................................8

*Cleveland v. Policy Mgmt. Sys. Corp.,*
526 U.S. 795 (1999)................................................................9

*Constructive Hands, Inc. v. Baker,*
446 F. Supp. 2d 88 (N.D.N.Y. 2006).......................................12

*Doyle v. Hasbro, Inc.,,*
103 F.3d 186 (1st Cir.1996).....................................................14

*Ely-Cruikshank Co., Inc. v. Bank of Montreal,*
615 N.E.2d 985 (N.Y. Ct. App. 1993)..................................10, 11

*Espie v. Murphy,*
No. 2005-07034, 2006 N.Y. App. Div. LEXIS 14544 (N.Y. App. Div.
Dec. 5, 2006)........................................................................12

*Fandy Corp. v. Lung-Fong Chen,*
691 N.Y.S.2d 572 (N.Y. App. Div. 1999)..................................11

*Hydro Investors, Inc. v. Trafalgar Power, Inc.,*
227 F.3d 8 (2d Cir. 2000)........................................................14

*Levin v. Berley,*
728 F.2d 551 (1st Cir. 1984).....................................................11

*Millipore Corp. v. Travelers Indem. Co.,*
115 F.3d 21 (1st Cir. 1997)........................................................9

*Nota Const. Corp. v. Keyes Assocs., Inc.,*
    694 N.E.2d 401 (Mass. Ct. App. 1998) .................................................15

*Patsos v. First Albany Corporation,*
    741 N.E.2d 841 (Mass. 2001) ..............................................................11

*Reicher v. Berkshire Life Ins. Co. of Am.,*
    360 F.3d 1 (1st Cir. 2004) ......................................................................9

*Rogers v. Fair,*
    902 F.2d 140 (1st Cir. 1990) ..............................................................8, 9

*Sampson v. MacDougall,*
    802 N.E.2d 602 (Mass. Ct. App. 2004) ...............................................15

*Singarella v. Boston,*
    173 N.E.2d 290 (Mass. 1961) .........................................................13-14

*Sitkiewicz v. County of Sullivan,*
    681 N.Y.S.2d 677 (N.Y. App. Div. 1998) ...........................................10

*St. George Hotel Assocs. v. Shurkin,*
    786 N.Y.S.2d 56 (N.Y. App. Div. 2004) .........................................10-11

*The Travelers Indem. Co. of Illinois v. Wolverine Corp.,*
    No. 03-10164, 2005 U.S. Dist. LEXIS 31651 (D. Mass. Dec. 8, 2005)......................9

*Veal v. Geraci,*
    23 F.3d 722 (2nd Cir. 1994)..................................................................11

## STATUTES AND RULES

Fed. R. Civ. P. 56(c) .................................................................................8

Mass. Gen. Laws ch. 260, § 2 (2006) .....................................................11

Mass. Gen. Laws ch. 260, § 2A (2006) ...................................................11

N.Y. C.P.L.R. 213(2006) .........................................................................12

## I.    __INTRODUCTION__

This lawsuit centers on a dispute involving the terms of an annuity policy funding the settlement of an underlying personal injury action that concluded in 1983.  Plaintiff has filed suit against four defendants, and has made purported claims against Kemper for breach of contract and negligent misrepresentation.  Plaintiff's claims against Kemper cannot be sustained for two separate and independent reasons:   (1) both claims are barred by the applicable statutes of limitations; and (2) in any event, Plaintiff cannot establish the essential elements of his claims.  For each of these reasons, Kemper is entitled to summary judgment.

## II.    __FACTS__

### A.    __Settlement Of The Underlying Personal Injury Action.__

In January 1981, Plaintiff was injured while serving as a crew member of the Jenny C. Inc.  See Plaintiff's Complaint ("Compl.") at ¶ 10 (attached hereto as Exhibit A).  Plaintiff subsequently commenced a personal injury lawsuit styled Dennis Jay Dimon v. Jenny C., Inc., No. 81-0063, in the United States District Court for the District of Rhode Island (the "Underlying Action").   See Transcript of Guardian Ad Litem Hearing ("Guardian Hrg.") (attached hereto as Exhibit B).  As his legal counsel in the Underlying Action, Plaintiff retained and was represented by the law firm of Latti Associates.[1]  See Compl. at ¶ 12; Deposition Transcript of Michael B. Latti ("Latti Dep.") at 24:23-25:14 (attached hereto as Exhibit C).  The Underlying Action ultimately proceeded to trial, where Plaintiff was awarded a verdict in the amount of $710,000.  See Compl. at ¶ 11.

---

[1]    Michael Latti, Esq. ("Mr. Latti") of Latti Associates, and Roger Hughes, Esq. ("Mr. Hughes"), formerly of Latti Associates, acted as Plaintiff's lawyers in the Underlying Action.  See Latti Dep. at 24:23-25:14, 26:16-18, 31:7-22. Latti Associates, Mr. Latti, and Mr. Hughes are referred to collectively herein as "Plaintiff's lawyers."

Following the verdict in the Underlying Action, Plaintiff's lawyers agreed to a settlement of the Underlying Action with the defendant, the defendant's primary insurer, and Kemper, which was the defendant's excess insurer.[2]  See Guardian Hrg. at 1:20-23, 9:3-14; Deposition Transcript of William Mensie ("Mensie Dep.") at ex. 5 (attached hereto as Exhibit D).[3]  The terms of the settlement were negotiated with Plaintiff's lawyers in April, 1983.  See Guardian Hrg. at 7:11-8:14, 13:14-14:20, 16:19-23; Mensie Dep. at at ex. 5.  The settlement agreement provided that the primary insurer and Kemper would pay to Plaintiff a lump sum in the amount of $250,000.  See Guardian Hrg. at 6:19-20; Mensie Dep. at ex. 5.  The settlement agreement further provided, upon Plaintiff's lawyers' insistence, that Kemper would pay an additional lump sum in the amount of $175,000 so that Plaintiff's lawyers could purchase an annuity to fund a stream of future periodic payments for Plaintiff.  See Guardian Hrg. at 7:20-8:4; Mensie Dep. at 79:18-80:11 and at ex. 5.

Specifically, Plaintiff's lawyers advised that they were able to purchase, for a premium of $175,000, an annuity that would pay out a stream of periodic payments as follows:  $1,450 per month for life, with a 3 % increase compounded annually, and 20 years certain.  See Guardian Hrg. at 6:20-23, 7:23-8:4, Mensie Dep. at ex. 5.  Plaintiff's lawyers stated that they had obtained this annuity quote from Charter Security Life Insurance Company ("Charter Security Life")

---

[2]    Several companies traded under the name of Kemper, including "American Motorists Insurance Company."  For the purposes of the instant Motion, references in the supporting exhibits to "American Motorists Insurance Company" may be considered references to Kemper.  For the Court's ease of reference, wherever possible, the instant Motion will make reference only to Kemper, rather than to "American Motorists Insurance Company."

[3]    Mr. Mensie was the witness designated by Kemper in the instant lawsuit for the purposes of its Fed. R. Civ. P. 30(b)(6) deposition.

through Plaintiff's lawyers' broker, Dean Witter, Inc. ("Dean Witter").[4]  See Latti Dep. at 71:2-11; Mensie Dep. at ex. 6.[5]

On or about April 19, 1983, Plaintiff signed a "General Release" memorializing the terms of the settlement and the payments due to Plaintiff, specifically, a lump sum payment of $250,000, and $1,450 per month for life, with a 3 % increase compounded annually, and 20 years certain.  See Mensie Dep. at 220:13-221-9, and at ex. 10.  The "General "Release" provided that the monthly payments would be paid from a "fully paid annuity contract for [Plaintiff's] benefit with Charter [Security] Life[.]"  See Mensie Dep. at ex. 10.  Plaintiff's lawyers prepared a "settlement sheet" detailing the total amount of the cash payment that Plaintiff would receive following deductions for fees and costs, and also noting that the cost of the annuity was $175,000.  See Latti Dep. at ex. 1.

On or about April 22, 1983, in order to ensure that Plaintiff had a full understanding of the terms of this settlement, the court in the Underlying Action appointed one Leonard DeCof ("Mr. Decof") as guardian ad litem for Plaintiff.  See Guardian Hrg. at 1:15-18, 2:24-25, 3:3-5.  On May 3, 1983, Mr. DeCof appeared before the court in the Underlying Action in order to testify as to the background and terms of the settlement.  Id. at 1:1, 1:6-7, 1:15-2:12, 6:19-23, 7:21-8:25, 13:16-18, 14:2-15:9, 16:19-23.  Mr. Decof testified that the settlement provided, at the insistence of Plaintiff's lawyers, that the defendants would pay Plaintiff's lawyers the sum of

---

[4]    Charter Security Life is now known as Metropolitan Life Insurance Company ("Metropolitan Life"), which has been named as a defendant in this lawsuit. Dean Witter is now known as Morgan Stanley, DW, Inc. ("Morgan Stanley"), which also has been named as a defendant in this lawsuit.

[5]    Specifically, on April 8, 1983, Charter Security Life had prepared a proposal of a "life annuity 20 year certain" that provided for "$1,450.45 per month for the first year [to] increase 3% per year[.]" See Latti Dep. at ex. 3, p. 3.

$175,000 so that Plaintiff's lawyers could purchase an annuity of their choice. Id. at 7:11-8:20. The court approved the settlement. Id. at 21:9-16.

**B.    The Purchase And Issuance Of The Annuity.**

On or about May 4, 1983, an annuity application from Charter Security Life was signed by Kemper. See Mensie Dep. at ex. 2. The annuity application required an annuity premium in the amount of $175,000. See Mensie Dep. at ex. 2. As payment for the annuity premium and in settlement of the Underlying Action, Kemper issued check number 250-0-008-585, made payable to Charter Security Life in the amount of $175,000 (the "Settlement Check"), and Kemper's counsel delivered the Settlement Check to Plaintiff's lawyer. See the Settlement Check (attached hereto as Exhibit E); Correspondence to Kemper dated May 3, 1983 ("May 3, 1983 Correspondence") (attached hereto as Exhibit F).

On or about June 17, 1983, Charter Security Life signed and issued a single premium deferred annuity contract (the "Annuity"). See Mensie Dep. at ex. 11. The Annuity provides that the "Single Premium payment for this contract was paid in advance." Id. at ex. 11, p. 5. As the annuity issuer, Charter Security Life became obligated to make the Annuity payments to Plaintiff (i.e., the annuitant). Id. at ex. 11, pp. 1, 5. The Annuity provides that it is a "Lifetime Annuity" and that "[Charter Security Life] will pay a lifetime monthly income to the Annuitant if living on the Annuity Date." Id. at ex. 11, p. 1. The Annuity also included a "Supplementary Agreement" further specifying that Plaintiff would receive monthly payments of "$1,450.45 each, increasing 3% annually, commencing June 6, 1983, for a period of 240 months certain and life thereafter." Id. at ex. 11.

4

C.    **Charter Security's Subsequent Attempt To Change The Terms Of The Annuity.**

On July 14, 1983 - approximately one month after Charter Security Life issued the Annuity and began making payments to Plaintiff in accordance therewith – Barbara Boehm of Charter Security Life sent correspondence to Kurt Snyder of Dean Witter, claiming that "due to a clerical error the option indicated on the above supplementary contract for [Plaintiff] was incorrectly typed as 240 months certain and life thereafter instead of 240 months only. Enclosed is a new contract...." See Deposition Transcript of Barbara Fasman ("Fasman Dep.") at ex. 3 (attached hereto as Exhibit G).[6] Mr. Snyder forwarded a copy of this correspondence to John Noe of Kemper, and on August 12, 1983, by correspondence to Robert Foley of Dean Witter, Mr. Noe responded to Charter Security Life's attempt to change the terms of the Annuity, as follows:

> "I received the replacement policy issued by Charter Security Life Insurance (New York) changing the terms of the annuity from 240 months certain and life thereafter to 240 months certain only.
>
> I am advised by Mr. Hughes of Lattie [sic] Associates that your quotation was to provide an annuity which would pay $1,450.45 per month for the first year increasing annually at a rate of 3% compounded annually for 240 months certain and life thereafter for a singe premium of $175,000.00. This was the benefit to be provided under the terms of a general release and settlement agreement approved by Judge Pettine of the United States District Court for the District of Rhode Island.
>
> The agreed upon premium was paid and a policy issued which is now in the files of the contract owner, [Kemper], providing benefits required by the release, settlement agreement and court order. I consider the original annuity contract valid and enforceable and will retain it in our files...."

---

[6]    Ms. Fasman was the witness designated by Metropolitan Life in the instant lawsuit for the purposes of its Fed. R. Civ. P. 30(b)(6) deposition.

<u>See</u> Fasman Dep. at ex. 4. Mr. Noe sent copies of this correspondence to Plaintiff's lawyer, Mr. Hughes, and to Ms. Boehm at Charter Security Life. <u>Id</u>.

On September 26, 1983, Robert Ligouri of Charter Security Life sent correspondence to Mr. Noe, claiming that the Annuity was "incorrectly typed" for "240 month certain and life thereafter…instead of 240 months only", and that "the original supplementary contract" was "null and void." <u>See</u> Fasman Dep. at ex. 5. Plaintiff's lawyer, Mr. Hughes, was sent a copy of this correspondence as well (as was Mr. Foley of Dean Witter). <u>Id</u>. On October 10, 1983, Mr. Noe replied to Mr. Ligouri, and again refused to change the terms of the Annuity. <u>See</u> Fasman Dep. at ex. 6. Specifically, Mr. Noe advised that Kemper "intend[s] to retain the original policy in [its] files and consider[s] it to be valid and enforceable." <u>Id</u>. Mr. Noe also sent a copy of this correspondence to Plaintiff's lawyer, Mr. Hughes (as well as to Mr. Foley). <u>Id</u>.

On October 14, 1983, Ms. Boehm sent correspondence to Mr. Noe enclosing a "corrected" supplementary agreement to "reflect monthly payments for a period of 240 months only." <u>See</u> Fasman Dep. at Ex. 8.[7] By reply correspondence, Mr. Noe again refused to change the terms of the Annuity, and stated as follows:

> "In response to your October 14, 1983 I reject and return herewith the Supplementary Agreement and General Provisions attached thereto. The original annuity policy will be retained in the files of [Kemper] and considered valid and enforceable."

<u>See</u> Fasman Dep. ex. at 7. Kemper also sent a copy of this correspondence to Plaintiff's lawyer, Mr. Hughes (as well as to Mr. Foley). <u>Id</u>.

In 1983, Plaintiff himself had no contact whatsoever with Kemper. <u>See</u> Deposition Transcript of Dennis J. Dimon ("Dimon Dep.") at 117:20-118:11 (attached hereto as Exhibit H).

---

[7]   It is noted that Charter Security Life did not attempt to return any premium to Plaintiff's lawyers, Kemper, or any other party.

Of the parties to the instant lawsuit, the only parties with which Plaintiff had any contact in 1983 were Plaintiff's lawyers. Id.[8]

After making the Annuity payment due on May 5, 2003, Metropolitan Life stopped making the Annuity payments to Plaintiff. See Fasman Dep. at ex. 20.

### D.     Plaintiff Files The Instant Lawsuit.

On May 23, 2005, Plaintiff filed the instant lawsuit, naming as defendants Mr. Latti, Latti Associates, Latti & Anderson LLP,[9] Metropolitan Life, Morgan Stanley, and Kemper. See Compl.[10] Of the thirteen counts in the Complaint, only two counts are directed against Kemper. Those counts purport to assert causes of action for breach of contact (Count Twelve) and negligent misrepresentation (Count Thirteen). Id. With respect to the purported claim for breach of contract, the Complaint alleges that "[Kemper] was to provide a lifetime annuity guaranteed for twenty (20) years… but breached this contract by altering the terms of the agreement after the contract was signed and approved by the court and for failing to perform the contract." Id. at ¶¶ 72, 73. With respect to the purported claim for negligent misrepresentation, the Complaint alleges that "[Kemper] negligently misrepresented the terms of contract, stating that the contract was for life, guaranteed for twenty years," and that Plaintiff "relied on the representation of counsel and [Kemper] as manifested in the original contract approved by the court and suffered financial losses as a result of [Kemper's[ negligent misrepresentation in altering the contract." Id. at ¶¶ 77, 78.

---

[8]     It is noted that, in September 1999, Plaintiff's wife had inquired with Metropolitan Life (Charter Security Life's successor) as to the terms of the Annuity. Id. at ex. 11. On September 24, 1999, Metropolitan Life sent correspondence to Plaintiff stating that "[y]ou receive monthly payments until 5/5/2003." Id.

[9]     Latti & Anderson LLP is the successor law firm to Latti Associates.

[10]     Kemper did not receive any communications from Plaintiff, Plaintiff's lawyers, Metropolitan Life, or any other person or entity, relating to the Annuity, from October 1983 until the filing of this lawsuit on May 23, 2005.

On November 22, 2006, Plaintiff proffered an expert report in this matter which purports to allocate liability among the defendants.  See Plaintiff's proffered Expert Report ("Plaintiff's Expert Report") (attached hereto as Exhibit I).  Plaintiff's Expert Report does not assert that Kemper breached any contract or made any negligent misrepresentation; indeed, Plaintiff's Expert Report does not reference Kemper at all.  See id.[11]

## III.  LEGAL ARGUMENT

### A.    Legal Standard.

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Barbour v. Dynamics Research Corp., 63 F.3d 32, 36-37 (1st Cir. 1995) (quoting Fed. R. Civ. P. 56(c)).  The movant has the initial burden of either offering evidence to disprove an element of the plaintiff's case or by demonstrating "an absence of evidence to support the nonmonving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

After the movant has met this burden, the nonmovant must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answer to interrogatories, and admissions on file, designate specific facts showing that there is some genuine issue for trial." Celtox, 477 U.S. at 324.  The nonmovant cannot rely upon mere allegations, but must "adduce specific, provable facts demonstrating that there is a triable issue." Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990) (quoting Brennan v. Hendrigran, 888 F.2d 189, 191 (1st Cir. 1989). There must be "sufficient evidence" favoring the nonmoving party for a jury to find in its favor.  Id.  "If the

---

[11]    It is noted that Plaintiff's Expert Report asserts that the alleged breach of the Annuity occurred in 1983. Id. at p. 7.

evidence is merely colorable or not significantly probative, summary judgment may be granted."
Id. (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 249-50 (1986). And where, as here, the
plaintiff would bear the burden of proof at trial, summary judgment for the defendant is
appropriate when the plaintiff cannot establish the existence of an element essential to its case.
Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 805-06 (1999).

**B.     Choice Of Law.**

In determining which state's laws applies, the question is resolved by using the choice of
law analysis of the forum state. The Travelers Indem. Co. of Illinois v. Wolverine Corp., No. 03-
10164, 2005 U.S. Dist. LEXIS 31651, at *2 (D. Mass. Dec. 8, 2005) (citing Reicher v. Berkshire
Life Ins. Co. of Am., 360 F.3d 1, 4 (1st Cir. 2004)).   Absent a contractual choice of law
provision, "Massachusetts' choice-of-law framework requires consideration of several factors in
order to determine the appropriate forum state." Id.  (citing Reicher, 360 F.3d at 4-6).

The first step in a choice of law analysis is to determine whether an actual conflict
actually exists between the laws of the interested jurisdictions.  Reicher, 360 F.3d at 4 (citing
Millipore Corp. v. Travelers Indem. Co., 115 F.3d 21, 29 (1st Cir. 1997)).  Assuming a conflict,
Massachusetts courts consider a "variety of factors" in order to determine which state has a more
"significant relationship" to the case.  The Travelers Indemnity Co., 2005 U.S. Dist. LEXIS
31651, at * 4 (citing Reicher, F.3d at 5).  The Massachusetts Supreme Court has stated that it
"feels free...to borrow from any of the various lists to help focus...attention on the
considerations particularly relevant to the case." Reicher, 360 F.3d at 5 (citations omitted).

In this case, Metropolitan Life – the issuer of the subject Annuity, and as such, the entity
that was responsible for making the subject Annuity payments – is located in New York.  It is

therefore submitted that New York has the most significant relationship to the case, and that New York law governs this action.[12]

**C.    Plaintiff's Claims Against Kemper Are Time-Barred.**

Plaintiff's claims against Kemper are plainly barred by the applicable statutes of limitations.

**1.    Plaintiff's Claim Against Kemper For Breach of Contract Is Time-Barred.**

Under New York law, the statute of limitations for a breach of contract claim is six years from the date of breach. See N.Y. C.P.L.R. 213(2) (2006); see also Sitkiewicz v. County of Sullivan, 681 N.Y.S.2d 677, 678 (N.Y. App. Div. 1998) (citations omitted). The statute of limitations begins to run at the time of the breach, even if damages do not occur until later. Ely-Cruikshank Co., Inc. v. Bank of Montreal, 615 N.E.2d 985, 986 (N.Y. Ct. App. 1993) (citations omitted).

The last time that Kemper had any involvement with Plaintiff's lawyers, or any other person or entity, relating to the Underlying Action or the Annuity was in October 1983. Therefore, even assuming – all facts and law to the contrary – that Kemper breached a contract with Plaintiff, any such breach necessarily could have occurred no later than October 1983.[13] See St. George Hotel Assocs. v. Shurkin, 786 N.Y.S.2d 56 (N.Y. App. Div. 2004) (ruling that

---

[12]    In addition to New York law, Kemper also will apply in this Memorandum of Law the relevant provisions of Massachusetts law. It is further noted that, under the law of any potentially relevant jurisdiction, Kemper would be entitled to summary judgment.

[13]    As noted above, Plaintiff's own Expert Report asserts that the alleged breach of the Annuity occurred in 1983. See Plaintiff's Expert Report at p. 7.

breach of contract action accrued at time of insurance policy's procurement and issuance not when damages allegedly occurred and was therefore barred by statute of limitations).[14]

Because Plaintiff commenced this action on May 23, 2005 – approximately twenty-two years after the alleged breach – Plaintiff's breach of contract claim is clearly barred by New York's six-year statute of limitations.  N.Y. C.P.L.R. 213(2) (2006).[15]

### 2.     Plaintiff's Claim Against Kemper For Negligent Misrepresentation Is Time-Barred.

Under New York law, the statute of limitations for a negligent misrepresentation claim is six years from the date of accrual.  See N.Y. C.P.L.R. 213(1) (2006); see also Fandy Corp. v. Lung-Fong Chen, 691 N.Y.S.2d 572, 572-73 (N.Y. App. Div. 1999) (citations omitted).  A cause of action for negligent misrepresentation accrues "on the date of the alleged misrepresentation which is relied upon by the plaintiff."  Id. at 573 (citations omitted).

As explained above, the last time that Kemper had any involvement with Plaintiff's lawyers, or any other person or entity, relating to the Underlying Action or the Annuity was in October 1983.  Therefore, even assuming – all facts and law to the contrary – that Kemper had made a negligent misrepresentation to Plaintiff, any such misrepresentation necessarily could

---

[14]      "Knowledge of the occurrence of the wrong on the part of the plaintiff is not necessary to start the Statute of Limitations running in [a] contract [action]."  Ely-Cruikshank, 615 N.E.2d at 987 (citations omitted). Nevertheless, it is noted that Plaintiff was aware, in 1983, of Charter Security Life's unilateral attempt to change the terms of the Annuity, by virtue of no less than four (4) letters sent to Plaintiff's lawyer regarding said attempt between August and October 1983.  As Plaintiff's agent, Plaintiff's lawyer's knowledge is imputed to Plaintiff. Veal v. Geraci, 23 F.3d 722, 725 (2nd Cir. 1994) (applying New York law, court concludes that attorney's knowledge of conduct giving rise to claim was imputed to client).   It is noted that under Massachusetts law as well, a client is charged with the knowledge of his attorney.  Levin v. Berley, 728 F.2d 551 (1st Cir. 1984) (citations omitted) (applying Massachusetts law, court notes that knowledge of attorney is imputed to client for purposes of statute of limitations considerations).

[15]      Similarly, under Massachusetts law, the statute of limitations for a breach of contract claim is six years. Mass. Gen. Laws ch. 260, § 2 (2006); see also Patsos v. First Albany Corporation, 741 N.E.2d 841, 846 (Mass. 2001) (discussing statutes of limitations on various actions, including breach of contract).  Therefore, assuming Massachusetts law governed this action, Plaintiff's breach of contract claim still would be barred by the applicable statute of limitations, for the reasons set forth above.

have been made no later than October 1983. See Espie v. Murphy, No. 2005-07034, 2006 N.Y. App. Div. LEXIS 14544 (N.Y. App. Div. Dec. 5, 2006) (ruling that plaintiffs' cause of action for negligent misrepresentation began to run on date of closing agreement when misrepresentations from which fraud could have been inferred were made to plaintiffs).

Because Plaintiff commenced this action on May 23, 2005 - nearly twenty-two years after the alleged misrepresentation – Plaintiff's claim for negligent misrepresentation is clearly barred by New York's six-year statute of limitations. See N.Y. C.P.L.R. 213(1) (2006).[16]

**D.    Plaintiff Cannot Establish The Requisite Elements Of His Claims Against Kemper.**

In addition, Kemper is entitled to summary judgment on the separate and independent grounds that Plaintiff cannot establish the substantive elements of his claims for breach of contract and negligent misrepresentation.

**1.    Plaintiff Cannot Establish The Requisite Elements Of A Claim Against Kemper For Breach Of Contract.**

Under New York law, the essential elements of breach of contract claim are as follows: "(1) the formation of an agreement by an offer, acceptance, and consideration; (2) performance by one party; (3) breach of the agreement by the other party; and (4) damages." Constructive Hands, Inc. v. Baker, 446 F. Supp. 2d 88, 93 (N.D.N.Y. 2006) (citations omitted).

In support of his breach of contract claims, Plaintiff alleges that "[Kemper] was to provide a lifetime annuity guaranteed for twenty (20) years... but breached this contract by altering the terms of the agreement after the contract was signed and approved by the court and

---

[16]    Under Massachusetts law, the statute of limitations for a negligent misrepresentation claim is three years. Mass. Gen. Laws. ch. 260, § 2A (2006). Therefore, assuming Massachusetts law governed this action, Plaintiff's negligent misrepresentation claim still would be barred by the applicable statute of limitations, for the reasons set forth above.

12

for failing to perform the contract." See Compl. at ¶¶ 72, 73. Plaintiff has adduced no evidence

to support these allegations. Indeed, the evidence demonstrates that nothing could be further

from the truth: Kemper complied with all of its obligations in connection with the settlement of

the Underlying Action, and, in fact, refused to alter the terms of the Annuity when Charter

Security Life subsequently attempted to do so. Specifically, the evidence demonstrates as

follows:

- Plaintiff's lawyers (or their broker) secured from Charter Security Life a $175,000 premium quote for an annuity that would provide monthly payments in the amount of $1,450.45 each, increasing 3% annually, for a period of 20 years certain and life thereafter. See Latti Dep. 71:2-11; Mensie Dep. at ex. 6. Plaintiff's lawyers requested that Kemper pay them a lump sum in the amount of $175,000 so that Plaintiff's lawyers could obtain this annuity. See Guardian Hrg. at 7:11-8:20; Mensie Dep. at ex. 5.

- Kemper completed Charter Security Life's annuity application, issued the Settlement Check in the amount of the $175,000 annuity premium, and delivered same to Plaintiff's lawyer, in fulfillment of Kemper's settlement obligations. See Mensie Dep. at ex. 2; Settlement Check; May 3, 1983 Correspondence.

- Charter Security Life issued the lifetime Annuity, which specified that Plaintiff would receive monthly payments of $1,450.45 each, increasing 3% annually, commencing June 6, 1983, for a period of 20 years certain and life thereafter. See Mensie Dep. at ex. 11.

- Metropolitan Life subsequently attempted to unilaterally change the terms of the Annuity, but Kemper refused to agree to this. See Fasman Dep. at ex. 3, 4, 5, 6, 7 and 8.

- Kemper further took the affirmative step of advising Plaintiff's lawyers of Charter Security Life's attempt to change the terms of the Annuity. See Fasman Dep. at ex. 4, 6, and 7.

In light of these facts, it is beyond cavil that Plaintiff's claim against Kemper for breach

of contract is simply unsupportable.[17]

---

[17]     Similarly, under Massachusetts law, Plaintiff must establish the following elements in order to recover on a breach of contract claim: "(1) an agreement was made between the plaintiffs and the defendant supported by valid consideration; (2) the plaintiffs have been ready, willing, and able to perform; (3) the defendant's breach has prevented them from performing; and (4) the plaintiffs have suffered damage. Singarella v. Boston, 173 N.E.2d 290, 291 (Mass. 1961) (citations omitted); see also Doyle v. Hasbro, Inc., 103 F.3d 186, 194-195 (1st Cir. 1996).

(continued...)

2.    **Plaintiff Cannot Establish The Requisite Elements Of A Claim Against Kemper For Negligent Misrepresentation.**

The elements of negligent misrepresentation under New York law are as follows: "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." Hydro Investors, Inc. v. Trafalgar Power, Inc., 227 F.3d 8, 20 (2d Cir. 2000) (citations omitted). The alleged misrepresentation must be factual in nature and not promissory or relating to events in the future that may not come to a realization. Id. at 20-21.

In support of his negligent misrepresentation claim, Plaintiff alleges that "[Kemper] negligently misrepresented the terms of contract, stating that the contract was for life, guaranteed for twenty years," and that Plaintiff "relied on the representation of counsel and [Kemper] as manifested in the original contract approved by the court and suffered financial losses as a result of [Kemper's] negligent misrepresentation in altering the contract." See Compl. at ¶¶ 77, 78. Plaintiff has adduced no evidence to support these allegations. Indeed, the evidence demonstrates that Plaintiff cannot support a claim against Kemper for negligent misrepresentation for at least three separate and independent reasons:

- First, Plaintiff has failed to establish that Kemper made any representation to Plaintiff regarding the Annuity terms. Indeed, quite to the contrary, the evidence shows that it was Plaintiff's own lawyers who determined that $175,000 would purchase a lifetime annuity on the desired terms. See Mensie Dep. at ex. 5 and 6. To that end, Plaintiff's lawyers

---

(..continued)

Therefore, assuming Massachusetts law governed this action, Plaintiff's breach of contract claim still would fail as a matter of law, for the reasons set forth above.

demanded that Kemper provide a Settlement Check in the amount of the $175,000 Annuity premium, and Kemper did so. <u>See</u> Guardian Hrg. at 7:11-8:20; Mensie Dep. at ex. 5,6; Settlement Check, May 3, 1983 Correspondence.

- Second, even assuming (contrary to fact) that Kemper made a representation to Plaintiff regarding the Annuity terms, Plaintiff has not shown and cannot show that he relied upon such representation. Indeed, Plaintiff has testified that he had no contact whatsoever with Kemper, and that he was relying on the advice of his lawyers. <u>See</u> Dimon Dep. at 117:20-118:11.

- Third, even assuming (contrary to fact) that Kemper made a representation to Plaintiff regarding the Annuity terms, and that Plaintiff relied upon such representation, Plaintiff has not shown and cannot show that any such representation was false. To the contrary, it always has been and remains Kemper's position that the Annuity is clearly payable for life. Neither Charter Security Life's subsequent attempt to unilaterally alter the terms of the Annuity (to which attempt Kemper <u>refused to agree</u>), nor Metropolitan's Life cessation of Annuity payments in May 2003, can possibly operate to render "false" any previous representation by Kemper that the Annuity is payable for life.

Because Plaintiff cannot establish any of the elements of a claim against Kemper for negligent misrepresentation, Plaintiff's claim should be dismissed.[18]

## IV.    CONCLUSION

For the foregoing reasons, Kemper respectfully requests that this Court enter summary judgment in its favor.

Respectfully submitted,

KEMPER INSURANCE COMPANY

by its, attorneys,

/s/ Kevin L. Golden
DRINKER BIDDLE & REATH LLP

---

[18]    Similarly, in order to recover for negligent misrepresentation under Massachusetts law, a "plaintiff must prove that the defendant (1) in the course of his business, (2) supplied false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and (6) with failure to exercise reasonable care or competence in obtaining or communicating the information." <u>Sampson v. MacDougall</u>, 802 N.E.2d 602, 608 (Mass. Ct. App. 2004) (<u>quoting</u> <u>Nota Const. Corp. v. Keyes Assocs., Inc.</u>, 694 N.E.2d 401, 405 (Mass. Ct. App. 1998)). Therefore, assuming Massachusetts law governed this action, Plaintiff's breach of contract claim still would fail as a matter of law, for the reasons set forth above.

Timothy O'Driscoll (Admitted Pro Hac Vice)
Kevin L. Golden (Admitted Pro Hac Vice)
DRINKER BIDDLE & REATH LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996
(215) 988-2700

Local Counsel
Kevin Murphy
Anthony B. Fioravanti
YURKO & SALVESEN, P.C.
One Washington Mall, 11th Floor
Boston, MA 02108-2603
(617) 723-6900

Dated: January 2, 2007

## Certification Pursuant To Local Rules 7.1 and 37.1

The above-signed certifies that the parties have conferred in good faith in attempts to resolve the issues raised herein but were unable to do so.  Specifically, the parties conferred by correspondence dated December 21, 2006, and December 28, 2006, between Timothy J. O'Driscoll and Brian Keane.

## **Certification of Service**

I hereby certify that a true and accurate copy of the foregoing document was filed via the ECF system and will be served electronically through that system upon Counsel of Record on January 2, 2007.

/s/ Kevin L. Golden
Kevin L. Golden

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.

|  |  |
|---|---|
| DENNIS DIMON, | ) |
| Plaintiff | ) |
|  | ) **05 - 1 1 0 7 3 REK** |
| vs. | ) |
|  | ) **COMPLAINT** |
| MICHAEL B. LATTI, LATTI | ) |
| ASSOCIATES, LATTI & ANDERSON | **MAGISTRATE JUDGE** _____ |
| LLP, METROPOLITAN LIFE | ) |
| INSURANCE COMPANY, KEMPER | ) |
| INSURANCE COMPANY, and | ) |
| MORGAN STANLEY DW, INC., | ) |
| Defendants | ) |
|  | ) |

RECEIPT # _____
AMOUNT $ _N/A_
SUMMONS ISSUED _YES_
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
_____ 5/73/05

### INTRODUCTION

1.   This is a contract and malpractice action for monetary relief resulting from the premature cancellation of the plaintiff's structured settlement payments, which occurred on or about May 5, 2003 when the defendants ceased paying the settlement due the plaintiff as a result of a personal injury action in 1983. The plaintiff released the defendant shipowner in his personal injury action in consideration of a life annuity guaranteed for 20 years which the court approved. The plaintiff asserts a cause of action against the defendants based upon their breach of the settlement contract and for the breach of fiduciary duties by his former attorney.

### JURISDICTION

2.   Jurisdiction is proper pursuant to 28 U.S.C., sec. 1332(a). Venue is proper in the

1

District Court of Massachusetts pursuant to 28 U.S.C., sec. 1391(c).

## PARTIES

3.  The plaintiff, Dennis Dimon, is of legal age and resides in West Kingston, Rhode Island.

4.  The defendant, Michael B. Latti, is now a resident of the State of Maine and a lawyer licensed to practice law in the Commonwealth of Massachusetts who formerly resided in and practiced law in the Commonwealth of Massachusetts in 1983.

5.  The defendant, Latti Associates, was a law firm created under the laws of the Commonwealth of Massachusetts by Michael B. Latti, with a principal place of business at 30-31 Union Wharf, Boston, Massachusetts.

6.  The defendant, Latti & Anderson, LLP, is a law firm created under the laws of the Commonwealth of Massachusetts, with a principal place of business at 30-31 Union Wharf, Boston, Massachusetts and is the successor in interest to Latti Associates.

7.  The defendant, Metropolitan Life Insurance Company is an insurance company with a principal place of business in New York, New York, and regularly conducts business in the Commonwealth of Massachusetts.

8.  The defendant, Kemper Insurance Company is an insurance company with a principal place of business in Long Grove, Illinois, which regularly conducts business in the Commonwealth of Massachusetts.

9.  The defendant, Morgan Stanley, is a brokerage company with a principal place of business in New York, New York, and regularly conducts business in the Commonwealth of Massachusetts.

2

## FACTUAL ALLEGATIONS

10. In 1981, the plaintiff was severely injured while serving as a member of the crew aboard the F/V/ JENNY C, resulting in the loss of his eye.

11. On or about February 4, 1983, following a trial, a jury awarded the plaintiff $710,000 for his injuries against the defendant, Jenny C., Inc.

12. The plaintiff was represented at all times for the trial and subsequent settlement by Latti Associates, operated under the authority of Michael B. Latti.

13. Latti & Anderson, LLP is the successor in interest to Latti Associates.

14. Following the verdict, the parties entered into a settlement agreement, approved by the United States District Court for the District of Rhode Island and a *guardian ad litem* appointed by the court, providing the plaintiff with a lump sum payment of $250,000 and an annuity for the life of the plaintiff and guaranteed for twenty (20) years which would continue for the life of the plaintiff. The annuity would pay the plaintiff a set amount (beginning at $1,450.45) each month with the amount increasing by three (3) percent each year.

15. Prior to the settlement the court appointed Leonard Decof, Esquire as *guardian ad litem* to review the settlement and to report to the court.

16. The *guardian ad litem* was appointed by the court due to the plaintiff's inability to read or understand the settlement contract and was an extra measure by the court to protect the plaintiff even though he had separate counsel through Latti Associates.

17. American Motorists Insurance Company (now Kemper Insurance Company) applied for the annuity.

3

18. Dean Witter, Inc.(now Morgan Stanley), acting as the agent and broker for American Motorists Insurance Company, arranged for the lifetime annuity.

19. The defendant Metropolitan Life Insurance Company (formerly Charter Security Insurance Company), provided the annuity beginning June 5, 1983.

20. On or about June 14, 1983, Charter Security Life Insurance (now Metropolitan Life Insurance Company) informed Dean Witter, Inc. (now Morgan Stanley) that a clerical error had been made on the annuity contract and that the contract should have read for 240 months (20 years) rather than for life with a guarantee of twenty (20) years.

21. On or about September 26, 1983, Charter Security Life Insurance (now Metropolitan Life Insurance Company) informed American Motorists (now Kemper Insurance) and Latti Associates of the clerical error described in paragraph 20.

22. A supplementary document changing the contract from life, guaranteed for twenty (20) years to twenty (20) years only was forwarded to each of the insurance companies and Latti Associates.

23. The plaintiff was not advised of this change nor was the court or *guardian ad litem* informed of the alleged clerical error upon which the plaintiff, court, and *guardian ad litem* had relied in accepting the settlement agreement.

24. On May 5, 2003, the defendant Metropolitan Life Insurance Company, stopped payment on the plaintiff's settlement, stating that the annuity was only for a fixed period of twenty years rather than for the life of the plaintiff.

25. Upon the suspension of payments, the plaintiff attempted to contact his former lawyer at Latti Associates, now Latti & Anderson, but was informed that no file

4

existed and that the firm could not help him.

## COUNT I
### (Dennis Dimon v. Michael B. Latti -
Breach of Fiduciary Duty)

26.    Paragraphs 1-25 are realleged and incorporated by reference.

27.    A lawyer has a duty to act in the best interest of his client and not to act in any way

adverse or contrary to the interests of the client.

28.    The plaintiff relied upon the defendant for advice, counsel, and information in order

to make an informed decision prior to entering into any settlement agreement

whereby the plaintiff would forfeit his rights to future compensation for his injuries.

29.    The defendant, in breach of his fiduciary duty, represented to the plaintiff that the

annuity was for life with a guarantee of twenty (20) years.

30.    Due to the defendant's breach, the plaintiff has suffered financial loss.

### REQUEST FOR RELIEF

1.    That this Court, under Count I, enter judgment in favor of the plaintiff against

the defendant for breach of fiduciary duty.

2.    For such other relief as this Court deems appropriate.

## COUNT II
### (Dennis Dimon v. Michael B. Latti -
Negligence)

31.    Paragraphs 1-30 are realleged and incorporated by reference.

32.    A lawyer has a duty to act with reasonable care and to use the skill of a reasonably

competent lawyer in representing a client.

5

33.    The defendant failed to act reasonably in not informing the plaintiff of the alleged

clerical error changing the terms of the annuity.

34.    Due to the actions of the defendant, the plaintiff suffered financial loss.

### REQUEST FOR RELIEF

1.    That this Court, under Count II, enter judgment in favor of the plaintiff.

2.    For such other relief as this Court deems appropriate.

### COUNT III
(Dennis Dimon v. Michael B. Latti -
Breach of Contract)

35.    Paragraphs 1-34 are realleged and incorporated by reference.

36.    The plaintiff and the defendant entered into a contract for the defendant to provide

legal representation for injuries suffered by the plaintiff in a fishing boat accident.

37.    The defendant breached this contract by failing to provide competent legal

representation, in failing to inform the plaintiff of an alleged clerical error changing

the plaintiff's settlement agreement, and failing to ensure that the plaintiff understood

the alleged changes to the settlement agreement.

38.    The plaintiff suffered financial losses as a result of the defendant's breach of contract.

### REQUEST FOR RELIEF

1.    That this Court, under Count III, enter judgment in favor of the plaintiff

against the defendant for breach of contract.

2.    For such other relief as this Court deems appropriate.

6

### COUNT IV
(Dennis Dimon v. Latti Associates-
Breach of Fiduciary Duty)

39.    Paragraphs 1-38 are realleged and incorporated by reference.

40.    A lawyer has a duty to act in the best interest of his client and not to act in any way

adverse or contrary to the interests of the client.

41.    The plaintiff relied upon the defendant law firm for advice, counsel, and information

in order to make an informed decision prior to entering into any settlement agreement

whereby the plaintiff would forfeit his rights to future compensation for his injuries.

42.    Due to the defendant's breach, the plaintiff has suffered financial loss.

### REQUEST FOR RELIEF

1.    That this Court, under Count IV, enter judgment in favor of the plaintiff

against the defendant for breach of fiduciary duty.

2.    For such other relief as this Court deems appropriate.

### COUNT V
(Dennis Dimon v. Latti Associates -
Negligence)

43.    Paragraphs 1-42 are realleged and incorporated by reference.

44.    A lawyer has a duty to act with reasonable care and to use the skill of a reasonably

competent lawyer in representing a client.

45.    The defendant failed to act reasonably in not informing the plaintiff and ensuring that

the plaintiff understood the changes to the settlement agreement.

46.    Due to the actions of the defendant, the plaintiff suffered financial loss.

7

## REQUEST FOR RELIEF

1.    That this Court, under Count V, enter judgment in favor of the plaintiff.

2.    For such other relief as this Court deems appropriate.

## COUNT VI
### (Dennis Dimon v. Latti Associates -
### Breach of Contract)

47.    Paragraphs 1-46 are realleged and incorporated by reference.

48.    The plaintiff and the defendant entered into a contract for whereby the defendant was to provide legal representation for injuries suffered by the plaintiff in a fishing accident.

49.    The defendant breached this contract by failing to provide competent legal representation, failing to inform the plaintiff of changes to the plaintiff's settlement agreement, and failing to ensure that the plaintiff understood the changes to the settlement agreement.

50.    The plaintiff suffered financial losses as a result of the defendant's breach of contract.

## REQUEST FOR RELIEF

1.    That this Court, under Count VI, enter judgment in favor of the plaintiff against the defendant for breach of contract.

2.    For such other relief as this Court deems appropriate.

## COUNT VII
### (Dennis Dimon v. Latti & Anderson LLP -
### Breach of Fiduciary Duty)

51.    Paragraphs 1-50 are realleged and incorporated by reference.

8

52.    A lawyer has a duty to act in the best interest of his client and not to act in any way
       adverse or contrary to the interests of the client.

53.    The plaintiff relied upon the defendant for advice, counsel, and information in order
       to make an informed decision prior to entering into any settlement agreement
       whereby the plaintiff would forfeit his rights to future compensation for his injuries.

54.    Due to the defendant's breach, the plaintiff has suffered financial loss.

### REQUEST FOR RELIEF

1.     That this Court, under Count VII, enter judgment in favor of the plaintiff
       against the defendant for breach of fiduciary duty

2.     For such other relief as this Court deems appropriate.

### COUNT VIII
(Dennis Dimon v. Latti & Anderson LLP -
Negligence)

55.    Paragraphs 1-54 are realleged and incorporated by reference.

56.    A lawyer has a duty to act with reasonable care and to use the skill of a reasonably
       competent lawyer in representing a client.

57.    The defendant failed to act reasonably in not informing the plaintiff and ensuring that
       the plaintiff understood the changes to the settlement agreement.

58.    Due to the actions of the defendant, the plaintiff suffered financial loss.

### REQUEST FOR RELIEF

1.     That this Court, under Count VII, enter judgment in favor of the plaintiff.

2.     For such other relief as this Court deems appropriate.

9

## COUNT IX
(Dennis Dimon v. Latti & Anderson LLP -
Breach of Contract)

59.    Paragraphs 1-58 are realleged and incorporated by reference.

60.    The plaintiff and the defendant entered into a contract for whereby the defendant was
to provide legal representation for injuries suffered by the plaintiff in a fishing
accident.

61.    The defendant breached this contract by failing to provide competent legal
representation, failing to inform the plaintiff of changes to the plaintiff's settlement
agreement, and failing to ensure that the plaintiff understood the changes to the
settlement agreement.

62.    The plaintiff suffered financial losses as a result of the defendant's breach of contract.

## REQUEST FOR RELIEF

1.    That this Court, under Count IX, enter judgment in favor of the plaintiff
against the defendant for breach of contract.

2.    For such other relief as this Court deems appropriate.

## COUNT X
(Dennis Dimon v. Metropolitan Life Insurance Company -
Breach of Contract)

63.    Paragraphs 1-62 are realleged and incorporated by reference.

64.    The plaintiff and the defendant entered into a contract whereby the defendant was to
provide a lifetime annuity guaranteed for twenty (20) years in exchange for the
plaintiff releasing all claims for injuries suffered by the plaintiff in a fishing accident.

65.    The defendant breached this contract by altering the agreement after the contract was

10

signed and approved by the court and for failing to perform the contract.

66.    The plaintiff suffered financial losses as a result of the defendant's breach of contract.

### REQUEST FOR RELIEF

1.    That this Court, under Count X, enter judgment in favor of the plaintiff

against the defendant for breach of contract.

2.    For such other relief as this Court deems appropriate.

### COUNT XI
(Dennis Dimon v. Metropolitan Life Insurance Company -
Negligent Misrepresentation)

67.    Paragraphs 1-66 are realleged and incorporated by reference.

68.    The plaintiff and the defendant entered into a contract whereby the defendant was to

provide a lifetime annuity guaranteed for twenty (20) years in exchange for the

plaintiff releasing all claims for injuries suffered by the plaintiff in a fishing accident.

69.    The defendant negligently misrepresented the terms of the contract, stating that the

contract was for life, guaranteed for 20 years.

70.    The plaintiff relied on the representation of counsel and this defendant as manifested

in the original contract approved by the court and suffered financial losses as a result

of the defendant's negligent misrepresentation in altering the contract.

### REQUEST FOR RELIEF

1.    That this Court, under Count XI, enter judgment in favor of the plaintiff

against the defendant.

2.    For such other relief as this Court deems appropriate.

11

## COUNT XII
(Dennis Dimon v. Kemper Insurance Company -
Breach of Contract)

71.    Paragraphs 1-70 are realleged and incorporated by reference.

72.    The plaintiff and the defendant entered into a contract whereby the defendant was to

provide a lifetime annuity guaranteed for twenty (20) years in exchange for the

plaintiff releasing all claims for injuries suffered by the plaintiff in a fishing accident.

73.    The defendant breached this contract by altering the agreement after the contract was

signed and approved by the court and for failing to perform the contract.

74.    The plaintiff suffered financial losses as a result of the defendant's breach of contract.

## REQUEST FOR RELIEF

1.    That this Court, under Count XII, enter judgment in favor of the plaintiff

against the defendant for breach of contract.

2.    For such other relief as this Court deems appropriate.

## COUNT XIII
(Dennis Dimon v. Kemper Insurance Company -
Negligent Misrepresentation)

75.    Paragraphs 1-74 are realleged and incorporated by reference.

76.    The plaintiff and the defendant entered into a contract whereby the defendant was to

provide a lifetime annuity guaranteed for twenty (20) years in exchange for the

plaintiff releasing all claims for injuries suffered by the plaintiff in a fishing accident.

77.    The defendant negligently misrepresented the terms of the contract, stating that the

contract was for life, guaranteed for 20 years.

78.    The plaintiff relied on the representation of counsel and this defendant as manifested

in the original contract approved by the court and suffered financial losses as a result of the defendant's negligent misrepresentation in altering the contract.

### REQUEST FOR RELIEF

1.    That this Court, under Count XIII, enter judgment in favor of the plaintiff against the defendant.

2.    For such other relief as this Court deems appropriate.

### COUNT XIV
(Dennis Dimon v. Morgan Stanley - Breach of Contract)

79.    Paragraphs 1-78 are realleged and incorporated by reference.

80.    The plaintiff and the defendant entered into a contract whereby the defendant was to provide a lifetime annuity guaranteed for twenty (20) years in exchange for the plaintiff releasing all claims for injuries suffered by the plaintiff in a fishing accident.

81.    The defendant breached this contract by altering the agreement after the contract was signed and approved by the court and for failing to perform the contract.

82.    The plaintiff suffered financial losses as a result of the defendant's breach of contract.

### REQUEST FOR RELIEF

1.    That this Court, under Count XIV, enter judgment in favor of the plaintiff against the defendant for breach of contract.

2.    For such other relief as this Court deems appropriate.

13

COUNT XV
(Dennis Dimon v. Morgan Stanley -
Breach of Fiduciary Duty)

83.    Paragraphs 1-81 are realleged and incorporated by reference.

84.    A broker has a duty to act in the best interest of his client and not to act in any way

adverse or contrary to the interests of the client.

85.    The plaintiff relied upon the defendant for advice, counsel, and information in order

to make an informed decision prior to entering into any settlement agreement

whereby the plaintiff would forfeit his rights to future compensation for his injuries.

86.    Due to the defendant's breach, the plaintiff has suffered financial loss.

REQUEST FOR RELIEF

1.    That this Court, under Count XV, enter judgment in favor of the plaintiff

against the defendant for breach of fiduciary duty

2.    For such other relief as this Court deems appropriate.


PLAINTIFF DEMANDS TRIAL BY JURY ON ALL COUNTS.

Respectfully submitted
By his attorney

DATED: **MAY 20, 2005**

David B. Kaplan, Esq.
**THE KAPLAN/BOND GROUP**
88 Black Falcon Avenue
Suite 301
Boston, MA 02210
(617) 261-0080
BBO #258540

14

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY) _Dennis Dimon v. Michael B. Latti_

2. CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE CIVIL COVER SHEET. (SEE LOCAL RULE 40.1(A)(1)).

  I.   160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

  II.   195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,    *Also complete AO 120 or AO 121
    740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.    for patent, trademark or copyright cases

  III.   110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
    315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
    380, 385, 450, 891.

  IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
    690, 810, 861-865, 870, 871, 875, 900.

  V.   150, 152, 153.

3. TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(G)). IF MORE THAN ONE PRIOR RELATED CASE HAS BEEN FILED IN THIS DISTRICT PLEASE INDICATE THE TITLE AND NUMBER OF THE FIRST FILED CASE IN THIS COURT.

4. HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS COURT?

                YES     (NO)

5. DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE PUBLIC INTEREST? (SEE 28 USC §2403)

                YES     (NO)

  IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY?

                YES     (NO)

6. IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE 28 USC §2284?

                YES     (NO)

7. DO ALL OF THE PARTIES IN THIS ACTION, EXCLUDING GOVERNMENTAL AGENCIES OF THE UNITED STATES AND THE COMMONWEALTH OF MASSACHUSETTS ("GOVERNMENTAL AGENCIES"), RESIDING IN MASSACHUSETTS RESIDE IN THE SAME DIVISION? - (SEE LOCAL RULE 40.1(D)).

                YES     (NO)

  A.   IF YES, IN WHICH DIVISION DO _ALL_ OF THE NON-GOVERNMENTAL PARTIES RESIDE?

    EASTERN DIVISION     CENTRAL DIVISION     WESTERN DIVISION

  B.   IF NO, IN WHICH DIVISION DO THE MAJORITY OF THE PLAINTIFFS OR THE ONLY PARTIES, EXCLUDING GOVERNMENTAL AGENCIES, RESIDING IN MASSACHUSETTS RESIDE?

    (EASTERN DIVISION)     CENTRAL DIVISION     WESTERN DIVISION

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME _David B. Kaplan_

ADDRESS _88 Black Falcon Avenue, Suite 301, Boston, MA 02110_

TELEPHONE NO. _617-261-0080_

(Cover sheet local.wpd - 11/27/00)

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| Dennis Dimon | Michael B. Latti, Latti Associates, Latti & Anderson, LLP, Metropolitan Life Ins., Co., Kemper Ins. Co., and Morgan Stanley, DW, Inc. |

**(b)**  County of Residence of First Listed Plaintiff  **Washington, RI**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)**  Attorney's (Firm Name, Address, and Telephone Number)
David B. Kaplan
88 Black Falcon Ave, Suite 301, Boston, MA 02110

Attorneys (If Known)

## II.  BASIS OF JURISDICTION  (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☐ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III.  CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT  (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | **PRISONER PETITIONS** | | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | **Habeas Corpus:** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 530 General | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 540 Mandamus & Other | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | |
| | | ☐ 555 Prison Condition | | |

(TORTS — PERSONAL INJURY column): ☐ 362 Personal Injury - Med. Malpractice  ☐ 365 Personal Injury - Product Liability  ☐ 368 Asbestos Personal Injury Product Liability
**PERSONAL PROPERTY**  ☐ 370 Other Fraud  ☐ 371 Truth in Lending  ☐ 380 Other Personal Property Damage  ☐ 385 Property Damage Product Liability

(LABOR): ☐ 790 Other Labor Litigation  ☐ 791 Empl. Ret. Inc. Security Act

## V.  ORIGIN  (Place an "X" in One Box Only)

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 USC 1332
Brief description of cause:
Breach of Contract, Breach of Fiduciary Duty, Neg. Misrepresentation

## VII.  REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23     DEMAND $     CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☐ No

## VIII.  RELATED CASE(S) IF ANY

(See instructions):     JUDGE _____     DOCKET NUMBER _____

DATE  **5/23/05**     SIGNATURE OF ATTORNEY OF RECORD  _David B Kaplan_

**FOR OFFICE USE ONLY**

RECEIPT # _____     AMOUNT _____     APPLYING IFP _____     JUDGE _____     MAG. JUDGE _____

```
1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF RHODE ISLAND

3

4     DENNIS J. DIMON          )

5

6          vs.                 )          C.A. 81-0063

7

8     JENNY C., INC.           )

9

10

11

12

13    PROCEEDINGS HELD ON MAY  3, 1983 IN THE ABOVE-CAPTIONED CASE

14    IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE

15    ISLAND BEFORE SENIOR JUDGE RAYMOND J. PETTINE.

16

17

18

19    APPEARANCES:

20    ROGER E. HUGHES, JR., ESQUIRE--------FOR THE PLAINTIFF

21    GUY WELLS, ESQUIRE-------------------FOR THE DEFENDANT

22    W. SLATER ALLEN, ESQUIRE

23    JEROME B. SPUNT, ESQUIRE

24

25
```

K-0032

1

1    MORNING SESSION, MAY 3, 1983

2         THE COURT: I realize the plaintiff is not here,

3    but I have such an exacting schedule today, I just got

4    to keep on time, or otherwise, everything's going to fall

5    all along the line. So, I think we better just go ahead.

6    All right, Mr. Decof, would you mind taking the stand

7    and giving a report to the Court please?

8         MR. DECOF: Yes, your Honor.

9         THE COURT: We may have to have this typed.

10   L E O N A R D   D E C O F   was duly sworn.

11        THE COURT: All right. Would you be kind enough to

12   trace the history of this case, as you understand it,

13   starting with my first contact with you and placing it

14   on the record?

15        MR. DECOF: Yes, your Honor. On April 20, 1983

16   I received a telephone call from Senior Judge Pettine

17   asking me if I would be willing to serve as a guardian

18   ad litem in a case which was somewhat disturbing to him.

19   He told me basically that the case was an admiralty case

20   a Jones Act case, in which the plaintiff was a seaman who

21   got injured, had lost an eye, that he had received a

22   verdict which totaled more than $700,000 before a jury,

23   that the parties had agreed to a settlement, and that

24   at a hearing before the Court, the plaintiff responded

25   to questioning from his attorney as to whether or not he

K-0033

1   understood he would have no more right of action against
2   anyone, if he accepted the settlement, but that when the
3   Court put some questions to him, he failed to understand
4   the questions or failed to reply to them in a way which
5   showed that he understood and more disturbing, informed
6   the Court that he was unable to read.  He couldn't read
7   the release, and because he was unable to read, the Court
8   felt that a guardian ad litem should be appointed to
9   report back to the Court as to whether or not this
10  plaintiff was capable of understanding the consequences
11  of the settlement and asked me if I would be willing to
12  undertake this task.
13  I instructed the Court that I had one matter pending
14  with one of the attorneys involved.  I didn't know if it
15  would be a conflict or not, and that I would discuss that
16  with the attorney involved, see if he had any objection
17  and I did.  I discussed it with the attorney involved.
18  He had no objection.  He felt there was no conflict.  I
19  felt there was no conflict.  It was just a matter where
20  we were on opposite sides of the case; and I, therefore,
21  instructed the Court that I would be willing to undertake
22  this task.  My understanding was that none of the
23  attorneys had any objection to my appointment as guardian
24  ad litem; and I, therefore, told Judge Pettine that I
25  would undertake this task.

K-0034

3

1        Do you want me to continue further, Judge?

2        THE COURT:  Yes.

3        MR. DECOF:  Following that, on April - I informed

4 the Court on April 22, 1983 that I would undertake -

5 accept the Court's appointment as guardian.  On April 25,

6 1983, I held my first conference with the attorneys

7 involved, Roger Hughes, Slater Allen, Guy Wells, and

8 with the plaintiff, Dennis Dimon, his wife, Cathy Dimon,

9 and his mother, Mrs. Louis Dimon.

10       I outlined to all of the parties, all of the

11 attorneys, what I understood my function to be, that my

12 function was to review the file, to review the basic

13 facts of the case, and to assess the posture of the

14 case so that I could inform the plaintiff of all of the

15 ramifications of the settlement and determine that he

16 understood what he was doing, if he agreed to accept the

17 settlement.

18       In order to be able to do this, I instructed all

19 the parties that it was not my function to evaluate the

20 case.  It had not yet been heard on the motion for new

21 trial or on the defendant's motion to limit liability

22 under Section 183 of the 46 U.S. Code.  But I told all

23 the parties it was not my function to evaluate the case,

24 but I would inform the plaintiff of all of the various

25 options, and I had to know the background of everything

K-0035

that was happening so that I could make sure he was aware

of all of the ramifications.  I accordingly --

THE COURT:  What's on your mind, Mr. Allen?

MR. ALLEN:  Your Honor, may the record now show

that the plaintiff is in court?

THE COURT:  Yes.  All right.

MR. DECOF:  I accordingly did some research on

46 U.S. Code 688 and 46 U.S. Code 183.  After the first

conference that I had, all of the parties understood the

position that I was in, and the plaintiff understood.

I was careful to inform the plaintiff that the Court

wanted me to do this, to make sure that he was protected,

and that he understood the nature, the full nature, of

everything that he was doing.

Subsequent to that, I requested the following

documents from the attorneys, and I did receive all

these documents, and I did review them:  The complaint

in the case, the answer in the case, the interrogatories

to the jury, the medical reports concerning the plaintiff,

the deposition of Dr. Levin who was the plaintiff's

opthamologist, the insurance policies of the Kemper and

the Home, the expenditures of the Home Insurance Company

for maintenance, counsel fees, and so forth itemized,

financial statements of the vessel the Jenny C, the

school records of the plaintiff, the psychological reports

K-0036

5

1    of the plaintiff, the appraisal of the Jenny C, the

2    structured settlement proposal, the general releases,

3    the application for annuity which was made for the

4    plaintiff, and I'll explain all these; and the release

5    of the defendant, Jenny C, from the notice provisions of

6    the plaintiff with reference to seizure of the vessel.

7    Plaintiff's attorneys had properly filed a notice which

8    prevented the Jenny C being sold so that it could be

9    seized to satisfy a judgment, if that became necessary.

10        I did receive all of these documents, and I reviewed

11   them all at length.   I also reviewed and researched the

12   plaintiff's and defendant's memorandum concerning the

13   motion to limit liability of the defendants under 46 U.S.

14   Code 183 (a), and I did this not so that I could make

15   a decision on it, but so that I could inform the plaintiff

16   of the significance of it, and I came to an opinion

17   myself as to whether or not the limit of liability

18   would - whether the defendants would be successful.

19        In researching this, I did determine that the

20   defendants properly and timely set this up in their

21   answer so that defense wasn't necessary, but my opinion

22   was, and I informed the plaintiff of this later on,

23   that the plaintiff would probably prevail on this issue

24   because I felt that under 183 (a) there was privity or

25   knowledge in the sense that under the cases, Coryell

v. Phillips. And Peace and various other cases, the Cleveco
and especially the China Union Lines case, that the
condition that the plaintiff complained of which
made the vessel unseaworthy was something which the
owner knew about or if he had inspected properly
would have found out.

I state this because I want to inform the Court
that I informed the plaintiff that I thought he would
prevail on this, and he understood this, and he still
wants to take the settlement.

Now, following my research I had further conferences
with the various attorneys, and I had a meeting, another
meeting in my office on April 28, 1983 with Dennis Dimon,
the plaintiff, Cathy Dimon, his wife, his mother,
Mrs. Dimon, and Roger Hughes, his attorney. In the
intervening days, I had determined what the present value
of the structured settlement was by consultations with
actuaries, and I had also determined the availability of
annuity policies. The settlement, as it was agreed upon,
provided for a payment, a cash payment, of $250,000, and
in addition to that, a structured settlement of $1450.45
per month guaranteed for 20 years but which would continue
for the life of the plaintiff. The plaintiff, by the
way, was born on December 9, 1959. His life expectancy
is 49.7 years, and he is married, and he has two children.

K-0038

1    Now, this structured settlement would -- The structured

2    payments would increase by three percent each year, and

3    I instructed the plaintiff in the second conference that

4    we had that this three percent per year was not - did not

5    keep up with the cost of living index which ordinarily

6    raises seven percent per year.  He understood this, and

7    his mother, who is an intelligent woman, understood it,

8    and in fact, she immediately replied to me, but that

9    they had the advantage that there would be no income tax

10   paid, and all this money he received would be tax free.

11       At any rate, in - I questioned Mr. Hughes carefully

12   about the present value of this structured portion of

13   the settlement because there are many different present

14   values.  I know from my experience that different

15   discount rates can be used and different companies will

16   give different amounts for the same amount of money.

17   Mr. Hughes had told me that when the settlement was

18   originally offered, I think he acted with care and expertise

19   by the way in this matter, when the - or his office

20   did, when the settlement was originally offered, the

21   structured settlement, Mr. Hughes asked the defendants

22   what it was costing them to pay for this structured

23   settlement, and they told him $175,000.  He then asked

24   that they allow him the $175,000, and his office would

25   purchase an annuity policy for the plaintiff on the market

K-0039

1    at the best rate that they could get it; and I checked out

2    the annuity policy and found that this is a very solid

3    and good return for $175,000 with reference to the

4    stature of the company that's involved.  I did find out

5    and I instructed the plaintiff and his wife and mother

6    and Mr. Hughes, that it was possible to get a little bit

7    higher payments for the same $175,000, as a matter of

8    fact, rather than $1450.45 per month for the first year,

9    they could possibly get payments of up to as high as

10    $1550 a month but that this - these would be with a

11    company that was not quite as highly rated as the company

12    that's being used.  They understood this, and their

13    choice was to have the security of the company that was

14    that was used.

15    And so, the opinion that I came to, after consul-

16    tations with the experts, was that the $175,000 was the

17    present value, a fair present value, of the settlement,

18    the structured portion of the settlement, and that the

19    annuity purchased for it was a good solid annuity with

20    a solid company at market rates.

21    Now, I instructed the plaintiff and his wife and

22    mother when we met with them that the verdict was $710,000,

23    and he understood that, the contributory negligence was

24    found to be - comparative negligence, 12 and 1/2 percent

25    with 8 and 1/2 percent interest for two years.  The total

1   came to $720,650.  The -- I determined from the insurance

2   policies from Mr. Allen and from Mr. Wells that there

3   were two insurance companies involved here. The Home

4   Indemnity which was the primary carrier had originally

5   $100,000 coverage, and under the provisions of the policy,

6   they had paid certain payments out for maintenance of

7   the plaintiff and for attorneys' fees and so forth which

8   brought - which under the policy could be deducted from

9   their coverage, and therefore, brought the amount that

10   they had available to contribute to the settlement down

11   to roughly $76,000.

12       The -- Mr. Allen -- That was the Home Indemnity.

13   And Mr. Allen's company, the American Motors, Kemper,

14   had a limit of liability of $400,000.  So, between the

15   two insurance companies, there was $476,000 available

16   for contribution to the settlement.

17       I also requested financial statements concerning

18   the defendant, Jenny C, so that I could advise the

19   plaintiff as to his possibility of collecting any excess

20   against the defendant.  And Mr. Spunt who represents the

21   Jenny C Incorporated, which is a Rhode Island corporation,

22   furnished me financial statement and a certificate of

23   his that that - this was an accurate financial statement.

24   As a matter of fact, he furnished me a - copies of the

25   corporate tax return of the corporation, Jenny C

K-0041

Corporation, which revealed that the only asset of the corporation was this vessel; and the vessel, I also asked for and received an appraisal by a maritime expert of the value of this vessel, and the value was some $105,000.

The tax -- I'm sorry. I thought I heard something. The tax return of the defendant, Jenny C, showed that this vessel was carried on the books at about - if you give me one moment.

(P A U S E)

The tax return indicated - corporate tax return of the Jenny C Inc. on schedule L indicated that the depreciable asset which was the vessel was carried on the books at $105,855, and less accumulated depreciation carried on the books at $62,705. I advised the defendant - rather, the plaintiff of this; and in our conference, I advised the plaintiff also of the supplementary proceedings process and what would happen if he sustained his judgment through appeal and proceeded to try to get execution against the vessel. The plaintiff very promptly stated to me that he didn't want to go against the owner of the vessel who was a Mr. Gary Champlin. He said he was very friendly with the Champlin family. They've been very nice to him, and he said - I can quote him verbatim, he wouldn't want to take away anybody's livelihood, and he was very strong about this.

1      I discussed the plaintiff's medical history at

2  length with him and his personal history. He went to

3  the South Rose Elementary School to the sixth grade. He

4  went to South Kingstown Junior High School to the eighth

5  grade at which time he left, and he went to work. His

6  subjects were shop, woodworking, machine shop, so forth,

7  English, Science, Math. He failed everything in the

8  eighth grade excepting Mathematics, and he stated to me

9  that he got an A in Math. He couldn't pass anything

10  which required reading because he was unable to read.

11      I asked from his mother his psychological records,

12  and she presented me with this folder which have rather

13  voluminous records of psychological testing and reports

14  by the South Kingstown School Department, by Dr. Denhoff

15  of the Child Development Center, by Madeline Sullivan

16  who's a school psychologist, there are various educational

17  evaluations, various test forms. And I reviewed these.

18  These revealed that the plaintiff, Dennis Dimon, has

19  average intelligence. His I.Q. on a verbal scale was 87

20  which is dull normal. His -- On a performance scale,

21  his I.Q. was 110 which is high average. And on his

22  overall full scale I.Q. was 98 which is listed as average.

23  And all of the psychologists and doctors state  that it

24  is average.

25      Dr. Denhoff found that the plaintiff had a cerebral

K-0043

12

dysfunction and integrative language disturbance.

Various other psychologists have found things in this area

which would mean he had a perceptual handicap. His

mother has stated to me, although the records don't

state this in these words, but his mother has stated to

me that when she took him to the University of Rhode

Island for testing, they told her that he had borderline

dyslexia. And the sum and substance of all of these

reports were that he is a person who has average intel-

ligence but has a dysfunction with reference to reading,

and he has not been able to learn to read, and that's

why he gave so much concern to this Court.

I did find in talking with him that he understood

readily the things that I said to him; and as he was -

he was much better than average in Mathematics as his

school records show.

Now, when I had the conference with the plaintiff,

his mother, and his - and his wife, I spoke with him

first while the attorney was present, and then I asked

the attorney to leave, and I told everybody that I wanted

to be able to state to the Court that I talked with the

plaintiff and his mother and his wife outside the

presence of his attorney so that he could reply to my

questions with no pressure, with no fear of embarassing

anybody. I asked him if he was satisfied with the

1   services that the attorneys performed, and he said that

2   he was.  I asked him if he had any complaints or any

3   questions that he wanted to raise with me.  At this time,

4   his mother had one question.  She was of the understanding

5   that after the settlement was made, that the insurance

6   company would still pay for some cosmetic surgery to

7   Dennis' left eye.  I called in Mr. Hughes, and he stated

8   categorically this was not so, that once this was done,

9   there was no more comeback against the company.  I --

10  Dennis stated that he understood this.  I told him that

11  from what I had gathered this surgery could cost five to

12  $10,000.  Asked him if he understood this.  He said he

13  did, and he still wanted to go forward with the settlement.

14       Again, speaking with him outside the presence of

15  his attorney, I discussed the settlement sheet, and the

16  attorney's fees.  Now, the plaintiff had originally

17  signed an agreement with the attorney's firm for a

18  one-third contingent fee.  And by the way, I asked why

19  this firm in Boston was selected, and the plaintiff's

20  mother told me that she had -- she looked for an admiralty

21  firm, a firm that specializes in admiralty.  She talked

22  with a number of people in the area who had cases, found

23  out that this was a good firm.  I say this to the Court

24  because it was a sophisticated choice that was made.

25  This is an admiralty firm.  I know them to specialize in

14

1    this, and they're very familiar with the admiralty work.

2        The one-third contingency fee had been agreed to,

3    and this fee would have come out to a little bit more

4    than the $141,485.47 that the attorneys are charging.

5    But they had agreed with Dennis that he would receive

6    out of the $250,000 in cash $100,000.  So, they modified

7    their fee down by several hundred dollars in order to

8    allow $100,000 balance to come to the plaintiff.  So

9    that of the $250,000 up front, once the attorneys'

10   costs are reimbursed to them for medical records,

11   depositions, and witness fees and so forth, and these

12   costs were quite modest, I thought, for a case of this

13   size, and Dr. Levin's bills were paid, and the attorney's

14   fees of $141,485.47 which were modified down from

15   $141,666.66 were deducted, the total bills and expenses

16   came to $150,000, and the plaintiff will receive $100,000

17   in cash.  Although it has no part of this case, the

18   plaintiff understands that there is an IRS lien of

19   $4679.35 which he will have to pay from his proceeds

20   which will bring his proceeds down to $95,320.65.

21       I advised the plaintiff and his family of the pros

22   and cons.  I told them that they had a judgment in excess

23   of $700,000, that once the settlement of $425,000 was

24   accepted, there would be no comeback whether there were

25   further hospitalizations or whatever.  I discussed with

1   the plaintiff Dr. Levin's resume of his condition which

2   states that, in effect, that he has a tearing eye which

3   will always be subject to infection, that he will need

4   one or two more operations, that he has some problems

5   with depth perception which could make it difficult or

6   dangerous to work with sharp objects at close range; and

7   asked him how he was doing.  He told me he has been

8   working on another vessel since the accident, and he

9   intends to continue working as a fisherman.

10      I told him that there would be a hearing in which

11  Judge Watson would decide whether or not the liability

12  in this case would be limited to the value of the vessel,

13  and that although I hadn't researched it as carefully

14  as I'm sure the Judge would, that my opinion, after my

15  research, was that he would prevail on this because of

16  what I said before, the privity or knowledge that could

17  be attributed to the owner of the vessel.

18      I also told him what the appeal process was.  I

19  advised him, in my opinion, as to how long an appeal

20  would take before the First Circuit, and the outside

21  possibility of appeal to the United States Supreme Court.

22      The main thing I want to state to the Court is

23  that he understood what I was saying to him, and I took

24  care to point out the down side or the dark side of all

25  the settlement so that he could make an informed judgment,

1    and he told me that this structured settlement is more

2    money than he has ever earned as a fisherman, and he

3    will still be able to work as a fisherman.  I asked him

4    what he was going to do with the $100,000, and he stated

5    to me that he was going to buy a house for himself and

6    his family, he was going to make a modest down payment,

7    that he had a modest house near the University of Rhode

8    Island he was going to buy for $77,000, he was going

9    to make a small down payment, and get a mortgage and put

10   the rest of it in the bank.  He also wanted very much

11   the annuity because that would be something that would

12   keep coming to him and would be a guarantee against his

13   spending the money in an improvident way.

14        The earnings that he had made as a fisherman

15   reported on his income tax in 1980 were roughly $11,000,

16   in 1979 roughly $8,000, and in 1982 roughly $12,000.  So,

17   the amount he is receiving on the settlement is more than

18   he has ever earned as a fisherman.

19        I went over the copy of the settlement sheet with

20   the plaintiff in detail, and he told me he had already

21   gone over it with his attorneys, and he understood it

22   and was satisfied with all the expenses and the legal

23   fees.

24        I determined one other thing, your Honor, well,

25   several other things, but what's important here is I

K-0048

1    asked about whether or not there were any hospital liens,

2    Blue Cross liens, or subrogation of any kind which would

3    take away from the amount of money that would be coming

4    to the plaintiff; and I determined that there is no Blue

5    Cross, there is no hospitalization, there's no subrogation

6    of any kind so that this sum of $95,320.65 he will have

7    net to him after he pays the Internal Revenue lien.

8         One final thing I found out from Mr. Hughes that

9    the price or the terms of this annuity which he has

10   gotten a commitment for will change on May 6, 1983.  We

11   can't tell whether the terms will be better or they will

12   be worse.  The -- Mr. Hughes got an opinion from the

13   insurance people that they will probably be worse.  This

14   is because of the fluctuating interest rates.  But if

15   the contract -- excuse me.  I think I said May 6, 1983.

16   If the contract is purchased on or before May 6, 1983,

17   then that amount that I have discussed with the Court

18   will be available.

19        In sum, your Honor, I did not attempt to advise

20   the plaintiff one way or another whether he should accept

21   this settlement.  The plaintiff is an adult.  I understood

22   my function to be to determine whether or not he understood

23   the terms of the settlement.  I think that I exercised

24   an excess of caution and went maybe farther than I had

25   to, but I wanted to do this, to go into the plaintiff's

1   background, to go into the law of the case so that I

2   could tell him what, in my opinion, would be all the

3   downside risks of the settlement and make sure that he

4   understood these; and although I wasn't in any attempt

5   trying to evaluate the prospects on appeal, I did want

6   to tell him what could happen, that he could prevail on

7   the motion to limit liability, that he could prevail on

8   the motion - I thought he probably would prevail on that,

9   that he could prevail on the motion for new trial, that

10  he could prevail on appeal, and he could come out with a

11  judgment in excess of $700,000 plus accumulated interest;

12  and he understood this. I also told him the possibilities

13  on the other side. The -- That -- And if he did want -

14  prevail on his judgment, that all he could get from the

15  companies would be some $476,000 and would then have to

16  proceed against the corporation the vessel at forced

17  sale, might bring anywhere from fifty to $100,000. He

18  would still come up short.

19       But as I said, he was very adamant about the fact

20  that he did not want to go against the corporation. He

21  did not want to deprive Mr. Champlin of his right to earn

22  a living. And the bottom line is that, in my opinion,

23  he understood the things that I was saying to him despite

24  the fact that he has this reading disability and cannot

25  read - can't read the releases or whatever. He is aware

1    of what's happening, and it is his choice and his free

2    choice to accept this settlement.

3        THE COURT:  Any questions of Mr. Decof?

4        MR. ALLEN:  No, your Honor.

5        MR. HUGHES:  No, your Honor.

6        THE COURT:  All right, no questions.  Let me say

7    this, Mr. Decof, I certainly appreciate what you've

8    done for this Court.  I must be candid and say I didn't

9    quite know what my jurisdiction was in this matter.

10    Counsel requested that I take it upon myself to evaluate

11    the settlement offer, and I really still don't know

12    whether that's within the jurisdiction of the Court; but

13    I've assumed the responsibility for whatever it's worth.

14        To begin with, I place on the record I consider

15    the report that you have just rendered an exhaustive

16    report detailing every element of the case which was

17    done in a highly professional manner and could only be

18    done of a man of your caliber and your experience in

19    this area of the law.  Certainly, I think we ought to

20    place on the record that Mr. Decof is a leading member

21    of the Rhode Island Bar and who has, in addition, an

22    enviable reputation that extends well beyond the State.

23    It would not be inappropriate for me to ask you to submit

24    to the Court - I don't want to give you added work, but

25    if you have one, I would think you have one all made up,

1     a curriculum vitae of yours that's all typed.  I would

2     like to --

3          MR. DECOF:  Yes, your Honor, be happy to do that.

4          THE COURT:  I would like to file your curriculum

5     vitae with the records of this case so that if it's

6     ever reviewed, they'll know the kind of person who has

7     rendered this report.

8          Now, also, I want to straighten out your fee at

9     this time.  Are you prepared to state what your fee is?

10          MR. DECOF:  Yes, your Honor.  I notified the parties

11     that the Court had instructed me to present a bill for

12     my services in rendering this report, and my original

13     understanding was that this would be paid by the

14     plaintiff.  However, Mr. Allen and Mr. Wells advised

15     that their insurance companies will pay this fee so that

16     the plaintiff will - will not have any more money coming

17     out of his area of settlement.  I told Mr. Allen roughly

18     what my fee would be last Friday.  But I have prepared

19     a bill which did not include this morning, but it came

20     to 18.5 hours at $150 an hour which is, I think, a

21     reasonable fee, and this Court has held to be a reason-

22     able fee.  It's less than I ordinarily charge per hour,

23     which comes to $2775.

24          THE COURT:  Okay.

25          MR. DECOF:  We have another hour that came here.

1    I'm not going to make an issue out of that.

2        THE COURT:  Well, since they asked for this hearing,

3    I feel at liberty to say I order that that fee be paid

4    and be part of this order of the Court; and I assume

5    that will be paid in 48 hours, and not 48 months.

6        MR. ALLEN:  Your Honor, probably take about a week

7    to get it back from New York.

8        THE COURT:  Well, let's say within one week, all

9    right?  All right, I feel every avenue has been explored

10   to insure that this plaintiff has the capacity and does

11   indeed understand this settlement.  Certainly, we can

12   say that he's made an informed judgment to accept the

13   offer; and as far as the Court is concerned, I can do no

14   more than say he apparently knows what he is doing, and

15   which is about as far as the Court can go.  I do not

16   believe you expected the Court to go any further than that.

17   Am I correct?

18       MR. ALLEN:  Yes, your Honor.

19       THE COURT:  Okay.  I might just add that there was

20   some thought originally when I first saw this man as to

21   whether or not he had the capacity to handle $100,000 in

22   cash money which would be turned over to him.  That

23   certainly is a lot of money.  I do not believe it's

24   within the province of this Court to try - even attempt

25   to impress a trust upon it.  He knows what's he's doing.

K-0053

22

1   He's an adult.  He's married, and I can only hope that

2   they use discretion because once that money's gone, it's

3   gone forever.  It better be used wisely and carefully.

4        All right, I thank you very much, and I thank you

5   again, Mr. Decof.  I certainly appreciate the responsi-

6   bility that you assumed, and I must say again as usual

7   you did it magnificently.

8        MR. DECOF:  Thank you, your Honor.

9             (A D J O U R N E D)

10            * * * * * * * * * *

1

2          I, Joseph A. Fontes, Official Court Reporter for the

3    United States District Court for the District of Rhode Island,

4    appointed pursuant to the provisions of Title 28, United States

5    Code, Section 753, do hereby certify that the foregoing is a

6    full, true and correct transcript of proceedings had in the

7    within-entitled and numbered cause on the date hereinbefore

8    set forth; and I do further certify that the foregoing

9    transcript has been prepared by me or under my direction.

10

11

12

13                                          (Court Reporter)

14

15

16

17

18

19

20

21

22

23

24

25

                                                        K-0055

1

VOLUME:  I
PAGES:  1 through 123
EXHIBITS:  See Index


UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-11073 WGY


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
DENNIS DIMON,                    )
                    Plaintiff,  )
                                 )
     VS.                         )
                                 )
METROPOLITAN LIFE INSURANCE )
COMPANY, KEMPER INSURANCE    )
COMPANY, MORGAN STANLEY DW   )
INC., MICHAEL B. LATTI,      )
LATTI ASSOCIATES, and        )
LATTI & ANDERSON LLP,        )
                    Defendants. )
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*



     **DEPOSITION OF MICHAEL B. LATTI,** a witness
called on behalf of the Defendant, taken pursuant
to the Provisions of the Federal Rules of Civil
Procedure, before Julie A. Healey, a Certified
Shorthand Reporter, Registered Professional
Reporter, and Notary Public in and for the
Commonwealth of Massachusetts, at the offices of
Ciapciak & Associates, P.C., 99 Access Road,
Norwood, Massachusetts, on July 25, 2006,
commencing at 11:08 a.m.



COPLEY COURT REPORTING
101 Tremont Street
Boston, Massachusetts 02108


COPLEY COURT REPORTING, INC.
(617) 423-5841

**Page 2**

```
1  APPEARANCES:
2  THE KAPLAN/BOND GROUP
   BY: Brian Keane, Esq.
3  88 Black Falcon Avenue, Suite 301
   Boston, Massachusetts 02210
4  Counsel for the Plaintiff
5
6  CIAPCIAK & ASSOCIATES, P.C.
   BY: Peter M. LeBlanc, Esq.
7  99 Access Road
   Norwood, Massachusetts 02062
8  Counsel for the Defendant,
   Metropolitan Life Insurance Company
9
10
   SULLIVAN WEINSTEIN & McQUAY, P.C.
11 BY: Sandra Sue McQuay, Esq.
   Two Park Plaza
12 Boston, Massachusetts 02116-3902
   Counsel for the Defendant,
13 Morgan Stanley DW, Inc.
14
15 TODD & WELD, LLP
   BY: John E. DeWick, Esq.
16 28 State Street
   Boston, Massachusetts 02109
17 Counsel for the Defendants,
   Michael B. Latti, Latti Associates,
18 and Latti & Anderson LLP
19
20 DRINKER, BIDDLE & REATH, LLP (VIA TELEPHONE)
   BY: Kevin Golden, Esq.
21 One Logan Square
   18th and Cherry Streets
22 Philadelphia, Pennsylvania 19103-6969
   Counsel for the Defendant,
23 Kemper Insurance Company
24
```

**Page 3**

```
                   I N D E X
Witness      Direct Cross Redirect Recross
MICHAEL B. LATTI
(By Mr. LeBlanc)  5          118
(By Mr. Keane)         97
(By Mr. Golden)             112

                 E X H I B I T S
Exhibit No.          Page
1   Settlement Sheet          43
2   Pages 153-155 of          62
    Dennis Dimon's Deposition
3   Fax dated 6/12/03         65
4   Annuity Application       76
5   Letter dated 8/12/83      79
6   Letter dated 9/26/83      82
7   Letter dated 10/10/83     82
8   Letter dated 10/12/83     86
9   Docket Sheet             104
```

**Page 4**

```
                  PROCEEDINGS
          MICHAEL B. LATTI, having been
satisfactorily identified and duly sworn by the
Notary Public, was examined and testified as
follows:
          MR. LeBLANC: First, does everyone
want to enter into the usual stipulations, waive
objections except as to form, waive notary?
          MR. DeWICK: Is thirty days?
          THE WITNESS: One thing, I want to
read it and sign it, read and sign.
          MR. DeWICK: Okay.
          MR. LeBLANC: Do you want sixty days?
          MR. DeWICK: I don't care, thirty
days is enough.
          MR. LeBLANC: Okay, thirty days.
Does everyone agree to that?
          MR. KEANE: Yes.
          MR. DeWICK: Yes.
          MS. McQUAY: Yes.
          MR. LeBLANC: Kevin, can you hear us?
          MR. GOLDEN: Yes, that's fine by me.
          MR. LeBLANC: Okay.
          THE WITNESS: Kevin represents?
```

**Page 5**

```
          MR. DeWICK: Kemper.
               DIRECT EXAMINATION
BY MR. LeBLANC:
   Q.   My name is Peter LeBlanc, I represent
MetLife.
   A.   Okay.
   Q.   And I guess my first question is could
you state your full name?
   A.   Michael B. Latti.
   Q.   And what does the B. stand for?
   A.   Bruce.
   Q.   Okay, and where do you currently reside?
   A.   26 Surf, S-U-R-F, Point Road, York,
Maine, it's actually York Harbor. My mailing
address is York, Maine.
   Q.   Okay, and how long have you resided
there?
   A.   About fifteen or sixteen years.
   Q.   Okay, and before you moved to York, where
did you reside before then?
   A.   In Concord, Concord, Mass.
   Q.   Okay, and how long did you reside in
Concord?
   A.   Oh, thirty years or so, thirty years
```

**Page 6**

```
plus.
   Q.   Okay. Can you tell us how long you've
been in the practice of law?
          MR. DeWICK: Objection.
BY MR. LeBLANC:
   A.   I was actively practicing from 1960 until
'99 when I became of counsel with the firm of
Latti Associates. It later became Latti &
Anderson, and I, today, I'm of counsel, but I'm
not actively practicing.
   Q.   Okay, and in 1999 when you became of
counsel, who were the partners at Latti &
Associates at that time?
   A.   David Anderson, Carolyn Latti, and
myself.
   Q.   Okay, and what's Carolyn Latti's
relationship to you?
   A.   It's my daughter.
   Q.   And Mr. Anderson?
   A.   Son-in-law.
   Q.   Okay. What was the corporate form, the
business form of Latti & Associates in 1983?
   A.   It was probably, '83, it was Michael B.
Latti and Roger E. Hughes doing business as Latti
```

**Page 7**

```
Associates, most of '83.
   Q.   Okay. When you say doing business as,
was it a partnership?
   A.   It was a partnership, Roger Hughes became
a partner in March of '83, but the agreement was
predated to January 1st, '82, so, he actually
became a partner in '82, January 1st, '82.
   Q.   Were there any other partners at that
time?
   A.   No.
   Q.   Any associates?
   A.   There was about eight or nine associates
that worked for the firm.
   Q.   Okay, and what was the agreement between
the firm and the associates at that time?
   A.   I don't understand your question.
   Q.   Did you have agreements with the
associates about their employment with Latti &
Associates?
   A.   They were employees, there wasn't a
written contract, they were employed day-to-day I
guess or year to year.
   Q.   Okay. Did Latti & Associates provide
those employees benefits?
```

8

1    **A.**  It wasn't Latti & Associates, it's Latti
2  Associates.
3    **Q.**  Okay, thanks for clearing that up, there
4  was some questions about that before.
5    **A.**  Yes, it's Latti Associates.
6    **Q.**  Did Latti Associates provide those
7  employees benefits?
8    **A.**  I don't, what time are you referring to?
9  There was a time -- first of all, at that time in
10  '83, there's no question there were benefits, they
11  were Blue Cross and Blue Shield and there was
12  pension benefits, it was a defined pension plan.
13       I'm almost sure it was '83 that we had
14  that. I know there was Blue Cross and Blue
15  Shield. At some point, we developed a defined
16  pension plan, and that continued until '94, or I'm
17  not sure, yes, until '94, it continued until '94
18  or '95.
19    **Q.**  Okay. Did these employees have, were
20  they covered by a malpractice insurance policy?
21    **A.**  Yes.
22    **Q.**  Were the partners covered by the same
23  policy?
24    **A.**  Yeah.

9

1    **Q.**  And do you know the name of the company?
2    **A.**  Oh, no, not at that time, no. You're
3  referring to '83 or '84?
4    **Q.**  Yes.
5    **A.**  No.
6    **Q.**  The early 80's.
7    **A.**  No, no.
8    **Q.**  But you're certain there was insurance
9  coverage?
10    **A.**  I'm positive there was malpractice
11  coverage.
12    **Q.**  Do you know what your bar number is, your
13  Massachusetts bar number?
14    **A.**  No, no.
15    **Q.**  Do you have a card?
16    **A.**  I have a card, yeah. I do not have it on
17  me though. I still am listed at the bar
18  association, the Board of Bar Overseers.
19    **Q.**  Did you go through a process to change
20  from active to inactive status?
21    **A.**  No, I'm still active status. I still go
22  to court, but I choose not to go to court at this
23  time. I'm retired basically.
24    **Q.**  Okay. Do you have any active cases at

10

1  this time?
2    **A.**  No, none. The only active case is this
3  case.
4    **Q.**  An active case where you're representing
5  another party?
6    **A.**  No.
7    **Q.**  Okay, and have you ever had a complaint
8  filed against you with the Board of Bar Overseers?
9    **A.**  I've had complaints, they've all been
10  dismissed as far as I can remember. I know of no
11  complaint that ever went to the hearing stage.
12    **Q.**  And what did these complaints allege?
13    **A.**  I don't even remember. They were
14  frivolous, and they were dismissed. By memory, I
15  know of no complaint that was filed that ever went
16  to a hearing stage, they were all dismissed.
17    **Q.**  And how many complaints are we talking
18  about?
19    **A.**  I don't know, I don't remember. Maybe,
20  maybe three or four in forty-six years people have
21  filed, but none recently.
22    **Q.**  Do you know of any complaints that were
23  filed against other attorneys at Latti
24  Associates --

11

1    **A.**  Yes.
2    **Q.**  -- for that early 80's period?
3    **A.**  I don't know whether it was in the 80's,
4  I think it was in the 80's, early 80's, there was
5  a complaint filed against Joe Flannery.
6    **Q.**  And do you know what the basis of that
7  complaint was?
8    **A.**  He was an alcoholic, unknown to me, and
9  he was a diabetic. The person filed the complaint
10  that he entered into a settlement on a case which
11  he never opened in the office. He handled himself
12  as his own.
13       He had no docketing or anything available
14  to him. He didn't docket it and he let it go to
15  judgment for the defendant. He settled the case
16  with her with his own money. He faked a release
17  with an insurance company, but he paid the money.
18       He was disbarred indefinitely or he was
19  suspended indefinitely by the hearing committee of
20  the bar association, and we appealed the case, I
21  appealed the case and a person by the name of
22  Jerry Facher from Hale and Dorr appealed the case,
23  and an opinion was written by Liachos, the supreme
24  judge of the Supreme Judicial Court that alcohol

12

1  was a disease, alcoholism, and he had suffered
2  enough, and he was reinstated by the chief judge,
3  and he was with me several, I think several years,
4  and then he left to go on his own.
5    **Q.**  Okay.
6    **A.**  But he was a recovering alcoholic, he is
7  at present, at the present time.
8    **Q.**  Do you know what time period when this
9  complaint was filed?
10    **A.**  No, it was either in the late 70's or
11  early 80's. His alcoholism was unknown to me, he
12  drank vodka.
13    **Q.**  Now, you said that you brought an appeal
14  and that this other attorney brought an appeal?
15    **A.**  I did and Jerry Facher from Hale and
16  Dorr. We appealed the case from the lower level
17  of the hearing before the bar association.
18    **Q.**  Okay, and at any time was Latti
19  Associates involved in the complaint?
20    **A.**  That I don't know whether it was -- well,
21  it became Latti Associates when Kaplan -- well, we
22  dissolved the partnership in '77 or '78, it was
23  probably Latti Associates at that time when we
24  appealed it.

13

1    **Q.**  Okay, and when you say we dissolved the
2  partnership, are you referring to your partnership
3  with Mr. Kaplan, David Kaplan?
4    **A.**  Yes.
5    **Q.**  And how did that partnership come to be
6  dissolved?
7    **A.**  David Kaplan cheated and was dishonest in
8  the manner in which he hid at least three vessels
9  that he had constructed, three fishing vessels in
10  Brownsville, Texas. I became aware of that only
11  through someone telling me that it was the names
12  of his children instead of in his names.
13       I went up to the State House and I found
14  that was true, that there were three vessels, and
15  people that we had sued, he was insured by
16  different companies that we had brought suit on
17  behalf of fishermen, so, it was a terrible
18  conflict.
19       I had no knowledge whatever of him
20  building these boats, and I thought he was trying
21  cases and taking time to practice law, but he
22  wasn't.
23       These three boats came to Boston, and I
24  confronted him with the story that I just stated.

**14**

1 He denied it at first and then admitted it, and I
2 dissolved the partnership because of that, and he
3 continued then in a, we had a dissolution, we were
4 represented. I bought him out, I prevailed in the
5 dissolution and bought him out and paid him, I
6 don't remember the percentage on every case that
7 was in the office, and he agreed not to practice,
8 and we caught him practicing law, which at that
9 time was lawful.
10        You could enter into a noncompete clause
11 and agreement. Since that time it has come about
12 that you cannot prevent a person from practicing
13 law, and he agreed in the agreement of dissolution
14 and compromise not to practice law, and he did
15 practice law, and he was acting as the lawyer for
16 the same client that we represented. That's how
17 we found that he practiced law.
18        So, I let him practice law, I could care,
19 I did not care if he practiced law or not, and I
20 relieved him of the obligation and he continued to
21 practice law. We dissolved in, I guess in '77.
22    Q.   And what was the name of the firm that
23 both of you were partners in?
24    A.   At one point, I can remember that it was

**15**

1 Kaplan & Latti and then we had Kaplan Latti and I
2 think Flannery for a while, I'm not sure. These
3 were the two entities, but I'm not sure when we
4 dissolved whether it was Kaplan Latti & Flannery
5 or Kaplan & Latti.
6    Q.   Are you sure or do you have a specific
7 recollection whether Mr. Flannery was a partner in
8 that pre 1977 firm?
9    A.   At some point, Joseph Flannery, prior to
10 the hearing on suspension, he was a limited
11 partner. He got a percent that was above a
12 certain figure gross that we made, and that only
13 lasted I believe for one or two years, that's it.
14    Q.   And do you recall what years those were?
15    A.   No, not at all.
16    Q.   Do you recall if it was before he got
17 suspended?
18    A.   That I recall because we did not use his
19 name after he was suspended, and he was released
20 at that time when the matter was pending.
21 According to the bar association, he was no longer
22 allowed to practice.
23    Q.   Now, when Mr. Flannery was a limited
24 partner and he received a percentage of profits

**16**

1 after a certain formula was applied, what other
2 responsibilities or duties or authority did he
3 have?
4    A.   That's difficult, very broad to answer.
5 He was just a practicing attorney, tried and
6 settled cases, and I don't know what you're
7 driving at here for the question. It's too broad.
8    Q.   Did he make hiring and firing decisions
9 at the firm?
10    A.   No.
11    Q.   Did he make decisions about what cases
12 you would bring into the firm?
13    A.   Yes.
14    Q.   On his own or in consult with you?
15    A.   No, he would, he would talk to me, and we
16 would decide what to take and which cases to
17 prosecute and that type of thing, yeah, oh, yeah.
18    Q.   Did he have authority to overrule your
19 decisions about what cases to take if he felt
20 strongly about a case?
21    A.   We weren't that way, we were very close,
22 Joe Flannery and myself. We also worked out an
23 understanding where it was unanimous, either he or
24 me or I would listen to him and he would listen to

**17**

1 me and then we would decide, and it was always, it
2 seemed to me it was never any conflict with Joe
3 Flannery. I was just shocked by what happened.
4    Q.   When Mr. Flannery took that case outside
5 the office, did you feel that that should have
6 been a Latti Associates case?
7    A.   Did I think that it should have been, no
8 question it should have been a Latti Associates
9 case because other than, a lawyer was not allowed
10 to practice separate and compete with Latti
11 Associates.
12        Cases came to Latti Associates through
13 the associates, and sometimes they would get
14 credit in bonus time, all the associates got
15 bonuses.
16        So, if they brought cases into the
17 office, that would be accounted for when the time
18 for bonus came. In a sense, they owned the case,
19 even though they processed it through Latti
20 Associates.
21        So, it was mentally so much for ownership
22 for a case and so much for processing the case,
23 and the formula was not set, but the person would
24 be given merit depending on the case itself. In

**18**

1 other words, a large case, a small case.
2    Q.   Okay. Who made the decision about how
3 much credit an individual associate would get?
4    A.   I would make the decision along with my
5 partners.
6    Q.   Okay.
7    A.   They would have input depending on what
8 interest they had. Roger Hughes had more of an
9 input because he was, in all the profits, he had
10 15 percent which accounted for a significant sum
11 of money at Latti Associates when he was a
12 partner.
13        Joe Flannery had very little input
14 because he was a limited partner, he was like a
15 junior partner.
16    Q.   Okay. When you just testified all my
17 partners, was there ever a time between '77 and
18 '99 that you had more than one partner?
19    A.   I can't answer that. I don't know when
20 Flannery was a limited partner, I don't remember
21 when that was. I doubt, I doubt whether it was
22 after '77 because David Kaplan and I were together
23 from 1960 to 1977, and Joseph Flannery became a
24 limited partner during that time, so, it was

**19**

1 prior.
2    Q.   Okay. During the time that you were a
3 partner with Roger Hughes, did you have any other
4 partners during that period of time?
5    A.   I don't think so.
6    Q.   Okay, and Mr. Hughes' partnership
7 interest was 15 percent?
8    A.   Yes.
9    Q.   Was your partnership interest 85 percent?
10    A.   Yes.
11    Q.   Okay, and in terms of decision making
12 authority at the firm Latti Associates when
13 Mr. Hughes was a partner, who had the decision
14 making authority at that time?
15    A.   Both of us.
16    Q.   Okay.
17    A.   In fact, Roger Hughes had a great deal of
18 authority in decision making, and he made it on
19 his own because I had back surgery in December of
20 '82 at the Mass. General Hospital, I had two discs
21 removed, and I was out of the office from, I would
22 say November the 7th or 8th until February, and
23 even in February I only came in maybe two or three
24 times for either settling up a case or when I had

| 20 | 23 |
|---|---|
| 1 to.<br>2     I was on trial when I collapsed in the<br>3 courtroom and went to the Mass. General. I<br>4 remember coming in for that, and I don't remember<br>5 sitting, I was only allowed to stand, stand or lie<br>6 down, and I couldn't sit until probably May or<br>7 June of that year.<br>8     So, I was not in the office a great deal<br>9 at the time, and Roger Hughes was very involved in<br>10 the decision making because he was my partner and<br>11 at that time very close.<br>12    Q.  And when you say at that time, you mean<br>13 that 1982, '83 period?<br>14    A.  I mean from November until I got on my<br>15 feet, basically it was May or June. I used to<br>16 take depositions lying down in our conference<br>17 room.<br>18    Q.  Okay.<br>19    A.  During that period of time of April and<br>20 May, I remember numerous cases. I was excused<br>21 from participating in trials in the Federal Court<br>22 for months, I think six or eight months.<br>23    Q.  And when you say at that time, that's the<br>24 time period you're referring to? | 1    A.  Did I do anything, I met with Jed<br>2 yesterday for about an hour and fifteen minutes.<br>3 In that meeting, he showed me some documents that<br>4 had been marked and the exhibits in depositions.<br>5     MR. DeWICK:  I'm just going to make<br>6 sure we don't disclose anything we discussed in<br>7 that meeting.<br>8     THE WITNESS:  Okay, I'm not going to.<br>9 BY MR. LeBLANC:<br>10    A.  And he gave me depositions of Roger<br>11 Hughes and the plaintiff, that's it, and I looked<br>12 at the documents, and that was it.<br>13    Q.  Okay, and when you say he gave you the<br>14 depositions of Mr. Hughes and --<br>15    A.  Copies.<br>16    Q.  He gave you transcripts?<br>17    A.  Yes, of the depositions of Hughes and the<br>18 plaintiff.<br>19    Q.  And can you describe which documents you<br>20 reviewed?<br>21    A.  All I remember is seeing different<br>22 letters from Kemper, Metropolitan, and different<br>23 documents like that that were exhibits in<br>24 depositions. |
| **21** | **24** |
| 1    A.  I'm referring from May, November of '82<br>2 until at least when I got on my feet in September<br>3 of '83.<br>4    Q.  And during that period of time or during<br>5 the period of time where Mr. Hughes was a partner,<br>6 did he have the authority to hire and fire<br>7 employees?<br>8    A.  He had the, subject to my consent or<br>9 approval, but he could bring up an employee and<br>10 hire them or fire them. He was in complete, I<br>11 wasn't even there at the office. I was flat on my<br>12 back in bed for months.<br>13    Q.  Likewise, bringing cases into the firm,<br>14 did Mr. Hughes need your consent or approval to<br>15 bring cases into the firm?<br>16    A.  He didn't need my approval, he just<br>17 brings them into the firm. He knows that's the<br>18 rule, that every case comes into the firm and is<br>19 processed by the firm.<br>20     He doesn't need my approval or my<br>21 sanction or anything. He makes his own decision,<br>22 what cases to bring in. If the case was not<br>23 meritorious and I knew it, I would say something<br>24 to him, "We're not going to take that case," and | 1    Q.  Okay. Before you saw those documents<br>2 yesterday, have you seen them before, any of them?<br>3    A.  I have seen them before, some of them,<br>4 probably not all of them. They were sent to me<br>5 when my deposition was noticed originally in May<br>6 by Jed, and I saw some of them but not all of<br>7 them.<br>8    Q.  Okay. So, prior to May, did you see any<br>9 of those documents, recollect seeing any of those<br>10 documents?<br>11    A.  Not that I -- rephrase your question or<br>12 ask it in another way.<br>13     MR. LeBLANC:  Or we can have the<br>14 court reporter read it back to you.<br>15     (Last question read back by the court<br>16 reporter.)<br>17 BY MR. LeBLANC:<br>18    A.  Not the ones that he sent, that was the<br>19 first time I saw those documents. I might have, I<br>20 don't -- no, the answer is no, that's the first<br>21 time in May that I saw those documents that I<br>22 remember.<br>23    Q.  Okay. Do you remember Latti & Associates<br>24 having a client named Dennis Dimon? |
| **22** | **25** |
| 1 he'd say "Well, we'll take it," and we'll work it<br>2 out. He'd tell me the pros and cons, and I would<br>3 listen, and then it was always a decision by both<br>4 of us.<br>5    Q.  In terms of the operation of Latti<br>6 Associates during that period of time when you had<br>7 your back surgery, the firm continued to operate<br>8 during that period of time; is that correct?<br>9    A.  Continued to operate with the associates<br>10 and with Roger Hughes in charge.<br>11    Q.  And --<br>12    A.  And the paralegals and the secretaries<br>13 and everybody.<br>14    Q.  Okay, and it continued to work on cases<br>15 and handle cases?<br>16    A.  Yeah.<br>17    Q.  And be responsible for decisions made<br>18 about cases and activity in cases?<br>19    A.  Right, yes.<br>20    Q.  Did you do anything to prepare for<br>21 today's deposition?<br>22    A.  I don't understand your question.<br>23    Q.  Did you do anything to prepare for<br>24 today's deposition? | 1    A.  Yes.<br>2    Q.  And what do you recall about that<br>3 representation?<br>4    A.  That's very broad, what do I recall about<br>5 the representation, it's too broad to answer.<br>6    Q.  Okay. Do you recall that he was a<br>7 client?<br>8    A.  He was a client.<br>9    Q.  And do you recall that the firm was his<br>10 attorney of record?<br>11    A.  We were attorney of record, right.<br>12    Q.  And that the firm represented Mr. Dimon<br>13 in a personal injury action?<br>14    A.  Yes.<br>15    Q.  Okay, and that the firm entered an<br>16 appearance on behalf of Mr. Dimon in Federal<br>17 Court?<br>18    A.  We must have, I think that's correct,<br>19 that if we represented him, that we filed an<br>20 appearance. I don't remember filing an appearance<br>21 though.<br>22    Q.  Do you recall ever meeting with<br>23 Mr. Dimon?<br>24    A.  I do remember a meeting with Mr. Dimon, |

26

1 probably two.
2    **Q.** Can you tell us what happened at those
3 meetings?
4    **A.** The first meeting with Dennis Dimon that
5 I remember was after the verdict that Joe Flannery
6 got, I don't remember the amount, but it was a
7 good verdict, and I met with Dimon, Dennis Dimon I
8 would say sometime in the beginning of April as I
9 remember it of '83.
10        He was undecided at that time whether to
11 go with Joseph Flannery, Joseph Flannery had left,
12 or to stay with Latti Associates and continue the
13 case with Latti Associates. It was being
14 appealed, I do remember that, by the boat owner,
15 meaning the insurance company involved.
16 I convinced him to stay with Latti
17 Associates and he did stay with Latti Associates.
18 I remember, that's all I remember of that meeting.
19 I met with Dimon I'd say a couple weeks after, and
20 I explained to him the settlement that, I believed
21 Rogers Hughes gave me the particulars of that
22 settlement. I do not remember settling the Dimon
23 case.
24        I recommended the settlement to Dimon, I

27

1 remember that, and that's all I remember. Oh,
2 excuse me, and Dimon agreed to the settlement that
3 was negotiated by somebody else. I could have had
4 some input into the settlement, but I do not
5 remember any input whatsoever.
6    **Q.** So, other than these two meetings in
7 April of 1982, did you ever have --
8    **A.** No, '83.
9    **Q.** '83, in 1983, did you ever have any other
10 meetings with Mr. Dimon?
11    **A.** That I don't remember.
12    **Q.** Do you ever recall speaking with him on
13 the phone at any time?
14    **A.** I don't remember. I just would like the
15 record to show that I have processed literally
16 thousands of cases, thousands, both class actions,
17 multi district, and Dennis Dimon does not stand
18 out in my mind because of the conversations I had
19 with him twenty-eight years ago, I just don't
20 remember.
21    **Q.** When you say you processed thousands of
22 cases, are you talking about in the interim
23 between 1982 and today or just throughout your
24 career?

28

1    **A.** No, over the period of forty some odd
2 years of practicing law.
3    **Q.** Do you ever recall writing any letters to
4 Mr. Dimon?
5    **A.** No.
6    **Q.** Do you ever recall or do you recall if
7 anyone else attended the meetings you had with
8 Mr. Dimon?
9    **A.** That I remember, I believe his, I have a
10 memory that they were attended by the mother and
11 by the wife, and I believe one if not both of the
12 meetings that I remember Roger Hughes was present
13 during those discussions.
14    **Q.** Did it cause you any surprise that a
15 young twenty something man would bring his mother
16 and wife to a meeting?
17    **A.** No, not at all, not a seaman because a
18 seaman constantly brought somebody with him to
19 interpret, to listen to, to understand because
20 most of the seamen, to the extent we represented
21 them, did not have an education, most of them did
22 not have an education.
23    **Q.** Okay. Do you know what Mr. Dimon's
24 educational status was, or?

29

1    **A.** Mr. Who?
2    **Q.** Dimon.
3    **A.** Simon?
4    **Q.** Dimon, Dennis Dimon?
5    **A.** Dennis Dimon, what his what?
6    **Q.** His educational level or educational
7 status was?
8    **A.** No, only I've learned from reading his
9 deposition, I think he said that he was seventh or
10 eighth grade, that's it, but I don't remember
11 that. I read his deposition last night.
12    **Q.** Did anything in his deposition stand out
13 to you as being inaccurate or incorrect?
14    **A.** I have to object to that question, that
15 is so broad.
16    **Q.** Mr. Latti, you can't object, you're not
17 an attorney.
18        MR. DeWICK: Objection.
19 BY MR. LeBLANC:
20    **A.** I will not answer that question because
21 it's too broad, I don't understand it.
22    **Q.** Okay. Did you read Mr. Dimon's
23 deposition?
24    **A.** Yes.

30

1    **Q.** Was there anything in there that you
2 found to be inaccurate?
3        MR. DeWICK: Objection.
4 BY MR. LeBLANC:
5    **A.** I skip read it and I cannot point out
6 unless you ask me a question specifically what was
7 wrong with his deposition, what part and go to
8 that part. I'm not going through 190 pages and
9 answer that question. It is too broad.
10    **Q.** And the pages you read, I'm not asking
11 you to ratify the entire deposition, I'm asking
12 you if you read the deposition, were there or was
13 there anything in the deposition that you believe
14 to be inaccurate?
15        MR. DeWICK: Objection.
16 BY MR. LeBLANC:
17    **A.** Again, I ask you to state certain parts,
18 what part was inaccurate.
19    **Q.** Okay. I've asked a question, are you
20 refusing to answer the question?
21    **A.** No, I can't answer that question, I can't
22 answer it. If you want to delineate the parts of
23 the deposition that you're referring to that were
24 inaccurate, I can answer that, but I cannot answer

31

1 each question, the answer to the question that the
2 whole deposition was other accurate or inaccurate.
3 There were parts that weren't.
4    **Q.** What parts were inaccurate then?
5    **A.** I don't remember what parts were
6 inaccurate then.
7    **Q.** We'll come back to that. In terms of
8 which attorney at Latti Associates handled
9 Mr. Dimon's case, who was primarily responsible
10 for that case?
11    **A.** That's difficult to say. At what time?
12    **Q.** In 1983.
13    **A.** In '83, the case probably was tried
14 according to the records by Joseph Flannery and I
15 do have a memory that he tried the case. The case
16 was, and I think Roger Hughes had some input into
17 the case.
18        Again, I was not present during that time
19 that it was tried in the office. It was tried in
20 February of '83, and after Joseph Flannery got the
21 verdict, the case was assigned completely to Roger
22 Hughes and he was responsible for the case.
23    **Q.** And at that point he was a partner at
24 Latti Associates?

**32**

1   **A.**  Correct.
2   **Q.**  Okay, and in fact in this period of time
3 after your back surgery in April of 1983, you had
4 at least two meetings or two meetings that you
5 recollect with Mr. Dimon?
6   **A.**  Yes.
7   **Q.**  Is that correct?
8   **A.**  Yes.
9   **Q.**  Okay. Now, do you recall if you came to
10 the office that day or those days just to meet
11 with Mr. Dimon or were you there generally
12 working?
13   **A.**  Yeah, I came to the office lying down in
14 a special car, and I think I stood most of the
15 meeting with Dennis Dimon.
16   **Q.**  In 1983, what was the mailing address for
17 Latti Associates?
18   **A.**  I would say 30-31 Union Wharf, Boston.
19   **Q.**  During that period of time, do you recall
20 if anything would have alerted you to a problem
21 with receiving mail at Latti Associates?
22   **A.**  In what month?
23   **Q.**  In 1983?
24   **A.**  I don't know whether it's '83. We

**33**

1 moved from 95 Commercial Wharf I believe in '82,
2 and we had a problem with the mail. We put in
3 cards of transfer of address with the post office.
4 We failed to get certain notification of hearings
5 and trials in the Federal Court.
6     We showed that we never got at the time
7 the notification. We had a means of docketing the
8 mail and what was received, and that was vacant,
9 so, we never got certain hearings and trial dates,
10 and we never appeared and we were defaulted.
11     By showing that, that we never got
12 notice, they were removed, the defaults, and
13 restored. That was during '82, and I don't
14 remember if it was also '83.
15   **Q.**  And was the reason you didn't get notice
16 that they mailed it to your old address instead of
17 your current address?
18   **A.**  It came back to the center. I do not
19 remember whether they were addressed to 30-31 that
20 we received it or it was addressed to 95
21 Commercial Wharf, I don't remember.
22     We showed we never got mail in the
23 Federal Court and because, I'm not sure, I don't
24 remember and I remember we tried to clear it up

**34**

1 and it still occurred and it had stopped in '82 or
2 stopped in '83.
3   **Q.**  And in answering that question, you
4 referred to docketing the mail?
5   **A.**  We had a system that the mail was
6 docketed.
7   **Q.**  And what does that mean?
8   **A.**  Every piece of mail we get, we have a
9 different, we had a book that showed that we
10 received such and such, that we received a letter
11 or something like that.
12   **Q.**  Okay, and that was every piece of mail
13 that came into the firm?
14   **A.**  Not every piece of mail, most of the
15 mail.
16   **Q.**  Okay. What mail was docketed?
17   **A.**  I think court appearances and that type
18 of thing was docketed on to a diary, into a book
19 of trials, of hearings, and things like that that
20 we had, and there was a check mark put on the
21 piece of mail so the lawyer would know that it was
22 docketed, and he would not only, so, we, when the
23 mail came in, we had docketed certain things like
24 hearings and things like that and the lawyer

**35**

1 himself was responsible for the docketing.
2   **Q.**  What about mail that didn't contain a
3 hearing date or some response due date, general
4 correspondence about a case?
5   **A.**  That was not docketed.
6   **Q.**  Okay, and when that mail came in, what
7 happened to it once it came into the door at Latti
8 Associates?
9   **A.**  Once a letter or mail came to Latti
10 Associates, we had -- in what year because it
11 varied?
12   **Q.**  1982, 1983, that time period.
13   **A.**  '82 and '83, my recollection is that the
14 office manager, Cathy Foster, slitted the mail,
15 and she would call Donna Tempesta, the secretary,
16 to go through the mail with her. Donna would
17 assist Cathy Foster in the mail. She was a legal
18 secretary, she understood docketing.
19     She knew time periods, she knew dates,
20 Cathy Foster did not. The mail was opened or
21 slitted as I called it, and it was then put in
22 different folders according to the initials of the
23 lawyers. Each folder had the initial of the
24 attorney.

**36**

1     If Donna or Cathy was not certain who was
2 handling the mail, excuse me, the file that it
3 pertained to, they would look in a docket card and
4 that would have the initials of the lawyer that
5 was handling the particular file.
6     The mail was then slotted into the
7 different folders. If it was addressed to a
8 lawyer, mail, that lawyer probably would pick it
9 unless they were certain that it was being
10 processed by somebody else even though the letter
11 was addressed to an individual.
12     Most of the time it went with the
13 individual that was handling the file. The mail
14 was docketed by Donna, checks were retained by the
15 office manager, a copy of the check was given to
16 the attorney who settled the case so he would know
17 that the check was received and the money was
18 received, and the original check would go to Cathy
19 Foster, and she would deposit that check in the
20 bank, and the mail was then, after it was docketed
21 by Donna, it was then distributed to the different
22 lawyers.
23     Sometimes Donna would distribute,
24 sometimes the lawyer would pick up his mail, but

**37**

1 if the lawyer hadn't picked up after they did the
2 mail, it would be distributed.
3   **Q.**  Where did your participation in this
4 process fit in, did you review mail that was for
5 everyone or just for yourself?
6   **A.**  First of all, in '82 you're asking, '83?
7   **Q.**  Yes.
8   **A.**  Okay, I'm assuming '82 and '83 is your
9 question, Roger Hughes looked at the mail from
10 approximately the end of '82 into '83. A great
11 deal of time I was on trial in '82 and '83, we
12 tried numerous cases. There were not rules of
13 court that precipitated settlement such as
14 discovery as today.
15     So, when I was out, when I was on trial,
16 which was constant, Roger Hughes would review the
17 mail and then it would be passed out, so, before
18 it was passed out to each individual, Roger Hughes
19 or myself would look at the mail but mostly Roger
20 Hughes.
21     When he became a partner in March of '83,
22 he constantly reviewed the mail. That was his
23 job, and I would look at the mail occasionally.
24 It was reviewed only for defaults and trouble,

## 38

1 troublesome mail that Roger Hughes felt or I felt
2 was troublesome, and then we would talk to the
3 attorney, "Why haven't you answered
4 interrogatories yet?  Why haven't you taken a
5 deposition?" or "Maybe you should take an expert"
6 and that type of thing.
7    Q.   During this early 1983 period, after
8 March of 1983, Mr. Hughes was a partner --
9    A.   Yes.
10    Q.   -- at Latti Associates?  And when did
11 that partnership end?
12    A.   In September of '84.
13    Q.   And why did it end?
14    A.   Because Roger Hughes at the time did not,
15 at the time he failed to live up to partnership
16 material as far as leadership and as far as work
17 ethic, and by agreement, it was best that he left
18 as a partner, and he left in as I said, September
19 of '84, or well, he probably left the first few
20 days of October.
21    Q.   Of October 1984?
22    A.   '84, yeah, either the end of September or
23 the beginning of October of '84.
24    Q.   Was that amicable?

## 39

1    A.   I thought it was until he sued me, I
2 thought it was until he sued me.
3    Q.   Okay.  He sued you?
4    A.   He sued me.
5    Q.   Okay, and what did he sue you for?
6    A.   For his interest in the cases, which was
7 15 percent in the existing cases, and if I
8 remember correctly, he wanted, his attorney wanted
9 an accounting.
10    Q.   Did he either get compensated 15 percent
11 and/or an accounting?
12    A.   The cases never got that far.
13    Q.   Okay.
14    A.   In other words, his lawsuit claimed an
15 interest in the case, we countered ourselves with
16 a lawsuit that was never filed, we countered with
17 a lawsuit that was never filed.
18    Q.   We being Latti Associates?
19    A.   Latti Associates.
20    Q.   And you're positive no lawsuit was filed
21 by Latti Associates or yourself individually
22 against Mr. Hughes?
23    A.   They were, or Roger Hughes was served,
24 and Owen Todd represented me at that time, and he

## 40

1 gave Hughes through his attorney a day certain
2 that he was going to enter the complaint, and
3 Roger Hughes' attorney called that day, it was
4 Good Friday, I remember it, to say that Roger
5 Hughes was dropping the lawsuit if we would not
6 enter the lawsuit.
7         The lawsuit consisted of solicitation of
8 clients and things that he had done since the
9 dissolution.  We had affidavits that were taken by
10 a former FBI man in the file of people that he had
11 completely solicited after he left, and the suit
12 was terminated by general releases and neither
13 party prevailed.
14         He signed a release and I signed a
15 release also with respect to the things that he
16 had done.
17    Q.   And do you know what court Mr. Hughes'
18 complaint was filed in?
19    A.   No.
20    Q.   Do you know if it was federal or state?
21    A.   No, I don't remember.
22    Q.   Was that suit against Latti Associates or
23 yourself individually?
24    A.   I don't remember.

## 41

1    Q.   After October of 1984, did you have any
2 other partners after that point?
3    A.   Yes.
4    Q.   And who were they?
5    A.   William Grissot.
6    Q.   Anyone else?
7    A.   I already alluded to my son-in-law and
8 daughter, I don't remember any others.
9    Q.   How long was Mr. Grissot a partner?
10    A.   Two years maybe, maybe three.
11    Q.   And was Mr. Grissot a full partner or a
12 limited partner?
13    A.   He was a full partner.
14    Q.   Okay, and what was the percentage that he
15 received from the profits?
16    A.   I don't remember.
17    Q.   Was it 50 percent?
18    A.   I don't remember.
19    Q.   And why did your partnership with
20 Mr. Grissot end?
21    A.   I believe that Bill really wanted to go
22 on his own, which he is today, and he left around
23 '92, I'd say '92, and he has a general practice,
24 corporate, and he does mediation and stuff like

## 42

1 that.  He was an excellent trial lawyer.
2    Q.   Okay.
3         MR. LeBLANC:  Can we take a quick
4 break?
5         MR. DeWICK:  Yes.
6         (A short break was taken.)
7 BY MR. LeBLANC:
8    Q.   Mr. Latti, do you remember who were the
9 parties involved in the Dimon vs. Jenny C. case?
10    A.   I don't understand your question.
11    Q.   Do you remember who the parties in the
12 Dimon vs. Jenny C. case were?
13    A.   I don't know what you mean by parties.
14    Q.   Well, what would you define a party as to
15 a case?
16    A.   A party to a case, the people that were
17 involved in the case.
18    Q.   Okay.  Who was involved in the Dimon vs.
19 Jenny C. case?
20    A.   Dennis Dimon and the boat, I don't
21 remember the boat's name.
22    Q.   Okay.
23    A.   It was the corporation probably.
24    Q.   Do you recall if any other person was

## 43

1 involved or entity was involved in that case?
2    A.   As a plaintiff sued the boat owner, which
3 was the corporation, that's to me who was involved
4 in the case.
5    Q.   Do you know if Charter Security was a
6 party to --
7    A.   No.
8    Q.   Let me finish the question, please.  Do
9 you know if Charter Security was a party in the
10 Dimon vs. Jenny C. case?
11    A.   Charter Security was not.
12    Q.   They were not a party?
13    A.   Were not a party.
14    Q.   Do you know if Kemper Insurance Company
15 was a party?
16    A.   They were not a party.
17         MR. LeBLANC:  For the record, I'm
18 going to hand everyone a copy of what was marked
19 as Exhibit 25 to Mr. Hughes' deposition.  Can you
20 mark that document as Exhibit 1, please.
21         (Exhibit No. 1, Settlement Sheet,
22 marked for identification.)
23 BY MR. LeBLANC:
24    Q.   For the record, Mr. Latti, I'm going to

**44**

1 hand you a document that we've marked as Exhibit 1
2 titled "Settlement sheet," and the case identified
3 on the settlement sheet is Dimon vs. Jenny C.
4 Corporation and a settlement date of 4/19/1983.
5        Can you look at that document, Mr. Latti?
6    A.  Okay, I've looked at it.
7    Q.  Do you know what that document is?
8    A.  It's a settlement sheet from, it looks
9 like from our office.
10    Q.  Okay, and when you say our office, you
11 mean Latti Associates?
12    A.  Latti Associates.
13    Q.  Okay, and what was the purpose of this
14 document?
15    A.  To determine out of a settlement what the
16 client gets net, what he gets clear, and to be
17 given to the client at the time if he requests it.
18    Q.  Is there any other purpose for creating a
19 document like this?
20    A.  It's standard procedure that we use a
21 settlement sheet for each case that was disposed
22 of, either a trial and settlement.
23    Q.  Do you see the third line from the top
24 where it says "Submitted by BEH/MBL"?

**45**

1    A.  Yeah.
2    Q.  And what do those initials mean?
3    A.  That means that the person that had input
4 into the case.
5    Q.  And what does having input into the case
6 mean?
7    A.  It means either that they or the
8 individual who was responsible for getting the
9 case or processing the case, and it was used by
10 myself and also my partners in determining the
11 input that the person had in the case at the time
12 that he was issued a bonus.
13        So, if I worked on the case some, I put
14 my initials on it, my initials would go on it, and
15 if Roger Hughes worked on the case at some point,
16 his initials would go on it.
17    Q.  Okay.  Would -- I'm sorry.
18    A.  Go ahead.
19    Q.  Was it possible that an attorney who
20 worked on the case didn't have their initials or
21 wouldn't have their initials on the submitted by?
22    A.  Well, Joe Flannery's are not on there and
23 he tried the case, so, it was possible.
24    Q.  And why did Mr. Flannery's initials not

**46**

1 appear on this sheet?
2    A.  Because he's no longer with Latti
3 Associates at the time of the, it looks like the
4 date of settlement was 4/19/83.
5    Q.  Okay.  So, even though Mr. Flannery had
6 taken the case to trial and tried the case and
7 left shortly after trial, he wouldn't receive a
8 portion of the credit for this case?
9    A.  It was used for the purposes of bonuses,
10 so, Flannery would not get a bonus as he was no
11 longer with Latti Associates, he was on his own.
12    Q.  Okay, and if you look down to the line
13 that says "Attorneys fees."
14    A.  Okay.
15    Q.  In parentheses it says "SB," what does
16 that stand for?
17    A.  I don't know, SB, that I don't know.  No,
18 it would only be a guess.  That, it looks like
19 Dimon wanted $100,000 clear, I don't remember
20 though, but looking at the settlement sheet, and
21 in order to do that, we had to reduce the fee to
22 $141,485.47 instead of $141,666.66.  That's
23 probably subtract, SB, I'm really guessing.
24    Q.  Okay, and whose responsibility was it to

**47**

1 prepare a settlement sheet like this?
2    A.  It was the attorney who actually was
3 responsible for the case as well as Cathy Foster
4 and the office manager.  She handled the
5 accounting on the finances of the office.
6    Q.  Okay, and in the Dimon vs. Jenny C.
7 Corporation case, what did you do on that case in
8 terms of work on the case?
9    A.  I don't remember except what I've told
10 you.
11    Q.  Okay.  Did your name appear on every
12 single settlement sheet for Latti Associates?
13    A.  No, no, but I was responsible in a sense
14 for keeping Dimon with Latti Associates because I
15 talked to him and he agreed to stay with us, and I
16 was also responsible in a sense for talking to him
17 about the settlement.
18        So, I had input into the Dimon case, so,
19 my initials would appear.  I don't know
20 whether -- strike that.  That answers your
21 question I think.
22    Q.  Now, in terms of your meetings with
23 Mr. Dimon in April of 1983 when you convinced him
24 to stay with Latti Associates, what did you say to

**48**

1 convince him to stay with Latti Associates?
2    A.  I don't remember, I don't remember.
3    Q.  Okay.
4    A.  I, I don't remember.
5    Q.  Okay.  Is it possible that you said
6 "We're going to do a good job for you, we'll
7 continue to handle your case," those kind of
8 things?
9    A.  Is it possible?  Sure, it's possible,
10 yeah.
11    Q.  Is it probable that that's what you told
12 him?
13    A.  I don't know, I don't remember what I
14 told him in order to for him to stay with the
15 firm and not go with Joseph Flannery.
16        There was a question of whether since Joe
17 tried the case, whether he would go with Flannery
18 or he had retained the firm in a sense, and I
19 really don't remember, but he felt that, he stayed
20 with us, so, he must have felt the firm was
21 important and not the individual.
22    Q.  Okay.  So, in terms of your meetings in
23 April of 1983, you had some conversations with
24 Mr. Dimon, and the end result was that he decided

**49**

1 to stay with you rather than go with Mr. Flannery?
2    A.  Right.
3    Q.  And when I say you, I mean Latti
4 Associates?
5    A.  Right, I understand that.
6    Q.  Okay.  In terms of your representation of
7 Mr. Dimon, what do you consider or what do you
8 understand it to be an attorney's representation
9 of a client?
10        MR. DeWICK:  Objection.
11        THE WITNESS:  Go ahead?
12        MR. DeWICK:  You can answer.
13 BY MR. LeBLANC:
14    A.  You mean Latti Associates?
15    Q.  Yes.
16    A.  What do I understand to represent him?
17 To get him the most money possible and to
18 compensate him for his injuries, and that's our
19 job, to get the highest award or settlement
20 possible based on the facts of the case.
21    Q.  Okay.  Is it also your job to protect a
22 client's interest?
23        MR. DeWICK:  Objection.
24

**50**

1 BY MR. LeBLANC:
2    **A.**   Is that one of our jobs or
3 responsibilities, sure.
4    **Q.**   Okay, and what do you understand it to
5 mean to protect a client's interest?
6    **A.**   As I said, to, to protect his interests,
7 to see that he's fairly compensated for his
8 injuries depending if it's a personal injury case.
9 If it's a business, then to prevail and do the
10 best that's possible for your client.
11    **Q.**   Okay, and when does the attorney client
12 relationship or representation begin in your
13 opinion?
14          MR. DeWICK:  Objection.
15 BY MR. LeBLANC:
16    **A.**   That's hard to stay.  I think most of the
17 time the attorney client relationship begins with
18 the signing of a contingent agreement where he
19 signs that we represent him and he will pay X
20 number of dollars as a fee, I think that's
21 probably the beginning of an attorney relationship
22 and client.
23    **Q.**   Okay, and when does that end?
24          MR. DeWICK:  Objection.

**51**

1 BY MR. LeBLANC:
2    **A.**   That again is very hard to say.  It
3 depends on the circumstances and the facts of a
4 case, but I think in most cases, it ends when
5 there is a settlement or a trial and the case is
6 finally disposed of, and when he receives his
7 money, that's when to me the attorney client
8 relationship would end when the case is disposed
9 of, if it's in court when the case is terminated,
10 and that's when the attorney client relationship
11 ends.
12    **Q.**   Earlier we were talking about mail
13 docketing and mail distributing in the firm.
14    **A.**   Yeah.
15    **Q.**   Post settlement, was it the practice of
16 Latti Associates to continue to distribute mail
17 that an attorney got on a case that had already
18 been settled?
19    **A.**   Yes, because he, there would still appear
20 a docket card, and if it was addressed to the
21 individual, that mail would go to that individual,
22 but again, as I testified, if they knew it was
23 being handled by somebody else, that mail would go
24 to that individual that was responsible for that

**52**

1 file or that case, whether it was pre or post or
2 whatever it was verdict or settlement.
3    **Q.**   Okay, and what was Latti Associates'
4 practice with regard to withdrawing or terminating
5 their attorney of record status on a particular
6 case after the case was resolved?
7    **A.**   The --
8          MR. DeWICK:  Objection.
9          THE WITNESS:  Excuse me.
10 BY MR. LeBLANC:
11    **A.**   The file was probably closed and stored,
12 and sometimes the court required, depending on the
13 case, it really varied.  Depending on the case, we
14 would file papers closing the case out.  If it was
15 a court ordered settlement, a compensation case,
16 when it was approved by the court, we would close
17 the file, and we wouldn't file any papers because
18 there would be approval by the judge, and again,
19 this refers only to a personal injury accident,
20 and we handled different types of cases.
21    **Q.**   What was, and I'll ask you this question
22 in kind of two parts, did you have a personal
23 practice with regard to keeping your clients
24 informed and updated on their case's status?

**53**

1    **A.**   Not a personal practice, no.
2    **Q.**   Was there a practice, a firm practice at
3 Latti Associates for keeping clients updated and
4 informed about their cases?
5    **A.**   Only according to the rules that an
6 attorney knew, ethics and conduct.  There is, it
7 was up to the individual to inform the client as
8 to matters that were relevant and particularly of
9 interest in the case itself.
10    **Q.**   And whose responsibility would it be to
11 make the determination of whether or not a matter
12 was relevant or of interest to the client?
13    **A.**   It would be a judgment call from the
14 attorney, I never sat down with the attorneys and
15 set forth rules or practices with respect to the
16 client.  He knows the ethics that he works under
17 and what is expected of him.
18    **Q.**   Was it Latti Associates' practice for all
19 the attorneys to sit down together and kind of go
20 through the cases they had active?
21    **A.**   No, not the way you said it, but there is
22 a meeting every Thursday night that a lawyer could
23 bring up any problems that he had with the cases
24 that he was handling, and we would discuss them as

**54**

1 a group which was about ten or eleven lawyers at
2 the time.
3    **Q.**   Okay, but there was no formal organized
4 system for review of particular cases on a case by
5 case basis throughout the office?
6    **A.**   They would not be reviewed by me, it was
7 up to the attorney who was responsible for the
8 file to come to the, to Latti Associates or me
9 with respect to the problems.
10    **Q.**   And if you became aware of any problem as
11 a partner at Latti Associates, what would be your
12 responsibility?
13          MR. DeWICK:  Objection.
14 BY MR. LeBLANC:
15    **A.**   If I became aware of a problem with a
16 partner, what would I do?
17    **Q.**   If you became aware of a problem with a
18 case handled by Latti Associates, what would you
19 do?
20          MR. DeWICK:  Objection.
21 BY MR. LeBLANC:
22    **A.**   I would sit down with that lawyer and
23 discuss it with him.
24    **Q.**   At any time in that 1983 period, did you

**55**

1 become aware that there was a dispute regarding
2 the settlement in the Dimon case?
3          MR. DeWICK:  Objection.
4 BY MR. LeBLANC:
5    **A.**   I have no memory of that whatsoever.
6    **Q.**   Okay.  So, when you say you have no
7 memory, you're not saying it never happened, just
8 you don't recall one way or the other?
9    **A.**   I have, I was never consulted nor did I
10 learn about any dispute between any insurance
11 companies that insured the vessel or took out an
12 annuity.  I had no knowledge of that.
13    **Q.**   And if you had knowledge of that, what
14 would be your responsibility to the client?
15          MR. DeWICK:  Objection.
16 BY MR. LeBLANC:
17    **A.**   That's difficult to say.  What would I do
18 if I became aware that there was a dispute after
19 there was a settlement is your question?
20          MR. LeBLANC:  We can have the court
21 reporter read the question back.
22          (Last question read back by the court
23 reporter.)
24

**56**

1 THE WITNESS: Excuse me, it's not as
2 to what period, what time? That's my question.
3 MR. LeBLANC: Let's have the court
4 reporter read the question back.
5 (Last question read back by the court
6 reporter.)
7 BY MR. LeBLANC:
8 **A.** Knowledge of what?
9 **Q.** The prior question was knowledge of a
10 dispute regarding a settlement after the
11 settlement was entered into, what would be your
12 responsibility to the client?
13 MR. DeWICK: Objection.
14 BY MR. LeBLANC:
15 **A.** It would depend on the circumstances
16 of -- you have to give me more facts in your
17 hypothetical that you've asked. It would depend
18 whether I would speak to the client, whether I
19 would take the information and do something.
20 It depends on the defense that was
21 involved or the settlement, what the dispute was,
22 what was the defense of the two companies
23 fighting, one or the other, it would depend what
24 the dispute was about, it would depend on how long

**57**

1 a dispute, whether I could do anything, it would
2 depend on many factors what I would do depending
3 on the facts and the situation in question.
4 **Q.** Okay. In the facts of the Dimon vs.
5 Jenny C. case where there was a settlement
6 reached, the terms of the settlement in terms of
7 the annuity paid to Mr. Dimon was disputed, what
8 would be your responsibility in those
9 circumstances?
10 MR. DeWICK: Objection.
11 BY MR. LeBLANC:
12 **A.** What would I do, in other words, right?
13 **Q.** What would be your responsibility to the
14 client?
15 MR. DeWICK: Objection.
16 BY MR. LeBLANC:
17 **A.** First of all, I have read the material
18 like I said, I have seen the exhibits, and I've
19 read the transcript of the hearing before Judge
20 Pettine, the chief judge in Rhode Island in the
21 Federal Court.
22 The dispute that arose over the annuity
23 was whether Dimon was entitled to twenty years or
24 was he entitled to payments for life more than

**58**

1 twenty years, that was the dispute.
2 Metropolitan said that it was a mistake,
3 a typographical mistake, they say that to Dimon,
4 they say that it was a unilateral. To me as a
5 lawyer, legally trained, it was a unilateral
6 mistake, which is no defense whatsoever.
7 They cannot avoid the original policy,
8 and these are things that I would consider in
9 whether I would tell Dimon. I don't believe that
10 there is an obligation or duty to tell the client,
11 but in all likelihood, in the Dimon case I would
12 say something to him if, assuming I received the
13 letters and assuming that the dispute arose where
14 they weren't going to pay after twenty years.
15 Kemper is the insurance company for the
16 vessel, they agreed to pay Dimon for life. They
17 settled the case on this basis, Kemper. They said
18 that they would pay Dimon for life which was
19 approved by Pettine, the chief judge, from what I
20 read, and not only that, Pettine appointed a
21 guardian, so, he had a guardian, there was a
22 hearing.
23 Kemper knew that they were responsible to
24 pay him for life, and they knew it and they

**59**

1 negotiated it. That was part of Dimon's contract
2 with them.
3 So, to me, Dimon always has that action
4 for enforcement of settlement against Kemper. The
5 thing that I would consider in Dimon also,
6 although there is no obligation or duty to do it,
7 to speak to him is anticipatory breach, the
8 defense of anticipatory breach.
9 We, or no attorney if we received these
10 letters could file suit. He wasn't hurt. To file
11 suit before the time was up, and the time wasn't
12 up for twenty years, he couldn't bring suit, an
13 attorney could not bring a lawsuit.
14 The excuse that Metropolitan uses a
15 typographical error, how can there be a
16 typographical error, and there are occasions on
17 typographical errors when one talks of more than
18 twenty years or just he's going to get it for
19 life.
20 That's so significant, the terms of life
21 and certain for twenty years or no more than
22 twenty years. That's no typographical error.
23 So, it's a weak defense, it's a real
24 thing. The dispute is between two companies,

**60**

1 Kemper and Metropolitan. Kemper guaranteed the
2 settlement, their gripe is against Metropolitan,
3 and Dimon should be, I say, entitled to go against
4 all of them, the broker, Metropolitan, and Kemper.
5 So, would I have told Dimon if I had
6 received the letters and knew there was a dispute?
7 On a practical basis, I think I would have told
8 Dimon something.
9 I either would have written him that
10 nothing can be done for twenty years, or I would
11 have said something to him orally, but the big
12 thing is there's nothing I could do even if I
13 received those letters, even if I learned that
14 there was a dispute because to me he has to wait
15 for twenty years.
16 Anticipatory breach is the defense, I
17 cannot sue, and then in twenty years, he has the
18 same rights as he had at the start.
19 He isn't prejudiced in any way, he has
20 just as many rights, he has the same rights today
21 as he has then, and I, I really question whether
22 the attorney client relationship still exists.
23 Did it terminate when Pettine, the chief judge,
24 said I approve the settlement and the guardian

**61**

1 told the reasons why and Pettine approved it.
2 I think it's a different matter, but I
3 still, in a practical sense, I would speak to the
4 client, I would say something to him or write to
5 him, and I'd tell him to wait for twenty years and
6 do what he did.
7 At the time I did not know I was going to
8 retire in '99, but the firm continued on, and in
9 the sense that there were different participants
10 from what I've read and looked at, Dimon contacted
11 the firm, and then he went elsewhere.
12 **Q.** So, in summary, your position is you had
13 no responsibility and no duty but you would have
14 done something anyway?
15 MR. DeWICK: Objection.
16 BY MR. LeBLANC:
17 **A.** I don't say that, my testimony stands as
18 it is. I did not say that.
19 **Q.** Was your testimony, and we can have it
20 read back, just that you had no duty and no
21 responsibility?
22 **A.** I, I --
23 MR. DeWICK: Objection.
24

**62**

```
 1  BY MR. LeBLANC:
 2      A.  -- I cannot answer that question, I did
 3  not say that.  I said there was no obligation, and
 4  there is no duty to tell Dimon according to the
 5  law, but on a practical basis, I would have told
 6  Dimon, and that's what I testified.
 7      Q.  But without any duty and without any
 8  obligation; is that right?
 9      A.  Right, I said that.
10      Q.  Okay.
11          MR. LeBLANC:  Can you mark this as
12  Exhibit 2, please.
13          (Exhibit No. 2, Pages 153-155 of
14  Dennis Dimon's Deposition, marked for
15  identification.)
16          MR. LeBLANC:  For the record, I've
17  asked that Exhibit 2 be marked, it's pages 153,
18  154, and 155 of Dennis Dimon's deposition.
19          MR. DeWICK:  Could I just ask that
20  the witness see the marked copy, please?
21          MR. LeBLANC:  Oh, sure, absolutely,
22  I'm sorry.
23  BY MR. LeBLANC:
24      A.  Okay, I've read page 153 through 155 in
```

**63**

```
 1  Exhibit 2.
 2      Q.  Thank you.  Do you have any reason to
 3  dispute that Mr. Dimon's annuity payments started
 4  in May or June of 1983?
 5      A.  I have read that, I'm not sure that they
 6  started in May.  I read the transcript of the
 7  hearing before Pettine, that was either the 3rd or
 8  4th of May.
 9          I don't know whether he received a
10  payment in May.  I think he received it in June
11  and July and continued, but I don't think he
12  received it in May from reading the transcript and
13  looking at the different documents.
14      Q.  Okay.  Let's assume for purposes of these
15  questions that he started receiving his payments
16  in June of 1983.
17      A.  Okay.
18      Q.  Do you have any reason to dispute that
19  approximately one year later, he had an
20  interruption in his payments?
21      A.  I don't know, I don't know that.  I don't
22  remember that at all.
23      Q.  Okay.  Do you have any reason to dispute
24  or any reason to dispute that he contacted Latti
```

**64**

```
 1  Associates roughly in June of 1984 to discuss this
 2  interruption in his payments?
 3      A.  I have no recollection of him contacting
 4  Latti Associates or memory of him doing what it
 5  says in Exhibit 2 that he did.
 6      Q.  Okay, and do you have any recollection of
 7  whether or not Latti & Associates, Latti
 8  Associates offered him assistance with continuing
 9  the stream of payments at that time?
10      A.  I have no memory of that.
11      Q.  No reason to dispute that that's in fact
12  what happened?
13      A.  I have no memory, I don't know if he did
14  or he didn't, I just don't know.
15      Q.  Okay.
16      A.  He never contacted me, that's the only
17  thing I can say.
18      Q.  And just to make sure I have it right,
19  your testimony is that you only recall ever
20  speaking with Mr. Dimon two times?
21      A.  I only remember two times that I spoke
22  with him.  I could have spoken with him more than
23  that, but I don't know, I don't remember.
24      Q.  Are there any written records that are in
```

**65**

```
 1  existence that would help you recall?
 2      A.  No, no, no.
 3      Q.  Okay.
 4          MR. LeBLANC:  Could you mark this as
 5  Exhibit 3, please.
 6          (Exhibit No. 3, Fax dated 6/12/03,
 7  marked for identification.)
 8  BY MR. LeBLANC:
 9      Q.  Mr. Latti, could you take a look at that,
10  please.
11      A.  Okay.
12      Q.  Mr. Latti, have you ever seen this
13  document before?
14          MR. GOLDEN:  What document are you
15  referring to?
16          MR. LeBLANC:  I'm sorry, for the
17  record, we've marked Exhibit 15 from Dennis
18  Dimon's deposition as Exhibit 3 for Mr. Latti's
19  deposition.
20          MR. GOLDEN:  Thank you.
21          MR. LeBLANC:  It consists of four
22  pages with a fax cover sheet as the first page.
23  BY MR. LeBLANC:
24      A.  Have I ever seen -- there are four
```

**66**

```
 1  documents and you said document.
 2      Q.  Right, have you ever seen these four
 3  pages together as a document?
 4      A.  I don't remember if I've seen them
 5  together, but I've seen them.
 6      Q.  Okay, and on the first page, it says to
 7  Carolyn Latti.
 8      A.  Right.
 9      Q.  Do you know a Carolyn Latti?
10      A.  The Latti is spelled incorrectly, there
11  is no E on Latti, Carolyn is my daughter.
12      Q.  Okay, and do you know if the
13  (617) 523-7394 is the fax number for Latti &
14  Anderson?
15      A.  Yes.
16      Q.  And if you turn to that second page, a
17  letter dated June 9th, 2003 to Dennis Dimon from
18  Sandy Franklin, have you ever seen that document
19  before?
20      A.  Yes.
21      Q.  Okay, and when did you see it?
22      A.  I think that document was forwarded to me
23  I'd say in February '05, February or March of '05,
24  but I'm not sure, but I have seen this document I
```

**67**

```
 1  think.
 2      Q.  And who forwarded the document to you in
 3  February or March of '05?
 4      A.  Carolyn Latti.
 5      Q.  Okay.
 6      A.  Yeah, I think in February '05.
 7      Q.  Okay, and when we're referring to this
 8  document in this circumstance, we're talking about
 9  Exhibit 3, page 2; is that correct?
10      A.  Exhibit 3, page 2, yes.
11      Q.  Okay.  How about Exhibit 3, page 3?
12      A.  I think that was forwarded to me also by
13  Carolyn Latti in February '05.
14      Q.  Okay, and how about Exhibit 3, page 4?
15      A.  I think that was forwarded also in
16  February '05.
17      Q.  So, taking Exhibit 3 as a whole, only the
18  last three pages were forwarded to you?
19      A.  I think all of them were forwarded to me
20  in February '05 was the first time I saw them.
21      Q.  Okay.  When was the first time you
22  discussed them with anyone?
23      A.  Discussed?
24      Q.  Discussed these documents with anyone?
```

**68**

1   **A.** I didn't say that I discussed them.
2   **Q.** Did you discuss them with anyone?
3   **A.** I don't think so. Well, excuse me, I
4 did, I received, Latti Associates, Latti
5 Associates I think received a letter from Kaplan
6 is my memory, David B. Kaplan in February of '05.
7     That precipitated, I think he wrote a
8 letter also that was sent to 30-31 Union Wharf
9 which was forwarded to me. That's when I received
10 these documents that you refer to as Exhibit 3,
11 and I discussed these documents with Kaplan.
12     That was the first time that I was aware
13 that there was a problem.
14   **Q.** Okay. Do you see where these documents
15 are dated 6/12/03?
16   **A.** Yeah.
17   **Q.** Or at least the cover sheet is dated
18 6/12/03?
19   **A.** Yeah.
20   **Q.** And if you look at the top, the fax
21 legend is dated June 12th, 2003, 8:50, do you see
22 where it says that?
23   **A.** Yeah, yeah.
24   **Q.** Okay. So, did you ever discuss with

**69**

1 Carolyn Latti why she didn't send those documents
2 to you sooner, she waited over a year and a half?
3     MR. DeWICK: Objection.
4 BY MR. LeBLANC:
5   **A.** The only thing that she said to me was
6 that she had spoken to Dennis Dimon at that time,
7 I imagine she spoke to him on the phone or it
8 could have been his wife or his mother, but she
9 had spoken to the Dimon's, and she had no file and
10 no way of getting the contract.
11     She had no papers on it, and that's about
12 it that she told me, and she then kept what Dimon
13 sent her, which is Exhibit 3, and it was not until
14 I asked, "Well, what's the story on Dimon, do you
15 have anything?" She says, "No file, no nothing
16 that remains from twenty some odd years ago," and
17 she said, "I did get a fax from Dimon," and this
18 is Exhibit 3. That's it.
19   **Q.** Okay. When she forwarded this Exhibit 3
20 to you, was there any cover letter with that, a
21 fax cover or anything?
22   **A.** Not that I remember, no, not that I
23 remember.
24   **Q.** Do you recall how you received that

**70**

1 document?
2   **A.** I think it was faxed, it could have been
3 mailed though, but I think it was faxed.
4   **Q.** Okay, and by 2003, you were already
5 living in Maine; is that correct?
6   **A.** Right.
7   **Q.** Okay. Did you come to Boston to conduct
8 business in 2003?
9   **A.** Did I come to conduct law practice
10 business? No, never.
11   **Q.** And you were still of counsel at Latti &
12 Anderson?
13   **A.** Yes, yeah.
14   **Q.** If you flip to page 3 of Exhibit 3, do
15 you know if any of the non typewritten marks on
16 this page were made by you?
17   **A.** That's not my writing, so, the answer is
18 they probably were not made by me, the notations
19 because that is not my writing.
20   **Q.** Okay. Do you know what the stamp on the
21 bottom right-hand corner of the document is, have
22 you ever seen a stamp like that?
23   **A.** No, I can't even read it, hardly,
24 something about an original copy, and it's signed

**71**

1 by somebody with an initial.
2   **Q.** Okay. Do you know what this document is,
3 this page 3 of Exhibit 3?
4   **A.** Only from what I've learned from
5 reviewing the documents in this case, that
6 somebody, and I think it was Roger Hughes,
7 contacted Dean Witter and got a proposal from them
8 as to the annuity that Dimon was going to, excuse
9 me, that Kemper was going to purchase.
10     That's as far as I know, and this sets
11 forth the terms of the proposal by Dean Witter.
12   **Q.** Mr. Latti, you testified earlier that you
13 believed Mr. Dimon was in the same position as he
14 was in 1983. Do you see him being in the same
15 position now after twenty plus years of time has
16 passed?
17   **A.** I don't --
18     MR. DeWICK: Objection.
19 BY MR. LeBLANC:
20   **A.** I don't think Dimon is a factor, I think
21 it's what legal rights he has and whether in some
22 way they were prejudiced by the delay, and I don't
23 see any prejudice with respect to the suit against
24 Metropolitan, Kemper, and the broker, and again, I

**72**

1 stress that he was guaranteed by Kemper payments
2 for life which was approved by the chief federal
3 judge, and I read it was Mr. Decof who was a
4 guardian.
5     This guarantee means he is still entitled
6 to enforce that settlement against Kemper.
7     MR. GOLDEN: Objection.
8 BY MR. LeBLANC:
9   **A.** And I don't see how in any way that he
10 was prejudiced.
11   **Q.** Would you agree with me that your memory
12 was fresher in 1983 of the events regarding the
13 settlement than they are today?
14     MR. DeWICK: Objection.
15 BY MR. LeBLANC:
16   **A.** Would I in '83 have a better memory than
17 today, yes.
18   **Q.** Okay, and in your experience as a trial
19 lawyer over forty years, would you agree that the
20 passage of time doesn't necessarily or doesn't
21 generally help people's memories, particularly
22 where it's a twenty plus year passage?
23   **A.** It depends on the cases and the
24 circumstances. In Dimon, it is a paper trial in a

**73**

1 sense, and the issues were laid out by the papers
2 and what occurred.
3     The issues are very narrow, so, time in
4 Dimon does not hurt this case or his causes of
5 actions against the different parties, and I
6 stress that he cannot bring a lawsuit against
7 until twenty years when he was hurt when they
8 stopped payment because if he brought a suit
9 before twenty years, there was the defense of
10 anticipatory breach, and that is a good defense,
11 and it is binding on Dimon as well as anyone.
12   **Q.** Wouldn't it be the case that twenty years
13 ago you would still have a file on the Dimon vs.
14 Jenny C. case?
15   **A.** I don't understand your question.
16   **Q.** In 1983, you would still have a complete
17 file on the Dimon vs. Jenny C. case at Latti
18 Associates?
19   **A.** Yes.
20   **Q.** And wouldn't you also expect that in
21 1983, Kemper Insurance Company would have a
22 complete file on an annuity that was less than a
23 year old at the time?
24     MR. GOLDEN: Objection.

**74**

1          MR. DeWICK: Objection.
2 BY MR. LeBLANC:
3    A.  Would I expect, I don't know, I don't
4 know their practice or procedure at all, so, I
5 can't answer that.
6    Q.  Okay.  Would you be surprised if they
7 didn't have a complete file?
8    A.  I don't know.
9          MR. GOLDEN: Objection.
10 BY MR. LeBLANC:
11   A.  I don't know.
12   Q.  And in your own experience over forty
13 years of file keeping as an attorney, would you be
14 surprised if a complete file was not kept by a
15 party or a person involved in a case after just
16 months after the case was over?
17   A.  I would be surprised, yeah.
18   Q.  Okay, and in fact, in your case, in the
19 Dimon vs. Jenny C., can you tell us when that file
20 was destroyed?
21          MR. DeWICK: Objection.
22 BY MR. LeBLANC:
23   A.  I can't tell you when that file was
24 destroyed, but we have a practice of keeping them

**75**

1 for tax purposes for about six or eight years
2 before a file is destroyed.
3    Q.  Okay.  So, you don't have any reason to
4 believe that the Dimon vs. Jenny C. file was
5 destroyed any time before 1988, '89?
6    A.  I don't know, I don't know that.  Of
7 course I'm telling you our practice.  It could
8 have been destroyed before because of computers
9 coming into being, and we were completely
10 computerized, and we destroyed files earlier than
11 six years.
12       We put them on disks, some of them, it
13 got out of control, the class actions and the
14 multi districts with files galore at warehouse
15 storage, and some of them were destroyed and some
16 of them were put on disk.  I don't know.
17   Q.  Okay.  I'm sorry, go ahead.
18   A.  Yeah, that's it, I don't know.
19   Q.  In terms of the disks, that, the files
20 that were put on disks, did you cause a search to
21 be made of those disks for files related to the
22 Dimon vs. Jenny C. case?
23   A.  Yes.
24   Q.  Okay, and what was the result of that

**76**

1 search?
2    A.  Zero.
3    Q.  Okay, and in terms of the files that are
4 retained in a warehouse by Latti Associates or
5 Latti & Anderson, did you cause a search to be
6 made of those files?
7    A.  Yes.
8    Q.  And what was the result of that search?
9    A.  Nothing.
10   Q.  Okay.  Other than the documents that you
11 have disclosed or produced by, through your
12 attorney, do you know of any other documents that
13 exist related to the Dimon vs. Jenny C. case?
14   A.  No.
15   Q.  Any other documents related to Dennis
16 Dimon in any way?
17   A.  No.
18          MR. LeBLANC: Can you mark that as
19 Exhibit 4, please.
20       (Exhibit No. 4, Annuity Application,
21 marked for identification.)
22          MR. LeBLANC: Why don't we go off
23 record, we're going to take a quick break.
24       (A short break was taken.)

**77**

1          MR. LeBLANC: Kevin, are you still
2 with us?
3          MR. GOLDEN: Yes, I'm here.
4          MR. LeBLANC: Okay.  For the record,
5 I've asked that a document entitled "Annuity
6 application" be marked as Exhibit 4.
7 BY MR. LeBLANC:
8    Q.  Mr. Latti, could you take a look at that
9 exhibit, please?
10   A.  Okay, I've looked at it.
11   Q.  Have you ever seen this document before?
12   A.  Yes.
13   Q.  And when did you see it?
14   A.  When I was sent the exhibits marked in a
15 deposition or depositions around May, the
16 beginning of May by my attorney.
17   Q.  Okay, and before then, have you ever seen
18 it?
19   A.  No.
20   Q.  Okay.  Do you know what this document is?
21   A.  It says annuity application, that's the
22 only way I would know what it is.  It looks like
23 an annuity application at that time, yes, annuity
24 application.

**78**

1    Q.  Do you have any reason to dispute
2 Mr. Dimon's testimony that he signed this document
3 in your office or in Latti Associates' offices?
4    A.  I don't know, I don't remember.
5    Q.  Did you present this document to
6 Mr. Latti for his signature?
7    A.  I don't remember presenting this document
8 to him at all.
9    Q.  Okay.  Now, would a document like this be
10 something that an attorney representing Mr. Dimon,
11 something that they would review before he signed
12 it?
13          MR. DeWICK: Objection.
14 BY MR. LeBLANC:
15   A.  I don't know that for a fact.
16   Q.  Okay, and do you have any knowledge
17 whether or not someone from Latti Associates
18 actually reviewed this document --
19   A.  I have no knowledge.
20   Q.  -- before he signed it?
21   A.  No memory, no knowledge of it at all.
22          MR. LeBLANC: Can I have that back,
23 sir.
24          THE WITNESS: Yes.

**79**

1          MR. LeBLANC: Thank you.  Can you
2 mark that as 5, please.
3       (Exhibit No. 5, Letter dated 8/12/83,
4 marked for identification.)
5          MR. LeBLANC: For the record, I've
6 asked that a letter dated August 12th, 1983
7 addressed to Mr. Robert Foley of Dean Witter
8 Reynolds, Incorporated from John L. Noe of
9 American Motorists be marked as Exhibit 5.
10 BY MR. LeBLANC:
11   Q.  Mr. Latti, can you review that document,
12 please?
13   A.  I'll read it, okay.
14   Q.  Have you had a chance to look at that
15 document, sir?
16   A.  Yes.
17   Q.  And I notice you kind of snickered a
18 little bit.  Can you tell us why?
19   A.  It says on page 2, Exhibit 5 that he
20 can't return the placement, replacement contract
21 because he lost his briefcase on August 11th.
22   Q.  Does that strike you as humorous?
23   A.  Yeah, it's unusual.
24   Q.  On a scale of excuses, is that the best

| 80 | |
|---|---|
| 1 or worst excuse you've ever heard over your forty<br>2 years of practice?<br>3    **A.** I, I don't know.<br>4    **Q.** And if you look at Exhibit 5 on page 2<br>5 under the cc section, it says Mr. Roger Hughes,<br>6 Latti Associates Attorneys, do you see that?<br>7    **A.** Yes, except the Latti is not spelled<br>8 correctly again.<br>9    **Q.** Okay. Do you know of any other Latti<br>10 Associates spelled with an I-E practicing in<br>11 Boston at that time?<br>12    **A.** I know of no other.<br>13    **Q.** Okay, and particularly practicing at --<br>14    **A.** There could be, I just don't know.<br>15    **Q.** Okay. Do you know if any other Latti<br>16 Associates was practicing at 30-31 Union Wharf at<br>17 that time?<br>18    **A.** I know that there was no one else.<br>19    **Q.** Okay, and in August of 1983, that was<br>20 your correct mailing address or Latti Associates'<br>21 correct mailing address?<br>22    **A.** In August of '83, yes.<br>23    **Q.** Okay, and have you ever seen this letter<br>24 before? |

| 81 | |
|---|---|
| 1    **A.** I have seen this letter, it was sent to<br>2 me with the exhibits that were previously marked<br>3 as I said in depositions. This is one of them.<br>4    **Q.** Okay.<br>5    **A.** It had been marked before, but I never<br>6 saw it before that time.<br>7    **Q.** And within Latti Associates in terms of<br>8 your mail distribution policy or practices, what<br>9 would happen to this letter if it came into the<br>10 office as a carbon copy?<br>11    **A.** The person that, either Donna or Cathy<br>12 would take this letter, and if they knew that<br>13 Roger Hughes was handling the file, they would put<br>14 it in his mail folder.<br>15      If they weren't certain who was handling<br>16 the case, even though it was post verdict, they<br>17 would look at the card, and that would tell them<br>18 by the initials, the attorney, and it would go in<br>19 that folder.<br>20    **Q.** Okay. Now, during this 1983 period, did<br>21 you ever become aware of any situation where mail<br>22 wasn't reaching the intended attorney?<br>23    **A.** I can't answer that, I don't know.<br>24    **Q.** Okay. |

| 82 | |
|---|---|
| 1      MR. LeBLANC: Can you mark this as<br>2 Exhibit 6, please.<br>3      (Exhibit No. 6, Letter dated 9/26/83,<br>4 marked for identification.)<br>5      MR. LeBLANC: For the record, I've<br>6 asked that a September 26, 1983 letter to John Noe<br>7 from Robert Liguori be marked as Exhibit 6, it's a<br>8 two-page letter.<br>9 BY MR. LeBLANC:<br>10    **Q.** Mr. Latti, can you take a look at that,<br>11 please?<br>12    **A.** Okay, I've read Exhibit 6.<br>13    **Q.** Okay. If you look at that second page of<br>14 that letter under the cc section, do you see it's<br>15 carbon copied to Mr. Roger Hughes, Latti<br>16 Associates Attorneys, 30-31 Union Wharf, Boston?<br>17    **A.** Again, Latti is spelled wrong. It's got<br>18 an E on it, and it is as you said except that<br>19 Latti is spelled incorrectly.<br>20    **Q.** Okay.<br>21      MR. LeBLANC: Can you mark this as 7.<br>22      (Exhibit No. 7, Letter dated<br>23 10/10/83, marked for identification.)<br>24 |

| 83 | |
|---|---|
| 1      MR. LeBLANC: For the record, I've<br>2 asked that a letter dated October 10th, 1983 to<br>3 Robert Liguori from John Noe be marked as<br>4 Exhibit 7.<br>5 BY MR. LeBLANC:<br>6    **Q.** Can you take a look at that, please, sir.<br>7    **A.** I've read Exhibit 7.<br>8    **Q.** Thank you. I'd like to draw your<br>9 attention to the carbon copy to Mr. Roger Hughes,<br>10 Latti Associates Attorneys, Latti spelled<br>11 correctly this time, 30-31 Union Wharf, Boston.<br>12    **A.** That is correct, you've read it<br>13 correctly.<br>14    **Q.** Okay, and again, the 30-31 Union Wharf,<br>15 Boston was the correct mailing address for Latti<br>16 Associates at that time in 1983?<br>17    **A.** Yes.<br>18    **Q.** Okay. Now, in light of Latti Associates<br>19 receiving at least three letters regarding the<br>20 dispute as to the terms of the annuity, does that<br>21 change your testimony as to what Latti Associates<br>22 should or shouldn't have done to protect<br>23 Mr. Dimon's interests?<br>24      MR. DeWICK: Objection. |

| 84 | |
|---|---|
| 1 BY MR. LeBLANC:<br>2    **A.** You've testified that Latti received the<br>3 documents that you referred to. There is no proof<br>4 whatsoever that they were received by Latti<br>5 Associates at the time, so, your question is<br>6 improper. I can't answer it.<br>7    **Q.** Okay.<br>8    **A.** Because that's not the evidence.<br>9    **Q.** Do you have any evidence or proof that<br>10 Latti Associates did not receive those letters?<br>11    **A.** I have no evidence or proof of<br>12 nonreceipt.<br>13    **Q.** Okay, and you have testified that in fact<br>14 that was Latti Associates' address at the time in<br>15 question?<br>16    **A.** Yes.<br>17    **Q.** And that there was no problem with<br>18 receiving mail at that address at that time that<br>19 you're aware of?<br>20    **A.** I did not testify to that, I said I don't<br>21 know in the early part of '83 whether or not there<br>22 was difficulties with the mail.<br>23      There was certain mail that we hadn't<br>24 received that I know it carried into '82, that's |

| 85 | |
|---|---|
| 1 when we moved, and I think it carried into '83,<br>2 but I'm not certain. I don't remember.<br>3    **Q.** Okay. So, the early part of '83, there<br>4 may be some dispute as to whether or not Latti<br>5 Associates received mail?<br>6    **A.** There may be.<br>7    **Q.** Would you agree with me that October of<br>8 1983 is not the early part of 1983?<br>9    **A.** Yes.<br>10    **Q.** And August is not the early part of 1983?<br>11    **A.** I don't think so.<br>12    **Q.** Okay. So, there is no dispute as to<br>13 whether or not Latti Associates received mail that<br>14 you're aware of in 1983, the latter part of 1983?<br>15      MR. DeWICK: Objection.<br>16 BY MR. LeBLANC:<br>17    **A.** I don't know, I don't know.<br>18    **Q.** Do you know of a dispute in the latter<br>19 part of 1983?<br>20    **A.** You asked me that question before, you<br>21 asked that question before, I don't know whether<br>22 we received it. I have no personal knowledge, I<br>23 did not receive it. I don't know if somebody else<br>24 at Latti Associates received it, I don't know. |

**86**

1 **Q.** Okay.
2 **A.** That's my testimony.
3 **Q.** Mr. Latti, the question was not whether
4 you received this letter, the question was whether
5 or not there was any problem with receiving mail
6 in the latter portion of 1983?
7 **A.** In the latter part, I don't know if there
8 was a problem. There was a problem --
9 **Q.** Thank you.
10 **A.** -- I testified earlier in the earlier
11 part, I don't know if there was a problem in the
12 latter part of 1983.
13 MR. LeBLANC: Could you mark that as
14 Exhibit 8, please.
15 (Exhibit No. 8, Letter dated
16 10/12/83, marked for identification.)
17 BY MR. LeBLANC:
18 **Q.** Mr. Latti, can you take a look at that
19 letter, please?
20 **A.** I've read Exhibit 8, yeah.
21 **Q.** May I see that, thank you.
22 MR. LeBLANC: For the record, I've
23 asked that a letter dated October 12th, 1983 from,
24 to Barbara Boehm from John Noe be marked as

**87**

1 Exhibit 8.
2 BY MR. LeBLANC:
3 **Q.** Mr. Latti, can you read the first line of
4 that letter, please?
5 **A.** "In response to your October 14, 1983, I
6 reject and return," that's the first sentence.
7 **Q.** And the date on that, October 14th,
8 1983 --
9 **A.** No, the date on it is October 14th, '83.
10 **Q.** And the date cited in the first line is
11 October 14th?
12 **A.** The 14th, yeah.
13 **Q.** Would that lead you to believe that the
14 October 12th, 1983 date is actually a misdate?
15 **A.** By looking at this, it looks like it is
16 an incorrect date.
17 **Q.** Okay, and could you also look on the cc
18 section where it's cc'd to Mr. Roger Hughes?
19 **A.** Yes, I see that.
20 **Q.** And in 1983, Mr. Hughes was a partner --
21 **A.** I said yes --
22 **Q.** -- of Latti Associates?
23 **A.** -- three or four times.
24 **Q.** Okay, and in terms of the liability of

**88**

1 Latti Associates, is there a difference in
2 liability for the actions of a partner as opposed
3 to an associate?
4 MR. DeWICK: Objection.
5 BY MR. LeBLANC:
6 **A.** I don't know.
7 **Q.** Okay. Are Roger Hughes' actions and
8 furtherance of a case handled by Latti Associates,
9 are they the responsibility of Latti Associates?
10 MR. DeWICK: Objection.
11 BY MR. LeBLANC:
12 **A.** I don't know, I don't know. That's for
13 the court to determine.
14 **Q.** Okay. Have you ever sued an attorney
15 and/or a firm based on legal malpractice?
16 **A.** Have I? I think Latti Associates has,
17 I've never sued I don't think, as far as I can
18 remember, I've never sued a brother attorney.
19 **Q.** Okay, but the firm that you own may have?
20 **A.** The firm may have, yeah, as far as I can
21 remember.
22 **Q.** In light of the exhibits that we looked
23 at, Exhibits 5 through 8, do you believe that
24 Latti Associates, does it change your prior

**89**

1 testimony regarding what Latti Associates'
2 obligation to Mr. Dimon was?
3 MR. DeWICK: Before you answer that,
4 would you like to see 5 through 8?
5 THE WITNESS: I know which exhibits
6 he refers to.
7 MR. DeWICK: Okay.
8 BY MR. LeBLANC:
9 **A.** No, it does not change my testimony.
10 **Q.** Okay.
11 **A.** No.
12 **Q.** And does it change your testimony any or
13 your opinion any that months after receiving these
14 letters regarding a dispute in terms of the
15 annuity, that Mr. Dimon contacted Latti Associates
16 for assistance with payments on the annuity?
17 MR. DeWICK: Objection.
18 BY MR. LeBLANC:
19 **A.** Again, that is not evidenced that we
20 received that and you in your question asked me
21 that. I cannot answer your question because there
22 is no evidence or facts to establish that we
23 received those letters.
24 You're assuming we received them. We,

**90**

1 that is an assumption you're making. I cannot
2 answer your question because that is not part of
3 the evidence.
4 **Q.** Okay. Would it be fair to say it's
5 difficult for you to answer many of my questions
6 or some of my questions because of the time lapse
7 between when the events occurred and today?
8 MR. DeWICK: Objection.
9 BY MR. LeBLANC:
10 **A.** No, no, no.
11 **Q.** So, you would have no way of knowing if
12 you received these letters if I asked you the
13 questions in 1983 as opposed to asking you now in
14 2006?
15 MR. DeWICK: Objection.
16 BY MR. LeBLANC:
17 **A.** I said that I have no knowledge of
18 receiving the letters, none. Whether it was then
19 or now, I still have no knowledge. I never saw
20 those letters until litigation was commenced. I
21 never received those letters.
22 I was never told anything of a dispute
23 between insurance companies, Metropolitan and
24 Kemper, except when litigation occurred or shortly

**91**

1 before when Kaplan called me, I learned there was
2 a problem in February '05.
3 **Q.** Okay. So, your testimony here today is
4 you don't know if you received them, but you know
5 for a fact that you never discussed any of the
6 information contained in these letters with any
7 person back in 1983?
8 **A.** My testimony stands as it is. I have
9 testified continuously.
10 **Q.** Do you think it's more difficult to
11 prosecute an action due to a lapse of time?
12 MR. DeWICK: Objection.
13 BY MR. LeBLANC:
14 **A.** It depends on the action, what the facts
15 are and what the circumstances are. Some cases
16 yes, others no.
17 **Q.** In this case?
18 **A.** No. That a lapse of time, he had no
19 choice but to bring the suit when he was wronged
20 because an anticipatory breach is a valid defense.
21 We couldn't bring the suit for twenty
22 years no matter what way you look at it, and he
23 waited for the twentieth year, and then he came to
24 an attorney to represent him, so, I don't, so, to

|    | 92 |
|----|----|
| 1 | answer your question, I don't think seeing the |
| 2 | documents set forward in discovery that it has |
| 3 | anything to do with lapse of time, I think lapse |
| 4 | of time was required in this case. |
| 5 | So, I don't see any prejudice whatsoever |
| 6 | to his case against the three defendants, |
| 7 | Metropolitan, Kemper, or the broker. |
| 8 | **Q.** How about prejudice in his case against |
| 9 | you or against Latti Associates? |
| 10 | **A.** I don't see any difficulty, I don't think |
| 11 | a case exists between Dimon and us legally. |
| 12 | **Q.** Okay. In your forty plus years of |
| 13 | practice, have you ever brought a case in which |
| 14 | the defendant had a valid defense? |
| 15 | MR. DeWICK: Objection. |
| 16 | BY MR. LeBLANC: |
| 17 | **A.** Have I ever brought a case which the |
| 18 | defendant had a valid defense? |
| 19 | **Q.** Yes. |
| 20 | **A.** Yeah, of course. |
| 21 | **Q.** Okay. Have you ever not brought a case |
| 22 | because the defendant may have a valid defense? |
| 23 | **A.** I can't answer that, I don't know, I |
| 24 | don't know. |

|    | 93 |
|----|----|
| 1 | **Q.** Have you ever made the decision not to |
| 2 | bring a case based on what the defense might be? |
| 3 | **A.** Have I ever, I don't think so. I would |
| 4 | bring the case and then I would find out what the |
| 5 | defense was. |
| 6 | **Q.** Except under these circumstances, right? |
| 7 | **A.** I don't understand your question. |
| 8 | **Q.** Well, you testified earlier that |
| 9 | Mr. Dimon wouldn't have a case to bring because |
| 10 | the company would have this valid, in your |
| 11 | opinion, anticipatory breach claim defense? |
| 12 | **A.** As an attorney, as a lawyer, I cannot see |
| 13 | a case brought for Dimon within the twenty years. |
| 14 | You have to wait until you were wronged. That is |
| 15 | my understanding of the law. |
| 16 | **Q.** Have you ever brought a declaratory |
| 17 | judgment action? |
| 18 | **A.** Have I? I don't remember ever bringing |
| 19 | one in particular. |
| 20 | **Q.** Okay. Do you know what a declaratory |
| 21 | judgment action is? |
| 22 | **A.** Yes, but in this case to determine, if a |
| 23 | declaratory judgment was brought, I don't know |
| 24 | whether or not the defense is valid of |

|    | 94 |
|----|----|
| 1 | anticipatory breach. |
| 2 | Prior to bringing a declaratory judgment, |
| 3 | I would do a great deal of research because I'm |
| 4 | not familiar with it, and I would determine the |
| 5 | merits of whether such an action lies, and then I |
| 6 | would look at whether or not he was better off, |
| 7 | Dimon, to wait the twenty years, and I call this |
| 8 | case that we're involved in a paper case when it |
| 9 | involves documents and they speak for themselves |
| 10 | and it's not necessary to have testimony or |
| 11 | refresh people's recollection. |
| 12 | So, whether or not I would bring a |
| 13 | declaratory judgment would depend on what he |
| 14 | faced, which case was stronger, and I think by far |
| 15 | the case that's stronger is in the, and the case |
| 16 | that lies is the case that Dimon brought, not |
| 17 | against me or the firm, but against the three |
| 18 | insurance, and I go again that Dimon can enforce a |
| 19 | settlement at any time against Kemper, and he has |
| 20 | not, but he has a right to. |
| 21 | They guaranteed his payment in front of a |
| 22 | federal judge, the chief judge. |
| 23 | **Q.** Okay. Do you know if Charter Security |
| 24 | guaranteed a payment in front of a federal judge? |

|    | 95 |
|----|----|
| 1 | **A.** Did they, they were not present as far as |
| 2 | I can tell from reading the record or the |
| 3 | transcript before Pettine, which is Metropolitan, |
| 4 | right? |
| 5 | **Q.** Now, they are, yes, Charter Security is |
| 6 | now Metropolitan. |
| 7 | **A.** Okay. |
| 8 | **Q.** When you became of counsel in 1999, was |
| 9 | it Carolyn Latti and Mr. Anderson? |
| 10 | **A.** David Anderson and myself. |
| 11 | **Q.** They were partners with you at Latti |
| 12 | Associates? |
| 13 | **A.** Yes. |
| 14 | **Q.** In 1999? |
| 15 | **A.** Yes. |
| 16 | **Q.** Okay, and then you became of counsel? |
| 17 | **A.** Yes. |
| 18 | **Q.** And at that point, what happened to Latti |
| 19 | Associates? |
| 20 | **A.** I think within a year or two, they named |
| 21 | the firm, they named, within a year or two, it |
| 22 | became Latti & Anderson. |
| 23 | **Q.** And they used the same address? |
| 24 | **A.** They're in the same space but smaller |

|    | 96 |
|----|----|
| 1 | than Latti Associates. |
| 2 | **Q.** Same phone number? |
| 3 | **A.** Same phone number. |
| 4 | **Q.** Same fax number? |
| 5 | **A.** Yeah. |
| 6 | **Q.** Other than changing the names, they |
| 7 | handled the same cases? |
| 8 | **A.** I do not know that, I don't know their |
| 9 | case load. I have nothing to do with their files |
| 10 | when I walked out of the office or the cases. |
| 11 | Occasionally, I will offer some help with |
| 12 | examination of a witness or something like that, |
| 13 | very seldom, and as years have gone on, they don't |
| 14 | call. |
| 15 | **Q.** Okay. So, when you left in 1999, you |
| 16 | left all your cases there? |
| 17 | **A.** Not everybody stayed when I left. Some |
| 18 | of the cases remained and some clients went |
| 19 | elsewhere. |
| 20 | **Q.** Okay. |
| 21 | MR. LeBLANC: I don't have any |
| 22 | further questions. |
| 23 | MR. KEANE: Nothing? |
| 24 | MS. McQUAY: Nothing. |

|    | 97 |
|----|----|
| 1 | CROSS-EXAMINATION |
| 2 | BY MR. KEANE: |
| 3 | **Q.** Mr. Latti, my name is Brian Keane and I |
| 4 | represent Dennis Dimon in this action. |
| 5 | **A.** You are Brian Keane? |
| 6 | **Q.** Brian Keane, and I represent Dennis Dimon |
| 7 | in this action, and I'm going to ask you a couple |
| 8 | of questions. |
| 9 | **A.** Yeah. |
| 10 | **Q.** You said that Mr. Flannery represented |
| 11 | Dennis Dimon at the trial of this matter; is that |
| 12 | right? |
| 13 | **A.** The record shows that Joseph Flannery |
| 14 | represented him, but I'm not sure if somebody sat with |
| 15 | of Flannery, but I'm not sure if somebody sat with |
| 16 | him from the office of Latti Associates. |
| 17 | **Q.** Okay, and after the verdict came back and |
| 18 | before the ultimate settlement in this case, |
| 19 | Mr. Flannery left Latti Associates? |
| 20 | **A.** Yes. |
| 21 | **Q.** Okay. You stated at that time you |
| 22 | thought there was an appeal in this case? |
| 23 | **A.** They threatened to file an appeal in the |
| 24 | Dimon case, and there was a question in the |

98

1 settlement I remember of whether or not we were
2 going to seize the vessel, and in reading the
3 Dimon deposition last night, he said that he did
4 not want to sue the owner and personally take the
5 vessel.
6     So, does that answer your question?
7    **Q.** It does. I guess my next question is
8 would that appeal also, is it -- strike that.
9     Is it your understanding that that appeal
10 was supposed to be a limitation of action?
11    **A.** They have a right to appeal within so
12 many days, I think it's thirty days of judgment.
13 I believe, I don't know whether a notice of appeal
14 was filed, but I know that there was another trial
15 from reading the transcript to follow which was a
16 limitation proceeding.
17    **Q.** Okay.
18    **A.** Before a judge only, so, it was a case
19 again, I read the transcript, it was tried before
20 Judge Watson, so, there would have been a
21 limitation proceeding before Watson, so, the
22 insurer had a right, Kemper had a right to appeal,
23 and I don't know whether they filed it, and a
24 limitation proceeding as well.

99

1    **Q.** And is it your understanding that Kemper
2 Insurance at the time of this trial was the
3 insurer of the boat owned by the Jenny C.
4 Corporation?
5    **A.** Yes, from reading the transcripts.
6    **Q.** Do you know who brought in Mr. Dimon as a
7 client to Latti Associates?
8    **A.** No.
9    **Q.** You spoke about the mail process at Latti
10 Associates in or around 1982, 1983. Was that
11 always your process for receiving mail, the
12 process that you described here today?
13    **A.** Yes.
14    **Q.** Was there ever a time in your practice
15 from 1960 to 1983 where you saw all incoming mail
16 on a daily basis?
17    **A.** What period?
18    **Q.** 1960 when I think you said you started
19 practicing to 1983?
20    **A.** No, I saw the mail up to probably, excuse
21 me, first of all, in 1960 I was on trial nearly
22 every single day because it was nothing but
23 litigation.
24     Our firm is strictly litigation, so, I

100

1 was never there, so, the most senior man would
2 look at the mail and then it would be passed out.
3     I had Kaplan as a partner originally, and
4 I worked for another individual. When it was my
5 ship so to speak in '77 when I became by myself, I
6 employed other people, it was my practice if I was
7 there to see the mail, and then the first person
8 that took the mail from me and would review for the
9 mail was Roger Hughes, and that was I believe in
10 late 70's or early 80's.
11    **Q.** But if you were there each day, you would
12 see the mail?
13    **A.** Up to, good point, I testified that Roger
14 Hughes responsible for the mail, but I would
15 look at my own mail, he didn't need to look at my
16 mail because I felt that I was responsible with
17 respect to interrogatories, depositions, and I
18 knew how the process worked, so, I looked at my
19 own mail.
20    **Q.** And I think you testified earlier that at
21 this period of time, 1983, the partnership
22 agreement that you had with Roger Hughes was 85
23 percent for you, Mr. Latti, and 15 percent for
24 Mr. Hughes?

101

1    **A.** When Roger Hughes became a partner, which
2 I testified to, that is correct, he had 15 percent
3 and I had 85.
4    **Q.** Okay. Did that also include 1983 or
5 around the time of the settlement of this Dimon
6 case?
7    **A.** Yes.
8    **Q.** If I could show you Exhibit 1, which was
9 previously marked today, and to go back to a
10 question that you heard before, but if you look at
11 attorneys' fees, and I think you said that there
12 was some possibility that maybe Mr. Dimon wanted
13 $100,000 in his pocket, therefore, there was a
14 decrease in the attorneys fees, but was it your
15 testimony that $141,485.47 was the attorneys fees
16 in the Dennis Dimon case?
17    **A.** Yes, that's what it looks like according
18 to this sheet.
19    **Q.** And of that number, would that mean you
20 would receive 85 percent of that and Mr. Hughes
21 would receive 15 percent?
22    **A.** No, because overhead in our firm ran
23 anywhere from, it was extremely high, I don't
24 remember what it was in '81, but it was anywhere

102

1 from 40 something percent to 80 something percent,
2 that we only netted at times 20 some odd percent.
3    **Q.** Off of the 20 percent it would be split
4 85, 15?
5    **A.** Yes, it would be split off the percentage
6 with the attorney, yeah.
7    **Q.** Okay. I think you testified earlier that
8 you represented seamen, fishermen at this point of
9 the 80's; is that correct?
10    **A.** No. I testified that we represented
11 them, but we had an adverse practice. There were
12 many types of cases that we handled including
13 habeas and products liability, business, and that
14 type of thing.
15    **Q.** Prior to this case, the Dimon vs. Jenny
16 C. Corporation, had you recommended or advised
17 other clients to enter into structured
18 settlements?
19    **A.** Yes.
20    **Q.** Would you typically do that for a seaman
21 or a fisherman?
22    **A.** It would depend on what the interest rate
23 was, what the going rate was at the time, it
24 depends on the circumstances of the settlement,

103

1 whether we felt that he could not handle the money
2 that the, that the seaman was not capable and a
3 structured settlement, so much over a period of
4 years and then he would get that, the very type of
5 settlement we recommended to the individual
6 seaman.
7     Again, a lot of the seaman did not have
8 the education that others did, so, they were not
9 used to large sums of money that was obtained for
10 their injury.
11    **Q.** With regard to prior structured
12 settlements that you either advised or recommended
13 clients to enter into, did you use Dean Witter
14 Reynolds as a broker?
15    **A.** No, no, not me personally.
16    **Q.** And my question was to you personally
17 actually.
18    **A.** No.
19    **Q.** Did Latti Associates use Dean Witter
20 Reynolds on previous annuity settlements?
21    **A.** Usually not.
22    **Q.** The early 1980's, who did you personally
23 use as a broker?
24    **A.** There was a friend in New York that he

**104**

1 became a friend after many, many cases that he,
2 his office, and I don't remember the name, was
3 strictly structured settlements, and we used the
4 person in New York, I think it was in upper
5 Westchester, I don't remember for sure, and we
6 used an outfit in Arizona or out West, and the way
7 they were picked up was through the American Trial
8 Lawyers which I was a member of.
9    Q.  Okay.
10        MR. KEANE:  Can I have that marked.
11        (Exhibit No. 9, Docket Sheet, marked
12 for identification.)
13 BY MR. KEANE:
14    Q.  Mr. Latti, if you wouldn't mind taking a
15 look at that.
16    A.  Okay, I've quickly read Exhibit 9.
17    Q.  Do you recognize what Exhibit 9 is,
18 Mr. Latti?
19    A.  It looks like a docket sheet for the
20 Dimon case in Rhode Island --
21    Q.  Okay, and --
22    A.  -- in the Federal Court.
23    Q.  And I think right at the top, does it say
24 "Affidavit of Michael B. Latti filed"?

**105**

1    A.  All affidavits were filed by Michael B.
2 Latti. In seaman's cases, it was a standard form
3 mimeographed, so, my name went on every, just
4 about, I don't know of a case in a seaman's case
5 that the affidavit was not filed by me, it was a
6 form that was mimeographed and the secretary
7 signed my name.
8    Q.  Other than in, I think looking at that
9 document in 1983, do you see an entry of
10 appearance from anyone from your office?
11    A.  Entry of appearance of Joseph Flannery.
12    Q.  And that's in --
13    A.  January 3rd, 1983.
14    Q.  Okay.  Prior to that entry of Joseph
15 Flannery, do you see any other entries of
16 appearance?
17    A.  No.
18    Q.  Would that indicate that you filed the
19 Dennis Dimon case in Federal Court in Providence?
20    A.  No, because as I said, every seaman's
21 affidavit had my name on it that I know, then the
22 attorney would file a complaint that was told to
23 handle the case or to him.  Maybe I was the
24 handling partner, excuse me, the handling attorney

**106**

1 up to a certain point.
2        Again, that point occurred probably in
3 November or December of '83.  I notice Flannery
4 filed an appearance January 3rd, '83.  I think I
5 was still in the hospital, so, what I'm saying is
6 I don't know --
7    Q.  Okay.
8    A.  -- whether I was the attorney that filed
9 the complaint.
10    Q.  Okay.  There is an entry on there, I
11 apologize, I don't have my own copy, 1/19/82.
12    A.  Okay.
13    Q.  A notice of deposition of Dennis Jay, and
14 it looks like the end is cut off, but Dimon?
15    A.  Yes, Dimon even though it is not
16 photographed.
17    Q.  Do you have a recollection of attending
18 that deposition?
19    A.  No.
20    Q.  Do you have a recollection of preparing
21 Mr. Dimon for that deposition?
22    A.  No.
23    Q.  Okay.
24    A.  Except it was my practice on a heavy case

**107**

1 to prepare the plaintiff even though I did not
2 take the deposition or attend, I would have some
3 input on a heavy case, and I consider the Dimon
4 case a heavy case because he lost his eye.  That
5 probably I prepared him except that's dated
6 1/19/82?
7    Q.  That's what it looks like.
8    A.  I could have prepared him some and had
9 some input into the preparation before he
10 testified, I don't remember though.
11    Q.  In preparation on a big case such as you
12 described --
13    A.  Dimon.
14    Q.  Dimon, would you sit in with the attorney
15 of record to prepare the plaintiff?
16    A.  The attorney that was working on the
17 file, yes.
18    Q.  Yes.
19    A.  Yes, that attorney would be present when
20 I prepared him most of the time, most of the time.
21    Q.  I think you testified earlier that, you
22 may not have called it this, but your document
23 retention program at Latti Associates was roughly
24 six to eight years?

**108**

1    A.  The what?
2    Q.  How long you retain files after a case
3 had been concluded?
4    A.  Six or eight years was a start, and then
5 it changed as the computers came into being and
6 storage, and then we changed the warehouse and
7 everything.
8    Q.  Exactly, that was your testimony earlier,
9 correct?
10    A.  Yeah, yeah.
11    Q.  And then you also spoke about potential
12 defenses for parties in this action and around
13 1983.  One of the defenses you listed was
14 anticipatory breach.
15    A.  Right.
16    Q.  And you had said that you couldn't bring
17 a suit based on that defense in 1983, you would
18 have to wait the period of time for the annuity to
19 run before you could bring a case?
20    A.  If the letters were received, in other
21 words, I had no, assuming that I was aware, what
22 would I do, and that's assuming.
23    Q.  Exactly, yes.
24    A.  Yes, I testified to that.

**109**

1    Q.  Okay.  I guess my question is in an
2 annuity case such as this and understanding that
3 those could be possible defenses brought at the
4 time of the commencement of the annuity --
5    A.  You mean commencement of the suit.
6    Q.  Commencement of the annuity or if there
7 is a problem with the annuity at the
8 beginning -- let me start over.
9        You testified there was anticipatory
10 breach may be a possible defense for any of the
11 parties in this case.
12    A.  Right.
13    Q.  My question is if that's a possible
14 defense and a reason not to bring the case early
15 on in the annuity, wouldn't it be prudent to keep
16 documents on annuity cases for longer than the
17 twenty years?
18    A.  If you had knowledge of the situation of
19 the companies disputing, which I had no knowledge
20 of.
21    Q.  Okay, and other than the documents that
22 had been produced by your attorney pursuant to
23 document requests and initial disclosures, you
24 have no other documents concerning this case or

## 110

1 the Jenny C. case; is that correct?
2    **A.**   That's correct.
3    **Q.**   On the underlying case here, Dimon vs.
4 The Jenny C. Corporation, would you have to
5 approve the settlement in that matter?
6    **A.**   The judge had to approve the settlement
7 in the Dimon case.
8    **Q.**   I meant actually within your office, I
9 understand that --
10    **A.**   Do I have to approve a settlement that's
11 conducted by another lawyer or just in the Dimon
12 case are you referring to?
13    **Q.**   Let me ask you, in the Dimon case, did
14 you approve the ultimate settlement in that case?
15    **A.**   Yes.
16    **Q.**   Did you approve that settlement based on
17 a meeting with Dennis Dimon and his wife and his
18 mother?
19    **A.**   I, I approved of the settlement based on
20 either, somehow I became aware of the terms of the
21 settlement and the terms of the settlement and
22 their, based on the circumstances of the Dimon
23 case of all the defenses and the problems involved
24 and the insurance involved, so, that settlement

## 111

1 seemed fair, and I do remember I recommended it to
2 Dimon.
3    **Q.**   Because of Mr. Dimon's education, his
4 understanding, his injury, did you think it was
5 important that Mr. Dimon receive payments for his
6 life as settlement of this matter?
7    **A.**   I thought it was important because of the
8 nature of the person I was dealing with, that was
9 very important, that he accept a structured
10 settlement, and I do remember this from reading
11 his deposition last night, that he was very keen
12 because he did not pay income tax on the
13 structured settlement.
14         That was very important, and the interest
15 rate was high at that point, '83.
16    **Q.**   You say he was very keen, did he not want
17 to pay income tax on the structured settlement, is
18 that what you're saying?
19    **A.**   It was better for him that he take the
20 money and he could get the money and he didn't
21 have to pay taxes on that money received because
22 he did not own the policy, the policy was owned by
23 Kemper, that was important.
24    **Q.**   All right.

## 112

1    **A.**   Very important.
2    **Q.**   Mr. Latti, if you just give me one
3 minute. At the time of, at the period of time
4 around the settlement of the Jenny C. action, were
5 you aware that this matter had to go before a
6 judge with a guardian ad litem for approval of
7 settlement?
8    **A.**   Before this erupted, before this
9 litigation ensued, no, I don't have a memory that
10 a person appeared before Pettine and everything,
11 only from the documents.
12    **Q.**   Okay.
13         MR. KEANE: That's all I have, thank
14 you.
15         MR. LeBLANC: Kevin?
16         MR. GOLDEN: Yes.
17         MR. LeBLANC: Do you have anything?
18         MR. GOLDEN: Yes, a couple of
19 questions.
20        RECROSS EXAMINATION
21 BY MR. GOLDEN:
22    **Q.**   Mr. Latti, my name is Kevin Golden for
23 Kemper Insurance Company, and I want to follow-up
24 with some questions related to your prior

## 113

1 testimony.
2    **A.**   Yeah.
3    **Q.**   You said after you learned the terms of
4 the settlement, you recommended that to?
5    **A.**   After I learned I recommended it to
6 Dennis Dimon, yes.
7    **Q.**   Did you participate in the negotiation of
8 the settlement terms yourself?
9    **A.**   I have no memory of that.
10    **Q.**   Okay. Do you have any memory of
11 contacting anyone at American Motorists Insurance
12 Company regarding the settlement of this case?
13    **A.**   Contacting Kemper or American Motorists,
14 right?
15    **Q.**   Correct. Well, I'll take it in two parts
16 just so we're clear, did you contact anyone at
17 Kemper Insurance Company regarding the settlement
18 of the case?
19    **A.**   I don't, I don't think so.
20    **Q.**   Did you contact anyone at American
21 Motorist -- pardon me, did you contact anyone at
22 American Motorists Insurance Company regarding
23 settlement of the case?
24    **A.**   I don't remember contacting either

## 114

1 American Motorists or Kemper, but I could have.
2    **Q.**   Okay. Do you remember contacting either
3 one of them in response to the letters that were
4 previously introduced today, Exhibits 5 through 8?
5    **A.**   I never had any knowledge of those
6 letters.
7    **Q.**   Okay. So, you wouldn't have spoken with
8 anyone at American Motorists?
9    **A.**   So, I would never speak with them because
10 of the letters.
11    **Q.**   Okay. You testified today that in
12 advance and in preparation of this deposition, you
13 reviewed a variety of documentation, correct?
14    **A.**   Yes.
15    **Q.**   But you do not recall reviewing any of
16 that documentation or seeing any of that
17 documentation prior to the commencement of this
18 action, correct?
19    **A.**   Only those documents that Carolyn Latti
20 sent me I testified to, there was four or five
21 documents there.
22    **Q.**   Okay.
23    **A.**   Then I saw the other documents after this
24 lawsuit was commenced through my attorney who sent

## 115

1 them to me.
2    **Q.**   Okay, and you just testified shortly ago
3 you have no other documentation relating to this
4 dispute outside from the documentation from your
5 attorney and from Carolyn Latti, correct?
6    **A.**   That's correct.
7    **Q.**   Okay. Getting back to your prior
8 testimony, you stated that Kemper had agreed to
9 make certain payments to Mr. Dimon. Is the basis
10 for your testimony limited to the documentation
11 which you just acknowledged you've seen in advance
12 of this case?
13    **A.**   Yes.
14         MR. DeWICK: Objection.
15 BY MR. GOLDEN:
16    **A.**   Yes.
17    **Q.**   And you have no other basis for that
18 understanding, correct?
19    **A.**   I have, I did learn, I do have a memory
20 of talking to Dimon of the structured settlement
21 of the terms of the settlement and recommending
22 the transcript, it's that they insured the vessel,
23 Kemper, I knew that and I remember that.

116

1  **Q.**  Right.
2  **A.**  And I recommended the settlement and
3 inferred, I mean I would have inferred that Kemper
4 insured the vessel, I mean I knew that at the
5 time.
6  **Q.**  Does the name Home Insurance Company ring
7 any bells for you?
8  **A.**  From reading the transcript, they had the
9 primary insurance, I don't know, 500,000, and
10 Lumberman's or Kemper had 400,000 bucks, $400,000.
11  **Q.**  What was your understanding of the
12 involvement of Home Insurance Company in the
13 underlying dispute?
14  **A.**  Only from the transcript that, before
15 Pettine, Decof testified that they paid the
16 maintenance and they paid the medical bills and
17 with the attorneys' fees, it was almost used up if
18 not used up.
19  **Q.**  Okay.  Now, with reference to this
20 hearing before Pettine, were you present at that
21 hearing?
22  **A.**  No.
23  **Q.**  So, the basis for any opinion you would
24 make relating to that hearing is limited to the

117

1 transcript you reviewed?
2  **A.**  Yes.
3  **Q.**  Okay.  In that transcript, that
4 transcript does not contain any testimony relating
5 to any of the annuity terms, correct?
6  **A.**  I don't remember exactly, but I don't
7 think it even though the attorney was present.
8  **Q.**  Okay.
9  **A.**  That attorney was present for Kemper
10 according to the transcript.
11  **Q.**  Right, and in addition, but it does not
12 contain any representations by that attorney with
13 respect to what Kemper agreed to pay, correct?
14  **A.**  No, I didn't read any, no.
15  **Q.**  All right.  One final question just so I
16 can be clear, this may sound familiar, I'm just
17 going to follow-up on a question I previously
18 asked.
19        With respect to your understanding of
20 Kemper's obligations in this case, that would be
21 limited to documentation that you reviewed with
22 your attorney, the transcripts that we just
23 discussed in front of Pettine, and any
24 conversations you might have had with Mr. Dimon,

118

1 correct?
2  **A.**  Can you ask --
3        THE WITNESS:  Do you want the
4 reporter to read it or ask me the question again?
5 BY MR. GOLDEN:
6  **Q.**  Let me rephrase it maybe to make it more
7 simple.  The basis for your opinion of Kemper's
8 obligation is based upon the documentation that
9 you reviewed in advance of today's testimony and
10 the transcripts before Pettine, correct?
11  **A.**  Well, yes and no.  It's based on my
12 experience, knowledge of the law, and plus the
13 transcripts and documents that I reviewed, yes.
14  **Q.**  Okay.
15        MR. GOLDEN:  That's all the questions
16 I have.
17        MR. LeBLANC:  Just one quick
18 question.
19        REDIRECT EXAMINATION
20 BY MR. LeBLANC:
21  **Q.**  You testified earlier that one of the
22 goals of representing a client in a personal
23 injury action was to get them the most you could
24 get for them, the most compensation?

119

1  **A.**  Based on their injuries.
2  **Q.**  Okay.
3  **A.**  That they were fairly compensated.
4  **Q.**  Okay, and you testified in response to
5 questions from Mr. Keane that another goal that
6 you might have is depending on the nature of the
7 person I think is the words you used, you may want
8 to structure a settlement to protect that person;
9 is that right?
10  **A.**  Yes.
11  **Q.**  Okay.  So, you also, I guess one of your
12 considerations in reaching a settlement like was
13 reached in the <u>Dimon vs. Jenny C.</u> case was
14 twofold, to get them fair compensation and to
15 protect them from themselves in essence by not
16 giving them a large lump sum of money and letting
17 them walk away, is that fair?
18        MR. DeWICK:  Objection.
19 BY MR. LeBLANC:
20  **A.**  Many of the cases called for that, yes.
21  **Q.**  Okay, and in fact, in this case, Pettine
22 was concerned about Mr. Dimon's ability to handle
23 and/or understand the settlement?
24  **A.**  Yes.

120

1  **Q.**  And that's why he appointed Mr. Decof?
2  **A.**  Yes.
3  **Q.**  Okay.  So, part of your goal as an
4 attorney representing a client in a personal
5 injury action, a client like Mr. Dimon was not
6 just to protect their interests now but to protect
7 their interests into the future?
8  **A.**  To help them into the future, yeah.
9  **Q.**  Okay.
10        MR. LeBLANC:  I don't have any
11 further questions.
12        MR. DeWICK:  Thank you.
13        (Whereupon, the deposition concluded
14 at 2:20 p.m.)
15
16
17
18
19
20
21
22
23
24

121

1        I, Michael B. Latti, having read the
2 foregoing transcript of my testimony, do hereby
3 certify under the pains and penalties of perjury
4 the same contains a true and accurate record of my
5 answers to the questions herein set forth,
6 together with correction pages, if any, attached.
7
8
9
10
11        _____
         MICHAEL B. LATTI
12
13
14
15
16
17
18
19
20
21
22
23
24

122

1                          ERRATA SHEET

2

3   PAGE  LINE                    DESCRIPTION

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

123

1                    C E R T I F I C A T E

2

3   COMMONWEALTH OF MASSACHUSETTS
    SUFFOLK, SS.
4

5
6
7        I, Julie A. Healey, Certified Shorthand
8   Reporter, Registered Professional Reporter, and
9   Notary Public in and for the Commonwealth of
10  Massachusetts, do hereby certify:
11       That MICHAEL B. LATTI, the witness whose
12  testimony is hereinbefore set forth, was duly
13  sworn by me and that such testimony is a true and
14  accurate record of my stenotype notes taken in the
15  foregoing matter, to the best of my knowledge,
16  skill and ability.
17       IN WITNESS WHEREOF, I have hereunto set
18  my hand and Notarial Seal this 8th day of August,
19  2006.
20

21       _____
         Julie A. Healey
22       CSR, RPR
         Notary Public
23

24  My Commission Expires:  March 26, 2010

1

**$**

$100,000 - 46:19, 101:13
$141,485.47 - 46:22, 101:15
$141,666.66 - 46:22
$400,000 - 116:10

**'**

'05 - 66:23, 67:3, 67:6, 67:13, 67:16, 67:20, 68:6, 91:2
'77 - 12:22, 14:21, 18:17, 18:22, 100:5
'78 - 12:22
'81 - 101:24
'82 - 7:6, 7:7, 19:20, 21:1, 33:1, 33:13, 34:1, 35:13, 37:6, 37:8, 37:10, 37:11, 84:24
'83 - 6:23, 7:1, 7:5, 8:10, 8:13, 9:3, 20:13, 21:3, 26:9, 27:8, 27:9, 31:13, 31:20, 32:24, 33:14, 34:2, 35:13, 37:6, 37:8, 37:10, 37:11, 37:21, 72:16, 80:22, 84:21, 85:1, 85:3, 87:9, 106:3, 106:4, 111:15
'84 - 9:3, 38:12, 38:19, 38:22, 38:23
'89 - 75:5
'92 - 41:23
'94 - 8:16, 8:17
'95 - 8:18
'99 - 6:7, 18:18, 61:8

**0**

02062 - 2:7
02108 - 1:24
02109 - 2:16
02116-3902 - 2:12
02210 - 2:3
05-11073 - 1:5

**1**

1 - 1:1, 3:12, 43:20, 43:21, 44:1, 101:8
1/1982 - 106:11, 107:6
10/10/83 - 3:19, 82:23
10/12/83 - 3:20, 86:16
101 - 1:24
104 - 3:21
10th - 83:2
112 - 3:5
118 - 3:4
11:08 - 1:21
11th - 79:21
123 - 1:1
12th - 68:21, 79:6, 86:23, 87:9, 87:14
14 - 87:5
14th - 87:7, 87:11, 87:12
15 - 18:10, 19:7, 39:7, 39:10, 65:17, 100:23, 101:2, 101:21, 102:4
153 - 62:17, 62:24
153-155 - 3:13, 62:13

**154** - 62:18
155 - 62:18, 62:24
18th - 2:21
190 - 30:8
19103-6969 - 2:22
1960 - 6:6, 18:23, 99:15, 99:18, 99:21
1977 - 15:8, 18:23
1980's - 103:22
1982 - 20:13, 27:7, 27:23, 35:12, 99:10
1983 - 6:22, 27:9, 31:12, 32:3, 32:16, 32:23, 35:12, 38:7, 38:8, 47:23, 48:23, 54:24, 63:4, 63:16, 71:14, 72:12, 73:16, 73:21, 79:6, 80:19, 81:20, 82:6, 83:2, 83:16, 85:8, 85:10, 85:14, 85:19, 86:6, 86:12, 86:23, 87:5, 87:8, 87:14, 87:20, 90:13, 91:7, 99:10, 99:15, 99:19, 100:21, 101:4, 105:9, 105:13, 108:13, 108:17
1984 - 38:21, 41:1, 64:1
1988 - 75:5
1999 - 6:11, 95:8, 95:14, 96:15
1st - 7:6, 7:7

**2**

2 - 3:13, 62:12, 62:13, 62:17, 63:1, 64:5, 67:9, 67:10, 79:19, 80:4
20 - 102:2, 102:3
2003 - 66:17, 68:21, 70:4, 70:8
2006 - 1:20, 90:14, 123:19
2010 - 123:24
25 - 1:20, 43:19
26 - 5:13, 82:6, 123:24
28 - 2:16
2:20 - 120:14

**3**

3 - 3:15, 65:5, 65:6, 65:18, 67:9, 67:10, 67:11, 67:14, 67:17, 68:10, 69:13, 69:18, 69:19, 70:14, 71:3
30-31 - 32:18, 33:19, 68:8, 80:16, 82:16, 83:11, 83:14
301 - 2:3
3rd - 63:7, 105:13, 106:4

**4**

4 - 3:16, 67:14, 76:19, 76:20, 77:6
4/19/1983 - 44:4
4/19/83 - 46:4
40 - 102:1
400,000 - 116:10
43 - 3:12
4th - 63:8

**5**

5 - 3:4, 3:17, 79:2, 79:3, 79:9, 79:19, 80:4, 88:23, 89:4, 114:4
50 - 41:17
500,000 - 116:9
523-7394 - 66:13

**6**

6 - 3:18, 82:2, 82:3, 82:7, 82:12
6/12/03 - 3:15, 65:6, 68:15, 68:18
617 - 66:13
62 - 3:13
65 - 3:15

**7**

7 - 3:19, 82:21, 82:22, 83:4, 83:7
70's - 12:10, 100:10
76 - 3:16
79 - 3:17
7th - 19:22

**8**

8 - 3:20, 86:14, 86:15, 86:20, 87:1, 88:23, 89:4, 114:4
8/12/83 - 3:17, 79:3
80 - 102:1
80's - 9:6, 11:2, 11:3, 11:4, 12:11, 100:10, 102:9
82 - 3:18, 3:19
85 - 19:9, 100:22, 101:3, 101:20, 102:4
86 - 3:20
88 - 2:3
8:50 - 68:21
8th - 19:22, 123:18

**9**

9 - 3:21, 104:11, 104:16, 104:17
9/26/83 - 3:18, 82:3
95 - 33:1, 33:20
97 - 3:5
99 - 1:20, 2:7
9th - 66:17

**A**

ability - 119:22, 123:16
absolutely - 62:21
accept - 111:9
Access - 1:20, 2:7
accident - 52:19
According - 64:5
according - 31:14, 35:22, 53:5, 62:4, 101:17, 117:10
accounted - 17:17, 18:10
accounting - 39:9, 39:11, 47:5
accurate - 31:2, 121:4, 123:14
acknowledged - 115:11
acting - 14:15
Action - 1:5
action - 25:13, 59:3,

91:1, 91:14, 93:17, 93:21, 94:5, 97:4, 97:7, 98:10, 108:12, 112:4, 114:18, 118:23, 120:5
actions - 27:16, 73:5, 75:13, 88:2, 88:7
active - 9:20, 9:21, 9:24, 10:2, 10:4, 53:20
actively - 6:6, 6:10
activity - 22:18
ad - 112:6
addition - 117:11
address - 5:15, 32:16, 33:3, 33:16, 33:17, 80:20, 80:21, 83:15, 84:14, 84:18, 95:23
addressed - 33:19, 33:20, 36:7, 36:11, 51:20, 79:7
admitted - 14:1
advance - 114:12, 115:11, 118:9
adverse - 102:11
advised - 102:16, 103:12
Affidavit - 104:24
affidavit - 105:5, 105:21
affidavits - 40:9, 105:1
ago - 27:19, 69:16, 73:13, 115:2
agree - 4:17, 72:11, 72:19, 85:7
agreed - 14:7, 14:13, 27:2, 47:15, 58:16, 115:8, 117:13
agreement - 7:5, 7:14, 14:11, 14:13, 38:17, 50:18, 100:22
agreements - 7:17
ahead - 45:18, 49:11, 75:17
alcohol - 11:24
alcoholic - 11:8, 12:6
alcoholism - 12:1, 12:11
alerted - 32:20
allege - 10:12
allowed - 15:22, 17:9, 20:5
alluded - 41:7
almost - 8:13, 116:17
American - 79:9, 104:7, 113:11, 113:13, 113:20, 113:22, 114:1, 114:8
amicable - 38:24
amount - 26:6
Anderson - 1:13, 2:18, 6:9, 6:14, 6:19, 66:14, 70:12, 76:5, 95:9, 95:10, 95:22
annuity - 55:12, 57:7, 57:22, 63:3, 71:8, 73:22, 77:21, 77:23, 83:20, 89:15, 89:16, 103:20, 108:18, 109:2, 109:4, 109:6, 109:7, 109:15, 109:16, 117:5
Annuity - 3:16, 76:20, 77:5
answer - 16:4, 18:19, 24:20, 25:5, 29:20, 30:9, 30:20, 30:21, 30:22, 30:24, 31:1,

49:12, 62:2, 70:17, 74:5, 81:23, 84:6, 89:3, 89:21, 90:2, 90:5, 92:1, 92:23, 98:6
answered - 38:3
answering - 34:3
answers - 47:20, 121:5
anticipatory - 59:7, 59:8, 73:10, 91:20, 93:11, 94:1, 108:14, 109:9
Anticipatory - 60:16
anyway - 61:14
apologize - 106:11
appeal - 12:13, 12:14, 97:22, 97:23, 98:8, 98:9, 98:11, 98:13, 98:22
appealed - 11:20, 11:21, 11:22, 12:16, 12:24, 26:14
appear - 46:1, 47:11, 47:19, 51:19
appearance - 25:16, 25:20, 105:10, 105:11, 105:16, 106:4
Appearances - 2:1
appearances - 34:17
appeared - 33:10, 112:10
application - 77:6, 77:21, 77:23, 77:24
Application - 3:16, 76:20
applied - 16:1
appointed - 58:20, 120:1
approval - 21:9, 21:14, 21:16, 21:20, 52:18, 112:6
approve - 60:24, 110:5, 110:6, 110:10, 110:14, 110:16
approved - 52:16, 58:19, 61:1, 72:2, 110:19
April - 20:19, 26:8, 27:7, 32:3, 47:23, 48:23
Arizona - 104:6
arose - 57:22, 58:13
assigned - 31:21
assist - 35:17
assistance - 64:8, 89:16
associate - 18:3, 88:3
Associates - 1:12, 1:20, 2:6, 2:17, 6:8, 6:13, 6:22, 7:1, 7:19, 7:23, 8:1, 8:2, 8:5, 8:6, 10:24, 12:19, 12:21, 12:23, 17:6, 17:8, 17:11, 17:12, 17:20, 18:11, 19:12, 22:6, 24:23, 26:12, 26:13, 26:17, 31:8, 31:24, 32:17, 32:21, 35:8, 35:10, 38:10, 39:18, 39:19, 39:21, 40:22, 44:11, 44:12, 46:3, 46:11, 47:12, 47:14, 47:24, 48:1, 49:4, 49:14, 51:16, 53:3, 54:8, 54:11, 54:18, 64:1, 64:4,

64:7, 64:8, 68:4,·
68:5, 73:18, 76:4,
78:17, 80:6, 80:10,
80:16, 81:7, 82:16,
83:10, 83:16, 83:18,
83:21, 84:5, 84:10,
85:5, 85:13, 85:24,
87:22, 88:1, 88:8,
88:9, 88:16, 88:24,
89:15, 92:9, 95:12,
95:19, 96:1, 97:16,
97:19, 99:7, 99:10,
103:19, 107:23
associates - 7:11,
7:12, 7:15, 7:18,
17:13, 17:14, 22:9
Associates' - 52:3,
53:18, 78:3, 80:20,
84:14, 89:1
association - 9:18,
11:20, 12:17, 15:21
assume - 63:14
assuming - 37:8,
58:12, 58:13, 89:24,
108:21, 108:22
assumption - 90:1
attached - 121:6
attend - 107:2
attended - 28:7, 28:10
attending - 106:17
attention - 83:9
attorney - 12:14, 16:5,
25:10, 25:11, 29:17,
31:8, 35:24, 36:16,
38:3, 39:8, 40:1,
40:3, 45:19, 47:2,
50:11, 50:17, 50:21,
51:7, 51:10, 51:17,
52:5, 53:6, 53:14,
54:7, 59:9, 59:13,
60:22, 74:13, 76:12,
77:16, 78:10, 81:18,
81:22, 88:14, 88:18,
91:24, 93:12, 102:6,
105:22, 105:24,
106:8, 107:14,
107:16, 107:19,
109:22, 114:24,
115:5, 117:7, 117:9,
117:12, 117:22,
120:4
attorney's - 49:8
Attorneys - 46:13,
80:6, 82:16, 83:10
attorneys - 10:23,
53:14, 53:19, 101:14,
101:15
attorneys' - 101:11,
116:17
August - 79:6, 79:21,
80:19, 80:22, 85:10,
123:18
authority - 16:2,
16:18, 19:12, 19:14,
19:18, 21:6
available - 11:13
Avenue - 2:3
avoid - 58:7
award - 49:19
aware - 13:10, 54:10,
54:15, 54:17, 55:1,
55:18, 68:12, 81:21,
84:19, 85:14, 108:21,
110:20, 112:5

**B**

bank - 36:20

bar - 9:12, 9:13, 9:17,
11:20, 12:17, 15:21
Bar- 9:18, 10:8
Barbara - 86:24
Based - 119:1
based - 49:20, 88:15,
93:2, 108:17, 110:16,
110:19, 110:22,
118:8, 118:11
basis - 11:6, 54:5,
58:17, 60:7, 62:5,
99:16, 115:9, 115:17,
116:23, 118:7
became - 6:7, 6:8,
6:11, 7:4, 7:7, 12:21,
13:10, 18:23, 37:21,
54:10, 54:15, 54:17,
55:18, 95:8, 95:16,
95:22, 100:5, 101:1,
104:1, 110:20
become - 55:1, 81:21
bed - 21:12
begin - 50:12
beginning - 26:8,
38:23, 50:21, 77:16,
109:8
begins - 50:17
Beh/mbl- 44:24
behalf - 1:17, 13:17,
25:16
bells - 116:7
benefits - 7:24, 8:7,
8:10, 8:12
best - 38:17, 50:10,
79:24, 123:15
better - 72:16, 94:6,
111:19
between - 7:14, 18:17,
27:23, 55:10, 59:24,
90:7, 90:23, 92:11
Biddle- 2:20
big - 60:11, 107:11
Bill - 41:21
bills - 116:16
binding - 73:11
bit - 79:18
Black- 2:3
Blue - 8:11, 8:14
Board - 9:18, 10:8
boat - 26:14, 42:20,
43:2, 99:3
boat's - 42:21
boats - 13:20, 13:23
Boehm- 86:24
bonus - 17:14, 17:18,
45:12, 46:10
bonuses - 17:15, 46:9
book - 34:9, 34:18
Boston - 1:24, 2:3,
2:12, 2:16, 13:23,
32:18, 70:7, 80:11,
82:16, 83:11, 83:15
bottom - 70:21
bought - 14:4, 14:5
breach - 59:7, 59:8,
60:16, 73:10, 91:20,
93:11, 94:1, 108:14,
109:10
break - 42:4, 42:6,
76:23, 76:24
Brian - 2:2, 97:3, 97:5,
97:6
briefcase - 79:21
bring - 16:12, 21:9,
21:15, 21:22, 28:15,
53:23, 59:12, 59:13,
73:6, 91:19, 91:21,
93:2, 93:4, 93:9,

94:12, 108:16,
108:19, 109:14
bringing - 21:13,
93:18, 94:2
brings - 21:17
broad - 16:4, 16:7,
25:4, 25:5, 29:15,
29:21, 30:9
broker - 60:4, 71:24,
92:7, 103:14, 103:23
brother - 88:18
brought - 12:13,
12:14, 13:16, 17:16,
28:18, 73:8, 92:13,
92:17, 92:21, 93:13,
93:16, 93:23, 94:16,
99:6, 109:3
Brownsville- 13:10
Bruce- 5:11
bucks - 116:10
building - 13:20
business - 6:22, 6:24,
7:2, 50:9, 70:8,
70:10, 102:13

**C**

cannot - 14:12, 30:5,
30:24, 58:7, 60:17,
62:2, 73:6, 89:21,
90:1, 93:12
capable - 103:2
car - 32:14
carbon - 81:10, 82:15,
83:9
card - 9:15, 9:16, 36:3,
51:20, 81:17
cards - 33:3
care - 4:14, 14:18,
14:19
career - 27:24
Carolyn - 6:14, 6:16,
66:7, 66:9, 66:11,
67:4, 67:13, 69:1,
95:9, 114:19, 115:5
carried - 84:24, 85:1
case - 10:2, 10:3,
10:4, 11:10, 11:15,
11:20, 11:21, 11:22,
12:16, 14:6, 16:20,
17:4, 17:6, 17:9,
17:18, 17:22, 17:24,
18:1, 19:24, 21:18,
21:22, 21:24, 26:13,
26:23, 31:9, 31:10,
31:21, 31:22, 35:4,
36:16, 39:15, 42:9,
42:12, 42:15, 42:16,
42:17, 42:19, 43:1,
43:4, 43:10, 44:2,
44:21, 45:4, 45:5,
45:9, 45:11, 45:13,
45:15, 45:20, 45:23,
46:6, 46:8, 47:3,
47:7, 47:8, 47:18,
48:7, 48:17, 49:20,
50:8, 51:4, 51:5,
51:8, 51:9, 51:17,
52:1, 52:6, 52:13,
52:14, 52:15, 53:9,
54:4, 54:5, 54:18,
55:2, 57:5, 58:11,
58:17, 71:5, 73:4,
73:12, 73:14, 73:17,
74:15, 74:16, 74:18,
75:22, 76:13, 81:16,
88:8, 91:17, 92:4,

92:6, 92:8, 92:11,
92:13, 92:17, 92:21,
93:2, 93:4, 93:9,
93:13, 93:22, 94:8,
94:14, 94:15, 94:16,
96:9, 97:18, 97:22,
97:24, 98:18, 101:6,
101:16, 102:15,
104:20, 105:4,
105:19, 105:23,
106:24, 107:3, 107:4,
107:11, 108:2,
108:19, 109:2,
109:11, 109:14,
109:24, 110:1, 110:3,
110:7, 110:12,
110:13, 110:14,
110:23, 113:12,
113:18, 113:23,
115:12, 117:20,
119:13, 119:21
case's - 52:24
Cases - 17:12
cases - 9:24, 13:21,
16:6, 16:11, 16:16,
16:19, 17:16, 20:20,
21:13, 21:15, 21:22,
22:14, 22:15, 22:18,
27:16, 27:22, 37:12,
39:6, 39:7, 39:12,
51:4, 52:20, 53:4,
53:20, 53:23, 54:4,
72:23, 91:15, 96:7,
96:10, 96:16, 96:18,
102:12, 104:1, 105:2,
109:16, 119:20
Cathy- 35:14, 35:17,
35:20, 36:1, 36:18,
47:3, 81:11
caught - 14:8
causes - 73:4
cc - 80:5, 82:14, 87:17
cc'd - 87:18
center - 33:18
certain - 9:8, 15:12,
16:1, 30:17, 33:4,
33:9, 34:23, 36:1,
36:9, 40:1, 59:21,
81:15, 84:23, 85:2,
106:1, 115:9
Certified - 1:18, 123:7
certify - 121:3, 123:10
chance - 79:14
change - 9:19, 83:21,
88:24, 89:9, 89:12
changed - 108:5,
108:6
changing - 96:6
charge - 22:10
Charter - 43:5, 43:9,
43:11, 94:23, 95:5
cheated - 13:7
check - 34:20, 36:15,
36:17, 36:18, 36:19
checks - 36:14
Cherry - 2:21
chief - 12:2, 57:20,
58:19, 60:23, 72:2,
94:22
children - 13:12
choice - 91:19
choose - 9:22
Ciapciak - 1:20, 2:6
circumstance - 67:8
circumstances - 51:3,
56:15, 57:9, 72:24,
91:15, 93:6, 102:24,
110:22

cited - 87:10
Civil - 1:5, 1:17
claim - 93:11
claimed - 39:14
class - 27:16, 75:13
clause - 14:10
clear - 33:24, 44:16,
46:19, 113:16,
117:16
clearing - 8:3
client - 14:16, 24:24,
25:7, 25:8, 44:16,
44:17, 49:9, 50:10,
50:11, 50:17, 50:22,
51:7, 51:10, 53:7,
53:12, 53:16, 55:14,
56:12, 56:18, 57:14,
58:10, 60:22, 61:4,
99:7, 118:22, 120:4,
120:5
client's - 49:22, 50:5
clients - 40:8, 52:23,
53:3, 96:18, 102:17,
103:13
close - 16:21, 20:11,
52:16
closed - 52:11
closing - 52:14
collapsed - 20:2
coming - 20:4, 75:9
commenced - 90:20,
114:24
commencement -
109:4, 109:5, 114:17
Commencement-
109:6
commencing - 1:21
Commercial- 33:1,
33:21
Commission- 123:24
committee - 1:19
Commonwealth-
1:19, 123:3, 123:9
companies - 13:16,
55:11, 56:22, 59:24,
90:23, 109:19
company - 9:1, 11:17,
26:15, 58:15, 93:10
Company - 1:11, 2:8,
2:23, 43:14, 73:21,
112:23, 113:12,
113:17, 113:22,
116:6, 116:12
compensate - 49:18
compensated - 39:10,
50:7, 119:3
compensation -
52:15, 118:24,
119:14
compete - 17:10
complaint - 10:7,
10:11, 10:15, 11:5,
11:7, 11:9, 12:9,
12:19, 40:2, 40:18,
105:22, 106:9
complaints - 10:9,
10:12, 10:17, 10:22
complete - 21:10,
73:16, 73:22, 74:7,
74:14
completely - 31:21,
40:11, 75:9
compromise - 14:14
computerized - 75:10
computers - 75:8,
108:5
concerned - 119:22
concerning - 109:24

concluded - 108:3, 120:13
Concord- 5:21, 5:23
conduct - 53:6, 70:7, 70:9
conducted - 110:11
conference - 20:16
conflict - 13:18, 17:2
confronted - 13:24
cons - 22:2
consent - 21:8, 21:14
consider - 49:7, 58:8, 59:5, 107:3
considerations - 119:12
consisted - 40:7
consists - 65:21
constant - 37:16
constantly - 28:18, 37:22
constructed - 13:9
consult - 16:14
consulted - 55:9
contact - 113:16, 113:20, 113:21
contacted - 61:10, 63:24, 64:16, 71:7, 89:15
Contacting- 113:13
contacting - 64:3, 113:11, 113:24, 114:2
contain - 35:2, 117:4, 117:12
contained - 91:6
contains - 121:4
contingent - 50:18
continue - 26:12, 48:7, 51:16
continued - 8:16, 8:17, 14:3, 14:20, 22:7, 22:14, 61:8, 63:11
Continued- 22:9
continuing - 64:8
continuously - 91:9
contract - 7:21, 59:1, 69:10, 79:20
control - 75:13
conversations - 27:18, 48:23, 117:24
convince - 48:1
convinced - 26:16, 47:23
copied - 82:15
Copies- 23:15
Copley- 1:23
copy - 36:15, 43:18, 62:20, 70:24, 81:10, 83:9, 106:11
corner - 70:21
corporate - 6:21, 41:24
corporation - 42:23, 43:3
Corporation- 44:4, 47:7, 99:4, 102:16, 110:4
Correct- 32:1, 113:15
correct - 22:8, 25:18, 32:7, 67:9, 70:5, 80:20, 80:21, 83:12, 83:15, 101:2, 102:9, 108:9, 110:1, 110:2, 114:13, 114:18, 115:5, 115:6, 115:18, 117:5, 117:13, 118:1, 118:10

correction - 121:6
correctly - 39:8, 80:8, 83:11, 83:13
correspondence - 35:4
Counsel- 2:4, 2:8, 2:12, 2:17, 2:22
counsel - 6:7, 6:9, 6:12, 70:11, 95:8, 95:16
countered - 39:15, 39:16
couple - 26:19, 97:7, 112:18
course - 75:7, 92:20
Court- 1:4, 1:23, 11:24, 20:21, 25:17, 33:5, 33:23, 57:21, 104:22, 105:19
court - 9:22, 24:14, 24:15, 34:17, 37:13, 40:17, 51:9, 52:12, 52:15, 52:16, 55:20, 55:22, 56:3, 56:5, 88:13
courtroom - 20:3
cover - 65:22, 68:17, 69:20, 69:21
coverage - 9:9, 9:11
covered - 8:20, 8:22
creating - 44:18
credit - 17:14, 18:3, 46:8
Cross- 3:2, 8:11, 8:14, 97:1
Cross-examination- 97:1
Csr- 123:22
current - 33:17
cut - 106:14

## D

daily - 99:16
date - 35:3, 44:4, 46:4, 87:7, 87:9, 87:10, 87:14, 87:16
dated - 3:15, 3:17, 3:18, 3:19, 3:20, 65:6, 66:17, 68:15, 68:17, 68:21, 79:3, 79:6, 82:3, 82:22, 83:2, 86:15, 86:23, 107:5
dates - 33:9, 35:19
daughter - 6:18, 41:8, 66:11
David - 6:14, 13:3, 13:7, 18:22, 68:6, 95:10
day-to-day - 7:21
days - 4:9, 4:13, 4:15, 4:16, 32:10, 38:20, 98:12
deal - 19:17, 20:8, 37:11, 94:3
dealing - 111:8
Dean - 71:7, 71:11, 79:7, 103:13, 103:19
December- 19:19, 106:3
decide - 16:16, 17:1
decided - 48:24
decision - 18:2, 18:4, 19:11, 19:13, 19:18, 20:10, 21:21, 22:3, 93:1
decisions - 16:8,

16:11, 16:19, 22:17
declaratory - 93:16, 93:20, 93:23, 94:2, 94:13
Decof- 72:3, 116:15, 120:1
decrease - 101:14
defaulted - 33:10
defaults - 33:12, 37:24
Defendant- 1:17, 2:8, 2:12, 2:22
defendant - 11:15, 92:14, 92:18, 92:22
defendants - 92:6
Defendants - 1:13, 2:17
defense - 56:20, 56:22, 58:6, 59:8, 59:23, 60:16, 73:9, 73:10, 91:20, 92:14, 92:18, 92:22, 93:2, 93:5, 93:11, 93:24, 108:17, 109:10, 109:14
defenses - 108:12, 108:13, 109:3, 110:23
define - 42:14
defined - 8:12, 8:15
delay - 71:22
delineate - 30:22
denied - 14:1
Dennis - 1:8, 3:14, 24:24, 26:4, 26:7, 27:17, 29:4, 29:5, 32:15, 42:20, 62:14, 62:18, 65:17, 66:17, 69:6, 76:15, 97:4, 97:6, 97:11, 101:16, 105:19, 106:13, 110:17, 113:6
deposit - 36:19
Deposition- 1:16, 3:14, 62:14
deposition - 22:21, 22:24, 24:5, 29:9, 29:11, 29:12, 29:23, 30:7, 30:11, 30:12, 30:13, 30:23, 31:2, 38:5, 43:19, 62:18, 65:18, 65:19, 77:15, 98:3, 106:13, 106:18, 106:21, 107:2, 111:11, 114:12, 120:13
depositions - 20:16, 23:4, 23:10, 23:14, 23:17, 23:24, 77:15, 81:3, 100:17
describe - 23:19
described - 99:12, 107:12
Description- 122:3
destroyed - 74:20, 74:24, 75:2, 75:5, 75:8, 75:10, 75:15
determination - 53:11
determine - 44:15, 88:13, 93:22, 94:4
determining - 45:10
developed - 8:15
Dewick - 2:15, 4:9, 4:12, 4:14, 4:19, 5:1, 6:4, 23:5, 29:18, 30:3, 30:15, 42:5, 49:10, 49:12, 49:23, 50:14, 50:24, 52:8, 54:13, 54:20, 55:3,

55:15, 56:13, 57:10, 57:15, 61:15, 61:23, 62:19, 69:3, 71:18, 72:14, 74:1, 74:21, 78:13, 83:24, 85:15, 88:4, 88:10, 89:3, 89:7, 89:17, 90:8, 90:15, 91:12, 92:15, 115:14, 119:18, 120:12
diabetic - 11:9
diary - 34:18
difference - 88:1
different - 13:16, 23:21, 23:22, 34:9, 35:22, 36:7, 36:21, 52:20, 61:2, 61:9, 63:13, 73:5
difficult - 16:4, 31:11, 55:17, 90:5, 91:10
difficulties - 84:22
difficulty - 92:10
Dimon - 1:8, 24:24, 25:12, 25:16, 25:23, 25:24, 26:4, 26:7, 26:19, 26:22, 26:24, 27:2, 27:10, 27:17, 28:4, 28:8, 29:2, 29:4, 29:5, 32:5, 32:11, 32:15, 42:9, 42:12, 42:18, 42:20, 43:10, 44:3, 46:19, 47:6, 47:14, 47:18, 47:23, 48:24, 49:7, 57:23, 58:3, 58:9, 58:11, 58:16, 58:18, 59:3, 59:5, 60:3, 60:5, 60:8, 61:10, 62:4, 62:6, 64:20, 66:17, 69:6, 69:12, 69:14, 69:17, 71:8, 71:13, 71:20, 72:24, 73:4, 73:11, 73:13, 73:17, 74:19, 75:4, 75:22, 76:13, 76:16, 78:10, 89:2, 89:15, 92:11, 93:9, 93:13, 94:7, 94:16, 94:18, 97:4, 97:6, 97:11, 97:24, 98:3, 99:6, 101:5, 101:12, 101:16, 102:15, 104:20, 105:19, 106:14, 106:15, 106:21, 107:3, 107:13, 107:14, 110:3, 110:7, 110:11, 110:13, 110:17, 110:22, 111:2, 111:5, 113:6, 115:9, 115:20, 115:22, 117:24, 119:13, 120:5
Dimon's - 3:14, 28:23, 29:22, 31:9, 59:1, 62:14, 62:18, 63:3, 65:18, 69:9, 78:2, 83:23, 111:3, 119:22
Direct- 3:2, 5:2
disbarred - 11:18
disclose - 23:6
disclosed - 76:11
disclosures - 109:23
discovery - 37:14, 92:2
discs - 19:20
discuss - 53:24, 54:23, 64:1, 68:2,

68:24
Discussed- 67:23, 67:24
discussed - 23:6, 67:22, 68:1, 68:11, 91:5, 117:23
discussions - 28:13
disease - 42:1
dishonest - 13:7
disk - 75:16
disks - 75:12, 75:19, 75:20, 75:21
dismissed - 10:10, 10:14, 10:16
disposed - 44:21, 51:6, 51:8
dispute - 55:1, 55:10, 55:18, 56:10, 56:21, 56:24, 57:1, 57:22, 58:1, 58:13, 59:24, 60:6, 60:14, 63:3, 63:18, 63:23, 63:24, 64:11, 78:1, 83:20, 85:4, 85:12, 85:18, 89:14, 90:22, 115:4, 116:13
disputed - 57:7
disputing - 109:19
dissolution - 14:3, 14:5, 14:13, 40:9
dissolved - 12:22, 13:1, 13:6, 14:2, 14:21, 15:4
distribute - 36:23, 51:16
distributed - 36:21, 37:2
distributing - 51:13
distribution - 81:8
district - 27:17
District- 1:4
districts - 75:14
Docket- 3:21, 104:11
docket - 11:14, 36:3, 51:20, 104:19
docketed - 34:6, 34:16, 34:18, 34:22, 34:23, 35:5, 36:14, 36:20
docketing - 11:13, 33:7, 34:4, 35:1, 35:18, 51:13
document - 43:20, 44:1, 44:5, 44:7, 44:14, 44:19, 65:13, 65:14, 66:1, 66:3, 66:18, 66:22, 66:24, 67:2, 67:8, 70:1, 70:21, 71:2, 77:5, 77:11, 77:20, 78:2, 78:5, 78:7, 78:9, 78:18, 79:11, 79:15, 105:9, 107:22, 109:23
documentation - 114:13, 114:16, 114:17, 115:3, 115:4, 115:10, 117:21, 118:8
documents - 23:3, 23:12, 23:19, 23:23, 24:1, 24:9, 24:10, 24:19, 24:21, 63:13, 66:1, 67:24, 68:10, 68:11, 68:14, 69:1, 71:5, 76:10, 76:12, 76:15, 84:3, 92:2, 94:9, 109:16, 109:21,

109:24, 112:11,
114:19, 114:21,
114:23, 118:13
**dollars** - 50:20
**done** - 40:8, 40:16,
60:10, 61:14, 83:22
**Donna** - 35:15, 35:16,
36:1, 36:14, 36:21,
36:23, 81:11
**door** - 35:7
**Dorr** - 11:22, 12:16
**doubt** - 18:21
**down** - 20:6, 20:16,
32:13, 46:12, 53:14,
53:19, 54:22
**drank** - 12:12
**draw** - 83:8
**Drinker** - 2:20
**driving** - 16:7
**dropping** - 40:5
**due** - 35:3, 91:11
**duly** - 4:3, 123:12
**during** - 18:24, 19:4,
21:4, 22:6, 22:8,
28:13, 31:18, 33:13,
81:20
**During** - 19:2, 20:19,
32:19, 38:7
**duties** - 16:2
**duty** - 58:10, 59:6,
61:13, 61:20, 62:4,
62:7
**Dw** - 1:11, 2:13

## E

**early** - 9:6, 11:2, 11:4,
12:11, 38:7, 84:21,
85:3, 85:8, 85:10,
100:10, 103:22,
109:14
**education** - 28:21,
28:22, 103:8, 111:3
**educational** - 28:24,
29:6
**eight** - 7:12, 20:22,
27:19, 75:1, 107:24,
108:4
**eighth** - 29:10
**either** - 12:10, 16:23,
19:24, 38:22, 39:10,
44:22, 45:7, 60:9,
63:7, 81:11, 103:12,
110:20, 113:24,
114:2
**eleven** - 54:1
**elsewhere** - 61:11,
96:19
**employed** - 7:21,
100:6
**employee** - 21:9
**employees** - 7:20,
7:24, 8:7, 8:19, 21:7
**employment** - 7:18
**end** - 37:10, 38:11,
38:13, 38:22, 41:20,
48:24, 50:23, 51:8,
106:14
**ended** - 52:6
**ends** - 51:4, 51:11
**enforce** - 72:6, 94:18
**enforcement** - 59:4
**ensued** - 112:9
**enter** - 4:7, 14:10,
40:2, 40:6, 102:17,
103:13
**entered** - 11:10,
25:15, 56:11

**entire** - 30:11
**entities** - 15:3
**entitled** - 57:23, 57:24,
60:3, 72:5, 77:5
**entity** - 43:1
**entries** - 105:15
**entry** - 105:9, 105:14,
106:10
**Entry** - 105:11
**Errata** - 122:1
**error** - 59:15, 59:16,
59:22
**errors** - 59:17
**erupted** - 112:8
**Esq** - 2:2, 2:6, 2:11,
2:15, 2:20
**essence** - 119:15
**establish** - 89:22
**ethic** - 38:17
**ethics** - 53:6, 53:16
**events** - 72:12, 90:7
**evidence** - 84:8, 84:9,
84:11, 89:22, 90:3
**evidenced** - 89:19
**Exactly** - 108:8,
108:23
**exactly** - 117:6
**Examination** - 5:2,
112:20, 118:19
**examination** - 96:12,
97:1
**examined** - 4:4
**excellent** - 42:1
**Except** - 93:6, 106:24
**except** - 4:8, 47:9,
80:7, 82:18, 90:24,
107:5
**Excuse** - 52:9, 56:1
**excuse** - 27:2, 36:2,
59:14, 68:3, 71:8,
80:1, 99:20, 105:24
**excused** - 20:20
**excuses** - 79:24
**Exhibit** - 3:11, 43:19,
43:20, 43:21, 44:1,
62:12, 62:13, 62:17,
63:1, 64:5, 65:5,
65:6, 65:17, 65:18,
67:9, 67:10, 67:11,
67:14, 67:17, 68:10,
69:13, 69:18, 69:19,
70:14, 71:3, 76:19,
76:20, 77:6, 79:3,
79:9, 79:19, 80:4,
82:2, 82:3, 82:7,
82:12, 82:22, 83:4,
83:7, 86:14, 86:15,
86:20, 87:1, 101:8,
104:11, 104:16,
104:17
**exhibit** - 77:9
**exhibits** - 23:4, 23:23,
57:18, 77:14, 81:2,
88:22, 89:5
**Exhibits** - 1:2, 88:23,
114:4
**exist** - 76:13
**existence** - 65:1
**existing** - 39:7
**exists** - 60:22, 92:11
**expect** - 73:20, 74:3
**expected** - 53:17
**experience** - 72:18,
74:12, 118:12
**expert** - 38:5
**Expires** - 123:24
**explained** - 26:20
**extent** - 28:20

**extremely** - 101:23
**eye** - 107:4

## F

**faced** - 101:23
**Facher** - 11:22, 12:15
**fact** - 19:17, 32:2,
64:11, 74:18, 78:15,
84:13, 91:5, 119:21
**factor** - 71:20
**factors** - 57:2
**facts** - 49:20, 51:3,
56:16, 57:3, 57:4,
89:22, 91:14
**failed** - 33:4, 38:15
**fair** - 90:4, 111:1,
119:14, 119:17
**fairly** - 50:7, 119:3
**faked** - 11:16
**Falcon** - 2:3
**familiar** - 94:4, 117:16
**far** - 10:10, 38:16,
39:12, 71:10, 88:17,
88:20, 94:14, 95:1
**Fax** - 31:5, 65:6
**fax** - 65:22, 66:13,
68:20, 69:17, 69:21,
96:4
**faxed** - 70:2, 70:3
**Fbi** - 40:10
**February** - 19:22,
19:23, 31:20, 66:23,
67:3, 67:6, 67:13,
67:16, 67:20, 68:6,
91:2
**Federal** - 1:17, 20:21,
25:16, 33:5, 33:23,
57:21, 104:22,
105:19
**federal** - 40:20, 72:2,
94:22, 94:24
**fee** - 46:21, 50:20
**fees** - 46:13, 101:11,
101:14, 101:15,
116:17
**feet** - 20:15, 21:2
**felt** - 16:19, 38:1,
48:19, 48:20, 100:16,
103:1
**few** - 38:19
**fifteen** - 5:18, 23:2
**fighting** - 56:23
**figure** - 15:12
**file** - 36:2, 36:5, 36:13,
40:10, 52:1, 52:11,
52:14, 52:17, 54:8,
59:10, 69:9, 69:15,
73:13, 73:17, 73:22,
74:7, 74:13, 74:14,
74:19, 74:23, 75:2,
75:4, 81:13, 97:23,
105:22, 107:17
**filed** - 10:8, 10:15,
10:21, 10:23, 11:5,
11:9, 12:9, 19:19,
39:16, 39:17, 39:20,
40:18, 98:14, 98:23,
104:24, 105:1, 105:5,
105:18, 106:4, 106:8
**files** - 75:10, 75:14,
75:19, 75:21, 76:3,
76:6, 96:9, 108:2
**filing** - 25:20
**final** - 117:15
**finally** - 51:6
**finances** - 47:5
**fine** - 4:22

**finish** - 43:8
**fire** - 21:6, 21:10
**firing** - 16:8
**firm** - 6:7, 7:13, 7:15,
14:22, 15:8, 16:9,
16:12, 19:12, 21:13,
21:15, 21:17, 21:18,
21:19, 22:7, 25:9,
25:12, 25:15, 34:13,
48:15, 48:18, 48:20,
51:13, 53:2, 61:8,
61:11, 88:15, 88:19,
88:20, 94:17, 95:21,
99:24, 101:22
**First** - 4:6, 37:6, 57:17
**first** - 5:7, 8:9, 14:1,
24:19, 24:20, 26:4,
38:19, 65:22, 66:6,
67:20, 67:21, 68:12,
87:3, 87:6, 87:10,
89:24
**fisherman** - 102:21
**fishermen** - 13:17,
102:8
**fishing** - 13:9
**fit** - 37:4
**five** - 114:20
**Flannery** - 11:5, 15:2,
15:4, 15:7, 15:9,
15:23, 16:22, 17:3,
17:4, 18:13, 18:20,
18:23, 26:5, 26:11,
31:14, 31:20, 46:5,
46:10, 48:15, 48:17,
49:1, 97:10, 97:13,
97:15, 97:19, 105:11,
105:15, 106:3
**Flannery's** - 45:22,
45:24
**flat** - 21:11
**flip** - 70:14
**folder** - 35:23, 81:14,
81:19
**folders** - 35:22, 36:7
**Foley** - 79:7
**follow** - 98:15, 112:23,
117:17
**follow-up** - 112:23,
117:17
**follows** - 4:5
**foregoing** - 121:2,
123:15
**form** - 4:8, 6:21, 6:22,
105:2, 105:6
**formal** - 54:3
**former** - 40:10
**formula** - 16:1, 17:23
**forth** - 53:15, 71:11,
121:5, 123:12
**forty** - 10:20, 28:1,
72:19, 74:12, 80:1,
92:12
**forty-six** - 10:20
**forward** - 92:2
**forwarded** - 66:22,
67:2, 67:12, 67:15,
67:18, 67:19, 68:9,
69:19
**Foster** - 35:14, 35:17,
35:20, 36:19, 47:3
**four** - 10:20, 65:21,
65:24, 66:2, 87:23,
114:20
**Franklin** - 66:18
**fresher** - 72:12
**Friday** - 40:4
**friend** - 103:24, 104:1
**frivolous** - 10:14

**front** - 94:21, 94:24,
117:23
**full** - 5:8, 41:11, 41:13
**furtherance** - 88:8
**future** - 120:7, 120:8

## G

**galore** - 75:14
**general** - 35:3, 40:12,
41:23
**General** - 19:20, 20:3
**generally** - 32:11,
72:21
**given** - 17:24, 36:15,
44:17
**goal** - 119:5, 120:3
**goals** - 118:22
**Golden** - 2:20, 3:5,
4:22, 65:14, 65:20,
72:7, 73:24, 74:9,
77:3, 112:16, 112:18,
112:21, 112:22,
115:15, 118:5,
118:15
**grade** - 29:10
**great** - 19:17, 20:8,
37:10, 94:3
**gripe** - 60:2
**Grissot** - 41:5, 41:9,
41:11, 41:20
**gross** - 15:12
**group** - 54:1
**Group** - 2:2
**guarantee** - 72:5
**guaranteed** - 60:1,
72:1, 94:21, 94:24
**guardian** - 58:21,
60:24, 72:4, 112:6
**guess** - 5:7, 7:22,
14:21, 46:18, 98:7,
109:1, 119:11
**guessing** - 46:23

## H

**habeas** - 102:13
**Hale** - 11:22, 12:15
**half** - 69:2
**hand** - 43:18, 44:1,
70:21, 123:18
**handle** - 22:15, 48:7,
103:1, 105:23,
119:22
**handled** - 11:11, 31:8,
47:4, 51:23, 52:20,
54:18, 88:8, 96:7,
102:12
**handling** - 36:2, 36:5,
36:13, 53:24, 81:13,
81:15, 105:24
**Harbor** - 5:14
**hard** - 50:16, 51:2
**hardly** - 70:23
**Healey** - 1:18, 123:7,
123:21
**hear** - 4:21
**heard** - 80:1, 101:10
**hearing** - 10:11,
10:16, 11:19, 12:17,
15:10, 35:3, 57:19,
58:22, 63:7, 116:20,
116:21, 116:24
**hearings** - 33:4, 33:9,
34:19, 34:24
**heavy** - 106:24, 107:3,
107:4
**help** - 65:1, 72:21,

96:11, 120:8
**hereby** - 121:2, 123:10
**herein** - 121:5
**hereinbefore** - 123:12
**hereunto** - 123:17
**hid** - 13:8
**high** - 101:23, 111:15
**highest** - 49:19
**himself** - 11:11, 35:1
**hire** - 21:6, 21:10
**hiring** - 16:8
**Home** - 116:6, 116:12
**Hospital** - 19:20
**hospital** - 106:5
**hour** - 23:2
**House** - 13:13
**Hughes** - 6:24, 7:4, 18:8, 19:3, 19:13, 19:17, 20:9, 21:5, 21:14, 22:10, 23:11, 23:14, 23:17, 26:21, 28:12, 31:16, 31:22, 37:9, 37:16, 37:18, 37:20, 38:1, 38:8, 38:14, 39:22, 39:23, 40:1, 40:5, 45:15, 71:6, 80:5, 81:13, 82:15, 83:9, 87:18, 87:20, 100:9, 100:14, 100:22, 100:24, 101:1, 101:20
**Hughes'** - 19:6, 40:3, 40:17, 43:19, 88:7
**humorous** - 79:22
**hurt** - 59:10, 73:4, 73:7
**hypothetical** - 56:17

## I

**identification** - 43:22, 62:15, 65:7, 76:21, 79:4, 82:4, 82:23, 86:16, 104:12
**identified** - 4:3, 44:2
**imagine** - 69:7
**important** - 48:21, 111:5, 111:7, 111:9, 111:14, 111:23, 112:1
**improper** - 84:6
**inaccurate** - 29:13, 30:2, 30:14, 30:18, 30:24, 31:2, 31:4, 31:6
**inactive** - 9:20
**Inc** - 1:12, 2:13
**include** - 101:4
**including** - 102:12
**income** - 111:12, 111:17
**incoming** - 99:15
**Incorporated** - 79:8
**incorrect** - 29:13, 87:16
**incorrectly** - 66:10, 82:19
**indefinitely** - 11:18, 11:19
**independent** - 97:14
**Index** - 1:2
**indicate** - 105:18
**individual** - 18:3, 36:11, 36:13, 37:18, 45:8, 48:21, 51:21, 51:24, 53:7, 100:4, 103:5
**individually** - 39:21,

40:23
**inferred** - 116:3
**inform** - 53:7
**information** - 56:19, 91:6
**informed** - 52:24, 53:4
**initial** - 35:23, 71:1, 109:23
**initials** - 35:22, 36:4, 45:2, 45:14, 45:16, 45:20, 45:21, 45:24, 47:19, 81:18
**injuries** - 49:18, 50:8, 119:1
**injury** - 25:13, 50:8, 52:19, 103:10, 111:4, 118:23, 120:5
**input** - 18:7, 18:9, 18:13, 27:4, 27:5, 31:16, 45:3, 45:5, 45:11, 47:18, 107:3, 107:9
**instead** - 13:12, 33:16, 46:22
**insurance** - 8:20, 9:8, 11:17, 26:15, 55:10, 58:15, 90:23, 94:18, 110:24, 116:9
**Insurance** - 1:10, 1:11, 2:8, 2:23, 43:14, 73:21, 99:2, 112:23, 113:11, 113:17, 113:22, 116:6, 116:12
**insured** - 13:15, 55:11, 115:23, 116:4
**insurer** - 98:22, 99:3
**intended** - 81:22
**interest** - 18:8, 19:7, 19:9, 39:6, 39:15, 49:22, 50:5, 53:9, 53:12, 102:22, 111:14
**interests** - 50:6, 83:23, 120:6, 120:7
**interim** - 27:22
**interpret** - 28:19
**interrogatories** - 38:4, 100:17
**interruption** - 63:20, 64:2
**introduced** - 114:4
**involved** - 12:19, 20:9, 26:15, 42:9, 42:17, 42:18, 43:1, 43:3, 56:21, 74:15, 94:8, 110:23, 110:24
**involvement** - 116:12
**involves** - 94:9
**Island** - 57:20, 104:20
**issued** - 45:12
**issues** - 73:1, 73:3
**itself** - 17:24, 53:9

## J

**January** - 7:6, 7:7, 105:13, 106:4
**Jay** - 106:13
**Jed** - 23:1, 24:6
**Jenny** - 42:9, 42:12, 42:19, 43:10, 44:3, 47:6, 57:5, 73:14, 73:17, 74:19, 75:4, 75:22, 76:13, 99:3, 102:15, 110:1, 110:4, 112:4, 119:13
**Jerry** - 11:22, 12:15

**job** - 37:23, 48:6, 49:19, 49:21
**jobs** - 50:2
**Joe** - 11:5, 16:22, 17:2, 18:13, 26:5, 45:22, 48:16
**John** - 2:15, 79:8, 82:6, 83:3, 86:24
**Joseph** - 15:9, 18:23, 26:11, 31:14, 31:20, 48:15, 97:13, 105:11, 105:14
**Judge** - 57:19, 98:20
**judge** - 11:24, 12:2, 52:18, 57:20, 58:19, 60:23, 72:3, 94:22, 94:24, 98:18, 110:6, 112:6
**judgment** - 11:15, 53:13, 93:17, 93:21, 93:23, 94:2, 94:13, 98:12
**Judicial** - 11:24
**Julie** - 1:18, 123:7, 123:21
**July** - 1:20, 63:11
**June** - 20:7, 20:15, 63:4, 63:10, 63:16, 64:1, 66:17, 68:21
**junior** - 18:15

## K

**Kaplan** - 12:21, 13:3, 13:7, 15:1, 15:4, 15:5, 18:22, 68:5, 68:6, 68:11, 91:1, 100:3
**Kaplan/bond** - 2:2
**Keane** - 2:2, 3:5, 4:18, 96:23, 97:2, 97:3, 97:5, 97:6, 104:10, 104:13, 112:13, 119:5
**keen** - 111:11, 111:16
**keep** - 109:15
**keeping** - 47:14, 52:23, 53:3, 74:13, 74:24
**Kemper** - 1:11, 2:23, 5:1, 23:22, 43:14, 58:15, 58:17, 58:23, 59:4, 60:1, 60:4, 71:9, 71:24, 72:1, 72:6, 73:21, 90:24, 92:7, 94:19, 98:22, 99:1, 111:23, 112:23, 113:13, 113:17, 114:1, 115:8, 115:24, 116:3, 116:10, 117:9, 117:13
**Kemper's** - 117:20, 118:7
**kept** - 69:12, 74:14
**Kevin** - 2:20, 4:21, 4:24, 77:1, 112:15, 112:22
**kind** - 48:7, 52:22, 53:19, 79:17
**knowing** - 90:11
**knowledge** - 13:19, 55:12, 55:13, 56:9, 78:16, 78:19, 78:21, 85:22, 90:17, 90:19, 109:18, 109:19, 114:5, 118:12, 123:15
**Knowledge** - 56:8

**knows** - 21:17, 53:16

## L

**laid** - 73:1
**lapse** - 90:6, 91:11, 91:18, 92:3
**large** - 18:1, 103:9, 119:16
**Last** - 24:15, 55:22, 56:5
**last** - 29:11, 67:18, 98:3, 111:11
**lasted** - 13:13
**late** - 12:10, 100:10
**latter** - 85:14, 85:18, 86:6, 86:7, 86:12
**Latti** - 1:12, 1:13, 1:16, 2:17, 2:18, 3:3, 4:2, 5:9, 6:8, 6:12, 6:14, 6:22, 6:24, 7:18, 7:23, 8:1, 8:5, 8:6, 10:23, 12:18, 12:21, 12:23, 15:1, 15:4, 15:5, 17:6, 17:8, 17:10, 17:12, 17:19, 18:11, 19:12, 22:5, 24:23, 26:12, 26:13, 26:16, 26:17, 29:16, 31:8, 31:24, 32:17, 32:21, 35:7, 35:9, 38:10, 39:18, 39:19, 39:21, 40:22, 42:8, 43:24, 44:5, 44:11, 44:12, 46:2, 46:11, 47:12, 47:14, 47:24, 48:1, 49:3, 49:14, 51:16, 52:3, 53:3, 53:18, 54:8, 54:11, 54:18, 63:24, 64:4, 64:7, 65:9, 65:12, 66:7, 66:9, 66:10, 66:11, 66:13, 67:4, 67:13, 68:4, 69:1, 70:11, 71:12, 73:17, 76:4, 76:5, 77:8, 78:3, 78:6, 78:17, 79:11, 80:6, 80:7, 80:9, 80:15, 80:20, 81:7, 82:10, 82:15, 82:17, 82:19, 83:10, 83:15, 83:18, 83:21, 84:2, 84:4, 84:10, 84:14, 85:4, 85:13, 85:24, 86:3, 86:18, 87:3, 87:22, 88:1, 88:8, 88:9, 88:16, 88:24, 89:1, 89:15, 92:9, 95:9, 96:11, 95:18, 95:22, 96:1, 97:3, 97:16, 97:19, 99:7, 99:9, 100:23, 103:19, 104:14, 104:18, 104:24, 105:2, 107:23, 112:2, 112:22, 114:19, 115:5, 121:1, 121:11, 123:11
**Latti's** - 6:16, 65:18
**law** - 6:3, 6:20, 13:21, 14:8, 14:13, 14:14, 14:15, 14:17, 14:18, 14:19, 14:21, 28:2, 41:7, 62:5, 70:9, 93:15, 118:12
**lawful** - 14:9
**lawsuit** - 39:14, 39:16, 39:17, 39:20, 40:5,

40:6, 40:7, 59:13, 73:6, 114:24
**lawyer** - 14:15, 17:9, 34:21, 34:24, 36:4, 36:8, 36:24, 37:1, 42:1, 53:22, 54:22, 58:5, 72:19, 93:12, 110:11
**Lawyers** - 104:8
**lawyers** - 35:23, 36:22, 54:1
**lead** - 87:13
**leadership** - 38:16
**learn** - 55:10, 115:19
**learned** - 29:8, 60:13, 71:4, 91:1, 113:3, 113:5
**least** - 13:8, 21:2, 32:4, 68:17, 83:19
**Leblanc** - 2:6, 3:4, 4:6, 4:13, 4:16, 4:21, 4:23, 5:3, 5:4, 6:5, 23:9, 24:13, 24:17, 29:19, 30:4, 30:16, 42:3, 42:7, 43:17, 43:23, 49:13, 50:1, 50:15, 51:1, 52:10, 54:14, 54:21, 55:4, 55:16, 55:20, 56:3, 56:7, 56:14, 57:11, 57:16, 61:16, 62:1, 62:11, 62:16, 62:21, 62:23, 65:4, 65:8, 65:16, 65:21, 65:23, 69:4, 71:19, 72:8, 72:15, 74:2, 74:10, 74:22, 76:18, 76:22, 77:1, 77:4, 77:7, 78:14, 78:22, 79:1, 79:5, 79:10, 82:1, 82:5, 82:9, 82:21, 83:1, 83:5, 84:1, 85:16, 86:13, 86:17, 86:22, 87:2, 88:5, 88:11, 89:8, 89:18, 90:9, 90:16, 91:13, 92:16, 96:21, 112:15, 112:17, 118:17, 118:20, 119:19, 120:10
**left** - 12:4, 26:11, 38:17, 38:18, 38:19, 40:11, 41:22, 46:7, 96:15, 96:16, 96:17, 97:19
**legal** - 35:17, 71:21, 88:15
**legally** - 58:5, 92:11
**legend** - 68:21
**less** - 73:22
**letter** - 34:10, 35:9, 36:10, 66:17, 68:5, 68:8, 69:20, 79:6, 80:23, 81:1, 81:9, 81:12, 82:6, 82:8, 82:14, 83:2, 86:4, 86:19, 86:23, 87:4
**Letter** - 3:17, 3:18, 3:19, 3:20, 79:3, 82:3, 82:22, 86:15
**letters** - 23:22, 28:3, 58:13, 59:10, 60:6, 60:13, 83:19, 84:10, 89:14, 89:23, 90:12, 90:18, 90:20, 90:21, 91:6, 108:20, 114:3, 114:6, 114:10
**letting** - 119:16

6

level - 12:16, 29:6
liability - 87:24, 88:2,
  102:13
Liachos- 11:23
lie - 20:5
lies - 94:5, 94:16
Life - 1:10, 2:8
life - 57:24, 58:16,
  58:18, 58:24, 59:19,
  59:20, 72:2, 111:6
light - 83:18, 88:22
Liguori- 82:7, 83:3
likelihood - 58:11
Likewise- 21:13
limitation - 98:10,
  98:16, 98:21, 98:24
limited - 15:10, 15:23,
  18:14, 18:20, 18:24,
  41:12, 115:10,
  116:24, 117:21
Line- 122:3
line - 44:23, 46:12,
  87:3, 87:10
listed - 9:17, 108:13
listen - 16:24, 22:3,
  28:19
litem - 112:6
literally - 27:15
litigation - 90:20,
  90:24, 99:23, 99:24,
  112:9
live - 38:15
living - 70:5
Llp- 1:13, 2:15, 2:18,
  2:20
load - 96:9
Logan- 2:21
look - 36:3, 37:19,
  37:23, 44:5, 46:12,
  65:9, 68:20, 77:8,
  79:14, 80:4, 81:17,
  82:10, 82:13, 83:6,
  86:18, 87:17, 91:22,
  94:6, 100:2, 100:15,
  101:10, 104:15
looked - 23:11, 37:9,
  44:6, 61:10, 77:10,
  88:22, 100:18
looking - 46:20, 63:13,
  87:15, 105:8
looks - 44:8, 46:3,
  46:18, 77:22, 87:15,
  101:17, 104:19,
  106:14, 107:7
lost - 79:21, 107:4
lower - 12:16
Lumberman's- 116:10
lump - 119:16
lying - 20:16, 32:13

**M**

mail - 32:21, 33:2,
  33:8, 33:22, 34:4,
  34:5, 34:8, 34:12,
  34:14, 34:15, 34:16,
  34:21, 34:23, 35:2,
  35:6, 35:9, 35:14,
  35:16, 35:17, 35:20,
  36:2, 36:6, 36:8,
  36:13, 36:20, 36:24,
  37:2, 37:4, 37:9,
  37:17, 37:19, 37:22,
  37:23, 38:1, 51:12,
  51:13, 51:16, 51:21,
  51:23, 81:8, 81:14,
  81:21, 84:18, 84:22,
  84:23, 85:5, 85:13,

86:5, 99:9, 99:11,
  99:15, 99:20, 100:2,
  100:7, 100:8, 100:9,
  100:12, 100:14,
  100:15, 100:16,
  100:19
mailed - 33:16, 70:3
mailing - 5:14, 32:16,
  80:20, 80:21, 83:15
Maine - 5:14, 5:15,
  70:5
maintenance - 116:16
malpractice - 8:20,
  9:10, 88:15
man - 28:15, 40:10,
  100:1
manager - 35:14,
  36:15, 47:4
manner - 13:8
March - 7:5, 37:21,
  38:8, 66:23, 67:3,
  123:24
mark - 34:20, 43:20,
  62:11, 65:4, 76:18,
  79:2, 82:1, 82:21,
  86:13
marked - 23:4, 43:18,
  43:22, 44:1, 62:14,
  62:17, 62:20, 65:7,
  65:17, 76:21, 77:6,
  77:14, 79:4, 79:9,
  81:2, 81:5, 82:4,
  82:7, 82:23, 83:3,
  86:16, 86:24, 101:9,
  104:10, 104:11
marks - 70:15
Mass - 5:21, 19:20,
  20:3
Massachusetts - 1:4,
  1:19, 1:20, 1:24, 2:3,
  2:7, 2:12, 2:16, 9:13,
  123:3, 123:10
material - 38:16, 57:17
matter - 15:20, 53:11,
  61:2, 91:22, 97:11,
  110:5, 111:6, 112:5,
  123:15
matters - 53:8
Mcquay - 2:10, 2:11,
  4:20, 96:24
mean - 20:12, 20:14,
  34:7, 42:13, 44:11,
  45:2, 45:6, 49:3,
  49:14, 50:5, 101:19,
  109:5, 116:3, 116:4
meaning - 26:15
means - 33:7, 45:3,
  45:7, 72:5
meant - 110:8
mediation - 41:24
medical - 116:16
meet - 32:10
meeting - 23:3, 23:7,
  25:22, 25:24, 26:4,
  28:16, 32:15, 53:22,
  110:17
meetings - 26:3, 27:6,
  27:10, 28:7, 28:12,
  32:4, 47:22, 48:22
member - 104:8
memories - 72:21
memory - 10:14,
  28:10, 31:15, 55:5,
  55:7, 64:4, 64:10,
  64:13, 68:6, 72:11,
  72:16, 78:21, 97:14,
  112:9, 113:9, 113:10,
  115:19

mentally - 17:21
merit - 17:24
meritorious - 21:23
merits - 94:5
met - 23:1, 26:7, 26:19
meting - 26:18
Metlife - 5:5
Metropolitan - 1:10,
  2:8, 23:22, 58:2,
  59:14, 60:1, 60:2,
  60:4, 71:24, 90:23,
  92:7, 95:3, 95:6
Michael - 1:12, 1:16,
  2:17, 3:3, 4:2, 5:9,
  6:23, 104:24, 105:1,
  121:1, 121:11,
  123:11
might - 24:19, 93:2,
  117:24, 119:6
mimeographed -
  105:3, 105:6
mind - 17:18, 104:14
minute - 112:3
minutes - 23:2
misdate - 87:14
mistake - 58:2, 58:3,
  58:6
money - 11:16, 11:17,
  18:11, 36:17, 49:17,
  51:7, 103:1, 103:9,
  111:20, 111:21,
  119:16
month - 32:22
months - 20:22,
  21:12, 74:16, 89:13
Morgan - 1:11, 2:13
most - 7:1, 28:20,
  28:21, 32:14, 34:14,
  49:17, 50:16, 51:4,
  100:1, 107:20,
  118:23, 118:24
Most - 36:12
mostly - 37:19
mother - 28:10, 28:15,
  69:8, 110:18
Motorist - 113:21
Motorists - 79:9,
  113:11, 113:13,
  113:22, 114:1, 114:8
moved - 5:19, 33:1,
  85:1
multi - 27:17, 75:14
must - 25:18, 48:20

**N**

name - 5:4, 5:8, 9:1,
  11:21, 14:22, 15:19,
  42:21, 47:11, 97:3,
  104:2, 105:3, 105:7,
  105:21, 112:22,
  116:6
named - 24:24, 95:20,
  95:21
names - 13:11, 13:12,
  96:6
narrow - 73:3
nature - 111:8, 119:6
nearly - 99:21
necessarily - 72:20
necessary - 94:10
need - 21:14, 21:16,
  21:20, 100:15
negotiated - 27:3,
  59:1
negotiation - 113:7
net - 44:16
netted - 102:2

never - 11:11, 17:2,
  33:6, 33:9, 33:10,
  33:11, 33:22, 39:12,
  39:16, 39:17, 53:14,
  55:7, 55:9, 64:16,
  70:10, 81:5, 88:17,
  88:18, 90:19, 90:21,
  90:22, 91:5, 100:1,
  114:5, 114:9
New - 103:24, 104:4
next - 98:7
night - 29:11, 53:22,
  98:3, 111:11
nine - 7:12
Noe - 79:8, 82:6, 83:3,
  86:24
non - 70:15
noncompete - 14:10
none - 10:2, 10:21,
  90:18
nonreceipt - 84:12
Norwood - 1:20, 2:7
Notarial - 123:18
notary - 4:8
Notary - 1:19, 4:4,
  123:9, 123:22
notations - 70:18
notes - 123:14
nothing - 60:10,
  60:12, 69:15, 96:9,
  99:22
Nothing - 76:9, 96:23,
  96:24
notice - 33:12, 33:15,
  79:17, 98:13, 106:3,
  106:13
noticed - 24:5
notification - 33:4,
  33:7
November - 19:22,
  20:14, 21:1, 106:3
number - 9:12, 9:13,
  50:20, 66:13, 96:2,
  96:3, 96:4, 101:19
numerous - 20:20,
  37:12

**O**

object - 29:14, 29:16
Objection- 6:4, 29:18,
  30:3, 30:15, 49:10,
  49:23, 50:14, 50:24,
  52:8, 54:13, 54:20,
  55:3, 55:15, 56:13,
  57:10, 57:15, 61:15,
  61:23, 69:3, 71:18,
  72:7, 72:14, 73:24,
  74:1, 74:9, 74:21,
  78:13, 83:24, 85:15,
  88:4, 88:10, 89:17,
  90:8, 90:15, 91:12,
  92:15, 115:14,
  119:18
objections - 4:8
obligation - 14:20,
  58:10, 59:6, 62:3,
  62:8, 89:2, 118:8
obligations - 117:20
obtained - 103:9
occasionally - 37:23
Occasionally- 96:11
occasions - 59:16
occurred - 34:1, 73:2,
  90:7, 90:24, 106:2
October- 38:20,
  38:21, 38:23, 41:1,
  83:2, 85:7, 86:23,

87:5, 87:7, 87:9,
  87:11, 87:14
odd - 28:1, 69:16,
  102:2
offer - 96:11
offered - 64:8
office - 111:1, 14:7,
  17:5, 17:17, 19:21,
  20:8, 21:11, 31:19,
  32:10, 32:13, 33:3,
  35:14, 36:15, 44:9,
  44:10, 47:4, 47:5,
  54:5, 78:3, 81:10,
  96:10, 97:16, 104:2,
  105:10, 110:8
offices - 1:19, 78:3
old - 33:16, 73:23
once - 35:7
Once- 35:9
one - 14:24, 15:13,
  18:18, 28:11, 50:2,
  55:8, 56:23, 59:17,
  63:19, 80:18, 81:3,
  93:19, 112:2, 114:3,
  118:17, 118:21,
  119:11
One- 2:21, 4:10,
  108:13, 117:15
ones - 24:18
opened - 11:11, 35:20
operate - 22:7, 22:9
operation - 22:5
opinion - 11:23,
  50:13, 89:13, 93:11,
  116:23, 118:7
opposed - 88:2, 90:13
orally - 60:11
order - 46:21, 48:14
ordered - 52:15
organized - 54:3
original - 36:18, 58:7,
  70:24
originally - 24:5,
  100:3
ourselves - 39:15
outfit - 104:6
outside - 17:4, 115:4
overhead - 101:22
overrule - 16:18
Overseers- 9:18, 10:8
Owen- 39:24
own - 1:12, 11:16,
  12:4, 16:14, 19:19,
  21:21, 41:22, 46:11,
  74:12, 88:19, 100:15,
  100:19, 106:11,
  111:22
owned - 17:18, 99:3,
  111:22
owner - 26:14, 43:2,
  98:4
ownership - 17:21

**P**

page - 62:24, 65:22,
  66:6, 66:16, 67:9,
  67:10, 67:11, 67:14,
  70:14, 70:16, 71:3,
  79:19, 80:4, 82:8,
  82:13
Page - 3:11, 122:3
Pages - 1:1, 3:13,
  62:13
pages - 30:8, 30:10,
  62:17, 65:22, 66:3,
  67:18, 121:6
paid - 11:17, 14:5,

57:7, 116:15, 116:16
pains - 121:3
paper - 72:24, 94:8
papers - 52:14, 52:17, 69:11, 73:1
paralegals - 22:12
pardon - 113:21
parentheses - 46:15
Park - 2:11
part - 30:7, 30:8, 30:18, 59:1, 84:21, 85:3, 85:8, 85:10, 85:14, 85:19, 86:7, 86:11, 86:12, 90:2, 120:3
participants - 61:9
participate - 113:7
participating - 20:21
participation - 37:3
particular - 36:5, 52:5, 54:4, 93:19
particularly - 53:8, 72:21, 80:13
particulars - 26:21
parties - 42:9, 42:11, 42:13, 73:5, 108:12, 109:11
partner - 7:5, 7:7, 15:7, 15:11, 15:24, 18:12, 18:14, 18:15, 18:18, 18:20, 18:24, 19:3, 19:13, 20:10, 21:5, 31:23, 37:21, 38:8, 38:18, 41:9, 41:11, 41:12, 41:13, 54:11, 54:16, 87:20, 88:2, 100:3, 101:1, 105:24
partners - 6:12, 7:8, 8:22, 14:23, 18:5, 18:17, 19:4, 41:2, 45:10, 95:11
partnership - 7:3, 7:4, 12:22, 13:2, 13:5, 14:2, 19:6, 19:9, 38:11, 38:15, 41:19, 100:21
parts - 30:17, 30:22, 31:3, 31:4, 31:5, 52:22, 113:15
party - 10:5, 40:13, 42:14, 42:16, 43:6, 43:9, 43:12, 43:13, 43:15, 43:16, 74:15
passage - 72:20, 72:22
passed - 37:17, 37:18, 71:16, 100:2
pay - 50:19, 58:14, 58:16, 58:18, 58:24, 111:12, 111:17, 111:21, 117:13
payment - 63:10, 73:8, 94:21, 94:24
payments - 57:24, 63:3, 63:15, 63:20, 64:2, 64:9, 72:1, 89:16, 111:5, 115:9
Pc - 1:20, 2:6, 2:10
penalties - 121:3
pending - 15:20
Pennsylvania - 2:22
pension - 8:12, 8:16
people - 10:20, 13:15, 40:10, 42:16, 100:6
people's - 72:21, 94:11
percent - 15:11,

18:10, 19:7, 19:9, 39:7, 39:10, 41:17, 100:23, 101:2, 101:20, 101:21, 102:1, 102:2, 102:3
percentage - 14:6, 15:24, 41:14, 102:5
period - 11:2, 12:8, 19:4, 20:13, 20:19, 20:24, 21:4, 21:5, 22:6, 22:8, 28:1, 32:2, 32:19, 35:12, 38:7, 54:24, 56:2, 81:20, 99:17, 100:21, 103:3, 108:18, 112:3
periods - 35:19
perjury - 121:3
person - 11:9, 11:21, 14:12, 17:23, 42:24, 45:3, 45:11, 74:15, 81:11, 91:7, 100:7, 104:4, 111:8, 112:10, 119:7, 119:8
personal - 25:13, 50:8, 52:19, 52:22, 53:1, 85:22, 118:22, 120:4
personally - 98:4, 103:15, 103:16, 103:22
pertained - 36:3
Peter - 2:6, 5:4
Pettine - 57:20, 58:19, 58:20, 60:23, 61:1, 63:7, 95:3, 112:10, 116:15, 116:20, 117:23, 118:10, 119:21
Philadelphia - 2:22
phone - 27:13, 69:7, 96:2, 96:3
photographed - 106:16
pick - 36:24
picked - 37:1, 104:7
piece - 34:8, 34:12, 34:14, 34:21
placement - 79:20
Plaintiff - 1:8, 2:4
plaintiff - 23:11, 23:18, 43:2, 107:1, 107:15
plan - 8:12, 8:16
Plaza - 2:11
plus - 6:1, 71:15, 72:22, 92:12, 118:12
Pm - 120:14
pocket - 101:13
Point - 5:13
point - 8:15, 14:24, 15:9, 30:5, 31:23, 41:2, 45:15, 95:18, 100:13, 102:8, 106:1, 106:2, 111:15
policy - 8:20, 8:23, 58:7, 81:8, 111:22
portion - 46:8, 86:6
position - 61:12, 71:13, 71:15
positive - 9:10, 39:20
possibility - 101:12
possible - 45:15, 45:23, 48:5, 48:9, 49:17, 49:20, 50:10, 109:3, 109:10, 109:13
Post - 51:15
post - 33:3, 52:1,

81:16
potential - 108:11
practical - 60:7, 61:3, 62:5
practice - 6:3, 13:21, 14:7, 14:14, 14:15, 14:18, 14:21, 15:22, 17:10, 41:23, 51:15, 52:4, 52:23, 53:1, 53:2, 53:18, 70:9, 74:4, 74:24, 75:7, 80:2, 92:13, 99:14, 100:6, 102:11, 106:24
practiced - 14:17, 14:19
practices - 53:15, 81:8
practicing - 6:6, 6:10, 14:8, 14:12, 16:5, 28:2, 80:10, 80:13, 80:16, 99:19
pre - 15:8, 52:1
precipitated - 37:13, 68:7
predated - 7:6
prejudice - 71:23, 92:5, 92:8
prejudiced - 60:19, 71:22, 72:10
preparation - 107:9, 107:11, 114:12
prepare - 22:20, 22:23, 47:1, 107:1, 107:15
prepared - 107:5, 107:8, 107:20
preparing - 106:20
present - 12:7, 28:12, 31:18, 78:5, 95:1, 107:19, 116:20, 117:7, 117:9
presenting - 78:7
prevail - 50:9
prevailed - 14:4, 40:13
prevent - 14:12
previous - 103:20
previously - 81:2, 101:9, 114:4, 117:17
primarily - 31:9
primary - 116:9
probable - 48:11
problem - 32:20, 33:2, 54:10, 54:15, 54:17, 68:13, 84:17, 86:5, 86:8, 86:11, 91:2, 109:7
problems - 53:23, 54:9, 110:23
procedure - 44:20, 74:4
Procedure - 1:18
proceeding - 98:16, 98:21, 98:24
Proceedings - 4:1
process - 9:19, 37:4, 99:9, 99:11, 99:12, 100:18
processed - 17:19, 21:19, 27:15, 27:21, 36:10
processing - 17:22, 45:9
produced - 76:11, 109:22
products - 102:13
Professional - 1:18, 123:8
profits - 15:24, 18:9,

41:15
program - 107:23
proof - 84:3, 84:9, 84:11
proposal - 71:7, 71:11
prosecute - 16:17, 91:11
protect - 49:21, 50:5, 50:6, 83:22, 119:8, 119:15, 120:6
provide - 7:23, 8:6
Providence - 105:19
Provisions - 1:17
prudent - 109:15
Public - 1:19, 4:4, 123:9, 123:22
purchase - 71:9
purpose - 44:13, 44:18
purposes - 46:9, 63:14, 75:1
pursuant - 1:17, 109:22
put - 33:2, 34:20, 35:21, 45:13, 75:12, 75:16, 75:20, 81:13

## Q

questions - 8:4, 63:15, 90:5, 90:6, 90:13, 96:22, 97:8, 112:19, 112:24, 118:15, 119:5, 120:11, 121:5
quick - 42:3, 76:23, 118:17
quickly - 104:16

## R

ran - 101:22
rate - 102:22, 102:23, 111:15
rather - 49:1
ratify - 30:11
reached - 57:6, 119:13
reaching - 81:22, 109:14
read - 4:11, 24:14, 24:15, 29:11, 29:22, 30:5, 30:10, 30:12, 55:21, 55:22, 56:4, 56:5, 57:17, 57:19, 58:20, 61:10, 61:20, 62:24, 63:5, 63:6, 70:23, 72:3, 79:13, 82:12, 83:7, 83:12, 86:20, 87:3, 98:19, 104:16, 117:14, 118:4, 121:1
reading - 29:8, 63:12, 95:2, 98:2, 98:15, 99:5, 111:10, 116:8
real - 59:23
really - 41:21, 46:23, 48:19, 52:13, 60:21
reason - 33:15, 63:2, 63:18, 63:23, 63:24, 64:11, 75:3, 78:1, 109:14
reasons - 61:1
Reath- 2:20
receive - 46:7, 84:10, 85:23, 101:20, 101:21, 111:5
received - 15:24, 33:8,

33:20, 34:10, 36:17, 36:18, 41:15, 58:12, 59:9, 60:6, 60:13, 63:9, 63:10, 63:12, 68:4, 68:5, 68:9, 69:24, 84:2, 84:4, 84:24, 85:5, 85:13, 85:22, 85:24, 86:4, 89:20, 89:23, 89:24, 90:12, 90:21, 91:4, 108:20, 111:21
receives - 51:6
receiving - 32:21, 63:15, 83:19, 84:18, 86:5, 89:13, 90:18, 99:11
recently - 10:21
recognize - 104:17
recollect - 24:9, 32:5
recollection - 15:7, 35:13, 64:3, 64:6, 94:11, 106:17, 106:20
recommended - 26:24, 102:16, 103:5, 103:12, 111:1, 113:4, 113:5, 116:2
recommending - 115:21
record - 25:10, 25:11, 27:15, 43:17, 43:24, 52:5, 62:16, 65:17, 76:23, 77:4, 79:5, 82:5, 83:1, 86:22, 95:2, 97:13, 107:15, 121:4, 123:14
records - 31:14, 64:24
recovering - 12:6
Recross- 3:2, 112:20
Redirect- 3:2, 118:19
reduce - 46:21
refer - 68:10
reference - 116:19
referred - 34:4, 84:3
referring - 8:8, 9:3, 13:2, 20:24, 21:1, 30:23, 65:15, 67:7, 110:12
refers - 52:19, 89:6
refresh - 94:11
refusing - 30:20
regard - 52:4, 52:23, 103:11
regarding - 55:1, 56:10, 72:12, 83:19, 89:1, 89:14, 113:12, 113:17, 113:22
Registered- 1:18, 123:8
reinstated - 12:2
reject - 87:6
related - 75:21, 76:13, 76:15, 112:24
relating - 115:3, 116:24, 117:4
relationship - 6:17, 50:12, 50:17, 50:21, 51:8, 51:10, 60:22
release - 11:16, 40:14, 40:15
released - 15:19
releases - 40:12
relevant - 53:8, 53:12
relieved - 14:20
remained - 96:18
remains - 69:16
remember - 10:10, 10:13, 10:19, 14:6,

14:24, 18:20, 20:4,
20:20, 23:21, 24:22,
24:23, 25:20, 25:24,
26:5, 26:6, 26:9,
26:14, 26:18, 26:22,
27:1, 27:5, 27:11,
27:14, 27:20, 28:9,
28:12, 29:10, 31:5,
33:14, 33:19, 33:21,
33:24, 39:8, 40:4,
40:21, 40:24, 41:8,
41:16, 41:18, 42:8,
42:11, 42:21, 46:19,
47:9, 48:2, 48:4,
48:13, 48:19, 63:22,
64:21, 64:23, 66:4,
69:22, 69:23, 78:4,
78:7, 85:2, 88:18,
88:21, 93:18, 98:1,
101:24, 104:2, 104:5,
107:10, 111:1,
111:10, 113:24,
114:2, 115:24, 117:6
removed - 19:21,
33:12
rephrase - 24:11,
118:6
replacement - 79:20
reporter - 24:14,
24:16, 55:21, 55:23,
56:4, 56:6, 118:4
Reporter- 1:18, 1:19,
123:8
Reporting- 1:23
represent - 5:4, 49:16,
50:19, 91:24, 97:4,
97:6
representation - 25:3,
25:5, 49:6, 49:8,
50:12
representations -
117:12
represented - 14:4,
14:16, 25:12, 25:19,
28:20, 39:24, 97:10,
97:14, 102:8, 102:10
representing - 10:4,
78:10, 118:22, 120:4
represents - 4:24
requests - 44:17,
109:23
required - 52:12, 92:4
research - 94:3
reside - 5:12, 5:20,
5:22
resided - 5:16
respect - 40:15, 53:15,
54:9, 71:23, 100:17,
117:13, 117:19
response - 35:3, 87:5,
114:3, 119:4
responsibilities -
16:2, 50:3
responsibility - 46:24,
53:10, 54:12, 55:14,
56:12, 57:8, 57:13,
63:13, 61:21, 88:9
responsible - 22:17,
31:9, 31:22, 35:1,
45:8, 47:3, 47:13,
47:16, 51:24, 54:7,
58:23, 100:8, 100:14,
100:16
restored - 33:13
result - 48:24, 75:24,
76:8
retain - 108:2
retained - 36:14,

48:18, 76:4
retention - 107:23
retire - 61:8
retired - 9:23
return - 79:20, 87:6
review - 37:4, 37:16,
54:4, 78:11, 79:11
reviewed - 23:20,
37:22, 37:24, 54:6,
78:18, 114:13, 117:1,
117:21, 118:9,
118:13
reviewing - 71:5,
114:15
Reynolds- 79:8,
103:14, 103:20
Rhode- 57:20, 104:20
right-hand - 70:21
rights - 60:18, 60:20,
71:21
ring - 116:6
Road- 1:20, 2:7, 5:13
Robert- 79:7, 82:7,
83:3
Roger- 6:24, 7:4, 18:8,
19:3, 19:17, 20:9,
22:10, 23:10, 28:12,
31:16, 31:21, 37:9,
37:16, 37:18, 37:19,
38:1, 38:14, 39:23,
40:3, 40:4, 45:15,
71:6, 80:5, 81:13,
82:15, 83:9, 87:18,
88:7, 100:9, 100:13,
100:22, 101:1
Rogers- 26:21
room - 20:17
roughly - 64:1, 107:23
Rpr- 123:22
rule - 21:18
rules - 37:12, 53:5,
53:15
Rules- 1:17
run - 108:19

S

sanction - 21:21
Sandra - 2:11
Sandy - 66:18
sat - 53:14, 97:15
satisfactorily - 4:3
saw - 24:1, 24:6,
24:19, 24:21, 67:20,
81:6, 90:19, 99:15,
99:20, 114:23
Sb- 46:15, 46:17,
46:23
scale - 79:24
Seal - 123:18
seaman - 28:17,
28:18, 102:20, 103:2,
103:6, 103:7
seaman's - 105:2,
105:4, 105:20
seamen - 28:20, 102:8
search - 75:20, 76:1,
76:5, 76:8
second - 66:16, 82:13
secretaries - 22:12
secretary - 35:15,
35:18, 105:6
section - 80:5, 82:14,
87:18
Security - 43:5, 43:9,
43:11, 94:23, 95:5
See - 1:2
see - 24:8, 44:23,

50:7, 62:20, 66:21,
68:14, 68:21, 71:14,
71:23, 72:9, 77:13,
80:6, 82:14, 86:21,
87:19, 89:4, 92:5,
92:10, 93:12, 100:7,
100:12, 105:9,
105:15
seeing - 23:21, 24:9,
92:1, 114:16
seize - 98:2
seldom - 96:13
send - 69:1
senior - 100:1
sense - 17:18, 47:13,
47:16, 48:18, 61:3,
61:9, 73:1
sent - 24:4, 24:18,
68:8, 69:13, 77:14,
81:1, 114:20, 114:24
sentence - 87:6
separate - 17:10
September- 21:2,
38:12, 38:18, 38:22,
82:6
served - 39:23
set - 17:23, 53:15,
92:2, 121:5, 123:12,
123:17
sets - 71:10
settled - 11:15, 16:6,
36:16, 51:18, 58:17
Settlement- 3:12,
43:21, 44:2
settlement - 11:10,
26:20, 26:22, 26:24,
27:2, 27:4, 37:13,
44:3, 44:4, 44:8,
44:15, 44:21, 44:22,
46:4, 46:20, 47:1,
47:12, 47:17, 49:19,
51:5, 51:15, 52:2,
52:15, 55:2, 55:19,
56:10, 56:11, 56:21,
57:5, 57:6, 59:4,
60:2, 60:24, 72:6,
72:13, 94:19, 97:18,
98:1, 101:5, 102:24,
103:3, 103:5, 110:5,
110:6, 110:10,
110:14, 110:16,
110:19, 110:21,
110:24, 111:6,
111:10, 111:13,
111:17, 112:4, 112:7,
113:4, 113:8, 113:12,
113:17, 113:23,
113:24, 115:21,
115:22, 116:2, 119:8,
119:12, 119:23
settlements - 102:18,
103:12, 103:20,
104:3
settling - 19:24, 26:22
seventh - 29:9
several - 12:3
Sheet - 3:12, 3:21,
43:21, 104:11, 122:1
sheet - 44:2, 44:3,
44:8, 44:21, 46:1,
46:20, 47:1, 47:12,
65:22, 68:17, 101:18,
104:19
Shield - 8:11, 8:15
ship - 100:5
shocked - 17:3
short - 42:6, 76:24
Shorthand- 1:18,

123:7
shortly - 46:7, 90:24,
115:2
show - 27:15, 101:8
showed - 23:3, 33:6,
33:22, 34:9
showing - 33:11
shows - 97:13
sign - 4:11
signature - 78:6
signed - 40:14, 70:24,
78:2, 78:11, 78:20,
105:7
significant - 18:10,
59:20
signing - 50:18
signs - 50:19
Simon - 29:3
simple - 118:7
single - 47:12, 99:22
sit - 26:6, 53:19,
54:22, 107:14
sitting - 20:5
situation - 57:3,
81:21, 109:18
Six - 108:4
six - 10:20, 20:22,
75:1, 75:11, 107:24
sixteen - 5:18
sixty - 4:13
skill - 123:16
skip - 30:5
slitted - 35:14, 35:21
slotted - 36:6
small - 18:1
smaller - 95:24
snickered - 79:17
solicitation - 40:7
solicited - 40:11
someone - 11:1,
78:17
sometime - 26:8
sometimes - 17:13,
36:24, 52:12
Sometimes - 36:23
son - 41:7
Son- 6:20
son-in-law - 41:7
Son-in-law- 6:20
sooner - 69:2
sorry - 45:17, 62:22,
65:16, 75:17
sound - 117:16
space - 95:24
speaking - 27:12,
64:20
special - 32:14
specific - 15:6
specifically - 30:6
spelled - 66:10, 80:7,
80:10, 82:17, 82:19,
83:10
split - 102:3, 102:5
spoken - 64:22, 69:6,
69:9, 114:7
Square - 2:21
Ss - 123:3
stage - 10:11, 10:16
stamp - 70:20, 70:22
stand - 5:10, 20:5,
27:17, 29:12, 46:16
standard - 44:20,
105:2
stands - 61:17, 91:8
Stanley - 1:11, 2:13
start - 60:18, 108:4,
109:8
started - 63:3, 63:6,

63:15, 99:18
State - 2:16, 13:13
state - 5:8, 30:17,
40:20
States - 1:4
status - 9:20, 9:21,
28:24, 29:7, 52:5,
52:24
stay - 26:12, 26:16,
26:17, 47:15, 47:24,
48:1, 48:14, 49:1,
50:16
stayed - 48:19, 96:17
stenotype - 123:14
still - 9:17, 9:21, 34:1,
51:19, 60:22, 61:3,
70:11, 72:5, 73:13,
73:16, 77:1, 90:19,
106:5
stipulations - 4:7
stood - 32:14
stopped - 34:1, 34:2,
73:8
storage - 75:15, 108:6
stored - 52:11
story - 13:24, 69:14
stream - 64:9
Street - 1:24, 2:16
Streets - 2:21
stress - 72:1, 73:6
strictly - 99:24, 104:3
strike - 47:20, 79:22,
98:8
stronger - 94:14,
94:15
strongly - 16:20
structure - 119:8
structured - 102:17,
103:3, 103:11, 104:3,
111:9, 111:13,
111:17, 115:20
stuff - 41:24
subject - 21:8
Submitted - 44:24
submitted - 45:21
subtract - 46:23
Sue - 21:1
sue - 39:5, 60:17, 98:4
sued - 13:15, 39:1,
39:2, 39:3, 39:4,
43:2, 88:14, 88:17,
88:18
suffered - 12:1
Suffolk - 123:3
suit - 13:16, 40:11,
40:22, 59:10, 59:11,
59:12, 71:23, 73:8,
91:19, 91:21, 108:17,
109:5
Suite - 2:3
Sullivan - 2:10
sum - 18:10, 119:16
summary - 61:12
sums - 103:9
supposed - 98:10
supreme - 11:23
Supreme - 11:24
Surf- 5:13
surgery - 19:19, 22:7,
32:3
surprise - 28:14
surprised - 74:6,
74:14, 74:17
suspended - 11:19,
15:17, 15:19
suspension - 15:10
sworn - 4:3, 123:13
system - 34:5, 54:4

9

## T

talks - 59:17
tax - 75:1, 111:12,
111:17
taxes - 111:21
Telephone- 2:20
Tempesta- 35:15
ten - 54:1
terminate - 60:23
terminated - 40:12,
51:9
terminating - 52:4
terms - 19:11, 22:5,
31:7, 47:8, 47:22,
48:22, 49:6, 57:6,
59:20, 71:11, 75:19,
76:3, 81:7, 83:20,
87:24, 89:14, 110:20,
110:21, 113:3, 113:8,
115:21, 117:5
terrible - 13:17
testified - 4:4, 18:16,
51:22, 62:6, 71:12,
84:2, 84:13, 86:10,
91:9, 93:8, 100:13,
100:20, 101:2, 102:7,
102:10, 107:10,
107:21, 108:24,
109:9, 114:11,
114:20, 115:2,
116:15, 118:21,
119:4
testify - 84:20
testimony - 61:17,
61:19, 64:19, 78:2,
83:21, 86:2, 89:1,
89:9, 89:12, 91:3,
91:8, 94:10, 101:15,
108:8, 113:1, 115:8,
115:10, 117:4, 118:9,
121:2, 123:12,
123:13
Texas- 13:10
themselves - 94:9,
119:15
therefore - 101:13
they've - 10:9
third - 44:23
thirty - 4:9, 4:14, 4:16,
5:24, 98:12
thousands - 27:16,
27:21
threatened - 97:23
three - 10:20, 13:8,
13:9, 13:14, 13:23,
19:23, 41:10, 67:18,
83:19, 87:23, 92:6,
94:17
throughout - 27:23,
54:5
Thursday- 53:22
titled - 44:2
today - 6:9, 27:23,
37:14, 41:22, 60:20,
72:13, 72:17, 90:7,
91:3, 99:12, 101:9,
114:4, 114:11
today's - 22:21, 22:24,
118:9
Todd- 2:15, 39:24
together - 18:22,
53:19, 66:3, 66:5,
121:6
took - 17:4, 55:11,
100:8
top - 44:23, 68:20,

104:23
trained - 58:5
transcript - 57:19,
63:6, 63:12, 95:3,
98:15, 98:19, 115:23,
116:8, 116:14, 117:1,
117:3, 117:4, 117:10,
121:2
transcripts - 23:16,
99:5, 117:22, 118:10,
118:13
transfer - 33:3
Tremont- 1:24
Trial- 104:7
trial - 20:2, 33:9,
37:11, 37:15, 42:1,
44:22, 46:6, 46:7,
51:5, 72:18, 72:24,
97:11, 98:14, 99:2,
99:21
trials - 20:21, 33:5,
34:19
tried - 16:5, 31:13,
31:15, 31:19, 33:24,
37:12, 45:23, 46:6,
48:17, 98:19
trouble - 37:24
troublesome - 38:1,
38:2
true - 13:14, 121:4,
123:13
trying - 13:20
turn - 66:16
twentieth - 91:23
twenty - 27:19, 28:15,
57:23, 58:1, 58:14,
59:12, 59:18, 59:21,
59:22, 60:10, 60:15,
60:17, 61:5, 69:16,
71:15, 72:22, 73:7,
73:9, 73:12, 91:21,
93:13, 94:7, 109:17
twenty-eight - 27:19
two - 15:3, 15:13,
19:20, 19:23, 26:1,
27:6, 32:4, 52:22,
56:22, 59:24, 64:20,
64:21, 82:8, 95:20,
95:21, 113:15
Two- 2:11, 41:10
two-page - 82:8
twofold - 119:14
type - 16:17, 34:17,
38:6, 102:14, 103:4
types - 52:20, 102:12
typewritten - 70:15
typically - 102:20
typographical - 58:3,
59:15, 59:16, 59:17,
59:22

## U

ultimate - 97:18,
110:14
unanimous - 16:23
undecided - 26:10
under - 53:16, 80:5,
82:14, 93:6, 121:3
underlying - 110:3,
116:13
understood - 35:18
unilateral - 58:4, 58:5
Union - 123:18, 68:8,
80:16, 82:16, 83:11,
83:14
United - 1:4
unknown - 11:8, 12:11

unless - 30:6, 36:9
unusual - 79:23
up - 8:3, 13:13, 19:24,
21:9, 33:24, 36:24,
37:1, 38:15, 53:7,
53:23, 54:7, 59:11,
59:12, 99:20, 104:7,
106:1, 112:23,
116:17, 116:18,
117:17
Up- 100:13
updated - 52:24, 53:3
upper - 104:4
uses - 59:14
usual - 4:7

## V

vacant - 33:8
valid - 91:20, 92:14,
92:18, 92:22, 93:10,
93:24
varied - 35:11, 52:13
variety - 114:13
verdict - 26:5, 26:7,
31:21, 52:2, 81:16,
97:17
vessel - 55:11, 58:16,
98:2, 98:5, 115:23,
116:4
vessels - 13:8, 13:9,
13:14
Via- 2:20
vodka - 12:12
Volume- 1:1
vs - 42:9, 42:12,
42:18, 43:10, 44:3,
47:6, 57:4, 73:13,
73:17, 74:19, 75:4,
75:22, 76:13, 102:15,
110:3, 119:13
Vs- 1:9

## W

wait - 60:14, 61:5,
93:14, 94:7, 108:18
waited - 69:2, 91:23
waive - 4:7, 4:8
walk - 119:17
walked - 96:10
warehouse - 75:14,
76:4, 108:6
Watson- 98:20, 98:21
weak - 59:23
weeks - 26:19
Weinstein - 2:10
Weld- 2:15
West- 104:6
Westchester- 104:5
Wgy- 1:5
Wharf- 32:18, 33:1,
33:21, 68:8, 80:16,
82:16, 83:11, 83:14
whatsoever - 27:5,
55:5, 58:6, 84:4, 92:5
Whereof- 123:17
whole - 31:2, 67:17
wife - 28:11, 28:16,
69:8, 110:17
William- 41:5
withdrawing - 52:4
witness - 1:16, 62:20,
96:12, 123:11
Witness- 3:2, 4:10,
4:24, 23:8, 49:11,
52:9, 56:1, 78:24,
89:5, 118:3, 123:17

Witter- 71:7, 71:11,
79:7, 103:13, 103:19
words - 18:1, 39:14,
57:12, 108:21, 119:7
works - 53:16
worst - 80:1
write - 61:4
writing - 28:3, 70:17,
70:19
written - 7:21, 11:23,
60:9, 64:24
wronged - 91:19,
93:14
wrote - 68:7

## Y

year - 7:22, 20:7,
35:10, 63:19, 69:2,
72:22, 73:23, 91:23,
95:20, 95:21
years - 5:18, 5:24,
10:20, 12:3, 15:13,
15:14, 27:19, 28:2,
41:10, 57:23, 58:1,
58:14, 59:12, 59:18,
59:21, 59:22, 60:10,
60:15, 60:17, 69:16,
69:16, 71:15, 72:19,
73:7, 73:9, 73:12,
74:13, 75:1, 75:11,
80:2, 91:22, 92:12,
93:13, 94:7, 96:13,
103:4, 107:24, 108:4,
109:17
yesterday - 23:2, 24:2
York- 5:13, 5:14, 5:15,
5:19, 103:24, 104:4
young - 28:15
yourself - 37:5, 39:21,
40:23, 113:8

## Z

Zero- 76:2

1

CASE  Dimon  v.  Jenny C. Corporation

DATE OF SETTLEMENT  4 '19 '83

SUBMITTED BY  REH'MBL

## SETTLEMENT SHEET

GROSS SETTLEMENT                                 $ 425,000.00
                                                  175,000.00 Annuity
LESS - Paid Bills & Expenses:                     250,000.00 Up-front

 E. Fee                          $      60.00

 Lancer Co. (Investigation) $     336.75

 Investigo (Investigation) $     958.15

 Med. Recs.                      $       3.60
 Depostions                            467.60
 Boston Photo (Copies)           $      58.80
 Travel Exp - R.I.-Trial
 Meals - Misc. Exp.              $     454.78

 Witness Fees - Experts          $     517.70

 _____         $ _____

 _____         $ _____

Unpaid Bills & Expenses:

 Valed (Depos)                   $     219.75

 Valed (Depos)                   $     207.25

 Potter & McArthur Expert        $    3812.90

 Bristol D. Sheriffs             $      17.25

 Moore Virgadamo                 $     400.00
 Dr. Levin                            1,000.00
ATTORNEYS FEE (sb)141,666.66 $   141,485.47

TOTAL BILLS & EXPENSES                           $ 150,000.00

BALANCE DUE TO CLIENT                            $ 100,000.00
                                          Less
Attorney's Fee      $ _____     IRS lien      4,679.35

Referral Fee to:                                95,320.65

 _____    $ _____

Referral Fee to:

 _____    $ _____

2

153

```
1        A.    Yes, true.

2        Q.    They did not come through any other third

3   party?

4        A.    No.

5        Q.    For example, they didn't come through

6   Latti Associates?

7        A.    Right.

8        Q.    After the Jenny C. case settled and you

9   began receiving the checks, did you have any

10  contact after that point with anyone from Latti or

11  Latti & Associates?

12       A.    Very brief, yeah, nothing as far as

13  discussing on how much, you know, what was going

14  on with the money itself.

15       Q.    When did that contact occur?

16       A.    Um, just when simple things would come

17  up, like, one time when it changed hands, it was,

18  it was kind of late and stuff like that, it was,

19  like, almost two months late, something like that,

20  and we had to call up and find out what was going

21  on then, you know, because we always tried to keep

22  track of it to find out what was going on.

23              You know, there were brief, they were

24  just brief, you know.
```

154

1     Q.    So, there was a time when the payments

2     from the insurance company were two months late?

3     A.    Yeah, generally when it changed hands,

4     that's the way I took it, you know.

5     Q.    But do you recall a specific instance

6     when the payments were two months late?

7     A.    Just one that I know of, yeah.

8     Q.    And do you recall generally when that

9     happened, what year, how long after the annuity

10    issued?

11    A.    No, I can't remember right offhand, no,

12    exactly when.

13    Q.    Was it closer in time to when the annuity

14    issued or closer in time to when the annuity

15    stopped paying, do you know that?

16    A.    It was when the annuity was first going

17    on, it was, like, maybe, I would say a year after

18    it had started.

19    Q.    Okay, and when the payments were two

20    months late, you contacted Latti Associates at

21    that point?

22    A.    Right.

23    Q.    And do you recall who you spoke to

24    directly?

155

1      A.    No, I don't.

2      Q.    And what did you ask them to do at that

3   time, if anything?

4      A.    Well, I asked them if they could find out

5   what was going on and stuff like that, and they

6   did get back to me at one time and said that it

7   was on its way, that it was in the mail.

8            They didn't specify exactly what had

9   happened or anything else like that, they just

10  said, you know, that it was on its way.

11     Q.    Okay.  Other than that time where the

12  payments were two months late, were there other

13  times that you contacted Latti Associates?

14     A.    No.

15     Q.    So, that the next time you contacted them

16  after that was in June of '03 when the payments

17  stopped; is that correct?

18     A.    Basically, yeah.

19     Q.    Well, are there any other times that you

20  can recall between --

21     A.    Not that I can recall, no.

22     Q.    To your knowledge, did anyone on your

23  behalf, your wife or your mother or anyone else,

24  contact Latti Associates during that time?

3

99 Fortin Road
Kingston, RI 02881
Phone: (401) 788.8277
Fax: (401) 788.8278



# icopy

JUN 12 2003

| To: | CAROLYNN LATTIE | From: | Dennis Dimon |
|-----|-----------------|-------|--------------|
| Fax: | 1-617-523-7394 | Pages: | |
| Phone: | | Date: | 6/12/03 |
| Re: | | CC: | |

☐ Urgent     ☐ For Review     ☐ Please Comment     ☐ Please Reply     ☐ Please Recycle

● Comments:

06/28/2006 13:04 IFAX Fax_Center@dbr.com                          → Fax_Center      ☒047/064
Jun-12-JUN.28.2006  11:58AM  CIAPCIAK AND ASSOCIATES PC         1-8'NO.140'''''P.11/28

Metropolitan Life Insurance Company
Annuity Administration Operations
12902 East 51st Street, PO Box 22053, Tulsa, OK 74121-2053

**MetLife**®

*ATT CAROLYNN LAFFIE*

June 9, 2003


**DENNIS DIMON**
**PO BOX 56**
**WEST KINGSTON  RI  02892 0056**


RE: SCIW1126


Dear Mr. Dimon,

This letter is in response to a phone call we received from Katherine Dimon.  Since your annuity contract has expired, we are unable to provide you with a duplicate contract.  However, the terms of your annuity are described below.

The annuity contract was issued on May 5, 1983 under the "Certain 20 Year" option.  American Motorist Insurance Company was considered to be the owner of the annuity, however, you were the annuitant and payee.  This contract provided you with a monthly income due on June 5th of each year payable for a total of 20 years (240 monthly payments).  The payment amount increased by 3% each year.

The first payment was on June 5, 1983.  The final payment was on May 5, 2003.

If you have any questions, please call our customer service center at 1-800-635-7775.



Sincerely,

*Sandy Franklin*

Sandy Franklin
Annuity Payout Specialist III
Annuity Administration Operations

06/28/2006 13:04 IFAX Fax_Center@dbr.com                          → Fax Center        ☑048/064
Jun-12-JUN.28.2006   11:58AM    CIAPCIAK AND ASSOCIATES PC              I-3 NO.140      P.12/28

ATT. CAROLYNN LATTRE.

*DEAN WITTER REYNOLDS INC.*
*One Boston Place, Boston, MA 02108   Telephone (617) 722-5500*

April 8, 1983

PROPOSAL BY

CHARTER SECURITY LIFE INSURANCE COMPANY

OF NEW JERSEY

FOR A

LIFE ANNUITY 20 YEAR CERTAIN

UNDER A STRUCTURED ANNUITY SETTLEMENT

OF $1,450.45 PER MONTH FOR THE FIRST

YEAR AND IT WOULD INCREASE 3%

PER YEAR AS FOLLOWS:

| | |
|---|---|
| 2ND YEAR | $1,493.96 |
| 3RD YEAR | $1,538.78 |
| 4TH YEAR | $1,584.95 |
| 5TH YEAR | $1,632.49 |
| 6TH YEAR | $1,681.47 |
| 7TH YEAR | $1,731.91 |
| 8TH YEAR | $1,783.87 |
| 9TH YEAR | $2,837.38 |
| 10TH YEAR | $1,890.51 |
| 20TH YEAR | $2,543.37 |
| 30TH YEAR | $3,418.08 |
| 40TH YEAR | $4,593.61 |
| 50TH YEAR | $6,173.43 |

A. M. BEST RATING

06/28/2006 13:04 IFAX Fax_Center@dbr.com          → Fax Center      ☑049/064
Jun-12JUN.28.2006  11:58AM    CIAPCIAK AND ASSOCIATES PC        T-3NO.14004/DDP.13/28

06-12-03

DENNIS J. DIMON
KATHERINE I. DIMON

151 Holly Ridge RD.
Po Box 56
WEST Kingston R.I.
02892

401-782-4613  Home Phone
401-207-9197  Cell Phone

Charter Security Life Insurance Co.
We had the understand that my
wife was to collect this check up to
20 years. if anything happen To me
and I was To collect it for 50 years

THANK you

*[signatures]*

4

Black Ink

**83A08153**

ANNUITY
APPLICATION 10010

CHARTER SECURITY LIFE INSURANCE COMPANY, NEW YORK, 720 FIFTH AVENUE, NEW YORK, N.Y.

| | |
|---|---|
| Name of Annuitant (please print)    ☒ Male    ☐ Female | 9. Type of Contract  Single Premium Deferred Annuity |
| Dennis J. Dixon | 10. Single Premium Amount    $ 175,000. |
| Date and Place of Birth | 11. Maturity Age    ☐ 65   ☐ 70½   ☐ Other: Immediate |
| 12/9/59  So. Kingstown, RI | 6/15/83 |
| Residence (No., Street, City, State and Zip Code) | 12. Will this annuity replace or change any existing life insurance or annuity contract? ☐ Yes  ☒ No |
| Laurel Lane, West Kingston, RI  02892 | (If yes, give name of company, policy number, and plan of life insurance or annuity.) |
| Business Address (include Name of Employer) | |
| Mail Notices to ☐ Residence    ☐ Business    ☐ Owner | |
| Social Security No.  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 | 13. Is this contribution for a tax qualified plan? ☐ Yes  ☒ No |
| Owner (if other than Proposed Annuitant) | If so, contract will be issued with a limitation on transferability to conform with IRS regulations. (Check appropriate box for type of qualified plan.) |
| Name:  American Motorists Insurance Co. | ☐ I.R.A. Rollover       ☐ Corporate pension |
| Relationship: | ☐ T.S.A. Exchange         or profit sharing plan |
| Address: | ☐ H.R. 10 Exchange    ☐ Terminal Funding |
| Social Security Tax Payer I.D. No.  36-0727430 | ☐ H.R. 10              ☐ Other |
| ☐ Contingent Owner | 14. Special Requests   *Immediate Annuity* |
| | *20 yr Certain - 3% increase* |
| | *$175,000 = 1450.45 per month* |
| | *(1st 7) etc.* |
| Beneficiary and Relationship | 15. Amendments and Corrections (For Home Office use only) |
| Primary:  Katerina I. Dixon | |
| Contingent:  Jessica I. Dixon - Daughter | *Quote Number 53113* |
| Rebecca Lee Dixon - Daughter | |

undersigned represent(s), to the best of his (her) knowledge and belief, that the foregoing statements and answers are complete, true, and correctly recorded and answers made or to be bound by statements and answers made or to be made in this application. The undersigned further expressly agree(s) as follows:
This application and any policy issued in consequence thereof shall constitute the entire contract. No agent is authorized to make or modify contracts, to waive any of the Company's rights or requirements or to bind the Company by accepting or receiving any promise, representation or informa-

tion, unless the same be in writing, submitted to the Company, and made a part of such policy.
2. Acceptance of any contract(s) issued on the basis of the application shall constitute a ratification and acceptance of any change, correction, addition or amendment noted by the Company in the "Amendments and Corrections" section above, except that in those jurisdictions where it is required any change in amount or benefits shall require a written consent by the Proposed Annuitant and by the Applicant if other than the Proposed Annuitant.

| | | |
|---|---|---|
| at Syracuse NY this 4th day of May 1983 | Signature of Annuitant   *Dennis J. Dixon* | |
| *agent signature* _____ 621-11 | Applicant if other than Annuitant  X *American M..........* | |
| Agent Signature (1)         Code | | |
| J. E. Snider | By _____ | |
| Please Print Name of Agent (1) | Signature and Title | |
| | *Dean Witter Reynolds* | |
| Agent Signature (2)         Code | Please Print Name of General Agency | |
| | | 0000010 |

Please Print Name of Agent (2)

5



Lumbermens Mutual Casualty Company • American Motorists Insurance Company
American Manufacturers Mutual Insurance Company • American Protection Insurance Company

Long Grove, IL 60049 · 312 540-2000

August 12, 1983

Mr. Robert A. Foley
Dean Witter Reynolds, Inc.
One Boston Place
Boston, Massachusetts  02108

Dear Mr. Foley:

DENNIS DIMON
CHARTER SECURITY POLICY NO: 83 A 08153
OUR FILE NO: 399 LM 106125-Z

I received the replacement policy issued by Charter
Security Life Insurance Company (New York) changing
the terms of the annuity from 240 months certain and
life thereafter to 240 months certain only.

I am advised by Mr. Hughes of Lattie Associates that your
quotation was to provide an annuity which would pay
$1,450.45 per month for the first year increasing annually
at a rate of 3% compounded annually for 240 months certain
and life thereafter for a single premium of $175,000.
This was the benefit to be provided under the terms of a
general release and settlement agreement approved by
Judge Pettine of the United States District Court for the
District of Rhode Island.

The agreed upon premium was paid and a policy issued which
is now in the files of the contract owner, American Motor sts
Insurance Company, providing benefits required by the rel ase,
settlement agreement and court order.  I consider the ori inal
annuity contract valid and enforceable and will retain it
in our files.



RECEIVED

AUG 1 7 1983

B. BOEHM

000025

Mr. Robert A. Foley
August 12, 1983
-2-

I intended to return the replacement contract issued by
Barbara Boehm of Charter Security, but it was lost with
my briefcase on August 11, 1983.


Very truly yours,

AMERICAN MOTORISTS INSURANCE COMPANY


John L. Noe
Home Office Claim

JLN:bw

cc:    Ms. Barbara Boehm
       Vice President
       Charter Security Life Insurance Company
       (New York)
       720 Fifth Avenue
       New York City, New York  10019

       Mr. Roger Hughes
       Lattie Associates, Attorneys
       30-31 Union Wharf
       Boston, MA  02109

000026

6





Charter Security Life Insurance Company (New York)
720 Fifth Avenue
New York, New York 10019
Telephone 212-397-2350

September 26, 1983

Mr. John L. Noe
Home Office Claim
American Motorists
Insurance Company
Long Grove, Illinois 60049

     Re: Dennis Dimon - Policy No. 83 A 08153
        Your File No. 399 LM J06125-2

Dear Mr. Noe:

    I am in receipt of your letter to Barbara Boehm, Vice
President of Charter Security Life Insurance Company (New York
("CSL(NY)"), regarding the annuity policy (Policy No. 83 A 08153)
issued by CSL(NY) to Dennis Dimon.

    According to information you received from Mr. Hughes of
Lattie Associates, Robert Foley of Dean Witter Reynolds, Inc.,
allegedly offered to provide Mr. Dimon with a CSL(NY) annuity
which would pay $1,450.45 per month for the first year increasing
annually at a rate of 3% compounded annually for 240 months
certain and life thereafter based on a single premium of
$175,000.00.

    Contrary to the information you received from Mr. Hughes,
there is nothing to indicate that anything other than a single
premium immediate annuity with a 20 year (i.e., 240 months)
certain period was applied for. As you can see from the attached
copy of Mr. Dimon's application, which American Motorists
Insurance Company signed as applicant, a 20 year certain policy
was applied for. I have also attached for your reference, a copy
of a quotation sheet from CSL(NY) to Mr. Foley which clearly
shows that CSL(NY)'s quote was based on the issuance of a certain
period annuity without a life option. As previously explained by
Ms. Boehm in her letter to Mr. Kurt Snyder of Dean Witter
Reynolds dated July 14, 1983 (see enclosed copy), the option
indicated on the Supplementary Contract originally sent to Dean
Witter Reynolds on June 17, 1983 for delivery to your office was
incorrectly typed as a 240 month certain and life thereafter
annuity instead of 240 months only. Again, on behalf of CSL(NY),
I apologize for this oversight.

000027

A Member of Charter Insurance Group, Inc.

Mr. John L. Noe
Page 2
September 26, 1983

Based on the foregoing, CSL(NY) guarantees to continue to pay Mr. Dimon under the terms of his policy a $1,450.45 monthly annuity during the first policy year, which will increase annually at a rate of 3% compounded annually for 240 months certain. No payments will be made beyond the expiration of the 240 month period. Accordingly, the original Supplementary Contract mailed to Robert Foley and in your possession is null and void. I would appreciate your returning that contract to:

> Barbara Boehm
> Vice President
> Policyowner Service Department
> Charter Security Life
> Insurance Company (New York)
> 720 Fifth Avenue
> New York, New York 10019

By copy of this letter, I am instructing Ms. Boehm to send to your attention a correct copy of the Supplementary Contract for Dennis Dimon which you stated was lost with your briefcase on August 11, 1983.

If I can be of any further assistance in this matter, please do not hesitate to contact me at the above address.

Very truly yours,

Robert Liguori
Counsel

RL/spf
Enclosures

cc: Ms. Barbara Boehm

> Mr. Robert A. Foley
> Dean Witter Reynolds, Inc.
> One Boston Place
> Boston, Massachusetts 02108

> Mr. Roger Hughes
> Lattie Associates, Attorneys
> 30-31 Union Wharf
> Boston, MA 02109

000026

7



Lumbermens Mutual Casualty Company • American Motorists Insurance Company
American Manufacturers Mutual Insurance Company • American Protection Insurance Company

Long Grove, IL 60049 · 312/540-2000

October 10, 1983

Mr. Robert Liguori, Counsel
Charter Security Life Insurance
Company (New York)
720 Fifth Avenue
New York, New York  10019

Dear Mr. Liguori:

DENNIS DIMON
CHARTER SECURITY POLICY: 83A08153
OUR FILE NO: 399 LM 106125-Z

In reply to your September 26, 1983, Sections 14 and 15
of the application that I signed were blank.  The entries
now appearing were filled in after I returned the signed
application.

The original annuity policy received was for a term of
240 months certain and life thereafter as ordered and
agreed upon between Mr. Hughes and Mr. Foley.  Your agent,
Mr. Foley further confirmed this to me by telephone in
April, 1983.  May I suggest you contact him to verify
this?

I intend to retain the original policy in our files and
consider it to be valid and enforceable.

Very truly yours,

AMERICAN MOTORISTS INSURANCE COMPANY

John L. Noe
Home Office Claim

JLN:ml

cc: Mr. Robert A. Foley
    Dean Witter Reynolds, Inc.
    One Boston Place
    Boston, MA  02108

    Mr. Roger Hughes
    Latti Assoc., Attorneys
    30-31 Union Wharf
    Boston, MA  02109

cc: Ms. Barbara Boehm
    Vice President
    Policyowner Service Dept.
    Charter Security Life
      Insurance Co. (New York)
    720 Fifth Avenue
    New York, NY  10019

000029

8



**Lumbermens Mutual Casualty Company • American Motorists Insurance Company**
**American Manufacturers Mutual Insurance Company • American Protection Insurance Company**

Long Grove, IL 60049 · 312｜540-2000

October 12, 1983

Ms. Barbara Boehm, Vice President
Policyowner Service Department
Charter Security Life Insurance Company (New York)
720 Fifth Avenue
New York, New York  10019

Dear Ms. Boehm:

RE:  DENNIS DIMON
     CONTRACT NO. 83408153
     OUR FILE NO. 399 LM 156125 Z

In reponse to your October 14, 1983 I reject and return
herewith the Supplementary Agreement and General Provisions
attached thereto. The original annuity policy will be re-
tained in the files of American Motorists Insurance
Company and considered valid and enforceable.

Very truly yours,

AMERICAN MOTORISTS INSURANCE COMPANY

John L. Noe
Home Office Claims

JLN/lz

cc:  Mr. Roger Hughes
     Latti  Associates, Attorneys
     30-31 Union Wharf
     Boston, MA  02109

cc:  Mr. Robert A. Foley
     Dean Witter Reynolds, Inc.
     One Boston Place
     Boston, MA  02108

000024

9

| DATE | NR. | PROCEEDINGS |
|---|---|---|
| Feb 9 | | Complaint filed.<br>Affadaivt of Michael =B. Latti, filed.<br>Summons issued. jr |
| eb 10 | | Summons returned. cz |
| eb 17 | | Marshal's service form returned and filed. sc |
| Mar 2 | | Enter the appearance of Edward P. Sowa for the deft. cz |
| Mar 2 | | Deft's answer filed. cz |
| ay 19 | | Pltffs' motion to compel production of documents filed. cz |
| ay 19 | | Pltff's motion to compel answers filed. cz |
| lay 21 | | Pltff's motion for an order for payment of maintenance and cure fil-ed. cz |
| June 5 | | Pltf's motion to compel production of documents is granted. sc |
| June 5 | | Pltf's motion to compel answers to interros is granted. sc |
| June 10 | | Pltff's motion for an order for payment of maintenance and cure is granted.cz |
| July 16 | | Entry of appearance of Jerome B. Spunt for deft, Jenny C. Inc. as Co-counsel filed. sc |
| July 23 | | Deft's motion for leave to amend its answer filed. sc |
| Aug 11 | | Pltff's notice to take the deposition of Errol B. Zittel filed. cz |
| Aug 11 | | Pltff's notice to take the deposition of Gary Champlin filed. cz |
| Aug 11 | | Pltff's motion to inspect, survey & photograph filed. cz |
| Sept 9 | | Deft's notice to take the deposition of Dennis Jay Dimon filed.cz |
| Sept 10 | | Enter the appearance of W. Slater Allen, Jr.filed.cz |
| Sept 4 | | Pltf's motion to inspect, survey and photograph is granted. sc |
| Sept 17 | | Deft's motion for leave to amend its answer is granted.sc |
| ept 29 | | PRELIMINARY PRE-TRIAL ORDER re: discovery to close by March 1, 1982; trial to commence by March 10, 1982.sc |
| Nov 17 | | Deft's amended answer filed.sc |
| 1/19/82 | | Deft's notice to take the deposition of Dennis Jay Dimon filed.cz |
| 1/19/82 | | Deft's notice to take the deposition of Gary Champlin filed.cz |
| 1/19/82 | | Deft's notice to take the deposition of Errol B. Zittel filed.cz |
| Feb 18 | | Notice to take depo of Jenny C., Inc. filed.sc |
| Feb 18 | | Notice to take depo ofGary Champlin filed.sc |
| Feb 18 | | Notice to take depo of Gary Gray filed.sc |
| Feb 18 | | Noitce to take depo of Errol B. Zittel filed.sc |
| Mar 1 | | STIPULATION re: time for discovery is extended until April 15, 1982.sc |
| Sept 30 | | Noitce to take depo of Gary Champlin filed.sc |
| Sept 30 | | Notice to take depo of Gary Gray filed.sc |
| Oct 29 | | Notice to take depo of Gary Gray.cz |
| 29 | | Notice to take depo of Gary Champlin.cz |
| Dec 21 | | Enter the appearance of Guy J. Wells for deft.cz |
| 1983 | | |
| Jan 3 | | Entry of appearance of Joseph Flannery for pltf filed.sc |
| Jan 28 | | Notice to take depo of Richard F. Learned filed.sc |
| Feb 2 | | 1st day of trial -- two witnesses sworn in; four exhibits entered.sc |
| Feb 3 | | 2nd day of trial -- three witnesses sworn in; 15 exhibits entered; defts m/for directed verdict is denied.sc |
| Feb 4 | | 3rd day of trial; final arguments; jury charge; jurors go into delib.s |
| Feb 4 | | Verdict for pltf in amt of $710,000.00sc |

DC 111A
(Rev. 1/75)

CIVIL DOCKET CONTINUATION SHEET

| PLAINTIFF | DEFENDANT | |
|---|---|---|
| Dennis Jay Dimon | Jenny C., Inc. | DOCKET NO. 81-006: PAGE 2 OF PAGE |

| DATE | NR. | PROCEEDINGS |
|---|---|---|
| 2/14 | | D/judgment N.O.V.cz |
| 14 | | D/new trial or in the alternative a remittitur.cz |
| 14 | | Order: Deft and pltff shall file memo in accordance with a stipulation to be filed not later than 2/21/83.cz |
| 24 | | P/obj to deft's m/new trial.cz |
| Apr 12 | | ORDER re: hearing before Court on April 19, 1983 at 9:00 a.m. re: settlement to be put on record.sc |
| 14 | | Affidavit of notice by W. Slater Allen, Jr.cz |
| May 3 | | Hearing held in open court re: Mr. Decof as Guardian for Mr. Dimon; atty's fees granted.sc |
| May 9 | | Transcript of May 3, 1983 filed.sc |
| May 6 | | Release of deft from its agreement dated Feb 17, 1983 entered.sc |
| 17 | | Copy of Transcript and attachments placed in file.cz |
| June 6 | | Stipulation re: dismissed w/prej., no costs.sc |

```
 1
 2                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
 3                           EASTERN DIVISION
 4
 5    DENNIS DIMON,                    )
                                       )
 6              Plaintiffs,            )
                                       )
 7         vs.                         ) C.A. No:  05-11073 WGY
                                       )
 8    METROPOLITAN LIFE INSURANCE, )
      KEMPER INSURANCE COMPANY,        )
 9    MORGAN STANLEY DW, INC.,         )
      MICHAEL B. LATTI, LATTI          )
10    ASSOCIATES, and LATTI &          )
      ANDERSON LLP,                    )
11                                     )
                Defendants.            )
12
13
14              The telephonic deposition of WILLIAM R.
15    MENSIE, called by the Defendant Metropolitan Life
16    Insurance for examination, pursuant to Notice, and
17    pursuant to the Rules of Civil Procedure for the United
18    States District Courts pertaining to the taking of
19    depositions, taken before Joanne M. Brogan, a Certified
20    Shorthand Reporter and a Notary Public in and for the
21    County of Cook and State of Illinois, at One Kemper
22    Drive, Long Grove, Illinois, on Thursday, 7th day of
23    September, 2006, at the hour of 9:00 o'clock a.m.
24
```

Dimon vs. Metropolitan Life                9-8-06                          William R. Mensie
                                    C.A. No.: 05-11073 WGY

---

**Page 2**

1  APPEARANCES:
2
3    THE KAPLAN/BOND GROUP
     By MR. BRIAN KEANE   (present telephonically)
4    88 Black Falcon Avenue, Suite 301
     Boston, Massachusetts 02210
5    (617)261-0080
       appeared on behalf of the Plaintiff;
6
7    CIAPCIAK & ASSOCIATES, P.C.
     By MR. PETER M. LeBLANC  (present telephonically)
8    99 Access Road
     Norwood, Massachusetts 02062
9    (781)255-7401
       appeared on behalf of Defendant
10     Metropolitan Life Insurance Company;
11
     SULLIVAN WEINSTEIN & McQUAY, P.C.
12   By MS. SANDRA SUE McQUAY  (present telephonically)
     Two Park Plaza
13   Boston, Massachusetts 02116-3902
     (617)348-4355
14     appeared on behalf of Defendant
       Morgan Stanley DW, Inc.;
15
16   TODD & WELD, LLP
     By MR. JOHN E. DeWICK  (present telephonically)
17   28 State Street
     Boston, Massachusetts 02109
18   (617)624-4803
       appeared on behalf of Defendants
19     Michael B. Latti, Latti Associates and
       Latti & Anderson LLP;
20
21   DRINKER BIDDLE & REATH, LLP
     By MR. TIMOTHY J. O'DRISCOLL
22   One Logan Square, 18th and Cherry Streets
     Philadelphia, Pennsylvania 19103-6969
23   (215)988-2865
       appeared on behalf of Defendant
24     Kemper Insurance Company.
       PRECISE REPORTING SERVICE, P.C.

---

**Page 3**

1          I N D E X
2        WILLIAM R. MENSIE
3              PAGES
4
     MR. LeBLANC:
5
     DIRECT EXAMINATION          4 - 214
6    REDIRECT EXAMINATION        253 - 274
     FURTHER REDIRECT EXAMINATION   276 - 278
7
     MS. McQUAY:
8
     CROSS EXAMINATION           214 - 240
9
     MR. DeWICK:
10
     CROSS EXAMINATION           240 - 244
11   RECROSS EXAMINATION         274 - 275
12   MR. KEANE:
13   CROSS EXAMINATION           244 - 252
14
15
          INDEX TO EXHIBITS
16
     EXHIBIT NO.  DESCRIPTION        PAGE
17
     1    October 10, 1983 Letter    53
18   2    Application        80
     3    Annuity Application        83
19   4    Annuity Application        86
     5    April 18, 1983 Memorandum   127
20   6    November 8, 1983 Memorandum  132
     7    August 12, 1983 Letter     196
21   8    March 10, 1983 Jerome B. Spunt  199
       Letter
22   9    March 10, 1983 Medway Marine  204
       Letter
23   10   General Release            218
     11   Single Premium Deferred Annuity  223
24
     PRECISE REPORTING SERVICE, P.C.

---

**Page 4**

1       MR. LeBLANC:  Do counsel want to enter into the
2  usual stipulation waiving the notary that's required in
3  Illinois and reserving objections except as to form until
4  trial?
5       MR. O'DRISCOLL:  That's fine with me.
6       MR. DeWICK:  I'm fine with those stipulations.
7       MR. KEANE:  I'm fine with those stipulations as
8  well.
9       MR. LeBLANC:  Has the witness been sworn?
10      (Witness sworn.)
11          WILLIAM R. MENSIE,
12  called as a witness on behalf of the Defendant
13  Metropolitan Life Insurance, having been first duly
14  sworn, was examined and testified as follows:
15          DIRECT EXAMINATION
16  BY MR. LeBLANC:
17   Q   This is Peter LeBlanc.  State your full name
18  for the record, sir.
19   A   William Randolph Mensie.
20   Q   Spell your last name, please.
21   A   M-e-n-s-i-e.
22   Q   Are you an employee of Kemper Insurance?
23   A   I am.
24   Q   Okay.  And what's your position with Kemper?
          PRECISE REPORTING SERVICE, P.C.

---

**Page 5**

1    A   Liability claim consultant.
2    Q   Okay.  And what does that mean?  What do you
3  do?
4    A   I handle claims, liability claims, from the
5  Long Grove office facility.
6    Q   Okay.  And can you tell me a little bit about
7  what a liability claim might be?
8    A   A claim where a third party has instituted an
9  action against a Kemper insured.
10   Q   Okay.  And does that also involve when third
11 parties institute actions against Kemper itself?
12   A   It could.
13   Q   Okay.  What do you understand the allegations
14 made against Kemper in this case to be?
15   A   I understand — stood that an action was
16 initiated against Kemper alleging misrepresentation and
17 breach of contract.
18   Q   Okay.  Do you understand that you're here to
19 testify on behalf of Kemper Insurance?
20   A   Yes.
21   Q   And that you're testifying as the
22 representative of Kemper Insurance?
23   A   Yes.
24   Q   How long have you been employed with Kemper?
          PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                    9-8-06                    William R. Mensie
                            C.A. No.: 05-11073 WGY

Page 6

1    A    A little over six years.
2    Q    And what was your prior employment before you
3    started working for Kemper?
4    A    I worked for Great American Insurance Company.
5    Q    Okay.  And what did you do there?
6    A    Litigation manager.
7    Q    And what are the job duties of a litigation
8    manager?
9    A    I managed the regional litigation for Great
10   American Insurance, cases that were in suit.
11   Q    Okay.  Was Great American Insurance an
12   independent insurance company, or were they owned by
13   somebody?
14   A    The corporate structure at the time was private
15   ownership.
16   Q    Since then do you know what the corporate
17   structure is?
18   .  A    I do not.
19   Q    Prior to being a liability claims consultant
20   with Kemper what other positions, if any, did you have
21   there?
22   A    Client service representative, senior liability
23   analyst.
24   Q    Did either of those positions require that you
                    PRECISE REPORTING SERVICE, P.C.

Page 7

1    do any direct sales of Kemper products?
2    A    No.
3    Q    Have you ever sold annuity or insurance
4    products?
5    A    No.
6    Q    Have you ever testified before?
7    A    Yes.
8    Q    Okay.  And have you ever testified in a
9    deposition before?
10   A    Yes.
11   Q    How many times?
12   A    Don't recall specifically, more than five, less
13   than 25.
14   Q    Did you ever testify on behalf of Kemper
15   Insurance in your capacity at Kemper Insurance before at
16   a deposition?
17   A    No, I don't recall having done so.
18   Q    Okay.  In the five to 25 depositions you've
19   testified at in the past were they as representatives of
20   a company or on a personal basis?
21   A    Not sure what you mean by "on a personal
22   basis."
23   Q    Let's break it down.  Did you testify on behalf
24   of a company, as a company representative, at any
                    PRECISE REPORTING SERVICE, P.C.

Page 8

1    deposition prior to today?
2    A    Yes.
3    Q    And what was the name of that company?
4    A    Great American.
5    Q    Anyone else?
6    A    Providence Washington.
7    Q    Anyone else?
8    A    None come to mind at this time.
9    Q    Okay.  When you testified on behalf of Great
10   American and Providence Washington, were you employees of
11   those companies at the time -- were you an employee of
12   those companies?
13   A    I've testified on behalf of Providence
14   Washington after having been an employee of that company,
15   and also during the course of my employment there I've
16   testified on behalf of Great American while as an
17   employee.
18   Q    Just so I have it straight, this is the first
19   time you've testified as a representative of Kemper; is
20   that correct?
21   A    Correct.
22   Q    Okay.  When I use the term Kemper or Kemper
23   Insurance or Kemper Group, are those all the same thing
24   in your mind?
                    PRECISE REPORTING SERVICE, P.C.

Page 9

1    A    For the purposes of our discussion, yes.
2    Kemper is a business trade name.
3    Q    So when I say Kemper or Kemper Insurance or
4    Kemper Group, do you understand that I'm asking questions
5    about both this case and the entity that's being sued in
6    this case?
7    A    Yes.
8    Q    Okay.  What were the subject matter of the
9    other depositions you testified in on behalf of employer,
10   former or at the time present employers?
11   A    There were a variety of subject matters.  It
12   runs the gamut, anything from an automobile accident to a
13   workers' compensation case.
14   Q    Did you ever testify on an annuity?
15   A    No.
16   Q    Was that no?
17   A    That's correct.  No.
18   Q    Have you ever worked in your professional life
19   for any of the prior insurance companies you were
20   employed by or your current employer on an annuity
21   dispute?
22        MR. O'DRISCOLL:  Could you rephrase that
23   question.  I wasn't sure that I understood it actually,
24   Peter.  It's Tim O'Driscoll.
                    PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                9-8-06                    William R. Mensie
                                 C.A. No.: 05-11073 WGY

Page 10

1  BY MR. LeBLANC:
2      Q   Let's see if the witness understood it.
3      A   No, I did not. I'm not really sure when you --
4  dispute, are you speaking of matters that were in
5  litigation involving annuities?
6      Q   Speaking of any dispute regarding an annuity
7  whether it was in litigation or not.
8      A   And the question is have I -- can you restate
9  the question, please.
10     Q   Sure. Have you ever worked on a case, a claim,
11 or any other issue related to an annuity or an annuity
12 dispute?
13     A   I have worked on a claim involving annuities.
14 I do not recall any specific claim involving a dispute
15 involving an annuity.
16     Q   Okay. And what -- when you say you worked on a
17 claim involving an annuity, what was the subject matter
18 of that claim?
19     A   During the course of my career I've seen, you
20 know, dozens of claims that involve annuities, so when
21 asked the question whether or not I've worked on a claim
22 involving an annuity, I've been involved in claims where
23 annuities have been a part of that claim.
24     Q   Okay. Did you ever work on a claim that
                    PRECISE REPORTING SERVICE, P.C.

Page 11

1  involved a dispute as to the terms of an annuity?
2      A   During the course of working on a claim
3  involving an annuity, I don't know that I would qualify
4  it as a dispute as such, but during the course of
5  negotiation the terms of the annuity could be at issue;
6  but I wouldn't qualify that as a dispute. So in answer
7  to your question I'd have to say no, if I understood the
8  question correctly.
9      Q   Claims that you worked on regarding annuities,
10 were they claims prior to or after the issuance of the
11 annuity?
12     A   I have not been involved in any claims where
13 there has been a dispute after the issuance of the
14 annuity.
15     Q   Do you know if Kemper has ever been involved
16 with a claim regarding a dispute as the terms of an
17 annuity after the annuity was issued?
18     A   No.
19     Q   No, Kemper has never been involved in that type
20 of issue, or you don't know?
21     A   I do not know.
22     Q   What did you do to prepare for today's
23 deposition?
24     A   Reviewed the documents relating to the lawsuit
                    PRECISE REPORTING SERVICE, P.C.

Page 12

1  and the annuity that was issued in this case.
2      Q   Okay. More specific as to what documents you
3  actually reviewed?
4      A   I reviewed the annuity policy, various
5  memorandums that were a part of the claim file concerning
6  the annuity, as well as the documents that were produced
7  during the course of the discovery.
8      Q   And when you say "claim file," is there a set
9  of identifying numbers that you can point to that would
10 point me to the claim file?
11     A   Claim file reference number is -- there is a
12 claim file reference number, that's correct.
13     Q   And what is that number?
14     A   399 LM 106125.
15     Q   Is that an internal Kemper number?
16     A   Yes.
17     Q   Do you have the documents that were recently
18 disclosed by Mr. O'Driscoll in this case, No. K-005
19 through K-0128?
20     A   Yes.
21     Q   If you look at document K-0005 under the title
22 Structured Settlement Check-Off Sheet.
23     A   I have it before me.
24     Q   If you look at the file number there, it gives
                    PRECISE REPORTING SERVICE, P.C.

Page 13

1  me the same number as your claim file reference number
2  except it has a Z at the end or what appears to be a Z.
3  Do you see that?
4      A   That's correct.
5      Q   And why is that, if you know?
6      A   The Z signified the type of file that it
7  involved.
8      Q   Okay. And what is the type of file that's
9  involved by marking it with a Z?
10     A   Z level files were handled at a home office
11 level.
12     Q   And what does that mean?
13     A   The level of the adjuster's experience that
14 would be involved in handling a case would be changed.
15     Q   Is Z the highest level?
16     A   Yes.
17     Q   And what are the levels below Z?
18     A   The other qualifier would be an X file; and
19 below that, there is nothing below that. It's an X or a
20 Z.
21     Q   Okay. And what makes a file a Z file?
22     A   The managing person who would have signed the
23 file could have qualified it as such because of the
24 seriousness of the injury. That manager's discretion
                    PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                    9-8-06                    William R. Mensie
C.A. No.: 05-11073 WGY

| Page 14 | Page 16 |
|---|---|
| 1 might have dictated that there were circumstances that | 1 BY MR. LeBLANC: |
| 2 they wanted a person who had a more specialized | 2   Q   And who assigned you? |
| 3 understanding of a claim to be involved in the case and | 3   A   By virtue of the -- my job responsibilities, |
| 4 so it was qualified as such. | 4 the lawsuit came in. It falls within my jurisdiction, |
| 5   Q   Okay. And who is the manager on this claim or | 5 and I'm handling the claim. |
| 6 on this case? | 6   Q   Were you assigned based on any particular |
| 7   A   1983 looks to me it's K. Lemhoefer. | 7 criteria? |
| 8   Q   And where did you get that information? | 8   A   More geographic than a specific criteria of |
| 9   A   It appears on a memorandum that's amongst the | 9 such. |
| 10 claim file material. | 10   Q   And when you say "geographic," is there a |
| 11   Q   And can you tell me what the K number for that | 11 region that if cases come out of that region, they go to |
| 12 memorandum is? | 12 you? |
| 13   A   It appears on K-0006. | 13   A   Yeah, that's one of the criterias for the cases |
| 14   Q   Okay. Mr. Mensie, I'd ask you not to refer to | 14 that I'm involved in is by location of the -- |
| 15 documents unless I ask you to or unless you tell me | 15   Q   Criteria? |
| 16 you're doing that, okay? | 16   A   Pardon me. |
| 17   A   Okay. | 17   Q   What are the other criterias? You said that |
| 18   Q   If you look at K-0006 where it says K. | 18 was one criteria. |
| 19 Lemhoefer, Division Claims Summit. | 19   A   I'm also involved in international claims, and |
| 20   A   Okay. | 20 I have responsibility for annuities. |
| 21   Q   What does a division claims mean? | 21   Q   And when you said "responsibility for |
| 22   A   In 1983 it was a divisional claim unit, an | 22 annuities," what does that mean? |
| 23 operation, and it was housed in Summit. | 23   A   If a claim involves an annuity where Kemper is |
| 24   Q   Is that a town or county or building? | 24 involved in, the documents are housed here in Long Grove, |
| PRECISE REPORTING SERVICE, P.C. | PRECISE REPORTING SERVICE, P.C. |

| Page 15 | Page 17 |
|---|---|
| 1   A   Summit, New Jersey I believe. | 1 that data center, I'm charged with keeping that data |
| 2   Q   Now, in preparation for today's deposition, Mr. | 2 center updated, locating annuities. There's a lot of |
| 3 Mensie, did you review any documents that you know or | 3 activity nowadays involving annuities that are being |
| 4 have reason to believe weren't disclosed? | 4 transferred. I'm involved in that as well. |
| 5   MR. O'DRISCOLL: Well, I'll object to that to | 5   Q   And what does it mean to have an annuity |
| 6 the extent that they were the documents -- if there were | 6 transferred in your -- |
| 7 any documents as to which we've claimed attorney-client | 7   A   There are vendors who are purchasing the |
| 8 and/or work product privilege. | 8 benefit streams from the annuitant, and they are |
| 9   MR. LeBLANC: I'd ask the witness to answer the | 9 having -- by court orders allowing that to take place, so |
| 10 question then. | 10 there's a ton of activity along those lines. |
| 11   THE WITNESS: Not to my knowledge. | 11   Q   Did you speak with anyone or have you spoken |
| 12 BY MR. LeBLANC: | 12 with anyone at Kemper regarding the Dimon versus MetLife |
| 13   Q   And Mr. Mensie, why were you chosen to be the | 13 case? |
| 14 witness for Kemper today? | 14   MR. O'DRISCOLL: I would object to the extent |
| 15   MR. O'DRISCOLL: I'll interject at that point. | 15 that Mr. Mensie, if he has, spoken with any counsel at |
| 16 I would object to the question to the extent that that | 16 Kemper, but otherwise Mr. Mensie may respond. |
| 17 would implicate any communications protected by the | 17   THE WITNESS: During the course of handling |
| 18 attorney-client privilege, any communications between | 18 this claim I'm certain I've spoken with others here at |
| 19 myself and Mr. Mensie. | 19 Kemper concerning the claim. |
| 20   But to the extent that the witness knows | 20 BY MR. LeBLANC: |
| 21 and would not implicate any of those communications, | 21   Q   Okay. And who are they? |
| 22 Mr. Mensie, you may answer. | 22   A   One that readily comes to mind is the clerical |
| 23   THE WITNESS: I'm assigned to handle this | 23 manager, seeking her assistance in locating the annuity. |
| 24 litigation. | 24 This is an older policy. Her name is Kim Skaya. That's |
| PRECISE REPORTING SERVICE, P.C. | PRECISE REPORTING SERVICE, P.C. |

Dimon vs. Metropolitan Life                    9-8-06                    William R. Mensie
C.A. No.: 05-11073 WGY

Page 18

1  someone that readily comes to mind.
2      Q   And how do you spell -- is it Ms. Skaya?
3      A   Yes.
4      Q   How do you spell her name?
5      A   S-k-a-y-a.
6      Q   And other than -- did I pronounce it correctly,
7  Skaya?
8      A   Yes.
9      Q   Other than Ms. Skaya, did you speak with anyone
10 else at Kemper?
11     A   I'm sure I have, but no one readily comes to
12 mind. Just during the course of handling the claim,
13 locating the claim file, locating information -- oh,
14 another person, the HR personnel. I've had a
15 communication to locate individuals whose names appear in
16 this matter, last known address.
17     Q   Anyone else?
18     A   Nothing that I can think of.
19     Q   Do you have a supervisor at Kemper?
20     A   Do I?
21     Q   Yes.
22     A   I have a manager that I report to, that's
23 correct.
24     Q   Have you reported anything regarding this case
                   PRECISE REPORTING SERVICE, P.C.

Page 19

1  to that person?
2      A   During the course of handling the claim,
3  there's no formal reporting that has taken place.
4      Q   Any informal reporting?
5      A   As today I reported that I'm involved in this
6  deposition, so I guess that would be a matter of
7  reporting.
8      Q   Other than telling your manager that you are
9  involved in today's deposition, have you told him
10 anything else or her anything else about this case?
11     A   It's a he, and other than the fact that it
12 involves a dispute regarding an annuity contract, no.
13     Q   Do you have a name of an individual in the HR
14 department that you spoke with regarding last known
15 addresses?
16     A   I do not recall her name.
17     Q   And whose last known addresses were you looking
18 for?
19     A   I don't recall.
20     Q   How long ago did you conduct this search?
21     A   Sometime within the last six months.
22     Q   And how many individuals were you looking for
23 their last known addresses?
24     A   It's in direct response to a discovery request,
                   PRECISE REPORTING SERVICE, P.C.

Page 20

1  so each individual that was requested during the course
2  of discovery I conducted a search on each of those
3  individuals.
4      Q   Did your search yield any results?
5      A   To the extent that the records were available,
6  yes.
7      Q   And can you tell us which individuals you
8  discovered last known addresses for?
9      A   I don't recall, but I did relay the
10 information.
11     Q   And who did you relay that information to?
12     A   To counsel.
13     Q   Okay. Is that Mr. O'Driscoll?
14     A   That is correct.
15     Q   Without revealing what your discussions were,
16 just so I understand the structure at Kemper, is there --
17 are you reporting directly to Mr. O'Driscoll or a
18 representative of Drinker, Biddle; or is there in-house
19 counsel that you report to and they report to
20 Mr. O'Driscoll?
21         MR. O'DRISCOLL: I'm not sure I understand the
22 question. I mean I -- this is Mr. O'Driscoll. I am
23 Mr. Mensie's attorney. I report to him. I guess I don't
24 understand the question, if you could rephrase it for my
                   PRECISE REPORTING SERVICE, P.C.

Page 21

1  benefit please. I'm not sure if the witness understood
2  it or not, but I didn't.
3  BY MR. LeBLANC:
4      Q   Can you describe for me, Mr. Mensie, the
5  structure at Kemper with regards to reporting your search
6  for last known addresses or any other information you
7  might find regarding this case to Mr. O'Driscoll?
8          MR. O'DRISCOLL: Well, I'm going to object to
9  that. I think that calls for privileged information.
10 You're asking directly about communications between --
11 how Mr. Mensie and I structure our communications between
12 each other, so I think that's privileged; and I will
13 instruct the witness not to answer that question.
14         MR. LeBLANC: What the question seeks is not
15 the communication itself but whether or not he reports to
16 more than just one attorney.
17         MR. O'DRISCOLL: No, no, I will instruct the
18 witness not to answer that. How Mr. Mensie and his
19 attorneys communicate between each other is privileged
20 information as well as of no moment.
21 BY MR. LeBLANC:
22     Q   Mr. Mensie, is there any other attorney other
23 than Mr. O'Driscoll that you discussed this case with?
24         MR. O'DRISCOLL: Objection.
                   PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                9-8-06                William R. Mensie
C.A. No.: 05-11073 WGY

---

Page 22

1  BY MR. LeBLANC:
2      Q   Mr. Mensie.
3          MR. O'DRISCOLL:  Instruct the witness not to
4  answer that question.
5  BY MR. LeBLANC:
6      Q   Mr. Mensie, based on Mr. O'Driscoll's
7  instruction not to answer it, are you going to refuse to
8  answer that question?
9          MR. O'DRISCOLL:  I'll give my reason for my
10  objecting and instructing the witness not to answer.
11  Mr. --
12         MR. LeBLANC:  That will be fine.  I'd ask the
13  witness to answer the question first though.  Is he going
14  to refuse based on advice of counsel?
15         MR. O'DRISCOLL:  I'm going to instruct the
16  witness not to answer the question.
17         MR. LeBLANC:  Is he going to take your
18  instruction to the question?
19         MR. O'DRISCOLL:  Yes.  Mr. LeBlanc, if we could
20  step back for a second here.  You know the attorneys that
21  work on this file.  It's myself and Kevin Golden at
22  Drinker, Biddle.  To the extent you're asking if there
23  are any other attorneys Mr. Mensie has spoken to at
24  Drinker, Biddle who have worked on this case, I think
                PRECISE REPORTING SERVICE, P.C.

---

Page 23

1  it's clearly privileged information as well as entirely
2  irrelevant.
3          MR. LeBLANC:  What I was asking was whether
4  there was in-house counsel at Kemper who he has worked
5  with.
6          MR. O'DRISCOLL:  Okay.  If the question is
7  whether there is in-house counsel that he has worked
8  with, to the extent that's a yes or no question, then the
9  witness may answer that.
10         THE WITNESS:  No.
11  BY MR. LeBLANC:
12     Q   Okay.  So any of your communications with any
13  employees at Kemper would not be with attorneys; is that
14  right?
15     A   To the extent that I have had communications
16  with other employees at Kemper, it has not been in their
17  capacity as if they are in fact attorneys.
18     Q   Okay.  In communicating with the HR department
19  and the clerical manager, did you send them emails or
20  voicemails?  How did you communicate with those folks?
21     A   Possibly both.  My recollection is that I would
22  have sent an email to our -- to the HR department.  My
23  communications with the clerical manager could have been
24  by email, or it may have been just because of the
                PRECISE REPORTING SERVICE, P.C.

---

Page 24

1  proximity where she works, you know, may have been just a
2  verbal.
3      Q   And in communicating with the HR department
4  about last known addresses of former Kemper employees,
5  did they produce a report?
6          MR. O'DRISCOLL:  I'm going to object to that
7  question.  That seeks information that's potentially
8  protected by the work product privilege.  If this is
9  information that Mr. Mensie sought to obtain during the
10  course of this litigation, not only in anticipation of
11  but during the course of this litigation that related to
12  the case, that would be protected by the work product
13  privilege.  And I allowed you to ask questions as to
14  whether there were folks that Mr. Mensie communicated
15  with; but as far as the substance of any communications
16  of Mr. Mensie as a representative of Kemper post filing
17  of this lawsuit in connection with this litigation, would
18  be protected by the work product -- representative work
19  product privilege.  And to the extent --
20         MR. LeBLANC:  We'll have to disagree on that
21  issue.  The question is whether or not they produced the
22  report, not what was in the report.  I just want to know
23  if there's a document in existence, a report from HR to
24  Mr. Mensie.
                PRECISE REPORTING SERVICE, P.C.

---

Page 25

1          MR. O'DRISCOLL:  I'll allow the witness to
2  answer that question.
3          THE WITNESS:  There's no report.  I received a
4  response with the addresses that I produced to Mr.
5  O'Driscoll.
6  BY MR. O'DRISCOLL:
7      Q   Okay.  Well, what form did the response come
8  in?
9          MR. O'DRISCOLL:  Objection, instruct the
10  witness not to answer that.
11  BY MR. LeBLANC:
12     Q   Was it a written report?
13         MR. O'DRISCOLL:  If I may just object to this
14  question to the extent on a number of grounds.
15  Mr. Mensie has already testified that he does have last
16  known addresses of some individuals.  So I don't see what
17  the further relevance of the line of questioning would
18  be; and also to the extent that it goes into the
19  substance of the communications, I do think that's
20  protected by the work product privilege.
21         MR. LeBLANC:  Mr. Mensie's prior testimony is he had
22  no recollection of the results.  If there's a report that
23  would refresh his recollection, then we're entitled to
24  use that since he told us there are results.  Mr. Mensie
                PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                    9-8-06                    William R. Mensie
C.A. No.: 05-11073 WGY

Page 26

1  further testified that he relayed that information to his
2  attorney. We need to know whether or not all the
3  information Mr. Mensie received was relayed to his
4  attorney and then relayed to us. That's the basis of the
5  question.
6      MR. O'DRISCOLL: Well, there has been no
7  discovery request for last known addresses of any
8  individuals, just so we're all clear.
9      MR. LeBLANC: There is a disclosure
10 requirement.
11     MR. O'DRISCOLL: Well, the disclosure
12 requirements have been met.
13     MR. LeBLANC: And that's what I'm trying to
14 find out here: What individuals do they look for last
15 known addresses and on which individuals were they
16 successful.
17     MR. O'DRISCOLL: Well, I think Mr. Mensie has
18 testified he doesn't remember what individuals he
19 searched for the last known addresses for.
20     MR. LeBLANC: Exactly, and that's why I need to
21 know whether the response he received from HR was written
22 or verbal.
23 BY MR. LeBLANC:
24   Q  Mr. Mensie, can you tell me?
            PRECISE REPORTING SERVICE, P.C.

Page 27

1      MR. O'DRISCOLL: The question is whether it was
2  written or verbal?
3      MR. LeBLANC: Yes.
4      THE WITNESS: Written.
5  BY MR. LeBLANC:
6    Q  And when did you receive that report, that
7  response?
8    A  Shortly after the request was made, so it's
9  within at least three months ago but not more than six
10 months ago, so sometime between — I think if my
11 recollection is correct it was in February or March of
12 '06.
13   Q  And you have no recollection of what the
14 results of that response was at this time?
15   A  The last known addresses were provided.
16   Q  But you have no recollection at this time of
17 what those last known addresses were?
18   A  I do not recall what they were, no.
19     MR. O'DRISCOLL: That's fine. For the record
20 again I'd like to state just so we're all clear there's
21 been no discovery request for last known addresses of any
22 individuals propounded upon Kemper.
23     MS. McQUAY: I'd like to interject on that
24 point if I may. Not only has there been either the
            PRECISE REPORTING SERVICE, P.C.

Page 28

1  disclosure obligation that Mr. LeBlanc referred to, but
2  the fact this individual is here testifying not simply as
3  an individual but as Kemper's representative; and,
4  therefore, I think he cannot merely say I don't remember.
5  I mean he has an obligation in fact to provide the
6  information particularly if it's available to him in
7  documentary form.
8      MR. O'DRISCOLL: well, Mr. Mensie has testified
9  that he doesn't remember what individuals' addresses he
10 looked for.
11     MS. McQUAY: But there is — he's also
12 testified there is a document that reflects that
13 information, and I think that he has an obligation to
14 provide it.
15     MR. O'DRISCOLL: No, I disagree he has any
16 obligation to provide it. There's been no discovery
17 request for it.
18     MS. McQUAY: He certainly as the Kemper
19 30(b)(6) witness has an obligation to refresh his memory
20 so that he can testify to it.
21     MR. O'DRISCOLL: No, I disagree. If there had
22 been a discovery request for that information, then it
23 would be a different situation, but there has been no
24 such discovery request.
            PRECISE REPORTING SERVICE, P.C.

Page 29

1      MS. McQUAY: I'll disagree then because there
2  is a discovery request being purportedly fulfilled right
3  now, and that is for a 30(b)(6) most knowledgeable
4  witness on the part of Kemper to testify.
5      MR. O'DRISCOLL: Yes, and there has been no
6  request to produce any additional documents at this
7  deposition.
8      MS. McQUAY: He doesn't have to produce a
9  document, but he has to testify regarding the contents of
10 it; and if he needs to look at it to refresh his memory,
11 he should do so.
12     MR. O'DRISCOLL: Well, he's testified that he
13 has no recollection of it.
14     MR. DeWICK: This is Jed DeWick. I'd also like
15 to go on the record just that I don't think it can be
16 disputed that the initial disclosure requirement requires
17 the addresses of folks with information, so to the extent
18 that we do not have the addresses of people with
19 discoverable information from Kemper, I am formally
20 requesting that at this point on the record.
21     MR. O'DRISCOLL: Yes, I don't believe that the
22 initial disclosure requirement is that if we're not
23 intending to use any individuals as witnesses. Having
24 said that, I think we can circumvent this whole
            PRECISE REPORTING SERVICE, P.C.

8 (Pages 26 to 29)

Dimon vs. Metropolitan Life                    9-8-06                    William R. Mensie
                              C.A. No.: 05-11073 WGY

| Page 30 | Page 32 |
|---|---|

**Page 30**

1  conversation because if I determine that it is necessary
2  to supplement, then I will do that. It's really not an
3  issue.
4       MR. LeBLANC: We'll suspend on this issue; and
5  if we have to come back another day, we can do that.
6       MR. O'DRISCOLL: Well, we won't be coming back
7  for that, but I certainly am willing to discuss this
8  issue with respect to the initial disclosures
9  subsequently, and I'm sure we can work it out.
10 BY MR. LeBLANC:
11      Q  Mr. Mensie, where you sit today are you in the
12 office building you normally work in?
13      A  Yes.
14      Q  Okay.  And how far away from your office are
15 you right now?
16      A  My individual office?
17      Q  Yes.
18      A  40 yards maybe
19      Q  Okay.  And how long would it take you to go
20 down to your office and get the report we're discussing
21 and bring it back?
22      MR. O'DRISCOLL: I'm going to interject because
23 there is no obligation for him to do that, and he's not
24 going to do that.
                    PRECISE REPORTING SERVICE, P.C.

**Page 31**

1       MR. LeBLANC: I would still like the witness to
2  answer the question.
3  BY MR. LeBLANC:
4       Q  How long would it take you to get down there,
5  get the report and bring it back?
6       A  The length of time that it would take me to
7  walk I guess 40 yards and return.  I'm estimating I
8  could -- five minutes, ten minutes.
9       Q  Okay.  Do you know where the report is now?
10      A  I -- I think so.  I mean it's -- yeah.
11      MR. O'DRISCOLL: I'm going to interject again
12 at this point.  Any document that exists is protected by
13 the work product privilege.  There have been no discovery
14 requests for last known address information.  Some of you
15 had indicated that you believe that there is an
16 obligation to supplement disclosures with that
17 information.  I disagree that there is necessarily such
18 an obligation; but, you know, we can talk about this.
19 And if it later is determined that there is such an
20 obligation, you know, the information will be
21 supplemented in the form of a supplemental disclosure as
22 other parties have used in this case.  They will not be
23 in the form of any document that Mr. Mensie has.
24      MR. LeBLANC: Okay.  We'll suspend on that
                    PRECISE REPORTING SERVICE, P.C.

**Page 32**

1  issue and move on.
2  BY MR. LeBLANC:
3       Q  Mr. Mensie, am I pronouncing your name
4  correctly by the way?  Is it Mensie?
5       A  No, it's not.  It's Mensie.
6       Q  Mensie, okay.  Like M-e-n-c?
7       A  No.  Like M-e-n-s, Mensie.
8       Q  Okay.  Thank you, sir.
9            When you contacted the clerical manager,
10 Ms. Skaya, can you tell me when you made contact with her
11 first regarding this case.
12      A  I suspect my initial contact with her would
13 have been when the litigation was first filed.
14      Q  And what was the purpose of your initial
15 contact with her?
16      A  To locate the annuity file.
17      Q  And did she in fact locate the annuity file?
18      A  To the extent that we had an annuity file, yes.
19      Q  Okay.  And what was contained in the file she
20 located?
21      A  A Memorandum concerning the annuity
22 circumstances, the loss facts and an outline of the
23 stream of benefits.
24      Q  You said a word I didn't hear.  It sounded like
                    PRECISE REPORTING SERVICE, P.C.

**Page 33**

1  lost fax?
2       A  Loss, the circumstances of the accident, the
3  loss facts.
4       Q  The loss facts, okay.  If you look at the
5  documents that I sent down as proposed exhibits on August
6  24th, these first documents page 001 to 004, are they an
7  accurate representation of your initial efforts to find
8  the annuity file in this case?
9       MR. O'DRISCOLL: He is referring to -- if I
10 may, I'm just directing the witness to your exhibits.
11 Mr. LeBlanc is asking regarding K-001 through K-004.
12      THE WITNESS: Okay.
13      MR. O'DRISCOLL:  just to make sure we have the
14 same documents here, this is the K-001 and K-002 are
15 photocopies of a check?
16      MR. LeBLANC: Correct.
17      MR. O'DRISCOLL: K-003 to K-004 is a memo.
18      THE WITNESS:  The memo was contained in the
19 annuity file.
20 BY MR. LeBLANC:
21      Q  Okay.  In that initial search the documents
22 that have been marked as K-003 through K-004 were
23 documents that were in the annuity file that you
24 initially found through the clerical manager, correct?
                    PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                                   9-8-06                                   William R. Mensie
                                                    C.A. No.: 05-11073 WGY

Page 34

1      A    I believe so, yes.
2      Q    You mentioned there were other documents.  What
3  were those other documents?
4      A    I'm not certain in what context we were
5  speaking of other documents.  What's the context of
6  that --
7      Q    In the initial search you mentioned several
8  documents were discovered in the annuity file.
9      A    Perhaps I misspoke.  The documentation that
10  were contained in the annuity file consisted of a
11  memorandum concerning the loss facts and the case
12  evaluation and the stream of payments.
13      Q    And how many pages was the loss facts
14  memorandum?
15      A    It's a two-page memorandum.
16      Q    Is it what's been marked as K-003 and K-004?
17      A    I believe that is correct.
18      Q    In the case evaluation, how many pages was
19  that?
20      A    It's all contained in the same memorandum.
21      Q    So when you say loss facts memo and case
22  evaluations, those are the same documents?
23      A    It's in the same memorandum.  It's in the same
24  document.

PRECISE REPORTING SERVICE, P.C.

Page 35

1      Q    Okay.  And what about the stream of payments?
2      A    It's in the same -- it's a part of the same
3  document.  It's the document you referred to as K-003 and
4  K-004.
5      Q    Okay.  So is it your testimony here today that
6  Kemper's initial search for documents yielded two pages?
7      A    Yes.
8      Q    Okay.  So the three things you mentioned were
9  all from the same document?
10      A    Yes.
11      Q    Did it cause you any concern or alarm that
12  there were only two pages on an annuity claim like this?
13      A    No.
14      Q    It did not.  Why not?
15      A    Not knowing what the -- not knowing why, you
16  know, it did not contain the actual contract as it should
17  have.  I have seen other instances where that was the
18  case.  This dates back to 1983; and, you know, the
19  methods by which they maintain records were certainly
20  different than they are today; but having seen in these
21  older structures the two-page outline, it didn't cause me
22  any particular concern.
23      Q    After your initial contact with Ms. Skaya
24  looking for documents, did you ever contact her again

PRECISE REPORTING SERVICE, P.C.

Page 36

1  after that?
2      A    Yes.
3      Q    Okay.  And when was the next time?
4      A    Probably a few months later.  As the litigation
5  was progressing, it became more important to actually
6  find the actual contract if we could, so we conducted a
7  search for the claim file.
8      Q    Okay.  When did you make your initial request
9  of Ms. Skaya to locate documents regarding the Dimon
10  case?
11      A    When the initial lawsuit was received.
12      Q    So how long after service of the lawsuit?
13      A    Would have been within, you know, days of
14  having received it I requested the copy of our annuity
15  file so that I could refer to counsel for counsel's
16  preparation in defense of the lawsuit.
17      Q    A few months later when you went back to Ms.
18  Skaya to look for additional documents, what documents
19  were discovered then?
20      A    At some point we were able to locate the actual
21  underlying claim file; and within that claim file within
22  the last month or so we've actually uncovered the annuity
23  contract that should have been a part of the annuity
24  file, but it was actually housed inside the claim file.

PRECISE REPORTING SERVICE, P.C.

Page 37

1      Q    In Kemper's system is the annuity file and the
2  claim file two separate distinct files?
3      A    When the claim file is closed, the annuity
4  contracts are sent here to the home office and an annuity
5  file is established, that's correct.
6      Q    And you said that within the last month a claim
7  file was discovered?
8      A    That's correct.
9      Q    Okay.  Do you know when it was discovered?
10      A    No, I do not.  Within the last month or so
11  it -- someone through their diligent efforts were able to
12  find the claim file.  we were still not certain as to how
13  she was able to locate it.
14      Q    Was it misfiled?
15      A    I do not know how they were able to locate it.
16  They actually through their own diligence or own efforts
17  were able to track it down.
18      Q    And who is "she"?
19      A    One of the clerical people that works for Ms.
20  Skaya I believe is the person who actually was able to
21  find it.  How she went about doing so I do not know.
22      Q    Do you know when you were first alerted that
23  they found the claim file?
24      A    It was delivered to me.  It appeared on my

PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                9-8-06                          William R. Mensie
C.A. No.: 05-11073 WGY

Page 38

1    desk, and I advised counsel.
2        Q   Okay.  When it was -- when it appeared on your
3    desk, was it in an envelope or interdepartmental mail,
4    something like that?
5        A   No.  It's a very voluminous file.  It contained
6    of course -- it's the underlying -- the underlying claim
7    file that contains all the documents relating to the
8    underlying case which included, you know, check copies
9    and memorandums and transcripts of testimony that took
10   place in the underlying case and weeding through that
11   material I located the matters relating to this
12   litigation.
13       Q   When you say "very voluminous file," what do
14   you mean by that?
15       A   It's probably about I guess maybe as much as
16   seven inches thick of paperwork.
17       Q   Okay.  Would that -- was the claim file
18   specific to Mr. Dimon and his annuity, or were there
19   other cases in that claim file?
20       A   This claim file is specific to the Dimon
21   litigation.
22       Q   Okay.  And that was discovered within a month?
23       A   Within the last, yes, within the last 30 days
24   or so.
                    PRECISE REPORTING SERVICE, P.C.

Page 39

1        Q   Okay.  And if you'd refer to K-005 through
2    K-00128, those documents, do you have those documents in
3    front of you?
4            MR. O'DRISCOLL:  I'm sorry.  Could you say
5    those numbers again, Peter.
6            MR. LeBLANC:  Sure.  It's K-005 through K-0128.
7            MR. O'DRISCOLL:  Yes, these were the documents
8    produced earlier this week.
9            MR. LeBLANC:  Correct.
10           MR. O'DRISCOLL:  Yes.
11           MR. LeBLANC:  Well, the day before yesterday,
12   one business day before today.
13   BY MR. LeBLANC:
14       Q   Were these documents in the claim file,
15   Mr. Mensie?
16       A   Yes.
17       Q   Okay.  And in addition to these documents there
18   are many, many more documents that aren't in this
19   disclosure; is that correct?
20       A   Yes.
21       Q   And what did you do with the seven inches of
22   documents that you received from the clerical department?
23       A   Referred it to counsel.
24       Q   And do you have a communication to counsel, a
                    PRECISE REPORTING SERVICE, P.C.

Page 40

1    letter, transmittal letter, anything like that?
2            MR. O'DRISCOLL:  Well, I mean obviously we're
3    getting into attorney-client privilege areas here.
4    BY MR. LeBLANC:
5        Q   I just want to know if the letter exists, if a
6    letter exists?
7            MR. O'DRISCOLL:  You can answer that question,
8    Mr. Mensie.
9            THE WITNESS:  Not to my knowledge.  We
10   communicated I think by phone.
11   BY MR. LeBLANC:
12       Q   I'm asking:  Did you transmit the file, the
13   seven inches of documents, to your attorney?
14       A   Yes, I did.
15       Q   And how did you accomplish that?  What method
16   did you use to send those documents to your attorney?
17       A   By mail.
18       Q   Okay.  So, for example, the documents that I
19   received were in PDF form.  Do you know what that means?
20       A   Yes.
21       Q   Okay.  So the documents you sent to your
22   attorney were actual paper form?
23       A   That's correct.
24       Q   Okay.  And you mailed those to your attorney?
                    PRECISE REPORTING SERVICE, P.C.

Page 41

1        A   Yes.
2        Q   And do you know what date you mailed those on?
3        A   No.
4        Q   Did you mail them shortly after they were
5    discovered about a month ago?
6        A   Well, I mailed them after I went through the
7    claim file and discovered that there were documents
8    related to the annuity within that claim file, so the
9    claim file was received, and I actually went through it
10   first.  Once I discovered that there were documents
11   pertaining to the annuity within that file, I alerted
12   counsel and sent counsel the entire file.
13       Q   Okay.  When you say "the entire file," you mean
14   all seven inches of the file?
15       A   Whatever the volume of the transmittal was, but
16   I sent him the complete claim file, yes.
17       Q   In any event, that's more than the pages we
18   have marked K-005 through K-00 -- I'm sorry, through
19   K-00128; is that correct?
20       A   It appears so.
21           MR. O'DRISCOLL:  Peter, if I may interject for
22   a moment.  As I say when I transmitted the
23   correspondence, when I transmitted these documents that
24   have been Bates stamped, we have not produced documents
                    PRECISE REPORTING SERVICE, P.C.

Page 42

1    **that have not been asked for and which also do not relate**
2    **to this case such as the pleadings and briefs in the**
3    **underlying claim prior to settlement of this case or the**
4    **purchase of the annuity. None of that, underlying claim**
5    **file documents, such as pleadings and briefs and**
6    **deposition transcripts and so forth, has been requested;**
7    **and, therefore, it was not produced.**
8    **Also not produced, as I said in the**
9    **correspondence to you the other day, were documents**
10   **relating to the subsequent bad faith litigation by Kemper**
11   **against the primary carrier, also for the same reasons**
12   **because those documents were not requested in discovery**
13   **and also they don't have anything to do with this case,**
14   **just so we're clear.**
15   MR. LeBLANC: Okay. That's fair enough. I
16   disagree with your statements to the effect that you
17   didn't have an obligation to disclose the entire claim
18   file, but we'll leave that as we agree to disagree I
19   think.
20   BY MR. LeBLANC:
21   Q   Mr. Mensie, is there any record that you have
22   that would evidence when you transmitted these documents
23   to your attorney?
24   A   **The answer I guess is yes. I mean it was**
        PRECISE REPORTING SERVICE, P.C.

Page 43

1    **transmitted by overnight delivery service to expedite the**
2    **matter so the answer there would be a record of the**
3    **transmittal.**
4    Q   If we take a break, can you go find out when
5    that was sent?
6    MR. O'DRISCOLL: I'm going to object on several
7    grounds, and then I'll make a statement for the record
8    too. Any transmittal from Mr. Mensie to me, if there
9    were such a transmittal, would be protected by the
10   attorney-client privilege, number one.
11   Number two, it's not Mr. Mensie's
12   obligation to go to his office to search out for such a
13   document.
14   And number three, Peter, I've been very
15   clear with you and up front about the chronology of this.
16   When the claim file documents were discovered, I
17   immediately brought them to your attention. I believe it
18   was Friday, the Friday before this deposition was
19   originally scheduled. Because of the discovery the
20   deposition was postponed.
21   I received the documents that week and
22   produced them to you on Tuesday of this week. I've been
23   very up front about that, and I want the record to be
24   clear about that.
        PRECISE REPORTING SERVICE, P.C.

Page 44

1    MR. LeBLANC: Is that the end of your
2    statement?
3    MR. O'DRISCOLL: Yes.
4    MR. LeBLANC: Mr. O'Driscoll, I just want to
5    make sure that I'm not being misunderstood here. I'm not
6    implying that anyone did anything incorrectly. What I'm
7    suggesting here is that Kemper had these documents for 30
8    days. I got them at 4:53 on the day before the day
9    before the deposition. I essentially had one business
10   day to review these documents. All of us had one
11   business day to review these documents; and at this point
12   I'm going to suspend as to these documents and any
13   documents that have not been disclosed by Kemper at this
14   point.
15   MR. O'DRISCOLL: Suspend as to these documents,
16   you mean K through 120?
17   MR. LeBLANC: K-005 through K-0128. Although
18   I'm reserving my right to use them during today's
19   deposition, I'm going to have to suspend. They were
20   promised to me over a week ago, and I received them
21   essentially the close of business the day before the
22   dep --
23   MR. O'DRISCOLL: You received them on Tuesday.
24   With respect to suspending the deposition, Mr. LeBlanc,
        PRECISE REPORTING SERVICE, P.C.

Page 45

1    if that was your intention, you certainly ought to have
2    said something to me yesterday or the day before. I'm
3    definitely not going to agree to any kind of suspension
4    as to these documents if what you mean by suspension is
5    that we're going to conduct another deposition.
6    MR. LeBLANC: I'm not asking you to agree. I'm
7    just telling you that as the taker of the deposition, I'm
8    going to suspend on issues related to the recently late
9    disclosed documents.
10   MR. O'DRISCOLL: I would advise you if you
11   intend to ask any questions, to do it now because there
12   is not going to be another deposition. If you wanted to
13   suspend or have more time to review these documents, you
14   ought to have told me that yesterday or the day before.
15   We could have postponed this deposition. You didn't do
16   that.
17   MR. LeBLANC: The day before? I didn't get
18   them until close of business and --
19   MR. O'DRISCOLL: It was 3:00 or 4:00 o'clock I
20   think on Tuesday. You had plenty of time to call me if
21   you thought that there wasn't enough time to review these
22   documents. For the record there are a hundred documents.
23   Many of these were previously produced by other parties
24   in this litigation, and I can't imagine there's many of
        PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                  9-8-06                    William R. Mensie
                                    C.A. No.: 05-11073 WGY

Page 46

1  these documents that you would have any questions about,
2  so there's no just cause for you to suspend the
3  deposition in any case.
4        MR. LeBLANC: I believe you stated your case,
5  Mr. O'Driscoll. My position is we're suspending the
6  deposition as to these issues --
7        MR. O'DRISCOLL: One more thing --
8        MR. LeBLANC: -- my right to call the witness
9  back.
10       MR. O'DRISCOLL: No. Well, I disagree with
11 that. And one more thing in addition to there being no
12 just cause. If you did think there was just cause, you
13 should have brought it to my attention before we started
14 to conduct this deposition.
15       MR. LeBLANC: I just found out the disclosure
16 was received very late at 4:57 on the day before the day
17 before the deposition was partial at best and late.
18       MR. O'DRISCOLL: Partial --
19       MR. LeBLANC: We're going to suspend on those
20 issues if we need to --
21       MR. O'DRISCOLL: It was not partial at best. I
22 made it very clear in my communication that the documents
23 that were being produced were all documents that were
24 asked for during discovery. I told you exactly what was
              PRECISE REPORTING SERVICE, P.C.

Page 47

1  not being produced. I've reiterated that on the record
2  today. If you disagree with any of that --
3        MR. LeBLANC: That is evidence that we
4  weren't -- all documents were not disclosed.
5        MR. O'DRISCOLL: All documents that were asked
6  for were disclosed.
7        MR. LeBLANC: In its possession were not
8  disclosed; is that correct?
9        MR. O'DRISCOLL: I'm sorry?
10       MR. LeBLANC: Would you agree all documents
11 that Kemper has in its possession were not disclosed in
12 this case?
13       MR. O'DRISCOLL: All documents to the discovery
14 request in this case were disclosed.
15       MR. LeBLANC: Okay. But not all documents?
16       MR. O'DRISCOLL: All documents?
17       MR. LeBLANC: Yes.
18       MR. O'DRISCOLL: In the universe of documents?
19 All documents that Kemper had an obligation to disclose,
20 that is, that were asked for in discovery in this case,
21 were disclosed. Did Kemper disclose all of its documents
22 in all of its offices? No, we can agree it didn't do
23 that.
24       MR. LeBLANC: Can we agree it didn't disclose
              PRECISE REPORTING SERVICE, P.C.

Page 48

1  all documents in a claim file that Mr. Mensie, the
2  witness for Kemper testified, that he gave to his
3  attorney, being you?
4        MR. O'DRISCOLL: All documents that were
5  requested in discovery in this case were disclosed, and I
6  told you exactly what was the nature of the documents
7  that were in the claim file that were not responsive to
8  the discovery requests.
9        MR. LeBLANC: I think your email of September
10 5th or Mr. Golden's email of September 5th speaks for
11 itself.
12       MR. O'DRISCOLL: It certainly does. We can
13 agree on that.
14 BY MR. LeBLANC:
15    Q  In addition to the documents you received from
16 the clerical department in your initial search and the
17 documents you discovered over a month ago that are seven
18 inches thick, have you discovered any additional
19 documents?
20       MR. O'DRISCOLL: Objection. That question lacks
21 foundation.
22       MR. LeBLANC: We're reserving objections for
23 trial.
24 BY MR. LeBLANC:
              PRECISE REPORTING SERVICE, P.C.

Page 49

1    Q  Mr. Mensie, can you answer?
2        MR. O'DRISCOLL: I object to the form of the
3  question, lack of foundation. It's also a compound
4  question.
5  BY MR. LeBLANC:
6    Q  Mr. Mensie, did you understand the question?
7        MR. O'DRISCOLL: Do you want to repeat the
8  question or ask the court reporter to read it back?
9        MR. LeBLANC: Let's ask the deponent if he
10 understands the question first.
11 BY MR. LeBLANC:
12    Q  Mr. Mensie?
13    A  I believe I do.
14    Q  Can you answer it then, please.
15    A  The answer would be no.
16    Q  Okay. So other than those initial two pages,
17 what has been marked as K-003 and K-004, and K-005
18 through K-0128, to your knowledge there are no additional
19 documents in Kemper's possession that should be or have
20 been disclosed?
21    A  To my knowledge and understanding the
22 documents, all documents related to the claim file and
23 the annuity file, have been produced and given to counsel
24 for his review.
              PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life        9-8-06        William R. Mensie
C.A. No.: 05-11073 WGY

Page 50

1    Q.  Okay.  Can you tell me in the annuity file how
2  many pages were in that file?
3    A.  I believe it were just the two sheets.  The
4  memorandum was the only thing that we initially located.
5    Q.  That was the entire contents of the annuity
6  file?
7    A.  That's correct.
8    Q.  And then later when you found the claim file,
9  that was the seven inches -- roughly seven inches of
10  documents?
11    A.  The claim file contained the underlying --
12  documents related to the underlying lawsuit as well as
13  documents relating to the actual annuity, that is
14  correct.
15    Q.  At your review of the claim file, did you
16  separate documents from the claim file into two separate
17  piles?
18    A.  Did I separate documents, is that the question?
19    Q.  Yes.
20    A.  No, I did not separate any documents.
21    Q.  Okay.  So you took the seven inches of
22  documents you had, you sent them to your attorney; is
23  that correct?
24    A.  I took the entire claim file and submitted it
             PRECISE REPORTING SERVICE, P.C.

Page 51

1  to counsel.
2    Q.  Okay.  You said that you reviewed the claim
3  file before you did that?
4    A.  I looked through the claim file before it was
5  submitted, yes.
6    Q.  And for what purpose did you look through the
7  claim file before it was submitted?
8    A.  I was trying to find any documents related to
9  the annuity.
10    Q.  Okay.  And did you find documents related to
11  the annuity?
12    A.  Yes.
13    Q.  And did you at any time estimate how many pages
14  in that seven inches of claim file were related to the
15  annuity?
16    A.  No.
17    Q.  You never guesstimated how many pages?
18    A.  I think I said no.
19    Q.  Did you ever guesstimate how thick the related
20  documents would be in terms of whether there are one,
21  two, three, four, five, six, seven inches of documents
22  related to this case?
23    A.  I did not.
24    Q.  Okay.  Did you do anything to prepare for
             PRECISE REPORTING SERVICE, P.C.

Page 52

1  today's deposition related to what Kemper's policy was in
2  1983 regarding retention of documents?
3    A.  Yes, I read the claim -- reviewed through the
4  file material to try to understand what the policy may
5  have been.
6    Q.  And what did you discover?
7    A.  I wasn't able to understand -- well, I wasn't
8  able to understand much in terms of why that contract
9  hadn't been sent to the annuity file.  Other than the
10  document -- I seem to recall there was documentation that
11  the person who was handling the file had in fact sent a
12  memorandum that the contract was being retained in the
13  claim file, so without having looked at the claim file,
14  would have had no way of knowing that.  So he makes it
15  clear he sent the contract to the claim file.
16    Q.  Okay.  And who makes it clear?
17    A.  The person whose memorandum I'm recalling, a
18  fellow by the name of Mr. Noe.
19    Q.  And in that stack of documents K-005 through
20  K-0128 can you point to the document where Mr. Noe makes
21  it clear that the annuity contract or annuity documents
22  were to be sent to the claim file?
23      MR. O'DRISCOLL:  Are you referring to --
24      THE WITNESS:  I'll continue to search for it.
             PRECISE REPORTING SERVICE, P.C.

Page 53

1  I seem to recall having read that in one of the
2  memorandums.
3      MR. LeBLANC:  Actually at this time why don't
4  we take a break while you search for that.  Any
5  objection?
6      MR. O'DRISCOLL:  No.
7      MR. LeBLANC:  Okay.  Let's go off the record
8  for a few minutes.
9        (Whereupon a short recess was had,
10          after which the preceding deposition
11          continued as follows:)
12      THE WITNESS:  Okay.  I've located where I
13  recalled having seen it.  It's in a letter dated October
14  10th, 1983, to Charter Security Life insurance by John
15  Noe, and he makes notice there that he intends to retain
16  the original policy in the files and considers it to be a
17  valid and enforceable contract.
18      MR. LeBLANC:  Okay.  Can we have that document,
19  which is a one-page letter, marked as Exhibit 1, please.
20        (Exhibit No. 1 was marked for
21          identification.)
22      MR. LeBLANC:  Just so we make sure we have the
23  right document, my document has a Bates stamp in the
24  corner, No. 29.
             PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                    9-8-06                    William R. Mensie
C.A. No.: 05-11073 WGY

**Page 54**

1      MR. O'DRISCOLL: That's correct.
2      MR. LeBLANC: Okay. Can we have that document
3  marked as Exhibit 1, please.
4      THE REPORTER: It's marked.
5      MR. LeBLANC: Thank you.
6  BY MR. LeBLANC:
7      Q   Other than this letter, was there a memorandum
8  or memoranda that you referred to?
9      A   My recollection is -- I'm referring to that
10  document. I recall having read it, and that's where it
11  does appear.
12     Q   Can you refer to the document number K-0006.
13     A   It's the memorandum dated 8-16-83?
14     Q   That's correct.
15     A   Okay.
16     Q   And I'll point you to the second paragraph
17  where it says: "Please be aware there are special
18  procedures to be followed for handling files involving
19  annuity settlements." Have you read that?
20     A   Yes, I've read it.
21     Q   Okay. Can you tell me what the special
22  procedures are or were in 1983?
23     A   The procedures are that when the claim file is
24  closed, the annuity contracts along with the settlement
                PRECISE REPORTING SERVICE, P.C.

**Page 55**

1  agreement were to be sent to the home office here in Long
2  Grove where they are logged into a database, and an
3  annuity file is established.
4      Q   And is that response inclusive of 1983, what
5  the policy was then?
6      A   I believe -- yes, I believe it was at that time
7  as well, and that's what he's referring to.
8      Q   Okay. That procedure wasn't followed in this
9  case, was it?
10     A   It was not.
11     Q   Okay. And in terms of document storage, where
12  was the claim file stored?
13     A   I do not know where they actually were able to
14  locate the claim file.
15     Q   Does anyone at Kemper know where they were able
16  to locate the claim file?
17     A   I backtracked and thus far have not been able
18  to uncover how they were able to locate it.
19     Q   So you attempted to find out how they were able
20  to locate it, but you weren't able to do that?
21     A   That's correct.
22     Q   So essentially this file, this seven inches of
23  documents landed on your desk one day, and you have no
24  idea where they came from?
                PRECISE REPORTING SERVICE, P.C.

**Page 56**

1      MR. O'DRISCOLL: Objection, the witness didn't
2  testify to that.
3  BY MR. LeBLANC:
4      Q   Do you have an idea where they came from,
5  Mr. Mensie?
6      A   I'm not sure where they were able to locate the
7  claim file.
8      Q   Where does Kemper store documents like claim
9  files?
10     A   It depends, you know, claim files are stored in
11  the office that handled the claim for a period of time
12  and after that period of time it could be stored by an
13  outside vendor, such as Iron Mountain, and then -- or
14  either the records are destroyed. In this instance,
15  well, being that it was a New York office, I know that a
16  lot of documents were in fact lost in the World Trade
17  Center because documents were stored at our office there
18  as well.
19     Q   Okay. The documents related -- or the claim
20  file that was discovered in this case if it were sent to
21  you from an office other than one in Long Grove, would
22  you expect that it would appear on your desk without an
23  envelope or without any kind of box or anything?
24     A   Well, it could, yes, absolutely. You know, it
                PRECISE REPORTING SERVICE, P.C.

**Page 57**

1  comes in -- if it came in through the mail, it would have
2  come through the mail. They would have opened it and
3  delivered it to me, so it was nothing unusual about
4  finding the claim file appear having requested it.
5      Q   Without any envelope or any indication of where
6  it came from or how it got there?
7      A   That wouldn't have been unusual, no.
8      Q   Do you know if any documents related to this
9  case were destroyed at any point since 1983?
10     A   I do not know. It does not appear to me that
11  they were, but I do not know. I mean the claim file
12  looked as though it contained the relevant documents
13  relating to this claim.
14     Q   Did the claim file contain any letters between
15  any of the parties, the Dimon versus Jenny C case?
16     A   There were letters in the claim file between
17  the parties, yes.
18     Q   And do you know if any of those letters
19  involved employees of Kemper or were addressed to or
20  copied to employees of Kemper?
21     A   The letters would have involved employees of
22  Kemper, yes. I mean otherwise I don't think they would
23  be in the claim file. I mean yes.
24     Q   Okay. Do you consider John Noe to be an
                PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                9-8-06                William R. Mensie
C.A. No.: 05-11073 WGY

Page 58

1  employee of Kemper?
2      A   He was at that time, yes.
3      Q   Can you tell me what the distinction if any is
4  between American Motorists Insurance Company and Kemper
5  Insurance Company?
6      A   Again Kemper is the trade name.  American
7  Motorists is actually the carrier that would have written
8  this policy.  The policy would have been issued --
9  American Motorists is the actual carrier to which the
10  policies could have been issued.
11      Q   So were employees of American Motorists
12  employees of Kemper?
13      A   Yes.
14      Q   If you look at what we've marked as Exhibit 1,
15  in the top right-hand corner you see it says Kemper
16  Group?
17      A   Yes.
18      Q   And you also see there's a listing of what
19  appear to be insurance companies?
20      A   That's correct.
21      Q   American Motorists Insurance Company right
22  under that Kemper Group logo?
23      A   Yes.
24      Q   What's the exact relationship between Kemper
                PRECISE REPORTING SERVICE, P.C.

Page 59

1  and American Motorists?
2      A   Kemper is the trade name.  American Motorists
3  is actually the carrier.
4      Q   Is Kemper responsible for acts taken by
5  American Motorists?
6          MR. O'DRISCOLL:  Objection to the form of that
7  question, calls for a legal conclusion.  I don't know if
8  it's even answerable stated in that broad of a fashion;
9  but in any event, it calls for a legal conclusion.
10          MR. LeBLANC:  Let's find out what the witness
11  has to say.
12          MR. O'DRISCOLL:  You may answer that.
13          THE WITNESS:  I'm not sure when you say
14  "responsible" what you mean by responsible.
15  BY MR. LeBLANC:
16      Q   Is Kemper liable for the acts of American
17  Motorists?
18          MR. O'DRISCOLL:  Objection, same grounds.
19          THE WITNESS:  I'd have to say I don't know in
20  the context of which that is being asked.
21  BY MR. LeBLANC:
22      Q   If American Motorists made a promise to provide
23  a product, and they failed to fulfill their promise,
24  would Kemper be responsible for that or liable for that?
                PRECISE REPORTING SERVICE, P.C.

Page 60

1      A   I think American Motorists would answer.
2  Kemper may answer on behalf of -- Kemper again is a trade
3  name.  I don't know to what degree that becomes an entity
4  responsible.
5      Q   Are you an employee of Kemper or of American
6  Motorists?
7      A   I am actually an employee of Lumbermen's
8  Mutual.
9      Q   Which means you're an employee of Kemper?
10      A   Which if Kemper -- Kemper being a trade name --
11  Lumbermen's Mutual signs my checks, okay.
12      Q   But you're here testifying on behalf of Kemper?
13      A   I'm testifying on behalf of the trade name of
14  doing business as Kemper Insurance, that's correct, or
15  Kemper Group, that's correct.
16      Q   Are you an employee of Kemper Insurance
17  Company?
18          MR. O'DRISCOLL:  Well, I think the witness just
19  testified that Kemper is a trade name.  It's a name under
20  which various companies trade.
21  BY MR. LeBLANC:
22      Q   Okay.  Well, I'm curious as to whether or not
23  this witness is a proper 30(b)(6) deponent.  Is the
24  witness a proper 30(b)(6) deponent, Mr. O'Driscoll?
                PRECISE REPORTING SERVICE, P.C.

Page 61

1          MR. O'DRISCOLL:  Yes.
2          MR. LeBLANC:  And on what basis do you say
3  that?
4          MR. O'DRISCOLL:  Well, he is an employee of
5  Kemper, Kemper being a trade name, name under which
6  various companies trade who has been noticed in your
7  notice of deposition.
8          MR. LeBLANC:  The notice of deposition asks
9  that an employee of Defendant Kemper Insurance Company.
10  Is Mr. Mensie an employee of Defendant Kemper Insurance
11  Company?
12          MR. O'DRISCOLL:  Well, certainly for purposes
13  of this lawsuit he is an agent or employee of Kemper.  He
14  is the representative with the most knowledge about this
15  case.
16  BY MR. LeBLANC:
17      Q   Mr. Mensie, is there any distinction as a
18  representative of Kemper, Kemper Insurance Company or
19  Kemper Group, is there any distinction between those
20  three terms in your mind?
21      A   No.
22      Q   Okay.  So when I say Kemper, to you that means
23  Kemper, Kemper Insurance Company or Kemper Group; is that
24  true?
                PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                9-8-06                    William R. Mensie
C.A. No.: 05-11073 WGY

---

Page 62

1    A   That's -- when you say Kemper, yes.
2    Q   Mr. Noe sometimes signs his letter as home
3  office claim or lists his title as home office claim.
4  Can you tell us what that is?
5    A   He was a part of the home office claim staff.
6    Q   That's the staff that would handle the Z files
7  that we talked about earlier?
8    A   That's correct.
9    Q   Can you tell us what Kemper's role in the Jenny
10 C case was?
11       MR. O'DRISCOLL:  When you say "the Jenny C
12 case," could you be more specific.
13 BY MR. LeBLANC:
14   Q   Well, I can ask:  Is there more than one Jenny
15 C case that the witness is aware of?
16   A   No.
17   Q   So when I say the Jenny C case, what does the
18 witness understand that phrase Jenny C to mean?
19   A   I'm not certain.
20       MR. O'DRISCOLL:  Peter, are you referring to
21 the underlying lawsuit, Dimon versus Jenny C, the Jenny
22 C?
23       MR. LeBLANC:  I was, but --
24       MR. O'DRISCOLL:  Okay.  All right.
         PRECISE REPORTING SERVICE, P.C.

---

Page 63

1  BY MR. LeBLANC:
2    Q   Dimon versus Jenny C, are you aware of that
3  case, Mr. Mensie?
4    A   If that's what you're referring to, that's
5  fine.
6    Q   Do you know of any other case involving Jenny C
7  or as a result of the Dimon versus Jenny C case?
8    A   As part of this same case, there was in fact a
9  bad faith litigation against the primary carrier.
10   Q   Okay.  And what was the -- who were the parties
11 to the bad faith litigation?
12   A   The defendants in that case was home insurance.
13   Q   And who was the plaintiff?
14   A   I think it was filed on behalf of the -- I'd
15 have to refer back to the complaint which I don't have
16 before me, but it was filed on behalf of the Kemper
17 companies, one of the Kemper companies.  I don't know if
18 they actually filed it in the name of the actual carrier
19 that actually wrote the policy or not.
20   Q   Do you know where it was filed?
21   A   I don't have that in front of me, no.
22   Q   Do you know which state it was filed in?
23   A   Again I don't have the complaint in front of
24 me.
         PRECISE REPORTING SERVICE, P.C.

---

Page 64

1    Q   Is there anyone at Kemper who would be more
2  knowledgeable about where or when this case -- that case,
3  was filed?
4    A   The documents are contained in the claim file.
5    Q   Okay.  Which was not disclosed; is that
6  correct?
7        MR. O'DRISCOLL:  We just went over this, Peter.
8        MR. LeBLANC:  I just want the witness to
9  confirm as a representative of Kemper that those
10 documents related to this bad faith litigation were not
11 disclosed.
12       MR. O'DRISCOLL:  As I went over and as I told
13 you in the correspondence the other day, those were never
14 asked for, and they don't have anything to do with this
15 case.
16       MR. LeBLANC:  Would you stipulate they weren't
17 disclosed?
18       MR. O'DRISCOLL:  No, I don't -- I wouldn't use
19 the term disclosed because to me that implies there was
20 some sort of obligation to disclose them, and there
21 wasn't.
22       MR. LeBLANC:  What term would you be
23 comfortable with using, Mr. O'Driscoll?
24       MR. O'DRISCOLL:  Well, I would say this, Peter,
         PRECISE REPORTING SERVICE, P.C.

---

Page 65

1  you're here to depose Mr. Mensie as the 30(b)(6) witness
2  of Kemper.  I don't think this is the time or place for
3  us to conduct discussions regarding this.  If you want to
4  discuss it afterwards, that's fine with me, but I think
5  we ought to get on with this deposition.
6  BY MR. LeBLANC:
7    Q   Mr. Mensie, to your knowledge were any
8  documents related to the bad faith litigation disclosed
9  to the other parties in the Dimon versus MetLife, et al.,
10 case?
11   A   All documents in my possession were given to
12 counsel.  I have not seen the communication that counsel
13 submitted to other parties relative to those documents.
14   Q   Okay.  And in your capacity as the liability
15 claims consultant, is that your current capacity with
16 Kemper?
17   A   That's correct.
18   Q   In your capacity as a liability claims
19 consultant is it your responsibility to make decisions
20 regarding the litigation in this case?
21   A   Yes.
22   Q   Okay.  So you would be essentially the contact
23 person at Kemper who would make the decisions regarding
24 what was done, what steps were taken, what strategy to
         PRECISE REPORTING SERVICE, P.C.

---

Dimon vs. Metropolitan Life                    9-8-06                    William R. Mensie
                                    C.A. No.: 05-11073 WGY

Page 66

1  use, anything like that?
2      A   With respect to the current litigation, yes.
3      Q   Do you know if anyone else at Kemper has been
4  or would be in contact with Mr. O'Driscoll regarding this
5  case?
6          MR. O'DRISCOLL: Peter, we've been over this.
7  We've been over this. I'm going to object.
8          MR. LeBLANC: I'm not asking what the
9  communications were. I'm just asking if anyone else made
10  communications.
11         MR. O'DRISCOLL: You can answer, Mr. Mensie.
12         THE WITNESS: I do recall that a communication
13  was sent to Mr. O'Driscoll from another party at Kemper
14  advising Mr. O'Driscoll of the claim file being routed to
15  his office. Other than that there was no other
16  communication to my knowledge.
17  BY MR. LeBLANC:
18      Q   Okay. You broke up a little bit there. Did
19  you say another party at Kemper?
20      A   I said I recall a communication from another
21  party at Kemper advising Mr. O'Driscoll that the claim
22  file was enroute.
23      Q   Okay. And who was that other party?
24      A   That would have been one of the clerical staff.
          PRECISE REPORTING SERVICE, P.C.

Page 67

1  I'm not sure which party it was.
2      Q   And when did you -- did you review that
3  communication recently?
4      A   It was by email. So it was instantly reviewed
5  and discarded. I mean it was a simple communication.
6  We're trying to expedite getting this material to him,
7  and the person took it upon themselves to advise him that
8  the file was enroute.
9      Q   And when did you see that communication?
10      A   It would have been last week I believe.
11      Q   Okay. Mr. Mensie, during our break did you
12  review any documents other than the document I requested
13  you find?
14      A   In order to find that document I had to look
15  through other documents.
16      Q   Did you go anyplace during the break?
17      A   I went -- yes.
18      Q   Okay. Other than conferences with counsel and
19  what I suspect might have been a trip to the restroom,
20  did you go back to your office?
21      A   I did not.
22      Q   Office at Kemper?
23      A   I did not.
24      Q   Okay. Now, with reference to the Dimon versus
          PRECISE REPORTING SERVICE, P.C.

Page 68

1  Jenny C case, what was Kemper's role in that case?
2      A   Kemper issued a policy that was in excess of a
3  primary policy issued by Home Insurance.
4      Q   Okay. And what does it mean to be a policy in
5  excess of or that was excess of?
6      A   That there was an underlying insurance cover
7  available to this insured that must be exhausted before
8  the application of the policy that Kemper issued.
9      Q   And who is this insured in the Dimon versus
10  Jenny C case?
11      A   Home insurance issued the primary policy.
12      Q   Who were the insured?
13      A   The insured would have been the same.
14      Q   So Kemper insured Home Insurance?
15      A   No. I'm sorry. I didn't understand your
16  question if that's the conclusion you drew.
17      Q   It is. So who was Kemper insuring? Who was
18  the insured for Kemper's purposes?
19      A   Kemper's insureds were the members of the Point
20  Judith Fishery Corporation Associates.
21      Q   Do you understand that to include the Jenny C
22  or Jenny C Incorporated?
23      A   Jenny C was a vessel, and that would have been
24  a vessel owned by those members.
          PRECISE REPORTING SERVICE, P.C.

Page 69

1      Q   Did you look at or review a document in
2  concluding that the insured were the Point Judith
3  Fisherman's Cooperative?
4      A   Did I review?
5      Q   Making that answer you just made, did you look
6  at a document?
7      A   I've looked at the claim file.
8      Q   Okay. I'm talking about right now to refresh
9  your recollection. Did you look at any document in
10  answering that question?
11      A   Before me I have the exhibits.
12      Q   Okay. Can you push those to the side or give
13  those back to Mr. O'Driscoll, please.
14      A   (Witness complies.)
15         MR. O'DRISCOLL: For the record Mr. Mensie did
16  not look at any document when he made that answer.
17         MR. LeBLANC: Okay.
18         MR. O'DRISCOLL: But I will move the documents
19  as you have requested.
20         MR. LeBLANC: Does Mr. Mensie have any
21  documents in front of him at this time?
22         MR. O'DRISCOLL: No.
23  BY MR. LeBLANC:
24      Q   Now, what was Kemper's responsibility in light
          PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                9-8-06                        William R. Mensie
                              C.A. No.: 05-11073 WGY

| Page 70 | Page 72 |
|---|---|
| 1 of the fact that they issued an excess policy in this | 1      MR. O'DRISCOLL:  Which documents are you |
| 2 case -- or in the Jenny C case?  I'm sorry. | 2 referring to, Peter? |
| 3      **A   That is a very broad question, and without** | 3      MR. LeBLANC:  The documents the witness just |
| 4 **having review of the actual policy itself I can't answer** | 4 mentioned would clarify his answer. |
| 5 **what the responsibilities at Kemper would have been.** | 5 BY MR. LeBLANC: |
| 6      Q   Do you have the policy in front of you, or is | 6      Q   Let me first ask:  Are those documents in the |
| 7 it in the room with you? | 7 room with you? |
| 8      **A   No, it's not.** | 8      **A   I believe so.** |
| 9      Q   Do you know if it was in the claim file? | 9      **MR. O'DRISCOLL:  Yes.** |
| 10      **A   I don't recall seeing it in the claim file** | 10      THE WITNESS:  The ones I had before me were the |
| 11 **either.** | 11 ones that would clarify that answer. |
| 12      Q   Okay.  Is there anyone at Kemper who would have | 12      MR. O'DRISCOLL:  As I said at the beginning, |
| 13 knowledge greater than yourself of the policy requiring | 13 Peter, the documents available here are the exhibits that |
| 14 Kemper to do or -- | 14 you sent to us the other week and the documents that we |
| 15      **A   Not without the actual policy before them, no.** | 15 produced on Tuesday. |
| 16      Q   Does the policy exist to your knowledge? | 16      MR. LeBLANC:  Okay. |
| 17      **A   Not to my knowledge.** | 17      THE WITNESS:  The question was who was |
| 18      Q   Okay.  So would it be safe to say no one at | 18 responsible for handling this claim file on behalf of |
| 19 Kemper would be able to answer that question, what | 19 Kemper? |
| 20 Kemper's responsibilities were? | 20 BY MR. LeBLANC: |
| 21      **A   It would be safe to say only -- you could** | 21      Q   We can ask the court reporter to read the |
| 22 **answer it only in its broadest terms, but the policy will** | 22 question back. |
| 23 **contain specific obligations as to what Kemper's** | 23      (Record read as follows:  Who at |
| 24 **responsibilities were at that time.** | 24      Kemper was responsible for handling |
| PRECISE REPORTING SERVICE, P.C. | PRECISE REPORTING SERVICE, P.C. |

| Page 71 | Page 73 |
|---|---|
| 1      Q   Okay.  Let's answer it in the broadest terms | 1 the Dimon versus Jenny C case?) |
| 2 then. | 2      THE WITNESS:  The handling adjuster appears to |
| 3      **A   If it was a liability policy, it was available** | 3 be a Mr. Jesus LaTorre, L-a-T-o-r-r-e. |
| 4 **to provide an insurance cover arising out of certain** | 4 BY MR. LeBLANC: |
| 5 **circumstances for which the named insured might be** | 5      Q   What is a handling adjuster? |
| 6 **liable.  Or the insured; it doesn't necessarily have to** | 6      **A   That would have been the person responsible for** |
| 7 **be the named insured.  It could have also stipulated** | 7 **handling the claim file, the underlying --** |
| 8 **others who qualified as insureds.** | 8      Q   And what would be Mr. LaTorre's relationship to |
| 9      Q   Other than issuer of the excess policy, did | 9 Mr. Noe? |
| 10 Kemper have any other involvement in the Jenny C -- Dimon | 10      **A   Mr. Torre [sic.] would have -- I can answer** |
| 11 versus Jenny C case? | 11 **that in terms of a relationship.  They had different** |
| 12      **A   Not to my knowledge.** | 12 **responsibilities.** |
| 13      Q   And at Kemper who was the person responsible | 13      Q   What would be Mr. LaTorre's responsibilities? |
| 14 for the handling or addressing the Dimon versus Jenny C | 14      **A   As repects to this claim file, Mr. LaTorre was** |
| 15 case? | 15 **the adjuster or the claim rep who was charged with the** |
| 16      **A   Was the question who -- what was the question** | 16 **responsibility of handling the claim file.  He would have** |
| 17 **again, sir?** | 17 **investigated it and resolved the matter within his** |
| 18      Q   Who at Kemper was responsible for handling the | 18 **responsibilities as the person assigned to the file.** |
| 19 Dimon versus Jenny C case? | 19      Q   And Mr. Noe, what are his responsibilities? |
| 20      **A   Without the documents before me I cannot tell** | 20      **A   After the matter -- after there was a judgment** |
| 21 **you that.  I mean if you want the record straight, the** | 21 **in the matter, the case was assigned to Mr. Noe.** |
| 22 **documents do speak to that question.** | 22      Q   Okay.  And what were Mr. Noe's |
| 23      Q   Okay.  Why don't you review the documents and | 23 responsibilities? |
| 24 then give me the answer. | 24      **A   Mr. Noe took over the file for the purposes of** |
| PRECISE REPORTING SERVICE, P.C. | PRECISE REPORTING SERVICE, P.C. |

Dimon vs. Metropolitan Life                9-8-06                William R. Mensie
C.A. No.: 05-11073 WGY

Page 74

1   settling the claim after there had been a judgment.
2       Q   So prejudgment it was Mr. LaTorre; post
3   judgment it was Mr. Noe?
4       A   That's correct.
5       Q   The information available to you, what did Mr.
6   Noe do in this case?
7       A   Mr. Noe actually settled the claim with the
8   plaintiff's attorney.
9       Q   And what did that entail?
10      A   The settlement entailed a lump sum payment
11  along with a payment to -- a payment that involved the
12  purchasing of an annuity.
13      Q   And in this case, purchasing an annuity, what
14  does that mean?
15      A   It means that a premium was paid to a life
16  company to provide a stream of benefits to the plaintiff.
17      Q   In practical terms who was the owner of the
18  annuity?
19      A   The owner of the annuity is stated as -- let me
20  refer back to the annuity, which Kemper company actually
21  was the owner.
22      Q   Are you looking at documents again?
23      MR. O'DRISCOLL: Do you want him to?
24      MR. LeBLANC: I would like him to answer the
        PRECISE REPORTING SERVICE, P.C.

Page 75

1   question if he knows without looking at the documents.
2       THE WITNESS: Without looking at the documents
3   I do not know who it states is the owner of the annuity,
4   but I believe that the contract does state an owner. It
5   was one of the Kemper companies. I'm not sure if it --
6   which company it actually identified.
7       Q   Mr. Mensie, I'm just going to take a few
8   minutes to try to find the document I'm looking for, a
9   recently disclosed document.
10      Mr. Mensie, as the handler of the claim
11  postjudgment, did Mr. Noe have the authority to act on
12  behalf of Kemper Insurance Company?
13      A   Yes.
14      Q   And what was the extent of his authority; what
15  could he do in this case?
16      A   He was assigned to negotiate a settlement with
17  the plaintiff's attorney, and he did so.
18      Q   Was he authorized to settle the claim at all
19  costs, or was he given guidelines to your knowledge?
20      A   What his authority level was I do not know
21  specifically, but he certainly had the authority to
22  settle the claim within the limits of the policy.
23      Q   Have you seen any documents in your review of
24  the seven inches of the claim file or any other documents
        PRECISE REPORTING SERVICE, P.C.

Page 76

1   available to you that would have indicated what his
2   authority was exactly?
3       A   What his specific authority was I don't recall.
4   My recollection is that he had the authority to settle
5   the claim within the policy limits.
6       Q   Okay. And your recollection is based on a
7   document you saw?
8       A   It's based upon the material that I have read.
9   I can't speak to any specific document as such. I
10  didn't -- my impression was that he had the authority to
11  settle the case within his authority from what I read of
12  the claim -- what I read of the material related to this
13  settlement.
14      Q   Do you know if the document you read led you to
15  that conclusion or disclosed in this case?
16      A   I believe so.
17      Q   Okay. Did you see any of those documents in
18  the documents that were marked as K-005 through K-0128?
19      MR. O'DRISCOLL: Mr. LeBlanc, if I may
20  interject, certainly the questions that you're asking are
21  appropriate, but I do not think it's appropriate to ask
22  Mr. Mensie to go through these documents and find
23  something that you recall seeing in there. These
24  documents are available to all the parties; and as you
        PRECISE REPORTING SERVICE, P.C.

Page 77

1   pointed out on occasion, Mr. Mensie is testifying from
2   his best recollection of his review of those documents.
3       MR. LeBLANC: The question more goes to is his
4   recollection based on documents that weren't disclosed?
5       THE WITNESS: Here's an example if you need
6   something more specific. There's a memorandum, your --
7   the document is K-0102 where Mr. Noe says he was assigned
8   to negotiate a settlement within the $400,000 policy
9   limit. That to me implies he had the authority to do so.
10  BY MR. LeBLANC:
11      Q   Okay. Did you base your last answer on this
12  document specifically?
13      A   I will suggest -- I will state that this
14  document reflects my understanding of what his
15  authorities were.
16      Q   And what in this document leads you to believe
17  that he had the authority to settle up to $400,000?
18      MR. O'DRISCOLL: Objection. Mr. Mensie has
19  already testified as to what his impression is on the
20  basis of the sentence you just read in the document,
21  answered already.
22  BY MR. LeBLANC:
23      Q   Mr. Mensie, could you answer my question for
24  me?
        PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life     9-8-06     William R. Mensie
C.A. No.: 05-11073 WGY

**Page 78**

1  A  It reads: Assigned to negotiate settlement
2  within our policy limit.
3  Q  Okay. Are there any other documents to your
4  recollection that would have led you to that conclusion
5  that Mr. Noe had the authority to settle within the
6  policy limits other than that document?
7  A  There may --
8  MR. O'DRISCOLL: To your recollection.
9  THE WITNESS: To the best of my recollection
10  without any further independent review of the documents
11  I'd have to say this document led me to have that
12  impression. There may be other sentences such as that
13  within the context of the material that's here, but my
14  independent recollection of specifically where that might
15  be I don't recall at this time.
16  BY MR. LeBLANC:
17  Q  Can you refer to document K-0107.
18  A  Yes.
19  Q  Do you recognize this document?
20  A  I do.
21  Q  Can you tell me what you understand this
22  document to be?
23  A  I understand it to be the application that Mr.
24  Noe signed with respect to the purchase of the annuity.
PRECISE REPORTING SERVICE, P.C.

**Page 80**

1  purchasing this annuity. Did they receive a stream of
2  payments?
3  A  They did not.
4  Q  Did they have any responsibilities to purchase
5  this annuity in your opinion?
6  A  It was a part of the settlement agreement with
7  the plaintiff's attorney that we would pay $175,000 for
8  this annuity.
9  Q  Was it part of the settlement in the Dimon
10  versus Jenny C case?
11  A  That's correct.
12  Q  Mr. Mensie, when you received the claim file,
13  was it copies of documents, or was it the original
14  documents themselves?
15  A  The claim file contains both originals and
16  copies to my recollection.
17  Q  Okay. Specifically K-0107, do you know if that
18  was an original or a copy?
19  A  Appears -- it appeared to be a copy of the
20  original application that Mr. Noe signed and submitted
21  along with the premium, the $175,000.
22  MR. LeBLANC: Can we mark K-0107 as Exhibit 2,
23  please.
24  (Exhibit No. 2 was marked for
PRECISE REPORTING SERVICE, P.C.

**Page 79**

1  Q  When it says applicant if other than annuitant,
2  what does that mean to you?
3  A  That's -- in there lies the name American
4  Motorists Insurance Company, and he was signing it on
5  behalf of American Motorists Insurance Company who were
6  the -- designated as the applicant who was requesting the
7  annuity.
8  Q  Do you know who prepared this document?
9  A  I do not have any firsthand knowledge of that,
10  no. It appears to be prepared by Charter Life Insurance
11  Company is typically how it's done.
12  Q  But that's just a guess on your part?
13  A  Probably. I'm not going to say a guess. It's
14  Charter Security Life Insurance Company's application, so
15  leads me to believe they may have prepared it.
16  Q  But you don't know for certain?
17  A  No.
18  Q  Okay. And under the section owner, do you see
19  where it says American Motorists Insurance Company?
20  A  Yes.
21  Q  What's it mean to be an owner of an annuity?
22  A  That the -- with respect to the annuity, that
23  they were the purchaser. They purchased the annuity.
24  Q  Did they directly receive any benefit from
PRECISE REPORTING SERVICE, P.C.

**Page 81**

1  identification.)
2  THE REPORTER: Okay. It's marked.
3  MR. LeBLANC: Thank you.
4  BY MR. LeBLANC:
5  Q  To your knowledge did Mr. Noe ever sign any
6  other application other than this in the Dimon versus
7  Jenny C case?
8  A  I saw no evidence of that.
9  Q  Mr. Mensie, are you looking at documents again?
10  A  I have before me your exhibit marked No. 2.
11  Q  And that's it?
12  A  Well, the other stacks are here as well, but
13  I'm looking at Exhibit No. 2.
14  Q  Okay. To your knowledge did Mr. Noe sign any
15  other application other than Exhibit 2?
16  A  To my knowledge I don't recall having seen any
17  evidence of Mr. Noe's signature appearing on any other
18  application relative to this annuity other than the one
19  that I'm looking at before me.
20  Q  And do you know what the process was after Mr.
21  Noe signed this application, what happened to it?
22  A  The process should have been that it was
23  submitted along with the premium and the annuity was then
24  issued, the contracts were issued; and I believe that's
PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                9-8-06                William R. Mensie
C.A. No.: 05-11073 WGY

Page 82

1 what took place here.
2     Q   Okay. Do you know if this application was
3 issued in multiple parts?
4         MR. O'DRISCOLL: I'm sorry. Application was
5 issued in multiple parts? I don't understand that.
6 BY MR. LeBLANC:
7     Q   The application was in multiple parts, or was
8 there carbon copies to your knowledge?
9     A   From what I have before me I cannot tell
10 whether or not there were multiple parts.
11     Q   Okay. Can you refer to the application that I
12 sent you or I sent to your attorney on August 24th. Pull
13 out that stack of documents. It's the sixth document in
14 the stack, sixth page.
15     A   I believe I have it before me.
16         MR. O'DRISCOLL: Yes, yes, the witness has the
17 document before him.
18 BY MR. LeBLANC:
19     Q   Okay. And for the record the document has the
20 number 83A08153 written across the top in handwriting?
21     A   Yes.
22     Q   It says an annuity application with Charter
23 Security Life Insurance Company, New York, 720 Fifth
24 Avenue, New York, New York across the top?
PRECISE REPORTING SERVICE, P.C.

Page 83

1     A   Yes.
2     Q   Okay. Can you tell me on that application if
3 you look in box 1 under name of annuitant.
4     A   Okay. Is there a question there?
5     Q   Yes, I'm asking if you see box 1.
6     A   Yes, I do.
7     Q   Okay. Can you tell me how on box 1 Mr. Dimon's
8 name is spelled, his last name?
9     A   It is difficult to read, but it's Dennis J.,
10 and then the last name is difficult to read.
11     Q   Okay. If you go back, go down to box 8, the
12 beneficiary and relationship box.
13     A   Okay.
14     Q   Is it easier for you to read how Katherine or
15 Katerine I. Dimon's name is spelled?
16     A   Yes.
17     Q   And how is that spelled?
18     A   It's spelled D-i-m-o-n.
19         MR. LeBLANC: Okay. Can we mark this as
20 Exhibit 3 I guess we're on now.
21         (Exhibit No. 3 was marked for
22         identification.)
23     THE REPORTER: Okay. It's marked.
24 BY MR. LeBLANC:
PRECISE REPORTING SERVICE, P.C.

Page 84

1     Q   If you refer back to Exhibit 2, Mr. Mensie, you
2 see on the primary beneficiary -- or beneficiary
3 relationship under primary, Mrs. Dimon's name is spelled
4 D-i-a-m-o-n?
5     A   Yes.
6     Q   And in fact throughout Exhibit 2 the Dimon name
7 is spelled D-I-a-m-o-n?
8     A   That's correct.
9     Q   Do you see how in Exhibit 3 the Dimon named is
10 spelled D-i-m-o-n?
11     A   That's correct.
12     Q   Do you see on Exhibit 3 that the application is
13 still American Motorists Insurance?
14     A   It's not really legible, but it appears to be
15 so, yes.
16     Q   And that there appears to be the signature of
17 John Noe on that applicant -- on that application?
18     A   That's correct.
19     Q   And you see in box 9, type of contract, single
20 premium, on Exhibit 3 the "deferred" is crossed out and
21 "immediate" is written in?
22     A   Yes, I do.
23     Q   And you see on Exhibit 2 that deferred is not
24 crossed out?
PRECISE REPORTING SERVICE, P.C.

Page 85

1     A   Correct.
2     Q   And you also see on Exhibit 3 that Mr. Dimon
3 signed as the annuitant?
4     A   Yes.
5     Q   And that it appears on Exhibit 3 Syracuse, New
6 York this 4th day of May, 1983?
7     A   That's correct.
8     Q   And then on Exhibit 2 Mr. Dimon's signature
9 isn't present?
10     A   That's correct.
11     Q   And that there's no reference to Syracuse, New
12 York on Exhibit 2?
13     A   That's correct.
14     Q   So would it be fair to say that Exhibit 3 is a
15 more complete copy of the application than Exhibit 2 is?
16         MR. O'DRISCOLL: Objection to the form of that
17 question.
18 BY MR. LeBLANC:
19     Q   Mr. Mensie?
20     A   I don't know about the fairness of it. It
21 certainly appears that Exhibit 3 contains modifications
22 that are not in Exhibit 2.
23     Q   Mr. Mensie, could you look at K-0021.
24     A   Okay.
PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                    9-8-06                    William R. Mensie
C.A. No.: 05-11073 WGY

Page 86

1      MR. LeBLANC: Can we mark that as Exhibit 4, please.
2          (Exhibit No. 4 was marked for
3              identification.)
4  BY MR. LeBLANC:
5      Q   Mr. Mensie, as between Exhibit 2 and 3, which
6  does Exhibit 4 more closely correspond with?
7      MR. O'DRISCOLL: I'll object to the form of
8  that question. I don't think it's fair that you would
9  ask the witness to compare a number of documents together
10 on the spot.
11     But, Mr. Mensie, you certainly may answer.
12     THE WITNESS: There are certainly similarities
13 in 2. Again now, Exhibit 4 is not legible as repects to
14 sections 6, 8, nor the underlying date area.  Section 14
15 seems to have been modified from Exhibit 2.  It is not
16 legible in Exhibit 14 after it says immediate annuity the
17 remaining handwritten notes are not legible in 4; whereas
18 in 3 it is.  And in section 15 on Exhibit 4 the
19 handwritten note or indicator on 15 that you can see on
20 Exhibit 3 you cannot see on Exhibit 4.
21 BY MR. LeBLANC:
22     Q   After that analysis, Mr. Mensie, which of the
23 two exhibits, 2 or 3, does Exhibit 4 most look like, most
24 correspond with?
              PRECISE REPORTING SERVICE, P.C.

Page 87

1      MR. O'DRISCOLL: Again, object to the form of
2  the question, but Mr. Mensie, you can answer to the
3  extent --
4      THE WITNESS: The documents all look the same;
5  they've just been changed.  They're modified in different
6  forms and different fashions and certainly in their
7  degree of legibility.
8  BY MR. LeBLANC:
9      Q   Okay and Exhibit 4 is a document that Kemper
10 produced; is that correct?
11     A   Exhibit 4 was produced by Kemper.  I don't know
12 if that is in fact correct.
13     Q   It has a Kemper Bates stamp on the bottom
14 K-0021.  Do you understand that to be meaning this is a
15 Kemper document produced in this litigation numbered
16 0012?
17     MR. O'DRISCOLL: Mr. LeBlanc, obviously it is.
18 I produced it two days ago.
19     THE WITNESS: I'll defer to counsel on that;
20 and if that being so, then it's correct.
21 BY MR. LeBLANC:
22     Q   Okay.  Do you know if there exists a more clear
23 or legible copy of Exhibit 4?
24     A   Not to my knowledge.
              PRECISE REPORTING SERVICE, P.C.

Page 88

1      Q   Do you recall seeing Exhibit 4 in your review
2  of the claim file?
3      A   I recall -- yes, I recall seeing the Exhibit 2
4  specifically; and as respects to 4, I do recall having
5  seen it. I'm not sure where it originated from.
6      Q   What do you mean by that, where it originated
7  from?
8      A   I don't recall specifically where I saw it.
9      Q   Okay.  In the claim file, do you recall how
10 many copies of an annuity application were in the claim
11 file?
12     A   My recollection is that there was just this
13 one, which you referred to as Exhibit No. 2.
14     Q   Would you be surprised if you didn't recall
15 every document in the seven inch stack of documents you
16 received as the claim file?
17     Q   Would I be surprised by that?
18     Q   Yeah.
19     A   No, I wouldn't.
20     Q   Is what we've marked as Exhibit 2, is that a
21 complete application in your opinion?
22     MR. O'DRISCOLL: Complete with respect to who?
23     MR. LeBLANC: Complete with respect to the
24 application process.
              PRECISE REPORTING SERVICE, P.C.

Page 89

1      THE WITNESS: It appeared to be pretty
2  consistent with the process of attaining an annuity.
3  Again looking back to this matter back to 1983, I simply
4  saw the documents that were there and made them available
5  to counsel to review.
6  BY MR. LeBLANC:
7      Q   If you saw an application like this one we've
8  marked as Exhibit 2, only a signature of the applicant on
9  it and no other signatures, would you consider that to be
10 a complete application?
11     MR. O'DRISCOLL: Object to form.  With respect
12 to -- from whose perspective?
13     MR. LeBLANC: Kemper's.
14     THE WITNESS: When I saw that -- again looking
15 at this document that I saw in the file suggests to me
16 that this would not have been unusual to have seen the
17 application with only Mr. Noe's signature on it because
18 it's a process.  This application was submitted; and
19 again we were trying to, at least I was at that point,
20 you know, searching for documents that before having
21 located these documents, I did not know they even
22 existed.  So while that voluminous file was of great
23 volume, it was also more important to me to get that
24 material to counsel.
              PRECISE REPORTING SERVICE, P.C.

23 (Pages 86 to 89)

Dimon vs. Metropolitan Life                9-8-06                    William R. Mensie
C.A. No.: 05-11073 WGY

Page 90

1  BY MR. LeBLANC:
2      Q   Okay. I'm not asking you why you disclosed it.
3  I'm asking you is this a complete document? And to use
4  your words why don't I ask: At what point in the
5  application process -- what point in the application
6  process is represented by this application?
7      A   That the annuity has been applied for and
8  signed off by the person who was paying the premium.
9      Q   Is that the beginning or the end?
10     MR. O'DRISCOLL:  Object to the form, but you
11 may answer.
12     THE WITNESS:  It's probably --
13 BY MR. LeBLANC:
14     Q   Is that the beginning or the end, Mr. Mensie?
15     A   It's not the beginning and it's not the end.
16 It's somewhere in the middle because there has to be a
17 process that goes on before that.
18     Q   Okay. Can you describe to me what the process
19 is?
20     A   The process would have been that Charter
21 Security would have relayed a quote for which the premium
22 would have been based upon, then the premium would
23 have -- and then the application would have so reflected
24 that the premium cost for the annuity was in this
              PRECISE REPORTING SERVICE, P.C.

Page 91

1  instance $175,000. They would have submitted that to Mr.
2  Noe who would have signed off on it and sent it either
3  back to Charter or to a broker who would have attained
4  the remaining signatures and submitted it to the company,
5  who would have then issued a policy.
6      Q   And if there was a mistake on the application
7  at the point where it was prepared and submitted to the
8  owner, the owner signed it, sent it to the agent, if
9  there was a mistake discovered at that point, would it be
10 unusual for the owner to have to sign a second
11 application with correct information on it?
12     A   If there was a material mistake, would the
13 owner have signed -- if there was agreement that there
14 was a mistake, then I suspect the process would have gone
15 smoothly, that the owner would have signed a second
16 application.
17     Q   Do you know if there was any disagreement as to
18 whether or not Mr. Dimon's name was spelled incorrectly
19 or whether or not it was a deferred or immediate annuity?
20     A   I saw no -- you asked a twofold question there,
21 but I saw no indicator that I can recall seeing relative
22 to this that the mistake for which was at issue pertained
23 to his name.
24     Q   Was there anything in the file that would
              PRECISE REPORTING SERVICE, P.C.

Page 92

1  indicate to you that Mr. Noe didn't sign a second
2  application as reflected in Exhibit 3 and 4?
3      MR. O'DRISCOLL:  Objection, asked and answered.
4  BY MR. LeBLANC:
5      Q   Mr. Mensie, could you answer the question,
6  please.
7      A   I don't recall having seen anything of that so
8  reflected.
9      Q   Thank you.
10     MR. O'DRISCOLL:  I'm sorry. Could you read
11 back that question.
12         (Record read as follows:  Was there
13             anything in the file that would
14             indicate to you that Mr. Noe didn't
15             sign a second application as
16             reflected in Exhibit 3 and 4?)
17     MR. O'DRISCOLL:  Did not sign an application.
18     THE WITNESS:  Did not sign an application.
19 BY MR. LeBLANC:
20     Q   Does that change your answer, Mr. Mensie?
21     A   The question is whether or not I saw evidence
22 that Mr. Noe did not sign a second application. The
23 evidence that I saw reflected that he in fact said he was
24 not going to sign a second application because the
              PRECISE REPORTING SERVICE, P.C.

Page 93

1  dispute was one over the substance of the agreement not
2  over the name.
3      Q   Mr. Mensie, is it Kemper's position that Mr.
4  Noe only signed one application?
5      MR. O'DRISCOLL:  Objection, asked and answered.
6      MR. LeBLANC:  Not to my knowledge, no, it
7  wasn't answered.
8      MR. O'DRISCOLL:  Mr. Mensie has testified as to
9  his review of the documents and what they appear to him.
10     MR. LeBLANC:  Him as a representative of
11 Kemper.
12     MR. O'DRISCOLL:  Yes.
13 BY MR. LeBLANC:
14     Q   Mr. Mensie, if you refer to Exhibit 2,
15 (inaudible) sign that document?
16     A   I didn't hear your question.
17     Q   Referring to Exhibit 2, do you see where Mr.
18 Noe signed that document?
19     A   Yes, I do.
20     Q   Do you see that Mr. Dimon's name is misspelled
21 in box 1?
22     A   I see the spelling of Mr. Dimon's name there,
23 correct.
24     Q   Do you understand that that's a misspelling?
              PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life     9-8-06     William R. Mensie
C.A. No.: 05-11073 WGY

Page 94

1   A   It seems inconsistent with how it's spelled in
2 other places, that is correct.
3   Q   And do you see where it's -- that inconsistency
4 is repeated in box 8?
5   A   I do.
6   Q   And where in box 9 the word "immediate" doesn't
7 appear and "deferred" does?
8   A   I see where box 9 is typed single premium
9 deferred annuity.
10   Q   Okay. And then if you look at Exhibit 3,
11 application with different information on it, do you
12 agree that the information on application or Exhibit 3 is
13 different from the information on Exhibit 2?
14   A   I do.
15   Q   Do you see where Mr. Noe signed Exhibit 3?
16   A   I see where it purports to be -- it's really
17 not legible, but it purports to be the signature line;
18 and it looks similar to the signature as it appears on
19 Exhibit No. 2, which is really unusual but...
20   Q   Why is that unusual?
21   A   Because as best I can make out, they're in the
22 exact same places. I'm no handwriting expert, but that
23 looks rather unusual to me.
24   Q   So is it Kemper's position that Mr. Noe didn't
PRECISE REPORTING SERVICE, P.C.

Page 95

1 sign Exhibit 3 as it appears today?
2   A   I don't know. I didn't see any evidence. I
3 saw evidence that said he was not going to sign another
4 application. I didn't see any evidence that had
5 reflected that he had signed one, as your questions would
6 suggest, relative to a misspelling of the name.
7   Q   Mr. Mensie, I would suggest that you might be a
8 little confused about what Mr. Noe was asked to do. Do
9 you mean to say that Mr. Noe was asked to accept an
10 amended or changed annuity contract?
11    MR. O'DRISCOLL: Objection to the form of the
12 question. I don't think we have established the
13 foundation of the time period you're talking about
14 anything or anything else.
15    MR. LeBLANC: Can we go off record for a second
16 here?
17    MR. O'DRISCOLL: Okay.
18    MR. LeBLANC: Anyone else object?
19    MR. DeWICK: No.
20    MS. McQUAY: What are we going off record for?
21    MR. LeBLANC: Because I think I need to clarify
22 this issue, and we can do it much more quickly off
23 record.
24    MS. McQUAY: If you're going to be clarifying
PRECISE REPORTING SERVICE, P.C.

Page 96

1 things for the witness, I think it needs to be on the
2 record.
3    MR. LeBLANC: I'm going to clarify something
4 with Mr. O'Driscoll. If you object, then we'll just stay
5 on record.
6    MS. McQUAY: I think we should stay on record
7 on this.
8    MR. LeBLANC: Mr. O'Driscoll, my understanding
9 is the witness may be referring to letters that were
10 produced regarding the dispute as to the terms of the
11 annuity and not any letter requesting Mr. Noe signed a
12 different application.
13    MR. O'DRISCOLL: Well, you can certainly ask
14 the witness about that, Peter. That was kind of the
15 basis for my objection as to form.
16    MR. LeBLANC: Okay.
17 BY MR. LeBLANC:
18   Q   Mr. Mensie, can you point me to a document that
19 requested that Mr. Noe sign a different or changed
20 application?
21    MR. O'DRISCOLL: Well, again, Peter, I would
22 just say I don't think it's fair to ask Mr. Mensie to go
23 through all of these documents and point out something.
24 You might want to be more pointed in your question.
PRECISE REPORTING SERVICE, P.C.

Page 97

1    MR. LeBLANC: Frankly I'm not sure it's fair to
2 disclose 120 documents the day before the deposition
3 either, but that's a different point. The issue is
4 Mr. Mensie testified that Mr. Noe was asked to sign a
5 different application. I would like to know the basis of
6 his knowledge for that.
7    THE WITNESS: Bear with me. I'll find the
8 letter.
9    MR. O'DRISCOLL: Peter, you had made reference
10 to correspondence from MetLife in the exhibits that you
11 had sent. Perhaps, if I could, I might direct the
12 witness' attention toward that.
13    MR. LeBLANC: I made reference to
14 correspondence from Charter Security and to Charter
15 Security; but to speed this process up, that would be
16 great.
17    MR. O'DRISCOLL: I'm sorry. What?
18    MR. LeBLANC: If we could speed the process up,
19 that would be great. I would have no objection to you
20 pointing to particular documents.
21    MR. O'DRISCOLL: Mr. LeBlanc refers to the --
22 made reference to the correspondence in there in
23 connection with what Mr. Noe was asked to do.
24    THE WITNESS: It's back to Exhibit 1. Okay.
PRECISE REPORTING SERVICE, P.C.

25 (Pages 94 to 97)

Dimon vs. Metropolitan Life                           9-8-06                           William R. Mensie
C.A. No.: 05-11073 WGY

Page 98

1  Yeah, I've located it. It's back to Exhibit No. 1 that
2  is a letter dated October 10th, 1983, where Mr. Noe
3  writes to Charter Security Life and advises them that the
4  original policy received was for the term of 240 months
5  certain and life thereafter and an order agreed upon
6  between Mr. Hughes and Mr. Foley. He cites that --
7      Q   What document does it say that Mr. Noe was
8  asked to sign a different application?
9      A   I read that to understand that is exactly what
10 he was being asked to do. And he says there: I intend
11 to retain the original policy in our files and consider
12 this to be a valid and enforceable agreement.
13     Q   But that doesn't say he was asked to sign a
14 different application; is that correct?
15     A   I don't see the communication from Charter
16 Security here. I suspect that would shed light on what
17 he was actually being asked to do.
18     Q   I'm asking you on Exhibit 1, there's nothing in
19 there that says, Mr. Noe, please sign an amended
20 application or a different application?
21     A   It does not read Mr. Noe, please sign a
22 different application.
23     Q   Okay. Thank you.
24         Do you know when the application was
                PRECISE REPORTING SERVICE, P.C.

Page 99

1  signed by Mr. Noe, the date when it was signed by Mr.
2  Noe?
3      MR. O'DRISCOLL: If you know Mr. Mensie.
4      THE WITNESS: No, no.
5      MR. O'DRISCOLL: There's been no request for
6  you to go through any documents. We'll just put these
7  aside.
8  BY MR. LeBLANC:
9      Q   Okay. If you look at Exhibit 2, is that
10 application dated as to Mr. Noe's signature?
11     A   Exhibit 2, unfortunately we don't have them
12 out. There is no date.
13     Q   Look at Exhibit 3. Do you see a date on
14 Exhibit 3 as to Mr. Noe's signature?
15     A   I cannot see a date.
16     Q   Mr. Mensie, with reference to the bad faith
17 litigation.
18     MR. O'DRISCOLL: Is there a question pending,
19 Peter?
20 BY MR. LeBLANC:
21     Q   The reason I asked, in reference to the bad
22 faith litigation, did Kemper prevail?
23     A   There was a resolution of it.
24     Q   And what was that resolution?
                PRECISE REPORTING SERVICE, P.C.

Page 100

1      MR. O'DRISCOLL: If you know.
2      THE WITNESS: I don't recall.
3  BY MR. LeBLANC:
4      Q   Are there any documents in your possession or
5  in Kemper's possession that would --
6      A   Yeah, they were part of the claim file.
7      Q   Okay. We're going to suspend on that issue
8  then.
9      MR. O'DRISCOLL: Well, I've made my position
10 clear on that today.
11     MR. DeWICK: If I may, are we going to break
12 for lunch or are we going to try to go straight through?
13     MR. LeBLANC: I would be more than happy to
14 break for lunch if everyone else wants to do that, and if
15 the court reporter can find a lunch in Long Grove.
16     MR. DeWICK: I guess my question was: Can we
17 push on through, or is it necessary to break for lunch?
18 Are we going long into the afternoon?
19     MR. LeBLANC: We'll probably go long into the
20 afternoon so why don't we do that. Why don't we take a
21 break for lunch.
22     MR. O'DRISCOLL: Okay. What's say we -- it's
23 12:45. Do you guys want to go another half hour and then
24 take a short break? Is that acceptable?
                PRECISE REPORTING SERVICE, P.C.

Page 101

1      MS. McQUAY: Okay with me.
2      MR. DeWICK: I'm actually late for a call I
3  have to make. I'd actually prefer to take it now if
4  everyone is willing to accommodate me.
5      MR. O'DRISCOLL: Okay. And we'll reconvene
6  1:15 East Coast time.
7          (Whereupon the preceding
8           deposition was recessed for
9           lunch and scheduled to
10          continue on September 7, 2006, at
11          1:15 o'clock p.m.)
12     MR. LeBLANC: Let's go back on record. I'd ask
13 the court reporter to read the last question back,
14 please.
15         (Record read.)
16 BY MR. LeBLANC:
17     Q   Mr. Mensie, have you ever spoken with John Noe
18 or Noe?
19     A   No.
20     Q   Mr. Mensie?
21     A   The answer was no.
22     Q   Oh, I didn't hear you. Sorry. Do you know if
23 anyone at Kemper has spoken with Mr. Noe regarding this
24 case.
                PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                  9-8-06                    William R. Mensie
                                    C.A. No.: 05-11073 WGY

| Page 102 | Page 104 |
|---|---|
| 1    A  I would think not. | 1        MR. LeBLANC: I just want to know if he has a |
| 2    Q  As the litigation claims consultant assigned to | 2  different recollection now.  Now he remembered Mr. -- |
| 3  this case, would it be your responsibility to contact | 3  trying to find out Mr. Noe's last known address. |
| 4  potential witnesses? | 4        MR. O'DRISCOLL: Yes, he testified he |
| 5    A  No. | 5  remembered Mr. Noe.  He doesn't remember anybody else. |
| 6    Q  Whose responsibility would it be? | 6  Asked and answered. |
| 7    A  Defense counsel's. | 7  BY MR. LeBLANC: |
| 8    Q  Okay.  And would it be your responsibility to | 8    Q  Mr. Mensie, do you recall asking about anyone |
| 9  find out where these witnesses may be? | 9  else's address other than Mr. Noe's? |
| 10       MR. O'DRISCOLL: Object to form in terms of | 10    A  I recall asking about each of the individuals |
| 11  responsibility, the use of that word; but to the extent | 11  who counsel made a request of.  Do I recall them |
| 12  that you understand the question, Mr. Mensie, you may of | 12  specifically by name at this time?  No.  If you would |
| 13  course answer. | 13  care to give me a name I will answer specifically |
| 14       THE WITNESS:  To the extent that I could assist | 14  regarding that person if I have an independent |
| 15  counsel in whatever task he might deem appropriate | 15  recollection of that person. |
| 16  relative to this litigation, I would be responsible. | 16    Q  How about Mr. LaTorre? |
| 17  BY MR. LeBLANC: | 17    A  I do not recall Mr. LaTorre specifically, no. |
| 18    Q  Okay.  But based on your prior testimony you | 18    Q  How about Mary Graci? |
| 19  don't have a recollection whether or not you tried to | 19       MR. O'DRISCOLL: Okay, listen.  I'm going to |
| 20  ascertain Mr. Noe's last known address; is that correct? | 20  object to this again on the grounds of privilege.  I |
| 21    A  That is not correct.  I hope that that's not | 21  think what you're asking now -- you're asking Mr. Mensie |
| 22  what my testimony suggested. | 22  what I said to him and what individuals I asked him to |
| 23    Q  Okay.  Did you attempt to ascertain Mr. Noe's | 23  contact? |
| 24  last known address? | 24       MR. LeBLANC: I'm asking Mr. Mensie what |
|        PRECISE REPORTING SERVICE, P.C. |        PRECISE REPORTING SERVICE, P.C. |

| Page 103 | Page 105 |
|---|---|
| 1    A  At the request of counsel, yes. | 1  individuals he tried to ascertain their last known |
| 2    Q  Okay.  Your testimony earlier was that you | 2  address.  He just told me if I mentioned specific names, |
| 3  didn't recollect which individuals you tried to ascertain | 3  he might recollect it. |
| 4  last known addresses.  Do you have a recollection now? | 4       MR. O'DRISCOLL: Well, as his counsel, I'm |
| 5    A  I don't have a complete recollection, but those | 5  going to instruct him not to answer that. |
| 6  to which counsel asked that I attain last known addresses | 6       MR. LeBLANC: You're going to instruct him not |
| 7  for I did attempt to do so. | 7  to answer a factual question about whether or not he |
| 8    Q  Okay.  And who were those individuals? | 8  tried to locate witnesses? |
| 9    A  I suspect they are -- I don't have a | 9       MR. O'DRISCOLL: Well, yes, because Mr. Mensie |
| 10  recollection of who those individuals are in the | 10  just testified that I asked him to find the addresses of |
| 11  entirety, so I don't want to suggest to you otherwise. | 11  some people, and now you're asking him to identify those |
| 12  Counsel made a request.  They were people amongst those | 12  people. |
| 13  who were noted through some discovery to have been | 13       MR. LeBLANC: I'm asking him to identify the |
| 14  involved in the case, and they were former employees; and | 14  individuals that he tried to locate, that he asked |
| 15  I attempted to attain their last known addresses. | 15  someone at Kemper to try to locate. |
| 16    Q  You specifically just said that you attempted | 16       MR. O'DRISCOLL: Yes, and he just told you |
| 17  to attain Mr. Noe's last known address.  You have a | 17  those individuals are the ones that I asked him about. |
| 18  recollection you tried to do that? | 18       MR. LeBLANC: I've asked several questions on |
| 19    A  That is correct. | 19  this, and I think you may have objected to the questions |
| 20    Q  Is there anyone else you can recall trying to | 20  being asked and answered; and now you're raising an |
| 21  ascertain their last known address? | 21  objection as to privilege. |
| 22       MR. O'DRISCOLL: Peter, this has been asked and | 22       MR. O'DRISCOLL: I've had a continuing |
| 23  answered, and we're also getting into privileged areas | 23  objection as to privilege.  You've been swimming around |
| 24  too.  It's been asked and answered. | 24  it, and now you've clearly zeroed in.  I've tried to give |
|        PRECISE REPORTING SERVICE, P.C. |        PRECISE REPORTING SERVICE, P.C. |

Page 106

1  you some leeway, but it's over now.
2  BY MR. LeBLANC:
3      Q   Okay. How about Mr. Lemhoefer; does that name
4  ring a bell to you, Mr. Mensie?
5          MR. O'DRISCOLL: Objection. I'll instruct the
6  witness not to answer.
7          MR. LeBLANC: He can't even answer whether he
8  recollects the name?
9          MR. O'DRISCOLL: I'm sorry. I misunderstood
10  the question. You're asking him if he recollects the
11  name from his review of the file?
12          MR. LeBLANC: Does he as a representative of
13  Kemper know who Mr. Lemhoefer is.
14          MR. O'DRISCOLL: Okay. You may answer that.
15          THE WITNESS: No, I do not know who he is
16  specifically.
17  BY MR. LeBLANC:
18      Q   Do you know if he was a former or present
19  employee of Kemper?
20      A   I believe that he was a former employee.
21      Q   How about Mr. Noe, was he a former or current
22  employee of Kemper?
23      A   Former.
24      Q   Do you know of anyone who worked on this case,
                PRECISE REPORTING SERVICE, P.C.

Page 107

1  being the Dimon versus Jenny C case, whether any of those
2  individuals are current employees of Kemper?
3      A   No.
4      Q   No, you don't know or no, they're not current
5  employees?
6      A   No, they're not current employees to my
7  knowledge.
8      Q   Did you attempt to try to locate
9  Mr. Lemhoefer's last known address?
10          MR. O'DRISCOLL: Objection, privilege and also
11  asked and answered.
12  BY MR. LeBLANC:
13      Q   Mr. Mensie.
14      A   If he was one of the people that counsel
15  requested, then I attempted to try to locate him.
16      Q   Okay. Did you have any success with that?
17          MR. O'DRISCOLL: Objection. I'll instruct the
18  witness not to answer. Peter, we've been over all this
19  already. I've told you my position. If you want to talk
20  about this afterwards whether you think that this is --
21  there's any obligation for me to supplement disclosures
22  about this sort of information, we can talk about that
23  later; but we've been over this now in this deposition I
24  don't know how long, clearly a disproportionate amount of
                PRECISE REPORTING SERVICE, P.C.

Page 108

1  time.
2          MR. LeBLANC: That sounds like your opinion,
3  Mr. O'Driscoll, and I will suspend on the issue of who
4  Mr. Mensie tried to locate on behalf of Kemper at this
5  time.
6          MS. McQUAY: Just so the record is clear, I'd
7  like it stated on the record that am I correct,
8  Mr. O'Driscoll, in that you instruct the witness not to
9  answer any question that inquired which former witness --
10  employees of Kemper he sought to locate?
11          MR. O'DRISCOLL: I do think, yes, that is
12  privileged information based upon the witness' testimony
13  today that any witnesses that he attempted to locate was
14  done on the advice of counsel. My objection in this
15  regard, as I said, is separate from what I am willing to
16  do, which is to discuss with you afterwards if you think
17  there is some sort of a need for Kemper to supplement its
18  initial disclosures on the grounds of this, then I of
19  course am willing to discuss that.
20          MS. McQUAY: Well, I understand that, but my
21  immediate concern and the reason I was -- and I'm sure
22  that other people wanted the record to be very clear is
23  that I believe your instruction to the witness not to
24  answer is erroneous. So I want a clear record so we can
                PRECISE REPORTING SERVICE, P.C.

Page 109

1  go to the court on the point.
2          MR. O'DRISCOLL: Yes, my instruction to the
3  witness is not to answer on those grounds. He's
4  testified clearly that anything he did was at my request,
5  and I think that's privileged as both attorney work
6  product and on the grounds of attorney-client privilege.
7          MS. McQUAY: Fine. Mr. LeBlanc, I'm sorry for
8  interrupting.
9          MR. LeBLANC: No problem, Ms. McQuay. Thank
10  you.
11  BY MR. LeBLANC:
12      Q   Mr. Mensie, can you refer to what was marked as
13  K-0005.
14      A   Yes.
15      Q   It's entitled Structured Settlement Check-Off
16  Sheet. Do you see that?
17      A   Yes.
18      Q   Do you know if this is a complete copy of that
19  document?
20      A   I don't know if it is or not. This dates back
21  to '83. In terms of its form and substance it -- in
22  answer to your question, I don't know.
23      Q   Okay. Have you ever seen a document that
24  looked like this?
                PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                    9-8-06                    William R. Mensie
C.A. No.: 05-11073 WGY

Page 110

1     A   Not that I recall specifically in this format
2   other than this document I guess.
3     Q   Is this document a document that was produced
4   by Kemper?
5     A   Yes.
6     Q   And do you know if -- strike that.
7         Do you know who Mary Graci is?
8     A   She was an employee.  From the claim file it
9   appears that she was an employee of Kemper working out of
10  the New York City office in '83.
11    Q   Okay.  And what was the involvement in 1983 of
12  the New York City office in this case, in Dimon versus
13  Jenny C?  I'm sorry.
14    A   In the underlying case they were the office
15  that -- where the claim file was being actually handled.
16    Q   So did Mr. LaTorre work out of the New York
17  office?
18    A   All the indications are that he did.
19    Q   Okay.  And at some point was the claim file or
20  the case transferred out of the New York City office to
21  another office?
22    A   It was transferred to Mr. Noe.
23    Q   And which office did Mr. Noe work out of?
24    A   Mr. Noe was assigned, the home office.
              PRECISE REPORTING SERVICE, P.C.

Page 111

1     Q   And where is that located?
2     A   The physical location of the home office is in
3   Round Lake, Illinois -- Long Grove, Illinois.  Strike
4   that.
5     Q   Just so I have it straight, Mr. Noe may have
6   not worked out of the home office, when you say the home
7   office was physically located there?
8     A   From what I can see he -- from the claim file
9   itself it appears that he -- he was assigned to the home
10  office staff.  I guess it just depends on the function
11  that he was involved in, whether or not he was actually
12  physically located in the home office.  It looks like he
13  worked as a regional resident of some sort assigned to
14  the home office.
15    Q   And what does it mean to be a regional
16  resident?
17    A   I don't know.  I probably should strike that
18  and say regional because I can't make an independent
19  judgment from this file what his specific territory was.
20  The address on the correspondence suggests that his
21  office was not here in Long Grove.
22    Q   And where was it located then?
23    A   Communications that I saw -- well, strike that.
24        The communications are sent to him in Long
              PRECISE REPORTING SERVICE, P.C.

Page 112

1   Grove so the record is incorrect.  It was being sent to
2   him in Long Grove.
3     Q   Okay.  When you say "it was," what are you
4   referring to?
5     A   Well, there were communications in the file
6   that were sent to John Noe at the home office here in
7   Long Grove.
8     Q   Okay.  Were you looking at those documents when
9   you gave me that answer?
10    A   Yes.
11    Q   Okay.  One more time, Mr. Mensie, unless I ask
12  you to look at a document, please don't look at them
13  until I request that, okay?
14        MR. O'DRISCOLL:  For the record -- okay.
15  That's fine.  For the record Mr. Mensie was actually
16  looking at the exhibits that you had sent over
17  previously.
18        MR. LeBLANC:  I understand that, but I'd ask
19  that the witness not refer to any documents unless I ask
20  him to refer to those documents.
21        MR. O'DRISCOLL:  Very well.
22  BY MR. LeBLANC:
23    Q   Would it be unusual for an individual assigned
24  to a claim to have documents sent to their home address?
              PRECISE REPORTING SERVICE, P.C.

Page 113

1     A   Not if they worked from their home address.
2     Q   So even if Mr. Noe had letters addressed to
3   home office claim, American Motorists Insurance Company,
4   Long Grove, that doesn't mean that was actually his
5   office; is that true?
6     A   No, that's not true.  If he was assigned to the
7   home office staff, he would have worked out of Long
8   Grove.  However, if he was working as a resident, he may
9   have worked from another physical location as well.
10    Q   Okay.  If he worked as a resident, would he
11  still receive mail in Long Grove?
12    A   Yes.
13    Q   Then that mail would be forwarded to him at
14  some other location?
15    A   That's correct.
16    Q   So if you turn to what's been marked as K-0007?
17        MR. O'DRISCOLL:  Okay.  I'm showing the witness
18  that document now.
19        THE WITNESS:  Okay.
20  BY MR. LeBLANC:
21    Q   Mr. Noe requests that Ms. Graci send him the
22  settlement agreement to my home address?
23    A   Correct.
24    Q   Seeing that address, does that refresh your
              PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                    9-8-06                        William R. Mensie
                                    C.A. No.: 05-11073 WGY

Page 114

1    recollection about what Mr. Noe's last known address
2    might be?
3        A    Whether or not this is a correct address or
4    not, I do not know.
5            MR. O'DRISCOLL:  Peter, is there a question
6    pending?
7            MR. LeBLANC:  No, I'm just looking at some
8    documents right now.
9    BY MR. LeBLANC:
10       Q    Mr. Mensie, I believe you testified that
11   postjudgment in this case was assigned to Mr. Noe; is
12   that correct?
13       A    Yes.
14       Q    Okay.  If a dispute arose as to the terms of
15   the annuity postjudgment, would it be Mr. Noe's
16   responsibility to address that dispute?
17           MR. O'DRISCOLL:  Object to the form of the
18   question.  You may answer to the extent that you
19   understand it.
20           THE WITNESS:  I understand it to the extent of
21   this, the material that I've read relative to this case,
22   that that dispute that arose was one that should have
23   been addressed by the plaintiff's attorney.
24   BY MR. LeBLANC:
                 PRECISE REPORTING SERVICE, P.C.

Page 116

1    about over the last 20 years every employee at Kemper who
2    talked about or thought about the Dimon Jenny C case.
3    BY MR. LeBLANC:
4        Q    Was it Mr. Noe's responsibility to address the
5    dispute?  Was it his responsibility to assert Kemper's
6    position regarding the dispute?
7        A    Okay.  That's a different question.
8            MR. O'DRISCOLL:  Object to the form because
9    that's two questions.  It's compound.
10           But to the extent you can answer the
11   question, you can answer.
12           THE WITNESS:  To the extent I can answer the
13   question relative to state Kemper's position regarding
14   the dispute, yes, that's Mr. Noe's responsibility.
15   BY MR. LeBLANC:
16       Q    Do you know if Mr. Noe received information
17   from any other individual at Kemper to respond to the
18   dispute?
19       A    Not from the documents that I reviewed.
20       Q    Do you know or is it Kemper's position now that
21   Mr. Noe had full authority to respond to the dispute as
22   to the terms of the annuity back in 1983?
23           MR. O'DRISCOLL:  Object to the form.
24           THE WITNESS:  My testimony is that Mr. Noe had
                 PRECISE REPORTING SERVICE, P.C.

Page 115

1        Q    I'm asking you within Kemper would it be Mr.
2    Noe's responsibility to address that dispute?
3        A    As it relates specifically to this case, the
4    dispute that arose, again my testimony is that my reading
5    of the documents suggest that that dispute was one that
6    the plaintiff's attorney would have been obligated to
7    address.
8        Q    That's not really responsive to my question.
9    My question is:  Within Kemper whose responsibility would
10   it be to address this dispute?
11       A    When you say "this dispute," I can only answer
12   that by again referring back to my prior answer.
13       Q    And that's nonresponsive.  Who at Kemper would
14   work on this issue?  After the dispute arose who would
15   work on it?
16           MR. O'DRISCOLL:  Well, when you say what issue,
17   object to the form, question of what issue are you
18   talking about?
19           MR. LeBLANC:  The issue I just asked four or
20   five questions about, the dispute as to the terms of the
21   annuity.
22           MR. O'DRISCOLL:  Well, I mean at what point?
23   We're addressing that issue now as we speak.
24           MR. LeBLANC:  We can do that.  We can talk
                 PRECISE REPORTING SERVICE, P.C.

Page 117

1    the responsibility to state Kemper's position with
2    respect to the dispute.
3    BY MR. LeBLANC:
4        Q    Did he have the authority to state Kemper's
5    position?
6        A    In the context of resolving the matter that was
7    before him, yes.
8        Q    What is the procedure for correcting errors in
9    annuities?
10       A    I don't know that there's a general procedure.
11   I guess it depends on the nature of the error.
12       Q    In this case what was the procedure that should
13   have been used?
14           MR. O'DRISCOLL:  Object to form, assumes that
15   there was an error to correct.
16           But to the extent you can make sense of
17   the question, you can answer.
18           THE WITNESS:  I can't make sense of the
19   question because you talked earlier about a type -- an
20   error in the name.  You know, to the extent that --
21   BY MR. LeBLANC:
22       Q    The dispute.  That's an error.  I'm asking
23   about the dispute in this case.  Did you understand that
24   there's a dispute as to what the terms of the annuity
                 PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                     9-8-06                     William R. Mensie
C.A. No.: 05-11073 WGY

Page 118

1    are?
2        A    I do, yes.
3        Q    Who gave Mr. Noe the authority to respond with
4    Kemper's position as to the dispute regarding the terms
5    of the annuity in this case?
6        A    I think the authority is inherent in the
7    responsibility of assigning him the claim file to settle
8    the underlying case.
9        MR. O'DRISCOLL:  Peter, was there a question
10    pending?  I'm sorry.
11        MR. LeBLANC:  No, I'm reviewing the documents.
12    BY MR. LeBLANC:
13        Q    Mr. Mensie, to whom did Mr. Noe report
14    regarding the Dimon versus Jenny C case at Kemper?
15        A    I have no independent recollection of that.
16    Absent a review of the actual claim contents I can't
17    answer that question.
18        Q    Would it surprise you that someone referred to
19    as tech claim would report to someone at division claim?
20        A    I have no -- I mean surprise, I mean qualify
21    that.  That doesn't make any sense to me.
22        Q    Who is Mr. Noe's supervisor or manager?
23        A    Absent a review of the claim file documents, I
24    cannot give you that information.
                    PRECISE REPORTING SERVICE, P.C.

Page 119

1        Q    Can you refer to what's been marked as K-0102.
2        MR. O'DRISCOLL:  All right.  I'm handing those
3    two documents to the witness at this time, documents
4    Kemper produced marked K-001 and K-0002, three zeros that
5    is.
6        MR. LeBLANC:  No, it's just K-0102.
7        MR. O'DRISCOLL:  Oh, okay, 0102, got you.
8    K-0102 is the first page of a document that's two pages
9    long so I'm going to hand the witness K-0102 and K 0103.
10        MR. LeBLANC:  Thank you.
11    BY MR. LeBLANC:
12        Q    Mr. Mensie, can you let me know when you're
13    done reviewing those documents.
14        A    Okay.  (Witness peruses documents.)
15        Okay.
16        Q    Starting at the top in the black box, that says
17    Kemper?
18        A    Yes.
19        Q    But there's no group.  Why is the group
20    missing?
21        A    I don't know.
22        Q    Is there a distinction between Kemper and
23    Kemper Group?
24        A    If there was, I do not know what that
                    PRECISE REPORTING SERVICE, P.C.

Page 120

1    distinction may have been at that time.
2        Q    Okay.  Look at the top line of K-0102, you see
3    an arrow that says Mary Graci or an arrow next to Mary
4    Graci?
5        A    Yes.
6        Q    Do you know what that arrow signifies?
7        A    I do not.
8        Q    Have you ever seen a mark like that on a Kemper
9    document?
10        A    I don't recall any independent knowledge of
11    seeing that.  I mean it seems to be a directional error
12    marked to the people who are going to be recipients of
13    this memorandum.
14        Q    Okay.  And where it says ocean marine claim,
15    New York City, can you tell me what that means?
16        A    That was the office that Mary Graci worked out
17    of I suspect.
18        Q    The term ocean marine claim, what does that
19    mean?
20        A    That was the title of the division that she was
21    assigned to or that she worked for.
22        Q    But Ms. Graci was an employee of Kemper; is
23    that correct?
24        A    Yes, I believe so.  Yes.
                    PRECISE REPORTING SERVICE, P.C.

Page 121

1        Q    Do you see that the document's dated 4-18-1983?
2        A    Yes.
3        Q    To Klaus Lemhoefer?
4        A    Yes.
5        Q    From J. L. Noe, tech. claim, Long Grove, B-8.
6        A    Okay.  Yes.
7        Q    Why would a person in Mr. Noe's position write
8    a memorandum to a person in Mr. Klaus Lemhoefer's
9    position?
10        MR. O'DRISCOLL:  Object to form in that it
11    assumes lack of foundation, specifically talking about
12    the positions of these folks when I don't know that's
13    been established on the record.
14        But to the extent that you can answer the
15    question, you may answer.
16        THE WITNESS:  For informational purposes.
17    BY MR. LeBLANC:
18        Q    What was Mr. Noe's position at Kemper?
19        A    Based on how he signed his memoran -- letters
20    and memorandum he was assigned to the home office claim
21    technical staff.
22        Q    Okay.  And Mr. Lemhoefer's position based on
23    0102?
24        A    That he's assigned to the divisional claim
                    PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                                9-8-06                                William R. Mensie
C.A. No.: 05-11073 WGY

Page 122

1  staff.
2     Q    And what is the relationship between Mr. Noe's
3  position and Mr. Lemhoefer's position?
4     A    Back in 1983 I can only speculate.  I mean it
5  would not be unusual that you'd have multiple lines of
6  authority to whom might have an interest in this claim,
7  so this may have been part of his divisional
8  responsibilities.
9     Q    You mean Mr. Lemhoefer's?
10    A    Yes.
11    Q    Does the fact that Mr. Noe wrote this memo to
12  Mr. Lemhoefer indicate that one of these individuals was
13  in a position of authority over the other?
14    A    Not necessarily.  The division may
15  have been Mr. Lemhoefer's responsibility whereas the
16  technical responsibilities were that of Mr. Noe's.
17    Q    And when you say technical responsibilities,"
18  what do you mean by that?
19    A    The actual nuts and bolts of resolving the
20  claim.
21    Q    Okay.  And Mr. Lemhoefer wouldn't deal with the
22  actual nuts and bolts?
23    A    He certainly was not dealing with the nuts and
24  bolts with respect to this claim.  He may have had
                PRECISE REPORTING SERVICE, P.C.

Page 123

1  division responsibility for the ocean marine operation,
2  for example, which this claim fell as a part of, and so
3  Mr. Noe was advising him that he was assigned to
4  negotiate the settlement of the claim.  It certainly
5  doesn't appear that -- well, I would only be speculating.
6     Q    Do you see the stamp there.  It says J.
7  LaTorre, April 21st, maybe, 1983?
8     A    Yes.
9     Q    What does that indicate to you?
10    A    That indicates that the claim file handler
11  stamped this memorandum on that date for his claim file.
12    Q    Would this 4-18-1983 memoranda be postjudgment
13  or prejudgment?
14    A    This was postjudgment.
15    Q    Okay.  As the person assigned to handle the
16  case prejudgment, Mr. LaTorre would still review this
17  document?
18    A    He very well obvious -- yeah, it appears that
19  he very well did, at least the stamp would suggest he
20  did.
21    Q    If you'd refer now to the second paragraph.
22    A    Yes.
23    Q    Twelve lines down that says "I checked with two
24  brokers"?
                PRECISE REPORTING SERVICE, P.C.

Page 124

1     A    Yes.
2     Q    It says:  "I checked with two brokers and was
3  unable to come anywhere near this pay-out for $175,000
4  cost"?
5     A    Yes.
6     Q    What do you take that statement to mean?
7     A    I read it literally that he checked with two
8  brokers, and he wasn't able to come anywhere -- the
9  question when it says near, that needs to probably be
10  qualified; but near the pay-out cost for 175.  So to me
11  that simply means that he made an independent inquiry and
12  got costs that were different.
13    Q    Would it be unusual for a person in Mr. Noe's
14  position to make independent inquiries to find the lowest
15  cost annuity in a case like this?
16        MR. O'DRISCOLL:  Object to the form.  You may
17  answer if you understand.
18        THE WITNESS:  I think I understood you to say
19  would it be unusual.  I don't think that it would be
20  unusual.  I mean you look around, and you make inquiry.
21  That's pretty standard stuff.
22  BY MR. LeBLANC:
23    Q    You see four lines above that is -- five lines
24  it says: "Plaintiff's attorney agreed that if I would
                PRECISE REPORTING SERVICE, P.C.

Page 125

1  pay $175,000 and agreed to be nominal owner of the
2  annuity, he would place it with an A rated life insurance
3  company"?
4     A    Yes.
5     Q    When Mr. Noe writes "I would pay," what he
6  really means is Kemper would pay?
7     A    Okay.
8     Q    Is that true, or is that what you understand
9  that to be?
10    A    Yes.
11    Q    You don't think Mr. Noe was going to come up
12  with $175,000 out of his own pocket for this, right?
13    A    I do not.
14    Q    He was acting as a representative of Kemper in
15  negotiating and including the settlement; is that right?
16    A    That's correct.
17    Q    Have you ever worked on a case, Mr. Mensie,
18  where there were multiple quotes from different carriers
19  for the same annuity terms?
20        MR. O'DRISCOLL:  Object to form.  You may
21  answer to the extent you understand it.
22        THE WITNESS:  Yes.
23  BY MR. LeBLANC:
24    Q    And was it more than one case or just one?
                PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                                9-8-06                              William R. Mensie
                                              C.A. No.: 05-11073 WGY

| Page 126 | Page 128 |
|---|---|
| 1    A  I can recall more than one.<br>2    Q  Is it common to get multiple quotes to find the<br>3  best rate?<br>4    A  When you say "common," I have to qualify that.<br>5  I mean out of all the cases that I've worked on it's not<br>6  common as such, but it's not necessarily unusual.<br>7    Q  Okay.  Can you give us a percentage of all the<br>8  cases you've worked on how many there were multiple<br>9  quotes on?<br>10    A  Just by recollection I'd suspect maybe, early<br>11  days, probably oh, 10 to 20 percent maybe overall the<br>12  universe of cases that I've worked on.<br>13    MR. O'DRISCOLL:  If I may have a point of<br>14  clarification.  Multiple quotes obtained by whom?<br>15    MR. LeBLANC:  The witness already answered the<br>16  question so I think it's moot at this point.<br>17  BY MR. LeBLANC:<br>18    Q  And when you say the "early days," what does<br>19  that mean?<br>20    A  I was thinking of my own experiences.<br>21    Q  In your own experiences professionally or<br>22  purchasing annuities for yourself?<br>23    A  Professionally.<br>24    Q  Okay.  What's the percentage of annuity cases<br>PRECISE REPORTING SERVICE, P.C. | 1  BY MR. LeBLANC:<br>2    Q  Mr. Mensie, if you'd turn to the second page of<br>3  Exhibit 5, last line: "Thereafter I will close my<br>4  interest without further report."  What does Mr. Noe mean<br>5  by that?<br>6    A  That he was concluding his assignment.<br>7    Q  And after the point that Mr. Noe concluded his<br>8  assignment, would the responsibility for addressing any<br>9  issues that arose after that point be his or somebody<br>10  else's?<br>11    A  If they were issues that arose specific to his<br>12  assignment, it would have been his to resolve.<br>13    Q  If you'd turn to K-0125.<br>14    MR. O'DRISCOLL:  All right.  Handing the<br>15  witness K-0125, K-0126.<br>16    MR. LeBLANC:  Just K-0125.<br>17    MR. O'DRISCOLL:  Well, oh, forgive me.  Witness<br>18  has K-0125.<br>19    MR. LeBLANC:  Thank you.<br>20  BY MR. LeBLANC:<br>21    Q  Mr. Mensie, if you'd just let me know when<br>22  you're done reviewing that document.<br>23    A  Okay.  (Witness peruses document.)<br>24         Okay.<br>PRECISE REPORTING SERVICE, P.C. |
| Page 127 | Page 129 |
| 1  that you handle right now?<br>2    MR. O'DRISCOLL:  Object to form.  You may<br>3  answer.<br>4    THE WITNESS:  I'm not directly involved --<br>5  well, handle, can you qualify what you mean by "handle."<br>6  BY MR. LeBLANC:<br>7    Q  By virtue of your position as a liability<br>8  claims consultant, you handle claims by or made against<br>9  or involving Kemper Insurance; is that right?<br>10    A  That's correct.<br>11    Q  Of those claims that you handle that you're<br>12  assigned that you're responsible for, how many are<br>13  annuity claims?<br>14    A  I see upwards of 20 annuity cases a week.<br>15    Q  And how many cases do you see a week?<br>16    A  I'm involved in maybe a hundred or so cases a<br>17  week.<br>18    MR. LeBLANC:  I'd ask that K-0102 and K-0103 be<br>19  marked as Exhibit 5.<br>20    (Exhibit No. 5 was marked for<br>21      identification.)<br>22    MR. LeBLANC:  Have those documents been marked?<br>23    THE REPORTER:  Yes.<br>24    MR. LeBLANC:  Thank you.<br>PRECISE REPORTING SERVICE, P.C. | 1    Q  Based on this document -- or strike that.<br>2  Sorry.<br>3         Do you see where it's dated November 8,<br>4  1983?<br>5    A  Yes.<br>6    Q  Mr. Mensie?<br>7    A  Yes.<br>8    Q  And again it's to Klaus Lemhoefer from J. L.<br>9  Noe, do you see that?<br>10    A  Yes.<br>11    Q  The line below from it says previous comm.?<br>12    A  Yes.<br>13    Q  Is there anything marked next to that on your<br>14  copy?<br>15    A  No.<br>16    Q  Would you expect that there would be something<br>17  marked?<br>18    A  No.  Seems consistent with the other documents.<br>19    Q  Okay.  Is that a mechanism to track<br>20  communications between individuals like a reference?<br>21    A  I suspect it could be used that way.<br>22    Q  Is there any other use that you know of for<br>23  that?<br>24    A  It's -- it could be used if someone wanted to<br>PRECISE REPORTING SERVICE, P.C. |

Dimon vs. Metropolitan Life                 9-8-06                    William R. Mensie
                                    C.A. No.: 05-11073 WGY

Page 130

1  refer to previous communications, I suspect they could
2  notate it to the extent that they wanted to do so.  I
3  don't have that it would be, you know, something that
4  would be mandatory.
5        Q   Have you ever produced a report or a memorandum
6  that looked like this?
7        MR. O'DRISCOLL: Object to form.  Unclear as to
8  what it means to say "looked like this."
9        THE WITNESS:  I have produced memorandums along
10 these lines, yes.
11 BY MR. LeBLANC:
12       Q   Have you ever worked in a position similar to
13 Mr. Noe's position for Kemper or any other insurance
14 company?
15       A   Yes.
16       Q   Was that with Kemper?
17       A   I'm not sure I understand the question.  I'll
18 explain -- well, my understanding of what Mr. Noe's
19 function and what he did.  I have worked in similar
20 positions of handling larger exposure cases, both for
21 Kemper and for other carriers.
22       Q   Was this a larger exposure case?
23       A   As signified by Z, being a home office mandated
24 file, I would say yes.
                   PRECISE REPORTING SERVICE, P.C.

Page 131

1        Q   Do you see the first line of K-0125: "We have
2  encountered some difficulty with Charter Security Life
3  Insurance Company, New York, who issued the annuity
4  policy"?  Do you see that?
5        A   Yes.
6        Q   Does that indicate to you that Mr. Noe had some
7  reason to believe there was a dispute regarding the terms
8  of the annuity?
9        A   It seems to me in reading this memo in its
10 entirety, he didn't think there was much of a dispute.
11 He said there was a difficulty there.  At least from his
12 perspective he didn't see it as an issue.
13       Q   Do you know if Mr. Noe ever personally
14 contacted anyone at Charter Security?
15       A   I have no independent knowledge of that.
16       Q   If you read the last line, second to the last
17 paragraph: "If not, Mr. Hughes may file an action for
18 declaratory judgment."  Do you see where it says that?
19       A   Yes.
20       Q   Do you know what an action for declaratory
21 judgment is?
22       A   Yes.
23       Q   What is that in your understanding?
24       A   Seeking the court's adjudication of a matter
                   PRECISE REPORTING SERVICE, P.C.

Page 132

1  relative to a dispute.
2        Q   And in the Dimon versus Jenny C case whose
3  responsibility would it be to resolve the dispute
4  regarding the terms of the annuity?
5        MR. O'DRISCOLL: Object to form.
6        MR. DeWICK:  I'll also object, Jed DeWick.
7        THE WITNESS:  If the dispute over the terms of
8  the annuity took place after the case was assigned to Mr.
9  Noe but to the extent that Mr. Noe's involvement in that
10 matter as outlined in his memorandums this was a dispute
11 that existed at least in his mind with the broker and
12 Mr. Hughes.  He specifically says that Mr. Hughes may
13 file an action for declaratory relief.  So that leads me
14 to an understanding that Mr. Noe's thinking was that this
15 was Mr. Hughes' dispute not Kemper's.
16       MR. LeBLANC:  Can we mark this as Exhibit 6, please.
17       (Exhibit No. 6 was marked for
18            identification.)
19       THE REPORTER:  Okay.  It's marked.
20       MR. O'DRISCOLL:  Sorry, Peter.  We're not
21 missing a question, are we?
22       MR. LeBLANC:  No, not yet.
23 BY MR. LeBLANC:
24       Q   Mr. Mensie, I'd ask that you look at a letter
                   PRECISE REPORTING SERVICE, P.C.

Page 133

1  dated July 14, 1983.  It's in the premarked exhibits.
2        MR. O'DRISCOLL:  I have it, July 14, 1983.
3        THE WITNESS:  I've reviewed it.
4  BY MR. LeBLANC:
5        Q   Was Mr. Snyder an employee of Kemper?
6        A   No.
7        Q   What do you understand Mr. Snyder's role in the
8  annuity application to be?
9        A   He was the broker for the plaintiff's attorney.
10       Q   And what do you mean he was the broker for the
11 plaintiff's attorney?
12       A   There was communication that through Dean
13 Witter, the plaintiff's attorney had been able to secure
14 a quote for 240 months certain and life thereafter
15 through Dean Witter.
16       Q   Did Kemper have any involvement in securing
17 that quote?
18       A   No.
19       Q   I'd ask that you look at a letter dated August
20 12, 1983.
21       MR. O'DRISCOLL:  August 12, 1983.  Mr. Mensie
22 has it in front of him.
23 BY MR. LeBLANC:
24       Q   For the record this is a letter dated August
                   PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                                9-8-06                                William R. Mensie
C.A. No.: 05-11073 WGY

Page 134

1   12, 1983, to a Mr. Robert Foley from Mr. John Noe.  Is
2   that the document you have in front of you, sir?
3       A   Yes, I do.
4       Q   The first paragraph says:  I received a
5   replacement policy through Charter Security Life
6   Insurance Company."
7       A   Changing the terms of the annuity for 240
8   months, yes.
9       Q   Okay.  Have you ever heard the term replacement
10  policy in the context of an annuity?
11      A   No.
12      Q   What would you call an annuity that was issued
13  and then corrected later?
14          MR. O'DRISCOLL:  Objection to form.
15  BY MR. LeBLANC:
16      Q   Would you call it anything?
17      A   The policy that was issued and subsequently
18  reissued with a change in the terms?
19      Q   Yes.
20      A   I would call that a new policy.
21      Q   Okay.  Have you ever seen such a thing before?
22      A   Not a unilateral one.  I've seen where all the
23  parties have agreed and then a new policy was then
24  issued.

PRECISE REPORTING SERVICE, P.C.

Page 135

1       Q   Have you seen any documents or can you tell us
2   whether you know whether Charter Security was involved in
3   the original Jenny C litigation?
4           MR. O'DRISCOLL:  Objection to form, but you may
5   answer.
6           THE WITNESS:  I wouldn't think so.  I mean I
7   haven't seen anything, and it wouldn't seem that they
8   would be; but I would not know from the documents that
9   I've seen.
10  BY MR. LeBLANC:
11      Q   So you can't tell us one way or the other; is
12  that true?
13      A   Not independent -- not specifically per a
14  document I cannot say would make much sense but who
15  knows.
16          MR. O'DRISCOLL:  I'm sorry.  Was that a
17  question?
18  BY MR. LeBLANC:
19      Q   Yes.  Why wouldn't it make sense?
20      A   Well, in the context of this litigation let me
21  say that then -- let me qualify by saying that then in
22  the context of this litigation.  The normal course of
23  things would be that, you know, annuity brokers are
24  involved in the course of the settlement; and since

PRECISE REPORTING SERVICE, P.C.

Page 136

1   Kemper was not involved in the settlement of the
2   underlying case until after the judgment, I wouldn't
3   think that I would see documentation relative to the
4   involvement of the broker and the annuity vendors before
5   the case was assigned to Mr. Noe.
6       Q   In 1983 did Kemper -- was Kemper in the
7   business of issuing annuities?
8       A   I would think so, yes.
9       Q   And why wouldn't Kemper just buy an annuity
10  from itself to cover this settlement?
11      A   I'm sorry I misunderstood your question.
12  You're asking was Kemper a life company who issued
13  annuities at that time?
14      Q   Yes.
15      A   I don't know.  I'll have to say that.  1983,
16  I'd have to -- yeah, I'm not sure.
17      Q   Would it be unusual for when Kemper was
18  involved as the insurer to purchase an annuity from
19  itself to cover a settlement like this?
20      A   That doesn't happen.  I haven't had an
21  experience where I've seen that happening.  Usually the
22  companies operate independent of each other if it's a
23  stand-alone life insurance company that might issue an
24  annuity.  It wouldn't be that Kemper was purchasing an

PRECISE REPORTING SERVICE, P.C.

Page 137

1   annuity from itself.
2           I mean Kemper was at one time in the
3   business of life insurance policies.  Whether or not they
4   were still in the business in 1983, I can't speak to that
5   today; but even if they were, you know, you go outside to
6   the vendors, and it would be based upon the competitive
7   rates.
8       Q   Do you know if this letter dated August 12,
9   1983, was in the claim file?
10      A   I don't recall having seen it.
11      Q   Do you know if there were any letters involving
12  the disputes in the claim file?
13          MR. O'DRISCOLL:  Objection to form as far as
14  any letters regarding the dispute, but you may answer to
15  the extent --
16          THE WITNESS:  To the extent of my recollection,
17  my independent recollection is that I don't really recall
18  specifically.  I gathered up the claim file documents as
19  soon as I realized that there were documents related to
20  the annuity and sent the file to counsel.
21  BY MR. LeBLANC:
22      Q   Would it have been Kemper's procedure at the
23  time in 1983 for Mr. Noe to keep a separate file of his
24  own regarding a claim he was working on?

PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                9-8-06                          William R. Mensie
C.A. No.: 05-11073 WGY

Page 138

1    A   It's possible.
2    Q   And do you know what the procedure would be for
3    Mr. Noe to send his file to Kemper or hold on to his file
4    for a certain period of time?  Do you have a procedure
5    for that?
6    A   Yeah.  Ordinarily if there were documents that
7    related to the claim file within his working file, if he
8    had such an animal, then he would have — at the time the
9    file was closed he would have sent those documents to the
10   claim file.  That wouldn't be an unusual process.
11   Q   Refer to Exhibit 5, the second page.
12   A   Yes.
13   Q   Where it says, the second line from the bottom:
14   "...my copy of the claim file to Mr. Moore."
15   A   Yes.
16   Q   Would that lead you to believe that Mr. Noe had
17   his own copy of the claim file?
18   A   Yes.
19   Q   Okay.  And do you know what happened to that
20   copy of the claim file?
21   A   I do not.
22   Q   What would be the procedure -- a technical
23   claims individual had a copy of a claim file, what would
24   be their procedure for getting that file to Kemper?
                    PRECISE REPORTING SERVICE, P.C.

Page 139

1            MR. O'DRISCOLL:  Object to the form.
2            To the extent you understand, you may
3    answer.
4            THE WITNESS:  I'm not sure I understood the
5    question.  But if it's a copy of a file and it's actually
6    a replica and he has a copy for his purposes of working
7    the file while being away from the actual file that's
8    housed at the claims office, there's two options.  You
9    know, if there's added information, you know, at the time
10   the file is closed, he would send it back; but I doubt
11   seriously as a practical matter that he would send back
12   an entire copy because it's a duplication.
13   BY MR. LeBLANC:
14   Q   Okay.  And when an individual like Mr. Noe who
15   has documents sent to his home address also received
16   documents in Long Grove, when those documents were
17   received in Long Grove, what would be Kemper's policy and
18   procedure regarding those documents?
19   A   They would have been sent to Mr. Noe.
20   Q   Without making a copy?
21   A   Without making a copy.
22   Q   Okay.  So Mr. Noe may have been in possession
23   of original documents?
24   A   If he had communications with individuals that
                    PRECISE REPORTING SERVICE, P.C.

Page 140

1    were writing directly to him, absolutely.
2    Q   Directly to him at the home office even though
3    that's not where he worked?
4            MR. O'DRISCOLL:  Object to the form.
5            THE WITNESS:  He may not have been physically
6    located at the home office at all times because he was
7    mobile, but I wouldn't qualify it as him not actually
8    working at the home office.
9            MR. LeBLANC:  Mr. O'Driscoll, if you could hand
10   the witness the letter dated September 26, 1983 to John
11   Noe.
12           MR. O'DRISCOLL:  Mr. Mensie has that in front
13   of him now.
14   BY MR. LeBLANC:
15   Q   Mr. Mensie, using the September 26, 1983 letter
16   as an example, describe for me what the procedure would
17   be once this letter was received at the home office in
18   Long Grove, Illinois?
19   A   It would have been directed to Mr. Noe.
20   Q   Could anything be done with it before it was
21   directed to Mr. Noe?
22   A   No, I wouldn't think so.
23   Q   Okay.  So the only copy of this letter that
24   Kemper would have would be in Mr. Noe's file?
                    PRECISE REPORTING SERVICE, P.C.

Page 141

1    A   Unless Mr. Noe sent it to the claim file, that
2    would be correct.
3    Q   Okay.  And referring back to 0103, Exhibit 5,
4    page 2 where it says "...my copy of the claim file to Mr.
5    Moore," would this original letter that was only in Mr.
6    Noe's possession be made part of the claim file that's in
7    Kemper's possession?
8    A   I would think — well, I'm not sure I
9    understood the question.
10   Q   How would this letter dated September 26, 1983,
11   get into the files of Kemper?
12   A   Mr. Noe would have to have either physically
13   put it there or have sent it to the claim file.
14   Q   Do you know if he did that?
15   A   There's nothing here that I — well, there's
16   nothing here that I can decipher from that would tell me
17   one way or the other.
18   Q   Do you know if Kemper had any direct contact
19   with Mr. Dimon in 1983?
20   A   I wouldn't think so.  Mr. Dimon was represented
21   by counsel, so Kemper's contact would have been with
22   Mr. Dimon's attorney.
23   Q   Mr. Mensie, what would you expect to be
24   contained in an annuity contract?
                    PRECISE REPORTING SERVICE, P.C.

Page 142

1      MR. O'DRISCOLL: Object to form, but you may
2  answer.
3      THE WITNESS: In the contract itself?
4  BY MR. LeBLANC:
5      Q    Yes.
6      A    The terms of the agreement.
7      Q    Is there a certain document or documents that
8  you would expect to see setting forth the terms of the
9  agreement?
10     A    The contract itself.
11     Q    Do you know if it would come in any parts, or
12 would you expect to see addendums or anything like that?
13     A    I don't necessarily expect them, but there are
14 occasions when the contracts contain addendums, the
15 contracts that come in various forms and various
16 fashions; but the essence of the question at least to my
17 extent that I understand it, I would expect to see the
18 terms of the agreement within the contract.
19     Q    Mr. Mensie, I'd like you to look at what's been
20 marked as K-001 and 002?
21     MR. O'DRISCOLL: The first two documents?
22     MR. LeBLANC: Yes.
23     MR. O'DRISCOLL: K-001 and K-002 documents
24 produced by Kemper, the witness has them.
        PRECISE REPORTING SERVICE, P.C.

Page 143

1  BY MR. LeBLANC:
2      Q    Mr. Mensie, what was the first time you saw
3  these two documents?
4      A    After the litigation it's a part of the search
5  to obtain as much information as I could regarding the --
6  the circumstances surrounding the litigation that was
7  filed against Kemper, I initiated an action to recover a
8  copy of the checks since my annuity file did not contain
9  the actual contract.
10     Q    Okay. And then when was that?
11     A    I don't have any independent recollection of
12 the actual date.
13     Q    Can you give me a time frame?
14     A    It was post having received the suit in this
15 matter, and without additional references I really
16 couldn't say.
17     Q    You testified earlier that you made an initial
18 request for documents and that what was marked as
19 Exhibit -- I'm sorry, not Exhibit, K-003 and K-004 were
20 discovered?
21     A    Correct.
22     Q    Did you discover this check at the same time?
23     A    No.
24     Q    When did you discover this check?
        PRECISE REPORTING SERVICE, P.C.

Page 144

1      A    I just testified after having uncovered that
2  the annuity file did not contain contract information, I
3  initiated an investigation to try to piecemeal this 1983
4  claim.
5      Q    Okay. So sometime between when you discovered
6  the annuity claim file contained two pages and the seven
7  inch stack of documents you found in the claim file --
8      A    Right.
9      Q    -- you found a copy of this check?
10     A    Yeah, the checks were -- the checks were
11 uncovered sometime ago, yes.
12     Q    And where were these checks uncovered from?
13     A    The data on checks were in a computer so that's
14 why I looked to the computer source for those, so the
15 financial records were there. Being that this was such
16 an old matter, I didn't suspect that the paper contents
17 would be available; but the financial data was kept in
18 the computer.
19     Q    In addition to these checks, these two pages,
20 K-001 and K-002, was there any other financial data in
21 the system?
22     A    I wasn't searching for any other financial
23 data. I'm sure that that data exists, but my specific
24 search was -- my search was specific to this check.
        PRECISE REPORTING SERVICE, P.C.

Page 145

1      Q    Did you provide copies of disks to your
2  attorneys with other financial data that's in the system?
3      A    No.
4      Q    So that information hasn't been disclosed to
5  any of the parties in this case yet, has it?
6      A    The financial information that's in this
7  system? You now have the claim file, so you now have the
8  financial data as well.
9      Q    Well, we now have part of the claim file. Do
10 you understand that we don't have all of the claim file?
11     MR. O'DRISCOLL: As we went over, the part of
12 the claim file that's responsive to the document request
13 in this case you have.
14 BY MR. LeBLANC:
15     Q    Okay. Is the claim file and the financial data
16 on the system the same thing in your mind, Mr. Mensie?
17     A    The claim file and the financial data? The
18 financial data is a part of the claim file.
19     Q    So the claim file under Kemper's system
20 includes both hard copy or paper copy and electronic
21 documents?
22     A    Well, in '83 the claim file was hard copy
23 material, and financial data was both hard copy and
24 computerized. They were issuing checks off the computers
        PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life      9-8-06      William R. Mensie
C.A. No.: 05-11073 WGY

---

Page 146

1  so, therefore, you had a computer record of the check
2  that was issued, but you also had the actual copy of the
3  check which apparently -- which was stored on a
4  microfiche I believe, some type of disk. I'm not sure
5  how it's actually stored so let me back off of that
6  answer.
7    Q  Okay. Did you provide copies of the computer
8  records, the financial data stored on the computer, to
9  your attorney?
10    A  No. I provided copies of the copy check that
11  we have before us.
12    Q  So there are records stored at Kemper on the
13  computer that haven't been provided to your attorney yet?
14    MR. O'DRISCOLL: Well, as Mr. Mensie has
15  testified --
16    MR. LeBLANC: Let's have the witness answer.
17  Is this an objection?
18    MR. O'DRISCOLL: Yes. I mean it's been asked
19  and answered. He testified he provided the entire claim
20  file to me.
21    MR. LeBLANC: Then the witness can answer the
22  question.
23    MR. O'DRISCOLL: All right. It's been asked
24  and answered, but we can do it one more time.

PRECISE REPORTING SERVICE, P.C.

---

Page 147

1    THE WITNESS: All right. I provided my
2  attorney with the contents of the claim files which
3  contain the hard copy data as it existed when we were
4  able to locate it. I have not provided any
5  computer-generated data to counsel with respect to this
6  matter.
7  BY MR. LeBLANC:
8    Q  Okay. And that computer-generated data exists?
9    A  There is something that exists on the computer
10  relative to the financial transactions that took place on
11  this claim file, yes.
12    Q  We're going to suspend on the issue of the
13  computer data that haven't been disclosed yet to the
14  parties.
15    If you refer to K-001 and K-002.
16    A  Yes.
17    Q  Which appears to be a check from Kemper Group
18  front and back copy?
19    A  Okay. Yes.
20    Q  Is that the microfiche or microform copy of the
21  check to your knowledge?
22    A  Again as I said, I'm not sure exactly how the
23  data was actually stored, but this was in response to my
24  request for a copy of the check from the computer system,

PRECISE REPORTING SERVICE, P.C.

---

Page 148

1  this was what was furnished.
2    Q  And do you know if there's a more legible copy
3  of this?
4    A  We now have the claim file. I think there's --
5    MR. O'DRISCOLL: Yes, at this point -- well, I
6  would note for the record that K-0001 appears to be the
7  same document as the lower portion of K-0123. It clearly
8  is the same document.
9    THE WITNESS: It is.
10    MR. O'DRISCOLL: So all counsel have a very
11  clear copy of K-001 now in the form of K-0123.
12  BY MR. LeBLANC:
13    Q  Mr. Mensie, is it your testimony that K-001 is
14  the same copy or is the same document as represented in
15  K-0123?
16    MR. O'DRISCOLL: I will hand to the witness
17  K-0123 at this time so that he can make a comparison.
18    THE WITNESS: Yes, as signified by the fact
19  that you can see where it says claim check No.
20  250-0-008-585.
21  BY MR. LeBLANC:
22    Q  But based on that you're saying these are two
23  of exactly the same document?
24    A  Yes.

PRECISE REPORTING SERVICE, P.C.

---

Page 149

1    Q  Mr. Mensie?
2    A  Yes.
3    Q  Is that your testimony that it is the exact
4  same document?
5    A  It was my testimony that these appear to be the
6  exact same document, again as signified by the check
7  number because the other part is not legible. So I mean
8  I'm not -- you know, the check numbers are the same; and
9  from what you can read on them they appear to be the same
10  document. It was the document that I was searching for
11  and so, yes, the answer is yes.
12    Q  So your initial search yielded four pages of
13  documents; is that true?
14    A  To the best of my recollection my initial
15  search uncovered a memorandum -- my initial search
16  uncovered the material that was contained in the annuity
17  file which appears to have been the memorandum that we
18  discussed earlier. A subsequent search uncovered the
19  check.
20    Q  And then a subsequent search uncovered the
21  seven inches of documents which were partially disclosed
22  this week; is that true?
23    A  I can speak to the retrieval. I can't speak to
24  what was disclosed. So in answer to your question, yes,

PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                9-8-06                          William R. Mensie
                                    C.A. No.: 05-11073 WGY

Page 150

1  we located the claim file. The claim file was given to
2  counsel, and counsel reviewed it and disclosed -- at my
3  understanding disclosed the information in accordance
4  with the request.
5      Q  Do you agree with me that there were many, many
6  more documents in the claim file than what has been
7  disclosed by counsel thus far?
8      MR. O'DRISCOLL: Objection to form. Also
9  asked and answered and objected to at that time.
10 BY MR. LeBLANC:
11     Q  Mr. Mensie?
12     A  Many, many more, again, I don't know how to
13 qualify that. Only thing I can say for the record is
14 that the entire contents of the claim file were
15 transmitted to counsel in the most expeditious manner
16 that we could, overnight delivery. Counsel reviewed it
17 and my understanding is disclosed documents that he was
18 required to do.
19     Q  Okay. So you understand that counsel disclosed
20 128 pages -- actually 124 pages the day before yesterday
21 just before close of business, you understand that,
22 right?
23     A  I understand your -- that you have made that
24 indication, yes.
                    PRECISE REPORTING SERVICE, P.C.

Page 151

1      Q  Okay. And your reference was seven inches of
2  documents in the claim file?
3      A  Well, if it turns out that it's three inches,
4  then my measurement tool is off; but as best I can
5  reflect and measure it from a physical observation,
6  whatever it is, it is. You know, if it's five inches,
7  it's five inches. It's the entire claim file contents.
8      Q  But Mr. Mensie, you're the only one of all of
9  us other than Mr. O'Driscoll who knows what it is.
10     A  Okay. Well, it is what it is. You qualifying
11 it -- I represented to you that I -- my estimation was
12 seven, but my estimation may be not accurate. It may be
13 five.
14     Q  How many pages?
15     A  Oh, I didn't count the number of pages.
16     Q  Can you estimate how many pages?
17     A  No. It was more than 10, perhaps less than a
18 thousand, I don't know. I didn't count them.
19     Q  It was more than ten and less than a thousand?
20     A  That would be a guess.
21     Q  It obviously was more than 128, isn't that
22 true?
23     A  Yes, that's true. Counsel --
24     Q  So it's more than 128 but less than a thousand?
                    PRECISE REPORTING SERVICE, P.C.

Page 152

1      A  Okay.
2      MR. LeBLANC: I'm going to take a quick break.
3      MR. O'DRISCOLL: Okay. Five minutes.
4          (Whereupon a short recess was had,
5          after which the preceding deposition
6          continued as follows:)
7      MR. O'DRISCOLL: Peter, was there a question?
8      MR. LeBLANC: There will be shortly.
9  BY MR. LeBLANC:
10     Q  Mr. Mensie.
11     A  Okay.
12     Q  Will you please look at document K-0009.
13     MR. O'DRISCOLL: Okay. The witness has
14 K-0009.
15 BY MR. LeBLANC:
16     Q  Okay. Can you tell me the date on that
17 document?
18     A  7-18-83.
19     Q  Okay. And to whom is the document addressed?
20     A  It's addressed to Mr. LaTorre, J. LaTorre.
21     Q  From whom is it?
22     A  I'm sorry.
23     Q  Who wrote it?
24     A  Who wrote it? It doesn't specify an author.
                    PRECISE REPORTING SERVICE, P.C.

Page 153

1      Q  Does it under the return to line, do you see a
2  name there?
3      A  Yes, it says J. L. Noe.
4      Q  And it's regarding Dimon versus Jenny C?
5      A  It is.
6      Q  Can you read the remainder of the document to
7  yourself if you haven't already?
8      A  I have.
9      Q  Okay. And what is this document -- what does
10 this document direct Mr. LaTorre to do?
11     A  To copy the annuity and send the original to
12 Mr. Klaus Lemhoefer for long-term presentation under the
13 special procedures for structured settlements.
14     MR. O'DRISCOLL: Preservation.
15     THE WITNESS: Preservation, is it? Yes.
16 BY MR. LeBLANC:
17     Q  Do you see special procedures that were noted
18 in the memo to Mary Graci, document K-006?
19     MR. O'DRISCOLL: I hand the witness K-006.
20     If you know.
21     THE WITNESS: Yes, seems to be.
22 BY MR. LeBLANC:
23     Q  Okay. Do you have a copy of those procedures
24 or have you ever seen a copy of those procedures?
                    PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                9-8-06                    William R. Mensie
                                    C.A. No.: 05-11073 WGY

| Page 154 | Page 156 |
|---|---|

**Page 154**

1    A  Yes, they're the procedures that I described to
2 you. Well, let me check that. The procedures that I
3 understood to be in place, I don't have any memorandums
4 in '83, but the procedures as I understood them to be in
5 place are the ones that are in place today where the
6 original contracts are sent here to the home office where
7 they're logged and stored.
8    Q  Okay. And why would there be a special
9 procedure for structured settlements?
10    A  I don't know. Retention policies were probably
11 different, but I'm again speculating here. You know, you
12 wouldn't keep the claim file as long as you would have
13 kept an annuity, so they may have come up with some
14 special procedure for separating the two.
15    Q  Does it have to do with the length of time that
16 the contract goes on for, the fact that it's --
17    A  Again that would seem to make sense, but
18 speculating as to what they did, but that certainly makes
19 sense.
20    Q  Is there anyone at Kemper currently who would
21 know why the document retention policy requires special
22 procedures for structured settlement?
23    A  The people who implemented those procedures are
24 no longer Kemper employees. I suspect they would be the
            PRECISE REPORTING SERVICE, P.C.

**Page 155**

1 only ones that could speak to why they did so.
2    Q  You know for a fact that they're no longer
3 Kemper employees?
4    A  The individuals that I'm looking at, their
5 names, Mr. Lemhoefer is no longer an employee; and we
6 went through the list previously. They're no longer
7 employees, that is correct.
8    Q  If you refer back to K-006.
9    A  Yes.
10    Q  It says: I am attaching a copy of R. W.
11 Boncher's April 12, 1983 memo and Frank Bennett's outline
12 of these procedures?
13    A  Yes.
14    Q  Do you know who Mr. Boncher is?
15    A  He was a Kemper employee at the time.
16    Q  And he's no longer a Kemper employee?
17    A  That's correct.
18    Q  And Mr. Bennett?
19    A  He's no longer a Kemper employee.
20    Q  How do you know he's not a Kemper employee?
21    A  Kemper employees are housed here in Long Grove
22 now, and I don't know a Mr. Bennett within the claim
23 department.
24    Q  Okay. So when you're saying that these
            PRECISE REPORTING SERVICE, P.C.

**Page 156**

1 individuals are no longer Kemper employees, is that
2 because you know for a fact as the representative of
3 Kemper that they no longer work at Kemper, or is that
4 just based on who you see around the office?
5    A  From an administrative fact I know the
6 employees here. I don't really know how to answer that
7 question. To the best of my knowledge Mr. Bennett is not
8 an employee -- is no longer an employee of Kemper.
9    Q  Throughout the course of this deposition we
10 talked about people being in a New York City office or
11 people being regional representatives like Mr. Noe.
12    A  Right.
13    Q  Does Kemper have that anymore?
14    A  No.
15    Q  Mr. Mensie?
16    A  I said no.
17    Q  Okay. I didn't hear your response. I'm sorry.
18       So all of Kemper's employees as we speak,
19 every single person employed by Kemper, works in the same
20 building?
21    A  To the best of my knowledge, yes.
22    Q  Do you know if a copy of Mr. Boncher's April
23 12, 1983 memo and Mr. Bennett's outline of the procedure
24 still exists?
            PRECISE REPORTING SERVICE, P.C.

**Page 157**

1       MR. O'DRISCOLL: I'm sorry. What document are
2 you referring to? April -- what was the date?
3       MR. LeBLANC: Mr. Boncher's April 12, 1983 --
4       MR. O'DRISCOLL: Okay.
5 BY MR. LeBLANC:
6    Q  And Frank Bennett's outline of the procedure,
7 do they still exist?
8    A  A procedure memo exists. Whether or not that
9 memo actually has the author's name attached to it, I
10 don't have any independent recollection of it.
11    Q  When it says handling files involving annuity
12 settlements in that same paragraph. Special procedures
13 to be followed for handling files involving annuity
14 settlements.
15    A  Okay.
16    Q  I'm sorry. Do you see that section?
17    A  The paragraph you're referring to beginning
18 with the annuity report?
19    Q  Yes.
20    A  Yes.
21    Q  Is that an -- would you call that a document
22 retention policy?
23    A  The purpose of it was to retain the documents
24 separate from the claim file, so to that extent it was a
            PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                    9-8-06                    William R. Mensie
                                    C.A. No.: 05-11073 WGY

Page 158

1  retention procedure.
2      Q    And do you see the last line of that K-006
3  memoranda:  The annuity report should be completed at
4  this time and the additional documentation should be sent
5  upon receipt by your office?
6      A    Yes.
7      Q    Okay.  What's the annuity report?
8      A    In 1983 it's the document that you have that's
9  the first document that we referred to earlier as a check
10  list.
11     Q    And how do you know that first document is the
12  annuity report?
13     A    Because it says structured settlement check-off
14  sheet.
15     Q    But that doesn't say annuity report?
16     A    Well, that's what I'm interpreting it to be.
17     Q    You're just basing that on your guess.  You
18  don't know for a fact that this first page, K-005, is
19  what's referred to in K-006?
20     A    I'm reading this retrospectively, and that's --
21  to the best of my knowledge that's what this document
22  reflects.  It looks similar to the ones that exist today.
23     Q    Can you refer down to the end of the text on
24  K-006, there's initials BFB/LZ?
                    PRECISE REPORTING SERVICE, P.C.

Page 159

1      A    Okay.  Yes.
2      Q    Who is BFB?
3      A    I don't know.
4      Q    Whose initials would you expect to see there?
5      A    Could be the typist.  Back in '83, this may
6  have been dictated.  I'm not certain.
7      Q    Do you know who LZ is or what that stands for?
8      A    I do not.
9      Q    If you'd look at the next page, K-007.
10     A    Okay.
11     Q    And at the end of the text again we see the
12  initials JLN:JD.
13     A    Okay.
14     Q    And do you see that that document is from J. L.
15  Noe?
16     A    Yes.
17     Q    Is it or was it Kemper's procedure in 1983 when
18  they had documents typed to indicate who the author is in
19  capital letters with a slash or a colon and who the
20  typist was in lower case letters?
21     A    I don't have any independent recollection or
22  knowledge of that.  From the materials that I've reviewed
23  I don't -- there's nothing I can draw that inference
24  from.
                    PRECISE REPORTING SERVICE, P.C.

Page 160

1      Q    Do you type your own documents that you produce
2  for Kemper?
3          MR. O'DRISCOLL:  Objection to form.  I have no
4  idea what the relevance of that is, but, you know, you
5  can answer it.
6          THE WITNESS:  Yes, I type some I guess.  Since
7  1983 things have changed quite a bit.  Most communication
8  now is done by email so to that extent, yes, I type my
9  own documents.
10  BY MR. LeBLANC:
11     Q    Okay.  Do you have someone in your office that
12  helps you with typing documents or types documents for
13  you?
14     A    No.  I mean there are clerical support people
15  who will assist you should you need assistance in typing
16  documents or transmitting correspondence or whatever the
17  case may be; but in terms of a specific task, do I have
18  someone who does that for me?  No.
19         MR. O'DRISCOLL:  Is there a question, Peter?
20         MR. LeBLANC:  There will be.
21  BY MR. LeBLANC:
22     Q    Now, if you refer back to K-0009, and also I'd
23  like you to look at K-0008.
24     A    Yes.
                    PRECISE REPORTING SERVICE, P.C.

Page 161

1      Q    Does K-008 -- sorry.  Is K-0009 directed to Mr.
2  LaTorre, Mr. LaTorre?
3      A    Yes.
4      Q    And K-008 is from Mr. LaTorre to Mr. Lemhoefer?
5      A    Yes.
6      Q    K-008 says:  Herewith attached is annuity
7  contract and note from Mr. J. L. Noe.
8      A    Yes.
9      Q    Why would Mr. LaTorre send Mr. Lemhoefer the
10  annuity contract?
11     A    I would only be speculating, but in the sense
12  of following consistent with the procedures that they're
13  discussing Mr. Lemhoefer may have had charge of the
14  setting or establishing the annuity claim file.
15     Q    Is that a responsibility that would be
16  delegated to someone in Mr. Lemhoefer's position?
17     A    It may have fell within his responsibilities
18  just as it is within mine at this point.
19     Q    Mr. Mensie, I refer you to K-0025.
20         MR. O'DRISCOLL:  The witness has the document.
21  BY MR. LeBLANC:
22     Q    Tell me what this document is.
23         MR. O'DRISCOLL:  If you can.  Take a moment to
24  look at it.
                    PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life | 9-8-06 | William R. Mensie
C.A. No.: 05-11073 WGY

---

Page 162

1    THE WITNESS: Not independent of other
2  information, no.
3  BY MR. LeBLANC:
4    Q   And in reference to other information could you
5  tell us what it is?
6    A   Depending on what information that would be.
7    Q   Do you have any information that would lead you
8  to an understanding of what this document is?
9    A   I do not independent of matching it with
10  something for which I have not done, so in its context
11  alone I have no idea.
12    Q   Mr. Mensie, I refer you to document K-0028.
13    MR. O'DRISCOLL: Okay. The witness has the
14  document.
15    MR. LeBLANC: Thank you.
16  BY MR. LeBLANC:
17    Q   Do you know if there's a cleaner copy of this
18  document in Kemper's possession?
19    A   I do not.
20    Q   I notice that some of the letters are pretty
21  crisp, but this letter is a pretty poor quality. Do you
22  know if that reflects what quality the letter was in the
23  claim file, how the letter was copied to the claim file?
24    A   I'm not sure of the -- I'm not sure which is
PRECISE REPORTING SERVICE, P.C.

---

Page 163

1  the case. These documents were very old, and some were
2  even actually brittle in '83 so...
3    Q   I refer you to K-0030.
4    MR. O'DRISCOLL: Okay. Mr. Mensie has the
5  document.
6  BY MR. LeBLANC:
7    Q   Single document K-0030. Do you have the
8  document --
9    MR. O'DRISCOLL: Yes, he does. Yes.
10  BY MR. LeBLANC:
11    Q   And the document in the second paragraph: You
12  may not be aware that on April 18, 1983, Internal Revenue
13  Service served a levy on American Motorists at Quincy,
14  Massachusetts?
15    A   Yes.
16    Q   Did American Motorists have an office in
17  Quincy, Massachusetts?
18    A   This letter doesn't give an indicator one way
19  or the other. It could certainly have been if they did
20  business in Massachusetts, they may have had a person to
21  whom could be served with those documents. So in answer
22  to your question I don't recall a Quincy, Massachusetts
23  office.
24    Q   Okay. Does American Motorists still exist as
PRECISE REPORTING SERVICE, P.C.

---

Page 164

1  of today?
2    A   Financial -- yeah, my understanding -- yes, I
3  think it does. Yes.
4    Q   Is there still letterhead that says American
5  Motorists on it?
6    A   Yes.
7    Q   And are they still part of the Kemper Group?
8    A   Yes.
9    Q   Do you know of any employees of American
10  Motorists or anyone that worked for Kemper at American
11  Motorists is still employed by Kemper?
12    MR. O'DRISCOLL: If you know.
13    THE WITNESS: I don't really understand the
14  question. If you understand the context of the personnel
15  that work for Kemper work under the banner of Kemper,
16  work for all of the companies that fall within the
17  umbrella of the Kemper group of companies that are doing
18  business.
19  BY MR. LeBLANC:
20    Q   So using Mr. Noe as an example, you would sign
21  documents as home claim American Motorists Insurance
22  Company. Do you know whether or not someone in Mr. Noe's
23  position would also sign documents indicating that he was
24  an employee of Lumbermen's Mutual?
PRECISE REPORTING SERVICE, P.C.

---

Page 165

1    A   It wouldn't be inconsistent to do that.
2    Q   Now, would someone in Mr. Noe's position be
3  authorized to act on behalf of each of the insurance
4  companies listed under the Kemper Group?
5    A   Yes. To the extent of that person's position,
6  so if a claim came in and it involved one of those Kemper
7  companies, yes.
8    Q   Now, how many people are currently employed by
9  Kemper?
10    A   Less than 300.
11    Q   Total?
12    A   Total.
13    Q   1983 do you have any idea how many people were
14  employed by Kemper?
15    A   Probably in excess of 3,000. Well, let me
16  qualify that. The last numbers I have date back to 2000
17  so 1983, you know, we're still talking a number of years.
18  So, no, I do not know in 1983 what that number was.
19    Q   Okay. But you do know that there was more than
20  one office?
21    A   Yes.
22    Q   They had offices in, based on the documents,
23  Quincy, New York, Illinois, New Jersey; is that true?
24    A   That's true.
PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                    9-8-06                    William R. Mensie
C.A. No.: 05-11073 WGY

Page 166

1   Q.  Okay. If you'd turn to page K-0031 entitled
2  Release of Levy.
3   A.  Yes.
4   Q.  Do you know what this document does, what
5  affect this document has?
6   A.  It's an -- rephrase the question. Maybe I can
7  answer it better. I'm not really sure I understand the
8  question. It's a levy against -- issued by the Internal
9  Revenue Service for I think there was some other -- there
10  was a transcript, if memory serves me correct, of the
11  proceedings pertaining to this levy.
12   Q.  Proceedings pertaining to the levy, and you saw
13  a transcript of that?
14   A.  I thought I saw something. I did not -- I'd
15  have to refer back to the documents. No, it just
16  followed in order of the transcript. Okay. I did see
17  this document within the claim file, yes.
18   Q.  Did you see any other documents related to the
19  IRS in the claim file that you recall?
20   A.  Not that I recall.
21   Q.  K-032.
22     MR. O'DRISCOLL: I will give the witness 0032
23  through 0055.
24     MR. LeBLANC: Okay.
       PRECISE REPORTING SERVICE, P.C.

Page 167

1     THE WITNESS: Okay. This was the transcript I
2  read.
3  BY MR. LeBLANC:
4   Q.  Mr. Mensie, have you seen this document before?
5   A.  Yes.
6   Q.  And do you recall where you saw this document?
7   A.  Within the claim file.
8   Q.  Did you review the document when you first saw
9  it in the claim file?
10   A.  I did review it having -- that it had relevance
11  to this -- to the structured settlement, yes.
12   Q.  And when you reviewed the claim files, what
13  criteria did you use? What criteria were you looking for
14  in terms of relevant documents?
15   A.  Well, I was looking for any documents that
16  could shed any light on my understanding of what took
17  place back in 1983.
18   Q.  When you found a document, the first document
19  in the claim file you found that shed some light, did you
20  then decide to send it to your attorney?
21   A.  When I found that the contract was in the claim
22  file, it was all part of the same process, yes. I
23  told -- alerted my attorney that I had located documents
24  relative to the structured settlement, that they were
       PRECISE REPORTING SERVICE, P.C.

Page 168

1  contained in the claim file, and provided him with the
2  claim file.
3   Q.  Okay.
4     MR. O'DRISCOLL: Was that a question? We
5  didn't get that if it was.
6     MR. LeBLANC: It wasn't.
7  BY MR. LeBLANC:
8   Q.  How long did your review of the claim file
9  take?
10     MR. O'DRISCOLL: During what period of time are
11  you talking about?
12     MR. LeBLANC: The period of time from the time
13  he found the claim file on his desk to the time he
14  stopped reviewing it.
15     MR. O'DRISCOLL: Well, I believe Mr. Mensie
16  testified that there was a file placed on his desk. At
17  some point he realized this file might relate to the
18  case. He began to review it. Is that the point in time
19  that you're talking about, how long he reviewed the claim
20  file then?
21     MR. LeBLANC: How long from the time that he
22  found it on his desk until he was done reviewing it and
23  sent it to you basically, to his attorney.
24     THE WITNESS: I do not know.
       PRECISE REPORTING SERVICE, P.C.

Page 169

1  BY MR. LeBLANC:
2   Q.  Was it a day, two days, two weeks, how long?
3   A.  Again, I don't recall specifically what time I
4  allocated to reviewing the file. I took -- I received
5  the file, looked at it. It had documents relative to
6  this, alerted counsel and had the matter -- provided him
7  with the file.
8   Q.  Well, you testified prior that you found the
9  claim file about a month ago. Is that true?
10   A.  True.
11   Q.  Okay. And your attorney contacted us about a
12  week and a half, two weeks ago at this point on August
13  25th to tell us that the claim file was discovered. So
14  did you have the claim file for two weeks, for three
15  weeks before you contacted your attorney?
16   A.  I had it for the period of time between the
17  time I received it and the time I transmitted it.
18   Q.  How long was that?
19   A.  I don't know specifically, but whatever that
20  time frame was when it was transmitted last week, then
21  that's three weeks.
22   Q.  If you know, how long was anyone else at Kemper
23  aware of the claim file before you received it?
24   A.  I don't know.
       PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                    9-8-06                    William R. Mensie
                              C.A. No.: 05-11073 WGY

Page 170

1    Q   And you testified earlier that you tried to
2  backtrack to find out where the file came from, right?
3    A   Right.
4    Q   What efforts did you take to try to find where
5  the file came from?
6    A   Talked to the clerical supervisor.
7    Q   Skaya?
8    A   Yes.
9    Q   And after you spoke with Ms. Skaya, did you
10  have a better understanding of where the file came from?
11    A   Not yet. Didn't know that that was really
12  important. I was actually surprised that we were able to
13  locate it considering that it was as old as it was.
14    Q   Mr. Mensie, when did you first become aware
15  that you were going to be a deponent in this case?
16    A   Several months ago.
17    Q   When did you -- when you -- strike that. I'm
18  sorry.
19        So you learned several months ago you were
20  going to be deposed.
21    A   Yes.
22    Q   Did you understand that your deposition was
23  supposed to be taken on August 29th?
24    A   Yes.
                    PRECISE REPORTING SERVICE, P.C.

Page 171

1    Q   How long before August 29 did the claim file
2  surface?
3    A   Maybe a matter of a few weeks I suspect.
4    Q   Okay.
5    A   I really don't know.
6    Q   And did you immediately alert your counsel that
7  you found the claim file, or did you sit on it for a
8  while?
9        MR. O'DRISCOLL: Object to the form.
10        THE WITNESS: I wouldn't classify it as having
11  been sat on. I've never physically sat on a file; but in
12  conjunction with my normal course of business for that
13  day, that file was in fact on my desk. I didn't expect
14  to find any documents actually related to this matter in
15  the claim file; but when I did discover them, I did
16  communicate it.
17  BY MR. LeBLANC:
18    Q   How long between the time the claim file was
19  brought to your desk and the time you found that the
20  documents related to this case, how long was that period
21  of time?
22    A   It kind of all operates within that same time
23  frame. I don't know specifically when it arrived and
24  don't recall specifically when I actually initiated a
                    PRECISE REPORTING SERVICE, P.C.

Page 172

1  review of it.
2    Q   Well, in any event, it was several weeks before
3  you and/or your attorneys contacted the other parties
4  regarding the deposition being postponed because of this
5  disclosure; is that right?
6        MR. O'DRISCOLL: Object to form.
7        THE WITNESS: That would be my understanding.
8        MR. O'DRISCOLL: Several weeks from when?
9        MR. LeBLANC: The witness answered the
10  question.
11  BY MR. LeBLANC:
12    Q   Referring back to K-0032 and K-0055, was this a
13  document that you read in your review of the claim file?
14        MR. O'DRISCOLL: This is -- I'm sorry. Could
15  you say that again, the numbers, Peter.
16        MR. LeBLANC: It's the transcript, it's K --
17        MR. O'DRISCOLL: Oh, right.
18        MR. LeBLANC: -- 0032 through K-0055.
19        MR. O'DRISCOLL: Can you repeat the question.
20        MR. LeBLANC: Court Reporter, can you read that
21  back, please.
22        (Record read as follows: Referring
23            back to K-0032 and K-0055, was this a
24            document that you read in your review
                    PRECISE REPORTING SERVICE, P.C.

Page 173

1          of the claim file?)
2        THE WITNESS: Yes.
3  BY MR. LeBLANC:
4    Q   And in your reading of the document, did the
5  name Charter Security come up at all?
6    A   I do not recall if the documents contain the
7  name of Charter Security.
8        MR. O'DRISCOLL: Question, Peter?
9        MR. LeBLANC: Yes.
10  BY MR. LeBLANC:
11    Q   If you'd refer to K-0032, do you know who
12  Mr. Wells represented?
13        MR. O'DRISCOLL: He's referring to this page
14  here.
15        MR. LeBLANC: First page of the transcript.
16        MR. O'DRISCOLL: He's referring to the
17  appearances at the bottom.
18        THE WITNESS: It says for the defendant being
19  Jenny C.
20  BY MR. LeBLANC:
21    Q   How about W. Slater Allen?
22    A   Mr. Allen is on -- it doesn't state who he
23  is representing in the sheet that you're referring to.
24        MR. LeBLANC: Mr. O'Driscoll, would you
                    PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                9-8-06                          William R. Mensie
                                    C.A. No.: 05-11073 WGY

Page 174

1  stipulate Mr. Allen represented Kemper in the Jenny C
2  matter?
3         MR. O'DRISCOLL:  Well, no, I'm not prepared to
4  make a stipulation at this time.
5  BY MR. LeBLANC:
6     Q   I'm going to refer the witness to K-0059
7  through K-0060?
8         MR. O'DRISCOLL:  The witness has them.
9  BY MR. LeBLANC:
10    Q   Do you recognize those documents or that
11 document as a letter dated May 3rd, 1983?
12    A   Yes.
13    Q   Addressed to Mr. Jesus LaTorre?
14    A   Yes.
15    Q   In care of Kemper Group?
16    A   Yes.
17    Q   Did you see that the letter is on Booth and
18 Brodsky letterhead?
19    A   Yes.
20    Q   Do you see under that the reference W. Slater
21 Allen, Jr.?
22    A   Yes.
23    Q   If you go to the next page, the last line:  I
24 enclose my final bill in this matter including the cost
                  PRECISE REPORTING SERVICE, P.C.

Page 175

1  of the transcript.
2     A   Yes.
3     Q   Okay.  Do you draw any conclusion that
4  Mr. Allen represented Kemper in the Jenny C matter?
5     A   Not from what you have outlined.
6     Q   Do you think that an attorney for another party
7  would submit a bill to Kemper for litigation?
8     A   Well, sure, parties that are employed to
9  represent the defendant would submit bills to Kemper.
10    Q   Refer to K-0041.
11        MR. O'DRISCOLL:  K-0041.  I will give the
12 witness K-0032 through K-0055.
13        THE WITNESS:  Okay.
14 BY MR. LeBLANC:
15    Q   Do you see in the middle paragraph there where
16 it says Mr. Allen?
17    A   Yes.
18    Q   And Mr. Allen's company, the American
19 Motorists/Kemper had a limited liability of $400,000?
20    A   I do.
21    Q   Do you see -- does that cause you to believe
22 that Mr. Allen represented American Motorists/Kemper in
23 that action?
24    A   Well, I can only read what it says, and what it
                  PRECISE REPORTING SERVICE, P.C.

Page 176

1  says is that Mr. Allen's company, the American
2  Motorists/Kemper had a limited liability of $400,000.
3  Was that Mr. Allen's company?  Was American Motorists
4  Mr. Allen's company?  I don't quite understand what he's
5  saying there.
6     Q   Are you adamant that you're not going to
7  stipulate that Mr. Allen was Kemper's attorney in the
8  Jenny C matter?
9         MR. O'DRISCOLL:  Is that question directed to
10 me.
11        MR. LeBLANC:  I was asking if you are still
12 unwilling to stipulate that Mr. Allen represented --
13        MR. O'DRISCOLL:  No, I'm not prepared to
14 stipulate on the record now during Mr. Mensie's
15 deposition really to anything probably except for the
16 usual stipulations.
17        MR. LeBLANC:  That's fair enough.  Why don't we
18 go off record for five minutes while I review the
19 documents.
20        MR. O'DRISCOLL:  Another five-minute break?
21        MR. LeBLANC:  At least.
22        MR. O'DRISCOLL:  Well, let's make it a
23 five-minute break then.
24        (Whereupon a short recess was had,
                  PRECISE REPORTING SERVICE, P.C.

Page 177

1         after which the preceding deposition
2         continued as follows:)
3  BY MR. LeBLANC:
4     Q   Mr. Mensie, who was Kemper Insurance Company's
5  representative in the Jenny C matter?
6         MR. O'DRISCOLL:  Object to the form.
7         THE WITNESS:  Kemper Insurance representative,
8  we've talked about that earlier, was according to the
9  file Jesus -- I've forgotten his last name, forgive me,
10 but the claim rep was Jesus.
11 BY MR. LeBLANC:
12    Q   Who was the attorney?
13        MR. O'DRISCOLL:  Who was what attorney?
14        MR. LeBLANC:  The attorney for Kemper in the
15 Jenny C matter.
16        THE WITNESS:  In the underlying litigation?
17 BY MR. LeBLANC:
18    Q   In the Jenny C matter.
19        MR. O'DRISCOLL:  Are you distinguishing that
20 from the underlying litigation?
21        MR. LeBLANC:  I'm asking him the Jenny C
22 matter.  I mean we've been talking about it for hours
23 now.  If the witness doesn't understand what the Jenny C
24 matter is, we have a serious problem.
                  PRECISE REPORTING SERVICE, P.C.

Page 178

1       THE WITNESS: Let me interject something
2   because my understanding is that the Jenny C matter that
3   you have been referring to is the underlying litigation.
4   I wanted to make sure that that's clear, but by nature of
5   your question asking who Kemper's representative was in
6   the Jenny C matter, I'm not so certain.
7           To the best of my knowledge Kemper was not
8   a party to the Jenny C matter for which they have not
9   needed to have an attorney. So Kemper did not have an
10  attorney in, as you call it, the Jenny C matter.
11  BY MR. LeBLANC:
12      Q   Is that Kemper's official position, they had no
13  representation, no attorney, in the Jenny C matter?
14      A   **Unless Kemper was a party in the Jenny C**
15  **matter, Kemper would not have had an attorney in the**
16  **Jenny C matter. The attorneys — it's my — from what**
17  **I've read here.**
18      Q   Refer to document K-0114.
19          MR. O'DRISCOLL: Yes, K-0114. Mr. Mensie has
20  the document.
21  BY MR. LeBLANC:
22      Q   Can you read the first line of that document
23  for me, please.
24      A   **It says: On behalf of Jenny C, I want to write**
                **PRECISE REPORTING SERVICE, P.C.**

Page 179

1   **you formally as an attorney for American Motorists, the**
2   **Kemper Group, to register my distress of the current**
3   **status of the case and the failure of your company to**
4   **make reasonable efforts to settle the matter within the**
5   **policy limits.**
6       Q   And who is that letter addressed to?
7       A   **It's addressed to W. Slater Allen, Jr.**
8       Q   Okay. W. Slater Allen, Jr., the attorney for
9   the Kemper Company, Kemper Group?
10      A   **That's Mr. Spunt's interpretation.**
11      Q   And who is Mr. Spunt?
12      A   **He says that he is — he's writing on behalf of**
13  **Jenny C.**
14      Q   And wouldn't Mr. Spunt know better than you
15  since he was involved in the case in 1983?
16          MR. O'DRISCOLL: Object to the form.
17          THE WITNESS: I suspect that him being closer
18  to the situation he would, but you are not asking Mr.
19  Spunt the case. You are asking me.
20  BY MR. LeBLANC:
21      Q   I'm asking you: Wouldn't he have a better
22  understanding than you do now 23 years later?
23      A   **I'm glad you stipulated that it has been that**
24  **long ago, and I am looking at this matter**
                **PRECISE REPORTING SERVICE, P.C.**

Page 180

1   retrospectively. I would suspect that he would have.
2       Q   Thank you.
3       A   **That doesn't mean his understanding was correct**
4   **either.**
5       Q   Doesn't mean that yours is.
6       A   **That's correct.**
7       Q   Now, let's go back to K-0032.
8           MR. O'DRISCOLL: Mr. Mensie has now K-0032
9   through 55.
10  BY MR. LeBLANC:
11      Q   Under the appearance section you see there are
12  four individuals listed by name?
13      A   **Correct.**
14      Q   Your review of the claim file, both the portion
15  that was disclosed and the portion that was withheld, is
16  there any indication in any of those documents that any
17  of these people represented Charter Security Life
18  Insurance Company?
19      A   **The people that are listed on this document**
20  **that were — that appeared, there's no — I don't have**
21  **any recollection of any of these people making**
22  **representations that they represented Charter.**
23      Q   Thank you.
24          MR. O'DRISCOLL: Peter, is there a question?
                **PRECISE REPORTING SERVICE, P.C.**

Page 181

1           MR. LeBLANC: Do you have a question, Tim?
2           MR. O'DRISCOLL: Yes, my question is: Do you
3   have a question?
4           MR. LeBLANC: My answer is yes, I do have a
5   question.
6   BY MR. LeBLANC:
7       Q   Mr. Mensie, can you tell me what the procedure
8   would be for Kemper to finalize the purchase of the
9   annuity in the Jenny C versus — or Dimon versus Jenny C
10  case?
11      A   **From a claim standpoint the final — finalizing**
12  **the purchase of the annuity is generally when you issue**
13  **the check.**
14      Q   Okay. And to whom would the check be issued?
15          MR. O'DRISCOLL: To whom was it issued in this
16  case?
17          MR. LeBLANC: No. In terms of the policy in
18  the procedures Kemper uses, does Kemper issue the check
19  to the company that issues the annuity or to opposing
20  counsel directly?
21          THE WITNESS: It would depend. If you're — if
22  Kemper were brokering the deal through one of its
23  brokers, they would issue the check in that manner. If
24  the plaintiff's attorney, as happened here, was involved
                **PRECISE REPORTING SERVICE, P.C.**

Dimon vs. Metropolitan Life        9-8-06        William R. Mensie
C.A. No.: 05-11073 WGY

Page 182

1  in brokering the deal, the check was issued to the
2  plaintiff's attorney.
3  BY MR. LeBLANC:
4      Q   And made payable to who?
5      A   It's made payable to the life company.
6      Q   I'd like you to look at K-0123.
7      A   Yes.
8      Q   And can you tell me who that check is made
9  payable to?
10      A   Charter Security Life Insurance Company.
11      Q   And the reference in the portion directly below
12  the amount where it says:  By hand-J. Noe?
13      A   Yes.
14      Q   What does that mean?
15      A   The check was generated by computer and would
16  have gone out by computer but for a code that I suspect,
17  as it is today, you enter -- which moves the check to a
18  different batching whereby the person -- it can be
19  delivered by hand.  It's just not automatically mailed.
20      Q   Okay.  So what would have happened to this
21  check once it was processed by the computer?
22      A   It was for delivery to J. Noe.
23      Q   And do you know what Mr. Noe did with the
24  check?
PRECISE REPORTING SERVICE, P.C.

Page 183

1      A   There's other documents in the file that Mr.
2  Noe delivered the check to Mr. Allen I think, if the
3  record's correct, for delivery to the plaintiff's
4  attorney.
5      Q   If you'd look under the section towards the top
6  of the check that says final payment, yes/no.
7      A   Yes.
8      Q   What does that refer to?
9      A   That there may have been other payments that
10  would have been required on the file.
11      Q   And what types of other payments would be made
12  on a file like this?
13      A   You've got -- there was another component of
14  this settlement agreement that was up front cash, so
15  depending on the sequence I suspect or the contemplation.
16  You know, there's expense payments to be made.
17      Q   Is that your answer, sir?
18      A   Yes.
19      Q   Okay.  I didn't know if you were just pausing.
20  If you'd look at K-0124?
21       MR. O'DRISCOLL:  Mr. Mensie has the document.
22  BY MR. LeBLANC:
23      Q   Okay.  And are checks issued by Kemper in
24  number sequence order?
PRECISE REPORTING SERVICE, P.C.

Page 184

1      A   Boy, I do not know.
2      Q   K-0124, claim check number, you don't know
3  whether it's just a randomly generated number or --
4      A   It appears to be in sequence; but it could, you
5  know, in '83, I don't know how they actually issued them.
6  I'm not even sure today.  There could be a security issue
7  there, but this appears to have been in sequence.
8      Q   And in this case the check directly to Dennis
9  Dimon and his attorneys issued first, and then a check to
10  Charter Security Life Insurance Company issued second?
11      A   That appears to be how they were -- how they
12  came out, yes.
13      Q   Okay.  And on the check to Mr. Dimon and Latti
14  Associates under the final payment box, both yes and no
15  are checked.  What does that indicate to you?
16      A   I'm not sure what it means if both boxes are
17  checked.
18      Q   Do you know if those boxes would have been
19  checked as a result of the computer program?
20      A   I have no idea.
21      Q   Do you know if someone would have gone in there
22  and typed that information if the rest of the check was
23  generated by computer?
24      A   I wouldn't think so.  This is computer
PRECISE REPORTING SERVICE, P.C.

Page 185

1  generated so it would have been the person who -- and
2  it's done by code now, so I suspect it was done by code
3  there as well.
4       MS. McQUAY:  If I may interject at this point,
5  Peter, I have some questions to ask of this witness.  I
6  suspect that the other people on the line do as well, and
7  I'm becoming concerned.  I see it's now 4:15 so 5:00
8  o'clock is drawing very near.  How close are you to
9  finishing?
10       MR. LeBLANC:  That's a good question.  It
11  appears that Mr. O'Driscoll is expecting me to go through
12  the entire 128 pages that were disclosed yesterday before
13  the end of today, so I'll do my best to make that happen;
14  and then we'll have to come back another day to finish
15  the deposition.
16       MR. O'DRISCOLL:  Well, I'll say a few things.
17  First of all, the documents were given to you two days
18  ago.  Second of all, as far as coming back for another
19  day, you know, I'll have to check with Mr. Mensie on
20  that.
21       THE WITNESS:  Can we go off the record for a
22  second?
23       MR. O'DRISCOLL:  Off.
24       MR. LeBLANC:  Actually I don't know why we need
PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                    9-8-06                    William R. Mensie
C.A. No.: 05-11073 WGY

Page 186

1 to go off the record.
2        THE WITNESS: I need to speak to my attorney.
3        MR. LeBLANC: I just point out that the notice
4 says the oral examination will continue from day to day
5 until completed.
6        MR. O'DRISCOLL: We're going to talk. We're
7 going off the record.
8              (Discussion held off the record.)
9        MR. O'DRISCOLL: I've spoken with Mr. Mensie,
10 and his timing issues and other conflicts he has in his
11 schedule are consistent with what the concerns that Sue
12 has expressed. So we can go for a little bit more today;
13 but you know, to the extent that there are other
14 questions, we're just going to have to reschedule a time
15 to continue it.
16        MS. McQUAY: just so that we can get a time
17 frame on that, and I know that it may be subject to some
18 change, but how soon do you anticipate we might be able
19 to do that, Tim?
20        MR. O'DRISCOLL: That I don't know. That we
21 didn't discuss.
22        MS. McQUAY: Just so we're clear that we will
23 be resuming. I just was becoming concerned that we might
24 take a position we were limited to one day, and I didn't
PRECISE REPORTING SERVICE, P.C.

Page 187

1 want to be left out in the cold here.
2        MR. O'DRISCOLL: No.
3        MS. McQUAY: I understand that's not your
4 position.
5        MR. O'DRISCOLL: No, that's not my position.
6 You know, we can be somewhat flexible on that, and I
7 understand there are multiple parties. So let me suggest
8 that we go for a bit more today, and let's see what we
9 can finish up here.
10        MS. McQUAY: Okay.
11        MR. LeBLANC: Is there any chance that everyone
12 has their calendar so we can pick another day before we
13 get off record today or before we conclude today?
14        MR. DeWICK: This is Jed. That's what I would
15 prefer to do if everyone has the ability to do that.
16        MS. McQUAY: Yes. I'd like to do that. I'd
17 also actually like to suggest at least if we're going to
18 be resuming another day if maybe we could wrap this day
19 up around 4:30 because we've all been sitting here on the
20 phone all day long with other things piling up to do.
21        MR. O'DRISCOLL: 15 minutes from now?
22        MS. McQUAY: Yes.
23        MR. O'DRISCOLL: Yes, that's fine.
24        MR. LeBLANC: I would just need one minute to
PRECISE REPORTING SERVICE, P.C.

Page 188

1 have someone bring me my calendar. So I'm going to do
2 that now, and I'll be back in less than a minute.
3        MR. O'DRISCOLL: I'm out here in Illinois. If
4 it's okay with your schedule, folks, I would suggest that
5 we resume this at 9:00 a.m. tomorrow.
6        MR. DeWICK: This is Jed. That works for me.
7        MS. McQUAY: Well, it doesn't work for me if
8 9:00 o'clock means Boston time.
9        MR. O'DRISCOLL: Forgive me. 10:00 a.m. Boston
10 time.
11        MS. McQUAY: 10:00 would be all right.
12        MR. KEANE: I'm in depositions tomorrow.
13        MR. LeBLANC: And tomorrow doesn't work for me
14 either.
15        MR. O'DRISCOLL: Any chance that you gentlemen
16 could have someone else at your firms take over those
17 depositions tomorrow or postpone those depositions?
18        MR. KEANE: This is Brian Keane. I can
19 certainly see what I can do. Unfortunately these have
20 been moved several times, but I can certainly see what I
21 can do.
22        MR. O'DRISCOLL: Is that --
23        MR. KEANE: On my end I had other things I was
24 going to take care of tomorrow.
PRECISE REPORTING SERVICE, P.C.

Page 189

1        MR. O'DRISCOLL: I think we all did.
2        MR. KEANE: If everyone else can meet tomorrow,
3 I wouldn't be opposed to meeting then, like a 10:00
4 start.
5        MR. O'DRISCOLL: Okay. Well, Brian, can I
6 suggest this then in light of that, and this is just a
7 suggestion, but I would suggest that if you could make
8 those calls that you suggested and then we could --
9 because we want to wrap all this up one way or the other
10 before we leave today. So if you can in fact make a call
11 or two and see if we can't do that, that would make a lot
12 of sense.
13        MR. KEANE: I will do that.
14        MR. O'DRISCOLL: Okay.
15        MR. KEANE: Do you want me to do that right
16 now? I think the earlier the better on that.
17        MR. O'DRISCOLL: I think so.
18        MR. KEANE: Do you want to stay on the line?
19        MR. O'DRISCOLL: We'll stay on the line and
20 just take another two-minute break or whatever it takes
21 you.
22        MR. KEANE: Let me make a call. Hold on.
23        MR. DeWICK: And for what it's worth, I know
24 you guys accommodated me earlier, and I appreciate that.
PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                    9-8-06                    William R. Mensie
                                    C.A. No.: 05-11073 WGY

---

Page 190

1  If we are going to start at 10:00 a.m. tomorrow, let me
2  just request that we end now because I have a 4:00 that
3  I'm currently late for obviously.
4       MR. O'DRISCOLL:  That would definitely be the
5  case. We're going to be ending in a few minutes no
6  matter what.
7       MR. KEANE:  Let me make a call.
8            (Discussion held off the record.)
9       MR. KEANE:  I set it up with a colleague to
10 take those tomorrow so I am free.
11      MR. O'DRISCOLL:  Good.  Thank you for your
12 courtesies.  If it's all the same to you, then we
13 probably should break now.  I'm sorry.  I haven't even
14 asked you, Joanne.
15           (Discussion held off the record.)
16      MR. O'DRISCOLL:  Did you guys hear us just
17 talking about the arrangements tomorrow?
18      MS. McQUAY:  No.
19      MR. O'DRISCOLL:  Okay.  we're all set.
20 Joanne's going to be here.  So we'll reconvene tomorrow
21 morning at 10:00 a.m.  Same arrangements.
22      MS. McQUAY:  Same phone number?
23      MR. O'DRISCOLL:  10:00 a.m. East Coast time,
24 and Peter will finish up, and we'll go with Sue and get
                    PRECISE REPORTING SERVICE, P.C.

---

Page 191

1  this done.
2
3            (Whereupon the preceding deposition
4            was adjourned until 9:00 o'clock
5            a.m., Friday, September 8, 2006.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
                    PRECISE REPORTING SERVICE, P.C.

---

Page 192

1            IN THE UNITED STATES DISTRICT COURT
2          FOR THE NORTHERN DISTRICT OF ILLINOIS
                    EASTERN DIVISION
3
4  DENNIS DIMON,                )
5       Plaintiffs,             )
                                )
6  vs.                          ) C.A. No: 05-11073 WGY
7                               )
   METROPOLITAN LIFE INSURANCE, )
8  KEMPER INSURANCE COMPANY,    )
   MORGAN STANLEY DW, INC.,     )
9  MICHAEL B. LATTI, LATTI      )
   ASSOCIATES, and LATTI &      )
10 ANDERSON LLP,                )
                                )
11      Defendants.             )
12
13         The continued telephonic deposition of
14 WILLIAM R. MENSIE, called by the Defendant Metropolitan
15 Life Insurance for examination, pursuant to Notice, and
16 pursuant to the Rules of Civil Procedure for the United
17 States District Courts pertaining to the taking of
18 depositions, taken before Joanne M. Brogan, a Certified
19 Shorthand Reporter and a Notary Public in and for the
20 County of Cook and State of Illinois, at One Kemper
21 Drive, Long Grove, Illinois, on Friday, the 8th day of
22 September, 2006, at the hour of 9:00 o'clock a.m.
23
24

---

Page 193

1  APPEARANCES:
2
3     THE KAPLAN/BOND GROUP
      By MR. BRIAN KEANE  (present telephonically)
4     88 Black Falcon Avenue, Suite 301
      Boston, Massachusetts  02210
5     (617)261-0080
      appeared on behalf of the Plaintiff;
6
7     CIAPCIAK & ASSOCIATES, P.C.
      By MR. PETER M. LeBLANC  (present telephonically)
8     99 Access Road
      Norwood, Massachusetts  02062
9     (781)255-7401
      appeared on behalf of Defendant
10    Metropolitan Life Insurance Company;
11
      SULLIVAN WEINSTEIN & McQUAY, P.C.
12    By MS. SANDRA SUE McQUAY  (present telephonically)
      Two Park Plaza
13    Boston, Massachusetts  02116-3902
      (617)348-4355
14    appeared on behalf of Defendant
      Morgan Stanley DW, Inc.;
15
16    TODD & WELD, LLP
      By MR. JOHN E. DeWICK  (present telephonically)
17    28 State Street
      Boston, Massachusetts  02109
18    (617)624-4803
      appeared on behalf of Defendants
19    Michael B. Latti, Latti Associates and
      Latti & Anderson LLP;
20
21    DRINKER BIDDLE & REATH, LLP
      By MR. TIMOTHY J. O'DRISCOLL
22    One Logan Square, 18th and Cherry Streets
      Philadelphia, Pennsylvania  19103-6969
23    (215)988-2865
      appeared on behalf of Defendant
24    Kemper Insurance Company.
                    PRECISE REPORTING SERVICE, P.C.

---

Page 194

1              WILLIAM R. MENSIE,
2    recalled as a witness on behalf of the Defendant
3    Metropolitan Life Insurance, having been previously duly
4    sworn, was examined and testified further as follows:
5              DIRECT EXAMINATION
               (Continued)
6    BY MR. LeBLANC:
7        Q   Good morning, Mr. Mensie.  We're back on record
8    in your deposition, and you're still under oath.  Do you
9    understand that?
10       A   Yes.
11       Q   Okay.  Since you testified -- last testified
12   yesterday did you review any additional documents since
13   then?
14       A   No.
15       Q   Did you talk to anyone at Kemper other than
16   your attorney about the case since then?
17       A   No.
18       Q   Okay.  Is there any reason why any of your
19   answers from yesterday would have to be changed today?
20       MR. O'DRISCOLL:  Mr. Mensie obviously doesn't
21   have the transcript in front of him, so I'll object to
22   the form of that question.  I don't know frankly if
23   that's a fair question to ask him after six hours of
24   testimony yesterday to ask him to go over.  He's going to
              PRECISE REPORTING SERVICE, P.C.

Page 195

1    review the transcript obviously when we get it back, and
2    he'll be able to review and sign at that time.
3        MR. LeBLANC:  Understood.  I'm just asking if
4    anything -- if he knows of anything that he wants to
5    change with his testimony yesterday.  I'm not asking him
6    to reaffirm everything he said.
7        MR. O'DRISCOLL:  Okay.  And I'm just saying I
8    want to make it clear he wouldn't be waiving his right to
9    change something later if he didn't mention it right now
10   in response to your question.
11       MR. LeBLANC:  Okay.  Fair enough.
12   BY MR. LeBLANC:
13       Q   Mr. Mensie?
14       A   Yes.
15       Q   Do you recall anything that you testified
16   yesterday that you want to change today?
17       A   Not at this time.
18       Q   Okay.  Can you tell me what part Kemper played
19   in negotiating the annuity with Charter Security?
20       A   From my review of the record, none.
21       Q   None, okay.  So prior to the annuity being
22   issued, no one at Kemper had any contact with anyone at
23   Charter Security regarding this annuity?
24       A   Not from any of the documents that I have read.
              PRECISE REPORTING SERVICE, P.C.

Page 196

1        Q   Now, I'd ask you to look at a letter dated
2    August 12, 1983, in the packet of documents I sent to
3    Mr. O'Driscoll on August 24, 2006, a letter from Robert
4    Foley to John Noe?
5        MR. O'DRISCOLL:  Yes, I'll get that now for
6    Mr. Mensie.
7            I have the letter August 12.  Mr. Mensie
8    has it in front of him now.  If we could just give him an
9    opportunity to review it.
10       MR. LeBLANC:  Absolutely.
11       THE WITNESS:  Okay.
12       MR. LeBLANC:  Can you mark that as -- are we on
13   7 or 8?
14       THE REPORTER:  We're on 7.
15       MR. LeBLANC:  Exhibit 7, please.
16           (Exhibit No. 7 was marked for
17            identification.)
18   BY MR. LeBLANC:
19       Q   Mr. Mensie, did you have a chance to review
20   this letter?
21       A   Yes.
22       Q   And in this letter does it appear that Mr. Noe
23   is relaying to Mr. Foley what he understands about the
24   annuity?
              PRECISE REPORTING SERVICE, P.C.

Page 197

1        A   Yes.
2        Q   And do you understand that August 12, 1983 is a
3    date after which the annuity was issued?
4        A   Yes.
5        Q   Does it appear from this letter that Mr. Noe or
6    Mr. Noe and Mr. Foley had any other communications prior
7    to the date of this letter?
8        A   The letter states that Mr. Noe received the
9    replacement policy issued by Charter Security, so that
10   would suggest that sometime prior to August 12th a
11   replacement policy was received by Mr. Noe.
12       Q   Does it indicate that Mr. Noe and Mr. Foley had
13   any communications?
14       A   I don't see that it does.
15       Q   Okay.  And do you see where it says:  "I am
16   advised by Mr. Hughes of Latti Associates"?
17       A   Yes.
18       Q   "That your quotation was," and it continues?
19       A   Okay.  Yes.
20       Q   Does that indicate to you that Mr. Noe had any
21   communication with Mr. Foley directly regarding what the
22   quotation was?
23       A   I don't draw that conclusion.
24       Q   Okay.  Turn to what we marked as Exhibit 1.
              PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                     9-8-06                     William R. Mensie
C.A. No.: 05-11073 WGY

Page 198

1       MR. O'DRISCOLL: Exhibit 1?
2       MR. LeBLANC: Yes, please.
3       MR. O'DRISCOLL: Mr. Mensie has that in front
4   of him.
5       THE WITNESS: Okay.
6   BY MR. LeBLANC:
7    Q  Do you see in that letter where it says: "Your
8   agent, Mr. Foley, further confirmed this to me by
9   telephone in April 1983"?
10   A  Yes.
11   Q  Would you agree with me that August 12, 1983 is
12   prior to October 10th, 1983?
13   A  Yes.
14   Q  And does it strike you as inconsistent that in
15   August Mr. Noe writes to Mr. Foley that he was advised by
16   Mr. Hughes what the quotation was, then writes a letter
17   to Charter Security that he confirmed this with Mr. Foley
18   in April.  Is that inconsistent at all in your opinion?
19   A  No.
20   Q  Okay.  Why not?
21   A  Well, in the August 12th letter he's just
22   simply stating a fact.  He doesn't suggest anything other
23   than what the letter says.
24   Q  Do you think it's strange that he didn't
         PRECISE REPORTING SERVICE, P.C.

Page 199

1   mention to Mr. Foley that Mr. Foley actually confirmed
2   what the terms of the settlement -- or the terms of the
3   annuity were to be in his letter of August 12th directly
4   to Mr. Foley?
5    A  No, I don't know what was in his mind at the
6   time; but, no, it doesn't necessarily strike me strange
7   that he would be communicating to Mr. Foley the facts
8   that he does on August 12th.
9    Q  But in any event, you would agree that no
10   representative of Kemper negotiated directly with Charter
11   Security during the application and issuance process of
12   the annuity?
13   A  I didn't see -- I don't recall having seen
14   anything that suggested that.
15       MR. LeBLANC: As a housekeeping matter, I'd
16   like to have marked as Exhibit K-0114 through K-0115.  Is
17   that marked as Exhibit 8?
18       MR. O'DRISCOLL: That will be Exhibit 8.
19   Mr. Mensie now has that letter.
20       (Exhibit No. 8 was marked for
21        identification.)
22   BY MR. LeBLANC:
23   Q  If you could turn to K-0116, the letter to W.
24   Slater Allen.
         PRECISE REPORTING SERVICE, P.C.

Page 200

1       MR. O'DRISCOLL: I'm sorry.  Did you say K-0114
2   to K-0115?
3       MR. LeBLANC: Yes, that's Exhibit 8.  Now
4   moving on to a separate letter.
5       MR. O'DRISCOLL: Oh, all right.  And you want
6   Mr. Mensie to look at K-0116?
7       MR. LeBLANC: Please.
8       MR. O'DRISCOLL: Mr. Mensie has that.  He'll
9   just review it.
10       THE WITNESS: Okay.
11   BY MR. LeBLANC:
12   Q  Do you see where -- the last line of the
13   letter: "...which you are acting as counsel for Kemper
14   Insurance Company"?
15   A  Yes.
16   Q  And do you see it's directed to Mr. Allen?
17   A  Yes.
18   Q  Okay.  Would you read that to mean that
19   Mr. Allen was acting as Kemper's attorney?
20   A  I don't.
21   Q  I'm sorry?
22   A  I said I do not.
23   Q  You do not.  Why not?
24   A  Well, from a claim perspective Kemper was not a
         PRECISE REPORTING SERVICE, P.C.

Page 201

1   party to the litigation, so Mr. Allen could not have been
2   appointed to represent Kemper's interest from a claim
3   perspective.  I mean it was the insured's -- Kemper had
4   an obligation to its insured.  Bringing in Mr. Allen
5   should have been for the purpose of protecting its
6   obligation to its insured.  So when I read the letter,
7   even though Mr. Fisher interprets Mr. Allen as acting as
8   counsel for Kemper, it's not clear to me that that was in
9   fact the case.
10   Q  Would it never be the case that Kemper would
11   have counsel when it held an excess liability policy even
12   if it wasn't directly named as a party?
13   A  That's just a general question.  You know, I
14   don't know of an -- you know, I'd have to look at a
15   specific set of circumstances.
16   Q  Okay.  Is it your testimony here yesterday and
17   today that Mr. Slater -- or Mr. Allen could not have been
18   Kemper's counsel?
19   A  I think Mr. -- well, you know, when you speak
20   of counsel, you know, certainly Mr. Allen provided
21   counsel to; but acting as its counsel of record as this
22   letter would suggest are in my mind two different things.
23   Q  The term "counsel of record" never came up in
24   this letter, does it?
         PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                9-8-06                William R. Mensie
C.A. No.: 05-11073 WGY

Page 202

1  A  No, but it certainly -- I get the inference
2  that when he identifies him as counsel, I get the
3  inference and the inference from your question that
4  you're saying that Mr. Allen in fact represented Kemper,
5  and I think that was your question.
6  Q  And your testimony is that Mr. Allen at no time
7  ever represented Kemper Insurance Company in this case,
8  in the Jenny C versus -- Dimon versus Jenny C case?
9  A  I'm saying I have not seen anything that has
10  made that clear to me.  As I read the documents that you
11  point out, that's not the conclusion I draw from those
12  documents.
13  Q  But that was the conclusion that Mr. Fisher
14  drew, would you agree with that?
15  A  Mr. -- that is the conclusion Mr. Fisher drew.
16  Q  And that's also the conclusion that Mr. Spunt
17  drew on Exhibit 8?
18  A  That is again correct.
19  Q  So it seems that the people or some of the
20  individuals who were dealing with or involved in the
21  Jenny C case at the time treated Mr. Allen like he was
22  counsel for Kemper?
23  A  That is correct, and that is not necessarily
24  unusual.
        PRECISE REPORTING SERVICE, P.C.

Page 203

1  Q  Okay.  So is it Kemper's position that
2  Mr. Allen was not their attorney at the time in 1983?
3  A  As best I can answer that is the information I
4  reviewed indicated that Kemper appointed Mr. Allen to be
5  involved in this case.
6  Q  Okay.  So you agree that Mr. Allen was retained
7  by Kemper?
8  A  The information I've seen suggests that, yes.
9  Q  Okay.
10  A  But again Kemper's obligation was to its
11  insured.
12  Q  Mr. Allen was not retained as an attorney for
13  Kemper?
14  MR. O'DRISCOLL: I'm sorry.  Could you repeat
15  that question, Peter.  We couldn't make it out.
16  BY MR. LeBLANC:
17  Q  Is it Kemper's position that Mr. Allen was not
18  retained as an attorney for Kemper?
19  MR. O'DRISCOLL: Objection, asked and answered.
20  BY MR. LeBLANC:
21  Q  Mr. Mensie?
22  MR. O'DRISCOLL: Mr. Mensie already answered
23  that question in several different ways.
24  MR. LeBLANC: Well, I want to hear.
        PRECISE REPORTING SERVICE, P.C.

Page 204

1  BY MR. LeBLANC:
2  Q  Is it Kemper's position that he is not retained
3  as an attorney for Kemper in the Jenny C matter, yes or
4  no?
5  MR. O'DRISCOLL: Objection, asked and answered.
6  BY MR. LeBLANC:
7  Q  Mr. Mensie.
8  MR. O'DRISCOLL: I mean if you have anything
9  further to add, Mr. Mensie, you may but...
10  THE WITNESS: I don't have anything further to
11  add to my answer that I've given.
12  BY MR. LeBLANC:
13  Q  Mr. Mensie, do you know -- I'm sorry.
14  MR. LeBLANC: First let's make the March 10th,
15  1983 letter to Mr. Allen from Mr. Fisher as Exhibit 9.
16  Did we already do that?
17  THE REPORTER: No.
18  MR. LeBLANC: Okay.  Let's do that now, please.
19  (Exhibit No. 9 was marked for
20  identification.)
21  THE REPORTER: Okay.  It's marked.
22  BY MR. LeBLANC:
23  Q  Mr. Mensie, what did Kemper understand about
24  Mr. Dimon's education or ability to comprehend the
        PRECISE REPORTING SERVICE, P.C.

Page 205

1  settlement at the time of the settlement in 1983?
2  MR. O'DRISCOLL: I don't think we got that
3  whole question.
4  MR. LeBLANC: Okay.  I'll strike that and
5  rephrase.
6  BY MR. LeBLANC:
7  Q  Mr. Mensie, do you have an understanding of
8  what Kemper understood regarding Mr. Dimon's capabilities
9  or abilities to understand the settlement in 1983?
10  A  Within the documents I seem to recall that
11  there were references regarding his ability to the extent
12  that the court in fact appointed a guardian ad litem.
13  Q  Have you worked on a seamen's case before?
14  A  Yes.
15  Q  And do you understand that there may be
16  challenges with regards to educational levels or
17  cognitive abilities with seamen?
18  A  I don't recall any specific understanding of
19  that requirement at this time.
20  Q  Can you turn to Exhibit 5.
21  Actually don't worry about Exhibit 5.
22  We're going to move on to something else.  Can you turn
23  to page 0069.
24  MR. O'DRISCOLL: Okay.  The witness has that
        PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                    9-8-06                    William R. Mensie
                              C.A. No.: 05-11073 WGY

| Page 206 | Page 208 |
|---|---|

Page 206

1  document.
2  BY MR. LeBLANC:
3    Q  Can you review that document, sir.
4    A  Okay. (Witness peruses document.)
5      Okay.
6    Q  Can you tell me what this document is?
7    A  It's a memorandum, an internal memorandum.
8    Q  How does this relate to the Dimon versus Jenny
9  C matter?
10    A  It seems to relate to the fact that the primary
11  carrier of -- excuse me. There was a lot of rattling
12  going on there. It seemed to relate to me to the bad
13  faith action.
14    Q  Okay. Is the bad faith action and the Dimon
15  versus Jenny C action the same thing in your mind?
16    A  They were independent actions.
17    Q  So with regards to the Dimon versus Jenny C,
18  does that page K-0069 have any relation at all to Dimon
19  versus Jenny C?
20    A  Well, the substance of the matter that they're
21  discussing or that the memorandum seems to involve has to
22  do with -- well, it says it, you know, we want to sue
23  home for bad faith, which would be a separate action.
24    Q  Do you see where Mr. Moore is mentioned in that
          PRECISE REPORTING SERVICE, P.C.

Page 207

1  letter or in that note?
2    A  Yes.
3    Q  And do you know who Mr. Moore is?
4    A  I don't recall at this time.
5    Q  Mr. Mensie, did Kemper have any responsibility
6  to that assignment in the Dimon versus Jenny C matter?
7      MR. O'DRISCOLL: Objection to form.
8      THE WITNESS: Kemper's obligation was to its
9  insured.
10  BY MR. LeBLANC:
11    Q  So it had no obligation to Mr. Dimon at all?
12    A  That's such a general question. Without having
13  reviewed the policy I can't speak to that issue. I don't
14  know if Mr. Dimon was an insured under that policy, and
15  that goes to -- in my opinion it might even be a legal
16  issue.
17    Q  How long have you known about your deposition
18  being taken?
19    A  Several months maybe.
20    Q  Did you try to find the policy and find out
21  what it provided?
22    A  I tried to find any and all documents that I
23  could related to this case. The matter that -- the
24  subject matter that we -- of the suit had to do with the
          PRECISE REPORTING SERVICE, P.C.

Page 208

1  structured settlement.
2    Q  Okay. So it's Kemper's position here today
3  that it has no idea what the policy provided for?
4      MR. O'DRISCOLL: Objection to form. The
5  witness didn't testify to that. But you may answer,
6  Mr. Mensie.
7      THE WITNESS: To the extent that I understood
8  your question, which was a general question as to whether
9  Kemper had an obligation, my testimony is that Kemper's
10  obligation was to its insured. If Mr. Dimon in any way
11  qualified as an insured, then the Kemper policy would
12  have responded to its obligation to Mr. Dimon.
13  BY MR. LeBLANC:
14    Q  Okay. And your testimony also was that you
15  can't tell us what its obligation was because you haven't
16  reviewed the policy; is that right?
17      MR. O'DRISCOLL: Objection to form. What
18  policy are we talking about here?
19      MR. LeBLANC: The Kemper policy that brought it
20  in to the Dimon versus Jenny C case, the excess policy.
21      MR. O'DRISCOLL: Well, Mr. Mensie -- could you
22  read back the question please, Joanne.
23      (Record read as follows: And your
24        testimony also was that you can't
          PRECISE REPORTING SERVICE, P.C.

Page 209

1        tell us what its obligation was
2        because you haven't reviewed the
3        policy; is that right?)
4      MR. O'DRISCOLL: Is the question whether
5  Mr. Dimon was an insured under Kemper's excess policy?
6      MR. LeBLANC: The question is exactly what the
7  court reporter read, and I'd like the witness to answer
8  the question.
9      THE WITNESS: Well, the point you didn't add
10  also is that I'm not knowledgeable of the law as it
11  respects to what those obligations may have been. So in
12  order to answer your question not only would I have to
13  review the policy, I'd have to review the law.
14  BY MR. LeBLANC:
15    Q  And you did neither before today's deposition?
16      MR. O'DRISCOLL: Objection to the form of the
17  question. Mr. Mensie is here to testify as a fact
18  witness for Kemper. He is not here to testify as to
19  legal judgments.
20      MR. LeBLANC: Mr. Mensie is here to testify as
21  the representative of Kemper.
22      MR. O'DRISCOLL: Yes, as to facts, not legal
23  opinions.
24      MR. LeBLANC: The question was directed towards
          PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                9-8-06                      William R. Mensie
C.A. No.: 05-11073 WGY

Page 210

1  what Kemper knew. Mr. Mensie's testimony thus far seems
2  to be that Kemper didn't know anything about what the
3  policy was because they can't find it, and they haven't
4  tried to -- or their attempts to locate it haven't been
5  successful. I would like him to answer the question.
6       MR. O'DRISCOLL: I think that mischaracterizes
7  Mr. Mensie's testimony entirely.
8       MR. LeBLANC: Read the question back again.
9       (Record read as follows: And your
10            testimony also was that you can't
11            tell us what its obligation was
12            because you haven't reviewed the
13            policy; is that right?)
14      MR. O'DRISCOLL: And we're talking about the
15  actual excess policy?
16      MR. LeBLANC: There's a question before the
17  witness. He can answer it based on what the question is.
18      THE WITNESS: Based on the documents that I
19  have reviewed and my understanding of your question
20  requires a broader understanding than I presently have
21  regarding the obligations.
22  BY MR. LeBLANC:
23   Q  So your testimony now is that you can't answer
24  the question because you don't have a broad enough
PRECISE REPORTING SERVICE, P.C.

Page 211

1  understanding?
2    A  What the law was in '83 in terms of the --
3    Q  The question is: You can't answer the question
4  because you don't have a broad enough understanding?
5       MR. O'DRISCOLL: The witness is trying to
6  explain.
7       THE WITNESS: Of the law as respects to the
8  obligations of the policy in 1983, that's correct.
9  BY MR. LeBLANC:
10   Q  What about the terms of the policy. You don't
11  know what those are, do you?
12   A  The terms of the policies are that Kemper would
13  have an obligation to its insured.
14   Q  And who is that?
15   A  Without the policy before me, whether or not
16  Mr. -- the insured -- I'm sorry, strike that. I do know.
17  The insured --
18      MR. O'DRISCOLL: I believe there was testimony
19  previously about the insured in the case, but Mr. Mensie,
20  you know, doesn't have the documents in front of him.
21      THE WITNESS: The members of the Point Judith
22  Fishman's Corporation is the insured.
23  BY MR. LeBLANC:
24   Q  Mr. Mensie, are you looking at a document right
PRECISE REPORTING SERVICE, P.C.

Page 212

1  now?
2    A  In order to answer your question, yes.
3    Q  Please do not look at any documents unless I
4  ask you to look at the documents.
5    A  Are you trying to get a clear record or are
6  you --
7    Q  This is the fourth time I suggested that you
8  not do that, okay.
9       MR. O'DRISCOLL: Mr. LeBlanc.
10      MR. LeBLANC: For the record every time
11  Mr. Mensie looks at a document when I don't ask him to do
12  so, because I'm not in the room I can't tell.
13      MR. O'DRISCOLL: Your questions call for very
14  specific answers as to certain documents, and then you
15  say that Mr. Mensie can't look at the documents.
16      MR. LeBLANC: And that he doesn't.
17      MR. O'DRISCOLL: Mr. LeBlanc has requested that
18  you not look at any documents. Just testify as to your
19  recollection and we'll go forward. What's the next
20  question?
21      MR. LeBLANC: I didn't get an answer to my
22  prior question. There's a question pending before the
23  witness.
24      THE WITNESS: Could you repeat the question.
PRECISE REPORTING SERVICE, P.C.

Page 213

1       MR. LeBLANC: Joanne, could you repeat the
2  question for a third time for Mr. Mensie.
3       (Record read as follows: The question
4            is: You can't answer the question
5            because you don't have a broad enough
6            understanding?)
7       MR. O'DRISCOLL: He answered that.
8       MR. LeBLANC: The question before that.
9       (Record read as follows: So your
10            testimony now is that you can't
11            answer the question because you don't
12            have a broad enough understanding?)
13      MR. O'DRISCOLL: That's the same question.
14  He's answered it.
15      MR. LeBLANC: There was a question about
16  whether or not he could tell us who -- what
17  responsibility he had to Mr. Dimon. I don't believe he
18  answered that question.
19      MR. O'DRISCOLL: He answered all of the pending
20  questions. If you have another question that's different
21  from the one you've asked, you may pose that.
22      MR. LeBLANC: He didn't answer all the pending
23  questions, so we'll suspend on that issue.
24      MR. O'DRISCOLL: There will be no suspension.
PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                    9-8-06                    William R. Mensie
C.A. No.: 05-11073 WGY

Page 214

1      MR. LeBLANC: Excuse me. I didn't hear that.
2  Sorry.
3      MR. O'DRISCOLL: There's not going to be any
4  suspension, if you're talking about suspending the
5  deposition and continuing on another day.
6      MR. LeBLANC: That's your position. Thank you
7  for noting that.
8          That's all the questions I have for now
9  until we come back.
10     MR. O'DRISCOLL: Okay.
11     MR. LeBLANC: I'm not concluding from MetLife's
12  position. I'm suspending and allowing the other parties
13  to ask questions.
14     MR. O'DRISCOLL: Okay. Who is next?
15     MS. McQUAY: Can I go next?
16     MR. O'DRISCOLL: Yes, Sue.
17          CROSS EXAMINATION
18  BY MS. McQUAY:
19     Q   Okay. I have a few questions, Mr. Mensie. My
20  name is Sue McQuay, and I represent Morgan Stanley in
21  this case.
22          And I noted in the documents that Kemper
23  produced in this case there were in several places a
24  reference to the settlement agreement in the Jenny C
          PRECISE REPORTING SERVICE, P.C.

Page 216

1  asked for a copy of the settlement agreement?
2     A   Yes.
3     Q   Okay. Does that lead you to believe, sir, that
4  there was some hard copy of a settlement agreement in the
5  Jenny C matter?
6     A   **Taking in its actual context of this**
7  **memorandum, yes, it does lead me to -- either that or the**
8  **fact that I have seen a hard copy of the settlement**
9  **agreement leads me to believe there was a settlement**
10  **agreement.**
11     Q   You have seen a hard copy of a settlement
12  agreement?
13     A   **I seem to recall having seen a settlement**
14  **agreement, yes.**
15     Q   Has that been produced by Kemper in this case?
16     A   **My understanding is yes.**
17     Q   Can you direct me to -- my attention to what
18  constitutes that settlement agreement among the documents
19  that Kemper has produced, which I believe are all in the
20  room with you?
21     MR. O'DRISCOLL: Yes, they're in the room, Sue.
22  Are you asking the witness now to go through the
23  documents?
24     MS. McQUAY: If he believes that they contain.
          PRECISE REPORTING SERVICE, P.C.

Page 215

1  matter. Do you recall seeing those references?
2     A   **Not specifically in terms of where I may have**
3  **seen them. I certainly seem to recall having read that.**
4     Q   Let me direct your attention, for example, to
5  the Kemper document that there is Bates stamped K-0125.
6  Do you have that in front you, sir?
7     MR. O'DRISCOLL: Not just yet, Sue. I'll have
8  it in one second. This has also been marked for the
9  record as Exhibit 6.
10  BY MS. McQUAY:
11     Q   All right. Do you have that in front of you
12  now, sir?
13     A   **I do.**
14     Q   And I direct your attention, for example, in
15  the very first paragraph Mr. Noe states the settlement
16  agreement -- and I'm quoting now: "The settlement
17  agreement was to establish a fully paid annuity contract
18  for a sum plus 3 percent compounded annually, added
19  annually to be paid during the term of a plaintiff's life
20  and in no event for less than 20 years." Do you see
21  that?
22     A   **Yes, I do.**
23     Q   And down further in the next paragraph he, Mr.
24  Noe, goes on to say that Charter Security's counsel has
          PRECISE REPORTING SERVICE, P.C.

Page 217

1  I may be mistaken, but I'd like him to identify for me
2  what among these documents he believes constitutes the
3  settlement agreement.
4     MR. O'DRISCOLL: The witness has in front of
5  him a document titled General Release.
6  BY MS. McQUAY:
7     Q   All right. Is it your testimony, sir, that the
8  document entitled General Release, which bears the Bates
9  stamp No. K-0063 and K-0064, constitutes the settlement
10  agreement?
11     MR. O'DRISCOLL: I don't know that the witness
12  has testified to that.
13     MS. McQUAY: I'm asking him if that is his
14  testimony.
15     THE WITNESS: This is the agreement that I'm
16  reading from the paragraph in the memorandum when asked
17  the question, this was the agreement that I recall asking
18  read.
19  BY MS. McQUAY:
20     Q   Did you see anything else in any of the Kemper
21  documents that you believe -- other than this general
22  release that you believe constituted the settlement
23  agreement?
24     A   **Not that I recall.**
          **PRECISE REPORTING SERVICE, P.C.**

Dimon vs. Metropolitan Life                  9-8-06                  William R. Mensie
C.A. No.: 05-11073 WGY

Page 218

1      Q    It's your understanding or belief that when
2    there is a reference to a settlement agreement it is
3    referring to this general release, K-0063 to 0064; is
4    that correct?
5      A    Looking back on it retrospectively, this is the
6    document I thought they were referring to, yes.
7            MS. McQUAY: Could we have this document, the
8    general release, marked as the next exhibit, please.
9            (Exhibit No. 10 was marked for
10                identification.)
11   BY MS. McQUAY:
12     Q    In fact, sir, directing your attention to the
13   document produced by Kemper bearing the Bates stamp No.
14   K-0007, would you place that document in front of you,
15   please.
16           MR. O'DRISCOLL: Mr. Mensie has the document in
17   front of him.
18   BY MS. McQUAY:
19     Q    In fact that document reflects that Mr. Noe was
20   asking that he be sent a copy of the settlement
21   agreement, does it not?
22           MR. O'DRISCOLL: Forgive me. I apologize.
23   Exhibit 6, K-0125, is that what you're asking about now?
24           MS. McQUAY: No, it's K-0007, K-7.
              PRECISE REPORTING SERVICE, P.C.

Page 219

1            MR. O'DRISCOLL: Okay. Now we're on K-007.
2            MS. McQUAY: Yes.
3    BY MS. McQUAY:
4      Q    Do you have that document in front of you, sir?
5            MR. O'DRISCOLL: Now he does. That's the first
6    time we referred to this today I believe.
7            MS. McQUAY: All right.
8    BY MS. McQUAY:
9      Q    In that Kemper document Mr. Noe asked Ms. Graci
10   to send him a copy of the settlement agreement, does he
11   not?
12     A    Yes.
13     Q    And down at the bottom of the document there's
14   a handwritten notation sent 7-26-83 release and
15   proceedings 5-3-83 before Judge Pettine, do you see that?
16     A    Yes.
17     Q    Do you see that, sir?
18     A    Yes.
19     Q    And does that further reinforce your belief
20   that the settlement agreement that is being referred to
21   in the Kemper documents is the general release?
22     A    I'd like to -- well, in order to answer your
23   question the person who interpreted this memo, that Mary
24   Graci, not only did she send the release, but she also
              PRECISE REPORTING SERVICE, P.C.

Page 220

1    sent the proceedings.
2      Q    Before Judge Pettine?
3      A    Before Judge Pettine. Now, I don't recall if
4    within that document there was also settlement release
5    language.
6      Q    Okay. But am I correct in understanding that
7    you have seen nothing in any Kemper documents
8    constituting a settlement agreement other than the
9    general release and perhaps language within the
10   proceedings before Judge Pettine; is that correct?
11     A    That's -- I'm sorry. That would be my
12   recollection at this time.
13     Q    Okay. Thank you, sir. Now, going back to the
14   general release which has been marked as Exhibit 10, in
15   that general release Mr. Dimon releases all of his claims
16   in the Jenny C matter, does he not?
17     A    To the best of my understanding. That's
18   certainly what my understanding was, that there was an
19   intent to do.
20     Q    And in return for releasing all of his claims
21   in the Jenny C matter, that general release recites the
22   fact that he was to receive $250,000 cash payment,
23   correct?
24     A    Correct.
              PRECISE REPORTING SERVICE, P.C.

Page 221

1      Q    And in addition he was to receive in return for
2    release of those claims a fully paid annuity contract for
3    his benefit with Charter Life Insurance Company to pay
4    him $1,450 per month for one year following the execution
5    of that contract and thereafter such monthly sum
6    increased at the rate of 3 percent per year, compounded
7    annually, to be paid to him during the term of his life
8    and in no event for less than 20 years, correct?
9      A    Correct.
10     Q    Was such an annuity contract issued and
11   provided to Kemper for Mr. Dimon's benefit?
12           MR. O'DRISCOLL: I'm sorry. I didn't get that
13   question, but if I could just ask Joanne to read it back
14   instead of asking you to.
15           (Record read as follows: Was such an
16                annuity contract issued and provided
17                to Kemper for Mr. Dimon's benefit?)
18           MR. O'DRISCOLL: Provided to Kemper for
19   Mr. Dimon's benefit?
20           MS. McQUAY: Yes.
21           MR. O'DRISCOLL: I'll object to the question as
22   compound.
23   BY MS. McQUAY:
24     Q    Mr. Mensie?
              PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                    9-8-06                    William R. Mensie
C.A. No.: 05-11073 WGY

Page 222

1    MR. O'DRISCOLL: Well, if I may object to the
2  form of the question. It's a compound question. You're
3  asking at least two questions in there.
4        THE WITNESS: To the extent that I understand
5  the question it was represented by Charter that the
6  monies that Kemper paid to Charter would comply with the
7  release requirements.
8  BY MS. McQUAY:
9    Q   And what form did Charter make that
10  representation?
11   A   **The distribution of at least what I could seem**
12  **to see was -- I seem to recall was there was actually a**
13  **policy that was issued.**
14   Q   That was my question: Did in fact Charter
15  issue a policy that conformed to the requirements that
16  resided here in the general release, Exhibit 10?
17   A   Yes.
18   Q   Okay. And did Kemper receive a copy of that
19  policy?
20   A   It seems -- yes.
21   Q   All right. And is that what you have referred
22  to and others have referred to from time to time as the,
23  quote, original policy issued by Charter?
24   A   Yes.
                    PRECISE REPORTING SERVICE, P.C.

Page 223

1    Q   Is a copy of that original policy issued by
2  Charter among the documents that Kemper has produced?
3    A   I believe they have been produced, yes.
4    Q   Would you identify, please, for the record what
5  you believe to be the annuity policy issued by Charter
6  that complied with requirements set forth in the general
7  release?
8        MR. O'DRISCOLL: The witness has in front of
9  him a document marked K-0010.
10  BY MS. McQUAY:
11   Q   And is that a multiple page document?
12   A   Yes.
13   Q   And what is the end -- would you give us the
14  range of Bates stamp numbers comprising that document,
15  please.
16   A   **Yes, I will. One moment, please. It's K-0010**
17  **through K-0020.**
18   MS. McQUAY: Would you mark that as Exhibit 11,
19  please.
20       (Exhibit No. 11 was marked for
21       identification.)
22   THE REPORTER: Okay, it's marked.
23  BY MS. McQUAY:
24   Q   And just so the record is entirely clear, do
                    PRECISE REPORTING SERVICE, P.C.

Page 224

1  you understand, Mr. Mensie, that it is your testimony on
2  behalf of Kemper that this Exhibit 11 constituted an
3  annuity policy issued by Charter Security that comported
4  with requirements recited in the general release, Exhibit
5  10?
6        MR. O'DRISCOLL: May the witness review the
7  document first.
8        MS. McQUAY: Okay.
9        MR. O'DRISCOLL: If you need the opportunity,
10  William.
11       THE WITNESS: I believe this is a document I
12  reviewed previously and that it is in fact what my
13  understanding was looking back on the record as the
14  policy that was issued by Charter to comply with the
15  requirements of the general release.
16  BY MS. McQUAY:
17   Q   And does in fact in your view -- this annuity
18  policy that was issued by Charter, did it in fact meet
19  the requirements recited in the general release?
20   A   **I seem to recall having read that it did, and**
21  **in fact it says that: "Monthly payments in the amount of**
22  **$1,450.45, increasing 3 percent annually, commencing on**
23  **June 6, 1983, for a period 240 months certain and life**
24  **thereafter" is contained in the document.**
                    PRECISE REPORTING SERVICE, P.C.

Page 225

1    Q   Are you directing your attention in particular
2  to page K-0019 of the annuity policy issued by Charter?
3    A   Yes.
4    Q   And therein it states up at the top, and I'm
5  quoting now: "The undersigned surrenders said policies
6  to the insurance company and concurrently herewith
7  revokes any beneficiary designation and any election of
8  settlement heretofore made under said policy"?
9    A   Yes, it does read there.
10   Q   And then it goes on to recite, as you have
11  read, that the payee, the primary payee, Dennis Dimon, is
12  to receive monthly payments in the amount of $1,450.45,
13  increasing 3 percent annually, commencing on June 6,
14  1983, for a period of 240 months certain and life
15  thereafter?
16   A   Yes.
17   Q   Okay. Now, directing your attention to page
18  K-0015 of Exhibit 11, that page sets forth various
19  settlement options, does it not?
20   A   **Yes. It's titled Settlement Options.**
21   Q   Do you see that, Mr. Mensie?
22   A   **Yes. It's titled Settlement Options.**
23   Q   Yes. And on the page it lays out various
24  options; option 11 being limited payments. Do you see
                    PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                9-8-06                William R. Mensie
C.A. No.: 05-11073 WGY

Page 226

1    that?
2      A   Yes.
3      Q   And then option 2 is life income, life annuity.
4    Do you see that?
5      A   Yes.
6      Q   And then you see next it says "with certain
7    periods"?
8      A   Yes.
9      Q   And the option that is boldly titled "with
10   certain periods" the document goes on to describe that
11   option as being: "Equal monthly payments for five, ten
12   or twenty years, the certain period, as elected, and
13   thereafter for the remaining lifetime of the payee."  Do
14   you see that, sir?
15     A   Yes, I do.
16     Q   Now, I would like to direct your attention to
17   the application submitted to Charter Life Insurance
18   Company on behalf of Kemper or American Motorists, and in
19   particular I want to -- this is marked, and I'm not sure
20   I got the exhibit number, one second, please.
21       MS. McQUAY: Off the record for a moment.
22          (Discussion held off the record.)
23       MS. McQUAY: Back on the record.
24   BY MS. McQUAY:
          PRECISE REPORTING SERVICE, P.C.

Page 227

1      Q   Mr. Mensie, would you look at Exhibit 3,
2    please.
3        MR. O'DRISCOLL: Well, Sue, you said the
4    application that was submitted by Kemper/American
5    Motorists?
6        MS. McQUAY: My only question now is:
7    Mr. Mensie, would you look at Exhibit 3, please.
8        MR. O'DRISCOLL: Exhibit 3.
9    BY MS. McQUAY:
10     Q   Do you have that in front of you, sir?
11       MR. O'DRISCOLL: No.  Exhibit 3 is the
12   application as the witness has testified was modified.
13       MS. McQUAY: Well, whatever the testimony.  The
14   only question now is would you look at Exhibit 3.
15       MR. O'DRISCOLL: Yes, the witness has that in
16   front of him.
17       MS. McQUAY: Thank you.
18   BY MS. McQUAY:
19     Q   Now, Mr. Mensie, looking at Exhibit 3 in the
20   space, paragraph 14, special requests, there is some
21   handwritten notations.  Do you see that?
22     A   I'm not sure I have in front of me Exhibit 3.
23       MR. O'DRISCOLL: This is Exhibit 3.  This is
24   the document that Ms. McQuay is asking about at this
          PRECISE REPORTING SERVICE, P.C.

Page 228

1    time.
2        THE WITNESS: On counsel's advice I will --
3        MR. O'DRISCOLL: Just to make clear, you had
4    originally said, Sue --
5        MS. McQUAY: Forget what I originally said.  I
6    struck that.  The question now is would you look at
7    Exhibit 3.
8        MR. O'DRISCOLL: Well, you can strike it, but
9    for the record originally you said the application that
10   was submitted by Kemper/American Motorists.  Now you're
11   asking for a different document.
12       MS. McQUAY: I struck it.  Please, just look at
13   Exhibit 3.
14   BY MS. McQUAY:
15     Q   My question, sir, is:  Do you have Exhibit 3 in
16   front of you?
17     A   Based on representations of counsel I have
18   Exhibit 3 in front of me.
19     Q   Sir, looking at Exhibit 3, do you see the
20   paragraph 14, special requests?
21     A   I do.
22     Q   And do you see that someone has written into
23   that space in handwriting: "Immediate annuity, 20 years
24   certain, 3 percent increases"?
          PRECISE REPORTING SERVICE, P.C.

Page 229

1      A   20 years certain, 3 percent increases.
2      Q   Yes, sir.
3      A   Yes.
4      Q   20 years certain, 3 percent increases, sir.
5    Going back to Exhibit 11, the annuity contract issued by
6    Charter and page K-0015 which we had been looking at
7    where it describes settlement options.
8      A   Yes.
9      Q   Would you infer, sir, that a 20 year certain, 3
10   percent increases comports with the settlement option
11   captioned "with certain periods"?
12       MR. O'DRISCOLL: Sue, I'm sorry.  I just need
13   to clarify for the record -- and if you understand the
14   question, please just answer, Mr. Mensie.  I wasn't sure
15   I did.
16       THE WITNESS: I didn't understand the question.
17   I'm sorry.
18   BY MS. McQUAY:
19     Q   I'm trying to refer to various settlement
20   options, one of which is "with certain period," correct?
21     A   Yes.
22     Q   Okay.  And that option caption "with certain
23   period" is described as being one that includes equal
24   monthly payments for five, ten or twenty years as elected
          PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                9-8-06                William R. Mensie
C.A. No.: 05-11073 WGY

**Page 230**

1  and thereafter for the remaining lifetime of the payee.
2  Do you see that?
3      A   Yes.
4      Q   Looking at Exhibit 3 where it says 20 years
5  certain, 3 percent increases, would you infer that that
6  refers to the settlement option described as with certain
7  period and with an election of 20 years?
8          MR. O'DRISCOLL:  20 years and thereafter for
9  the remaining lifetime of the payee?
10         MS. McQUAY:  Yes.
11         THE WITNESS:  I'm still not sure that I
12 understand the question; but with respects to an attempt
13 to understand it, I'll have to phrase what I think you're
14 asking me and that is whether or not the settlement
15 option captioned here with the certain period complies
16 with the special request. I'm not clear whether it does
17 or it does not because, you know, I haven't worked with
18 the drafting of the annuity policies, but the part that
19 closer resembles that request is the Exhibit K-0019.
20 BY MS. McQUAY:
21     Q   Okay. When you say the -- that quotes the part
22 that K-0019 more closely resembles that request, what are
23 you referring to?
24     A   The fact that it reads the 20 year certain, 3
          PRECISE REPORTING SERVICE, P.C.

**Page 231**

1  percent annually; whereas this one, the certain period
2  equal -- it says equal monthly payments in the settlement
3  option.
4      Q   Okay. So in any event, what Kemper received
5  from Charter as being the annuity policy issued by
6  Charter specifically provided right here on page K-0019,
7  that in fact the payee, Mr. Dimon, was to receive monthly
8  payments as recited for a period of 240 months certain or
9  20 years and life thereafter, correct?
10     A   That is correct.
11     Q   Okay. Now, bear with me one moment, please.
12         Directing your attention, sir, to Exhibit
13 5 please again.
14         MR. O'DRISCOLL:  Just give me one moment, Sue.
15         Here we go. The witness has Exhibit 5 in
16 front of him.
17 BY MS. McQUAY:
18     Q   Sir, I'd like to direct your attention to the
19 second paragraph of Exhibit 5 and in particular the
20 portion of that paragraph that begins: "Plaintiff's
21 attorney agreed that if I would pay $175,000 and agree to
22 the nominal owner of the annuity, he would place it with
23 an A rated life insurance company."  Do you see that,
24 sir?
          PRECISE REPORTING SERVICE, P.C.

**Page 232**

1      A   Yes, I do.
2      Q   And in the next sentence it states -- Mr. Noe
3  states in the letter at least: "After consultation with
4  Mr. Boncher, we agreed with the condition that we will
5  not guarantee payments, and plaintiff will have no
6  recourse against defendants or carriers in the event of
7  default by the life insurance company." Do you see that,
8  sir?
9      A   Yes, I do.
10     Q   Now, when it says that after consultation with
11 Mr. Boncher, we agreed, who is Mr. Boncher?
12     A   He was a Kemper employee at the time. I'm not
13 sure what his actual position was.
14     Q   Well, do you know what his responsibilities
15 were generally vis-a-vis those of Mr. Noe?
16     A   They were on the home office staff.
17     Q   Do you know if he was essentially a peer of Mr.
18 Noe, or was he a superior?
19     A   Based on the fact that he suggested he
20 consulted with him, it would infer to me that he was his
21 superior.
22     Q   But you're unable to say that for certain, am I
23 correct?
24     A   At that specific time I couldn't -- I didn't
          PRECISE REPORTING SERVICE, P.C.

**Page 233**

1  see any records at 1983 as to exactly what position the
2  respective parties held.
3      Q   Okay. Now, when it says that he, Mr. Boncher,
4  agreed that they would do as plaintiff's attorney
5  requested with a condition that we will not guarantee
6  payments and plaintiff will have no recourse against
7  defendants or carriers in the event of default by the
8  life insurance company, what do you understand him to be
9  saying there?
10     A   That if the life company defaulted, Kemper
11 wouldn't make the payments.
12     Q   And what do you understand to be their concern
13 in that regard?
14     A   That they didn't have knowledge about Charter
15 at the time. They didn't know who Charter Life was, or
16 simply they were trying to -- you know, the whole purpose
17 of their involvement was to extinguish all claims against
18 its insured and thereby Kemper.
19     Q   Okay. Any other purpose that you can think of
20 was motivating them, Mr. Boncher and Mr. Noe, to sort of
21 reach this agreement between themselves?
22     A   Well, the fact that it, you know -- as I read
23 everything in this context, I think, you know, it was
24 just clear that this was the plaintiff's deal and that
          PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                                9-8-06                                William R. Mensie
                                                C.A. No.: 05-11073 WGY

Page 234

1    just further reflected that they were saying, you know,
2    we have nothing to do with this deal, you know, in terms
3    of making representations of further allegations.
4        Q   Now, in your review of Kemper's files in this
5    matter, was any such condition ever in fact agreed to and
6    provided for as part of the settlement agreement?
7        A   I didn't see anything in any of the agreements
8    that talked about the default of the life company.
9        Q   So based on your review of all the documents in
10   Kemper's claim file, you saw nothing that indicated that
11   this condition was in fact agreed to and provided for as
12   part of the settlement; is that correct?
13       MR. O'DRISCOLL: Objection to form.
14   BY MS. McQUAY:
15       Q   You may answer, Mr. Mensie.
16       A   Not that I recall. I'd have to rereview the
17   release, but I don't recall that, no, specifically the
18   use of the word default of the life company.
19       Q   Okay. Well, let's look at the release.
20       A   Okay.
21       Q   You have it there, do you not, sir, Exhibit 10?
22       A   They keep removing them.
23       MR. O'DRISCOLL: Yes.
24   BY MS. McQUAY:
              PRECISE REPORTING SERVICE, P.C.

Page 235

1        Q   Do you have it now, sir?
2        A   Not yet.
3        Q   Would you look at it, please, and my question:
4    Am I not correct in that the release contains no such
5    condition as we have been discussing?
6        A   The release just purports to release any and
7    all such claims. Taken to its broadest generality I
8    guess you could encompass the default of a life company
9    as being further claims.
10       Q   But nowhere in the release is there any
11   reference to the fact that Kemper in providing the
12   annuity policy described in the release is at the same
13   time providing that policy on the condition that it will
14   not guarantee payment, and Mr. Dimon will have no
15   recourse against Kemper or the defendants in the event of
16   default by the life insurance company; is that correct?
17       MR. O'DRISCOLL: I'm going to just object and
18   state for the record that I question the relevance of
19   this where there has been no default of the life
20   insurance company of this case.
21       MS. McQUAY: I'm sorry. You got broken up.
22   Would you restate that, please.
23       MR. O'DRISCOLL: Yes. I just object to the
24   form of the question and to its relevance where there
              PRECISE REPORTING SERVICE, P.C.

Page 236

1    hasn't been a default by the life insurance company in
2    this case.
3    BY MS. McQUAY:
4        Q   Fine. Would you answer my question first,
5    Mr. Mensie.
6        A   I'll certainly try. I didn't read anything
7    that was as specific or as narrow as your question.
8        Q   Okay. Now, would you agree with the statement
9    that your counsel just made, that in point of fact there
10   has been no default in this case?
11       A   To my knowledge that was not at issue here.
12   There was no default.
13       Q   And could you explain for the record, sir, why
14   you say that to be the case?
15       A   Well, there's two things, that the -- the
16   payments were continuing. My understanding was that
17   payments continued, so there was no indication whatsoever
18   that I saw that there was any default; and the claim is
19   not one claiming that the life company defaulted. The
20   life company simply changed the conditions of the
21   contract, and the claim is one of breach of contract is
22   my understanding.
23       Q   What do you understand a default to be, sir?
24       A   Failure to pay.
              PRECISE REPORTING SERVICE, P.C.

Page 237

1        Q   And in this case there has been no default, but
2    how would you characterize what has happened in this
3    case?
4        A   Well, let me strike and clarify my answer. I
5    guess I was a little brief when I said a failure to pay.
6    A failure to pay because of an inability to pay would
7    probably be more precise my understanding of a default.
8        Q   Okay. So when Kemper was talking about we're
9    not going to guarantee or there won't be any recourse if
10   there's a default, you were anticipating, what you
11   understood you were talking about was a default because
12   Charter went under, for example, and couldn't pay,
13   correct?
14       A   A bankruptcy, yes.
15       Q   And that certainly is not the case here, sir?
16       A   That's correct.
17       Q   Here what we have is a situation where they are
18   simply claiming they're not obligated to pay; it's not
19   that they can't pay, correct?
20       A   That's my understanding.
21       Q   Thank you, sir.
22           Sir, now I would like to direct your
23   attention, if I may, to Exhibit 6, please.
24       MR. O'DRISCOLL: Just removing the other
              PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                9-8-06                    William R. Mensie
C.A. No.: 05-11073 WGY

| Page 238 |
|---|
| 1  exhibits, and the witness has Exhibit 6 in front of him, |
| 2  Sue. |
| 3  BY MS. McQUAY: |
| 4      Q   In Exhibit 6, sir, Mr. Noe, this is November of |
| 5  1983, he says in his memo that he is now dealing with |
| 6  Charter Security's counsel in Jacksonville, Florida.  He |
| 7  has asked for a copy of the settlement agreement.  Do you |
| 8  see that, sir? |
| 9      A   Yes. |
| 10     Q   Do you know -- well, strike that. |
| 11         What was the nature of Mr. Noe's dealings |
| 12  with Charter Security's counsel in Jacksonville, Florida |
| 13  at that point? |
| 14     A   As the memo outlines he was -- the counsel for |
| 15  Charter had requested a copy of the settlement agreement, |
| 16  and that's as far as I could glean from the information |
| 17  that I reviewed. |
| 18     Q   Do you know what came from Mr. Noe's dealings |
| 19  with Charter Security's counsel in Jacksonville, Florida? |
| 20     A   I do not. |
| 21     Q   Do you know what further transpired between |
| 22  them after November 8, 1983? |
| 23     A   I don't recall seeing any further |
| 24  communications or any communications relative to counsel |
| PRECISE REPORTING SERVICE, P.C. |

| Page 240 |
|---|
| 1      Q   Well, let me just ask it this way:  Now, it was |
| 2  Kemper's position back in 1983, certainly as of November |
| 3  1983, that the policy issued by Charter was in fact what |
| 4  was required under the settlement agreement and in fact |
| 5  was a valid and enforceable contract, correct? |
| 6      A   Yes. |
| 7      Q   Has that continued to be Kemper's position |
| 8  today? |
| 9      A   Yes. |
| 10         MS. McQUAY:  Thank you, sir.  I have nothing |
| 11  further. |
| 12         MR. DeWICK:  This is Jed DeWick.  I just have a |
| 13  couple if I may. |
| 14                 CROSS EXAMINATION |
| 15  BY MR. DeWICK: |
| 16     Q   Mr. Mensie, again my name is Jed DeWick.  I |
| 17  represent the Latti entities in this action. |
| 18         First of all, I believe you touched in |
| 19  general on this subject, but I just wanted to get it a |
| 20  little clearer on the record.  You obviously were not |
| 21  with Kemper in 1983, correct? |
| 22     A   Correct. |
| 23     Q   And you were not personally involved with the |
| 24  settlement of this Dimon verse Jenny C matter, correct? |
| PRECISE REPORTING SERVICE, P.C. |

| Page 239 |
|---|
| 1  in Jackson, Florida [sic.]. |
| 2      Q   Are you able to describe what if any further |
| 3  steps Kemper took after this date, November 1983, to |
| 4  insure that the policy they had received from Charter |
| 5  would continue to be honored? |
| 6      A   I couldn't -- I didn't see evidence of |
| 7  anything.  I'm not sure that Kemper could have taken any |
| 8  other steps, but I didn't see anything that suggested |
| 9  that Mr. Noe or anyone else on Kemper's behalf had taken |
| 10  further steps. |
| 11     Q   So as far as you are aware, after November |
| 12  1983, it just simply continued to be Kemper's position |
| 13  that the original policy issued was valid and enforceable |
| 14  and should be honored, correct? |
| 15     A   That is correct. |
| 16     Q   Now, you testified yesterday, because I wrote |
| 17  this down in my notes, you testified yesterday, |
| 18  Mr. Mensie, that you did not believe there was much of a |
| 19  dispute here.  Could you explain that, please. |
| 20         MR. O'DRISCOLL:  I'm sorry, Sue.  Could you |
| 21  give more context to that? |
| 22         MS. McQUAY:  I'm not sure I can.  Let's see if |
| 23  I can. |
| 24  BY MS. McQUAY: |
| PRECISE REPORTING SERVICE, P.C. |

| Page 241 |
|---|
| 1      A   Correct. |
| 2      Q   And you were not involved in any aspect in the |
| 3  obtaining of the annuity that was part of that |
| 4  settlement, correct? |
| 5      A   That's correct. |
| 6      Q   So your knowledge of this entire matter is |
| 7  based in part upon your review of all the documents that |
| 8  have been produced in this litigation, correct? |
| 9      A   That is correct. |
| 10     Q   As well as in part based on your experience in |
| 11  the insurance industry? |
| 12     A   Yes, sir. |
| 13     Q   And as well as your knowledge in general of |
| 14  Kemper's policies and procedures, correct? |
| 15     A   Correct. |
| 16     Q   And you have not had any discussions with |
| 17  anyone who had firsthand knowledge of the underlying |
| 18  settlement agreement, correct? |
| 19     A   That is correct. |
| 20     Q   And you do not know of anyone that is still |
| 21  employed by Kemper who has such firsthand knowledge, do |
| 22  you? |
| 23     A   I do not. |
| 24     Q   Are you a lawyer, Mr. Mensie? |
| PRECISE REPORTING SERVICE, P.C. |

Dimon vs. Metropolitan Life                    9-8-06                    William R. Mensie
C.A. No.: 05-11073 WGY

Page 242

1    A   No.
2    Q   Do you have any legal training at all?
3    A   Other than as it relates to claim handling.
4    Q   Could you just expand on that. What training
5  do you have, legal training do you have, as it relates to
6  claim handling?
7    A   A working knowledge of the law necessary to
8  handle claims that I'm charged with handling.
9    Q   Is that the law of liability, if you could just
10  be a little bit more --
11    A   Basic principles of -- basic legal principles
12  and understanding of the process and systems.
13    Q   And when you say "basic legal principles,"
14  again do you mean --
15    A   Principles of negligence, torts, contracts.
16    Q   Negligence, torts, contracts?
17    A   Negligence or torts, and I said contracts is
18  what I said, an understanding of, you know, the parties
19  of a contract.
20    Q   And so when you say you have a working
21  knowledge of it, have you had specific training, or is
22  this training you've acquired through performance of your
23  job over the years?
24    A   Performance of the job.
            PRECISE REPORTING SERVICE, P.C.

Page 243

1    Q   So there has been no formal training?
2    A   You know, I've attended training courses, I've
3  attended continuing education courses and things of that
4  nature over the years.
5    Q   And those courses dealt with what you spoke of,
6  legal principles with respect to torts?
7    A   Yes, sir.
8    Q   When you testified earlier that Kemper had no
9  involvement in obtaining the quote from Charter Life for
10  the life annuity, again that is based on your review of
11  all the documents in this litigation?
12    A   That's correct.
13    Q   So you have no firsthand knowledge that they
14  had no such involvement; is that correct?
15    A   No independent knowledge, that is correct.
16    Q   In all your years of experience with annuities
17  have you ever encountered an incident such as this one
18  where an after annuity contract issued, the issuing
19  company claimed that there had been a clerical error with
20  regard to the terms?
21    A   No.
22    Q   You testified yesterday that American Motorists
23  Company still exists?
24    A   Yes.
            PRECISE REPORTING SERVICE, P.C.

Page 244

1    Q   They are a part of the Kemper Group?
2    A   Yes.
3    Q   And the Kemper Group is not -- and correct me
4  if I'm wrong obviously, the Kemper Group is not an entity
5  unto itself, but it is a trade name under which certain
6  entities operate; is that correct?
7    A   That is correct.
8    Q   So in your capacity here testifying on behalf
9  of Kemper, are you also testifying on behalf of each
10  insurance company insofar as they operate under the
11  Kemper trade name?
12    A   With respect to American Motorists, yes.
13        MR. DeWICK:  Thank you very much.  I have
14  nothing further.
15             CROSS EXAMINATION
16  BY MR. KEANE:
17    Q   Mr. Mensie, my name is Brian Keane.  I just
18  have a few questions as well.  I represent the Plaintiff
19  Dennis Dimon in this matter.
20    A   Yes, sir.
21    Q   If I could have you look at Exhibit 11.  Do you
22  have that in front of you?
23        MR. O'DRISCOLL:  I'm just getting it for him,
24  Brian.
            PRECISE REPORTING SERVICE, P.C.

Page 245

1        THE WITNESS:  Yes, sir.
2  BY MR. KEANE:
3    Q   I just wanted to follow up on some of the
4  questions Attorney McQuay was asking you.  If you turn to
5  page K-0015, it looks like Attorney McQuay was asking you
6  questions about the highlighted and capital section "with
7  certain period."  Is it your understanding that that
8  section of the settlement options falls under option 2,
9  life income, down below on the left side?
10    A   Yes.
11    Q   And if you turn to K-0010 at the beginning of
12  Exhibit 11, at about a quarter of the way down it says:
13  Option 2. Life Income with a star.  Do you see that?
14    A   Which paragraph are you referring to?
15    Q   It's about a quarter of the way down on the
16  document. It's below the numbers, and it says: "Option
17  2. Life Income" with a star.
18    A   Yes, I see it.
19    Q   Now, does that relate to what's on page K-0015
20  in regards to Option 2, life income?
21    A   I would think so. I don't see any other option
22  2s in the policy.
23    Q   And therefore this policy issued by Charter
24  Security Life would be for the life of the person for who
            PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                9-8-06                        William R. Mensie
C.A. No.: 05-11073 WGY

---

**Page 246**

1  it was issued for; is that correct?
2    A  It represents to be so.
3    Q  If you'd look at page K-0018 of Exhibit 11.
4  The signature, can you tell me what that signature says?
5    A  Reads Barbara Boehm.
6    Q  And does it say that Barbara Boehm is from
7  Charter Life Insurance Company?
8    A  Yes, it does.
9    Q  Can you tell me the date that is typed just
10  above that area?
11    A  17th June, 1983.
12    Q  Is it your understanding June 17th, 1983, is
13  after the settlement hearing in front of Judge Pettine in
14  this matter?
15    A  Yes.
16    Q  And that's because the settlement hearing
17  actually took place on June 3rd, 1983, correct?
18    A  I recall that it was before the policy was
19  issued. My reading was and that was consistent with the
20  record. It was consistent with the record the policy --
21  the record in the hearing that was being represented to
22  the court for the approval of the settlement, and then
23  this document were consistent.
24    Q  Okay. On Exhibit 11, if you could look at
          PRECISE REPORTING SERVICE, P.C.

---

**Page 247**

1  K-0019.
2    A  Yes, sir.
3    Q  The settlement agreement, correct?
4    A  Yes.
5    Q  Who would have filled that out?
6    A  It appears to me this was filled out by
7  Charter.
8    Q  Now, for this annuity contract, the Charter
9  Security Life annuity contract, it was Kemper's money
10  from the excess coverage for the Point Judith Fishermen's
11  Association, it was actually Kemper's money, the $175,000
12  from that policy of insurance, that went to fund this
13  annuity, correct?
14    A  It was money paid out by Kemper is my
15  understanding, yes.
16    Q  And as a matter of fact, Kemper became part
17  owner of that annuity contract, correct?
18    A  That was my understanding, yes.
19    Q  You testified, and I just wanted to follow up
20  with you, you were actually adjusting this claim on
21  behalf of the specific claim that we're here for today on
22  behalf of Kemper, correct?
23    A  Correct.
24    Q  You testified yesterday you were talking about
          PRECISE REPORTING SERVICE, P.C.

---

**Page 248**

1  Mr. Noe, and we were referring to some of the documents
2  of the letters going back between Charter Security, Mr.
3  Noe, and you said that -- the testimony was that
4  something looked unusual to you with regard to Mr. Noe's
5  signature. Can you elaborate for me what you meant by
6  that?
7    A  The -- I was being asked to compare certain
8  documents. It was the application and the signatures
9  that while one was clear, the other was not. However,
10  just the lines just struck me as suspect in that, you
11  know, how often do people sign documents in the same
12  space which it appeared to me; and as I testified, I'm
13  not a handwriting expert or anything, but it just struck
14  me as odd to see that the signatures appeared to be
15  matched up; and I think the inference was that he had
16  signed both documents at different times.
17    Q  You also yesterday in regard to talking about
18  the changes that were made by Charter, you described
19  those changes as unilateral or that they did something
20  unilaterally. What did you mean by that?
21    A  Well, the fact that they took it upon
22  themselves to modify a contract that they had issued and
23  abide by the terms that they had framed versus that which
24  had been represented to the court that existed, and the
          PRECISE REPORTING SERVICE, P.C.

---

**Page 249**

1  parties to that agreement were not in agreement with them
2  in doing so. So they just took it upon themselves to
3  continue to make these payments when at least in their
4  understanding they were suggesting the terms were not as
5  they wanted them to be.
6    Q  What do you think that Charter Security Life
7  should have done in this situation?
8    A  I think they're obligated -- if they were in
9  fact cancelling the original agreement, I think they were
10  obligated to refund the money.
11    Q  And that would be refunded to Kemper?
12    A  That would have been a refund to Kemper.
13    Q  If you could look at what's been marked as
14  Exhibit 2.
15        MR. O'DRISCOLL: Okay. Let me just get that
16  for Mr. Mensie.
17        MR. DeWICK: I'm sorry. Brian, what document
18  was that Bates labeled?
19        MS. McQUAY: K-107.
20        THE WITNESS: Okay.
21  BY MR. KEANE:
22    Q  If you look at Exhibit 2, in box 12, I'll read
23  it to you: "Will this annuity replace or change any
24  existing life insurance or annuity contract?" And the
          PRECISE REPORTING SERVICE, P.C.

---

Dimon vs. Metropolitan Life                    9-8-06                    William R. Mensie
C.A. No.: 05-11073 WGY

Page 250

1    check mark says no; is that right?
2        A    It is checked no or X'd no.
3        Q    And if you look at Exhibit 3, which is a
4    document that was produced by Attorney LeBlanc in
5    anticipation of this deposition, do you have that in
6    front of you?
7            MR. O'DRISCOLL: I'll get that for him right
8    now.
9            THE WITNESS: Yes, sir, I have it in front of
10   me.
11   BY MR. KEANE:
12       Q    Would you agree with me that Exhibit 2 and
13   Exhibit 3 are different specifically in respects to
14   signatures in boxes 14 and 15?
15       A    Boxes 14 and 15 in Exhibit 3 contain
16   handwritten statements, and the second part of your
17   question pertained to the signature?
18       Q    Yes, the signatures on the left side of Exhibit
19   3 are different than Exhibit 2; is that correct?
20       A    That is -- well, there are signatures on
21   Exhibit 3 that are not on Exhibit 2, correct.
22       Q    Thank you. And if you look at Exhibit 3 in box
23   12, it also says: "Will this annuity replace or change
24   any existing life insurance or annuity contract?" And
            PRECISE REPORTING SERVICE, P.C.

Page 251

1    again the no is checked; is that right?
2        A    That is correct.
3        Q    Wouldn't the addition of the information
4    contained in box 14 and 15 change the prior annuity
5    contract?
6        A    Yes. I mean --
7        Q    Would you agree with me that it was incorrect
8    to check off no with regard to the question in No. 12?
9            MR. O'DRISCOLL: I'm sorry. Could you restate
10   that question?
11   BY MR. KEANE:
12       Q    Mr. Mensie, would you agree with me that it was
13   wrong for whoever filled this out to check off no in
14   answer to question -- the question in box No. 12?
15           MR. O'DRISCOLL: This is asking if it was wrong
16   for Charter Security Life to do it?
17           MR. KEANE: Yes.
18   BY MR. KEANE:
19       Q    Mr. Mensie, did you answer?
20           MR. O'DRISCOLL: The question No. 12: Will
21   this annuity replace or change any existing life
22   insurance or annuity contract?
23           MR. KEANE: Exactly.
24   BY MR. KEANE:
            PRECISE REPORTING SERVICE, P.C.

Page 252

1        Q    Did you answer?
2        A    To the extent of my understanding of the
3    question, it seems that the addition of 14, which
4    certainly changes the substance of it, as well as, as
5    counsel pointed out yesterday, even the name is being
6    changed, that that box 12 should have been marked X as
7    yes because the attempt being that there was a change of
8    an existing contract.
9        Q    And in fact you just testified that if there
10   was going to be a change, there should not be a new
11   contract; the money should be refunded to Kemper; isn't
12   that right?
13       A    If there was no -- if there was no meeting of
14   the minds, then I think that is -- you know, I'm not
15   certain what the laws are concerning that; but it seemed
16   to me that if you were in fact changing the beneficiary
17   stream, which is the substance of the contract, and you
18   did not have a meeting of the mind and there had been
19   reference in it to the court this vehicle to pay the
20   benefits that the court signed off on was being modified,
21   then the entire deal had to be ended.
22           MR. KEANE: Mr. Mensie, that's all I have.
23   Thank you.
24           MR. LeBLANC: Mr. O'Driscoll, do you have any
            PRECISE REPORTING SERVICE, P.C.

Page 253

1    questions before I ask a couple?
2            MR. O'DRISCOLL: No, not at this time.
3            REDIRECT EXAMINATION
4    BY MR. LeBLANC:
5        Q    Mr. Mensie, I'd like you to look at Exhibit 2
6    and 3 if you could. Do you have those exhibits in front
7    of you?
8        A    Yes, I do.
9        Q    Thank you. First on Exhibit 3, just looking at
10   Exhibit 3, is there anything on this application that
11   requests a lifetime annuity be issued?
12       A    On 3?
13       Q    On Exhibit 3.
14           MR. O'DRISCOLL: On the application itself?
15           MR. LeBLANC: Yes.
16   BY MR. LeBLANC:
17       Q    Anything to indicate in this application that a
18   lifetime annuity is being applied for?
19           MR. O'DRISCOLL: I mean, well, you can answer
20   the question, Mr. Mensie, whether there's anything on the
21   application itself.
22           THE WITNESS: There's nothing that I see on
23   application indicating life.
24   BY MR. LeBLANC:
            PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                9-8-06                          William R. Mensie
                                 C.A. No.: 05-11073 WGY

| Page 254 | Page 256 |
|---|---|

Page 254

1    Q    And if you look at Exhibit 2, is there anything
2  on that application that indicates a lifetime annuity was
3  applied for?
4    A    Again, I don't see anything on Exhibit 2
5  indicating life.
6    Q    Okay. If we refer back to Exhibit 3, in box 9
7  it says: Type of contract single premium immediate
8  annuity. Do you see where it says that?
9    A    Box 9 it says: Type of contract single premium
10  deferred annuity. Deferred is marked off and above it is
11  handwritten immediate.
12    Q    Okay. Was there any indication in any of your
13  review of the documents in the claim file in this case
14  that Kemper intended to apply for a deferred annuity?
15    A    I don't recall seeing those terms in the
16  documents that I recall at this time.
17    Q    Now, in your experience in the insurance and
18  annuity industry, the term 20 year certain, does that
19  imply a lifetime annuity, just those words?
20      MR. O'DRISCOLL:  When read in conjunction with
21  the contract?
22      MR. LeBLANC:  No, on the application, 20 year
23  certain, does that mean lifetime?
24      THE WITNESS:  Certain -- go ahead. I'm sorry.
              PRECISE REPORTING SERVICE, P.C.

Page 256

1  20 year certain, that's what was applied for, wasn't it,
2  Mr. Mensie?
3      MR. O'DRISCOLL:  Are you asking him what was
4  applied for or what it says in the box?
5      MR. LeBLANC:  What it says in the box.
6      THE WITNESS:  Thank you for clarifying that. I
7  just read what it says in the box. The certain period as
8  signified by definition of the contract is outlined in a
9  previous question that had been asked of me where I think
10  it was one of the exhibits that, titled settlement
11  options, I think the company defines certain period to
12  the extent that it talks about a specific period of time
13  which that 20 year would be as elected and thereafter for
14  the remaining lifetime of the payee.
15  BY MR. LeBLANC:
16    Q    Okay. Would you agree with me at the time the
17  application was made that no contract existed?
18      MR. O'DRISCOLL:  Object to the form. When you
19  say "at the time the application was made," that's not
20  clear to me; but if the witness can answer it.
21      MR. LeBLANC:  To the extent that I can
22  understand the question and can answer it, there was a --
23  the actual -- my reading of the material suggested that
24  there in fact hadn't been a -- there had been a meeting
              PRECISE REPORTING SERVICE, P.C.

| Page 255 | Page 257 |
|---|---|

Page 255

1      MR. O'DRISCOLL:  Well, to the extent that you
2  can answer.
3      THE WITNESS:  To the extent that I can answer
4  this is that the certain signifies a specified period.
5  BY MR. LeBLANC:
6    Q    And what on the application in Exhibit 3 is the
7  specified period?
8    A    In the handwritten document are you speaking of
9  in section 14?
10    Q    I'm speaking of Exhibit 3, what is the certain
11  period represented in that application?
12    A    The application in section 14 is handwritten
13  immediate annuity 20 year certain, 3 percent interest,
14  175,000, I think that's an equal sign, 1,450.45 per
15  month, and I cannot decipher what that last portion is.
16    Q    But the 20 year certain annuity is being
17  applied for per the terms of this application; isn't that
18  correct?
19      MR. O'DRISCOLL:  Object to the form of the
20  question. Are you asking now in conjunction with the
21  rest of the contract?
22      MR. LeBLANC:  I'm asking in the annuity
23  application, the document that Mr. -- that we marked as
24  Exhibit 3 and Mr. Mensie I hope has in front of him says
              PRECISE REPORTING SERVICE, P.C.

Page 257

1  of the minds with respect to --
2  BY MR. LeBLANC:
3    Q    Mr. Mensie, that's not what I asked you.
4      MR. O'DRISCOLL:  The witness is trying to
5  answer the question.
6      MR. LeBLANC:  The witness is answering his own
7  question.
8  BY MR. LeBLANC:
9    Q    The question is:  Did a contract exist as of
10  the time this application was made?
11      MR. O'DRISCOLL:  Between what parties?
12      MR. LeBLANC:  An annuity contract.
13      MR. O'DRISCOLL:  Well, I'll object on a few
14  grounds. First of all, you're asking Mr. Mensie for a
15  legal opinion, and he's testifying here as a fact witness
16  as Kemper's representative.
17      MR. LeBLANC:  I'm asking him if factually a
18  contract existed as of the time the application was
19  submitted.
20      MR. O'DRISCOLL:  Well, you know, I would
21  continue in my objection. The existence of a contract
22  and when exactly it exists is the subject of case law,
23  not for Mr. Mensie's testimony.
24  BY MR. LeBLANC:
              PRECISE REPORTING SERVICE, P.C.

Page 258

1    Q    Mr. Mensie, could you answer the question,
2    please.
3    A    From my review of the file it seemed to me that
4    the parties thought that a contract did in fact exist at
5    the time. There was an agreement of the parties. There
6    was an exchange of money, and there was a document
7    produced representing that agreement of the minds.
8    Q    Mr. Mensie, in your experience in the insurance
9    and annuity industry is it the case that an annuity
10   contract is issued and that it is applied for, or is it
11   the other way around?
12   A    The issuance of a contract comes much later in
13   the process.
14   Q    So the process is an application is submitted;
15   is that true?
16   A    The process is that a quote is rendered
17   representing what it would cost to purchase the vehicle,
18   the check is drawn to reflect that quote, the money and
19   the application are submitted, and then the policy is
20   issued.
21   Q    Okay. So the application comes first, then the
22   policy; is that true?
23        MR. O'DRISCOLL: Mr. Mensie just testified that
24   after the application is submitted, the policy is issued.

PRECISE REPORTING SERVICE, P.C.

Page 259

1        MR. LeBLANC: Well, let's have the witness
2    testify as to that then.
3        MR. O'DRISCOLL: He just did.
4    BY MR. LeBLANC:
5    Q    Is that true, Mr. Mensie?
6        THE WITNESS: Can you read back my response?
7        MR. O'DRISCOLL: Yes.
8        MR. LeBLANC: Let's read back the question
9    first and see if Mr. Mensie can answer the question.
10       MR. O'DRISCOLL: It's been asked and answered,
11   but...
12       MR. LeBLANC: Joanne, could you read back the
13   question, please.
14       (Record read as follows: So the
15       application comes first, then the
16       policy; is that true?)
17       MR. O'DRISCOLL: That's what he just testified
18   to.
19       Actually, strike that. He testified as to
20   the entire process, and that included the answer to your
21   last question.
22   BY MR. LeBLANC:
23   Q    Okay. And the question still stands: Is it
24   true, Mr. Mensie, the application comes first and then

PRECISE REPORTING SERVICE, P.C.

Page 260

1    the policy is issued; is that true?
2        MR. O'DRISCOLL: He just testified what came
3    first and second and third and fourth. He went through
4    the whole process.
5    BY MR. LeBLANC:
6    Q    Mr. Mensie, there's a question before you. Is
7    it true the application comes first, then the policy is
8    issued, yes or no?
9    A    As far as I know the process is as I've
10   reflected, and once again I'll state it for the record
11   that the quote comes first.
12   Q    What's that?
13   A    The quote comes first.
14   Q    Relative just with reference to the application
15   and the policy, which of those documents comes first?
16       MR. O'DRISCOLL: The application and the
17   policy, is that your question?
18   BY MR. LeBLANC:
19   Q    With reference to only the application and the
20   policy, which comes first?
21       MR. O'DRISCOLL: The policy issuance, is that
22   what you're talking about?
23   BY MR. LeBLANC:
24   Q    Mr. Mensie?

PRECISE REPORTING SERVICE, P.C.

Page 261

1    A    Yeah, that's the confusion because, you know,
2    the life company -- the issuance of the policy is the
3    final process. So in the sequence of whatever their
4    orders might be in terms of what they require, you know,
5    I can't necessarily speak to that; but the first process
6    is the quote.
7    Q    Okay. Mr. Mensie, does the application predate
8    the issuance of the policy?
9    A    In most times, yes.
10   Q    Thank you. You testified earlier when
11   discussing Exhibit 5 that Kemper did not know who Charter
12   was at the time. Are you saying as of 4-18-1983 Kemper
13   did not know who Charter was?
14       MR. O'DRISCOLL: Objection to the form of the
15   question. It's a compound question. Would you like me
16   to get Exhibit 5 for the witness so that he may review
17   it?
18       MR. LeBLANC: He doesn't need to review it.
19   That was his testimony regarding the exhibit. I'm just
20   asking him is it his testimony as of 4-18-1983 that
21   Kemper did not know who Charter was.
22       THE WITNESS: Thank you for giving me an
23   opportunity to clarify that statement. I didn't realize
24   that it came out that way.

PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                      9-8-06                      William R. Mensie
C.A. No.: 05-11073 WGY

Page 262

1  BY MR. LeBLANC:
2      Q  Do you want to change your testimony now
3  regarding that statement?
4      A  Well, I want to be able to explain it if you
5  interpreted what I'm saying to suggest that no one at
6  Kemper knew who Charter was.  I cannot speak to that.  I
7  was speaking to the document that was before me and my
8  reading of what he was suggesting.
9          That is not to say that even Mr. Noe
10  personally did not know who Charter was at the time.  It
11  was my reading of a document and impression that I got is
12  that they had not done business with each other, or that
13  was my impression of it, and that doesn't necessarily
14  mean that that was so either; but that was simply my
15  impression of the reading of that document.
16      Q  And you're testifying today as the
17  representative of Kemper; you understand that, right?
18      A  I do understand that.
19      Q  Can you refer to Exhibit 2, please.
20          MR. O'DRISCOLL:  Mr. Mensie has Exhibit 2 in
21  front of him.
22  BY MR. LeBLANC:
23      Q  Box 12 where Mr. Keane asked some questions
24  will this annuity replace or change any existing life
              PRECISE REPORTING SERVICE, P.C.

Page 263

1  insurance or annuity contract, and it was checked no.
2          MR. O'DRISCOLL:  This is Exhibit 2?  You're
3  asking about Exhibit 2, now, Peter?  I'm sorry.
4          MR. LeBLANC:  Exhibit 2, box 12.
5          THE WITNESS:  Got it.
6  BY MR. LeBLANC:
7      Q  He asked a question about no being checked in
8  box 12, do you recall that question or that line of
9  questions?
10      A  Yes.
11      Q  Okay.  And then he also asked a question if you
12  look at Exhibit 3, again the same box no -- no box is
13  checked to the question will this annuity replace or
14  change any existing insurance or annuity contract?
15          MR. O'DRISCOLL:  I'm handing the witness
16  Exhibit 3.
17          THE WITNESS:  Yes.
18  BY MR. LeBLANC:
19      Q  Mr. Mensie, why don't you have Exhibit 2 and
20  Exhibit 3 in front of you because Exhibit 2 is easier to
21  read.
22          MR. O'DRISCOLL:  He does.
23  BY MR. LeBLANC:
24      Q  At the time that this application was submitted
              PRECISE REPORTING SERVICE, P.C.

Page 264

1  by Mr. Noe, was there an existing annuity contract issued
2  by Charter Security owned by American Motorists with
3  Mr. Dimon being the beneficiary?
4          MR. O'DRISCOLL:  Objection to the form of the
5  question because it's compound.  There are a number of
6  questions contained within your question.
7  BY MR. LeBLANC:
8      Q  Mr. Mensie, you can answer if you understand.
9      A  I do, but I don't have the date that they
10  actually issued the policy.
11      Q  We just went over what the process was and what
12  the steps were, right?
13      A  In general, but actually you have a specific
14  record here.
15      Q  Right.  So we have a document signed by Mr.
16  Noe, Exhibit 2 and Exhibit 3?
17      A  That's correct.  Well, I have the exhibits
18  before me, Exhibit 2 and Exhibit 3.  Whether or not
19  Exhibit 3 was signed by Mr. Noe, I don't think I've
20  testified to that.
21      Q  I believe you did yesterday, and are you now
22  saying that Exhibit 3 is not signed by Mr. Noe?
23      A  I'm saying I cannot read that signature line on
24  Exhibit 3.
              PRECISE REPORTING SERVICE, P.C.

Page 265

1      Q  Okay.  Well, I'll rely on your testimony from
2  yesterday.  Is it Kemper's position today as we speak
3  that there was an existing life insurance or annuity
4  contract when box -- when the no box was checked in box
5  12 of the application?
6      A  On which Exhibit?
7      Q  On Exhibit 2, Exhibit 3, Exhibit 4, any of the
8  copies of the application.
9          MR. O'DRISCOLL:  Exhibit 4?
10          MR. LeBLANC:  Exhibit 4 is a very poor copy of
11  Exhibit 3 that was submitted in the claim file that we
12  received recently or the partial claim file that we
13  received recently.
14          THE WITNESS:  Well, as best I understand your
15  question, because these exhibits obviously took place at
16  different time frames, Exhibit 2, the box is checked no;
17  but between the time of Exhibit 2 and Exhibit 3 which you
18  actually have a date on, May of '83, if the policy
19  wasn't -- there may very well have been a policy issued
20  between those times.
21  BY MR. LeBLANC:
22      Q  Do you have any evidence that there was a
23  policy issued prior to May of 1983?
24          MR. O'DRISCOLL:  The witness didn't testify
              PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life        9-8-06        William R. Mensie
C.A. No.: 05-11073 WGY

Page 266

1  that prior to May of 1983 that there was an --
2      MR. LeBLANC: He said there may have been a
3  policy issued between the time Mr. Noe signed it and the
4  date on Exhibit 3. I want to know does the witness have
5  any evidence at all that there was a policy issued prior
6  to May of 1983.
7      THE WITNESS: As best I can recall, the policy
8  that was issued contained language that was different
9  than that language that you now see on Exhibit 3.
10 BY MR. LeBLANC:
11    Q  Is Exhibit 3 a policy, Mr. Mensie?
12    A  No. It's an application.
13    Q  Okay. I'm asking was a policy issued prior to
14 May of 1983? Do you have any evidence of that?
15    A  The evidence that I would suggest that would --
16 that may have been existent would be the policy itself
17 that shows terms that are different than those terms that
18 Exhibit 3 purports to represent.
19    Q  Mr. Mensie, in your experience in the insurance
20 and annuity industry is an application a contract?
21    A  Not in my experience, not by itself.
22    Q  Is an application a policy?
23    A  Not -- my experience is not by itself. It
24 doesn't stand alone.
        PRECISE REPORTING SERVICE, P.C.

Page 267

1     Q  Okay. Now, if an individual submits an
2  application, the insurer or the company that's to issue
3  the policy, are they free to do anything they want with
4  the terms of the policy after the application was
5  submitted?
6     A  I think that it's spelled out in their
7  agreement what they can do as respects to an application.
8     Q  Okay. So if the application says 20 year
9  certain, the policy should say 20 year certain; isn't
10 that true?
11     MR. O'DRISCOLL: Objection to the form of the
12 question.
13 BY MR. LeBLANC:
14    Q  Mr. Mensie, if you can answer.
15    A  You're asking me if a party submits an
16 application that contains -- I'm sorry. Could you ask
17 the question again.
18     MR. LeBLANC: Let's have the question read back
19 by the court reporter, please.
20     (Record read as follows: So if the
21        application says 20 year certain, the
22        policy should say 20 year certain;
23        isn't that true?)
24     MR. O'DRISCOLL: Is your question asked in a
        PRECISE REPORTING SERVICE, P.C.

Page 268

1  vacuum of what the contract language says and what the
2  prior agreement of the parties are?
3      MR. LeBLANC: My question is asked as it's
4  asked. If Mr. Mensie can answer, then he can answer.
5      MR. O'DRISCOLL: He's already testified to that
6  as regards to this case; but, Mr. Mensie, you can answer
7  to the extent that you --
8      THE WITNESS: I'm not really sure what that
9  process would be. If the application -- if they're
10 applying for -- if they're making application for
11 something, should the policy reflect what the application
12 says; is that your question?
13     MR. LeBLANC: My question can be read back by
14 the court reporter if you would like.
15     (Record read as follows: So if the
16        application says 20 year certain, the
17        policy should say 20 year certain;
18        isn't that true?)
19     THE WITNESS: I'm really not sure how to answer
20 that question because I mean if the -- if the
21 application -- my understanding at least of the question,
22 if the application represents a -- no, you know, actually
23 if the application represents something that the carrier
24 does not want to do, they should -- they could reject the
        PRECISE REPORTING SERVICE, P.C.

Page 269

1  application.
2     Q  That really doesn't answer the question though.
3     A  If I understood, you asked the question if the
4  application represented something to the carrier 20 year
5  certain, should the policy be issued for 20 year certain;
6  and my answer to that is not necessarily if the carrier
7  doesn't want to accept the application as it's written.
8  It doesn't have to always issue it as it's written. It
9  could reject the application.
10    Q  Okay. But if it doesn't reject the application
11 and actually issues a policy, shouldn't the policy
12 reflect what was applied for?
13    A  Then that would be the same thing as -- well,
14 if the application spelled the name wrong, the policy
15 should be issued with the wrong name?
16    Q  That's not the question.
17    A  Well, I'm not sure I understand the question.
18    Q  Okay. If an application is submitted that
19 requests a 20 year certain immediate annuity, shouldn't
20 the policy that was issued only be a 20 year certain
21 immediate annuity if the company doesn't reject the
22 application?
23     MR. O'DRISCOLL: I'm going to object to the
24 form of the question.
        PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                           9-8-06                           William R. Mensie
C.A. No.: 05-11073 WGY

Page 270

1       MR. LeBLANC:  Come on.
2       MR. O'DRISCOLL:  You're assuming facts not in
3    evidence for one thing.
4       MR. LeBLANC:  How so?
5       MR. O'DRISCOLL:  Well, the application that was
6    submitted here, Exhibit 2, doesn't say anything about 20
7    year certain in the first place.
8       MR. LeBLANC:  Exhibit 3 says 20 year certain.
9    That's the application that was submitted.
10       MR. O'DRISCOLL:  That's not what the witness
11    testified to.
12       MR. LeBLANC:  The witness can't testify as to
13    what application was submitted because he wasn't there in
14    1983.
15    BY MR. LeBLANC:
16       Q   Isn't that true, Mr. Mensie, as Mr. DeWick
17    asked, you weren't present in 1983?
18       A   That's correct.
19       Q   So you have no idea what was submitted and what
20    wasn't?
21       A   Only from the review of the record.
22       Q   Okay.  So if an application is submitted that
23    says special request immediate annuity 20 year certain,
24    if the application isn't rejected by the company, that's
                PRECISE REPORTING SERVICE, P.C.

Page 271

1    the policy that should issue; isn't that true?
2       MR. O'DRISCOLL:  Object to the form of the
3    question.  It's a complete hypothetical because there's
4    been no evidence that's what happened here, but the
5    witness can answer the question to the extent he
6    understands it.
7       THE WITNESS:  To the extent of my
8    understanding, if the application is submitted, the
9    policy would be issued to comply with what was requested
10    if that's what the agreements were.
11    BY MR. LeBLANC:
12       Q   Okay.  And that's only to the extent -- and
13    what do you mean by if that's what the agreements were?
14       A   If you have -- if the application is somehow --
15    doesn't reflect what the agreements were, then I think
16    the obligation becomes together make sure they have a
17    meeting of the minds before the policy is issued.  I
18    don't think one party can just unilaterally modify the
19    application and then assume that that's -- a policy
20    should be issued that way.
21       Q   Is that what Kemper would do?  Would they come
22    together and make sure there was a meeting of the minds?
23       MR. O'DRISCOLL:  Object to the form of the
24    question.  Is that what Kemper would do under what
                PRECISE REPORTING SERVICE, P.C.

Page 272

1    circumstances?
2       MR. LeBLANC:  Under the circumstances
3    Mr. Mensie just described.
4       THE WITNESS:  My involvement where I have a
5    settlement and I'm going to issue a settlement document,
6    if that settlement document does not reflect the
7    understanding that the parties have, then we get the
8    settlement document worked out.  So I would not issue a
9    settlement agreement without having everyone who was to
10    honor that agreement involved in -- for example, in this
11    application you've got handwritten notes, but you've got
12    no one having stenciled them, no one having initialed
13    them to signify that there was any agreement on these
14    parts.
15    BY MR. LeBLANC:
16       Q   Mr. Mensie, is the claim file kept in any
17    particular order?
18       A   Claim files are usually kept in reverse
19    chronological order, yes.
20       Q   So documents received first go in the back and
21    they move forward from there?
22       A   Correct.
23       Q   And do you know if the documents that represent
24    a partial claim file from Kemper that were disclosed and
                PRECISE REPORTING SERVICE, P.C.

Page 273

1    marked by your attorney continue that reverse
2    chronological order organization?
3       A   The documents disclosed in March would not have
4    been the claim file.
5       Q   The documents disclosed this week.
6       A   Oh.  To the extent --
7       MR. O'DRISCOLL:  If you know.
8       THE WITNESS:  I don't know what, you know,
9    this -- how counsel disclosed the information, but to the
10    extent that the claim file remained organized in the
11    method that is prescribed, then the documents would be in
12    reverse chronological order.
13    BY MR. LeBLANC:
14       Q   Okay.  Do you know for a fact that they are in
15    reverse chronological order or are not in reverse
16    chronological order?
17       A   When I reviewed the file, for the most part
18    they were.  I did find documents that did not appear in
19    date sequence reverse chronological order.  Again this
20    dates back to 1983, so it was -- they were commingled
21    within the documents.
22       Q   They were commingled when you received the
23    claim file?
24       A   That's correct.
                PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                 9-8-06                 William R. Mensie
C.A. No.: 05-11073 WGY

**Page 274**

1    Q    You sent it to your attorney?
2    A    I sent it to my attorney in the form that I
3  received it, and there were documents within that review,
4  within my initial review, that were not in date sequence
5  order.
6    Q    Do you recall what those documents were?
7    A    No, I do not.
8    MR. LeBLANC:  I have no further questions;
9  although I am reserving the right to suspend.
10    MR. O'DRISCOLL:  I have no questions.  Does
11  anyone else?
12    MS. McQUAY:  No.
13    MR. DeWICK:  I have one actually.  This is Jed
14  DeWick.
15    RECROSS EXAMINATION
16  BY MR. DeWICK:
17    Q    Mr. Mensie, back to Exhibit 3 where it
18  indicates about 14 immediate annuity, 20 year certain?
19    A    Yes, sir.
20    Q    You referenced a document earlier that was --
21  you testified was part of the annuity contract and that
22  that's Bates labeled K-0015.
23    MR. O'DRISCOLL:  I'm going to hand that to the
24  witness if that's okay.
PRECISE REPORTING SERVICE, P.C.

**Page 275**

1    MR. DeWICK:  Yes, please, hand both of them if
2  you will, Exhibit 3 as well as that page.
3    THE WITNESS:  Oh, yes.
4  BY MR. DeWICK:
5    Q    Just so we're clear here, the portion on Bates
6  labeled K-0015 indicates option 2, life annuity.  Do you
7  see that?
8    A    Yes.
9    Q    And then in the next column it says with
10  certain period, and it describes what with certain period
11  means?
12    A    Yes.
13    Q    And then we see on box 14 of Exhibit 3 that it
14  indicates in the special request box immediate annuity,
15  20 year certain?
16    A    That's correct.
17    Q    Referencing those two documents, is it fair to
18  say that this application is applying for a life annuity
19  with a 20 year certain period?
20    A    It appears to be so, yes.
21    MR. DeWICK:  I don't have anything further.
22  Thank you.
23    MR. O'DRISCOLL:  Anyone else?
24    MR. LeBLANC:  I do.
PRECISE REPORTING SERVICE, P.C.

**Page 276**

1    FURTHER REDIRECT EXAMINATION
2  BY MR. LeBLANC:
3    Q    Mr. Mensie, box 14 of Exhibit 3, does the term
4  "the certain period" appear anywhere in box 14?
5    MR. O'DRISCOLL:  Box 14 of Exhibit 3.
6    THE WITNESS:  In Exhibit 3 it reads:  Immediate
7  annuity, 20 year certain.
8  BY MR. LeBLANC:
9    Q    But not the certain period?
10    A    It does not read the certain period.
11    Q    Okay.  So you're making the leap of faith
12  between box 14 and K-0015 that the certain period and
13  certain mean the same thing; isn't that true?
14    MR. O'DRISCOLL:  Objection to the form.  You
15  may answer.
16    THE WITNESS:  No.  My leap was actually my
17  recollection of what -- how it read in Exhibit K-0015,
18  it's in parentheses the certain period.  So the person
19  authoring box 14 may have been classifying the certain
20  period to be reflective of what the actual contract says,
21  so it was actually the reverse.  I was going from the
22  contract itself by what was being asked of me earlier
23  trying to define what they were suggesting here in box
24  14.
PRECISE REPORTING SERVICE, P.C.

**Page 277**

1  BY MR. LeBLANC:
2    Q    Okay.  And you would agree with me that the day
3  is --
4    A    Whoever the author was of this handwritten
5  document.
6    Q    The day you're referring to is someone from
7  1983, right?
8    A    This document was -- appears that this dates
9  back to 1983, yes.
10    Q    And you don't know who wrote that?
11    MR. O'DRISCOLL:  Who wrote what?
12    MR. LeBLANC:  Who wrote certain in box 14.
13    THE WITNESS:  I do not know the identity of the
14  author of what appears in the special remarks section.
15  BY MR. LeBLANC:
16    Q    Okay.  When you say "special remarks," do you
17  mean special requests?
18    A    I'm sorry.  Special requests, yes.
19    Q    So you're speculating as to what they may have
20  been thinking but have no basis of knowledge for that;
21  isn't that true?
22    A    My knowledge is only based upon my
23  interpretation of what it says.
24    Q    Okay.  But you testified earlier that the
PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                    9-8-06                    William R. Mensie
C.A. No.: 05-11073 WGY

Page 278

1   application predates or comes prior to the issuance of
2   the policy.  Do you recall that?
3        MR. O'DRISCOLL:  Object to the form.  I believe
4   the record will show the witness testified that the
5   submission of the original application does come before
6   the policy.  You may answer, Mr. Mensie.
7        THE WITNESS:  To the extent I understand the
8   question, my testimony earlier attempted to explain my
9   understanding of the process.  I did not mean to suggest
10  by any means that this particular application was
11  submitted prior to the issuance of the policy.
12       MR. LeBLANC:  I don't have any other questions
13  at this time.  Anyone else?
14       MR. DeWICK:  No.
15       MR. O'DRISCOLL:  No.
16       MR. KEANE:  No, I do not.
17       MS. McQUAY:  No.
18       MR. LeBLANC:  Then we're going to suspend the
19  deposition at this time and determine at a later date
20  whether we'll reconvene.  Also we're suspending based on
21  my statements yesterday and the partial disclosure of the
22  documents in the claim file.
23       MR. O'DRISCOLL:  And I will state for the
24  record that we do not agree to any -- Kemper does not
                    PRECISE REPORTING SERVICE, P.C.

Page 279

1   agree to any suspension of the deposition.  There's been
2   no cause whatsoever shown for that, and that should
3   suffice.
4        MR. LeBLANC:  Thank you all.  Thank you, Mr.
5   Mensie.
6        THE REPORTER:  Do you do signature?
7        MR. O'DRISCOLL:  Yes.
8        THE REPORTER:  He needs to read?
9        MR. O'DRISCOLL:  Yes.
10       MR. LeBLANC:  Let's go off record but take care
11  of some housekeeping issues, can we all agree to that?
12       (Discussion held off the record.)
13       (Witness excused.)
14
15
16
17
18
19
20
21
22
23
24

Page 280

1       I have read the foregoing transcript of my
    deposition taken on September 7 and 8, 2006, and
2       It is a true and correct transcript of my
    deposition given on the day and date aforesaid.
3       (or)
4       _____ I wish to make the following changes to my
    deposition:
5
6   Page _____ Line _____ Change _____ _____ _____ _____
7       Reason _____ _____ _____ _____ _____
8   Page _____ Line _____ Change _____ _____ _____ _____
9       Reason _____ _____ _____ _____ _____
10  Page _____ Line _____ Change _____ _____ _____ _____
11      Reason _____ _____ _____ _____ _____
12  Page _____ Line _____ Change _____ _____ _____ _____
13      Reason _____ _____ _____ _____ _____
14  Page _____ Line _____ Change _____ _____ _____ _____
15      Reason _____ _____ _____ _____ _____
16  Page _____ Line _____ Change _____ _____ _____ _____
17      Reason _____ _____ _____ _____ _____
18
19           William R. Mensie
20  Subscribed and sworn to
21  before me this _____ day
    of _____, 2006.
22  _____
23  (Seal)  Notary Public
24
        PRECISE REPORTING SERVICE, P.C.

Page 281

1
2   STATE OF ILLINOIS )
              ) SS.
3   COUNTY OF C O O K )
4
5       I, JOANNE M. BROGAN, CSR, RPR, a notary
6   public in and for the County of Cook and State of
7   Illinois, do hereby certify that WILLIAM R. MENSIE, was
8   by me first duly sworn to testify to the truth, the whole
9   truth, and nothing but the truth, and that the above
10  deposition was recorded stenographically by me and
11  reduced to computer-aided transcription by me.
12      I FURTHER CERTIFY that the foregoing
13  transcript of the said deposition is a true, correct, and
14  complete transcript of the testimony given by the said
15  witness at the time and place specified hereinbefore.
16      I FURTHER CERTIFY that I am not a
17  relative or employee or attorney or counsel of any of the
18  parties, nor a relative or employee of such attorney or
19  counsel, or financially interested directly or indirectly
20  in this action.
21
22
23
24

71 (Pages 278 to 281)

Dimon vs. Metropolitan Life          9-8-06          William R. Mensie

C.A. No.: 05-11073 WGY

Page 282

1
2       I FURTHER CERTIFY that my certificate
3  annexed hereto applies to the original and typed
4  transcripts only, signed and certified transcripts only.
5  I assume no responsibility for the accuracy of any
6  reproduced copies not made under my control or direction.
7       IN WITNESS WHEREOF, I have hereunto set my
8  hand and affixed my seal of office at Chicago, Illinois,
9  this 28th day of September, 2006.
10
11      _____
      Certified Shorthand Reporter
12     Registered Professional Reporter
      Notary Public, Cook County, Illinois
13     C.S.R. No. 084-002353
14
15
16
17
18
19
20
21
22
23
24
     PRECISE REPORTING SERVICE, P.C.

WORD

INDEX

Dimon vs. Metropolitan Life       9-8-06       William R. Mensie
C.A. No.: 05-11073 WGY

Page 1

| **A** | | | | |
|---|---|---|---|---|
| abide 248:23 | accomplish 40:15 | 144:19 221:1 | 239:3,11 243:18 | 218:2,21 219:10 |
| abilities 205:9,17 | accordance 150:3 | 251:3 252:3 | 246:13 258:24 | 219:20 220:8 |
| ability 187:15 | according 177:8 | additional 29:6 | 267:4 | 233:21 234:6 |
| 204:24 205:11 | accuracy 282:5 | 36:18 48:18 49:18 | afternoon 100:18 | 238:7,15 240:4 |
| able 36:20 37:11,13 | accurate 33:7 | 143:15 158:4 | 100:20 | 241:18 247:3 |
| 37:15,17,20 52:7 | 151:12 | 194:12 | afterwards 65:4 | 249:1,1,9 258:5,7 |
| 52:8 55:13,15,17 | acquired 242:22 | address 18:16 | 107:20 108:16 | 267:7 268:2 272:9 |
| 55:18,19,20 56:6 | across 82:20,24 | 31:14 102:20,24 | again 27:20 31:11 | 272:10,13 |
| 70:19 124:8 | act 75:11 165:3 | 103:17,21 104:3,9 | 35:24 39:5 58:6 | agreements 234:7 |
| 133:13 147:4 | acting 125:14 | 105:2 107:9 | 60:2 63:23 71:17 | 271:10,13,15 |
| 170:12 186:18 | 200:13,19 201:7 | 111:20 112:24 | 74:22 81:9 86:13 | ahead 254:24 |
| 195:2 239:2 262:4 | 201:21 | 113:1,22,24 114:1 | 87:1 89:3,14,19 | al 65:9 |
| about 5:6 9:5 19:10 | action 5:9,15 | 114:3,16 115:2,7 | 96:21 104:20 | alarm 35:11 |
| 21:10 24:4 31:18 | 131:17,20 132:13 | 115:10 116:4 | 115:4,12 129:8 | alert 171:6 |
| 35:1 37:21 38:15 | 143:7 175:23 | 139:15 | 147:22 149:6 | alerted 37:22 41:11 |
| 41:5 43:15,23,24 | 206:13,14,15,23 | addressed 57:19 | 150:12 154:11,17 | 167:23 169:6 |
| 46:1 57:3 61:14 | 240:17 281:20 | 113:2 114:23 | 159:11 169:3 | allegations 5:13 |
| 62:7 64:2 69:8 | actions 5:11 206:16 | 152:19,20 174:13 | 172:15 202:18 | 234:3 |
| 85:20 95:8,13 | activity 17:3,10 | 179:6,7 | 203:10 210:8 | alleging 5:16 |
| 96:14 104:8,10,16 | acts 59:4,16 | addresses 19:15,17 | 231:13 240:16 | Allen 173:21,22 |
| 104:18 105:7,17 | actual 35:16 36:6 | 19:23 20:8 21:6 | 242:14 243:10 | 174:1,21 175:4,16 |
| 106:3,21 107:20 | 36:20 40:22 50:13 | 24:4 25:4,16 26:7 | 251:1 254:4 | 175:22 176:7,12 |
| 107:22,22 114:1 | 58:9 63:18 70:4 | 26:15,19 27:15,17 | 260:10 263:12 | 179:7,8 183:2 |
| 115:18,20 116:1,2 | 70:15 118:16 | 27:21 28:9 29:17 | 267:17 273:19 | 199:24 200:16,19 |
| 116:2 117:19,23 | 122:19,22 139:7 | 29:18 103:4,6,15 | against 5:9,11,14 | 201:1,4,7,17,20 |
| 121:11 156:10 | 143:9,12 146:2 | 105:10 | 5:16 42:11 63:9 | 202:4,6,21 203:2 |
| 168:11,19 169:9 | 210:15 216:6 | addressing 71:14 | 127:8 143:7 166:8 | 203:4,6,12,17 |
| 169:11 173:21 | 232:13 256:23 | 115:23 128:8 | 232:6 233:6,17 | 204:15 |
| 177:8,22 190:17 | 276:20 | adjourned 191:4 | 235:15 | Allen's 175:18 |
| 194:16 196:23 | actually 9:23 12:3 | adjudication | agent 61:13 91:8 | 176:1,3,4 |
| 204:23 205:21 | 36:5,22,24 37:16 | 131:24 | 198:8 | allocated 169:4 |
| 207:17 208:18 | 37:20 41:9 53:3 | adjuster 73:2,5,15 | ago 19:20 27:9,10 | allow 25:1 |
| 210:2,14 211:10 | 55:13 58:7 59:3 | adjuster's 13:13 | 41:5 44:20 48:17 | allowed 24:13 |
| 211:19 213:15 | 60:7 63:18,19 | adjusting 247:20 | 87:18 144:11 | allowing 17:9 |
| 214:4 218:23 | 74:7,20 75:6 | administrative | 169:9,12 170:16 | 214:12 |
| 227:24 233:14 | 98:17 101:2,3 | 156:5 | 170:19 179:24 | alone 162:11 |
| 234:8 237:8,11 | 110:15 111:11 | advice 22:14 108:14 | 185:18 | 266:24 |
| 245:6,12,15 | 112:15 113:4 | 228:2 | agree 42:18 45:3,6 | along 17:10 54:24 |
| 247:24 248:17 | 139:5 140:7 146:5 | advise 45:10 67:7 | 47:10,22,24 48:13 | 74:11 80:21 81:23 |
| 256:12 260:22 | 147:23 150:20 | advised 38:1 197:16 | 94:12 150:5 | 130:9 |
| 263:3,7 270:6 | 157:9 163:2 | 198:15 | 198:11 199:9 | already 25:15 77:19 |
| 274:18 | 170:12 171:14,24 | advises 98:3 | 202:14 203:6 | 77:21 107:19 |
| above 124:23 | 184:5 185:24 | advising 66:14,21 | 231:21 236:8 | 126:15 153:7 |
| 246:10 254:10 | 187:17 199:1 | 123:3 | 250:12 251:7,12 | 203:22 204:16 |
| 281:9 | 205:21 222:12 | affect 166:5 | 256:16 277:2 | 268:5 |
| Absent 118:16,23 | 246:17 247:11,20 | affixed 282:8 | 278:24 279:1,11 | although 44:17 |
| absolutely 56:24 | 259:19 264:10,13 | aforesaid 280:2 | agreed 98:5 124:24 | 274:9 |
| 140:1 196:10 | 265:18 268:22 | after 8:14 11:10,13 | 125:1 134:23 | always 269:8 |
| accept 95:9 269:7 | 269:11 274:13 | 11:17 27:8 35:23 | 231:21 232:4,11 | amended 95:10 |
| acceptable 100:24 | 276:16,21 | 36:1,12 41:4,6 | 233:4 234:5,11 | 98:19 |
| Access 2:8 193:8 | ad 205:12 | 53:10 56:12 73:20 | agreement 55:1 | American 6:4,10,11 |
| accident 9:12 33:2 | adamant 176:6 | 73:20 74:1 81:20 | 80:6 91:13 93:1 | 8:4,10,16 58:4,6,9 |
| accommodate | add 204:9,11 209:9 | 86:16,22 115:14 | 98:12 113:22 | 58:11,21 59:1,2,5 |
| 101:4 | added 139:9 215:18 | 128:7,9 132:8 | 142:6,9,18 183:14 | 59:16,22 60:1,5 |
| accommodated | addendums 142:12 | 136:2 143:4 144:1 | 214:24 215:16,17 | 79:3,5,19 84:13 |
| 189:24 | 142:14 | 152:5 170:9 177:1 | 216:1,4,9,10,12 | 113:3 163:13,16 |
| | addition 39:17 | 194:23 197:3 | 216:14,18 217:3 | 163:24 164:4,9,10 |
| | 46:11 48:15 | 232:3,10 238:22 | 217:10,15,17,23 | 164:21 175:18,22 |

Dimon vs. Metropolitan Life
9-8-06
C.A. No.: 05-11073 WGY
William R. Mensie

Page 2

176:1,3 179:1
226:18 243:22
244:12 264:2
**among** 216:18
217:2 223:2
**amongst** 14:9
103:12
**amount** 107:24
182:12 224:21
225:12
**analysis** 86:22
**analyst** 6:23
**Anderson** 1:10 2:19
192:10 193:19
**and/or** 15:8 172:3
**animal** 138:8
**annexed** 282:3
**annually** 215:18,19
221:7 224:22
225:13 231:1
**annuitant** 17:8 79:1
83:3 85:3
**annuities** 10:5,13
10:20,23 11:9
16:20,22 17:2,3
117:9 126:22
136:7,13 243:16
**annuity** 3:18,19,23
7:3 9:14,20 10:6
10:11,11,15,17,22
11:1,3,5,11,14,17
11:17 12:1,4,6
16:23 17:5,23
19:12 32:16,17,18
32:21 33:8,19,23
34:8,10 35:12
36:14,22,23 37:1
37:3,4 38:18 41:8
41:11 42:4 49:23
50:1,5,13 51:9,11
51:15 52:9,21,21
54:19,24 55:3
74:12,13,18,19,20
75:3 78:24 79:7
79:21,22,23 80:1
80:5,8 81:18,23
82:22 86:16 88:10
89:2 90:7,24
91:19 94:9 95:10
96:11 114:15
115:21 116:22
117:24 118:5
124:15 125:2,19
126:24 127:13,14
131:3,8 132:4,8
133:8 134:7,10,12
135:23 136:4,9,18
136:24 137:1,20

141:24 143:8
144:2,6 149:16
153:11 154:13
157:11,13,18
158:3,7,12,15
161:6,10,14 181:9
181:12,19 195:19
195:21,23 196:24
197:3 199:3,12
215:17 221:2,10
221:16 223:5
224:3,17 225:2
226:3 228:23
229:5 230:18
231:5,22 235:12
241:3 243:10,18
247:8,9,13,17
249:23,24 250:23
250:24 251:4,21
251:22 253:11,18
254:2,8,10,14,18
254:19 255:13,16
255:22 257:12
258:9,9 262:24
263:1,13,14 264:1
265:3 266:20
269:19,21 270:23
274:18,21 275:6
275:14,18 276:7
**another** 18:14 30:5
45:5,12 66:13,19
66:20 95:3 100:23
110:21 113:9
175:6 176:20
183:13 185:14,18
187:12,18 189:20
213:20 214:5
**answer** 11:6 15:9
15:22 21:13,18
22:4,7,8,10,13,16
23:9 25:2,10 31:2
40:7 42:24 43:2
49:1,14,15 59:12
60:1,2 66:11 69:5
69:16 70:4,19,22
71:1,24 72:4,11
73:10 74:24 77:11
77:23 86:11 87:2
90:11 92:5,20
101:21 102:13
104:13 105:5,7
106:6,7,14 107:18
108:9,24 109:3,22
112:9 114:18
115:11,12 116:10
116:11,12 117:17
118:17 121:14,15
124:17 125:21

127:3 135:5
137:14 139:3
142:2 146:6,16,21
149:11,24 156:6
160:5 163:21
166:7 181:4
183:17 203:3
204:11 208:5
209:7,12 210:5,17
210:23 211:3
212:2,21 213:4,11
213:22 219:22
229:14 234:15
236:4 237:4
251:14,19 252:1
253:19 255:2,3
256:20,22 257:5
258:1 259:9,20
264:8 267:14
268:4,4,6,19
269:2,6 271:5
276:15 278:6
**answerable** 59:8
**answered** 77:21
92:3 93:5,7
103:23,24 104:6
105:20 107:11
126:15 146:19,24
150:9 172:9
203:19,22 204:5
213:7,14,18,19
259:10
**answering** 69:10
257:6
**answers** 194:19
212:14
**anticipate** 186:18
**anticipating** 237:10
**anticipation** 24:10
250:5
**anybody** 104:5
**anymore** 156:13
**anyone** 8:5,7 17:11
17:12 18:9,17
44:6 55:15 64:1
66:3,9 70:12
95:18 101:23
103:20 104:8
106:24 131:14
154:20 164:10
169:22 194:15
195:22 239:9
241:17,20 274:11
275:23 278:13
**anyplace** 67:16
**anything** 9:12
18:24 19:10,10
40:1 42:13 44:6

51:24 56:23 64:14
66:1 91:24 92:7
92:13 95:14,14
109:4 129:13
134:16 135:7
140:20 142:12
176:15 195:4,4,15
198:22 199:14
202:9 204:8,10
210:2 217:20
234:7 236:6 239:7
239:8 248:13
253:10,17,20
254:1,4 267:3
270:6 275:21
**anywhere** 124:3,8
276:4
**apologize** 218:22
**apparently** 146:3
**appear** 18:15 54:11
56:22 57:4,10
58:19 93:9 94:7
123:5 149:5,9
196:22 197:5
273:18 276:4
**appearance** 180:11
**appearances** 2:1
173:17 193:1
**appeared** 2:5,9,14
2:18,23 37:24
38:2 80:19 89:1
180:20 193:5,9,14
193:18,23 248:12
248:14
**appearing** 81:17
**appears** 13:2 14:9
14:13 41:20 73:2
79:10 80:19 84:14
84:16 85:5,21
94:18 95:1 110:9
111:9 123:18
147:17 148:6
149:17 184:4,7,11
185:11 247:6
275:20 277:8,14
**applicant** 79:1,6
84:17 89:8
**application** 3:18,18
3:19 68:8 78:23
79:14 80:20 81:6
81:15,18,21 82:2
82:4,7,11,22 83:2
84:12,17 85:15
88:10,21,24 89:7
89:10,17,18 90:5
90:5,6,23 91:6,11
91:16 92:2,15,17
92:18,22,24 93:4

94:11,12 95:4
96:12,20 97:5
98:8,14,20,20,22
98:24 99:10 133:8
199:11 226:17
227:4,12 228:9
248:8 253:10,14
253:17,21,23
254:2,22 255:6,11
255:12,17,23
256:17,19 257:10
257:18 258:14,19
258:21,24 259:15
259:24 260:7,14
260:16,19 261:7
263:24 265:5,8
266:12,20,22
267:2,4,7,8,16,21
268:9,10,11,16,21
268:22,23 269:1,4
269:7,9,10,14,18
269:22 270:5,9,13
270:22,24 271:8
271:14,19 272:11
275:18 278:1,5,10
**applied** 90:7 253:18
254:3 255:17
256:1,4 258:10
269:12
**applies** 282:3
**apply** 254:14
**applying** 268:10
275:18
**appointed** 201:2
203:4 205:12
**appreciate** 189:24
**appropriate** 76:21
76:21 102:15
**approval** 246:22
**April** 3:19 123:7
155:11 156:22
157:2,3 163:12
198:9,18
**area** 86:14 246:10
**areas** 40:3 103:23
**arising** 71:4
**arose** 114:14,22
115:4,14 128:9,11
**around** 105:23
124:20 156:4
187:19 258:11
**arrangements**
190:17,21
**arrived** 171:23
**arrow** 120:3,3,6
**ascertain** 102:20,23
103:3,21 105:1
**aside** 99:7

Dimon vs. Metropolitan Life
9-8-06
C.A. No.: 05-11073 WGY
William R. Mensie

Page 3

| | | | | |
|---|---|---|---|---|
| **asked** 10:21 42:1 | **assistance** 17:23 | 178:16 184:9 | 167:17 172:12,21 | 45:17 46:13,16,17 |
| 46:24 47:5,20 | 160:15 | **attorney-client** 15:7 | 172:23 180:7 | 51:3,4,7 63:16 |
| 59:20 64:14 91:20 | **Associates** 1:10 2:7 | 15:18 40:3 43:10 | 185:14,18 188:2 | 68:7 69:11 70:15 |
| 92:3 93:5 95:8,9 | 2:19 68:20 184:14 | 109:6 | 194:7 195:1 | 71:20 72:10 81:10 |
| 97:4,23 98:8,10 | 192:9 193:7,19 | **August** 3:20 33:5 | 208:22 210:8 | 81:19 82:9,15,17 |
| 98:13,17 99:21 | 197:16 | 82:12 133:19,21 | 214:9 218:5 | 89:20 90:17 97:2 |
| 103:6,22,24 104:6 | **Association** 247:11 | 133:24 137:8 | 220:13 221:13 | 117:7 134:21 |
| 104:22 105:10,14 | **assume** 271:19 | 169:12 170:23 | 224:13 226:23 | 136:4 140:20 |
| 105:17,18,20 | 282:5 | 171:1 196:2,3,7 | 229:5 240:2 248:2 | 146:11 150:20,21 |
| 107:11 115:19 | **assumes** 117:14 | 197:2,10 198:11 | 254:6 259:6,8,12 | 167:4 169:15,23 |
| 146:18,23 150:9 | 121:11 | 198:15,21 199:3,8 | 267:18 268:13 | 171:1 172:2 |
| 190:14 203:19 | **assuming** 270:2 | **author** 152:24 | 272:20 273:20 | 185:12 187:12,13 |
| 204:5 213:21 | **attached** 157:9 | 159:18 277:4,14 | 274:17 277:9 | 189:10 192:18 |
| 216:1 217:16 | 161:6 | **authoring** 276:19 | **backtrack** 170:2 | 205:13 209:15 |
| 219:9 238:7 248:7 | **attaching** 155:10 | **authorities** 77:15 | **backtracked** 55:17 | 210:16 211:15 |
| 256:9 257:3 | **attain** 103:6,15,17 | **authority** 75:11,14 | **bad** 42:10 63:9,11 | 212:22 213:8 |
| 259:10 262:23 | **attained** 91:3 | 75:20,21 76:2,3,4 | 64:10 65:8 99:16 | 219:15 220:2,3,10 |
| 263:7,11 267:24 | **attaining** 89:2 | 76:10,11 77:9,17 | 99:21 206:12,14 | 246:18 253:1 |
| 268:3,4 269:3 | **attempt** 102:23 | 78:5 116:21 117:4 | 206:23 | 260:6 262:7 |
| 270:17 276:22 | 103:7 107:8 | 118:3,6 122:6,13 | **bankruptcy** 237:14 | 264:18 271:17 |
| **asking** 9:4 21:10 | 230:12 252:7 | **authorized** 75:18 | **banner** 164:15 | 278:5 280:21 |
| 22:22 23:3 33:11 | **attempted** 55:19 | 165:3 | **Barbara** 246:5,6 | **began** 168:18 |
| 40:12 45:6 66:8,9 | 103:15,16 107:15 | **author's** 157:9 | **base** 77:11 | **beginning** 72:12 |
| 76:20 83:5 90:2,3 | 108:13 278:8 | **automatically** | **based** 16:6 22:6,14 | 90:9,14,15 157:17 |
| 98:18 104:8,10,21 | **attempts** 210:4 | 182:19 | 76:6,8 77:4 90:22 | 245:11 |
| 104:21,24 105:11 | **attended** 243:2,3 | **automobile** 9:12 | 102:18 108:12 | **begins** 231:20 |
| 105:13 106:10 | **attention** 43:17 | **available** 20:5 28:6 | 121:19,22 129:1 | **behalf** 2:5,9,14,18 |
| 115:1 117:22 | 46:13 97:12 215:4 | 68:7 71:3 72:13 | 137:6 148:22 | 2:23 4:12 5:19 |
| 136:12 176:11 | 215:14 216:17 | 74:5 76:1,24 89:4 | 156:4 165:22 | 7:14,23 8:9,13,16 |
| 177:21 178:5 | 218:12 225:1,17 | 144:17 | 210:17,18 228:17 | 9:9 60:2,12,13 |
| 179:18,19,21 | 226:16 231:12,18 | **Avenue** 2:4 82:24 | 232:19 234:9 | 63:14,16 72:18 |
| 195:3,5 216:22 | 237:23 | 193:4 | 241:7,10 243:10 | 75:12 79:5 108:4 |
| 217:13,17 218:20 | **attorney** 20:23 | **aware** 54:17 62:15 | 277:22 278:20 | 165:3 178:24 |
| 218:23 221:14 | 21:16,22 26:2,4 | 63:2 163:12 | **basic** 242:11,11,13 | 179:12 193:5,9,14 |
| 222:3 227:24 | 40:13,16,22,24 | 169:23 170:14 | **basically** 168:23 | 193:18,23 194:2 |
| 228:11 230:14 | 42:23 48:3 50:22 | 239:11 | **basing** 158:17 | 224:2 226:18 |
| 245:4,5 251:15 | 74:8 75:17 80:7 | **away** 30:14 139:7 | **basis** 7:20,22 26:4 | 239:9 244:8,9 |
| 255:20,22 256:3 | 82:12 109:5 | **a.m** 1:23 188:5,9 | 61:2 77:20 96:15 | 247:21,22 |
| 257:14,17 261:20 | 114:23 115:6 | 190:1,21,23 191:5 | 97:5 277:20 | **being** 6:19 9:5 17:3 |
| 263:3 266:13 | 124:24 133:9,11 | 192:22 | **batching** 182:18 | 29:2 44:5 46:11 |
| 267:15 | 133:13 141:22 | | **Bates** 41:24 53:23 | 46:23 47:1 48:3 |
| **asks** 61:8 | 146:9,13 147:2 | **B** | 87:13 215:5 217:8 | 52:12 56:15 59:20 |
| **aspect** 241:2 | 167:20,23 168:23 | **B** 1:9 2:19 3:21 | 218:13 223:14 | 60:10 61:5 66:14 |
| **assert** 116:5 | 169:11,15 175:6 | 192:9 193:19 | 249:18 274:22 | 87:20 98:10,17 |
| **assigned** 15:23 16:2 | 176:7 177:12,13 | **back** 22:20 30:5,6 | 275:5 | 105:20 107:1 |
| 16:6 73:18,21 | 177:14 178:9,10 | 30:21 31:5 35:18 | **bear** 97:7 231:11 | 110:15 112:1 |
| 75:16 77:7 78:1 | 178:13,15 179:1,8 | 36:17 46:9 49:8 | **bearing** 218:13 | 130:23 139:7 |
| 102:2 110:24 | 181:24 182:2 | 63:15 67:20 69:13 | **bears** 217:8 | 144:15 156:10,11 |
| 111:9,13 112:23 | 183:4 186:2 | 72:22 74:20 83:11 | **became** 36:5 247:16 | 172:4 173:18 |
| 113:6 114:11 | 194:16 200:19 | 84:1 89:3,3 91:3 | **become** 170:14 | 179:17 195:21 |
| 120:21 121:20,24 | 203:2,12,18 204:3 | 92:11 97:24 98:1 | **becomes** 60:3 | 207:18 219:20 |
| 123:3,15 127:12 | 231:21 233:4 | 101:12,13 109:20 | 271:16 | 225:24 226:11 |
| 132:8 136:5 | 245:4,5 250:4 | 115:12 116:22 | **becoming** 185:7 | 229:23 231:5 |
| **assigning** 118:7 | 273:1 274:1,2 | 122:4 139:10,11 | 186:23 | 235:9 246:21 |
| **assignment** 128:6,8 | 281:17,18 | 141:3 146:5 | **before** 1:19 6:2 7:6 | 248:7 252:5,7,20 |
| 128:12 207:6 | **attorneys** 21:19 | 147:18 155:8 | 7:9,15 12:23 | 253:18 255:16 |
| **assist** 102:14 | 22:20,23 23:13,17 | 159:5 160:22 | 39:11,12 43:18 | 263:7 264:3 |
| 160:15 | 145:2 172:3 | 165:16 166:15 | 44:8,9,21 45:2,14 | 276:22 |

Dimon vs. Metropolitan Life                     9-8-06                     William R. Mensie
C.A. No.: 05-11073 WGY

Page 4

belief 218:1 219:19
believe 15:1,4 29:21
  31:15 34:1,17
  37:20 43:17 46:4
  49:13 50:3 55:6,6
  67:10 72:8 75:4
  76:16 77:16 79:15
  81:24 82:15
  106:20 108:23
  114:10 120:24
  131:7 138:16
  146:4 168:15
  175:21 211:18
  213:17 216:3,9,19
  217:21,22 219:6
  223:3,5 224:11
  239:18 240:18
  264:21 278:3
believes 216:24
  217:2
bell 106:4
below 13:17,19,19
  129:11 182:11
  245:9,16
benefactor 207:14
beneficiary 83:12
  84:2,2 225:7
  252:16 264:3
benefit 17:8 21:1
  79:24 221:3,11,17
  221:19
benefits 32:23
  74:16 252:20
Bennett 155:18,22
  156:7
Bennett's 155:11
  156:23 157:6
best 46:17,21 77:2
  78:9 94:21 126:3
  149:14 151:4
  156:7,21 158:21
  178:7 185:13
  203:3 220:17
  265:14 266:7
better 166:7 170:10
  179:14,21 189:16
between 15:18
  21:10,11,19 27:10
  57:14,16 58:4,24
  61:9 86:5 98:6
  119:22 122:2
  129:20 144:5
  169:16 171:18
  233:21 238:21
  248:2 257:11
  265:17,20 266:3
  276:12
BFB 159:2

BFB/LZ 158:24
Biddle 2:21 20:18
  22:22,24 193:21
bill 174:24 175:7
bills 175:9
bit 5:6 66:18 160:7
  186:12 187:8
  242:10
black 2:4 119:16
  193:4
Boehm 246:5,6
boldly 226:9
bolts 122:19,22,24
Boncher 155:14
  232:4,11,11 233:3
  233:20
Boncher's 155:11
  156:22 157:3
Booth 174:17
Boston 2:4,13,17
  188:8,9 193:4,13
  193:17
both 9:5 23:21
  80:15 109:5
  130:20 145:20,23
  180:14 184:14,16
  248:16 275:1
bottom 87:13
  138:13 173:17
  219:13
box 56:23 83:3,5,7
  83:11,12 84:19
  93:21 94:4,6,8
  119:16 184:14
  249:22 250:22
  251:4,14 252:6
  254:6,9 256:4,5,7
  262:23 263:4,8,12
  263:12 265:4,4,4
  265:16 275:13,14
  276:3,4,5,12,19
  276:23 277:12
boxes 184:16,18
  250:14,15
Boy 184:1
breach 5:17 236:21
break 7:23 43:4
  53:4 67:11,16
  100:11,14,17,21
  100:24 152:2
  176:20,23 189:20
  190:13
Brian 2:3 188:18
  189:5 193:3
  244:17,24 249:17
brief 237:5
briefs 42:2,5
bring 30:21 31:5

188:1
Bringing 201:4
brittle 163:2
broad 59:8 70:3
  210:24 211:4
  213:5,12
broader 210:20
broadest 70:22 71:1
  235:7
Brodsky 174:18
Brogan 1:19 192:18
  281:5
broke 66:18
broken 235:21
broker 91:3 132:11
  133:9,10 136:4
brokering 181:22
  182:1
brokers 123:24
  124:2,8 135:23
  181:23
brought 43:17
  46:13 171:19
  208:19
building 14:24
  30:12 156:20
business 9:2 39:12
  44:9,11,21 45:18
  60:14 136:7 137:3
  137:4 150:21
  163:20 164:18
  171:12 262:12
buy 136:9
B-8 121:5

——————
C
C 57:15 62:10,11,15
  62:17,18,21,22
  63:2,6,7 68:1,10
  68:21,22,23 70:2
  71:10,11,14,19
  73:1 80:10 81:7
  107:1 110:13
  116:2 118:14
  132:2 135:3 153:4
  173:19 174:1
  175:4 176:8 177:5
  177:15,18,21,23
  178:2,6,8,10,13
  178:14,16,24
  179:13 181:9,9
  202:8,8,21 204:3
  206:9,15,17,19
  207:6 208:20
  214:24 216:5
  220:16,21 240:24
  281:3
calendar 187:12

188:1
call 45:20 46:8
  101:2 134:12,16
  134:20 157:21
  178:10 189:10,22
  190:7 212:13
called 1:15 4:12
  192:14
calls 21:9 59:7,9
  189:8
came 16:4 55:24
  56:4 57:1,6 165:6
  170:2,5,10 184:12
  201:23 238:18
  260:2 261:24
cancelling 249:9
capabilities 205:8
capacity 7:15 23:17
  65:14,15,18 244:8
capital 159:19
  245:6
caption 229:22
captioned 229:11
  230:15
carbon 82:8
care 104:13 174:15
  188:24 279:10
career 10:19
carrier 42:11 58:7
  58:9 59:3 63:9,18
  206:11 268:23
  269:4,6
carriers 125:18
  130:21 232:6
  233:7
case 5:14 9:5,6,13
  10:10 12:1,18
  13:14 14:3,6
  17:13 18:24 19:10
  21:7,23 22:24
  24:12 31:22 32:11
  33:8 34:11,18,21
  35:18 36:10 38:8
  38:10 42:2,3,13
  46:3,4 47:12,14
  47:20 48:5 51:22
  55:9 56:20 57:9
  57:15 61:15 62:10
  62:12,15,17 63:3
  63:6,7,8,12 64:2,2
  64:15 65:10,20
  66:5 68:1,1,10
  70:2,2 71:1,11,15
  71:19 73:1,21
  74:6,13 75:15
  76:11,15 80:10
  81:7 101:24 102:3
  103:14 106:24

107:1 110:12,14
  110:20 114:11,21
  115:3 116:2
  117:12,23 118:5,8
  118:14 123:16
  124:15 125:17,24
  130:22 132:2,8
  136:2,5 145:5,13
  159:20 160:17
  163:1 168:18
  170:15 171:20
  179:3,15,19
  181:10,16 184:8
  190:5 194:16
  201:9,10 202:7,8
  202:21 203:5
  205:13 207:23
  208:20 211:19
  214:21,23 216:15
  235:20 236:2,10
  236:14 237:1,3,15
  254:13 257:22
  258:9 268:6
cases 6:10 16:11,13
  38:19 126:5,8,12
  126:24 127:14,15
  127:16 130:20
cash 183:14 220:22
cause 35:11,21 46:2
  46:12,12 175:21
  279:2
center 17:1,2 56:17
certain 17:18 34:4
  37:12 62:19 71:4
  79:16 98:5 133:14
  138:4 142:7 159:6
  178:6 212:14
  224:23 225:14
  226:6,10,12
  228:24 229:1,4,9
  229:11,20,22
  230:5,6,15,24
  231:1,8 232:22
  244:5 245:7 248:7
  252:15 254:18,23
  254:24 255:4,10
  255:13,16 256:1,7
  256:11 267:9,9,21
  267:22 268:16,17
  269:5,5,19,20
  270:7,8,23 274:18
  275:10,10,15,19
  276:4,7,9,10,12
  276:13,18,19
  277:12
certainly 28:18
  30:7 35:19 45:1
  48:12 61:12 75:21

Dimon vs. Metropolitan Life

9-8-06
C.A. No.: 05-11073 WGY

William R. Mensie

Page 5

76:20 85:21 86:11
86:12 87:6 96:13
122:23 123:4
154:18 163:19
188:19,20 201:20
202:1 215:3
220:18 236:6
237:15 240:2
252:4
**certificate** 282:2
**certified** 1:19
192:18 282:4,11
**certify** 281:7,12,16
282:2
**challenges** 205:16
**chance** 187:11
188:15 196:19
**change** 92:20
134:18 186:18
195:5,9,16 249:23
250:23 251:4,21
252:7,10 262:2,24
263:14 280:5,7,9
280:11,13,15
**changed** 13:14 87:5
95:10 96:19 160:7
194:19 236:20
252:6
**changes** 248:18,19
252:4 280:3
**changing** 134:7
252:16
**characterize** 237:2
**charge** 161:13
**charged** 17:1 73:15
242:8
**Charter** 53:14
79:10,14 82:22
90:20 91:3 97:14
97:14 98:3,15
131:2,14 134:5
135:2 173:5,7
180:17,22 182:10
184:10 195:19,23
197:9 198:17
199:10 215:24
221:3 222:5,6,9
222:14,23 223:2,5
224:3,14,18 225:2
226:17 229:6
231:5,6 233:14,15
237:12 238:6,12
238:15,19 239:4
240:3 243:9
245:23 246:7
247:7,8 248:2,18
249:6 251:16
261:11,13,21

262:6,10 264:2
**check** 33:15 38:8
143:22,24 144:9
144:24 146:1,3,10
147:17,21,24
148:19 149:6,8,19
154:2 158:9
181:13,14,18,23
182:1,8,15,17,21
182:24 183:2,6
184:2,8,9,13,22
185:19 250:1
251:8,13 258:18
**checked** 123:23
124:2,7 184:15,17
184:19 250:2
251:1 263:1,7,13
265:4,16
**checks** 60:11 143:8
144:10,10,12,13
144:19 145:24
183:23
**check-off** 12:22
109:15 158:13
**Cherry** 2:22 193:22
**Chicago** 282:8
**chosen** 15:13
**chronological**
272:19 273:2,12
273:15,16,19
**chronology** 43:15
**CIAPCIAK** 2:7
193:7
**circumstances** 14:1
32:22 33:2 71:5
143:6 201:15
272:1,2
**circumvent** 29:24
**cites** 98:6
**City** 110:10,12,20
120:15 156:10
**Civil** 1:17 192:16
**claim** 5:1,7,8 10:10
10:13,14,17,18,21
10:23,24 11:2,16
12:5,8,10,11,12
13:1 14:3,5,10,22
16:5,23 17:18,19
18:12,13 19:2
35:12 36:7,21,21
36:24 37:2,3,6,12
37:23 38:6,17,19
38:20 39:14 41:7
41:8,9,16 42:3,4
42:17 43:16 48:1
48:7 49:22 50:8
50:11,15,16,24
51:2,4,7,14 52:3

52:13,13,15,22
54:23 55:12,14,16
56:7,8,10,11,19
57:4,11,13,14,16
57:23 62:3,3,5
64:4 66:14,21
69:7 70:9,10
72:18 73:7,14,15
73:16 74:1,7
75:10,18,22,24
76:5,12 80:12,15
88:2,9,10,16
100:6 110:8,15,19
111:8 112:24
113:3 118:7,16,19
118:19,23 120:14
120:18 121:5,20
121:24 122:6,20
122:24 123:2,4,10
123:11 137:9,12
137:18,24 138:7
138:10,14,17,20
138:23 141:1,4,6
141:13 144:4,6,7
145:7,9,10,12,15
145:17,18,19,22
146:19 147:2,11
148:4,19 150:1,1
150:6,14 151:2,7
154:12 155:22
157:24 161:14
162:23,23 164:21
165:6 166:17,19
167:7,9,12,19,21
168:1,2,8,13,19
169:9,13,14,23
171:1,7,15,18
172:13 173:1
177:10 180:14
181:11 184:2
200:24 201:2
234:10 236:18,21
242:3,6 247:20,21
254:13 265:11,12
272:16,18,24
273:4,10,23
278:22
**claimed** 15:7
243:19
**claiming** 236:19
237:18
**claims** 5:4,4 6:19
10:20,22 11:9,10
11:12 14:19,21
16:19 65:15,18
102:2 127:8,8,11
127:13 138:23
139:8 220:15,20

221:2 233:17
235:7,9 242:8
**clarification** 126:14
**clarify** 72:4,11
95:21 96:3 229:13
237:4 261:23
**clarifying** 95:24
256:6
**classify** 171:10
**classifying** 276:19
**cleaner** 162:17
**clear** 26:8 27:20
42:14 43:15,24
46:22 52:15,16,21
87:22 100:10
108:6,22,24
148:11 178:4
186:22 195:8
201:8 202:10
212:5 223:24
228:3 230:16
233:24 248:9
256:20 275:5
**clearer** 240:20
**clearly** 23:1 105:24
107:24 109:4
148:7
**clerical** 17:22 23:19
23:23 32:9 33:24
37:19 39:22 48:16
66:24 160:14
170:6 243:19
**Client** 6:22
**close** 44:21 45:18
128:3 150:21
185:8
**closed** 37:3 54:24
138:9 139:10
**closely** 86:6 230:22
**closer** 179:17
230:19
**Coast** 101:6 190:23
**code** 182:16 185:2,2
**cognitive** 205:17
**cold** 187:1
**colleague** 190:9
**colon** 159:19
**column** 275:9
**come** 8:8 16:11 25:7
30:5 57:2 124:3,8
125:11 142:11,15
154:13 173:5
185:14 214:9
270:1 271:21
278:5
**comes** 17:22 18:1
18:11 57:1 258:12
258:21 259:15,24

260:7,11,13,15,20
278:1
**comfortable** 64:23
**coming** 30:6 185:18
**comm** 129:11
**commencing**
224:22 225:13
**commingled** 273:20
273:22
**common** 126:2,4,6
**communicate** 21:19
23:20 171:16
**communicated**
24:14 40:10
**communicating**
23:18 24:3 199:7
**communication**
18:15 21:15 39:24
46:22 65:12 66:12
66:16,20 67:3,5,9
98:15 133:12
160:7 197:21
**communications**
15:17,18,21 21:10
21:11 23:12,15,23
24:15 25:19 66:9
66:10 111:23,24
112:5 129:20
130:1 139:24
197:6,13 238:24
238:24
**companies** 8:11,12
9:19 58:19 60:20
61:6 63:17,17
75:5 136:22
164:16,17 165:4,7
**company** 1:8 2:10
2:24 6:4,12 7:20
7:24,24 8:3,14
58:4,5,21 60:17
61:9,11,18,23
74:16,20 75:6,12
79:4,5,11,19
82:23 91:4 113:3
125:3 130:14
131:3 134:6
136:12,23 164:22
175:18 176:1,3,4
179:3,9 180:18
181:19 182:5,10
184:10 192:8
193:10,24 200:14
202:7 221:3 225:6
226:18 231:23
232:7 233:8,10
234:8,18 235:8,16
235:20 236:1,19
236:20 243:19,23

Dimon vs. Metropolitan Life                9-8-06                William R. Mensie
                              C.A. No.: 05-11073 WGY

Page 6

244:10 246:7
256:11 261:2
267:2 269:21
270:24
**Company's** 79:14
177:4
**compare** 86:9 248:7
**comparison** 148:17
**compensation** 9:13
**competitive** 137:6
**complaint** 63:15,23
**complete** 41:16
85:15 88:21,22,23
89:10 90:3 103:5
109:18 271:3
281:14
**completed** 158:3
186:5
**complied** 223:6
**complies** 69:14
230:15
**comply** 222:6
224:14 271:9
**component** 183:13
**comported** 224:3
**comports** 229:10
**compound** 49:3
116:9 221:22
222:2 261:15
264:5
**compounded**
215:18 221:6
**comprehend**
204:24
**comprising** 223:14
**computer** 144:13
144:14,18 146:1,7
146:8,13 147:9,13
147:24 182:15,16
182:21 184:19,23
184:24
**computerized**
145:24
**computers** 145:24
**computer-aided**
281:11
**computer-genera...**
147:5,8
**concern** 35:11,22
108:21 233:12
**concerned** 185:7
186:23
**concerning** 12:5
17:19 32:21 34:11
252:15
**concerns** 186:11
**conclude** 187:13
**concluded** 128:7

**concluding** 69:2
128:6 214:11
**conclusion** 59:7,9
68:16 76:15 78:4
175:3 197:23
202:11,13,15,16
**concurrently** 225:6
**condition** 232:4
233:5 234:5,11
235:5,13
**conditions** 236:20
**conduct** 19:20 45:5
46:14 65:3
**conducted** 20:2
36:6
**conferences** 67:18
**confirm** 64:9
**confirmed** 198:8,17
199:1
**conflicts** 186:10
**conformed** 222:15
**confused** 95:8
**confusion** 261:1
**conjunction** 171:12
254:20 255:20
**connection** 24:17
97:23
**consider** 57:24 89:9
98:11
**considering** 170:13
**considers** 53:16
**consisted** 34:10
**consistent** 89:2
129:18 161:12
186:11 246:19,20
246:23
**constituted** 217:22
224:2
**constitutes** 216:18
217:2,9
**constituting** 220:8
**consultant** 5:1 6:19
65:15,19 102:2
127:8
**consultation** 232:3
232:10
**consulted** 232:20
**contact** 32:10,12,15
35:23,24 65:22
66:4 102:3 104:23
141:18,21 195:22
**contacted** 32:9
131:14 169:11,15
172:3
**contain** 35:16 57:14
70:23 142:14
143:8 144:2 147:3
173:6 216:24

250:15
**contained** 32:19
33:18 34:10,20
38:5 50:11 57:12
64:4 141:24 144:6
149:16 168:1
224:24 251:4
264:6 266:8
**contains** 38:7 80:15
85:21 235:4
267:16
**contemplation**
183:15
**contents** 29:9 50:5
118:16 144:16
147:2 150:14
151:7
**context** 34:4,5
59:20 78:13 117:6
134:10 135:20,22
162:10 164:14
216:6 233:23
239:21
**continue** 52:24
101:10 186:4,15
239:5 249:3
257:21 273:1
**continued** 53:11
152:6 177:2
192:13 194:5
236:17 239:12
240:7
**continues** 197:18
**continuing** 105:22
214:5 236:16
243:3
**contract** 5:17 19:12
35:16 36:6,23
52:8,12,15,21
53:17 75:4 84:19
95:10 141:24
142:3,10,18 143:9
144:2 154:16
161:7,10 167:21
215:17 221:2,5,10
221:16 229:5
236:21,21 240:5
242:19 243:18
247:8,9,17 248:22
249:24 250:24
251:5,22 252:8,11
252:17 254:7,9,21
255:21 256:8,17
257:9,12,18,21
258:4,10,12 263:1
263:14 264:1
265:4 266:20
268:1 274:21

276:20,22
**contracts** 37:4
54:24 81:24
142:14,15 154:6
242:15,16,17
**control** 282:6
**conversation** 30:1
**Cook** 1:21 192:20
281:6 282:12
**Cooperative** 69:3
**copied** 57:20
162:23
**copies** 38:8 80:13
80:16 82:8 88:10
145:1 146:7,10
265:8 282:6
**copy** 36:14 80:18
80:19 85:15 87:23
109:18 129:14
138:14,17,20,23
139:5,6,12,20,21
140:23 141:4
143:8 144:9
145:20,20,22,23
146:2,10 147:3,18
147:20,24 148:2
148:11,14 153:11
153:23,24 155:10
156:22 162:17
216:1,4,8,11
218:20 219:10
222:18 223:1
238:7,15 265:10
**corner** 53:24 58:15
**corporate** 6:14,16
**Corporation** 68:20
211:22
**correct** 8:20,21
9:17 12:12 13:4
18:23 20:14 27:11
33:16,24 34:17
37:5,8 39:9,19
40:23 41:19 47:8
50:7,14,23 54:1
54:14 55:21 58:20
60:14,15 62:8
64:6 65:17 74:4
80:11 84:8,11,18
85:1,7,10,13
87:10,12,20 91:11
93:23 94:2 98:14
102:20,21 103:19
108:7 113:15,23
114:3,12 117:15
120:23 125:16
127:10 141:2
143:21 155:7,17
166:10 180:3,6,13

183:3 202:18,23
211:8 218:4 220:6
220:10,23,24
221:8,9 229:20
231:9,10 232:23
234:12 235:4,16
237:13,16,19
239:14,15 240:5
240:21,22,24
241:1,4,5,8,9,14
241:15,18,19
243:12,14,15
244:3,6,7 246:1
246:17 247:3,13
247:17,22,23
250:19,21 251:2
255:18 264:17
270:18 272:22
273:24 275:16
280:2 281:13
**corrected** 134:13
**correcting** 117:8
**correctly** 11:8 18:6
32:4
**correspond** 86:6,24
**correspondence**
41:23 42:9 64:13
97:10,14,22
111:20 160:16
**cost** 90:24 124:4,10
124:15 174:24
258:17
**costs** 75:19 124:12
**counsel** 4:1 17:15
20:12,19 22:14
23:4,7 36:15 38:1
39:23,24 41:12,12
49:23 51:1 65:12
65:12 67:18 87:19
89:5,24 102:15
103:1,6,12 104:11
105:4 107:14
108:14 137:20
141:21 147:5
148:10 150:2,2,7
150:15,16,19
151:23 169:6
171:6 181:20
200:13 201:8,11
201:18,20,21,21
201:23 202:2,22
215:24 228:17
236:9 238:6,12,14
238:19,24 252:5
273:9 281:17,19
**counsel's** 36:15
102:7 228:2
**count** 151:15,18

Dimon vs. Metropolitan Life      9-8-06      William R. Mensie
C.A. No.: 05-11073 WGY

Page 7

county 1:21 14:24
  192:20 281:3,6
  282:12
couple 240:13
  253:1
course 8:15 10:19
  11:2,4 12:7 17:17
  18:12 19:2 20:1
  24:10,11 38:6
  102:13 108:19
  135:22,24 156:9
  171:12
courses 243:2,3,5
court 1:2 17:9 49:8
  72:21 100:15
  101:13 109:1
  172:20 192:1
  205:12 209:7
  246:22 248:24
  252:19,20 267:19
  268:14
courtesies 190:12
Courts 1:18 192:17
court's 131:24
cover 68:6 71:4
  136:10,19
coverage 247:10
crisp 162:21
criteria 16:7,8,15
  16:18 167:13,13
criterias 16:13,17
CROSS 3:8,10,13
  214:17 240:14
  244:15
crossed 84:20,24
CSR 281:5
curious 60:22
current 9:20 65:15
  66:2 106:21 107:2
  107:4,6 179:2
currently 154:20
  165:8 190:3
C.A 1:7 192:6
C.S.R 282:13

&mdash;&mdash;&mdash; D &mdash;&mdash;&mdash;

D 3:1
data 17:1,1 144:13
  144:17,20,23,23
  145:2,8,15,17,18
  145:23 146:8
  147:3,5,8,13,23
database 55:2
date 41:2 86:14
  99:1,12,13,15
  123:11 143:12
  152:16 157:2
  165:16 197:3,7

239:3 246:9 264:9
  265:18 266:4
  273:19 274:4
  278:19 280:2
dated 53:13 54:13
  98:2 99:10 121:1
  129:3 133:1,19,24
  137:8 140:10
  141:10 174:11
  196:1
dates 35:18 109:20
  273:20 277:8
day 1:22 30:5 39:11
  39:12 42:9 44:8,8
  44:10,11,21 45:2
  45:14,17 46:16,16
  55:23 64:13 85:6
  97:2 150:20 169:2
  171:13 185:14,19
  186:4,4,24 187:12
  187:18,18,20
  192:21 214:5
  277:2,6 280:2,21
  282:9
days 36:13 38:23
  44:8 87:18 126:11
  126:18 169:2
  185:17
deal 122:21 181:22
  182:1 233:24
  234:2 252:21
dealing 122:23
  202:20 238:5
dealings 238:11,18
dealt 243:5
Dean 133:12,15
decide 167:20
decipher 141:16
  255:15
decisions 65:19,23
declaratory 131:18
  131:20 132:13
deem 102:15
default 232:7 233:7
  234:8,18 235:8,16
  235:19 236:1,10
  236:12,18,23
  237:1,7,10,11
defaulted 233:10
  236:19
defendant 1:15 2:9
  2:14,23 4:12 61:9
  61:10 173:18
  175:9 192:14
  193:9,14,23 194:2
defendants 1:11
  2:18 63:12 192:11
  193:18 232:6

233:7 235:15
defense 36:16 102:7
defer 87:19
deferred 3:23 84:20
  84:23 91:19 94:7
  94:9 254:10,10,14
define 276:23
defines 256:11
definitely 45:3
  190:4
definition 256:8
degree 60:3 87:7
delegated 161:16
delivered 37:24
  57:3 182:19 183:2
delivery 43:1
  150:16 182:22
  183:3
Dennis 1:5 83:9
  184:8 192:4
  225:11 244:19
dep 44:22
department 19:14
  23:18,22 24:3
  39:22 48:16
  155:23
depend 181:21
depending 162:6
  183:15
depends 56:10
  111:10 117:11
deponent 49:9
  60:23,24 170:15
depose 65:1
deposed 170:20
deposition 1:14 7:9
  7:16 8:1 11:23
  15:2 19:6,9 29:7
  42:6 43:18,20
  44:9,19,24 45:5,7
  45:12,15 46:3,6
  46:14,17 52:1
  53:10 61:7,8 65:5
  97:2 101:8 107:23
  152:5 156:9
  170:22 172:4
  176:15 177:1
  185:15 191:3
  192:13 194:8
  207:17 209:15
  214:5 250:5
  278:19 279:1
  280:1,2,4 281:10
  281:13
depositions 1:19
  7:18 9:9 188:12
  188:17,17 192:18
describe 21:4 90:18

140:16 226:10
  239:2
described 154:1
  229:23 230:6
  235:12 248:18
  272:3
describes 229:7
  275:10
DESCRIPTION
  3:16
designated 79:6
designation 225:7
desk 38:1,3 55:23
  56:22 168:13,16
  168:22 171:13,19
destroyed 56:14
  57:9
determine 30:1
  278:19
determined 31:19
DeWICK 2:16 3:9
  4:6 29:14,14
  95:19 100:11,16
  101:2 132:6,6
  187:14 188:6
  189:23 193:16
  240:12,12,15,16
  244:13 249:17
  270:16 274:13,14
  274:16 275:1,4,21
  278:14
dictated 14:1 159:6
different 28:23
  35:20 73:11 87:5
  87:6 94:11,13
  96:12,19 97:3,5
  98:8,14,20,22
  104:2 116:7
  124:12 125:18
  154:11 182:18
  201:22 203:23
  213:20 228:11
  248:16 250:13,19
  265:16 266:8,17
difficult 83:9,10
difficulty 131:2,11
diligence 37:16
diligent 37:11
Dimon 1:5 17:12
  36:9 38:18,20
  57:15 62:21 63:2
  63:7 65:9 67:24
  68:9 71:10,14,19
  73:1 80:9 81:6
  84:6,9 85:2 107:1
  110:12 116:2
  118:14 132:2
  141:19,20 153:4

181:9 184:9,13
  192:4 202:8 206:8
  206:14,17,18
  207:6,11,14
  208:10,12,20
  209:5 213:17
  220:15 225:11
  231:7 235:14
  240:24 244:19
  264:3
Dimon's 83:7,15
  84:3 85:8 91:18
  93:20,22 141:22
  204:24 205:8
  221:11,17,19
direct 3:5 4:15 7:1
  19:24 97:11
  141:18 153:10
  194:5 215:4,14
  216:17 226:16
  231:18 237:22
directed 140:19,21
  161:1 176:9
  200:16 209:24
directing 33:10
  218:12 225:1,17
  231:12
direction 282:6
directional 120:11
directly 20:17
  21:10 79:24 127:4
  140:1,2 181:20
  182:11 184:8
  197:21 199:3,10
  201:12 281:19
disagree 24:20
  28:15,21 29:1
  31:17 42:16,18
  46:10 47:2
disagreement 91:17
discarded 67:5
disclose 42:17
  47:19,21,24 64:20
  97:2
disclosed 12:18
  15:4 44:13 45:9
  47:4,6,8,11,14,21
  48:5 49:20 64:5
  64:11,17,19 65:8
  75:9 76:15 77:4
  90:2 145:4 147:13
  149:21,24 150:2,3
  150:7,17,19
  180:15 185:12
  272:24 273:3,5,9
disclosure 26:9,11
  28:1 29:16,22
  31:21 39:19 46:15

Dimon vs. Metropolitan Life       9-8-06       William R. Mensie
C.A. No.: 05-11073 WGY

Page 8

| | | | | |
|---|---|---|---|---|
| 172:5 278:21 | District 1:2,2,18 | 274:20 277:5,8 | 163:1,21 164:21 | 24:9,11 44:18 |
| disclosures 30:8 | 192:1,2,17 | documentary 28:7 | 164:23 165:22 | 46:24 67:11,16 |
| 31:16 107:21 | division 1:3 14:19 | documentation | 166:15,18 167:14 | 168:10 176:14 |
| 108:18 | 14:21 118:19 | 52:10 136:3 158:4 | 167:15,23 169:5 | 199:11 215:19 |
| discover 52:6 | 120:20 122:14 | documentations | 171:14,20 173:6 | 221:7 |
| 143:22,24 171:15 | 123:1 192:2 | 34:9 | 174:10 176:19 | duties 6:7 |
| discoverable 29:19 | divisional 14:22 | documents 11:24 | 180:16 183:1 | DW 1:9 2:14 192:8 |
| discovered 20:8 | 121:24 122:7 | 12:2,6,17 14:15 | 185:17 194:12 | 193:14 |
| 34:8 36:19 37:7,9 | document 12:21 | 15:3,6,7 16:24 | 195:24 196:2 | D-i-a-m-o-n 84:4,7 |
| 38:22 41:5,7,10 | 24:23 28:12 29:9 | 29:6 33:5,6,14,21 | 202:10,12 205:10 | D-i-m-o-n 83:18 |
| 43:16 48:17,18 | 31:12,23 34:24 | 33:23 34:2,3,5,8 | 207:22 210:18 | 84:10 |
| 56:20 91:9 143:20 | 35:3,3,9 43:13 | 34:22 35:6,24 | 211:20 212:3,4,14 | |
| 144:5 169:13 | 52:10,20 53:18,23 | 36:9,18,18 38:7 | 212:15,18 214:22 | **E** |
| discovery 12:7 | 53:23 54:2,10,12 | 39:2,2,7,14,18,18 | 216:18,23 217:2 | E 2:16 3:1 193:16 |
| 19:24 20:2 26:7 | 55:11 67:12,14 | 39:22 40:13,16,18 | 217:21 219:21 | each 20:1,2 21:12 |
| 27:21 28:16,22,24 | 69:1,6,9,16 75:8,9 | 40:21 41:7,10,23 | 220:7 223:2 234:9 | 21:19 104:10 |
| 29:2 31:13 42:12 | 76:7,9,14 77:7,12 | 41:24 42:5,9,12 | 241:7 243:11 | 136:22 165:3 |
| 43:19 46:24 47:13 | 77:14,16,20 78:6 | 42:22 43:16,21 | 248:1,8,11,16 | 244:9 262:12 |
| 47:20 48:5,8 | 78:11,17,19,22 | 44:7,10,11,12,13 | 254:13,16 260:15 | earlier 39:8 62:7 |
| 103:13 | 79:8 82:13,17,19 | 44:15 45:4,9,13 | 272:20,23 273:3,5 | 103:2 117:19 |
| discretion 13:24 | 87:9,15 88:15 | 45:22,22 46:1,22 | 273:11,18,21 | 143:17 149:18 |
| discuss 30:7 65:4 | 89:15 90:3 93:15 | 46:23 47:4,5,10 | 274:3,6 275:17 | 158:9 170:1 177:8 |
| 108:16,19 186:21 | 93:18 96:18 98:7 | 47:13,15,16,18,19 | 278:22 | 189:16,24 243:8 |
| discussed 21:23 | 109:19,23 110:2,3 | 47:21 48:1,4,6,15 | document's 121:1 | 261:10 274:20 |
| 149:18 | 110:3 112:12 | 48:17,19 49:19,22 | doing 14:16 37:21 | 276:22 277:24 |
| discussing 30:20 | 113:18 119:8 | 49:22 50:10,12,13 | 60:14 164:17 | 278:8 |
| 161:13 206:21 | 120:9 123:17 | 50:16,18,20,22 | 249:2 | early 126:10,18 |
| 235:5 261:11 | 128:22,23 129:1 | 51:8,10,20,21 | done 7:17 65:24 | easier 83:14 263:20 |
| discussion 9:1 | 134:2 135:14 | 52:2,19,21 55:23 | 79:11 108:14 | East 101:6 190:23 |
| 186:8 190:8,15 | 142:7 145:12 | 56:8,16,17,19 | 119:13 128:22 | EASTERN 1:3 |
| 226:22 279:12 | 148:7,8,14,23 | 57:8,12 64:4,10 | 140:20 160:8 | 192:2 |
| discussions 20:15 | 149:4,6,10,10 | 65:8,11,13 67:12 | 162:10 168:22 | education 204:24 |
| 65:3 241:16 | 152:12,17,19 | 67:15 69:18,21 | 185:2,2 191:1 | 243:3 |
| disk 146:4 | 153:6,9,10,18 | 71:20,22,23 72:1 | 249:7 262:12 | educational 205:16 |
| disks 145:1 | 154:21 157:1,21 | 72:3,6,13,14 | doubt 139:10 | effect 42:16 |
| disproportionate | 158:8,9,11,21 | 74:22 75:1,2,23 | down 7:23 30:20 | efforts 33:7 37:11 |
| 107:24 | 159:14 161:20,22 | 75:24 76:17,18,22 | 31:4 33:5 37:17 | 37:16 170:4 179:4 |
| dispute 9:21 10:4,6 | 162:8,12,14,18 | 76:24 77:2,4 78:3 | 83:11 123:23 | either 6:24 27:24 |
| 10:12,14 11:1,4,6 | 163:5,7,8,11 | 78:10 80:13,14 | 158:23 215:23 | 56:14 70:11 91:2 |
| 11:13,16 19:12 | 166:4,5,17 167:4 | 81:9 82:13 86:9 | 219:13 239:17 | 97:3 141:12 180:4 |
| 93:1 96:10 114:14 | 167:6,8,18,18 | 87:4 88:15 89:4 | 245:9,12,15 | 188:14 216:7 |
| 114:16,22 115:2,4 | 172:13,24 173:4 | 89:20,21 93:9 | dozens 10:20 | 262:14 |
| 115:5,10,11,14,20 | 174:11 178:18,20 | 96:23 97:2,20 | drafting 230:18 | elaborate 248:5 |
| 116:5,6,14,18,21 | 178:22 180:19 | 99:6 100:4 112:8 | draw 159:23 175:3 | elected 226:12 |
| 117:2,22,23,24 | 183:21 206:1,3,4 | 112:19,20,24 | 197:23 202:11 | 229:24 256:13 |
| 118:4 131:7,10 | 206:6 211:24 | 114:8 115:5 | drawing 185:8 | election 225:7 |
| 132:1,3,7,10,15 | 212:11 215:5 | 116:19 118:11,23 | drawn 258:18 | 230:7 |
| 137:14 239:19 | 217:5,8 218:6,7 | 119:3,3,13,14 | drew 68:16 202:14 | electronic 145:20 |
| disputed 29:16 | 218:13,14,16,19 | 127:22 129:18 | 202:15,17 | else's 104:9 128:10 |
| disputes 137:12 | 219:4,9,13 220:4 | 135:1,8 137:18,19 | Drinker 2:21 20:18 | email 23:22,24 48:9 |
| distinct 37:2 | 223:9,11,14 224:7 | 138:6,9 139:15,16 | 22:22,24 193:21 | 48:10 67:4 160:8 |
| distinction 58:3 | 224:11,24 226:10 | 139:16,18,23 | Drive 1:22 192:21 | emails 23:19 |
| 61:17,19 119:22 | 227:24 228:11 | 142:7,21,23 143:3 | duly 4:13 194:3 | employed 5:24 9:20 |
| 120:1 | 245:16 246:23 | 143:18 144:7 | 281:8 | 156:19 164:11 |
| distinguishing | 249:17 250:4 | 145:21 149:13,21 | duplication 139:12 | 165:8,14 175:8 |
| 177:19 | 255:8,23 258:6 | 150:6,17 151:2 | during 8:15 10:19 | 241:21 |
| distress 179:2 | 262:7,11,15 | 157:23 159:18 | 11:2,4 12:7 17:17 | employee 4:22 8:11 |
| distribution 222:11 | 264:15 272:5,6,8 | 160:1,9,12,12,16 | 18:12 19:2 20:1 | 8:14,17 58:1 60:5 |

Dimon vs. Metropolitan Life                9-8-06                William R. Mensie
C.A. No.: 05-11073 WGY

60:7,9,16 61:4,9
61:10,13 106:19
106:20,22 110:8,9
116:1 120:22
133:5 155:5,15,16
155:19,20 156:8,8
164:24 232:12
281:17,18
employees 8:10
23:13,16 24:4
57:19,20,21 58:11
58:12 103:14
107:2,5,6 108:10
154:24 155:3,7,21
156:1,6,18 164:9
employer 9:9,20
employers 9:10
employment 6:2
8:15
enclose 174:24
encompass 235:8
encountered 131:2
243:17
end 13:2 44:1 90:9
90:14,15 158:23
159:11 185:13
188:23 190:2
223:13
ended 252:21
ending 190:5
enforceable 53:17
98:12 239:13
240:5
enough 42:15 45:21
176:17 195:11
210:24 211:4
213:5,12
enroute 66:22 67:8
entail 74:9
entailed 74:10
enter 4:1 182:17
entire 41:12,13
42:17 50:5,24
139:12 146:19
150:14 151:7
185:12 241:6
252:21 259:20
entirely 23:1 210:7
223:24
entirety 103:11
131:10
entities 240:17
244:6
entitled 25:23
109:15 166:1
217:8
entity 9:5 60:3
244:4

envelope 38:3 56:23
57:5
equal 226:11
229:23 231:2,2
255:14
erroneous 108:24
error 117:11,15,20
117:22 120:11
243:19
errors 117:8
essence 142:16
essentially 44:9,21
55:22 65:22
232:17
establish 215:17
established 37:5
55:3 95:12 121:13
establishing 161:14
estimate 51:13
151:16
estimating 31:7
estimation 151:11
151:12
et 65:9
evaluation 34:12,18
evaluations 34:22
even 59:8 89:21
106:7 113:2 137:5
140:2 163:2 184:6
190:13 201:7,11
207:15 252:5
262:9
event 41:17 59:9
172:2 199:9
215:20 221:8
231:4 232:6 233:7
235:15
ever 7:3,6,8,14 9:14
9:18 10:10,24
11:15 35:24 51:19
81:5 101:17
109:23 120:8
125:17 130:5,12
131:13 134:9,21
153:24 202:7
234:5 243:17
every 88:15 116:1
156:19 212:10
everyone 100:14
101:4 187:11,15
189:2 272:9
everything 195:6
233:23
evidence 42:22 47:3
81:8,17 92:21,23
95:2,3,4 239:6
265:22 266:5,14
266:15 270:3

271:4
exact 58:24 94:22
149:3,6
exactly 26:20 46:24
48:6 76:2 98:9
147:22 148:23
209:6 233:1
251:23 257:22
examination 1:16
3:5,6,6,8,10,11,13
4:15 186:4 192:15
194:5 214:17
240:14 244:15
253:3 274:15
276:1
examined 4:14
194:4
example 40:18 77:5
123:2 140:16
164:20 215:4,14
237:12 272:10
except 4:3 13:2
176:15
excess 68:2,5,5 70:1
71:9 165:15
201:11 208:20
209:5 210:15
247:10
exchange 258:6
excuse 206:11
214:1
excused 279:13
execution 221:4
exhausted 68:7
exhibit 3:16 53:19
53:20 54:3 58:14
80:22,24 81:10,13
81:15 83:20,21
84:1,6,9,12,20,23
85:2,5,8,12,14,15
85:21,22 86:1,2,5
86:6,13,15,16,18
86:20,20,23 87:9
87:11,23 88:1,3
88:13,20 89:8
92:2,16 93:14,17
94:10,12,13,15,19
95:1 97:24 98:1
98:18 99:9,11,13
99:14 127:19,20
128:3 132:16,17
138:11 141:3
143:19,19 196:15
196:16 197:24
198:1 199:16,17
199:18,20 200:3
202:17 204:15,19
205:20,21 215:9

218:8,9,23 220:14
222:16 223:18,20
224:2,4 225:18
226:20 227:1,7,8
227:11,14,19,22
227:23 228:7,13
228:15,18,19
229:5 230:4,19
231:12,15,19
234:21 237:23
238:1,4 244:21
245:12 246:3,24
249:14,22 250:3
250:12,13,15,18
250:19,21,21,22
253:5,9,10,13
254:1,4,6 255:6
255:10,24 261:11
261:16,19 262:19
262:20 263:2,3,4
263:12,16,19,20
263:20 264:16,16
264:18,18,19,22
264:24 265:6,7,7
265:7,9,10,11,16
265:17,17 266:4,9
266:11,18 270:6,8
274:17 275:2,13
276:3,5,6,17
exhibits 3:15 33:5
33:10 69:11 72:13
86:23 97:10
112:16 133:1
238:1 253:6
256:10 264:17
265:15
exist 70:16 157:7
158:22 163:24
257:9 258:4
existed 89:22
132:11 147:3
248:24 256:17
257:18
existence 24:23
257:21
existent 266:16
existing 249:24
250:24 251:21
252:8 262:24
263:14 264:1
265:3
exists 31:12 40:5,6
87:22 144:23
147:8,9 156:24
157:8 243:23
257:22
expand 242:4
expect 56:22 129:16

141:23 142:8,12
142:13,17 159:4
171:13
expecting 185:11
expedite 43:1 67:6
expeditious 150:15
expense 183:16
experience 13:13
136:21 241:10
243:16 254:17
258:8 266:19,21
266:23
experiences 126:20
126:21
expert 94:22 248:13
explain 130:18
211:6 236:13
239:19 262:4
278:8
exposure 130:20,22
expressed 186:12
extent 15:6,16,20
17:14 20:5 22:22
23:8,15 24:19
25:14,18 29:17
32:18 75:14 87:3
102:11,14 114:18
114:20 116:10,12
117:16,20 121:14
125:21 130:2
132:9 137:15,16
139:2 142:17
157:24 160:8
165:5 186:13
205:11 208:7
222:4 252:2 255:1
255:3 256:12,21
268:7 271:5,7,12
273:6,10 278:7
extinguish 233:17

F
facility 5:5
fact 19:11 23:17
28:2,5 32:17
52:11 56:16 63:8
70:1 84:6 87:12
92:23 122:11
148:18 154:16
155:2 156:2,5
158:18 171:13
189:10 198:22
201:9 202:4
205:12 206:10
209:17 216:8
218:12,19 220:22
222:14 224:12,17
224:18,21 230:24

Dimon vs. Metropolitan Life                 9-8-06                 William R. Mensie
C.A. No.: 05-11073 WGY

Page 10

| | | | | |
|---|---|---|---|---|
| 231:7 232:19 | 43:16 48:1,7 | **filing** 24:16 | **Fishermen's** 247:10 | 208:4,17 209:16 |
| 233:22 234:5,11 | 49:22,23 50:1,2,6 | **filled** 247:5,6 | **Fishery** 68:20 | 222:2,9 234:13 |
| 235:11 236:9 | 50:8,11,15,16,24 | 251:13 | **Fishman's** 211:22 | 235:24 255:19 |
| 240:3,4 247:16 | 51:3,4,7,14 52:4,9 | **final** 174:24 181:11 | **five** 7:12,18 31:8 | 256:18 261:14 |
| 248:21 249:9 | 52:11,13,13,15,22 | 183:6 184:14 | 51:21 115:20 | 264:4 267:11 |
| 252:9,16 256:24 | 54:23 55:3,12,14 | 261:3 | 124:23 151:6,7,13 | 269:24 271:2,23 |
| 257:15 258:4 | 55:16,22 56:7,20 | **finalize** 181:8 | 152:3 176:18 | 274:2 276:14 |
| 273:14 | 57:4,11,14,16,23 | **finalizing** 181:11 | 226:11 229:24 | 278:3 |
| **facts** 32:22 33:3,4 | 64:4 66:14,22 | **financial** 144:15,17 | **five-minute** 176:20 | **formal** 19:3 243:1 |
| 34:11,13,21 199:7 | 67:8 69:7 70:9,10 | 144:20,22 145:2,6 | 176:23 | **formally** 29:19 |
| 209:22 270:2 | 72:18 73:7,14,16 | 145:8,15,17,18,23 | **flexible** 187:6 | 179:1 |
| **factual** 105:7 | 73:18,24 75:24 | 146:8 147:10 | **Florida** 238:6,12,19 | **format** 110:1 |
| **factually** 257:17 | 80:12,15 88:2,9 | 164:2 | 239:1 | **former** 9:10 24:4 |
| **failed** 59:23 | 88:11,16 89:15,22 | **financially** 281:19 | **Foley** 98:6 134:1 | 103:14 106:18,20 |
| **failure** 179:3 | 91:24 92:13 100:6 | **find** 21:7 26:14 | 196:4,23 197:6,12 | 106:21,23 108:9 |
| 236:24 237:5,6 | 106:11 110:8,15 | 33:7 36:6 37:12 | 197:21 198:8,15 | **forms** 87:6 142:15 |
| **fair** 42:15 85:14 | 110:19 111:8,19 | 37:21 43:4 51:8 | 198:17 199:1,1,4 | **forth** 42:6 142:8 |
| 86:8 96:22 97:1 | 112:5 118:7,23 | 51:10 55:19 59:10 | 199:7 | 223:6 225:18 |
| 176:17 194:23 | 123:10,11 130:24 | 67:13,14 75:8 | **folks** 23:20 24:14 | **forward** 212:19 |
| 195:11 275:17 | 131:17 132:13 | 76:22 97:7 100:15 | 29:17 121:12 | 272:21 |
| **fairness** 85:20 | 137:9,12,18,20,23 | 102:9 104:3 | 188:4 | **forwarded** 113:13 |
| **faith** 42:10 63:9,11 | 138:3,3,7,7,9,10 | 105:10 124:14 | **follow** 245:3 247:19 | **found** 33:24 37:23 |
| 64:10 65:8 99:16 | 138:14,17,20,23 | 126:2 170:2,4 | **followed** 54:18 55:8 | 46:15 50:8 144:7 |
| 99:22 206:13,14 | 138:24 139:5,7,7 | 171:14 207:20,20 | 157:13 166:16 | 144:9 167:18,19 |
| 206:23 276:11 | 139:10 140:24 | 207:22 210:3 | **following** 161:12 | 167:21 168:13,22 |
| **Falcon** 2:4 193:4 | 141:1,4,6,13 | 273:18 | 221:4 280:3 | 169:8 171:7,19 |
| **fall** 164:16 | 143:8 144:2,6,7 | **finding** 57:4 | **follows** 4:14 53:11 | **foundation** 48:21 |
| **falls** 16:4 245:8 | 145:7,9,10,12,15 | **fine** 4:5,6,7 22:12 | 72:23 92:12 152:6 | 49:3 95:13 121:11 |
| **far** 24:15 30:14 | 145:17,18,19,22 | 27:19 63:5 65:4 | 172:22 177:2 | **four** 51:21 115:19 |
| 55:17 137:13 | 146:20 147:11 | 109:7 112:15 | 194:4 208:23 | 124:23 149:12 |
| 150:7 185:18 | 148:4 149:17 | 187:23 236:4 | 210:9 213:3,9 | 180:12 |
| 210:1 238:16 | 150:1,1,6,14 | **finish** 185:14 187:9 | 221:15 259:14 | **fourth** 212:7 260:3 |
| 239:11 260:9 | 151:2,7 154:12 | 190:24 | 267:20 268:15 | **frame** 143:13 |
| **fashion** 59:8 | 157:24 161:14 | **finishing** 185:9 | **foregoing** 280:1 | 169:20 171:23 |
| **fashions** 87:6 | 162:23,23 166:17 | **firms** 188:16 | 281:12 | 186:17 |
| 142:16 | 166:19 167:7,9,19 | **first** 4:13 8:18 | **Forget** 228:5 | **framed** 248:23 |
| **fax** 33:1 | 167:22 168:1,2,8 | 22:13 32:11,13 | **forgive** 128:11 | **frames** 265:16 |
| **February** 27:11 | 168:13,16,17,20 | 33:6 37:22 41:10 | 177:9 188:9 | **Frank** 155:11 157:6 |
| **fell** 123:2 161:17 | 169:4,5,7,9,13,14 | 49:10 72:6 119:8 | 218:22 | **frankly** 97:1 194:22 |
| **fellow** 52:18 | 169:23 170:2,5,10 | 131:1 134:4 | **forgotten** 177:9 | **free** 190:10 267:3 |
| **few** 36:4,17 53:8 | 171:1,7,11,13,15 | 142:21 143:2 | **form** 4:3 25:7 28:7 | **Friday** 43:18,18 |
| 75:7 171:3 185:16 | 171:18 172:13 | 158:9,11,18 167:8 | 31:21,23 40:19,22 | 191:5 192:21 |
| 190:5 214:19 | 173:1 177:9 | 167:18 170:14 | 49:2 59:6 85:16 | **from** 5:4 9:12 17:8 |
| 244:18 257:13 | 180:14 183:1,10 | 173:15 178:22 | 86:7 87:1 89:11 | 24:23 26:21 29:19 |
| **Fifth** 82:23 | 183:12 234:10 | 184:9 185:17 | 90:10 95:11 96:15 | 30:14 35:9 39:22 |
| **file** 12:5,8,10,11,12 | 254:13 258:3 | 204:14 215:15 | 102:10 109:21 | 43:8 48:15 50:16 |
| 12:24 13:1,6,8,18 | 265:11,12 272:16 | 219:5 224:7 236:4 | 114:17 115:17 | 55:24 56:4,21 |
| 13:21,21,23 14:10 | 272:24 273:4,10 | 240:18 253:9 | 116:8,23 117:14 | 57:6 66:13,20 |
| 18:13 22:21 32:16 | 273:17,23 278:22 | 257:14 258:21 | 121:10 124:16 | 76:11 77:1 79:24 |
| 32:17,18,19 33:8 | **filed** 32:13 63:14,16 | 259:9,15,24 260:3 | 125:20 127:2 | 82:9 86:15 88:5,7 |
| 33:19,23 34:8,10 | 63:18,20,22 64:3 | 260:7,11,13,15,20 | 130:7 132:5 | 89:12 94:13 97:10 |
| 36:7,15,21,21,24 | 143:7 | 261:5 270:7 | 134:14 135:4 | 97:14 98:15 |
| 36:24 37:1,2,3,5,7 | **files** 13:10 37:2 | 272:20 281:8 | 137:13 139:1 | 106:11 108:15 |
| 37:12,23 38:5,7 | 53:16 54:18 56:9 | **firsthand** 79:9 | 140:4 142:1 | 110:8 111:8,8,19 |
| 38:13,17,19,20 | 56:10 62:6 98:11 | 241:17,21 243:13 | 148:11 150:8 | 113:1,9 116:17,19 |
| 39:14 40:12 41:7 | 141:11 147:2 | **Fisher** 201:7 202:13 | 160:3 171:9 172:6 | 121:5 125:18 |
| 41:8,9,11,12,13 | 157:11,13 167:12 | 202:15 204:15 | 177:6 179:16 | 129:8,11 131:11 |
| 41:14,16 42:5,18 | 234:4 272:18 | **Fisherman's** 69:3 | 194:22 207:7 | 134:1 135:8 |

Dimon vs. Metropolitan Life                9-8-06                William R. Mensie
                        C.A. No.: 05-11073 WGY

Page 11

| | | | | |
|---|---|---|---|---|
| 136:10,18 137:1 | **G** | 90:17 154:16 | guarantee 232:5 | 147:3 216:4,8,11 |
| 138:13 139:7 | gamut 9:12 | 207:15 215:24 | 233:5 235:14 | having 4:13 7:17 |
| 141:16 144:12 | gathered 137:18 | 225:10 226:10 | 237:9 | 8:14 17:9 29:23 |
| 147:17,24 149:9 | gave 48:2 112:9 | going 21:8 22:7,13 | guardian 205:12 | 35:20 36:14 52:13 |
| 151:5 152:21 | 118:3 | 22:15,17 24:6 | guess 19:6 20:23 | 53:1,13 54:10 |
| 156:5 157:24 | general 3:23 117:10 | 30:22,24 31:11 | 31:7 38:15 42:24 | 57:4 70:4 81:16 |
| 159:14,22,24 | 201:13 207:12 | 43:6 44:12,19 | 79:12,13 83:20 | 88:4 89:20 92:7 |
| 161:4,7 168:12,21 | 208:8 217:5,8,21 | 45:3,5,8,12 46:19 | 100:16 110:2 | 137:10 143:14 |
| 170:2,5,10 172:8 | 218:3,8 219:21 | 66:7 75:7 79:13 | 111:10 117:11 | 144:1 167:10 |
| 175:5 177:20 | 220:9,14,15,21 | 92:24 95:3,20,24 | 151:20 158:17 | 171:10 194:3 |
| 178:16 181:11 | 222:16 223:6 | 96:3 100:7,11,12 | 160:6 235:8 237:5 | 199:13 207:12 |
| 186:4 187:21 | 224:4,15,19 | 100:18 104:19 | guesstimate 51:19 | 215:3 216:13 |
| 194:19 195:20,24 | 240:19 241:13 | 105:5,6 119:9 | guesstimated 51:17 | 224:20 272:9,12 |
| 196:3 197:5 | 264:13 | 120:12 125:11 | guidelines 75:19 | 272:12 |
| 200:24 201:2 | generality 235:7 | 147:12 152:2 | guys 100:23 189:24 | hear 32:24 93:16 |
| 202:3,11 204:15 | generally 181:12 | 170:15,20 174:6 | 190:16 | 101:22 156:17 |
| 213:21 214:11 | 232:15 | 176:6 186:6,7,14 | | 190:16 203:24 |
| 217:16 222:22 | generated 182:15 | 187:17 188:1,24 | **H** | 214:1 |
| 231:5 238:16,18 | 184:3,23 185:1 | 190:1,5,20 194:24 | half 100:23 169:12 | heard 134:9 |
| 239:4 243:9 246:6 | gentlemen 188:15 | 205:22 206:12 | hand 119:9 140:9 | hearing 246:13,16 |
| 247:10,12 258:3 | geographic 16:8,10 | 214:3 220:13 | 148:16 153:19 | 246:21 |
| 265:1 270:21 | getting 40:3 67:6 | 229:5 235:17 | 182:19 274:23 | held 186:8 190:8,15 |
| 272:21,24 276:21 | 103:23 138:24 | 237:9 248:2 | 275:1 282:8 | 201:11 226:22 |
| 277:6 | 244:23 | 252:10 269:23 | handing 119:2 | 233:2 279:12 |
| front 39:3 43:15,23 | give 22:9 69:12 | 272:5 274:23 | 128:14 263:15 | helps 160:12 |
| 63:21,23 69:21 | 71:24 104:13 | 276:21 278:18 | handle 5:4 15:23 | her 17:23,24 18:4 |
| 70:6 133:22 134:2 | 105:24 118:24 | Golden 22:21 | 62:6 123:15 127:1 | 19:10,16 32:10,12 |
| 140:12 147:18 | 126:7 143:13 | Golden's 48:10 | 127:5,5,8,11 | 32:15 35:24 |
| 183:14 194:21 | 163:18 166:22 | gone 91:14 182:16 | 242:8 | hereinbefore |
| 196:8 198:3 | 175:11 196:8 | 184:21 | handled 13:10 | 281:15 |
| 211:20 215:6,11 | 223:13 231:14 | good 185:10 190:11 | 56:11 110:15 | hereto 282:3 |
| 217:4 218:14,17 | 239:21 | 194:7 | handler 75:10 | heretofore 225:8 |
| 219:4 223:8 | given 49:23 65:11 | Graci 104:18 110:7 | 123:10 | hereunto 282:7 |
| 227:10,16,22 | 75:19 150:1 | 113:21 120:3,4,16 | handling 13:14 | herewith 161:6 |
| 228:16,18 231:16 | 185:17 204:11 | 120:22 153:18 | 16:5 17:17 18:12 | 225:6 |
| 238:1 244:22 | 280:2 281:14 | 219:9,24 | 19:2 52:11 54:18 | he'll 195:2 200:8 |
| 246:13 250:6,9 | gives 12:24 | great 6:4,9,11 8:4,9 | 71:14,18 72:18,24 | highest 13:15 |
| 253:6 255:24 | giving 261:22 | 8:16 89:22 97:16 | 73:2,5,7,16 | highlighted 245:6 |
| 262:21 263:20 | glad 179:23 | 97:19 | 130:20 157:11,13 | him 19:9 20:23 28:6 |
| fulfill 59:23 | glean 238:16 | greater 70:13 | 242:3,6,8 | 30:23 41:16 67:6 |
| fulfilled 29:2 | go 16:11 29:15 | grounds 25:14 43:7 | handwriting 82:20 | 67:7 69:21 74:23 |
| full 4:17 116:21 | 30:19 43:4,12 | 59:18 104:20 | 94:22 228:23 | 74:24 82:17 93:9 |
| fully 215:17 221:2 | 53:7 67:16,20 | 108:18 109:3,6 | 248:13 | 93:10 104:22,22 |
| function 111:10 | 76:22 83:11,11 | 257:14 | handwritten 86:17 | 105:5,6,10,11,13 |
| 130:19 | 95:15 96:22 99:6 | group 2:3 8:23 9:4 | 86:19 219:14 | 105:17 106:10 |
| fund 247:12 | 100:12,19,23 | 58:16,22 60:15 | 227:21 250:16 | 107:15 111:24 |
| furnished 148:1 | 101:12 109:1 | 61:19,23 119:19 | 254:11 255:8,12 | 112:2,20 113:13 |
| further 3:6 25:17 | 137:5 174:23 | 119:19,23 147:17 | 272:11 277:4 | 113:21 117:7 |
| 26:1 78:10 128:4 | 176:18 180:7 | 164:7,17 165:4 | hand-J 181:12 | 118:7 123:3 |
| 194:4 198:8 204:9 | 185:11,21 186:1 | 174:15 179:2,9 | happen 136:20 | 133:22 140:1,2,7 |
| 204:10 215:23 | 186:12 187:8 | 193:3 244:1,3,4 | 185:13 | 140:13 168:1 |
| 219:19 234:1,3 | 190:24 194:24 | Grove 1:22 5:5 | happened 81:21 | 169:6 177:21 |
| 235:9 238:21,23 | 212:19 214:15 | 16:24 55:2 56:21 | 138:19 181:24 | 179:17 194:21,23 |
| 239:2,10 240:11 | 216:22 231:15 | 100:15 111:3,21 | 182:20 237:2 | 194:24 195:5 |
| 244:14 274:8 | 254:24 272:20 | 112:1,2,7 113:4,8 | 271:4 | 196:8,8 198:4 |
| 275:21 276:1 | 279:10 | 113:11 121:5 | happening 136:21 | 202:2 210:5 |
| 281:12,16 282:2 | goes 25:18 77:3 | 139:16,17 140:18 | happy 100:13 | 211:20 212:11 |
| | | 155:21 192:21 | hard 145:20,22,23 | 217:1,5,13 218:17 |

Dimon vs. Metropolitan Life                    9-8-06                                    William R. Mensie
                                        C.A. No.: 05-11073 WGY

Page 12

219:10 221:4,7
223:9 227:16
231:16 232:20
233:8 238:1
244:23 250:7
255:24 256:3
257:17 261:20
262:21
hold 138:3 189:22
home 13:10 37:4
55:1 62:2,3,5
63:12 68:3,11,14
110:24 111:2,6,6
111:9,12,14 112:6
112:24 113:1,3,7
113:22 121:20
130:23 139:15
140:2,6,8,17
154:6 164:21
206:23 232:16
honor 272:10
honored 239:5,14
hope 102:21 255:24
hour 1:23 100:23
192:22
hours 177:22
194:23
housed 14:23 16:24
36:24 139:8
155:21
housekeeping
199:15 279:11
HR 18:14 19:13
23:18,22 24:3,23
26:21
Hughes 98:6 131:17
132:12,12,15
197:16 198:16
hundred 45:22
127:16
hypothetical 271:3

**I**

idea 55:24 56:4
160:4 162:11
165:13 184:20
208:3 270:19
identification 53:21
81:1 83:22 86:3
127:21 132:18
196:17 199:21
204:20 218:10
223:21
identified 75:6
identifies 202:2
identify 105:11,13
217:1 223:4
identifying 12:9

identity 277:13
Illinois 1:2,21,22
4:3 111:3,3
140:18 165:23
188:3 192:2,20,21
281:2,7 282:8,12
imagine 45:24
immediate 84:21
86:16 91:19 94:6
108:21 228:23
254:7,11 255:13
269:19,21 270:23
274:18 275:14
276:6
immediately 43:17
171:6
implemented
154:23
implicate 15:17,21
implies 64:19 77:9
imply 254:19
implying 44:6
important 36:5
89:23 170:12
impression 76:10
77:19 78:12
262:11,13,15
inability 237:6
inaudible 93:15
Inc 1:9 2:14 192:8
193:14
inch 88:15 144:7
inches 38:16 39:21
40:13 41:14 48:18
50:9,9,21 51:14
51:21 55:22 75:24
149:21 151:1,3,6
151:7
incident 243:17
include 68:21
included 38:8
259:20
includes 145:20
229:23
including 125:15
174:24
inclusive 55:4
income 226:3 245:9
245:13,17,20
inconsistency 94:3
inconsistent 94:1
165:1 198:14,18
Incorporated 68:22
incorrect 112:1
251:7
incorrectly 44:6
91:18
increased 221:6

increases 228:24
229:1,4,10 230:5
increasing 224:22
225:13
independent 6:12
78:10,14 104:14
111:18 118:15
120:10 124:11,14
131:15 135:13
136:22 137:17
143:11 157:10
159:21 162:1,9
206:16 243:15
**INDEX** 3:15
indicate 92:1,14
122:12 123:9
131:6 159:18
184:15 197:12,20
253:17
indicated 31:15
76:1 203:4 234:10
indicates 123:10
254:2 274:18
275:6,14
indicating 164:23
253:23 254:5
indication 57:5
150:24 180:16
236:17 254:12
indications 110:18
indicator 86:19
91:21 163:18
indirectly 281:19
individual 19:13
20:1 28:2,3 30:16
112:23 116:17
138:23 139:14
267:1
individuals 18:15
19:22 20:3,7
25:16 26:8,14,15
26:18 27:22 28:9
29:23 103:3,8,10
104:10,22 105:1
105:14,17 107:2
122:12 129:20
139:24 155:4
156:1 180:12
202:20
industry 241:11
254:18 258:9
266:20
infer 229:9 230:5
232:20
inference 159:23
202:1,3,3 248:15
informal 19:4
information 14:8

18:13 20:10,11
21:6,9,20 23:1
24:7,9 26:1,3 28:6
28:13,22 29:17,19
31:14,17,20 74:5
91:11 94:11,12,13
107:22 108:12
116:16 118:24
139:9 143:5 144:2
145:4,6 150:3
162:2,4,6,7
184:22 203:3,8
238:16 251:3
273:9
informational
121:16
inherent 118:6
initial 29:16,22
30:8 32:12,14
33:7,21 34:7 35:6
35:23 36:8,11
48:16 49:16
108:18 143:17
149:12,14,15
274:4
initialed 272:12
initially 33:24 50:4
initials 158:24
159:4,12
initiated 5:16 143:7
144:3 171:24
injury 13:24
inquired 108:9
inquiries 124:14
inquiry 124:11,20
inside 36:24
insofar 244:10
instance 56:14 91:1
instances 35:17
instantly 67:4
instead 221:14
institute 5:11
instituted 5:8
instruct 21:13,17
22:3,15 25:9
105:5,6 106:5
107:17 108:8
instructing 22:10
instruction 22:7,18
108:23 109:2
insurance 1:8,8,16
2:10,24 4:13,22
5:19,22 6:4,10,11
6:12 7:3,15,15
8:23 9:3,19 53:14
58:4,5,19,21
60:14,16 61:9,10
61:18,23 63:12

68:3,6,11,14 71:4
75:12 79:4,5,10
79:14,19 82:23
84:13 113:3 125:2
127:9 130:13
131:3 134:6
136:23 137:3
164:21 165:3
177:4,7 180:18
182:10 184:10
192:7,8,15 193:10
193:24 194:3
200:14 202:7
221:3 225:6
226:17 231:23
232:7 233:8
235:16,20 236:1
241:11 244:10
246:7 247:12
249:24 250:24
251:22 254:17
258:8 263:1,14
265:3 266:19
insure 239:4
insured 5:9 68:7,9
68:12,13,14,18
69:2 71:5,6,7
201:4,6 203:11
207:9 208:10,11
209:5 211:13,16
211:17,19,22
233:18
insureds 68:19 71:8
insured's 201:3
insurer 136:18
267:2
insuring 68:17
intend 45:11 98:10
intended 254:14
intending 29:23
intends 53:15
intent 220:19
intention 45:1
interdepartmental
38:3
interest 122:6 128:4
201:2 255:13
interested 281:19
interject 15:15
27:23 30:22 31:11
41:21 76:20 178:1
185:4
internal 12:15
163:12 166:8
206:7
international 16:19
interpretation
179:10 277:23

Dimon vs. Metropolitan Life                    9-8-06                    William R. Mensie
C.A. No.: 05-11073 WGY

Page 13

| | | | | |
|---|---|---|---|---|
| interpreted 219:23 | 81:24 82:3,5 91:5 | 207:6 208:20 | 195:3,7 196:8 | 59:24 60:2,2,5,9 |
| 262:5 | 131:3 134:12,17 | 214:24 216:5 | 198:21 200:9 | 60:10,10,12,14,15 |
| interpreting 158:16 | 134:24 136:12 | 220:16,21 240:24 | 201:13 212:18 | 60:16,19 61:5,5,9 |
| interprets 201:7 | 146:2 166:8 | Jerome 3:21 | 215:7 221:13 | 61:10,13,18,18,19 |
| interrupting 109:8 | 181:14,15 182:1 | Jersey 15:1 165:23 | 223:24 228:3,12 | 61:22,23,23,23 |
| investigated 73:17 | 183:23 184:5,9,10 | Jesus 73:3 174:13 | 229:12,14 231:14 | 62:1 63:16,17 |
| investigation 144:3 | 195:22 197:3,9 | 177:9,10 | 233:24 234:1 | 64:1,9 65:2,16,23 |
| involve 5:10 10:20 | 221:10,16 222:13 | JLN:JD 159:12 | 235:6,17,23 236:9 | 66:3,13,19,21 |
| 206:21 | 222:23 223:1,5 | Joanne 1:19 190:14 | 237:24 239:12 | 67:22 68:2,8,14 |
| involved 10:22 11:1 | 224:3,14,18 225:2 | 192:18 208:22 | 240:1,12,19 242:4 | 68:17 70:5,12,14 |
| 11:12,15,19 13:7 | 229:5 231:5 | 213:1 221:13 | 242:9 244:17,23 | 70:19 71:10,13,18 |
| 13:9,14 14:3 | 239:13 240:3 | 259:12 281:5 | 245:3 246:9 | 72:19,24 74:20 |
| 16:14,19,24 17:4 | 243:18 245:23 | Joanne's 190:20 | 247:19 248:10,10 | 75:5,12 87:9,11 |
| 19:5,9 57:19,21 | 246:1,19 248:22 | job 6:7 16:3 242:23 | 248:13 249:2,15 | 87:13,15 93:11 |
| 74:11 103:14 | 253:11 258:10,20 | 242:24 | 252:9 253:9 | 99:22 101:23 |
| 111:11 127:4,16 | 258:24 260:1,8 | John 2:16 53:14 | 254:19 256:7 | 105:15 106:13,19 |
| 135:2,24 136:1,18 | 264:1,10 265:19 | 57:24 84:17 | 258:23 259:3,17 | 106:22 107:2 |
| 165:6 179:15 | 265:23 266:3,5,8 | 101:17 112:6 | 260:2,14 261:19 | 108:4,10,17 110:4 |
| 181:24 202:20 | 266:13 269:5,15 | 134:1 140:10 | 264:11 271:18 | 110:9 115:1,9,13 |
| 203:5 240:23 | 269:20 271:9,17 | 193:16 196:4 | 272:3 275:5 | 116:1,17 118:14 |
| 241:2 272:10 | 271:20 | Jr 174:21 179:7,8 | | 119:4,17,22,23 |
| involvement 71:10 | issuer 71:9 | Judge 219:15 220:2 | **K** | 120:8,22 121:18 |
| 110:11 132:9 | issues 45:8 46:6,20 | 220:3,10 246:13 | K 14:7,11,18 44:16 | 125:6,14 127:9 |
| 133:16 136:4 | 128:9,11 181:19 | judgment 73:20 | 119:9 172:16 | 130:13,16,21 |
| 233:17 243:9,14 | 186:10 269:11 | 74:1,3 111:19 | 281:3 | 133:5,16 136:1,6 |
| 272:4 | 279:11 | 131:18,21 136:2 | **KAPLAN/BOND** | 136:6,9,12,17,24 |
| involves 16:23 | issuing 136:7 | judgments 209:19 | 2:3 193:3 | 137:2 138:3,24 |
| 19:12 | 145:24 243:18 | Judith 68:20 69:2 | Katerine 83:15 | 140:24 141:11,18 |
| involving 10:5,13 | | 211:21 247:10 | Katherine 83:14 | 142:24 143:7 |
| 10:14,15,17,22 | **J** | July 133:1,2 | Keane 2:3 3:12 4:7 | 146:12 147:17 |
| 11:3 17:3 54:18 | J 2:21 83:9 121:5 | June 224:23 225:13 | 188:12,18,18,23 | 154:20,24 155:3 |
| 63:6 127:9 137:11 | 123:6 129:8 | 246:11,12,17 | 189:2,13,15,18,22 | 155:15,16,19,20 |
| 157:11,13 | 152:20 153:3 | jurisdiction 16:4 | 190:7,9 193:3 | 155:21 156:1,3,3 |
| in-house 20:18 23:4 | 159:14 161:7 | just 8:18 18:12 | 244:16,17 245:2 | 156:8,13,19 160:2 |
| 23:7 | 182:22 193:21 | 20:16 21:16 23:24 | 249:21 250:11 | 164:7,10,11,15,15 |
| Iron 56:13 | Jackson 239:1 | 24:1,22 25:13 | 251:11,17,18,23 | 164:17 165:4,6,9 |
| irrelevant 23:2 | Jacksonville 238:6 | 26:8 27:20 29:15 | 251:24 252:22 | 165:14 169:22 |
| IRS 166:19 | 238:12,19 | 33:10,13 40:5 | 262:23 278:16 | 174:1,15 175:4,7 |
| issuance 11:10,13 | Jed 29:14 132:6 | 42:14 44:4 45:7 | keep 137:23 154:12 | 175:9 177:4,7,14 |
| 199:11 258:12 | 187:14 188:6 | 46:2,12,12,15 | 234:22 | 178:7,9,14,15 |
| 260:21 261:2,8 | 240:12,16 274:13 | 50:3 53:22 60:18 | keeping 17:1 | 179:2,9,9 181:8 |
| 278:1,11 | Jenny 57:15 62:9 | 64:7,8 66:9 69:5 | Kemper 1:8,21 2:24 | 181:18,18,22 |
| issue 10:11 11:5,20 | 62:11,14,17,18,21 | 72:3 75:7 77:20 | 4:22,24 5:9,11,14 | 183:23 192:8,20 |
| 24:21 30:3,4,8 | 62:21 63:2,6,7 | 79:12 87:5 88:12 | 5:16,19,22,24 6:3 | 193:24 194:15 |
| 32:1 91:22 95:22 | 68:1,10,21,22,23 | 96:4,22 99:6 | 6:20 7:1,14,15 | 195:18,22 199:10 |
| 97:3 100:7 108:3 | 70:2 71:10,11,14 | 103:16 104:1 | 8:19,22,22,23 9:2 | 200:13,24 201:3,8 |
| 115:14,16,17,19 | 71:19 73:1 80:10 | 105:2,10,16 108:6 | 9:3,3,4 11:15,19 | 201:10 202:4,7,22 |
| 115:23 131:12 | 81:7 107:1 110:13 | 111:5,10 114:7 | 12:15 15:14 16:23 | 203:4,7,13,18 |
| 136:23 147:12 | 116:2 118:14 | 115:19 119:6 | 17:12,16,19 18:10 | 204:3,23 205:8 |
| 181:12,18,23 | 132:2 135:3 153:4 | 125:24 126:10 | 18:19 20:16 21:5 | 207:5 208:9,11,19 |
| 184:6 207:13,16 | 173:19 174:1 | 128:16,21 136:9 | 23:4,13,16 24:4 | 209:18,21 210:1,2 |
| 213:23 222:15 | 175:4 176:8 177:5 | 144:1 150:21 | 24:16 27:22 28:18 | 211:12 214:22 |
| 236:11 267:2 | 177:15,18,21,23 | 156:4 158:17 | 29:4,9 42:10 | 215:5 216:15,19 |
| 269:8 271:1 272:5 | 178:2,6,8,10,13 | 161:18 166:15 | 44:7,13 47:11,19 | 217:20 218:13 |
| 272:8 | 178:14,16,24 | 182:19 183:19 | 47:21 48:2 55:15 | 219:9,21 220:7 |
| issued 11:17 12:1 | 179:13 181:9,9 | 184:3 186:3,14,16 | 56:8 57:19,20,22 | 221:11,17,18 |
| 58:8,10 68:2,3,8 | 202:8,8,21 204:3 | 186:22,23 187:24 | 58:1,4,6,12,15,22 | 222:6,18 223:2 |
| 68:11 70:1 81:24 | 206:8,15,17,19 | 189:6,20 190:2,16 | 58:24 59:2,4,16 | 224:2 226:18 |

Dimon vs. Metropolitan Life                    9-8-06                    William R. Mensie
                                        C.A. No.: 05-11073 WGY

Page 14

| | | | | |
|---|---|---|---|---|
| 231:4 232:12 | 87:11,22 89:20,21 | 40:9 49:18,21 | K-0021 85:23 87:14 | L 121:5 129:8 153:3 |
| 233:10,18 235:11 | 91:17 95:2 97:5 | 61:14 65:7 66:16 | K-0025 161:19 | 159:14 161:7 |
| 235:15 237:8 | 98:24 99:3 100:1 | 70:13,16,17 71:12 | K-0028 162:12 | labeled 249:18 |
| 239:3,7 240:21 | 101:22 104:1 | 75:19 79:9 81:5 | K-003 33:17,22 | 274:22 275:6 |
| 241:21 243:8 | 106:13,15,18,24 | 81:14,16 82:8 | 34:16 35:3 49:17 | lack 49:3 121:11 |
| 244:1,3,4,9,11 | 107:4,24 109:18 | 87:24 93:6 97:6 | 143:19 | lacks 48:20 |
| 247:14,16,22 | 109:20,22 110:6,7 | 107:7 120:10 | K-0030 163:3,7 | Lake 111:3 |
| 249:11,12 252:11 | 111:17 114:4 | 131:15 147:21 | K-0031 166:1 | landed 55:23 |
| 254:14 261:11,12 | 116:16,20 117:10 | 156:7,21 158:21 | K-0032 172:12,23 | language 220:5,9 |
| 261:21 262:6,17 | 117:20 119:12,21 | 159:22 178:7 | 173:11 175:12 | 266:8,9 268:1 |
| 271:21,24 272:24 | 119:24 120:6 | 233:14 236:11 | 180:7,8 | larger 130:20,22 |
| 278:24 | 121:12 122:14 | 241:6,13,17,21 | K-004 33:11,17,22 | last 4:20 18:16 |
| Kemper's 28:3 35:6 | 128:21 129:22 | 242:7,21 243:13 | 34:16 35:4 49:17 | 19:14,17,21,23 |
| 37:1 49:19 52:1 | 130:3,3 131:13,20 | 243:15 277:20,22 | 143:19 | 20:8 21:6 24:4 |
| 62:9 68:1,18,19 | 135:2,8,23 136:15 | knowledgeable | K-0041 175:10,11 | 25:15 26:7,14,19 |
| 69:24 70:20,23 | 137:5,8,11 138:2 | 29:3 64:2 209:10 | K-005 12:18 39:1,6 | 27:15,17,21 31:14 |
| 89:13 93:3 94:24 | 138:19 139:9,9 | known 18:16 19:14 | 41:18 44:17 49:17 | 36:22 37:6,10 |
| 100:5 116:5,13,20 | 141:14,18 142:11 | 19:17,23 20:8 | 52:19 76:18 | 38:23,23 67:10 |
| 117:1,4 118:4 | 148:2 149:8 | 21:6 24:4,25:16 | 158:18 | 77:11 83:8,10 |
| 132:15 137:22 | 150:12 151:6,18 | 26:7,15,19 27:15 | K-0055 172:12,18 | 101:13 102:20,24 |
| 139:17 141:7,21 | 153:20 154:10,11 | 27:17,21 31:14 | 172:23 175:12 | 103:4,6,15,17,21 |
| 145:19 156:18 | 154:21 155:2,14 | 102:20,24 103:4,6 | K-0059 174:6 | 104:3 105:1 107:9 |
| 159:17 162:18 | 155:20,22 156:2,5 | 103:15,17,21 | K-006 153:18,19 | 114:1 116:1 128:3 |
| 176:7 178:5,12 | 156:6,22 158:11 | 104:3 105:1 107:9 | 155:8 158:2,19,24 | 131:16,16 158:2 |
| 200:19 201:2,18 | 158:18 159:3,7 | 114:1 207:17 | K-0060 174:7 | 165:16 169:20 |
| 203:1,10,17 204:2 | 160:4 162:17,22 | knows 15:20 75:1 | K-0063 217:9 218:3 | 174:23 177:9 |
| 207:8 208:2,9 | 164:9,12,22 | 135:15 151:9 | K-0064 217:9 | 194:11 200:12 |
| 209:5 234:4,10 | 165:17,18,19 | 195:4 | K-0069 206:18 | 255:15 259:21 |
| 239:9,12 240:2,7 | 166:4 168:24 | K-00 41:18 | K-007 159:9 219:1 | late 45:8 46:16,17 |
| 241:14 247:9,11 | 169:19,22,24 | K-0001 148:6 | K-008 161:1,4,6 | 101:2 190:3 |
| 257:16 265:2 | 170:11 171:5,23 | K-0002 119:4 | K-0102 77:7 119:1 | later 31:19 36:4,17 |
| Kemper/American | 173:11 179:14 | K-0005 12:21 | 119:6,8,9 120:2 | 50:8 107:23 |
| 227:4 228:10 | 182:23 183:16,19 | 109:13 | 127:18 | 134:13 179:22 |
| kept 144:17 154:13 | 184:1,2,5,5,18,21 | K-0006 14:13,18 | K-0103 127:18 | 195:9 258:12 |
| 272:16,18 | 185:19,24 186:13 | 54:12 | K-0107 78:17 80:17 | 278:19 |
| Kevin 22:21 | 186:17,20 187:6 | K-0007 113:16 | 80:22 | LaTorre 73:3,14 |
| Kim 17:24 | 189:23 194:22 | 218:14,24 | K-0114 178:18,19 | 74:2 104:16,17 |
| kind 45:3 56:23 | 199:5 201:13,14 | K-0008 160:23 | 199:16 200:1 | 110:16 123:7,16 |
| 96:14 171:22 | 201:14,19,20 | K-0009 152:12,14 | K-0115 199:16 | 152:20,23 153:10 |
| Klaus 121:3,8 | 204:13 206:22 | 160:22 161:1 | 200:2 | 161:2,2,4,9 |
| 129:8 153:12 | 207:3,14 210:2 | K-001 33:11,14 | K-0116 199:23 | 174:13 |
| knew 210:1 262:6 | 211:11,16,20 | 119:4 142:20,23 | 200:6 | LaTorre's 73:8,13 |
| know 6:16 10:20 | 217:11 230:17 | 144:20 147:15 | K-0123 148:7,11,15 | Latti 1:9,9,10 2:19 |
| 11:3,15,20,21 | 232:14,17 233:15 | 148:11,13 | 148:17 182:6 | 2:19,19 184:13 |
| 13:5 15:3 22:20 | 233:16,22,23 | K-0010 223:9,16 | K-0124 183:20 | 192:9,9,9 193:19 |
| 24:1,22 26:2,21 | 234:1,2 238:10,18 | 245:11 | 184:2 | 193:19,19 197:16 |
| 31:9,18,20 35:16 | 238:21 241:20 | K-00128 39:2 41:19 | K-0125 128:13,15 | 240:17 |
| 35:18 36:13 37:9 | 242:18 243:2 | K-0015 225:18 | 128:16,18 131:1 | law 209:10,13 |
| 37:15,21,22 38:8 | 248:11 252:14 | 229:6 245:5,19 | 215:5 218:23 | 211:2,7 242:7,9 |
| 40:5,19 41:2 | 257:20 260:9 | 274:22 275:6 | K-0126 128:15 | 257:22 |
| 55:13,15 56:10,15 | 261:1,4,11,13,21 | 276:12,17 | K-0128 12:19 39:6 | laws 252:15 |
| 56:24 57:8,10,11 | 262:10 266:4 | K-0018 246:3 | 44:17 49:18 52:20 | lawsuit 11:24 16:4 |
| 57:18 59:7,19 | 268:22 272:23 | K-0019 225:2 | 76:18 | 24:17 36:11,12,16 |
| 60:3 63:6,17,20 | 273:7,8,8,14 | 230:19,22 231:6 | K-032 166:21 | 50:12 61:13 62:21 |
| 63:22 66:3 70:9 | 277:10,13 | 247:1 | K-107 249:19 | lawyer 241:24 |
| 75:3,20 76:14 | knowing 35:15,15 | K-002 33:14 142:23 | K-7 218:24 | lays 225:23 |
| 79:8,16 80:17 | 52:14 | 144:20 147:15 | | lead 138:16 162:7 |
| 81:20 82:2 85:20 | knowledge 15:11 | K-0020 223:17 | L | 216:3,7 |

Dimon vs. Metropolitan Life                    9-8-06                    William R. Mensie
C.A. No.: 05-11073 WGY

Page 15

**leads** 77:16 79:15
132:13 216:9
**leap** 276:11,16
**learned** 170:19
**least** 27:9 89:19
123:19 131:11
132:11 142:16
176:21 187:17
222:3,11 232:3
249:3 268:21
**leave** 42:18 189:10
**LeBLANC** 2:7 3:4
4:1,9,16,17 10:1
15:9,12 16:1
17:20 21:3,14,21
22:1,5,12,17,19
23:3,11 24:20
25:6,11,21 26:9
26:13,20,23 27:3
27:5 28:1 30:4,10
31:1,3,24 32:2
33:11,16,20 39:6
39:9,11,13 40:4
40:11 42:15,20
44:1,4,17,24 45:6
45:17 46:4,8,15
46:19 47:3,7,10
47:15,17,24 48:9
48:14,22,24 49:5
49:9,11 53:3,7,18
53:22 54:2,5,6
56:3 59:10,15,21
60:21 61:2,8,16
62:13,23 63:1
64:8,16,22 65:6
66:8,17 69:17,20
69:23 72:3,5,16
72:20 73:4 74:24
76:19 77:3,10,22
78:16 80:22 81:3
81:4 82:6,18
83:19,24 85:18
86:1,4,21 87:8,17
87:21 88:23 89:6
89:13 90:1,13
92:4,19 93:6,10
93:13 95:15,18,21
96:3,8,16,17 97:1
97:13,18,21 99:8
99:20 100:3,13,19
101:12,16 102:17
104:1,7,24 105:6
105:13,18 106:2,7
106:12,17 107:12
108:2 109:7,9,11
112:18,22 113:20
114:7,9,24 115:19
115:24 116:3,15

117:3,21 118:11
118:12 119:6,10
119:11 121:17
124:22 125:23
126:15,17 127:6
127:18,22,24
128:1,16,19,20
130:11 132:16,22
132:23 133:4,23
134:15 135:10,18
137:21 139:13
140:9,14 142:4,22
143:1 145:14
146:16,21 147:7
148:12,21 150:10
152:2,8,9,15
153:16,22 157:3,5
160:10,20,21
161:21 162:3,15
162:16 163:6,10
164:19 166:24
167:3 168:6,7,12
168:21 169:1
171:17 172:9,11
172:16,18,20
173:3,9,10,15,20
173:24 174:5,9
175:14 176:11,17
176:21 177:3,11
177:14,17,21
178:11,21 179:20
180:10 181:1,4,6
181:17 182:3
183:22 185:10,24
186:3 187:11,24
188:13 193:7
194:6 195:3,11,12
196:10,12,15,18
198:2,6 199:15,22
200:3,7,11 203:16
203:20,24 204:1,6
204:12,14,18,22
205:4,6 206:2
207:10 208:13,19
209:6,14,20,24
210:8,16,22 211:9
211:23 212:9,10
212:16,17,21
213:1,8,15,22
214:1,6,11 250:4
252:24 253:4,15
253:16,24 254:22
255:5,22 256:5,15
256:21 257:2,6,8
257:12,17,24
259:1,4,8,12,22
260:5,18,23
261:18 262:1,22

263:4,6,18,23
264:7 265:10,21
266:2,10 267:13
267:18 268:3,13
270:1,4,8,12,15
271:11 272:2,15
273:13 274:8
275:24 276:2,8
277:1,12,15
278:12,18 279:4
279:10
**led** 76:14 78:4,11
**leeway** 106:1
**left** 187:1 245:9
250:18
**legal** 59:7,9 207:15
209:19,22 242:2,5
242:11,13 243:6
257:15
**legibility** 87:7
**legible** 84:14 86:13
86:16,17 87:23
94:17 148:2 149:7
**Lemhoefer** 14:7,19
106:3,13 121:3
122:12,21 129:8
153:12 155:5
161:4,9,13
**Lemhoefer's** 107:9
121:8,22 122:3,9
122:15 161:16
**length** 31:6 154:15
**less** 7:12 151:17,19
151:24 165:10
188:2 215:20
221:8
**let** 72:6 74:19
119:12 128:21
135:20,21 146:5
154:2 165:15
178:1 187:7
189:22 190:1,7
215:4 237:4 240:1
249:15
**letter** 3:17,20,21,22
40:1,1,5,6 53:13
53:19 54:7 62:2
96:11 97:8 98:2
132:24 133:19,24
137:8 140:10,15
140:17,23 141:5
141:10 162:21,22
162:23 163:18
174:11,17 179:6
196:1,3,7,20,22
197:5,7,8 198:7
198:16,21,23
199:3,19,23 200:4

200:13 201:6,22
201:24 204:15
207:1 232:3
**letterhead** 164:4
174:18
**letters** 57:14,16,18
57:21 96:9 113:2
121:19 137:11,14
159:19,20 162:20
248:2
**let's** 7:23 10:2 49:9
53:7 59:10 71:1
101:12 146:16
176:22 180:7
187:8 204:14,18
234:19 239:22
259:1,8 267:18
279:10
**level** 13:10,11,13,15
75:20
**levels** 13:17 205:16
**levy** 163:13 166:2,8
166:11,12
**liability** 5:1,4,7
6:19,22 65:14,18
71:3 127:7 175:19
176:2 201:11
242:9
**liable** 59:16,24 71:6
**lies** 79:3
**life** 1:8,15 2:10 4:13
9:18 53:14 74:15
79:10,14 82:23
98:3,5 125:2
131:2 133:14
134:5 136:12,23
137:3 180:17
182:5,10 184:10
192:7,15 193:10
194:3 215:19
221:3,7 224:23
225:14 226:3,3,17
231:9,23 232:7
233:8,10,15 234:8
234:18 235:8,16
235:19 236:1,19
236:20 243:9,10
245:9,13,17,20,24
245:24 246:7
247:9 249:6,24
250:24 251:16,21
253:23 254:5
261:2 262:24
265:3 275:6,18
**lifetime** 226:13
230:1,9 253:11,18
254:2,19,23
256:14

**light** 69:24 98:16
167:16,19 189:6
**like** 27:20,23 29:14
31:1 32:6,7,24
35:12 38:4 40:1
56:8 66:1 74:24
86:23 89:7 97:5
108:2,7 109:24
111:12 120:8
124:15 129:20
130:6,8 139:19
139:14 142:12,19
156:11 160:23
182:6 183:12
187:16,17 189:3
199:16 202:21
209:7 210:5 217:1
219:22 226:16
231:18 237:22
245:5 253:5
261:15 268:14
**limit** 77:9 78:2
**limited** 175:19
176:2 186:24
225:24
**limits** 75:22 76:5
78:6 179:5
**line** 25:17 94:17
120:2 128:3
129:11 131:1,16
138:13 153:1
158:2 174:23
178:22 185:6
189:18,19 200:12
263:8 264:23
280:5,7,9,11,13
280:15
**lines** 17:10 122:5
123:23 124:23,23
130:10 248:10
**list** 155:6 158:10
**listed** 165:4 180:12
180:19
**listen** 104:19
**listing** 58:18
**lists** 62:3
**litem** 205:12
**literally** 124:7
**litigation** 6:6,7,9
10:5,7 15:24
24:10,11,17 32:13
36:4 38:12,21
42:10 45:24 63:9
63:11 64:10 65:8
65:20 66:2 87:15
99:17,22 102:2,16
135:3,20,22 143:4
143:6 175:7

Dimon vs. Metropolitan Life          9-8-06          William R. Mensie
C.A. No.: 05-11073 WGY

Page 16

| | | | | |
|---|---|---|---|---|
| 177:16,20 178:3 | 142:19 152:12 | 225:8 236:9 | 196:12 223:18 | 246:14 247:16 |
| 201:1 241:8 | 159:9 160:23 | 248:18 256:17,19 | 250:1 | **matters** 9:11 10:4 |
| 243:11 | 161:24 182:6 | 257:10 282:6 | **marked** 33:22 | 38:11 |
| **little** 5:6 6:1 66:18 | 183:5,20 196:1 | **mail** 38:3 40:17 | 34:16 41:18 49:17 | **may** 15:22 17:16 |
| 95:8 186:12 237:5 | 200:6 201:14 | 41:4 57:1,2 | 53:19,20 54:3,4 | 23:9,24 24:1 |
| 240:20 242:10 | 212:3,4,15,18 | 113:11,13 | 58:14 76:18 80:24 | 25:13 27:24 33:10 |
| **LLP** 1:10 2:16,19 | 227:1,7,14 228:6 | **mailed** 40:24 41:2,6 | 81:2,10 83:21,23 | 41:21 52:4 59:12 |
| 2:21 192:10 | 228:12 234:19 | 182:19 | 86:2 88:20 89:8 | 60:2 76:19 78:7 |
| 193:16,19,21 | 235:3 244:21 | **maintain** 35:19 | 109:12 113:16 | 78:12 79:15 85:6 |
| **LM** 12:14 | 246:3,24 249:13 | **make** 33:13 36:8 | 119:1,4 120:12 | 86:11 90:11 96:9 |
| **locate** 18:15 32:16 | 249:22 250:3,22 | 43:7 44:5 53:22 | 127:19,20,22 | 100:11 102:9,12 |
| 32:17 36:9,20 | 253:5 254:1 | 65:19,23 94:21 | 129:13,17 132:17 | 105:19 106:14 |
| 37:13,15 55:14,16 | 263:12 | 101:3 111:18 | 132:19 142:20 | 111:5 113:8 |
| 55:18,20 56:6 | **looked** 28:10 51:4 | 117:16,18 118:21 | 143:18 196:16 | 114:18 120:1 |
| 105:8,14,15 107:8 | 52:13 57:12 69:7 | 124:14,20 135:14 | 197:24 199:16,17 | 121:15 122:7,14 |
| 107:15 108:4,10 | 109:24 130:6,8 | 135:19 148:17 | 199:20 204:19,21 | 122:24 124:16 |
| 108:13 147:4 | 144:14 169:5 | 154:17 174:4 | 215:8 218:8,9 | 125:20 126:13 |
| 170:13 210:4 | 248:4 | 176:22 178:4 | 220:14 223:9,20 | 127:2 131:17 |
| **located** 32:20 38:11 | **looking** 19:17,22 | 179:4 185:13 | 223:22 226:19 | 132:12 135:4 |
| 50:4 53:12 89:21 | 35:24 74:22 75:1 | 189:7,10,11,22 | 249:13 252:6 | 137:14 139:2,22 |
| 98:1 111:1,7,12 | 75:2,8 81:9,13,19 | 190:7 195:8 | 254:10 255:23 | 140:5 142:1 |
| 111:22 140:6 | 89:3,14 112:8,16 | 203:15 204:14 | 273:1 | 151:12,12 154:13 |
| 150:1 167:23 | 114:7 155:4 | 222:9 228:3 | **marking** 13:9 | 159:5 160:17 |
| **locating** 17:2,23 | 167:13,15 179:24 | 233:11 249:3 | **Mary** 104:18 110:7 | 161:13,17 163:12 |
| 18:13,13 | 211:24 218:5 | 271:16,22 280:3 | 120:3,3,16 153:18 | 163:20 174:11 |
| **location** 16:14 | 224:13 227:19 | **makes** 13:21 52:14 | 219:23 | 183:9 185:4 |
| 111:2 113:9,14 | 228:19 229:6 | 52:16,20 53:15 | **Massachusetts** 2:4 | 186:17 204:9 |
| **Logan** 2:22 193:22 | 230:4 253:9 | 154:18 | 2:8,13,17 163:14 | 205:15 208:5 |
| **logged** 55:2 154:7 | **looks** 14:7 94:18,23 | **making** 69:5 139:20 | 163:17,20,22 | 209:11 213:21 |
| **logo** 58:22 | 111:12 158:22 | 139:21 180:21 | 193:4,8,13,17 | 215:2 217:1 222:1 |
| **long** 1:22 5:5,24 | 212:11 245:5 | 234:3 268:10 | **matched** 248:15 | 224:6 234:15 |
| 16:24 19:20 30:19 | **loss** 32:22 33:2,3,4 | 276:11 | **matching** 162:9 | 237:23 240:13 |
| 31:4 36:12 55:1 | 34:11,13,21 | **managed** 6:9 | **material** 14:10 | 261:16 265:18,19 |
| 56:21 100:15,18 | **lost** 33:1 56:16 | **manager** 6:6,8 14:5 | 38:11 52:4 67:6 | 265:23 266:1,2,6 |
| 100:19 107:24 | **lot** 17:2 56:16 | 17:23 18:22 19:8 | 76:8,12 78:13 | 266:14,16 276:15 |
| 111:3,21,24 112:2 | 189:11 206:11 | 23:19,23 32:9 | 89:24 91:12 | 276:19 277:19 |
| 112:7 113:4,7,11 | **lower** 148:7 159:20 | 33:24 118:22 | 114:21 145:23 | 278:6 |
| 119:9 121:5 | **lowest** 124:14 | **manager's** 13:24 | 149:16 256:23 | **maybe** 30:18 38:15 |
| 139:16,17 140:18 | **Lumbermen's** 60:7 | **managing** 13:22 | **materials** 159:22 | 123:7 126:10,11 |
| 154:12 155:21 | 60:11 164:24 | **mandated** 130:23 | **matter** 9:8 10:17 | 127:16 166:6 |
| 168:8,19,21 169:2 | **lump** 74:10 | **mandatory** 130:4 | 18:16 19:6 43:2 | 171:3 187:18 |
| 169:18,22 171:1 | **lunch** 100:12,14,15 | **manner** 150:15 | 73:17,20,21 89:3 | 207:19 |
| 171:18,20 179:24 | 100:17,21 101:9 | 181:23 | 117:6 131:24 | **McQUAY** 2:11,12 |
| 187:20 192:21 | **LZ** 159:7 | **many** 7:11 19:22 | 132:10 139:11 | 3:7 27:23 28:11 |
| 207:17 | **L-a-T-o-r-r-e** 73:3 | 34:13,18 39:18,18 | 143:15 144:16 | 28:18 29:1,8 |
| **longer** 154:24 155:2 | ——————— | 45:23,24 50:2 | 147:6 169:6 171:3 | 95:20,24 96:6 |
| 155:5,6,16,19 | **M** | 51:13,17 88:10 | 171:14 174:2,24 | 101:1 108:6,20 |
| 156:1,3,8 | **M** 1:19 2:7 192:18 | 126:8 127:12,15 | 175:4 176:8 177:5 | 109:7,9 185:4 |
| **long-term** 153:12 | 193:7 281:5 | 150:5,5,12,12 | 177:15,18,22,24 | 186:16,22 187:3 |
| **look** 12:21,24 14:18 | **made** 5:14 27:8 | 151:14,16 165:8 | 178:2,6,8,10,13 | 187:10,16,22 |
| 26:14 29:10 33:4 | 32:10 46:22 59:22 | 165:13 | 178:15,16 179:4 | 188:7,11 190:18 |
| 36:18 51:6 58:14 | 66:9 69:5,16 89:4 | **March** 3:21,22 | 179:24 190:6 | 190:22 193:11,12 |
| 67:14 69:1,5,9,16 | 97:9,13,22 100:9 | 27:11 204:14 | 199:15 204:3 | 214:15,18,20 |
| 83:3 85:23 86:23 | 103:12 104:11 | 273:3 | 206:9,20 207:6,23 | 215:10 216:24 |
| 87:4 94:10 99:9 | 124:11 127:8 | **marine** 3:22 120:14 | 207:24 215:1 | 217:6,13,19 218:7 |
| 99:13 112:12,12 | 141:6 143:17 | 120:18 123:1 | 216:5 220:16,21 | 218:11,18,24 |
| 120:2 124:20 | 150:23 182:4,5,8 | **mark** 80:22 83:19 | 234:5 240:24 | 219:2,3,7,8 |
| 132:24 133:19 | 183:11,16 202:10 | 86:1 120:8 132:16 | 241:6 244:19 | 221:20,23 222:8 |

Dimon vs. Metropolitan Life     9-8-06     William R. Mensie
C.A. No.: 05-11073 WGY

Page 17

| | | | | |
|---|---|---|---|---|
| 223:10,18,23 | 131:9 153:18 | 149:1 150:11 | **Michael** 1:9 2:19 | **month** 36:22 37:6 |
| 224:8,16 226:21 | 155:11 156:23 | 151:8 152:10 | 192:9 193:19 | 37:10 38:22 41:5 |
| 226:23,24 227:6,9 | 157:8,9 219:23 | 156:15 161:19 | **microfiche** 146:4 | 48:17 169:9 221:4 |
| 227:13,17,18,24 | 238:5,14 | 162:12 163:4 | 147:20 | 255:15 |
| 228:5,12,14 | **memoran** 121:19 | 167:4 168:15 | **microform** 147:20 | **monthly** 221:5 |
| 229:18 230:10,20 | **memoranda** 54:8 | 170:14 177:4 | **middle** 90:16 | 224:21 225:12 |
| 231:17 234:14,24 | 123:12 158:3 | 178:19 180:8 | 175:15 | 226:11 229:24 |
| 235:21 236:3 | **memorandum** 3:19 | 181:7 183:21 | **might** 5:7 14:1 21:7 | 231:2,7 |
| 238:3 239:22,24 | 3:20 14:9,12 | 185:19 186:9 | 67:19 71:5 78:14 | **months** 19:21 27:9 |
| 240:10 245:4,5 | 32:21 34:11,14,15 | 192:14 194:1,7,20 | 95:7 96:24 97:11 | 27:10 36:4,17 |
| 249:19 274:12 | 34:20,23 50:4 | 195:13 196:6,7,19 | 102:15 105:3 | 98:4 133:14 134:8 |
| 278:17 | 52:12,17 54:7,13 | 198:3 199:19 | 114:2 122:6 | 170:16,19 207:19 |
| **mean** 5:2 7:21 | 77:6 120:13 121:8 | 200:6,8 203:21,22 | 136:23 168:17 | 224:23 225:14 |
| 13:12 14:21 16:22 | 121:20 123:11 | 204:7,9,13,20 | 186:18,23 207:15 | 231:8 |
| 17:5 20:22 28:5 | 130:5 149:15,17 | 205:7 207:5 208:6 | 261:4 | **Moore** 138:14 |
| 31:10 38:14 40:2 | 206:7,7,21 216:7 | 208:21 209:17,20 | **mind** 8:8,24 17:22 | 141:5 206:24 |
| 41:13 42:24 44:16 | 217:16 | 211:19,24 212:11 | 18:1,12 61:20 | 207:3 |
| 45:4 57:11,22,23 | **memorandums** | 212:15 213:2 | 132:11 145:16 | **moot** 126:16 |
| 59:14 62:18 67:5 | 12:5 38:9 53:2 | 214:19 218:16 | 199:5 201:22 | **more** 7:12 12:2 14:2 |
| 68:4 71:21 74:14 | 130:9 132:10 | 221:24 224:1 | 206:15 252:18 | 16:8 21:16 27:9 |
| 79:2,21 88:6 95:9 | 154:3 | 225:21 227:1,7,19 | **minds** 252:14 257:1 | 36:5 39:18 41:17 |
| 111:15 113:4 | **memory** 28:19 | 229:14 234:15 | 258:7 271:17,22 | 45:13 46:7,11 |
| 115:22 118:20,20 | 29:10 166:10 | 236:5 239:18 | **mine** 161:18 | 62:12,14 64:1 |
| 120:11,19 122:4,9 | **Mensie** 1:15 3:2 | 240:16 241:24 | **minute** 187:24 | 77:3,6 85:15 86:6 |
| 122:18 124:6,20 | 4:11,19 14:14 | 244:17 249:16 | 188:2 | 87:22 89:23 95:22 |
| 126:5,19 127:5 | 15:3,13,19,22 | 251:12,19 252:22 | **minutes** 31:8,8 53:8 | 96:24 100:13 |
| 128:4 133:10 | 17:15,16 21:4,11 | 253:5,20 255:24 | 75:8 152:3 176:18 | 112:11 125:24 |
| 135:6 137:2 | 21:18,22 22:2,6 | 256:2 257:3,14 | 187:21 190:5 | 126:1 146:24 |
| 146:18 149:7 | 22:23 24:9,14,16 | 258:1,8,23 259:5 | **mischaracterizes** | 148:2 150:6,12 |
| 160:14 177:22 | 24:24 25:15,24 | 259:9,24 260:6,24 | 210:6 | 151:17,19,21,24 |
| 180:3,5 182:14 | 26:3,17,24 28:8 | 261:7 262:20 | **misfiled** 37:14 | 165:19 186:12 |
| 200:18 201:3 | 30:11 31:23 32:3 | 263:19 264:8 | **misrepresentation** | 187:8 230:22 |
| 204:8 242:14 | 32:4,5,6,7 39:15 | 266:11,19 267:14 | 5:16 | 237:7 239:21 |
| 248:20 251:6 | 40:8 42:21 43:8 | 268:4,6 270:16 | **missing** 119:20 | 242:10 |
| 253:19 254:23 | 48:1 49:1,6,12 | 272:3,16 274:17 | 132:21 | **Morgan** 1:9 2:14 |
| 262:14 268:20 | 56:5 61:10,17 | 276:3 278:6 279:5 | **misspelled** 93:20 | 192:8 193:14 |
| 271:13 276:13 | 63:3 65:1,7 66:11 | 280:19 281:7 | **misspelling** 93:24 | 214:20 |
| 277:17 278:9 | 67:11 69:15,20 | **Mensie's** 20:23 | 95:6 | **morning** 190:21 |
| **meaning** 87:14 | 75:7,10 76:22 | 25:21 43:11 | **misspoke** 34:9 | 194:7 |
| **means** 40:19 60:9 | 77:1,18,23 80:12 | 176:14 210:1,7 | **mistake** 91:6,9,12 | **most** 29:3 61:14 |
| 61:22 74:15 | 81:9 84:1 85:19 | 257:23 | 91:14,22 | 86:23,23 150:15 |
| 120:15 124:11 | 85:23 86:5,11,22 | **mention** 195:9 | **mistaken** 217:1 | 160:7 261:9 |
| 125:6 130:8 | 87:2 90:14 92:5 | 199:1 | **misunderstood** 44:5 | 273:17 |
| 184:16 188:8 | 92:20 93:3,8,14 | **mentioned** 34:2,7 | 106:9 136:11 | **motivating** 233:20 |
| 275:11 278:10 | 95:7 96:18,22 | 35:8 72:4 105:2 | **mobile** 140:7 | **Motorists** 58:4,7,9 |
| **meant** 248:5 | 97:4 99:3,16 | 206:24 | **modifications** 85:21 | 58:11,21 59:1,2,5 |
| **measure** 151:5 | 101:17,20 102:12 | **merely** 28:4 | **modified** 86:15 87:5 | 59:17,22 60:1,6 |
| **measurement** 151:4 | 104:8,21,24 105:9 | **met** 26:12 | 227:12 252:20 | 79:4,5,19 84:13 |
| **mechanism** 129:19 | 106:4 107:13 | **method** 40:15 | **modify** 248:22 | 113:3 163:13,16 |
| **Medway** 3:22 | 108:4 109:12 | 273:11 | 271:18 | 163:24 164:5,10 |
| **meet** 189:2 224:18 | 112:11,15 114:10 | **methods** 35:19 | **moment** 21:20 | 164:11,21 176:3 |
| **meeting** 189:3 | 118:13 119:12 | **MetLife** 17:12 65:9 | 41:22 161:23 | 179:1 226:18 |
| 252:13,18 256:24 | 125:17 128:2,21 | 97:10 | 223:16 226:21 | 227:5 228:10 |
| 271:17,22 | 129:6 132:24 | **MetLife's** 214:11 | 231:11,14 | 243:22 244:12 |
| **members** 68:19,24 | 133:21 140:12,15 | **Metropolitan** 1:8 | **money** 247:9,11,14 | 264:2 |
| 211:21 | 141:23 142:19 | 1:15 2:10 4:13 | 249:10 252:11 | **Motorists/Kemper** |
| **memo** 33:17,18 | 143:2 145:16 | 192:7,14 193:10 | 258:6,18 | 175:19,22 176:2 |
| 34:21 122:11 | 146:14 148:13 | 194:3 | **monies** 222:6 | **Mountain** 56:13 |

Dimon vs. Metropolitan Life                9-8-06                      William R. Mensie
                                   C.A. No.: 05-11073 WGY

Page 18

move 32:1 69:18
   205:22 272:21
moved 188:20
moves 182:17
moving 200:4
much 38:15 52:8
   95:22 131:10
   135:14 143:5
   239:18 244:13
   258:12
multiple 82:3,5,7,10
   122:5 125:18
   126:2,8,14 187:7
   223:11
must 68:7
Mutual 60:8,11
   164:24
myself 15:19 22:21
M-e-n-c 32:6
M-e-n-s 32:7
M-e-n-s-i-e 4:21

             N

N 3:1
name 4:17,20 8:3
   9:2 17:24 18:4
   19:13,16 32:3
   52:18 58:6 59:2
   60:3,10,13,19,19
   61:5,5 63:18 79:3
   83:3,8,8,10,15
   84:3,6 91:18,23
   93:2,20,22 95:6
   104:12,13 106:3,8
   106:11 117:20
   153:2 157:9 173:5
   173:7 177:9
   180:12 214:20
   240:16 244:5,11
   244:17 252:5
   269:14,15
named 71:5,7 84:9
   201:12
names 18:15 105:2
   155:5
narrow 236:7
nature 48:6 117:11
   178:4 238:11
   243:4
near 124:3,9,10
   185:8
necessarily 31:17
   71:6 122:14 126:6
   142:13 199:6
   202:23 261:5
   262:13 269:6
necessary 30:1
   100:17 242:7

need 26:2,20 46:20
   77:5 95:21 108:17
   160:15 185:24
   186:2 187:24
   224:9 229:12
   261:18
needed 178:9
needs 29:10 96:1
   124:9 279:8
negligence 242:15
   242:16,17
negotiate 75:16
   77:8 78:1 123:4
negotiated 199:10
negotiating 125:15
   195:19
negotiation 11:5
neither 209:15
never 11:19 51:17
   64:13 171:11
   201:10,23
new 15:1 56:15
   82:23,24,24 85:5
   85:11 110:10,12
   110:16,20 120:15
   131:3 134:20,23
   156:10 165:23,23
   252:10
next 36:3 120:3
   129:13 159:9
   174:23 212:19
   214:14,15 215:23
   218:8 226:6 232:2
   275:9
Noe 52:18,20 53:15
   57:24 62:2 73:9
   73:19,21,24 74:3
   74:6,7 75:11 77:7
   78:5,24 80:20
   81:5,14,21 84:17
   91:2 92:1,14,22
   93:4,18 94:15,24
   95:8,9 96:11,19
   97:4,23 98:2,7,19
   98:21 99:1,2
   101:17,18,23
   104:5 106:21
   110:22,23,24
   111:5 112:6 113:2
   113:21 114:11
   116:16,21,24
   118:3,13 121:5
   122:11 123:3
   125:5,11 128:4,7
   129:9 131:6,13
   132:9 134:1 136:5
   137:23 138:3,16
   139:14,19,22

140:11,19,21
   141:1,12 153:3
   156:11 159:15
   161:7 164:20
   182:12,22,23
   183:2 196:4,22
   197:5,6,8,11,12
   197:20 198:15
   215:15,24 218:19
   219:9 232:2,15,18
   233:20 238:4
   239:9 248:1,3
   262:9 264:1,16,19
   264:22 266:3
Noe's 73:22 81:17
   89:17 99:10,14
   102:20,23 103:17
   104:3,9 114:1,15
   115:2 116:4,14
   118:22 121:7,18
   122:2,16 124:13
   130:13,18 132:9
   132:14 140:24
   141:6 164:22
   165:2 238:11,18
   248:4
nominal 125:1
   231:22
none 8:8 42:4
   195:20,21
nonresponsive
   115:13
normal 135:22
   171:12
normally 30:12
NORTHERN 1:2
   192:2
Norwood 2:8 193:8
notary 1:20 4:2
   192:19 280:23
   281:5 282:12
notate 130:2
notation 219:14
notations 227:21
note 86:19 148:6
   161:7 207:1
noted 103:13
   153:17 214:22
notes 86:17 239:17
   272:11
nothing 13:19
   18:18 57:3 98:18
   141:15,16 159:23
   220:7 234:2,10
   240:10 244:14
   253:22 281:9
notice 1:16 53:15
   61:7,8 162:20

186:3 192:15
noticed 61:6
noting 214:7
November 3:20
   129:3 238:4,22
   239:3,11 240:2
nowadays 17:3
nowhere 235:10
number 12:11,12
   12:13,15,24 13:1
   13:1 14:11 25:14
   43:10,11,14 54:12
   82:20 86:9 149:7
   151:15 165:17,18
   183:24 184:2,3
   190:22 226:20
   264:5
numbered 87:15
numbers 12:9 39:5
   149:8 165:16
   172:15 223:14
   245:16
nuts 122:19,22,23

             O

O 281:3,3
oath 194:8
object 15:5,16
   17:14 21:8 24:6
   25:13 43:6 49:2
   66:7 86:7 87:1
   89:11 90:10 95:18
   96:4 102:10
   104:20 114:17
   115:17 116:8,23
   117:14 121:10
   124:16 125:20
   127:2 130:7 132:5
   132:6 139:1 140:4
   142:1 171:9 172:6
   177:6 179:16
   194:21 221:21
   222:1 235:17,23
   255:19 256:18
   257:13 269:23
   271:2,23 278:3
objected 105:19
   150:9
objecting 22:10
objection 21:24
   25:9 48:20 53:5
   56:1 59:6,18
   77:18 85:16 92:3
   93:5 95:11 96:15
   97:19 105:21,23
   106:5 107:10,17
   108:14 134:14
   135:4 137:13

146:17 150:8
   160:3 203:19
   204:5 207:7 208:4
   208:17 209:16
   234:13 257:21
   261:14 264:4
   267:11 276:14
objections 4:3
   48:22
obligated 115:6
   237:18 249:8,10
obligation 28:1,5
   28:13,16,19 30:23
   31:16,18,20 42:17
   43:12 47:19 64:20
   107:21 201:4,6
   203:10 207:8,11
   208:9,10,12,15
   209:1 210:11
   211:13 271:16
obligations 70:23
   209:11 210:21
   211:8
observation 151:5
obtain 24:9 143:5
obtained 126:14
obtaining 241:3
   243:9
obvious 123:18
obviously 40:2
   87:17 151:21
   190:3 194:20
   195:1 240:20
   244:4 265:15
occasion 77:1
occasions 142:14
ocean 120:14,18
   123:1
October 3:17 53:13
   98:2 198:12
odd 248:14
off 53:7 90:8 91:2
   95:15,20,22
   145:24 146:5
   151:4 176:18
   185:21,23 186:1,7
   186:8 187:13
   190:8,15 226:21
   226:22 251:8,13
   252:20 254:10
   279:10,12
office 5:5 13:10
   30:12,14,16,20
   37:4 43:12 55:1
   56:11,15,17,21
   62:3,3,5 66:15
   67:20,22 110:10
   110:12,14,17,20

Dimon vs. Metropolitan Life                    9-8-06                    William R. Mensie
                                   C.A. No.: 05-11073 WGY

Page 19

| | | | | |
|---|---|---|---|---|
| 110:21,23,24 | 110:11,19 112:3,8 | **old** 144:16 163:1 | **opinion** 80:5 88:21 | 129:18,22 130:13 |
| 111:2,6,7,10,12 | 112:11,13,14 | 170:13 | 108:2 198:18 | 130:21 135:11 |
| 111:14,21 112:6 | 113:10,17,19 | **older** 17:24 35:21 | 207:15 257:15 | 136:22 141:17 |
| 113:3,5,7 120:16 | 114:14 116:7 | **once** 41:10 140:17 | **opinions** 209:23 | 144:20,22 145:2 |
| 121:20 130:23 | 119:7,14,15 120:2 | 182:21 260:10 | **opportunity** 196:9 | 149:7 151:9 162:1 |
| 139:8 140:2,6,8 | 120:14 121:6,22 | **one** 1:21 2:22 16:13 | 224:9 261:23 | 162:4 163:19 |
| 140:17 154:6 | 122:21 123:15 | 16:18 17:22 18:11 | **opposed** 189:3 | 166:9,18 172:3 |
| 156:4,10 158:5 | 125:7 126:7,24 | 21:16 37:19 39:12 | **opposing** 181:19 | 183:1,9,11 185:6 |
| 160:11 163:16,23 | 128:23,24 129:19 | 43:10 44:9,10 | **option** 225:24 226:3 | 186:10,13 187:20 |
| 165:20 232:16 | 132:19 134:9,21 | 46:7,11 51:20 | 226:9,11 229:10 | 188:23 189:9 |
| 282:8 | 138:19 139:14,22 | 53:1 55:23 56:21 | 229:22 230:6,15 | 194:15 197:6 |
| **offices** 47:22 165:22 | 140:23 141:3 | 62:14 63:17 66:24 | 231:3 245:8,13,16 | 198:22 214:12 |
| **official** 178:12 | 143:10 144:5 | 70:18 75:5 81:18 | 245:20,21 275:6 | 217:21 220:8 |
| **often** 248:11 | 145:15 146:7 | 88:13 89:7 93:1,4 | **options** 139:8 | 233:19 237:24 |
| **oh** 18:13 101:22 | 147:8,19 150:19 | 95:5 107:14 | 225:19,20,22,24 | 239:8 242:3 |
| 119:7 126:11 | 151:1,10 152:1,3 | 112:11 114:22 | 229:7,20 245:8 | 245:21 248:9 |
| 128:17 151:15 | 152:11,13,16,19 | 115:5 122:12 | 256:11 | 258:11 262:12 |
| 172:17 200:5 | 153:9,23 154:8 | 125:24,24 126:1 | **oral** 186:4 | 278:12 |
| 273:6 275:3 | 155:24 156:17 | 134:22 135:11 | **order** 67:14 98:5 | **others** 17:18 71:8 |
| **okay** 4:24 5:2,6,10 | 157:4,15 158:7 | 137:2 141:17 | 166:16 183:24 | 222:22 |
| 5:13,18 6:5,11 7:8 | 159:1,10,13 | 146:24 151:8 | 209:12 212:2 | **otherwise** 17:16 |
| 7:18 8:9,22 9:8 | 160:11 162:13 | 163:18 165:6,20 | 219:22 272:17,19 | 57:22 103:11 |
| 10:16,24 12:2 | 163:4,24 165:19 | 181:22 186:24 | 273:2,12,15,16,19 | **ought** 45:1,14 65:5 |
| 13:8,21 14:5,14 | 166:1,16,24 167:1 | 187:24 189:9 | 274:5 | **out** 16:11 26:14 |
| 14:16,17,20 17:21 | 168:3 169:11 | 192:20 193:22 | **orders** 17:9 261:4 | 30:9 43:4,12 |
| 20:13 23:6,12,18 | 171:4 175:3,13 | 195:22 213:21 | **Ordinarily** 138:6 | 46:15 55:19 59:10 |
| 25:7 30:14,19 | 179:8 181:14 | 215:8 221:4 | **organization** 273:2 | 71:4 77:1 82:13 |
| 31:9,24 32:6,8,19 | 182:20 183:19,23 | 223:16 226:20 | **organized** 273:10 | 84:20,24 94:21 |
| 33:4,12,21 35:1,5 | 184:13 187:10 | 229:20,23 231:1 | **original** 53:16 | 96:23 99:12 102:9 |
| 35:8 36:3,8 37:9 | 188:4 189:5,14 | 231:11,14 236:19 | 80:13,18,20 98:4 | 104:3 110:9,16,20 |
| 38:2,17,22 39:1 | 190:19 194:11,18 | 236:21 243:17 | 98:11 135:3 | 110:23 111:6 |
| 39:17 40:18,21,24 | 195:7,11,18,21 | 248:9 256:10 | 139:23 141:5 | 113:7 120:16 |
| 41:13 42:15 47:15 | 196:11 197:15,19 | 262:5 270:3 | 153:11 154:6 | 125:12 126:5 |
| 49:16 50:1,21 | 197:24 198:5,20 | 271:18 272:12,12 | 222:23 223:1 | 151:3 170:2 |
| 51:2,10,24 52:16 | 200:10,18 201:16 | 274:13 | 239:13 249:9 | 182:16 184:12 |
| 53:7,12,18 54:2 | 203:1,6,9 204:18 | **ones** 72:10,11 | 278:5 282:3 | 186:3 187:1 188:3 |
| 54:15,21 55:8,11 | 204:21 205:4,24 | 105:17 154:5 | **originally** 43:19 | 202:11 203:15 |
| 56:19 57:24 60:11 | 206:4,5,14 208:2 | 155:1 158:22 | 228:4,5,9 | 207:20 225:23 |
| 60:22 61:22 62:24 | 208:14 212:8 | **one-page** 53:19 | **originals** 80:15 | 247:5,6,14 251:13 |
| 63:10 64:5 65:14 | 214:10,14,19 | **only** 24:10 27:24 | **originated** 88:5,6 | 252:5 261:24 |
| 65:22 66:18,23 | 216:3 219:1 220:6 | 35:12 50:4 70:21 | **other** 6:20 9:9 | 267:6 272:8 |
| 67:11,18,24 68:4 | 220:13 222:18 | 70:22 89:8,17 | 10:11 13:18 16:17 | **outline** 22:22 35:21 |
| 69:8,12,17 70:12 | 223:22 224:8 | 93:4 115:11 122:4 | 18:6,9 19:8,11 | 155:11 156:23 |
| 70:18 71:1,23 | 225:17 229:22 | 123:5 140:23 | 21:6,12,19,22,22 | 157:6 |
| 72:16 73:22 76:6 | 230:21 231:4,11 | 141:5 150:13 | 22:23 23:16 31:22 | **outlined** 132:10 |
| 76:17 77:11 78:3 | 233:3,19 234:19 | 151:8 155:1 | 34:2,3,5 35:17 | 175:5 256:8 |
| 79:18 80:17 81:2 | 234:20 236:8 | 161:11 175:24 | 38:19 42:9 45:23 | **outlines** 238:14 |
| 81:14 82:2,11,19 | 237:8 246:24 | 209:12 219:24 | 49:16 52:9 54:7 | **outside** 56:13 137:5 |
| 83:2,4,7,11,13,19 | 249:15,20 254:6 | 227:6,14 260:19 | 56:21 63:6 64:13 | **over** 6:1 44:20 |
| 83:23 85:24 87:9 | 254:12 256:16 | 269:20 270:21 | 65:9,13 66:15,15 | 48:17 64:7,12 |
| 87:22 88:9 90:2,9 | 258:21 259:23 | 271:12 277:22 | 66:23 67:12,15,18 | 66:6,7 73:24 93:1 |
| 90:18 94:10 95:17 | 261:7 263:11 | 282:4,4 | 71:9,10 72:14 | 93:2 106:1 107:18 |
| 96:16 97:24 98:23 | 265:1 266:13 | **opened** 57:2 | 75:24 78:3,6,12 | 107:23 112:16 |
| 99:9 100:7,22 | 267:1,8 269:10,18 | **operate** 136:22 | 79:1 81:6,6,12,15 | 116:1 122:13 |
| 101:1,5 102:8,18 | 270:22 271:12 | 244:6,10 | 81:15,17,18 89:9 | 132:7 145:11 |
| 102:23 103:2,8 | 273:14 274:24 | **operates** 171:22 | 94:2 104:9 108:22 | 188:16 194:24 |
| 104:19 106:3,14 | 276:11 277:2,16 | **operation** 14:23 | 110:2 113:14 | 242:23 243:4 |
| 107:16 109:23 | 277:24 | 123:1 | 116:17 122:13 | 264:11 |

Dimon vs. Metropolitan Life      9-8-06      William R. Mensie
C.A. No.: 05-11073 WGY

Page 20

**overall** 126:11
**overnight** 43:1
  150:16
**own** 37:16,16
  125:12 126:20,21
  137:24 138:17
  160:1,9 257:6
**owned** 6:12 68:24
  264:2
**owner** 74:17,19,21
  75:3,4 79:18,21
  91:8,8,10,13,15
  125:1 231:22
  247:17
**ownership** 6:15
**o'clock** 1:23 45:19
  101:11 185:8
  188:8 191:4
  192:22
**O'Driscoll** 2:21 4:5
  9:22,24 12:18
  15:5,15 17:14
  20:13,17,20,21,22
  21:7,8,17,23,24
  22:3,9,15,19 23:6
  24:6 25:1,5,9,13
  26:6,11,17 27:1
  27:19 28:8,15,21
  29:5,12,21 30:6
  30:22 31:11 33:9
  33:13,17 39:4,7
  39:10 40:2,7
  41:21 43:6 44:3,4
  44:15,23 45:10,19
  46:5,7,10,18,21
  47:5,9,13,16,18
  48:4,12,20 49:2,7
  52:23 53:6 54:1
  56:1 59:6,12,18
  60:18,24 61:1,4
  61:12 62:11,20,24
  64:7,12,18,23,24
  66:4,6,11,13,14
  66:21 69:13,15,18
  69:22 72:1,9,12
  74:23 76:19 77:18
  78:8 82:4,16
  85:16 86:7 87:1
  87:17 88:22 89:11
  90:10 92:3,10,17
  93:5,8,12 95:11
  95:17 96:4,8,13
  96:21 97:9,17,21
  99:3,5,18 100:1,9
  100:22 101:5
  102:10 103:22
  104:4,19 105:4,9
  105:16,22 106:5,9

106:14 107:10,17
108:3,8,11 109:2
112:14,21 113:17
114:5,17 115:16
115:22 116:8,23
117:14 118:9
119:2,7 121:10
124:16 125:20
126:13 127:2
128:14,17 130:7
132:5,20 133:2,21
134:14 135:4,16
137:13 139:1
140:4,9,12 142:1
142:21,23 145:11
146:14,18,23
148:5,10,16 150:8
151:9 152:3,7,13
153:14,19 157:1,4
160:3,19 161:20
161:23 162:13
163:4,9 164:12
166:22 168:4,10
168:15 171:9
172:6,8,14,17,19
173:8,13,16,24
174:3,8 175:11
176:9,13,20,22
177:6,13,19
178:19 179:16
180:8,24 181:2,15
183:21 185:11,16
185:23 186:6,9,20
187:2,5,21,23
188:3,9,15,22
189:1,5,14,17,19
190:4,11,16,19,23
193:21 194:20
195:7 196:3,5
198:1,3 199:18
200:1,5,8 203:14
203:19,22 204:5,8
205:2,24 207:7
208:4,17,21 209:4
209:16,22 210:6
210:14 211:5,18
212:9,13,17 213:7
213:13,19,24
214:3,10,14,16
215:7 216:21
217:4,11 218:16
218:22 219:1,5
221:12,18,21
222:1 223:8 224:6
224:9 227:3,8,11
227:15,23 228:3,8
229:12 230:8
231:14 234:13,23

235:17,23 237:24
239:20 244:23
249:15 250:7
251:9,15,20
252:24 253:2,14
253:19 254:20
255:1,19 256:3,18
257:4,11,13,20
258:23 259:3,7,10
259:17 260:2,16
260:21 261:14
262:20 263:2,15
263:22 264:4
265:9,24 267:11
267:24 268:5
269:23 270:2,5,10
271:2,23 273:7
274:10,23 275:23
276:5,14 277:11
278:3,15,23 279:7
279:9
**O'Driscoll's** 22:6

**P**
**packet** 196:2
**page** 3:16 33:6
  82:14 119:8 128:2
  138:11 141:4
  158:18 159:9
  166:1 173:13,15
  174:23 205:23
  206:18 223:11
  225:2,17,18,23
  229:6 231:6 245:5
  245:19 246:3
  275:2 280:5,7,9
  280:11,13,15
**pages** 3:3 34:13,18
  35:6,12 41:17
  49:16 50:2 51:13
  51:17 119:8 144:6
  144:19 149:12
  150:20,20 151:14
  151:15,16 185:12
**paid** 74:15 215:17
  215:19 221:2,7
  222:6 247:14
**paper** 40:22 144:16
  145:20
**paperwork** 38:16
**paragraph** 54:16
  123:21 131:17
  134:4 157:12,17
  163:11 175:15
  215:15,23 217:16
  227:20 228:20
  231:19,20 245:14
**Pardon** 16:16

**parentheses** 276:18
**Park** 2:12 193:12
**part** 10:23 12:5
  29:4 35:2 36:23
  62:5 63:8 79:12
  80:6,9 100:6
  122:7 123:2 141:6
  143:4 145:9,11,18
  149:7 164:7
  167:22 195:18
  230:18,21 234:6
  234:12 241:3,7,10
  244:1 247:16
  250:16 273:17
  274:21
**partial** 46:17,18,21
  265:12 272:24
  278:21
**partially** 149:21
**particular** 16:6
  35:22 97:20 225:1
  226:19 231:19
  272:17 278:10
**particularly** 28:6
**parties** 5:11 31:22
  45:23 57:15,17
  63:10 65:9,13
  76:24 134:23
  145:5 147:14
  172:3 175:8 187:7
  214:12 233:2
  242:18 249:1
  257:11 258:4,5
  268:2 272:7
  281:18
**parts** 82:3,5,7,10
  142:11 272:14
**party** 5:8 66:13,19
  66:21,23 67:1
  175:6 178:8,14
  201:1,12 267:15
  271:18
**past** 7:19
**pausing** 183:19
**pay** 80:7 125:1,5,6
  221:3 231:21
  236:24 237:5,6,6
  237:12,18,19
  252:19
**payable** 182:4,5,9
**payee** 225:11,11
  226:13 230:1,9
  231:7 256:14
**paying** 90:8
**payment** 74:10,11
  74:11 183:6
  184:14 220:22
  235:14

**payments** 34:12
  35:1 80:2 183:9
  183:11,16 224:21
  225:12,24 226:11
  229:24 231:2,8
  232:5 233:6,11
  236:16,17 249:3
**pay-out** 124:3,10
**PDF** 40:19
**peer** 232:17
**pending** 99:18
  114:6 118:10
  212:22 213:19,22
**Pennsylvania** 2:22
  193:22
**people** 29:18 37:19
  103:12 105:11,12
  107:14 108:22
  120:12 154:23
  156:10,11 160:14
  165:8,13 180:17
  180:19,21 185:6
  202:19 248:11
**per** 135:13 221:4,6
  255:14,17
**percent** 126:11
  215:18 221:6
  224:22 225:13
  228:24 229:1,4,10
  230:5 231:1
  255:13
**percentage** 126:7
  126:24
**performance**
  242:22,24
**perhaps** 34:9 97:11
  151:17 220:9
**period** 56:11,12
  95:13 138:4
  168:10,12 169:16
  171:20 224:23
  225:14 226:12
  229:20,23 230:7
  230:15 231:1,8
  245:7 255:4,7,11
  256:7,11,12
  275:10,10,19
  276:4,9,10,12,18
  276:20
**periods** 226:7,10
  229:11
**person** 13:22 14:2
  18:14 19:1 37:20
  52:11,17 65:23
  67:7 71:13 73:6
  73:18 90:8 104:14
  104:15 121:7,8
  123:15 124:13

Dimon vs. Metropolitan Life                    9-8-06                    William R. Mensie
                                        C.A. No.: 05-11073 WGY

Page 21

| | | | | |
|---|---|---|---|---|
| 156:19 163:20 | 281:15 | **pointing** 97:20 | 187:4,5 203:1,17 | 91:24 92:24 93:24 |
| 182:18 185:1 | **placed** 168:16 | **policies** 58:10 137:3 | 204:2 208:2 214:6 | 94:24 95:24 96:24 |
| 219:23 245:24 | **places** 94:2,22 | 154:10 211:12 | 214:12 232:13 | 97:24 98:24 99:24 |
| 276:18 | 214:23 | 225:5 230:18 | 233:1 239:12 | 100:24 101:24 |
| **personal** 7:20,21 | **plaintiff** 2:5 63:13 | 241:14 | 240:2,7 265:2 | 102:24 103:24 |
| **personally** 131:13 | 74:16 193:5 232:5 | **policy** 12:4 17:24 | **positions** 6:20,24 | 104:24 105:24 |
| 240:23 262:10 | 233:6 244:18 | 52:1,4 53:16 55:5 | 121:12 130:20 | 106:24 107:24 |
| **personnel** 18:14 | **Plaintiffs** 1:6 192:5 | 58:8,8 63:19 68:2 | **possession** 47:7,11 | 108:24 109:24 |
| 164:14 | **plaintiff's** 74:8 | 68:3,4,8,11 70:1,4 | 49:19 65:11 100:4 | 110:24 111:24 |
| **person's** 165:5 | 75:17 80:7 114:23 | 70:6,13,15,16,22 | 100:5 139:22 | 112:24 113:24 |
| **perspective** 89:12 | 115:6 124:24 | 71:3,9 75:22 76:5 | 141:6,7 162:18 | 114:24 115:24 |
| 131:12 200:24 | 133:9,11,13 | 77:8 78:2,6 91:5 | **possible** 138:1 | 116:24 117:24 |
| 201:3 | 181:24 182:2 | 98:4,11 131:4 | **Possibly** 23:21 | 118:24 119:24 |
| **pertained** 91:22 | 183:3 215:19 | 134:5,10,17,20,23 | **post** 24:16 74:2 | 120:24 121:24 |
| 250:17 | 231:20 233:4,24 | 139:17 154:21 | 143:14 | 122:24 123:24 |
| **pertaining** 1:18 | **played** 195:18 | 157:22 179:5 | **postjudgment** | 124:24 125:24 |
| 41:11 166:11,12 | **Plaza** 2:12 193:12 | 181:17 197:9,11 | 75:11 114:11,15 | 126:24 127:24 |
| 192:17 | **pleadings** 42:2,5 | 201:11 207:13,14 | 123:12,14 | 128:24 129:24 |
| **peruses** 119:14 | **please** 4:20 10:9 | 207:20 208:3,11 | **postpone** 188:17 | 130:24 131:24 |
| 128:23 206:4 | 21:1 49:14 53:19 | 208:16,18,19,20 | **postponed** 43:20 | 132:24 133:24 |
| **Peter** 2:7 4:17 9:24 | 54:3,17 69:13 | 209:3,5,13 210:3 | 45:15 172:4 | 134:24 135:24 |
| 39:5 41:21 43:14 | 80:23 86:1 92:6 | 210:13,15 211:8 | **potential** 102:4 | 136:24 137:24 |
| 62:20 64:7,24 | 98:19,21 101:14 | 211:10,15 222:13 | **potentially** 24:7 | 138:24 139:24 |
| 66:6 72:2,13 | 112:12 132:16 | 222:15,19,23 | **practical** 74:17 | 140:24 141:24 |
| 96:14,21 97:9 | 152:12 172:21 | 223:1,5 224:3,14 | 139:11 | 142:24 143:24 |
| 99:19 103:22 | 178:23 196:15 | 224:18 225:2,8 | **preceding** 53:10 | 144:24 145:24 |
| 107:18 114:5 | 198:2 200:7 | 231:5 235:12,13 | 101:7 152:5 177:1 | 146:24 147:24 |
| 118:9 132:20 | 204:18 208:22 | 239:4,13 240:3 | 191:3 | 148:24 149:24 |
| 152:7 160:19 | 212:3 218:8,15 | 245:22,23 246:18 | **precise** 2:24 3:24 | 150:24 151:24 |
| 172:15 173:8 | 223:4,15,16,19 | 246:20 247:12 | 4:24 5:24 6:24 | 152:24 153:24 |
| 180:24 185:5 | 226:20 227:2,7 | 258:19,22,24 | 7:24 8:24 9:24 | 154:24 155:24 |
| 190:24 193:7 | 228:12 229:14 | 259:16 260:1,7,15 | 10:24 11:24 12:24 | 156:24 157:24 |
| 203:15 263:3 | 231:11,13 235:3 | 260:17,20,21 | 13:24 14:24 15:24 | 158:24 159:24 |
| **Pettine** 219:15 | 235:22 237:23 | 261:2,8 264:10 | 16:24 17:24 18:24 | 160:24 161:24 |
| 220:2,3,10 246:13 | 239:19 258:2 | 265:18,19,23 | 19:24 20:24 21:24 | 162:24 163:24 |
| **Philadelphia** 2:22 | 259:13 262:19 | 266:3,5,7,11,13 | 22:24 23:24 24:24 | 164:24 165:24 |
| 193:22 | 267:19 275:1 | 266:16,22 267:3,4 | 25:24 26:24 27:24 | 166:24 167:24 |
| **phone** 40:10 187:20 | **plenty** 45:20 | 267:9,22 268:11 | 28:24 29:24 30:24 | 168:24 169:24 |
| 190:22 | **plus** 215:18 | 268:17 269:5,11 | 31:24 32:24 33:24 | 170:24 171:24 |
| **photocopies** 33:15 | **pocket** 125:12 | 269:11,14,20 | 34:24 35:24 36:24 | 172:24 173:24 |
| **phrase** 62:18 | **point** 12:9,10 15:15 | 271:1,9,17,19 | 37:24 38:24 39:24 | 174:24 175:24 |
| 230:13 | 27:24 29:20 31:12 | 278:2,6,11 | 40:24 41:24 42:24 | 176:24 177:24 |
| **physical** 111:2 | 36:20 44:11,14 | **poor** 162:21 265:10 | 43:24 44:24 45:24 | 178:24 179:24 |
| 113:9 151:5 | 52:20 54:16 57:9 | **portion** 148:7 | 46:24 47:24 48:24 | 180:24 181:24 |
| **physically** 111:7,12 | 68:19 69:2 89:19 | 180:14,15 182:11 | 49:24 50:24 51:24 | 182:24 183:24 |
| 140:5 141:12 | 90:4,5 91:7,9 | 231:20 255:15 | 52:24 53:24 54:24 | 184:24 185:24 |
| 171:11 | 96:18,23 97:3 | 275:5 | 55:24 56:24 57:24 | 186:24 187:24 |
| **pick** 187:12 | 109:1 110:19 | **pose** 213:21 | 58:24 59:24 60:24 | 188:24 189:24 |
| **piecemeal** 144:3 | 115:22 126:13,16 | **position** 4:24 46:5 | 61:24 62:24 63:24 | 190:24 191:24 |
| **piles** 50:17 | 128:7,9 148:5 | 93:3 94:24 100:9 | 64:24 65:24 66:24 | 193:24 194:24 |
| **piling** 187:20 | 161:18 168:17,18 | 107:19 116:6,13 | 67:24 68:24 69:24 | 195:24 196:24 |
| **place** 17:9 19:3 | 169:12 185:4 | 116:20 117:1,5 | 70:24 71:24 72:24 | 197:24 198:24 |
| 38:10 65:2 82:1 | 186:3 202:11 | 118:4 121:7,9,18 | 73:24 74:24 75:24 | 199:24 200:24 |
| 125:2 132:8 | 209:9 211:21 | 121:22 122:3,3,13 | 76:24 77:24 78:24 | 201:24 202:24 |
| 147:10 154:3,5,5 | 236:9 238:13 | 124:14 127:7 | 79:24 80:24 81:24 | 203:24 204:24 |
| 167:17 218:14 | 247:10 | 130:12,13 161:16 | 82:24 83:24 84:24 | 205:24 206:24 |
| 231:22 246:17 | **pointed** 77:1 96:24 | 164:23 165:2,5 | 85:24 86:24 87:24 | 207:24 208:24 |
| 265:15 270:7 | 252:5 | 178:12 186:24 | 88:24 89:24 90:24 | 209:24 210:24 |

Dimon vs. Metropolitan Life
9-8-06
C.A. No.: 05-11073 WGY
William R. Mensie

Page 22

| | | | | |
|---|---|---|---|---|
| 211:24 212:24 | **presentation** | 154:1,2,4,22,23 | 169:6 201:20 | 73:24 74:24 75:24 |
| 213:24 214:24 | 153:12 | 155:12 157:12 | 207:21 208:3 | 76:24 77:24 78:24 |
| 215:24 216:24 | **presently** 210:20 | 161:12 181:18 | 221:11,16,18 | 79:24 80:24 81:24 |
| 217:24 218:24 | **Preservation** | 241:14 | 231:6 234:6,11 | 82:24 83:24 84:24 |
| 219:24 220:24 | 153:14,15 | **proceedings** 166:11 | **Providence** 8:6,10 | 85:24 86:24 87:24 |
| 221:24 222:24 | **pretty** 89:1 124:21 | 166:12 219:15 | 8:13 | 88:24 89:24 90:24 |
| 223:24 224:24 | 162:20,21 | 220:1,10 | **providing** 235:11 | 91:24 92:24 93:24 |
| 225:24 226:24 | **prevail** 99:22 | **process** 81:20,22 | 235:13 | 94:24 95:24 96:24 |
| 227:24 228:24 | **previous** 129:11 | 88:24 89:2,18 | **proximity** 24:1 | 97:24 98:24 99:24 |
| 229:24 230:24 | 130:1 256:9 | 90:5,6,17,18,20 | **public** 1:20 192:19 | 100:24 101:24 |
| 231:24 232:24 | **previously** 45:23 | 91:14 97:15,18 | 280:23 281:6 | 102:24 103:24 |
| 233:24 234:24 | 112:17 155:6 | 138:10 167:22 | 282:12 | 104:24 105:24 |
| 235:24 236:24 | 194:3 211:19 | 199:11 242:12 | **Pull** 82:12 | 106:24 107:24 |
| 237:7,24 238:24 | 224:12 | 258:13,14,16 | **purchase** 42:4 | 108:24 109:24 |
| 239:24 240:24 | **primary** 42:11 63:9 | 259:20 260:4,9 | 78:24 80:4 136:18 | 110:24 111:24 |
| 241:24 242:24 | 68:3,11 84:2,3 | 261:3,5 264:11 | 181:8,12 258:17 | 112:24 113:24 |
| 243:24 244:24 | 206:10 225:11 | 268:9 278:9 | **purchased** 79:23 | 114:24 115:24 |
| 245:24 246:24 | **principles** 242:11 | **processed** 182:21 | **purchaser** 79:23 | 116:24 117:24 |
| 247:24 248:24 | 242:11,13,15 | **produce** 24:5 29:6,8 | **purchasing** 17:7 | 118:24 119:24 |
| 249:24 250:24 | 243:6 | 160:1 | 74:12,13 80:1 | 120:24 121:24 |
| 251:24 252:24 | **prior** 6:2,19 8:1 | **produced** 12:6 | 126:22 136:24 | 122:24 123:24 |
| 253:24 254:24 | 9:19 11:10 25:21 | 24:21 25:4 39:8 | **purportedly** 29:2 | 124:24 125:24 |
| 255:24 256:24 | 42:3 102:18 | 41:24 42:7,8 | **purports** 94:16,17 | 126:24 127:24 |
| 257:24 258:24 | 115:12 169:8 | 43:22 45:23 46:23 | 235:6 266:18 | 128:24 129:24 |
| 259:24 260:24 | 195:21 197:6,10 | 47:1 49:23 72:15 | **purpose** 32:14 51:6 | 130:24 131:24 |
| 261:24 262:24 | 198:12 212:22 | 87:10,11,15,18 | 157:23 201:5 | 132:24 133:24 |
| 263:24 264:24 | 251:4 265:23 | 96:10 110:3 119:4 | 233:16,19 | 134:24 135:24 |
| 265:24 266:24 | 266:1,5,13 268:2 | 130:5,9 142:24 | **purposes** 9:1 61:12 | 136:24 137:24 |
| 267:24 268:24 | 278:1,11 | 214:23 216:15,19 | 68:18 73:24 | 138:24 139:24 |
| 269:24 270:24 | **private** 6:14 | 218:13 223:2,3 | 121:16 139:6 | 140:24 141:24 |
| 271:24 272:24 | **privilege** 15:8,18 | 241:8 250:4 258:7 | **pursuant** 1:16,17 | 142:24 143:24 |
| 273:24 274:24 | 24:8,13,19 25:20 | **product** 15:8 24:8 | 192:15,16 | 144:24 145:24 |
| 275:24 276:24 | 31:13 40:3 43:10 | 24:12,18,19 25:20 | **push** 69:12 100:17 | 146:24 147:24 |
| 277:24 278:24 | 104:20 105:21,23 | 31:13 59:23 109:6 | **put** 99:6 141:13 | 148:24 149:24 |
| 280:24 282:24 | 107:10 109:6 | **products** 7:1,4 | **P.C** 2:7,11,24 3:24 | 150:24 151:24 |
| **predate** 261:7 | **privileged** 21:9,12 | **professional** 9:18 | 4:24 5:24 6:24 | 152:24 153:24 |
| **predates** 278:1 | 21:19 23:1 103:23 | 282:12 | 7:24 8:24 9:24 | 154:24 155:24 |
| **prefer** 101:3 187:15 | 108:12 109:5 | **professionally** | 10:24 11:24 12:24 | 156:24 157:24 |
| **prejudgment** 74:2 | **probably** 36:4 | 126:21,23 | 13:24 14:24 15:24 | 158:24 159:24 |
| 123:13,16 | 38:15 79:13 90:12 | **program** 184:19 | 16:24 17:24 18:24 | 160:24 161:24 |
| **premarked** 133:1 | 100:19 111:17 | **progressing** 36:5 | 19:24 20:24 21:24 | 162:24 163:24 |
| **premium** 3:23 | 124:9 126:11 | **promise** 59:22,23 | 22:24 23:24 24:24 | 164:24 165:24 |
| 74:15 80:21 81:23 | 154:10 165:15 | **promised** 44:20 | 25:24 26:24 27:24 | 166:24 167:24 |
| 84:20 90:8,21,22 | 176:15 190:13 | **pronounce** 18:6 | 28:24 29:24 30:24 | 168:24 169:24 |
| 90:24 94:8 254:7 | 237:7 | **pronouncing** 32:3 | 31:24 32:24 33:24 | 170:24 171:24 |
| 254:9 | **problem** 109:9 | **proper** 60:23,24 | 34:24 35:24 36:24 | 172:24 173:24 |
| **preparation** 15:2 | 177:24 | **proposed** 33:5 | 37:24 38:24 39:24 | 174:24 175:24 |
| 36:16 | **procedure** 1:17 | **propounded** 27:22 | 40:24 41:24 42:24 | 176:24 177:24 |
| **prepare** 11:22 | 55:8 117:8,10,12 | **protected** 15:17 | 43:24 44:24 45:24 | 178:24 179:24 |
| 51:24 | 137:22 138:2,4,22 | 24:8,12,18 25:20 | 46:24 47:24 48:24 | 180:24 181:24 |
| **prepared** 79:8,10 | 138:24 139:18 | 31:12 43:9 | 49:24 50:24 51:24 | 182:24 183:24 |
| 79:15 91:7 174:3 | 140:16 154:9,14 | **protecting** 201:5 | 52:24 53:24 54:24 | 184:24 185:24 |
| 176:13 | 156:23 157:6,8 | **provide** 28:5,14,16 | 55:24 56:24 57:24 | 186:24 187:24 |
| **prescribed** 273:11 | 158:1 159:17 | 59:22 71:4 74:16 | 58:24 59:24 60:24 | 188:24 189:24 |
| **present** 2:3,7,12,16 | 181:7 192:16 | 145:1 146:7 | 61:24 62:24 63:24 | 190:24 191:24 |
| 9:10 85:9 106:18 | **procedures** 54:18 | **provided** 27:15 | 64:24 65:24 66:24 | 193:7,11,24 |
| 193:3,7,12,16 | 54:22,23 153:13 | 146:10,13,19 | 67:24 68:24 69:24 | 194:24 195:24 |
| 270:17 | 153:17,23,24 | 147:1,4 168:1 | 70:24 71:24 72:24 | 196:24 197:24 |

Dimon vs. Metropolitan Life　　　　　9-8-06　　　　　William R. Mensie
C.A. No.: 05-11073 WGY

Page 23

| | | | | |
|---|---|---|---|---|
| 198:24 199:24 | 10:9,21 11:7,8 | 259:8,9,13,21,23 | 114:21 124:7 | 104:11,17 110:1 |
| 200:24 201:24 | 15:10,16 20:22,24 | 260:6,17 261:15 | 131:16 149:9 | 120:10 126:1 |
| 202:24 203:24 | 21:13,14 22:4,8 | 261:15 263:7,8,11 | 153:6 167:2 | 137:10,17 163:22 |
| 204:24 205:24 | 22:13,16,18 23:6 | 263:13 264:5,6 | 172:13,20,22,24 | 166:19,20 167:6 |
| 206:24 207:24 | 23:8 24:7,21 25:2 | 265:15 267:12,17 | 175:24 178:17,22 | 169:3 171:24 |
| 208:24 209:24 | 25:14 26:5 27:1 | 267:18,24 268:3 | 195:24 200:18 | 173:6 195:15 |
| 210:24 211:24 | 31:2 40:7 48:20 | 268:12,13,20,21 | 201:6 202:10 | 199:13 205:10,18 |
| 212:24 213:24 | 49:3,4,6,8,10 | 269:2,3,16,17,24 | 208:22,23 209:7 | 207:4 215:1,3 |
| 214:24 215:24 | 50:18 59:7 68:16 | 271:3,5,24 278:8 | 210:8,9 213:3,9 | 216:13 217:17,24 |
| 216:24 217:24 | 69:10 70:3,19 | questioning 25:17 | 215:3 217:18 | 220:3 222:12 |
| 218:24 219:24 | 71:16,16,22 72:17 | questions 9:4 24:13 | 221:13,15 224:20 | 224:20 234:16,17 |
| 220:24 221:24 | 72:22 75:1 77:3 | 45:11 46:1 76:20 | 225:9,11 233:22 | 238:23 246:18 |
| 222:24 223:24 | 77:23 83:4 85:17 | 95:5 105:18,19 | 236:6 249:22 | 254:15,16 263:8 |
| 224:24 225:24 | 86:8 87:2 91:20 | 115:20 116:9 | 254:20 256:7 | 266:7 274:6 278:2 |
| 226:24 227:24 | 92:5,11,21 93:16 | 185:5 186:14 | 259:6,8,12,14 | recalled 53:13 |
| 228:24 229:24 | 95:12 96:24 99:18 | 212:13 213:20,23 | 263:21 264:23 | 194:2 |
| 230:24 231:24 | 100:16 101:13 | 214:8,13,19 222:3 | 267:18,20 268:13 | recalling 52:17 |
| 232:24 233:24 | 102:12 105:7 | 244:18 245:4,6 | 268:15 276:10,17 | receipt 158:5 |
| 234:24 235:24 | 106:10 108:9 | 253:1 262:23 | 279:8 280:1 | receive 27:6 79:24 |
| 236:24 237:24 | 109:22 114:5,18 | 263:9 264:6 274:8 | readily 17:22 18:1 | 80:1 113:11 |
| 238:24 239:24 | 115:8,9,17 116:7 | 274:10 278:12 | 18:11 | 220:22 221:1 |
| 240:24 241:24 | 116:11,13 117:17 | quick 152:2 | reading 115:4 | 222:18 225:12 |
| 242:24 243:24 | 117:19 118:9,17 | quickly 95:22 | 131:9 158:20 | 231:7 |
| 244:24 245:24 | 121:15 124:9 | Quincy 163:13,17 | 173:4 217:16 | received 25:5 26:3 |
| 246:24 247:24 | 126:16 130:17 | 163:22 165:23 | 246:19 256:23 | 26:21 36:11,14 |
| 248:24 249:24 | 132:21 135:17 | quite 160:7 176:4 | 262:8,11,15 | 39:22 40:19 41:9 |
| 250:24 251:24 | 136:11 139:5 | quotation 197:18 | reads 78:1 230:24 | 43:21 44:20,23 |
| 252:24 253:24 | 141:9 142:16 | 197:22 198:16 | 246:5 276:6 | 46:16 48:15 80:12 |
| 254:24 255:24 | 146:22 149:24 | quote 90:21 133:14 | reaffirm 195:6 | 88:16 98:4 116:16 |
| 256:24 257:24 | 152:7 156:7 | 133:17 222:23 | realize 261:23 | 134:4 139:15,17 |
| 258:24 259:24 | 160:19 163:22 | 243:9 258:16,18 | realized 137:19 | 140:17 143:14 |
| 260:24 261:24 | 164:14 166:6,8 | 260:11,13 261:6 | 168:17 | 169:4,17,23 197:8 |
| 262:24 263:24 | 168:4 172:10,19 | quotes 125:18 | really 10:3 30:2 | 197:11 231:4 |
| 264:24 265:24 | 173:8 176:9 178:5 | 126:2,9,14 230:21 | 84:14 94:16,19 | 239:4 265:12,13 |
| 266:24 267:24 | 180:24 181:1,2,3 | quoting 215:16 | 115:8 125:6 | 272:20 273:22 |
| 268:24 269:24 | 181:5 185:10 | 225:5 | 137:17 143:15 | 274:3 |
| 270:24 271:24 | 194:22,23 195:10 | | 156:6 164:13 | recently 12:17 45:8 |
| 272:24 273:24 | 201:13 202:3,5 | _____ R _____ | 166:7 170:11 | 67:3 75:9 265:12 |
| 274:24 275:24 | 203:15,23 205:3 | R 1:14 3:2 4:11 | 171:5 176:15 | 265:13 |
| 276:24 277:24 | 207:12 208:8,8,22 | 155:10 192:14 | 268:8,19 269:2 | recess 53:9 152:4 |
| 278:24 280:24 | 209:4,6,8,12,17 | 194:1 280:19 | reason 15:4 22:9 | 176:24 |
| 282:24 | 209:24 210:5,8,16 | 281:7 | 99:21 108:21 | recessed 101:8 |
| p.m 101:11 | 210:17,19,24 | raising 105:20 | 131:7 194:18 | recipients 120:12 |
| | 211:3,3 212:2,20 | Randolph 4:19 | 280:6,8,10,12,14 | recite 225:10 |
| _____ Q _____ | 212:22,22,24 | randomly 184:3 | 280:16 | recited 224:4,19 |
| qualified 13:23 | 213:2,3,4,8,11,13 | range 223:14 | reasonable 179:4 | 231:8 |
| 14:4 71:8 124:10 | 213:15,18,20 | rate 126:3 221:6 | reasons 42:11 | recites 220:21 |
| 208:11 | 217:17 219:23 | rated 125:2 231:23 | REATH 2:21 | recognize 78:19 |
| qualifier 13:18 | 221:13,21 222:2,2 | rates 137:7 | 193:21 | 174:10 |
| qualify 11:3,6 | 222:5,14 227:6,14 | rather 94:23 | recall 7:12,17 10:14 | recollect 103:3 |
| 118:20 126:4 | 228:6,15 229:14 | rattling 206:11 | 19:16,19 20:9 | 105:3 |
| 127:5 135:21 | 229:16 230:12 | reach 233:21 | 27:18 52:10 53:1 | recollection 23:21 |
| 140:7 150:13 | 235:3,18,24 236:4 | read 49:8 52:3 53:1 | 54:10 66:12,20 | 25:22,23 27:11,13 |
| 165:16 | 236:7 250:17 | 54:10,19,20 72:21 | 70:10 76:3,23 | 27:16 29:13 54:9 |
| qualifying 151:10 | 251:8,10,14,14,20 | 72:23 76:8,11,12 | 78:15 81:16 88:1 | 69:9 76:4,6 77:2,4 |
| quality 162:21,22 | 252:3 253:20 | 76:14 77:20 83:9 | 88:3,3,4,8,9,14 | 78:4,8,9,14 80:16 |
| quarter 245:12,15 | 255:20 256:9,22 | 83:10,14 92:10,12 | 91:21 92:7 100:2 | 88:12 102:19 |
| question 9:23 10:8 | 257:5,7,9 258:1 | 98:9,21 101:13,15 | 103:20 104:8,10 | 103:4,5,10,18 |

Dimon vs. Metropolitan Life | 9-8-06<br>C.A. No.: 05-11073 WGY | William R. Mensie

Page 24

| | | | | |
|---|---|---|---|---|
| 104:2,15 114:1 | 112:19,20 119:1 | 233:13 243:20 | **relayed** 26:1,3,4 | 54:4 72:21 81:2 |
| 118:15 126:10 | 123:21 130:1 | 248:4,17 251:8 | 90:21 | 83:23 100:15 |
| 137:16,17 143:11 | 138:11 147:15 | **regarding** 10:6 11:9 | **relaying** 196:23 | 101:13 127:23 |
| 149:14 157:10 | 155:8 158:23 | 11:16 17:12 18:24 | **release** 3:23 166:2 | 132:19 172:20 |
| 159:21 180:21 | 160:22 161:19 | 19:12,14 21:7 | 217:5,8,22 218:3 | 192:19 196:14 |
| 212:19 220:12 | 162:12 163:3 | 29:9 32:11 33:11 | 218:8 219:14,21 | 204:17,21 209:7 |
| 276:17 | 166:15 173:11 | 36:9 52:2 65:3,20 | 219:24 220:4,9,14 | 223:22 267:19 |
| **recollects** 106:8,10 | 174:6 175:10 | 65:23 66:4 96:10 | 220:15,21 221:2 | 268:14 279:6,8 |
| **reconvene** 101:5 | 178:18 183:8 | 101:23 104:14 | 222:7,16 223:7 | 282:11,12 |
| 190:20 278:20 | 229:19 254:6 | 116:6,13 118:4,14 | 224:4,15,19 | **reporting** 2:24 3:24 |
| **record** 4:18 27:19 | 262:19 | 131:7 132:4 | 234:17,19 235:4,6 | 4:24 5:24 6:24 |
| 29:15,20 42:21 | **reference** 12:11,12 | 137:14,24 139:18 | 235:6,10,12 | 7:24 8:24 9:24 |
| 43:2,7,23 45:22 | 13:1 67:24 85:11 | 143:5 153:4 172:4 | **releases** 220:15 | 10:24 11:24 12:24 |
| 47:1 53:7 69:15 | 97:9,13,22 99:16 | 195:23 197:21 | **releasing** 220:20 | 13:24 14:24 15:24 |
| 71:21 72:23 82:19 | 99:21 129:20 | 205:8,11 210:21 | **relevance** 25:17 | 16:24 17:24 18:24 |
| 92:12 95:15,20,23 | 151:1 162:4 | 261:19 262:3 | 160:4 167:10 | 19:3,4,7,24 20:17 |
| 96:2,5,6 101:12 | 174:20 182:11 | **regards** 21:5 | 235:18,24 | 20:24 21:5,24 |
| 101:15 108:6,7,22 | 214:24 218:2 | 205:16 206:17 | **relevant** 57:12 | 22:24 23:24 24:24 |
| 108:24 112:1,14 | 235:11 252:19 | 245:20 268:6 | 167:14 | 25:24 26:24 27:24 |
| 112:15 121:13 | 260:14,19 | **region** 16:11,11 | **relief** 132:13 | 28:24 29:24 30:24 |
| 133:24 146:1 | **referenced** 274:20 | **regional** 6:9 111:13 | **rely** 265:1 | 31:24 32:24 33:24 |
| 148:6 150:13 | **references** 143:15 | 111:15,18 156:11 | **remainder** 153:6 | 34:24 35:24 36:24 |
| 172:22 176:14,18 | 205:11 215:1 | **register** 179:2 | **remained** 273:10 | 37:24 38:24 39:24 |
| 185:21 186:1,7,8 | **Referencing** 275:17 | **Registered** 282:12 | **remaining** 86:17 | 40:24 41:24 42:24 |
| 187:13 190:8,15 | **referred** 28:1 35:3 | **reinforce** 219:19 | 91:4 226:13 230:1 | 43:24 44:24 45:24 |
| 194:7 195:20 | 39:23 54:8 88:13 | **reissued** 134:18 | 230:9 256:14 | 46:24 47:24 48:24 |
| 201:21,23 208:23 | 118:18 158:9,19 | **reiterated** 47:1 | **remarks** 277:14,16 | 49:24 50:24 51:24 |
| 210:9 212:5,10 | 219:6,20 222:21 | **reject** 268:24 269:9 | **remember** 26:18 | 52:24 53:24 54:24 |
| 213:3,9 215:9 | 222:22 | 269:10,21 | 28:4,9 104:5 | 55:24 56:24 57:24 |
| 221:15 223:4,24 | **referring** 33:9 | **rejected** 270:24 | **remembered** 104:2 | 58:24 59:24 60:24 |
| 224:13 226:21,22 | 52:23 54:9 55:7 | **relate** 42:1 168:17 | 104:5 | 61:24 62:24 63:24 |
| 226:23 228:9 | 62:20 63:4 72:2 | 206:8,10,12 | **removing** 234:22 | 64:24 65:24 66:24 |
| 229:13 235:18 | 93:17 96:9 112:4 | 245:19 | 237:24 | 67:24 68:24 69:24 |
| 236:13 240:20 | 115:12 141:3 | **related** 10:11 24:11 | **rendered** 258:16 | 70:24 71:24 72:24 |
| 246:20,20,21 | 157:2,17 172:12 | 41:8 45:8 49:22 | **rep** 73:15 177:10 | 73:24 74:24 75:24 |
| 259:14 260:10 | 172:22 173:13,16 | 50:12 51:8,10,14 | **repeat** 49:7 172:19 | 76:24 77:24 78:24 |
| 264:14 267:20 | 173:23 178:3 | 51:19,22 52:1 | 203:14 212:24 | 79:24 80:24 81:24 |
| 268:15 270:21 | 218:3,6 230:23 | 56:19 57:8 64:10 | 213:1 | 82:24 83:24 84:24 |
| 278:4,24 279:10 | 245:14 248:1 | 65:8 76:12 137:19 | **repeated** 94:4 | 85:24 86:24 87:24 |
| 279:12 | 277:6 | 138:7 166:18 | **repects** 73:14 86:13 | 88:24 89:24 90:24 |
| **recorded** 281:10 | **refers** 97:21 230:6 | 171:14,20 207:23 | **rephrase** 9:22 | 91:24 92:24 93:24 |
| **records** 20:5 35:19 | **reflect** 151:5 258:18 | **relates** 115:3 242:3 | 20:24 166:6 205:5 | 94:24 95:24 96:24 |
| 56:14 144:15 | 268:11 269:12 | 242:5 | **replace** 249:23 | 97:24 98:24 99:24 |
| 146:8,12 233:1 | 271:15 272:6 | **relating** 11:24 38:7 | 250:23 251:21 | 100:24 101:24 |
| **record's** 183:3 | **reflected** 90:23 92:2 | 38:11 42:10 50:13 | 262:24 263:13 | 102:24 103:24 |
| **recourse** 232:6 | 92:8,16,23 95:5 | 57:13 | **replacement** 134:5 | 104:24 105:24 |
| 233:6 235:15 | 234:1 260:10 | **relation** 206:18 | 134:9 197:9,11 | 106:24 107:24 |
| 237:9 | **reflective** 276:20 | **relationship** 58:24 | **replica** 139:6 | 108:24 109:24 |
| **recover** 143:7 | **reflects** 28:12 77:14 | 73:8,11 83:12 | **report** 18:22 20:19 | 110:24 111:24 |
| **RECROSS** 3:11 | 158:22 162:22 | 84:3 122:2 | 20:19,23 24:5,22 | 112:24 113:24 |
| 274:15 | 218:19 | **relative** 65:13 81:18 | 24:22,23 25:3,12 | 114:24 115:24 |
| **REDIRECT** 3:6,6 | **refresh** 25:23 28:19 | 91:21 95:6 102:16 | 25:22 27:6 30:24 | 116:24 117:24 |
| 253:3 276:1 | 29:10 69:8 113:24 | 114:21 116:13 | 31:5,9 118:13,19 | 118:24 119:24 |
| **reduced** 281:11 | **refund** 249:10,12 | 132:1 136:3 | 128:4 130:5 | 120:24 121:24 |
| **refer** 14:14 36:15 | **refunded** 249:11 | 147:10 167:24 | 157:18 158:3,7,12 | 122:24 123:24 |
| 39:1 54:12 63:15 | 252:11 | 169:5 238:24 | 158:15 | 124:24 125:24 |
| 74:20 78:17 82:11 | **refuse** 22:7,14 | 260:14 281:17,18 | **reported** 18:24 19:5 | 126:24 127:24 |
| 84:1 93:14 109:12 | **regard** 108:15 | **relay** 20:9,11 | **reporter** 1:20 49:8 | 128:24 129:24 |

Dimon vs. Metropolitan Life                 9-8-06                 William R. Mensie
C.A. No.: 05-11073 WGY

Page 25

| | | | | |
|---|---|---|---|---|
| 130:24 131:24 | 247:24 248:24 | 147:24 150:4 | 25:7 26:21 27:7 | 67:12 69:1,4 70:4 |
| 132:24 133:24 | 249:24 250:24 | 190:2 230:16,19 | 27:14 55:4 147:23 | 71:23 75:23 77:2 |
| 134:24 135:24 | 251:24 252:24 | 230:22 270:23 | 156:17 195:10 | 78:10 88:1 89:5 |
| 136:24 137:24 | 253:24 254:24 | 275:14 | 259:6 | 93:9 106:11 |
| 138:24 139:24 | 255:24 256:24 | requested 20:1 | responsibilities | 118:16,23 123:16 |
| 140:24 141:24 | 257:24 258:24 | 36:14 42:6,12 | 16:3 70:5,20,24 | 167:8,10 168:8,18 |
| 142:24 143:24 | 259:24 260:24 | 48:5 57:4 67:12 | 73:12,13,18,19,23 | 172:1,13,24 |
| 144:24 145:24 | 261:24 262:24 | 69:19 96:19 | 80:4 122:8,16,17 | 176:18 180:14 |
| 146:24 147:24 | 263:24 264:24 | 107:15 212:17 | 161:17 232:14 | 194:12 195:1,2,20 |
| 148:24 149:24 | 265:24 266:24 | 233:5 238:15 | responsibility 16:20 | 196:9,19 200:9 |
| 150:24 151:24 | 267:24 268:24 | 271:9 | 16:21 65:19 69:24 | 206:3 209:13,13 |
| 152:24 153:24 | 269:24 270:24 | requesting 29:20 | 73:16 102:3,6,8 | 224:6 234:4,9 |
| 154:24 155:24 | 271:24 272:24 | 79:6 96:11 | 102:11 114:16 | 241:7 243:10 |
| 156:24 157:24 | 273:24 274:24 | requests 31:14 48:8 | 115:2,9 116:4,5 | 254:13 258:3 |
| 158:24 159:24 | 275:24 276:24 | 113:21 227:20 | 116:14 117:1 | 261:16,18 270:21 |
| 160:24 161:24 | 277:24 278:24 | 228:20 253:11 | 118:7 122:15 | 274:3,4 |
| 162:24 163:24 | 280:24 282:24 | 269:19 277:17,18 | 123:1 128:8 132:3 | reviewed 11:24 |
| 164:24 165:24 | reports 21:15 | require 6:24 261:4 | 161:15 207:5 | 12:3,4 51:2 52:3 |
| 166:24 167:24 | represent 175:9 | required 4:2 150:18 | 213:17 282:5 | 67:4 116:19 133:3 |
| 168:24 169:24 | 201:2 214:20 | 183:10 240:4 | responsible 59:4,14 | 150:2,16 159:22 |
| 170:24 171:24 | 240:17 244:18 | requirement 26:10 | 59:14,24 60:4 | 167:12 168:19 |
| 172:24 173:24 | 266:18 272:23 | 29:16,22 205:19 | 71:13,18 72:18,24 | 203:4 207:13 |
| 174:24 175:24 | representation 33:7 | requirements 26:12 | 73:6 102:16 | 208:16 209:2 |
| 176:24 177:24 | 178:13 222:10 | 222:7,15 223:6 | 127:12 | 210:12,19 224:12 |
| 178:24 179:24 | representations | 224:4,15,19 | responsive 48:7 | 238:17 273:17 |
| 180:24 181:24 | 180:22 228:17 | requires 29:16 | 115:8 145:12 | reviewing 118:11 |
| 182:24 183:24 | 234:3 | 154:21 210:20 | rest 184:22 255:21 | 119:13 128:22 |
| 184:24 185:24 | representative 5:22 | requiring 70:13 | restate 10:8 235:22 | 168:14,22 169:4 |
| 186:24 187:24 | 6:22 7:24 8:19 | rereview 234:16 | 251:9 | revokes 225:7 |
| 188:24 189:24 | 20:18 24:16,18 | reschedule 186:14 | restroom 67:19 | right 23:14 29:2 |
| 190:24 191:24 | 28:3 61:14,18 | resembles 230:19 | result 63:7 184:19 | 30:15 44:18 46:8 |
| 193:24 194:24 | 64:9 93:10 106:12 | 230:22 | results 20:4 25:22 | 53:23 58:21 62:24 |
| 195:24 196:24 | 125:14 156:2 | reserving 4:3 44:18 | 25:24 27:14 | 69:8 114:8 119:2 |
| 197:24 198:24 | 177:5,7 178:5 | 48:22 274:9 | resume 188:5 | 125:12,15 127:1,9 |
| 199:24 200:24 | 199:10 209:21 | resided 222:16 | resuming 186:23 | 128:14 144:8 |
| 201:24 202:24 | 257:16 262:17 | resident 111:13,16 | 187:18 | 146:23 147:1 |
| 203:24 204:24 | representatives | 113:8,10 | retain 53:15 98:11 | 150:22 156:12 |
| 205:24 206:24 | 7:19 156:11 | resolution 99:23,24 | 157:23 | 170:2,3 172:5,17 |
| 207:24 208:24 | represented 90:6 | resolve 128:12 | retained 52:12 | 188:11 189:15 |
| 209:24 210:24 | 141:20 148:14 | 132:3 | 203:6,12,18 204:2 | 195:8,9 200:5 |
| 211:24 212:24 | 151:11 173:12 | resolved 73:17 | retention 52:2 | 208:16 209:3 |
| 213:24 214:24 | 174:1 175:4,22 | resolving 117:6 | 154:10,21 157:22 | 210:13 211:24 |
| 215:24 216:24 | 176:12 180:17,22 | 122:19 | 158:1 | 215:11 217:7 |
| 217:24 218:24 | 202:4,7 222:5 | respect 30:8 44:24 | retrieval 149:23 | 219:7 222:21 |
| 219:24 220:24 | 246:21 248:24 | 66:2 78:24 79:22 | retrospectively | 231:6 250:1,7 |
| 221:24 222:24 | 255:11 269:4 | 88:22,23 89:11 | 158:20 180:1 | 251:1 252:12 |
| 223:24 224:24 | representing | 117:2 122:24 | 218:5 | 262:17 264:12,15 |
| 225:24 226:24 | 173:23 258:7,17 | 147:5 243:6 | return 31:7 153:1 | 274:9 277:7 |
| 227:24 228:24 | represents 246:2 | 244:12 257:1 | 220:20 221:1 | right-hand 58:15 |
| 229:24 230:24 | 268:22,23 | respective 233:2 | revealing 20:15 | ring 106:4 |
| 231:24 232:24 | reproduced 282:6 | respects 88:4 | Revenue 163:12 | Road 2:8 193:8 |
| 233:24 234:24 | request 19:24 26:7 | 209:11 211:7 | 166:9 | Robert 134:1 196:3 |
| 235:24 236:24 | 27:8,21 28:17,22 | 230:12 250:13 | reverse 272:18 | role 62:9 68:1 133:7 |
| 237:24 238:24 | 28:24 29:2,6 36:8 | 267:7 | 273:1,12,15,15,19 | room 70:7 72:7 |
| 239:24 240:24 | 47:14 99:5 103:1 | respond 17:16 | 276:21 | 212:12 216:20,21 |
| 241:24 242:24 | 103:12 104:11 | 116:17,21 118:3 | review 15:3 44:10 | roughly 50:9 |
| 243:24 244:24 | 109:4 112:13 | responded 208:12 | 44:11 45:13,21 | Round 111:3 |
| 245:24 246:24 | 143:18 145:12 | response 19:24 25:4 | 49:24 50:15 67:2 | routed 66:14 |

Dimon vs. Metropolitan Life
9-8-06
C.A. No.: 05-11073 WGY
William R. Mensie

Page 26

| | | | | |
|---|---|---|---|---|
| **RPR** 281:5 | 246:4 250:1,23 | 84:2,9,12,19,23 | 134:21,22 135:1,7 | 16:24 17:24 18:24 |
| **Rules** 1:17 192:16 | 254:7,8,9 255:24 | 85:2 86:19,20 | 135:9 136:21 | 19:24 20:24 21:24 |
| **runs** 9:12 | 256:4,5,7 267:8 | 93:17,20,22 94:3 | 137:10 153:24 | 22:24 23:24 24:24 |
| ——— | 267:21 268:1,12 | 94:8,15,16 95:2,4 | 167:4 199:13 | 25:24 26:24 27:24 |
| **S** | 268:16 270:8,23 | 98:15 99:13,15 | 202:9 203:8 215:3 | 28:24 29:24 30:24 |
| **safe** 70:18,21 | 275:9 276:20 | 109:16 111:8 | 216:8,11,13 220:7 | 31:24 32:24 33:24 |
| **sales** 7:1 | 277:23 | 120:2 121:1 123:6 | **send** 23:19 40:16 | 34:24 35:24 36:12 |
| **same** 8:23 13:1 | **schedule** 186:11 | 124:23 127:14,15 | 113:21 138:3 | 36:24 37:24 38:24 |
| 33:14 34:20,22,23 | 188:4 | 129:3,9 131:1,4 | 139:10,11 153:11 | 39:24 40:24 41:24 |
| 34:23 35:2,2,9 | **scheduled** 43:19 | 131:12,18 136:3 | 161:9 167:20 | 42:24 43:1,24 |
| 42:11 59:18 63:8 | 101:9 | 142:8,12,17 | 219:10,24 | 44:24 45:24 46:24 |
| 68:13 87:4 94:22 | **seal** 280:23 282:8 | 148:19 153:1,17 | **senior** 6:22 | 47:24 48:24 49:24 |
| 125:19 143:22 | **seamen** 205:17 | 156:4 157:16 | **sense** 117:16,18 | 50:24 51:24 52:24 |
| 145:16 148:7,8,14 | **seamen's** 205:13 | 158:2 159:4,11,14 | 118:21 135:14,19 | 53:24 54:24 55:24 |
| 148:14,23 149:4,6 | **search** 19:20 20:2,4 | 166:16,18 174:17 | 154:17,19 161:11 | 56:24 57:24 58:24 |
| 149:8,9 156:19 | 21:5 33:21 34:7 | 174:20 175:15,21 | 189:12 | 59:24 60:24 61:24 |
| 157:12 167:22 | 35:6 36:7 43:12 | 180:11 185:7 | **sent** 23:22 33:5 | 62:24 63:24 64:24 |
| 171:22 190:12,21 | 48:16 52:24 53:4 | 187:8 188:19,20 | 37:4 40:21 41:12 | 65:24 66:24 67:24 |
| 190:22 206:15 | 143:4 144:24,24 | 189:11 197:14,15 | 41:16 43:5 50:22 | 68:24 69:24 70:24 |
| 213:13 235:12 | 149:12,15,15,18 | 198:7 199:13 | 52:9,11,15,22 | 71:24 72:24 73:24 |
| 248:11 263:12 | 149:20 | 200:12,16 206:24 | 55:1 56:20 66:13 | 74:24 75:24 76:24 |
| 269:13 276:13 | **searched** 26:19 | 215:20 217:20 | 72:14 82:12,12 | 77:24 78:24 79:24 |
| **SANDRA** 2:12 | **searching** 89:20 | 219:15,17 222:12 | 91:2,8 97:11 | 80:24 81:24 82:24 |
| 193:12 | 144:22 149:10 | 225:21,24 226:4,6 | 111:24 112:1,6,16 | 83:24 84:24 85:24 |
| **sat** 171:11,11 | **second** 22:20 54:16 | 226:14 227:21 | 112:24 137:20 | 86:24 87:24 88:24 |
| **saw** 76:7 81:8 88:8 | 91:10,15 92:1,15 | 228:19,22 230:2 | 138:9 139:15,19 | 89:24 90:24 91:24 |
| 89:4,7,14,15 | 92:22,24 95:15 | 231:23 232:7 | 141:1,13 154:6 | 92:24 93:24 94:24 |
| 91:20,21 92:21,23 | 123:21 128:2 | 233:1 234:7 238:8 | 158:4 168:23 | 95:24 96:24 97:24 |
| 95:3 111:23 143:2 | 131:16 138:11,13 | 239:6,8,22 245:13 | 196:2 218:20 | 98:24 99:24 |
| 166:12,14 167:6,8 | 163:11 184:10 | 245:18,21 248:14 | 219:14 220:1 | 100:24 101:24 |
| 234:10 236:18 | 185:18,22 215:8 | 253:22 254:4,8 | 274:1,2 | 102:24 103:24 |
| **saying** 135:21 | 226:20 231:19 | 259:9 266:9 275:7 | **sentence** 77:20 | 104:24 105:24 |
| 148:22 155:24 | 250:16 260:3 | 275:13 | 232:2 | 106:24 107:24 |
| 176:5 195:7 202:4 | **section** 79:18 86:14 | **seeing** 70:10 76:23 | **sentences** 78:12 | 108:24 109:24 |
| 202:9 233:9 234:1 | 86:18 157:16 | 88:1,3 91:21 | **separate** 37:2 50:16 | 110:24 111:24 |
| 261:12 262:5 | 180:11 183:5 | 113:24 120:11 | 50:16,18,20 | 112:24 113:24 |
| 264:22,23 | 245:6,8 255:9,12 | 215:1 238:23 | 108:15 137:23 | 114:24 115:24 |
| **says** 14:18 54:17 | 277:14 | 254:15 | 157:24 200:4 | 116:24 117:24 |
| 58:15 77:7 79:1 | **sections** 86:14 | **seeking** 17:23 | 206:23 | 118:24 119:24 |
| 79:19 82:22 86:16 | **secure** 133:13 | 131:24 | **separating** 154:14 | 120:24 121:24 |
| 98:10,19 119:16 | **securing** 133:16 | **seeks** 21:14 24:7 | **September** 1:23 | 122:24 123:24 |
| 120:3,14 123:6,23 | **security** 53:14 | **seem** 52:10 53:1 | 48:9,10 101:10 | 124:24 125:24 |
| 124:2,9,24 129:11 | 79:14 82:23 90:21 | 135:7 154:17 | 140:10,15 141:10 | 126:24 127:24 |
| 131:18 132:12 | 97:14,15 98:3,16 | 205:10 215:3 | 191:5 192:22 | 128:24 129:24 |
| 134:4 138:13 | 131:2,14 134:5 | 216:13 222:11,12 | 280:1 282:9 | 130:24 131:24 |
| 141:4 148:19 | 135:2 173:5,7 | 224:20 | **sequence** 183:15,24 | 132:24 133:24 |
| 153:3 155:10 | 180:17 182:10 | **seemed** 206:12 | 184:4,7 261:3 | 134:24 135:24 |
| 157:11 158:13 | 184:6,10 195:19 | 252:15 258:3 | 273:19 274:4 | 136:24 137:24 |
| 161:6 164:4 | 195:23 197:9 | **seems** 86:15 94:1 | **serious** 177:24 | 138:24 139:24 |
| 173:18 175:16,24 | 198:17 199:11 | 120:11 129:18 | **seriously** 139:11 | 140:24 141:24 |
| 176:1 178:24 | 224:3 245:24 | 131:9 153:21 | **seriousness** 13:24 | 142:24 143:24 |
| 179:12 182:12 | 247:9 248:2 249:6 | 202:19 206:10,21 | **served** 163:13,21 | 144:24 145:24 |
| 183:6 186:4 | 251:16 264:2 | 210:1 222:20 | **serves** 166:10 | 146:24 147:24 |
| 197:15 198:7,23 | **Security's** 215:24 | 252:3 | **service** 2:24 3:24 | 148:24 149:24 |
| 206:22 224:21 | 238:6,12,19 | **seen** 10:19 35:17,20 | 4:24 5:24 6:22,24 | 150:24 151:24 |
| 226:6 230:4 231:2 | **see** 10:2 13:3 25:16 | 53:13 65:12 75:23 | 7:24 8:24 9:24 | 152:24 153:24 |
| 232:10 233:3 | 58:15,18 67:9 | 81:16 88:5 89:16 | 10:24 11:24 12:24 | 154:24 155:24 |
| 238:5 245:12,16 | 76:17 79:18 83:5 | 92:7 109:23 120:8 | 13:24 14:24 15:24 | 156:24 157:24 |

Dimon vs. Metropolitan Life                    9-8-06                    William R. Mensie
C.A. No.: 05-11073 WGY

Page 27

| | | | | |
|---|---|---|---|---|
| 158:24 159:24 | 275:24 276:24 | short 53:9 100:24 | 194:11,12,16 | someone 18:1 37:11 |
| 160:24 161:24 | 277:24 278:24 | 152:4 176:24 | single 3:23 84:19 | 105:15 118:18,19 |
| 162:24 163:13,24 | 280:24 282:24 | Shorthand 1:20 | 94:8 156:19 163:7 | 129:24 160:11,18 |
| 164:24 165:24 | set 12:8 190:9,19 | 192:19 282:11 | 254:7,9 | 161:16 164:22 |
| 166:9,24 167:24 | 201:15 223:6 | shortly 27:8 41:4 | sir 4:18 32:8 71:17 | 165:2 184:21 |
| 168:24 169:24 | 282:7 | 152:8 | 134:2 183:17 | 188:1,16 228:22 |
| 170:24 171:24 | sets 225:18 | show 278:4 | 206:3 215:6,12 | 277:6 |
| 172:24 173:24 | setting 142:8 | showing 113:17 | 216:3 217:7 | something 38:4 |
| 174:24 175:24 | 161:14 | shown 279:2 | 218:12 219:4,17 | 45:2 76:23 77:6 |
| 176:24 177:24 | settle 75:18,22 76:4 | shows 266:17 | 220:13 226:14 | 96:3,23 129:16 |
| 178:24 179:24 | 76:11 77:17 78:5 | sic 73:10 239:1 | 227:10 228:15,19 | 130:3 147:9 |
| 180:24 181:24 | 118:7 179:4 | side 69:12 245:9 | 229:2,4,9 231:12 | 162:10 166:14 |
| 182:24 183:24 | settled 74:7 | 250:18 | 231:18,24 232:8 | 178:1 195:9 |
| 184:24 185:24 | settlement 12:22 | sign 81:5,14 91:10 | 234:21 235:1 | 205:22 248:4,19 |
| 186:24 187:24 | 42:3 54:24 74:10 | 92:1,15,17,18,22 | 236:13,23 237:15 | 268:11,23 269:4 |
| 188:24 189:24 | 75:16 76:13 77:8 | 92:24 93:15 95:1 | 237:21,22 238:4,8 | sometime 19:21 |
| 190:24 191:24 | 78:1 80:6,9 | 95:3 96:19 97:4 | 240:10 241:12 | 27:10 144:5,11 |
| 193:24 194:24 | 109:15 113:22 | 98:8,13,19,21 | 243:7 244:20 | 197:10 |
| 195:24 196:24 | 123:4 125:15 | 164:20,23 195:2 | 245:1 247:2 250:9 | sometimes 62:2 |
| 197:24 198:24 | 135:24 136:1,10 | 248:11 255:14 | 274:19 | somewhat 187:6 |
| 199:24 200:24 | 136:19 154:22 | signature 81:17 | sit 30:11 171:7 | somewhere 90:16 |
| 201:24 202:24 | 158:13 167:11,24 | 84:16 85:8 89:8 | sitting 187:19 | soon 137:19 186:18 |
| 203:24 204:24 | 183:14 199:2 | 89:17 94:17,18 | situation 28:23 | sorry 39:4 41:18 |
| 205:24 206:24 | 205:1,1,9 208:1 | 99:10,14 246:4,4 | 179:18 237:17 | 47:9 68:15 70:2 |
| 207:24 208:24 | 214:24 215:15,16 | 248:5 250:17 | 249:7 | 82:4 92:10 97:17 |
| 209:24 210:24 | 216:1,4,8,9,11,13 | 264:23 279:6 | six 6:1 19:21 27:9 | 101:22 106:9 |
| 211:24 212:24 | 216:18 217:3,9,22 | signatures 89:9 | 51:21 194:23 | 109:7 110:13 |
| 213:24 214:24 | 218:2,20 219:10 | 91:4 248:8,14 | sixth 82:13,14 | 118:10 129:2 |
| 215:24 216:24 | 219:20 220:4,8 | 250:14,18,20 | Skaya 17:24 18:2,7 | 132:20 135:16 |
| 217:24 218:24 | 225:8,19,20,22 | signed 13:22 78:24 | 18:9 32:10 35:23 | 136:11 143:19 |
| 219:24 220:24 | 229:7,10,19 230:6 | 80:20 81:21 85:3 | 36:9,18 37:20 | 152:22 156:17 |
| 221:24 222:24 | 230:14 231:2 | 90:8 91:2,8,13,15 | 170:7,9 | 157:1,16 161:1 |
| 223:24 224:24 | 234:6,12 238:7,15 | 93:4,18 94:15 | slash 159:19 | 170:18 172:14 |
| 225:24 226:24 | 240:4,24 241:4,18 | 95:5 96:11 99:1,1 | Slater 173:21 | 190:13 200:1,21 |
| 227:24 228:24 | 245:8 246:13,16 | 121:19 248:16 | 174:20 179:7,8 | 203:14 204:13 |
| 229:24 230:24 | 246:22 247:3 | 252:20 264:15,19 | 199:24 201:17 | 211:16 214:2 |
| 231:24 232:24 | 256:10 272:5,5,6 | 264:22 266:3 | smoothly 91:15 | 220:11 221:12 |
| 233:24 234:24 | 272:8,9 | 282:4 | Snyder 133:5 | 229:12,17 235:21 |
| 235:24 236:24 | settlements 54:19 | signified 13:6 | Snyder's 133:7 | 239:20 249:17 |
| 237:24 238:24 | 153:13 154:9 | 130:23 148:18 | sold 7:3 | 251:9 254:24 |
| 239:24 240:24 | 157:12,14 | 149:6 256:8 | some 25:16 31:14 | 263:3 267:16 |
| 241:24 242:24 | settling 74:1 | signifies 120:6 | 36:20 64:20 | 277:18 |
| 243:24 244:24 | seven 38:16 39:21 | 255:4 | 103:13 105:11 | sort 64:20 107:22 |
| 245:24 246:24 | 40:13 41:14 48:17 | signify 272:13 | 106:1 108:17 | 108:17 111:13 |
| 247:24 248:24 | 50:9,9,21 51:14 | signing 79:4 | 110:19 111:13 | 233:20 |
| 249:24 250:24 | 51:21 55:22 75:24 | signs 60:11 62:2 | 113:14 114:7 | sought 24:9 108:10 |
| 251:24 252:24 | 88:15 144:6 | similar 94:18 | 131:2,6 146:4 | sounded 32:24 |
| 253:24 254:24 | 149:21 151:1,12 | 130:12,19 158:22 | 154:13 160:6 | sounds 108:2 |
| 255:24 256:24 | several 34:7 43:6 | similarities 86:12 | 162:20 163:1 | source 144:14 |
| 257:24 258:24 | 105:18 170:16,19 | simple 67:5 | 166:9 167:19 | space 227:20 |
| 259:24 260:24 | 172:2,8 188:20 | simply 28:2 89:3 | 168:17 185:5 | 228:23 248:12 |
| 261:24 262:24 | 203:23 207:19 | 124:11 198:22 | 186:17 202:19 | speak 17:11 18:9 |
| 263:24 264:24 | 214:23 | 233:16 236:20 | 216:4 227:20 | 71:22 76:9 115:23 |
| 265:24 266:24 | shed 98:16 167:16 | 237:18 239:12 | 245:3 248:1 | 137:4 149:23,23 |
| 267:24 268:24 | 167:19 | 262:14 | 262:23 279:11 | 155:1 156:18 |
| 269:24 270:24 | sheet 12:22 109:16 | since 6:16 25:24 | somebody 6:13 | 186:2 201:19 |
| 271:24 272:24 | 158:14 173:23 | 57:9 135:24 143:8 | 128:9 | 207:13 261:5 |
| 273:24 274:24 | sheets 50:3 | 160:6 179:15 | somehow 271:14 | 262:6 265:2 |

Dimon vs. Metropolitan Life                     9-8-06                     William R. Mensie
C.A. No.: 05-11073 WGY

Page 28

| | | | | |
|---|---|---|---|---|
| **speaking** 10:4,6 | **Square** 2:22 193:22 | 163:24 164:4,7,11 | 80:20 81:23 89:18 | **supplement** 30:2 |
| 34:5 255:8,10 | SS 281:2 | 165:17 176:11 | 91:1,4,7 226:17 | 31:16 107:21 |
| 262:7 | **stack** 52:19 82:13 | 194:8 230:11 | 227:4 228:10 | 108:17 |
| **speaks** 48:10 | 82:14 88:15 144:7 | 241:20 243:23 | 257:19 258:14,19 | **supplemental** 31:21 |
| **special** 54:17,21 | **stacks** 81:12 | 259:23 | 258:24 263:24 | **supplemented** |
| 153:13,17 154:8 | **staff** 62:5,6 66:24 | **stipulate** 64:16 | 265:11 267:5 | 31:21 |
| 154:14,21 157:12 | 111:10 113:7 | 174:1 176:7,12,14 | 269:18 270:6,9,13 | **support** 160:14 |
| 227:20 228:20 | 121:21 122:1 | **stipulated** 71:7 | 270:19,22 271:8 | **supposed** 170:23 |
| 230:16 270:23 | 232:16 | 179:23 | 278:11 | **sure** 7:21 9:23 10:3 |
| 275:14 277:14,16 | **stamp** 53:23 87:13 | **stipulation** 4:2 | **Subscribed** 280:20 | 10:10 18:11 20:21 |
| 277:17,18 | 123:6,19 217:9 | 174:4 | **subsequent** 42:10 | 21:1 30:9 33:13 |
| **specialized** 14:2 | 218:13 223:14 | **stipulations** 4:6,7 | 149:18,20 | 39:6 44:5 53:22 |
| **specific** 10:14 12:2 | **stamped** 41:24 | 176:16 | **subsequently** 30:9 | 56:6 59:13 67:1 |
| 16:8 38:18,20 | 123:11 215:5 | **stood** 5:15 | 134:17 | 75:5 88:5 97:1 |
| 62:12 70:23 76:3 | **stand** 266:24 | **stopped** 168:14 | **substance** 24:15 | 108:21 130:17 |
| 76:9 77:6 105:2 | **standard** 124:21 | **storage** 55:11 | 25:19 93:1 109:21 | 136:16 139:4 |
| 111:19 128:11 | **standpoint** 181:11 | **store** 56:8 | 206:20 252:4,17 | 141:8 144:23 |
| 144:23,24 160:17 | **stands** 159:7 259:23 | **stored** 55:12 56:10 | **success** 107:16 | 146:4 147:22 |
| 201:15 205:18 | **stand-alone** 136:23 | 56:12,17 146:3,5 | **successful** 26:16 | 162:24,24 166:7 |
| 212:14 232:24 | **Stanley** 1:9 2:14 | 146:8,12 147:23 | 210:5 | 175:8 178:4 184:6 |
| 236:7 242:21 | 192:8 193:14 | 154:7 | **sue** 2:12 186:11 | 184:16 226:19 |
| 247:21 256:12 | 214:20 | **straight** 8:18 71:21 | 190:24 193:12 | 227:22 229:14 |
| 264:13 | **star** 245:13,17 | 100:12 111:5 | 206:22 214:16,20 | 230:11 232:13 |
| **specifically** 7:12 | **start** 189:4 190:1 | **strange** 198:24 | 215:7 216:21 | 239:7,22 268:8,19 |
| 75:21 77:12 78:14 | **started** 6:3 46:13 | 199:6 | 227:3 228:4 | 269:17 271:16,22 |
| 80:17 88:4,8 | **Starting** 119:16 | **strategy** 65:22 | 229:12 231:14 | **surface** 171:2 |
| 103:16 104:12,13 | **state** 1:21 2:17 4:17 | **stream** 32:23 34:12 | 238:2 239:20 | **surprise** 118:18,20 |
| 104:17 106:16 | 27:20 63:22 75:4 | 35:1 74:16 80:1 | **sued** 9:5 | **surprised** 88:14,17 |
| 110:1 115:3 | 77:13 116:13 | 252:17 | **suffice** 279:3 | 170:12 |
| 121:11 132:12 | 117:1,4 173:22 | **streams** 17:8 | **suggest** 77:13 95:6 | **surrenders** 225:5 |
| 135:13 137:18 | 192:20 193:17 | **Street** 2:17 193:17 | 95:7 103:11 115:5 | **surrounding** 143:6 |
| 169:3,19 171:23 | 235:18 260:10 | **Streets** 2:22 193:22 | 123:19 187:7,17 | **suspect** 32:12 67:19 |
| 171:24 215:2 | 278:23 281:2,6 | **strike** 110:6 111:3 | 188:4 189:6,7 | 91:14 98:16 103:9 |
| 231:6 234:17 | **stated** 46:4 59:8 | 111:17,23 129:1 | 197:10 198:22 | 120:17 126:10 |
| 250:13 | 74:19 108:7 | 170:17 198:14 | 201:22 262:5 | 129:21 130:1 |
| **specified** 255:4,7 | **statement** 43:7 44:2 | 199:6 205:4 | 266:15 278:9 | 144:16 154:24 |
| 281:15 | 124:6 236:8 | 211:16 228:8 | **suggested** 102:22 | 171:3 179:17 |
| **specify** 152:24 | 261:23 262:3 | 237:4 238:10 | 189:8 199:14 | 180:1 182:16 |
| **speculate** 122:4 | **statements** 42:16 | 259:19 | 212:7 232:19 | 183:15 185:2,6 |
| **speculating** 123:5 | 250:16 278:21 | **struck** 228:6,12 | 239:8 256:23 | 248:10 |
| 154:11,18 161:11 | **states** 1:2,18 75:3 | 248:10,13 | **suggesting** 44:7 | **suspend** 30:4 31:24 |
| 277:19 | 192:1,17 197:8 | **structure** 6:14,17 | 249:4 262:8 | 44:12,15,19 45:8 |
| **speed** 97:15,18 | 215:15 225:4 | 20:16 21:5,11 | 276:23 | 45:13 46:2,19 |
| **spell** 4:20 18:2,4 | 232:2,3 | **structured** 12:22 | **suggestion** 189:7 | 100:7 108:3 |
| **spelled** 83:8,15,17 | **stating** 198:22 | 109:15 153:13 | **suggests** 89:15 | 147:12 213:23 |
| 83:18 84:3,7,10 | **status** 179:3 | 154:9,22 158:13 | 111:20 203:8 | 274:9 278:18 |
| 91:18 94:1 267:6 | **stay** 96:4,6 189:18 | 167:11,24 208:1 | **suit** 6:10 143:14 | **suspending** 44:24 |
| 269:14 | 189:19 | **structures** 35:21 | 207:24 | 46:5 214:4,12 |
| **spelling** 93:22 | **stenciled** 272:12 | **stuff** 124:21 | **Suite** 2:4 193:4 | 278:20 |
| **spoke** 19:14 170:9 | **stenographically** | **subject** 9:8,11 | **SULLIVAN** 2:11 | **suspension** 45:3,4 |
| 243:5 | 281:10 | 10:17 186:17 | 193:11 | 213:24 214:4 |
| **spoken** 17:11,15,18 | **step** 22:20 | 207:24 240:19 | **sum** 74:10 215:18 | 279:1 |
| 22:23 101:17,23 | **steps** 65:24 239:3,8 | 257:22 | 221:5 | **swimming** 105:23 |
| 186:9 | 239:10 264:12 | **submission** 278:5 | **Summit** 14:19,23 | **sworn** 4:9,10,14 |
| **spot** 86:10 | **still** 31:1 37:12 | **submit** 175:7,9 | 15:1 | 194:4 280:20 |
| **Spunt** 3:21 179:11 | 84:13 113:11 | **submits** 267:1,15 | **superior** 232:18,21 | 281:8 |
| 179:14,19 202:16 | 123:16 137:4 | **submitted** 50:24 | **supervisor** 18:19 | **Syracuse** 85:5,11 |
| **Spunt's** 179:10 | 156:24 157:7 | 51:5,7 65:13 | 118:22 170:6 | **system** 37:1 144:21 |

Dimon vs. Metropolitan Life                  9-8-06                    William R. Mensie
                                     C.A. No.: 05-11073 WGY

| | | | |
|---|---|---|---|
| 145:2,7,16,19 | 182:8 195:18 | 259:2 265:24 | **think** 18:18 21:9,12 | 185:11 199:16 |
| 147:24 | 206:6 208:15 | 270:12 281:8 | 22:24 25:19 26:17 | 216:22 223:17 |
| **systems** 242:12 | 209:1 210:11 | **testifying** 5:21 28:2 | 27:10 28:4,13 | 242:22 260:3 |
| **S-k-a-y-a** 18:5 | 212:12 213:16 | 60:12,13 77:1 | 29:15,24 31:10 | **throughout** 84:6 |
| | 246:4,9 | 244:8,9 257:15 | 40:10 42:19 45:20 | 156:9 |
| **T** | **telling** 19:8 45:7 | 262:16 | 46:12 48:9 51:18 | **Thursday** 1:22 |
| **take** 17:9 22:17 | **ten** 31:8 151:19 | **testimony** 25:21 | 57:22 60:1,18 | **Tim** 9:24 181:1 |
| 30:19 31:4,6 43:4 | 226:11 229:24 | 35:5 38:9 102:18 | 63:14 65:2,4 | 186:19 |
| 53:4 75:7 100:20 | **term** 8:22 64:19,22 | 102:22 103:2 | 76:21 86:8 95:12 | **time** 6:14 8:8,11,19 |
| 100:24 101:3 | 98:4 120:18 134:9 | 108:12 115:4 | 95:21 96:1,6,22 | 9:10 27:14,16 |
| 124:6 152:2 | 201:23 215:19 | 116:24 148:13 | 102:1 104:21 | 31:6 36:3 45:13 |
| 161:23 168:9 | 221:7 254:18 | 149:3,5 194:24 | 105:19 107:20 | 45:20,21 51:13 |
| 170:4 186:24 | 276:3 | 195:5 201:16 | 108:11,16 109:5 | 53:3 55:6 56:11 |
| 188:16,24 189:20 | **terms** 11:1,5,16 | 202:6 208:9,14,24 | 118:6 124:18,19 | 56:12 58:2 65:2 |
| 190:10 279:10 | 51:20 52:8 55:11 | 210:1,7,10,23 | 125:11 126:16 | 69:21 70:24 78:15 |
| **taken** 1:19 19:3 | 61:20 70:22 71:1 | 211:18 213:10 | 131:10 135:6 | 95:13 101:6 |
| 59:4 65:24 170:23 | 73:11 74:17 96:10 | 217:7,14 224:1 | 136:3,8 140:22 | 104:12 108:1,5 |
| 192:18 207:18 | 102:10 109:21 | 227:13 248:3 | 141:8,20 148:4 | 112:11 119:3 |
| 235:7 239:7,9 | 114:14 115:20 | 257:23 261:19,20 | 164:3 166:9 175:6 | 120:1 136:13 |
| 280:1 | 116:22 117:24 | 262:2 265:1 278:8 | 183:2 184:24 | 137:2,23 138:4,8 |
| **taker** 45:7 | 118:4 125:19 | 281:14 | 189:1,16,17 | 139:9 143:2,13,22 |
| **takes** 189:20 | 131:7 132:4,7 | **text** 158:23 159:11 | 198:24 201:19 | 146:24 148:17 |
| **taking** 1:18 192:17 | 134:7,18 142:6,8 | **Thank** 32:8 54:5 | 202:5 205:2 210:6 | 150:9 154:15 |
| 216:6 | 142:18 160:17 | 81:3 92:9 98:23 | 230:13 233:19,23 | 155:15 158:4 |
| **talk** 31:18 107:19 | 167:14 181:17 | 109:9 119:10 | 245:21 248:15 | 168:10,12,12,13 |
| 107:22 115:24 | 199:2,2 211:2,10 | 127:24 128:19 | 249:6,8,9 252:14 | 168:18,21 169:3 |
| 186:6 194:15 | 211:12 215:2 | 162:15 180:2,23 | 255:14 256:9,11 | 169:16,17,17,20 |
| **talked** 62:7 116:2 | 234:2 243:20 | 190:11 214:6 | 264:19 267:6 | 171:18,19,21,22 |
| 117:19 156:10 | 248:23 249:4 | 220:13 227:17 | 271:15,18 | 174:4 186:14,16 |
| 170:6 177:8 234:8 | 254:15 255:17 | 237:21 240:10 | **thinking** 126:20 | 188:8,10 190:23 |
| **talking** 69:8 95:13 | 261:4 266:17,17 | 244:13 250:22 | 132:14 277:20 | 195:2,17 199:6 |
| 115:18 121:11 | 267:4 | 252:23 253:9 | **third** 5:8,10 213:2 | 202:6,21 203:2 |
| 165:17 168:11,19 | **territory** 111:19 | 256:6 261:10,22 | 260:3 | 205:1,19 207:4 |
| 177:22 190:17 | **testified** 4:14 7:6,8 | 275:22 279:4,4 | **though** 22:13 57:12 | 212:7,10 213:2 |
| 208:18 210:14 | 7:19 8:9,13,16,19 | **their** 19:23 23:16 | 140:2 201:7 269:2 | 219:6 220:12 |
| 214:4 237:8,11 | 9:9 25:15 26:1,18 | 37:11,16 59:23 | **thought** 45:21 | 222:22,22 228:1 |
| 247:24 248:17 | 28:8,12 29:12 | 87:6 103:15,21 | 116:2 166:14 | 232:12,24 233:15 |
| 260:22 | 48:2 60:19 77:19 | 105:1 112:24 | 218:6 258:4 | 235:13 253:2 |
| **talks** 256:12 | 93:8 97:4 104:4 | 113:1 138:24 | **thousand** 151:18,19 | 254:16 256:12,16 |
| **task** 102:15 160:17 | 105:10 109:4 | 155:4 187:12 | 151:24 | 256:19 257:10,18 |
| **tech** 118:19 121:5 | 114:10 143:17 | 203:2 210:4 | **three** 27:9 35:8 | 258:5 261:12 |
| **technical** 121:21 | 144:1 146:15,19 | 233:12,17 249:3 | 43:14 51:21 61:20 | 262:10 263:24 |
| 122:16,17 138:22 | 168:16 169:8 | 261:3 267:6 | 119:4 151:3 | 265:16,17 266:3 |
| **telephone** 198:9 | 170:1 194:4,11,11 | **themselves** 67:7 | 169:14,21 | 278:13,19 281:15 |
| **telephonic** 1:14 | 195:15 217:12 | 80:14 233:21 | **through** 12:19 | **times** 7:11 140:6 |
| 192:13 | 227:12 239:16,17 | 248:22 249:2 | 33:11,22,24 37:11 | 188:20 248:16 |
| **telephonically** 2:3,7 | 243:8,22 247:19 | **thick** 38:16 48:18 | 37:16 38:10 39:1 | 261:9 265:20 |
| 2:12,16 193:3,7 | 247:24 248:12 | 51:19 | 39:6 41:6,9,18,18 | **timing** 186:10 |
| 193:12,16 | 252:9 258:23 | **thing** 8:23 46:7,11 | 44:16,17 49:18 | **TIMOTHY** 2:21 |
| **tell** 5:6 14:11,15 | 259:17,19 260:2 | 50:4 134:21 | 51:4,6 52:3,19 | 193:21 |
| 20:7 26:24 32:10 | 261:10 264:20 | 145:16 150:13 | 57:1,2 67:15 | **title** 12:21 62:3 |
| 50:1 54:21 58:3 | 268:5 270:11 | 206:15 269:13 | 76:18,22 96:23 | 120:20 |
| 62:4,9 71:20 | 274:21 277:24 | 270:3 276:13 | 99:6 100:12,17 | **titled** 217:5 225:20 |
| 78:21 82:9 83:2,7 | 278:4 | **things** 35:8 96:1 | 103:13 133:12,15 | 225:22 226:9 |
| 120:15 135:1,11 | **testify** 5:19 7:14,23 | 135:23 160:7 | 134:5 155:6 | 256:10 |
| 141:16 152:16 | 9:14 28:20 29:4,9 | 185:16 187:20 | 166:23 172:18 | **today** 8:1 15:14 |
| 161:22 162:5 | 56:2 208:5 209:17 | 188:23 201:22 | 174:7 175:12 | 19:5 30:11 35:5 |
| 169:13 181:7 | 209:18,20 212:18 | 236:15 243:3 | 180:9 181:22 | 35:20 39:12 47:2 |

Dimon vs. Metropolitan Life                          9-8-06                          William R. Mensie
                                              C.A. No.: 05-11073 WGY

| | | | | |
|---|---|---|---|---|
| 95:1 100:10 | transferred 17:4,6 | 142:21 143:3 | 98:9 102:12 | 112:11,19 141:1 |
| 108:13 137:5 | 110:20,22 | 144:6,19 148:22 | 108:20 112:18 | 178:14 212:3 |
| 154:5 158:22 | transmit 40:12 | 154:14 169:2,2,12 | 114:19,20 117:23 | until 4:3 45:18 |
| 164:1 182:17 | transmittal 40:1 | 169:14 185:17 | 124:17 125:8,21 | 112:13 136:2 |
| 184:6 185:13 | 41:15 43:3,8,9 | 189:11 193:12 | 130:17 133:7 | 168:22 186:5 |
| 186:12 187:8,13 | transmitted 41:22 | 201:22 222:3 | 139:2 142:17 | 191:4 214:9 |
| 187:13 189:10 | 41:23 42:22 43:1 | 236:15 275:17 | 145:10 150:19,21 | unusual 57:3,7 |
| 194:19 195:16 | 150:15 169:17,20 | twofold 91:20 | 150:23 164:13,14 | 89:16 91:10 94:19 |
| 201:17 208:2 | transmitting | two-minute 189:20 | 166:7 170:22 | 94:20,23 112:23 |
| 219:6 240:8 | 160:16 | two-page 34:15 | 176:4 177:23 | 122:5 124:13,19 |
| 247:21 262:16 | transpired 238:21 | 35:21 | 187:3,7 194:9 | 124:20 126:6 |
| 265:2 | treated 202:21 | type 11:19 13:6,8 | 197:2 204:23 | 136:17 138:10 |
| today's 11:22 15:2 | trial 4:4 48:23 | 84:19 117:19 | 205:9,15 222:4 | 202:24 248:4 |
| 19:9 44:18 52:1 | tried 102:19 103:3 | 146:4 160:1,6,8 | 224:1 229:13,16 | unwilling 176:12 |
| 209:15 | 103:18 105:1,8,14 | 254:7,9 | 230:12,13 233:8 | updated 17:2 |
| TODD 2:16 193:16 | 105:24 108:4 | typed 94:8 159:18 | 233:12 236:23 | upwards 127:14 |
| together 86:9 | 170:1 207:22 | 184:22 246:9 | 256:22 262:17,18 | use 8:22 25:24 |
| 271:16,22 | 210:4 | 282:3 | 264:8 265:14 | 29:23 40:16 44:18 |
| told 19:9 25:24 | trip 67:19 | types 160:12 183:11 | 269:17 278:7 | 64:18 66:1 90:3 |
| 45:14 46:24 48:6 | true 61:24 113:5,6 | typically 79:11 | understanding 14:3 | 102:11 129:22 |
| 64:12 105:2,16 | 125:8 135:12 | typing 160:12,15 | 49:21 77:14 96:8 | 167:13 234:18 |
| 107:19 167:23 | 149:13,22 151:22 | typist 159:5,20 | 130:18 131:23 | used 31:22 117:13 |
| tomorrow 188:5,12 | 151:23 165:23,24 | | 132:14 150:3,17 | 129:21,24 |
| 188:13,17,24 | 169:9,10 258:15 | _____ U _____ | 162:8 164:2 | uses 181:18 |
| 189:2 190:1,10,17 | 258:22 259:5,16 | umbrella 164:17 | 167:16 170:10 | using 64:23 140:15 |
| 190:20 | 259:24 260:1,7 | unable 124:3 | 172:7 178:2 | 164:20 |
| ton 17:10 | 267:10,23 268:18 | 232:22 | 179:22 180:3 | usual 4:2 176:16 |
| tool 151:4 | 270:16 271:1 | Unclear 130:7 | 205:7,18 210:19 | usually 136:21 |
| top 58:15 82:20,24 | 276:13 277:21 | uncover 55:18 | 210:20 211:1,4 | 272:18 |
| 119:16 120:2 | 280:2 281:13 | uncovered 36:22 | 213:6,12 216:16 | |
| 183:5 225:4 | truth 281:8,9,9 | 144:1,11,12 | 218:1 220:6,17,18 | _____ V _____ |
| Torre 73:10 | try 52:4 75:8 | 149:15,16,18,20 | 224:13 236:16,22 | vacuum 268:1 |
| torts 242:15,16,17 | 100:12 105:15 | under 12:21 58:22 | 237:7,20 242:12 | valid 53:17 98:12 |
| 243:6 | 107:8,15 144:3 | 60:19 61:5 79:18 | 242:18 245:7 | 239:13 240:5 |
| Total 165:11,12 | 170:4 207:20 | 83:3 84:3 145:19 | 246:12 247:15,18 | variety 9:11 |
| touched 240:18 | 236:6 | 153:1,12 164:15 | 249:4 252:2 | various 12:4 60:20 |
| toward 97:12 | trying 26:13 51:8 | 165:4 174:20 | 268:21 271:8 | 61:6 142:15,15 |
| towards 183:5 | 67:6 89:19 103:20 | 180:11 183:5 | 272:7 278:9 | 225:18,23 229:19 |
| 209:24 | 104:3 211:5 212:5 | 184:14 194:8 | understands 49:10 | vehicle 252:19 |
| town 14:24 | 229:19 233:16 | 209:5 225:8 | 196:23 271:6 | 258:17 |
| track 37:17 129:19 | 257:4 276:23 | 237:12 240:4 | understood 9:23 | vendor 56:13 |
| trade 9:2 56:16 | Tuesday 43:22 | 244:5,10 245:8 | 10:2 11:7 21:1 | vendors 17:7 136:4 |
| 58:6 59:2 60:2,10 | 44:23 45:20 72:15 | 271:24 272:2 | 124:18 139:4 | 137:6 |
| 60:13,19,20 61:5 | turn 113:16 128:2 | 282:6 | 141:9 154:3,4 | verbal 24:2 26:22 |
| 61:6 244:5,11 | 128:13 166:1 | underlying 36:21 | 195:3 205:8 208:7 | 27:2 |
| training 242:2,4,5 | 197:24 199:23 | 38:6,6,8,10 42:3,4 | 237:11 269:3 | verse 240:24 |
| 242:21,22 243:1,2 | 205:20,22 245:4 | 50:11,12 62:21 | unfortunately | versus 17:12 57:15 |
| transactions 147:10 | 245:11 | 68:6 73:7 86:14 | 99:11 188:19 | 62:21 63:2,7 65:9 |
| transcript 166:10 | turns 151:3 | 110:14 118:8 | unilateral 134:22 | 67:24 68:9 71:11 |
| 166:13,16 167:1 | Twelve 123:23 | 136:2 177:16,20 | 248:19 | 71:14,19 73:1 |
| 172:16 173:15 | twenty 226:12 | 178:3 241:17 | unilaterally 248:20 | 80:10 81:6 107:1 |
| 175:1 194:21 | 229:24 | undersigned 225:5 | 271:18 | 110:12 118:14 |
| 195:1 280:1,2 | two 2:12 35:6,12 | understand 5:13,15 | unit 14:22 | 132:2 153:4 181:9 |
| 281:13,14 | 37:2 43:11 49:16 | 5:18 9:4 20:16,21 | United 1:2,17 192:1 | 181:9 202:8,8 |
| transcription | 50:3,16 51:21 | 20:24 49:6 52:4,7 | 192:16 | 206:8,15,17,19 |
| 281:11 | 86:23 87:18 116:9 | 52:8 62:18 68:15 | universe 47:18 | 207:6 208:20 |
| transcripts 38:9 | 119:3,8 123:23 | 68:21 78:21,23 | 126:12 | 248:23 |
| 42:6 282:4,4 | 124:2,7 139:8 | 82:5 87:14 93:24 | unless 14:15,15 | very 38:5,13 43:14 |

Dimon vs. Metropolitan Life                9-8-06                William R. Mensie
                              C.A. No.: 05-11073 WGY

Page 31

43:23 46:16,22
70:3 108:22
112:21 123:18,19
148:10 163:1
185:8 212:13
215:15 244:13
265:10,19
**vessel** 68:23,24
**view** 224:17
**virtue** 16:3 127:7
**vis-a-vis** 232:15
**voicemails** 23:20
**volume** 41:15 89:23
**voluminous** 38:5,13
89:22
**vs** 1:7 192:6

___

**W**

**W** 155:10 173:21
174:20 179:7,8
199:23
**waiving** 4:2 195:8
**walk** 31:7
**want** 4:1 24:22 40:5
43:23 44:4 49:7
64:8 65:3 71:21
74:23 96:24
100:23 103:11
104:1 107:19
108:24 178:24
187:1 189:9,15,18
195:8,16 200:5
203:24 206:22
226:19 262:2,4
266:4 267:3
268:24 269:7
**wanted** 14:2 45:12
108:22 129:24
130:2 178:4
240:19 245:3
247:19 249:5
**wants** 100:14 195:4
**Washington** 8:6,10
8:14
**wasn't** 9:23 45:21
52:7,7 55:8 64:21
93:7 124:8 144:22
168:6 201:12
229:14 256:1
265:19 270:13,20
**way** 32:4 52:14
129:21 135:11
141:17 163:18
189:9 208:10
240:1 245:12,15
258:11 261:24
271:20
**ways** 203:23

**weeding** 38:10
**week** 39:8 43:21,22
44:20 67:10 72:14
127:14,15,17
149:22 169:12,20
273:5
**weeks** 169:2,12,14
169:15,21 171:3
172:2,8
**WEINSTEIN** 2:11
193:11
**WELD** 2:16 193:16
**well** 4:8 12:6 15:5
17:4 21:8,20 23:1
25:7 26:6,11,17
28:8 29:12 30:6
39:11 40:2 41:6
46:10 50:12 52:7
55:7 56:15,18,24
60:18,22 61:4,12
62:14 64:24 81:12
81:12 96:13,21
100:9 105:4,9
108:20 111:23
112:5,21 113:9
115:16,22 123:5
123:18,19 127:5
128:17 130:18
135:20 141:8,15
145:8,9,22 146:14
148:5 151:3,10
154:2 158:16
165:15 167:15
168:15 169:8
172:2 174:3 175:8
175:24 176:22
185:3,6,16 188:7
189:5 198:21
200:24 201:19
203:24 206:20,22
208:21 209:9
219:22 222:1
227:3,13 228:8
232:14 233:22
234:19 236:15
237:4 238:10
240:1 241:10,13
244:18 248:21
250:20 252:4
253:19 255:1
257:13,20 259:1
262:4 264:17
265:1,14,19
269:13,17 270:5
275:2
**Wells** 173:12
**went** 36:17 37:21
41:6,9 64:7,12

67:17 145:11
155:6 237:12
247:12 260:3
264:11
**were** 6:10,12 7:19
8:10,11 9:8,11,19
10:4 11:10 12:5,6
12:17 13:10 14:1
15:6,6,13 16:6
19:17,22 20:5,15
24:14 26:15 27:15
27:17,18 33:22,23
34:2,3,4,8,10 35:8
35:12,19 36:19,20
37:11,12,15,17,22
38:18 39:7,14
40:19,22 41:4,7
41:10 42:9,12
43:9,16 44:19
45:23 46:23,23,23
47:4,5,6,7,11,14
47:20,21 48:4,5,7
48:7 50:2,3 51:14
52:22 54:22 55:1
55:13,15,18,19
56:6,16,17,20
57:9,11,16,19
58:11 63:10 64:10
64:13 65:7,11,24
66:9 68:12,19
69:2 70:20,24
72:10 73:22 76:18
77:15 79:5,23
81:24 82:10 88:10
89:4,19 96:9
100:6 103:8,12,13
103:14 110:14
112:5,6,8 122:16
124:12 125:18
126:8 128:11
137:4,5,11,19
138:6 139:16
140:1 143:19
144:10,10,12,13
144:15 145:24
147:3 149:21
150:5,14 153:17
154:10 163:1,1
165:13 167:13,24
170:12,15,19
180:20 181:22
183:19 184:11
185:12,17 186:24
199:3 202:20
205:11 206:16
214:23 218:6
232:15,16 233:16
234:1 236:16

237:10,11 240:20
240:23 241:2
246:23 247:20,24
248:1,18 249:1,4
249:4,8,9 252:16
264:12 271:10,13
271:15 272:24
273:18,20,22
274:3,4,6 276:23
**weren't** 15:4 47:4
55:20 64:16 77:4
270:17
**we'll** 24:20 30:4
31:24 42:18 96:4
99:6 100:19 101:5
185:14 189:19
190:20,24 212:19
213:23 278:20
**we're** 25:23 26:8
27:20 29:22 30:20
40:2 42:14 45:5
46:5,19 48:22
67:6 83:20 100:7
103:23 115:23
132:20 147:12
165:17 186:6,6,14
186:22 187:17
190:5,19 194:7
196:14 205:22
210:14 219:1
237:8 247:21
275:5 278:18,20
**we've** 15:7 36:22
58:14 66:6,7
88:20 89:7 107:18
107:23 177:8,22
187:19
**WGY** 1:7 192:6
**whatsoever** 236:17
279:2
**WHEREOF** 282:7
**while** 8:16 53:4
89:22 139:7 171:8
176:18 248:9
**whole** 29:24 205:3
233:16 260:4
281:8
**William** 1:14 3:2
4:11,19 192:14
194:1 224:10
280:19 281:7
**willing** 30:7 101:4
108:15,19
**wish** 280:3
**withheld** 180:15
**witness** 4:9,10,12
10:2 15:9,11,14
15:20,23 17:17

21:1,13,18 22:3
22:10,13,16 23:9
23:10 25:1,3,10
27:4 28:19 29:4
31:1 33:10,12,18
40:9 46:8 48:2
52:24 53:12 56:1
59:10,13,19 60:18
60:23,24 62:15,18
64:8 65:1 66:12
69:14 72:3,10,17
73:2 75:2 77:5
78:9 82:16 86:9
86:12 87:4,19
89:1,14 90:12
92:18 96:1,9,14
97:7,12,24 99:4
100:2 102:14
106:6,15 107:18
108:8,9,12,23
109:3 112:19
113:17,19 114:20
116:12,24 117:18
119:3,9,14 121:16
124:18 125:22
126:15 127:4
128:15,17,23
130:9 132:7 133:3
135:6 137:16
139:4 140:5,10
142:3,24 146:16
146:21 147:1
148:9,16,18
152:13 153:15,19
153:21 160:6
161:20 162:1,13
164:13 166:22
167:1 168:24
171:10 172:7,9
173:2,18 174:6,8
175:12,13 177:7
177:16,23 178:1
179:17 181:21
185:5,21 186:2
194:2 196:11
198:5 200:10
204:10 205:24
206:4 207:8 208:5
208:7 209:7,9,18
210:17,18 211:5,7
211:21 212:23,24
216:22 217:4,11
217:15 222:4
223:8 224:6,11
227:12,15 228:2
229:16 230:11
231:15 238:1
245:1 249:20

Dimon vs. Metropolitan Life       9-8-06       William R. Mensie
C.A. No.: 05-11073 WGY

Page 32

| | | | | |
|---|---|---|---|---|
| 250:9 253:22 | 195:8 233:11 | 82:24,24 85:6,12 | 198:12 204:14 | 165:13,17,18 |
| 254:24 255:3 | 251:3 | 110:10,12,16,20 | **10:00** 188:9,11 | 167:17 174:11 |
| 256:6,20 257:4,6 | **wrap** 187:18 189:9 | 120:15 131:3 | 189:3 190:1,21,23 | 179:15 196:2 |
| 257:15 259:1,6 | **write** 121:7 178:24 | 156:10 165:23 | **106125** 12:14 | 197:2 198:9,11,12 |
| 261:16,22 263:5 | **writes** 98:3 125:5 | | **11** 3:23 223:18,20 | 203:2 204:15 |
| 263:15,17 265:14 | 198:15,16 | **Z** | 224:2 225:18,24 | 205:1,9 211:8 |
| 265:24 266:4,7 | **writing** 140:1 | **Z** 13:2,2,6,9,10,15 | 229:5 244:21 | 224:23 225:14 |
| 268:8,19 270:10 | 179:12 | 13:17,20,21 62:6 | 245:12 246:3,24 | 233:1 238:5,22 |
| 270:12 271:5,7 | **written** 25:12 26:21 | 130:23 | **12** 3:20 133:20,21 | 239:3,12 240:2,3 |
| 272:4 273:8 | 27:2,4 58:7 82:20 | **zeroed** 105:24 | 134:1 137:8 | 240:21 246:11,12 |
| 274:24 275:3 | 84:21 228:22 | **zeros** 119:4 | 155:11 156:23 | 246:17 265:23 |
| 276:6,16 277:13 | 269:7,8 | | 157:3 196:2,7 | 266:1,6,14 270:14 |
| 278:4,7 279:13 | **wrong** 244:4 251:13 | **$** | 197:2 198:11 | 270:17 273:20 |
| 281:15 282:7 | 251:15 269:14,15 | **$1,450** 221:4 | 249:22 250:23 | 277:7,9 |
| **witnesses** 29:23 | **wrote** 63:19 122:11 | **$1,450.45** 224:22 | 251:8,14,20 252:6 | **199** 3:21 |
| 102:4,9 105:8 | 152:23,24 239:16 | 225:12 | 262:23 263:4,8 | |
| 108:13 | 277:10,11,12 | **$175,000** 80:7,21 | 265:5 | **2** |
| **Witter** 133:13,15 | | 91:1 124:3 125:1 | **12th** 197:10 198:21 | **2** 3:18 80:22,24 |
| **word** 32:24 94:6 | **X** | 125:12 231:21 | 199:3,8 | 81:10,13,15 84:1 |
| 102:11 234:18 | **X** 3:1 13:18,19 | 247:11 | **12:45** 100:23 | 84:6,23 85:8,12 |
| **words** 90:4 254:19 | 252:6 | **$250,000** 220:22 | **120** 44:16 97:2 | 85:15,22 86:5,13 |
| **work** 10:24 15:8 | **X'd** 250:2 | **$400,000** 77:8,17 | **124** 150:20 | 86:15,23 88:3,13 |
| 22:21 24:8,12,18 | | 175:19 176:2 | **127** 3:19 | 88:20 89:8 93:14 |
| 24:18 25:20 30:9 | **Y** | | **128** 150:20 151:21 | 93:17 94:13,19 |
| 30:12 31:13 109:5 | **yards** 30:18 31:7 | **0** | 151:24 185:12 | 99:9,11 141:4 |
| 110:16,23 115:14 | **yeah** 16:3 31:10 | **001** 33:6 | **132** 3:20 | 226:3 245:8,13,17 |
| 115:15 156:3 | 88:18 98:1 100:6 | **0012** 87:16 | **14** 86:14,16 133:1,2 | 245:20 249:14,22 |
| 164:15,15,16 | 123:18 136:16 | **002** 142:20 | 227:20 228:20 | 250:12,19,21 |
| 188:7,13 | 138:6 144:10 | **0032** 166:22 172:18 | 250:14,15 251:4 | 253:5 254:1,4 |
| **worked** 6:4 9:18 | 164:2 261:1 | **004** 33:6 | 252:3 255:9,12 | 262:19,20 263:2,3 |
| 10:10,13,16,21 | **year** 221:4,6 229:9 | **0055** 166:23 | 274:18 275:13 | 263:4,19,20 |
| 11:9 22:24 23:4,7 | 230:24 254:18,22 | **0064** 218:3 | 276:3,4,5,12,19 | 264:16,18 265:7 |
| 106:24 111:6,13 | 255:13,16 256:1 | **0069** 205:23 | 276:24 277:12 | 265:16,17 270:6 |
| 113:1,7,9,10 | 256:13 267:8,9,21 | **0102** 119:7 121:23 | **15** 86:18,19 187:21 | 275:6 |
| 120:16,21 125:17 | 267:22 268:16,17 | **0103** 119:9 141:3 | 250:14,15 251:4 | **2s** 245:22 |
| 126:5,8,12 130:12 | 269:4,5,19,20 | **02062** 2:8 193:8 | **17th** 246:11,12 | **20** 116:1 126:11 |
| 130:19 140:3 | 270:7,8,23 274:18 | **02109** 2:17 193:17 | **175** 124:10 | 127:14 215:20 |
| 164:10 205:13 | 275:15,19 276:7 | **02116-3902** 2:13 | **175,000** 255:14 | 221:8 228:23 |
| 230:17 272:8 | **years** 6:1 116:1 | 193:13 | **18** 3:19 163:12 | 229:1,4,9 230:4,7 |
| **workers** 9:13 | 165:17 179:22 | **02210** 2:4 193:4 | **18th** 2:22 193:22 | 230:8,24 231:9 |
| **working** 6:3 11:2 | 215:20 221:8 | **05-11073** 1:7 192:6 | **19103-6969** 2:22 | 254:18,22 255:13 |
| 110:9 113:8 | 226:12 228:23 | **06** 27:12 | 193:22 | 255:16 256:1,13 |
| 137:24 138:7 | 229:1,4,24 230:4 | **084-002353** 282:13 | **196** 3:20 | 267:8,9,21,22 |
| 139:6 140:8 242:7 | 230:7,8 231:9 | | **1983** 3:17,19,20,20 | 268:16,17 269:4,5 |
| 242:20 | 242:23 243:4,16 | **1** | 3:21,22 14:7,22 | 269:19,20 270:6,8 |
| **works** 24:1 37:19 | **yesterday** 39:11 | **1** 3:17 53:19,20 | 35:18 52:2 53:14 | 270:23 274:18 |
| 156:19 188:6 | 45:2,14 150:20 | 54:3 58:14 83:3,5 | 54:22 55:4 57:9 | 275:15,19 276:7 |
| **World** 56:16 | 185:12 194:12,19 | 83:7 93:21 97:24 | 85:6 89:3 98:2 | **2000** 165:16 |
| **worry** 205:21 | 194:24 195:5,16 | 98:1,18 197:24 | 110:11 116:22 | **2006** 1:23 101:10 |
| **worth** 189:23 | 201:16 239:16,17 | 198:1 | 122:4 123:7 129:4 | 191:5 192:22 |
| **wouldn't** 11:6 57:7 | 243:22 247:24 | **1,450.45** 255:14 | 133:1,2,20,21 | 196:3 280:1,21 |
| 64:18 88:19 | 248:17 252:5 | **1:15** 101:6,11 | 134:1 136:6,15 | 282:9 |
| 122:21 135:6,7,19 | 264:21 265:2 | **10** 3:17,21,22,23 | 137:4,9,23 140:10 | **204** 3:22 |
| 136:2,9,24 138:10 | 278:21 | 126:11 151:17 | 140:15 141:10,19 | **21st** 123:7 |
| 140:7,22 141:20 | **yes/no** 183:6 | 218:9 220:14 | 144:3 155:11 | **214** 3:5,8 |
| 154:12 165:1 | **yield** 20:4 | 222:16 224:5 | 156:23 157:3 | **215)988-2865** 2:23 |
| 171:10 179:14,21 | **yielded** 35:6 149:12 | **10th** 53:14 98:2 | 158:8 159:17 | 193:23 |
| 184:24 189:3 | **York** 56:15 82:23 | | 160:7 163:12 | **218** 3:23 |

Dimon vs. Metropolitan Life      9-8-06      William R. Mensie
C.A. No.: 05-11073 WGY

Page 33

| | | |
|---|---|---|
| **223** 3:23 | **399** 12:14 | 199:17,18,20 |
| **23** 179:22 | | 200:3 202:17 |
| **24** 196:3 | **4** | 238:22 280:1 |
| **24th** 33:6 82:12 | **4** 3:5,19 86:1,2,6,13 | **8th** 192:21 |
| **240** 3:8,10 98:4 | 86:17,18,20,23 | **8-16-83** 54:13 |
| 133:14 134:7 | 87:9,11,23 88:1,4 | **80** 3:18 |
| 224:23 225:14 | 92:2,16 265:7,9 | **83** 3:18 109:21 |
| 231:8 | 265:10 | 110:10 145:22 |
| **244** 3:10,13 | **4th** 85:6 | 154:4 159:5 163:2 |
| **25** 7:13,18 | **4-18-1983** 121:1 | 184:5 211:2 |
| **25th** 169:13 | 123:12 261:12,20 | 265:18 |
| **250-0-008-585** | **4:00** 45:19 190:2 | **83A08153** 82:20 |
| 148:20 | **4:15** 185:7 | **86** 3:19 |
| **252** 3:13 | **4:30** 187:19 | **88** 2:4 193:4 |
| **253** 3:6 | **4:53** 44:8 | |
| **26** 140:10,15 | **4:57** 46:16 | **9** |
| 141:10 | **40** 30:18 31:7 | **9** 3:22 84:19 94:6,8 |
| **274** 3:6,11 | | 204:15,19 254:6,9 |
| **275** 3:11 | **5** | **9:00** 1:23 188:5,8 |
| **276** 3:6 | **5** 3:19 127:19,20 | 191:4 192:22 |
| **278** 3:6 | 128:3 138:11 | **99** 2:8 193:8 |
| **28** 2:17 193:17 | 141:3 205:20,21 | |
| **28th** 282:9 | 231:13,15,19 | |
| **29** 53:24 171:1 | 261:11,16 | |
| **29th** 170:23 | **5th** 48:10,10 | |
| | **5-3-83** 219:15 | |
| **3** | **5:00** 185:7 | |
| **3** 3:18 83:20,21 | **53** 3:17 | |
| 84:9,12,20 85:2,5 | **55** 180:9 | |
| 85:14,21 86:5,18 | | |
| 86:20,23 92:2,16 | **6** | |
| 94:10,12,15 95:1 | **6** 3:20 86:14 132:16 | |
| 99:13,14 215:18 | 132:17 215:9 | |
| 221:6 224:22 | 218:23 224:23 | |
| 225:13 227:1,7,8 | 225:13 237:23 | |
| 227:11,14,19,22 | 238:1,4 | |
| 227:23 228:7,13 | **617)261-0080** 2:5 | |
| 228:15,18,19,24 | 193:5 | |
| 229:1,4,9 230:4,5 | **617)348-4355** 2:13 | |
| 230:24 250:3,13 | 193:13 | |
| 250:15,19,21,22 | **617)624-4803** 2:18 | |
| 253:6,9,10,12,13 | 193:18 | |
| 254:6 255:6,10,13 | | |
| 255:24 263:12,16 | **7** | |
| 263:20 264:16,18 | **7** 3:20 101:10 | |
| 264:19,22,24 | 196:13,14,15,16 | |
| 265:7,11,17 266:4 | 280:1 | |
| 266:9,11,18 270:8 | **7th** 1:22 | |
| 274:17 275:2,13 | **7-18-83** 152:18 | |
| 276:3,5,6 | **7-26-83** 219:14 | |
| **3rd** 174:11 246:17 | **720** 82:23 | |
| **3,000** 165:15 | **781)255-7401** 2:9 | |
| **3:00** 45:19 | 193:9 | |
| **30** 38:23 44:7 | | |
| **30(b)(6)** 28:19 29:3 | **8** | |
| 60:23,24 65:1 | **8** 3:20,21 83:11 | |
| **300** 165:10 | 86:14 94:4 129:3 | |
| **301** 2:4 193:4 | 191:5 196:13 | |

1

08/24/2006 17:17 IFAX Fax_Center@dbr.com                    ⁺ Fax Center     ☑014/016
AUG.24.2006   4:14PM   CIAPCIAK AND ASSOCIATES PC                NO.433      P.14



Lumbermens Mutual Casualty Company • American Motorists Insurance Company
American Manufacturers Mutual Insurance Company • American Protection Insurance Company

Long Grove, IL 60049 · 312|540-2000

October 10, 1983

Mr. Robert Liguori, Counsel
Charter Security Life Insurance
  Company (New York)
720 Fifth Avenue
New York, New York  10019

Dear Mr. Liguori:

DENNIS DIMON
CHARTER SECURITY POLICY: 83A08153
OUR FILE NO: 399 LM 105125-2

In reply to your September 26, 1983, Sections 14 and 15
of the application that I signed were blank. The entries
now appearing were filled in after I returned the signed
application.

The original annuity policy received was for a term of
240 months certain and life thereafter as ordered and
agreed upon between Mr. Hughes and Mr. Foley. Your agent,
Mr. Foley further confirmed this to me by telephone in
April, 1983. May I suggest you contact him to verify
this?

I intend to retain the original policy in our files and
consider it to be valid and enforceable.

Very truly yours,

AMERICAN MOTORISTS INSURANCE COMPANY

John L. Noe
Home Office Claim

JLN:ml

cc: Mr. Robert A. Foley          cc: Ms. Barbara Boehm
    Dean Witter Reynolds, Inc.       Vice President
    One Boston Place               → Policyowner Service Dept.
    Boston, MA  02108                Charter Security Life
                                       Insurance Co. (New York)
    Mr. Roger Hughes                 720 Fifth Avenue
    Latti Assoc., Attorneys          New York, NY  10019
    30-31 Union Wharf
    Boston, MA  02109

                                                      000029

2

a Black Ink                                                                                    APPLICATION

**CHARTER SECURITY LIFE INS  NCE COMPANY, NEW YORK , 720 FII  AVENUE, NEW YORK, N.Y. 10019**

| | |
|---|---|
| **Name of Annuitant (please print)**  ☒ Male   ☐ Female | **9. Type of Contract** Single Premium Deferred Annuity |
| Dennis J. Diamon | **10. Single Premium Amount**  $ 175,000. |
| **Date and Place of Birth**  12/9/59  So. Kingstown, RI | **11. Maturity Age**  ☐ 65  ☐ 70½  ☒ Other: Immediate  6/15/83 |
| **Residence (No., Street, City, State and Zip Code)**  Laurel Lane, West Kingston, RI   02892 | **12.** Will this annuity replace or change any existing life insurance or annuity contract? ☐ Yes  ☒ No |
| **Business Address (Include Name of Employer)** | (If yes, give name of company, policy number, and plan of life insurance or annuity.) |
| 5. Mail Notices to ☐ Residence  ☐ Business  ☐ Owner | |
| 6. **Social Security No.**  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 | |
| **Owner (If other than Proposed Annuitant)**  Name:  American Motorists Insurance Co. | **13.** Is this contribution for a tax qualified plan? ☐ Yes  ☒ No  If so, contract will be issued with a limitation on transferability to conform with IRS regulations. (Check appropriate box for type of qualified plan.) |
| Relationship: | ☐ I.R.A. Rollover       ☐ Corporate pension  ☐ T.S.A. Exchange        or profit sharing plan  ☐ H.R. 10 Exchange     ☐ Terminal Funding  ☐ H.R. 10                ☐ Other |
| Address:  Social Security Tax Payer I.D. No.  36-0727430 | **14. Special Requests** |
| ☐ Contingent Owner | |
| 8. **Beneficiary and Relationship**  Primary:  Katerine I. Diamon  Contingent:  Jessica I. Diamon – Daughter  Rebecca Lee Diamon – Daughter | **15. Amendments and Corrections** (For Home Office use only) |

Exhibit # 2 9/21/04 OB

The undersigned represent(s), to the best of his (her) knowledge and belief, that the foregoing statements and answers are complete, true, and correctly recorded and agree(s) to be bound by all statements and answers made or to be made in this application. The undersigned further expressly agree(s) as follows: 1. This application and any policy issued in consequence thereof shall constitute the entire contract. No agent is authorized to make or modify contracts, to waive any of the Company's rights or requirements or to bind the Company by making or receiving any promise, representation or informa-

tion, unless the same be in writing, submitted to the Company, and made a part of such policy. 2. Acceptance of any contract(s) issued on the basis of the application shall constitute a ratification and acceptance of any change, correction, addition or amendment noted by the "Company" in the "Amendments and Corrections" section above, except that in those jurisdictions where it is required any change in amount or benefits shall require a written consent by the Proposed Annuitant and by the Applicant if other than the Proposed Annuitant.

Dated at _____ this _____ day of _____ 19____

_____
Agent Signature (1)                          Code

_____
Please Print Name of Agent (1)

_____
Agent Signature (2)                          Code

_____
Please Print Name of Agent (2)

AP-109
1/80

Signature of Annuitant _____

Applicant if other than Annuitant  X _AMERICAN MOTORIST S INSURANCE_

By _John L. Fox_ – _HOME OFFICE CLAIM_
Signature and Title

Please Print Name of General Agency _____

General Agent Code _____  K-0107

3

08/24/2006 17:17 IFAX Fax_Center@dbr.com → Fax Center  ☑008/016
AUG.24.2006□□ 4:13PM CIAPCIAK AND ASSOCIATES PC  NO.433  P.8

Sick Ink  **83A08153**

**CHARTER SECURITY LIFE INSURANCE COMPANY, NEW YORK, 720 FIFTH AVENUE, NEW YORK, N.Y.** 10019

ANNUITY APPLICATION

| | |
|---|---|
| Name of Annuitant (please print)  ☑ Male  ☐ Female | 9. Type of Contract Single Premium Deferred Annuity |
| Dennis J. Dixon | 10. Single Premium Amount  $ 175,000. |
| Date and Place of Birth | 11. Maturity Age  ☐ 65  ☐ 70½  ☐ Other  Immediate |
| 12/9/59  So. Kingstown, RI | 6/15/83 |
| Residence (No., Street, City, State and Zip Code) | 12. Will this annuity replace or change any existing life insurance or annuity contract? ☐ Yes  ☑ No |
| Laurel Lane, West Kingston, RI  02892 | (if yes, give name of company, policy number, and plan of life insurance or annuity.) |
| Business Address (include Name of Employer) | |
| Mail Notices to ☐ Residence  ☐ Business  ☐ Owner | |
| Social Security No.  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 | |
| Owner (if other than Proposed Annuitant) | 13. Is this contribution for a tax qualified plan? ☐ Yes  ☑ No |
| Name:  American Motorists Insurance Co. | If so, contract will be issued with a limitation on transferability to conform with IRS regulations. (Check appropriate box for type of qualified plan.) |
| Relationship: | ☐ I.R.A. Rollover      ☐ Corporate pension |
| Address: | ☐ T.S.A. Exchange       or profit sharing plan |
| Social Security Tax Payer I.D. No.  36-0727430 | ☐ H.R. 10 Exchange  ☐ Terminal Funding |
| | ☐ H.R. 10      ☐ Other |
| ☐ Contingent Owner | 14. Special Requests  *Immediate Annuity* |
| | *20yr Certain . 3% increase* |
| | *$175,000 = 1450.45 per month* |
| Beneficiary and Relationship | *first year* |
| Primary:  Katerina I. Dixon | 15. Amendments and Corrections (For Home Office use only) |
| Contingent:  Jessica I. Dixon - Daughter | *Quote Number  Sc 113* |
| Rebecca Lea Dixon - Daughter | |

undersigned represent(s), to the best of his (her) knowledge and belief, that the foregoing statements and answers are complete, true, and correctly recorded and agree(s) to be bound by statements and answers made or to be made in this application.  The undersigned further expressly agree(s) as follows: this application and any policy issued in consequence hereof shall constitute the entire contract. No agent is authorized to make or modify contracts, to waive any of the Company's rights or requirements or to bind the Company by accepting or receiving any promise, representation or information, unless the same be in writing, submitted to the Company, and made a part of such policy.  2. Acceptance of any contract(s) issued on the basis of this application shall constitute a ratification and acceptance of any change, correction, addition or amendment noted by the "Company" in the "Amendments and Corrections" section above, except that in those jurisdictions where it is required any change in amount or benefits shall require a written consent by the Proposed Annuitant and by the Applicant if other than the Proposed Annuitant.

| | |
|---|---|
| Dated at Syracuse NY this 4th day of May 19 83 | Signature of Annuitant  X Dennis J. Dixon |
| Lest B. Croydon  621-11 | Applicant if other than Annuitant  X American M... |
| Agent Signature (1)  Code | |
| J.F. Snyder | By |
| Please Print Name of Agent (1) | Signature and Title |
| | Dean Witter Reynolds |
| Agent Signature (2)  Code | Please Print Name of General Agency |
| Please Print Name of Agent (2) | 00001G |

4

## 83A08153

**ANNUITY APPLICATION**

ARTER SECURITY LIFE INSURANCE COMPANY, NEW YORK , 720 FIFTH AVENUE, NEW YORK, N.Y. 10019

| | |
|---|---|
| Annuitant (please print)   ☒ Male   ☐ Female | 9. Type of Contract  Single Premium ~~Deferred~~ Annuity |
| nis J. Dimon | 10. Single Premium Amount   $ 175,000. |
| d Place of Birth | 11. Maturity Age   ☐ 65  ☐ 70½  ☐ Other  Immediate |
| 9/59  So. Kingstown, RI | 6/15/83 |
| ce (No., Street, City, State and Zip Code) | 12. Will this annuity replace or change any existing life insurance or annuity contract? ☐ Yes  ☒ No |
| rel L ne, West Kingston, RI   02892 | (If yes, give name of company, policy number, and plan of life insurance or annuity.) |
| s Address (include Name of Employer) | |
| ?es to  . Residence   ☐ Business   ☐ Owner | |
| Security No.   (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 | 13. Is this contribution for a tax qualified plan? ☐ Yes ☒ No |
| of other then Proposed Annuitant) | If so, contract will be issued with a limitation on transferability to conform with IRS regulations. (Check appropriate box for type of qualified plan.) |
| | ☐ I.R.A. Rollover     ☐ Corporate pension |
| | ☐ T.S.A. Exchange       or profit sharing plan |
| | ☐ H.R. 10 Exchange   ☐ Terminal Funding |
| ?. ?y Tax Payer ID No.   ?4-0?10630 | ☐ H.R. 10                ☐ Other |
| | 14 Special Requests  Immediate Annuity |
| | |
| | 15. Amendments and Corrections (For Home Office use only) |

tion, unless the same be in writing, submitted to the Company, and made a part of such policy.

2. Acceptance of any contract(s) issued on the basis of the application shall constitute a ratification and acceptance of any change, correction, addition, or amendment noted by the "Company" in the "Amendments and Corrections" section above, except that in those jurisdictions where it is required any change in amount or benefits shall require a written consent by the Proposed Annuitant and by the Applicant if other than the Proposed Annuitant.

Signature of Applicant   _Dennis T. Dimon_

Applicant if other than Annuitant  X _____

By _____   Signature and Title

Exhibit #4

K-0021

5



Mary Graci, Ocean Marine Claim, New York City
T. J. Donohue, Tech. Claim, Long Grove, B-8
John Kimberly, Tech. Claim, Long Grove, B-8
R. W. Boncher, Tech. Claim, Long Grove, B-8



Date 4-18-83

To Klaus Lemhoefer, Div. Claim, Summit

From J. L. Noe, Tech. Claim, Long Grove, B-8

Previous Comm.

Regarding 399 LM 106125-Z
DIMON VERSUS JENNY C., INC.

J. LaTORRE   APR 21 1983

Assigned to negotiate settlement within our $400,000 policy
limit, I met with plaintiff's attorneys Hughes and Latti at
Latti Associates, Boston, Massachusetts. Structured settle-
ment negotiations were undertaken resulting in settlement
at $250,000 cash plus $175,000 to be applied toward purchase
of an annuity to provide plaintiff a monthly income for life,
20 years certain with 3% compounded annually added annually.
Primary carrier Home Insurance will contribute the remainder
of their policy limit toward the cash portion. They have not
been billed for legal services and expense of their trial
counsel. To date, they have paid $1,340 maintenance,
$12,829.61 medical bills, $4,032.95 legal and survey expense
through mid-January for a total of $18,202.56. After re-
maining legal expense is paid, they should be able to re-
contribute approximately $75,000 toward the settlement.

I conducted settlement negotiations on a basis of pay-outs
and would not reveal our annuity costs. Plaintiff's attorney
insisted that he be able to obtain competitive bidding. I
presented four alternative offers, one of which was to provide
$1,100 per month for life, 20 years certain with 3% compounded
annually added annually. Based on quotations from Mangelsdorf
cost would be $180,863. Plaintiff's attorney agreed that if I
would pay $175,000 and agree to be nominal owner of the annuity
he would place it with an A rated life insurance company from
whom he would be able to purchase $1,450 per month for life,
20 years certain with 3% compounded annually added annually.
I checked with two brokers and was unable to come anywhere
near this pay-out for $175,000 cost. After consultation with
Mr. Boncher, we agreed with the condition that we will not
guarantee payments and plaintiff will have no recourse against
defendants or carriers in the event of default by the life
insurance company. That company will be Charter Life Insurance
Company.

Throughout I have been in consultation with New York City counsel
John Moore, Providence, Rhode Island counsel W. Slater Allen
and Home Insurance Claims Representative John Falvey of their
North Haven, Connecticut office. Mr. Moore and Mr. Allen have
consulted and guidelines established to protect our rights

PRINTED IN U.S.

Klaus Lemhoefer
4-18-83
-2-

to bring an action against Home Insurance after settlement
should we so desire.  Mr. Lemhoefer will ask Mr. Moore to
give us a report assessing our chances.  The case will be
set for hearing on the settlement and certified notice of
that hearing given to Home Insurance.

I will attend to various details necessary to bring this
case to conclusion including signing the application for the
annuity, arranging for payment of the premium and delivery
of my copy of the claim file to Mr. Moore.  Thereafter, I
will close my interest without further report.

JLN:es

K-0103

6

Copy to  Mary Graci, Ocean Marine Claim, New York City
T. J. Donohue, Tech. Claim, Long Grove, B-8
John Kimberly, Tech. Claim, Long Grove, B-8
R. W. Boncher, Tech. Claim, Long Grove, B-8



**Date**  11-8-83

**To**  Klaus Lemhoefer, Div. Claim, Summit

**From**  J. L. Noe, Tech. Claim, Long Grove

**Previous Comm.**

**RECEIVED**
**KEMPER GROUP**

NOV 1 1 1983

OCEAN MARINE CLAIMS
NEW YORK

**Regarding**  399 LM 106125-Z
DIAMON V. JENNY C, INC.

We have encountered some difficulty with Charter Security
Life Insurance Company (New York) who issued the annuity
policy. The settlement agreement was to establish a fully
paid annuity contract for a sum plus 3% compounded annually,
added annually to be paid during the term of a plaintiff's
life and in no event for less than 20 years. Mr. Hughes,
plaintiff's attorney, made the arrangement with broker
Mr. Foley of Dean Witter Reynolds, Inc., Boston, Massachusetts
and according to him, was quoted a premium of $175,000 to
meet that requirement. Mr. Foley and I had telephone communication
in April 1983 at which time he confirmed what Mr. Hughes told
me. The premium was paid, and the policy was issued and was
correct. Thereafter, Charter Security declared that a mistake
had been made and issued a replacement policy for a term of
20 years certain, only. I rejected it. Charter Security tried
to persuade me that their position was correct, and again they
issued a replacement policy declaring the original policy to
be null and void. Again, I rejected it and declared the
original policy to be valid and enforceable. In the meantime,
Mr. Hughes threatened Mr. Foley with an errors and omissions
claim, and Mr. Foley, on advice of counsel, has nothing further
to say.

I am now dealing with Charter Security's counsel in Jacksonville,
Florida, who has asked for a copy of the settlement agreement.
I hope they will be persuaded to honor the original policy, and
if additional premium must be paid, this will be arranged be-
tween Charter Security and Mr. Foley of Dean Witter Reynolds.
If not, Mr. Hughes may file an action for declaratory judgment.

In the meantime, plaintiff is receiving his benefits and will
continue to do so for at least the 20 year certain term. I
think this will ultimately work out.

JLN:es

Mary Graci   NOV 1 1 1983



K-0125

PRINTED IN U.S.A.

7

Lumbermens Mutual Casualty Company • American Motorists Insurance Company
American Manufacturers Mutual Insurance Company • American Protection Insurance Company

Long Grove, IL 60049 · 312/540-2000

August 12, 1983

Mr. Robert A. Foley
Dean Witter Reynolds, Inc.
One Boston Place
Boston, Massachusetts 02108

Dear Mr. Foley:

DENNIS DIMON
CHARTER SECURITY POLICY NO: 83 A 08153
OUR FILE NO: 399 IM 106125-Z

I received the replacement policy issued by Charter Security Life Insurance Company (New York) changing the terms of the annuity from 240 months certain and life thereafter to 240 months certain only.

I am advised by Mr. Hughes of Lattie Associates that your quotation was to provide an annuity which would pay $1,450.45 per month for the first year increasing annuall at a rate of 3% compounded annually for 240 months certai and life thereafter for a single premium of $175,000. This was the benefit to be provided under the terms of a general release and settlement agreement approved by Judge Pettine of the United States District Court for the District of Rhode Island.

The agreed upon premium was paid and a policy issued whic is now in the files of the contract owner, American Motor sts Insurance Company, providing benefits required by the rel ase, settlement agreement and court order. I consider the ori inal annuity contract valid and enforceable and will retain it in our files.







000025

Mr. Robert A. Foley
August 12, 1983
-2-

I intended to return the replacement contract issued by
Barbara Boehm of Charter Security, but it was lost with
my briefcase on August 11, 1983.

Very truly yours,

AMERICAN MOTORISTS INSURANCE COMPANY

John L. Noe
Home Office Claim

JLN:bw

cc:  Ms. Barbara Boehm
     Vice President
     Charter Security Life Insurance Company
     (New York)
     720 Fifth Avenue
     New York City, New York  10019

     Mr. Roger Hughes
     Lattie Associates, Attorneys
     30-31 Union Wharf
     Boston, MA  02109

000028

8

**JEROME B. SPUNT**
ATTORNEY AT LAW
II PARK ROW
PROVIDENCE, RHODE ISLAND 02903
——
(401) 274-4044

March 10, 1983

W. Slater Allen, Jr., Esq.
155 Westminster Street
Providence, Rhode Island 02903

Re: Dennis Dimon v. Jenny C., Inc.

Dear Mr. Allen:

On behalf of Jenny C., Inc., I want to write you formally as attorney for American Motorists Insurance Company (Kemper Group) to register my distress at the current status of the case and the failure of your company to make reasonable efforts to settle the matter within the policy limits. This is, in substance, what I said to you informally in our phone conversation yesterday.

As you know, plaintiff demanded $90,000 before trial began, and by my letter of January 19, 1983 I put Home Indemnity Company on notice that I saw a risk of a verdict in exesss of $500,000 and that Home would be liable for breach of its duties to the insured in failing to compromise the case in the event of judgment over the policy limits. I understand that you gave Home similar notice.

We are now faced with a jury verdict of in exesss of $720,000. The assets of the corporation representing, substantially, the life savings of my clients, Gary Champlin and his father Leon F. Champlin, may well have to be taken to satisfy this judgment.

Joseph Flannery, plaintiff's counsel, has taken the position that "he does not want to bid against himself", and in the absence of a responsible indication of a willingness to negotiate on the part of defendant, has stuck to his original post-verdict settlement proposal which he first made to you on February 10, 1983, that is, that plaintiff would now be willing to accept $600,000 prior to the hearing on limitation of liability. Jack Wells has advised me that Home Indemnity Company will now, of course, contribute the balance of its policy, and we would expect any proposal by your company to be conditioned on that.

You told me, when we talked yesterday, that neither Jack Wells nor Joe Flannery have put any proposals in writing, and you are not disposed to make any suggestions to your company until they do so. I implore you not to stand on ceremony. There is a realistic chance



K-0114

W. Slater Allen, Jr., Esq.
-2-
March 10, 1983

the case can be settled within the $500,000 aggregate policy limits,
and the $600,000 demand by plaintiff should be regarded, realistical-
ly, only as his opening proposal, which has been left unresponded
to for one month.

Your company, I believe, has an obligation to the insured to
make responsible efforts to eliminate the risk of ultimate judgment
being entered for $720,000 or more. If you feel that others have
made mistakes in the past, that is no reason to suspend efforts
for a sensible solution at this time.

I feel, further, that your company has an obligation to affirma-
tively make a proposal, within the policy limits, for settlement at
this time. It is more than likely that Mr. Flannery will respond
with a demand within the policy limits.

We fully understand and appreciate the question that exists as
between American Motorists and Home Indemnity as to Home's obliga-
tion to share in payment of amounts in excess of its policy limits,
and Jack Wells advises, as you know, that this matter can be left
open and would not be prejudiced in any way by your company's pay-
ment.

In my opinion, if your company does not alter its position as
outlined above, it, in addition to Home Indemnity Company, will be
liable to the insured for judgment in excess of the policy limits.

Very truly yours,

JEROME B. SPUNT

JBS:ilb
cc: Guy J. Wells, Esq.
    Gary Champlin

K-0115

9



# MEDWAY MARINE
### CORPORATION

OCEAN & INLAND MARINE INSURANCE

P.O. BOX 2385
PROVIDENCE, RHODE ISLAND 02906
TELEPHONE (401) 861 - 6800 · TELEGRAMS: SMITHINC
TELEX - 92 - 7751

March 10, 1983

W. Slater Allen, Esq.
Booth and Brodsky
515 Howard Building
Providence, RI  02903

RE:  Fishing Vessel Jenny C

Dear Mr. Allen:

No Protection and Indemnity insurance in excess of the limit
of liability in the American Motorists Insurance Company
excess policy was in effect through this agency on the date
of the accident in the case on which you are acting as counsel
for the Kemper Insurance Group.

Yours very truly,

MEDWAY MARINE CORPORATION

Carleton I. Fisher
Vice President

CIF:rw



K-0116

*A Subsidiary of Morton Smith, Inc.*

10

## GENERAL RELEASE

Dennis Jay Dimon, now or formerly of the Town of Charlestown, State of Rhode Island, in consideration of the payment of Two Hundred Fifty Thousand and No/100 ($250,000.00) Dollars and the establishment of a fully paid annuity contract for my benefit with Charter Life Insurance Company, to pay me One Thousand Four Hundred Fifty and No/100 ($1,450.00) Dollars per month for one year following the execution of that contract and thereafter, such monthly sum increased at the rate of three (3%) percent per year, compounded annually, to be paid to me during the term of my life, and in no event for less than twenty (20) years, the receipt whereof is hereby acknowledged, do hereby remise, release, and quitclaim unto Jenny C. Inc. all and any such claims, rights, choses, and actions of every manner and kind which I have ever had, which I have now, or which I may have in the future from the beginning of the world to the date of these presents more specifically, without limiting the generality hereof all and every claim arising out of an injury suffered by me aboard the fishing vessel Jenny C. owned by Jenny C. Inc. on January 24, 1981, and all my rights, claims, and choses asserted or involved in the complaint or libel filed in the United States District Court for the District of Rhode Island under the name and style Dennis Jay Dimon vs. Jenny C. Inc., civil action No. 81-0063.



K-0063

I understand the nature and extent of my injury and that I will never be cured. I understand that this is a full and final settlement. I further certify that this release is fully understood by me and is entirely satisfactory.

IN WITNESS WHEREOF, Dennis Jay Dimon has set his hand this *19th* day of April, 1983.

THIS IS A FINAL RELEASE.

_____
Dennis Jay Dimon

On April 19, 1983 I read the above two pages to the plaintiff and explained its contents to him.

Roger E. Hughes

LATTI ASSOCIATES

K-0064

11



NY

**Charter Security Life Insurance Company (New York)**
720 Fifth Avenue • New York, New York 10019

| .0 75 | 14 | 7 49 | 19 | 5.97 | 24 |
| 9 83 | 15 | 7.10 | 20 | 5.75 | 25 |

### OPTION 2.    LIFE INCOME*

We will pay a lifetime monthly income to the Annuitant if living on the Annuity Date. The basis for this amount of income is explained in this contract.

Unless you make an alternate election, we will make the first monthly payment on the Annuity Date; payments after the first will be on that same date of the month as long as the Annuitant lives. Unless you make an alternate election, we guarantee 120 monthly payments; they will be continued to the Beneficiary if the Annuitant dies before receiving them. Payments will be made by check to the Annuitant or Beneficiary. We reserve the right to require proof that the payee is living on payment dates.

We will pay the benefit explained in this contract if the Annuitant dies before the Annuity Date. It will be paid to the Beneficiary when we receive acceptable proof of death.

The Beneficiary and Owner are as named in the application if not later changed.

Notice of ten-day right to examine contract: This contract may be cancelled within ten days after its receipt. The steps to follow are:

Return the contract with a written notice to us or to the agent through whom you purchased the contract. If you return the contract directly to us, use the address of our Home Office shown on the top of this page. If return is through the agent, obtain a receipt.

We will return all payments made for this contract after we receive it. As soon as the contract is delivered or mailed to us, it will be deemed void from its beginning.

Read this contract carefully. It is a legal contract between you and us.

Secretary                            President

## SINGLE PREMIUM DEFERRED ANNUITY

Monthly Life Annuity With Ten Years Certain Payable At Annuity Date
Benefit in Event of Death is Payable Prior To Annuity Date
Optional Life Annuities at Annuity Date—Optional Annuity Date
Non-Participating



RA-104
11/82

K-0010
Page 1

# TABLE OF CONTENTS

| Item | Page No. |
|------|----------|

Face Page ................................................1
Schedule Page ............................................3
Table of Guaranteed Contract Values .......................4
Definitions ..............................................5
General Provisions
  Basis of Contract ....................................5
  Entire contract; changes .............................5
  Premium payment ......................................5
  Issue date ...........................................5
  Incontestability .....................................5
  Misstatement of age or sex ...........................5
  Ownership ............................................6
  Change of ownership ..................................6
  Assignment ...........................................6
  Beneficiary ..........................................6
  Conformance to statutes ..............................6
Interest Rates
  Declared Interest Rate ...............................6
  Guaranteed Interest Rates ............................6
Joint Annuitant
  Definition ...........................................6
  Annuity Date .........................................6
  Deferral of Annuity Date .............................6
  Benefit In Event of Death ............................6
  Separate Annuities ...................................6
Non-Forfeiture Provisions
  Accumulation Value ...................................7
  Cash surrenders ......................................7
  Benefit in Event of Death ............................7
  Annual statement of values ...........................7
  Normal settlement; annuity date ......................7
  Change in annuity option or date .....................7
  Benefits payable to beneficiary ......................7
  Minimum payments .....................................7



Settlement Options
  Option 1, limited payments ...........................8
  Option 2, life income ................................8
  Option 3, joint life income with two-thirds to survivor ..............8
  Rate basis ...........................................8
  Settlement option tables .............................9

**NY**

# DEFINITIONS

This is what we mean when we use these words or phrases:

"**We,**" "**us**" and "**our**" refer to Charter Security Life Insurance Company (New York).

"**You**" and "**yours**" refer to the Owner named in the application.

The "**Accumulation Interest Rate**" is the annual effective interest rate which we use to credit interest to the Single Premium less any Partial Surrenders.

The "**Accumulation Value**" is the value of the contract before the charge, if any, for withdrawing funds.

The "**Annuitant**" is the person who is to receive annuity payments.

The "**Beneficiary**" receives the benefits, if any, due at the Annuitant's death.

A "**Contingent Owner,**" if named, becomes the Owner if the Annuitant survives the Owner.

"**Contract Years**" are measured from the Issue Date.

The "**Declared Interest Rate**" is the Accumulation Interest Rate which we declare and guarantee for the Effective Period.

The "**Effective Period**" is the period during which the Accumulation Value will accrue interest at the Declared Interest Rate.

The "**Owner**" owns and controls this contract.

A "**Partial Surrender**" is a surrender of part of the Accumulation Value.

The "**Surrender Charge**" is the charge for withdrawing funds. It is equal to the Surrender Charge Percentage times the amount of Accumulation Value surrendered. The Surrender Charge Percentages are shown on the Schedule Page. Refer to NONFORFEITURE PROVISIONS; the Surrender Charge applies only under certain conditions.

The "**Surrender Interest Rate**" is the Declared Interest Rate below which the Surrender Charge is waived for 60 days. Refer to NONFORFEITURE PROVISIONS.

The Surrender Value" is the Accumulation Value less the Surrender Charge.

"**Survive**" refers to the continued life of a person or legal existence of an entity other than a person.

# GENERAL PROVISIONS

**BASIS OF CONTRACT:** This contract is issued on the basis of the application and receipt of the Single Premium payment in advance.

**ENTIRE CONTRACT; CHANGES:** This contract, the attached application, and any endorsements make up the entire contract. All statements in the application are representations and not warranties.

No agent can change this contract or waive any of its terms. Changes can be made only by written endorsement signed by one of our officers.

**PREMIUM PAYMENT:** The Single Premium payment for this contract was paid in advance. If the check or other instrument is not honored for payment, this contract is deemed void from the beginning.

**ISSUE DATE:** This contract takes effect on its Issue Date which is shown on the Schedule Page.

**INCONTESTABILITY:** This contract is incontestable from its issue date.

**MISSTATEMENT OF AGE OR SEX:** We will require proof of age before we make payments to the Annuitant or any Beneficiary. If age or sex is misstated, we will pay the amount due at the true age or sex. In case of age or sex correction after payments start, we will:

(1) In case of underpayment, pay the full amount due the payee with the next payment due.

(2) in case of overpayment, deduct the amount due us from future payments; deductions will be spread over the payment period.

K-0012

## GENERAL PROVISIONS
### (Continued)

**OWNERSHIP:** You have all rights under this contract during the Annuitant's lifetime, subject to:

   (1) the rights of any assignee of record with us;

   (2) the rights of any irrevocable Beneficiary;

   (3) any restricted ownership endorsement;

   (4) the change of ownership provision.

**CHANGE OF OWNERSHIP:** During the Annuitant's lifetime, you may name a new Owner. If you are a natural person other than the Annuitant, you may name or change a Contingent Owner. A Contingent Owner becomes Owner only by surviving you.

Notice of the change must be sent to our Home Office; it must be signed and dated by you. We are not liable for any actions we take before we receive and file the notice at our Home Office.

Change of ownership:

   (1) voids any Contingent Ownership;

   (2) does not affect the Beneficiary.

**ASSIGNMENT:** You may assign all rights, privileges and benefits provided by this contract. We are not bound by an assignment until we receive and file a signed copy at our Home Office. We are not responsible for the validity of assignments.

**BENEFICIARY:** You may change the Beneficiary during the Annuitant's lifetime; an irrevocable Beneficiary may be changed only by that Beneficiary's written consent. Notice of the change must be sent to our Home Office; it must be signed and dated by you. It takes effect on the date it is signed. We are not liable for any actions we take before we receive and file the notice at our Home Office.

A Beneficiary's interest is effective if that Beneficiary:

   (1) survives the Annuitant by 15 days; or

   (2) survives until we receive proof of the Annuitant's death.

We will pay the proceeds in this order unless this contract is assigned at the time of the Annuitant's death:

   (1) We will pay the designated Beneficiaries who survive the Annuitant.

   (2) If no Beneficiary survives, we will pay the Annuitant's estate.

No Beneficiary can change your previous choice of a settlement option.

To the extent permitted by law, no payment we make will be subject to the claims of any creditors.

**CONFORMANCE TO STATUTES:** Any annuity, Surrender Value or benefit in event of death payable under this contract is not less than the minimum benefit required by any statute of the state in which this contract is delivered.

### INTEREST RATES

**DECLARED INTEREST RATE.** We declare an Accumulation Interest Rate, and Effective Period, on the Issue Date. They are shown on the Schedule Page. Prior to the expiration of the Effective Period, we will declare a new Accumulation Interest Rate and Effective Period. We will notify you of declared Accumulation Interest Rates and effective periods in writing.

**GUARANTEED INTEREST RATES:** We guarantee that the Accumulation Interest Rates will be at least as great as the Guaranteed Interest Rates shown on the Schedule Page.

### JOINT ANNUITANT

If you designate two persons as joint annuitants in the application, these rules will be in effect:

**Definition:** The term "Annuitant" means the joint annuitants or the survivor of them, as the case may be.

**Annuity Date:** The Annuity Date will be:

   (1) the Contract Anniversary following the 65th birthday of the older joint annuitant; or

   (2) ten years from the Issue Date if the issue age of the older joint annuitant is more than 55 Years; or

   (3) the date specified in the application.

**Deferral of Annuity Date:** The Annuity Date may not be deferred to a date beyond the 85th birthday of the older joint annuitant.

**BENEFIT IN EVENT OF DEATH:** We will not pay any benefit upon the death, before the Annuity Date, of the first of the joint annuitants to die. Instead, the contract will remain in force as to the surviving joint annuitant. If one joint annuitant dies before the Annuity Date, the latest permitted Annuity Date will become the 85th birthday of the remaining joint annuitant or, if later, ten years after the Issue Date. If both joint annuitants die before the Annuity Date, we will pay the benefit to the Beneficiary.

**Separate annuities:** At your request, we will apply the Accumulation Value to provide separate annuities for each joint annuitant, if both are living on the Annuity Date. You must make this request in writing at least 30 days before the Annuity Date. For this purpose, you must specify a division of the Accumulation Value into two portions. These portions may but need not be of equal size. You must specify the annuity option for each joint annuitant. You are not required to choose the same option for both joint annuitants.

In addition to these three options, you may choose any other form of annuity agreed upon by us.

Except with our consent, settlement options will not be available to:

   (1) an assignee; or

   (2) any other than a natural person receiving proceeds in his or her own right

Page 6

K-0013

**ACCUMULATION VALUE:** The Accumulation Value at any time is the Single Premium you paid, less any Partial Surrenders and Surrender Charges, accumulated at the Accumulation Interest Rates.

**CASH SURRENDERS:** You may surrender all or part of the Accumulation Value before annuity payments begin.

We have a Surrender Charge in effect for the first seven years after the Issue Date, but only if:

(1) there is more than one surrender within a Contract Year, or

(2) the surrender exceeds the Allowable Portion of the Accumulation Value. The Allowable Portion is shown on the Schedule Page.

On the first surrender in a Contract Year, the Surrender Charge applies only to the amount in excess of the Allowable Portion of the Accumulation Value.

If an Accumulation Interest Rate is less than the Surrender Interest Rate, you may surrender this contract without a Surrender Charge provided you notify us within 60 days of the effective date of the Accumulation Interest Rate. After 60 days, any Surrender Charge in effect will be reinstated. However, you will not forfeit your right to surrender this contract without a Surrender Charge should a future Accumulation Interest Rate be below the Surrender Interest Rate.

If you surrender the entire Accumulation Value, the amount we pay you, added to any prior amounts we paid you for Partial Surrenders, will not be less than the Single Premium you paid us.

We may defer payment of cash surrenders for not more than six months.

**BENEFIT IN EVENT OF DEATH:** We will pay the Accumulation Value to the Beneficiary if:

(1) the Annuitant dies before the Annuity Date; and

(2) you have not specified a settlement option.

The amount paid will be the Accumulation Value as of the date of death accumulated at the Accumulation Interest Rate to the date of payment by us. It will be paid when we receive acceptable proof of death. No Surrender Charge will apply.

**ANNUAL STATEMENT OF VALUES:** As of each contract anniversary on or before the Annuity Date, we will send you a statement which shows the:

(1) Accumulation Value; and

(2) Surrender Value; and

(3) Monthly life annuity with ten years certain which can be provided on the Annuity Date by the current Accumulation Value; and

(4) Declared Interest Rate.

**NORMAL SETTLEMENT; ANNUITY DATE:** The Accumulation Value will be used to provide a life annuity as shown on the Schedule Page if:

(1) the Annuitant is living on the Annuity Date; and

(2) you have not made an alternate election.

The Annuity Date will be:

(1) the contract anniversary following the Annuitant's 65th birthday; or

(2) ten years from the Issue Date if the Issue Age is more than 55 years; or

(3) the date specified in the application.

**CHANGE IN ANNUITY OPTION OR DATE:** You may defer the Annuity Date; deferral may not be to a date beyond the Annuitant's 85th birthday. After five years from the Issue Date, you may:

(1) Advance the Annuity Date (but not to a date earlier than the date of the request); or

(2) elect to begin payments under a settlement option.

Written request must be made:

(1) during the Annuitant's lifetime;

(2) at least 30 days before the Annuity Date; and

(3) at least 30 days before any settlement option date.

**BENEFITS PAYABLE TO BENEFICIARY:** During the Annuitant's lifetime, you may choose a settlement option rather than a lump sum death benefit. The Beneficiary may make this choice after the Annuitant's death if:

(1) you have not done so; and

(2) payments have not begun.

**MINIMUM PAYMENTS:** We will not make periodic payments of less than $20.00; for lesser amounts due, we will change the frequency of payments. This provision applies to payments we make to the Annuitant or to any Beneficiary.

K-0014

# SETTLEMENT OPTIONS

If you elect an annuity option by death, surrender or annuitization, the Accumulation Value of this contract may be applied under any of the options set forth below, provided that:

(1) In the event of surrender, the option is elected on or prior to the surrender date.

(2) In the event of death, the option is elected within 30 days of the date on which we notify the Beneficiary that proceeds are payable.

At the time payments under a settlement option begin, we will pay the greater of

(1) the amount guaranteed under this contract; or

(2) the amount that would be provided by the application of the Accumulation Value to purchase a single premium immediate annuity offered by us to the same class of annuitants, or

(3) an amount determined by more favorable rates which we then offer.

**OPTION 1, LIMITED PAYMENTS:** Equal payments for a set time, not more than 30 years. Any excess interest we declare will be paid yearly.

**OPTION 2, LIFE INCOME:**
LIFE ANNUITY. Equal monthly payments as long as the payee lives.

**WITH CERTAIN PERIOD.** Equal monthly payments for five, ten, or twenty years (the certain period), as elected, and thereafter for the remaining lifetime of the payee.

**WITH INSTALLMENT REFUND.** Equal monthly payments until the sum of such payments equals the proceeds settled under this option (at which time the installment refund period ends) and thereafter for the remaining lifetime of the payee.

**OPTION 3, JOINT LIFE INCOME WITH TWO-THIRDS TO SURVIVOR:** Payment of equal monthly (or less frequent) installments during the joint lifetime of the payee and another person. After the death of either the payee or the joint payee, the amount of each installment shall be reduced to two-thirds of the original amount and payments shall continue during the entire remaining lifetime of the survivor.

Rate basis: The monthly installments guaranteed under this contract are based on:

(1) the 1937 Standard Annuity Table,

(2) 3½% interest, and

(3) age nearest birthday.

K-0015                                              Page 8

## SETTLEMENT OPTION TABLES

### GUARANTEED MONTHLY INSTALLMENTS UNDER OPTIONS 1, 2 OR 3
(Monthly installments are shown for each $1,000 of net proceeds applied.
The ages shown are ages nearest birthday when the first monthly installment is payable.)

### OPTION 1.   INSTALLMENTS FOR A SPECIFIED PERIOD

| Years | Installment | Years | Installment | Years | Installment | Years | Installment | Years | Installment | Years | Installment |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | $84.65 | 6 | $15.35 | 11 | $9.09 | 16 | $6.76 | 21 | $5.56 | 26 | $4.84 |
| 2 | 43.05 | 7 | 13.38 | 12 | 8.46 | 17 | 6.47 | 22 | 5.39 | 27 | 4.73 |
| 3 | 29.19 | 8 | 11.90 | 13 | 7.94 | 18 | 6.20 | 23 | 5.24 | 28 | 4.63 |
| 4 | 22.27 | 9 | 10.75 | 14 | 7.49 | 19 | 5.97 | 24 | 5.09 | 29 | 4.53 |
| 5 | 18.12 | 10 | 9.83 | 15 | 7.10 | 20 | 5.75 | 25 | 4.96 | 30 | 4.45 |

### OPTION 2.   LIFE INCOME*

| Issue Age Male | Female | Life | 5 Years Certain | 10 Years Certain | 20 Years Certain | Installment Refund | Issue Age Male | Female | Life | 5 Years Certain | 10 Years Certain | 20 Years Certain | Installment Refund |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 34 | 39 | 4.11 | 4.10 | 4.08 | 4.00 | 3.98 | 59 | 64 | 6.56 | 6.45 | 6.15 | 5.28 | 5.78 |
| 35 | 40 | 4.16 | 4.15 | 4.13 | 4.04 | 4.03 | 60 | 65 | 6.74 | 6.62 | 6.28 | 5.31 | 5.90 |
| 36 | 41 | 4.21 | 4.20 | 4.18 | 4.08 | 4.07 | 61 | 66 | 6.93 | 6.79 | 6.41 | 5.35 | 6.03 |
| 37 | 42 | 4.26 | 4.26 | 4.23 | 4.12 | 4.12 | 62 | 67 | 7.13 | 6.97 | 6.55 | 5.39 | 6.16 |
| 38 | 43 | 4.33 | 4.32 | 4.29 | 4.16 | 4.16 | 63 | 68 | 7.35 | 7.16 | 6.69 | 5.43 | 6.29 |
| 39 | 44 | 4.39 | 4.38 | 4.34 | 4.21 | 4.21 | 64 | 69 | 7.57 | 7.36 | 6.83 | 5.47 | 6.44 |
| 40 | 45 | 4.45 | 4.44 | 4.40 | 4.26 | 4.27 | 65 | 70 | 7.81 | 7.58 | 6.98 | 5.51 | 6.59 |
| 41 | 46 | 4.52 | 4.51 | 4.47 | 4.30 | 4.32 | 66 | 71 | 8.06 | 7.79 | 7.12 | 5.54 | 6.75 |
| 42 | 47 | 4.59 | 4.58 | 4.53 | 4.35 | 4.37 | 67 | 72 | 8.33 | 8.03 | 7.27 | 5.57 | 6.91 |
| 43 | 48 | 4.67 | 4.65 | 4.60 | 4.40 | 4.43 | 68 | 73 | 8.62 | 8.26 | 7.42 | 5.60 | 7.08 |
| 44 | 49 | 4.75 | 4.73 | 4.67 | 4.45 | 4.49 | 69 | 74 | 8.92 | 8.52 | 7.58 | 5.63 | 7.26 |
| 45 | 50 | 4.83 | 4.81 | 4.75 | 4.50 | 4.56 | 70 | 75 | 9.24 | 8.78 | 7.73 | 5.65 | 7.46 |
| 46 | 51 | 4.92 | 4.89 | 4.82 | 4.56 | 4.62 | 71 | 76 | 9.59 | 9.06 | 7.88 | 5.67 | 7.66 |
| 47 | 52 | 5.01 | 4.98 | 4.90 | 4.61 | 4.69 | 72 | 77 | 9.95 | 9.34 | 8.03 | 5.69 | 7.86 |
| 48 | 53 | 5.10 | 5.07 | 4.99 | 4.66 | 4.76 | 73 | 78 | 10.33 | 9.63 | 8.18 | 5.70 | 8.08 |
| 49 | 54 | 5.20 | 5.17 | 5.07 | 4.72 | 4.84 | 74 | 79 | 10.74 | 9.94 | 8.32 | 5.71 | 8.32 |
| 50 | 55 | 5.31 | 5.27 | 5.17 | 4.77 | 4.91 | 75 | 80 | 11.19 | 10.27 | 8.46 | 5.72 | 8.56 |
| 51 | 56 | 5.42 | 5.38 | 5.26 | 4.83 | 4.99 | 76 | 81 | 11.66 | 10.59 | 8.60 | 5.73 | 8.81 |
| 52 | 57 | 5.54 | 5.49 | 5.36 | 4.89 | 5.08 | 77 | 82 | 12.15 | 10.93 | 8.73 | 5.73 | 9.09 |
| 53 | 58 | 5.66 | 5.61 | 5.46 | 4.94 | 5.17 | 78 | 83 | 12.67 | 11.27 | 8.86 | 5.74 | 9.37 |
| 54 | 59 | 5.79 | 5.73 | 5.56 | 5.00 | 5.26 | 79 | 84 | 13.25 | 11.63 | 8.97 | 5.74 | 9.67 |
| 55 | 60 | 5.93 | 5.87 | 5.67 | 5.05 | 5.35 | 80 | 85 | 13.85 | 11.99 | 9.08 | 5.75 | 9.98 |
| 56 | 61 | 6.08 | 6.00 | 5.79 | 5.10 | 5.45 | 81 | 86 | 14.49 | 12.36 | 9.18 | 5.75 | 10.32 |
| 57 | 62 | 6.23 | 6.14 | 5.90 | 5.15 | 5.56 | 82 | 87 | 15.17 | 12.74 | 9.28 | 5.75 | 10.66 |
| 58 | 63 | 6.39 | 6.29 | 6.02 | 5.21 | 5.67 | 83 | 88 | 15.92 | 13.11 | 9.36 | 5.75 | 11.03 |

### OPTION 3.   JOINT AND TWO-THIRDS TO SURVIVOR*

Age of Other Payee.   Age of Annuitant (Male, age on first line. Female age on second line).

| M | | 55 | 56 | 57 | 58 | 59 | 60 | 61 | 62 | 63 | 64 | 65 | 66 | 67 | 68 | 69 | 70 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | F | 60 | 61 | 62 | 63 | 64 | 65 | 66 | 67 | 68 | 69 | 70 | 71 | 72 | 73 | 74 | 75 |
| 55 | 60 | $5.53 | $5.59 | $5.65 | $5.71 | $5.78 | $5.84 | $5.91 | $5.98 | $6.05 | $6.11 | $6.18 | $6.25 | $6.32 | $6.39 | $6.46 | $6.53 |
| 56 | 61 | 5.59 | 5.65 | 5.72 | 5.78 | 5.85 | 5.92 | 5.99 | 6.06 | 6.13 | 6.20 | 6.27 | 6.34 | 6.42 | 6.49 | 5.56 | 6.64 |
| 57 | 62 | 5.65 | 5.72 | 5.78 | 5.85 | 5.92 | 5.99 | 6.07 | 6.14 | 6.21 | 6.29 | 6.36 | 6.44 | 6.51 | 6.59 | 6.67 | 6.74 |
| 58 | 63 | 5.71 | 5.78 | 5.85 | 5.92 | 5.99 | 6.07 | 6.14 | 6.22 | 6.30 | 6.37 | 6.45 | 6.53 | 6.61 | 6.69 | 6.77 | 6.85 |
| 59 | 64 | 5.78 | 5.85 | 5.92 | 6.00 | 6.07 | 6.15 | 6.23 | 6.30 | 6.38 | 6.47 | 6.55 | 6.63 | 6.71 | 6.80 | 6.88 | 6.96 |
| 60 | 65 | 5.84 | 5.92 | 5.99 | 6.07 | 6.15 | 6.23 | 6.31 | 6.39 | 6.47 | 6.56 | 6.64 | 6.73 | 6.82 | 6.90 | 6.99 | 7.08 |
| 61 | 66 | 5.91 | 5.99 | 6.07 | 6.14 | 6.23 | 6.31 | 6.39 | 6.48 | 6.56 | 6.65 | 6.74 | 6.83 | 6.92 | 7.01 | 7.11 | 7.20 |
| 62 | 67 | 5.98 | 6.06 | 6.14 | 6.22 | 6.30 | 6.39 | 6.48 | 6.57 | 6.66 | 6.75 | 6.84 | 6.94 | 7.03 | 7.13 | 7.22 | 7.32 |
| 63 | 68 | 6.05 | 6.13 | 6.21 | 6.30 | 6.38 | 6.47 | 6.56 | 6.66 | 6.75 | 6.85 | 6.94 | 7.04 | 7.14 | 7.24 | 7.34 | 7.44 |
| 64 | 69 | 6.11 | 6.20 | 6.29 | 6.37 | 6.47 | 6.56 | 6.65 | 6.75 | 6.85 | 6.95 | 7.05 | 7.15 | 7.25 | 7.36 | 7.47 | 7.57 |
| 65 | 70 | 6.18 | 6.27 | 6.36 | 6.45 | 6.55 | 6.64 | 6.74 | 6.84 | 6.94 | 7.05 | 7.15 | 7.26 | 7.37 | 7.48 | 7.59 | 7.70 |
| 66 | 71 | 6.25 | 6.34 | 6.44 | 6.53 | 6.63 | 6.73 | 6.83 | 6.94 | 7.04 | 7.15 | 7.26 | 7.37 | 7.49 | 7.60 | 7.72 | 7.84 |
| 67 | 72 | 6.32 | 6.42 | 6.51 | 6.61 | 6.71 | 6.82 | 6.92 | 7.03 | 7.14 | 7.25 | 7.37 | 7.49 | 7.61 | 7.73 | 7.85 | 7.97 |
| 68 | 73 | 6.39 | 6.49 | 6.59 | 6.69 | 6.80 | 6.90 | 7.01 | 7.13 | 7.24 | 7.36 | 7.48 | 7.60 | 7.73 | 7.85 | 7.98 | 8.11 |
| 69 | 74 | 6.46 | 6.56 | 6.67 | 6.77 | 6.88 | 6.99 | 7.11 | 7.22 | 7.34 | 7.47 | 7.59 | 7.72 | 7.85 | 7.98 | 8.11 | 8.25 |
| 70 | 75 | 6.53 | 6.64 | 6.74 | 6.85 | 6.96 | 7.08 | 7.20 | 7.32 | 7.44 | 7.57 | 7.70 | 7.84 | 7.97 | 8.11 | 8.25 | 8.39 |

*Figures for ages not shown will be furnished on request.

Page 9

K-0016

## GENERAL PROVISIONS

**1. DEFINITIONS:**

The following terms are defined solely for the purpose of interpreting and administering this Agreement:

TERMINATION, shall mean maturity of a policy as a result of, (a) the death of the Insured, or (b) endowment, or (c) surrender of such policy for its cash value, or (d) final amounts payable after termination of Family Income payments.

NET PROCEEDS, when applicable to the termination date, shall be the net amount payable under a policy on the termination date, excluding, however, any unearned premiums paid in advance thereunder.

NET PROCEEDS, when applicable to any time other than the termination date, shall be the single sum which equals (a) the then commuted value of the remainder of the death benefit of a policy containing a Family Income provision, or (b) the then commuted value of any installments certain not yet due under Options A or B, or (c) the amount then held under Options C or D, including any unpaid accrued interest thereon, as the case may be.

CHILDREN, if not designated by name, shall include only the lawful and legally ado    d sons and daughters of the primary payee and not grandchildren or other descendants. This classification is available only    the primary payee was the Insured hereunder.

BY REPRESENTATION shall mean succeeding, by reason of the death of a parent, to net proceeds which would have been apportioned to or further held for such parent, had he lived.

ESTATE OF SURVIVOR shall mean the executors or administrators of the last survivor of the payees designated in preceding Sections of the same Table.

OPTION shall mean the corresponding Option appearing in the policy under the heading "Optional Modes of Settlement" to be attached hereto. If the policy does not contain said "Optional Modes of Settlement", this Agreement shall constitute a request to add hereto "Optional Modes of Settlement" corresponding to that contained in policies which the Company is now issuing.

POLICY shall, mean, annuity contract when such meaning is applicable; and masculine pronouns shall include the feminine.

**2. PAYMENTS UNDER A TABLE:**

(a) If there is more than one Table, each Table shall be considered separately in construing the provisions of this Agreement.

(b) Payment of the net proceeds under a Table shall be in accordance with the first Section thereof in which there is a payee surviving, and at the death of the last survivor of the payees designated in such Section, payment of any remaining net proceeds shall be in accordance with the next succeeding Section in which there is a then surviving payee, and so on from Section to Section until payment shall have been made of the entire net proceeds under such Table.

(c) In order to be entitled to receive payments provided for him under a Section, a payee must be living on their respective due dates.

(d) If a Section of a Table designates two or more payees but does not designate as payees by representation the children of deceased children of the primary payee, payment of the net proceeds under such Section shall be as follows:

If such Section does not provide for division of net proceeds into separate shares, such payees who are living at the time of each payment shall share the payments under such Section and such shares shall be equal unless otherwise expressly provided therein;

If such Section provides for division of net proceeds into separate shares, one such share, payable as provided in such Section, shall be for each such payee who is living at the death of the last survivor of the payees designated in preceding Sections, and such shares shall be equal unless otherwise expressly provided therein. At the subsequent death of a payee designated in such Section, any net proceeds then held for such payee shall be paid to any then surviving payees of such Section in single sums proportionate to their original shares.

(e) If a Section of a Table designates as payees by representation the children of deceased children of the primary payee, payment of net proceeds under such Section shall be as follows:

Net proceeds at the death of the last survivor of the payees designated in preceding Sections shall be divided into equal separate shares, one share, payable as provided in such Section, for each then surviving designated child of the primary payee, if any, and one share, payable in equal single sums, to the then surviving children, if any, of each deceased designated child of the primary payee;

At the subsequent death of a child of the primary payee, any net proceeds then held for such child shall be paid in equal single sums to his then surviving children, if any, otherwise such net proceeds shall be divided into equal separate shares, one share, payable in one sum, to each then surviving designated child of the primary payee, if any, and one share, payable

**3. PRIVILEGES:**

(a) If a payee designated in a Section of a Table is given in such Section a privilege of withdrawal or commutation, such payee may, subject to any limitations with respect thereto stated in such Section and upon written notice to the Insurance Company accompanied by this Agreement, make withdrawals in amounts of not less than $100.00 each from any net proceeds held for him in such Section under Options C or D, or, as the case may be, elect to receive the commuted value of any installments certain or share therein payable to him in such Section under Options A or B, but under Option B only if the right to installments for life has expired with the primary payee.

Wherever the following appear herein............ they shall be read as:

| | |
|---|---|
| Option A | Option 3 |
| Option B | Option 4 |
| Option C | Option 1 |
| Option D | Option 2 |

K-0017

(b) If a primary payee designated in Section 1 of a Table is given in such Section the privilege of substituting payment under another Option:

The amount to be applied under such other Option shall be the net proceeds held for such payee in Section 1 at the time such privilege is exercised, but such privilege shall not be available when such net proceeds are less than $1000.

A primary payee may make only one such substitution and must be by written notice accompanied by this Agreement.

### 4. OPTION PAYMENTS ALTERED OR TERMINATED:

After thirty full years following the termination date of a policy, no Option payments shall be made under any Section of a ~~Table and payment shall be made in one sum. If net proceeds held~~ for the proceeds at the death of the last survivor of the primary payees designated in Section 1 shall be less than $1,000, then such share shall be immediately paid in one sum. If net proceeds held for a payee under Option C be reduced by withdrawals to less than $1,000, then such net proceeds shall be immediately paid in one sum.

If the Option payments for the fractional part of a year shall amount to less than $10.00 each, the Company will pay at such intervals as will make each payment amount to at least $10.00. If a Section of a Table provides for Option D installments and the sum of one year's tabular installments shall be less than 5% of the net proceeds applied under that Option, then the Company shall increase each such tabular installment by the amount necessary to achieve such percentage, any provision of said Option for a different percentage notwithstanding.

### 5. RELIANCE ON AFFIDAVITS:

Before permitting or taking any action provided by this Agreement which is contingent upon the death or survival of any payee, the Company shall be furnished with due proof thereof. As to any facts relating to any payee, including dates of birth and death, and identity, the Company may rely upon any affidavit or other written evidence deemed satisfactory to it, and is hereby released from all liability in relying and acting upon the statements contained therein.

### 6. EFFECT OF CHANGES OF BENEFICIARY AND EXERCISE OF PRIVILEGES UNDER THIS AGREEMENT:

If allowed by the statutes of the state of residence, the primary payee may, without the consent of a secondary payee, (a) change the designation of contingent beneficiaries, and (b) freely exercise the privileges contained in Section 1 of any Table herein. In the absence of an enabling statute, the consent of the secondary payee (s) shall be required for the exercise of all such rights.

### 7. PAYMENT TO MINORS:

Any proceeds due and payable to any minor payee hereunder shall be paid to the legally appointed guardian of such minor except to the extent that provision is made by statute for payment directly to a minor.

Dated    CHARTER SECURITY LIFE INSURANCE COMPANY (NY) this    SEVENTEENTH

day of    JUNE    , 1983

CHARTER SECURITY LIFE INSURANCE COMPANY
(NEW YORK)

REGISTRAR

VICE PRESIDENT

K-0018

## SUPPLEMENTARY AGREEMENT
(No. SC1126 )

Due to termination, as of   May 5,         19 83   of Policy No(s)    83A08153                   issued
by     Charter Security Life Insurance Company (New York)        on the life   Dennis J. Dimon
the undersigned hereby requests that the aggregate net proceeds payable under said pol    s) as of the termination date be paid
to the payees designated in, and in the order and manner provided in, the following Tabl    Tables and in the General Provisions
of this Agreement.

The undersigned surrenders said policy(s) to the Insurance Company and, concurrently herewith, revokes any beneficiary designa-
tion and any election of settlement heretofore made under the said policy(s).

| PAYEES | MANNER OF PAYMENT | PRIVILEGES |
|---|---|---|
| TABLE I<br><br>SECTION ONE - PRIMARY PAYEE<br><br>Dennis Dimon<br>Laurel Lane<br>West Kingston, RI 02892<br><br><br>SECTION TWO-CONTINGENT PAYEE<br><br>Katherine I. Dimon,  Wife | Monthly payments in the amount of<br>$1,450.45, increasing 3% annually,<br>commencing on June 6, 1983, for a<br>period of 240 months certain and<br>life thereafter.<br><br><br><br>In the same manner as the Primary<br>Payee, for the period certain. |  |

(SEE OTHER SIDE FOR ANY COMPANY ENDORSEMENTS)

SIP-100

K-0019

# Charter Security Life Insurance Company (New York)

**ENDORSEMENT**

This amendment is attached to and forms part of the policy.

The Annual Statement of Values provision on Page 7 is hereby amended as follows:

The words "As of each contract anniversary" are replaced with the words "At least once each year".



President

RA-104E1
4/84

K-0020

58    250008585

EK906 3-81 150M
PRINTED IN U.S.A.

**PROGRAM - 808**

| | BANK CODE | CHECK NO. | CLAIM OFFICE PREFIX | K I N G | E S K | CLAIM SERIAL NO. | CHECK DIGIT | SUFFIX | Q A L | POLICY PREF. NUMBER | SUFF. | CHECK DIGIT | LOSS/DISCOVERY DATE | DAILY SEQUENCE NO. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 58 | 25 008 585 | 399 | L | M | 106125 | 9 | Z | | OM 015241 | | 2 | 01 24 81 | 48 |

| | SEG CE | CONTROL RECD | DEPT RECD | P/A | AMOUNT | FINAL PAYMENT YES NO | WEEKS | DAYS | FROM | THROUGH |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 01 | 30 | 01 | | 175,000.00 | X | | | | |
| 3 | | | | | | | | | | |
| 4 | | | | | | | | | | |
| 5 | | | | | | | | | | |
| 6 | | | TOTAL | | 175,000.00 | | | | | |

COMPLETE FOR A & H AND COMPENSATION

| | TYPE OF EXP. | TAXPAYER NO. | IRS STATE CODE | SERVICE FEE | CLOSE CLAIM | SPECIAL ID | REFUND REIMB. TYPE OF REFUND | ENTRY DATE |
|---|---|---|---|---|---|---|---|---|
| 7 | | | | | | | | 04/13/83 |

| | | |
|---|---|---|
| 8 | TO THE ORDER OF | |
| 9 | | CHARTER SECURITY LIFE INSURANCE COMPANY |
| 10 | | |
| 11 | | |
| 12 | PAYMENT FOR | PREMIUM FOR IMMEDIATE ANNUITY. |
| 13 | | |
| 14 | | |
| 15 | MAIL TO | BY HAND- J. NOE. |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |

UMBERMENS MUTUAL CASUALTY COMPANY
MERICAN MANUFACTURERS MUTUAL INS. CO.
MERICAN MOTORISTS INSURANCE COMPANY
MERICAN PROTECTION INSURANCE COMPANY
EDERAL KEMPER INSURANCE COMPANY

FEDERAL KEMPER LIFE ASSURANCE COMPANY
FIDELITY LIFE ASSOCIATION: A MUTUAL LEGAL
  RESERVE CO.
KEMPER COUNTY MUTUAL INSURANCE CO.

**Kemper GROUP**
Long Grove, Illinois 60049

CLAIM CHECK NUMBER **250-0-008-585**

CONTINENTAL ILLINOIS NATIONAL BANK AND
TRUST CO. OF CHICAGO, CHICAGO, ILLINOIS 60693

PAY    $175,000.00*    TO THE ORDER OF    CHARTER SECURITY LIFE INSURANCE COMPANY    AMOUNT    $175,000.00*

| ISSUED AT | NEW YORK, N.Y. | DATE ISSUED | APRIL 13, 1983 |
|---|---|---|---|
| PAYMENT FOR | PREMIUM FOR IMMEDIATE ANNUITY. | | |

BY HAND- J. NOE.

| CLAIM NUMBER | 399 L M 106125 Z | PO NO. | OM 015241 | LOSS DATE | 01/24/81 |
|---|---|---|---|---|---|
| INSURED | MEMBERS OF THE POINT JUDITH FISHERMEN'S COOPERATIVE ASSOCIATION, INC. | | | | |
| CLAIMANT | | PROD. NO. 06106043 | | | |

NOT NEGOTIABLE
CLAIM OFFICE COPY
BY
BY
TWO SIGNATURES REQUIRED FOR AMOUNT OVER $2000

⑈250008585⑈ ⑆071000039⑆ 50⑈10187⑈

K-0123

# BOOTH AND BRODSKY
### COUNSELLORS AT LAW

TELEPHONE
(401) 751-3400

JOHN M. BOOTH
IRVING BRODSKY*
W. SLATER ALLEN, JR.
*ALSO MEMBER MASS. BAR

SUITE 515
155 WESTMINSTER STREET
PROVIDENCE, RHODE ISLAND 02903

May 3, 1983

Mr. Jesus LaTorre
c/o Kemper Group
5 World Trade Center
New York, New York 10048

OCEAN MARINE CLAIMS
— NEW YORK

J. LaTORRE    MAY 1 1 1983

> Re: Jenny C. Inc.
> Insured: Members of the Point Judith
> Fishermen's Co-operative Association, Inc.
> Claimant: Dennis Jay Dimon
> Date of Loss: January 25, 1981
> File No. 399LM-106125-Z
>
> Final Report

Dear Mr. LaTorre:

The captioned matter was concluded this morning. A hearing was had at which Leonard Decof, Esquire, reported to the Court for approximately fifty minutes on the record. Mr. Decof stated to the Court the steps he had taken to inform himself of the details of the settlement and the state of comprehension of those details by Dennis Dimon. In sum, he stated to the Court that Dimon had the capacity to understand and evaluate the settlement and that Dimon evaluated the settlement, understood it throughly and entered into it entirely of his own free will. Thereupon, the Court approved the report of the Master, ordered that the settlement be approved and that Kemper pay the Master's charge within one week. The Court then closed the record and left the bench. A copy of the transcript of the proceeding has been ordered by order of the Court from Mr. Joseph Fontes at the United States District Court, United States Court House, Providence, Rhode Island 02903.

I thereupon delivered your checks No. 250-0-008-584 and 250-0-008-585 to plaintiff's attorney, Mr. Hughes. I received in return a Stipulation which I have conformed to that on file in the Court. The signatures on the Stipulation enclosed are original signatures, except of that of the Court. I also enclose an original General Release; a copy has been retained in our office. I also enclose copies of certified mail receipts showing

# BOOTH AND BRODSKY

notice of this proceeding given to the resident attorney in the
Rhode Island office of Home Insurance Company and to Mr. John
Falvy, New England Claims Supervisor of Home Insurance Company,
P.O. Box 800, New Haven, Connecticut 06473.  The originals are
on file in the Court.  Neither Mr. Lietar nor Mr. Falvy appeared.

I also enclose the Master's bill; the hourly rate was set
by the Court.  As stated on the telephone, when it was agreed
between counsel for Home and myself to proceed with the Master,
Mr. Wells agreed to pay half of the costs.  This morning, however,
Mr. Wells said that such a payment would be deducted from the
coverage and therefore passed along to Kemper.  In my opinion,
this is further evidence of bad faith on the part of Home Insurance
Company.  The Master's fee should be discussed with Mr. Falvy
whose name and address appears above.

I enclose my final bill in this matter, including the cost
of the transcript.

Very truly yours,

W. Slater Allen, Jr.,

WSA/dmm

Enclosures

K-0060

**In The Matter Of:**

*Dennis Dimon  v.*
*Met Life Insurance Co., et al.*

---

*Barbara Fasman*
*Vol. 1, May 10, 2006*

---

*Greenhouse Reporting, Inc.*
*Computerized Litigation Support*
*363 Seventh Avenue*
*20th Floor*
*New York, NY  10001*
*(212) 279-5108     FAX: (212) 279-5431*

*Original File BF051006.V1, 94 Pages*
*Min-U-Script® File ID: 3923061621*

**Word Index included with this Min-U-Script®**

**Dennis Dimon  v.**
**Met Life Insurance Co., et al.**

**Barbara Fasman**
**Vol. 1, May 10, 2006**

---

Page 1

[1]
[2] UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
[3]
[4] DENNIS DIMON,
        Plaintiff,
[5]    -against-
[6] MET LIFE INSURANCE CO., KEMPER INSURANCE
CO., MORGAN STANLEY D.W., INC., MICHAEL B.
[7] LATTI, LATTI ASSOCIATES and LATTI &
ANDERSON, LLP
[8]        Defendants.
[9]
[10]        May 10, 2006
            10:00 a.m.
[11]
[12]
[13]
[14]    Deposition of Met Life Insurance Co.
[15] by Barbara Fasman, 30(b)(6) witness, held at
[16] the offices of Met Life, One Met life Plaza,
[17] 27-01 Queens Plaza North, Long Island City,
[18] New York, before Vicky Galitsis, a Certified
[19] Shorthand Reporter and Notary Public of the
[20] State of New York.
[21]
[22]
[23]
[24]        GREENHOUSE REPORTING, INC.
        363 Seventh Avenue - 20th Floor
        New York, New York  10001
[25]        (212) 279-5108

---

Page 2

[1]
[2] APPEARANCES:
[3]
[4] THE KAPLAN BOND GROUP
        Attorneys for the Plaintiff
[5]        88 Black Falcon Avenue
        Boston, Massachusetts  02210
[6] BY:   BRIAN KEANE, ESQ.,
            of Counsel
[7] (Appearing Telephonically)
[8]
[9]
[10] CIAPCIAK & ASSOCIATES, P.C.
        Attorneys for the Defendant
[11]        Met Life Insurance Co.
        99 Access Road
[12]    Norwood, Massachusetts  02062
    BY:   JAMES J. CIAPCIAK, ESQ.
[13]
            -and-
[14]
        Alvin Pasternack, Esq.
[15]    Associate General Counsel,
        Law Department
[16]    One MetLife Plaza
        27-01 Queens Plaza North
[17]    Long Island City, New York  1101
[18]
[19]
        DRINKER BIDDLE & REACH, ESQS.
[20]    Attorneys for the Defendant
        Kemper Insurance Co.
[21]    One Logan Square
        18th and Cherry Streets
[22]    Philadelphia, Pennsylvania  19103
    BY:   TIMOTHY O'DRISCOLL, ESQ.,
[23]        of Counsel
    (Appearing Telephonically)
[24]
[25]

---

Barbara Fasman                                                    Dennis Dimon v.
Vol. 1, May 10, 2006                          Met Life Insurance Co., et al.

---

Page 3

[1]
[2] APPEARANCES: (Continued.)
[3]
[4] SULLIVAN WEINSTEIN & McQUAY, ESQS.
      Attorneys for the Defendants
[5]     Morgan Stanley D.W., Inc.
        Two Park Plaza
[6]     Boston, Massachusetts 02116
      BY:   SANDRA SUE McQUAY, ESQ.
[7] (Appearing Telephonically)
[8]
      8
[9] TODD & WELD, ESQS.
      Attorneys for the Defendants
[10]    Michael B. Latti, Latti Associates
        and Latti & Anderson, LLP
[11]    28 State Street
        Boston, Massachusetts 02104
[12] BY:   JED DeWICK, ESQ.
             of Counsel
[13] (Appearing Telephonically)
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

Page 4

[1]                         B. Fasman
[2] (Exhibits 1 through 21 were
[3] pre-marked for identification.)
[4] BARBARA FASMAN,
[5] stating an address of One MetLife
[6] Plaza, 27-01 Queens Plaza North,
[7] Long Island City, New York 11101
[8] having been first duly sworn by a
[9] Notary Public of the State of New
[10] York, was examined and testified as
[11] follows:
[12]        EXAMINATION BY MS. McQUAY:
[13]    Q: Ms. Fasman, this is Sue McQuay.
[14] As I indicated already, I represent the
[15] defendant Morgan Stanley. Because we are
[16] conducting this deposition today by telephone
[17] as a request of your counsel, because we are
[18] doing this over the telephone, it's
[19] particularly important that you speak up and
[20] we'll try to do the same so that we can hear
[21] each other clearly.
[22]    It's also very important that you
[23] let me finish my question and I accordingly
[24] will try to let you finish your answer so we
[25] don't talk across each other.

---

Page 5

[1]                         B. Fasman
[2]    Further if you have any questions
[3] or you don't understand a question that I'm
[4] asking you, please let me know and I will try
[5] to rephrase, is that clear?
[6]    A: Yes.
[7]    Q: Now, is it Ms. Fasman? What is
[8] your address, please?
[9]    A: Mrs. Fasman.
[10]    Q: Okay, Mrs. Fasman. What is your
[11] address, please?
[12]    A: Met Life at One Met Life Plaza,
[13] 2701 Queens Plaza North, Long Island City
[14] New York, 11101.
[15]    Q: Am I correct in understanding
[16] that you work for Met Life?
[17]    A: I do work for Met Life.
[18]    Q: What is your position with Met
[19] Life?
[20]    A: My title is consultant.
[21]    Q: I'm sorry?
[22]    A: My title is consultant.
[23]    Q: Titlist?
[24]    A: My title is consultant.
[25]    Q: Your title is consultant, okay.

---

Page 6

[1]                         B. Fasman
[2] And what are your duties and responsibilities
[3] as a consultant for Met Life?
[4]    A: I support our Corporate Customer
[5] Relations Department and our Administrative
[6] Offices with regard to annuity questions and
[7] complaints. I also do calculations of various
[8] technical amounts as requested.
[9]    Q: Would you explain what you mean
[10] when you say you do calculations of various
[11] technical amounts when requested?
[12]    A: Present values of benefits,
[13] interest calculations, any mathematical
[14] calculation that the administrative offices
[15] are not able to handle.
[16]    Q: When you say that your title at
[17] Met Life is consultant, am I correct in
[18] understanding that you are in fact an employee
[19] of Met Life?
[20]    A: Yes.
[21]    Q: How long have you been with Met
[22] Life?
[23]    A: 25 years.
[24]    Q: When did you begin work?
[25]    A: I began work at Met Life in

---

Dennis Dimon  v.
Met Life Insurance Co., et al.

Barbara Fasman
Vol. 1, May 10, 2006

---

Page 7

*B. Fasman*

[1]
[2] June of 1981.
[3]   **Q:** How long have you had the title
[4] of consultant?
[5]   **A:** I believe it's four years.
[6]   **Q:** When you started working for Met
[7] Life in June of 1981 in what position did you
[8] begin?
[9]   **A:** I was a senior actuarial
[10] associate, I believe.
[11]   **Q:** And what were your duties and
[12] responsibilities in that position?
[13]   **A:** I had that title for several
[14] years and I was in several positions, so it
[15] varied.
[16]   **Q:** Can you describe in what way,
[17] what your responsibilities were and in what
[18] way they varied from time to time?
[19]   **A:** Yes. I did expense analysis, I
[20] did pricing of group close outs, I did pricing
[21] of individual life insurance. I then had a
[22] new title, I was a called an actuary and in
[23] that role I also did pricing of individual
[24] life insurance, and I did pricing and product
[25] development for annuities.

---

Page 8

*B. Fasman*

[1]
[2]   **Q:** How long did you hold the title
[3] of senior actuarial associate or actuary?
[4]   **A:** Combined?
[5]   **Q:** Yes.
[6]   **A:** 21 years.
[7]   **Q:** Okay. So you had those positions
[8] until your current position as a consultant
[9] approximately four years ago?
[10]   **A:** Yes.
[11]   **Q:** Can you tell us your educational
[12] background?
[13]   **A:** Yes. I have a Bachelors of Arts
[14] in economics and mathematics and I have — I
[15] am a fellow of the Society of Actuaries.
[16]   **Q:** Where did you receive your
[17] bachelor's degree?
[18]   **A:** State University of New York at
[19] Albany.
[20]   **Q:** When did you receive your
[21] bachelor's degree?
[22]   **A:** In 1976.
[23]   **Q:** And in connection with the
[24] deposition this morning, Morgan Stanley has
[25] requested that Met Life designate one or more

---

Page 9

*B. Fasman*

[1]
[2] persons to testify on its behalf regarding the
[3] subject matter of the complaint in this
[4] action, and any defenses thereto of Met Life.
[5] Are you the person who has been so designated?
[6]   **A:** Yes.
[7]   **Q:** Okay. Have you seen the
[8] complaint in this action?
[9]   **A:** Yes.
[10]   **Q:** What, if anything, did you do to
[11] prepare for today's deposition?
[12]   **A:** I met with my counsel.
[13]   **Q:** And your counsel being
[14] Mr. Ciapciak?
[15]   **A:** Yes.
[16]   **Q:** As well as Mr. Pasternack?
[17]   **A:** Yes, Mr. Pasternack was also
[18] there.
[19]   **Q:** Okay. Was anyone else present?
[20]   **A:** Yes.
[21]   **Q:** Who else?
[22]   **A:** Another attorney.
[23]   **Q:** I'm sorry?
[24]   **A:** Another attorney, Patker and
[25] Reinheart.

---

Page 10

*B. Fasman*

[1]
[2]   **Q:** Another attorney?
[3]   **A:** Yes.
[4]   **Q:** Okay. Anyone else?
[5]   **A:** No.
[6]   **Q:** And when did this meeting take
[7] place?
[8]   **A:** Yesterday.
[9]   **Q:** Other than meeting with your
[10] attorneys yesterday, did you do anything else
[11] to prepare for today's deposition?
[12]   **A:** Yes.
[13]   **Q:** What else did you do?
[14]   **A:** I consulted with our
[15] administrative office to see if there was any
[16] information they had that I did not have.
[17]   **Q:** With whom in your administrative
[18] office did you consult?
[19]   **A:** Cynthia Yansee.
[20]   **Q:** I'm sorry?
[21]   **A:** Cynthia Yansee.
[22]   **Q:** What is her position?
[23]   **A:** I don't know her title but she
[24] works in the payout area of our administrative
[25] office.

---

Barbara Fasman
Vol. 1, May 10, 2006

Dennis Dimon  v.
Met Life Insurance Co., et al.

---

Page 11

**B. Fasman**

[1]
[2] **Q:** And what did you ask? Tell me
[3] about your discussion with Ms. Yansee.
[4] **A:** I asked her if all the documents
[5] she had previously given me were all that they
[6] had in their files. And I asked her if she
[7] was familiar with Charter specifically.
[8] **Q:** What else did you ask her?
[9] **A:** I really don't recall.
[10] **Q:** Okay. What did she tell you?
[11] **A:** She told me that she wasn't
[12] familiar with Charter — I also asked her if
[13] there was a procedural manual for Charter.
[14] She told me she wasn't familiar with Charter
[15] and that there was no procedure manual from
[16] Charter and that all the documents that she
[17] had previously supplied was all that were
[18] available.
[19] **Q:** Did she tell you anything else?
[20] **A:** She also told me Met Life doesn't
[21] have a written procedure manual.
[22] **Q:** Anything else?
[23] **A:** Not that I recall.
[24] **Q:** And why were you inquiring about
[25] whether or not there existed a procedure

---

Page 12

**B. Fasman**

[1]
[2] manual?
[3] **A:** In order to be able to respond to
[4] my counsel.
[5] **Q:** Explain further why you were
[6] interested in knowing why there was a
[7] procedure manual?
[8] **MR. CIAPCIAK:** She said, in
[9] response to a question from counsel.
[10] And I'm going to instruct her not to
[11] answer about conversations with
[12] counsel.
[13] **MS. McQUAY:** I'm not interest in
[14] conversations with counsel.
[15] **Q:** But other than your counsel
[16] inquiring about it, was there any other reason
[17] why you were asking whether there was a
[18] procedure manual?
[19] **A:** No.
[20] **Q:** Now other than this
[21] conversation — when did this conversation
[22] with Ms. Yansee take place?
[23] **A:** I really don't recall if it
[24] was — I really don't recall. It was either
[25] this week or last week.

---

Page 13

**B. Fasman**

[1]
[2] **Q:** Okay. Did you have one such
[3] conversation?
[4] **A:** Yes, in preparation for the
[5] deposition, yes.
[6] **Q:** Other than speaking with
[7] Ms. Yansee and meeting yesterday with your
[8] counsel, did you do anything else to prepare
[9] for today's deposition?
[10] **A:** I went over the premarked
[11] exhibits.
[12] **Q:** Anything else?
[13] **A:** I called one other person who is
[14] not an employee of Met Life.
[15] **Q:** Who did you call?
[16] **A:** Teresa Mannino.
[17] **Q:** Why did you call her?
[18] **A:** To see if she had any information
[19] about Charter.
[20] **Q:** What led you to believe that she
[21] might have information about Charter?
[22] **A:** She's a former employee and she
[23] was in the administrative office when we
[24] acquired Charter.
[25] **Q:** Where is she now?

---

Page 14

**B. Fasman**

[1]
[2] **A:** She's retired.
[3] **Q:** What did she tell you when you
[4] spoke to her?
[5] **A:** She said that she really didn't
[6] remember anything and she was not able to
[7] answer any of my specific questions.
[8] **Q:** Did she have any knowledge
[9] whatsoever about the circumstances of this
[10] case?
[11] **A:** I didn't ask her about the
[12] circumstances of this case.
[13] **Q:** What did you ask her about?
[14] **A:** I asked her about procedures. I
[15] asked her if there was anyone else at Met Life
[16] that might have information that I should
[17] know, and I asked her how the contract numbers
[18] were assigned, because there seemed to be
[19] multiple contract numbers.
[20] **Q:** And why did you ask her about
[21] procedures?
[22] **A:** She was in charge of the
[23] administrative office at the time we took over
[24] Charter.
[25] **Q:** And what specific procedures were

---

**Dennis Dimon  v.**
**Met Life Insurance Co., et al.**

**Barbara Fasman**
**Vol. 1, May 10, 2006**

---

Page 15

**B. Fasman**

[1]
[2] you interested in learning about?
[3]    **A:** I didn't have any specific
[4] questions I just wanted to know any general
[5] information.
[6]    **Q:** Regarding what kind of
[7] procedures?
[8]    **A:** Administrative procedures with
[9] regard to immediate annuities.
[10]    **Q:** What kind of administrative
[11] procedures?
[12]    **A:** I didn't have anything specific
[13] in mind.
[14]    **Q:** Well, in terms of administrative
[15] procedures regarding annuities, what were you
[16] interested in learning?
[17]    **A:** Whatever I could.
[18]    **Q:** What specifically were you
[19] interested in finding out about?
[20]    **A:** I didn't have anything specific.
[21]    **Q:** Well, administrative procedures
[22] regarding what with regard to annuities; their
[23] issuance, what?
[24]    **A:** Their issuance, how we paid the
[25] checks, how we communicate with customers,

---

Page 16

**B. Fasman**

[1]
[2] anything.
[3]    **Q:** And am I correct in understanding
[4] that Ms. Mannino was not able to provide you
[5] with any such information?
[6]    **A:** That's correct, she did not give
[7] me any information.
[8]    **Q:** Were you able to acquire any
[9] information regarding these administrative
[10] procedures from any other source?
[11]    **A:** No, I wasn't, other than from the
[12] exhibits that I can look at, and other than
[13] that, no.
[14]    **Q:** When you say other than from the
[15] exhibits you can look at, are you referring to
[16] the exhibits that have been premarked for this
[17] deposition?
[18]    **A:** Yes, I am.
[19]    **Q:** Are you referring to anything
[20] else?
[21]    **A:** No I'm not.
[22]    **Q:** Okay. Other than asking
[23] Ms. Mannino about administrative proceedings
[24] what else did you ask her about?
[25]    **A:** I asked her about if anyone else,

---

Page 17

**B. Fasman**

[1]
[2] if there was anyone else at Met Life that was
[3] — that I could talk to about this.
[4]    **Q:** What did she say?
[5]    **A:** Not that she could think of.
[6]    **Q:** Have you learned the identity of
[7] anyone else at Met Life from any other source?
[8]    **A:** No, I haven't.
[9]    **Q:** I believe you testified that you
[10] also asked her how contract numbers were
[11] assigned because there were multiple contract
[12] numbers in this case?
[13]    **A:** Yes.
[14]    **Q:** What did she say?
[15]    **A:** She didn't remember.
[16]    **Q:** When you say there are multiple
[17] contract numbers that you've seen in this case
[18] what are you referring to?
[19]    **A:** Well, there's the Charter
[20] number on the top of the application, and then
[21] there are — there's a number that I believe
[22] is 1126, and there's different prefixes in
[23] front of it.
[24]    **Q:** Have you been able to garner or
[25] develop any explanation for why there are such

---

Page 18

**B. Fasman**

[1]
[2] multiple contract numbers?
[3]    **MR. CIAPCIAK:** Other than the
[4] premarked exhibits?
[5]    **MS. McQUAY:** Any explanation.
[6]    **A:** Only that the one on the top of
[7] the exhibit is a Charter number, no. That's
[8] the only thing I was able to understand
[9] completely. And I'm not sure where I got that
[10] information.
[11]    **Q:** We'll come back to that when we
[12] get to the exhibits themselves.
[13]    Other than what you already told
[14] me about, did you do anything else to prepare
[15] for today's deposition?
[16]    **A:** Not that I can think of.
[17]    **Q:** Are you aware of anyone in the
[18] company who is more knowledgeable than you
[19] regarding the claims in this case?
[20]    **A:** No.
[21]    **Q:** Are you aware of anyone outside
[22] of Met Life who is more knowledgeable?
[23]    **A:** No.
[24]    **Q:** I would ask you if you would turn
[25] now to what has been marked as Exhibit 1.

---

Barbara Fasman                                                    Dennis Dimon v.
Vol. 1, May 10, 2006                                   Met Life Insurance Co., et al.

---

Page 19

[1]                    **B. Fasman**

[2]    **A:** Okay.

[3]      (Exhibit 1, Annuity Application

[4]  was introduced for identification.)

[5]    **Q:** Can you describe to me what this

[6]  document is?

[7]    **A:** This document appears to be an

[8]  annuity application.

[9]    **Q:** And is this one of the documents

[10]  that you reviewed in preparation for today's

[11]  deposition?

[12]    **A:** Yes, it is.

[13]    **Q:** Does this appear to be a form of

[14]  annuity application that was used by Charter

[15]  Security Life Insurance Company?

[16]    **A:** Yes.

[17]    **Q:** Okay. What is the relationship

[18]  between Metropolitan Life and Charter Security

[19]  Life Insurance Company?

[20]    **MR. CIAPCIAK:** Objection. Are

[21]  you looking for a legal relationship?

[22]  She wasn't educated on —

[23]    **MS. McQUAY:** I'm not looking for

[24]  a legal relationship.

[25]    **Q:** Is it your understanding that

---

Page 20

[1]                    **B. Fasman**

[2]  Charter Security was acquired by or in some

[3]  other fashion became a part of Met Life?

[4]    **MR. CIAPCIAK:** Sue, perhaps I can

[5]  get to the point here.

[6]    **MS. McQUAY:** Sure.

[7]    **MR. CIAPCIAK:** If you're asking

[8]  whether Met Life is responsible legally

[9]  for anything that Charter might have

[10]  done or didn't do in this case, Met

[11]  Life is responsible.

[12]    **MS. McQUAY:** I won't belabor the

[13]  issue then.

[14]    **MR. CIAPCIAK:** Great.

[15]    **Q:** Ms. Fasman, directing your

[16]  attention to Exhibit 1, at the top of the

[17]  document there appears a number 83A08153, do

[18]  you see that?

[19]    **A:** Yes.

[20]    **Q:** To what does that refer?

[21]    **A:** To my understanding that refers

[22]  to the number of the annuity that Charter

[23]  sold, the contract number.

[24]    **Q:** Okay. How did you derive that

[25]  understanding?

---

Page 21

[1]                    **B. Fasman**

[2]    **A:** I really don't know.

[3]    **Q:** You don't know how you came to

[4]  have that understanding?

[5]    **A:** No, I really don't know.

[6]    **MR. CIAPCIAK:** Perhaps I can

[7]  help. Did you know at one time and

[8]  you've forgotten or —

[9]    **THE WITNESS:** I'm sure I knew at

[10]  one time. I mean, I'm sure someone

[11]  told me that is what a Charter

[12]  number looks like, but I don't

[13]  remember.

[14]    **Q:** You don't remember whether you

[15]  were told that, and if you were, who told you?

[16]    **A:** Right, although it is noted on at

[17]  least one of the letters as a policy number,

[18]  but I'm not sure that's the first time I was

[19]  aware of it being that.

[20]    **Q:** Okay, so you don't know, other

[21]  than what's reflected in the document, you

[22]  don't know on what basis you believe that to

[23]  be a Charter security policy number?

[24]    **A:** Right.

[25]    **Q:** Again directing your attention to

---

Page 22

[1]                    **B. Fasman**

[2]  Exhibit 1, the application form contains

[3]  information that was typed in, do you agree?

[4]    **A:** Yes.

[5]    **Q:** For example, there is the name of

[6]  the annuitant, Dennis Dimon, his date and

[7]  place of birth and so forth?

[8]    **A:** Yes.

[9]    **Q:** Okay. Now, all the information

[10]  that was typed in on the application form,

[11]  Exhibit 1, who typed it in?

[12]    **A:** I have no idea.

[13]    **Q:** Do you know if somebody at

[14]  Charter Security typed it in?

[15]    **A:** I do not.

[16]    **Q:** Would that be the normal

[17]  procedure in your understanding?

[18]    **A:** I don't know what the normal

[19]  procedure was.

[20]    **Q:** Okay. Do you know when that

[21]  information was typed in?

[22]    **A:** No, I don't.

[23]    **Q:** Do you know who provided the

[24]  information that was typed in?

[25]    **A:** No.

---

Dennis Dimon  v.
Met Life Insurance Co., et al.

Barbara Fasman
Vol. 1, May 10, 2006

---

Page 23

*B. Fasman*

[1]
[2] **Q:** Now, directing your attention
[3] again to Exhibit 1, there is on the form a
[4] paragraph 14 with the heading, "Special
[5] Requests," do you see that?
[6] **A:** Yes.
[7] **Q:** And then in the space for that
[8] paragraph 14, Special Requests, there appears
[9] to be some handwriting, do you see that?
[10] **A:** Yes, I do.
[11] **Q:** Do you know who inserted that
[12] handwriting that appears in that space?
[13] **A:** No, I don't.
[14] **Q:** Do you know whose handwriting it
[15] is?
[16] **A:** No.
[17] **Q:** Do you know when it was inserted?
[18] **A:** No, I don't know that either.
[19] **Q:** Do you know if it was there when
[20] the application form was signed?
[21] **A:** No.
[22] **Q:** Do you know anyone at Met Life
[23] who would have such knowledge?
[24] **A:** No, I don't.
[25] **Q:** Directing your attention again to

---

Page 24

*B. Fasman*

[1]
[2] Exhibit 1, there is a paragraph 15 that bears
[3] the title, "Amendments And Corrections (For
[4] Home Office Use Only)," do you see that?
[5] **A:** Yes.
[6] **Q:** And that space also contains some
[7] handwriting?
[8] **A:** Yes.
[9] **Q:** Do you know who inserted that
[10] handwriting?
[11] **A:** No, I don't.
[12] **Q:** It says, For Home Office Use
[13] Only, correct?
[14] **A:** Yes.
[15] **Q:** Do you understand that that
[16] refers to the home office of Charter Security?
[17] **MR. CIAPCIAK:** Are you asking if
[18] she has personal knowledge of that?
[19] **Q:** Is that what you infer from
[20] looking at the application form?
[21] **A:** Yes.
[22] **Q:** So looking at the application
[23] form, your understanding of the document where
[24] it says, For Home Office Use Only in space 15
[25] that would be — that refers to the home

---

Page 25

*B. Fasman*

[1]
[2] office of Charter Security, correct?
[3] **A:** Yes, that notation is my
[4] understanding.
[5] **Q:** Okay. And would that indicate to
[6] you that the handwriting there was inserted by
[7] someone at Charter Security?
[8] **A:** No, actually not.
[9] **Q:** Do you have any reason to believe
[10] that was not the case?
[11] **A:** I don't have any reason to
[12] believe it's not the case.
[13] **Q:** Do you know when the handwriting
[14] in space 15 was inserted?
[15] **A:** No.
[16] **Q:** The handwriting in space 15 says,
[17] "Quote Number", and that appears to be — can
[18] you read the number?
[19] **A:** It appears to be S0113.
[20] **Q:** And to what does that refer?
[21] **A:** I don't know.
[22] **Q:** Has Met Life made a search of its
[23] files for a copy of any such document?
[24] **A:** Yes.
[25] **Q:** Have you been able to find any

---

Page 26

*B. Fasman*

[1]
[2] such document?
[3] **A:** No.
[4] **Q:** Do you know what was contained in
[5] any such document?
[6] **A:** No.
[7] **Q:** Do you know what the quote
[8] reference there consisted of?
[9] **A:** Can you please clarify the
[10] question?
[11] **Q:** It refers to Quote Number S0113
[12] as you already testified. It refers to a
[13] quote, do you know what if anything that quote
[14] consisted of?
[15] **A:** No, I don't.
[16] **Q:** Do you have any understanding
[17] about the practices or procedures of Charter
[18] Security back at the time in terms of
[19] ascribing numbers to any quotes that it gave
[20] out?
[21] **A:** No, I don't have any knowledge of
[22] that.
[23] **Q:** Do you have any knowledge or
[24] understanding of what procedures Charter
[25] Security followed back at the time in terms of

---

Barbara Fasman
Vol. 1, May 10, 2006

Dennis Dimon  v.
Met Life Insurance Co., et al.

Page 27

[1]                     B. Fasman
[2] giving out quotes?
[3]     A: No.
[4]     Q: I would like to direct your
[5] attention next, Mrs. Fasman, to what has been
[6] marked as Exhibit 2.
[7]     (Exhibit 2, Supplemental
[8] Agreement, was introduced for
[9] identification.)
[10]     A: Okay.
[11]     Q: Would you describe what this
[12] document is?
[13]     A: It appears to be a supplementary
[14] agreement number SC1126.
[15]     Q: What in your understanding is a
[16] supplementary agreement?
[17]     A: It's an agreement that describes
[18] the benefits that are provided.
[19]     Q: Provided by what?
[20]     A: The agreement.
[21]     Q: When you say it describes the
[22] benefits provided by the agreement, what
[23] agreement are you referring to?
[24]     A: Well, whatever has been applied
[25] for and requested this describes what it is

Page 28

[1]                     B. Fasman
[2] and it summarizes it in a document.
[3]     Q: Okay. Is it fair to say that the
[4] supplementary agreement form describes the
[5] benefits that have been applied for and
[6] provided by the annuity policy?
[7]     A: Yes.
[8]     MR. CIAPCIAK: I object to form.
[9] Do you call it an annuity policy? Just
[10] the terms used there, Sue, I just want
[11] to make sure. She kind of hesitated
[12] there.
[13]     Q: Do you have some problem with the
[14] term annuity policy?
[15]     A: No, I'm okay with that.
[16]     Q: Okay.
[17]     MR. CIAPCIAK: Thank you.
[18]     Q: Now this Exhibit 2, is this a
[19] former document that was used by Charter
[20] Security?
[21]     A: I don't know. It appears to be.
[22]     Q: You have no reason to believe
[23] otherwise?
[24]     A: Right.
[25]     Q: The number at the top of the

Page 29

[1]                     B. Fasman
[2] document Exhibit 2, SC1126, do you see that?
[3]     A: Yes.
[4]     Q: What does that number refer to?
[5]     A: I don't know. That was one of
[6] the questions I was trying to find out. But
[7] it is referred to in one of the other
[8] exhibits.
[9]     Q: Okay. If I understood you
[10] correctly, there was a policy number, the
[11] annuity policy number 83A08153, correct?
[12]     A: Yes.
[13]     Q: And that was the actual annuity
[14] policy that was issued in your understanding?
[15]     A: Yes, it is.
[16]     Q: And am I correct in understanding
[17] you don't know why this supplementary
[18] agreement Exhibit 2 has a different number?
[19]     A: That's right.
[20]     Q: Does that seem unusual to you in
[21] your experience?
[22]     A: Yes.
[23]     Q: And in what way is it unusual in
[24] your experience?
[25]     A: Well, it appears there's two

Page 30

[1]                     B. Fasman
[2] contract numbers although they are not of the
[3] same form so I really don't know what it
[4] means, so —
[5]     Q: Is it usual in your experience
[6] that the annuity policy and the supplementary
[7] agreement will have the same number?
[8]     A: It actually depends.
[9]     Q: On what?
[10]     A: On the administrative procedures
[11] of the company.
[12]     Q: Based on your experience, is it
[13] usual that the numbers are the same?
[14]     A: It depends, it really depends on
[15] what contract it is that's being dealt with.
[16] At Met Life we have some where the contract
[17] number continues, and we have some where we
[18] issue a supplementary agreement with a new
[19] contract number.
[20]     Q: Okay. But in your experiences,
[21] in what circumstances is there a new contract
[22] number assigned?
[23]     MR. CIAPCIAK: I object to form.
[24] Go ahead.
[25]     A: It depends on how the contract

Dennis Dimon  v.                                                      Barbara Fasman
Met Life Insurance Co., et al.                              Vol. 1, May 10, 2006

---

Page 31

**B. Fasman**

[1]
[2] was drafted.
[3]   **Q:** Again I would ask, in your
[4] experience, in what circumstances is a new
[5] contract number assigned?
[6]   **A:** I really don't know how to
[7] explain it other than to say depending on what
[8] the terms of the original contract are, and
[9] what the new contract looks like there may be
[10] a new number. If they're put on different
[11] administrative systems there may be a new
[12] number. I really don't know how to be more
[13] specific.
[14]   **Q:** Am I correct in understanding,
[15] however, that in your experience a different
[16] contract number is assigned only in
[17] circumstances where there is a new and
[18] separate contract that's issued?
[19]   **MR. CIAPCIAK:** I object to form.
[20]   **A:** Yes.
[21]   **Q:** Okay. Now with regard to
[22] Exhibit 2, who filled out this form?
[23]   **A:** I don't know.
[24]   **Q:** Would you expect that this was
[25] filled out by someone at Charter Security?

---

Page 32

**B. Fasman**

[1]
[2]   **A:** I would expect that's true.
[3]   **Q:** Okay. Do you know when it was
[4] filled out?
[5]   **A:** No, I don't.
[6]   **Q:** Do you have any understanding at
[7] all about when it was filled out?
[8]   **A:** The date at the top appears to be
[9] May 4th, 1983, but I'm not sure if that's when
[10] it was filled out.
[11]   **Q:** I don't see a date on my copy?
[12]   **A:** Well —
[13]   **Q:** Am I missing — where do you see
[14] the date?
[15]   **A:** There is a blank line and the top
[16] of it, it's sort of like scratched through
[17] where there is the fill-in number directly
[18] under number SC1126, there are 2 black lines
[19] where it's scratched out a little bit.
[20]   **Q:** Yeah.
[21]   **A:** So the bottom of the numbers
[22] before the line looks like 19 and then there
[23] is a line and it looks like an 8, and I guess
[24] I'm guessing it's a 3. And the other piece is
[25] a short month, and then it looks like a 4 to

---

Page 33

**B. Fasman**

[1]
[2] me, as best as I can guess, and a comma.
[3]   **Q:** On the copy that we were
[4] provided, I see where you are referring to,
[5] but that is actually quite illegible and it
[6] appears to have been scratched out, is that
[7] the same on your copy?
[8]   **A:** Yes.
[9]   **Q:** Other than trying to decipher
[10] what's been scratched out in those blanks, do
[11] you have any understanding about when this
[12] form was filled out?
[13]   **A:** No, I don't.
[14]   **Q:** Whatever dates may have been
[15] inserted there, if at all, you don't know when
[16] they were put there, correct?
[17]   **A:** That's right.
[18]   **Q:** Again with reference to
[19] Exhibit 2, was there another agreement issued
[20] by Charter Security prior to this one as far
[21] as Dennis Dimon was concerned?
[22]   **A:** There is in the other exhibits,
[23] it refers to other supplementary — other
[24] agreements, but I don't know if that was prior
[25] or after this one.

---

Page 34

**B. Fasman**

[1]
[2]   **Q:** Okay. When you say the other
[3] exhibits you are referring to the other
[4] exhibits or documents that have been produced
[5] by Met Life and that have been marked as
[6] exhibits in this deposition?
[7]   **A:** Yes.
[8]   **Q:** Okay. Directing your attention
[9] to Exhibit 3, can you describe what this
[10] document is?
[11]      (Exhibit 3, a letter to Kurt
[12] Snyder from B. Boehm dated July 14,
[13] 1983 was introduced for
[14] identification.)
[15]   **A:** This appears to be a letter from
[16] Barbara Boehm to Kurt Snyder of Dean Witter
[17] Reynolds.
[18]   **Q:** Who is Barbara Boehm?
[19]   **A:** According to the letter she was
[20] the vice president of Charter Security Life.
[21]   **Q:** Does she still work for Charter
[22] Security or Met Life?
[23]   **A:** Not as far as I know.
[24]   **Q:** Have you tried to determine
[25] whether or not that's the case?

---

Barbara Fasman
Vol. 1, May 10, 2006

Dennis Dimon  v.
Met Life Insurance Co., et al.

Page 35

**B. Fasman**

[1]

[2]    **A:** No, I haven't.

[3]    **Q:** Has anyone at Met Life tried to

[4] determine whether or not she still works for

[5] them or Charter Security?

[6]    **A:** I don't know.

[7]    **Q:** But this is not an inquiry that

[8] you or, to your knowledge, anyone else at Met

[9] Life has made?

[10]    **A:** Right.

[11]    **Q:** Can you explain why not?

[12]    **MR. CIAPCIAK:** Was she asked to?

[13]    **MS. McQUAY:** I'm asking her can

[14] she explain why not.

[15]    **A:** I guess I assumed that she wasn't

[16] after I spoke with Teresa Mannino, and she was

[17] the most knowledgeable person of the Charter

[18] business, and she told me that she didn't know

[19] of anyone else here.

[20]    **Q:** Did you specifically ask about

[21] Ms. Boehm?

[22]    **A:** I don't think so.

[23]    **Q:** You had seen these exhibits with

[24] her name on them, had you not?

[25]    **A:** Yes, I did.

Page 36

**B. Fasman**

[1]

[2]    **Q:** Based on your review of this

[3] matter, are you aware of anyone, have you seen

[4] anyone else's name besides Mrs. Boehm and

[5] Mr. Liguori who were involved on behalf of

[6] Charter Security back at the time?

[7]    **MR. CIAPCIAK:** I object to form.

[8]    **Q:** Let me ask you, do you know where

[9] Mrs. Boehm is?

[10]    **A:** No, I have no idea.

[11]    **Q:** And you made no effort to find

[12] out?

[13]    **A:** That's right.

[14]    **Q:** And as far as you know no one at

[15] Met Life has made any effort to locate her?

[16]    **A:** As far as I know.

[17]    **MR. CIAPCIAK:** Objection. Are

[18] you including counsel?

[19]    **MS. McQUAY:** I'm asking this

[20] witness who has been put forward by Met

[21] Life, this designated witness, whether

[22] as far as she knows anybody, anybody

[23] has made any effort to locate

[24] Ms. Boehm.

[25]    **A:** I don't know.

Page 37

**B. Fasman**

[1]

[2]    **Q:** In Exhibit 3, Mrs. Boehm refers

[3] to a supplementary contract having been issued

[4] for Dennis Dimon for 240-month certain and

[5] life that after, do you see that?

[6]    **A:** Yes, I do.

[7]    **Q:** Does Met Life have a copy of that

[8] contract?

[9]    **A:** Not as far as I know. I've been

[10] unable to find it.

[11]    **Q:** Have you searched for it?

[12]    **A:** I have made document requests.

[13]    **Q:** When you say you have made

[14] documents requests, have you asked

[15] specifically that a search be made for that

[16] document for that contract?

[17]    **A:** I asked — no, I did not ask

[18] specifically for that contract. I asked that

[19] documents be searched for, any documents

[20] relating to this situation.

[21]    **Q:** And in response to that request

[22] you have not been able to locate a copy of

[23] that contract?

[24]    **A:** That's correct.

[25]    **Q:** Can you explain why Met Life

Page 38

**B. Fasman**

[1]

[2] would not have a copy of that contract in its

[3] files?

[4]    **A:** I can only speculate, so, no.

[5]    **Q:** So you can't explain why that's

[6] the case?

[7]    **A:** No, I can't. I am not familiar

[8] with the record retention policies or anything

[9] like that.

[10]    **Q:** Okay. Now in Exhibit 3

[11] Mrs. Boehm states that the original contract

[12] contained a clerical error, and that the

[13] reference to 240-month certain and life

[14] thereafter was incorrectly typed in. Do you

[15] see that?

[16]    **A:** Yes.

[17]    **MR. CIAPCIAK:** I object to form.

[18] I don't believe that's exactly what it

[19] says, but that's the gist of it.

[20]    **Q:** That's your understanding of what

[21] she's saying, isn't that correct Ms. Fasman?

[22]    **A:** I'm sorry. Can you say that

[23] again please?

[24]    **Q:** Okay. Mrs. Boehm indicates in

[25] her letter, Exhibit 3, that the original

Dennis Dimon  v.
Met Life Insurance Co., et al.

Barbara Fasman
Vol. 1, May 10, 2006

---

Page 39

[1]                          **B. Fasman**
[2] contract contained a clerical error and that
[3] the reference to 240-months certain and life
[4] thereafter was incorrectly typed in, does she
[5] not?
[6]     **MR. CIAPCIAK:** I object to form.
[7] I don't believe it says original
[8] contract.
[9]     **Q:** Is that your understanding of the
[10] gist of what she's saying in the letter,
[11] Mrs. Fasman?
[12]     **A:** I am just reading it again.
[13] Well, she doesn't say original contract, she
[14] said on the above supplementary contract was
[15] incorrectly typed.
[16]     **Q:** But she says she's enclosing a
[17] new contract, doesn't she?
[18]     **A:** Yes.
[19]     **Q:** And that certainly suggests to
[20] you, does it not, that she's referring to
[21] another contract that purportedly had a
[22] clerical error?
[23]     **MR. CIAPCIAK:** I object to form.
[24]     **A:** It does appear she is referring
[25] to a former contract, yes.

---

Page 40

[1]                          **B. Fasman**
[2]     **Q:** Now, what was the basis for
[3] Ms. Boehm's assertion that that original or
[4] former contract made a clerical error?
[5]     **A:** I'm not sure what the basis for
[6] her assertion was. Although the application
[7] does show that what was applied for was a
[8] 20-year certain annuity.
[9]     **Q:** My question however is, what was
[10] the basis for her assertion that the original
[11] contract that was issued had a "clerical
[12] error"?
[13]     **MR. CIAPCIAK:** I object to form.
[14] Unless you know what was going through
[15] her head at the time, I'm not sure you
[16] can answer it.
[17]     **A:** I don't know what the basis for
[18] her assertion was.
[19]     **Q:** What was the basis for
[20] Ms. Boehm's assertion that the addition of the
[21] words "life thereafter" was a mere clerical
[22] error, do you know, have any understanding?
[23]     **MR. CIAPCIAK:** That's a compound
[24] question. But I believe she testified
[25] she doesn't know. But do you have any

---

Page 41

[1]                          **B. Fasman**
[2] understanding as to why she might have
[3] said that, I believe is what your
[4] trying to say, right, Sue?
[5]     **MS. McQUAY:** My question stands.
[6]     **Q:** Mrs. Fasman?
[7]     **A:** Okay, I'm confused now after all
[8] the side talking. Can you please say it
[9] again?
[10]     **Q:** Let me restate it. Can Met Life
[11] explain why it was that someone added the
[12] words life thereafter in the original contract
[13] that should not have been there?
[14]     **A:** It appears it was a clerical
[15] error.
[16]     **Q:** Can you explain why someone added
[17] those words if they should not have been
[18] there?
[19]     **A:** No.
[20]     **Q:** Now, who made this purported
[21] clerical error?
[22]     **A:** I don't know.
[23]     **Q:** When was it made?
[24]     **A:** Sometime before July 14th, 1983.
[25]     **Q:** But other than that you have no

---

Page 42

[1]                          **B. Fasman**
[2] idea?
[3]     **A:** Right.
[4]     **Q:** And how was it purported
[5] addition, a clerical error or addition of the
[6] words life thereafter made?
[7]     **A:** I don't know.
[8]     **Q:** Now, the new contract that
[9] Ms. Boehm refers to in her letter, is that the
[10] supplementary contract that has been marked as
[11] Exhibit 2?
[12]     **A:** It's not clear but it appears to
[13] be that might be what she's referring to.
[14]     **Q:** In the Re line on Exhibit 3,
[15] there is reference again to policy
[16] number 83A08153, did you see that?
[17]     **A:** Yes.
[18]     **Q:** And I believe you already
[19] testified that it's your understanding that
[20] that would be the number of the annuity policy
[21] itself?
[22]     **A:** Yes.
[23]     **Q:** And am I correct in understanding
[24] that Met Life does not have a copy of that
[25] annuity policy in its files?

---

Barbara Fasman
Vol. 1, May 10, 2006

Dennis Dimon v.
Met Life Insurance Co., et al.

Page 43

[1]                          B. Fasman
[2]    A: Yes.
[3]    Q: Can you explain why Met Life
[4] would not have a copy of the annuity policy in
[5] its files?
[6]    A: I don't know.
[7]    Q: Okay. Now, the NSC 1126 on the
[8] Re line on Exhibit 3, am I correct in
[9] understanding that that refers to the
[10] supplementary agreement that has been marked
[11] as Exhibit 2?
[12]    A: It appears to be, however, the
[13] suffix is different, so I'm not sure.
[14]    Q: Okay.
[15]    A: Actually the prefix, sorry.
[16]    Q: The only difference is on
[17] Exhibit 2 is number SC 1126?
[18]    A: Yes.
[19]    Q: And on Exhibit 3 the reference is
[20] in NSC 1126?
[21]    A: Yes.
[22]    Q: And your understanding is that
[23] that would refer to Number SC 1126?
[24]    A: No, that's not my understanding.
[25] I don't know what N refers to.

Page 44

[1]                          B. Fasman
[2]    Q: So you don't know if that N
[3] refers to number or why it's there?
[4]    A: That's right.
[5]    Q: Okay. Now, directing your
[6] attention to what has been marked as
[7] Exhibit 4.
[8]    (Exhibit 4, a letter to Robert
[9] Foley from John L. Noe, dated
[10] August 12, 1983 was introduced for
[11] identification.)
[12]    A: Before we go to Exhibit 4, can I
[13] just use the ladies' room?
[14]    Q: Certainly, by all means. Any
[15] time you need a break just tell us so and
[16] we'll be happy to have a break.
[17]    A: Okay, thank you.
[18]    (Recess: 10:45 a.m. to
[19] 10:51 a.m.)
[20]    Q: I would like to direct your
[21] attention now to what has been marked as
[22] Exhibit 4 in the deposition.
[23]    A: Okay.
[24]    Q: And this is a letter dated is
[25] August 12th, 1983 from a Mr. John Noe at

Page 45

[1]                          B. Fasman
[2] Kemper, correct?
[3]    A: Yes.
[4]    Q: And a copy of this letter was
[5] received by Charter Security, is that your
[6] understanding?
[7]    A: It's my understanding, it has a
[8] receive stamp by a B. Boehm.
[9]    Q: That's Ms. Barbara Boehm?
[10]    A: I think so.
[11]    Q: And she's shown actually as being
[12] copied on the letter, is she not?
[13]    A: Yes, she is.
[14]    Q: And am I correct in understanding
[15] that a copy of this letter was retained in
[16] Charter Security's files?
[17]    A: Yes.
[18]    Q: On Exhibit 4 which is a document
[19] that was produced by Met Life from its files,
[20] the addressee Mr. Robert Foley, his name is
[21] crossed out, do you see that?
[22]    A: Yes.
[23]    Q: And there is some handwriting up
[24] at the top of the letter?
[25]    A: Yes.

Page 46

[1]                          B. Fasman
[2]    Q: Can you read it on your copy?
[3]    A: No, I can't.
[4]    Q: You can't make that out at all?
[5]    A: I can see that the first letter
[6] is an R and the last 3 appear to be T E R but
[7] — and those are two underlines but I really
[8] can't read the rest.
[9]    Q: Okay. Now in his letter Mr. Noe
[10] at Kemper states that he considers the
[11] original annuity contract to be valid and
[12] enforceable, do you see that?
[13]    MR. CIAPCIAK: Do you want her to
[14] read the letter?
[15]    MS. McQUAY: You've read this
[16] before, I take it, in preparation for
[17] the deposition today?
[18]    THE WITNESS: Yes, I have.
[19]    MR. CIAPCIAK: I am just asking
[20] if you —
[21]    Q: If you want to read it again, by
[22] all means take your time and do so.
[23]    MR. CIAPCIAK: I am just asking
[24] if you are looking for her to confirm
[25] the exact language he used.

**Dennis Dimon  v.**
**Met Life Insurance Co., et al.**

**Barbara Fasman**
**Vol. 1, May 10, 2006**

---

Page 47

[1]                    *B. Fasman*
[2]    **Q:** Well, you see at the bottom of
[3] the letter he says, "I consider the original
[4] annuity contract valid and enforceable," do
[5] you see that?
[6]    **A:** Yes, I do.
[7]    **Q:** And the Charter Security policy
[8] number that he references in his letter is
[9] number 83A08153, correct?
[10]    **A:** 83A08153, yes.
[11]    **Q:** Which is the same number that we
[12] referred to earlier, that you identified
[13] earlier, which appears to be the number given
[14] to the annuity policy?
[15]    **A:** That's correct.
[16]    **Q:** Notwithstanding Mr. Noe's
[17] statement that he considers that original
[18] annuity contract to be valid and enforceable,
[19] am I correct in understanding that so far as
[20] you know and have been able to determine,
[21] Charter Security or Met Life did not keep a
[22] copy of that original annuity policy contract?
[23]    **MR. CIAPCIAK:** I object to form.
[24] You may answer.
[25]    **A:** We do not have a copy at this

---

Page 48

[1]                    *B. Fasman*
[2] point.
[3]    **Q:** And you have not been able to
[4] find a copy?
[5]    **A:** That's right.
[6]    **Q:** And you don't know what happened
[7] to it?
[8]    **A:** That's right.
[9]    **Q:** Okay.
[10]    **MR. CIAPCIAK:** You are asking her
[11] personal knowledge, right, because I
[12] believe some of the other exhibits
[13] indicate that somebody else kept it in
[14] their brief case.
[15]    **MS. McQUAY:** I'm asking for her
[16] knowledge on behalf of Met Life as far
[17] as what's in Met Life's files.
[18]    **MR. CIAPCIAK:** Sue, I'm not
[19] trying to be obstreperous here, I'm
[20] just trying to — our witness when we
[21] met yesterday I said, if she asks what
[22] you know, you have to be careful based
[23] upon — are you looking for her
[24] personal knowledge?
[25]    **MS. McQUAY:** No, no I'm asking

---

Page 49

[1]                    *B. Fasman*
[2] for Met Life's knowledge.
[3]    **MR. CIAPCIAK:** Okay. I just
[4] wanted to clarify that now just so that
[5] we don't go through the whole
[6] deposition of her saying she doesn't
[7] know.
[8]    **MS. McQUAY:** I don't think
[9] there's been any mistake here, but let
[10] me be clear.
[11]    **Q:** You're appearing here today as
[12] Met Life's witness and when I ask you
[13] questions I'm asking you as Met Life's
[14] witness.
[15]    **A:** Okay.
[16]    **Q:** Do we understand each other?
[17]    **A:** Yes.
[18]    **MR. CIAPCIAK:** I just want to
[19] clarify further that if she knows
[20] something based upon her review of the
[21] documents that she should note that.
[22]    **THE WITNESS:** Okay.
[23]    **Q:** At any rate, I want to turn back
[24] your attention to — let's go back. You
[25] indicated that you had no explanation for why

---

Page 50

[1]                    *B. Fasman*
[2] Charter Security or Met Life did not keep a
[3] copy of the original annuity contract in it's
[4] files, correct?
[5]    **A:** I indicated that I don't know why
[6] we don't have one.
[7]    **Q:** Okay. Thank you. Directing your
[8] attention —
[9]    **A:** However, Met Life doesn't have
[10] one because we took over from Charter whatever
[11] they gave us. I don't know why Charter didn't
[12] have one in their files to start with.
[13]    **Q:** Okay, great. That's fine, that's
[14] all I needed to know. Well, let me ask you
[15] this. In the ordinary course, would you have
[16] expected that Charter Security would have
[17] retained under any circumstances the copy of
[18] the original annuity contract in its files?
[19]    **A:** I don't know what Charter's
[20] procedures were.
[21]    **Q:** In your experience would you have
[22] expected that they would have retained a copy
[23] in their files?
[24]    **A:** Met Life does not maintain copies
[25] of contracts in our files, so I would not

---

---

Page 51

**B. Fasman**

[1]
[2] necessarily have expected that Charter would
[3] have a copy of this contract in its files.
[4]     **Q:** Even though Mr. Noe is saying
[5] that he considers the original contract to be
[6] valid and enforceable, you would not expect
[7] under those circumstances that Charter
[8] Security would maintain a copy of that
[9] contract?
[10]    **MR. CIAPCIAK:** Objection to the
[11] extent that you are asking her about —
[12]    **Q:** Is that your understanding?
[13]    **MR. CIAPCIAK:** Let me finish my
[14] objection. I've got to finish my
[15] objection.
[16]    **MS. McQUAY:** I'm sorry, I thought
[17] you had.
[18]    **MR. CIAPCIAK:** Objection to the
[19] extent that you're questioning her
[20] about her knowledge of document
[21] retention policies. She wasn't
[22] produced here to talk about document
[23] retention policies.
[24]    **MS. McQUAY:** I'm asking her about
[25] her expectations based on her own

---

Page 52

**B. Fasman**

[1]
[2] experience for 25 years in this
[3] industry?
[4]    **MR. CIAPCIAK:** Sure.
[5]    **Q:** Mrs. Fasman?
[6]    **A:** Met Life produces duplicate
[7] contracts rather than maintaining in each
[8] policy file a copy of the contract as issued.
[9]    **Q:** How does it know what to produce
[10] as a duplicate contract?
[11]    **A:** It's according to the number and
[12] the criteria and specifications of the
[13] contract in the system.
[14]    **Q:** So in this circumstance where a
[15] contract has been issued and the owner of the
[16] contract says he considers it valid and
[17] enforceable, would you expect that in some
[18] form the information reflected in that
[19] original contract would have been maintained
[20] by Charter Security?
[21]    **MR. CIAPCIAK:** I object to form.
[22] I don't believe John Noe is the owner.
[23]    **Q:** You may answer.
[24]    **A:** I believe that Charter would have
[25] been able to — might have been able to

---

Page 53

**B. Fasman**

[1]
[2] reproduce a copy of the contract.
[3]    **Q:** From what source?
[4]    **A:** Whatever their procedures were.
[5] It could have been manual pages in a file that
[6] they pulled out. It could have been a copy of
[7] the original contract, or it could have been a
[8] system generated contract. I don't know what
[9] their procedure was.
[10]    **Q:** But you expect that information
[11] to have been retained in some form somewhere
[12] in their files, correct?
[13]    **MR. CIAPCIAK:** I object to form.
[14]    **A:** Yes, I would of.
[15]    **Q:** And am I correct in understanding
[16] however that you in your search of files in
[17] this case have not been able to find any such
[18] information?
[19]    **A:** I haven't been able to find a
[20] copy of the contract and not knowing what
[21] their procedures were or not having their
[22] systems any longer, I couldn't regenerate a
[23] copy of the contract.
[24]    **Q:** Okay. Thank you. Directing your
[25] attention to what has been marked as Exhibit 5

---

Page 54

**B. Fasman**

[1]
[2] for the deposition, would you describe this
[3] document, please?
[4]    (Exhibit 5, a letter to John L.
[5] Noe from John Liguori dated
[6] September 26, 1983 was introduced for
[7] identification.)
[8]    **MR. CIAPCIAK:** Hang on, let me
[9] get it in front of her.
[10]    **MS. McQUAY:** Sure.
[11]    **A:** This appears to be a letter from
[12] Robert Liguori, counsel of Charter Security
[13] Life to John Noe of American Motorist.
[14]    **Q:** Okay. In your understanding
[15] Mr. Liguori was a lawyer at Charter Security?
[16]    **A:** Robert Liguori was the counsel.
[17]    **Q:** I said Mr. Liguori, Robert
[18] Liguori was a lawyer at Charter Security is
[19] that your understanding?
[20]    **A:** That's my understanding.
[21]    **Q:** I'm sorry?
[22]    **A:** That's my understanding.
[23]    **Q:** I can't hear you.
[24]    **A:** That is my understanding.
[25]    **Q:** Okay. And is it your

---

**Dennis Dimon v.**
**Met Life Insurance Co., et al.**

**Barbara Fasman**
**Vol. 1, May 10, 2006**

---

Page 55

*B. Fasman*

[1]
[2] understanding that Mr. Liguori was in-house
[3] counsel at Charter Security?
[4]  **A:** Yes, that's my understanding
[5] based on his title at the bottom of the
[6] letter.
[7]  **Q:** Do you know where Mr. Liguori is
[8] today?
[9]  **A:** No, I do not.
[10]  **Q:** Have you made any effort to
[11] determine his whereabouts?
[12]  **A:** No, I have not.
[13]  **Q:** To your knowledge, has anyone on
[14] behalf of Met Life made any effort to
[15] determine his whereabouts?
[16]  **A:** Only from my conversations with
[17] counsel.
[18]  **Q:** Do you have any understanding
[19] that his whereabouts have, in fact, been
[20] determined?
[21]  **MR. CIAPCIAK:** If you gleaned
[22] anything from conversations from
[23] counsel you're instructed not to
[24] answer.
[25]  **A:** I guess I'm not answering.

---

Page 56

*B. Fasman*

[1]
[2]  **Q:** Okay. So just so the record is
[3] clear, any knowledge you have as to whether or
[4] not his whereabouts are known came from
[5] counsel and you won't reveal that knowledge,
[6] is that correct?
[7]  **A:** Yes.
[8]  **Q:** Okay. Do you know where
[9] Mr. Liguori obtained the information contained
[10] in his letter Exhibit 5?
[11]  **A:** It appears that he got a copy —
[12] from the letter, got a copy of Barbara Boehm's
[13] — Mr. Noe's letter to Barbara Boehm. And I
[14] don't know, but he may have had some of the
[15] other documents as well.
[16]  **Q:** In his letter Mr. Liguori states
[17] that there is nothing to indicate that
[18] anything other than a single premium immediate
[19] annuity with a 20-year certain period was
[20] applied for, do you see that?
[21]  **MR. CIAPCIAK:** Which paragraph so
[22] I can point her to it?
[23]  **Q:** It's the third paragraph on the
[24] first page, the first sentence.
[25]  **A:** Yes.

---

Page 57

*B. Fasman*

[1]
[2]  **Q:** Do you know the basis for his
[3] assertion in that regard?
[4]  **A:** Well, based on the next sentence
[5] which refers to the application, it would
[6] appear that that was the basis for that
[7] statement.
[8]  **Q:** And does it also appear to you
[9] that when he makes that sentence this was
[10] information that was given to him by someone
[11] else?
[12]  **A:** Well, it appears he also had a
[13] copy of a quotation sheet that showed a period
[14] certain without life option as well.
[15]  **Q:** But my question was when he makes
[16] that statement, is that your understanding
[17] from looking at the letter, is this
[18] information that was given to him by someone
[19] else?
[20]  **MR. CIAPCIAK:** And she was
[21] answering. Were you done?
[22]  **Q:** I don't think she was answering
[23] responsively.
[24]  **MR. CIAPCIAK:** I do.
[25]  **A:** I think it was information he

---

Page 58

*B. Fasman*

[1]
[2] gleaned from documents as well as perhaps from
[3] Ms. Boehm.
[4]  **Q:** Do you know where he got those
[5] documents?
[6]  **A:** I don't know where he got them,
[7] but he refers to them in his letter.
[8]  **Q:** Do you know who created them?
[9]  **MR. CIAPCIAK:** Can you let her
[10] finish her answer?
[11]  **MS. McQUAY:** I thought she had.
[12]  **MR. CIAPCIAK:** No, you had
[13] interrupted her.
[14]  **Q:** Do you have anything to add?
[15]  **MR. CIAPCIAK:** You know what,
[16] you're jumping in before she finishes a
[17] sentence.
[18]  **MS. McQUAY:** I'm sorry, because I
[19] can't see her, I mean, her voice falls
[20] and I think she has completed.
[21]   If I'm cutting you off, I
[22] apologize.
[23]  **Q:** Did you have something further to
[24] add?
[25]  **A:** I'm sorry, but I lost my train of

---

Barbara Fasman
Vol. 1, May 10, 2006

Dennis Dimon v.
Met Life Insurance Co., et al.

---

Page 59

**B. Fasman**

[1]
[2] thought.
[3] **Q:** Okay. Now you said that, if I
[4] understood your testimony, that it appears
[5] that Mr. Liguori was looking at some
[6] documents, correct?
[7] **A:** Yes, it does appear that way.
[8] **Q:** Do you know where he got the
[9] documents?
[10] **A:** I don't know where he got the
[11] documents.
[12] **Q:** Do you know who created the
[13] documents?
[14] **A:** Well, it appears that some of
[15] the — I mean, it appears he was relying on
[16] several of the documents that we were looking
[17] at. So to the extent these letters were
[18] written by people, I believe that they were
[19] the ones who created the letters. And I don't
[20] know who filled in the application as I
[21] already said. And Charter I believe put
[22] together the contract.
[23] **Q:** Okay. Do you have anything else
[24] to add to your answer?
[25] **A:** No.

---

Page 60

**B. Fasman**

[1]
[2] **Q:** Okay. To your knowledge, as far
[3] as you know, was Mr. Liguori involved in the
[4] issuance of this annuity?
[5] **A:** It doesn't appear he was.
[6] **Q:** Okay. Now, when he says in his
[7] letter to Mr. Noe that the original contract
[8] was incorrectly typed as being 240 months
[9] certain and life thereafter, what's your
[10] understanding, was the basis of his assertion
[11] in that regard?
[12] **A:** The application.
[13] **Q:** When he said it was incorrectly
[14] typed, on what basis do you understand he was
[15] making the assertion that it was incorrectly
[16] typed?
[17] **A:** Well, I don't know but it might
[18] be because he was informed there was a
[19] clerical error so he may have inferred that
[20] was a typo.
[21] **Q:** Okay. Now, he also in his letter
[22] in Exhibit 5 refers to a copy of a quotation
[23] sheet from CSL to Mr. Foley?
[24] **A:** Yes.
[25] **Q:** Do you know where he obtained any

---

Page 61

**B. Fasman**

[1]
[2] such copy of a quotation sheet?
[3] **A:** I don't know where he got the
[4] copy of the quotation sheet.
[5] **Q:** So do you know who filled any
[6] such quotation sheet out?
[7] **A:** I don't know who filled the
[8] quotation sheet out, but generally they're
[9] generated by the issuing company.
[10] **Q:** Generated by whom?
[11] **A:** The company.
[12] **Q:** When you refer to the company,
[13] what are you talking about? I couldn't hear
[14] you, is the problem.
[15] **A:** The issuing company.
[16] **Q:** When you say they're generally
[17] filled out by the issuing company?
[18] **A:** Yes.
[19] **Q:** So that would be in this case
[20] Charter Security?
[21] **A:** Yes.
[22] **Q:** But you don't know in fact? Let
[23] me ask you, do you know when it was filled
[24] out?
[25] **MR. CIAPCIAK:** I object to form.

---

Page 62

**B. Fasman**

[1]
[2] **A:** No, I don't.
[3] **Q:** Do you know whether it was in
[4] fact sent to Mr. Foley?
[5] **A:** I don't know.
[6] **Q:** Do you know who sent it, if at
[7] all?
[8] **A:** I don't know who sent, no.
[9] **Q:** Did Charter Security or Met Life
[10] retain in its files a copy of any such
[11] quotation sheet?
[12] **A:** We don't have a copy, I mean at
[13] the time that this letter was written it
[14] appears there was a copy that was forwarded to
[15] Mr. Noe, but we don't have one now as far as I
[16] was able to find.
[17] **Q:** There is a reference to it, but
[18] you don't know whether, in fact, it was
[19] forwarded to Mr. Noe, is that correct?
[20] **A:** Right. I don't know other than
[21] it's referred to in this letter, and at the
[22] bottom of the letter it says enclosures.
[23] **Q:** Okay. Am I correct in
[24] understanding that Charter Security retained
[25] in its files, and Met Life retained in its

---

**Dennis Dimon v.**
**Met Life Insurance Co., et al.**

**Barbara Fasman**
**Vol. 1, May 10, 2006**

---

Page 63

*B. Fasman*

[1]
[2] files a copy of this letter, Exhibit 5, but it
[3] did not retain a copy of any attachments such
[4] as the alleged quotation sheet that went with
[5] the letter, correct?
[6]    **MR. CIAPCIAK:** I object to form.
[7]    **A:** Right, I don't have access to the
[8] quotation sheet, so it doesn't appear we have
[9] one in our files.
[10]    **Q:** Okay. I would like the direct
[11] your attention now to Exhibit 6.
[12]    (Exhibit 6, a letter to Robert
[13] Liguori from John L. Noe dated
[14] October 10, 1983 was introduced for
[15] identification.)
[16]    **A:** Okay.
[17]    **Q:** Can you describe this document
[18] please?
[19]    **A:** This is a letter that appears to
[20] be from Mr. Noe to Mr. Liguori dated
[21] October 10th, 1983.
[22]    **Q:** And this is a copy of a document
[23] that came from Met Life's files?
[24]    **A:** Yes, it appears to be.
[25]    **Q:** Now, in his letter to Charter

---

Page 64

*B. Fasman*

[1]
[2] Security Mr. Noe at Kemper states that
[3] sections 14 and 15 of the application that he
[4] signed were blank, do you see that?
[5]    **A:** Yes, I see that.
[6]    **Q:** Does Met Life have any reason to
[7] believe that was not the case?
[8]    **A:** Other than from standard
[9] procedures that it's unusual to sign a blank
[10] form, I don't know.
[11]    **Q:** Well, you say other than it's
[12] unusual to sign a blank form. In fact,
[13] Exhibit 1, the annuity application wasn't
[14] blank was it, it was filled in with a lot of
[15] typing, correct?
[16]    **MR. CIAPCIAK:** I object to form.
[17]    **Q:** Is that correct Mrs. Fasman?
[18]    **A:** The typing, yes, well, I don't
[19] know actually. I didn't refer to that.
[20]    **Q:** He referred to sections 14 and 15
[21] which do not contain typed information but
[22] contain handwritten information, correct?
[23]    **A:** That's right.
[24]    **Q:** Do you have — does Met Life have
[25] any reason to believe that that handwriting

---

Page 65

*B. Fasman*

[1]
[2] was not there — or excuse me, was there when
[3] Mr. Noe signed it?
[4]    **A:** Yes, I mean, based on the fact
[5] that Mr. Noe was an employee in the claims
[6] office and was very familiar with insurance
[7] forms, I would have every expectation that he
[8] wouldn't sign a form that didn't have all the
[9] information necessary on it.
[10]    **Q:** If the information reflected in
[11] the handwriting on the form, Exhibit 1, was
[12] necessary why had it not been typed in?
[13]    **A:** I don't know.
[14]    **Q:** Addressing your attention to
[15] Exhibit 7.
[16]    (Exhibit 7, a letter to B. Boehm
[17] from John L. Noe dated October 12, 1983
[18] was introduced for identification.)
[19]    **A:** Yes.
[20]    **Q:** Can you describe this document,
[21] please?
[22]    **A:** This is a letter from John Noe to
[23] Barbara Boehm, which is dated October 12th,
[24] 1983.
[25]    **Q:** And this is a document that was

---

Page 66

*B. Fasman*

[1]
[2] retained in the files of Charter Security and
[3] Met Life?
[4]    **A:** Yes.
[5]    **Q:** Now, in his letter Exhibit 7,
[6] Mr. Noe states that the original annuity
[7] policy will be considered valid and
[8] enforceable, do you see that?
[9]    **A:** Yes.
[10]    **Q:** What if any action did Charter
[11] Security take after receiving this letter,
[12] Exhibit 7?
[13]    **MR. CIAPCIAK:** She's looking at
[14] me. She can refer to the other
[15] exhibits.
[16]    **MS. McQUAY:** She can refer to
[17] anything she needs to answer the
[18] question.
[19]    **A:** I don't know. There is an
[20] October 14th letter which seems to have been
[21] received prior to the October 12th letter, so
[22] I'm not really sure.
[23]    **Q:** You said the October 14th letter
[24] appears to have been received — will you
[25] state that again please, I didn't hear you.

---

Barbara Fasman
Vol. 1, May 10, 2006

Dennis Dimon   v.
Met Life Insurance Co., et al.

---

Page 67

**B. Fasman**

[1]
[2]     **A:** There is another letter.
[3]     **MR. CIAPCIAK:** I am going ask her
[4] to refer to exhibit numbers.
[5]     **A:** There is another letter,
[6] Exhibit 8, which has a October 14th date on
[7] it —
[8]     **Q:** Yes.
[9]     **A:** — to Mr. Noe.
[10]     **Q:** Yes.
[11]     **A:** Which would appear to have been
[12] dated after Mr. Noe's letter of October 12th.
[13] However the October 12th letter also refers to
[14] the October 14th letter, so I'm not sure what
[15] was done after the October 12th letter.
[16]     **Q:** Okay. Other than the —
[17]     **MR. O'DRISCOLL:** Can we go off
[18] the record for a moment, I think I have
[19] something, just an observation that
[20] might be helpful to the questioning.
[21]     **MS. McQUAY:** Certainly.
[22]     (Discussion off the record.)
[23]     **Q:** Mrs. Fasman, other than the
[24] handwritten reference to 20-year certain in
[25] paragraph 14 of Exhibit 1, did Charter

---

Page 68

**B. Fasman**

[1]
[2] Security, so far as you know, have any other
[3] basis for it's assertions that the original
[4] annuity contract that it issued to Kemper for
[5] 20-year certain and life thereafter was
[6] mistaken?
[7]     **MR. CIAPCIAK:** I object to the
[8] form. Other than the other exhibit?
[9]     **MS. McQUAY:** No, no.
[10]     **Q:** Other than that reference to
[11] 20-year certain in paragraph 14 in Exhibit 1,
[12] does Charter Security have any other basis in
[13] your understanding for its assertion that the
[14] original annuity contract for 20-year certain
[15] and life thereafter was mistaken?
[16]     **A:** Well, we have the application and
[17] then we have this supplementary agreement.
[18]     **Q:** The supplementary agreement
[19] was — I believe the document suggests were
[20] issued sometime after the original contract,
[21] correct?
[22]     **A:** Since it's not dated I'm not sure
[23] when it was issued.
[24]     **Q:** Let me ask you this, tell me in
[25] your understanding as far as Met Life is

---

Page 69

**B. Fasman**

[1]
[2] concerned, what was the basis, the factual
[3] basis on which Charter Security took the
[4] position that the original annuity contract
[5] issued to Kemper for 20-year certain and life
[6] thereafter was mistaken?
[7]     **MR. CIAPCIAK:** I object to form.
[8] Go ahead.
[9]     **A:** The basis was the application
[10] which requested immediate annuity 20-year
[11] certain.
[12]     **Q:** Anything else?
[13]     **MR. CIAPCIAK:** She's looking at
[14] exhibits, so hang on.
[15]     **A:** Well, we don't have a copy of it.
[16] There was a quotation down that Mr. Liguori
[17] refers to in his letter indicating that that
[18] was what the quote was, a 20-year certain
[19] only.
[20]     **Q:** Anything else?
[21]     **A:** Nothing prior to the issue of the
[22] original contract.
[23]     **Q:** Have you completed your answer?
[24]     **A:** Yes.
[25]     **Q:** Just to make sure, as far as Met

---

Page 70

**B. Fasman**

[1]
[2] Life is concerned in this case, other than
[3] what you have testified to just now, is there
[4] any other basis upon which Met Life contends
[5] that the original annuity contract issued for
[6] 20-year certain and life thereafter was
[7] mistaken?
[8]     **MR. CIAPCIAK:** I object to form.
[9]     **A:** Other than the exhibits, no, this
[10] is what we have.
[11]     **Q:** Okay. Now, did Charter Security
[12] or Met Life ever offer to return Kemper's
[13] money to it if there was a mistake here?
[14]     **A:** I don't know.
[15]     **Q:** Do you have any reason to believe
[16] that they did?
[17]     **A:** I don't have any reason to
[18] believe they did or didn't.
[19]     **Q:** You don't know one way or another
[20] what happened, correct?
[21]     **A:** That's right.
[22]     **Q:** Did Charter Security or Met Life
[23] ever do anything to try to resolve this matter
[24] after this exchange of letters in October of
[25] 1983?

---

Dennis Dimon  v.                                                                    Barbara Fasman
Met Life Insurance Co., et al.                                              Vol. 1, May 10, 2006

---

Page 71

**B. Fasman**

[1]
[2]   **A:** I don't know.
[3]   **Q:** You are not aware of anything,
[4] correct?
[5]   **A:** I'm not aware of anything.
[6]   **Q:** Okay. I would like to direct
[7] your attention to what has previously been
[8] marked as Exhibit 10.
[9]      (Exhibit 10, a document Bates
[10] Stamped 32 was introduced for
[11] identification.)
[12]   **A:** Yes.
[13]   **Q:** Can you describe this document,
[14] please?
[15]   **A:** It appears to be a phone record
[16] of a conversation between Katherine Dimon and
[17] Laura Green.
[18]   **Q:** This came from Met Life's files?
[19]   **A:** Yes.
[20]   **Q:** Am I correct in understanding
[21] that this document indicates that on June 5th,
[22] 2003 Katherine Dimon requested a copy of the
[23] annuity contract?
[24]   **A:** Yes.
[25]      (Exhibit 11, a letter to Dennis

---

Page 72

**B. Fasman**

[1]
[2] Dimon from Sandy Franklin dated June 9,
[3] 2003 was introduced for
[4] identification.)
[5]   **Q:** And directing your attention to
[6] what has been marked as Exhibit 11, is
[7] Exhibit 11 is a response to Mrs. Dimon's
[8] request?
[9]   **A:** Yes, it appears to be.
[10]   **Q:** In Exhibit 11, your company
[11] indicates that it is unable to send a copy of
[12] the contract to Mr. Dimon, correct?
[13]   **A:** Yes.
[14]   **Q:** Why was Met Life unable to send a
[15] copy of the contract to Mr. Dimon?
[16]   **A:** Well, we don't have a copy of the
[17] contract in our file, but it's also Met Life's
[18] policy not to send a copy of the policy to
[19] anyone but the owner.
[20]   **Q:** Who is the owner in this case?
[21]   **A:** American Motorist Insurance
[22] Company.
[23]   **Q:** So even though Mr. Dimon was the
[24] annuitant, if you will — do I have that word
[25] correct?

---

Page 73

**B. Fasman**

[1]
[2]   **A:** Yes.
[3]   **Q:** — you would not send him a copy
[4] upon his request?
[5]   **A:** That's generally our procedure,
[6] yes.
[7]   **Q:** Did you ever explain that to
[8] Mr. Dimon?
[9]   **A:** I personally did not, and I don't
[10] have a letter that would indicate that that
[11] was explained. But I don't know.
[12]   **Q:** So, so far as you know you are
[13] not aware that Met Life or anyone at Met Life
[14] ever explained that to Mr. Dimon?
[15]   **MR. CIAPCIAK:** I object to form.
[16]   **A:** I'm not aware of, right.
[17]   **MS. McQUAY:** I have no further
[18] questions.
[19]   **THE WITNESS:** Can we take another
[20] break?
[21]   **MS. McQUAY:** Certainly.
[22]      (Recess: 11:22 a.m. until
[23] 11:26 a.m.)
[24]   **MR. CIAPCIAK:** Back on the
[25] record.

---

Page 74

**B. Fasman**

[1]
[2]   **THE WITNESS:** I would just like
[3] to clarify or correct my answer from
[4] before. I reviewed the exhibits again
[5] and we actually did communicate with
[6] Mr. Dimon about why we couldn't give
[7] him an annuity contract and it's
[8] explained in Exhibits 11 and 13.
[9]   **BY MS. McQUAY:**
[10]   **Q:** With regard to Exhibit 11, what's
[11] the explanation?
[12]   **A:** Well, "Since your annuity
[13] contract has expired, we are unable to provide
[14] you with a duplicate contract."
[15]   **Q:** And what do you understand that
[16] to mean, in terms of why you can't give him a
[17] contract, a copy of the contract?
[18]   **A:** Once a contract is off of our
[19] system we can't produce another contract, a
[20] duplicate contract. We're just not able to
[21] should we have had the contract available.
[22]      (Exhibit 13, a letter to
[23] Dennis Dimon from Sandy Franklin, dated
[24] July 9, 2003 was introduced for
[25] identification.)

---

Page 75

B. Fasman

[1]
[2]    Q: Okay. And Exhibit 13 that you
[3] referenced, this is a letter to Mr. Dimon from
[4] Met Life in July of 2003?
[5]    A: Yes.
[6]    Q: This came from Met Life's files?
[7]    A: Yes, it did.
[8]    Q: And in this case you again state
[9] you're unable to provide him with a contract,
[10] correct?
[11]    A: Yes, we do.
[12]    Q: You give him an explanation as to
[13] why you can't?
[14]    A: Yes, we explain it was a contract
[15] issued as a settlement from another company.
[16]    Q: Yes. But any where, do you tell
[17] him why you can't give him a copy?
[18]    A: It eludes to the fact that
[19] American Motorists is the person who took out
[20] the contract.
[21]    Q: Okay. One final bit of
[22] housekeeping in this assessment, during the
[23] course of your testimony you referred to what
[24] has previously been marked as Exhibit 8 for
[25] the deposition. I don't believe we've

Page 76

B. Fasman

[1]
[2] formerly introduced it so I would like to do
[3] so now. Directing your attention to
[4] Exhibit 8, can you describe the document,
[5] please?
[6]    (Exhibit 8, a letter from John L.
[7] Noe from B. Boehm dated October 14,
[8] 1983 was introduced for
[9] identification.)
[10]    A: This is a letter from Barbara
[11] Boehm to Mr. Noe dated October 14th, 1983.
[12]    Q: This was a document that came
[13] from Met Life's files?
[14]    A: Yes, it was.
[15]    MS. McQUAY: Thank you, I have no
[16] further questions.
[17]    EXAMINATION BY MR. DeWICK:
[18]    Q: Hi, Mrs. Fasman, this is Jed
[19] DeWick. I just have one question. You
[20] indicated earlier that part of your duties are
[21] to perform calculations with respect to
[22] annuities, is that correct?
[23]    A: Calculations in general, yes.
[24]    Q: Okay. Have you personally
[25] performed any calculations with respect to the

Page 77

B. Fasman

[1]
[2] annuity in question here?
[3]    A: I did do some calculations to see
[4] different costs.
[5]    Q: Can you please just describe the
[6] calculations you did and what you found?
[7]    A: I did a calculation to see what a
[8] 20-year certain annuity with the 3 percent
[9] increase annually would cost using Met Life
[10] pricing assumptions from 1983, May 1983. And
[11] that would have cost $1,450 per month starting
[12] — as the starting amount, and that would have
[13] cost about $180,000. And to compare that to
[14] what the pricing was with the Charter annuity.
[15]    And I did other calculations as
[16] well.
[17]    Q: Let me just ask you what you
[18] meant there when you said the Charter annuity.
[19] What were the terms of the annuity that you
[20] are referring to when you say Charter annuity?
[21]    A: 20-year certain in life with a
[22] 3 percent increase annually starting — well,
[23] that one was 14 — 1,450.45 per month. But
[24] the quotes I did was $1,450.
[25]    Q: Did you do a calculation of what

Page 78

B. Fasman

[1]
[2] the 20-year certain in life thereafter annuity
[3] would approximately be?
[4]    A: I did a calculation of a 20-year
[5] certain in life annuity where during the first
[6] 20 years there was a 3 percent annual
[7] increase, and after that the amount was flat
[8] for life. And the cost of that was $270,900.
[9]    Q: And you are speaking of, when you
[10] say the cost, you are talking about a one time
[11] premium?
[12]    A: A single premium, yes. Using
[13] May '83 rate, 1983 rates.
[14]    Q: Do any document exist that
[15] reflect these calculations?
[16]    A: I took some notes.
[17]    Q: Are you in possession of these
[18] notes?
[19]    A: Yes, I am.
[20]    Q: Did you refer to any document
[21] when you were making this calculation?
[22]    MR. CIAPCIAK: I object on form.
[23]    A: I had requested from my attorney
[24] quotes to get these numbers.
[25]    Q: Can you repeat that? I didn't

Case 1:05-cv-11073-NG     Document 58-9     Filed 01/02/2007     Page 22 of 78

Dennis Dimon  v.                                              Barbara Fasman
Met Life Insurance Co., et al.                          Vol. 1, May 10, 2006

Page 79

**B. Fasman**

[1]
[2] catch it.
[3]  **A:** I had request from my attorney
[4] quotes from our annuity area to get these
[5] numbers.
[6]  **Q:** Your attorney, you mean Met Life?
[7]  **MR. CIAPCIAK:** That would be me.
[8]  **Q:** In-house?
[9]  **A:** Yes.
[10]  **Q:** Is the document that you referred
[11] to and the notes you took, these documents are
[12] still in your possession?
[13]  **A:** The notes are in my possession.
[14]  **Q:** What about the documents you
[15] referred to, do you know where those are?
[16]  **MR. CIAPCIAK:** I object to the
[17] form. What document are you referring
[18] to? The source? Or —
[19]  **MR. DeWICK:** Whatever documents
[20] Mrs. Fasman reviewed to make these
[21] calculations.
[22]  **MR. CIAPCIAK:** Okay, so the
[23] source of that.
[24]  **A:** I have the answers. I never
[25] physically got documents that had quotes or

Page 80

**B. Fasman**

[1]
[2] anything other than the numbers.
[3]  **Q:** You just received the figures
[4] verbally?
[5]  **A:** No, I got an e-mail with them.
[6]  **Q:** Do you still have that e-mail?
[7]  **MR. CIAPCIAK:** You know what, I
[8] am going to instruct her not to answer.
[9] The e-mail was from counsel.
[10]  **Q:** Okay.
[11]  **MR. CIAPCIAK:** I think what you
[12] are looking for is the source of the
[13] number. I don't want to mislead you
[14] here. Are you looking for what she
[15] looked at to get those numbers?
[16]  **MR. DeWICK:** Yes, I'm just trying
[17] to figure out basically —
[18]  **MR. CIAPCIAK:** That you may
[19] answer.
[20]  **MR. DeWICK:** Just to make sure
[21] that I covered the universe of
[22] information that was considered.
[23]  **A:** I called our quote unit and asked
[24] them to do quotes using 1983 numbers —
[25] assumptions and to get the single premium for

Page 81

**B. Fasman**

[1]
[2] the annuities that we just discussed, using my
[3] 1983 rates. And they ran their computer
[4] program and gave me back the answers.
[5]  **Q:** I have nothing further. Thank
[6] you.
[7]     **EXAMINATION BY MR. KEANE:**
[8]  **Q:** Mrs. Fasman, My name is Brian
[9] Keane and I represent Dennis Dimon. I just
[10] have a couple of questions. Again, I know you
[11] heard this from attorney McQuay, but if you
[12] don't understand a question please let me know
[13] and I will rephrase it.
[14]     Going back to the information you
[15] were just giving, when did you do these
[16] calculations?
[17]  **A:** I requested them, I believe it
[18] was August of 2005.
[19]  **Q:** That's when you did the
[20] calculations in August of 2005?
[21]  **A:** I didn't do the calculations. I
[22] had them done.
[23]  **Q:** That they be done in August of
[24] 2005?
[25]  **A:** Yes.

Page 82

**B. Fasman**

[1]
[2]  **Q:** What did you use in terms of life
[3] expectancy for Mr. Dimon when you did these
[4] calculations?
[5]  **A:** We did a standard life
[6] assumption. I don't know what is in — I
[7] don't know what's built into the program.
[8] There was nothing specifically changed to
[9] reflect anything about Mr. Dimon.
[10]  **Q:** Is the life expectancy a big
[11] factor in determining those types of numbers?
[12]  **A:** It is a big factor in determining
[13] the cost of a life annuity, yes.
[14]  **Q:** Wouldn't you need to have more
[15] information about Mr. Dimon to determine his
[16] life expectancy to come to a premium price?
[17]  **A:** For the purpose of this analysis
[18] what we were doing was, what it would have
[19] cost, an estimate of what it would have cost
[20] from Met Life to purchase, to provide the
[21] annuity, the 20-year certain annuity and the
[22] 20-year certain in life annuity in 1983. And
[23] at that time I have no reason to understand
[24] that there was special pricing done for
[25] Mr. Dimon.

Case 1:05-cv-11073-NG    Document 58-9    Filed 01/02/2007    Page 23 of 78

Barbara Fasman                                    Dennis Dimon  v.
Vol. 1, May 10, 2006              Met Life Insurance Co., et al.

Page 83

**B. Fasman**

[1]
[2]  **Q:** You mentioned earlier in your
[3]  testimony a woman by the name of Teresa
[4]  Mannino, is that right?
[5]  **A:** Yes.
[6]  **Q:** Who told you that Ms. Mannino
[7]  would have information regarding Charter
[8]  Security Life?
[9]  **MR. CIAPCIAK:** I object to form.
[10]  **A:** I just, well, my counsel
[11]  mentioned her but. But I happened to have
[12]  worked very closely with her.
[13]  **Q:** Was Ms. Mannino a former employee
[14]  of Charter Security Life?
[15]  **A:** No, she was not.
[16]  **Q:** Do you know approximately when
[17]  Met Life took over Charter Security Life?
[18]  **A:** In the mid '80s, I believe.
[19]  **Q:** You mentioned that this annuity
[20]  application was an immediate annuity. Can you
[21]  tell me what that means?
[22]  **A:** Generally, an immediate annuity
[23]  refers to an annuity which provides a stream
[24]  of payments, the first of which is made within
[25]  a year of the purchase date.

Page 84

**B. Fasman**

[1]
[2]  **Q:** As you look at Exhibit 1, can you
[3]  tell me the purchase date of that annuity?
[4]  **A:** I can tell you the application
[5]  date.
[6]  **Q:** Did you give me the date?
[7]  **A:** I said, I can tell you the
[8]  application date.
[9]  **Q:** I was waiting for that, I
[10]  apologize. What is that date?
[11]  **A:** May 4th, 1983.
[12]  **Q:** You mentioned earlier something
[13]  called a quotation sheet. What is that?
[14]  **A:** Typically in the industry when an
[15]  a immediate annuity is being sold there is a
[16]  quotation done to show how much benefit can be
[17]  provided for a single premium or how much a
[18]  specific benefit costs.
[19]  **Q:** You testified earlier that you do
[20]  not have a quotation sheet for Mr. Dimon's
[21]  annuity, is that right?
[22]  **A:** That's right.
[23]  **Q:** If you look at Exhibit 1 again,
[24]  and you look down on the bottom right side, it
[25]  says signature of annuitant. Can you read

Page 85

**B. Fasman**

[1]
[2]  that name?
[3]  **A:** It appears to be Dennis Dimon.
[4]  **Q:** And you testified earlier that
[5]  there was an annuity application and there
[6]  also was a supplementary agreement. And I
[7]  think you testified that the supplementary
[8]  agreement basically explained what the annuity
[9]  would be, is that right?
[10]  **MR. CIAPCIAK:** Objection.
[11]  **A:** I think that's what I said. It
[12]  would explain the payments.
[13]  **Q:** Can you tell me the timing or the
[14]  difference in timing for the annuity
[15]  application and the supplementary agreement?
[16]  **A:** I don't know when the
[17]  supplementary agreement was produced.
[18]  **Q:** I am asking a question based on
[19]  your experience. Is the supplementary
[20]  agreement usually offered after the annuity
[21]  application?
[22]  **A:** Generally, the annuity
[23]  application is taken, and then a contract is
[24]  issued subsequent to the annuity application
[25]  being taken.

Page 86

**B. Fasman**

[1]
[2]  **Q:** I believe you testified you do
[3]  not have the actual contract for Mr. Dimon's
[4]  annuity, is that right?
[5]  **MR. CIAPCIAK:** Objection.
[6]  **A:** I don't have the contract, right.
[7]  But I have the application and the
[8]  supplementary agreement, that's what I have.
[9]  To me the supplementary agreement is the
[10]  contract and it explains what the terms are.
[11]  **MR. KEANE:** If you would just
[12]  give me one minute.
[13]  **Q:** Mrs. Fasman, that's all I have,
[14]  thank you.
[15]  **MS. McQUAY:** Tim, do you have any
[16]  questions?
[17]  **MR. O'DRISCOLL:** No, I have no
[18]  questions.
[19]  **MS. McQUAY:** I have just a couple
[20]  further Mrs. Fasman.
[21]  **BY MS. McQUAY:**
[22]  **Q:** Just a couple of questions about
[23]  these calculations that you asked to be done
[24]  back in August of 2005.
[25]  **A:** Yes.

Case 1:05-cv-11073-NG     Document 58-9     Filed 01/02/2007     Page 24 of 78

Dennis Dimon  v.                                                    Barbara Fasman
Met Life Insurance Co., et al.                              Vol. 1, May 10, 2006

Page 87

**B. Fasman**

[1]
[2] **Q:** Am I correct in understanding
[3] that you supplied certain assumptions that
[4] should be used including the amount the
[5] annuity should payout each month, the age of
[6] the annuitant and so forth?
[7]    **MR. CIAPCIAK:** I object to form.
[8] **Q:** Is that correct?
[9] **A:** I did, yes.
[10] **Q:** Okay. And you asked that someone
[11] calculate what the premium would be based on
[12] such assumptions using Met Life's rates for
[13] 1983?
[14] **A:** Yes.
[15] **Q:** Now, do different companies have
[16] different rates?
[17] **A:** Yes.
[18] **Q:** Do you know what Charter
[19] Security's rates were back in 1983?
[20] **A:** No, I don't.
[21] **Q:** All right. So using your
[22] calculation you were not using whatever rates
[23] Charter Security might have been using,
[24] correct?
[25]    **MR. CIAPCIAK:** Objection.

Page 88

**B. Fasman**

[1]
[2] **A:** Right, I don't know what they
[3] were using so I couldn't use them. But I
[4] can't say that we didn't use them. They could
[5] have been the same coincidentally.
[6] **Q:** You just don't know?
[7] **A:** Right.
[8] **Q:** What are some of the factors that
[9] effect the variability of the different rates
[10] charged by different companies?
[11] **A:** The assumptions with regard to
[12] life expectancy, interest, expenses.
[13] **Q:** Life expectancy and what else?
[14] **A:** Interest, expenses, taxes,
[15] gender. I can't think of anything else
[16] offhand.
[17] **Q:** So different companies use
[18] different assumptions regarding those items?
[19] **A:** They can, yes.
[20] **Q:** Okay. And in terms of expenses,
[21] to the extent that that's a variable, does
[22] that depend upon the — are you referring to
[23] the different expenses of different companies?
[24] **A:** I am referring to what
[25] expenses — I guess it's the expenses of

Page 89

**B. Fasman**

[1]
[2] different companies. It's what expenses they
[3] billed into the single premium so that they
[4] can continue to service the annuity going
[5] forward.
[6]    **MS. McQUAY:** I have no further
[7] questions.
[8]    **MR. DeWick:** I have no further
[9] questions.
[10]    (Time noted is 11:50 a.m.)

Page 90

**B. Fasman**

[1]
[2]    I, the witness herein, having read
[3] the foregoing testimony do hereby
[4] certify it to be a true and correct
[5] transcript, subject to the corrections,
[6] if any, shown on the attached page.

[11]        **BARBARA FASMAN**

[16]    Subscribed and sworn to
[17] before me this_____day
[18] of_____, 2006.

**Barbara Fasman**
**Vol. 1, May 10, 2006**

<div align="right">

**Dennis Dimon v.**
**Met Life Insurance Co., et al.**

</div>

Page 91

[1]                     B. Fasman
[2]                     INDEX
[3]   WITNESS      EXAMINATION BY      PAGE
[4]   B. Fasman    Ms. McQuay          4
                                       86
[5]
          Mr. DeWick           76
[6]
          Mr. Keane            81
[7]
[8]
[9]   EXHIBITS                PAGE/LINE
[10]   1    Annuity Application      19   2
[11]   2    Supplemental Agreement   27   6
[12]   3    Letter to Kurt Snyder
            from B. Boehm dated
[13]        July 14, 1983        34  10
[14]   4    Letter to Robert Foley
            from John L. Noe dated
[15]        August 12, 1983      44   7
[16]   5    Letter to John L. Noe
            from Robert Liguori dated
[17]        September 26, 1983   54   3
[18]   6    Letter to Robert Liguori
            from John L. Noe dated
[19]        October 19, 1983     63  11
[20]   7    Letter to B. Boehm
            from John L. Noe dated
[21]        October 12, 1983     65  15
[22]   8    Letter to John L. Noe
            from B. Boehm dated
[23]        October 14, 1983     76   8
      25


Page 92

[1]                     B. Fasman
[2]                  INDEX (Continued.)
[3]   EXHIBITS                 PAGE/LINE
[4]   9    Letter to David B. Kaplan
           from Judy Kelly
[5]        Bates Stamped 22
[6]   10   Document Bates Stamped 32   71   8
[7]   11   Letter to Dennis Dimon
           from Sandy Franklin dated
[8]        June 8, 2003        71  24
[9]   12   Hand written note
[10]  13   Letter to Dennis Dimon
           from Sandy Franklin dated
[11]       July 9, 2003        74  21
[12]  14   Letter to Metropolitan Life
           Insurance Company
[13]       from David Kaplan dated
           September 13, 2004
[14]
      15   Letter to Metropolitan Life
[15]       Insurance Company
           from David Kaplan dated
[16]       September 28, 2004
[17]  16   Letter to Dennis Dimon
           from Clyda Isaacson
[18]       Bates Stamped 42
[19]  17   Letter to Metropolitan Life
           Insurance Company
[20]       from David Kaplan dated
           November 12, 2004
[21]
      18   Letter to David Kaplan
[22]       from Renee Ballard dated
           November 20, 2004
[23]
      19   Letter to Clyda Isaacson
[24]       from David Kaplan dated
           November 24, 2004, 2 pages
[25]

**Dennis Dimon v.**                                                      **Barbara Fasman**
Met Life Insurance Co., et al.                              **Vol. 1, May 10, 2006**

---

Page 93

[1]              B. Fasman
[2]                    INDEX (Continued.)
[3]  EXHIBITS              PAGE/LINE
[4]  20    Letter to Mr. Kaplan
           from Judy Kelly
[5]        Bates Stamped 49
[6]
     21    Letter to Mr. Kaplan
[7]        from Judy Kelly
           Bates Stamped 50
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

Page 94

[1]
[2]                 CERTIFICATE
[3]  STATE OF NEW YORK )
[4]                                    :ss.:
[5]  COUNTY OF NEW YORK)
[6]
[7]         I, Vicky Galitsis, a Certified
[8]  Shorthand Reporter and Notary Public within
[9]  and for the State of New York, do hereby
[10] certify:
[11]        That, BARBARA FASMAN, the witness whose
[12] deposition is hereinbefore set forth, was duly
[13] sworn by me and that such deposition is a true
[14] record of the testimony given by such witness.
[15]        I further certify that I am not related
[16] to any of the parties to this action by blood
[17] or marriage that I am in no way interested in
[18] the outcome of this matter.
[19]        In witness whereof, I have hereunto set
[20] my hand this 15th day of May 2006.
[21]
[22]
[23]               VICKY GALITSIS, CSR
[24]
[25]

---

**Lawyer's Notes**

## $

**$1,450** 77:11, 24
**$180,000** 77:13
**$270,900** 78:8

## 1

**1,450.45** 77:23
**10** 63:14; 71:8, 9
**10:45** 44:18
**10:51** 44:19
**10th** 63:21
**11** 71:25; 72:6, 10; 74:10
**11101** 4:7; 5:14
**1126** 17:22; 43:7, 17, 20, 23
**11:22** 73:22
**11:26** 73:23
**11:50** 89:10
**12** 44:10; 65:17
**12th** 44:25; 65:23; 66:21; 67:12, 13, 15
**13** 74:8, 22
**14** 23:8; 34:12; 76:7
**14th** 41:24; 66:20, 23; 67:6, 14; 76:11
**1976** 8:22
**1981** 7:2, 7
**1983** 32:9; 34:13; 41:24; 44:10, 25; 54:6; 63:14, 21; 65:17, 24; 70:25; 76:8, 11; 77:10, 10; 78:13; 80:24; 81:3; 82:22; 84:11; 87:13, 19

## 2

**20-year** 40:8; 56:19; 67:24; 68:5, 11, 14; 69:5, 10, 18; 70:6; 77:8, 21; 78:2, 4; 82:21, 22
**2003** 71:22; 72:3; 74:24; 75:4
**2005** 81:18, 20, 24; 86:24
**2006** 90:18
**240** 60:8
**240-month** 37:4; 38:13; 39:3
**26** 54:6
**27-01** 4:6
**2701** 5:13

## 4

**4th** 32:9; 84:11

## 5

**5th** 71:21

## 8

**80s** 83:18
**83** 78:13
**83A08153** 20:17; 29:11; 42:16; 47:9, 10

## A

**a.m** 44:18, 19; 73:22, 23; 89:10
**able** 6:15; 12:3; 14:6; 16:4, 8; 17:24; 18:8; 25:25; 37:22; 47:20; 48:3; 52:25, 25; 53:17, 19; 62:16; 74:20
**above** 39:14
**access** 63:7
**According** 34:19; 52:11
**accordingly** 4:23
**acquire** 16:8; 13:24; 20:2
**across** 4:25
**action** 9:4, 8; 66:10
**actual** 29:13; 86:3
**actually** 25:8; 30:8; 33:5; 43:15; 45:11; 64:19; 74:5
**actuarial** 7:9; 8:3
**Actuaries** 8:15
**actuary** 7:22; 8:3
**add** 58:14, 24; 59:24
**added** 41:11, 16
**addition** 40:20; 42:5, 5
**address** 4:5; 5:8, 11; 65:14
**addressee** 45:20
**Administrative** 6:5, 14; 10:15, 17, 24; 13:23; 14:23; 15:8, 10, 14, 21; 16:9, 23; 30:10; 31:11
**Again** 21:25; 23:3, 25; 31:3; 33:18; 38:23; 39:12; 41:9; 42:15; 46:21; 66:25; 74:4; 75:8; 81:10; 84:23
**age** 87:5
**ago** 8:9
**agree** 22:3
**Agreement** 27:8, 14, 16, 17, 20, 22, 23; 28:4; 29:18; 30:7, 18; 33:19; 43:10; 68:17, 18; 85:6, 8, 15, 17, 20; 86:8, 9; 33:24
**ahead** 30:24; 69:8
**Albany** 8:19
**alleged** 63:4
**although** 21:16; 30:2; 40:6
**Amendments** 24:3
**American** 54:13; 72:21; 75:19
**amount** 77:12; 78:7; 87:4; 6:8, 11
**analysis** 7:19; 82:17
**annual** 78:6

**annually** 77:9, 22
**annuitant** 22:6; 72:24; 84:25; 87:6
**annuities** 7:25; 15:9, 15, 22; 76:22; 81:2
**annuity** 6:6; 19:3, 8, 14; 20:22; 28:6, 9, 14; 29:11, 13; 30:6; 40:8; 42:20, 25; 43:4; 46:11; 47:4, 14, 18, 22; 50:3, 18; 56:19; 60:4; 64:13; 66:6; 68:4, 14; 69:4, 10; 70:5; 71:23; 74:7, 12; 77:2, 8, 14, 18, 19, 20; 78:2, 5; 79:4; 82:13, 21, 21, 22; 83:19, 20, 22, 23; 84:3, 15, 21; 85:5, 8, 14, 20, 22, 24; 86:4; 87:5; 89:4
**apologize** 58:22; 84:10
**appear** 19:13; 39:24; 46:6; 57:6, 8; 59:7; 60:5; 63:8; 67:11; 49:11; 19:7; 20:17; 23:8, 12; 25:17, 19; 27:13; 28:21; 29:25; 32:8; 33:6; 34:15; 41:14; 42:12; 43:12; 47:13; 54:11; 56:11; 57:12; 59:4, 14, 15; 62:14; 63:19, 24; 66:24; 71:15; 72:9; 85:3
**application** 17:20; 19:3, 8, 14; 22:2, 10; 23:20; 24:20, 22; 40:6; 57:5; 59:20; 60:12; 64:3, 13; 68:16; 69:9; 83:20; 84:4, 8; 85:5, 15, 21, 23, 24; 86:7
**applied** 27:24; 28:5; 40:7; 56:20
**approximately** 8:9; 78:3; 83:16
**area** 10:24; 79:4
**Arts** 8:13
**ascribing** 26:19
**assertion** 40:3, 6, 10, 18, 20; 57:3; 60:10, 15; 68:13, 3
**assessment** 75:22
**assigned** 14:18; 17:11; 30:22; 31:5, 16
**associate** 7:10; 8:3
**assumed** 35:15
**assumption** 82:6; 77:10; 80:25; 87:3, 12; 88:11, 18
**attached** 90:6
**attachments** 63:3
**attention** 20:16; 21:25; 23:2, 25; 27:5; 34:8; 44:6, 21; 49:24; 50:8; 53:25; 63:11; 65:14; 71:7; 72:5; 76:3
**attorney** 9:22, 24; 10:2; 78:23; 79:3, 6; 81:11; 10:10
**August** 44:10, 25; 81:18, 20, 23; 86:24
**available** 11:18; 74:21
**aware** 18:17, 21; 21:19; 36:3; 71:3, 5; 73:13, 16

## B

**bachelor's** 8:17, 21
**Bachelors** 8:13
**back** 18:11; 26:18, 25; 36:6; 49:23, 24; 72:21; 81:4, 14; 86:24; 87:19
**background** 8:12
**BARBARA** 4:4; 34:16, 18; 45:9; 56:12, 13; 65:23; 76:10; 90:11
**Based** 30:12; 36:2; 48:22; 49:20; 51:25; 55:5; 57:4; 65:4; 85:18; 87:11
**basically** 80:17; 85:8
**basis** 21:22; 40:2, 5, 10, 17, 19; 57:2, 6; 60:10, 14; 68:3, 12; 69:2, 3, 9; 70:4
**Bates** 71:9
**bears** 24:2
**became** 20:3
**began** 6:25
**begin** 6:24; 7:8
**behalf** 9:2; 36:5; 48:16; 55:14
**belabor** 20:12
**benefit** 84:16, 18; 6:12; 27:18, 22; 28:5
**besides** 36:4
**best** 33:2
**big** 82:10, 12
**billed** 89:3
**birth** 22:7
**bit** 32:19; 75:21
**black** 32:18
**blank** 32:15; 64:4, 9, 12, 14; 33:10
**Boehm** 34:12, 16, 18; 35:21; 36:4, 9, 24; 37:2; 38:11, 24; 42:9; 45:8, 9; 56:13; 58:3; 65:16, 23; 76:7, 11; 40:3, 20; 56:12
**bottom** 32:21; 47:2; 55:5; 62:22; 84:24
**break** 44:15, 16; 73:20
**Brian** 81:8
**brief** 48:14
**built** 82:7
**business** 35:18

## C

**calculate** 87:11
**calculation** 6:14; 77:7, 25; 78:4, 21; 87:22; 6:7, 10, 13; 76:21, 23, 25; 77:3, 6, 15; 78:15; 79:21; 81:16, 20, 21; 82:4; 86:23
**call** 13:15, 17; 28:9; 7:22; 13:13; 80:23; 84:13
**came** 21:3; 56:4; 63:23; 71:18; 75:6; 76:12
**can** 4:20; 7:16; 8:11;

**16:12, 15; 18:16; 19:5; 20:4; 21:6; 25:17; 26:9; 33:2; 34:9; 35:11, 13; 37:25; 38:4, 22; 40:16; 41:8, 10, 16; 43:3; 44:12; 46:2, 5; 56:22; 58:9; 63:17; 65:20; 66:14, 16; 67:17; 71:13; 73:19; 76:4; 77:5; 78:25; 83:20; 84:2, 4, 7, 16, 25; 85:13; 88:19; 89:4**
**careful** 48:22
**case** 14:10, 12; 17:12, 17; 18:19; 20:10; 25:10, 12; 34:25; 38:6; 48:14; 53:17; 61:19; 64:7; 70:2; 72:20; 75:8**
**catch** 79:2
**certain** 37:4; 38:13; 39:3; 40:8; 56:19; 57:14; 60:9; 67:24; 68:5, 11, 14; 69:5, 11, 18; 70:6; 77:8, 21; 78:2, 5; 82:21, 22; 87:3**
**certainly** 39:19; 44:14; 67:21; 73:21
**certify** 90:4
**changed** 82:8
**charge** 14:22; 88:10
**Charter** 11:7, 12, 13, 14, 16; 13:19, 21, 24; 14:24; 17:19; 18:7; 19:14, 18; 20:2, 9, 22; 21:11, 23; 22:14; 24:16; 25:2, 7; 26:17, 24; 28:19; 31:25; 33:20; 34:20, 21; 35:5, 17; 36:6; 45:5, 16; 47:7, 21; 50:2, 10, 11, 16; 51:2, 7; 52:20, 24; 54:12, 15, 18; 55:3; 59:21; 61:20; 62:9, 24; 63:25; 66:2, 10; 67:25; 68:12; 69:3; 70:11, 22; 77:14, 18, 20; 83:7, 14, 17; 87:18, 23; 50:19**
**checks** 15:25
**Ciapciak** 9:14; 12:8; 18:3; 19:20; 20:4, 7, 14; 21:6; 24:17; 28:8, 17; 30:23; 31:19; 35:12; 36:7, 17; 38:17; 39:6, 23; 40:13, 23; 46:13, 19, 23; 47:23; 48:10, 18; 49:3, 18; 51:10, 13, 18; 52:4, 21; 53:13; 54:8; 55:21; 56:21; 57:20, 24; 58:9, 12, 15; 61:25; 63:6; 64:16; 66:13; 67:3; 68:7; 69:7, 13; 70:8; 73:15, 24; 78:22; 79:7, 16, 22; 80:7, 11, 18; 83:9; 85:10; 86:5; 87:7, 25**
**circumstance** 52:14; 14:9, 12; 30:21; 31:4, 17; 50:17; 51:7**
**City** 4:7; 5:13
**claims** 18:19; 65:5
**clarify** 26:9; 49:4, 19; 74:3
**clear** 5:5; 42:12; 49:10; 56:3**
**clearly** 4:21

Case 1:05-cv-11073-NG   Document 58-9   Filed 01/02/2007   Page 29 of 78

Barbara Fasman                                                    Dennis Dimon  v.
Vol. 1, May 10, 2006                              Met Life Insurance Co., et al.

clerical 38:12; 39:2, 22; 40:4, 11, 21; 41:14, 21; 42:5; 60:19
close 7:20
closely 83:12
coincidentally 88:5
Combined 8:4
comma 33:2
communicate 15:25; 74:5
companies 87:15; 88:10, 17, 23; 89:2
company 18:18; 19:15, 19; 30:11; 61:9, 11, 12, 15, 17; 72:10, 22; 75:15
compare 77:13
complaint 9:3, 8; 6:7
completed 58:20; 69:23
completely 18:9
compound 40:23
computer 81:3
concerned 33:21; 69:2; 70:2
conducting 4:16
confirm 46:24
confused 41:7
connection 8:23
consider 47:3; 66:7; 80:22; 46:10; 47:17; 51:5; 52:16
consisted 26:8, 14
consult 10:18, 14
consultant 5:20, 22, 24, 25; 6:3, 17; 7:4; 8:8
contain 64:21, 22; 26:4; 38:12; 39:2; 56:9; 22:2; 24:6
contends 70:4
continue 89:4; 30:17
contract 14:17, 19; 17:10, 11, 17; 18:2; 20:23; 30:2, 15, 16, 19, 21, 25; 31:5, 8, 9, 16, 18; 37:3, 8, 16, 18, 23; 38:2, 11; 39:2, 8, 13, 14, 17, 21, 25; 40:4, 11; 41:12; 42:8, 10; 46:11; 47:4, 18, 22; 50:3, 18; 51:3, 5, 9; 52:8, 10, 13, 15, 16, 19; 53:2, 7, 8, 20, 23; 59:22; 60:7; 68:4, 14, 20; 69:4, 22; 70:5; 71:23; 72:12, 15, 17; 74:7, 13, 14, 17, 17, 18, 19, 20, 21; 75:9, 14, 20; 85:23; 86:3, 6, 10; 50:25; 52:7
conversation 12:21, 21; 13:3; 71:16; 12:11, 14; 55:16, 22
copied 45:12
copies 50:24
copy 25:23; 32:11; 33:3, 7; 37:7, 22; 38:2; 42:24; 43:4; 45:4, 15; 46:2; 47:22, 25; 48:4; 50:3, 17, 22; 51:3, 8; 52:8; 53:2, 6, 20, 23; 56:11, 12; 57:13;

60:22; 61:2, 4; 62:10, 12, 14; 63:2, 3, 22; 69:15; 71:22; 72:11, 15, 16, 18; 73:3; 74:17; 75:17
Corporate 6:4
Corrections 24:3; 90:5
correctly 29:10
cost 77:9, 11, 13; 78:8, 10; 82:13, 19, 19; 77:4; 84:18
counsel 4:17; 9:12, 13; 12:4, 9, 12, 14, 15; 13:8; 36:18; 54:12, 16; 55:3, 17, 23; 56:5; 80:9; 83:10
couple 81:10; 86:19, 22
course 50:15; 75:23
covered 80:21
created 58:8; 59:12, 19
criteria 52:12
crossed 45:21
CSL 60:23
current 8:8
Customer 6:4; 15:25
cutting 58:21
Cynthia 10:19, 21

## D

date 22:6; 32:8, 11, 14; 67:6; 83:25; 84:3, 5, 6, 8, 10; 34:12; 44:9, 24; 54:5; 63:13, 20; 65:17, 23; 67:12; 68:22; 72:2; 74:23; 76:7, 11; 33:14
dealt 30:15
Dean 34:16
decipher 33:9
defendant 4:15
defenses 9:4
degree 8:17, 21
Dennis 22:6; 33:21; 37:4; 71:25; 74:23; 81:9; 85:3
Department 6:5
depend 88:22; 31:7; 30:8, 14, 14, 25
deposition 4:16; 8:24; 9:11; 10:11; 13:5, 9; 16:17; 18:15; 19:11; 34:6; 44:22; 46:17; 49:6; 54:2; 75:25
derive 20:24
describe 7:16; 19:5; 27:11; 34:9; 54:2; 63:17; 65:20; 71:13; 76:4; 77:5; 27:17, 21, 25; 28:4
designate 8:25; 9:5; 36:21
determine 34:24; 35:4; 47:20; 55:11, 15; 82:15; 55:20
determining 82:11, 12
develop 17:25
development 7:25
DeWICK 76:17, 19; 79:19; 80:16, 20; 89:8

difference 43:16; 85:14
different 17:22; 29:18; 31:10, 15; 43:13; 77:4; 87:15, 16; 88:9, 10, 17, 18, 23, 23; 89:2
Dimon 22:6; 33:21; 37:4; 71:16, 22; 72:2, 12, 15, 23; 73:8, 14; 74:6, 23; 75:3; 81:9; 82:3, 9, 15, 25; 85:3; 72:7; 84:20; 86:3
direct 27:4; 44:20; 63:10; 71:6; 20:15; 21:25; 23:2, 25; 34:8; 44:5; 50:7; 53:24; 72:5; 76:3
directly 32:17
discussed 81:2
discussion 11:3; 67:22
document 19:6, 7; 20:17; 21:21; 24:23; 25:23; 26:2, 5; 27:12; 28:2, 19; 29:2; 34:10; 37:12, 16; 45:18; 51:20, 22; 54:3; 63:17, 22; 65:20, 25; 68:19; 71:9, 13, 21; 76:4, 12; 78:14, 20; 79:10, 17; 11:4, 16; 19:9; 34:4; 37:14, 19, 19; 49:21; 56:15; 58:2, 5; 59:6, 9, 11, 13, 16; 79:11, 14, 19, 25
done 20:10; 57:21; 67:15; 81:22, 23; 82:24; 84:16; 86:23
down 69:16; 84:24
drafted 31:2
duly 4:8
duplicate 52:6, 10; 74:14, 20
during 75:22; 78:5
duties 6:2; 7:11; 76:20

## E

e-mail 80:5, 6, 9
earlier 47:12, 13; 76:20; 83:2; 84:12, 19; 85:4
economics 8:14
educated 19:22
educational 8:11
effect 88:9
effort 36:11, 15, 23; 55:10, 14
either 12:24; 23:18
else 9:19, 21; 10:4, 10, 13; 11:8, 19, 22; 13:8, 12; 14:15; 16:20, 24, 25; 17:2, 7; 18:14; 35:8, 19; 48:13; 57:11, 19; 59:23; 69:12, 20; 88:13, 15; 36:4
eludes 75:18
employee 6:18; 13:14, 22; 65:5; 85:13
enclosing 39:16
enclosures 62:22
enforceable 46:12; 47:4, 18; 51:6; 52:17; 66:8
error 38:12; 39:2, 22;

40:4, 12, 22; 41:15, 21; 42:5; 60:19
estimate 82:19
Even 51:4; 72:23
exact 46:25
exactly 38:18
EXAMINATION 4:12; 76:17; 81:7
examined 4:10
example 22:5
exchange 70:24
excuse 65:2
exhibit 18:7, 25; 19:3; 20:16; 22:2, 11; 23:3; 24:2; 27:6, 7; 28:18; 29:2, 18; 31:22; 33:19; 34:9, 11; 37:2; 38:10, 25; 42:11, 14; 43:8, 11, 17, 19; 44:7, 8, 12, 22; 45:18; 53:25; 54:4; 56:10; 60:22; 63:2, 11, 12; 64:13; 65:11, 15, 16; 66:5, 12; 67:4, 6, 25; 68:8, 11; 71:8, 9, 25; 72:6, 7, 10; 74:10, 22; 75:2, 24; 76:4, 6; 84:2, 23; 4:2; 13:11; 16:12, 15, 16; 18:4, 12; 29:8; 33:22; 34:3, 4, 6; 35:23; 48:12; 66:15; 69:14; 70:9; 74:4, 8
exist 78:14; 11:25
expect 31:24; 32:2; 51:6; 52:17; 53:10; 50:16, 22; 51:2
expectancy 82:3, 10, 16; 88:12, 13
expectation 65:7; 51:25
expense 7:19; 88:12, 14, 20, 23, 25, 25; 89:2
experience 29:21, 24; 30:5, 12; 31:4, 15; 50:21; 52:2; 85:19; 30:20
expired 74:13
explain 6:9; 12:5; 31:7; 35:11, 14; 37:25; 38:5; 41:11, 16; 43:3; 73:7; 75:14; 85:12; 73:11, 14; 74:8; 85:8; 86:10
explanation 17:25; 18:5; 49:25; 74:11; 75:12
extent 51:11, 19; 59:17; 88:21

## F

fact 6:18; 55:19; 61:22; 62:4, 18; 64:12; 65:4; 75:18
factor 82:11, 12; 88:8
factual 69:2
fair 28:3
falls 58:19
familiar 11:7, 12, 14; 38:7; 65:6
far 33:20; 34:23; 36:14, 16, 22; 37:9; 47:19; 48:16;

60:2; 62:15; 68:2, 25; 69:25; 73:12
fashion 20:3
FASMAN 4:4, 13; 5:7, 9, 10; 20:15; 27:5; 38:21; 39:11; 41:6; 52:5; 64:17; 67:23; 76:18; 79:20; 81:8; 86:13, 20; 90:11
fellow 8:15
fellow 80:17, 3
figure 80:17, 3
file 52:8; 53:5; 72:17; 11:6; 25:23; 38:3; 42:25; 43:5; 45:16, 19; 48:17; 50:4, 12, 18, 23, 25; 51:3; 53:12, 16; 62:10, 25; 63:2, 9, 23; 66:2; 71:18; 75:6; 76:13
fill-in 32:17
filled 31:22, 25; 32:4, 7, 10; 33:12; 59:20; 61:5, 7, 17, 23; 64:14
final 75:21
find 25:25; 29:6; 36:11; 37:10; 48:4; 53:17, 19; 62:16; 15:19
fine 50:13
finish 4:23, 24; 51:13, 14; 58:10, 16
first 4:8; 21:18; 46:5; 56:24, 24; 78:5; 83:24
flat 78:7
Foley 44:9; 45:20; 60:23; 62:4
followed 26:25
follows 4:11
foregoing 90:3
forgotten 21:8
form 19:13; 22:2, 10; 23:3, 20; 24:20, 23; 28:4, 8; 30:3, 23; 31:19, 22; 33:12; 36:7; 38:17; 39:6, 23; 40:13; 47:23; 52:18, 21; 53:11, 13; 61:25; 63:6; 64:10, 12, 16; 65:8, 11; 68:8; 69:7; 70:8; 73:15; 78:22; 79:17; 83:9; 87:7; 65:7
former 13:22; 28:19; 39:25; 40:4; 83:13
formerly 76:2
forth 22:7; 87:6
forward 36:20; 89:5; 62:14, 19
found 77:6
four 7:5; 8:9
Franklin 72:2; 74:23
front 17:23; 54:9
Further 5:2; 12:5; 49:19; 58:23; 73:17; 76:16; 81:5; 86:20; 89:6, 8

## G

garner 17:24
gave 26:19; 50:11; 81:4



Case 1:05-cv-11073-NG    Document 58-9    Filed 01/02/2007    Page 30 of 78

Dennis Dimon  v.                                                    Barbara Fasman
Met Life Insurance Co., et al.                                      Vol. 1, May 10, 2006

gender 88:15
general 15:4; 76:23
generally 61:8, 16; 73:5;
83:22; 85:22
generated 53:8; 61:9, 10
gist 38:19; 39:10
given 11:5; 47:13; 57:10,
18
giving 27:2; 81:15
gleaned 55:21; 58:2
Great 20:14; 50:13
Green 71:17
group 7:20
guess 32:23; 33:2; 35:15;
55:25; 88:25; 32:24

## H

handle 6:15
handwriting 23:9, 12, 14;
24:7, 10; 25:6, 13, 16;
45:23; 64:25; 65:11
handwritten 64:22;
67:24
Hang 54:8; 69:14
happened 48:6; 70:20;
83:11
happy 44:16
head 40:15; 23:4
hear 4:20; 54:23; 61:13;
66:25; 81:11
help 21:7
helpful 67:20
hereby 90:3
herein 90:2
hesitated 28:11
Hi 76:18
hold 8:2
Home 24:4, 12, 16, 24, 25
housekeeping 75:22

## I

idea 22:12; 36:10; 42:2
identification 4:3; 19:4;
27:9; 34:14; 44:11; 54:7;
63:15; 65:18; 71:11; 72:4;
74:25; 76:9
identified 47:12
identity 17:6
illegible 33:5
immediate 15:9; 56:18;
69:10; 83:20, 22; 84:15
important 4:19, 22
in-house 55:2; 79:8
including 36:18; 87:4
incorrectly 38:14; 39:4,
15; 60:8, 13, 15
increase 77:9, 22; 78:7
indicate 25:5; 48:13;
56:17; 73:10; 4:14; 49:25;
50:5; 76:20; 38:24; 71:21;

72:11
indicating 69:17
individual 7:21, 23
industry 52:3; 84:14
infer 24:19; 60:19
information 10:16;
13:18, 21; 14:16; 15:5;
16:5, 7, 9; 18:10; 22:3, 9,
21, 24; 52:18; 53:10, 18;
56:9; 57:10, 18, 25; 64:21,
22; 65:9, 10; 80:22; 81:14;
82:15; 83:7
informed 60:18
inquiring 11:24; 12:16
inquiry 35:7
inserted 23:11, 17; 24:9;
25:6, 14; 33:15
instruct 12:10; 80:8;
55:23
insurance 7:21, 24;
19:15, 19; 65:6; 72:21
interest 6:13; 12:13;
88:12, 14; 12:6; 15:2, 16,
19
interrupted 58:13
into 82:7; 89:3
introduced 19:4; 27:8;
34:13; 44:10; 54:6; 63:14;
65:18; 71:10; 72:3; 74:24;
76:2, 8
involved 36:5; 60:3
Island 4:7; 5:13
issuance 15:23, 24; 60:4
issue 20:13; 30:18;
69:21; 29:14; 31:18;
33:19; 37:3; 40:11; 52:8,
15; 68:4, 20, 23; 69:5;
70:5; 75:15; 85:24
issuing 61:9, 15, 17
items 88:18

## J

Jed 76:18
John 44:9, 25; 52:22;
54:4, 5, 13; 63:13; 65:17,
22; 76:6
July 34:12; 41:24; 74:24;
75:4
jumping 58:16
June 7:2, 7; 71:21; 72:2

## K

Katherine 71:16, 22
KEANE 81:7, 9; 86:11
keep 47:21; 50:2
Kemper 45:2; 46:10;
64:2; 68:4; 69:5; 70:12
kept 48:13
kind 15:6, 10; 28:11
knew 21:9
knowing 12:6; 53:20

knowledge 14:8; 23:23;
24:18; 26:21, 23; 35:8;
48:11, 16, 24; 49:2; 51:20;
55:13; 56:3, 5; 60:2
knowledgeable 18:18,
22; 35:17
known 56:4
knows 36:22; 49:19
Kurt 34:11, 16

## L

ladies 44:13
language 46:25
last 12:25; 46:6
Laura 71:17
lawyer 54:15, 18
learned 17:6
learning 15:2, 16
least 21:17
led 13:20
legal 19:21, 24
legally 20:8
letter 34:11, 15, 19;
38:25; 39:10; 42:9; 44:8,
24; 45:4, 12, 15, 24; 46:5,
9, 14; 47:3, 8; 54:4, 11;
55:6; 56:10, 12, 13, 16;
57:17; 58:7; 60:7, 21;
62:13, 21, 22; 63:2, 5, 12,
19, 25; 65:16, 22; 66:5, 11,
20, 21, 23; 67:2, 5, 12, 13,
14, 15; 69:17; 71:25;
73:10; 74:22; 75:3; 76:6,
10; 21:17; 59:17, 19; 70:24
Life 5:12, 16, 17, 19;
6:3, 17, 19, 21, 25; 7:6;
8:25; 9:4, 12; 11:20; 13:14;
14:15; 17:2, 7; 18:22; 20:3,
8, 10; 23:22; 25:22; 30:16;
34:5, 22; 35:3, 8; 36:15,
20; 37:7, 25; 41:10; 42:24;
43:3; 45:19; 47:21; 48:16,
17, 21; 49:2, 12, 13; 63:23;
71:18; 72:17; 75:6; 76:13;
87:12
Liguori 36:5; 54:5, 12, 15,
16, 17, 18; 55:2, 7; 56:9,
16; 59:5; 60:3; 63:13, 20;
69:16
line 32:15, 22, 23; 42:14;
43:8; 32:18
little 32:19
locate 36:15, 23; 37:22
Long 4:7; 5:13; 6:21; 7:3;
8:2

longer 53:22
look 16:12, 15; 84:2, 23,
24; 80:15; 19:21, 23;
24:20, 22; 46:24; 48:23;
57:17; 59:5, 16; 66:13;
69:13; 80:12, 14; 21:12;
31:9; 32:22, 23, 25
lost 58:25
lot 64:14

## M

maintain 50:24; 51:8;
52:19, 7
makes 57:9, 15
making 60:15; 78:21
Mannino 13:16; 16:4, 23;
35:16; 83:4, 6, 13
manual 11:13, 15, 21;
12:2, 7, 18; 53:5
marked 18:25; 27:6;
34:5; 42:10; 43:10; 44:6,
21; 53:25; 71:8; 72:6;
75:24
mathematical 6:13
mathematics 8:14
matter 9:3; 36:3; 70:23
may 31:9, 11; 32:9; 33:14;
47:24; 52:23; 56:14;
60:19; 77:10; 78:13;
80:18; 84:11
McQUAY 4:12, 13; 12:13;
18:5; 19:23; 20:6, 12;
35:13; 36:19; 41:5; 46:15;
48:15, 25; 49:8; 51:16, 24;
54:10; 58:11, 18; 66:16;
67:21; 68:9; 73:17, 21;
74:9; 76:15; 81:11; 86:15,
19, 21; 89:6
mean 6:9; 21:10; 58:19;
59:15; 62:12; 65:4; 74:16;
79:6; 30:4; 44:14; 46:22;
83:21
meant 77:18
meeting 10:6, 9; 13:7
mentioned 83:2, 11, 19;
84:12
mere 40:21
Met 5:12, 12, 16, 17, 18;
6:3, 17, 19, 21, 25; 7:6;
8:25; 9:4, 12; 11:20; 13:14;
14:15; 17:2, 7; 18:22; 20:3,
8, 10; 23:22; 25:22; 30:16;
34:5, 22; 35:3, 8; 36:15,
20; 37:7, 25; 41:10; 42:24;
43:3; 45:19; 47:21; 48:16,
17, 21; 49:2, 12, 13; 63:23;
71:18; 72:17; 75:6; 76:13;
87:12
MetLife 4:5
Metropolitan 19:18
mid 83:18

might 13:21; 14:16; 20:9;
41:2; 42:13; 52:25; 60:17;
67:20; 87:23
mind 15:13
minute 86:12
mislead 80:13
missing 32:13
mistake 49:9; 70:13
mistaken 68:6, 15; 69:6;
70:7
moment 67:18
money 70:13
month 32:25; 77:11, 23;
87:5; 60:8
more 8:25; 18:18, 22;
31:12; 82:14
Morgan 4:15; 8:24
morning 8:24
most 35:17
Motorist 54:13; 72:21;
75:19
Mrs 5:9, 10; 27:5; 36:4, 9;
37:2; 38:11, 24; 39:11;
41:6; 52:5; 64:17; 67:23;
72:7; 76:18; 79:20; 81:8;
86:13, 20
much 84:16, 17
multiple 14:19; 17:11, 16;
18:2

## N

name 22:5; 35:24; 36:4;
45:20; 81:8; 83:3; 85:2
necessarily 51:2
necessary 65:9, 12
need 44:15; 82:14; 50:14;
66:17
New 4:7, 9; 5:14; 7:22;
8:18; 30:18, 21; 31:4, 9,
10, 11, 17; 39:17; 42:8
next 27:5; 57:4
Noe 44:9, 25; 46:9; 51:4;
52:22; 54:5, 13; 60:7;
62:15, 19; 63:13, 20; 64:2;
65:3, 5, 17, 22; 66:6; 67:9;
76:7, 11
Noe's 47:16; 56:13; 67:12
normal 22:16, 18
North 4:6; 5:13
Notary 4:9
notation 25:3
note 49:21; 21:16; 89:10;
78:16, 18; 79:11, 13
Notwithstanding 47:16
NSC 43:7, 20
number 17:20, 21; 18:7;
20:17, 22, 23; 21:12, 17,
23; 25:17, 18; 26:11;
27:14; 28:25; 29:4, 10, 11,
18; 30:7, 17, 19, 22; 31:5,
10, 12, 16; 32:17, 18;
42:16, 20; 43:17, 23; 44:3;
47:8, 9, 11, 13; 52:11;

80:13; 14:17, 19; 17:10, 12, 17; 18:2; 26:19; 30:2, 13; 32:21; 67:4; 78:24; 79:5; 80:2, 15, 24; 82:11

## O

**O'DRISCOLL** 67:17; 86:17

**object** 28:8; 30:23; 31:19; 36:7; 38:17; 39:6, 23; 40:13; 47:23; 52:21; 53:13; 61:25; 63:6; 64:16; 68:7; 69:7; 70:8; 73:15; 78:22; 79:16; 83:9; 87:7

**Objection** 19:20; 36:17; 51:10, 14, 15, 18; 85:10; 86:5; 87:25

**observation** 67:19

**obstreperous** 48:19

**obtained** 56:9; 60:25

**October** 63:14, 21; 65:17, 23; 66:20, 21, 23; 67:6, 12, 13, 14, 15; 70:24; 76:7, 11

**off** 58:21; 67:17, 22; 74:18

**offer** 70:12; 85:20

**offhand** 88:16

**office** 10:15, 18, 25; 13:23; 14:23; 24:4, 12, 16, 24; 25:2; 65:6; 6:6, 14

**Once** 74:18

**One** 4:5; 5:12; 8:25; 13:2, 13; 18:6; 19:9; 21:7, 10, 17; 29:5, 7; 33:20, 25; 36:14; 50:6, 10, 12; 62:15; 63:9; 70:19; 75:21; 76:19; 77:23; 78:10; 86:12

**ones** 59:19

**Only** 18:6, 8; 24:4, 13, 24; 31:16; 38:4; 43:16; 55:16; 69:19

**option** 57:14

**order** 12:3

**ordinary** 50:15

**original** 31:8; 38:11, 25; 39:7, 13; 40:3, 10; 41:12; 46:11; 47:3, 17, 22; 50:3, 18; 51:5; 52:19; 57:7; 60:7; 66:6; 68:3, 14, 20; 69:4, 22; 70:5

**otherwise** 28:23

**out** 15:19; 26:20; 27:2; 29:6; 31:22, 25; 32:4, 7, 10, 19; 33:6, 10, 12; 36:12; 45:21; 46:4; 53:6; 61:6, 8, 17, 24; 75:19; 80:17

**outs** 7:20

**outside** 18:21

**over** 4:18; 13:10; 14:23; 50:10; 83:17

**own** 51:25

**owner** 52:15, 22; 72:19, 20

## P

**page** 56:24; 90:6; 53:5

**paid** 15:24

**paragraph** 23:4, 8; 24:2; 56:21, 23; 67:25; 68:11

**part** 20:3; 76:20

**particularly** 4:19

**Pasternack** 9:16, 17

**Patker** 9:24

**payments** 83:24; 85:12

**payout** 10:24; 87:5

**people** 59:18

**per** 77:11, 23

**percent** 77:8, 22; 78:6

**perform** 76:21, 25

**perhaps** 20:4; 21:6; 58:2

**period** 56:19; 57:13

**person** 9:5; 13:13; 35:17; 75:19; 9:2

**personal** 24:18; 48:11, 24

**personally** 73:9; 76:24

**phone** 71:15

**physically** 79:25

**piece** 32:24

**place** 10:7; 12:22; 22:7

**Plaza** 4:6, 6; 5:12, 13

**please** 5:4, 8, 11; 26:9; 38:23; 41:8; 54:3; 63:18; 65:21; 66:25; 71:14; 76:5; 77:5; 81:12

**point** 20:5; 48:2; 56:22

**policies** 38:8; 51:21, 23

**policy** 21:17, 23; 28:6, 9, 14; 29:10, 11, 14; 30:6; 42:15, 20, 25; 43:4; 47:7, 14, 22; 52:8; 66:7; 72:18, 18

**position** 5:18; 7:7, 12; 8:8; 10:22; 69:4; 7:14; 8:7

**possession** 78:17; 79:12, 13

**practices** 26:17

**pre-marked** 4:3

**prefix** 43:15; 17:22

**premarked** 13:10; 16:16; 18:4

**premium** 56:18; 78:11, 12; 80:25; 82:16; 84:17; 87:11; 89:3

**preparation** 13:4; 19:10; 46:16

**prepare** 9:11; 10:11; 13:8; 18:14

**Present** 6:12; 9:19

**president** 34:20

**previously** 11:5, 17; 71:7; 75:24

**price** 82:16

**pricing** 7:20, 20, 23, 24; 77:10, 14; 82:24

**prior** 33:20, 24; 66:21; 69:21

**problem** 28:13; 61:14

**procedural** 11:13

**procedure** 11:15, 21, 25; 12:7, 18; 22:17, 19; 53:9; 73:5; 14:14, 21, 25; 15:7, 8, 11, 15, 21; 16:10; 26:17, 24; 30:10; 50:20; 53:4, 21; 64:9

**proceedings** 16:23

**produce** 52:9; 74:19; 34:4; 45:19; 51:22; 85:17; 52:6

**product** 7:24

**program** 81:4; 82:7

**provide** 16:4; 74:13; 75:9; 82:20; 22:23; 27:18, 19, 22; 28:6; 33:4; 84:17; 83:23

**Public** 4:9

**pulled** 53:6

**purchase** 82:20; 83:25; 84:3

**purported** 41:20; 42:4

**purportedly** 39:21

**purpose** 82:17

**put** 31:10; 33:16; 36:20; 59:21

## Q

**Queens** 4:6; 5:13

**quite** 33:5

**quotation** 57:13; 60:22; 61:2, 4, 6, 8; 62:11; 63:4, 8; 69:16; 84:13, 16, 20

**Quote** 25:17; 26:7, 11, 13, 13; 69:18; 80:23; 26:19; 27:2; 77:24; 78:24; 79:4, 25; 80:24

## R

**ran** 81:3

**rate** 49:23; 78:13, 13; 81:3; 87:12, 16, 19, 22; 88:9

**rather** 52:7

**read** 25:18; 46:2, 8, 14, 15, 21; 84:25; 90:2; 39:12

**really** 11:9; 12:23, 24; 14:5; 21:2, 5; 30:3, 14; 31:6, 12; 46:7; 66:22

**reason** 12:16; 25:9, 11; 28:22; 64:6, 25; 70:15, 17; 82:23

**recall** 11:9, 23; 12:23, 24

**receive** 8:16, 20; 45:8, 5; 66:21, 24; 80:3

**receiving** 66:11

**Recess** 44:18; 73:22

**record** 38:8; 56:2; 67:18, 22; 71:15; 73:25

**refer** 20:20; 25:20; 29:4; 43:23; 61:12; 64:19; 66:14, 16; 67:4; 78:20; 29:7; 47:12; 62:21; 64:20; 75:23; 79:10, 15; 20:21; 24:16, 25; 26:11, 12; 33:23; 37:2; 42:9; 43:9, 25; 44:3; 57:5; 58:7; 60:22; 67:13; 69:17; 83:23

**reference** 26:8; 33:18; 38:13; 39:3; 42:15; 43:19; 62:17; 67:24; 68:10; 75:3; 47:8

**referring** 16:15, 19; 17:18; 27:23; 33:4; 34:3; 39:20, 24; 42:13; 77:20; 79:17; 88:22, 24

**reflect** 78:15; 82:9; 21:21; 52:18; 65:10

**regard** 6:6; 15:9, 22; 31:21; 57:3; 60:11; 74:10; 88:11; 9:2; 15:6, 15, 22; 16:9; 18:19; 83:7; 88:18

**regenerate** 53:22

**Reinheart** 9:25

**relating** 37:20

**Relations** 6:5

**relationship** 19:17, 21, 24

**relying** 59:15

**remember** 14:6; 17:15; 21:13, 14

**repeat** 78:25

**rephrase** 5:5; 81:13

**represent** 4:14; 81:9

**reproduce** 53:2

**request** 4:17; 37:21; 72:8; 73:4; 79:3; 6:8, 11; 8:25; 27:25; 69:10; 71:22; 78:23; 81:17; 23:5, 8; 37:12, 14

**resolve** 70:23

**respect** 76:21, 23

**respond** 12:3

**response** 12:9; 37:21; 72:7

**responsibilities** 6:2; 7:12, 17

**responsible** 20:8, 11

**responsively** 57:23

**rest** 46:8

**restate** 41:10

**retain** 62:10; 63:3; 45:15; 50:17, 22; 53:11; 62:24, 25; 66:2

**retention** 38:8; 51:21, 23

**retired** 14:2

**return** 70:12

**reveal** 56:5

**review** 36:2; 49:20; 19:10; 74:4; 79:20

**Reynolds** 34:17

**Right** 21:16, 24; 28:24; 29:19; 33:17; 35:10; 36:13; 41:4; 42:3; 44:4;

**48:5, 8, 11; 62:20; 63:7; 64:23; 70:21; 73:16; 83:4; 84:21, 22, 24; 85:9; 86:4, 6; 87:21; 88:2, 7**

**Robert** 44:8; 45:20; 54:12, 16, 17; 63:12

**role** 7:23

**room** 44:13

## S

**S0113** 25:19; 26:11

**same** 4:20; 30:3, 7, 13; 33:7; 47:11; 88:5

**Sandy** 72:2; 74:23

**saying** 38:21; 39:10; 49:6; 51:4

**SC1126** 27:14; 29:2; 32:18

**scratched** 32:16, 19; 33:6, 10

**search** 25:22; 37:15; 53:16; 37:11, 19

**sections** 64:3, 20

**Security** 19:15, 18; 20:2; 21:23; 22:14; 24:16; 25:2, 7; 26:18, 25; 28:20; 31:25; 33:20; 34:20, 22; 35:5; 36:6; 45:5; 47:7, 21; 50:2, 16; 51:8; 52:20; 54:12, 15, 18; 55:3; 61:20; 62:9, 24; 64:2; 66:2, 11; 68:2, 12; 69:3; 70:11, 22; 83:8, 14, 17; 87:23; 45:16; 87:19

**seem** 29:20; 14:18; 66:20

**send** 72:11, 14, 18; 73:3

**senior** 7:9; 8:3

**sent** 62:4, 6, 8

**sentence** 56:24; 57:4, 9; 58:17

**separate** 31:18

**September** 54:6

**service** 89:4

**settlement** 75:15

**several** 7:13, 14; 59:16

**sheet** 57:13; 60:23; 61:2, 4, 6, 8; 62:11; 63:4, 8; 84:13, 20

**short** 32:25

**show** 40:7; 84:16; 57:13

**shown** 45:11; 90:6

**side** 41:8; 84:24

**sign** 64:9, 12; 65:8; 23:20; 64:4; 65:3

**signature** 84:25

**single** 56:18; 78:12; 80:25; 84:17; 89:3

**situation** 37:20

**Snyder** 34:12, 16

**Society** 8:15

**sold** 20:23; 84:15

**somebody** 22:13; 48:13

**someone** 21:10; 25:7; 31:25; 41:11, 16; 57:10,

18; 87:10
**Sometime** 41:24; 68:20
**somewhere** 53:11
**sorry** 5:21; 9:23; 10:20; 38:22; 43:15; 51:16; 54:21; 58:18, 25
**sort** 32:16
**source** 16:10; 17:7; 53:3; 79:18, 23; 80:12
**space** 23:7, 12; 24:6, 24; 25:14, 16
**speak** 4:19; 13:6; 78:9
**Special** 23:4, 8; 82:24
**specific** 14:7, 25; 15:3, 12, 20; 31:13; 84:18
**specifically** 11:7; 15:18; 35:20; 37:15, 18; 82:8
**specifications** 52:12
**speculate** 38:4
**spoke** 14:4; 35:16
**stamp** 45:8; 71:10
**standard** 64:8; 82:5
**stands** 41:5
**Stanley** 4:15; 8:24
**start** 50:12; 7:6; 77:11, 12, 22
**State** 4:9; 8:18; 66:25; 75:8; 38:11; 46:10; 56:16; 64:2; 66:6
**statement** 47:17; 57:7, 16
**stating** 4:5
**still** 34:21; 35:4; 79:12; 80:6
**stream** 83:23
**subject** 9:3; 90:5
**Subscribed** 90:16
**subsequent** 85:24
**Sue** 4:13; 20:4; 28:10; 41:4; 48:18
**suffix** 43:13
**suggests** 39:19; 68:19
**summarizes** 28:2
**Supplemental** 27:7
**supplementary** 27:13, 16; 28:4; 29:17; 30:6, 18; 33:23; 37:3; 39:14; 42:10; 43:10; 68:17, 18; 85:6, 7, 15, 17, 19; 86:8, 9
**supplied** 11:17; 87:3
**support** 6:4
**sure** 18:9; 20:6; 21:9, 10, 18; 28:11; 32:9; 40:5, 15; 43:13; 52:4; 54:10; 66:22; 67:14; 68:22; 69:25; 80:20
**sworn** 4:8; 90:16
**system** 52:13; 53:8; 74:19; 31:11; 53:22

## T

**talk** 4:25; 17:3; 51:22; 41:8; 61:13; 78:10

**taxes** 88:14
**technical** 6:8, 11
**telephone** 4:16, 18
**Teresa** 13:16; 35:16; 83:3
**term** 28:14; 15:14; 26:18, 25; 28:10; 31:8; 74:16; 77:19; 82:2; 86:10; 88:20
**testified** 4:10; 17:9; 26:12; 40:24; 42:19; 70:3; 84:19; 85:4, 7; 86:2
**testify** 9:2
**testimony** 59:4; 75:23; 83:3; 90:3
**thereafter** 38:14; 39:4; 40:21; 41:12; 42:6; 60:9; 68:5, 15; 69:6; 70:6; 78:2
**thereto** 9:4
**third** 56:23
**this_____day** 90:17
**though** 51:4; 72:23
**thought** 51:16; 58:11; 59:2
**Tim** 86:15
**timing** 85:13, 14
**title** 5:20, 22, 24, 25; 6:16; 7:3, 13, 22; 8:2; 10:23; 24:3; 55:5
**Titlist** 5:23
**today** 4:16; 46:17; 49:11; 55:8; 9:11; 10:11; 13:9; 18:15; 19:10
**together** 59:22
**told** 11:11, 14, 20; 18:13; 21:11, 15, 15; 35:18; 83:6
**took** 14:23; 50:10; 69:3; 75:19; 78:16; 79:11; 83:17
**top** 17:20; 18:6; 20:16; 28:25; 32:8, 15; 45:24
**train** 58:25
**transcript** 90:5
**tried** 34:24; 35:3
**true** 32:2; 90:4
**try** 4:20, 24; 5:4; 70:23
**trying** 29:6; 33:9; 41:4; 48:19, 20; 80:16
**turn** 18:24; 49:23
**two** 29:25; 46:7
**typed** 22:3, 10, 11, 14, 21, 24; 38:14; 39:4, 15; 60:8, 14, 16; 64:21; 65:12
**types** 82:11
**Typically** 84:14
**typing** 64:15, 18
**typo** 60:20

## U

**unable** 37:10; 72:11, 14; 74:13; 75:9
**under** 32:18; 50:17; 51:7
**underlines** 46:7
**understood** 29:9; 59:4
**unit** 80:23

**universe** 80:21
**University** 8:18
**Unless** 40:14
**unusual** 29:20, 23; 64:9, 12
**upon** 48:23; 49:20; 70:4; 73:4; 88:22
**Use** 24:4, 12, 24; 44:13; 82:2; 88:3, 4, 17
**used** 19:14; 28:10, 19; 46:25; 87:4
**using** 77:9; 78:12; 80:24; 81:2; 87:12, 21, 22, 23; 88:3
**usual** 30:5, 13
**usually** 85:20

## V

**valid** 46:11; 47:4, 18; 51:6; 52:16; 66:7
**values** 6:12
**variability** 88:9
**variable** 88:21
**varied** 7:15, 18
**various** 6:7, 10
**verbally** 80:4
**vice** 34:20
**voice** 58:19

## W

**waiting** 84:9
**way** 7:16, 18; 29:23; 59:7; 70:19
**week** 12:25, 25
**what's** 21:21; 33:10; 48:17; 60:9; 74:10; 82:7
**whatsoever** 14:9
**whereabouts** 55:11, 15, 19; 56:4
**whole** 49:5
**whose** 23:14
**within** 83:24
**without** 57:14
**WITNESS** 21:9; 36:20, 21; 46:18; 48:20; 49:12, 14, 22; 73:19; 74:2; 90:2
**Witter** 34:16
**woman** 83:3
**word** 72:24; 40:21; 41:12, 17; 42:6
**work** 5:16, 17; 6:24, 25; 34:21; 83:12; 7:6; 10:24; 35:4
**written** 11:21; 59:18; 62:13

## Y

**Yansee** 10:19, 21; 11:3; 12:22; 13:7

**year** 83:25; 6:23; 7:5, 14; 8:6, 9; 52:2; 78:6
**Yesterday** 10:8, 10; 13:7; 48:21
**York** 4:7, 10; 5:14; 8:18

**Lawyer's Notes**

1

**Black Ink**

## 83A08153

## CHARTER SECURITY LIFE INSURANCE COMPANY, NEW YORK, 720 FIFTH AVENUE, NEW YORK, N.Y. 10019

**ANNUITY APPLICATION**

Name of Annuitant (please print)    ☒ Male    ☐ Female

Dennis J. Dixon

Date and Place of Birth

12/9/59  So. Kingstown, RI

Residence (No., Street, City, State and Zip Code)

Laurel Lane, West Kingston, RI  02892

Business Address (include Name of Employer)

Mail Notices to  ☐ Residence    ☐ Business    ☐ Owner

Social Security No.    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

Owner (if other than Proposed Annuitant)

Name:  American Motorists Insurance Co.

Relationship:

Address:

Social Security Tax Payer I.D. No.    36-0727430

Contingent Owner

Beneficiary and Relationship

Primary:    Katerine I. Dixon.

Contingent:  Jessica I. Dixon. - Daughter
             Rebecca Lee Dixon. - Daughter

9. Type of Contract  Single Premium Deferred Annuity

10. Single Premium Amount    $ 175,000.

11. Maturity Age  ☐ 65  ☐ 70½  ☐ Other:  Immediate
                   6/15/83

12. Will this annuity replace or change any existing life insurance or annuity contract?  ☐ Yes   ☒ No
(If yes, give name of company, policy number, and plan of life insurance or annuity.)

**EXHIBIT**
tabbies ___/___

13. Is this contribution for a tax qualified plan?  ☐ Yes  ☒ No
If so, contract will be issued with a limitation on transferability to conform with IRS regulations. (Check appropriate box for type of qualified plan.)
☐ I.R.A. Rollover          ☐ Corporate pension
☐ T.S.A. Exchange            or profit sharing plan
☐ H.R. 10 Exchange         ☐ Terminal Funding
☐ H.R. 10                  ☐ Other

14. Special Requests   Immediate Annuity
20 yr Certain - 3% increases
$175,000 = 1450.45 per month
first year

15. Amendments and Corrections (For Home Office use only)

Quote Number S0113

jersigned represent(s) to the best of his (her) knowledge lief, that the foregoing statements and answers are correct, true, and correctly recorded and agree(s) to be bound by ments and answers made or to be made in this application. e undersigned further expressly agree(s) as follows:

application and any policy issued in consequence make or modify contracts, to waive any of the company's rights or requirements or to bind the Company by or receiving any promise, representation or informa-

tion, unless the same be in writing, submitted to the Company, and made a part of such policy.

2. Acceptance of any contract(s) issued on the basis of the application shall constitute a ratification and acceptance of any change, correction, addition or amendment noted by the Company in the "Amendments and Corrections" section above, except that in those jurisdictions where it is required any change in amount or benefits shall require a written consent by the Proposed Annuitant and by the Applicant if other than the Proposed Annuitant.

Signed at _____ N Y this 4th day of May 19 83

_____ Agent Signature (1)      621-11 Code

E. Snider
Please Print Name of Agent (1)

_____ Agent Signature (2)      _____ Code

_____
Please Print Name of Agent (2)

Signature of Annuitant _____

Applicant if other than Annuitant  X _____

By _____
Signature and Title

Dean Witter Reynold
Please Print Name of General Agency

0000010

2

000020

# SUPPLEMENTARY AGREEMENT

## (No. SC1126.)

—— —— —— —— —— ——, or ruay noq1)
by _____ Charter Security Life Insurance Company (New York) _____ on the life of __ Dennis Dimon _____ _____ noted
the undersigned hereby requests that the aggregate net proceeds payable under said policy(s) as of the termination date be paid
to the payee designated in, and in the 'rder and manner provided in, the following Table or Tables and in the General Provisions
of this Agreement.

The undersigned surrenders said policy(s) to the Insurance Company and, concurrently herewith, revokes any beneficiary designa-
tion and any election of settlement heretofore made under the said policy(s).

## TABLE I

| PAYEE | MANNER OF PAYMENT | PRIVILEGES |
|---|---|---|
| **SECTION ONE — PRIMARY PAYEE** <br><br> Dennis Dimon <br> Laurel Lane <br> West Kingston, RI 02892 | Monthly payments in the amount of $1,450.45, increasing 3% annually, for a period of 240 months only. | |
| **SECTION TWO-CONTINGENT PAYEE** <br><br> Katherine I. Dimon, wife | In the same manner as the Primary Payee, for the specified period. | |



EXHIBIT

2

tabbies®

3



**Charter
Security
Life**

Charter Security Life Insurance Company (New York)
720 Fifth Avenue
New York, New York 10019
Telephone 212-397-2350

<u>CERTIFIED MAIL RETURN RECEIPT REQUESTED</u>

July 14, 1983

Mr. Kurt Snyder
Dean Witter Reynolds
111 E. Onondaga Street
Syracuse, New York   13202

RE:  Dennis Dimon
     Policy #83A08153
     NSC 1126

Dear Kurt:

As outlined in our telephone conversation, due to a clerical error
the option indicated on the above supplementary contract for Dennis
Dimon was incorrectly typed as 240 months certain and life thereafter
instead of 240 months only.

Enclosed is a new contract correctly stating the option elected.  Please
be advised that the former contract mailed to Robert Foley is null and
void.  I would appreciate it if you will return that contract to my
attention.

Thank you for your cooperation and again, my apologies for this oversight

Sincerely,

Barbara Boehm, Vice Presiden
Policyowner Service Department

BAB:aw

Enc.

EXHIBIT

3

000021

4



Lumbermens Mutual Casualty Company • American Motorists Insurance Company
American Manufacturers Mutual Insurance Company • American Protection Insurance Company

Long Grove, IL 60049 · 312 540-2000

August 12, 1983

R [handwritten initials]

Mr. Robert A. Foley
Dean Witter Reynolds, Inc.
One Boston Place
Boston, Massachusetts   02108

Dear Mr. Foley:

DENNIS DIMON
CHARTER SECURITY POLICY NO: 83 A 08153
OUR FILE NO: 399 LM 106125-Z

I received the replacement policy issued by Charter
Security Life Insurance Company (New York) changing
the terms of the annuity from 240 months certain and
life thereafter to 240 months certain only.

I am advised by Mr. Hughes of Lattie Associates that your
quotation was to provide an annuity which would pay
$1,450.45 per month for the first year increasing annually
at a rate of 3% compounded annually for 240 months certain
and life thereafter for a single premium of $175,000.
This was the benefit to be provided under the terms of a
general release and settlement agreement approved by
Judge Pettine of the United States District Court for the
District of Rhode Island.

The agreed upon premium was paid and a policy issued which
is now in the files of the contract owner, American Motor sts
Insurance Company, providing benefits required by the rel ase,
settlement agreement and court order. I consider the ori inal
annuity contract valid and enforceable and will retain it
in our files.



EXHIBIT
4



RECEIVED
✳ AUG 17 1983 ✳
B. BOEHM

000025

Mr. Robert A. Foley
August 12, 1983
-2-

I intended to return the replacement contract issued by
Barbara Boehm of Charter Security, but it was lost with
my briefcase on August 11, 1983.

Very truly yours,

AMERICAN MOTORISTS INSURANCE COMPANY

John L. Noe
Home Office Claim

JLN:bw

cc:  Ms. Barbara Boehm
     Vice President
     Charter Security Life Insurance Company
     (New York)
     720 Fifth Avenue
     New York City, New York   10019

     Mr. Roger Hughes
     Lattie Associates, Attorneys
     30-31 Union Wharf
     Boston, MA   02109

5





Charter Security Life Insurance Company (New York)
720 Fifth Avenue
New York, New York 10019
Telephone 212-397-2350

September 26, 1983

Mr. John L. Noe
Home Office Claim
American Motorists
Insurance Company
Long Grove, Illinois 60049



EXHIBIT

5

Re:  Dennis Dimon - Policy No. 83 A 08153
     Your File No. 399 LM J06125-2

Dear Mr. Noe:

I am in receipt of your letter to Barbara Boehm, Vice
President of Charter Security Life Insurance Company (New York
("CSL(NY)"), regarding the annuity policy (Policy No. 83 A 08153)
issued by CSL(NY) to Dennis Dimon.

According to information you received from Mr. Hughes of
Lattie Associates, Robert Foley of Dean Witter Reynolds, Inc.,
allegedly offered to provide Mr. Dimon with a CSL(NY) annuity
which would pay $1,450.45 per month for the first year increasing
annually at a rate of 3% compounded annually for 240 months
certain and life thereafter based on a single premium of
$175,000.00.

Contrary to the information you received from Mr. Hughes,
there is nothing to indicate that anything other than a single
premium immediate annuity with a 20 year (i.e., 240 months)
certain period was applied for.  As you can see from the attached
copy of Mr. Dimon's application, which American Motorists
Insurance Company signed as applicant, a 20 year certain policy
was applied for.  I have also attached for your reference, a copy
of a quotation sheet from CSL(NY) to Mr. Foley which clearly
shows that CSL(NY)'s quote was based on the issuance of a certain
period annuity without a life option.  As previously explained by
Ms. Boehm in her letter to Mr. Kurt Snyder of Dean Witter
Reynolds dated July 14, 1983 (see enclosed copy), the option
indicated on the Supplementary Contract originally sent to Dean
Witter Reynolds on June 17, 1983 for delivery to your office was
incorrectly typed as a 240 month certain and life thereafter
annuity instead of 240 months only.  Again, on behalf of CSL(NY),
I apologize for this oversight.

000027

A Member of Charter Insurance Group, Inc.

Mr. John L. Noe
Page 2
September 26, 1983

Based on the foregoing, CSL(NY) guarantees to continue to
pay Mr. Dimon under the terms of his policy a $1,450.45 monthl·
annuity during the first policy year, which will increase
annually at a rate of 3% compounded annually for 240 months
certain. No·payments will be made beyond the expiration of th:
240 month period. Accordingly, the original Supplementary
Contract mailed to Robert Foley and in your possession is null
and void. I would appreciate your returning that contract to:

> Barbara Boehm
> Vice President
> Policyowner Service Department
> Charter Security Life
> Insurance Company (New York)
> 720 Fifth Avenue
> New York, New York 10019

By copy of this letter, I am instructing Ms. Boehm to sen 1
to your attention a correct copy of the Supplementary Contract
for Dennis Dimon which you stated was lost with your briefcase on
August 11, 1983.

If I can be of any further assistance in this matter, ple ise
do not hesitate to contact me at the above address.

Very truly yours,

Robert Liguori
Counsel

RL/spf
Enclosures

cc: Ms. Barbara Boehm

> Mr. Robert A. Foley
> Dean Witter Reynolds, Inc.
> One Boston Place
> Boston, Massachusetts 02108

> Mr. Roger Hughes
> Lattie Associates, Attorneys
> 30-31 Union Wharf
> Boston, MA 02109

000026

6

Lumbermens Mutual Casualty Company • American Motorists Insurance Company
American Manufacturers Mutual Insurance Company • American Protection Insurance Company

Long Grove, IL 60049 · 312/540-2000

October 10, 1983

Mr. Robert Liguori, Counsel
Charter Security Life Insurance
    Company (New York)
720 Fifth Avenue
New York, New York   10019

Dear Mr. Liguori:

DENNIS DIMON
CHARTER SECURITY POLICY: 83A08153
OUR FILE NO: 399 LM 106125-Z

In reply to your September 26, 1983, Sections 14 and 15
of the application that I signed were blank.  The entries
now appearing were filled in after I returned the signed
application.

The original annuity policy received was for a term of
240 months certain and life thereafter as ordered and
agreed upon between Mr. Hughes and Mr. Foley.  Your agent,
Mr. Foley further confirmed this to me by telephone in
April, 1983.  May I suggest you contact him to verify
this?

I intend to retain the original policy in our files and
consider it to be valid and enforceable.

Very truly yours,

AMERICAN MOTORISTS INSURANCE COMPANY

John L. Noe
Home Office Claim

JLN:ml

cc: Mr. Robert A. Foley            cc: Ms. Barbara Boehm
    Dean Witter Reynolds, Inc.         Vice President
    One Boston Place                   Policyowner Service Dept.
    Boston, MA  02108                  Charter Security Life
                                           Insurance Co. (New York)
    Mr. Roger Hughes                   720 Fifth Avenue
    Latti Assoc., Attorneys            New York, NY  10019
    30-31 Union Wharf
    Boston, MA  02109

EXHIBIT

6

7

  

**Lumbermens Mutual Casualty Company • American Motorists Insurance Company**
**American Manufacturers Mutual Insurance Company • American Protection Insurance Company**

Long Grove, IL 60049 • 312/540-2000

October 12, 1983

Ms. Barbara Boehm, Vice President
Policyowner Service Department
Charter Security Life Insurance Company (New York)
720 Fifth Avenue
New York, New York  10019

Dear Ms. Boehm:

RE:  DENNIS DIMON
     CONTRACT NO. 83408153
     OUR FILE NO. 399 LM 156125 Z

In reponse to your October 14, 1983 I reject and return
herewith the Supplementary Agreement and General Provisions
attached thereto. The original annuity policy will be re-
tained in the files of American Motorists Insurance
Company and considered valid and enforceable.

Very truly yours,

AMERICAN MOTORISTS INSURANCE COMPANY

John L. Noe
Home Office Claims

JLN/lz

cc:  Mr. Roger Hughes
     Latti Associates, Attorneys
     30-31 Union Wharf
     Boston, MA  02109

cc:  Mr. Robert A. Foley
     Dean Witter Reynolds, Inc.
     One Boston Place
     Boston, MA  02108

EXHIBIT

tabbies

7

000024

8



Charter Security Life Insurance Company (N. Y York)
720 Fifth Avenue
New York, New York 10019
Telephone 212-397-2350

October 14, 1983

Mr. John L. Noe
Home Office Claim
American Motorists Insurance Company
Long Grove, IL   60049

Re:  Dennis Dimon
     Contract No.  83A08153
     Your File No.  399LM10612 -Z

Dear Mr. Noe;

As was indicated in Mr. Robert Ligouri's letter of September 26, 1983, we are
enclosing a corrected Supplementary Contract in regards to Mr. Dimon's Single
Premium Immediate Annuity.  This contract has been updated to reflect monthly
payments for a period of 240 months only.

Please see that the original Supplementary Contract, which was mailed to
Robert Foley, is returned to me, as that contract is no longer valid.

Please accept our apologies for any inconvenience this matter has caused you.

                              Sincerely,

                              Barbara Boehm, Vice President
                              Policyowner Service Department

BAB/cg

Enclosure

EXHIBIT

8

000023

9

DAVID B KAPLAN
THE KAPLAN BOND GROUP
ATTORNEYS AT LAW
88 BLACK FALCON AVE SUITE 301
BOSTON MA 02210



RE: SCIW1126
    Dennis Dimon

Dear Mr. Kaplan:

Thank you for your call of December 20, 2004 regarding copies of the original documentation for the above contract.

Enclosed please find the following:

- Original application and Supplementary Agreement dated May 4, 1983
- Letter from Barbara Boehm, Vice President Policyowner Services, Charter Security Life dated July 14, 1983
- Letter from Barbara Boehm, Charter Security Life dated September 26, 1983
- Letter from Barbara Boehm, Charter Security Life dated October 14, 1983

Based on the October 14, 1983 letter from Barbara Boehm, the contract was corrected to reflect the 240 monthly payments Period Certain contract. The final payment was issued on May 5, 2003.

We trust that this documentation will satisfy your inquiries and any misunderstanding of when this contract was scheduled to end.

If you have any additional questions, please feel free to contact me at 918 252-8217.

Sincerely,


Judy Kelley
Annuity Payout Specialists II
Affiliated Annuity Operations
December 21, 2004

000022

10

Clerk ID Prefix :     R81                          Attn :
Clerk Name :       Green, Laura               From :      TULSA TELESERVICES
Wip Case Number :     000000000          Subject :     CALL TO 1-800-MET-5000
Creation Date :    06/05/2003 01:17:54 PM            ANNUITY PAYOUTS

POLICY   SUFF  REF      INSURED NAME          DATE OF CALL: 06-05-03
0D0SCIW11 26    Y   DENNIS     DIMON

CALLER NAME....: KATHERINE      DIMON
CALLER STREET..: PO BOX 56
CALLER CITY....: WEST KINGSTON        STATE: RI ZIPCODE: 02892 0056
CALLER PHONE...: 401-782-4813  ALTERNATE PHONE:          ALT EXT:
RELATIONSHIP...: SPOUSE              DO/BR: L03    CALLER SEX: F

NOTES: ANNUITY PAYOUTS: PLEASE SEND A DUPLICATE CONTRACT TO THE OWNER
  AT THE ABOVE ADDRESS.

EXHIBIT
tabbies
10

|  |  |  |
|---|---|---|
|  | Not Assigned | Open - Sent/Unassigned |

Rush ? ○ Yes ● No          Sent To: IND_ANNUITY PAYOUTS TULSA,

Archive Date :   06/12/2003

Comments :

11

June 9, 2003



DENNIS DIMON
PO BOX 56
WEST KINGSTON  RI  02892 0056

RE: SCIW1126

Dear Mr. Dimon,

This letter is in response to a phone call we received from Katherine Dimon.  Since your annuity contract has expired, we are unable to provide you with a duplicate contract. However, the terms of your annuity are described below.

The annuity contract was issued on May 5, 1983 under the "Certain 20 Year" option. American Motorist Insurance Company was considered to be the owner of the annuity, however, you were the annuitant and payee.  This contract provided you with a monthly income due on June 5th of each year payable for a total of 20 years (240 monthly payments).  The payment amount increased by 3% each year.

The first payment was on June 5, 1983.  The final payment was on May 5, 2003.

If you have any questions, please call our customer service center at 1-800-635-7775.

Sincerely,

*Sandy Franklin*

Sandy Franklin
Annuity Payout Specialist III
Annuity Administration Operations

00003

12

2003 JUN 23  AH 6: 04  RECEIVED THIS

I Dennis J Dimon would Like
To have a copy of my Annuity
Contract. I was Told on the
Phone that if I wrote This
Letter To you. That you will
Sent me A Duplicate Contract
Sent ASAP "THANK you."

Dennis J Dimon

Dennis Dimon

RE. SCIW1126

06 / 19 / 03

EXHIBIT

12

13

July 9, 2003



DENNIS DIMON
PO BOX 56
WEST KINGSTON  RI  02892 0056

Dear Mr. Dimon,

We are unable to provide you with a contract.  Annuities such as this one were issued due to a settlement from some other company, in your case, it was American Motorist Insurance Company. The company issued the settlement terms and the annuity was set up in accordance to the payment schedule.

This annuity, in accordance with the terms set by American Motorist Insurance Company, provided you with monthly payments for a total of 20 years. The payments increased by 3% each year in June. The first payment was on June 5, 1983. The final payment was on May 5, 2003.

Unfortunately, I do not have any additional information to provide you with.

If you have any questions, please call the customer service center at 1-800-635-7775.

Sincerely,

*Sandy Franklin*

Sandy Franklin
Annuity Payout Specialist III
Annuity Administration Operations

000030

14

# THE KAPLAN / BOND GROUP

90          80          70

David B. Kaplan
Thomas M. Bond
Andrew S. Kaplan
Tracey N. Kaplan

*Attorneys at Law and Proctors in Admiralty*
*Boston Fish Pier, West Building, Suite 304*
*Boston, Massachusetts 02210*
*(617) 261-0080  FAX (617) 261-1558*

ı  'Counsel
Williamson & Melender

September 13, 2004

Metropolitan Life Insurance Company
P.O. Box 22053
Tulsa, OK 74121-2053

Dear Sir/Madam:

Please be advised that I have been retained by Mr. Dennis Dimon, Holly Ridge Road, South
Kingston, R.I., who entered into a Structured Settlement Contract with your company (see
EXHIBIT #2) in 1983.

From my review of the document (a copy of which I have enclosed), it seems that the contract is
for "life" and that there was a 20 year guarantee.  Mr. Dimon has stated that he has not received
his payments since 2/5/03 and that he has been unable to speak to anyone employed by you to
determine present status.

Accordingly, I would appreciate your immediate response including a copy of all documents
filed in this matter.

Thank you in anticipation of your cooperation.

Very truly yours,

*David B. Kaplan*

DAVID B. KAPLAN

DBK/cms

Enclosure

cc:   : Dennis Dimon
      Frederick W. Benson

EXHIBIT

14

15

# THE KAPLAN / BOND GROUP

David B. Kaplan
Thomas M. Bond
Tracey N. Kaplan

*Attorneys at Law and Proctors in Admiralty*
*88 Black Falcon Avenue, Suite 301*
*Boston, Massachusetts 02210*

(61 1261-0080
Fax (61 1261-1558

September 28, 2004

Metropolitan Life Insurance Company
P.O. Box 22053
Tulsa, OK 74121-2053

Dear Sir/Madam:

RE:    Mr. Dennis Dimon

Dear Sir/Madam:

On September 13, 2004 I communicated with you regarding the above-referenced matter (copy enclosed), and you have not responded.

I shall diary this matter for November 10, 2004 at which time if I have not received any respon e as requested I shall file suit to enforce the obligation herein.

Very truly yours,

David B. Kaplan /rcl

DAVID B. KAPLAN

DBK/rcl

Enclosure

cc:    Dennis Dimon
       Frederick W. Benson



EXHIBIT
15

000040

16

Nov 3, 2004
~~June 7, 2005~~

DENNIS DIMON
PO BOX 56
WEST KINGSTON RI 02892-0056

RE: 000SCIW1126

Dear Mr. Dimon

Thank you for the recent letter to our office.

I have reviewed the original paperwork for this case and found that the option you elected at the time of issue was Income for a Guaranteed Period of 20 Years. This means that you received payments for a period of 20 years and then the contract ended. Your final payment was on May 5, 2003, so you will no longer receive payments from this contract.

If you have any questions, please feel free to contact our customer service number at 1-800-635-7775.

Sincerely,

*Clyda Isaacson*

Clyda Isaacson
Payout Annuity Specialist
Annuity Administration Operations



**EXHIBIT**

_16_

000042

17

# THE KAPLAN / BOND GROUP

David B. Kaplan
Thomas M. Bond
Tracey N. Kaplan

*Attorneys at Law and Proctors in Admiralty*
*88 Black Falcon Avenue, Suite 301*
*Boston, Massachusetts 02210*

November 12, 2004

## SENT CERTIFIED MAIL --
## RETURN RECEIPT REQUESTED

Metropolitan Life Insurance Company
P.O. Box 22053
Tulsa, OK  74121-2053

Dear Sir/Madam:

RE:   Mr. Dennis Diman

Dear Sir/Madam:

It appears that your failure to respond to my communications dated 09/28/04 and 09/13/04 indicates that you may be in violation of M.G.L. 176 D and M.G.L. 93 A.

This is my last communication to you prior to filing suit to enforce your obligation herein.

Very truly yours,

DAVID B. KAPLAN

DBK/cms

Enclosures

cc:    Dennis Dimon
       Frederick W. Benson

EXHIBIT
17

000045

18

November 20, 2004

DAVID B KAPLAN
88 BLACK FALCON AVE STE 301
BOSTON MA 02210

RE: CONTRACT #000SCIW1126
    DENNIS DIMON

Dear Mr. Kaplan,

We have responded to Mr. Dimon on this matter on November 3, 2004.  We
cannot release any information to you.  You would need written authorization from
Mr. Dimon in order to obtain information on his contract.

If you have any questions regarding this matter, you may call 1-800-635-7775.

Sincerely,


Renee' Ballard
Annuity Payout Specialist
Affiliated Annuity Operations



19

# THE KAPLAN / BOND GROUP

| 90 | 80 | 70 |

*David B. Kaplan*
*Thomas M. Bond*
*Tracey N. Kaplan*

*Attorneys at Law and Proctors in Admiralty*
*88 Black Falcon Avenue, Suite 301*
*Boston, Massachusetts 02210*

*(617) 261-0080*
*Fax (617) 261-1558*

November 24, 2004

Clyda Isaacson
Metropolitan Life Insurance Company
P.O. Box 22053
Tulsa, OK  74121-2053

Dear Ms. Isaacson:

**RE:     Mr. Dennis Dimon**

Dear Sir/Madam:

As per my telephone conversation with you in the above-referenced matter and at your request,
enclose herewith an authorization executed by Mr. Dimon requesting that you provide me with
copy of all documents in connection with this matter.  Perhaps after I review the documents, I
will be in a position to understand what transpired.

Thank you for your anticipated cooperation in this matter.

Very truly yours,

*David B. Kaplan*
DAVID B. KAPLAN

DDK/cms

Enclosure

EXHIBIT
_19_

000047

November 16, 2004

To Whom It May Concern:-

I, Dennis J. Dimon, hereby authorize David B. Kaplan, Esq. to act for me in all matters relating to my structured settlement.

NAME _Dennis O___
ADDRESS
151 HollyRidge RD
W. Kingston I
02192

WITNESS
151 HollyRidge RD
W. Kingston RI 02892
ADDRESS

WITNESS
Before Long   WestKingston R.I
ADDRESS              02892

000046

20

THE KAPLAN BOND GROUP
ATTN DAVID B KAPLAN
88 BLACK FALCON AVE STE 301
BOSTON MA 02210

RE:  SCIW1126
     Dennis Dimon

Dear Mr. Kaplan:

The above contract was issued May 5, 1983 under a 20 year Certain Option.  This contract provided Mr. Dimon with a monthly income of $2,543.37 due on the 5th the month.  The final payment was issued on May 5, 2003.

The contract is no longer inforce and there is no cash value.

If you have any questions, please feel free to contact our customer service number at 1-800-635-7775.

Sincerely,

Judy Kelley
Annuity Payout Specialists II
Affiliated Annuity Operations
December 14, 2004



21

DAVID B KAPLAN
THE KAPLAN BOND GROUP
ATTORNEYS AT LAW
88 BLACK FALCON AVE SUITE 301
BOSTON MA 02210

RE: SCIW1126
    Dennis Dimon

Dear Mr. Kaplan:

Thank you for your call of December 20, 2004 regarding copies of the original documentation for the above contract.

Enclosed please find the following:

- Original application and Supplementary Agreement dated May 4, 1983
- Letter from Barbara Boehm, Vice President Policyowner Services, Charter Security Life dated July 14, 1983
- Letter from Barbara Boehm, Charter Security Life dated September 26, 1983
- Letter from Barbara Boehm. Charter Security Life dated October 14, 1983

Based on the October 14, 1983 letter from Barbara Boehm, the contract was corrected to reflect the 240 monthly payments Period Certain contract. The final payment was issued on May 5, 2003.

We trust that this documentation will satisfy your inquiries and any misunderstanding of when this contract was scheduled to end.

If you have any additional questions, please feel free to contact me at 918 252-8217.

Sincerely,


Judy Kelley
Annuity Payout Specialists II
Affiliated Annuity Operations
December 21, 2004



EXHIBIT

_2/_

1

```
                          VOLUME:  I
                          PAGES:  1 through 172
                          EXHIBITS:  See Index


              UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS

                       Civil Action No. 05-11073 WGY


     ***************************
     DENNIS DIMON,              )
                    Plaintiff, )
                               )
          VS.                  )
                               )
     METROPOLITAN LIFE INSURANCE )
     COMPANY, KEMPER INSURANCE  )
     COMPANY, MORGAN STANLEY DW )
     INC., MICHAEL B. LATTI,    )
     LATTI ASSOCIATES, and      )
     LATTI & ANDERSON LLP,      )
                    Defendants. )
     ***************************
```

**DEPOSITION OF DENNIS J. DIMON**, a witness called on behalf of the Defendant, taken pursuant to the Provisions of the Federal Rules of Civil Procedure, before Julie A. Healey, a Certified Shorthand Reporter, Registered Professional Reporter, and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Ciapciak & Associates, P.C., 99 Access Road, Norwood, Massachusetts, on June 29, 2006, commencing at 11:25 a.m.

```
              COPLEY COURT REPORTING
                 101 Tremont Street
              Boston, Massachusetts 02108


           COPLEY COURT REPORTING, INC.
                 (617) 423-5841
```

**Page 2**

```
 1  APPEARANCES:
 2  THE KAPLAN/BOND GROUP
    BY: Brian Keane, Esq.
 3  88 Black Falcon Avenue, Suite 301
    Boston, Massachusetts 02210
 4  Counsel for the Plaintiff
 5
 6  CIAPCIAK & ASSOCIATES, P.C.
    BY: Peter M. LeBlanc, Esq.
 7  99 Access Road
    Norwood, Massachusetts 02062
 8  Counsel for the Defendant,
    Metropolitan Life Insurance Company
 9
10  SULLIVAN WEINSTEIN & McQUAY, P.C.
11  BY: Sandra Sue McQuay, Esq.
    Two Park Plaza
12  Boston, Massachusetts 02116-3902
    Counsel for the Defendant,
13  Morgan Stanley DW, Inc.
14
15  TODD & WELD, LLP
    BY: John E. DeWick, Esq.
16  28 State Street
    Boston, Massachusetts 02109
17  Counsel for the Defendants,
    Michael B. Latti, Latti Associates,
18  and Latti & Anderson LLP
19
20  DRINKER, BIDDLE & REATH, LLP (VIA TELEPHONE)
    BY: Timothy J. O'Driscoll, Esq.
21  One Logan Square
    18th and Cherry Streets
22  Philadelphia, Pennsylvania 19103-6969
    Counsel for the Defendant,
23  Kemper Insurance Company
24
```

**Page 3**

```
 1                      I N D E X
 2  Witness      Direct Cross Redirect Recross
 3  DENNIS J. DIMON
 4  (By Mr. LeBlanc)  5       164
    (By Mr. DeWick)       148
 5  (By Ms. McQuay)              160
    (By Mr. O'Driscoll)          163
 6
 7
 8
 9
10            E X H I B I T S
11  Exhibit No.              Page
12   1   Complaint            124
13   2   Annuity Application  110
14   3   Supplementary Agreement  126
15       No. SC1126
16   5   Letter dated 8/12/83  112
17   6   Letter dated 9/26/83  115
18   7   Letter dated 10/10/83  118
19   9   Letter dated 10/12/83  118
20  11   Letter dated 9/24/99   96
21  12   Telephone Log         101
22  13   Letter dated 6/9/03   128
23
24
```

**Page 4**

```
 1              E X H I B I T S
 2  Exhibit No.              Page
 3
 4  14   Handwritten Note      17
         dated 6/19/03
 5  15   Fax dated 6/12/03     66
 6  17   Letter dated 9/13/04  103
 7  18   Letter dated 9/28/04  104
 8  20   Note dated 11/16/04   120
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 5**

```
 1                      PROCEEDINGS
 2           DENNIS J. DIMON, having been
 3  satisfactorily identified and duly sworn by the
 4  Notary Public, was examined and testified as
 5  follows:
 6                  DIRECT EXAMINATION
 7  BY MR. LeBLANC:
 8      Q.   For the record, my name is Peter LeBlanc.
 9  I'm representing Metropolitan Life Insurance
10  Company, and, Mr. Dimon, have you been introduced
11  to everyone else in the room?
12      A.   Yes.
13      Q.   And do you understand that Mr. Timothy
14  O'Driscoll is on the phone and he represents
15  Kemper Life Insurance?
16      A.   Yeah.
17      Q.   Okay, let's begin here. Mr. Dimon, can
18  you state your full --
19           MR. LeBLANC: Actually, Counsel, if
20  everyone would like to enter into any
21  stipulations, waive notary, sign within thirty
22  days?
23           MR. KEANE: Can he have forty-five
24  days, would that be okay?
```

**Page 6**

```
 1           MR. LeBLANC: Forty-five days, sure.
 2           MR. KEANE: Waive notary.
 3           MR. LeBLANC: And reserve objections
 4  except as to form and motions to strike until
 5  trial.
 6           MR. KEANE: Fine.
 7           MR. LeBLANC: Everyone agrees?
 8           MR. DeWICK: Yes.
 9           MR. LeBLANC: Mr. O'Driscoll, did you
10  hear the stipulations?
11           MR. O'DRISCOLL: Yes.
12           MR. LeBLANC: Do you agree?
13           MR. O'DRISCOLL: Yes.
14           MR. LeBLANC: Thank you.
15  BY MR. LeBLANC:
16      Q.   Mr. Dimon, can you tell us what your full
17  name is?
18      A.   Dennis Jay Diamond.
19      Q.   And can you spell your middle name?
20      A.   J-A-Y.
21      Q.   Now, have you ever gone by any other
22  name?
23      A.   No.
24      Q.   Okay, and what is your home address?
```

**Page 7**

```
 1      A.   151 Holly Ridge Road, West Kingston.
 2      Q.   Is that the address you also get your
 3  mail at?
 4      A.   No, it's P.O. Box 56, West Kingston.
 5           MR. O'DRISCOLL: Forgive me, Tim
 6  O'Driscoll, would it be possible for the witness
 7  to move closer to the telephone? I can barely
 8  hear him.
 9           MR. LeBLANC: We can try to move the
10  telephone closer to him and see if that works.
11           MR. O'DRISCOLL: Thank you.
12  BY MR. LeBLANC:
13      Q.   Mr. Dimon, can you repeat your last
14  answer, please?
15      A.   My Post Office Box is 56, West Kingston.
16      Q.   Okay, and that's Rhode Island?
17      A.   Yes, Kingston.
18      Q.   How long have you been receiving mail at
19  the P.O. Box?
20      A.   Um, about four years now.
21      Q.   Okay. Before you opened the P.O. Box,
22  where did you receive your mail?
23      A.   Right, at my other house that I had on
24  Greenwood Drive in Peacedale.
```

**8**

1  **Q.** And that's in Rhode Island as well?
2  **A.** Yeah.
3  **Q.** And what was the number Greenwood Drive?
4  **A.** 101 at that time.
5  **Q.** And how long did you live at Greenwood
6 Drive?
7  **A.** Almost nineteen years.
8  **Q.** Okay, and how long have you been living
9 at the, is it Holly?
10 **A.** Holly Ridge.
11 **Q.** At the Holly Ridge address?
12 **A.** Four years roughly.
13 **Q.** Okay. So, at the time of the trial in
14 the Jenny C. matter in 1983, what was your mailing
15 address then?
16 **A.** Um, that was also a post office box, that
17 was in -- oh, I'm trying to remember, I think that
18 was at Charlestown, I can't remember exactly what
19 it was.
20 **Q.** Okay. Did you ever live at Laura Lane in
21 West Kingston?
22 **A.** Laura Lane? No, well, yes, I'm sorry,
23 yeah. I lived there for a little while while the
24 case was going on.

**9**

1  **Q.** Okay. Did you ever have any trouble
2 getting your mail at any of your mailing addresses
3 since 1983?
4  **A.** Sometimes off and on, you know, it would
5 be misplaced or something, you know, wouldn't
6 receive some things. Like, one time I had to
7 track down my license because one of the renewals
8 was lost in the mail.
9  **Q.** Regarding the annuity payments that you
10 received in this case, did you ever have trouble
11 getting a check from MetLife in terms of mailing
12 you a check?
13 **A.** No, no.
14 **Q.** Okay. Was there a check that was mailed
15 to the wrong address in 1991?
16 **A.** Um, there was one, yes, and that was, I
17 was going through a separation then at that time,
18 but we wound up getting back together, and I
19 changed the mailing address to a post office box
20 and the other people that had the post office box
21 which canceled the post office box when I was out
22 fishing, and I didn't realize it, and then the
23 check had turned around and got sent back because
24 I never received it or anything.

**10**

1  **Q.** And was that check replaced --
2  **A.** Yeah.
3  **Q.** -- by MetLife?
4  **A.** Yeah, I called them up and had the check
5 replaced within, I forgot how many days it was,
6 but.
7  **Q.** Okay. Did you ever, between 1983 and
8 2003, not receive a monthly check from MetLife?
9  **A.** No.
10 **Q.** A payment on the annuity?
11 **A.** Right.
12 **Q.** So, you received every one of those
13 monthly checks?
14 **A.** Right.
15 **Q.** Okay. Can you tell me who your present
16 employer is?
17 **A.** Um, it's Mike, Mike Hall.
18 **Q.** Hall?
19 **A.** Hall.
20 **Q.** H-A-L-L?
21 **A.** I think that's how you pronounce it,
22 yeah.
23 **Q.** Okay. Does Mr. Hall have a title?
24 **A.** Um, he, he's the captain right now, he

**11**

1 owns Michaela Louise, it's a fishing boat.
2  **Q.** Now, when you say he owns the Michaela
3 Louise?
4  **A.** He owns a piece from what I understand.
5 I just started fishing on the boat, not even a
6 year ago now.
7  **Q.** Okay.
8  **A.** And I don't know his whole background or
9 anything, so.
10 **Q.** Do you own any part of the Michaela
11 Louise?
12 **A.** No, I don't own any boats.
13 **Q.** Okay. Have you ever owned a boat?
14 **A.** No. Oh, I'm sorry, yes, I owned a small
15 lobster boat, 38-footer, that was, that was quite
16 a few years ago now.
17 **Q.** Okay. Did you commercial fish off that
18 boat?
19 **A.** Yeah, for, yeah, for the time I had it,
20 yeah.
21 **Q.** Okay, and did you have some kind of
22 license or permit to allow you to commercial fish
23 off that boat?
24 **A.** Yeah, it was just a commercial fishing

**12**

1 license, that's all it was.
2  **Q.** Okay, and what did you fish for?
3  **A.** I was lobstering at that time, never made
4 anything.
5  **Q.** Okay, and what time frame was that?
6  **A.** Um, it was the same time I lived at
7 Greenwood, so, I can't remember the years right
8 now.
9  **Q.** And for how long did you do this?
10 **A.** That was only for, like, two years.
11 **Q.** Okay. Did you sell that boat?
12 **A.** No, it wound up getting actually
13 destroyed actually, it just nobody bought the boat
14 or anything else like that. I had it on the
15 market, and the boat just went to waste.
16 **Q.** So, dry rot or was it on land?
17 **A.** Yeah.
18 **Q.** Dry docked?
19 **A.** Yeah, I hauled it out and it sat there.
20 **Q.** Okay. Did you sell your permit or your
21 license to fish?
22 **A.** No, I just, you don't have to renew it
23 every year if you don't want to, you know, so, I
24 just let that go.

**13**

1  **Q.** Okay. Can you tell me what your Social
2 Security number is?
3  **A.** Not right off, not right off the top of
4 my hand. I got it in my wallet though.
5  **Q.** Okay. Would you mind pulling out the
6 card and reading that to me?
7  **A.** Sure, 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.
8  **Q.** Okay. Have you ever had a different
9 Social Security number?
10 **A.** Um, we had a big hassle about that with
11 credit companies, and at one point there when they
12 supposedly had another security number on me, and
13 which I never even knew about, and it destroyed my
14 credit references and stuff like that for, for
15 quite a while, and it took me about a year to
16 straighten that all out.
17 **Q.** Okay.
18 **A.** It didn't even belong to me.
19 **Q.** And how long ago was that?
20 **A.** That was in the same time frame I was in
21 Greenwood Drive, so.
22 **Q.** Okay, and you lived at Greenwood Drive
23 for about nineteen years?
24 **A.** Roughly, yeah.

**14**

1    **Q.**  Okay, and Mr. Dimon, I just want to
2 explain to you at this point, I asked you to read
3 your Social Security card and you read that for
4 me. There have been some evidence presented that
5 you may have some difficulty with reading.
6    **A.**  Yes, I have dyslexia.
7    **Q.**  Okay. If I ever ask you to read a
8 document and you can't read it, you don't
9 understand the document, you just let me know,
10 okay?
11    **A.**  Hmm mmm.
12    **Q.**  It's most important that we get the
13 accurate information today, is that fair enough?
14    **A.**  I've got, like, a second grade reading
15 level, that's what it is.
16    **Q.**  Okay. So, we can agree if you don't
17 understand something in a document I show you,
18 you'll just tell me that?
19    **A.**  Right.
20    **Q.**  Okay, fair enough, and are you married
21 now?
22    **A.**  Yes.
23    **Q.**  And you're married to?
24    **A.**  Katherine Dimon.

**15**

1    **Q.**  And what's Katherine's middle name?
2    **A.**  Irene I think.
3    **Q.**  And I'm about to ask you what may be the
4 toughest question the whole deposition, what date
5 were you married?
6    **A.**  October 1st.
7    **Q.**  That's good, a lot of guys don't know.
8    **A.**  Hunting season.
9    **Q.**  And what year was that?
10    **A.**  The year, that's another story, I can't
11 remember the year.
12    **Q.**  Okay.
13    **A.**  Sorry.
14    **Q.**  You were married when you were injured on
15 the Jenny C. though, right?
16    **A.**  Right.
17    **Q.**  So, it was before 1982?
18    **A.**  Yeah.
19    **Q.**  Was it a long time before 1982 or just a
20 couple years?
21    **A.**  No, it wasn't too much after that I got
22 hurt that we was married.
23    **Q.**  And can you tell me what -- do you mind
24 if I refer to your wife as Kathy during the

**16**

1 deposition?
2    **A.**  Go ahead, sure.
3    **Q.**  Can you tell me what Kathy's level of
4 education is?
5    **A.**  Um, I think she might have went to the
6 ninth or tenth grade I think.
7    **Q.**  Okay, and in the course of reviewing the
8 documents in this case, it appears that she had
9 provided you some assistance with reading and
10 understanding some documents, is that true?
11    **A.**  Yeah, just about all of it.
12    **Q.**  Okay. How much do you rely on her to
13 communicate to you about the mail you receive and
14 the documents you receive?
15    **A.**  Just about everything.
16    **Q.**  Okay, and when you receive a document,
17 say your attorney Mr. Kaplan sends you a letter,
18 when you open that, what do you do with it?
19    **A.**  I usually give it to her.
20    **Q.**  Okay, and then what happens?
21    **A.**  Then she'll read it to me.
22    **Q.**  Okay, and do you generally get, in your
23 opinion, a good understanding of what the letter
24 says from what she is reading to you?

**17**

1    **A.**  Yeah, basically, yeah.
2    **Q.**  Okay. Does she provide you financial
3 assistance in terms of balancing your checkbook
4 and paying your bills, that kind of thing?
5    **A.**  She handles all of it.
6    **Q.**  Okay. Is that, when you say she handles
7 all of it, is that part of the division of
8 responsibilities in the marriage?
9    **A.**  Yeah, pretty much because, you know, the
10 simple fact is I have trouble writing too.
11    **Q.**  Okay, and what kind of trouble do you
12 have writing?
13    **A.**  Spelling words, stuff like that.
14    **Q.**  Okay. There are some exhibits we'll get
15 to later in handwriting. Do you write letters to
16 people if you have to, or?
17    **A.**  No.
18    **Q.**  Never?
19    **A.**  No.
20        MR. LeBLANC: Can you mark that as
21 Exhibit 14, please.
22        (Exhibit No. 14, Handwritten Note
23 dated 6/19/03, marked for identification.)
24

**18**

1 BY MR. LeBLANC:
2    **Q.**  Mr. Dimon, I'm going to hand you a
3 document that's been marked as Exhibit 14 for
4 identification. It's dated June 19th, 2003, it's
5 not addressed to an individual, but it appears to
6 be signed by Dennis J. Dimon.
7       Can you take a look at that document,
8 please?
9    **A.**  It doesn't mean anything to me because I
10 don't, I don't even know when it was written,
11 let's put it that way.
12    **Q.**  Okay. Have you ever seen that document
13 before?
14    **A.**  I don't remember it to tell you the
15 truth.
16    **Q.**  Okay. Is that your handwriting?
17    **A.**  My signature is on the bottom, yes.
18    **Q.**  Okay, but the rest, the note part of the
19 handwriting, do you know whose handwriting that
20 is?
21    **A.**  Um, if it would have been anybody, it
22 would have been my wife's I guess.
23    **Q.**  Okay, and if your wife were to write a
24 letter on your behalf, would you discuss the

**19**

1 letter with her, would you tell her what to write?
2    **A.**  Basically, yeah.
3    **Q.**  Okay. So, was that your practice, if you
4 had to communicate in writing with MetLife or any
5 other individual or company, that Kathy would
6 write the note and you would tell her what to
7 write?
8    **A.**  Hmm mmm.
9    **Q.**  Okay. Do you recall what was happening
10 in June of 2003 that would cause you to ask Kathy
11 to write a letter like this?
12    **A.**  If I'm not mistaken, I think MetLife
13 wanted me to send them a letter with my signature
14 and stuff like that stating that, that we wanted
15 copies of the, the records and stuff like that
16 which was given to you by our lawyer and stuff
17 like that concerning, you know, the policy and
18 everything else like that.
19    **Q.**  Okay.
20    **A.**  I'm pretty sure.
21    **Q.**  All right. When you say given to you by
22 our lawyer, are you referring, when you say our
23 lawyer, to Mr. Kaplan?
24    **A.**  No, Mr. Latti, at that time it would have

20

1  been our lawyer that handled all of our, you know,
2  proceeds with the case at that time, you know. It
3  went down through so many different people that,
4  you know, that I thought, you know, Latti's office
5  was handling that all the way down through, you
6  know.
7          I'm not sure on how exactly it works,
8  but.
9      Q.   Okay, and when you just said that time,
10 do you mean the 1983 time frame?
11     A.   Yeah, right.
12     Q.   During the marriage, was Kathy ever
13 employed?
14     A.   Yes.
15     Q.   And what did she do for employment or
16 job?
17     A.   Well, she, right now she's a CNA. She
18 had some other jobs as housekeepers and stuff like
19 that through a place called South Bay Manor.
20     Q.   Okay. When you say CNA, do those
21 initials stand for certified nurse's assistant?
22     A.   Yeah.
23     Q.   And when she was a housekeeper, was that
24 in a hotel or a motel, or?

21

1      A.   It was, like, an old folk's home type of
2  thing, assisted living, a place like that.
3      Q.   Okay, and do you know what she earns,
4  what her wage is?
5      A.   No, not right offhand, no. She would
6  know though.
7      Q.   Okay. Before you married Kathy, did you
8  have any other prior marriages?
9      A.   No.
10     Q.   When you file your taxes -- well, I guess
11 I should ask, do you file tax returns?
12     A.   Yeah.
13     Q.   Okay. When you file your tax returns,
14 does someone help you with that?
15     A.   Yeah, H&R Block.
16     Q.   And do they just complete your returns,
17 are they your accountant?
18     A.   No, they're not our accountant, no, just
19 returns.
20     Q.   Okay. Do you have an accountant?
21     A.   No.
22     Q.   Have you ever used the services other
23 than H&R Block of a financial consultant?
24     A.   No.

22

1      Q.   A broker?
2      A.   No.
3      Q.   Any kind of financial advisor?
4      A.   No.
5      Q.   And where is the H&R Block office located
6  that you go to?
7      A.   It's in Narragansett.
8      Q.   And that's in Rhode Island?
9      A.   Yes.
10     Q.   And how long have you been going to H&R
11 Block?
12     A.   Um, ever since I've been fishing really,
13 ever since I got married we've been going there.
14     Q.   So, since before 1982?
15     A.   Yeah.
16     Q.   And what kind of services did H&R Block
17 provide to you, what did they do for you?
18     A.   They just did the taxes, I got to pay my
19 taxes, you know, myself, I don't have anything
20 taken out of my wages or anything else like that,
21 so, you know, they just do what they do I guess.
22     Q.   So, you bring them a stack of documents,
23 and?
24     A.   Receipts and stuff like that, that's all.

23

1      Q.   Now, can you explain to me why you don't
2  have taxes and deductions taken from your wages?
3      A.   Because commercial fisherman is declared
4  self-employed and so, they don't take any wages,
5  I mean not wages, taxes or even, you know, for
6  unemployment or anything like that, nothing out of
7  us, so, we wind up paying it at the end of the
8  year on, based on what we made for the year, and
9  then we have state tax, federal tax and
10 self-employment tax, it's all taken out.
11     Q.   Okay. Is that something that you plan
12 for every year?
13     A.   Yeah, try to.
14     Q.   Hopefully?
15     A.   Yeah, try to.
16     Q.   And in terms of your income from fishing,
17 the money you make, do you get a share of the
18 proceeds from the boat, or do you get paid by the
19 hour?
20     A.   No, a share.
21     Q.   So, when you're on a boat with Captain
22 Hall, do you get a full share or a partial share?
23     A.   Full share.
24     Q.   So, how many shares are there on a boat?

24

1      A.   Depending on how many people we take at
2  the time, there could be anywhere from three to
3  five.
4      Q.   Okay, and everyone gets one share?
5      A.   Right.
6      Q.   Even the captain?
7      A.   Yeah.
8      Q.   And when was the last time you went out
9  fishing?
10     A.   I've been almost four weeks ago now.
11     Q.   And how long were you out for that
12 fishing opener?
13     A.   Four days.
14     Q.   Is opener the term they use here, or is
15 there some other term?
16     A.   Just a trip, that's all.
17     Q.   Okay, and so, you were fishing, actually
18 fishing for four days?
19     A.   Right.
20     Q.   Okay, and how much, what was your take,
21 what was your share of that trip?
22     A.   Um, how much it was, I'm trying to
23 remember what it was now, I want to say $2,000
24 give or take.

25

1      Q.   Okay. Do you get paid in cash or check?
2      A.   Check.
3      Q.   And the $2,000 you received from your
4  last fishing trip, there were no deductions taken
5  out of that, that was your straight share?
6      A.   Right, right.
7      Q.   And how many trips do you go on in a
8  year?
9      A.   Oh, God, there's no way of answering that
10 because of the weather and stuff like that,
11 there's no way of answering that.
12     Q.   Okay. What's the fewest number of trips
13 you've made in a year?
14     A.   I wouldn't, I wouldn't even remember
15 because they're so frequent, you know, and
16 sometimes you go weeks or a month without even
17 going fishing.
18     Q.   Okay. Can you tell us what was your
19 gross income before taxes last year?
20     A.   I want to say 20 something, somewhere
21 around 20 some thousand I think.
22     Q.   Okay, and is that pretty average for you?
23     A.   No.
24     Q.   Low or high?

**26**

1   **A.**  High.
2   **Q.**  20 something is high?
3   **A.**  Yes, yeah.
4   **Q.**  Okay.
5   **A.**  I've had at least 15 for the year.
6   **Q.**  And do you recall what the high was?
7   **A.**  Um, 20 is about my highest.
8   **Q.**  That's about it, huh, okay. Do you have
9 any children?
10  **A.**  Two.
11  **Q.**  And what are their ages?
12  **A.**  Um, twenty-four and twenty-five I think.
13  **Q.**  Okay.
14  **A.**  I might be off.
15  **Q.**  Boy, girl, boy, boy?
16  **A.**  Two girls.
17  **Q.**  Is Kathy their mother?
18  **A.**  Yes.
19  **Q.**  Okay. Now, how far did your two girls
20 get in school, what was their formal education
21 like?
22  **A.**  They graduated high school.
23  **Q.**  Did they go to public or private school?
24  **A.**  Private, public school, sorry.

**27**

1   **Q.**  Okay. Have either of them gone to
2 college?
3   **A.**  No, they didn't want to go.
4   **Q.**  Do they still live with you, or?
5   **A.**  Yeah, they're still living with me.
6   **Q.**  Okay. Your mom was mentioned in some of
7 the earlier documents in this case.
8   **A.**  Hmm mmm.
9   **Q.**  Is she still living?
10  **A.**  Yes, she is.
11  **Q.**  And what's her name?
12  **A.**  Janice Dimon.
13  **Q.**  And is your father still living?
14  **A.**  Whose, my father?
15  **Q.**  Yes.
16  **A.**  No.
17  **Q.**  Okay, and how old is your mother?
18  **A.**  I'm not sure to tell you the truth. She
19 won't tell me.
20  **Q.**  Good for her, and is she still working
21 now?
22  **A.**  No, she's not, she's retired.
23  **Q.**  What business did she retire from?
24  **A.**  Oh, she was more or less self-employed.

**28**

1 She had a ceramic business that she started
2 herself.
3   **Q.**  Okay. A ceramic business, bowls,
4 knickknacks, that kind of thing?
5   **A.**  Right.
6   **Q.**  And she ran the business by herself?
7   **A.**  Well, her and my father.
8   **Q.**  Now, back in 1983, was your mother
9 involved in the Jenny C. settlement at all?
10  **A.**  Um, yeah, she was there more or less to
11 help me out with -- well, she got me the lawyer
12 actually. She called a few people and tried to
13 find the best one for me, you know, and she found
14 Mr. Latti for me.
15  **Q.**  Do you know if she was ever
16 represented by Mr. Latti herself?
17  **A.**  No.
18  **Q.**  And other than finding Mr. Latti to
19 represent you in that matter, in what other ways
20 did she help with that case?
21  **A.**  Well, she was there for me, you know,
22 when the court cases were going on and stuff like
23 that, she went over some of the documents and
24 stuff like that, and you know, advised me on some

**29**

1 things, you know, and some other things, you know,
2 what to do and what not to do, stuff like that.
3   **Q.**  And the things you're talking about are
4 the settlement and some of the decisions you made
5 during the trial or during that litigation?
6   **A.**  Yeah, a few things, right.
7   **Q.**  Okay, and where does she live now?
8   **A.**  She lives on Curtis Corner Road in
9 Peacedale.
10  **Q.**  What was that road?
11  **A.**  Curtis Corner.
12  **Q.**  Curnis?
13  **A.**  Curtis.
14  **Q.**  Okay. Do you have any brothers or
15 sisters?
16  **A.**  Two brothers.
17  **Q.**  And what do they do for a living?
18  **A.**  Both commercial fishermen.
19  **Q.**  Okay, and I guess is it Frederick Benson?
20  **A.**  Right.
21  **Q.**  Mr. Benson was telling me that he had
22 employed your brothers at a time.
23  **A.**  Right.
24  **Q.**  Were you ever employed by Mr. Benson?

**30**

1   **A.**  Yes.
2   **Q.**  Did you ever consult with your brothers
3 about either the accident on the Jenny C. or the
4 legal matter?
5   **A.**  Not so much on the legal matter, but you
6 know, we talked about everything that happened on
7 the boat and everything, you know, because they
8 knew the situation too, you know, so.
9   **Q.**  Okay. Did they work on the Jenny C. with
10 you?
11  **A.**  No, it was supposed to be a one-trip
12 deal.
13  **Q.**  Okay. It wasn't going to be a long-term
14 employment for you?
15  **A.**  No, it was more or less, like, a transit
16 site, what they call a transit site because I was
17 fishing on another boat, and he didn't want to go
18 out fishing, so, I took that site to make some
19 extra money at that time, and it didn't really
20 work out that good for me.
21  **Q.**  Okay, and where do your brothers live
22 right now?
23  **A.**  One lives in Wakefield, I'm not sure of
24 his address, and one lives in Laura Lane, West

**31**

1 Kingston.
2   **Q.**  Is that your current address, Laura Lane?
3   **A.**  No.
4   **Q.**  But you lived there?
5   **A.**  I lived there, right.
6   **Q.**  Is that a family home?
7   **A.**  My father-in-law had a place that we
8 could move into because we couldn't afford to rent
9 and stuff like that where we were staying, this is
10 after I got hurt, and so, we moved into my
11 father-in-law's mother's old place.
12  **Q.**  Okay. Is that the same house your
13 brother is living in now?
14  **A.**  No, no.
15  **Q.**  It's a different house on Laura Lane?
16  **A.**  Yeah, totally.
17  **Q.**  Do you have any family or friends who
18 have been employed by an insurance company before?
19  **A.**  No.
20  **Q.**  Anyone employed by a brokerage or
21 financial institution?
22  **A.**  No.
23  **Q.**  Okay. So, no one in your family is a
24 former employee of MetLife?

32

1   A.   No.
2   Q.   Or any of the other defendants in this
3 case?
4   A.   No.
5   Q.   Okay, and when I say defendants in this
6 case, do you understand I mean the parties that
7 you're suing?
8   A.   Right.
9   Q.   Okay, and that's MetLife, Kemper
10 Insurance Company, Mr. Latti, Latti Associates,
11 Latti & Anderson --
12   A.   Hmm mmm.
13   Q.   -- and Morgan Stanley.  With regards to
14 your education or formal education, what grade did
15 you complete in school?
16   A.   It would have been eighth grade.
17   Q.   And when did you leave school?
18   A.   When I was in ninth grade, about six
19 months after ninth grade.
20   Q.   Okay.
21   A.   At that time they didn't know how to deal
22 with dyslexia, so, they just almost tossed me
23 aside.
24   Q.   Okay.  After you left school in the ninth

33

1 grade, did you ever try to go back to school at
2 all for anything?
3   A.   I tried a few times, my mother got me
4 into a few classes, like, to try and improve my
5 reading and stuff like that, and some of them were
6 government funded, and they discontinued them
7 because they had lack of funds.
8        So, after that, I just got discouraged,
9 said to heck with it, and wound up going fishing
10 for the rest of that time.
11   Q.   Okay, and is commercial fishing the type
12 of business where you have mostly on-the-job
13 training?
14   A.   Basically, yeah.
15   Q.   Okay.  So, it's the first time you go out
16 on a boat, no one's showing you a manual of how to
17 gaff a fish, they just show you how to gaff a
18 fish, is that fair?
19   A.   Exactly, right.
20   Q.   So, you learn as you go?
21   A.   Right.
22   Q.   Okay, and as you gain experience as a
23 commercial fisherman, does the amount you get paid
24 change at all?

34

1   A.   Yes, yeah.
2   Q.   So, way back when, when you started, what
3 kind of pay did you receive, a partial share, or?
4   A.   When I first started out, I was only
5 getting what they call a share of the shack, and
6 shack is cash which you get for, on a dragger,
7 like, lobsters, scallops and stuff like that, and
8 that's all I was receiving at that time until I
9 got on to the crew itself, and then I was just
10 getting out, like, a half share, half of whatever
11 they made, and that was it until, well, a good
12 four years of fishing, and then I finally got into
13 a full share.
14   Q.   Okay.  Do you recall who owned the
15 Jenny C. in 1983?
16   A.   Um, that was Gary, Gary Champlin, I'm not
17 sure on the spelling either.
18   Q.   Okay, and what was your relationship with
19 Mr. Champlin?
20   A.   I never really spoke to him until after
21 the accident because he had somebody else running
22 the boat, and the person that was running the
23 boat, he's passed away now.
24   Q.   Okay.  So, that person who was running

35

1 the boat, would he be the captain?
2   A.   He would have been the captain, right.
3   Q.   Now, there were some documents from the
4 original Jenny C. case that indicated that you
5 didn't want to sue Mr. Champlin individually.
6   A.   Right.
7   Q.   And you also didn't want to seize the
8 boat, the Jenny C.?
9   A.   Right.
10   Q.   And why was that?
11   A.   Why take somebody's life for it?  You
12 know, you rely on fishing as your livelihood and
13 money, you know, and he was going through a hard
14 time himself with his daughter with cancer and
15 stuff like that, and she wound up passing away
16 too, she was only young, so, you know, why take
17 his form of income away, you know.
18        I'm not that way, I wasn't brought up
19 that way, you know.
20   Q.   Okay.  So, for the damages you suffered
21 on the Jenny C., how did you expect to be
22 compensated for those, who was going to pay?
23   A.   At that time, I, I really didn't know,
24 you know.  I knew he had insurance, you know, and

36

1 I figured, you know, they'd probably take care of
2 the hospital bills and stuff like that, you know,
3 and that would be it, you know.  That's the way I
4 felt about it.
5   Q.   Okay, but eventually, you received a
6 verdict that was more than the hospital bills; is
7 that right?
8   A.   Oh, yes, right.
9   Q.   And who in your mind did you think was
10 going to pay that verdict?
11   A.   The insurance companies I guess.
12   Q.   Okay.  Other than your training as a
13 commercial fisherman, since you left school, did
14 you take any other kind of training, employment
15 training or anything?
16   A.   No.
17   Q.   Okay.
18   A.   I've tried to get out of it a few years
19 ago and stuff like that and tried to find land
20 jobs and my education, and you know, the fact of
21 not being able to read and stuff like that, I, I
22 haven't been able to find anything on land to
23 really go to and stuff.
24   Q.   Okay, and when you just said I tried to

37

1 get out of it, did you mean get out of commercial
2 fishing?
3   A.   Right.
4   Q.   Have you ever applied or received any
5 federal or state certificates, licenses, or
6 permits to work in any particular field?
7   A.   No.
8   Q.   But you did receive a commercial fishing
9 license at some point?
10   A.   Right.
11   Q.   You applied for one?
12   A.   Right.
13   Q.   And you received that license, it was
14 issued to you?
15   A.   Right.
16   Q.   Okay, and who issued that?
17   A.   You mean?
18   Q.   Was it the State of Rhode Island, or?
19   A.   Yeah, it would have been the State
20 of Rhode Island, right.
21   Q.   Okay.  Did you ever receive a federal
22 license from the Fishery Service, the United
23 States Fishery Service or anyone else?
24   A.   No, no.

**38**

1    **Q.**   Okay. Is it common for a commercial
2 fisherman to have more than just a state
3 commercial fishing license?
4    **A.**   With a documented vessel, yeah.
5    **Q.**   And what do you mean by a documented
6 vessel?
7    **A.**   Federal funded I guess or something to do
8 with the federal government I guess, fisheries,
9 you know, for selling, you know, selling fish and
10 stuff I guess.
11    **Q.**   Okay. If you were working on a
12 documented vessel, would it be the captain's
13 responsibility or the owner's responsibility to
14 get you that kind of license?
15    **A.**   You mean a federal permit?
16    **Q.**   Right.
17    **A.**   Sometimes the captains will help them
18 out, yeah.
19    **Q.**   Do you currently hold a license to fish?
20    **A.**   No.
21    **Q.**   But you still fish?
22    **A.**   Yeah, right, I work on deck, I don't run
23 a boat or anything else like that, I just work on
24 deck.

**39**

1    **Q.**   If you were going to run a boat, would
2 you need a different kind of license?
3    **A.**   Yeah.
4    **Q.**   Do you have a driver's license?
5    **A.**   Yeah.
6    **Q.**   And issued by the State of Rhode Island?
7    **A.**   Hmm mmm.
8    **Q.**   Now, other than fishing, have you held
9 any other kind of jobs since you left school?
10    **A.**   No.
11    **Q.**   Was fishing kind of a natural for you
12 because of your family's involvement?
13    **A.**   Yeah, because my father was, he
14 lobstered, you know, out of a skiff for what,
15 almost twenty-six years, and more or less went
16 down through the family, you know, and that's how
17 I got into fishing.
18    **Q.**   Okay. Have you ever owned a business of
19 your own?
20    **A.**   Well, the lobster boat I had, it was kind
21 of business related, yeah.
22    **Q.**   Okay.
23    **A.**   Like I said, it didn't last long.
24    **Q.**   Did you have employees?

**40**

1    **A.**   Um, for say, no, not really, no.
2    **Q.**   Were there individuals like yourself who
3 were self-employed commercial fishermen who helped
4 you on the boat?
5    **A.**   Yeah, basically, yeah.
6    **Q.**   Okay. Did you do anything formal with
7 the state to get your fishing boat business going?
8    **A.**   No, no.
9    **Q.**   You never applied for a permit from the
10 state --
11    **A.**   No.
12    **Q.**   -- to have a corporation or anything like
13 that?
14    **A.**   No.
15    **Q.**   Okay, and I believe you testified earlier
16 that you have to renew your commercial fishing
17 license on a yearly basis?
18    **A.**   Right.
19    **Q.**   Who would help you with that renewal?
20    **A.**   My wife.
21    **Q.**   Is there a form you need to fill out?
22    **A.**   Yeah.
23    **Q.**   And how would you get that form?
24    **A.**   It was received to me through the mail.

**41**

1    **Q.**   Okay. So, the state would send you the
2 form, your wife would help you fill it out and
3 send it back?
4    **A.**   Right, right.
5    **Q.**   Okay. Did you ever serve in the armed
6 services?
7    **A.**   No.
8    **Q.**   Other than the injury you received during
9 your trip on the Jenny C., have you ever had any
10 other kind of physical injury?
11    **A.**   Um, just lower back, I slipped a disc a
12 few years back. Other than that, no.
13    **Q.**   Okay. Have you ever applied for a
14 disability rating?
15    **A.**   No.
16    **Q.**   Have you ever seen a mental health
17 professional, a counselor or psychologist?
18    **A.**   No, my wife would like me to, but no.
19    **Q.**   Are you currently taking any kind of
20 medication?
21    **A.**   Just for high blood pressure, that's it.
22    **Q.**   And what is the name of that medication?
23    **A.**   I'm not sure of the name.
24    **Q.**   Okay. Do you have to take it every day,

**42**

1 or?
2    **A.**   Yeah.
3    **Q.**   Does it, in your opinion, will taking
4 that medication have any kind of impact on your
5 testimony here today?
6    **A.**   No.
7    **Q.**   It doesn't cause you to be sleepy or
8 drowsy or anything like that?
9    **A.**   No, no.
10    **Q.**   It doesn't cause you to be confused, or?
11    **A.**   No.
12    **Q.**   Okay. Have you ever been a party to a
13 competency proceeding?
14    **A.**   What's that?
15    **Q.**   It's a proceeding where you, a court case
16 or a court action where you try to prove that
17 someone is not competent any longer, someone is
18 mentally ill, or?
19    **A.**   No, no.
20    **Q.**   Okay. Do you remember a gentleman by the
21 name of Leonard Decof?
22    **A.**   No.
23    **Q.**   Okay. During the Jenny C. trial or
24 Jenny C. litigation, Mr. Decof was appointed as a

**43**

1 guardian ad litem for you.
2    **A.**   Hmm mmm.
3    **Q.**   Does that ring a bell at all for you?
4    **A.**   I remember them appointing a guardian,
5 yes, but I didn't know his name.
6    **Q.**   Okay. Did you meet with Mr. Decof?
7    **A.**   Um, I remember going to an office with a
8 few other people and stuff like that and
9 discussing some stuff, but I'm not sure on names
10 and stuff like that.
11    **Q.**   Okay. When you say you're not sure on
12 names, you don't remember who went to the meeting
13 with you?
14    **A.**   Right.
15    **Q.**   Would it have been your wife, Kathy,
16 would she go to that kind of meeting?
17    **A.**   Yeah, she was there, and I think my
18 mother was there for one too.
19    **Q.**   Okay, and how many meetings total did you
20 have with Mr. Decof?
21    **A.**   I think one, I'm not sure.
22    **Q.**   And so, you recall that you and your wife
23 and maybe your mother went to a meeting with the
24 guardian at his office?

**44**

1   **A.**  Hmm mmm.
2   **Q.**  Was anyone else there at the meeting?
3   **A.**  Um, I'm not sure at that time. I know, I
4 know when things went down in the courtroom and
5 stuff like that, that we had, we left the
6 courthouse, and we went to another building, and
7 there was quite a few people there, but I'm not
8 sure exactly what was, was said all the way
9 around.
10      You know, it's so long ago, it's hard to
11 remember exactly what was going on at that time.
12   **Q.**  Okay, and I'm not sure I'm going to
13 phrase this correctly, but you just said we were
14 in the courtroom and either when it was going down
15 or when it went down, what did you mean by that?
16   **A.**  Well, at the end of the first trial and
17 then we went to another one because when they
18 appointed a guardian to me, I wasn't quite sure on
19 exactly, the judge asked me how much money that we
20 were going to receive and stuff like that, and
21 because I wasn't sure of the total amount of what
22 we were receiving, and then that's when the judge
23 turned around and assigned the guardian to me to
24 go over everything and make sure I understood

**45**

1 exactly what was going on and stuff like that as
2 far as how much I was getting, and you know, you
3 know, and stuff like that, what my intentions were
4 and stuff like that.
5   **Q.**  Okay. At that hearing where the judge
6 appointed the guardian, do you recall that
7 hearing, what happened there?
8   **A.**  Certain parts of it, yeah.
9   **Q.**  Okay. Do you recall who was there
10 representing you at that hearing?
11   **A.**  Latti & Associates was one of the people,
12 I'm not sure, I don't remember who it was.
13   **Q.**  Did you ever meet Mr. Latti?
14   **A.**  Himself, yeah.
15   **Q.**  Okay. Did he handle your trial?
16   **A.**  Not himself, no.
17   **Q.**  But someone from his office did?
18   **A.**  Right.
19   **Q.**  Okay.
20   **A.**  There was two of them, two people
21 actually from his office.
22   **Q.**  And at the hearing where the judge
23 appointed the guardian, you were represented by
24 counsel from Mr. Latti's office or Latti &

**46**

1 Associates?
2   **A.**  Right.
3   **Q.**  And would it be fair to say
4 that -- strike that.
5      Was it your understanding based on what
6 happened at that meeting that the judge had
7 concerns about your ability to understand the
8 settlement?
9   **A.**  Right, or the amount that we were
10 getting, right.
11   **Q.**  And do you recall what words the judge
12 used to tell you that he had that concern?
13   **A.**  That's about the way he put it to me, he
14 says, he was kind of a funny guy actually, "You're
15 not sure on exactly how much you're getting?" and
16 then he turned to the lawyers, and he says,
17 "Well," he says, "This is as far as this is going
18 to go," he says, "We've got to find somebody to
19 make sure exactly what Mr. Dimon knows what's
20 going on," you know, and that was more or less the
21 end of it from there.
22      He didn't let me testify, you know, let
23 me say anything more after that.
24   **Q.**  Okay, and before he made that statement,

**47**

1 did he ask you some questions?
2   **A.**  He might have, but I'm not sure, I don't
3 remember exactly what was said.
4   **Q.**  Okay, and did anyone in the courtroom ask
5 you questions before he made that statement?
6   **A.**  I'm not sure, I can remember a lot of
7 stuff going on, you know, and stuff like that, a
8 lot of things being said, but directed to me I
9 can't remember.
10   **Q.**  Do you recall speaking at that hearing
11 yourself?
12   **A.**  Yeah.
13   **Q.**  Okay, and before that hearing, how much
14 time had you spent in a courtroom?
15   **A.**  Just the time that we spent during the
16 hearing itself, you know, when the court case
17 itself was going on.
18   **Q.**  And in your experience in the courtroom,
19 did you just start speaking on your own or did
20 someone direct a question to you and then you
21 would respond?
22   **A.**  No, somebody directed a question and then
23 I responded.
24   **Q.**  So, were you sitting in what you thought

**48**

1 was a witness chair at the time that the judge
2 made his statement that he had concerns about your
3 understanding of the case?
4   **A.**  I was sitting in the witness chair.
5   **Q.**  Okay, and before that, you were sitting
6 at counsel table?
7   **A.**  Right.
8   **Q.**  What we call counsel table, it's where
9 the attorneys sit?
10   **A.**  Right.
11   **Q.**  Okay. So, at some point during that
12 hearing, you moved from counsel table up to the
13 witness chair?
14   **A.**  Right.
15   **Q.**  And I assume someone asked you to do
16 that?
17   **A.**  Right.
18   **Q.**  Do you recall who asked you to do that?
19   **A.**  No.
20   **Q.**  Okay, but you do recall that your
21 attorney was present at that hearing?
22   **A.**  Right, right.
23   **Q.**  Did he say anything to you after the
24 hearing, after the judge said he had concerns?

**49**

1   **A.**  Um, not really, that we had to go to, you
2 know, a different place and talk to this person
3 and stuff like that. That was about, about it.
4   **Q.**  Okay. Did you go talk to Mr. Decof or
5 the guardian the same day of the hearing?
6   **A.**  I think it was, yeah.
7   **Q.**  How did you feel about the court's
8 decision to appoint a guardian for you?
9   **A.**  How did I feel? It didn't matter to me,
10 you know. At that time, I mean they were only
11 looking out for my benefit, you know, and stuff.
12 That's the way I saw it.
13   **Q.**  Okay. Was it your understanding that
14 that was the job of the guardian, to look out for
15 your best interest?
16   **A.**  Yeah, I would say so, yes.
17   **Q.**  Okay. Did you understand that it was
18 also your attorney's job to look out for your best
19 interest?
20   **A.**  Yes.
21   **Q.**  Okay, and to do what you asked him to do?
22   **A.**  Yeah.
23   **Q.**  And to give you advice about what to do?
24   **A.**  Right.

50

1    **Q.**  When you were having meetings with your
2 attorney -- I guess first, let me ask, did you
3 have meetings with your attorney before trial in
4 the Jenny C. matter?
5    **A.**  Oh, yeah, yeah.
6    **Q.**  Okay.  How often did you meet with your
7 attorney back then?
8    **A.**  Well, for the simple fact we lived so far
9 away and stuff, it was probably, like, three or
10 four times, you know, within the course of a month
11 or something like that or a week.
12    **Q.**  And who attended those meetings with you
13 if anyone?
14    **A.**  My wife or my mother.
15    **Q.**  Okay.  Sometimes both?
16    **A.**  Right.
17    **Q.**  Okay, and during these meetings with your
18 attorney before the trial, did you ever tell him
19 or her -- were all your attorneys at that time
20 men?
21    **A.**  Yeah.
22    **Q.**  Did you ever tell your attorney "I can't
23 read"?
24    **A.**  Yes, oh, yes.

51

1    **Q.**  And "I have difficulty writing"?
2    **A.**  Oh, yeah, that came out the first time.
3    **Q.**  In your first meeting?
4    **A.**  Yeah.
5    **Q.**  So, would it be fair to say that your
6 attorneys knew right off the bat that you had some
7 difficulty with reading and writing?
8    **A.**  Oh, yeah.  I imagine my mother said that
9 to him too, you know, when she called then, I
10 imagine she said it too.
11    **Q.**  And if your attorney handed you a
12 document, would you read it, pretend to read it,
13 or would you hand it off to your wife to read it?
14    **A.**  No, no, either he'd read it to me or my
15 wife would, one or the other.  Most of the time
16 he'd read it to me.
17    **Q.**  Would he read it to you in the way that
18 someone might hand someone a document and kind of
19 say this means X, or would he actually read the
20 document to you?
21    **A.**  He'd actually read it to me, and he'd
22 also hand a copy to my wife or something like that
23 and have her go along with him and stuff like that
24 to make sure, you know, everyone was word to word.

52

1    **Q.**  Okay, and this was before the Jenny C.
2 ever went to trial, right?
3    **A.**  Right.
4    **Q.**  If you recall, did your attorney have any
5 reaction to a guardian being appointed on your
6 behalf?
7    **A.**  No, not that I can remember, no.
8    **Q.**  During the time of the Jenny C. trial,
9 did you, when you had meetings or needed to
10 contact your attorney, who would you call?
11    **A.**  Latti & Associates themselves in Boston.
12    **Q.**  Okay, and would you ask for a specific
13 attorney or just say "This is Dennis calling"?
14    **A.**  At that time, we'd ask for the attorney
15 that was handling the case.
16    **Q.**  Okay.  Do you remember who that person
17 was?
18    **A.**  I remember his first name was Roger or
19 something like that, I'm not sure.
20    **Q.**  Okay.  Does the name Roger Hughes ring a
21 bell?
22    **A.**  Yeah, yeah.
23    **Q.**  Okay.  How much interaction did you have
24 with Mr. Hughes back in 1982, '83?

53

1    **A.**  When we'd go to his, Latti's office
2 himself in Boston, I didn't have much, but when we
3 was meeting in Providence, it was basically
4 through him.
5    **Q.**  So, when you went to the Latti offices in
6 Boston, what attorney would you meet with there?
7    **A.**  I'd meet with Mr. Latti himself.
8    **Q.**  Did you consider Mr. Latti to be your
9 attorney?
10    **A.**  Um, well, it's like every other
11 attorneys, you know, they got people underneath of
12 them too, you know.  He was the main person that
13 was supposed to have gone through everything, you
14 know, so, he was most of the ones I was relying
15 on.
16    **Q.**  Okay.  When you say he was the main
17 person, was it your understanding that he was
18 overseeing the case?
19    **A.**  Right, in his own standards, right.
20    **Q.**  So, he was, in commercial fishing jargon,
21 he was the captain of Latti & Associates?
22    **A.**  Right.
23    **Q.**  He ran the ship?
24          MR. DeWICK:  Objection.

54

1 BY MR. LeBLANC:
2    **A.**  Yeah.
3    **Q.**  And just so you know, Mr. Dimon,
4 Mr. DeWick made an objection.
5    **A.**  Right.
6    **Q.**  If we have any discussions about that,
7 you should probably hold off your answer until we
8 can resolve that.
9    **A.**  Okay.
10    **Q.**  And if we need to, we'll ask you to
11 answer the question, and if there is some other
12 resolution, then we'll let you know.
13    **A.**  Hmm mmm.
14    **Q.**  Now, did Mr. Latti ever come down to
15 Rhode Island to meet you there?
16    **A.**  No.
17    **Q.**  Okay.  Mr. Hughes did?
18    **A.**  Right.
19    **Q.**  Do you recall meeting any other attorneys
20 from Latti & Associates?
21    **A.**  Not that wasn't familiar with the case
22 itself, no.
23    **Q.**  Okay.  Does the name Flannery ring a
24 bell?

55

1    **A.**  No, not really.
2    **Q.**  Okay.
3    **A.**  I did meet his daughter when we settled
4 the case, I'm not sure of her name now.
5    **Q.**  And whose daughter was that?
6    **A.**  Mr. Latti's daughter.
7    **Q.**  Okay, and when you say you met his
8 daughter?
9    **A.**  It was just briefly actually, you know,
10 Mr. Latti introduced us, you know, and that was
11 about the size of it.  My wife talked to her, you
12 know, quite a bit on the phone about, you know,
13 certain things and stuff.
14    **Q.**  And --
15          MR. LeBLANC:  If I said anything,
16 strike that because I forgot what it was at this
17 point.
18 BY MR. LeBLANC:
19    **Q.**  Who did you understand Mr. Latti's
20 daughter to be?
21    **A.**  At that time, probably just an associate
22 at that time.
23    **Q.**  You knew she was an attorney?
24    **A.**  Yeah.

**56**

1    **Q.** Okay. Is his daughter different from
2 Carolyn Latti?
3    **A.** I don't know. Like I said, I can't
4 really remember her name, so.
5    **Q.** Okay, but Mr. Latti identified her as his
6 daughter?
7    **A.** Right.
8    **Q.** And did she do any work on your case?
9    **A.** Not that I know of.
10    **Q.** Okay. Then why would your wife be
11 calling her?
12    **A.** This was, this would be after the fact,
13 you know, after the checks stopped and stuff like
14 that, that was the only person to contact because
15 from what we understood, that he retired at that
16 time.
17    **Q.** Okay.
18    **A.** I don't know exactly when he retired.
19    **Q.** So, when you first met Mr. Latti's
20 daughter, what time period was that?
21    **A.** That was when we had settled the case,
22 and I went up to sign the papers and stuff like
23 that for the, the insurance policies and stuff.
24    **Q.** Okay. Was that in 1983?

**57**

1    **A.** Right.
2    **Q.** Have you ever been a party to a lawsuit
3 other than this one or the Jenny C. matter?
4    **A.** No.
5    **Q.** Have you ever testified in court?
6    **A.** No.
7    **Q.** Other than in the Jenny C. trial?
8    **A.** Right.
9    **Q.** Have you ever given a deposition other
10 than today?
11    **A.** Just during the, you know, the case with
12 the Jenny C.
13    **Q.** And do you remember where that deposition
14 was taken?
15    **A.** Um, no, I don't.
16    **Q.** Other than your attorney being in Boston,
17 do you recall anything else happening in this case
18 in Boston, in Massachusetts?
19    **A.** I was in the hospital, I was in Boston
20 Ear & Eye Infirmary, that's about it.
21    **Q.** That was it, huh. Have you ever signed
22 an affidavit?
23    **A.** Affidavit, or?
24    **Q.** Okay. I'll describe what I consider an

**58**

1 affidavit to be, and you tell me if you ever
2 signed that. It's a document that states some
3 facts and that you sign under oath that they're
4 true and accurate.
5    **A.** Yeah.
6    **Q.** Have you ever signed a document like
7 that?
8    **A.** Yeah.
9    **Q.** Okay, and for what purpose did you sign
10 that document?
11    **A.** Um, it was all to do with the case, all
12 the documents that, you know, needed to be signed
13 for the lawyers and stuff like that, you know,
14 giving them power of attorney.
15    **Q.** Okay, and when you say the case, do you
16 mean the Jenny C. case?
17    **A.** The Jenny C. case, right.
18    **Q.** Okay. Other than kind of minor traffic
19 offenses, have you ever been charged with
20 violating any law?
21    **A.** No, not really.
22    **Q.** Okay. When you say no, not really, does
23 that mean no?
24    **A.** No.

**59**

1    **Q.** Have you ever been in court on any kind
2 of issue other than with Jenny C.?
3    **A.** Just with the separation with my wife.
4    **Q.** You went to court for that?
5    **A.** Yeah, that was just minor stuff actually.
6    **Q.** Did it revolve around child support kind
7 of issues or visitation, or?
8    **A.** It was child support and stuff, and stuff
9 like that, but.
10    **Q.** Okay.
11    **A.** It never went anywhere because we wound
12 up getting back together anyways, so.
13    **Q.** Okay. Did you do anything to prepare for
14 today's deposition?
15    **A.** Just went over a little bit in David's
16 office, my lawyer's office, that's all.
17    **Q.** And when you say we went over a little
18 bit, what does that mean?
19    **A.** Just what was going to be said and stuff
20 like that, you know, in a deposition, that's all.
21        MR. KEANE: I'm preparing.
22        MR. LeBLANC: Okay.
23 BY MR. LeBLANC:
24    **Q.** When Mr. Keane just said he was

**60**

1 preparing, my suspicion is that he may have wanted
2 to make an objection or may want to make an
3 objection, okay, so, let me just caution you right
4 now what you say to your lawyer may be
5 confidential, okay, so, when I ask you questions
6 that relate to that, you might want to give him an
7 opportunity to interpose an objection before you
8 answer, okay?
9    **A.** Okay.
10        MR. KEANE: Thank you, Peter.
11        MR. LeBLANC: Your welcome.
12 BY MR. LeBLANC:
13    **Q.** When you went over stuff at your
14 attorney's office, did you look at any documents?
15    **A.** We looked at a couple of things, yeah.
16    **Q.** Do you recall what they were?
17    **A.** Just some papers that I signed and stuff
18 like that, that's about all. I don't remember
19 exactly what they were, but.
20    **Q.** Okay. When you say papers that I signed,
21 were they papers you signed a long time ago or
22 papers you signed the day you had the meeting?
23    **A.** No, papers that I signed a long time ago.
24    **Q.** Okay, and did anyone else attend this

**61**

1 meeting with you?
2    **A.** My wife.
3    **Q.** And when you went and had your
4 discussions with your attorney, without revealing
5 what was said, was your wife present?
6    **A.** Yes.
7    **Q.** Was anyone else present?
8    **A.** Fred Benson.
9    **Q.** Okay. So --
10    **A.** He was in the office there with us, yeah.
11    **Q.** Okay. When you said he was in the office
12 there, does that mean that he was in the same
13 office you were in?
14    **A.** Right, right.
15    **Q.** Or just in the office building?
16    **A.** No, he was in the same office that we
17 were in.
18    **Q.** Okay. So, it was you, your wife,
19 Mr. Benson, and an attorney from the Kaplan/Bond
20 Group all sitting in the same office discussing
21 your case?
22    **A.** Right, right.
23    **Q.** Okay, and can you describe your
24 relationship with Mr. Benson?

---

**62**

1     **A.** You know, real good friends and stuff,
2 I worked with him for over five years on the boat,
3 and you know, got a pretty close friendship. You
4 know, he's done a lot for me and even in the past
5 years and stuff like that.
6     **Q.** Okay. Does your brother work for
7 Mr. Benson right now?
8     **A.** No, no.
9     **Q.** And how long was the meeting with your
10 attorney to prepare for today's deposition?
11     **A.** Not very long, maybe an hour.
12     **Q.** Okay. Did you take any notes during that
13 meeting or did anyone take any notes?
14     **A.** Not, David did, that's about all, my
15 lawyer.
16     **Q.** So, when you say David, are you referring
17 to Mr. Kaplan?
18     **A.** Right.
19     **Q.** Okay. Did your wife take any notes on
20 your behalf?
21     **A.** No.
22     **Q.** Mr. Benson?
23     **A.** No.
24     **Q.** And that meeting with your attorney to

---

**63**

1 prepare for today's deposition, when did that
2 happen?
3     **A.** Um, a couple weeks ago.
4     **Q.** Okay, and after that, did you have any
5 other meetings to prepare for today's deposition?
6     **A.** Not to prepare for this, no, just to sign
7 over power of attorney to him, that's all.
8     **Q.** Did you discuss your testimony here today
9 with anyone else other than those three
10 individuals?
11     **A.** No.
12     **Q.** And you understand when I say those three
13 individuals, I mean your wife, Mr. Benson, and
14 Mr. Kaplan?
15     **A.** Right.
16     **Q.** Okay. Do you have copies of the
17 documents you looked at to prepare for today's
18 deposition?
19     **A.** I don't myself, no.
20     **Q.** Have you discussed this lawsuit with
21 anyone other than your attorney?
22     **A.** You mean from year one, from the first
23 year you mean?
24     **Q.** No, from the time, the present time, from

---

**64**

1 this lawsuit meaning your case against MetLife?
2     **A.** Oh, this one here, very few people.
3     **Q.** Okay, and who are they?
4     **A.** Just, you know, brothers and stuff like
5 that.
6     **Q.** And what are your brother's names?
7     **A.** My brother, John.
8     **Q.** John Dimon?
9     **A.** Right, and Louis Dimon, Sr.
10     **Q.** Okay, and which of these brothers lives
11 on Laura Lane?
12     **A.** John.
13     **Q.** Okay.
14     **A.** I don't really talk to him that much, so,
15 what I have said to him is brief anyways.
16     **Q.** Okay, and does Louis live in Wakefield?
17     **A.** Yeah, he lives in Wakefield, I'm not sure
18 of the address.
19     **Q.** Okay, and what kind of discussions did
20 you have with Louis about the case?
21     **A.** Just went over, you know, a few things,
22 nothing drastic, let's put it that way.
23     **Q.** Do you recall what you said to him?
24     **A.** Oh, just, you know, you know, a few

---

**65**

1 people were going to get sued for it and stuff
2 like that, and that was about it.
3     **Q.** Okay, and do you recall what he said to
4 you?
5     **A.** He said, "That's good if you can get
6 anything out of it, go for it" he says, you know.
7     **Q.** How about your brother, John, what did
8 you say to him about the case?
9     **A.** Basically about the same thing. He said,
10 "Oh, well." He ain't a man of very words, a lot
11 of words, let's put it that way.
12     **Q.** Okay. Now, over the years, you've had
13 reason to contact MetLife about the annuity, is
14 that true?
15     **A.** Hmm mmm.
16     **Q.** Okay, and do you recall who at MetLife
17 you spoke with or contacted?
18     **A.** I can't remember her name right offhand,
19 no. Mostly it was a representative of MetLife.
20     **Q.** Okay, and did anyone else contact anyone
21 at MetLife on your behalf?
22     **A.** My wife did most of the time.
23     **Q.** Okay, and how did she get in touch with
24 the people at MetLife?

---

**66**

1     **A.** Over the phone.
2     **Q.** And would she call them because you
3 requested that she call them or would she just do
4 it on her own?
5     **A.** On my request.
6     **Q.** Okay.
7         MR. LeBLANC: Can you mark this as
8 Exhibit 15, please.
9         (Exhibit No. 15, Fax dated 6/12/03,
10 marked for identification.)
11         MR. LeBLANC: We're going to go off
12 record for a couple of minutes, Tim, okay?
13         MR. O'DRISCOLL: Okay.
14         (A short break was taken.)
15         MR. LeBLANC: Let's go back on
16 record. Mr. O'Driscoll, are you still with us?
17         MR. O'DRISCOLL: Yes.
18         MR. LeBLANC: Okay.
19 BY MR. LeBLANC:
20     **Q.** Mr. Dimon, during your meetings with
21 Mr. Kaplan that were attended by Mr. Benson and
22 your wife, can you tell me what was said during
23 those meetings?
24

---

**67**

1         MR. KEANE: I'm going to object to
2 that question, and I'm also going to instruct
3 Mr. Dimon not to answer that question.
4         MR. LeBLANC: Okay.
5 BY MR. LeBLANC:
6     **Q.** Mr. Dimon, your attorney has instructed
7 you not to answer that question. Are you going to
8 accept his instruction and not answer?
9     **A.** Yeah.
10     **Q.** Okay.
11         MR. LeBLANC: Then we're going to
12 suspend on that issue and come back to it.
13         MR. KEANE: I'll object to the
14 suspension of the depo on that issue.
15         MR. LeBLANC: Okay. Before we took a
16 break, I had asked that Exhibit 15 be marked, and
17 for the record, I'm going to describe it as a
18 faxed cover sheet, a letter dated June 9th, 2003
19 from MetLife to Mr. Dimon, a document on the Dean
20 Witter Reynolds letterhead, what appears to be
21 Dean Witter Reynolds letterhead entitled "Proposal
22 by Charter Security Life Insurance Company of New
23 Jersey."
24

68

1    MR. KEANE: I'm sorry, that's not
2 what we have.
3    MS. McQUAY: That's not what I have.
4    MR. KEANE: It's a copy of a fax to
5 Latti.
6    MR. LeBLANC: Yes, and then the
7 June 9th, 2003 letter, proposal sheet and
8 June 12th, 2003 letter from Dennis Dimon.
9    MR. KEANE: Thank you.
10    MR. LeBLANC: Does everyone have
11 that?
12    MR. DeWICK: Yes.
13    MS. McQUAY: Yes.
14    MR. LeBLANC: Okay.
15 BY MR. LeBLANC:
16  **Q.** Mr. Dimon, I'll hand you what was marked
17 as Exhibit 15. Can you take a look at those
18 documents for me, please?
19    MR. KEANE: Can we go off the record
20 for one second?
21    MR. LeBLANC: Sure.
22    (Off the record.)
23    MR. LeBLANC: Back on record.
24    MR. KEANE: Yes.

69

1 BY MR. LeBLANC:
2  **Q.** Mr. Dimon, do you recognize these
3 documents we have marked as Exhibit 15?
4  **A.** Only one of them.
5  **Q.** And which one of them did you recognize?
6  **A.** Stating on how much I was going to get
7 per month and the policy, supposedly the policy
8 itself on what I was going to receive.
9  **Q.** And right now for the record, you're
10 looking at the document entitled "Proposal by
11 Charter Security Life Insurance Company of New
12 Jersey"?
13  **A.** Right.
14  **Q.** The document that's on the Dean Witter
15 Reynolds letterhead or what appears to be?
16  **A.** Right.
17  **Q.** So, you recognize that document?
18  **A.** Right.
19  **Q.** Page 3 of Exhibit 15?
20  **A.** I think that's what it is, yes.
21  **Q.** Okay. You don't recognize any of the
22 other documents in that packet?
23  **A.** Not right off.
24  **Q.** And I'll just read a portion of Exhibit

70

1 15, the first page to you with the title fax on
2 the top in a black box, do you see that?
3  **A.** Hmm mmm.
4    MR. LeBLANC: And for the record, I'm
5 pointing at the words that I'm reading, and I
6 believe the witness is responding to that.
7 BY MR. LeBLANC:
8  **Q.** Is that true?
9  **A.** Right.
10  **Q.** Okay, and then the word "i copy"?
11  **A.** Hmm mmm.
12  **Q.** Is i copy a copy business in Rhode
13 Island?
14  **A.** I think so.
15  **Q.** Okay, and above that lists the address
16 99 Fortin Road in Kingston, Rhode Island?
17  **A.** Yeah, okay.
18  **Q.** Are you familiar with this business?
19  **A.** Um, myself, no. My wife must have used
20 it to fax papers I guess.
21  **Q.** And in the heading section, it's to
22 Carolyn Latti from Dennis Dimon.
23  **A.** Okay, yeah, now I remember.
24  **Q.** Okay. Do you recall who Carolyn Latti

71

1 is?
2  **A.** That would have been his daughter, right.
3  **Q.** Okay, and you see the date here, it's
4 June 12th, 2003?
5  **A.** Right.
6  **Q.** And the next page of that exhibit is a
7 June 9th, 2003 letter from MetLife to Dennis
8 Dimon, do you see that?
9  **A.** Right.
10  **Q.** And it's addressed to P.O. Box 56, West
11 Kingston, Rhode Island?
12  **A.** Hmm mmm.
13  **Q.** Is that your mailing address?
14  **A.** Right.
15  **Q.** Okay, and in 2003, was that your mailing
16 address?
17  **A.** Yeah.
18  **Q.** If you received a letter like this, who
19 would have read that to you?
20  **A.** My wife.
21  **Q.** Okay, and you see that there is a
22 handwritten section on here, "ATT Carolyn Latti"?
23  **A.** Uh-huh.
24  **Q.** Do you know who wrote that on there?

72

1  **A.** No.
2  **Q.** And just a question for clarification,
3 physically, can you see the words on the page?
4  **A.** Yes.
5  **Q.** So, your vision is okay?
6  **A.** Right.
7  **Q.** And do you see here, it says Sandy
8 Franklin, Annuity Payout Specialist III?
9  **A.** Hmm mmm.
10  **Q.** Do you recall having any discussions with
11 Ms. Franklin?
12  **A.** I might have talken to her on the phone
13 briefly, that's about all, if that's the same one
14 that I talked to on the phone.
15  **Q.** So, you don't have a specific
16 recollection about who that was?
17  **A.** Right.
18  **Q.** Okay, and just kind of off subject a
19 little bit, when your wife called MetLife on your
20 behalf, did she use a speaker phone or just a
21 regular phone with a handset?
22  **A.** Just a regular phone, but I was present
23 in the room sometimes, not all the time because
24 sometimes I was out fishing on some of the

73

1 conversations that was said between MetLife and my
2 wife.
3  **Q.** Okay, and when you were present in the
4 room, could you hear both sides of the
5 conversation or just your wife's side?
6  **A.** Just my wife's side.
7  **Q.** Okay. I'll read to you the first line of
8 this letter, "This letter is in response to a
9 phone call we received from Katherine Dimon."
10  **A.** Yeah.
11  **Q.** Okay. Was it your understanding that
12 they sent this letter to you because your wife
13 called?
14  **A.** Right, or I had her call, right.
15  **Q.** Or you asked her to call?
16  **A.** Right.
17  **Q.** The next line says "Since your annuity
18 contract has expired, we are unable to provide you
19 with a duplicate contract." Next line, "However,
20 the terms of your annuity are described below."
21  Now, what does that, those two lines
22 together mean to you?
23  **A.** That they were going to send me some
24 paperwork regarding the contract.

**74**

1   **Q.** Okay. Where it says "Since your annuity
2 contract has expired," did you take that to mean
3 that your annuity was done?
4   **A.** No, not really, not at that time because
5 we thought, you know, there was a mistake
6 somewhere along the line, you know, because it was
7 supposed to last me the rest of my life.
8   **Q.** Okay.
9       MR. LeBLANC: Mr. Dimon, do you need
10 a napkin at all?
11       THE WITNESS: Oh, for my eye?
12       MR. LeBLANC: A tissue for your eye?
13       THE WITNESS: I'll have to go.
14       MR. LeBLANC: I can run and grab it
15 for you if you need one.
16       THE WITNESS: Well, I can't see what
17 I'm doing to clean it out.
18       MR. LeBLANC: Do you want a minute to
19 do that?
20       THE WITNESS: Yeah, please.
21       MR. LeBLANC: Can we go off record
22 for a minute, please.
23       (Off the record.)
24

**75**

1       MR. LeBLANC: Why don't we go back on
2 record.
3 BY MR. LeBLANC:
4   **Q.** Mr. Dimon, you just testified that there
5 was a mistake made along the line, along the way?
6   **A.** That's, that's the way I took it, yes.
7   **Q.** Okay. When did you first come to the
8 conclusion that there was a mistake made?
9   **A.** It was right after the checks had stopped
10 and I had gotten in touch with MetLife and you
11 know, they stated that, you know, there was no
12 more funds or whatever it was, and I told them, I
13 said, "Well, you must have made a mistake because
14 the way it was discussed to me was that, you know,
15 that I was supposed to receive this for the rest
16 of my life and the twenty years was intended for
17 my wife, if something had happened to me, she'd be
18 able to receive it for the twenty years and then
19 stop," and, but, as far as I'm concerned as long
20 as I was alive, it was supposed to continue for
21 the rest of my life.
22   **Q.** Okay, and by June 9th, 2003, the date of
23 this letter in Exhibit 15, how late was or how
24 much time before this letter was written did you

**76**

1 expect to receive a check?
2   **A.** Well, this letter was written after the
3 checks had already stopped.
4   **Q.** And when did the checks stop?
5   **A.** Um, I'm not sure of the date right now.
6   **Q.** And what date in the month did you
7 receive the checks generally?
8   **A.** It was most generally the end of every
9 month, it was, like, the 5th of every month or
10 something like that, the beginning of the month.
11   **Q.** Okay. So, you received or did you
12 receive a check in May of 2003?
13   **A.** No, not that I know of.
14   **Q.** Did you receive a check in June of 2003?
15   **A.** Like I said, I can't really remember.
16   **Q.** Okay, and going back to the second page
17 of Exhibit 15, I'll read that first line, "The
18 annuity contract was issued on May 5, 1983 under
19 the, quote, 20," excuse me, "under the, quote,
20 "certain 20-year" option."
21       Did you understand that your annuity
22 started in May of 1983?
23   **A.** Yeah.
24   **Q.** And when I say annuity, what does that

**77**

1 mean to you?
2   **A.** The plan, the policy or whatever.
3   **Q.** Okay, and what did this plan or policy
4 give you, what benefit?
5   **A.** Um, the money I guess.
6   **Q.** So, your understanding from the plan or
7 policy or the term annuity is that it would
8 provide you with some amount of money?
9   **A.** Right.
10   **Q.** Okay. The next line here says "American
11 Motorist Insurance Company was considered to be
12 the owner of the annuity, however, you were the
13 annuitant and payee."
14       Do you have any specific understanding of
15 what that means, what that sentence means?
16   **A.** Well, they were the people that was
17 paying me, American Motors. I'm the payee, right,
18 and they're the payee.
19   **Q.** Who did you understand American Motorist
20 Insurance Company to be, how did they become
21 involved?
22   **A.** They were the first policyholders that
23 handled, you know, the annuity policy.
24   **Q.** Okay. Were they an insurance company

**78**

1 that was involved in the Jenny C. matter?
2   **A.** Not to my, you know, I'm not sure on any
3 of that part what was going on there because
4 Mr. Latti set this all up through, you know, I
5 guess through whatever he had powers to do, you
6 know.
7       I'm not sure on how this came about
8 myself.
9   **Q.** When you say Mr. Latti set this all up,
10 are you referring to the settlement in the
11 Jenny C.?
12   **A.** Right.
13   **Q.** Okay, and when you refer to Mr. Latti,
14 are you referring to him as an individual or him
15 as the firm?
16   **A.** Well, I'm referring to him himself, you
17 know. Otherwise, I'd say Latti & Associates, you
18 know.
19   **Q.** Okay, and I'll skip down to the third
20 paragraph, it says "The first payment was on
21 June 5, 1983." Do you recall getting a payment
22 way back then?
23   **A.** I remember getting a check, yes.
24   **Q.** The final payment was on May 5th, 2003.

**79**

1 Does that lead you to believe that you received a
2 check in May of 2003?
3   **A.** Yeah.
4   **Q.** Okay. Would it be fair to say that you
5 received twenty years of payments from MetLife on
6 this annuity?
7   **A.** I'm not sure what you're saying.
8   **Q.** Okay. Did you receive checks once a
9 month from MetLife for twenty years?
10   **A.** Not for the full twenty years, not from
11 MetLife itself.
12   **Q.** Okay. Then did you receive checks once a
13 month from any source for twenty years?
14   **A.** Yeah.
15   **Q.** And were the first checks you received,
16 are those initial checks from a different company
17 other than MetLife?
18   **A.** Yes.
19   **Q.** And what was that company's name?
20   **A.** I'm not quite sure, I know American
21 Motors or one was Charter Life Insurance, the
22 other one I'm not sure of to tell you the truth.
23   **Q.** So, when you see here, it says "The final
24 payment was on May 5, 2003." After June 9th of

**80**

1 2003 or as of June 9th, 2003, you understood that
2 you weren't going to be getting any other checks
3 from MetLife?
4    **A.**  As far as I know, yeah, unless something
5 was wrong, you know, and this is what we tried to
6 get down to the bottom of when we did call.
7    **Q.**  Okay, and after you received this letter
8 dated June 9th, 2003, what did you do?
9    **A.**  Well, we turned around and once we found
10 out this had stopped, we contacted Latti's office,
11 my wife did, and talked to Mr. Latti's daughter.
12    Like I said, the name, but, and she
13 turned around and said there wasn't much that she
14 could do for us, and we asked her, you know, if
15 she still had records, you know, on policy and
16 stuff like that, if she could send us any, and she
17 said they had already been destroyed because they
18 don't hold any policies after twenty years, which,
19 you know, a few friends of mine that I did talk to
20 about it thought it was kind of weird seeing it
21 was supposed to have been a lifetime policy, and
22 then after that, there wasn't much we could do,
23 and you know, we started contacting a few people
24 to find out if we could find anyplace where the

**81**

1 policy did go, and you know, and actual, I can't
2 think of what I want to say, you know, actually
3 proof of what was happening anyways.
4    We were looking for the originals, that's
5 what we were looking for, and we never found any
6 originals.
7    **Q.**  Okay. When you say we looked, who
8 looked?
9    **A.**  Well, my wife was calling a few people
10 that we were getting names of that we could
11 contact that could probably help us track it down
12 and stuff, and I'm not sure on who she got ahold
13 of.
14    I know there was one person that might
15 have had a chance of tracking it down, but we
16 couldn't find, we needed the check stub number,
17 you know, the check number to go back to American
18 Motors, which American Motors had gone out of
19 business at that time, and seeing how we couldn't
20 find any check, you know, numbers or anything else
21 like that, or policy numbers, there was nothing he
22 could do for us.
23    So, that was the extent to that because
24 we couldn't find any, you know, check stubs and

**82**

1 stuff like that, you know, so, he couldn't help us
2 at all, and then from there, it just went away for
3 a while.
4    We never really proceeded it that much,
5 and then Fred Benson asked if he could look into a
6 few things because I talked to him about, you
7 know, American Motors going out of business,
8 whether he could find, because he's better at the
9 computer than I am, whether he could find out any
10 information, you know, on what happened to the
11 business, if they changed names or anything else
12 like that, and he did find they went out of
13 business for me, you know, and he looked into a
14 few other things for me and stuff like that, but
15 then it got to the point where I wasn't getting
16 any answers or anything else like that and had to
17 turn somewhere.
18    So, and then Mr. Benson referred me to
19 David, my lawyer, to see what I could find out and
20 where these records are and stuff like that on,
21 you know, because I was in the dark.
22    You know, I had no way of knowing what
23 originally the policy said right from the
24 beginning and everything else like that, only the

**83**

1 word of what I had with Mr. Latti, you know, and
2 that was the only word I had and that paper that
3 you saw there with the amounts I was supposed to
4 get each year, that was it, so, and now we're
5 here.
6    **Q.**  Okay. When you were testifying, you said
7 he couldn't help me. Who was the he you were
8 referring to?
9    **A.**  Um, I'm not sure of the guy's name, it
10 was a company or something. My wife might
11 remember it, I don't know, but I'm not sure.
12    It was a company or somebody that she
13 could get ahold of and track it down maybe. Like
14 I said, she might remember, I don't know.
15    **Q.**  Okay.
16    **A.**  I was in and out from fishing so much
17 that, you know, she was handling most of it. I
18 was only getting in between what she would tell me
19 when I got back home from fishing. You know, that
20 was my extent what I could do with it, you know.
21    **Q.**  Okay. You also testified that
22 Mr. Latti's daughter told your wife that the
23 records were destroyed.
24    **A.**  Right.

**84**

1    **Q.**  Okay. Were you present during that
2 telephone conversation?
3    **A.**  Yeah.
4    **Q.**  Okay, and do you know who used the phrase
5 destroyed?
6    **A.**  Um, I think she did.
7    **Q.**  She being --
8    **A.**  You know --
9    **Q.**  -- Mr. Latti's daughter?
10    **A.**  Yeah, right. I think that's the way she
11 worded it. I'm not quite sure.
12    **Q.**  Did your wife use the phrase destroyed?
13    **A.**  Yeah, she did, right.
14    **Q.**  Okay.
15    **A.**  She said, my wife had said that she said
16 that they, they were destroyed or something,
17 that's the way my wife put it to me.
18    **Q.**  And during your conversations where your
19 wife would make a telephone call on your behalf,
20 would it be that she would talk to the person on
21 the phone and as she was talking to that person,
22 she would communicate to you what was being said?
23    **A.**  Right.
24    **Q.**  So, it wasn't like she had a whole

**85**

1 conversation, hung up the phone, and then told you
2 everything that happened?
3    **A.**  Right.
4    **Q.**  Did you have a chance to have any kind of
5 input, like, if she was on the phone with
6 Mr. Latti's daughter and she said "Dennis, the
7 records were destroyed" or "Dennis, she told me
8 the records were destroyed," would you have a
9 chance to say "What does she mean by that?"
10    **A.**  To my wife?
11    **Q.**  Yes.
12    **A.**  Yeah.
13    **Q.**  And what would your wife do with that
14 information?
15    **A.**  Um, what do you mean what would she do
16 with it, I mean?
17    **Q.**  Would she tell the person on the phone
18 "Dennis wants to know what you mean" or "What do
19 you mean by that?"
20    **A.**  Oh, yeah, she asked them why were they
21 destroyed, let's put it that way, and that's when
22 she replied they only kept records for up to
23 twenty years.
24    **Q.**  Okay. So, when you say she replied "They

**86**

1 only keep records up to twenty years," you mean
2 Mr. Latti's daughter replied?
3    **A.**  Right.
4    **Q.**  When you contacted or asked your wife to
5 contact Mr. Latti in 2003 after the checks
6 stopped, how did you find a number to call him at?
7    **A.**  Um, it was on one of the papers I think,
8 I'm pretty sure it was on one of the papers.
9    **Q.**  One of the papers?
10    **A.**  That I, I don't know if it was on this
11 (indicating) document -- no, it wasn't on that. I
12 know we had the number somewhere because we always
13 kept it around because, you know, in case
14 something did come up where we did need him again
15 or something like that.
16        I know it was on a paper, it was on no
17 specific document or something like that but on a
18 paper that I had.
19    **Q.**  And was this a paper that you got way
20 back in 1983 or before?
21    **A.**  I think it was in '83 I think, yeah.
22    **Q.**  So, you, in an effort to get in touch
23 with your attorney in 2003, called that number
24 that you had, and the phone was answered by a

**87**

1 person you believed to be Mr. Latti's daughter?
2        MR. DeWICK: Objection. You can
3 answer.
4 BY MR. LeBLANC:
5    **A.**  No, I think it was answered by a
6 secretary, I'm not sure. Like I said, my wife
7 handled that part of it because she had to ask for
8 her, you know, the party that remembered the case
9 or something like that, and she was the only one
10 as far as I know that remembered the case.
11    **Q.**  Okay. Did Mr. Latti's daughter ever
12 communicate to you that the firm that she worked
13 for or owned wasn't the same as Latti Associates?
14    **A.**  Like I said, I don't know what went on as
15 far as that was, you know. I hadn't had any
16 contact with him in quite a long time, so, I
17 didn't even know that he had retired himself, you
18 know, so, I'm not familiar on what went on on her
19 aspect up there, you know.
20    **Q.**  Okay, but did she ever tell you "We're
21 not the same firm," "This isn't our problem," or
22 anything like that?
23    **A.**  The only thing she said to me or my wife
24 I should say, you know, is she wouldn't be able to

**88**

1 help us out on what we were looking for, you know,
2 because she didn't have any records of the case
3 itself.
4    **Q.**  Okay.
5    **A.**  Or she did make one remark that it was
6 her father's case then, and that was the only
7 remark that she made.
8    **Q.**  Mr. Dimon, I'd like you to look at each
9 of the last three pages of Exhibit 15, each one of
10 them has a notation and I'll read it to you, it's
11 "ATT Carolyn Latti."
12        Do you see where each one of those
13 documents has that notation on there?
14    **A.**  Yeah.
15    **Q.**  Do you know who made that notation?
16    **A.**  No.
17    **Q.**  You don't know who wrote that down?
18    **A.**  No.
19    **Q.**  Was it you?
20    **A.**  No.
21    **Q.**  Does that look like your wife's writing
22 at all?
23    **A.**  No.
24    **Q.**  Would you be able to recognize your

**89**

1 wife's writing if you saw it?
2    **A.**  Not right offhand, no, but I know some of
3 it, and the letters in there, I know she don't
4 write like that.
5    **Q.**  Okay, and referring to the third page of
6 Exhibit 15, there's some handwriting next to the
7 numbers on the bottom, do you see where that
8 handwriting is?
9    **A.**  The numbers that's been wrote out?
10    **Q.**  Yes.
11    **A.**  Yeah.
12    **Q.**  Do you know who wrote those out?
13    **A.**  No.
14    **Q.**  Okay. Where did you get this document?
15    **A.**  From Latti, from Mr. Latti.
16    **Q.**  Okay. When you got this document, is
17 this the actual document you got from Mr. Latti or
18 is it a copy of that document?
19    **A.**  It's a copy.
20    **Q.**  How was the document you got from
21 Mr. Latti different than this?
22    **A.**  There wasn't any difference.
23    **A.**  It had all the same writings?
24    **A.**  All except for this stamp (indicating),

**90**

1 I'm not sure what that stamp was there for, so,
2 that stamp wasn't there and the writing up in the
3 corner there, you know, Carolyn Latti, that wasn't
4 there. It was just basic numbers and what it said
5 on the form itself.
6    **Q.**  Were these numbers written in the lower
7 right-hand corner?
8    **A.**  Yeah, those were there, yeah.
9    **Q.**  Okay.
10        MS. McQUAY: For the record, could
11 you identify the stamp that he's referring to on
12 the document?
13        MR. LeBLANC: Yes, for the record,
14 I'll identify the stamp that is mostly illegible,
15 I believe it says it may be a certification as to
16 the correctness of the copy with it signed and
17 then what looks like the letter D.
18        MS. McQUAY: And for the record, that
19 is the stamp that he testified was not there when
20 he got the document?
21        MR. LeBLANC: That's my
22 understanding.
23        THE WITNESS: Correct.
24

**91**

1 BY MR. LeBLANC:
2    **Q.**  Is that your signature, the D?
3    **A.**  No.
4    **Q.**  Do you know whose signature it is, or?
5    **A.**  No.
6    **Q.**  Okay, and the third page of this document
7 dated 6/12/03, I'm sorry, the fourth page of
8 Exhibit 15, it says Dennis J. Dimon, Katherine I.
9 Dimon, 151 Holly Ridge Road, P.O. Box 56, West
10 Kingston, Rhode Island 02892.
11        In June of 2003, was that your correct
12 physical and mailing address?
13    **A.**  No, not in 2003, no. Oh, 2003 yes, I'm
14 sorry, yes.
15    **Q.**  Okay, and on the bottom of this letter,
16 it says "Thank you, Dennis Dimon, Katherine Irene
17 Dimon."
18    **A.**  Right.
19    **Q.**  Those are two signatures?
20    **A.**  Right.
21    **Q.**  Is that (indicating) your signature?
22    **A.**  Yeah.
23    **Q.**  And does that (indicating) appear to be
24 your wife's signature?

## 92

1   **A.** Yeah.
2   **Q.** Okay. Do you know who wrote the body of
3 this letter, this portion here (indicating) in the
4 middle?
5   **A.** Um, I think Fred Benson did, I'm not
6 sure.
7   **Q.** Okay, and other than your signature which
8 you put on this document and your wife's signature
9 which she put on the document, is it your
10 understanding or belief that all of the rest of
11 this writing may have been Fred Benson's?
12   **A.** I think so, I think so.
13   **Q.** Okay. Now, if Mr. Benson wrote this or
14 any other party wrote this, would you have had
15 someone read it to you before you signed it?
16   **A.** I don't remember it right offhand.
17   **Q.** Do you recall signing a lined piece of
18 paper with nothing on it?
19   **A.** No.
20   **Q.** So, do you dispute that this document is
21 a document that you signed?
22   **A.** I'm just saying I don't remember it right
23 offhand, let's put it that way.
24   **Q.** Okay, and I'll read it to you with

## 93

1 respect, it says "Charter Security Life Insurance
2 Company." Do you know who they are?
3   **A.** Yeah.
4   **Q.** Okay, and who are they?
5   **A.** That was the first insurance company that
6 had taken the policy.
7   **Q.** And when you say the policy?
8   **A.** Annuity or whatever you want to call it
9 there.
10   **Q.** Okay, and I'll read from the document,
11 "We had the understand that my wife was to collect
12 this check up to twenty year. If nothing happened
13 to me and I was to collect it for fifty years."
14   MS. McQUAY: I think you misread it
15 actually, I think it says "If anything happened to
16 me."
17   MR. LeBLANC: "If anything," I'm
18 sorry, then I'll correct that.
19 BY MR. LeBLANC:
20   **Q.** "If anything happened to me and I was to
21 collect it for fifty years." Does that ring a
22 bell to you?
23   **A.** Not really.
24   **Q.** Was it your understanding in 2003 that

## 94

1 your wife was to collect the check for twenty
2 years?
3   **A.** Yeah.
4   **Q.** And that if --
5   **A.** Okay, yeah.
6   **Q.** And if nothing happened to you --
7   **A.** Right, right.
8   **Q.** -- how long were you supposed to collect
9 the check?
10   **A.** Well, all right, now I know where the
11 letter came from, if I can remember now, that is
12 what they had given me a life expectancy to
13 age of fifty.
14   The way they had based that on the way I
15 was, you know, the business I was in and down
16 through the families on the male side of my
17 family, that they never really lived over the age
18 of fifty, that and I was a heavy smoker and stuff
19 like that at that time, that the doctors had gave
20 me a life expectancy of fifty years because of my
21 livelihood and stuff like that, and I remember
22 saying that to somebody.
23   I think it was Fred Benson, I'm not sure,
24 so, he might have wrote that in there, I'm not

## 95

1 sure.
2   **Q.** Okay. So --
3   **A.** I know we sent a letter to somebody at
4 one time, I can't remember exactly who. It's been
5 a little while and so much has been going on, you
6 know, but I know he writ to somebody, let's put it
7 that way.
8   **Q.** And he is Mr. Benson?
9   **A.** Right, Mr. Benson, right.
10   **Q.** And did he do that on your behalf?
11   **A.** Right.
12   MR. LeBLANC: We'll take a half-hour
13 then.
14   (A lunch break was taken.)
15   MR. LeBLANC: We'll go back on
16 record. Just to confirm, Mr. O'Driscoll, do we
17 still have you down there?
18   MR. O'DRISCOLL: Yes.
19   MR. LeBLANC: Okay.
20 BY MR. LeBLANC:
21   **Q.** Mr. Dimon, we're back on record, and I
22 would like to show you Exhibit No. 11.
23   MR. LeBLANC: I'd like that marked as
24 11.

## 96

1   (Exhibit No. 11, Letter dated
2 9/24/99, marked for identification.)
3   MR. LeBLANC: And for the record,
4 we've marked as Exhibit 11 a letter dated
5 September 24th, 1999 addressed to Dennis Dimon by
6 Teresa Thorp.
7 BY MR. LeBLANC:
8   **Q.** Mr. Dimon, have you ever seen this
9 document before?
10   **A.** No, I don't even know what it is.
11   **Q.** Okay. I'll read the first paragraph, it
12 says "We received a call from Katherine Dimon
13 requesting information on the above contract.
14 This contract was issued as a structured
15 settlement on 5/5/1983."
16   Do you know what contract they're
17 referring to?
18   **A.** No, not right offhand.
19   **Q.** Okay. Was your settlement annuity that
20 you received issued on 5/5/1983?
21   **A.** It could have been, like I said, I'm not
22 too good with dates and stuff like that.
23   **Q.** Okay, and I'll skip down a sentence, "You
24 received monthly payments," the copy is kind of

## 97

1 bad, "You," some word, "monthly payments until the
2 final payment on 5/5/2003."
3   Now, what does that mean to you, the
4 final payment on 5/5/2003?
5   **A.** Like I said, I thought it was a mistake.
6   **Q.** Okay, but you admitted in your request
7 for production or request for admissions that we
8 sent you and you signed that you received this
9 letter?
10   **A.** Yeah, yeah, I think so.
11   **Q.** Okay, and in September of 1999, P.O. Box
12 56 was your mailing address?
13   **A.** Yeah.
14   **Q.** Okay. Was that where you were receiving
15 your checks?
16   **A.** Yeah.
17   **Q.** Okay. So, would it be fair to say that
18 you did receive this letter as you admitted?
19   **A.** I'm, I think so. Like I said, there's so
20 many papers, I don't remember all of them, let's
21 put it that way.
22   **Q.** Okay. Now, why did your wife, Kathy,
23 request information regarding the annuity in 1999?
24   **A.** Because I asked her to. The only other

98

1 thing I could think of was for a loan, the house,
2 after we sold the other house, we had gotten a
3 loan for the house that we're living in now, and
4 we used that, you know, as income purposes as far
5 as getting a loan.
6     Q.   Okay.
7     A.   That was the only other reason that I
8 could think of that she would be getting ahold of
9 them.
10     Q.   When you say we used that, do you mean
11 you used your monthly annuity payments as income?
12     A.   Right.
13     Q.   For purposes of getting a mortgage on a
14 home?
15     A.   Right.
16     Q.   Okay.  Did you ever try to sell or assign
17 your annuity to anyone?
18     A.   No.
19     Q.   Do you know what I mean when I say sell
20 or assign your annuity?
21     A.   Right, I know.
22     Q.   Like, lump sum?
23     A.   Right.
24     Q.   Have you ever known anyone who won a big

99

1 prize in the lottery?
2     A.   No.
3     Q.   Okay, that's where a lot of people know
4 that from.  So, and right around the September
5 1999 period, you were trying to apply for a loan
6 for a home or a mortgage?
7     A.   Right, right.
8     Q.   So, you called MetLife and asked for a
9 copy of the contract?
10     A.   Right.
11     Q.   Okay, and they sent you, or actually,
12 what the letter says is you requested information
13 on the contract; is that right?
14     A.   It was either that or the bank, one or
15 the other.  I wanted, you know, the bank wanted
16 confirmation too on the, on what we were getting
17 per month and stuff like that, so, it could have
18 been through the bank wanted the information, not
19 myself personally.
20     Q.   Okay, and what bank was that?
21     A.   Citizens Bank.
22     Q.   And they were the bank that you were
23 applying for a mortgage with?
24     A.   Right, right.  They had my first mortgage

100

1 on my first house.
2     Q.   Are you still paying off that mortgage?
3     A.   Oh, yeah.
4     Q.   And how long do you have left?
5     A.   I don't know.  I had to refinance, so, I
6 can't remember exactly.  I think we went for a
7 thirty-year I think.
8     Q.   And what did you do with this letter when
9 you received it?
10     A.   This letter here, I'm not sure.  My wife,
11 like I say, my wife takes care of a lot of the
12 paperwork and stuff like that.
13     She puts it in a file, or you know, if
14 it's a paper that the bank needed to see, then we,
15 you know, gave it to the bank for them, you know,
16 for them to go through.
17     Q.   And do you know for a fact whether or not
18 this was given to the bank in support of your
19 application for a mortgage?
20     A.   Not right offhand, no.
21     Q.   Do you know anyone who would know that?
22     A.   My wife would be the only one.
23     Q.   So, when you learned in September of 1999
24 that the final payment on your annuity was going

101

1 to be in May of 2003, what did you do with that
2 information?
3     A.   Like I said before, I thought it was a
4 mistake, and I said they didn't know, I told my
5 wife they don't know what they're talking about,
6 you know.  It wasn't no signed document, you know,
7 nothing was ever said, so, I just blew it off.
8     Q.   Okay.
9          MR. LeBLANC:  Can you mark this as
10 Exhibit 12, please.
11          (Exhibit No. 12, Telephone Log,
12 marked for identification.)
13 BY MR. LeBLANC:
14     Q.   Mr. Dimon, I'm going to show you what's
15 been marked as Exhibit 12.  Have you ever seen
16 this document before?
17     A.   No.
18     Q.   Okay.  I'm going to read from the
19 document where it says "From Tulsa Teleservices"
20 and the subject is "Call to 1-800-Met-5000 annuity
21 payouts."
22          The date on the document is 06/05/03, the
23 insured name is Dennis Dimon, and the caller name
24 is Katherine Dimon.

102

1     A.   Hmm mmm.
2     Q.   Do you know if your wife called MetLife
3 in June of 2003?
4     A.   I can't be sure, you'd have to ask her.
5     Q.   Okay, and I believe your prior testimony
6 was that you would receive your check around the
7 5th of every month?
8     A.   Roughly around there, yes.
9     Q.   And there was some documentation showing
10 you received a check in May of 2003?
11     A.   I think so, I think there was one, yeah.
12     Q.   Okay.  So, this June 5th, 2003 would have
13 been the next date you would have received a
14 check?
15     A.   Probably.
16     Q.   Okay, and back in 1991 when you had the
17 mailing issue when you separated from your wife
18 and you changed addresses, you didn't receive a
19 check for that, you missed one of those checks,
20 right, it was sent back?
21     A.   Right, right.
22     Q.   And in response to missing that check,
23 you called MetLife?
24     A.   Right, I had to call them personally

103

1 myself, yeah.
2     Q.   And why did you have to call them
3 personally yourself?
4     A.   Because my wife wasn't able to do
5 anything with it because they needed my approval.
6     Q.   Okay.  So, prior to 1999 when you
7 received a letter for the bank mortgage, before
8 that did anyone ever tell you that there was a
9 dispute about how long you were supposed to
10 receive annuity payments?
11     A.   No.
12     Q.   Did anyone ever contact you saying that
13 you may not receive all the payments that you
14 think you might be entitled to?
15     A.   No.
16     Q.   Okay.
17          MR. LeBLANC:  Can you mark that as
18 Exhibit 17, please.
19          (Exhibit No. 17, Letter dated
20 9/13/04, marked for identification.)
21          MR. LeBLANC:  For the record, I have
22 asked that Exhibit 17 be marked, it's a letter
23 dated September 13th, 2004 from the Kaplan/Bond
24 Group to Metropolitan Life Insurance Company.

### 104

1 BY MR. LeBLANC:
2   **Q.** Mr. Dimon, can you look at this document
3 and tell me if you recognize it?
4   **A.** I've seen it, but I've probably seen it,
5 yeah. Like I said, I can't recognize every one of
6 them.
7   **Q.** Okay, and I'll read to you here on the
8 bottom, it says "cc: Dennis Dimon, Frederick W.
9 Benson."
10  **A.** Yeah.
11  **Q.** Do you understand when it says cc, it
12 stands for either client copy or carbon copy, that
13 that indicates that that letter was sent to you?
14  **A.** I do now.
15  **Q.** Okay, and have you received other letters
16 from your attorney from the Kaplan/Bond Group?
17  **A.** No, not that I know of, maybe a few
18 others, but.
19      MR. LeBLANC: Can you mark that as
20 Exhibit 18, please.
21      (Exhibit No. 18, Letter dated
22 9/28/04, marked for identification.)
23      MR. LeBLANC: For the record, I've
24 asked that Exhibit 18 be marked, it's a letter

### 105

1 dated September 28th, 2004 from the Kaplan/Bond
2 Group to Metropolitan Life Insurance Company, and
3 it has an enclosed letter dated September 13th,
4 2004 from the Kaplan/Bond Group to the
5 Metropolitan Life Insurance Company.
6 BY MR. LeBLANC:
7   **Q.** On this Exhibit 18, do you see that this
8 letter was also cc'd to you and Mr. Benson?
9   **A.** Hmm mmm.
10  **Q.** Okay, and do you recall ever seeing this
11 letter?
12  **A.** I might have, yeah.
13  **Q.** Do you have any reason to believe you
14 didn't receive this letter?
15  **A.** No.
16  **Q.** What's your understanding of being a
17 person whose represented by an attorney?
18  **A.** What's my reason, say that again?
19  **Q.** What does it mean to you to be
20 represented by an attorney?
21  **A.** That, that you put your trust into his
22 hands to do the right thing for you.
23  **Q.** And does it also involve him advising you
24 about what the right thing might be?

### 106

1   **A.** Oh, yeah, definitely.
2   **Q.** And advising you about things that may
3 happen in your case?
4   **A.** Yeah.
5   **Q.** And do you think that Mr. Kaplan was
6 trying to do that when he copied you with these
7 letters?
8      MR. KEANE: Objection. Go ahead, you
9 can answer.
10 BY MR. LeBLANC:
11  **A.** I think so, yeah.
12  **Q.** So, you think that by getting copies of
13 the letters, that Mr. Kaplan was trying to keep
14 you informed about what was going on in your case?
15  **A.** Right.
16      MR. KEANE: Objection.
17 BY MR. LeBLANC:
18  **Q.** Did you ever receive letters from
19 Mr. Latti's office either directly addressed to
20 you or carbon copied that were addressed to
21 somebody else?
22  **A.** No, never received anything from him
23 really.
24  **Q.** Okay. Did he ever send you a letter

### 107

1 saying I'm going to represent you and here are the
2 terms?
3   **A.** Um, only when I was in the hospital, and
4 that was back when my mother first got ahold of
5 him.
6   **Q.** Okay. After that initial letter when you
7 were in the hospital, did he ever send you any
8 other letters?
9   **A.** No, actually, he didn't send me a letter
10 in the hospital, he sent a representative over to
11 the hospital and notified me that I'm going to be
12 your lawyer and all this other stuff, and when I
13 was in the hospital, you know, I didn't know what
14 was going on exactly, and you know, he told me
15 that my mother had gotten ahold of me, sorry,
16 gotten ahold of him and said that it was all right
17 for me to sign papers from this guy's office, you
18 know, and I said okay, you know.
19      So, everything that was being done while
20 I was in the hospital, I had no recollections of
21 outside of it, you know, so, I didn't know exactly
22 what was going on.
23  **Q.** Okay, and when you say I didn't know
24 exactly what was going on, what do you mean by

### 108

1 that, how do you mean that?
2   **A.** Well, I, I didn't know that, you know,
3 that any of the lawsuits and stuff like that were
4 being brought up right then and there, you know,
5 while I was still in the hospital, you know,
6 because nobody had told me anything, you know, and
7 like I said before, the next thing I know, there
8 was a guy in the office saying "Oh, I represent
9 Latti & Associates and your mother said that it
10 was okay" and all this other stuff, so, you know,
11 sign the documents for a lawsuit, you know, and I
12 just thought it was, you know, just regular, you
13 know, because nine times out of ten in an accident
14 like that, there's a lawsuit brought up against,
15 you know, the people, you know, so.
16  **Q.** Okay, and this was right after the
17 accident, right after you got hurt?
18  **A.** Basically.
19  **Q.** Because you were still in the hospital?
20  **A.** Oh, yeah.
21  **Q.** And even then, the representative from
22 Latti & Associates told you that you could sign
23 the papers because your mother said it was okay?
24  **A.** Yeah.

### 109

1   **Q.** And you were in your early twenties at
2 that point; is that right?
3   **A.** Right, right.
4   **Q.** If he had presented papers to you that
5 your mother didn't approve, would you have signed
6 them?
7   **A.** No.
8   **Q.** And why not?
9   **A.** Because I didn't know him from Adam from
10 Eve, you know. I never worked that way the whole
11 time I was growing up.
12      My mother always told me, you know, never
13 sign anything you're not sure of or a person you
14 don't know or anything else like that, and that's
15 why I always stuck by it, you know.
16  **Q.** Okay, and when this representative came
17 to the hospital to present the documents to you,
18 did he read those documents to you or did he just
19 give them to you to sign?
20  **A.** To tell you the truth, I can't really
21 remember. I mean there was quite a few of them,
22 and he says it's to give me power of attorney to
23 proceed with the case and stuff like that, which I
24 understood that point, you know. As far as

110

1 reading them all, I'm not sure.
2 **Q.** Okay, and did anyone read those documents
3 to you?
4 **A.** Not that I can recollect.
5 **Q.** Okay, but the representative did say your
6 mother said it was okay to sign?
7 **A.** Right.
8 **Q.** And the representative from Latti &
9 Associates who came to the hospital, that wasn't
10 Mr. Latti himself?
11 **A.** Um, no, not, not that I know of. I can't
12 even remember his name.
13 **Q.** Okay.
14 **A.** They had me on so many painkillers, I
15 didn't know if I was coming or going.
16 MR. LeBLANC: Can you mark that as
17 Exhibit 2, please.
18 (Exhibit No. 2, Annuity Application,
19 marked for identification.)
20 MR. LeBLANC: For the record, I've
21 asked that Exhibit 2 be marked, it's entitled
22 "Annuity Application, Charter Security Life
23 Insurance Company, New York."
24

111

1 BY MR. LeBLANC:
2 **Q.** Mr. Dimon, can you look at that document
3 and tell me if you recognize it?
4 **A.** I recognize it, yeah, somewhat.
5 **Q.** Okay, and where do you recognize it from?
6 **A.** Mr. Latti's office.
7 **Q.** And what happened with this document in
8 Mr. Latti's office, if anything?
9 **A.** I'm not sure.
10 **Q.** Okay. Do you see here on the bottom
11 where it says "Signature of annuitant," is that
12 your signature?
13 **A.** Yeah.
14 **Q.** Okay. Was this document completed when
15 you filled it out; do you recall?
16 **A.** I'm not sure.
17 **Q.** So, who was present when you signed that,
18 if you recall?
19 **A.** I'm not sure of that either.
20 **Q.** Okay. Do you remember if you were
21 sitting in an office alone signing documents?
22 **A.** I was never alone, my wife was most
23 generally with me or my mother or my mother and my
24 wife.

112

1 **Q.** And when you were in the Latti
2 Associates' offices, were you with a
3 representative of Latti Associates?
4 **A.** When I was in his office, I was mostly
5 with him or an associate of his, yeah.
6 **Q.** Okay.
7 MR. LeBLANC: Can you mark that as 5,
8 please.
9 (Exhibit No. 5, Letter dated 8/12/83,
10 marked for identification.)
11 MR. LeBLANC: For the record, I've
12 asked that a letter dated August 12th, 1983 from
13 John Noe of American Motorists Insurance Company
14 to Robert Foley of Dean Witter Reynolds be marked.
15 It's a two-page letter.
16 BY MR. LeBLANC:
17 **Q.** Mr. Dimon --
18 MS. McQUAY: I'm sorry, what exhibit
19 number?
20 MR. LeBLANC: No. 5.
21 MS. McQUAY: Thank you.
22 MR. LeBLANC: And just for everyone's
23 sake, I'm using the exhibits that were
24 preprepared, I may not use them all.

113

1 BY MR. LeBLANC:
2 **Q.** I'll show you what was marked as Exhibit
3 5 and ask if you recognize that document?
4 **A.** No, not at all.
5 **Q.** Do you know if anyone's ever read this
6 document to you?
7 **A.** Not to my knowledge.
8 **Q.** Okay. On the second page of the document
9 in the cc section, it says Mr. Roger Hughes, Latti
10 Associates, Attorneys, 30-31 Union Wharf, Boston,
11 Mass. 02109.
12 Do you see that?
13 **A.** Hmm mmm.
14 **Q.** Who do you understand Mr. Hughes to be?
15 **A.** That was the lawyer representing me
16 at -- Mr. Hughes?
17 **Q.** Roger Hughes.
18 **A.** Roger, yeah, he was the lawyer
19 representing me for my court case.
20 **Q.** Okay, and you understood that Mr. Hughes
21 worked with Mr. Latti?
22 **A.** Right.
23 **Q.** And he worked at Latti Associates?
24 **A.** Right.

114

1 **Q.** Okay, and do you see this was dated
2 August 12th, 1983?
3 **A.** Yeah.
4 **Q.** Okay. Between May of 1983 and August of
5 1983, had you received any documents from
6 Mr. Latti's office at all?
7 **A.** Not that I can recollect, no.
8 **Q.** Any letters?
9 **A.** Not that I can recollect, no.
10 **Q.** Okay. Did he at any time tell you that
11 he's no longer your attorney?
12 **A.** No.
13 **Q.** Okay. Did you ever see or sign a
14 document entitled "Motion to withdraw"?
15 **A.** No.
16 **Q.** By August 12th, 1983, was Mr. Latti and
17 Latti Associates still your attorney?
18 MR. DeWICK: Objection.
19 BY MR. LeBLANC:
20 **A.** As far as I know.
21 **Q.** And do you think it was their
22 responsibility to inform you regarding changes to
23 your case or your settlement?
24 **A.** Most definitely.

115

1 MR. DeWICK: Objection. You can
2 answer, I'm sorry.
3 BY MR. LeBLANC:
4 **A.** Yeah, most definitely.
5 **Q.** And did Mr. Hughes or Mr. Latti call you
6 and tell you there was a dispute about your policy
7 or your annuity at that point?
8 **A.** No.
9 **Q.** Okay.
10 MR. LeBLANC: Can you mark that as
11 Exhibit 6, please.
12 (Exhibit No. 6, Letter dated 9/26/83,
13 marked for identification.)
14 MR. LeBLANC: For the record, I've
15 asked that Exhibit 6 be marked, a letter dated
16 September 26th, 1983 from Charter Security
17 Insurance Company, New York York to Mr. John Noe,
18 American Motorists Insurance Company.
19 BY MR. LeBLANC:
20 **Q.** Mr. Dimon, can you take a look at that
21 document?
22 **A.** I can, but it won't mean nothing to me.
23 **Q.** Do you recognize it?
24 **A.** No.

116

1   **Q.** Have you ever seen it before?
2   **A.** No.
3   **Q.** Okay, and if you look at the second page,
4 do you see here on the bottom under the cc
5 section, it says Mr. Roger Hughes, Latti
6 Associates, Attorneys?
7   **A.** Yeah.
8   **Q.** And it gives an address?
9   **A.** Uh-huh.
10  **Q.** Did you ever receive a copy of this
11 letter from Mr. Hughes or Latti & Associates?
12  **A.** Not that I can recollect.
13  **Q.** Did either Mr. Hughes or Latti &
14 Associates ever call you and tell you there was a
15 question between the insurance companies about
16 what contract you had purchased or they had
17 purchased on your behalf?
18  **A.** No.
19  **Q.** Okay. If you had known in 1983 that
20 there was a dispute about how much payment you
21 would have gotten, what would you have done?
22  **A.** I'm not sure to tell you the truth, you
23 know. What can you do, take it back to court or
24 whatever, I don't know, you know.

117

1   **Q.** Would you have called your attorney in
2 1983?
3   **A.** Oh, yeah, most definitely, most
4 definitely.
5   **Q.** And what would your instructions be to
6 your attorney in 1983?
7   **A.** First, I'd ask him why the discrepancy if
8 it's already been going through court.
9   **Q.** And then would you tell him to fix it?
10  **A.** Of course.
11  **Q.** Would you expect that it would be his
12 responsibility, his job to fix it for you?
13  **A.** Oh, yeah, most definitely.
14  **Q.** Okay. Do you feel that you were done a
15 disservice by Latti & Associates by their not
16 informing you of this dispute?
17         MR. DeWICK: Objection.
18 BY MR. LeBLANC:
19  **A.** Yeah, yeah, they should have informed me.
20  **Q.** Among all the parties to this case, and
21 we addressed who they were earlier, among the
22 parties to this case, with whom did you have
23 contact in 1983?
24  **A.** Latti's mostly.

118

1   **Q.** Okay. Did you ever call Charter Security
2 Life Insurance Company of New York in 1983?
3   **A.** Not that I can remember.
4   **Q.** Okay, American Motorists Life Insurance
5 Company in 1983?
6   **A.** Not that I can remember.
7   **Q.** Dean Witter Reynolds in 1983?
8   **A.** I never even heard of them.
9   **Q.** Okay. So, among all the defendants, you
10 only had contact with Latti in 1983?
11  **A.** Right.
12  **Q.** Okay.
13         MR. LeBLANC: I'd like these marked
14 as 7 and 9.
15         (Exhibit No. 7, Letter dated
16 10/10/83, marked for identification.)
17         (Exhibit No. 9, Letter dated
18 10/12/83, marked for identification.)
19         MR. LeBLANC: For the record, I've
20 asked that two exhibits be marked, one Exhibit 7
21 is a letter dated October 10th, 1983 addressed to
22 Charter Security Life Insurance Company, New York
23 from John Noe, home office claims from American
24 Motorists Insurance Company.

119

1         The second document is Exhibit 9, a
2 letter dated October 12th, 1983 to Charter
3 Security Life Insurance Company, New York from
4 John Noe, American Motorists Insurance Company.
5 BY MR. LeBLANC:
6   **Q.** Mr. Dimon, I'd like you to look at both
7 of these documents, Exhibit 7 and Exhibit 9. Have
8 you ever seen either one of these documents?
9   **A.** No.
10  **Q.** Do you recognize either one of these
11 documents?
12  **A.** No.
13  **Q.** Do you see in each of these documents in
14 the cc section that they're both cc'd to Mr. Roger
15 Hughes, Latti Associates, Attorneys?
16  **A.** Hmm mmm.
17  **Q.** And it gives their address on Union
18 Wharf?
19  **A.** Yeah.
20  **Q.** In 1983, do you recall whether or not
21 Latti Associates was on Union Wharf?
22  **A.** I remember going to the office one time,
23 and it was right on the waterfront.
24  **Q.** Okay, and you have never seen either of

120

1 these documents --
2   **A.** No.
3   **Q.** -- to your recollection?
4   **A.** Right.
5   **Q.** Okay. Did Mr. Hughes, Mr. Latti, or any
6 representative of Latti Associates ever call you
7 or write to you in 1983 regarding a dispute as to
8 the terms of your annuity?
9   **A.** No.
10         MR. LeBLANC: Can you mark this as
11 Exhibit 20, please.
12         (Exhibit No. 20, Note dated 11/16/04,
13 marked for identification.)
14         MR. LeBLANC: For the record, I'm
15 going to, I've asked that Exhibit 20 be marked,
16 it's a note dated November 16th, 2004 addressed to
17 whom it may concern signed by Dennis Dimon and two
18 other individuals.
19 BY MR. LeBLANC:
20  **Q.** Mr. Dimon, can you look at that document
21 and tell me if you recognize it?
22  **A.** I'm not sure to tell you the truth.
23  **Q.** Okay, but is this (indicating) your
24 signature next to the title name?

121

1   **A.** Yeah, yeah.
2   **Q.** And I'll read it to you, it says "I,
3 Dennis J. Dimon, hereby authorize" and let me make
4 sure I'm getting this right, "Hereby authorize
5 David B. Kaplan, Esq. to act for me in all matters
6 relating to my structured settlement."
7         Does that ring a bell for you?
8   **A.** Yeah, now it does.
9   **Q.** And what were you requesting by way of
10 this letter?
11  **A.** Finding out information on what had
12 happened with the settlement, and you know,
13 whether there was anything to be done about it.
14  **Q.** And why did you draft this letter?
15  **A.** You mean write it out?
16  **Q.** Yes, was this your idea to write it out
17 or someone else's?
18  **A.** It was somebody else's I guess.
19  **Q.** And whose idea was it to write it out?
20  **A.** I think it was Fred's, I'm not sure.
21  **Q.** And this handwriting, do you recognize
22 whose handwriting this (indicating) is?
23  **A.** It's not mine.
24  **Q.** Okay. Is this (indicating) your wife's

122

1  handwriting?
2     **A.** Um, I'm not sure. Like I said, I'm not
3  sure of the letter itself, but I remember the
4  letter.
5     **Q.** Okay. If I represent to you that this
6  signature on the left-hand side of Exhibit 20 is
7  Katherine Irene Dimon, would you dispute that?
8     **A.** No.
9     **Q.** Do you believe that to be your wife's
10 signature?
11    **A.** Yeah.
12    **Q.** And it says "Witness" underneath, was she
13 witnessing your signature?
14    **A.** Basically, yeah.
15    **Q.** Okay, and do you know who this second
16 witness name is (indicating)?
17    **A.** My father-in-law.
18    **Q.** And what's his name?
19    **A.** George Carr.
20    **Q.** Is that C-A-R-R, do you know, two R's?
21    **A.** Yeah.
22    **Q.** And he lives on the now infamous Laura
23 Lane?
24    **A.** Yeah, he lives on Laura Lane.

123

1     **Q.** Is this 86 Laura Lane the house that you
2  lived in with your wife for a period of time?
3     **A.** It was right next to his.
4     **Q.** Okay, and why was your father-in-law
5  witnessing your signature?
6     **A.** He happened to be there, and we just
7  asked him if he wanted to witness it.
8     **Q.** Okay. Did anyone suggest to you that you
9  needed witnesses to your signature on this
10 document?
11    **A.** Not that I can remember.
12    **Q.** In 1983, you're aware that there was a
13 lawsuit filed on your behalf, is that true?
14    **A.** Yeah.
15    **Q.** Okay, and who filed that lawsuit for you?
16    **A.** Latti & Associates.
17    **Q.** Okay, and when they filed the lawsuit,
18 did they, if you recall, file a document entitled
19 complaint?
20    **A.** I'm not sure on how it was filed to tell
21 you the truth.
22    **Q.** Okay. Did you ever receive copies of the
23 pleadings that were filed in the Jenny C. case?
24    **A.** I never received much of anything.

124

1     **Q.** Okay. When you say you never received
2  much of anything, is it your testimony you never
3  received much of anything from Latti & Associates
4  in terms of documents?
5     **A.** Right.
6     **Q.** Okay.
7        MR. LeBLANC: Can you mark that as
8  Exhibit 1, please.
9        (Exhibit No. 1, Complaint, marked for
10 identification.)
11       MR. LeBLANC: For the record, I'd
12 like to, I've asked that Exhibit 1 be marked and
13 I represent that it's the complaint filed in this
14 matter and contains fourteen pages.
15       MR. KEANE: In the present matter?
16       MR. LeBLANC: In the <u>Dimon vs.</u>
17 <u>MetLife, et al.</u> matter.
18 BY MR. LeBLANC:
19    **Q.** Mr. Dimon, have you ever seen this
20 document before?
21    **A.** No.
22    **Q.** Did you know such a document was drafted
23 on your behalf?
24    **A.** I know it through Kaplan's office, yeah.

125

1     **Q.** Okay. Did they tell you they were
2  drafting this document for you?
3     **A.** Yes.
4     **Q.** And that they were going to file it in
5  court?
6     **A.** Yes.
7     **Q.** And since, without disclosing the
8  conversations you've had, since this document was
9  filed, have they contacted you to give you updates
10 and statuses on your case?
11    **A.** Yeah.
12    **Q.** So, they let you know what's going on?
13    **A.** Right.
14    **Q.** Do you consider that to be part of their
15 responsibilities as an attorney?
16    **A.** Oh, yeah, most definitely.
17    **Q.** And would that be a part of the
18 responsibility of any attorney you hire?
19    **A.** Oh, yeah, definitely.
20    **Q.** Okay. When the court appointed the
21 guardian on your behalf, did you dispute the
22 appointment of the guardian?
23    **A.** No.
24    **Q.** Did you say "Hey, judge, I'm fine, I know

126

1  what's going on"?
2     **A.** No, not that I can recollect.
3     **Q.** Did you, were you glad that the court
4  appointed someone to look after your interest?
5     **A.** Oh, yeah, most definitely.
6     **Q.** Okay.
7        MR. LeBLANC: Can you mark this as
8  Exhibit 3, please.
9        (Exhibit No. 3, Supplementary
10 Agreement No. SC1126, marked for identification.)
11       MR. LeBLANC: Mr. Dimon, first, for
12 the record, I've asked that Exhibit 3 be marked,
13 it's a document entitled "Supplementary Agreement
14 No. SC1126."
15 BY MR. LeBLANC:
16    **Q.** Mr. Dimon, does this document, do you
17 recognize this document?
18    **A.** No.
19    **Q.** Have you ever seen it before?
20    **A.** No.
21    **Q.** Do you know what this document is?
22    **A.** No.
23    **Q.** Okay. I represent to you this document
24 sets out the terms of your annuity payments from

127

1  Charter Security Life's perspective.
2     **A.** Uh-huh.
3     **Q.** If your attorney received such a
4  document, would you expect that they would
5  communicate that to you?
6     **A.** I'd hope so.
7     **Q.** Okay, and why would you hope so?
8     **A.** Because I'd want to know too.
9     **Q.** Okay. Now, in terms of the Jenny C.
10 litigation, did you consider yourself to be part
11 of a team in the sense that everyone was working
12 together for the same goal?
13    **A.** Yeah, I hope so.
14    **Q.** And that everyone should have been
15 communicating back and forth?
16    **A.** Yeah.
17    **Q.** Do you now believe that they weren't
18 communicating effectively with you?
19       MR. DeWICK: Objection.
20 BY MR. LeBLANC:
21    **Q.** At one point, yeah.
22    **Q.** And at what point weren't they
23 communicating with you?
24    **A.** Like, after everything was signed and

## 128

1 stuff like that, they never notified me really
2 that it was changing from one insurance company to
3 another insurance company or anything else like
4 that, they never notified me at all.
5      The only way I got notified is if, you
6 know, I got the check and on the letterhead it had
7 a different name on it, that's the only way I got
8 notified, otherwise, I didn't know nothing.
9   **Q.**  Okay.  Do you recall a situation where
10 one of the players in this Jenny C. litigation
11 lost their briefcase, does that ring a bell for
12 you?
13   **A.**  No.
14   **Q.**  Okay.  If someone used the excuse I can't
15 send you the document because I lost my briefcase,
16 would that be something you would remember?
17   **A.**  Yeah.
18   **Q.**  Okay.
19   **A.**  Most definitely, I'd tell them to go find
20 it.
21      MR. LeBLANC:  Can you mark this as
22 Exhibit 13, please.
23      (Exhibit No. 13, Letter dated 6/9/03,
24 marked for identification.)

## 129

1      MR. LeBLANC:  For the record, I've
2 asked that Exhibit 13 be marked, it's a letter
3 dated June 9th, 2003 addressed to Dennis Dimon
4 from Sandy Franklin, Annuity Payout Specialist
5 III.
6 BY MR. LeBLANC:
7   **Q.**  Mr. Dimon, do you recognize this letter?
8   **A.**  Yeah, I've seen it a couple times
9 already.
10   **Q.**  Okay, and when it says in the first line
11 here "This letter is in response to a phone call
12 we received from Katherine Dimon."
13      Did you receive more than one letter in
14 response to phone calls by your wife, Kathy?
15   **A.**  No, not that I know of.
16   **Q.**  Okay.  Were you involved in the decision
17 to purchase an annuity?
18   **A.**  You mean the settlement?
19   **Q.**  In the Jenny C. settlement.
20   **A.**  I don't quite understand.
21   **Q.**  Okay.
22   **A.**  Was I involved?
23   **Q.**  In the decision to accept an annuity
24 rather than just a cash payment?

## 130

1   **A.**  No, not really. Mr. Latti had set it all
2 up because he said if I had taken the whole thing,
3 that I'd wind up paying an awful lot of taxes on
4 it and stuff like that, and he said I'd get a lot
5 more out of it by investing it than taking it all
6 at once, so.
7   **Q.**  Okay, and based on his advice to you, you
8 decided to go with the plan that he came up with?
9   **A.**  Right.
10   **Q.**  Okay.  Did he ever present you with any
11 other options?
12   **A.**  He said he looked into other options and
13 he felt the one that he gave me was the best that
14 he could find.
15   **Q.**  Okay.  Did Mr. Latti ever comment on the
16 fact that your wife or your mother attended the
17 meetings with you?
18   **A.**  No, he didn't really mind.
19   **Q.**  Did he ever advise you that you
20 may be taking a risk that what you say would not
21 be confidential because your wife was there or
22 your mother was there?
23   **A.**  Anything he had to say, you know, I
24 thought was, you know, the right thing, you know.

## 131

1 I didn't find any threat, what you're saying is
2 you thought that my wife would be a threat?  I'm
3 confused, I'm sorry.
4   **Q.**  That's okay, it was a poor question, I'll
5 give you that.  Did he ever tell you that you
6 could be forced to testify about what you and he
7 talked about during your meetings if your wife or
8 your mother were present?
9   **A.**  He never, it never came up really.
10   **Q.**  Okay.  Did he ever ask your wife or your
11 mother to wait in the waiting room while you had
12 conversations with him?
13   **A.**  No, not really.
14   **Q.**  Okay.  When you had your discussions with
15 Mr. Latti, did he talk to you or did he talk to
16 your wife or your mother?
17   **A.**  It was me and my wife was in the room
18 with him and it was actually directed to both of
19 us.
20   **Q.**  Was he looking at you or was he looking
21 at the other party?
22   **A.**  I don't know, I can't remember.  I know
23 he was looking in our direction, let's put it that
24 way.

## 132

1   **Q.**  Okay.  When you accepted Mr. Latti's
2 recommendation that you buy an annuity --
3      MR. DeWICK:  Objection.
4 BY MR. LeBLANC:
5   **Q.**  Did you accept Mr. Latti's recommendation
6 that you buy an annuity?
7      MR. DeWICK:  Objection.
8 BY MR. LeBLANC:
9   **A.**  I felt that it was the right thing, you
10 know.
11   **Q.**  Did you speak with anyone else about
12 whether or not you wanted to buy an annuity or you
13 should buy an annuity?
14   **A.**  No.
15   **Q.**  After the decision was made to buy an
16 annuity, did you talk to anyone about whether or
17 not that was the right decision to be made for
18 you?
19   **A.**  I took it upon his word, you know, that
20 it was the right thing, and then after we
21 discussed it and stuff, you know, I felt it was
22 the best thing, you know.
23   **Q.**  I'm going to show you what we marked as
24 Exhibit 2.  Other than your signature, did you

## 133

1 write anything else on this document?
2   **A.**  No.
3   **Q.**  Okay.  Did anyone else in the room write
4 anything else on this document --
5   **A.**  I'm not sure.
6   **Q.**  -- when you were there?
7   **A.**  I'm not sure.
8   **Q.**  Okay, and this was a document that was
9 presented to you at Mr. Latti's office?
10   **A.**  I'm pretty sure, yeah.
11   **Q.**  Okay.  Do you recall on Exhibit 2 if
12 anyone read that to you before you signed it?
13   **A.**  Not that I know of.
14   **Q.**  Okay.  Do you know if either your wife or
15 your mother read that on your behalf before you
16 signed it?
17   **A.**  No.
18   **Q.**  Okay.  When you were signing this
19 document that we've marked Exhibit 2, did you go
20 over any other documents or sign any other
21 documents at the same meeting?
22   **A.**  I'm not sure to tell you the truth.
23   **Q.**  Okay.  Was it common for you to drive all
24 the way up to Boston to Mr. Latti's office just to

| | |
|---|---|
| **134** | **137** |

**134**

1 sign one document?
2   **A.** No.
3   **Q.** Okay. So, would you go up there and take
4 care of other business with Mr. Latti at the same
5 time?
6   **A.** Right. I only went to his office twice.
7   **Q.** Two times total?
8   **A.** That's it.
9   **Q.** Okay, and one time was you signed the
10 annuity application?
11   **A.** Right.
12   **Q.** And what did you go to his office the
13 other time for?
14   **A.** Well, the first time was to go over the
15 case and stuff like that, and that was basically
16 about it, what was going to happen and stuff like
17 that.
18   **Q.** Now, why did you decide to file a
19 complaint or begin litigation in this case?
20   **A.** What's that, litigation, what's that?
21   **Q.** That's a good question.
22     MS. McQUAY: A lawsuit.
23 BY MR. LeBLANC:
24   **Q.** A lawsuit, why did you want to bring a

**135**

1 lawsuit in this case?
2   **A.** I felt I had more coming, you know, you
3 know, like I said before, I felt I had more money
4 coming than what was being, you know, sent to me.
5   **Q.** Okay, and that was more than the twenty
6 years you actually got paid?
7   **A.** Yeah, like I said, I thought it was a
8 lifetime policy, I thought that's what it meant,
9 you know.
10   **Q.** Okay. Did you talk to any friends or
11 relatives before you decided to file the lawsuit?
12   **A.** No.
13   **Q.** And unless I clarify, the lawsuit means
14 this lawsuit and not the Jenny C. lawsuit, okay?
15   **A.** Right.
16   **Q.** Did you speak with your wife or your
17 mother or Mr. Benson about filing a lawsuit?
18   **A.** No.
19   **Q.** Have you ever heard of other people suing
20 MetLife?
21   **A.** No.
22   **Q.** Have you ever heard of other people suing
23 any of the other defendants in this case?
24   **A.** No.

**136**

1   **Q.** And what did you do once you decided to
2 file a lawsuit, what did you do to gather the
3 facts and the information in this case?
4   **A.** I left it up to my lawyer.
5   **Q.** So, you called your lawyer, and it was
6 his job to get all that together?
7   **A.** Right.
8   **Q.** And let me ask you if it's your lawyer's
9 responsibility to gather the information in the
10 case and he called you and asked you a question
11 about a specific fact, would it be your
12 responsibility as the client to tell him the
13 information you had?
14   **A.** Yeah.
15   **Q.** Is it your understanding that the
16 client and the lawyer should work together --
17   **A.** Yeah, most definitely.
18   **Q.** -- to achieve the same results?
19   **A.** Yeah.
20   **Q.** And during your, actually -- strike that.
21     How many times did you meet with your
22 attorney at his offices in your current case in
23 the Kaplan/Bond offices?
24   **A.** Twice.

**137**

1   **Q.** And was someone else present both times?
2   **A.** Yeah.
3   **Q.** Who was that?
4   **A.** My wife and Fred.
5   **Q.** And Mr. Benson?
6   **A.** Benson, right.
7   **Q.** Okay, and when a representative of
8 Kaplan/Bond calls you on the telephone, do you
9 take the call or does your wife take the call?
10   **A.** Sometimes we're not at home and it's left
11 on the answering machine.
12   **Q.** But when you are at home?
13   **A.** Either I will or my wife will.
14   **Q.** Okay. Now, was the Kaplan/Bond Group the
15 first attorneys you contacted regarding this
16 matter, the matter against MetLife and everyone
17 else?
18   **A.** Yeah, yeah.
19   **Q.** Okay. Have you ever been represented by
20 Kaplan/Bond before?
21   **A.** No.
22   **Q.** Did you know that Mr. Kaplan and
23 Mr. Latti used to work together?
24   **A.** Not until he told me.

**138**

1   **Q.** Okay, and did that change your opinion
2 about whether or not you wanted to use Mr. Kaplan?
3   **A.** No, not really.
4   **Q.** Did you ever work with Mr. Kaplan back in
5 1983?
6   **A.** No.
7   **Q.** Are you related to anyone whose employed
8 by Mr. Kaplan's office?
9   **A.** No.
10   **Q.** Do you have any financial arrangements
11 with any third party regarding your compensation
12 you might receive in this lawsuit?
13   **A.** No.
14   **Q.** And do you know what I mean by financial
15 arrangements?
16   **A.** Yeah.
17   **Q.** And what would that be?
18   **A.** Paying them.
19   **Q.** Okay. So, you're not going to pay some
20 third party, someone else if you win in this case,
21 right?
22   **A.** No.
23   **Q.** Okay. As part of the pleading practice
24 in this case, the documents attorneys exchange,

**139**

1 your attorney produced a document saying that
2 roughly the damages in this case are 1.8 million
3 dollars.
4   Do you know where that figure came from?
5   **A.** No.
6   **Q.** Okay. Do you have any idea how that was
7 calculated?
8   **A.** No.
9   **Q.** Do you know if that figure included the
10 payments you've already received?
11   **A.** No idea.
12   **Q.** Okay. You testified earlier that you
13 weren't aware in 1983 there was a dispute
14 about the terms on the annuity; is that correct?
15   **A.** Yeah, right.
16   **Q.** Okay. Whose fault was it that you
17 weren't aware about the dispute?
18     MR. DeWICK: Objection.
19 BY MR. LeBLANC:
20   **A.** The lawyer, Latti's.
21   **Q.** Was it his responsibility to let you know
22 there was a dispute?
23     MR. DeWICK: Objection.
24

140
1 BY MR. LeBLANC:
2    A.   Most definitely.
3    Q.   And as a client, you would expect that
4 your lawyer would advise you regarding that kind
5 of dispute?
6    A.   Yeah, I would think so, unless he felt it
7 wasn't necessary.
8    Q.   Okay.  Do you think it was necessary for
9 him to keep you advised?
10              MR. DeWICK:  Objection.
11 BY MR. LeBLANC:
12    A.   Oh, yeah, most definitely.
13    Q.   Okay.  In 1983, do you know if Mr. Latti
14 was paid for his services in the Jenny C. matter?
15    A.   As far as I know.
16    Q.   Did you ever receive a bill from him
17 saying he wasn't paid?
18    A.   No.
19    Q.   Okay.  Do you think it's fair for him to
20 accept payment on a case that ended up not being
21 what you wanted it to be?
22              MR. DeWICK:  Objection.
23 BY MR. LeBLANC:
24    A.   I'm not sure what you're saying.

141
1    Q.   Mr. Latti, assuming Mr. Latti received
2 his payment.
3    A.   Right.
4    Q.   Do you think it's fair that he got paid
5 and you didn't get what you wanted to get out of
6 the case?
7              MR. DeWICK:  Objection.
8 BY MR. LeBLANC:
9    A.   Yeah, I would say so.
10    Q.   You would say it's fair or it's not fair?
11    A.   It's not fair.
12    Q.   Okay.  Can you tell me what your
13 birthdate is?
14    A.   12/9/59.
15    Q.   And do you know what your account number
16 at Citizens Bank is?
17    A.   No.
18    Q.   After 2003 when you stopped receiving
19 payments, did you have any discussions with any of
20 the defendants in this case about not receiving
21 payments?
22    A.   Um, like, who, family and stuff?
23    Q.   Any of the defendants, any of the parties
24 to the case?

142
1    A.   No.
2    Q.   Did you call Mr. Latti directly?
3    A.   I called his office.
4    Q.   Okay, and did anyone there make any
5 statements about whether or not it was their
6 responsibility or they were at fault?
7    A.   No.
8    Q.   Were you angry when you found out you
9 weren't going to be receiving payments anymore?
10    A.   Curious was more the word for it because
11 I was wondering how come, you know, one thing was
12 said and all of a sudden, everything's turned
13 around and stopped.
14    Q.   Earlier when you testified that you
15 earned roughly $20,000, did that include the
16 annuity payments?
17    A.   No.
18    Q.   So, that's separate from the annuity
19 payments?
20    A.   Right.
21    Q.   Okay.
22    A.   I wasn't even getting them when I made
23 that.
24    Q.   Okay.

143
1              MR. LeBLANC:  I'll take a little
2 break here.
3              (A short break was taken.)
4              MR. LeBLANC:  We're back on record.
5 BY MR. LeBLANC:
6    Q.   Since your payments stopped in 2003, have
7 you ever tried to contact Mr. Decof, the guardian?
8    A.   No.
9    Q.   Okay, and is it your understanding that
10 by filing a lawsuit, a complaint, you're saying
11 certain parties did things wrong?
12    A.   Oh, yeah, most definitely.
13    Q.   And as part of the breakdown of that,
14 sometimes lawyers include counts, specific
15 allegations of wrongdoing.  I'd like you to look
16 at Exhibit 1, Count X, and I'll read this section
17 for you, "Dennis Dimon vs. Metropolitan Life
18 Insurance Company, Breach of Contract."
19    A.   Hmm mmm.
20    Q.   What do you understand the term breach of
21 contract to mean?
22    A.   It means ain't following up on their part
23 of the bargain.
24    Q.   And what is your understanding of what

144
1 their part of the bargain was?
2    A.   Is to pay what I had coming to me.
3    Q.   And what did you have coming to you?
4    A.   I don't know exactly how much, but it was
5 supposed to have been a check until I passed away.
6    Q.   Okay.  It says here in paragraph 66 on
7 page 11, "The plaintiff suffered financial losses
8 as a result of the defendant's breach of
9 contract."
10         What financial losses did you suffer?
11    A.   Well, I had to turn around and had to
12 stop fishing because some of the stuff that my
13 wife couldn't take care of I had to take care of
14 because we needed money, and you know, needed my
15 opinion, not opinion, what do I want to say, my
16 okay to go ahead with, stuff like that, so, I
17 missed fishing trips because of that.
18    Q.   Okay, and how many fishing trips?
19    A.   Um, it was, like, two or three that I can
20 remember.
21    Q.   And do you know what time frame that was?
22    A.   Um, it was in the course of a couple of
23 three weeks anyway.
24    Q.   Did you suffer any other financial

145
1 losses?
2    A.   That and took everything in the bank to
3 pay my mortgage and my loans and everything else
4 because I didn't have much money ahead, and I
5 wiped out everything I had.
6    Q.   It says here in paragraph 69, "The
7 defendant negligently misrepresented the terms of
8 the contract stating that the contract was for
9 life, guaranteed for twenty years."
10         Did you at any time have discussions with
11 Charter Security Life Insurance Company about what
12 the terms of the contract were?
13    A.   No.
14    Q.   Okay.  So, to your knowledge, did the
15 defendant, in this case, Charter Security Life or
16 Metropolitan Life Insurance Company, ever state
17 that the contract was for life, guaranteed for
18 twenty years to you?
19    A.   No.
20    Q.   This paragraph 64, and I'll read the
21 entire paragraph, "The plaintiff and the defendant
22 entered into a contract whereby the defendant was
23 to provide a lifetime annuity guaranteed for
24 twenty years in exchange for the plaintiff

146

1 releasing all claims for injuries suffered by the
2 plaintiff in a fishing accident."
3    **A.**  Hmm mmm.
4    **Q.**  And the fishing accident that they refer
5 to or that's referred to here, is that the
6 Jenny C. fishing accident?
7    **A.**  Yes.
8    **Q.**  Okay, and did you release all your claims
9 in the Jenny C. fishing accident?
10   **A.**  Yeah, releasing all them, yeah.
11   **Q.**  Do you know if you had any claims in the
12 Jenny C. case against MetLife or Charter Security
13 Life Insurance Company?
14   **A.**  No.
15   **Q.**  Okay. Your claims in Jenny C. were
16 against the boat?
17   **A.**  Right.
18   **Q.**  And the insurance companies insuring the
19 boat?
20   **A.**  Right, right.
21   **Q.**  But that wasn't Charter Security or
22 MetLife to your knowledge?
23   **A.**  Right.
24   **Q.**  Okay. So, if you -- strike that.

147

1            Mr. Dimon, did I say anything today that
2 you didn't get the meaning of but answered the
3 question anyway?
4    **A.**  No.
5    **Q.**  Okay. Do you feel that you understood
6 all the questions I asked you?
7    **A.**  Yeah.
8    **Q.**  And that you answered them all truthfully
9 and honestly?
10   **A.**  Yeah.
11   **Q.**  Okay, and that the documents we looked at
12 were not documents that caused you any kind of
13 confusion when I showed them to you today?
14   **A.**  You know, a few of them I never saw,
15 that's all.
16   **Q.**  Okay, but if you had any question about
17 any of the documents, do you feel you had an
18 opportunity to ask that question or to seek advice
19 of your counsel?
20   **A.**  Yeah.
21   **Q.**  Okay. What, if anything, has your mother
22 said about this lawsuit against MetLife and all of
23 the defendants?
24   **A.**  Um, she didn't really have much to say

148

1 about it, she just said, "Oh, do what you got to
2 do."
3    **Q.**  And was she upset when you stopped
4 receiving checks in 2003?
5    **A.**  Yeah, she was, yeah, kind of.
6    **Q.**  And were you upset?
7    **A.**  Wouldn't you?
8    **Q.**  Is that a yes?
9    **A.**  Yes, sorry.
10   **Q.**  That's okay.
11           MR. LeBLANC: I don't have any
12 further questions right now. Thank you,
13 Mr. Dimon.
14           MR. KEANE: Attorney DeWick is going
15 to ask you some questions.
16           CROSS-EXAMINATION
17 BY MR. DeWICK:
18   **Q.**  How are you doing, Mr. Dimon, I
19 introduced myself earlier, my name is Jay DeWick,
20 and I represent Mr. Latti and all the Latti
21 entities.
22           I believe you testified earlier something
23 to the effect at the time you were injured, you
24 thought that perhaps you could make a claim and

149

1 that Jenny C.'s insurance would pay your medical
2 expenses.
3            Does that capture your earlier testimony?
4    **A.**  Yeah.
5    **Q.**  And after you won at trial, the jury
6 awarded you much more than medical expenses; is
7 that correct?
8    **A.**  Right.
9    **Q.**  So, it's fair to say you were happy with
10 those results?
11   **A.**  Yeah.
12   **Q.**  And is it fair to say that you were
13 satisfied with the representation that Latti
14 Associates did for you in the underlying Jenny C.
15 litigation?
16   **A.**  Yes.
17   **Q.**  And it's safe to say that you expressed
18 this in fact to the guardian ad litem, that you
19 were satisfied with the services; is that correct?
20   **A.**  Right.
21   **Q.**  Okay. Now, the judge in the Jenny C.
22 case appointed a guardian to help you understand
23 the terms of the settlement; is that correct?
24   **A.**  Right.

150

1    **Q.**  And you met with this guardian on more
2 than one occasion I believe?
3    **A.**  Just one that I know of.
4    **Q.**  Just one?
5    **A.**  That I can remember, right.
6    **Q.**  Okay. During this meeting, did the
7 guardian explain to you the terms of the
8 settlement of the Jenny C. case?
9    **A.**  The full terms, yeah, he did.
10   **Q.**  And he explained them to you so that you
11 would understand them?
12   **A.**  Right.
13   **Q.**  And do you recall what he explained the
14 terms of the settlement to be?
15   **A.**  Right. Oh, do you want me to explain it
16 to you?
17   **Q.**  Please.
18   **A.**  That this was a lifetime policy, and you
19 know, that it's twenty years, and he said that it
20 seemed like a really good deal and stuff like
21 that, and you know, I can't remember exactly what
22 was all said, but he asked me what I was going to
23 do with the money, and you know, I told him I've
24 been looking into some property, buying a house

151

1 and stuff like that, and you know, that's
2 basically the extent to it.
3    **Q.**  Okay. So, he said that you, the way he
4 expressed the terms of the annuity to you were
5 that the payments would continue for your life?
6    **A.**  Right.
7    **Q.**  And he expressed to you he thought this
8 was a good deal as you said?
9    **A.**  Right.
10   **Q.**  So, earlier you testified I believe that
11 you didn't speak with anyone else about whether
12 the annuity was a good idea except for Mr. Latti,
13 but first of all, is it true you testified earlier
14 that you did not speak with anyone except
15 Mr. Latti about whether to accept the annuity?
16   **A.**  Right.
17   **Q.**  But that's not true, is it?
18   **A.**  Yeah, it is because the only other person
19 in the room was my wife because that was the only
20 time it was discussed.
21   **Q.**  Didn't we just go over the fact it was
22 also discussed with the guardian, however, that it
23 was a good deal?
24   **A.**  Oh, yeah, true, I'm sorry about that.

152

1 **Q.** So, just so the record is straight, you
2 discussed the terms of the annuity with Mr. Latti?
3 **A.** First.
4 **Q.** First, but you also discussed the terms
5 of the annuity with the guardian?
6 **A.** Right.
7 **Q.** And he explained to you what they were so
8 that you understood them?
9 **A.** Right.
10 **Q.** And he, using your words, said that it
11 was a good deal?
12 **A.** Right.
13 **Q.** When you started receiving checks from
14 the annuity, originally it was Charter Life and
15 then it became MetLife; is that correct?
16 **A.** Right. No, there was another one in
17 between for a short term.
18 **Q.** Do you recall who that was?
19 **A.** No, I don't.
20 **Q.** Okay. Did you always receive these
21 checks directly from the insurance company that
22 was paying them?
23 **A.** Right.
24 **Q.** That's a yes?

153

1 **A.** Yes, true.
2 **Q.** They did not come through any other third
3 party?
4 **A.** No.
5 **Q.** For example, they didn't come through
6 Latti Associates?
7 **A.** Right.
8 **Q.** After the Jenny C. case settled and you
9 began receiving the checks, did you have any
10 contact after that point with anyone from Latti or
11 Latti & Associates?
12 **A.** Very brief, yeah, nothing as far as
13 discussing on how much, you know, what was going
14 on with the money itself.
15 **Q.** When did that contact occur?
16 **A.** Um, just when simple things would come
17 up, like, one time when it changed hands, it was,
18 it was kind of late and stuff like that, it was,
19 like, almost two months late, something like that,
20 and we had to call up and find out what was going
21 on then, you know, because we always tried to keep
22 track of it to find out what was going on.
23        You know, there were brief, they were
24 just brief, you know.

154

1 **Q.** So, there was a time when the payments
2 from the insurance company were two months late?
3 **A.** Yeah, generally when it changed hands,
4 that's the way I took it, you know.
5 **Q.** But do you recall a specific instance
6 when the payments were two months late?
7 **A.** Just one that I know of, yeah.
8 **Q.** And do you recall generally when that
9 happened, what year, how long after the annuity
10 issued?
11 **A.** No, I can't remember right offhand, no,
12 exactly when.
13 **Q.** Was it closer in time to when the annuity
14 issued or closer in time to when the annuity
15 stopped paying, do you know that?
16 **A.** It was when the annuity was first going
17 on, it was, like, maybe, I would say a year after
18 it had started.
19 **Q.** Okay, and when the payments were two
20 months late, you contacted Latti Associates at
21 that point?
22 **A.** Right.
23 **Q.** And do you recall who you spoke to
24 directly?

155

1 **A.** No, I don't.
2 **Q.** And what did you ask them to do at that
3 time, if anything?
4 **A.** Well, I asked them if they could find out
5 what was going on and stuff like that, and they
6 did get back to me at one time and said that it
7 was on its way, that it was in the mail.
8        They didn't specify exactly what had
9 happened or anything else like that, they just
10 said, you know, that it was on its way.
11 **Q.** Okay. Other than that time where the
12 payments were two months late, were there other
13 times that you contacted Latti Associates?
14 **A.** No.
15 **Q.** So, that the next time you contacted them
16 after that was in June of '03 when the payments
17 stopped; is that correct?
18 **A.** Basically, yeah.
19 **Q.** Well, are there any other times that you
20 can recall between --
21 **A.** Not that I can recall, no.
22 **Q.** To your knowledge, did anyone on your
23 behalf, your wife or your mother or anyone else,
24 contact Latti Associates during that time?

156

1 **A.** Not that I know of.
2        MR. DeWICK: Are the exhibits around
3 here somewhere?
4        MR. LeBLANC: They are.
5 BY MR. DeWICK:
6 **Q.** Mr. Dimon, if you will just bear with me
7 here. You testified earlier that, and you can
8 look through those exhibits as I'm asking the
9 question, you testified earlier that you do not
10 recall receiving the letters which have been
11 marked Exhibit 5, 6, 7, and 9, and take a shot at
12 looking at them.
13 **A.** No, I don't.
14        MR. KEANE: Here they are
15 (indicating).
16        MR. DeWICK: Look through all of
17 them, take your time.
18        MR. KEANE: I believe you asked for
19 5, 6, 7, and 9?
20        MR. DeWICK: 5, 6, 7, and 9, exactly,
21 and I'll ask the question again, Mr. Dimon.
22 BY MR. DeWICK:
23 **A.** Some of them I've seen and some of them I
24 haven't seen.

157

1 **Q.** Okay. Well, you testified earlier that
2 5, 6, 7, and 9, that you do not recall receiving
3 any of those at the time.
4 **A.** Right.
5 **Q.** Is that correct?
6 **A.** That's correct.
7 **Q.** Do you have any reason to believe that
8 you did not receive them?
9 **A.** No.
10 **Q.** Where were you living at the time, during
11 this time period, the summer through the fall of
12 1983?
13 **A.** In Greenwood Drive.
14 **Q.** And that was your mailing address as
15 well?
16 **A.** Yes, it was.
17 **Q.** And I'm sorry, was that West Kingston?
18 **A.** No, that was in Peacedale.
19        MR. DeWICK: Just give me a moment.
20 BY MR. DeWICK:
21 **Q.** Mr. Dimon, you testified earlier you
22 received this document, and I'm referring to page
23 3 of Exhibit 15, you received this document minus
24 the stamp from Mr. Latti is your recollection?

**158**

1   **A.**   From himself, yes.
2   **Q.**   And do you remember when you received
3 that from him?
4   **A.**   The day that we signed the contract for
5 this policy.
6   **Q.**   And have we seen the contract for this
7 policy?
8   **A.**   No.
9   **Q.**   And did you receive a copy of that signed
10 contract?
11   **A.**   Nothing.
12   **Q.**   Do you know --
13   **A.**   This (indicating) is the only paper I
14 received at that time.
15   **Q.**   Do you know where the signed copy of the
16 annuity went after you signed it?
17   **A.**   No.
18   **Q.**   Who else was in the room when you signed
19 it?
20   **A.**   My wife, and I'm not sure if one of his
21 associates was there too, I'm not sure.
22   **Q.**   So, your wife, yourself, Mr. Latti?
23   **A.**   Right.
24   **Q.**   And perhaps one of his associates?

**159**

1   **A.**   I think so.
2   **Q.**   Anyone else?
3   **A.**   No, not that I know of.
4   **Q.**   And do you recall, you don't recall the
5 date that was signed, do you?
6   **A.**   No, not right off.
7   **Q.**   But you recall it was the same day that
8 he showed you page 3 --
9   **A.**   Yeah.
10   **Q.**   -- let me finish, it's hard for her, it's
11 impossible for her to write both of us at the same
12 time, actually.
13   **A.**   Sorry.
14   **Q.**   Not hard, impossible. You signed the
15 annuity the same day you received page 3 of
16 Exhibit 5, the proposal from Mr. Latti; is that
17 correct?
18   **A.**   Right.
19   **Q.**   And do you know whether that
20 was -- strike that.
21            Do you recall how long before you began
22 to receive payments that you signed the annuity
23 contract, how much time elapsed between the
24 signing and receiving your first payment?

**160**

1   **A.**   Not really, but it didn't seem like a
2 very long time. I can't tell exactly how much
3 time in between.
4   **Q.**   Are you able to estimate? Only if you
5 are able.
6   **A.**   I would say within a couple of weeks
7 maybe.
8   **Q.**   And after, in June of 2003, when your
9 wife contacted Mr. Latti's daughter to ask whether
10 she had documents regarding the settlement, after
11 that contact where she said that no such document,
12 that they did not have documents in their
13 possession any longer, was there any further
14 contact with Latti's office after that?
15   **A.**   Not as far as I know, not from myself.
16   **Q.**   Okay.
17            MR. DeWICK: I have nothing further,
18 thank you.
19            MS. McQUAY: Just a couple of
20 questions, Mr. Dimon.
21            RECROSS EXAMINATION
22 BY MS. McQUAY:
23   **Q.**   I believe you testified that you were
24 born in December of 1959?

**161**

1   **A.**   Right.
2   **Q.**   Which makes you, you'll be this December,
3 what, forty-seven years old?
4   **A.**   Yeah.
5   **Q.**   My math is right, you'll be forty-seven
6 in December?
7   **A.**   Yeah.
8   **Q.**   Okay. So, now, you testified I believe
9 that, if I heard you correctly, that you were told
10 that and I think you used the word they used a
11 life expectancy of fifty for you in coming up with
12 this annuity policy?
13   **A.**   Yes, correct.
14   **Q.**   Would you tell me more about that, who
15 told you that a life expectancy of fifty was used
16 in coming up with this annuity policy?
17   **A.**   Well, the doctors in Boston Ear & Eye
18 Infirmary and stuff like, there was a few
19 specialists and stuff like that, and I guess they
20 were trying to base it on, you know, the life
21 expectancy of the family, stuff like that, and
22 they wanted to know, you know, like, when my
23 father passed away, and well, he didn't pass away
24 then but my grandfathers and down the family tree.

**162**

1   **Q.**   So, someone took a look at your medical
2 records?
3   **A.**   Right.
4   **Q.**   And based on your medical records, it's
5 your understanding that a decision was arrived at
6 that you would have a life expectancy of only
7 about fifty years?
8   **A.**   Right.
9   **Q.**   Which means you've got three years to go,
10 let's hope you do better than they estimated.
11   **A.**   Well, it's sometime I guess.
12   **Q.**   Who told you that in fact they had
13 determined and that were using a life expectancy
14 of fifty years in connection with this annuity
15 policy?
16   **A.**   I'm pretty sure it was Latti.
17   **Q.**   Latti told you that?
18   **A.**   Yes.
19   **Q.**   Okay.
20            MS. McQUAY: I have no further
21 questions, thank you.
22            MR. KEANE: Nothing.
23            MR. LeBLANC: Mr. O'Driscoll, do you
24 have any questions?

**163**

1            MR. O'DRISCOLL: Just a few.
2            RECROSS EXAMINATION
3 BY MR. O'DRISCOLL:
4   **Q.**   Good afternoon, Mr. Dimon, my name is Tim
5 O'Driscoll.
6   **A.**   Hello.
7   **Q.**   Mr. Dimon, have you ever had any
8 discussions with anyone at American Motorist
9 Insurance Company regarding your annuity payments?
10   **A.**   Not that I can recollect, no.
11   **Q.**   Have you ever had any correspondence with
12 anyone at American Motorist Insurance Company
13 regarding your annuity payments?
14   **A.**   No.
15   **Q.**   Have you ever had any contact at all with
16 anyone at American Motorist Insurance Company
17 regarding your annuity payments?
18   **A.**   My wife did a couple of times, but that
19 was way before they changed hands.
20   **Q.**   Before who changed hands, sir?
21   **A.**   Before, it went from American Motors to
22 whatever it is now, I can't remember what it is
23 now, or they went out of business or whatever they
24 did, I'm not sure.

164

1    Q.   Have you ever had any discussions with
2 anyone at Kemper Insurance Company regarding your
3 annuity payments?
4    A.   No.
5    Q.   Have you ever exchanged any
6 correspondence with anyone at Kemper Insurance
7 Company regarding your annuity payments?
8    A.   No.
9    Q.   Have you ever had any contact with anyone
10 at Kemper Insurance Company regarding your annuity
11 payments?
12   A.   No.
13        MR. O'DRISCOLL:  I have no further
14 questions, thank you.
15        MR. LeBLANC:  Just one here.
16        REDIRECT EXAMINATION
17 BY MR. LeBLANC:
18   Q.   Mr. DeWick asked if you had any reason to
19 believe that you did not receive Exhibits 5, 6, 7,
20 and 9, those letters we talked about earlier.
21   A.   Hmm mmm.
22   Q.   And you answered no, and that confused me
23 a little bit.  I guess my question to you then is
24 do you have any reason to believe that you

165

1 actually did receive those exhibits, those
2 letters?
3    A.   There was one in there from Metropolitan
4 I think, I thought there was one in there from the
5 Metropolitan, but I guess I didn't see it, but
6 that was the only one that I was remembering, not
7 the other ones.
8    Q.   Okay, let's do this, Mr. Dimon.  I'm
9 going to show you in sequence Exhibits 5, 6, 7,
10 and 9, okay?
11   A.   Yeah.
12   Q.   Now, showing you Exhibit 5, do you have
13 any reason to believe that you actually received a
14 copy of this document from Latti & Associates?
15   A.   No, I never received a copy.
16   Q.   If we go to Exhibit 6, looking at this
17 document, do you have any reason to believe that
18 you actually received a copy of this document?
19   A.   No.
20   Q.   Okay.  Exhibit 7?
21   A.   No.
22   Q.   And Exhibit 9?
23   A.   No.
24   Q.   Okay, and when you responded no, that

166

1 means no, you didn't receive a copy of the
2 document?
3    A.   Right.
4    Q.   Okay.  Now, when you testified in
5 response to Mr. DeWick's question regarding
6 contacting Latti Associates about a check that was
7 a couple of months late, did I hear you right that
8 you said about one year into your annuity
9 payments, there was a check that was a couple of
10 months late?
11   A.   Right.
12   Q.   And that you called Latti & Associates
13 about that?
14   A.   Right.
15   Q.   And that you spoke with someone at Latti
16 & Associates?
17   A.   Yeah.
18   Q.   Do you know who you spoke with?
19   A.   No, I don't.
20   Q.   Do you recall if it was Mr. Latti?
21   A.   No, it wasn't.
22   Q.   Okay, and at that time, a year into the
23 contract, which would put you in roughly the June
24 1984 time frame.

167

1    A.   Somewhere around there.
2    Q.   Did they tell you that six months or
3 eight months or nine months before that that they had
4 received letters saying there were questions about
5 the contract terms?
6    A.   No.
7    Q.   So, even after Latti & Associates
8 received these letters, they never contacted you
9 or never informed you even when you contacted them
10 that there was this dispute?
11   A.   Right.
12   Q.   And when you told Mr. Decof that you were
13 satisfied with the services of Latti & Associates,
14 was that before you found out that there was this
15 dispute and Latti & Associates hadn't informed you
16 about the dispute?
17   A.   Right.
18   Q.   Because your meeting with Mr. Decof was
19 in April, May 1983; is that right?
20   A.   Right.
21   Q.   Okay.  Now that you know what you know
22 now about Latti & Associates and how they handled
23 your representation, has your opinion changed in
24 terms of whether you are satisfied with their

168

1 services?
2    A.   Well, myself, it's a hard question, you
3 know.  I'm upset because of the simple fact they
4 didn't notify me about this and stuff like that, I
5 think I'm more upset about that than anything, you
6 know.
7        If this is what's supposed to have taken
8 place, they should have notified me that's what
9 was going to be taking place, but nothing was ever
10 changed or anything else like that as far as my,
11 you know, I can't find the word, but I think you
12 know what I mean, but you know, and the simple
13 fact he stated himself by word of mouth that it
14 was a lifetime policy, twenty years intendency or
15 whatever.
16   Q.   Okay.
17        MR. LeBLANC:  I have no further
18 questions.
19 BY MR. LeBLANC:
20   A.   I mean if somebody had asked me, you
21 know, an attorney, I'd definitely give it to him
22 because, you know, I thought they did a great job
23 on the case and I'd definitely recommend them to
24 somebody, you know.

169

1 I mean you can't use one incident against
2 another, you know, I don't hold grudges like that.
3    Q.   Okay.
4        MR. DeWICK:  Nothing.
5        MR. O'DRISCOLL:  No.
6        MR. KEANE:  We're all set.
7        (Whereupon, the deposition suspended
8 at 3:50 p.m.)

170

```
1        I, Dennis J. Dimon, having read the
2  foregoing transcript of my testimony, do hereby
3  certify under the pains and penalties of perjury
4  the same contains a true and accurate record of my
5  answers to the questions herein set forth,
6  together with correction pages, if any, attached.
7
8
9
10

11              _____
               DENNIS J. DIMON
12

13

14
15
16
17
18
19
20
21
22
23
24
```

171

```
1                    ERRATA SHEET

2

3  PAGE  LINE              DESCRIPTION

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

172

```
1                 C E R T I F I C A T E

2

3  COMMONWEALTH OF MASSACHUSETTS
   SUFFOLK, SS.
4

5
6
7        I, Julie A. Healey, Certified Shorthand
8  Reporter, Registered Professional Reporter, and
9  Notary Public in and for the Commonwealth of
10 Massachusetts, do hereby certify:
11       That DENNIS J. DIMON, the witness whose
12 testimony is hereinbefore set forth, was duly
13 sworn by me and that such testimony is a true and
14 accurate record of my stenotype notes taken in the
15 foregoing matter, to the best of my knowledge,
16 skill and ability.
17       IN WITNESS WHEREOF, I have hereunto set
18 my hand and Notarial Seal this 6th day of July,
19 2006.
20

21              _____
               Julie A. Healey
22              CSR, RPR
               Notary Public
23

24 My Commission Expires:  March 26, 2010
```

**$**

$2,000 - 24:23, 25:3
$20,000 - 142:15

**'**

'03 - 155:16
'83 - 52:24, 86:21

**0**

02062 - 2:7
02108 - 1:24
02109 - 2:16, 113:11
02116-3902 - 2:12
02210 - 2:3
02892 - 91:10
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 - 13:7
05-11073 - 1:5
06/05/03 - 101:22

**1**

1 - 1:1, 3:12, 124:8,
  124:9, 124:12,
  143:16
1-800-met-5000 -
  101:20
1.8 - 139:2
10/10/83 - 3:18,
  118:16
10/12/83 - 3:19,
  118:18
101 - 1:24, 3:21, 8:4
103 - 4:6
104 - 4:7
10th - 118:21
11 - 3:20, 95:22,
  95:24, 96:1, 96:4,
  144:7
11/16/04 - 4:8, 120:12
110 - 3:13
112 - 3:16
115 - 3:17
118 - 3:18, 3:19
11:25 - 1:21
12 - 3:21, 101:10,
  101:11, 101:15
12/9/59 - 141:14
120 - 4:8
124 - 3:12
126 - 3:14
128 - 3:22
12th - 68:8, 71:4,
  112:12, 114:2,
  114:16, 119:2
13 - 3:22, 128:22,
  128:23, 129:2
13th - 103:23, 105:3
14 - 4:3, 17:21, 17:22,
  18:3
148 - 3:4
15 - 4:5, 26:5, 66:8,
  66:9, 67:16, 68:17,
  69:3, 69:19, 70:1,
  75:23, 76:17, 88:9,
  89:6, 91:8, 157:23
151 - 7:1, 91:9
160 - 3:4
163 - 3:5
164 - 3:3
16th - 120:16
17 - 4:3, 4:6, 103:18,
  103:19, 103:22
172 - 1:1
18 - 4:7, 104:20,

104:21, 104:24,
  105:7
18th - 2:21
19103-6969 - 2:22
1959 - 160:24
1982 - 15:17, 15:19,
  22:14, 52:24
1983 - 8:14, 9:3, 10:7,
  20:10, 28:8, 34:15,
  56:24, 76:18, 76:22,
  78:21, 86:20, 112:12,
  114:2, 114:4, 114:5,
  114:16, 115:16,
  116:19, 117:2, 117:6,
  117:23, 118:2, 118:5,
  118:7, 118:10,
  118:21, 119:2,
  119:20, 120:7,
  123:12, 138:5,
  139:13, 140:13,
  157:12, 167:19
1984 - 166:24
1991 - 9:15, 102:16
1999 - 96:5, 97:11,
  97:23, 99:5, 100:23,
  103:6
19th - 18:4
1st - 15:6

**2**

2 - 3:13, 110:17,
  110:18, 110:21,
  132:24, 133:11,
  133:19
20 - 4:8, 25:20, 25:21,
  26:2, 26:7, 76:19,
  120:11, 120:12,
  120:15, 122:6
20-year - 76:20
2003 - 10:8, 18:4,
  19:10, 67:18, 68:7,
  68:8, 71:4, 71:7,
  71:15, 75:22, 76:12,
  76:14, 78:24, 79:2,
  79:24, 80:1, 80:8,
  86:5, 86:23, 91:11,
  91:13, 93:24, 101:1,
  102:3, 102:10,
  102:12, 129:3,
  141:18, 143:6, 148:4,
  160:8
2004 - 103:23, 105:1,
  105:4, 120:16
2006 - 1:20, 172:19
2010 - 172:24
24th - 96:5
26 - 172:24
26th - 115:16
28 - 2:16
28th - 105:1
29 - 1:20

**3**

3 - 3:14, 69:19, 126:8,
  126:9, 126:12,
  157:23, 159:8,
  159:15
30-31 - 113:10
301 - 2:3
38-footer - 11:15
3:50 - 169:8

**5**

5 - 3:3, 3:16, 76:18,
  78:21, 79:24, 112:7,

112:9, 112:20, 113:3,
  156:11, 156:19,
  156:20, 157:2,
  159:16, 164:19,
  165:9, 165:12
5/5/1983 - 96:15,
  96:20
5/5/2003 - 97:2, 97:4
56 - 7:4, 7:15, 71:10,
  91:9, 97:12
5th - 76:9, 78:24,
  102:7, 102:12

**6**

6 - 3:17, 115:11,
  115:12, 115:15,
  156:11, 156:19,
  156:20, 157:2,
  164:19, 165:9,
  165:16
6/12/03 - 4:5, 66:9,
  91:7
6/19/03 - 4:4, 17:23
6/9/03 - 3:22, 128:23
64 - 145:20
66 - 4:5, 144:6
69 - 145:6
6th - 172:18

**7**

7 - 3:18, 118:14,
  118:15, 118:20,
  119:7, 156:11,
  156:19, 156:20,
  157:2, 164:19, 165:9,
  165:20

**8**

8/12/83 - 3:16, 112:9
86 - 123:1
88 - 2:3

**9**

9 - 3:19, 118:14,
  118:17, 119:1, 119:7,
  156:11, 156:19,
  156:20, 157:2,
  164:20, 165:10,
  165:22
9/13/04 - 4:6, 103:20
9/24/99 - 3:20, 96:2
9/26/83 - 3:17, 115:12
9/28/04 - 4:7, 104:22
96 - 3:20
99 - 1:20, 2:7, 70:16
9th - 67:18, 68:7, 71:7,
  75:22, 79:24, 80:1,
  80:8, 129:3

**A**

ability - 46:7, 172:16
able - 36:21, 36:22,
  75:18, 87:24, 88:24,
  103:4, 160:4, 160:5
accept - 67:8, 129:23,
  132:5, 140:20,
  151:15
accepted - 132:1
Access - 1:20, 2:7
accident - 30:3, 34:21,
  108:13, 108:17,
  146:2, 146:4, 146:6,
  146:9

account - 141:15
accountant - 21:17,
  21:18, 21:20
accurate - 14:13, 58:4,
  170:4, 172:14
achieve - 136:18
act - 121:5
Action- 1:5
action - 42:16
actual - 81:1, 89:17
ad - 43:1, 149:18
Adam - 109:9
address - 6:24, 7:2,
  8:11, 8:15, 9:15,
  9:19, 30:24, 31:2,
  64:18, 70:15, 71:13,
  71:16, 91:12, 97:12,
  116:8, 119:17,
  157:14
addressed - 18:5,
  71:10, 96:5, 106:19,
  106:20, 117:21,
  118:21, 120:16,
  129:3
addresses - 9:2,
  102:18
admissions - 97:7
admitted - 97:6, 97:18
advice - 49:23, 130:7,
  147:18
advise - 130:19, 140:4
advised - 28:24, 140:9
advising - 105:23,
  106:2
advisor - 22:3
affidavit - 57:22, 58:1
Affidavit- 57:23
afford - 31:8
afternoon - 163:4
age - 94:13, 94:17
ages - 26:11
ago - 11:6, 11:16,
  13:19, 24:10, 36:19,
  44:10, 60:21, 60:23,
  63:3
agree - 6:12, 14:16
Agreement- 3:14,
  126:10, 126:13
agrees - 6:7
ahead - 16:2, 106:8,
  144:16, 145:4
ahold - 81:12, 83:13,
  98:8, 107:4, 107:15,
  107:16
ain't - 65:10, 143:22
al - 124:17
alive - 75:20
allegations - 143:15
allow - 11:22
Almost - 8:7
almost - 24:10, 32:22,
  39:15, 153:19
alone - 111:21, 111:22
American - 77:10,
  77:17, 77:19, 79:20,
  81:17, 81:18, 82:7,
  112:13, 115:18,
  118:4, 118:23, 119:4,
  163:8, 163:12,
  163:16, 163:21
amount - 33:23,
  44:21, 46:9, 77:8
amounts - 83:3
Anderson - 1:13, 2:18,
  32:11
angry - 142:8
annuitant - 77:13,
  111:11

annuity - 9:9, 10:10,
  65:13, 73:17, 73:20,
  74:1, 74:3, 76:18,
  76:21, 76:24, 77:7,
  77:12, 77:23, 79:6,
  96:19, 97:23, 98:11,
  98:17, 98:20, 100:24,
  101:20, 103:10,
  115:7, 120:8, 126:24,
  129:17, 129:23,
  132:2, 132:6, 132:12,
  132:13, 132:16,
  134:10, 139:14,
  142:16, 142:18,
  145:23, 151:4,
  151:12, 151:15,
  152:2, 152:5, 152:14,
  154:9, 154:13,
  154:14, 154:16,
  158:16, 159:15,
  159:22, 161:12,
  161:16, 162:14,
  163:9, 163:13,
  163:17, 164:3, 164:7,
  166:10, 166:8
Annuity - 3:13, 72:8,
  93:8, 110:18, 110:22,
  129:4
answer - 7:14, 54:7,
  54:11, 60:8, 67:3,
  67:7, 67:8, 87:3,
  106:9, 115:2
answered - 86:24,
  87:5, 147:2, 147:8,
  164:22
answering - 25:9,
  25:11, 137:11
answers - 82:16,
  170:5
anyplace - 80:24
anyway - 144:23,
  147:3
anyways - 59:12,
  64:15, 81:3
appear - 91:23
Appearances- 2:1
Application- 3:13,
  110:18, 110:22
application - 100:19,
  134:10
applied - 37:4, 37:11,
  40:9, 41:13
apply - 99:5
applying - 99:23
appoint - 49:8
appointed - 42:24,
  44:18, 45:6, 45:23,
  52:5, 125:20, 126:4,
  149:22
appointing - 43:4
appointment - 125:22
approval - 103:5
approve - 109:5
April - 167:19
armed - 41:5
arrangements -
  138:10, 138:15
arrived - 162:5
aside - 32:23
aspect - 87:19
assign - 98:16, 98:20
assigned - 44:23
assistance - 16:9,
  17:3
assistant - 20:21
assisted - 21:2
associate - 55:21,
  112:5

Associates - 1:12,
1:20, 2:6, 2:17,
32:10, 45:11, 46:1,
52:11, 53:21, 54:20,
78:17, 87:13, 108:9,
108:22, 110:9, 112:3,
113:10, 113:23,
114:17, 116:6,
116:11, 116:14,
117:15, 119:15,
119:21, 120:6,
123:16, 124:3,
149:14, 153:6,
153:11, 154:20,
155:13, 155:24,
165:14, 166:6,
166:12, 166:16,
167:7, 167:13,
167:15, 167:22
associates - 158:21,
158:24
Associates' - 112:2
assume - 48:15
assuming - 141:1
Att- 71:22, 88:11
attached - 170:6
attend - 60:24
attended - 50:12,
66:21, 130:16
attorney - 16:17,
48:21, 50:2, 50:3,
50:7, 50:18, 50:22,
51:11, 52:4, 52:10,
52:13, 52:14, 53:6,
53:9, 55:23, 57:16,
58:14, 61:4, 61:19,
62:10, 62:24, 63:7,
63:21, 67:6, 86:23,
104:16, 105:17,
105:20, 109:22,
114:11, 114:17,
117:1, 117:6, 125:15,
125:18, 127:3,
136:22, 139:1,
168:21
Attorney - 148:14
attorney's - 49:18,
60:14
Attorneys - 113:10,
116:6, 119:15
attorneys - 48:9,
50:19, 51:6, 53:11,
54:19, 137:15,
138:24
August - 112:12,
114:2, 114:4, 114:16
authorize - 121:3,
121:4
Avenue - 2:3
average - 25:22
awarded - 149:6
aware - 112:12,
139:13, 139:17
awful - 130:3

**B**

background - 11:8
bad - 97:1
balancing - 17:3
bank - 99:14, 99:15,
99:18, 99:20, 99:22,
100:14, 100:15,
100:18, 103:7, 145:2
Bank - 99:21, 141:16
barely - 7:7
bargain - 143:23,
144:1

base - 161:20
based - 23:8, 46:5,
94:14, 130:7, 162:4
basic - 90:4
basis - 40:17
bat - 51:6
Bay - 20:19
bear - 156:6
became - 152:15
become - 77:20
began - 153:9, 159:21
begin - 5:17, 134:19
beginning - 76:10,
82:24
behalf - 1:17, 18:24,
52:6, 62:20, 65:21,
72:20, 84:19, 95:10,
116:17, 123:13,
124:23, 125:21,
133:15, 155:23
belief - 92:10
bell - 43:3, 52:21,
54:24, 93:22, 121:7,
128:11
belong - 13:18
below - 73:20
benefit - 49:11, 77:4
Benson- 29:19, 29:21,
29:24, 61:8, 61:19,
61:24, 62:7, 62:22,
63:13, 66:21, 82:5,
82:18, 92:5, 92:13,
94:23, 95:8, 95:9,
104:9, 105:8, 135:17,
137:5, 137:6
Benson's- 92:11
best - 28:13, 49:15,
49:18, 130:13,
132:22, 172:15
better - 82:8, 162:10
Between - 114:4
between - 10:7, 73:1,
83:18, 116:15,
152:17, 155:20,
159:23, 160:3
Biddle- 2:20
big - 13:10, 98:24
bill - 140:16
bills - 17:4, 36:2, 36:6
birthdate - 141:13
bit - 55:12, 59:15,
59:18, 72:19, 164:23
black - 70:2
Black- 2:3
blew - 101:7
Block - 21:15, 21:23,
22:5, 22:11, 22:16
blood - 41:21
boat - 11:1, 11:5,
11:13, 11:15, 11:18,
11:23, 12:11, 12:13,
12:15, 23:18, 23:21,
23:24, 30:7, 30:17,
33:16, 34:22, 34:23,
35:1, 35:8, 38:23,
39:1, 39:20, 40:4,
40:7, 62:2, 146:16,
146:19
boats - 11:12
body - 92:2
born - 160:24
Boston- 1:24, 2:3,
2:12, 2:16, 52:11,
53:2, 53:6, 57:16,
57:18, 57:19, 113:10,
133:24, 161:17
bottom - 18:17, 80:6,
89:7, 91:15, 104:8,

111:10, 116:4
bought - 12:13
bowls - 28:3
box - 8:16, 9:19, 9:20,
9:21, 70:2
Box- 7:4, 7:15, 7:19,
7:21, 71:10, 91:9,
97:11
Boy - 26:15
boy - 26:15
Breach- 143:18
breach - 143:20, 144:8
break - 66:14, 67:16,
95:14, 143:2, 143:3
breakdown - 143:13
Brian- 2:2
brief - 64:15, 153:12,
153:23, 153:24
briefcase - 128:11,
128:15
briefly - 55:9, 72:13
bring - 22:22, 134:24
broker - 22:1
brokerage - 31:20
brother - 31:13, 62:6,
64:7, 65:7
brother's - 64:6
brothers - 29:14,
29:16, 29:22, 30:2,
30:21, 64:4, 64:10
brought - 35:18,
108:4, 108:14
building - 44:6, 61:15
business - 27:23,
28:1, 28:3, 28:6,
33:12, 39:18, 39:21,
40:7, 70:12, 70:18,
81:19, 82:7, 82:11,
82:13, 94:15, 134:4,
163:23
buy - 132:2, 132:6,
132:12, 132:13,
132:15
buying - 150:24

**C**

C.'s - 149:1
calculated - 139:7
caller - 101:23
canceled - 9:21
cancer - 35:14
Captain- 23:21
captain - 10:24, 24:6,
35:1, 35:2, 53:21
captain's - 38:12
captains - 38:17
capture - 149:3
carbon - 104:12,
106:20
card - 13:6, 14:3
care - 36:1, 100:11,
134:4, 144:13
Carolyn- 56:2, 70:22,
70:24, 71:22, 88:11,
90:3
Carr- 122:19, 122:20
case - 8:24, 9:10,
16:8, 20:2, 27:7,
28:20, 32:3, 32:6,
35:4, 42:15, 47:16,
48:3, 52:15, 53:18,
54:21, 55:4, 56:8,
56:21, 57:11, 57:17,
58:11, 58:15, 58:16,
58:17, 61:21, 64:1,
64:20, 65:8, 86:13,
87:8, 87:10, 88:2,

88:6, 106:3, 106:14,
109:23, 113:19,
114:23, 117:20,
117:22, 123:23,
125:10, 134:15,
134:19, 135:1,
135:23, 136:3,
136:10, 136:22,
138:20, 138:24,
139:2, 140:20, 141:6,
141:20, 141:24,
145:15, 146:12,
149:22, 150:8, 153:8,
168:23
cases - 28:22
cash - 25:1, 34:6,
129:24
caused - 147:12
caution - 60:3
cc - 104:8, 104:11,
113:9, 116:4, 119:14
cc'd - 105:8, 119:14
ceramic - 28:1, 28:3
certain - 55:13, 76:20,
143:11
Certain- 45:8
certificates - 37:5
certification - 90:15
certified - 20:21
Certified - 1:18, 172:7
certify - 170:3, 172:10
chair - 48:1, 48:4,
48:13
Champlin- 34:16,
34:19, 35:5
chance - 81:15, 85:4,
85:9
change - 33:24, 138:1
changed - 9:19, 82:11,
102:18, 153:17,
154:3, 163:19,
163:20, 167:23,
168:10
changes - 114:22
changing - 128:2
charged - 58:19
Charlestown- 8:18
Charter- 67:22, 69:11,
79:21, 93:1, 110:22,
115:16, 118:1,
118:22, 119:2, 127:1,
145:11, 145:15,
146:12, 146:21,
152:14
Check- 25:2
check - 9:11, 9:12,
9:14, 9:23, 10:1,
10:4, 10:8, 25:1,
76:1, 76:12, 76:14,
78:23, 79:2, 81:16,
81:17, 81:20, 81:24,
93:12, 94:1, 94:9,
102:6, 102:10,
102:14, 102:19,
102:22, 128:6, 144:5,
166:5, 166:9
checkbook - 17:3
checks - 10:13, 56:13,
75:9, 76:3, 76:4,
76:7, 79:8, 79:12,
79:15, 79:16, 80:2,
86:5, 97:15, 102:19,
148:4, 152:13,
152:21, 153:9
Cherry- 2:21
child - 59:6, 59:8
children - 26:9
Ciapciak - 1:20, 2:6

Citizens- 99:21,
141:16
Civil- 1:5, 1:17
claim - 148:24
claims - 118:23,
146:1, 146:8, 146:11,
146:15
clarification - 72:2
clarify - 135:13
classes - 33:4
clean - 74:17
client - 104:12,
136:12, 136:16,
140:3
close - 62:3
closer - 7:7, 7:10,
154:13, 154:14
Cna- 20:17, 20:20
collect - 93:11, 93:13,
93:21, 94:1, 94:8
college - 27:2
coming - 110:15,
135:2, 135:4, 144:2,
144:3, 161:11,
161:16
commencing - 1:21
comment - 130:15
commercial - 11:17,
11:22, 11:24, 23:3,
29:18, 33:11, 33:23,
36:13, 37:1, 37:8,
38:1, 38:3, 40:3,
40:16, 53:20
Commission- 172:24
common - 38:1,
133:23
Commonwealth-
1:19, 172:3, 172:9
communicate - 16:13,
19:4, 84:22, 87:12,
127:5
communicating -
127:15, 127:18,
127:23
companies - 13:11,
36:11, 116:15,
146:18
Company - 1:11, 2:8,
2:23, 5:10, 32:10,
67:22, 69:11, 77:11,
77:20, 93:2, 103:24,
105:2, 105:5, 110:23,
112:13, 115:17,
115:18, 118:2, 118:5,
118:22, 118:24,
119:3, 119:4, 143:18,
145:11, 145:16,
146:13, 163:9,
163:12, 163:16,
164:2, 164:7, 164:10
company - 19:5,
31:18, 77:24, 79:16,
83:10, 83:12, 93:5,
128:2, 128:3, 152:21,
154:2
company's - 79:19
compensated - 35:22
compensation -
138:11
competency - 42:13
competent - 42:17
Complaint - 3:12,
124:9
complaint - 123:19,
124:13, 134:19,
143:10
complete - 21:16,
32:15

completed - 111:14
computer - 82:9
concern - 46:12, 120:17
concerned - 75:19
concerning - 19:17
concerns - 46:7, 48:2, 48:24
conclusion - 75:8
confidential - 60:5, 130:21
confirm - 95:16
confirmation - 99:16
confused - 42:10, 131:3, 164:22
confusion - 147:13
connection - 162:14
consider - 53:8, 57:24, 125:14, 127:10
considered - 77:11
consult - 30:2
consultant - 21:23
contact - 52:10, 56:14, 65:13, 65:20, 81:11, 86:5, 87:16, 103:12, 117:23, 118:10, 143:7, 153:10, 153:15, 155:24, 160:11, 160:14, 163:15, 164:9
contacted - 65:17, 80:10, 86:4, 125:9, 137:15, 154:20, 155:13, 155:15, 160:9, 167:8, 167:9
contacting - 80:23, 166:6
contains - 124:14, 170:4
continue - 75:20, 151:5
Contract - 143:18
contract - 73:18, 73:19, 73:24, 74:2, 76:18, 96:13, 96:14, 96:16, 99:9, 99:13, 116:16, 143:21, 144:9, 145:8, 145:12, 145:17, 145:22, 158:4, 158:6, 158:10, 159:23, 166:23, 167:5
conversation - 73:5, 84:2, 85:1
conversations - 73:1, 84:18, 125:8, 131:12
copied - 106:6, 106:20
copies - 19:15, 63:16, 106:12, 123:22
Copley - 1:23
copy - 51:22, 68:4, 70:10, 70:12, 89:18, 89:19, 90:16, 96:24, 99:9, 104:12, 116:10, 158:9, 158:15, 165:14, 165:15, 165:18, 166:1
corner - 90:3, 90:7
Corner - 29:8, 29:11
corporation - 40:12
Correct - 90:23
correct - 91:11, 93:18, 139:14, 149:7, 149:19, 149:23, 152:15, 155:17, 157:5, 157:6, 159:17, 161:13

correction - 170:6
correctly - 44:13, 161:9
correctness - 90:16
correspondence - 163:11, 164:6
Counsel - 2:4, 2:8, 2:12, 2:17, 2:22, 5:19
counsel - 45:24, 48:6, 48:8, 48:12, 147:19
counselor - 41:17
Count - 143:16
counts - 143:14
couple - 15:20, 60:15, 63:3, 66:12, 129:8, 144:22, 160:6, 160:19, 163:18, 166:7, 166:9
course - 16:7, 50:10, 117:10, 144:22
court - 28:22, 42:15, 42:16, 47:16, 57:5, 59:1, 59:4, 113:19, 116:23, 117:8, 125:5, 125:20, 126:3
Court's - 1:4, 1:23
court's - 49:7
courthouse - 44:6
courtroom - 44:4, 44:14, 47:4, 47:14, 47:18
cover - 67:18
credit - 13:11, 13:14
crew - 34:9
Cross - 3:1, 148:16
Cross-examination- 148:16
Csr- 172:22
Curious- 142:10
Curnis- 29:12
current - 31:2, 136:22
Curtis- 29:8, 29:11, 29:13

# D

damages - 35:20, 139:2
dark - 82:21
date - 15:4, 71:3, 75:22, 76:5, 78:6, 101:22, 102:13, 159:5
dated - 3:16, 3:17, 3:18, 3:19, 3:20, 3:22, 4:4, 4:5, 4:6, 4:7, 4:8, 17:23, 18:4, 66:9, 67:18, 80:8, 91:7, 96:1, 96:4, 103:19, 103:23, 104:21, 105:1, 105:3, 112:9, 112:12, 114:1, 115:12, 115:15, 118:15, 118:17, 118:21, 119:2, 120:12, 120:16, 128:23, 129:3
dates - 96:22
daughter - 35:14, 55:3, 55:5, 55:6, 55:8, 55:20, 56:1, 56:6, 56:20, 71:2, 80:11, 83:22, 84:9, 85:6, 86:2, 87:1, 87:11, 160:9
David - 62:14, 62:16, 82:19, 121:5
David's - 59:15

days - 5:22, 5:24, 6:1, 10:5, 24:13, 24:18
deal - 30:12, 32:21, 150:20, 151:8, 151:23, 152:11
Dean- 67:19, 67:21, 69:14, 112:14, 118:7
December- 160:24, 161:2, 161:6
decide - 134:18
decided - 130:8, 135:11, 136:1
decision - 49:8, 129:16, 129:23, 132:15, 132:17, 162:5
decisions - 29:4
deck - 38:22, 38:24
declared - 23:3
Decof- 42:21, 42:24, 43:6, 43:20, 49:4, 143:7, 167:12, 167:18
deductions - 23:2, 25:4
Defendant- 1:17, 2:8, 2:12, 2:22
defendant - 145:7, 145:15, 145:21, 145:22
defendant's - 144:8
defendants - 32:2, 32:5, 118:9, 135:23, 141:20, 141:23, 147:23
Defendants - 1:13, 2:17
definitely - 106:1, 114:24, 115:4, 117:3, 117:4, 117:13, 125:16, 125:19, 126:5, 128:19, 136:17, 140:2, 140:12, 143:12, 168:21, 168:23
Dennis - 1:8, 1:16, 3:2, 5:2, 6:18, 18:6, 52:13, 68:8, 70:22, 71:7, 85:6, 85:7, 85:18, 91:8, 91:16, 96:5, 101:23, 104:8, 120:17, 121:3, 129:3, 143:17, 170:1, 170:14, 172:11
depo - 67:14
Deposition - 1:16
deposition - 15:4, 16:1, 57:9, 57:13, 59:14, 59:20, 62:10, 63:1, 63:5, 63:18, 169:7
describe - 57:24, 61:23, 67:17
described - 73:20
Description - 171:3
destroyed - 12:13, 13:13, 80:17, 83:23, 84:5, 84:12, 84:16, 85:7, 85:8, 85:21
determined - 162:13
Dewick - 2:15, 3:4, 6:8, 53:24, 54:4, 68:12, 87:2, 114:18, 115:1, 117:17, 127:19, 132:3, 132:7, 139:18, 139:23, 140:10, 140:22, 141:7, 148:14,

148:17, 148:19, 156:2, 156:5, 156:16, 156:20, 156:22, 157:19, 157:20, 160:17, 164:18, 169:4
Dewick's- 166:5
Diamond- 6:18
difference - 89:22
different - 13:8, 20:3, 31:15, 39:2, 49:2, 56:1, 79:16, 89:21, 128:7
difficulty - 14:5, 51:1, 51:7
Dimon- 1:8, 1:16, 3:2, 5:2, 5:10, 5:17, 6:16, 7:13, 14:1, 14:24, 18:2, 18:6, 27:12, 46:19, 54:3, 64:8, 64:9, 66:20, 67:3, 67:6, 67:19, 68:8, 68:16, 69:2, 70:22, 71:8, 73:9, 74:9, 75:4, 88:8, 91:8, 91:9, 91:16, 91:17, 95:21, 96:5, 96:8, 96:12, 101:14, 101:23, 101:24, 102:4, 104:8, 111:2, 112:17, 115:20, 119:6, 120:17, 120:20, 121:3, 122:7, 124:16, 124:19, 126:11, 126:16, 129:3, 129:7, 129:12, 143:17, 147:1, 148:13, 148:18, 156:6, 156:21, 157:21, 160:20, 163:4, 163:7, 165:8, 170:1, 170:11, 172:11
Direct- 3:1, 5:6
direct - 47:20
directed - 47:8, 47:22, 131:18
direction - 131:23
directly - 106:19, 142:2, 152:21, 154:24
disability - 41:14
disc - 41:11
disclosing - 125:7
discontinued - 33:6
discouraged - 33:8
discrepancy - 117:7
discuss - 18:24, 63:8
discussed - 63:20, 75:14, 132:21, 151:20, 151:22, 152:2, 152:4
discussing - 43:9, 61:20, 153:13
discussions - 54:6, 61:4, 64:19, 72:10, 131:14, 141:19, 145:10, 163:8, 164:1
dispute - 92:20, 103:9, 115:6, 116:20, 117:16, 120:17, 122:7, 125:21, 139:13, 139:17, 139:22, 140:5, 167:10, 167:15, 167:16
disservice - 117:15
District- 1:4
division - 17:7

docked - 12:18
doctors - 94:19, 161:17
document - 14:8, 14:9, 14:17, 16:16, 18:3, 18:7, 18:12, 51:12, 51:18, 51:20, 58:2, 58:6, 58:10, 67:19, 69:10, 69:14, 69:17, 86:11, 86:17, 89:14, 89:16, 89:17, 89:18, 89:20, 90:12, 90:20, 91:6, 92:8, 92:9, 92:20, 92:21, 93:10, 96:9, 101:6, 101:16, 101:19, 101:22, 104:2, 111:2, 111:7, 111:14, 113:3, 113:6, 113:8, 114:14, 115:21, 119:1, 120:20, 123:10, 123:18, 124:20, 124:22, 125:2, 125:8, 126:13, 126:16, 126:17, 126:21, 126:23, 127:4, 128:15, 133:1, 133:4, 133:8, 133:19, 134:1, 139:1, 157:22, 157:23, 160:11, 165:14, 165:17, 165:18, 166:2
documentation - 102:9
documented - 38:4, 38:5, 58:12
documents - 16:8, 16:10, 16:14, 22:22, 27:7, 28:23, 35:3, 58:12, 60:14, 63:17, 68:18, 69:3, 69:22, 88:13, 108:11, 109:17, 109:18, 110:2, 111:21, 114:5, 119:7, 119:8, 119:11, 119:13, 120:1, 124:4, 133:20, 133:21, 138:24, 147:11, 147:12, 147:17, 160:10, 160:12
dollars - 139:3
done - 62:4, 74:3, 107:19, 116:21, 117:14, 121:13
down - 9:7, 20:3, 20:5, 39:16, 44:4, 44:14, 44:15, 54:14, 78:19, 80:6, 81:11, 81:15, 83:13, 88:17, 94:15, 95:17, 96:23, 161:24
draft - 121:14
drafted - 124:22
drafting - 125:2
dragger - 34:6
drastic - 64:22
Drinker- 2:20
drive - 133:23
Drive- 7:24, 8:3, 8:6, 13:21, 13:22, 157:13
driver's - 39:4
drowsy - 42:8
dry - 12:16
Dry - 12:18
duly - 5:3, 172:12
duplicate - 73:19
during - 15:24, 29:5, 41:8, 47:15, 48:11, 50:17, 57:11, 62:12,

66:20, 66:22, 84:1, 84:18, 131:7, 136:20, 155:24, 157:10
During- 20:12, 42:23, 52:8, 150:6
Dw - 1:11, 2:13
dyslexia - 14:6, 32:22

**E**

Ear- 57:20, 161:17
early - 109:1
earned - 142:15
earns - 21:3
education - 16:4, 26:20, 32:14, 36:20
effect - 148:23
effectively - 127:18
effort - 86:22
eight - 167:3
eighth - 32:16
Either- 137:13
either - 27:1, 30:3, 34:17, 44:14, 51:14, 99:14, 104:12, 106:19, 111:19, 116:13, 119:8, 119:10, 119:24, 133:14
elapsed - 159:23
employed - 20:13, 23:4, 27:24, 29:22, 29:24, 31:18, 31:20, 40:3, 138:7
employee - 31:24
employees - 39:24
employer - 10:16
employment - 20:15, 23:10, 30:14, 36:14
enclosed - 105:3
end - 23:7, 44:16, 46:21, 76:8
ended - 140:20
enter - 5:20
entered - 145:22
entire - 145:21
entities - 148:21
entitled - 67:21, 69:10, 103:14, 110:21, 114:14, 123:18, 126:13
Errata- 171:1
Esq - 2:2, 2:6, 2:11, 2:15, 2:20, 121:5
estimate - 160:4
estimated - 162:10
et - 124:17
Eve - 109:10
eventually - 36:5
evidence - 14:4
Exactly - 33:19
exactly - 8:18, 20:7, 44:8, 44:11, 44:19, 45:1, 46:15, 46:19, 47:3, 56:18, 60:19, 95:4, 100:6, 107:14, 107:21, 107:24, 144:4, 150:21, 154:12, 155:8, 156:20, 160:2
examination - 148:16
Examination- 5:6, 160:21, 163:2, 164:16
examined - 5:4
example - 153:5
except - 6:4, 89:24, 151:12, 151:14

**F**

fact - 17:10, 36:20, 50:8, 56:12, 100:17, 130:16, 136:11, 149:18, 151:21, 162:12, 168:3, 168:13
facts - 58:3, 136:3
fair - 14:13, 14:20, 33:18, 46:3, 51:5, 79:4, 97:17, 140:19, 141:4, 141:10, 141:11, 141:9,

exchange - 138:24, 145:24
exchanged - 164:5
excuse - 76:19, 128:14
exhibit - 71:6, 112:18
Exhibit - 3:11, 4:2, 17:21, 17:22, 18:3, 66:8, 66:9, 67:16, 68:17, 69:3, 69:19, 69:24, 75:23, 76:17, 88:9, 89:6, 91:8, 95:22, 96:1, 96:4, 101:10, 101:11, 101:15, 103:18, 103:19, 103:22, 104:20, 104:21, 104:24, 105:7, 110:17, 110:18, 110:21, 112:9, 113:2, 115:11, 115:12, 115:15, 118:15, 118:17, 118:20, 119:1, 119:7, 120:11, 120:12, 120:15, 122:6, 124:8, 124:9, 124:12, 126:8, 126:9, 126:12, 128:22, 128:23, 129:2, 132:24, 133:11, 133:19, 143:16, 156:11, 157:23, 159:16, 165:12, 165:16, 165:20, 165:22
Exhibits - 1:2, 164:19, 165:9
exhibits - 17:14, 112:23, 118:20, 156:2, 156:8, 165:1
expect - 35:21, 76:1, 117:11, 127:4, 140:3
expectancy - 94:12, 94:20, 161:11, 161:15, 161:21, 162:6, 162:13
expenses - 149:2, 149:6
experience - 33:22, 47:18
expired - 73:18, 74:2
Expires- 172:24
explain - 14:2, 23:1, 150:7, 150:15
explained - 150:10, 150:13, 152:7
expressed - 149:17, 151:4, 151:7
extent - 81:23, 83:20, 151:2
extra - 30:19
eye - 74:11, 74:12
Eye- 57:20, 161:17

149:12
Falcon- 2:3
fall - 157:11
familiar - 54:21, 70:18, 87:18
families - 94:16
family - 31:6, 31:17, 31:23, 39:16, 94:17, 141:22, 161:21, 161:24
family's - 39:12
far - 26:19, 45:2, 46:17, 50:8, 75:19, 80:4, 87:10, 87:15, 98:4, 109:24, 114:20, 140:15, 153:12, 160:15, 168:10
father - 27:13, 27:14, 28:7, 31:7, 31:11, 39:13, 122:17, 123:4, 161:23
father's- 88:6
father-in-law - 31:7, 122:17, 123:4
father-in-law's - 31:11
fault - 139:16, 142:6
Fax- 4:5, 66:9
fax - 68:4, 70:1, 70:20
faxed - 67:18
Federal- 1:17, 38:7
federal - 23:9, 37:5, 37:21, 38:8, 38:15
felt - 36:4, 130:13, 132:9, 132:21, 135:2, 135:3, 140:6
few - 11:16, 28:12, 29:6, 33:3, 33:4, 36:18, 41:12, 43:8, 44:7, 64:2, 64:21, 64:24, 80:19, 80:23, 81:9, 82:6, 82:14, 104:17, 109:21, 147:14, 161:18, 163:1
fewest - 25:12
field - 37:6
fifty - 93:13, 93:21, 94:13, 94:18, 94:20, 161:11, 161:15, 162:7, 162:14
figure - 139:4, 139:9
figured - 36:1
file - 21:10, 21:11, 21:13, 100:13, 123:18, 125:4, 134:18, 135:11, 136:2
filed - 123:13, 123:15, 123:17, 123:20, 123:23, 124:13, 125:9
filing - 135:17, 143:10
fill - 40:21, 41:2
filled - 111:15
final - 78:24, 79:23, 97:2, 97:4, 100:24
finally - 34:12
financial - 17:2, 21:23, 22:3, 31:21, 138:10, 138:14, 144:7, 144:10, 144:24
fine - 125:24
Fine- 6:6
finish - 159:10
firm - 78:15, 87:12, 87:21
first - 33:15, 34:4, 44:16, 50:2, 51:2,

51:3, 52:18, 56:19, 63:22, 70:1, 73:7, 75:7, 76:17, 77:22, 78:20, 79:15, 93:5, 96:11, 99:24, 100:1, 107:4, 126:11, 129:10, 134:14, 137:15, 151:13, 154:16, 159:24
First- 117:7, 152:3, 152:4
fish - 11:17, 11:22, 12:2, 12:21, 33:17, 33:18, 38:9, 38:19, 38:21
fisheries - 38:8
fisherman - 23:3, 33:23, 36:13, 38:2
fishermen - 29:18, 40:3
Fishery- 37:22, 37:23
fishing - 9:22, 11:1, 11:15, 11:24, 22:12, 23:16, 24:9, 24:12, 24:17, 24:18, 25:4, 25:17, 30:17, 30:18, 33:9, 33:11, 34:12, 35:12, 37:2, 37:8, 38:3, 39:8, 39:11, 39:17, 40:7, 40:16, 53:20, 72:24, 83:16, 83:19, 144:12, 144:17, 144:18, 146:2, 146:4, 146:6, 146:9
five - 5:23, 6:1, 24:3, 26:12, 62:2
fix - 117:9, 117:12
Flannery- 54:23
Foley- 112:14
folk's - 21:1
following - 143:22
follows - 5:5
forced - 131:6
foregoing - 170:2, 172:15
Forgive- 7:5
forgot - 10:5, 55:16
form - 6:4, 35:17, 40:21, 40:23, 41:2, 90:5
formal - 26:20, 32:14, 40:6
former - 31:24
forth - 127:15, 170:5, 172:12
Fortin- 70:16
forty - 5:23, 161:3, 161:5
Forty- 6:1
forty-five - 5:23
Forty-five- 6:1
forty-seven - 161:3, 161:5
four - 7:20, 24:10, 24:18, 26:12, 34:12, 50:10
Four- 8:12, 24:13
fourteen - 124:14
fourth - 91:7
frame - 12:5, 13:20, 20:10, 144:21, 166:24
Franklin- 72:8, 72:11, 129:4
Fred- 61:8, 82:5, 92:5, 92:11, 94:23, 137:4
Fred's- 121:20

Frederick- 29:19, 104:8
frequent - 25:15
friends - 31:17, 62:1, 80:19, 135:10
friendship - 62:3
full - 5:18, 6:16, 23:22, 34:13, 79:10, 150:9
Full- 23:23
funded - 33:6, 38:7
funds - 33:7, 75:12
funny - 46:14

**G**

gaff - 33:17
gain - 33:22
Gary- 34:16
gather - 136:2, 136:9
generally - 16:22, 76:7, 76:8, 111:23, 154:3, 154:8
gentleman - 42:20
George- 122:19
girl - 26:15
girls - 26:16, 26:19
given - 19:16, 19:21, 57:9, 94:12, 100:18
glad - 126:3
goal - 127:12
God- 25:9
government - 33:6, 38:8
grab - 74:14
grade - 14:14, 16:6, 32:14, 32:16, 32:18, 32:19, 33:1
graduated - 26:22
grandfathers - 161:24
great - 168:22
Greenwood- 7:24, 8:3, 8:5, 12:7, 13:21, 13:22, 157:13
gross - 25:19
Group- 2:2, 61:20, 103:24, 104:16, 105:2, 105:4, 137:14
growing - 109:11
grudges - 169:2
guaranteed - 145:9, 145:17, 145:23
guardian - 43:1, 43:4, 43:24, 44:18, 44:23, 45:6, 45:23, 49:5, 49:8, 49:14, 52:5, 125:21, 125:22, 143:7, 149:18, 149:22, 150:1, 150:7, 151:22, 152:5
guess - 18:22, 21:10, 22:21, 29:19, 36:11, 38:7, 38:8, 38:10, 50:2, 70:20, 77:5, 78:5, 121:18, 161:19, 162:11, 164:23, 165:5
guy - 46:14, 108:8
guys - 15:7

**H**

H&r- 21:15, 21:23, 22:5, 22:10, 22:16
half - 34:10, 95:12
half-hour - 95:12
Hall- 10:17, 10:18, 10:19, 10:20, 10:23, 23:22

hand - 13:4, 18:2, 51:13, 51:18, 51:22, 68:16, 90:7, 122:6, 172:18
handed - 51:11
handle - 45:15
handled - 20:1, 77:23, 87:7, 167:22
handles - 17:5, 17:6
handling - 20:5, 52:15, 83:17
hands - 105:22, 153:17, 154:3, 163:19, 163:20
handset - 72:21
handwriting - 17:15, 18:16, 18:19, 89:6, 89:8, 121:21, 121:22, 122:1
Handwritten - 4:3, 17:22
handwritten - 71:22
happy - 149:9
hard - 35:13, 44:10, 159:10, 159:14, 168:2
hassle - 13:10
hauled - 12:19
heading - 70:21
Healey - 1:18, 172:7, 172:21
health - 41:16
hear - 6:10, 7:8, 73:4, 166:7
heard - 118:8, 135:19, 135:22, 161:9
hearing - 45:5, 45:7, 45:10, 45:22, 47:10, 47:13, 47:16, 48:12, 48:21, 48:24, 49:5
heavy - 94:18
heck - 33:9
held - 39:8
Hello- 163:6
help - 21:14, 28:11, 28:20, 38:17, 40:19, 41:2, 81:11, 82:1, 83:7, 88:1, 149:22
helped - 40:3
hereby - 121:3, 170:2, 172:10
Hereby - 121:4
herein - 170:5
hereinbefore - 172:12
hereunto - 172:17
herself - 28:2, 28:6, 28:16
high - 25:24, 26:2, 26:6, 26:22, 41:21
High- 26:1
highest - 26:7
himself - 35:14, 45:16, 53:2, 53:7, 78:16, 87:17, 110:10, 158:1, 168:13
Himself - 45:14
hire - 125:18
Hmm - 14:11, 19:8, 27:8, 32:12, 39:7, 43:2, 44:1, 54:13, 65:15, 70:3, 70:11, 71:12, 72:9, 102:1, 105:9, 113:13, 119:16, 143:19, 146:3, 164:21
hold - 38:19, 54:7, 80:18, 169:2
Holly - 7:1, 8:9, 8:10,

8:11, 91:9
home - 6:24, 21:1, 31:6, 83:19, 98:14, 99:6, 118:23, 137:10, 137:12
honestly - 147:9
hope - 127:6, 127:7, 127:13, 162:10
Hopefully - 23:14
hospital - 36:2, 36:6, 57:19, 107:3, 107:7, 107:10, 107:11, 107:13, 107:20, 108:5, 108:19, 109:17, 110:9
hotel - 20:24
hour - 23:19, 62:11, 95:12
house - 7:23, 31:12, 31:15, 98:1, 98:2, 98:3, 100:1, 123:1, 150:24
housekeeper - 20:23
housekeepers - 20:18
Hughes- 52:20, 52:24, 54:17, 113:9, 113:14, 113:16, 113:17, 113:20, 115:5, 116:5, 116:11, 116:13, 119:15, 120:5
hung - 85:1
Hunting - 15:8
hurt - 15:22, 31:10, 108:17

## I

idea - 121:16, 121:19, 139:6, 139:11, 151:12
identification - 17:23, 18:4, 66:10, 96:2, 101:12, 103:20, 104:22, 110:19, 112:10, 115:13, 118:16, 118:18, 120:13, 124:10, 126:10, 128:24
identified - 5:3, 56:5
identify - 90:11, 90:14
III - 72:8, 129:5
ill - 42:18
illegible - 90:14
imagine - 51:8, 51:10
impact - 42:4
important - 14:12
impossible - 159:11, 159:14
improve - 33:4
Inc - 1:12, 2:13
incident - 169:1
include - 142:15, 143:14
included - 139:9
income - 23:16, 25:19, 35:17, 98:4, 98:11
Index - 1:2
indicated - 35:4
indicates - 104:13
indicating - 86:11, 89:24, 91:21, 91:23, 92:3, 120:23, 121:22, 121:24, 122:16, 156:15, 158:13
individual - 18:15, 19:5, 78:14
individually - 35:5
individuals - 40:2,

63:10, 63:13, 120:18
infamous - 122:22
Infirmary - 57:20, 161:18
inform - 114:22
information - 14:13, 82:10, 85:14, 96:13, 97:23, 99:12, 99:18, 101:2, 121:11, 136:3, 136:9, 136:13
informed - 106:14, 117:19, 167:9, 167:15
informing - 117:16
initial - 79:16, 107:6
initials - 20:21
injured - 15:14, 148:23
injuries - 146:1
injury - 41:8, 41:10
input - 85:5
instance - 154:5
institution - 31:21
instruct - 67:2
instructed - 67:6
instruction - 67:8
instructions - 117:5
Insurance - 1:10, 1:11, 2:8, 2:23, 5:9, 5:15, 32:10, 67:22, 69:11, 77:11, 77:20, 79:21, 93:1, 103:24, 105:2, 105:5, 110:23, 112:13, 115:17, 115:18, 118:2, 118:4, 118:22, 118:24, 119:3, 119:4, 143:18, 145:11, 145:16, 146:13, 163:9, 163:12, 163:16, 164:2, 164:6, 164:10
insurance - 31:18, 35:24, 36:11, 56:23, 77:24, 93:5, 116:15, 128:2, 128:3, 146:18, 149:1, 152:21, 154:2
insured - 101:23
insuring - 146:18
intended - 75:16
intendency - 168:14
intentions - 45:3
interaction - 52:23
interest - 49:15, 49:19, 126:4
interpose - 60:7
introduced - 5:10, 55:10, 148:19
investing - 130:5
involve - 105:23
involved - 28:9, 77:21, 78:1, 129:16, 129:22
involvement - 39:12
Irene - 15:2, 91:16, 122:7
Island - 7:16, 8:1, 22:8, 37:18, 37:20, 39:6, 54:15, 70:13, 70:16, 71:11, 91:10
issue - 59:2, 67:12, 67:14, 102:17
issued - 37:14, 37:16, 39:6, 76:18, 96:14, 96:20, 154:10, 154:14
issues - 59:7
itself - 34:9, 47:16, 47:17, 54:22, 69:8, 79:11, 88:3, 90:5,

122:3, 153:14

## J

Janice- 27:12
jargon - 53:20
Jay- 6:18, 6:20, 148:19
Jenny- 8:14, 15:15, 28:9, 30:3, 30:9, 34:15, 35:4, 35:8, 35:21, 41:9, 42:23, 42:24, 50:4, 52:1, 52:8, 57:3, 57:7, 57:12, 58:16, 58:17, 59:2, 78:1, 78:11, 123:23, 127:9, 128:10, 129:19, 135:14, 140:14, 146:6, 146:9, 146:12, 146:15, 149:1, 149:14, 149:21, 150:8, 153:8
Jersey- 67:23, 69:12
job - 20:16, 33:12, 49:14, 49:18, 117:12, 136:6, 168:22
jobs - 20:18, 36:20, 39:9
John- 2:15, 64:7, 64:8, 64:12, 65:7, 112:13, 115:17, 118:23, 119:4
judge - 44:19, 44:22, 45:5, 45:22, 46:6, 46:11, 48:1, 48:24, 125:24, 149:21
Julie- 1:18, 172:7, 172:21
July- 172:18
June- 1:20, 18:4, 19:10, 67:18, 68:7, 68:8, 71:4, 71:7, 75:22, 76:14, 78:21, 79:24, 80:1, 80:8, 91:11, 102:3, 102:12, 129:3, 155:16, 160:8, 166:23
jury - 149:5

## K

Kaplan - 16:17, 19:23, 62:17, 63:14, 66:21, 106:5, 106:13, 121:5, 137:22, 138:2, 138:4
Kaplan's - 124:24, 138:8
Kaplan/bond- 2:2, 61:19, 103:23, 104:16, 105:1, 105:4, 136:23, 137:8, 137:14, 137:20
Katherine- 14:24, 73:9, 91:8, 91:16, 96:12, 101:24, 122:7, 129:12
Katherine's - 15:1
Kathy - 15:24, 19:5, 19:10, 20:12, 21:7, 26:17, 43:15, 97:22, 129:14
Kathy's- 16:3
Keane- 2:2, 5:23, 6:2, 6:6, 59:21, 59:24, 60:10, 67:1, 67:13, 68:1, 68:4, 68:9, 68:19, 68:24, 106:8,

106:16, 124:15, 148:14, 156:14, 156:18, 162:22, 169:6
keep - 86:1, 106:13, 140:9, 153:21
Kemper- 1:11, 2:23, 5:15, 32:9, 164:2, 164:6, 164:10
kept - 85:22, 86:13
kind - 11:21, 17:4, 17:11, 22:3, 22:16, 28:4, 34:3, 36:14, 38:14, 39:2, 39:9, 39:11, 39:20, 41:10, 41:19, 42:4, 43:16, 46:14, 51:18, 58:18, 59:1, 59:6, 64:19, 72:18, 80:20, 85:4, 96:24, 140:4, 147:12, 148:5, 153:18
Kingston- 7:1, 7:4, 7:15, 7:17, 8:21, 31:1, 70:16, 71:11, 91:10, 157:17
knickknacks - 28:4
knowing - 82:22
knowledge - 113:7, 145:14, 146:22, 155:22, 172:15
known - 98:24, 116:19
knows - 46:19

## L

lack - 33:7
land - 12:16, 36:19, 36:22
Lane- 8:20, 8:22, 30:24, 31:2, 31:15, 64:11, 122:23, 122:24, 123:1
last - 7:13, 24:8, 25:4, 25:19, 39:23, 74:7, 88:9
late - 75:23, 153:18, 153:19, 154:2, 154:6, 154:20, 155:12, 166:7, 166:10
Latti- 1:12, 1:13, 2:17, 2:18, 19:24, 28:14, 28:16, 28:18, 32:10, 32:11, 45:11, 45:13, 45:24, 52:11, 53:5, 53:7, 53:8, 53:21, 54:14, 54:20, 55:10, 56:2, 56:5, 68:5, 70:22, 70:24, 71:22, 78:4, 78:9, 78:13, 78:17, 83:1, 86:5, 87:13, 88:11, 89:15, 89:17, 89:21, 90:3, 108:9, 108:22, 110:8, 110:10, 112:1, 112:3, 113:9, 113:21, 113:23, 114:16, 114:17, 115:5, 116:5, 116:11, 116:13, 117:15, 118:10, 119:15, 119:21, 120:5, 120:6, 123:16, 124:3, 130:1, 130:15, 131:15, 134:4, 137:23, 140:13, 141:1, 142:2, 148:20, 149:13, 151:12, 151:15, 152:2, 153:6, 153:10, 153:11,

154:20, 155:13,
155:24, 157:24,
158:22, 159:16,
162:16, 162:17,
165:14, 166:6,
166:12, 166:15,
166:20, 167:7,
167:13, 167:15,
167:22
**Latti's-** 20:4, 45:24,
53:1, 55:6, 55:19,
56:19, 80:10, 80:11,
83:22, 84:9, 85:6,
86:2, 87:1, 87:11,
106:19, 111:6, 111:8,
114:6, 117:24, 132:1,
132:5, 133:9, 133:24,
139:20, 160:9,
160:14
**Laura-** 8:20, 8:22,
30:24, 31:2, 31:15,
64:11, 122:22,
122:24, 123:1
**law -** 31:7, 58:20,
122:17, 123:4
**law's -** 31:11
**lawsuit -** 57:2, 63:20,
64:1, 108:11, 108:14,
123:13, 123:15,
123:17, 134:22,
134:24, 135:1,
135:11, 135:13,
135:14, 135:17,
136:2, 138:12,
143:10, 147:22
**lawsuits -** 108:3
**lawyer -** 19:16, 19:22,
19:23, 20:1, 28:11,
60:4, 62:15, 82:19,
107:12, 113:15,
113:18, 136:4, 136:5,
136:16, 139:20,
140:4
**lawyer's -** 59:16,
136:8
**lawyers -** 46:16,
58:13, 143:14
**lead -** 79:1
**learn -** 33:20
**learned -** 100:23
**least -** 26:5
**leave -** 32:17
**Leblanc-** 2:6, 3:3, 5:7,
5:8, 5:19, 6:1, 6:3,
6:7, 6:9, 6:12, 6:14,
6:15, 7:9, 7:12,
17:20, 18:1, 54:1,
55:15, 55:18, 59:22,
59:23, 60:11, 60:12,
66:7, 66:11, 66:15,
66:18, 66:19, 67:4,
67:5, 67:11, 67:15,
68:6, 68:10, 68:14,
68:15, 68:21, 68:23,
69:1, 70:4, 70:7,
74:9, 74:12, 74:14,
74:18, 74:21, 75:1,
75:3, 87:4, 90:13,
90:21, 91:1, 93:17,
93:19, 95:12, 95:15,
95:19, 95:20, 95:23,
96:3, 96:7, 101:9,
101:13, 103:17,
103:21, 104:1,
104:19, 104:23,
105:6, 106:10,
106:17, 110:16,
110:20, 111:1, 112:7,

112:11, 112:16,
112:20, 112:22,
113:1, 114:19, 115:3,
115:10, 115:14,
115:19, 117:18,
118:13, 118:19,
119:5, 120:10,
120:14, 120:19,
124:7, 124:11,
124:16, 124:18,
126:7, 126:11,
126:15, 127:20,
128:21, 129:1, 129:6,
132:4, 132:8, 134:23,
139:19, 140:1,
140:11, 140:23,
141:8, 143:1, 143:4,
143:5, 148:11, 156:4,
162:23, 164:15,
164:17, 168:17,
168:19
**left -** 32:24, 36:13,
39:9, 44:5, 100:4,
122:6, 136:4, 137:10
**left-hand -** 122:6
**legal -** 30:4, 30:5
**Leonard-** 42:21
**less -** 27:24, 28:10,
30:15, 39:15, 46:20
**Letter-** 3:16, 3:17,
3:18, 3:19, 3:20,
3:22, 4:6, 4:7, 96:1,
103:19, 104:21,
112:9, 115:12,
118:15, 118:17,
128:23
**letter -** 16:17, 16:23,
18:24, 19:1, 19:11,
19:13, 67:18, 68:7,
68:8, 71:7, 71:18,
73:8, 73:12, 75:23,
75:24, 76:2, 80:7,
90:17, 91:15, 92:3,
94:11, 95:3, 96:4,
97:9, 97:18, 99:12,
100:8, 100:10, 103:7,
103:22, 104:13,
104:24, 105:3, 105:8,
105:11, 105:14,
106:24, 107:6, 107:9,
112:12, 112:15,
115:15, 116:11,
118:21, 119:2,
121:10, 121:14,
122:3, 122:4, 129:2,
129:7, 129:11,
129:13
**letterhead -** 67:20,
67:21, 69:15, 128:6
**letters -** 17:15, 89:3,
104:15, 106:7,
106:13, 106:18,
107:8, 114:8, 156:10,
164:20, 165:2, 167:4,
167:8
**level -** 14:15, 16:3
**license -** 9:7, 11:22,
12:1, 12:21, 37:9,
37:13, 37:22, 38:3,
38:14, 38:19, 39:2,
39:4, 40:17
**licenses -** 37:5
**Life-** 1:10, 2:8, 5:9,
5:15, 67:22, 69:11,
79:21, 93:1, 103:24,
105:2, 105:5, 110:22,
118:2, 118:4, 118:22,
119:3, 143:17,

145:11, 145:15,
145:16, 146:13,
152:14
**life -** 35:11, 74:7,
75:16, 75:21, 94:12,
94:20, 145:9, 145:17,
151:5, 161:11,
161:15, 161:20,
162:6, 162:13
**Life's-** 127:1
**lifetime -** 80:21, 135:8,
145:23, 150:18,
168:14
**Line-** 171:3
**line -** 73:7, 73:17,
73:19, 74:6, 75:5,
76:17, 77:10, 129:10
**lined -** 92:17
**lines -** 73:21
**lists -** 70:15
**litem -** 43:1, 149:18
**litigation -** 29:5,
42:24, 127:10,
128:10, 134:19,
134:20, 149:15
**live -** 8:5, 8:20, 27:4,
29:7, 30:21, 64:16
**lived -** 8:23, 12:6,
13:22, 31:4, 31:5,
50:8, 94:17, 123:2
**livelihood -** 35:12,
94:21
**lives -** 29:8, 30:23,
30:24, 64:10, 64:17,
122:22, 122:24
**living -** 8:8, 21:2, 27:5,
27:9, 27:13, 29:17,
31:13, 98:3, 157:10
**LIp-** 1:13, 2:15, 2:18,
2:20
**loan -** 98:1, 98:3, 98:5,
99:5
**loans -** 145:3
**lobster -** 11:15, 39:20
**lobstered -** 39:14
**lobstering -** 12:3
**lobsters -** 34:7
**located -** 22:5
**Log-** 3:21, 101:11
**Logan-** 2:21
**long-term -** 30:13
**look -** 18:7, 49:14,
49:18, 60:14, 68:17,
82:5, 88:8, 88:21,
104:2, 111:2, 115:20,
116:3, 119:6, 120:20,
126:4, 143:15, 156:8,
162:1
**Look-** 156:16
**looked -** 60:15, 63:17,
81:7, 81:8, 82:13,
130:12, 147:11
**looking -** 49:11, 69:10,
81:4, 81:5, 88:1,
131:20, 131:23,
150:24, 156:12,
165:16
**looks -** 90:17
**losses -** 144:7,
144:10, 145:1
**lost -** 9:8, 128:11,
128:15
**lottery -** 99:1
**Louis-** 64:9, 64:16,
64:20
**Louise-** 11:1, 11:3,
11:11
**Low-** 25:24

**lower -** 41:11, 90:6
**lump -** 98:22
**lunch -** 95:14

## M

**machine -** 137:11
**mail -** 7:3, 7:18, 7:22,
9:2, 9:8, 16:13,
40:24, 155:7
**mailed -** 9:14
**mailing -** 8:14, 9:2,
9:11, 9:19, 71:13,
71:15, 91:12, 97:12,
102:17, 157:14
**main -** 53:12, 53:16
**male -** 94:16
**man -** 65:10
**Manor -** 20:19
**manual -** 33:16
**March -** 172:24
**mark -** 17:20, 66:7,
101:9, 103:17,
104:19, 110:16,
112:7, 115:10,
120:10, 124:7, 126:7,
128:21
**marked -** 17:23, 18:3,
66:10, 67:16, 68:16,
69:3, 95:23, 96:2,
96:4, 101:12, 101:15,
103:20, 103:22,
104:22, 104:24,
110:19, 110:21,
112:10, 112:14,
113:2, 115:13,
115:15, 118:13,
118:16, 118:18,
118:20, 120:13,
120:15, 124:9,
124:12, 126:10,
126:12, 128:24,
129:2, 132:23,
133:19, 156:11
**market -** 12:15
**marriage -** 17:8, 20:12
**marriages -** 21:8
**married -** 14:20,
14:23, 15:5, 15:14,
15:22, 21:7, 22:13
**Mass -** 113:11
**Massachusetts -** 1:4,
1:19, 1:20, 1:24, 2:3,
2:7, 2:12, 2:16,
57:18, 172:3, 172:10
**math -** 161:5
**matter -** 8:14, 28:19,
30:4, 30:5, 49:9,
50:4, 57:3, 78:1,
124:14, 124:15,
124:17, 137:16,
140:14, 172:15
**matters -** 121:5
**Mcquay -** 2:10, 2:11,
3:4, 68:3, 68:13,
90:10, 90:18, 93:14,
112:18, 112:21,
134:22, 160:19,
160:22, 162:20
**mean -** 18:9, 20:10,
23:5, 32:6, 37:1,
37:17, 38:5, 38:15,
44:15, 49:10, 58:16,
58:23, 59:18, 61:12,
63:13, 63:22, 63:23,
73:22, 74:2, 77:1,
85:9, 85:15, 85:16,
85:18, 85:19, 86:1,

97:3, 98:10, 98:19,
105:19, 107:24,
108:1, 109:21,
115:22, 121:15,
129:18, 138:14,
143:21, 168:12,
168:20, 169:1
**meaning -** 64:1, 147:2
**means -** 51:19, 77:15,
135:13, 143:22,
162:9, 166:1
**meant -** 135:8
**medical -** 149:1,
149:6, 162:1, 162:4
**medication -** 41:20,
41:22, 42:4
**meet -** 43:6, 45:13,
50:6, 53:6, 53:7,
54:15, 55:3, 136:21
**meeting -** 43:12,
43:16, 43:23, 44:2,
46:6, 51:3, 53:3,
54:19, 60:22, 61:11,
62:9, 62:13, 62:24,
133:21, 150:6,
167:18
**meetings -** 43:19,
50:1, 50:3, 50:12,
50:17, 52:9, 63:5,
66:20, 66:23, 130:17,
131:7
**men -** 50:20
**mental -** 41:16
**mentally -** 42:18
**mentioned -** 27:6
**met -** 55:7, 56:19,
150:1
**Metlife -** 9:11, 10:3,
10:8, 19:4, 19:12,
31:24, 32:9, 64:1,
65:13, 65:16, 65:19,
65:21, 65:24, 67:19,
71:7, 72:19, 73:1,
75:10, 79:5, 79:9,
79:11, 79:17, 80:3,
99:8, 102:2, 102:23,
124:17, 135:20,
137:16, 146:12,
146:22, 147:22,
152:15
**Metropolitan -** 1:10,
2:8, 5:9, 103:24,
105:2, 105:5, 143:17,
145:16, 165:3, 165:5
**Michael -** 1:12, 2:17
**Michaela -** 11:1, 11:2,
11:10
**middle -** 6:19, 15:1,
92:4
**might -** 16:5, 26:14,
47:2, 51:18, 60:6,
72:12, 81:14, 83:10,
83:14, 94:24, 103:14,
105:12, 105:24,
138:12
**Mike -** 10:17
**million -** 139:2
**mind -** 13:5, 15:23,
36:9, 130:18
**mine -** 80:19, 121:23
**minor -** 58:18, 59:5
**minus -** 157:23
**minute -** 74:18, 74:22
**minutes -** 66:12
**misplaced -** 9:5
**misread -** 93:14
**misrepresented -**
145:7

missed - 102:19, 144:17
missing - 102:22
mistake - 74:5, 75:5, 75:8, 75:13, 97:5, 101:4
mistaken - 19:12
mom - 27:6
moment - 157:19
money - 23:17, 30:19, 35:13, 44:19, 77:5, 77:8, 135:3, 144:14, 145:4, 150:23, 153:14
month - 25:16, 50:10, 69:7, 76:6, 76:9, 76:10, 79:9, 79:13, 99:17, 102:7
monthly - 10:8, 10:13, 96:24, 97:1, 98:11
months - 32:19, 153:19, 154:2, 154:6, 154:20, 155:12, 166:7, 166:10, 167:2, 167:3
Morgan - 1:11, 2:13, 32:13
mortgage - 98:13, 99:6, 99:23, 99:24, 100:2, 100:19, 103:7, 145:3
Most - 51:15, 114:24, 128:19, 140:2
most - 14:12, 53:14, 65:22, 76:8, 83:17, 111:22, 115:4, 117:3, 117:13, 125:16, 126:5, 136:17, 140:12, 143:12
Mostly - 65:19
mostly - 33:12, 90:14, 112:4, 117:24
motel - 20:24
mother - 26:17, 27:17, 28:8, 33:3, 43:18, 43:23, 50:14, 51:8, 107:4, 107:15, 108:9, 108:23, 109:5, 109:12, 110:6, 111:23, 130:16, 130:22, 131:8, 131:11, 131:16, 133:15, 135:17, 147:21, 155:23
mother's - 31:11
Motion - 114:14
motions - 6:4
Motorist - 77:11, 77:19, 163:8, 163:12, 163:16
Motorists - 112:13, 115:18, 118:4, 118:24, 119:4
Motors - 77:17, 79:21, 81:18, 82:7, 163:21
mouth - 168:13
move - 7:7, 7:9, 31:8
moved - 31:10, 48:12
must - 70:19, 75:13

**N**

name - 5:8, 6:17, 6:19, 6:22, 15:1, 27:11, 41:23, 41:23, 42:21, 43:5, 52:18, 52:20, 54:23, 55:4, 56:4, 65:18, 79:19, 80:12,

83:9, 101:23, 110:12, 120:24, 122:16, 122:18, 128:7, 148:19, 163:4
names - 43:9, 43:12, 64:6, 81:10, 82:11
napkin - 74:10
Narragansett- 22:7
natural - 39:11
necessary - 140:7, 140:8
need - 39:2, 40:21, 54:10, 74:9, 74:15, 86:14
needed - 52:9, 58:12, 81:16, 100:14, 103:5, 123:9, 144:14
negligently - 145:7
never - 9:24, 12:3, 13:13, 34:20, 40:9, 59:11, 81:5, 82:4, 94:17, 106:22, 109:10, 109:12, 111:22, 118:8, 119:24, 123:24, 124:1, 124:2, 128:1, 128:4, 131:9, 147:14, 165:15, 167:8, 167:9
Never- 17:18
New- 67:22, 69:11, 110:23, 115:17, 118:2, 118:22, 119:3
Next- 73:19
next - 71:6, 73:17, 77:10, 89:6, 102:13, 108:7, 120:24, 123:3, 155:15
nine - 108:13, 167:3
nineteen - 8:7, 13:23
ninth - 16:6, 32:18, 32:19, 32:24
nobody - 12:13, 108:6
Noe - 112:13, 115:17, 118:23, 119:4
Norwood - 1:20, 2:7
Notarial - 172:18
notary - 5:21, 6:2
Notary - 1:19, 5:4, 172:9, 172:22
notation - 88:10, 88:13, 88:15
Note - 4:3, 4:8, 17:22, 120:12
note - 18:18, 19:6, 120:16
notes - 62:12, 62:13, 62:19, 172:14
nothing - 23:6, 64:22, 81:21, 92:18, 93:12, 94:6, 101:7, 115:22, 128:8, 153:12, 160:17, 168:9
Nothing - 158:11, 162:22, 169:4
notified - 107:11, 128:1, 128:4, 128:5, 128:8, 168:8
notify - 168:4
November - 120:16
number - 8:3, 13:2, 13:9, 13:12, 25:12, 81:16, 81:17, 86:6, 86:12, 86:23, 112:19, 141:15
numbers - 81:20, 81:21, 89:7, 89:9, 90:4, 90:6
nurse's - 20:21

**O**

O'driscoll- 2:20, 3:5, 5:14, 6:9, 6:11, 6:13, 7:5, 7:6, 7:11, 66:13, 66:16, 66:17, 95:16, 95:18, 162:23, 163:1, 163:3, 163:5, 164:13, 169:5
oath - 58:3
object - 67:1, 67:13
Objection- 53:24, 87:2, 106:8, 106:16, 114:18, 115:1, 117:17, 127:19, 132:3, 132:7, 139:18, 139:23, 140:10, 140:22, 141:7
objection - 54:4, 60:2, 60:3, 60:7
objections - 6:3
occasion - 150:2
occur - 153:15
October- 15:6, 118:21, 119:2
offenses - 58:19
offhand - 21:5, 65:18, 89:2, 92:16, 92:23, 96:18, 100:20, 154:11
office - 8:16, 9:19, 9:20, 9:21, 20:4, 22:5, 43:7, 43:24, 45:17, 45:21, 45:24, 53:1, 59:16, 60:14, 61:10, 61:11, 61:13, 61:15, 61:16, 61:20, 80:10, 106:19, 107:17, 108:8, 111:6, 111:8, 111:21, 112:4, 114:6, 118:23, 119:22, 124:24, 133:9, 133:24, 134:6, 134:12, 138:8, 142:3, 160:14
Office- 7:15
offices - 1:19, 53:5, 112:2, 136:22, 136:23
often - 50:6
old - 21:1, 27:17, 31:11, 161:3
on-the-job - 33:12
once - 79:8, 79:12, 80:9, 130:6, 136:1
One- 2:21, 30:23, 86:9
one - 9:6, 9:7, 9:16, 10:12, 13:11, 24:4, 28:13, 30:11, 30:24, 31:23, 37:11, 43:18, 43:21, 44:17, 45:11, 51:15, 57:3, 63:22, 64:2, 68:20, 69:4, 69:5, 72:13, 74:15, 79:21, 79:22, 81:14, 86:7, 86:8, 87:9, 88:5, 88:9, 88:12, 95:4, 99:14, 100:22, 102:11, 102:19, 104:5, 118:20, 119:8, 119:10, 119:22, 127:21, 128:2, 128:10, 129:13, 130:13, 134:1, 134:9, 142:11, 150:2, 150:3, 150:4, 152:16, 153:17, 154:7, 155:6,

158:20, 158:24, 164:15, 165:3, 165:4, 165:6, 166:8, 169:1
one's - 33:16
one-trip - 30:11
ones - 53:14, 165:7
open - 16:18
opened - 7:21
opener - 24:12, 24:14
opinion - 16:23, 42:3, 138:1, 144:15, 167:23
opportunity - 60:7, 147:18
option - 76:20
options - 130:11, 130:12
original - 35:4
originally - 82:23, 152:14
originals - 81:4, 81:6
otherwise - 128:8
Otherwise- 78:17
outside - 107:21
overseeing - 53:18
own - 11:10, 11:12, 39:19, 47:19, 53:19, 66:4
owned - 11:13, 11:14, 34:14, 39:18, 87:13
owner - 77:12
owner's - 38:13
owns - 11:1, 11:2, 11:4

**P**

packet - 69:22
Page - 3:11, 4:2, 69:19, 171:3
page - 70:1, 71:6, 72:3, 76:16, 89:5, 91:6, 91:7, 112:15, 113:8, 116:3, 144:7, 157:22, 159:8, 159:15
Pages - 1:1
pages - 88:9, 124:14, 170:6
paid - 23:18, 25:1, 33:23, 135:6, 140:14, 140:17, 141:4
painkillers - 110:14
pains - 170:3
paper - 83:2, 86:16, 86:18, 86:19, 92:18, 100:14, 158:13
papers - 56:22, 60:17, 60:20, 60:21, 60:22, 60:23, 70:20, 86:7, 86:8, 86:9, 97:20, 107:17, 108:23, 109:4
paperwork - 73:24, 100:12
paragraph - 78:20, 96:11, 144:6, 145:6, 145:20, 145:21
Park - 2:11
part - 11:10, 17:7, 18:18, 78:3, 87:7, 125:14, 125:17, 127:10, 138:23, 143:13, 143:22, 144:2
partial - 23:22, 34:3
particular - 37:6
parties - 32:6, 117:20,

117:22, 141:23, 143:11
parts - 45:8
party - 42:12, 57:2, 87:8, 92:14, 131:21, 138:11, 138:20, 153:3
pass - 161:23
passed - 34:23, 144:5, 161:23
passing - 35:15
past - 62:4
pay - 22:18, 34:3, 35:22, 36:10, 138:19, 144:2, 145:3, 149:1
payee - 77:13, 77:17, 77:18
paying - 17:4, 23:7, 77:17, 100:2, 130:3, 152:22, 154:15
Paying - 138:18
payment - 10:10, 78:20, 78:21, 78:24, 79:24, 97:2, 97:4, 100:24, 116:20, 129:24, 140:20, 141:2, 159:24
payments - 9:9, 79:5, 96:24, 97:1, 98:11, 103:10, 103:13, 126:24, 139:10, 141:19, 141:21, 142:9, 142:16, 142:19, 143:6, 151:5, 154:1, 154:6, 154:19, 155:12, 155:16, 159:22, 163:9, 163:13, 163:17, 164:3, 164:7, 164:11, 166:9
Payout - 72:8, 129:4
payouts - 101:21
Pc - 1:20, 2:6, 2:10
Peaceable - 7:24, 29:9, 157:18
penalties - 170:3
Pennsylvania - 2:22
people - 9:20, 17:16, 20:3, 24:1, 28:12, 43:8, 44:7, 45:11, 45:20, 53:11, 64:2, 65:1, 65:24, 77:6, 80:23, 81:9, 99:3, 108:15, 135:19, 135:22
per - 69:7, 99:17
perhaps - 148:24, 158:24
period - 56:20, 99:5, 123:2, 157:11
perjury - 170:3
permit - 11:22, 12:20, 38:15, 40:9
permits - 37:6
person - 34:22, 34:24, 49:2, 52:16, 53:12, 53:17, 56:14, 81:14, 84:20, 84:21, 85:17, 87:1, 105:17, 109:13, 151:18
personally - 99:19, 102:24, 103:3
perspective - 127:1
Peter - 2:6, 5:8, 60:10
Philadelphia - 2:22
phone - 5:14, 55:12, 66:1, 72:12, 72:14, 72:20, 72:21, 72:22,

73:9, 84:21, 85:1,
85:5, 85:17, 86:24,
129:11, 129:14
phrase - 44:13, 84:4,
84:12
physical - 41:10,
91:12
physically - 72:3
piece - 11:4, 92:17
place - 20:19, 21:2,
31:7, 31:11, 49:2,
168:8, 168:9
Plaintiff - 1:8, 2:4
plaintiff - 144:7,
145:21, 145:24,
146:2
plan - 23:11, 77:2,
77:3, 77:6, 130:8
players - 128:10
Plaza - 2:11
pleading - 138:23
pleadings - 123:23
Pm - 169:8
Po - 7:4, 7:19, 7:21,
71:10, 91:9, 97:11
point - 13:11, 14:2,
37:9, 48:11, 55:17,
82:15, 109:2, 109:24,
115:7, 127:21,
127:22, 153:10,
154:21
pointing - 70:5
policies - 56:23, 80:18
policy - 19:17, 69:7,
77:2, 77:3, 77:7,
77:23, 80:15, 80:21,
81:1, 81:21, 82:23,
93:6, 93:7, 115:6,
135:8, 150:18, 158:5,
158:7, 161:12,
161:16, 162:15,
168:14
policyholders - 77:22
poor - 131:4
portion - 69:24, 92:3
possession - 160:13
possible - 7:6
post - 8:16, 9:19, 9:20,
9:21
Post - 7:15
power - 58:14, 63:7,
109:22
powers - 78:5
practice - 19:3, 138:23
prepare - 59:13,
62:10, 63:1, 63:5,
63:6, 63:17
preparing - 59:21,
60:1
preprepared - 112:24
present - 10:15,
48:21, 61:5, 61:7,
63:24, 72:22, 73:3,
84:1, 109:17, 111:17,
124:15, 130:10,
131:8, 137:1
presented - 14:4,
100:4, 133:9
pressure - 41:21
pretend - 51:12
pretty - 17:9, 19:20,
25:22, 62:3, 86:8,
133:10, 162:16
private - 26:23
Private - 26:24
prize - 99:1
problem - 87:21
Procedure - 1:18

proceed - 109:23
proceeded - 82:4
proceeding - 42:13,
42:15
Proceedings - 5:1
proceeds - 20:2,
23:18
produced - 139:1
production - 97:7
professional - 41:17
Professional - 1:18,
172:8
pronounce - 10:21
proof - 81:3
property - 150:24
Proposal - 67:21,
69:10
proposal - 68:7,
159:16
prove - 42:16
provide - 17:2, 22:17,
73:18, 77:8, 145:23
provided - 16:9
Providence - 53:3
Provisions - 1:17
psychologist - 41:17
public - 26:23, 26:24
Public - 1:19, 5:4,
172:9, 172:22
pulling - 13:5
purchase - 129:17
purchased - 116:16,
116:17
purpose - 58:9
purposes - 98:4,
98:13
pursuant - 1:17
put - 18:11, 46:13,
64:22, 65:11, 84:17,
85:21, 92:8, 92:9,
92:23, 95:6, 97:21,
105:21, 131:23,
166:23
puts - 100:13

**Q**

questions - 47:1,
47:5, 60:5, 147:6,
148:12, 148:15,
160:20, 162:21,
162:24, 164:14,
167:4, 168:18, 170:5
quite - 11:15, 13:15,
44:7, 44:18, 55:12,
79:20, 84:11, 87:16,
109:21, 129:20
quote - 76:19

**R**

R's- 122:20
ran - 28:6, 53:23
rather - 129:24
rating - 41:14
reaction - 52:5
read - 14:2, 14:3, 14:7,
14:8, 16:21, 36:21,
50:23, 51:12, 51:13,
51:14, 51:16, 51:17,
51:19, 51:21, 69:24,
71:19, 73:7, 76:17,
88:10, 92:15, 92:24,
93:10, 96:11, 101:18,
104:7, 109:18, 110:2,
113:5, 121:2, 133:12,
133:15, 143:16,
145:20, 170:1

reading - 13:6, 14:5,
14:14, 16:9, 16:24,
33:5, 51:7, 70:5,
110:1
real - 62:1
realize - 9:22
really - 22:12, 30:19,
34:20, 35:23, 36:23,
40:1, 49:1, 55:1,
56:4, 58:21, 58:22,
64:14, 74:4, 76:15,
82:4, 93:23, 94:17,
106:23, 109:20,
128:1, 130:1, 130:18,
131:9, 131:13, 138:3,
147:24, 150:20,
160:1
reason - 65:13, 98:7,
105:13, 105:18,
157:7, 164:18,
164:24, 165:13,
165:17
Reath- 2:20
Receipts- 22:24
receive - 7:22, 9:6,
10:8, 16:13, 16:14,
16:16, 34:3, 37:8,
37:21, 44:20, 69:8,
75:15, 75:18, 76:1,
76:7, 76:12, 76:14,
79:8, 79:12, 97:18,
102:6, 102:18,
103:10, 103:13,
105:14, 106:18,
116:10, 123:22,
129:13, 138:12,
140:16, 152:20,
157:8, 158:9, 159:22,
164:19, 165:1, 166:1
received - 9:10, 9:24,
10:12, 25:3, 36:5,
37:4, 37:13, 40:24,
41:8, 71:18, 73:9,
76:11, 79:1, 79:5,
79:15, 80:7, 96:12,
96:20, 96:24, 97:8,
100:9, 102:10,
102:13, 103:7,
104:15, 106:22,
114:5, 123:24, 124:1,
124:3, 127:3, 129:12,
139:10, 141:1,
157:22, 157:23,
158:2, 158:14,
159:15, 165:13,
165:15, 165:18,
167:4, 167:8
receiving - 7:18, 34:8,
44:22, 97:14, 141:18,
141:20, 142:9, 148:4,
152:13, 153:9,
156:10, 157:2,
159:24
recognize - 69:2, 69:5,
69:17, 69:21, 88:24,
104:3, 104:5, 111:3,
111:4, 111:5, 113:3,
115:23, 119:10,
120:21, 121:21,
126:17, 129:7
recollect - 110:4,
114:7, 114:9, 116:12,
126:2, 163:10
recollection - 72:16,
120:3, 157:24
recollections - 107:20
recommend - 168:23
recommendation -

132:2, 132:5
record - 5:8, 66:12,
66:16, 67:17, 68:19,
68:22, 68:23, 69:9,
70:4, 74:21, 74:23,
75:2, 90:10, 90:13,
90:18, 95:16, 95:21,
96:3, 103:21, 104:23,
110:20, 112:11,
115:14, 118:19,
120:14, 124:11,
126:12, 129:1, 143:4,
152:1, 170:4, 172:14
records - 19:15,
80:15, 82:20, 83:23,
85:7, 85:8, 85:22,
86:1, 88:2, 162:2,
162:4
Recross- 3:1, 160:21,
163:2
Redirect- 3:1, 164:16
refer - 15:24, 78:13,
148:4
references - 13:14
referred - 82:18, 146:5
referring - 19:22,
62:16, 78:10, 78:14,
78:16, 83:8, 89:5,
90:1, 96:17, 157:22
refinance - 100:5
Regarding- 9:9
regarding - 73:24,
97:23, 114:22, 120:7,
137:15, 138:11,
140:4, 160:10, 163:9,
163:13, 163:17,
164:2, 164:7, 164:10,
166:5
regards - 32:13
Registered- 1:18,
172:8
regular - 72:21, 72:22,
108:12
relate - 60:6
related - 39:21, 138:7
relating - 121:6
relationship - 34:18,
61:24
relatives - 135:11
release - 146:8
releasing - 146:1,
146:10
rely - 16:12, 35:12
relying - 53:14
remark - 88:5, 88:7
remember- 8:17,
8:18, 12:7, 15:11,
18:14, 24:23, 25:14,
42:20, 43:4, 43:7,
43:12, 44:11, 45:12,
47:3, 47:6, 47:9,
52:7, 52:16, 52:18,
56:4, 57:13, 60:18,
65:18, 70:23, 76:15,
78:23, 83:11, 83:14,
92:16, 92:22, 94:11,
94:21, 95:4, 97:20,
100:6, 109:21,
110:12, 111:20,
118:3, 118:6, 119:22,
122:3, 123:11,
128:16, 131:22,
144:20, 150:5,
150:21, 154:11,
158:2, 163:22
remembered- 87:8,
87:10
remembering - 165:6

renew - 12:22, 40:16
renewal - 40:19
renewals - 9:7
rent - 31:8
repeat - 7:13
replaced - 10:1, 10:5
replied - 85:22, 85:24,
86:2
Reporter- 1:18, 1:19,
172:8
Reporting- 1:23
represent - 28:19,
107:1, 108:8, 122:5,
124:13, 126:23,
148:20
representation -
149:13, 167:23
representative -
65:19, 107:10,
108:21, 109:16,
110:5, 110:8, 112:3,
112:6, 113:7
represented - 28:16,
45:23, 105:17,
105:20, 137:19
representing - 5:9,
45:10, 113:15,
113:19
represents - 5:14
request - 66:5, 97:6,
97:7, 97:23
requested - 66:3,
99:12
requesting - 96:13,
121:9
reserve - 6:3
resolution - 54:12
resolve - 54:8
respect - 93:1
respond - 47:21
responded - 47:23,
165:24
responding - 70:6
response - 73:8,
102:22, 129:11,
129:14, 166:5
responsibilities -
17:8, 125:15
responsibility - 38:13,
114:22, 117:12,
125:18, 136:9,
136:12, 139:21,
142:6
rest - 18:18, 33:10,
74:7, 75:15, 75:21,
92:10
result - 144:8
results - 136:18,
149:10
retire - 27:23
retired - 27:22, 56:15,
56:18, 87:17
returns - 21:11, 21:13,
21:16, 21:19
revealing - 61:4
reviewing - 16:7
revolve - 59:9
Reynolds- 67:20,
67:21, 69:15, 112:14,
118:7
Rhode- 7:16, 8:1,
22:8, 37:18, 37:20,
39:6, 54:15, 70:12,
70:16, 71:11, 91:10
Ridge- 7:1, 8:10, 8:11,
91:9
right-hand - 90:7
ring - 43:3, 52:20,

54:23, 93:21, 121:7,
128:11
risk - 130:20
Road- 1:20, 2:7, 7:1,
9:8, 70:16, 91:9
road - 29:10
Robert- 112:14
Roger- 52:18, 52:20,
113:9, 113:17,
113:18, 116:5,
119:14
room - 5:11, 72:23,
73:4, 131:11, 131:17,
133:3, 151:19,
158:18
rot - 12:16
roughly - 8:12, 139:2,
142:15, 166:23
Roughly- 13:24, 102:8
Rpr- 172:22
Rules- 1:17
run - 38:22, 39:1,
74:14
running - 34:21,
34:22, 34:24

**S**

safe - 149:17
sake - 112:23
Sandra - 2:11
Sandy - 72:7, 129:4
sat - 12:19
satisfactorily - 5:3
satisfied - 149:13,
149:19, 167:13,
167:24
saw - 49:12, 83:3,
89:1, 147:14
Sc(128- 3:15, 126:10,
126:14
scallops - 34:7
school - 26:20, 26:22,
26:23, 26:24, 32:15,
32:17, 32:24, 33:1,
36:13, 39:9
Seal- 172:18
season - 15:8
second - 14:14, 68:20,
76:16, 113:8, 116:3,
119:1, 122:15
secretary - 87:6
section - 70:21, 71:22,
113:9, 116:5, 119:14,
143:16
Security- 13:2, 13:9,
14:3, 67:22, 69:11,
93:1, 110:22, 115:16,
118:1, 118:22, 119:3,
127:1, 145:11,
145:15, 146:12,
146:21
security - 13:12
see - 7:10, 70:2, 71:3,
71:8, 71:21, 72:3,
72:7, 74:16, 79:23,
82:19, 88:12, 89:7,
100:14, 105:7,
111:10, 113:12,
114:1, 114:13, 116:4,
119:13, 165:5
See- 1:2
seeing - 80:20, 81:19,
105:10
seek - 147:18
seem - 160:1
seize - 35:7
self - 23:4, 23:10,

27:24, 40:3
self-employed - 23:4,
27:24, 40:3
self-employment -
23:10
sell - 12:11, 12:20,
98:16, 98:19
selling - 38:9
send - 19:13, 41:1,
41:3, 73:23, 80:16,
106:24, 107:7, 107:9,
128:15
sends - 16:17
sense - 127:11
sent - 9:23, 73:12,
95:3, 97:8, 99:11,
102:20, 104:13,
107:10, 135:4
sentence - 77:15,
96:23
separate - 142:18
separated - 102:17
separation - 9:17,
59:3
September - 96:5,
97:11, 99:4, 100:23,
103:23, 105:1, 105:3,
115:16
sequence - 165:9
serve - 41:5
Service- 37:22, 37:23
services - 21:22,
22:16, 41:6, 140:14,
149:19, 167:13,
168:1
set - 78:4, 78:9, 130:1,
169:6, 170:5, 172:12,
172:17
sets - 126:24
settled - 55:3, 56:21,
153:8
settlement - 28:9,
29:4, 46:8, 78:10,
96:15, 96:19, 114:23,
121:6, 121:12,
129:18, 129:19,
149:23, 150:8,
150:14, 160:10
seven - 161:3, 161:5
shack - 34:5, 34:6
share - 23:17, 23:20,
23:22, 23:23, 24:4,
24:21, 25:5, 34:3,
34:5, 34:10, 34:13
shares - 23:24
sheet - 67:18, 68:7
Sheet - 171:1
ship - 53:23
short - 66:14, 143:3,
152:17
Shorthand - 1:18,
172:7
shot - 156:11
show - 14:17, 33:17,
95:22, 101:14, 113:2,
132:23, 165:9
showed - 147:13,
159:8
showing - 33:16,
102:9, 165:12
side - 73:5, 73:6,
94:16, 122:6
sides - 73:4
sign - 5:21, 56:22,
58:3, 58:9, 63:6,
107:17, 108:11,
108:22, 109:13,
109:19, 110:6,

114:13, 133:20,
134:1
signature - 18:17,
19:13, 91:2, 91:4,
91:21, 91:24, 92:7,
92:8, 111:12, 120:24,
122:6, 122:10,
122:13, 123:5, 123:9,
132:24
Signature - 111:11
signatures - 91:19
signed - 18:6, 57:21,
58:2, 58:6, 58:12,
60:17, 60:20, 60:21,
60:22, 60:23, 90:16,
92:15, 92:21, 97:8,
101:6, 109:5, 111:17,
120:17, 127:24,
133:12, 133:16,
134:9, 158:4, 158:9,
158:15, 158:16,
158:18, 159:5,
159:14, 159:22
signing - 92:17,
111:21, 133:18,
159:24
simple - 17:10, 50:8,
153:16, 168:3,
168:12
sisters - 29:15
sit - 48:9
site - 30:16, 30:18
sitting - 47:24, 48:4,
48:5, 61:20, 111:21
situation - 30:8, 128:9
six - 32:18, 39:15,
167:2
size - 55:11
skiff - 39:14
skill - 172:16
skip - 78:19, 96:23
sleepy - 42:7
slipped - 41:11
small - 11:14
smoker - 94:18
Social - 13:1, 13:9,
14:3
sold - 98:2
someone - 21:14,
42:17, 45:17, 47:20,
48:15, 51:18, 92:15,
121:17, 126:4,
128:14, 137:1,
138:20, 162:1,
166:15
sometime - 162:11
Sometimes- 9:4,
38:17, 50:15, 137:10
sometimes - 25:16,
72:23, 72:24, 143:14
somewhat - 111:4
Somewhere - 167:1
somewhere - 25:20,
74:6, 82:17, 86:12,
156:3
Sorry - 15:13, 159:13
sorry - 8:22, 11:14,
26:24, 68:1, 91:7,
91:14, 93:18, 107:15,
112:18, 115:2, 131:3,
148:9, 151:24,
157:17
source - 79:13
South- 20:19
speaker - 72:20
speaking - 47:10,
47:19
Specialist- 72:8,

129:4
specialists - 161:19
specific - 52:12,
72:15, 77:14, 86:17,
136:11, 143:14,
154:5
specify - 155:8
spell - 6:19
Spelling - 17:13
spelling - 34:17
spent - 47:14, 47:15
Square - 2:21
Sr- 64:9
Ss - 172:3
stack - 22:22
stamp - 89:24, 90:1,
90:2, 90:11, 90:14,
90:19, 157:24
stand - 20:21
standards - 53:19
stands - 104:12
Stanley - 1:11, 2:13,
32:13
start - 47:19
started - 11:5, 28:1,
34:2, 34:4, 76:22,
80:23, 152:13,
154:18
state - 5:18, 23:9,
37:5, 38:2, 40:7,
40:10, 41:1, 145:16
State- 2:16, 37:18,
37:19, 39:6
statement - 46:24,
47:5, 48:2
statements - 142:5
States - 1:4, 37:23
states - 58:2
Stating - 69:6
stating - 19:14, 145:8
statuses - 125:10
staying - 31:9
stenotype - 172:14
still - 27:4, 27:5, 27:9,
27:13, 27:20, 38:21,
66:16, 80:15, 95:17,
100:2, 108:5, 108:19,
114:17
stipulations - 5:21,
6:10
stop - 75:19, 76:4,
144:12
stopped - 56:13, 75:9,
76:3, 80:10, 86:6,
141:18, 142:13,
143:6, 148:3, 154:15,
155:17
story - 15:10
straight - 25:5, 152:1
straighten - 13:16
Street - 1:24, 2:16
Streets- 2:21
strike - 6:4, 46:4,
55:16, 136:20,
146:24, 159:20
structured - 96:14,
121:6
stub - 81:16
studs - 81:24
stuck - 109:15
stuff - 13:14, 17:13,
19:14, 19:15, 19:16,
20:18, 22:24, 25:10,
28:22, 28:24, 29:2,
31:9, 33:5, 34:7,
35:15, 36:2, 36:19,
36:21, 36:23, 38:10,
43:8, 43:9, 43:10,

44:5, 44:20, 45:1,
45:3, 45:4, 47:7,
49:3, 49:11, 50:9,
51:23, 55:13, 56:13,
56:22, 56:23, 58:13,
59:5, 59:8, 59:19,
60:13, 60:17, 62:1,
62:5, 64:4, 65:1,
80:16, 81:12, 82:1,
82:14, 82:20, 94:18,
94:21, 96:22, 99:17,
100:12, 107:12,
108:3, 108:10,
109:23, 128:1, 130:4,
132:21, 134:15,
134:16, 141:22,
144:12, 144:16,
150:20, 151:1,
153:18, 155:5,
161:18, 161:19,
161:21, 168:4
subject - 72:18,
101:20
sudden - 142:12
Sue - 2:11
sue - 35:5
sued - 65:1
suffer - 144:10,
144:24
suffered - 35:20,
144:7, 146:1
Suffolk - 172:3
suggest - 123:8
suing - 32:7, 135:19,
135:22
Suite - 2:3
Sullivan - 2:10
sum - 98:22
summer - 157:11
Supplementary - 3:14,
126:9, 126:13
support - 59:6, 59:8,
100:18
supposed - 30:11,
53:13, 74:7, 75:15,
75:20, 80:21, 83:3,
94:8, 103:9, 144:5,
168:7
supposedly - 13:12,
69:7
suspend - 67:12
suspended - 169:7
suspension - 67:14
suspicion - 60:1
sworn - 5:3, 172:13

**T**

table - 48:6, 48:8,
48:12
talken - 72:12
tax - 21:11, 21:13,
23:9, 23:10
taxes - 21:10, 22:18,
22:19, 23:2, 23:5,
25:19, 130:3
team - 127:11
telephone - 7:7, 7:10,
84:2, 84:19, 137:8
Telephone- 2:20,
3:21, 101:11
Teleservices- 101:19
ten - 108:13
tenth - 16:6
Teresa- 96:6
term - 24:14, 24:15,
30:13, 77:7, 143:20,
152:17

terms - 9:11, 17:3,
23:16, 73:20, 107:2,
120:8, 124:4, 126:24,
127:9, 139:14, 145:7,
145:12, 149:23,
150:7, 150:9, 150:14,
151:4, 152:2, 152:4,
167:5, 167:24
testified - 5:4, 40:15,
57:5, 75:4, 83:21,
90:19, 139:12,
142:14, 148:22,
151:10, 151:13,
156:7, 156:9, 157:1,
157:21, 160:23,
161:8, 166:4
testify - 46:22, 131:6
testifying - 83:6
testimony - 42:5,
63:8, 102:5, 124:2,
149:3, 170:2, 172:12,
172:13
themselves - 52:11
third - 78:19, 89:5,
91:8, 138:11, 138:20,
153:2
thirty - 5:21, 100:7
thirty-year - 100:7
Thorp- 96:6
thousand - 25:21
threat - 131:1, 131:2
three - 24:2, 50:9,
63:9, 63:12, 88:9,
144:19, 144:23,
162:9
Tim- 7:5, 66:12, 163:4
Timothy- 2:20, 5:13
tissue - 74:12
title - 10:23, 70:1,
120:24
today - 14:13, 42:5,
57:10, 63:8, 147:1,
147:13
today's - 59:14, 62:10,
63:1, 63:5, 63:17
Todd- 2:15
together - 9:18, 59:12,
73:22, 127:12, 136:6,
136:16, 137:23,
170:6
took - 13:15, 30:18,
67:15, 75:6, 132:19,
145:2, 154:4, 162:1
top - 13:3, 70:2
tossed - 32:22
total - 43:19, 44:21,
134:7
totally - 31:16
touch - 65:23, 75:10,
86:22
toughest - 15:4
track - 9:7, 81:11,
83:13, 153:22
tracking - 81:15
traffic - 58:18
training - 33:13,
36:12, 36:14, 36:15
transcript - 170:2
transit - 30:15, 30:16
tree - 161:24
Tremont- 1:24
trial - 6:5, 8:13, 29:5,
42:23, 44:16, 45:15,
50:3, 50:18, 52:2,
52:8, 57:7, 149:5
tried - 28:12, 33:3,
36:18, 36:19, 36:24,
80:5, 143:7, 153:21

trip - 24:16, 24:21,
25:4, 30:11, 41:9
trips - 25:7, 25:12,
144:17, 144:18
trouble - 9:1, 9:10,
17:10, 17:11
true - 16:10, 58:4,
65:14, 70:8, 123:13,
151:13, 151:17,
151:24, 153:1, 170:4,
172:13
trust - 105:21
truth - 18:15, 27:18,
79:22, 109:20,
116:22, 120:22,
123:21, 133:22
truthfully - 147:8
try - 7:9, 23:13, 23:15,
33:1, 33:4, 42:16,
98:16
trying - 8:17, 24:22,
99:5, 106:6, 106:13,
161:20
Tulsa- 101:19
turn - 82:17, 144:11
turned - 9:23, 44:23,
46:16, 80:9, 80:13,
142:12
twenties - 109:1
twenty - 26:12, 39:15,
75:16, 75:18, 79:5,
79:9, 79:10, 79:13,
80:18, 85:23, 86:1,
93:12, 94:1, 135:5,
145:9, 145:18,
145:24, 150:19,
168:14
twenty-five - 26:12
twenty-four - 26:12
twenty-six - 39:15
twice - 134:6
Twice- 136:24
Two- 2:11, 26:10,
26:16, 29:16, 134:7
two - 12:10, 26:19,
45:20, 73:21, 91:19,
112:15, 118:20,
120:17, 122:20,
144:19, 153:19,
154:2, 154:6, 154:19,
155:12
two-page - 112:15
type - 21:1, 33:11

unable - 73:18
under - 58:3, 76:18,
76:19, 116:4, 170:3
underlying - 149:14
underneath - 53:11,
122:12
understood - 44:24,
56:15, 80:1, 109:24,
113:20, 147:5, 152:8
unemployment - 23:6
Union - 113:10,
119:17, 119:21
United - 1:4, 37:22
unless - 80:4, 135:13,
140:6
up - 9:18, 10:4, 12:12,
23:7, 33:9, 35:15,
35:18, 48:12, 56:22,
59:12, 78:4, 78:9,
85:1, 85:22, 86:1,
86:14, 87:19, 90:2,
93:12, 108:4, 108:14,

109:11, 130:2, 130:3,
130:8, 131:9, 133:24,
134:3, 136:4, 140:20,
143:22, 153:17,
153:20, 161:11,
161:16
updates - 125:9
upset - 148:3, 148:6,
168:3, 168:5

**V**

verdict - 36:6, 36:10
vessel - 38:4, 38:6,
38:12
Via- 2:20
violating - 58:20
vision - 72:5
visitation - 59:7
Volume- 1:1
vs - 124:16, 143:17
Vs - 1:9

**W**

wage - 21:4
wages - 22:20, 23:2,
23:4, 23:5
wait - 131:11
waiting - 131:11
Waive - 5:21
Waive- 6:2
Wakefield- 30:23,
64:16, 64:17
wallet - 13:4
wants - 85:18
waste - 12:15
waterfront - 119:23
ways - 28:19
weather - 25:10
week - 50:11
weeks - 24:10, 25:16,
63:3, 144:23, 160:6
Weinstein- 2:10
weird - 80:20
welcome - 60:11
Weld- 2:15
West- 7:1, 7:4, 7:15,
8:21, 30:24, 71:10,
91:9, 157:17
Wgy - 1:5
Wharf- 113:10,
119:18, 119:21
whereby - 145:22
Whereof- 172:17
whole - 11:8, 15:4,
84:24, 109:10, 130:2
wife - 15:24, 18:23,
40:20, 41:2, 41:18,
43:15, 43:22, 50:14,
51:13, 51:15, 51:22,
55:11, 56:10, 59:3,
61:2, 61:5, 61:18,
62:19, 63:13, 65:22,
66:22, 70:19, 71:20,
72:19, 73:2, 73:12,
75:17, 80:11, 81:9,
83:10, 83:22, 84:12,
84:15, 84:17, 84:19,
85:10, 85:13, 86:4,
87:6, 87:23, 93:11,
94:1, 97:22, 100:10,
100:11, 100:22,
101:5, 102:2, 102:17,
103:4, 111:22,
111:24, 123:2,
129:14, 130:16,
130:21, 131:2, 131:7,

131:10, 131:16,
131:17, 133:14,
135:16, 137:4, 137:9,
137:13, 144:13,
151:19, 155:23,
158:20, 158:22,
160:9, 163:18
wife's - 18:22, 73:5,
73:6, 88:21, 89:1,
91:24, 92:8, 121:24,
122:9
win - 138:20
wind - 23:7, 130:3
wiped - 145:5
withdraw - 114:14
Witness - 3:1, 74:11,
74:13, 74:16, 74:20,
90:23, 122:12,
172:17
witness - 1:16, 7:6,
48:1, 48:4, 48:13,
70:6, 122:16, 123:7,
172:11
witnesses - 123:9
witnessing - 122:13,
123:5
Witter- 67:20, 67:21,
69:14, 112:14, 118:7
won - 98:24, 149:5
wondering - 142:11
word - 51:24, 70:10,
83:1, 83:2, 97:1,
132:19, 142:10,
161:10, 168:11,
168:13
worded - 84:11
words - 17:13, 46:11,
65:10, 65:11, 70:5,
72:3, 152:10
works - 7:10, 20:7
wound - 9:18, 12:12,
33:9, 35:15, 59:11
writ - 95:6
write - 17:15, 18:23,
19:1, 19:6, 19:7,
19:11, 89:4, 120:7,
121:15, 121:16,
121:19, 133:1, 133:3,
159:11
writing - 17:10, 17:12,
19:4, 51:1, 51:7,
88:21, 89:1, 90:2,
92:11
writings - 89:23
written - 18:10, 75:24,
76:2, 90:6
wrongdoing - 143:15
wrote - 71:24, 88:17,
89:9, 89:12, 92:2,
92:13, 92:14, 94:24

**Y**

year - 11:6, 12:23,
13:15, 15:9, 15:10,
15:11, 23:8, 23:12,
25:8, 25:13, 25:19,
26:5, 63:22, 63:23,
83:4, 93:12, 100:7,
154:9, 154:17, 166:8,
166:22
yearly - 40:17
years - 7:20, 8:7, 8:12,
11:16, 12:7, 12:10,
13:23, 15:20, 34:12,
36:18, 39:15, 41:12,
62:2, 62:5, 65:12,
75:16, 75:18, 79:5,

79:9, 79:10, 79:13,
80:18, 85:23, 86:1,
93:13, 93:21, 94:2,
94:20, 135:6, 145:9,
145:18, 145:24,
150:19, 161:3, 162:7,
162:9, 162:14,
168:14
York - 110:23, 115:17,
118:2, 118:22, 119:3
young - 35:16
yourself - 40:2, 47:11,
103:3, 127:10,
158:22

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.

DENNIS DIMON,
        Plaintiff              05 - 1 1 0 7 3 REK

vs.                                    "COMPLAINT"

MICHAEL B. LATTI, LATTI
ASSOCIATES, LATTI & ANDERSON   MAGISTRATE JUDGE _____
LLP, METROPOLITAN LIFE
INSURANCE COMPANY, KEMPER
INSURANCE COMPANY, and                          RECEIPT #
MORGAN STANLEY DW, INC.,                         AMOUNT $_____
        Defendants                              SUMMONS ISSUED___
                                                LOCAL RULE 4.1____
                                                WAIVER FORM____
                                                MCF ISSUED_____

## INTRODUCTION

1.   This is a contract and malpractice action for monetary relief resulting from the
     premature cancellation of the plaintiff's structured settlement payments, which
     occurred on or about May 5, 2003 when the defendants ceased paying the settlement
     due the plaintiff as a result of a personal injury action in 1983. The plaintiff released
     the defendant shipowner in his personal injury action in consideration of a life
     annuity guaranteed for 20 years which the court approved. The plaintiff asserts a
     cause of action against the defendants based upon their breach of the settlement
     contract and for the breach of fiduciary duties by his former attorney.

## JURISDICTION

2.   Jurisdiction is proper pursuant to 28 U.S.C., sec. 1332(a). Venue is proper in the

1

District Court of Massachusetts pursuant to 28 U.S.C., sec. 1391(c).

## PARTIES

3. The plaintiff, Dennis Dimon, is of legal age and resides in West Kingston, Rhode Island.

4. The defendant, Michael B. Latti, is now a resident of the State of Maine and a lawyer licensed to practice law in the Commonwealth of Massachusetts who formerly resided in and practiced law in the Commonwealth of Massachusetts in 1983.

5. The defendant, Latti Associates, was a law firm created under the laws of the Commonwealth of Massachusetts by Michael B. Latti, with a principal place of business at 30-31 Union Wharf, Boston, Massachusetts.

6. The defendant, Latti & Anderson, LLP, is a law firm created under the laws of the Commonwealth of Massachusetts, with a principal place of business at 30-31 Union Wharf, Boston, Massachusetts and is the successor in interest to Latti Associates.

7. The defendant, Metropolitan Life Insurance Company is an insurance company with a principal place of business in New York, New York, and regularly conducts business in the Commonwealth of Massachusetts.

8. The defendant, Kemper Insurance Company is an insurance company with a principal place of business in Long Grove, Illinois, which regularly conducts business in the Commonwealth of Massachusetts.

9. The defendant, Morgan Stanley, is a brokerage company with a principal place of business in New York, New York, and regularly conducts business in the Commonwealth of Massachusetts.

2

## FACTUAL ALLEGATIONS

10.   In 1981, the plaintiff was severely injured while serving as a member of the crew
      aboard the F/V/ JENNY C, resulting in the loss of his eye.

11.   On or about February 4, 1983, following a trial, a jury awarded the plaintiff $710,000
      for his injuries against the defendant, Jenny C., Inc.

12.   The plaintiff was represented at all times for the trial and subsequent settlement by
      Latti Associates, operated under the authority of Michael B. Latti.

13.   Latti & Anderson, LLP is the successor in interest to Latti Associates.

14.   Following the verdict, the parties entered into a settlement agreement, approved by
      the United States District Court for the District of Rhode Island and a *guardian ad
      litem* appointed by the court, providing the plaintiff with a lump sum payment of
      $250,000 and an annuity for the life of the plaintiff and guaranteed for twenty (20)
      years which would continue for the life of the plaintiff. The annuity would pay the
      plaintiff a set amount (beginning at $1,450.45) each month with the amount
      increasing by three (3) percent each year.

15.   Prior to the settlement the court appointed Leonard Decof, Esquire as *guardian ad
      litem* to review the settlement and to report to the court.

16.   The *guardian ad litem* was appointed by the court due to the plaintiff's inability to
      read or understand the settlement contract and was an extra measure by the court to
      protect the plaintiff even though he had separate counsel through Latti Associates.

17.   American Motorists Insurance Company (now Kemper Insurance Company) applied
      for the annuity.

3

000003

18.  Dean Witter. Inc.(now Morgan Stanley), acting as the agent and broker for American Motorists Insurance Company, arranged for the lifetime annuity.

19.  The defendant Metropolitan Life Insurance Company (formerly Charter Security Insurance Company), provided the annuity beginning June 5, 1983.

20.  On or about June 14, 1983, Charter Security Life Insurance (now Metropolitan Life Insurance Company) informed Dean Witter, Inc. (now Morgan Stanley) that a clerical error had been made on the annuity contract and that the contract should have read for 240 months (20 years) rather than for life with a guarantee of twenty (20) years.

21.  On or about September 26, 1983, Charter Security Life Insurance (now Metropolitan Life Insurance Company) informed American Motorists (now Kemper Insurance) and Latti Associates of the clerical error described in paragraph 20.

22.  A supplementary document changing the contract from life, guaranteed for twenty (20) years to twenty (20) years only was forwarded to each of the insurance companies and Latti Associates.

23.  The plaintiff was not advised of this change nor was the court or *guardian ad litem* informed of the alleged clerical error upon which the plaintiff, court, and *guardian ad litem* had relied in accepting the settlement agreement.

24.  On May 5, 2003, the defendant Metropolitan Life Insurance Company, stopped payment on the plaintiff's settlement, stating that the annuity was only for a fixed period of twenty years rather than for the life of the plaintiff.

25.  Upon the suspension of payments, the plaintiff attempted to contact his former lawyer at Latti Associates, now Latti & Anderson, but was informed that no file

4

33. The defendant failed to act reasonably in not informing the plaintiff of the alleged clerical error changing the terms of the annuity.

34. Due to the actions of the defendant, the plaintiff suffered financial loss.

## REQUEST FOR RELIEF

1. That this Court, under Count II, enter judgment in favor of the plaintiff.

2. For such other relief as this Court deems appropriate.

## COUNT III
(Dennis Dimon v. Michael B. Latti -
Breach of Contract)

35. Paragraphs 1-34 are realleged and incorporated by reference.

36. The plaintiff and the defendant entered into a contract for the defendant to provide legal representation for injuries suffered by the plaintiff in a fishing boat accident.

37. The defendant breached this contract by failing to provide competent legal representation, in failing to inform the plaintiff of an alleged clerical error changing the plaintiff's settlement agreement, and failing to ensure that the plaintiff understood the alleged changes to the settlement agreement.

38. The plaintiff suffered financial losses as a result of the defendant's breach of contract.

## REQUEST FOR RELIEF

1. That this Court, under Count III, enter judgment in favor of the plaintiff against the defendant for breach of contract.

2. For such other relief as this Court deems appropriate.

6

## COUNT IV
### (Dennis Dimon v. Latti Associates-
### Breach of Fiduciary Duty)

39. Paragraphs 1-38 are realleged and incorporated by reference.

40. A lawyer has a duty to act in the best interest of his client and not to act in any way adverse or contrary to the interests of the client.

41. The plaintiff relied upon the defendant law firm for advice, counsel, and information in order to make an informed decision prior to entering into any settlement agreement whereby the plaintiff would forfeit his rights to future compensation for his injuries.

42. Due to the defendant's breach, the plaintiff has suffered financial loss.

### REQUEST FOR RELIEF

1. That this Court, under Count IV, enter judgment in favor of the plaintiff against the defendant for breach of fiduciary duty.

2. For such other relief as this Court deems appropriate.

## COUNT V
### (Dennis Dimon v. Latti Associates -
### Negligence)

43. Paragraphs 1-42 are realleged and incorporated by reference.

44. A lawyer has a duty to act with reasonable care and to use the skill of a reasonably competent lawyer in representing a client.

45. The defendant failed to act reasonably in not informing the plaintiff and ensuring that the plaintiff understood the changes to the settlement agreement.

46. Due to the actions of the defendant, the plaintiff suffered financial loss.

7

000007

## REQUEST FOR RELIEF

1.    That this Court, under Count V, enter judgment in favor of the plaintiff.

2.    For such other relief as this Court deems appropriate.

### COUNT VI
(Dennis Dimon v. Latti Associates -
Breach of Contract)

47.    Paragraphs 1-46 are realleged and incorporated by reference.

48.    The plaintiff and the defendant entered into a contract for whereby the defendant was
to provide legal representation for injuries suffered by the plaintiff in a fishing
accident.

49.    The defendant breached this contract by failing to provide competent legal
representation, failing to inform the plaintiff of changes to the plaintiff's settlement
agreement, and failing to ensure that the plaintiff understood the changes to the
settlement agreement.

50.    The plaintiff suffered financial losses as a result of the defendant's breach of contract.

### REQUEST FOR RELIEF

1.    That this Court, under Count VI, enter judgment in favor of the plaintiff
against the defendant for breach of contract.

2.    For such other relief as this Court deems appropriate.

### COUNT VII
(Dennis Dimon v. Latti & Anderson LLP -
Breach of Fiduciary Duty)

51.    Paragraphs 1-50 are realleged and incorporated by reference.

8

000008

52.     A lawyer has a duty to act in the best interest of his client and not to act in any way

        adverse or contrary to the interests of the client.

53.     The plaintiff relied upon the defendant for advice, counsel, and information in order

        to make an informed decision prior to entering into any settlement agreement

        whereby the plaintiff would forfeit his rights to future compensation for his injuries.

54.     Due to the defendant's breach, the plaintiff has suffered financial loss.

### REQUEST FOR RELIEF

    1.    That this Court, under Count VII, enter judgment in favor of the plaintiff

          against the defendant for breach of fiduciary duty

    2.    For such other relief as this Court deems appropriate.

### COUNT VIII
(Dennis Dimon v. Latti & Anderson LLP –
Negligence)

55.     Paragraphs 1-54 are realleged and incorporated by reference.

56.     A lawyer has a duty to act with reasonable care and to use the skill of a reasonably

        competent lawyer in representing a client.

57.   ' The defendant failed to act reasonably in not informing the plaintiff and ensuring that

        the plaintiff understood the changes to the settlement agreement.

58.     Due to the actions of the defendant, the plaintiff suffered financial loss,

### REQUEST FOR RELIEF

    1.    That this Court, under Count VII, enter judgment in favor of the plaintiff.

    2.    For such other relief as this Court deems appropriate.

9

000009

## COUNT IX
### (Dennis Dimon v. Latti & Anderson LLP -
### Breach of Contract)

59.    Paragraphs 1-58 are realleged and incorporated by reference.

60.    The plaintiff and the defendant entered into a contract for whereby the defendant was

       to provide legal representation for injuries suffered by the plaintiff in a fishing

       accident.

61.    The defendant breached this contract by failing to provide competent legal

       representation, failing to inform the plaintiff of changes to the plaintiff's settlement

       agreement, and failing to ensure that the plaintiff understood the changes to the

       settlement agreement.

62.    The plaintiff suffered financial losses as a result of the defendant's breach of contract.

## REQUEST FOR RELIEF

1.     That this Court, under Count IX, enter judgment in favor of the plaintiff

       against the defendant for breach of contract.

2.     For such other relief as this Court deems appropriate.

## COUNT X
### (Dennis Dimon v. Metropolitan Life Insurance Company -
### Breach of Contract)

63.    Paragraphs 1-62 are realleged and incorporated by reference.

64.    The plaintiff and the defendant entered into a contract whereby the defendant was to

       provide a lifetime annuity guaranteed for twenty (20) years in exchange for the

       plaintiff releasing all claims for injuries suffered by the plaintiff in a fishing accident.

65.    The defendant breached this contract by altering the agreement after the contract was

10

000010

signed and approved by the court and for failing to perform the contract.

66.    The plaintiff suffered financial losses as a result of the defendant's breach of contract.

### REQUEST FOR RELIEF

1.    That this Court, under Count X, enter judgment in favor of the plaintiff

      against the defendant for breach of contract.

2.    For such other relief as this Court deems appropriate.

### COUNT XI
(Dennis Dimon v. Metropolitan Life Insurance Company –
Negligent Misrepresentation)

67.    Paragraphs 1-66 are realleged and incorporated by reference.

68.    The plaintiff and the defendant entered into a contract whereby the defendant was to

       provide a lifetime annuity guaranteed for twenty (20) years in exchange for the

       plaintiff releasing all claims for injuries suffered by the plaintiff in a fishing accident.

69.    The defendant negligently misrepresented the terms of the contract, stating that the

       contract was for life, guaranteed for 20 years.

70.    The plaintiff relied on the representation of counsel and this defendant as manifested

       in the original contract approved by the court and suffered financial losses as a result

       of the defendant's negligent misrepresentation in altering the contract.

### REQUEST FOR RELIEF

1.    That this Court, under Count XI, enter judgment in favor of the plaintiff

      against the defendant.

2.    For such other relief as this Court deems appropriate.

11

000011

## COUNT XII
### (Dennis Dimon v. Kemper Insurance Company -
### Breach of Contract)

71.     Paragraphs 1-70 are realleged and incorporated by reference.

72.     The plaintiff and the defendant entered into a contract whereby the defendant was to

provide a lifetime annuity guaranteed for twenty (20) years in exchange for the

plaintiff releasing all claims for injuries suffered by the plaintiff in a fishing accident.

73.     The defendant breached this contract by altering the agreement after the contract was

signed and approved by the court and for failing to perform the contract.

74.     The plaintiff suffered financial losses as a result of the defendant's breach of contract.

### REQUEST FOR RELIEF

1.      That this Court, under Count XII, enter judgment in favor of the plaintiff

against the defendant for breach of contract.

2.      For such other relief as this Court deems appropriate.

## COUNT XIII
### (Dennis Dimon v. Kemper Insurance Company -
### Negligent Misrepresentation)

75.     Paragraphs 1-74 are realleged and incorporated by reference.

76.     The plaintiff and the defendant entered into a contract whereby the defendant was to

provide a lifetime annuity guaranteed for twenty (20) years in exchange for the

plaintiff releasing all claims for injuries suffered by the plaintiff in a fishing accident.

77.     The defendant negligently misrepresented the terms of the contract, stating that the

contract was for life, guaranteed for 20 years.

78.     The plaintiff relied on the representation of counsel and this defendant as manifested

12

000012

in the original contract approved by the court and suffered financial losses as a result

of the defendant's negligent misrepresentation in altering the contract.

### REQUEST FOR RELIEF

1.      That this Court, under Count XIII, enter judgment in favor of the plaintiff

        against the defendant.

2.      For such other relief as this Court deems appropriate.

### COUNT XIV
(Dennis Dimon v. Morgan Stanley -
Breach of Contract)

79.     Paragraphs 1-78 are realleged and incorporated by reference.

80.     The plaintiff and the defendant entered into a contract whereby the defendant was to

        provide a lifetime annuity guaranteed for twenty (20) years in exchange for the

        plaintiff releasing all claims for injuries suffered by the plaintiff in a fishing accident.

81.     The defendant breached this contract by altering the agreement after the contract was

        signed and approved by the court and for failing to perform the contract.

82.     The plaintiff suffered financial losses as a result of the defendant's breach of contract.

### REQUEST FOR RELIEF

1.      That this Court, under Count XIV, enter judgment in favor of the plaintiff

        against the defendant for breach of contract.

2.      For such other relief as this Court deems appropriate.

13

000013

## COUNT XV
(Dennis Dinton v. Morgan Stanley -
Breach of Fiduciary Duty)

83. Paragraphs 1-81 are realleged and incorporated by reference.

84. A broker has a duty to act in the best interest of his client and not to act in any way adverse or contrary to the interests of the client.

85. The plaintiff relied upon the defendant for advice, counsel, and information in order to make an informed decision prior to entering into any settlement agreement whereby the plaintiff would forfeit his rights to future compensation for his injuries.

86. Due to the defendant's breach, the plaintiff has suffered financial loss.

### REQUEST FOR RELIEF

1. That this Court, under Count XV, enter judgment in favor of the plaintiff against the defendant for breach of fiduciary duty

2. For such other relief as this Court deems appropriate.

PLAINTIFF DEMANDS TRIAL BY JURY ON ALL COUNTS.

Respectfully submitted
By his attorney

DATED: MAY 20, 2005

David B. Kaplan, Esq.
THE KAPLAN/BOND GROUP
88 Black Falcon Avenue
Suite 301
Boston. MA 02210
(617) 261-0080
BBO #258540

14

000014

2

**Black Ink**  **83A08153**

ANNUITY
APPLICATION
1008

## CHARTER SECURITY LIFE INSURANCE COMPANY, NEW YORK, 720 FIFTH AVENUE, NEW YORK, N.Y. 10019

| | |
|---|---|
| Name of Annuitant (please print)   ☒ Male   ☐ Female | 9. Type of Contract Single Premium Deferred Annuity  y |
| Dennis J. Dixon | 10. Single Premium Amount  $ 175,000. |
| Date and Place of Birth | 11. Maturity Age   ☐ 65  ☐ 70½  ☐ Other: Immediate |
| 12/9/59  So. Kingstown, RI | 6/15/83 |
| Residence (No., Street, City, State and Zip Code) | 12. Will this annuity replace or change any existing insurance or annuity contract? ☐ Yes  ☒ No |
| Laurel Lane, West Kingston, RI  02892 | If yes, give name of company, policy number, and plan of life insurance or annuity.) |
| Business Address (include Name of Employer) | |
| | |
| Mail Notices to ☐ Residence   ☐ Business   ☐ Owner | |
| Social Security No.   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 | |
| Owner (if other than Proposed Annuitant) | 13. Is this contribution for a tax qualified plan? ☐ Yes  ☒ No |
| Name:  American Motorists Insurance Co. | If so, contract will be issued with a limitation on transferability to conform with IRS regulations. (Check appropriate box for type of qualified plan.) |
| Relationship: | ☐ I.R.A. Rollover       ☐ Corporate pension |
| Address: | ☐ T.S.A. Exchange        or profit sharing plan |
| Social Security Tax Payer I.D, No. 36-0727430 | ☐ H.R. 10 Exchange    ☐ Terminal Funding |
| ☐ Contingent Owner | ☐ H.R. 10             ☐ Other |
| | 14. Special Requests  Immediate Annuity |
| | 20 yr Certain . 3% increases |
| Beneficiary and Relationship | $175,000 = 1450.45 per month |
| Primary:   Katerine I. Dixon. | first yr ??? |
| Contingent: Jessica I. Dixon. - Daughter | 15. Amendments and Corrections (For Home Office use only) |
| Rebecca Lee Dixon. - Daughter | Quote Number  SJ113 |

undersigned represent(s), to the best of his (her) knowledge belief, that the foregoing statements and answers are complete, true, and correctly recorded and agree(s) to be bound by the statements and answers made or to be made in this application. The undersigned further expressly agree(s) as follows: the application and any policy issued in consequence icof shall constitute the entire contract. No agent is authorized to make or modify contracts, to waive any of the company's rights or requirements or to bind the Company by ing or receiving any promise, representation or informa-

tion, unless the same be in writing, submitted to the Company, and made a part of such policy.
2. Acceptance of any contract(s) issued on the basis of the application shall constitute a ratification and acceptance of any change, correction, addition or amendment noted by the Company in the "Amendments and Corrections" section above, except that in those jurisdictions where it is required any change in amount or benefits shall require a written consent by the Proposed Annuitant and by the Applicant if other than the Proposed Annuitant.

I at _Providence, RI_ this _4th_ day of _May_ 19_83_

_[signature]_   _621-U_
Agent Signature (1)       Code

_E. Snider_
Please Print Name of Agent (1)

Agent Signature (2)            Code

Please Print Name of Agent (2)

**Signature of Annuitant** _Dennis J. Dixon_

**Applicant if other than Annuitant** _American M....  ...  ..._

By_____
        Signature and Title

_Dean W. Mac Reynold_
Please Print Name of General Agency

0000160

3

# SUPPLEMENTARY AGREEMENT

(No. SG1126.)

by _____ Charter Security Life Insurance Company (New York) _____ on the life of ___ Dennis Dimon _____
the undersigned hereby requests that the aggregate net proceeds payable under said policy(s) as of the termination date be paid
to the payees designated in, and in the rates and manner provided in, the following Table or Tables and in the General Provisions
of this Agreement.

The undersigned surrenders said policy(s) to the Insurance Company and, concurrently herewith, revokes any beneficiary designa-
tion and any election of settlement hereinafter made under the said policy(s).

| PAYEES | MANNER OF PAYMENT | PRIVILEGES |
|---|---|---|
| **TABLE I** | | |
| **SECTION ONE - PRIMARY PAYEE** | | |
| Dennis Dimon<br>Laurel Lane<br>West Kingston, RI 02892 | Monthly payments in the amount of $1,450.45, increasing 3% annually, for a period of 240 months only. | |
| **SECTION TWO-CONTINGENT PAYEE** | | |
| Katherine I. Dimon, wife | In the same manner as the Primary Payee, for the specified period. | |

000020

5



Lumbermens Mutual Casualty Company • American Motorists Insurance Company
American Manufacturers Mutual Insurance Company • American Protection Insurance Company

Long Grove, IL 60049 · 312|540-2000

August 12, 1983

Mr. Robert A. Foley
Dean Witter Reynolds, Inc.
One Boston Place
Boston, Massachusetts   02108

Dear Mr. Foley:

DENNIS DIMON
CHARTER SECURITY POLICY NO: 83 A 08153
OUR FILE NO: 399 LM 106125-Z

I received the replacement policy issued by Charter
Security Life Insurance Company (New York) changing
the terms of the annuity from 240 months certain and
life thereafter to 240 months certain only.

I am advised by Mr. Hughes of Lattie Associates that your
quotation was to provide an annuity which would pay
$1,450.45 per month for the first year increasing annually
at a rate of 3% compounded annually for 240 months certain
and life thereafter for a single premium of $175,000.
This was the benefit to be provided under the terms of a
general release and settlement agreement approved by
Judge Pettine of the United States District Court for the
District of Rhode Island.

The agreed upon premium was paid and a policy issued which
is now in the files of the contract owner, American Motorists
Insurance Company, providing benefits required by the release,
settlement agreement and court order.  I consider the original
annuity contract valid and enforceable and will retain it
in our files.



RECEIVED
✳ AUG 17 1983 ✳
B. BOEHM

000025

Mr. Robert A. Foley.
August 12, 1983
-2-

I intended to return the replacement contract issued by
Barbara Boehm of Charter Security, but it was lost with
my briefcase on August 11, 1983.

Very truly yours,

AMERICAN MOTORISTS INSURANCE COMPANY

John L. Noe
Home Office Claim

JLN:bw

cc: Ms. Barbara Boehm
    Vice President
    Charter Security Life Insurance Company
    (New York)
    720 Fifth Avenue
    New York City, New York  10019

    Mr. Roger Hughes
    Lattie Associates, Attorneys
    30-31 Union Wharf
    Boston, MA  02109

000026

6





Charter Security Life Insurance Company (New York)
720 Fifth Avenue
New York, New York 17019
Telephone: 212-397-2350

September 26, 1983

Mr. John L. Noe
Home Office Claim
American Motorists
Insurance Company
Long Grove, Illinois 60049

    Re:  Dennis Dimon – Policy No. 83 A 08153
        Your File No. 399 LM 106125-2

Dear Mr. Noe:

    I am in receipt of your letter to Barbara Boehm, Vice
President of Charter Security Life Insurance Company (New York
("CSL(NY)"), regarding the annuity policy (Policy No. 83 A 081 3)
issued by CSL(NY) to Dennis Dimon.

    According to information you received from Mr. Hughes of
Lattie Associates, Robert Foley of Dean Witter Reynolds, Inc.,
allegedly offered to provide Mr. Dimon with a CSL(NY) annuity
which would pay $1,450.45 per month for the first year increas ng
annually at a rate of 3% compounded annually for 240 months
certain and life thereafter based on a single premium of
$175,000.00.

    Contrary to the information you received from Mr. Hughes,
there is nothing to indicate that anything other than a single
premium immediate annuity with a 20 year (i.e., 240 months)
certain period was applied for. As you can see from the attac ed
copy of Mr. Dimon's application, which American Motorists
Insurance Company signed as applicant, a 20 year certain polic
was applied for.  I have also attached for your reference, a c py
of a quotation sheet from CSL(NY) to Mr. Foley which clearly
shows that CSL(NY)'s quote was based on the issuance of a cert in
period annuity without a life option.  As previously explained by
Ms. Boehm in her letter to Mr. Kurt Snyder of Dean Witter
Reynolds dated July 14, 1983 (see enclosed copy), the option
indicated on the Supplementary Contract originally sent to Dea
Witter Reynolds on June 17, 1983 for delivery to your office w s
incorrectly typed as a 240 month certain and life thereafter
annuity instead of 240 months only.  Again, on behalf of CSL(N ),
I apologize for this oversight.

000027

Mr. John L. Noe
Page 2
September 26, 1983

Based on the foregoing, CSL(NY) guarantees to continue to
pay Mr. Dimon under the terms of his policy a $1,450.45 monthl·
annuity during the first policy year, which will increase
annually at a rate of 3% compounded annually for 240 months
certain. No·payments will be made beyond the expiration of th:
240 month period. Accordingly, the original Supplementary
Contract mailed to Robert Foley and in your possession is null
and void. I would appreciate your returning that contract to:

> Barbara Boehm
> Vice President
> Policyowner Service Department
> Charter Security Life
> Insurance Company (New York)
> 720 Fifth Avenue
> New York, New York 10019

By copy of this letter, I am instructing Ms. Boehm to sen l
to your attention a correct copy of the Supplementary Contract
for Dennis Dimon which you stated was lost with your briefcase on
August 11, 1983.

If I can be of any further assistance in this matter, ple:se
do not hesitate to contact me at the above address.

Very truly yours,

Robert Liguori
Counsel

RL/spf
Enclosures

cc:  Ms. Barbara Boehm

Mr. Robert A. Foley
Dean Witter Reynolds, Inc.
One Boston Place
Boston, Massachusetts 02108

Mr. Roger Hughes
Lattie Associates, Attorneys
30-31 Union Wharf
Boston, MA 02109

000026

7



**Lumbermens Mutual Casualty Company • American Motorists Insurance Company**
**American Manufacturers Mutual Insurance Company • American Protection Insurance Company**

Long Grove, IL 60049 - 312|540-2000

October 10, 1983

Mr. Robert Liguori, Counsel
Charter Security Life Insurance
Company (New York)
720 Fifth Avenue
New York, New York  10019

Dear Mr. Liguori:

DENNIS DIMON
CHARTER SECURITY POLICY: 83A08153
OUR FILE NO: 399 LM 106125-Z

In reply to your September 26, 1983, Sections 14 and 15
of the application that I signed were blank. The entries
now appearing were filled in after I returned the signed
application.

The original annuity policy received was for a term of
240 months certain and life thereafter as ordered and
agreed upon between Mr. Hughes and Mr. Foley. Your agent,
Mr. Foley further confirmed this to me by telephone in
April, 1983.  May I suggest you contact him to verify
this?

I intend to retain the original policy in our files and
consider it to be valid and enforceable.

Very truly yours,

AMERICAN MOTORISTS INSURANCE COMPANY

John L. Noe
Home Office Claim

JLN:ml

cc: Mr. Robert A. Foley          cc: Ms. Barbara Boehm
    Dean Witter Reynolds, Inc.       Vice President
    One Boston Place               → Policyowner Service Dept.
    Boston, MA  02108                Charter Security Life
                                     Insurance Co. (New York)
    Mr. Roger Hughes                 720 Fifth Avenue
    Latti Assoc., Attorneys          New York, NY  10019
    30-31 Union Wharf
    Boston, MA  02109

000029

9





**Lumbermens Mutual Casualty Company • American Motorists Insurance Company**
**American Manufacturers Mutual Insurance Company • American Protection Insurance Company**

Long Grove, Il. 60049 · 312[540-2000

October 12, 1983

Ms. Barbara Boehm, Vice President
Policyowner Service Department
Charter Security Life Insurance Company (New York)
720 Fifth Avenue
New York, New York  10019

Dear Ms. Boehm:

RE:  DENNIS DIMON
     CONTRACT NO. 83408153
     OUR FILE NO. 399 LM 156125 Z

In reponse to your October 14, 1983 I reject and return
herewith the Supplementary Agreement and General Provisions
attached thereto. The original annuity policy will be re-
tained in the files of American Motorists Insurance
Company and considered valid and enforceable.

Very truly yours,

AMERICAN MOTORISTS INSURANCE COMPANY

John L. Noe
Home Office Claims

JLN/lz

cc:  Mr. Roger Hughes
     Latti Associates, Attorneys
     30-31 Union Wharf
     Boston, MA  02109

cc:  Mr. Robert A. Foley
     Dean Witter Reynolds, Inc.
     One Boston Place
     Boston, MA  02108

000024

11

September 24 1998


DENNIS DIXON
P O BOX 56
WEST KINGSTON RI 02892 0056

RE: CONTRACT # SCRV1128

Dear Mr. Dixon,

We received a call from Katheryn Dixon requesting information on the above contract. This contract was issued as a structured settlement on 5/5/1983. The owner of this contract is the American Motor Insurance Company. You receive monthly payments until the final payment on 5/5/2002. The monthly payments began on 6/5/1983 and increase 3% annually. This is programmed into the computer to increase 3% annually. I do not have specific payment amounts. To figure payments for the remaining years, increase the payment 3% each June 5.

If you have any questions, please call our Customer Service Center at 1-800-635-7775.

Sincerely,

*Teresa Thorp*

Teresa Thorp
Annuity Benefits

000033

12

[[

| | | Attn : | |
|---|---|---|---|
| Clerk ID Prefix : | R81 | From : | TULSA TELESERVICES |
| Clerk Name : | Green, Laura | Subject : | CALL TO 1-800-MET-5000 |
| Wip Case Number : | 000000000 | | ANNUITY PAYOUTS |
| Creation Date : | 06/05/2003 01:17:54 PM | | |

POLICY   SUFF  REF      INSURED NAME          DATE OF CALL: 06-05-03
000SCIW11 26    Y    DENNIS       DIMON

CALLER NAME....: KATHERINE       DIMON
CALLER STREET..: PO BOX 56
CALLER CITY....: WEST KINGSTON        STATE: RI ZIPCODE: 02892 0056
CALLER PHONE...: 401-782-4613  ALTERNATE PHONE:        ALT EXT:
RELATIONSHIP...: SPOUSE        DO/BR: L03    CALLER SEX: F

NOTES: ANNUITY PAYOUTS: PLEASE SEND A DUPLICATE CONTRACT TO THE OWNER
AT THE ABOVE ADDRESS.

Not Assigned                          Open - Sent/Unassigned

Rush ? ○ Yes ● No     Sent To: IND_ANNUITY PAYOUTS TULSA,

Archive Date : 06/12/2003

Comments :

13

June 9, 2003

DENNIS DIMON
PO BOX 58
WEST KINGSTON RI 02892 0058

RE: SCIW1126

Dear Mr. Dimon,

This letter is in response to a phone call we received from Katherine Dimon. Since your annuity contract has expired, we are unable to provide you with a duplicate contract. However, the terms of your annuity are described below.

The annuity contract was issued on May 5, 1983 under the "Certain 20 Year" option. American Motorist Insurance Company was considered to be the owner of the annuity, however, you were the annuitant and payee. This contract provided you with a monthly income due on June 5th of each year payable for a total of 20 years (240 monthly payments). The payment amount increased by 3% each year.

The first payment was on June 5, 1983. The final payment was on May 5, 2003.

If you have any questions, please call our customer service center at 1-800-635-7775.

Sincerely,

*Sandy Franklin*

Sandy Franklin
Annuity Payout Specialist III
Annuity Administration Operations

00003.4

14

I Dennis J Dimon would Like
To have a copy of my Annuity
Contract. I was Told on the
Phone That iP I wrote This
Letter To you That you will
Sent me A "Duplicate Contract
Sent ASAP "ThANK you!"

Dennis J Dimon

RE SCIW1126

06/19/03

15

99 Fortin Road
Kingston, RI 02881
Phone: (401) 788.8277
Fax: (401) 788.8278

**FAX**

# *i*copy

JUN 12 2003

To: CAROlyNN LAttie  From: Dennis Dimon

Fax: 1-617- 523 -7394   Pages:

Phone:                      Date: 6/12/03

Re:                         CC:

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

* Comments:

Metropolitan Life Insurance Company
Annuity Administration Operations
12302 East 51st Street, PO Box 22053, Tulsa, OK 74121-2053

**MetLife**®

*ATT CAROLYN LATTIE*

June 9, 2003


DENNIS DIMON
PO BOX 56
WEST KINGSTON  RI  02892 0056


RE: SCIW1126


Dear Mr. Dimon,

This letter is in response to a phone call we received from Katherine Dimon. Since your annuity contract has expired, we are unable to provide you with a duplicate contract. However, the terms of your annuity are described below.

The annuity contract was issued on May 5, 1983 under the "Certain 20 Year" option. American Motorist Insurance Company was considered to be the owner of the annuity, however, you were the annuitant and payee. This contract provided you with a monthly income due on June 5th of each year payable for a total of 20 years (240 monthly payments). The payment amount increased by 3% each year.

The first payment was on June 5, 1983. The final payment was on May 5, 2003.

If you have any questions, please call our customer service center at 1-800-635-7775.



Sincerely,

*Sandy Franklin*

Sandy Franklin
Annuity Payout Specialist III
Annuity Administration Operations

HTT:
CAROLYNN LATTE.

*DEAN WITTER REYNOLDS INC.*
*One Boston Place, Boston, MA 02108   Telephone (617) 722-5500*

April 8, 1983

PROPOSAL BY

CHARTER SECURITY LIFE INSURANCE COMPANY

OF NEW JERSEY

FOR A

LIFE ANNUITY 20 YEAR CERTAIN

UNDER A STRUCTURED ANNUITY SETTLEMENT

OF $1,450.45 PER MONTH FOR THE FIRST

YEAR AND IT WOULD INCREASE 3%

PER YEAR AS FOLLOWS:

```
2ND  YEAR . . . . . . . . . . . . . . . . . . . . . . . . .$1,493.96
3RD  YEAR . . . . . . . . . . . . . . . . . . . . . . . . .$1,538.78
4TH  YEAR . . . . . . . . . . . . . . . . . . . . . . . . .$1,584.95 x
5TH  YEAR . . . . . . . . . . . . . . . . . . . . . . . . .$1,632.49
6TH  YEAR . . . . . . . . . . . . . . . . . . . . . . . . .$1,681.47
7TH  YEAR . . . . . . . . . . . . . . . . . . . . . . . . .$1,731.91
8TH  YEAR . . . . . . . . . . . . . . . . . . . . . . . . .$1,783.87
9TH  YEAR . . . . . . . . . . . . . . . . . . . . . . . . .$1,837.38
10TH YEAR . . . . . . . . . . . . . . . . . . . . . . . . .$1,892.51 - 180 518.96
20TH YEAR . . . . . . . . . . . . . . . . . . . . . . . . .$2,543.37 - 417   567.50
30TH YEAR . . . . . . . . . . . . . . . . . . . . . . . . .$3,418.08 - 808 947.05
40TH YEAR . . . . . . . . . . . . . . . . . . . . . . . . .$4,593.61 - 1,443 867.57
50TH YEAR . . . . . . . . . . . . . . . . . . . . . . . . .$6,173.43 - 1,944,151.67
```

A. M. BEST RATING

06-12-03

DENNIS J. DIMON
KATHERINE I. DIMON

151 Holly Ridge RD.
Po Box 56
WEST Kingston RI.
02892

401-782-4613 Home Phone
401-207-9197 Cell Phone

Charter Security Life Insurance Co.

we had the understand that any
Wife was To Collect this check up to
20 year: and if anything happen To me
And I was To Collect it for 50 years

THANK you

Dennis Dimon
Walter Jane Dimon

17

# THE KAPLAN / BOND GROUP

David B. Kaplan
Thomas M. Bond
Andrew S. Kaplan
Tracey N. Kaplan

*Attorneys at Law and Proctors in Admiralty*
*Boston Fish Pier, West Building, Suite 304*
*Boston, Massachusetts 02210*
*(617) 261-0080   FAX (617) 261-1558*

†  ²Counsel
Williamson & Melendez

September 13, 2004

Metropolitan Life Insurance Company
P.O. Box 22053
Tulsa, OK 74121-2053

Dear Sir/Madam,

Please be advised that I have been retained by Mr. Dennis Dimon, Holly Ridge Road, South Kingston, R.I., who entered into a Structured Settlement Contract with your company (see EXHIBIT #2) in 1983.

From my review of the document (a copy of which I have enclosed), it seems that the contract is for "life" and that there was a 20 year guarantee. Mr. Dimon has stated that he has not received his payments since 2/5/03 and that he has been unable to speak to anyone employed by you to determine present status.

Accordingly, I would appreciate your immediate response including a copy of all documents filed in this matter.

Thank you in anticipation of your cooperation.

Very truly yours,

*David B. Kaplan*

DAVID B. KAPLAN

DBK/cms

Enclosure

cc:  : Dennis Dimon
     : Frederick W. Benson

18

# THE KAPLAN / BOND GROUP

| 5° | 6o | . 7° |
|----|----|------|

David B. Kaplan          Attorneys at Law and Proctors in Admiralty          (61) 1261-0080
Thomas M. Bond               82 Black Falcon Avenue, Suite 301          Fax (61) 1261-1558
Tracey N. Kaplan               Boston, Massachusetts 02210

September 28, 2004

Metropolitan Life Insurance Company
P.O. Box 22053
Tulsa, OK 74121-2053

Dear Sir/Madam:

RE:    Mr. Dennis Dimon

Dear Sir/Madam:

On September 13, 2004 I communicated with you regarding the above-referenced matter (copy
enclosed), and you have not responded.

I shall diary this matter for November 10, 2004 at which time if I have not received any respon e
as requested I shall file suit to enforce the obligation herein.

Very truly yours,

David B. Kaplan /rcl

DAVID B. KAPLAN

DBK/rcl

Enclosure

cc:     Dennis Dimon
        Frederick W. Benson

000040

20

November 16, 2004

To Whom It May Concern:—

I, Dennis J. Dimon, hereby authorize David B. Keylen, Esq
to act for me in all matters relating to my structured settlement.

NAME Dennis Dimon

ADDRESS
151 Holly Ridge RD
W. Kingston, RI
02192

Witness
151 Holly Ridge RD
W. Kingston, RI 02892
ADDRESS

Gary A. Orr
WITNESS

86 Maine Line Way
Wast Kingston RI
02892
ADDRESS

000046

UNITES STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11073 WGY

DENNIS DIMON,                                )
                    Plaintiff               )
                                             )
vs.                                          )
                                             )
METROPOLITAN LIFE                            )
INSURANCE COMPANY, KEMPER                    )
INSURANCE COMPANY,                           )
MORGAN STANLEY DW, INC., and                 )
MICHAEL B. LATTI, LATTI                      )
ASSOCIATES, LATTI & ANDERSON                 )
LLP,                                         )
                    Defendants               )

## PLAINTIFF'S EXPERT WITNESS DISCLOSURES

Pursuant to Fed.R.Civ.P. 26(a)(2), the Plaintiff discloses the following expert witness who

may be called upon to testify at trial on his behalf:

1.      Hans R. Hailey
        Law Offices of Hans R. Hailey
        225 Friend Street, 5th Floor
        Boston, MA 02114

With respect to the proposed expert testimony of Hans R. Hailey, please find enclosed his

signed report, Curriculum Vitae and a fee schedule. Mr. Hailey has not testified as an expert at

trial or by deposition within the past four years.

Respectfully submitted,
For the plaintiff,
By his attorneys,


DAVID B. KAPLAN, BBO #258540
BRIAN KEANE, BBO #656717
**THE KAPLAN/BOND GROUP**
88 Black Falcon Avenue, Suite 301
Boston, Massachusetts 02210
(617) 261-0080

Dated: November 22, 2006

**CERTIFICATE OF SERVICE**
I hereby certify that a true copy of the above document
was served upon the attorney of record for each party
(by mail (by hand) on _____

# Law Offices of Hans R. Hailey

Attorneys at Law
225 Friend Street, 5th Floor
Boston, Massachusetts 02114

hhailey@erols.com                (617) 723-4010  Fax (617) 720-6012                www.haileylaw.com

Hans R. Hailey
Gene R. Charny

November 10, 2006

Brian Keane, Esquire
The Kaplan/Bond Group
85 Black Falcon Avenue, Suite 301
Boston, Massachusetts 02210

RE:     *Dimon v. Michael Latti, Latti Associates, Latti & Anderson LLP, Metropolitan Life*
        *Ins. Co., Kemper Ins. Co. And Morgan Stanley, DW, Inc.*
        U.S.D.C. Civil Action No. 05-11073-REK

Dear Mr. Keane:

      Thank you for inviting me to serve as an expert witness. More specifically, you
would like me to address the issue of whether the representation of Dennis Dimon by
Latti Associates was negligent because of its failure to insure that Mr. Dimon's annuity
was limited to twenty years and did not continue for the rest of his life. My short answer
is that Latti Associates was indeed negligent.

      Let me start by listing the materials I reviewed, all of which you provided.

MATERIALS CONSIDERED:

1.      Charter Security Life Insurance Company annuity application;
2.      Supplementary Agreement;
3.      Letter from Barbara Boehm to Kurt Snyder dated July 14, 1983;
4.      Letter from John Noe to Robert Foley dated August 12, 1983;
5.      Letter from Robert Liguori to John Noe dated September 26, 1983;
6.      Letter from John Noe to Robert Liguorl dated October 10, 1983;
7.      Letter from John Noe to Barabara Boehm dated October 12, 1983;
8.      Letter from Barbara Boehm to John Noe dated October 14, 1983;

Brian Keane, Esquire
November 10, 2006
Page Two

9.    A settlement sheet from Latti and Associates date of settlement on April 19, 1983;
10.   A transcript of the Guardian Ad Litem hearing dated May 3. 1983;
11.   A proposal by Charter Security Life Insurance Company of New Jersey dated
      April 8, 1983;
12.   The docket from the U.S District Court for the District of Rhode Island for Docket
      No. 81-0063;
13.   Letter from David B. Kaplan to Roger E. Hughes, Esq. Dated December 2, 2005;
14.   Letter from Sandra Sue McQuay to Roger E. Hughes Jr., Esq. Dated April 13,
      2006;
15.   The Subpoena in a civil case from the U.S. District Court, case number: 05-
      11073;
16.   Deposition of Roger E. Hughes, Jr. Dated May 10, 2006; and
17.   Deposition of Michael B. Latti dated July 25, 2006.

FACTS:

        The facts upon which my opinions are based begin with Mr. Dimon's loss of an
eye. Latti Associates, as it was known in 1983, represented him in a claim against the
Jenny C., Inc. Latti Associates concentrated in representing plaintiffs in personal injury
claims. The claim was handled pursuant to a written contingent fee agreement. Suit was
filed in the U.S. District for the District of Rhode Island and went to trial in February
1983.

        Joseph Flannery, a limited partner in Latti Associates, represented Dimon at trial
and secured a judgment in excess of $700,000. As a result of post trial motions filed by
the defendant, a settlement was reached in April, 1983. Mr. Flannery had by that time
left the firm and Roger Hughes, also a partner in the firm, undertook Mr. Dimon's
representation.

        A release was signed and Judge Pettine held an initial hearing to approve the
settlement. Being uneasy about the ability of Mr. Dimon to appreciate the settlement
fully and to agree to it voluntarily, he asked attorney Leonard Decof to serve as guardian
ad litem. In May 1983, a hearing was held and Mr. Decof report to Judge Pettine the
details of the settlement and that Mr. Dimon fully comprehended the settlement and was
happy to accept it.

        The settlement was for an immediate payment of $250,000 and monthly payments

Brian Keane, Esquire
November 10, 2006
Page Three

for the rest of his life, with a guaranteed minimum of 20 years of payments. The payments were to be in the initial amount of $1,450 per month and were to increase by three per cent each year. A "Proposal By Charter Security Life Insurance Company of New Jersey" indicated the monthly payments would increase to $6,173.43 by the 50th year. Mr. Dimon was 23 years old at the time of this settlement and had a life expectancy of 49.7 years. The settlement had a total value of $425,000, which was almost as much as the insurance coverage available.

Based on this settlement, Latti Associates received a fee of $141,485.47, plus reimbursement of the expenses it advanced. About $200 was shaved off the fee to accommodate Mr. Dimon's hope to recover $100,000 of the $250,000 due immediately.

American Motorists Insurance Company, part of the Kemper Group, insured the defendant. It purchased the annuity from Charter Security Life Insurance Company through Robert Foley at Dean Witter Reynolds, Inc. American Motorists was the owner of the policy.

An annuity contract was sent to Mr. Foley in June, 1983. As provided by the settlement, the annuity was to pay Mr. Dimon monthly for the rest of his life and guaranteed payments for at least twenty years.

A month later, the fun began. Barbara Boehm, of Charter Security, wrote to Kurt Snyder of Dean Witter. In a curt letter, she said simply that a "clerical error" had been made in issuing the annuity for life, that it should have been limited to twenty years. She sent a new annuity contract and asked that the earlier contract be returned.

That triggered letters between Charter Security and American Motorists. Roger Hughes was sent a copy of each letter; those copies were mailed to the proper address. American Motorists took the position that the initial annuity was valid and refused to return that policy as requested. Unfortunately, Charter Security took a different position and terminated payments after twenty years.

There was no further correspondence after last of these letters, which is dated October 14, 1983.

Missing in the correspondence and the depositions is any reference to any action taken by Latti Associates. They never communicated, by phone or by letter, any

Brian Keane, Esquire
November 10, 2006
Page Four

insistence on compliance with the terms of the settlement. They apparently never
communicated with their client that there was an issue with the annuity.

Neither Mr. Hughes nor Mr. Latti have any memory of taking any action to
enforce the terms of the settlement. According to Mr. Hughes, even though his
appearance was never withdrawn, he wouldn't have done anything in these
circumstances; he accepted it as a dispute between two insurance companies. He would
have intervened only if the insurance company didn't pay what it was obligated to pay.

Mr. Latti had very much the same mind set. However, he believed that he was
powerless to take any action because, in his opinion, Massachusetts does not accept the
doctrine of anticipatory breach, meaning that no action could be maintained before the
time for performance had passed. Accordingly, he had no duty to take any action to
enforce the contract (the settlement).

OPINIONS:

By failing to take any action to enforce the terms of the settlement, Latti
Associates[1] breached it's duty to its client, served its client in a manner below the
standard of care of the average qualified personal injury attorney and may have violated
the present version of the Rules of Professional Conduct.

Having undertaken to represent Dimon and for so long as Latti Associates did
represent him, it was obligated to represent him zealously and not neglect his claim.
Both Mr. Hughes and Mr. Latti acknowledged in their depositions that it was their job to
obtain as much money for their client as possible.

Having negotiated a settlement, the duty of Latti Associates was to ensure that the
settlement terms were fulfilled. More specifically, by the settlement Mr. Dimon released
his claims in exchange for a lifetime annuity (along with a present cash payment).
Indeed, Latti Associates took its full fee based on the settlement. When the controversy

---

[1] By "Latti Associates," I mean Mr. Hughes and Mr. Latti, the two partners of the
firm in 1983. I express no opinion about whether the present day version of that firm is
responsible for the acts of the prior partners. Of course, however, as partners, Mr. Latti
and Mr. Hughes are responsible for each other's acts.

Brian Keane, Esquire
November 10, 2006
Page Five

arose over whether the annuity would be limited to twenty years, Latti Associates had the
duty to take those steps reasonably necessary to ensure that the annuity would continue
for life. By accepting the controversy as one simply between two insurance companies
and having failed to do anything, Latti Associates breached both its legal and contractual
duty to its client. The result was that the annuity payments ended after twenty years.

The duty to its client was also breached by having failed to inform Mr. Dimon of
the dispute. An attorney has a duty to keep his clients informed of important
developments in the client's case. The dispute being unknown to Mr. Dimon, he lost his
opportunity to insist the dispute be resolved (or hire new counsel to do so) and thereby
avoid the interruption in his annuity.

The standard practice of personal injury attorneys often includes services after the
settlement of a client's claim. Often, for example, a lien, such as a Medicare lien, needs
to be negotiated, or judicial approval of a settlement needs to be obtained. These
services are part of the job a personal injury attorney accepts. Moreover, an additional
fee is not charged; payment for such services is included in the contingent fee charged.
Having done nothing when the controversy arose, Latti Associates' services (post
settlement) fell below the standard of the average qualified personal injury attorney.

As a further matter, the failure to intercede in the controversy may have violated
the Professional Rules of Conduct, or, more particularly the Disciplinary Rules in effect
in 1983. Disciplinary Rule 2-110 provided in part:

> "a lawyer shall not withdraw from employment
> until he has taken reasonable steps to avoid foreseeable
> prejudice to the rights of his client, including giving due
> notice to his client, allowing time for employment of other
> counsel, delivering to the client all papers and property to
> which the client is entitled, and complying with applicable
> laws and rules."

Dimon was prejudiced by Latti Associates' termination of services at the time that
the controversy arose. The prejudice was very foreseeable. Mr. Dimon did not receive
the benefit of his bargain and his annuity terminated.

As a final matter, I'd like to address Mr. Latti's concern that there would have

Brian Keane, Esquire
November 9, 2006
Page Six

been nothing he could do in 1983, that Mr. Dimon would have to wait until the annuity
terminated because of the defense based on the doctrine of anticipatory breach. The
concern is unfounded. That doctrine has sufficient exceptions to allow an action to
enforce the settlement agreement. See, e.g. c. 106, §2-610. More to the point, this was a
written settlement agreement and such agreements are enforceable even if unwritten.
*Peters v. Wallach*, 366 Mass. 622, 628 (1975). More concretely, the controversy
involved an actual breach of the contract in 1983. Charter Security initially provided a
written annuity contract for life, but then disowned that contract and replaced it with one
limited to twenty years. That breach was enforceable in 1983.

FEE SCHEDULE:

Services will simply be billed at the rate of $420 per hour. No retainer will be
required and there will be no minimum charge for testimony at a deposition or trial.

PRIOR TESTIMONY:

I have not testified at deposition or at trial in the prior four years, with the
exception of my testimony at the trial of the 93A/176D claim in *Bobick v. U.S.F. & G. et
al*, Suffolk Superior Court No. 94-5753B. My testimony was not as an expert, but rather
involved my handling of the underlying tort claims.

Very truly yours,

Hans R. Hailey

HRH/at
Enclosure: Resume

# HANS R. HAILEY

**OFFICE:**           225 Friend Street, 5th Floor
                      Boston, Massachusetts 02108
                      Tel. (617) 723-4010

**HOME:**             74 Highview Street
                      Westwood, Massachusetts 02090
                      Tel. (781) 769-8035

**EDUCATION:**        BOSTON UNIVERSITY SCHOOL OF LAW, Boston,
1973 - 1976:          Massachusetts - J.D., June, 1976

1968-1973:            BOSTON UNIVERSITY, Boston, Massachusetts
                      B.A., June, 1973. Major: Psychology.

**BAR
ADMISSIONS:**         Massachusetts (admitted January, 1977);
                      United States District Court for the
                      District of Massachusetts (admitted May. 1977);
                      United Stales Court of Appeals for
                      the First Circuit (admitted March, 1978);
                      Land Court Examiner (appointed March, 1979);
                      United Slates Supreme Court (admitted May, 1993).

**EMPLOYMENT:**
1977 to present       *Law Offices of Hans R. Hailey.* Private practice of
                      law. My practice is not limited to a specialty,
                      but concentrates in personal injury and domestic
                      relations law.

1974 to 1975:         *Boston University Center for Law and Health
                      Sciences* - Research Assistant for the Center's
                      Director.

**BAR
ASSOCIATION
MEMBERSHIPS:**        Massachusetts Bar Association: Boston Bar Association,
                      (member, Family Law Committee);

### HANS R. HAILEY - - - Page Two

**ACTIVITIES:**

| | |
|---|---|
| 1972 TO 1975: | Co-founder of Paraplegia Research Foundation Paracure, Inc., a non-profit foundation organized to stimulate and support thai basic scientific research which may lead to cure for paraplegia. |
| 1977: | Volunteer attorney., Cambridgeport Problem Center The Cambridgeport Problem Center offers free legal and low-cost counseling services. |
| 1978 to 1982: | Member, Massachusetts Architectural Barriers Board (Chairman in 1980). Appointed by Governor Dukakis. The Architectural Barriers Board promulgates and enforces the specialized building code whidi requires public buildings to be accessible to handicapped persons. |
| 1979 to 1987: | Member Board of Trustees. Boston Center for Independent Living (Chairman of the Board, 1980-19S2 and 1986-1987). The Boston Center tor Independent Living trains and assists severely physically disabled persons to live independently rather than in institutions. |
| 1980: | Member, Ad Hoc Chapter 595 Advisory Committee The Committee was formed for the purpose of drafting regulations for the Massachusetts Commission Against Discrimination. Chapter 505, Acts of 1980 prohibits discrimination against the handicapped in places of public accommodation. |
| 1980: | Member, Subcommittee on The Physically Disabled Franklin N. Flaschner Judicial Inslilule. |
| 1982 and 1984 | Candidate for Democratic Nomination for State Representative from the 10th Suffolk District (West Roxbury and Roshndale). |

**HANS R. HAILEY - - - Page Three**

| | |
|---|---|
| 1983 to<br>1989 | <u>Member, Board of Directors and House of</u><br><u>Delegates, Massachusetts Easter Seal Society</u><br>(Chairman of the Legislative Action Network and Co-<br>Chairman of Public Affaire Committee). |
| 1987 to<br>1988: | <u>Instructor of Construction Law</u><br>Boston Architectural Center |
| **PUBLICATIONS:** | *So You Think You Have Better Things To Do Than Stay Married*,<br>(Vantage Press, 1992): *New Incentive for Insurers to Settle Claims*<br>*Reasonably and Promptly*, Boston Bar Journal Vol. 34, No. 5, 16<br>(September/October 1990); *Another Chip Off the Old Block;*<br>*Rakas v. Illinois. 30 Legalite* 230 (1979). |
| **HONORS:** | Selected by Boston Jaycees as one of 1981's Ten<br>Outstanding Young Leaders;<br>1995 to present: Certified Civil Trial Specialist, certified by the<br>National Board of Trial Advocacy |

To:   FILE

From:   *MARY GRACI*

STRUCTURED SETTLEMENT CHECK OFF SHEET

File#   *399 LM 106125 2*

Insd.   *Members of Point Judith Fishermans Corp.*

Clmt.   *Dennis Jay Dimon*

Settlement Report   *8-26-83*

Annuity Policy   *Charter Security Life Ins. C.*

Settlement Agreement   *4-18-83*

Dismissal of Suit   *4-18-83*

K-0005