# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **DENNIS DIMON,** | ) | |
| **Plaintiff,** | ) | |
| **VS.** | ) | **C. A. No:  05-11073 MEL** |
| **METROPOLITAN LIFE INSURANCE COMPANY, KEMPER INSURANCE COMPANY, MORGAN STANLEY DW, INC., MICHAEL B. LATTI, LATTI ASSOCIATES, and LATTI & ANDERSON LLP,** | ) | |
| **Defendants.** | ) | |

## DEFENDANT, METROPOLITAN LIFE INSURANCE COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT PURSUANT TO F.R.C.P. 56

### I.      INTRODUCTION

Defendant, Metropolitan Life Insurance Company ("MetLife"), hereby moves for Summary Judgment pursuant to Fed. R. Civ. P. 56.  As grounds therefore MetLife states that Summary Judgment is appropriate in this case because there are no genuine issues of material fact to be tried, and MetLife is entitled to judgment as a matter of law on Count X and Count XI of Plaintiff's Complaint, which are all claims against MetLife.

MetLife seeks Summary Judgment based upon M.G.L. c. 175, §181, under both Statute of Repose and Statute of Limitation theories.  Further, MetLife seeks Summary Judgment based

upon the separate Statutes of Limitation provided for in M.G.L. c. 260, §2 and M.G.L. c. 260, §2A.

## II.     RELEVANT FACTS

This case stems from a personal injury lawsuit that was filed over twenty-five years ago in 1981.  In that underlying action Plaintiff, Denis Dimon ("Mr. Dimon"), was a commercial fisherman who had been engaged on a fishing vessel named "Jenny C" when he suffered injuries that led to the loss of an eye.  See Plaintiff's Complaint, ¶ 10, attached hereto as EXHIBIT "A".  Mr. Dimon, through his attorneys, Latti Associates (Co-Defendants in the case at bar), sued the owner of the vessel, Jenny C., Inc. in Federal District Court for the District of Rhode Island in 1981.  See Complaint of Dennis Jay Dimon v. Jenny C., Inc. attached hereto as EXHIBIT "B".  Dimon v. Jenny C., Inc. made its way through the litigation process, and at trial Mr. Dimon obtained a verdict in his favor for $710,000.00.  See EXHIBIT "A" at ¶ 11.

The parties to Dimon v. Jenny C., Inc., both actual litigants as well as interested entities not named in the litigation[1], settled the case post-verdict.  See EXHIBIT "A" at ¶ 12 and ¶ 14; See also Settlement Sheet, attached hereto as EXHIBIT "C".   After the settlement was reached, an application was submitted to Charter Security Life Insurance Company ("Charter").   The application sought an annuity that would provide Mr. Dimon with monthly payments for twenty years certain.  See Annuity Application of Denis Dimon dated May 4, 1983, attached hereto as EXHIBIT "D"; See also Correspondence from MetLife to Dimon dated June 9, 2003, attached hereto as EXHIBIT "E".

Since 1983 when the settlement was reached, many of the parties involved have either changed their name or have merged with other entities.  Dean Witter Reynolds, Inc. ("Dean

---

[1] American Motorists Insurance Company was the excess insurer of the vessel, "Jenny C.", when Mr. Dimon was injured, and was involved in the post-verdict settlement negotiations.

Witter"), the agency that took the Application for Mr. Dimon's annuity, merged with Morgan

Stanley DW, Inc.  See EXHIBIT "A" at ¶ 18.  Charter, who issued the Annuity Contract for Mr.

Dimon in 1983, was subsequently purchased by MetLife.  See EXHIBIT "A" at ¶ 20.  Finally,

American Motorists Insurance Company ("American Motorists"), the insurance carrier for Jenny

C., Inc., was a subsidiary of the Kemper Group, and is no longer in existence as a separate entity

from Kemper.  See EXHIBIT "A" at ¶ 17; See also Correspondence from American Motorists to

Dean Witter dated August 12, 1983, attached hereto as EXHIBIT "F".

There is no dispute that Mr. Dimon and Latti Associates, his attorneys, received the lump

sum payment called for in the settlement.  Mr. Dimon filed this Complaint on May 23, 2005

based on the terms of the Annuity issued and whether a mistake was made.  It is important to

note that neither Charter, the Annuity issuer, nor MetLife who later purchased Charter, were

involved in the Dimon v. Jenny C., Inc. litigation or post-verdict settlement discussions.

Charter issued an Annuity on May 5, 1983 ("Annuity").[2]  That Annuity is the subject of

this litigation.  The Annuity was issued based upon an application that identified Mr. Dimon as

the annuitant, American Motorists as the applicant and Kurt Snyder[3] as the agent who took the

application.  See EXHIBIT "D".  Roger Hughes of Latti Associates had been identified in letters

exchanged between Charter and American Motorists as the person who provided information

regarding the terms of the annuity.  See EXHIBIT "F"; See also Correspondence from Charter to

American Motorists dated September 26, 1983, attached hereto as EXHIBIT "G"; and

Correspondence from American Motorists to Charter dated October 10, 1983, attached hereto as

EXHIBIT "H".

---

[2] The Annuity contract issued contained a clerical error regarding the term of the annuity payments.  The original
contract provided that the annuity would pay for 20 years certain then life thereafter.  This is the clerical error noted
by Charter in subsequent letters.  See below.
[3] Kurt Snyder was a representative of Dean Witter at the time the application for the Annuity was submitted.  See
EXHIBIT "L" L. Schmitt Dep. Tr. at 20:8-17.

The original Annuity contained a typographical error in the payment term, i.e. the length of time payments were to be made. <u>See</u> Correspondence from Charter to Dean Witter dated July 14, 1983, attached hereto as EXHIBIT "I". The typographical error was discovered by Charter a few weeks after the Annuity was issued. Charter, by letter dated July 14, 1983 (from Barbara Boehm at Charter to Kurt Snyder at Dean Witter), alerted Dean Witter that the Annuity contained a clerical mistake. <u>Id.</u> Following the July 14th letter, <u>several</u> letters were exchanged between Charter, American Motorists and Dean Witter addressing the terms of the Annuity. These letters are as follows:

| | |
|---|---|
| August 12, 1983 | Letter from John Noe, of American Motorists to Robert Foley of Dean Witter. <u>See</u> EXHIBIT "F"; |
| September 26, 1983 | Letter from Robert Liguori of Charter to John Noe of American Motorists. <u>See</u> EXHIBIT "G"; |
| October 10, 1983 | Letter from John Noe of American Motorists to Robert Liguori of Charter. <u>See</u> EXHIBIT "H"; |
| October 14, 1983 | Letter from Barbara Boehm of Charter to John Noe of American Motorists attached hereto as EXHIBIT "J"; and |
| October 12, 1983[4] | Letter from John Noe of American Motorists to Barbara Boehm of Charter attached hereto as EXHIBIT "K". |

These letters address the contentions of the parties regarding the terms of the Annuity and the negotiating process. In Exhibit "F", John Noe of American Motorists wrote to Robert Foley of Dean Witter asserting that his understanding, apparently gained through a discussion with Roger Hughes of Latti Associates, was that Mr. Foley quoted the costs of an annuity that would provide annually increasing lifetime payments, guaranteed for twenty years. <u>See</u> EXHIBIT "F". It is important to note that Mr. Noe does not assert that a lifetime annuity was applied for, or that

---

[4] This letter appears to be incorrectly dated, as it refers to the October 14, 1983 letter from Barbara Boehm but is dated October 12, 1983.

Charter was aware that the settlement of <u>Dimon v. Jenny C., Inc.</u> may have been a lifetime annuity with a guarantee period.

In follow up to Exhibit "G", Robert Liguori of Charter wrote to John Noe of American Motorists.  <u>See</u> EXHIBIT "G".  In Exhibit "H", Mr. Liguori corrected Mr. Noe and explained that the Application submitted by American Motorists was for "…a single premium immediate annuity with a 20 year (i.e. 240 months) certain period."  Mr. Noe responded by asserting that the sections describing the Annuity terms and listing the quote number were blank at the time he signed the Application.  <u>See</u> EXHIBIT "H".  For his part, Mr. Dimon has no recollection of what sections were filled out when he signed the Application at Latti Associates.  <u>See</u> D. Dimon Dep. Tr. at 110:14-16, attached hereto as EXHIBIT "M".

The series of correspondence contained in Exhibits "I", "J", "G", "H" and "K" can be viewed as a capsulation of the positions of American Motorists and Charter.  American Motorists refused to return the contract that contained the error regarding the terms of the payment.  <u>See</u> EXHIBIT "K".  Charter took the position that it would honor its obligations to pay Mr. Dimon for 20 years (i.e. 240 months), <u>but confirmed in 1983 that "[n]o payments will be made beyond the expiration of the 240 month period."</u>  <u>See</u> EXHIBIT "G".

Several of these letters were copied to Mr. Dimon's attorneys, Latti Associates.  <u>See</u> EXHIBITS "J", "F", "G", "H" and "K".  After the last of these letters, in October of 1983[5], there is no evidence of any further correspondence regarding the terms of the Annuity until September of 1999.

The law firm of Latti Associates represented Mr. Dimon in <u>Dimon v. Jenny C., Inc.</u>  <u>See</u> M. Latti Dep. Tr. at 25:6-21, attached hereto as EXHIBIT "N".  Specifically, a lawyer named

---

[5] Because of the apparent misdating of EXHIBIT "K", it is not clear exactly when this exchange of correspondence came to a close.

Joseph Flannery was the lead attorney responsible for the <u>Dimon v. Jenny C., Inc.</u> case. Attorney Flannery tried the case to verdict, and subsequently negotiated the settlement. <u>Id.</u> at 26:4-9 and 31:13-15. Attorney Flannery left Latti Associates shortly before the settlement was finalized. <u>Id.</u> at 26:11. Attorney Flannery has since passed away. <u>See</u> R. Hughes Dep. Tr. at 34:19-20, attached hereto as EXHIBIT "O". Roger Hughes, a partner at Latti Associates, oversaw Attorney Flannery's representation of Mr. Dimon and, in fact, actively represented Mr. Dimon during portions of the litigation. Michael Latti, the named partner at Latti Associates, personally persuaded Mr. Dimon to remain with Latti Associates as a client when Attorney Flannery left Latti Associates. <u>See</u> EXHIBIT "N" at 26:16-17.

As set forth above, Latti Associates received carbon copies of the letters notifying Dean Witter and American Motorists of the terms of the Annuity that was purchased. <u>See</u> EXHIBITS "I", "F", "G", "H", and "K". Both Attorney Latti and Attorney Hughes confirmed that the address used for Latti Associates on the letters in question was the correct address. <u>See</u> EXHIBIT "N" at 32:16-18; <u>See also</u> EXHIBIT "O" at 42:22 – 43:1. Neither Attorney Latti nor Attorney Hughes could definitively recall at their depositions there being any problem with Latti Associates' ability to receive mail during the relevant period in 1983. <u>See</u> EXHIBIT "N" at 32:19 – 33:14; <u>See also</u> EXHIBIT "O" at 43:2-11.

Latti Associates, through Attorney Hughes, therefore had knowledge in 1983 that the typographical error made in the Annuity had been corrected. John Noe of American Motorists asserted in a letter dated August 12, 1983 that "I am advised by Mr. Hughes of Lattie [sic] Associates that your quotation was to provide…" a lifetime Annuity with a 20 year certain period. <u>See</u> EXHIBIT "G". Mr. Noe also confirmed that Attorney Hughes of Latti Associates had discussed <u>in 1983 the possibility of bringing a Declaratory Judgment action</u> to clarify the

terms of the Annuity if the dispute could not be resolved.  See Memorandum from John Noe to Klaus Lemhoffer dated 11/8/83, attached hereto as EXHIBIT "P".  Additionally, Mr. Noe made clear in his correspondence that Attorney Hughes had "threatened Mr. Foley (of Dean Witter) with an [E]rrors and [O]missions claim."  Id.  No timely action, however, was brought on behalf of Mr. Dimon by Latti Associates when the terms of the Annuity were clarified in 1983.

At his deposition, Attorney Hughes was unable to recall any details of the dispute regarding the terms of the Annuity.  Attorney Latti was likewise unable to recall any of the relevant events in 1983 at his deposition, but asserted that Attorney Hughes was primarily running the firm in 1983 as Attorney Latti was either ailing or recovering from back surgery for portions of 1982 and 1983.  See EXHIBIT "N" at 19:17 – 21:3.

In September of 1999, Katherine Dimon ("Mrs. Dimon"), on behalf of her husband, Mr. Dimon, contacted MetLife seeking information on the terms of the Annuity.  See K. Dimon Dep. Tr. at 10:3-18 attached hereto as EXHIBIT "Q".  Following Mrs. Dimon's telephone call, MetLife sent a letter to Mr. Dimon.  See September 24, 1999 Letter from Theresa Thorp to Dennis Dimon attached hereto as EXHIBIT "R".  This letter, inter alia, notified Mr. Dimon that his payments under the terms of the Annuity Contract that was issued on May 5, 1983 would cease on May 5, 2003.

At her deposition, Mrs. Dimon testified that she and her husband used the Annuity as an income source for purposes of securing a mortgage in 1999 to purchase a residence in Rhode Island.  See EXHIBIT "Q" at 71:16-20.   Mrs. Dimon further testified that she was notified by her bank that it had obtained information that was contradictory to what the Dimons had represented on their mortgage application.  Id.  More specifically, that the bank told her that they (the Dimons) had indicated as an income source on their mortgage application a lifetime benefit

(i.e., the Annuity) which was guaranteed for 20 years, but MetLife informed the bank that the Annuity was <u>only</u> for 20 years. <u>See</u> <u>Id.</u> at 67:24 – 68:2.  Neither Mr. nor Mrs. Dimon took any action after being notified by their bank, and again by MetLife in the September 24, 1999 correspondence, that there was a dispute regarding the terms of the Annuity.  It was not until 2003 when the payments stopped that the Dimons took action regarding the Annuity and filed this lawsuit.

<u>Over twenty-two years have passed</u> since the issuance of the involved Annuity in May of 1983, and the filing of the Complaint in this case.  Time and world events have taken a heavy toll on the evidence available.   Mr. Dimon summarized it best at his deposition: "[y]ou know, it's so long ago, it's hard to remember exactly what was going on at that time."  <u>See</u> EXHIBIT "M" at 44:10-11.

The attorney primarily responsible for handling Mr. Dimon's case has passed away.  <u>See</u> EXHIBIT "O" at 34:19-20.  It has been represented that all of the documents that were in the possession of Latti Associates relative to this case were destroyed pursuant to its document retention policy.   <u>See</u> EXHIBIT "N" at 74:17 – 75:16.  The records held by Dean Witter (now Morgan Stanley DW, Inc.) were lost in the World Trade Center tragedy on September 11, 2001.  <u>See</u> EXHIBIT "L" at 27:5-18.  Roger Hughes, the attorney who handled finalizing the <u>Dimon v. Jenny C., Inc.</u> settlement, has no independent recollection of the settlement, and could not even identify his client, Mr. Dimon, if he walked in the same room.[6]  So much time passed between 1983, when the underlying settlement was completed and the Annuity in question was issued,

---

[6] Attorney Hughes testified at his deposition that "[i]f [Mr. Dimon] walked into the room today, I wouldn't know." <u>See</u> EXHIBIT "O" at 19:4-5.  Moreover, Attorney Hughes testified that he had "no independent recollection" of the terms of the settlement in <u>Dimon v. Jenny C., Inc.</u>  <u>Id.</u> at 20:6.

and the time of his deposition that Attorney Hughes could not even definitively identify the name

of the firm at which he was then a partner.[7] Id. at 43:18-19.

The intervening twenty-two years between when the Annuity was contracted and Mr.

Dimon filed the Complaint in this action have caused most of the salient evidence in this case to

be lost, destroyed or unavailable due to faded memories and unattainable witnesses.


# III.    ARGUMENT

### A.  SUMMARY JUDGMENT IS APPROPRIATE AS THERE ARE NO GENUINE ISSUES OF MATERIAL FACT AND METLIFE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW.

Summary Judgment is appropriate when "pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue of material fact and that the moving party is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(C).  "When a party fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party bears the burden of

proof at trial, there can no longer be a genuine issue as to any material fact ... and the moving

party is entitled to judgment as a matter of law."  Smith v. Stratus Computer, Inc., 40 F.3d 11, 12

(lst Cir. 1994), cert. denied, 115 S. Ct. 1958 (1995) (citation omitted).

Summary judgment is not "a disfavored procedural shortcut"; rather, it is an integral part

of the judicial system "designed 'to secure the just, speedy and inexpensive determination of

every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. F. Civ. P. 1);

See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

When, as in the present case, there is no genuine issue of material fact, summary

judgment should be granted to MetLife, as the moving party, to promote judicial economy.

---

[7] Attorney Hughes testified: "I think it was Latti & Associates.  I'm not sure anymore."

Here, the facts presented by Plaintiff's Complaint, as well as the undisputed facts gleaned from the depositions and documents in this case, are more than sufficient to grant Defendant, MetLife summary judgment.

**B.  COUNT X AND COUNT XI OF PLAINTIFF'S COMPLAINT AGAINST DEFENDANT, METLIFE, ARE BARRED BY M.G.L. C. 175, §181.**

Mr. Dimon's claims for breach of contract and misrepresentation are untimely and, therefore, barred by M.G.L. 175, §181 ("§181").

§181 provides, in pertinent part, that "[n]o company, no officer or agent thereof … shall make, issue, circulate or use, or cause or permit to be made, issued, circulated or used, any written or oral statement misrepresenting the terms of … any annuity … issued or to be issued by any company, or the benefits or privileges promised thereunder."  Further, §181 provides that "the holder of any annuity … who was induced to procure it by any action in violation of this section by an officer or agent of the company issuing or executing it may recover from such company all premiums paid on such policy or contract less any indebtedness to the company thereon or secured thereby and less any payments otherwise made by the company thereon, in an action brought within two years after the date of issue thereof."  *Emphasis added.*  The Annuity at issue in this case was issued on May 5, 1983; as such, a timely claim on this Annuity needed to be filed no later than May 5, 1985.

Mr. Dimon has asserted two claims against MetLife.  One based on an alleged negligent misrepresentation, and a second based on an alleged breach of contract.  The basis for both claims is the same set of facts: that Charter allegedly misrepresented the terms of the Annuity issued to Mr. Dimon.

For purposes of analyzing Plaintiff's claims pursuant to §181, the Court must look to the gravamen of the claims and not the labels used by Plaintiff in pleading his Complaint.  Grande v.

PFL Life Ins. Co., 2000 Mass. App. Div. 261, attached hereto as EXHIBIT "S". Plaintiff's breach of contract and negligent misrepresentation claims are covered under the two-year limitations period of §181 because Mr. Dimon's claims are grounded in misrepresentation.

In Grande v. PFL Life Ins. Co., the plaintiff sought to recover from the defendant, PFL Life Insurance Company ("PFL"), based on alleged deceptive acts in connection with its sale to the plaintiff of a life insurance policy instead of the annuity policy plaintiff thought she was purchasing. 2000 Mass. App. Div. 261. PFL filed a motion for judgment on the pleadings, which the Court treated as a motion for summary judgment, arguing that the plaintiff's claims were barred by the applicable statute of limitations – M.G.L. c. 175, §181. Id. The lower court in Grande granted the motion for summary judgment. Id. The Massachusetts Appeals Court affirmed and held that the plaintiff's claims for breach of contract and conversion were time-barred under the two-year statute of limitations set forth in §181 because "[a]lthough Grande's first claim is for breach of contract, it is the 'gravamen' of [her] complaint [as one for misrepresentation] which dictates the applicable statute of limitations." Id.

There are two related interpretations of the limitations period contained in §181. The §181 limitations period has been applied as both a period of repose, as well as a period of limitation. For reasons more fully discussed below, under either the repose or limitations theory, Mr. Dimon's claims in this case are barred by §181.

1. *M.G.L. c. 175, §181 is a Statute of Repose.*

§181 contains a statute of repose, as opposed to a mere limitation on actions period. It is an absolute bar to claims not brought within two years of the date of issue of an annuity. In Passatempo v. McMenimen, 20 Mass. L. Rep. 593 (2006), the Court held that "this Court concludes and rules that [M.]G.L. c. 175, sec.181, contains a statute of repose that is entirely

consistent with the Supreme Judicial Court's recent decisions in <u>Joslyn [v. Chang</u>], 445 Mass. 344, … and <u>Rudenauer [v. Zafiropoulos</u>], 445 Mass. 353…". Rudenauer only requires a triggering date. "A repose period begins to run from some 'definitely established event.'" <u>Rudenauer v. Zafiropoulos</u>, 445 Mass. 353, 358 (2005).

The purpose of a statute of repose is "to give particular types of defendants the benefit of a date certain on which their liability for past conduct will definitively come to an end." <u>Nett v. Bellucci</u>, 437 Mass. 630, 639 (2002). "There comes a time when [a defendant] ought to be secure in his reasonable expectation that the slate has been wiped clean of ancient obligations, and he ought not be called on to resist a claim 'when evidence has been lost, memories have faded, and witnesses have disappeared.'" <u>Id.</u>, citing <u>Klein v. Catalano</u>, 386 Mass. 701, 709 (1982), quoting <u>Rosenberg v. North Bergen</u>, 61 N.J. 190, 201 (1972).

In the instant case, the 'event' in §181 that triggered the running of the repose period was the issuance of the Annuity. The period of repose began to run on May 5, 1983, the date the Annuity was issued, and expired on May 5, 1985, two years later. <u>The "types" of defendants afforded the protection of the repose period are insurance companies like MetLife.</u>

As evidenced by the testimony of each of the witnesses (who could be found or who are still living) that were personally involved, namely Katherine Dimon, Dennis Dimon, Michael Latti and Roger Hughes, this case presents the perfect example of why a repose period is necessary and ought to be applied. Memories have faded, evidence has been lost, and witnesses have died or cannot be found. As stated by Mr. Dimon in response to a question regarding his meetings in 1983 with Mr. Decof, the Guardian *ad litem* appointed by the Federal District Court – Rhode Island, "[y]ou know, it's so long ago, it's hard to remember exactly what was going on at that time." <u>See</u> EXHIBIT "M" at 44:10-11.

Mr. Dimon's statement sums up nicely the state of the testimonial evidence in this case. Mr. Hughes, one of the partners at Latti Associates in 1983 and the attorney who personally appeared on behalf of Mr. Dimon in Court, testified that "[i]f [Mr. Dimon] walked into the room today, I wouldn't know." See EXHIBIT "O" at 19:4-5. Further Mr. Hughes testified that he had "no independent recollection" of the terms of the settlement in Dimon v. Jenny C., Inc. Id. at 20:6. Given that over two decades have passed since Dimon v. Jenny C., Inc., Mr. Hughes could not even identify the proper name of the firm at which he was the managing partner at the time. Id. at 43:18-19.

"Like all statutes of repose, 'the effect [of these statutes] is to place an absolute time limit on the liability of those within [their] protection and to abolish a plaintiff's cause of action thereafter, even if the plaintiff's injury does not occur, or is not discovered, until after the statute's time limit has expired." Nett v. Bellucci, 437 Mass. 630, 635 (2002), citing McGuinness v. Cotter, 412 Mass. 617, 622 (1992), citing Klein v. Catalano, 386 Mass. 701, 702 (1982). *Emphasis added.* Statutes of repose, unlike statutes of limitation, cannot be tolled for any reason unless the statute contains within it a specific tolling provision. "[S]tatutes of repose may not be 'tolled' for any reason, as 'tolling' would deprive the defendant of the certainty of the repose deadline and thereby defeat the purpose of a statute of repose." Id. (internal citations omitted).

§181 has no tolling provision whatsoever. Therefore, as set forth above, the May 5, 1985 deadline cannot be tolled for any reason(s). Any claim Plaintiff had regarding his Annuity against MetLife expired at the end of the repose period. Moreover, Mr. Dimon's knowledge of the alleged misrepresentations or breach (when he knew or should have known of his cause of action) is irrelevant. He failed to commence his action on or before May 5, 1985 and, therefore, his causes of action are, to use the term quoted in Rudenauer, "abolished."

MetLife is entitled to Judgment as a matter of law based upon the application of the two-year repose period contained in §181.

### 2. *M.G.L. c. 175, §181 is a Statute of Limitations.*

If this Court finds that the statute of repose in §181 is not applicable, or that the prior decisional authority needs to be overturned, then MetLife alternatively is entitled to summary judgment because §181 is a statute of limitations that imposes a two-year limitations period to claims that arise from alleged misrepresentation by an insurance company with respect to Annuities.

Although the general statute of limitations period for misrepresentation is three years (as set forth at M.G.L. c. 260, § 2A), Massachusetts courts have recognized that §181 is a "special provision" that preempts the general statute.  See Grande v. PFL Life Ins. Co., 2000 Mass. App. Div. 261, (providing that "Section 19 of [M.]G.L.c. 260 provides, however, that 'if a special provision is otherwise made relative to the limitation of any action, any provision of this chapter inconsistent therewith shall not apply'); See also Slingsby v. Metropolitan Life Ins. Co., 2001 Mass. App. Div. 49 (2001).

Mr. Dimon's breach of contract claim is also covered under the two-year statute of limitations of §181 because Plaintiff's causes of action are grounded in misrepresentation.  In Grande, as noted above, Plaintiff brought claims for breach of contract and conversion.  Id.  The Massachusetts Court of Appeals affirmed and held that the plaintiff's claims for breach of contract and conversion were time-barred under the two-year statute of limitations set forth in §181.  The Grande court found plaintiff's breach of contract claim was really a misrepresentation claim because, "… it is the 'gravamen of [her] complaint [as one for misrepresentation] which dictates the applicable statute of limitations."  Id.  Both Mr. Dimon's breach of contract and

negligent misrepresentation claims are subject to the two-year limitations period contained in §181 as his claims, at least as they pertain to MetLife, are <u>solely</u> based on the alleged misrepresentation of the Annuity's terms.

### C.  RUNNING OF THE STATUTE OF LIMITATIONS.

Several events occurred over the twenty-two years between the issuance of Annuity and the commencement of Mr. Dimon's Complaint.  Each of these events when taken either individually, or *en toto*, compel the conclusion that Mr. Dimon knew or should have known of his causes of action many years ago and, therefore, his Complaint is untimely.

Two specific events would have triggered the running of a statute of limitations in this case:

> 1.  Mr. Dimon's attorneys' Latti Associates, <u>knowledge</u> of the error that was corrected regarding the term of the Annuity in <u>1983</u>; and/or
>
> 2.  Mr. Dimon's personal knowledge in September of <u>1999</u> that MetLife had, in 1983, corrected the typographic error and that his Annuity was for 20 years certain <u>rather than</u> for life with the first 20 years guaranteed.

In Massachusetts an attorney's knowledge is imputed to the client, even where the client denies that they had the same information as the attorney.  "Levin [the client] denies knowledge of the letter, but a client is charged with the knowledge of his attorney."  <u>Levin v. Berley</u>, 728 F.2d 551, 553 (1st Cir. 1984); <u>citing</u> <u>Continental Casualty Co. v. United States</u>, 337 F.2d 602, 603 (1st Cir. 1964); <u>Quinn v. Hintlian</u>, 4 Mass. App. Ct. 805, 805 (1976); cf. <u>Flynn v. Wallace</u>, 359 Mass. 711, 717 (1971).  Based on this case law, Mr. Dimon is charged with knowledge of the dispute regarding the terms of the Annuity in 1983, twenty-two years before he filed his Complaint, when his attorneys corresponded with Charter and/or American Motorists.

Latti Associates' knowledge is imputed to Mr. Dimon.  The undisputed facts of this case show that Latti Associates knew of the disagreement regarding the terms of the Annuity in the

Summer of 1983.  Latti Associates was carbon copied with letters between other entities setting forth the dispute and the positions that those entities took relative to that dispute.  Although Mr. Hughes has no recollection of the settlement in <u>Dimon v. Jenny C., Inc.</u> because of the two decades that have passed, Mr. Noe documented in both a letter (<u>see</u> EXHIBIT "G"), and a memorandum (<u>see</u> EXHIBIT "P"), that Attorney Hughes was aware of the dispute and that he took the position that Mr. Foley, of Dean Witter, had committed either an error or omission that would subject Mr. Foley to a claim.  It appears from Mr. Noe's documentation that Attorney Hughes also considered bringing a Declaratory Judgment action if the dispute was not resolved.  As Mr. Dimon's attorney and agent, Attorney Hughes did not protect Mr. Dimon within the limitations period.

Assuming *arguendo* that there was a breach or misrepresentation, it occurred, if at all, in <u>1983</u>.  Because Mr. Dimon's attorneys' knowledge is imputed to him as noted above, Mr. Dimon had <u>actual</u> knowledge of his claim.  In fact, Mr. Dimon agrees that the misrepresentation or breach occurred in 1983: Mr. Dimon's expert in <u>this</u> case, Attorney Hans Hailey, testified that "[m]ore concretely, the controversy [regarding the terms of the annuity] involved an actual breach of the contract in 1983."  <u>See</u> <u>Hans Hailey Report</u> dated November 10, 2006, at 6, attached hereto as EXHIBIT "T".  Thus, Mr. Dimon <u>agrees</u> "that breach was enforceable in 1983."  <u>Id.</u>  As such, there are no disputed facts that could preclude this Court from issuing Judgment to MetLife.

### D.    THE STATUTES OF LIMITATIONS SHOULD NOT BE TOLLED.

There is no reason to toll the statutes of limitations in this matter.  In Massachusetts, there are only three circumstances that may give rise to tolling of the limitations period:

1.    Where a misrepresentation concerns a fact that was "inherently unknowable";

2.    Where a wrongdoer breached some duty of disclosure; or

3.    Where a wrongdoer concealed the existence of a cause of action through some affirmative act done with the intent to deceive.

See Loguidice v. Metropolitan Life Insurance Company _et al_, 336 F.3d 1, 6 (1st Cir. 2003); citing Patsos v. First Albany Corp., 433 Mass. 323 (2001) (citations omitted).  None of the above circumstances apply to the case at bar.

The ongoing dispute in 1983 over the terms of the Annuity, and Charter's position that a clerical error had been made, was known to Mr. Dimon not only through his attorney in 1983, but also through his direct communication with MetLife in 1999.  Mr. Dimon cannot now claim that the facts upon which he uses to support his Complaint against MetLife were "inherently unknowable."  Mr. Dimon has not asserted in his Complaint, and cannot now assert, that MetLife breached any duty to disclose something that was not disclosed in 1983.

In fact, MetLife did disclose facts that should have alerted Mr. Dimon (and/or his attorneys) that he might have a cause of action.  Charter, in 1983, and MetLife, in 1999, both took affirmative actions, i.e. put Mr. Dimon on notice in writing either through counsel or directly, of the terms of the Annuity that was purchased on his behalf.  As such, Mr. Dimon had sufficient information on each of those occasions to decide if he had a cause of action on which to proceed.  Moreover, Mr. Dimon's attorneys, whose duty it was to protect him in procuring his settlement proceeds, had actual knowledge that there was a dispute regarding the terms of the Annuity.  Based on the above, there is no basis to toll the statutes of limitation on Mr. Dimon's claims.

### E.  THE NEGLIGENT MISREPRESENTATION COUNT ALLEGED BY PLAINTIFF AGAINST METLIFE IS BARRED PURSUANT TO THE THREE-YEAR LIMITATION OF ACTION PERIOD PRESCRIBED BY MASSACHUSETTS LAW.

Even if §181 did not exist, based upon the three-year limitations period contained in M.G.L. c. 260, §2A, Mr. Dimon should have brought his claim for negligent misrepresentation by May 5, 1986, three years after his attorney was informed of the error in the Annuity. Alternatively, Mr. Dimon should have brought his claim for negligent misrepresentation by September 24, 2002, three years after he was informed by MetLife that his annuity payments were going to cease on May 5, 2003.

Mr. Dimon is barred from pursuing his claim for negligent misrepresentation because he failed to bring his claim within the applicable statute of limitations. Mr. Dimon, at the latest, could have brought a claim before September 24, 2002. He did not file his complaint until May, 2005, therefore his claim for negligent misrepresentation is barred by M.G.L. c. 260, §2A.

### F. THE BREACH OF CONTRACT COUNT ALLEGED BY PLAINTIFF AGAINST METLIFE IS BARRED PURSUANT TO THE SIX-YEAR LIMITATION OF ACTION PERIOD PRESCRIBED BY MASSACHUSETTS LAW.

The six-year limitation of action period in M.G.L. c. 260, §2, precludes recovery in this action because Mr. Dimon and his attorneys failed to bring suit against MetLife within the limitations period. Even though Mr. Dimon's claims against MetLife are based on misrepresentations of the terms of the Annuity, as noted above, by May of 1983 Mr. Dimon's attorneys' knew that a dispute had occurred regarding the terms of the Annuity issued by Charter. Because their knowledge is imputed to Mr. Dimon, he should have brought his claim by mid-1989. Because he did not bring his claim until May, 2005, sixteen years after the limitations period expired, he is barred from pursuing the claim for breach of contract.

## IV.  CONCLUSION

For the foregoing reasons, MetLife's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 should be granted.

WHEREFORE, Defendant, Metropolitan Life Insurance Company, respectfully requests that this Honorable Court grant its Motion for Summary Judgment on all Counts of Plaintiff's Complaint against Metropolitan Life Insurance Company based on the fact that the Statute of Repose contained in M.G.L. 175, §181 barred any claim regarding Plaintiff's Annuity that issued in 1983. Alternatively, the limitations period contained in M.G.L. 175, §181, if treated as a Statute of Limitation, would result in the running of the statute, and the expiration of the time within which Plaintiff could file a cause of action. If the Court determines that Plaintiff's claims are not subject to M.G.L. 175, §181, then the three year Statute of Limitation period for torts and six year Statute of Limitation period for contracts still bars Plaintiff's claims against Defendant, Metropolitan Life Insurance Company.

Respectfully submitted,
METROPOLITAN LIFE INSURANCE
COMPANY,
By its Attorneys,


/s/ James J. Ciapciak
James J. Ciapciak, BBO #: 552328
Peter M. LeBlanc, BBO # 645302
CIAPCIAK & ASSOCIATES, P.C.
99 Access Road
Norwood, MA  02062
Tel:  (781) 255-7401
Fax:  (781) 255-7402


## LOCAL RULE 7.1(A)(2) CERTIFICATION

I hereby certify that on December 29, 2006, I contacted Plaintiff's counsel and we conferred and attempted in good faith to resolve or narrow the issues pursuant to L.R. 7.1(A)(2).

   /s/ James J. Ciapciak
James J. Ciapciak

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and accurate copy of the foregoing document was filed via the ECF system and will be served electronically through that system upon Counsel of Record on – January 2, 2007.

  /s/ James J. Ciapciak              
James J. Ciapciak

# EXHIBIT A

FILED
CLERK'S OFFICE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
2005 MAY 23  P 2: 41
U.S. DISTRICT COURT
DISTRICT OF MASS.

CIVIL ACTION No. 05 11073 REK

|  |  |  |
|---|---|---|
| DENNIS DIMON, | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | COMPLAINT |
| | ) | |
| MICHAEL B. LATTI, LATTI | ) | |
| ASSOCIATES, LATTI & ANDERSON | ) | |
| LLP, METROPOLITAN LIFE | ) | |
| INSURANCE COMPANY, KEMPER | ) | |
| INSURANCE COMPANY, and | ) | |
| MORGAN STANLEY DW, INC., | ) | |
| Defendants | ) | |

## INTRODUCTION

1.    This is a contract and malpractice action for monetary relief resulting from the

premature cancellation of the plaintiff's structured settlement payments, which

occurred on or about May 5, 2003 when the defendants ceased paying the settlement

due the plaintiff as a result of a personal injury action in 1983. The plaintiff released

the defendant shipowner in his personal injury action in consideration of a life

annuity guaranteed for 20 years which the court approved. The plaintiff asserts a

cause of action against the defendants based upon their breach of the settlement

contract and for the breach of fiduciary duties by his former attorney.

## JURISDICTION

2.    Jurisdiction is proper pursuant to 28 U.S.C., sec. 1332(a). Venue is proper in the

District Court of Massachusetts pursuant to 28 U.S.C., sec. 1391(c).

<u>PARTIES</u>

3.     The plaintiff, Dennis Dimon, is of legal age and resides in West Kingston, Rhode Island.

4.     The defendant, Michael B. Latti, is now a resident of the State of Maine and a lawyer licensed to practice law in the Commonwealth of Massachusetts who formerly resided in and practiced law in the Commonwealth of Massachusetts in 1983.

5.     The defendant, Latti Associates, was a law firm created under the laws of the Commonwealth of Massachusetts by Michael B. Latti, with a principal place of business at 30-31 Union Wharf, Boston, Massachusetts.

6.     The defendant, Latti & Anderson, LLP, is a law firm created under the laws of the Commonwealth of Massachusetts, with a principal place of business at 30-31 Union Wharf, Boston, Massachusetts and is the successor in interest to Latti Associates.

7.     The defendant, Metropolitan Life Insurance Company is an insurance company with a principal place of business in New York, New York, and regularly conducts business in the Commonwealth of Massachusetts.

8.     The defendant, Kemper Insurance Company is an insurance company with a principal place of business in Long Grove, Illinois, which regularly conducts business in the Commonwealth of Massachusetts.

9.     The defendant, Morgan Stanley, is a brokerage company with a principal place of business in New York, New York, and regularly conducts business in the Commonwealth of Massachusetts.

2

## FACTUAL ALLEGATIONS

10.    In 1981, the plaintiff was severely injured while serving as a member of the crew

       aboard the F/V/ JENNY C, resulting in the loss of his eye.

11.    On or about February 4, 1983, following a trial, a jury awarded the plaintiff $710,000

       for his injuries against the defendant, Jenny C., Inc.

12.    The plaintiff was represented at all times for the trial and subsequent settlement by

       Latti Associates, operated under the authority of Michael B. Latti.

13.    Latti & Anderson, LLP is the successor in interest to Latti Associates.

14.    Following the verdict, the parties entered into a settlement agreement, approved by

       the United States District Court for the District of Rhode Island and a *guardian ad*

       *litem* appointed by the court, providing the plaintiff with a lump sum payment of

       $250,000 and an annuity for the life of the plaintiff and guaranteed for twenty (20)

       years which would continue for the life of the plaintiff. The annuity would pay the

       plaintiff a set amount (beginning at $1,450.45) each month with the amount

       increasing by three (3) percent each year.

15.    Prior to the settlement the court appointed Leonard Decof, Esquire as *guardian ad*

       *litem* to review the settlement and to report to the court.

16.    The *guardian ad litem* was appointed by the court due to the plaintiff's inability to

       read or understand the settlement contract and was an extra measure by the court to

       protect the plaintiff even though he had separate counsel through Latti Associates.

17.    American Motorists Insurance Company (now Kemper Insurance Company) applied

       for the annuity.

3

18.  Dean Witter, Inc.(now Morgan Stanley), acting as the agent and broker for American Motorists Insurance Company, arranged for the lifetime annuity.

19.  The defendant Metropolitan Life Insurance Company (formerly Charter Security Insurance Company), provided the annuity beginning June 5, 1983.

20.  On or about June 14, 1983, Charter Security Life Insurance (now Metropolitan Life Insurance Company) informed Dean Witter, Inc. (now Morgan Stanley) that a clerical error had been made on the annuity contract and that the contract should have read for 240 months (20 years) rather than for life with a guarantee of twenty (20) years.

21.  On or about September 26, 1983, Charter Security Life Insurance (now Metropolitan Life Insurance Company) informed American Motorists (now Kemper Insurance) and Latti Associates of the clerical error described in paragraph 20.

22.  A supplementary document changing the contract from life, guaranteed for twenty (20) years to twenty (20) years only was forwarded to each of the insurance companies and Latti Associates.

23.  The plaintiff was not advised of this change nor was the court or *guardian ad litem* informed of the alleged clerical error upon which the plaintiff, court, and *guardian ad litem* had relied in accepting the settlement agreement.

24.  On May 5, 2003, the defendant Metropolitan Life Insurance Company, stopped payment on the plaintiff's settlement, stating that the annuity was only for a fixed period of twenty years rather than for the life of the plaintiff.

25.  Upon the suspension of payments, the plaintiff attempted to contact his former lawyer at Latti Associates, now Latti & Anderson, but was informed that no file

existed and that the firm could not help him.

## COUNT I
(Dennis Dimon v. Michael B. Latti -
Breach of Fiduciary Duty)

26.    Paragraphs 1-25 are realleged and incorporated by reference.

27.    A lawyer has a duty to act in the best interest of his client and not to act in any way

adverse or contrary to the interests of the client.

28.    The plaintiff relied upon the defendant for advice, counsel, and information in order

to make an informed decision prior to entering into any settlement agreement

whereby the plaintiff would forfeit his rights to future compensation for his injuries.

29.    The defendant, in breach of his fiduciary duty, represented to the plaintiff that the

annuity was for life with a guarantee of twenty (20) years.

30.    Due to the defendant's breach, the plaintiff has suffered financial loss.

## REQUEST FOR RELIEF

1.    That this Court, under Count I, enter judgment in favor of the plaintiff against

the defendant for breach of fiduciary duty.

2.    For such other relief as this Court deems appropriate.

## COUNT II
(Dennis Dimon v. Michael B. Latti -
Negligence)

31.    Paragraphs 1-30 are realleged and incorporated by reference.

32.    A lawyer has a duty to act with reasonable care and to use the skill of a reasonably

competent lawyer in representing a client.

5

33. The defendant failed to act reasonably in not informing the plaintiff of the alleged clerical error changing the terms of the annuity.

34. Due to the actions of the defendant, the plaintiff suffered financial loss.

### REQUEST FOR RELIEF

1. That this Court, under Count II, enter judgment in favor of the plaintiff.

2. For such other relief as this Court deems appropriate.

### COUNT III
(Dennis Dimon v. Michael B. Latti -
Breach of Contract)

35. Paragraphs 1-34 are realleged and incorporated by reference.

36. The plaintiff and the defendant entered into a contract for the defendant to provide legal representation for injuries suffered by the plaintiff in a fishing boat accident.

37. The defendant breached this contract by failing to provide competent legal representation, in failing to inform the plaintiff of an alleged clerical error changing the plaintiff's settlement agreement, and failing to ensure that the plaintiff understood the alleged changes to the settlement agreement.

38. The plaintiff suffered financial losses as a result of the defendant's breach of contract.

### REQUEST FOR RELIEF

1. That this Court, under Count III, enter judgment in favor of the plaintiff against the defendant for breach of contract.

2. For such other relief as this Court deems appropriate.

6

## COUNT IV
(Dennis Dimon v. Latti Associates-
Breach of Fiduciary Duty)

39.   Paragraphs 1-38 are realleged and incorporated by reference.

40.   A lawyer has a duty to act in the best interest of his client and not to act in any way
adverse or contrary to the interests of the client.

41.   The plaintiff relied upon the defendant law firm for advice, counsel, and information
in order to make an informed decision prior to entering into any settlement agreement
whereby the plaintiff would forfeit his rights to future compensation for his injuries.

42.   Due to the defendant's breach, the plaintiff has suffered financial loss.

## REQUEST FOR RELIEF

1.   That this Court, under Count IV, enter judgment in favor of the plaintiff
against the defendant for breach of fiduciary duty.

2.   For such other relief as this Court deems appropriate.

## COUNT V
(Dennis Dimon v. Latti Associates -
Negligence)

43.   Paragraphs 1-42 are realleged and incorporated by reference.

44.   A lawyer has a duty to act with reasonable care and to use the skill of a reasonably
competent lawyer in representing a client.

45.   The defendant failed to act reasonably in not informing the plaintiff and ensuring that
the plaintiff understood the changes to the settlement agreement.

46.   Due to the actions of the defendant, the plaintiff suffered financial loss.

7

## REQUEST FOR RELIEF

1.    That this Court, under Count V, enter judgment in favor of the plaintiff.

2.    For such other relief as this Court deems appropriate.

## COUNT VI
### (Dennis Dimon v. Latti Associates -
### Breach of Contract)

47.    Paragraphs 1-46 are realleged and incorporated by reference.

48.    The plaintiff and the defendant entered into a contract for whereby the defendant was to provide legal representation for injuries suffered by the plaintiff in a fishing accident.

49.    The defendant breached this contract by failing to provide competent legal representation, failing to inform the plaintiff of changes to the plaintiff's settlement agreement, and failing to ensure that the plaintiff understood the changes to the settlement agreement.

50.    The plaintiff suffered financial losses as a result of the defendant's breach of contract.

## REQUEST FOR RELIEF

1.    That this Court, under Count VI, enter judgment in favor of the plaintiff against the defendant for breach of contract.

2.    For such other relief as this Court deems appropriate.

## COUNT VII
### (Dennis Dimon v. Latti & Anderson LLP -
### Breach of Fiduciary Duty)

51.    Paragraphs 1-50 are realleged and incorporated by reference.

8

52.    A lawyer has a duty to act in the best interest of his client and not to act in any way adverse or contrary to the interests of the client.

53.    The plaintiff relied upon the defendant for advice, counsel, and information in order to make an informed decision prior to entering into any settlement agreement whereby the plaintiff would forfeit his rights to future compensation for his injuries.

54.    Due to the defendant's breach, the plaintiff has suffered financial loss.

### REQUEST FOR RELIEF

1.    That this Court, under Count VII, enter judgment in favor of the plaintiff against the defendant for breach of fiduciary duty

2.    For such other relief as this Court deems appropriate.

### COUNT VIII
(Dennis Dimon v. Latti & Anderson LLP -
Negligence)

55.    Paragraphs 1-54 are realleged and incorporated by reference.

56.    A lawyer has a duty to act with reasonable care and to use the skill of a reasonably competent lawyer in representing a client.

57.    The defendant failed to act reasonably in not informing the plaintiff and ensuring that the plaintiff understood the changes to the settlement agreement.

58.    Due to the actions of the defendant, the plaintiff suffered financial loss.

### REQUEST FOR RELIEF

1.    That this Court, under Count VII, enter judgment in favor of the plaintiff.

2.    For such other relief as this Court deems appropriate.

9

COUNT IX
(Dennis Dimon v. Latti & Anderson LLP -
Breach of Contract)

59.   Paragraphs 1-58 are realleged and incorporated by reference.

60.   The plaintiff and the defendant entered into a contract for whereby the defendant was
      to provide legal representation for injuries suffered by the plaintiff in a fishing
      accident.

61.   The defendant breached this contract by failing to provide competent legal
      representation, failing to inform the plaintiff of changes to the plaintiff's settlement
      agreement, and failing to ensure that the plaintiff understood the changes to the
      settlement agreement.

62.   The plaintiff suffered financial losses as a result of the defendant's breach of contract.

REQUEST FOR RELIEF

1.   That this Court, under Count IX, enter judgment in favor of the plaintiff
     against the defendant for breach of contract.

2.   For such other relief as this Court deems appropriate.

COUNT X
(Dennis Dimon v. Metropolitan Life Insurance Company -
Breach of Contract)

63.   Paragraphs 1-62 are realleged and incorporated by reference.

64.   The plaintiff and the defendant entered into a contract whereby the defendant was to
      provide a lifetime annuity guaranteed for twenty (20) years in exchange for the
      plaintiff releasing all claims for injuries suffered by the plaintiff in a fishing accident.

65.   The defendant breached this contract by altering the agreement after the contract was

signed and approved by the court and for failing to perform the contract.

66.    The plaintiff suffered financial losses as a result of the defendant's breach of contract.

### REQUEST FOR RELIEF

1.    That this Court, under Count X, enter judgment in favor of the plaintiff

against the defendant for breach of contract.

2.    For such other relief as this Court deems appropriate.

### COUNT XI
(Dennis Dimon v. Metropolitan Life Insurance Company -
Negligent Misrepresentation)

67.    Paragraphs 1-66 are realleged and incorporated by reference.

68.    The plaintiff and the defendant entered into a contract whereby the defendant was to

provide a lifetime annuity guaranteed for twenty (20) years in exchange for the

plaintiff releasing all claims for injuries suffered by the plaintiff in a fishing accident.

69.    The defendant negligently misrepresented the terms of the contract, stating that the

contract was for life, guaranteed for 20 years.

70.    The plaintiff relied on the representation of counsel and this defendant as manifested

in the original contract approved by the court and suffered financial losses as a result

of the defendant's negligent misrepresentation in altering the contract.

### REQUEST FOR RELIEF

1.    That this Court, under Count XI, enter judgment in favor of the plaintiff

against the defendant.

2.    For such other relief as this Court deems appropriate.

11

## COUNT XII
(Dennis Dimon v. Kemper Insurance Company -
Breach of Contract)

71.  Paragraphs 1-70 are realleged and incorporated by reference.

72.  The plaintiff and the defendant entered into a contract whereby the defendant was to provide a lifetime annuity guaranteed for twenty (20) years in exchange for the plaintiff releasing all claims for injuries suffered by the plaintiff in a fishing accident.

73.  The defendant breached this contract by altering the agreement after the contract was signed and approved by the court and for failing to perform the contract.

74.  The plaintiff suffered financial losses as a result of the defendant's breach of contract.

### REQUEST FOR RELIEF

1.  That this Court, under Count XII, enter judgment in favor of the plaintiff against the defendant for breach of contract.

2.  For such other relief as this Court deems appropriate.

## COUNT XIII
(Dennis Dimon v. Kemper Insurance Company -
Negligent Misrepresentation)

75.  Paragraphs 1-74 are realleged and incorporated by reference.

76.  The plaintiff and the defendant entered into a contract whereby the defendant was to provide a lifetime annuity guaranteed for twenty (20) years in exchange for the plaintiff releasing all claims for injuries suffered by the plaintiff in a fishing accident.

77.  The defendant negligently misrepresented the terms of the contract, stating that the contract was for life, guaranteed for 20 years.

78.  The plaintiff relied on the representation of counsel and this defendant as manifested

12

in the original contract approved by the court and suffered financial losses as a result of the defendant's negligent misrepresentation in altering the contract.

### REQUEST FOR RELIEF

1.     That this Court, under Count XIII, enter judgment in favor of the plaintiff against the defendant.

2.     For such other relief as this Court deems appropriate.

### COUNT XIV
(Dennis Dimon v. Morgan Stanley -
Breach of Contract)

79.    Paragraphs 1-78 are realleged and incorporated by reference.

80.    The plaintiff and the defendant entered into a contract whereby the defendant was to provide a lifetime annuity guaranteed for twenty (20) years in exchange for the plaintiff releasing all claims for injuries suffered by the plaintiff in a fishing accident.

81.    The defendant breached this contract by altering the agreement after the contract was signed and approved by the court and for failing to perform the contract.

82.    The plaintiff suffered financial losses as a result of the defendant's breach of contract.

### REQUEST FOR RELIEF

1.     That this Court, under Count XIV, enter judgment in favor of the plaintiff against the defendant for breach of contract.

2.     For such other relief as this Court deems appropriate.

COUNT XV
(Dennis Dimon v. Morgan Stanley -
Breach of Fiduciary Duty)

83.    Paragraphs 1-81 are realleged and incorporated by reference.

84.    A broker has a duty to act in the best interest of his client and not to act in any way

adverse or contrary to the interests of the client.

85.    The plaintiff relied upon the defendant for advice, counsel, and information in order

to make an informed decision prior to entering into any settlement agreement

whereby the plaintiff would forfeit his rights to future compensation for his injuries.

86.    Due to the defendant's breach, the plaintiff has suffered financial loss.

REQUEST FOR RELIEF

1.    That this Court, under Count XV, enter judgment in favor of the plaintiff

against the defendant for breach of fiduciary duty

2.    For such other relief as this Court deems appropriate.

PLAINTIFF DEMANDS TRIAL BY JURY ON ALL COUNTS.

Respectfully submitted
By his attorney

DATED: *MAY 20, 2005*

David B. Kaplan, Esq.
**THE KAPLAN/BOND GROUP**
88 Black Falcon Avenue
Suite 301
Boston, MA 02210
(617) 261-0080
BBO #258540

14

# EXHIBIT B

UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

\* \* \* \* \* \* \* \* \* \* \* \*  \*
                                \*
DENNIS JAY DIMON,               \*     **81-0063**
            Plaintiff           \*
                                \*
vs.                             \*
                                \*
JENNY C., INC.,                 \*
            Defendant           \*
\* \* \* \* \* \* \* \* \* \* \* \*  \*

### PLAINTIFF'S COMPLAINT

        Now comes the plaintiff in the above-entitled action
and says:

### COUNT I

        <u>First</u>:    The plaintiff is a resident of Kenyon
in the State of Rhode Island       a seaman and, at all times
hereinafter referred to, a member of the crew of the F/V
JENNY C.

        <u>Second</u>:   The defendant is  Jenny C., Inc.
duly organized under the laws of the State of Rhode Island
with a principal place of business in Pt. Judith, Narragansett
within the District of Rhode Island, and, at all times herein-
after referred to, owned, operated and controlled the F/V
JENNY C.

        <u>Third</u>:    On or about January 24, 1981  the plaintiff
was in the employ of the defendant as a seaman
on the  F/V JENNY C.

        <u>Fourth</u>:   On or about January 24, 1981     while the
said      JENNY C             was in navigable
waters,              and while the plaintiff was in the
exercise of due care in the performance of his duties, he sus-
tained severe and painful personal injuries

        <u>Fifth</u>:    The injuries sustained by the plaintiff were
not caused by any fault on his part, but were caused by the
fault of the defendant, its agents or servants, as follows:

        (a)  Failure to use due care to provide and maintain a
             seaworthy vessel with safe and proper appliances.

        (b)  Failure to use due care to make reasonable and
             periodic inspection of the said vessel, its
             equipment and appliances.

        (c)  Failure to use due care to furnish the plaintiff
             with a reasonably safe place in which to perform
             his work.

(d)   Failure and negligence of fellow employees.

(e)   Failure and negligence in other respects that will
be shown at the trial.

Sixth:        As a result of the said injuries, the
plaintiff has suffered great pain of body and anguish of mind,
lost a great deal of time from his usual work, incurred medical
and hospital expenses, and has suffered and will suffer other
damages as will be shown at the trial, all in the sum of ONE
MILLION ($1,000,000.00) DOLLARS.

Seventh:        This cause of action is brought under the
Merchant Marine Act of 1920, commonly called the Jones Act.

WHEREFORE, the plaintiff demands judgment against the
defendant in the sum of ONE MILLION ($1,000,000.00) DOLLARS
together with costs and interest.

## COUNT II

First:        The plaintiff reitereates all the allega-
tions set forth in paragraphs "First", "Second", "Third" and
"Fourth" of Count I.

Second:        The injuries sustained by the plaintiff
were due to no fault of his, but were caused by the unseaworthi-
ness of the defendant's vessel.

Third:        As a result of the said injuries, the
plaintiff has suffered great pain of body and anguish of mind,
lost a great deal of time from his usual work, incurred medical
and hospital expenses, and has suffered and will suffer other
damages as will be shown at the trial, all in the sum of ONE
MILLION ($1,000,000.00) DOLLARS.

Fourth:        This cause of action is brought under the
General Maritime Law for Unseaworthiness and is for the same
cause of action as Count I.

WHEREFORE, the plaintiff demands judgment against the
defendant in the sum of ONE MILLION ($1,000,000.00) DOLLARS
together with costs and interest.

## COUNT III

First:        The plaintiff reiterates all the allega-
tions set forth in paragraphs "First", "Second", "Third" and
"Fourth" of Count I.

Second:        As a result of his injuries, the plaintiff
incurred expenses for his maintenance and cure and will continue
to do so all to his damage in the sum of TWO HUNDRED THOUSAND
($200,000.00) DOLLARS

WHEREFORE, the plaintiff demands judgment against the defendant in the sum of TWO HUNDRED THOUSAND ($200,000.00) DOLLARS             together with costs and interest; and, in addition, an award for attorney's fees incurred by the defendant's wilful and persistent failure to make prompt payment of maintenance and cure during the period of the plaintiff's disability.

The plaintiff hereby demands a trial by jury on all the issues raised in Counts I, II and III.

By his attorneys,

Michael B. Latti
Latti Associates
95 Commercial Wharf
Boston, Massachusetts   02110
Tel: (617) 523-1000


Laurent L. Rousseau
Moore, Virgadamo & Lynch, Ltd.
112 Bellevue Avenue
Newport, Rhode Island 02840

**EXHIBIT C**

CASE___Dimon___v.___Jenny C. Corporation_____

DATE OF SETTLEMENT___4 '19 '83_____

SUBMITTED BY___REH 'MBL_____

## SETTLEMENT SHEET

GROSS SETTLEMENT                                    $ 425,000.00
                                                    175,000.00 Annuity
LESS - Paid Bills & Expenses:                       250,000.00 Up-front

E. Fee_____      $____60.00_____

Lancer Co. (Investigation) $____336.75_____

Investigo (Investigation) $____958.15_____

Med. Recs._____    $_____3.60_____
Depostions                              467.60
Boston Photo (Copies)_____          $____58.80_____
Travel Exp - R.I.-Trial
Meals - Misc. Exp._____      $____454.78_____

Witness Fees - Experts_____       $____517.70_____

_____      $_____

_____      $_____

Unpaid Bills & Expenses:

Valed (Depos)_____      $____219.75_____

Valed (Depos)_____      $____207.25_____

Potter & McArthur Expert____       $___3812.90_____

Bristol D. Sheriffs_____       $____17.25_____

Moore Virgadamo_____       $____400.00_____
Dr. Levin                               1,000.00
ATTORNEYS FEE (sb) 141,666.66      $_141,485.47_____

TOTAL BILLS & EXPENSES                              $_150,000.00____

BALANCE DUE TO CLIENT                               $_100,000.00____

Attorney's Fee    $_____       Less
                                         IRS lien    4,679.35
Referral Fee to:                                    _____
                                                    95,320.65
_____ $_____

Referral Fee to:

_____ $_____

**EXHIBIT D**

Black Ink                                        83A08153

**CHARTER SECURITY LIFE INSURANCE COMPANY, NEW YORK, 720 FIFTH AVENUE, NEW YORK, N.Y. 10019**

ANNUITY APPLICATION

Name of Annuitant (please print)    ☒ Male    ☐ Female

Dennis J. Dimon

Date and Place of Birth

12/9/59 So. Kingstown, RI

Residence (No., Street, City, State and Zip Code)

Laurel Lane, West Kingston, RI 02892

Business Address (include Name of Employer)

Mail Notices to ☐ Residence   ☐ Business   ☐ Owner

Social Security No.    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

Owner (if other than Proposed Annuitant)

Name:   American Motorists Insurance Co.

Relationship:

Address:

Social Security Tax Payer I.D. No.   36-0727430

☐ Contingent Owner

Beneficiary and Relationship

Primary:   Katerine I. Dimon

Contingent: Jessica I. Dimon - Daughter
            Rebecca Lee Dimon - Daughter

9. Type of Contract Single Premium Deferred Annuity

10. Single Premium Amount   $ 175,000.

11. Maturity Age  ☐ 65  ☐ 70½  ☐ Other: Immediate
                  6/15/83

12. Will this annuity replace or change any existing life insurance or annuity contract? ☐ Yes   ☒ No
    (If yes, give name of company, policy number, and plan of life insurance or annuity.)

13. Is this contribution for a tax qualified plan? ☐ Yes ☒ No
    If so, contract will be issued with a limitation on transferability to conform with IRS regulations. (Check appropriate box for type of qualified plan.)
    ☐ I.R.A. Rollover        ☐ Corporate pension
    ☐ T.S.A. Exchange           or profit sharing plan
    ☐ H.R. 10 Exchange       ☐ Terminal Funding
    ☐ H.R. 10                ☐ Other

14. Special Requests   Immediate Annuity
    20 yr Certain - 3% increase
    $175,000 = 1450.45 per month
                    first payment

15. Amendments and Corrections (For Home Office use only)
    Quote Number 83113

The undersigned represent(s), to the best of his (her) knowledge and belief, that the foregoing statements and answers are complete, true, and correctly recorded and agree(s) to be bound by statements and answers made or to be made in this application. The undersigned further expressly agree(s) as follows:
This application and any policy issued in consequence shall constitute the entire contract. No agent is authorized to make or modify contracts, to waive any of the Company's rights or requirements or to bind the Company by making or receiving any promise, representation or information, unless the same be in writing, submitted to the Company, and made a part of such policy.
2. Acceptance of any contract(s) issued on the basis of the application shall constitute a ratification and acceptance of any change, correction, addition or amendment noted by the "Company" in the "Amendments and Corrections" section above, except that in those jurisdictions where it is required any change in amount or benefits shall require a written consent by the Proposed Annuitant and by the Applicant if other than the Proposed Annuitant.

Dated at Syracuse NY this 4th day of May 1983

Agent Signature (1)         Code  621-61

Please Print Name of Agent (1)

Agent Signature (2)         Code

Please Print Name of Agent (2)

Signature of Annuitant   Dennis J. Dimon

Applicant if other than Annuitant   American M...

By _____ Signature and Title

Please Print Name of General Agency   Dean Witter Reynold

000010

# EXHIBIT E

Metropolitan Life Insurance Company
Annuity Administration Operations
12902 East 51st Street, PO Box 22053, Tulsa, OK 74121-2053

**MetLife**®

June 9, 2003

*ATT CAROLYN LATTIE*

DENNIS DIMON
PO BOX 56
WEST KINGSTON RI 02892 0056

RE: SCIW1126

Dear Mr. Dimon,

This letter is in response to a phone call we received from Katherine Dimon. Since your annuity contract has expired, we are unable to provide you with a duplicate contract. However, the terms of your annuity are described below.

The annuity contract was issued on May 5, 1983 under the "Certain 20 Year" option. American Motorist Insurance Company was considered to be the owner of the annuity, however, you were the annuitant and payee. This contract provided you with a monthly income due on June 5th of each year payable for a total of 20 years (240 monthly payments). The payment amount increased by 3% each year.

The first payment was on June 5, 1983. The final payment was on May 5, 2003.

If you have any questions, please call our customer service center at 1-800-635-7775.

Sincerely,

*Sandy Franklin*

Sandy Franklin
Annuity Payout Specialist III
Annuity Administration Operations

**EXHIBIT F**

KEMPER GROUP

Lumbermens Mutual Casualty Company • American Motorists Insurance Company
American Manufacturers Mutual Insurance Company • American Protection Insurance Company

Long Grove, IL 60049 · 312|540-2000

August 12, 1983

Mr. Robert A. Foley
Dean Witter Reynolds, Inc.
One Boston Place
Boston, Massachusetts  02108

Dear Mr. Foley:

DENNIS DIMON
CHARTER SECURITY POLICY NO: 83 A 08153
OUR FILE NO: 399 LM 106125-Z

I received the replacement policy issued by Charter
Security Life Insurance Company (New York) changing
the terms of the annuity from 240 months certain and
life thereafter to 240 months certain only.

I am advised by Mr. Hughes of Lattie Associates that your
quotation was to provide an annuity which would pay
$1,450.45 per month for the first year increasing annuall
at a rate of 3% compounded annually for 240 months certai
and life thereafter for a single premium of $175,000.
This was the benefit to be provided under the terms of a
general release and settlement agreement approved by
Judge Pettine of the United States District Court for the
District of Rhode Island.

The agreed upon premium was paid and a policy issued whic
is now in the files of the contract owner, American Motor sts
Insurance Company, providing benefits required by the rel ase,
settlement agreement and court order.  I consider the ori inal
annuity contract valid and enforceable and will retain it
in our files.



RECEIVED
★ AUG 17 1983 ★
B. BOEHM

000027

Mr. Robert A. Foley
August 12, 1983
-2-

I intended to return the replacement contract issued by
Barbara Boehm of Charter Security, but it was lost with
my briefcase on August 11, 1983.


Very truly yours,

AMERICAN MOTORISTS INSURANCE COMPANY


John L. Noe
Home Office Claim

JLN:bw

cc:   Ms. Barbara Boehm
      Vice President
      Charter Security Life Insurance Company
      (New York)
      720 Fifth Avenue
      New York City, New York  10019

      Mr. Roger Hughes
      Lattie Associates, Attorneys
      30-31 Union Wharf
      Boston, MA  02109

**EXHIBIT G**





Charter Security Life Insurance Company (New York)
720 Fifth Avenue
New York, New York 10019
Telephone 212-397-2350

September 26, 1983

Mr. John L. Noe
Home Office Claim
American Motorists
Insurance Company
Long Grove, Illinois 60049

          Re:  Dennis Dimon - Policy No. 83 A 08153
               Your File No. 399 LM 106125-2

Dear Mr. Noe:

     I am in receipt of your letter to Barbara Boehm, Vice
President of Charter Security Life Insurance Company (New York
("CSL(NY)"), regarding the annuity policy (Policy No. 83 A 08153)
issued by CSL(NY) to Dennis Dimon.

     According to information you received from Mr. Hughes of
Lattie Associates, Robert Foley of Dean Witter Reynolds, Inc.,
allegedly offered to provide Mr. Dimon with a CSL(NY) annuity
which would pay $1,450.45 per month for the first year increasing
annually at a rate of 3% compounded annually for 240 months
certain and life thereafter based on a single premium of
$175,000.00.

     Contrary to the information you received from Mr. Hughes,
there is nothing to indicate that anything other than a single
premium immediate annuity with a 20 year (i.e., 240 months)
certain period was applied for.  As you can see from the attached
copy of Mr. Dimon's application, which American Motorists
Insurance Company signed as applicant, a 20 year certain policy
was applied for.  I have also attached for your reference, a copy
of a quotation sheet from CSL(NY) to Mr. Foley which clearly
shows that CSL(NY)'s quote was based on the issuance of a certain
period annuity without a life option.  As previously explained by
Ms. Boehm in her letter to Mr. Kurt Snyder of Dean Witter
Reynolds dated July 14, 1983 (see enclosed copy), the option
indicated on the Supplementary Contract originally sent to Dean
Witter Reynolds on June 17, 1983 for delivery to your office was
incorrectly typed as a 240 month certain and life thereafter
annuity instead of 240 months only.  Again, on behalf of CSL(NY),
I apologize for this oversight.

000027

A Member of Charter Insurance Group, Inc.

Mr. John L. Noe
Page 2
September 26, 1983

Based on the foregoing, CSL(NY) guarantees to continue to
pay Mr. Dimon under the terms of his policy a $1,450.45 monthl·
annuity during the first policy year, which will increase
annually at a rate of 3% compounded annually for 240 months
certain.  No·payments will be made beyond the expiration of th·
240 month period.  Accordingly, the original Supplementary
Contract mailed to Robert Foley and in your possession is null
and void.  I would appreciate your returning that contract to:

> Barbara Boehm
> Vice President
> Policyowner Service Department
> Charter Security Life
> Insurance Company (New York)
> 720 Fifth Avenue
> New York, New York 10019

By copy of this letter, I am instructing Ms. Boehm to sen
to your attention a correct copy of the Supplementary Contract
for Dennis Dimon which you stated was lost with your briefcase on
August 11, 1983.

If I can be of any further assistance in this matter, please
do not hesitate to contact me at the above address.

Very truly yours,

Robert Liguori
Counsel

RL/spf
Enclosures

cc:  Ms. Barbara Boehm

> Mr. Robert A. Foley
> Dean Witter Reynolds, Inc.
> One Boston Place
> Boston, Massachusetts 02108

> Mr. Roger Hughes
> Lattie Associates, Attorneys
> 30-31 Union Wharf
> Boston, MA 02109

000026





Lumbermens Mutual Casualty Company • American Motorists Insurance Company
American Manufacturers Mutual Insurance Company • American Protection Insurance Company

Long Grove, IL 60049 · 312|540-2000

October 10, 1983

Mr. Robert Liguori, Counsel
Charter Security Life Insurance
    Company (New York)
720 Fifth Avenue
New York, New York   10019

RECEIVED
* O T 1 3 1983
B. BOEHM

Dear Mr. Liguori:

DENNIS DIMON
CHARTER SECURITY POLICY: 83A08153
OUR FILE NO: 399 LM 106125-Z

In reply to your September 26, 1983, Sections 14 and 15
of the application that I signed were blank.  The entries
now appearing were filled in after I returned the signed
application.

The original annuity policy received was for a term of
240 months certain and life thereafter as ordered and
agreed upon between Mr. Hughes and Mr. Foley.  Your agent,
Mr. Foley further confirmed this to me by telephone in
April, 1983.  May I suggest you contact him to verify
this?

I intend to retain the original policy in our files and
consider it to be valid and enforceable.

Very truly yours,

AMERICAN MOTORISTS INSURANCE COMPANY

John L. Noe
Home Office Claim

JLN:ml

cc: Mr. Robert A. Foley
    Dean Witter Reynolds, Inc.
    One Boston Place
    Boston, MA   02108

    Mr. Roger Hughes
    Latti Assoc., Attorneys
    30-31 Union Wharf
    Boston, MA   02109

cc: Ms. Barbara Boehm
    Vice President
    Policyowner Service Dept.
    Charter Security Life
        Insurance Co. (New York)
    720 Fifth Avenue
    New York, NY   10019

000029

**EXHIBIT I**



**Charter
Security
Life**

Charter Security Life Insurance Company  New York
720 Fifth Avenue
New York, New York 10019
Telephone 212-397-2350

<u>CERTIFIED MAIL RETURN RECEIPT REQUESTED</u>

July 14, 1983

Mr. Kurt Snyder
Dean Witter Reynolds
111 E. Onondaga Street
Syracuse, New York   13202

RE:  Dennis Dimon
     Policy #83A08153
     NSC 1126

Dear Kurt:

As outlined in our telephone conversation, due to a clerical error
the option indicated on the above supplementary contract for Dennis
Dimon was incorrectly typed as 240 months certain and life thereafter
instead of 240 months only.

Enclosed is a new contract correctly stating the option elected.  Please
be advised that the former contract mailed to Robert Foley is null and
void.  I would appreciate it if you will return that contract to my
attention.

Thank you for your cooperation and again, my apologies for this oversight

Sincerely,

Barbara Boehm, Vice President
Policyowner Service Department

BAB:aw

Enc.

000021

# EXHIBIT J



Charter Security Life Insurance Company of New York
720 Fifth Avenue
New York, New York 10019
Telephone 212-397-2350

October 14, 1983

Mr. John L. Noe
Home Office Claim
American Motorists Insurance Company
Long Grove, IL  60049

Re:  Dennis Dimon
     Contract No.  83A08153
     Your File No.  399LM10512 -2

Dear Mr. Noe:

As was indicated in Mr. Robert Ligouri's letter of September 26, 1983, we ar
enclosing a corrected Supplementary Contract in regards to Mr. Dimon's Singl
Premium Immediate Annuity.  This contract has been updated to reflect monthl
payments for a period of 240 months only.

Please see that the original Supplementary Contract, which was mailed to
Robert Foley, is returned to me, as that contract is no longer valid.

Please accept our apologies for any inconvenience this matter has caused you

Sincerely,

Barbara Boehm, Vice President
Policyowner Service Department

BAB/cg

Enclosure

000023

A Member of Charter Insurance Group, Inc.

# EXHIBIT K



**Lumbermens Mutual Casualty Company • American Motorists Insurance Company**
**American Manufacturers Mutual Insurance Company • American Protection Insurance Company**

Long Grove, IL 60049 · 312|540-2000

October 12, 1983

Ms. Barbara Boehm, Vice President
Policyowner Service Department
Charter Security Life Insurance Company (New York)
720 Fifth Avenue
New York, New York  10019

Dear Ms. Boehm:

RE:   DENNIS DIMON
      CONTRACT NO. 83408153
      OUR FILE NO. 399 LM 156125 Z

In reponse to your October 14, 1983 I reject and return
herewith the Supplementary Agreement and General Provisions
attached thereto. The original annuity policy will be re-
tained in the files of American Motorists Insurance
Company and considered valid and enforceable.

Very truly yours,

AMERICAN MOTORISTS INSURANCE COMPANY

John L. Noe
Home Office Claims

JLN/lz

cc:   Mr. Roger Hughes
      Latti Associates, Attorneys
      30-31 Union Wharf
      Boston, MA  02109

cc:   Mr. Robert A. Foley
      Dean Witter Reynolds, Inc.
      One Boston Place
      Boston, MA  02108

000024

# EXHIBIT L

Page 1

1
2

UNITED STATES DISTRICT COURT

3

FOR THE DISTRICT OF MASSACHUSETTS

4

DENNIS DIMON,                    )
                                 )
5                                )
                  Plaintiff,     )
                                 )
6                                )
            vs.                  )
                                 )
7                                )
METROPOLITAN LIFE                )
8   INSURANCE, COMPANY,          )
    KEMPER INSURANCE COMPANY,    )
9   MORGAN STANLEY DW, INC.,     )
    MICHAEL B. LATTI, LATTI      )
10  ASSOCIATES, and LATTI &      )
    ANDERSON, LLP,               )
                                 )
11                               )
                  Defendants.    )
12  - - - - - - - - - - - - - - - - - - - - - - - - - -

13
14
15
16              DEPOSITION OF LEONARD SCHMITT
17                   Purchase, New York
18                 Monday, May 15, 2006
19
20
21
22
23                                          COPY
24

      Reported by: NICOLE AMENEIROS, RPR
25  JOB NO. 184350

1                      Schmitt

2    that would tell you how long that stream of

3    payments would last?

4        A.    There is.  In box number 14 it's in

5    handwriting again says immediate annuity

6    20-year certain.  I believe it says

7    three percent increases, but the photocopy

8    and everything is a little -- a little

9    sketchy there along with $175,000 equals

10   1450.45 per month first, and then I cannot --

11   I cannot make out what it says after that.

12       Q.    Okay.  Mr. Schmitt, can you tell me

13   what your understanding of a 20-year certain

14   annuity is?

15       A.    A product that would guarantee a

16   20-year income stream.

17       Q.    And what would happen in the 21st

18   year?

19            MS. McQUAY:  Objection as to form.

20       Q.    You can answer, Mr. Schmitt.

21       A.    20-year certain all on its own

22   would indicate just a 20-year payment, and

23   the 21st year, based on my understanding of

24   the products, is it would not -- it would not

25   make a payment in year 21.

Page 20

```
 1                      Schmitt
 2        Q.    Okay.  Is there anything on the
 3   annuity application, Exhibit 1, that would
 4   indicate to you that this would be a for-life
 5   annuity?
 6        A.    Nothing that I see on the
 7   application.
 8        Q.    And do you see that it was signed
 9   by a representative from Dean Witter?
10        A.    From what I can make out it -- on
11   my copy it has that it was signed in -- at
12   Syracuse, New York, by somebody, and I can't
13   read the first name.  It looks like E.
14   Schneider in printing, and the indication is
15   I see a code there 621-61, which I would
16   interpret as being the financial advisor
17   number for a Dean Witter representative.
18        Q.    Okay.  How -- and how do you know
19   that's a financial advisor number?  Is that
20   the format?
21        A.    It's the typical format of a
22   financial advisor number for -- for Dean
23   Witter.  And also I noticed in the bottom
24   right-hand side it says Dean Witter Reynolds,
25   the name of the general agency.
```

Page 21

```
 1                        Schmitt
 2         Q.    Have you spoken with Mr. Schneider?
 3         A.    No, I have not.
 4         Q.    Do you know where Mr. Schneider is
 5    located?
 6         A.    I have no idea.
 7         Q.    Do you know if Morgan Stanley has
 8    made any efforts to locate Mr. Schneider?
 9         A.    My understanding is that Morgan
10    Stanley has made effort to find
11    Mr. Schneider.
12         Q.    Do you know what the results of
13    those efforts were?
14         A.    My understanding is that they have
15    not been able to locate Mr. Schneider.
16              MS. McQUAY:  Just for purposes of
17         clarity of the record and point of fact,
18         Peter, in our initial disclosure we
19         recently gave you what we understand to
20         be Mr. Schneider's last known address.
21              MR. LeBLANC:  Your initial
22         disclosure, Sue?
23              MS. McQUAY:  In the supplemental
24         disclosure that we subsequently filed.
25              MR. LeBLANC:  Okay.
```

Page 27

1                          Schmitt

2          A.    They -- they -- whatever records

3    existed were retained within the department.

4    There was no change pre impulse merger.

5          Q.    Okay.  And where -- where was the

6    department?

7          A.    It was in the second World Trade

8    Center on the 74th floor.

9          Q.    And is that where those records

10   were stored?

11         A.    Yes.

12         Q.    What happened to those records?

13         A.    They were destroyed on

14   September 11th.

15         Q.    Do you know if any records survived

16   September 11th?

17         A.    No paper documents for the

18   department survived.

19         Q.    Any computer records?

20         A.    Various computer records were --

21   were -- did survive, certain e-mails, things

22   like that.

23         Q.    Any e-mails related to this annuity

24   for this case?

25         A.    Not that I'm aware of.

Page 82

```
 1                    Schmitt
 2          MS. McQUAY:  Tim?
 3          MR. O'DRISCOLL:  This is Tim
 4      O'Driscoll.  I have no questions.
 5          MS. McQUAY:  Are we done?
 6          MR. DEWICK:  This is Jed Dewick.  I
 7      have nothing further.
 8          MR. KEANE:  This is Brian Keane.  I
 9      have nothing further.
10          MR. LeBLANC:  This is Peter
11      LeBlanc.  We can suspend this deposition
12      without concluding at this time.
13          MS. McQUAY:  Well, I understand
14      that's your position, and just for the
15      record, I will -- I have a contrary
16      position, but we can save that for
17      another day if necessary.
18          MR. LeBLANC:  Thank you.
19          MS. McQUAY:  Okay.  Signing off.
20          ALL PARTIES:  Thank you.
21          MS. McQUAY:  Bye-bye.
22          (Time noted:  1:01 p.m.)
23                    _____
24                    LEONARD SCHMITT
25
```

Page 83

1                          Schmitt

2    Subscribed and sworn to before me

3    this ____ day of _____, 2006.

4

5    _____

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 84

```
 1

 2

 3              C E R T I F I C A T E

 4    STATE OF NEW YORK      )

 5                           : ss.

 6    COUNTY OF BRONX        )

 7

 8            I, NICOLE AMENEIROS, a Notary

 9    Public within and for the State of New

10    York, do hereby certify:

11            That LEONARD SCHMITT, the witness

12    whose deposition is hereinbefore set

13    forth, was duly sworn by me and that

14    such deposition is a true record of the

15    testimony given by the witness.

16            I further certify that I am not

17    related to any of the parties to this

18    action by blood or marriage, and that I

19    am in no way interested in the outcome

20    of this matter.

21            IN WITNESS WHEREOF, I have hereunto

22    set my hand this 15th day of May, 2006.

23

24            _____
                    Nicole Ameneiros
25                NICOLE AMENEIROS
```

# EXHIBIT M

1

VOLUME: I
PAGES: 1 through 172
EXHIBITS: See Index

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-11073 WGY

* * * * * * * * * * * * * * * * * * * * * * * * * *

DENNIS DIMON,                                  )
              Plaintiff,                        )
                                               )
      VS.                                       )
                                               )
METROPOLITAN LIFE INSURANCE                     )
COMPANY, KEMPER INSURANCE                        )
COMPANY, MORGAN STANLEY DW                       )
INC., MICHAEL B. LATTI,                          )
LATTI ASSOCIATES, and                            )
LATTI & ANDERSON LLP,                            )
              Defendants.  )
* * * * * * * * * * * * * * * * * * * * * * * * * *

**ORIGINAL**

**DEPOSITION OF DENNIS J. DIMON**, a witness
called on behalf of the Defendant, taken pursuant
to the Provisions of the Federal Rules of Civil
Procedure, before Julie A. Healey, a Certified
Shorthand Reporter, Registered Professional
Reporter, and Notary Public in and for the
Commonwealth of Massachusetts, at the offices of
Ciapciak & Associates, P.C., 99 Access Road,
Norwood, Massachusetts, on June 29, 2006,
commencing at 11:25 a.m.

COPLEY COURT REPORTING
101 Tremont Street
Boston, Massachusetts 02108

44

1      A.      Hmm mmm.

2      Q.      Was anyone else there at the meeting?

3      A.      Um, I'm not sure at that time.  I know, I

4    know when things went down in the courtroom and

5    stuff like that, that we had, we left the

6    courthouse, and we went to another building, and

7    there was quite a few people there, but I'm not

8    sure exactly what was, was said all the way

9    around.

10         You know, it's so long ago, it's hard to

11   remember exactly what was going on at that time.

12     Q.      Okay, and I'm not sure I'm going to

13   phrase this correctly, but you just said we were

14   in the courtroom and either when it was going down

15   or when it went down, what did you mean by that?

16     A.      Well, at the end of the first trial and

17   then we went to another one because when they

18   appointed a guardian to me, I wasn't quite sure on

19   exactly, the judge asked me how much money that we

20   were going to receive and stuff like that, and

21   because I wasn't sure of the total amount of what

22   we were receiving, and then that's when the judge

23   turned around and assigned the guardian to me to

24   go over everything and make sure I understood

77

1    mean to you?

2        A.    The plan, the policy or whatever.

3        Q.    Okay, and what did this plan or policy

4    give you, what benefit?

5        A.    Um, the money I guess.

6        Q.    So, your understanding from the plan or

7    policy or the term annuity is that it would

8    provide you with some amount of money?

9        A.    Right.

10        Q.    Okay.  The next line here says "American

11    Motorist Insurance Company was considered to be

12    the owner of the annuity, however, you were the

13    annuitant and payee."

14            Do you have any specific understanding of

15    what that means, what that sentence means?

16        A.    Well, they were the people that was

17    paying me, American Motors.  I'm the payee, right,

18    and they're the payee.

19        Q.    Who did you understand American Motorist

20    Insurance Company to be, how did they become

21    involved?

22        A.    They were the first policyholders that

23    handled, you know, the annuity policy.

24        Q.    Okay.  Were they an insurance company

78

that was involved in the Jenny C. matter?

    A.   Not to my, you know, I'm not sure on any of that part what was going on there because Mr. Latti set this all up through, you know, I guess through whatever he had powers to do, you know.

    I'm not sure on how this came about myself.

    Q.   When you say Mr. Latti set this all up, are you referring to the settlement in the Jenny C.?

    A.   Right.

    Q.   Okay, and when you refer to Mr. Latti, are you referring to him as an individual or him as the firm?

    A.   Well, I'm referring to him himself, you know. Otherwise, I'd say Latti & Associates, you know.

    Q.   Okay, and I'll skip down to the third paragraph, it says "The first payment was on June 5, 1983." Do you recall getting a payment way back then?

    A.   I remember getting a check, yes.

    Q.   The final payment was on May 5th, 2003.

110

1    reading them all, I'm not sure.

2        Q.    Okay, and did anyone read those documents

3    to you?

4        A.    Not that I can recollect.

5        Q.    Okay, but the representative did say your

6    mother said it was okay to sign?

7        A.    Right.

8        Q.    And the representative from Latti &

9    Associates who came to the hospital, that wasn't

10   Mr. Latti himself?

11       A.    Um, no, not, not that I know of.  I can't

12   even remember his name.

13       Q.    Okay.

14       A.    They had me on so many painkillers, I

15   didn't know if I was coming or going.

16            MR. LeBLANC:  Can you mark that as

17   Exhibit 2, please.

18            (Exhibit No. 2, Annuity Application,

19   marked for identification.)

20            MR. LeBLANC:  For the record, I've

21   asked that Exhibit 2 be marked, it's entitled

22   "Annuity Application, Charter Security Life

23   Insurance Company, New York."

24

170

1          I, Dennis J. Dimon, having read the

2     foregoing transcript of my testimony, do hereby

3     certify under the pains and penalties of perjury

4     the same contains a true and accurate record of my

5     answers to the questions herein set forth,

6     together with correction pages, if any, attached.

7

8

9

10

11                    _____
                      DENNIS J. DIMON

12

13

14

15

16

17

18

19

20

21

22

23

24

171

1                              ERRATA SHEET

2

3        PAGE    LINE                          DESCRIPTION

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

172

# C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK, SS.

I, Julie A. Healey, Certified Shorthand

Reporter, Registered Professional Reporter, and

Notary Public in and for the Commonwealth of

Massachusetts, do hereby certify:

That DENNIS J. DIMON, the witness whose

testimony is hereinbefore set forth, was duly

sworn by me and that such testimony is a true and

accurate record of my stenotype notes taken in the

foregoing matter, to the best of my knowledge,

skill and ability.

IN WITNESS WHEREOF, I have hereunto set

my hand and Notarial Seal this 6th day of July,

2006.

Julie A. Healey
CSR, RPR
Notary Public

My Commission Expires:  March 26, 2010

# EXHIBIT N

1

```
                    VOLUME:  I
                    PAGES:  1 through 123
                    EXHIBITS:  See Index


         UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF MASSACHUSETTS

              Civil Action No. 05-11073 WGY


   * * * * * * * * * * * * * * * * * * * * * * * * * *
   DENNIS DIMON,                    )
                     Plaintiff,    )
                                    )
        VS.                         )
                                    )
   METROPOLITAN LIFE INSURANCE )
   COMPANY, KEMPER INSURANCE     )
   COMPANY, MORGAN STANLEY DW    )        ORIGINAL
   INC., MICHAEL B. LATTI,       )
   LATTI ASSOCIATES, and         )
   LATTI & ANDERSON LLP,         )
                     Defendants. )
   * * * * * * * * * * * * * * * * * * * * * * * * * *
```

**DEPOSITION OF MICHAEL B. LATTI,** a witness called on behalf of the Defendant, taken pursuant to the Provisions of the Federal Rules of Civil Procedure, before Julie A. Healey, a Certified Shorthand Reporter, Registered Professional Reporter, and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Ciapciak & Associates, P.C., 99 Access Road, Norwood, Massachusetts, on July 25, 2006, commencing at 11:08 a.m.

```
              COPLEY COURT REPORTING
                 101 Tremont Street
            Boston, Massachusetts 02108
```

6

plus.

Q.   Okay.  Can you tell us how long you've been in the practice of law?

MR. DeWICK:  Objection.

BY MR. LeBLANC:

A.   I was actively practicing from 1960 until '99 when I became of counsel with the firm of Latti Associates.  It later became Latti & Anderson, and I, today, I'm of counsel, but I'm not actively practicing.

Q.   Okay, and in 1999 when you became of counsel, who were the partners at Latti & Associates at that time?

A.   David Anderson, Carolyn Latti, and myself.

Q.   Okay, and what's Carolyn Latti's relationship to you?

A.   It's my daughter.

Q.   And Mr. Anderson?

A.   Son-in-law.

Q.   Okay.  What was the corporate form, the business form of Latti & Associates in 1983?

A.   It was probably, '83, it was Michael B. Latti and Roger E. Hughes doing business as Latti

7

Associates, most of '83.

Q.    Okay.  When you say doing business as, was it a partnership?

A.    It was a partnership, Roger Hughes became a partner in March of '83, but the agreement was predated to January 1st, '82, so, he actually became a partner in '82, January 1st, '82.

Q.    Were there any other partners at that time?

A.    No.

Q.    Any associates?

A.    There was about eight or nine associates that worked for the firm.

Q.    Okay, and what was the agreement between the firm and the associates at that time?

A.    I don't understand your question.

Q.    Did you have agreements with the associates about their employment with Latti & Associates?

A.    They were employees, there wasn't a written contract, they were employed day-to-day I guess or year to year.

Q.    Okay.  Did Latti & Associates provide those employees benefits?

16

1    after a certain formula was applied, what other

2    responsibilities or duties or authority did he

3    have?

4         A.    That's difficult, very broad to answer.

5    He was just a practicing attorney, tried and

6    settled cases, and I don't know what you're

7    driving at here for the question.  It's too broad.

8         Q.    Did he make hiring and firing decisions

9    at the firm?

10        A.    No.

11        Q.    Did he make decisions about what cases

12   you would bring into the firm?

13        A.    Yes.

14        Q.    On his own or in consult with you?

15        A.    No, he would, he would talk to me, and we

16   would decide what to take and which cases to

17   prosecute and that type of thing, yeah, oh, yeah.

18        Q.    Did he have authority to overrule your

19   decisions about what cases to take if he felt

20   strongly about a case?

21        A.    We weren't that way, we were very close,

22   Joe Flannery and myself.  We also worked out an

23   understanding where it was unanimous, either he or

24   me or I would listen to him and he would listen to

19

1    prior.

2        Q.    Okay.  During the time that you were a

3    partner with Roger Hughes, did you have any other

4    partners during that period of time?

5        A.    I don't think so.

6        Q.    Okay, and Mr. Hughes' partnership

7    interest was 15 percent?

8        A.    Yes.

9        Q.    Was your partnership interest 85 percent?

10       A.    Yes.

11       Q.    Okay, and in terms of decision making

12   authority at the firm Latti Associates when

13   Mr. Hughes was a partner, who had the decision

14   making authority at that time?

15       A.    Both of us.

16       Q.    Okay.

17       A.    In fact, Roger Hughes had a great deal of

18   authority in decision making, and he made it on

19   his own because I had back surgery in December of

20   '82 at the Mass. General Hospital, I had two discs

21   removed, and I was out of the office from, I would

22   say November the 7th or 8th until February, and

23   even in February I only came in maybe two or three

24   times for either settling up a case or when I had

20

1    to.

2           I was on trial when I collapsed in the

3    courtroom and went to the Mass. General.  I

4    remember coming in for that, and I don't remember

5    sitting, I was only allowed to stand, stand or lie

6    down, and I couldn't sit until probably May or

7    June of that year.

8           So, I was not in the office a great deal

9    at the time, and Roger Hughes was very involved in

10   the decision making because he was my partner and

11   at that time very close.

12        Q.   And when you say at that time, you mean

13   that 1982, '83 period?

14        A.   I mean from November until I got on my

15   feet, basically it was May or June.  I used to

16   take depositions lying down in our conference

17   room.

18        Q.   Okay.

19        A.   During that period of time of April and

20   May, I remember numerous cases.  I was excused

21   from participating in trials in the Federal Court

22   for months, I think six or eight months.

23        Q.   And when you say at that time, that's the

24   time period you're referring to?

21

1      A.   I'm referring from May, November of '82

2    until at least when I got on my feet in September

3    of '83.

4      Q.   And during that period of time or during

5    the period of time where Mr. Hughes was a partner,

6    did he have the authority to hire and fire

7    employees?

8      A.   He had the, subject to my consent or

9    approval, but he could bring up an employee and

10   hire them or fire them.  He was in complete, I

11   wasn't even there at the office.  I was flat on my

12   back in bed for months.

13     Q.   Likewise, bringing cases into the firm,

14   did Mr. Hughes need your consent or approval to

15   bring cases into the firm?

16     A.   He didn't need my approval, he just

17   brings them into the firm.  He knows that's the

18   rule, that every case comes into the firm and is

19   processed by the firm.

20          He doesn't need my approval or my

21   sanction or anything.  He makes his own decision,

22   what cases to bring in.  If the case was not

23   meritorious and I knew it, I would say something

24   to him, "We're not going to take that case," and

24

1    Q.    Okay.  Before you saw those documents

2    yesterday, have you seen them before, any of them?

3    A.    I have seen them before, some of them,

4    probably not all of them.  They were sent to me

5    when my deposition was noticed originally in May

6    by Jed, and I saw some of them but not all of

7    them.

8    Q.    Okay.  So, prior to May, did you see any

9    of those documents, recollect seeing any of those

10   documents?

11   A.    Not that I -- rephrase your question or

12   ask it in another way.

13            MR. LeBLANC:  Or we can have the

14   court reporter read it back to you.

15            (Last question read back by the court

16   reporter.)

17   BY MR. LeBLANC:

18   A.    Not the ones that he sent, that was the

19   first time I saw those documents.  I might have, I

20   don't -- no, the answer is no, that's the first

21   time in May that I saw those documents that I

22   remember.

23   Q.    Okay.  Do you remember Latti & Associates

24   having a client named Dennis Dimon?

25

1          A.    Yes.

2          Q.    And what do you recall about that

3     representation?

4          A.    That's very broad, what do I recall about

5     the representation, it's too broad to answer.

6          Q.    Okay.  Do you recall that he was a

7     client?

8          A.    He was a client.

9          Q.    And do you recall that the firm was his

10    attorney of record?

11         A.    We were attorney of record, right.

12         Q.    And that the firm represented Mr. Dimon

13    in a personal injury action?

14         A.    Yes.

15         Q.    Okay, and that the firm entered an

16    appearance on behalf of Mr. Dimon in Federal

17    Court?

18         A.    We must have, I think that's correct,

19    that if we represented him, that we filed an

20    appearance.  I don't remember filing an appearance

21    though.

22         Q.    Do you recall ever meeting with

23    Mr. Dimon?

24         A.    I do remember a meeting with Mr. Dimon,

26

1    probably two.

2        Q.    Can you tell us what happened at those

3    meetings?

4        A.    The first meeting with Dennis Dimon that

5    I remember was after the verdict that Joe Flannery

6    got, I don't remember the amount, but it was a

7    good verdict, and I met with Dimon, Dennis Dimon I

8    would say sometime in the beginning of April as I

9    remember it of '83.

10            He was undecided at that time whether to

11    go with Joseph Flannery, Joseph Flannery had left,

12    or to stay with Latti Associates and continue the

13    case with Latti Associates.  It was being

14    appealed, I do remember that, by the boat owner,

15    meaning the insurance company involved.

16            I convinced him to stay with Latti

17    Associates and he did stay with Latti Associates.

18    I remember, that's all I remember of that meting.

19    I met with Dimon I'd say a couple weeks after, and

20    I explained to him the settlement that, I believed

21    Rogers Hughes gave me the particulars of the

22    settlement.  I do not remember settling the Dimon

23    case.

24            I recommended the settlement to Dimon, I

31

1    each question, the answer to the question that the

2    whole deposition was other accurate or inaccurate.

3    There were parts that weren't.

4        Q.    What parts were inaccurate then?

5        A.    I don't remember what parts were

6    inaccurate then.

7        Q.    We'll come back to that.  In terms of

8    which attorney at Latti Associates handled

9    Mr. Dimon's case, who was primarily responsible

10   for that case?

11       A.    That's difficult to say.  At what time?

12       Q.    In 1983.

13       A.    In '83, the case probably was tried

14   according to the records by Joseph Flannery and I

15   do have a memory that he tried the case.  The case

16   was, and I think Roger Hughes had some input into

17   the case.

18            Again, I was not present during that time

19   that it was tried in the office.  It was tried in

20   February of '83, and after Joseph Flannery got the

21   verdict, the case was assigned completely to Roger

22   Hughes and he was responsible for the case.

23       Q.    And at that point he was a partner at

24   Latti Associates?

32

1      A.    Correct.

2      Q.    Okay, and in fact in this period of time

3  after your back surgery in April of 1983, you had

4  at least two meetings or two meetings that you

5  recollect with Mr. Dimon?

6      A.    Yes.

7      Q.    Is that correct?

8      A.    Yes.

9      Q.    Okay.  Now, do you recall if you came to

10  the office that day or those days just to meet

11  with Mr. Dimon or were you there generally

12  working?

13      A.    Yeah, I came to the office lying down in

14  a special car, and I think I stood most of the

15  meeting with Dennis Dimon.

16      Q.    In 1983, what was the mailing address for

17  Latti Associates?

18      A.    I would say 30-31 Union Wharf, Boston.

19      Q.    During that period of time, do you recall

20  if anything would have alerted you to a problem

21  with receiving mail at Latti Associates?

22      A.    In what month?

23      Q.    In 1983?

24      A.    I don't know whether it was '83.  We

33

1    moved from 95 Commercial Wharf I believe in '82,

2    and we had a problem with the mail.  We put in

3    cards of transfer of address with the post office.

4    We failed to get certain notification of hearings

5    and trials in the Federal Court.

6         We showed that we never got at the time

7    the notification.  We had a means of docketing the

8    mail and what was received, and that was vacant,

9    so, we never got certain hearings and trial dates,

10   and we never appeared and we were defaulted.

11        By showing that, that we never got

12   notice, they were removed, the defaults, and

13   restored.  That was during '82, and I don't

14   remember if it was also '83.

15        Q.   And was the reason you didn't get notice

16   that they mailed it to your old address instead of

17   your current address?

18        A.   It came back to the center.  I do not

19   remember whether they were addressed to 30-31 that

20   we received it or it was addressed to 95

21   Commercial Wharf, I don't remember.

22        We showed we never got mail in the

23   Federal Court and because, I'm not sure, I don't

24   remember and I remember we tried to clear it up

34

1    and it still occurred and it had stopped in '82 or

2    stopped in '83.

3        Q.   And in answering that question, you

4    referred to docketing the mail?

5        A.   We had a system that the mail was

6    docketed.

7        Q.   And what does that mean?

8        A.   Every piece of mail we get, we have a

9    different, we had a book that showed that we

10   received such and such, that we received a letter

11   or something like that.

12       Q.   Okay, and that was every piece of mail

13   that came into the firm?

14       A.   Not every piece of mail, most of the

15   mail.

16       Q.   Okay.  What mail was docketed?

17       A.   I think court appearances and that type

18   of thing was docketed on to a diary, into a book

19   of trials, of hearings, and things like that that

20   we had, and there was a check mark put on the

21   piece of mail so the lawyer would know that it was

22   docketed, and he would not only, so, we, when the

23   mail came in, we had docketed certain things like

24   hearings and things like that and the lawyer

42

1    that.  He was an excellent trial lawyer.

2        Q.   Okay.

3             MR. LeBLANC:  Can we take a quick

4    break?

5             MR. DeWICK:  Yes.

6             (A short break was taken.)

7    BY MR. LeBLANC:

8        Q.   Mr. Latti, do you remember who were the

9    parties involved in the Dimon vs. Jenny C. case?

10       A.   I don't understand your question.

11       Q.   Do you remember who the parties in the

12   Dimon vs. Jenny C. case were?

13       A.   I don't know what you mean by parties.

14       Q.   Well, what would you define a party as to

15   a case?

16       A.   A party to a case, the people that were

17   involved in the case.

18       Q.   Okay.  Who was involved in the Dimon vs.

19   Jenny C. case?

20       A.   Dennis Dimon and the boat, I don't

21   remember the boat's name.

22       Q.   Okay.

23       A.   It was the corporation probably.

24       Q.   Do you recall if any other person was

43

1    involved or entity was involved in that case?

2        A.    As a plaintiff sued the boat owner, which

3    was the corporation, that's to me who was involved

4    in the case.

5        Q.    Do you know if Charter Security was a

6    party to --

7        A.    No.

8        Q.    Let me finish the question, please.    Do

9    you know if Charter Security was a party in the

10   Dimon vs. Jenny C. case?

11       A.    Charter Security was not.

12       Q.    They were not a party?

13       A.    Were not a party.

14       Q.    Do you know if Kemper Insurance Company

15   was a party?

16       A.    They were not a party.

17            MR. LeBLANC:  For the record, I'm

18   going to hand everyone a copy of what was marked

19   as Exhibit 25 to Mr. Hughes' deposition.  Can you

20   mark that document as Exhibit 1, please.

21            (Exhibit No. 1, Settlement Sheet,

22   marked for identification.)

23   BY MR. LeBLANC:

24       Q.    For the record, Mr. Latti, I'm going to

44

1    hand you a document that we've marked as Exhibit 1

2    titled "Settlement sheet," and the case identified

3    on the settlement sheet is Dimon vs. Jenny C.

4    Corporation and a settlement date of 4/19/1983.

5            Can you look at that document, Mr. Latti?

6        A.    Okay, I've looked at it.

7        Q.    Do you know what that document is?

8        A.    It's a settlement sheet from, it looks

9    like from our office.

10       Q.    Okay, and when you say our office, you

11   mean Latti Associates?

12       A.    Latti Associates.

13       Q.    Okay, and what was the purpose of this

14   document?

15       A.    To determine out of a settlement what the

16   client gets net, what he gets clear, and to be

17   given to the client at the time if he requests it.

18       Q.    Is there any other purpose for creating a

19   document like this?

20       A.    It's standard procedure that we use a

21   settlement sheet for each case that was disposed

22   of, either a trial or settlement.

23       Q.    Do you see the third line from the top

24   where it says "Submitted by BEH/MBL"?

45

exactly what was going on and stuff like that as far as how much I was getting, and you know, you know, and stuff like that, what my intentions were and stuff like that.

Q.   Okay.  At that hearing where the judge appointed the guardian, do you recall that hearing, what happened there?

A.   Certain parts of it, yeah.

Q.   Okay.  Do you recall who was there representing you at that hearing?

A.   Latti & Associates was one of the people, I'm not sure, I don't remember who it was.

Q.   Did you ever meet Mr. Latti?

A.   Himself, yeah.

Q.   Okay.  Did he handle your trial?

A.   Not himself, no.

Q.   But someone from his office did?

A.   Right.

Q.   Okay.

A.   There was two of them, two people actually from his office.

Q.   And at the hearing where the judge appointed the guardian, you were represented by counsel from Mr. Latti's office or Latti &

46

Associates?

    A.    Right.

    Q.    And would it be fair to say that -- strike that.

    Was it your understanding based on what happened at that meeting that the judge had concerns about your ability to understand the settlement?

    A.    Right, or the amount that we were getting, right.

    Q.    And do you recall what words the judge used to tell you that he had that concern?

    A.    That's about the way he put it to me, he says, he was kind of a funny guy actually, "You're not sure on exactly how much you're getting?" and then he turned to the lawyers, and he says, "Well," he says, "This is as far as this is going to go," he says, "We've got to find somebody to make sure exactly what Mr. Dimon knows what's going on," you know, and that was more or less the end of it from there.

    He didn't let me testify, you know, let me say anything more after that.

    Q.    Okay, and before he made that statement,

73

1    sense, and the issues were laid out by the papers

2    and what occurred.

3          The issues are very narrow, so, time in

4    Dimon does not hurt this case or his causes of

5    actions against the different parties, and I

6    stress that he cannot bring a lawsuit against

7    until twenty years when he was hurt when they

8    stopped payment because if he brought a suit

9    before twenty years, there was the defense of

10   anticipatory breach, and that is a good defense,

11   and it is binding on Dimon as well as anyone.

12         Q.   Wouldn't it be the case that twenty years

13   ago you would still have a file on the Dimon vs.

14   Jenny C. case?

15         A.   I don't understand your question.

16         Q.   In 1983, you would still have a complete

17   file on the Dimon vs. Jenny C. case at Latti

18   Associates?

19         A.   Yes.

20         Q.   And wouldn't you also expect that in

21   1983, Kemper Insurance Company would have a

22   complete file on an annuity that was less than a

23   year old at the time?

24              MR. GOLDEN:   Objection.

74

1                    MR. DeWICK:  Objection.

2      BY MR. LeBLANC:

3          A.   Would I expect, I don't know, I don't

4      know their practice or procedure at all, so, I

5      can't answer that.

6          Q.   Okay.  Would you be surprised if they

7      didn't have a complete file?

8          A.   I don't know.

9                    MR. GOLDEN:  Objection.

10     BY MR. LeBLANC:

11         A.   I don't know.

12         Q.   And in your own experience over forty

13     years of file keeping as an attorney, would you be

14     surprised if a complete file was not kept by a

15     party or a person involved in a case after just

16     months after the case was over?

17         A.   I would be surprised, yeah.

18         Q.   Okay, and in fact, in your case, in the

19     Dimon vs. Jenny C., can you tell us when that file

20     was destroyed?

21                    MR. DeWICK:  Objection.

22     BY MR. LeBLANC:

23         A.   I can't tell you when that file was

24     destroyed, but we have a practice of keeping them

75

1      for tax purposes for about six or eight years

2      before a file is destroyed.

3          Q.   Okay.  So, you don't have any reason to

4      believe that the Dimon vs. Jenny C. file was

5      destroyed any time before 1988, '89?

6          A.   I don't know, I don't know that.  Of

7      course I'm telling you our practice.  It could

8      have been destroyed before because of computers

9      coming into being, and we were completely

10     computerized, and we destroyed files earlier than

11     six years.

12              We put them on disks, some of them, it

13     got out of control, the class actions and the

14     multi districts with files galore at warehouse

15     storage, and some of them were destroyed and some

16     of them were put on disk.  I don't know.

17         Q.   Okay.  I'm sorry, go ahead.

18         A.   Yeah, that's it, I don't know.

19         Q.   In terms of the disks, that, the files

20     that were put on disks, did you cause a search to

21     be made of those disks for files related to the

22     Dimon vs. Jenny C. case?

23         A.   Yes.

24         Q.   Okay, and what was the result of that

76

1    search?

2         A.    Zero.

3         Q.    Okay, and in terms of the files that are

4    retained in a warehouse by Latti Associates or

5    Latti & Anderson, did you cause a search to be

6    made of those files?

7         A.    Yes.

8         Q.    And what was the result of that search?

9         A.    Nothing.

10         Q.    Okay.  Other than the documents that you

11    have disclosed or produced by, through your

12    attorney, do you know of any other documents that

13    exist related to the Dimon vs. Jenny C. case?

14         A.    No.

15         Q.    Any other documents related to Dennis

16    Dimon in any way?

17         A.    No.

18              MR. LeBLANC:  Can you mark that as

19    Exhibit 4, please.

20              (Exhibit No. 4, Annuity Application,

21    marked for identification.)

22              MR. LeBLANC:  Why don't we go off

23    record, we're going to take a quick break.

24              (A short break was taken.)

121

1          I, Michael B. Latti, having read the

2    foregoing transcript of my testimony, do hereby

3    certify under the pains and penalties of perjury

4    the same contains a true and accurate record of my

5    answers to the questions herein set forth,

6    together with correction pages, if any, attached.

7

8

9

10

11    _____
      MICHAEL B. LATTI

12

13

14

15

16

17

18

19

20

21

22

23

24

122

1                               ERRATA SHEET

2

3        PAGE     LINE                              DESCRIPTION

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

123

## C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK, SS.

        I, Julie A. Healey, Certified Shorthand

Reporter, Registered Professional Reporter, and

Notary Public in and for the Commonwealth of

Massachusetts, do hereby certify:

        That MICHAEL B. LATTI, the witness whose

testimony is hereinbefore set forth, was duly

sworn by me and that such testimony is a true and

accurate record of my stenotype notes taken in the

foregoing matter, to the best of my knowledge,

skill and ability.

        IN WITNESS WHEREOF, I have hereunto set

my hand and Notarial Seal this 8th day of August,

2006.

                          Julie A. Healey
                          CSR, RPR
                          Notary Public

My Commission Expires:  March 26, 2010

# EXHIBIT O

Exhibits:   22 - 25          Volume 1, Pages 1 - 84

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-11073-REK

- - - - - - - - - - - - - - - - - - - - - - - - - -

DENNIS DIMON

Plaintiff

vs.

METROPOLITAN LIFE INSURANCE

COMPANY, et al.

Defendants

(Complete caption on next page.)

- - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF ROGER E. HUGHES, JR.

Wednesday, May 10, 2006, 2:01 p.m.

Sullivan, Weinstein & McQuay, P.C.

2 Park Plaza, Suite 610

Boston, Massachusetts

- - - - - - - Reporter:  David A. Arsenault, RPR - - - - - - -

darsenault@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415, Boston, Mass. 02109

617.728.4404   fax 617.728.4403

Roger E. Hughes, Jr.
Volume 1 - May 10, 2006

6

1　Q. What is your occupation?
2　A. I'm a lawyer.
3　Q. By whom are you currently employed?
4　A. Myself.
5　Q. You are self-employed. Does your law
6　practice have a name?
7　A. Hughes & Associates.
8　Q. What is your business address?
9　A. 46 Accord Park Drive, Norwell, Mass. 02061.
10　Q. How long have you been self-employed?
11　A. Since I would guess 1984, '82.
12　Q. Could you describe your educational
13　background?
14　A. I went to Princeton University. I
15　graduated in 1968. I went to Boston College Law
16　School from '69 through '71, graduating in '71.
17　That's it.
18　Q. Are you admitted to practice law in the
19　State of Massachusetts?
20　A. I am.
21　Q. When were you admitted to the bar,
22　approximately?
23　A. 1971.
24　Q. After graduating from law school in 1971,

7

1　did you begin practicing law?
2　A. I did.
3　Q. Could you describe to us your employment
4　history as a lawyer following your graduation.
5　A. Once I was sworn in in Massachusetts, I
6　entered the U.S. Navy. I was a Navy JAG officer for
7　almost four years. When I was discharged from the
8　Navy, I started with Parker Coulter Daley & White, I
9　believe it was May 1975. I was there until February
10　of 1977. At that time I joined the firm of Kaplan
11　Latti & Flannery. I was with that firm and
12　successive firms until September of 1984, I believe.
13　In 1984 in September to approximately May of '85 I
14　was a partner in a firm Halstrom & Hughes, which was
15　at 132 Boylston Street, two or three doors down from
16　here.
17　　　　Then I opened a practice with an
18　associate, Brian Shontz. The name of that firm was
19　Hughes & Shontz. Our initial office was in
20　Braintree. Then in approximately 1989 and '90 we
21　opened an office in Norwell at 17 Accord Park Drive.
22　In 1995, I opened my present practice. I
23　have been at 46 Accord Park Drive since '95 or '96.
24　Q. If I understood you correctly, you

8

1　testified a little while ago that you have been
2　self-employed since 1982?
3　A. Yes.
4　Q. And yet if I also understood you, you were
5　working for Kaplan Latti & Flannery and successor
6　firms until September 1984?
7　A. Correct.
8　Q. Can you explain, please?
9　A. In 1982 I became a partner. The firm at
10　that point was called Latti & Associates.
11　Q. So Kaplan Latti & Flannery became Latti &
12　Associates?
13　A. Yes.
14　Q. Do you recall approximately when the firm's
15　name changed to Latti & Associates?
16　A. Approximately late 1978. It could have
17　been late 1977.
18　Q. When you left in September of 1984, was it
19　still known as Latti & Associates?
20　A. Yes.
21　Q. So approximately 1977 or '78 until the time
22　you left in September of 1984, you were working
23　first as an associate and then as a partner in Latti
24　& Associates?

9

1　A. Correct.
2　Q. Focusing in particular on the time that you
3　spent at Latti & Associates, what was the nature of
4　your practice?
5　A. We were trial lawyers.
6　Q. And prior to joining Latti & Associates,
7　had you also practiced as a trial lawyer?
8　A. I have.
9　Q. What's the nature of your practice today?
10　A. I'm a real estate lawyer.
11　Q. A radical change. When did you switch from
12　being a trail lawyer to a real estate lawyer?
13　A. It was a gradual change starting
14　approximately 15 years ago. In my practice probably
15　the last five to seven years has been almost
16　exclusively real estate and office work.
17　Q. As a trial lawyer during your years at
18　Latti & Associates, what kind of cases did you
19　handle, generally?
20　A. All kinds of cases, admiralty cases, motor
21　vehicle cases, product liability cases, I may have
22　done some contract cases. I really can't recall.
23　For the most part it was tort work.
24　Q. And did you represent mostly plaintiffs?

6 (Pages 18 to 21)

Roger E. Hughes, Jr.
Volume 1 - May 10, 2006

18

1  Exhibit 22, as you may have gathered is the
2  settlement sheet.
3      MR. O'DRISCOLL: Okay, thank you.
4      A. This is a copy of the transcript of the
5  hearing before Judge Pettine.
6      Q. And Exhibit 23 is the hearing transcript
7  that you indicated Mr. Kaplan gave to you earlier?
8      A. I haven't gone through it page by page but
9  I assume it is the same.
10     Q. If you would like to review it, by all
11  means.
12     A. I don't know what it is that he sent me.
13  The only way I could guarantee it is the same is to
14  go through it page by page. I'm trusting you that
15  this is the same copy.
16     Q. Let me put it this way. I will represent
17  to you that it is the same copy that Mr. Kaplan
18  provided to me.
19     A. Then it is the one that I have.
20     Q. All right. Now, reviewing the hearing
21  transcript, Exhibit 23, refreshed your memory that
22  you were present at the hearing before Judge
23  Pettine; is that correct?
24     A. I can picture in my mind being in a

19

1  courtroom with Leonard Decof on the stand, and I was
2  there representing, quote, "the plaintiff." I
3  couldn't picture Dennis Dimon in my mind at this
4  point in time. If he walked into the room today, I
5  wouldn't know.
6      Q. So if Mr. Dimon was the plaintiff in this
7  case and was the subject of this hearing before
8  Judge Pettine, you were there representing him,
9  correct?
10     A. It appears that way from the transcript.
11     Q. And you have no reason to disagree with
12  this?
13     A. I have no reason to disagree with that.
14     Q. Now, in reviewing the hearing transcript,
15  Exhibit 23, did you see that one portion of the
16  settlement in this case involving Mr. Dimon was a
17  structured settlement?
18     A. Yes. I saw that first from the settlement
19  sheet.
20     Q. And then you saw that referenced also in
21  the hearing transcript?
22     A. Correct.
23     Q. And do you have any memory at all now of
24  the terms of the settlement in this case, other than

20

1  what you see in the documents?
2      A. None.
3      Q. So all you know is what you see in the
4  documents. You have no independent recollection; is
5  that correct?
6      A. I have no independent recollection.
7      Q. In Mr. Decof's testimony in this hearing to
8  Judge Pettine, he testified that he had, I'm reading
9  now and I'm quoting from the transcript hearing,
10  Mr. Decof's testimony: "I questioned Mr. Hughes
11  carefully about the present value of this structured
12  portion of the settlement because there are many
13  different present values." He goes on to say: "I
14  know from my experience that different discount
15  rates can be used and different companies will give
16  different amounts for the same amount of money.
17  Mr. Hughes had told me that when the settlement was
18  originally offered -- I think he acted with care and
19  expert, by the way in this matter, or his office
20  did -- when the settlement was originally offered,
21  the structured settlement, Mr. Hughes asked the
22  defendants what it was costing them to pay for this
23  structured settlement and they told him $175,000."
24          Does that refresh your memory at all

21

1  about conversations that you had with Mr. Decof?
2      A. No.
3      Q. If you were present in the courtroom with
4  Mr. Decof when he was giving this testimony and he
5  testified erroneously, would you expect that you
6  would have corrected him?
7      A. Well, I expect that he was telling the
8  truth.
9      Q. He goes on to testify, quoting now,
10  "He," referring to you, "then asked that they allow
11  him the $175,000 and his office would purchase an
12  annuity policy for the plaintiff on the market at
13  the best rate that they could get it. And I checked
14  out the annuity policy and found that this is a very
15  solid and good return for $175,000 with reference to
16  the stature of the company that's involved. I did
17  find out, and I instructed the plaintiff that it was
18  possible to get a little bit higher payments for the
19  same $175,000, as a matter of fact. Rather than the
20  1450.45 per month for the first year, they could
21  possibly get payments of up to as high as 1550 a
22  month," and then he goes on.
23          When Mr. Decof testified that you had
24  asked the defendants what it was going to cost them

10 (Pages 34 to 37)

Roger E. Hughes, Jr.
Volume 1 - May 10, 2006

34

1    A. I'm not sure, because I'm not sure whether
2  this case was settled before I appeared at the
3  settlement conference. At that time in 1983 Joe
4  Flannery and an associate David Ansel left the firm.
5  I can tell you from looking at the docket entries
6  that Mr. Flannery in the docket entries has a
7  telephone number which is different from the
8  telephone number for Latti & Associates. I don't
9  know, but it may be that the case was settled by Mr.
10  Flannery.
11    **Q. When did Mr. Flannery leave Latti &**
12  **Associates?**
13    A. Roughly March, April 1983.
14    **Q. So you think it is possible, you're not**
15  **sure, but you think it is possible that Mr. Flannery**
16  **tried and settled this case and you sort of picked**
17  **up the pieces as it were?**
18    A. I think that's possible, yeah.
19    **Q. Do you know where Mr. Flannery is now?**
20    A. He's deceased.
21    **Q. Let me now show you what has been marked as**
22  **Exhibit 5 in this case. Take a moment to review**
23  **that, if you need to, and tell me if you've seen**
24  **that before today.**

35

1    A. This is a copy of the letter that I
2  received from Mr. Kaplan.
3    **Q. Now, you are shown as having also been sent**
4  **a copy of this letter back at the time, back in**
5  **1983, are you not?**
6    A. Yes.
7    **Q. Did you receive a copy back then?**
8    A. I don't remember seeing it.
9    **Q. Do you know whether or not you did or you**
10  **just don't remember?**
11    A. I don't believe I saw it.
12    **Q. Why do you believe you did not?**
13    A. Because I don't remember it.
14    **Q. With all due respect, you haven't**
15  **remembered a number of things that you believe you**
16  **did see.**
17    A. Correct.
18    **Q. Is there some reason other than the fact**
19  **that you don't recall seeing this to lead you to**
20  **believe that you didn't get it?**
21    A. Because of the office procedures at Latti &
22  Associates. The mail would come in. The mail was
23  separated by the office manager, reviewed by Mike
24  Latti, and then given to the individual attorneys.

36

1  Not everything was given to the individual
2  attorneys.
3    **Q. Are you telling us that every piece of mail**
4  **that came in was reviewed by Mr. Latti before it was**
5  **given to the addressee?**
6    A. My memory is that he would quickly scan
7  everything. It doesn't mean he would review
8  interrogatories or depositions. But Mr. Latti was
9  in control.
10    **Q. Did you have experiences with Mr. Latti**
11  **where he did not give you correspondence that was**
12  **addressed to you?**
13    A. How would I know?
14    **Q. So you don't know one way or the other?**
15    A. I don't know.
16    **Q. When you say he didn't give everything to**
17  **individual attorneys, on what do you base that?**
18    A. Because I knew with respect to settlements
19  of cases, not everything would go to the attorney.
20  We would do the legwork and paperwork and settle the
21  case. From that moment on it became an
22  administrative matter and it was no longer
23  information that was provided to the individual
24  attorneys.

37

1    **Q. Now, you were a partner in this firm at the**
2  **time?**
3    A. Yes, ma'am.
4    **Q. Notwithstanding that, Mr. Latti would not**
5  **necessarily give you every mail that was addressed**
6  **to you?**
7    A. There are partners and there are partners.
8    **Q. Would you explain that, please, just for**
9  **the record?**
10    A. I was a partner but a very minor partner.
11  And therefore I was not given the opportunity to see
12  all of the information that came into the firm. I
13  was there for only two years as a partner when I had
14  enough and left.
15    **Q. Now, you testified that it was Mr. Latti's**
16  **practice that once a case was settled, from that**
17  **point forward he controlled the flow of information?**
18    A. No, not that he controlled the flow of
19  information. But the paperwork that related to when
20  the checks would come in, the individual attorneys
21  wouldn't get to see the checks. The checks weren't
22  made out to Roger Hughes. They were made out to
23  Latti & Associates. So you wouldn't get to see
24  that. Other things were happening in the firm at

Roger E. Hughes, Jr.
Volume 1 - May 10, 2006

42

1  ever see a copy of an annuity policy that was issued
2  as part of this settlement?
3      A. No.
4      Q. Do you have any recollection of why you
5  didn't see it or what the circumstances were?
6      A. I have almost no recollection of any of the
7  facts in this case.
8      Q. Did you become aware at any time before you
9  were contacted by Mr. Kaplan in the past year that
10  Charter Security was taking the position that the
11  annuity they issued was only good for 20 years and
12  not for 20 years guaranteed and life?
13      A. I didn't know who Charter Security was.
14  Before Mr. Kaplan called me and told me about, as he
15  referred to him as Mr. Dim-mon, I didn't know
16  anything about this.
17      MS. McQUAY: I have no further
18  questions.
19      MR. LeBLANC: I have some.
20      EXAMINATION
21  BY MR. LeBLANC:
22      Q. At the time that the letters you were
23  shown, Exhibits 4, 5, 6, was the address of Latti &
24  Associates or Latti Associates 30-31 Union Wharf?

43

1      A. I believe so, yes.
2      Q. At that time, do you have any recollection
3  of there being any trouble at Latti Associates in
4  terms of receiving mail, mail being delivered by the
5  post office?
6      A. I wasn't involved in that. I never heard
7  of any.
8      Q. In 1983, did you ever receive calls from
9  opposing counsel saying did you get the letter I
10  sent you and you hadn't received that letter?
11      A. Not that I can remember today.
12      Q. And Ms. Foster, Kathy Foster in the 1983
13  time frame, she was an employee of Latti &
14  Associates or Latti Associates?
15      A. Yes.
16      Q. Is it Latti Associates or Latti &
17  Associates?
18      A. I think it was Latti & Associates. I'm not
19  sure anymore.
20      Q. When you referred to yourself as a minor
21  partner, was that in terms of your ownership
22  interest or authority and power at the firm?
23      A. In all respects.
24      Q. When you say you had enough of Mike, what

44

1  does that mean?
2      A. I had enough of the way that he ran the
3  firm.
4      Q. And what was your disagreement with the way
5  he ran the firm or your problem with the way he ran
6  the firm?
7      A. I'm not sure we have enough time.
8      Q. Can you sum it up for us quickly?
9      A. He ran the firm in a way that I disagreed.
10      Q. Can you give us an example of a
11  disagreement? Was it a professional disagreement,
12  you didn't like the style of his letterhead?
13      A. I didn't like the way that the employees
14  were treated. I didn't like the way matters were
15  handled. And I didn't like the way that I was
16  treated.
17      Q. I believe you testified earlier when you
18  were listing the documents that you received from
19  Mr. Kaplan that there was a proposal sheet from
20  Charter Security, what we have marked as Exhibit 24?
21      A. Yes.
22      Q. Can you read the top of that, who that was
23  addressed from or which letterhead was used for
24  that?

45

1      A. It says: Dean Witter Reynolds, Inc., One
2  Boston Place, Boston, Massachusetts, 02108, and a
3  telephone number.
4      Q. Do you have any reason to believe this was
5  produced by anyone other than Dean Witter Reynolds?
6      MS. McQUAY: Objection as to form; lack
7  of foundation.
8      A. I don't know who it was produced by.
9      Q. When you characterized it as a Charter
10  Security proposal, that's not necessarily accurate?
11      MS. McQUAY: Objection.
12      A. If I referred to it as that, it is probably
13  because I saw the words Proposal by Charter Security
14  Life Insurance Company of New Jersey.
15      Q. But that's just based on the title. You
16  have no reason to believe that that was actually
17  produced by Charter Security?
18      A. I have no idea who produced that document.
19      Q. Thank you. In terms of your relationship
20  with Mr. Latti and Latti & Associates, was there a
21  time when Mr. Latti sued you?
22      A. Yes.
23      Q. And what was his allegation in that suit?
24      A. Some things you just don't want to

Roger E. Hughes, Jr.
Volume 1 - May 10, 2006

58

1    C.?
2        A. Anyone that had any involvement in the
3    settlement of this case.
4        Q. But you don't have any specific
5    recollection of Charter Security being involved in
6    the sense that they were involved in the settlement
7    portion of this case.
8        A. I have no independent recollection, but I
9    have in front of me Exhibit 24.
10       Q. You just testified that you wouldn't have
11   done anything in this case where there's a dispute
12   between two parties, or two companies about what the
13   terms were.
14       A. Right.
15       Q. Under what circumstances would you have
16   done something?
17       A. I would have done something if the company
18   that agreed to pay money didn't pay the money. Then
19   I would go into court to enforce the settlement.
20       Q. And why didn't you do that in this case?
21       A. Because the company was paying. I didn't
22   have any knowledge of this, but the company, it
23   appears, paid money for 20 years. I didn't get a
24   call from David Kaplan until recently, within the

59

1    last year, nine months to a year, maybe more.
2        Q. You testified earlier that part of your job
3    is to make sure the plaintiffs get the most they can
4    for the longest period.
5        A. Correct, in a structured settlement.
6        Q. And in this, Dimon versus Jenny C.
7    structured settlement, there was a dispute about
8    what he could get and how long he could get it?
9        A. Not that I was aware of.
10       Q. Are you aware now that there was a dispute?
11       A. I am aware now that there are documents
12   that indicate that there was a dispute.
13       Q. And if you are aware of that at the time in
14   1983 what, if anything, would you have done about
15   it?
16       A. Nothing.
17       Q. Even though you were still counsel of
18   record?
19          MR. DEWICK: Objection.
20       A. Yes. Because the court had approved the
21   settlement. If the defendants were not going to
22   abide by the court-approved settlement, it is
23   incumbent to go to the court to have the settlement
24   altered. It is not incumbent on the plaintiff to go

60

1    and ask the court to do something. That was already
2    done. The court had already approved the
3    settlement.
4        Q. But it would be incumbent upon the
5    plaintiff to go to court if the plaintiff wasn't
6    going to receive the full benefit of the settlement;
7    isn't that true?
8        A. It would be incumbent upon the plaintiff to
9    go to court if the company failed to live up to the
10   agreement that it entered into and was approved by
11   the court.
12       Q. When was the last time you spoke to
13   Mr. Latti?
14       A. I couldn't really say. Five, ten, fifteen
15   years ago.
16       Q. It was after you got the frantic call from
17   your wife?
18       A. Yes. It was -- it may have been -- I may
19   have bumped into him at some bar function and I
20   think I probably said hello.
21       Q. Do you know a Mr. Robert Foley of Dean
22   Witter?
23       A. I know a Robert Foley. I don't know
24   whether he worked or works for Dean Witter.

61

1        Q. And how do you know the Mr. Foley that you
2    do know?
3        A. He was married to a person that I knew,
4    still know, who lived in Scituate.
5        Q. Did you have any professional dealings with
6    that Mr. Foley?
7        A. If it is the same person, it may be the
8    same individual that's referred to in some of this
9    correspondence. I just don't know.
10       Q. Do you know where we could find Ms. Foster
11   if we needed to?
12          MR. O'DRISCOLL: I hate to jump in
13   again, but I'm having difficulty hearing both the
14   questioning attorney and also the witness at this
15   point. I'm not sure why. This happened a few
16   minutes ago; it has continued.
17          MR. LeBLANC: I'll try to speak up.
18       Q. Do you know where we can find Kathy Foster
19   at this point?
20       A. The last time I knew, she was someplace in
21   Florida.
22       Q. Do you know any other information about
23   her, her middle name, birth date, anything like
24   that?

FARMER ARSENAULT BROCK LLC

Roger E. Hughes, Jr.
Volume 1 - May 10, 2006

82

1      CERTIFICATE OF COURT REPORTER
2          I, David A. Arsenault, Registered
3   Professional Reporter, and Massachusetts Certified
4   Reporter (100693), do certify that the deposition of
5   ROGER E. HUGHES, JR., in the matter of Dimon v Met
6   Life, on May 10, 2006, was stenographically recorded
7   by me; that the witness provided satisfactory
8   evidence of identification, as prescribed by
9   Executive Order 455 (03-13) issued by the Governor
10  of the Commonwealth of Massachusetts, before being
11  sworn by me, a Notary Public in and for the
12  Commonwealth of Massachusetts; that the transcript
13  produced by me is a true and accurate record of the
14  proceedings to the best of my ability; that I am
15  neither counsel for, related to, nor employed by any
16  of the parties to the above action; and further that
17  I am not a relative or employee of any attorney or
18  counsel employed by the parties thereto, nor
19  financially or otherwise interested in the outcome
20  of the action.
21
22  _____ 5/17/06
23  David A. Arsenault, RPR
24

84

WITNESS:  ROGER E. HUGHES, JR.
CASE:  Dimon v Met Life
              SIGNATURE PAGE/ERRATA SHEET
PAGE   LINE   CHANGE OR CORRECTION AND REASON
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
I have read the transcript of my deposition taken May 10, 2006.
Except for any corrections or changes noted above I hereby
subscribe to the transcript as an accurate record of the
statements made by me.
Signed under the pains and penalties of perjury.

_____DATE_____
Deponent, ROGER E. HUGHES, JR.

83

1          I N D E X
2
3          EXAMINATIONS
4   ROGER E. HUGHES, JR.
5      BY MS. McQUAY           5
6      BY MR. LeBLANC          42
7      BY MR. DEWICK           67
8      BY MR. LeBLANC          72
9      BY MR. KEANE            74
10     BY MR. O'DRISCOLL       79
11         EXHIBITS MARKED
12  22, settlement sheet        5
13  23, trial transcript, 5/3/83    5
14  24, proposal by Charter Security Life   5
15  Insurance Company of New Jersey
16  25, file of Mr. Hughes      72
17                             53
18
19  Exhibits returned to Sandra Sue McQuay, Esq.
20
21
22
23
24

1          Sent via UPS to witness on 5/17/06
2
3          ROGER E. HUGHES, JR.
4      SIGNATURE PAGE/ERRATA SHEET INFORMATION
5      For deposition taken on: May 10, 2006
6              Dimon v Met Life
7
8      SIGNATURE INFORMATION FOR COUNSEL
9   The original signature page/errata sheet has been sent to Roger
10  E. Hughes, Jr. to obtain signature. When complete, please send
11  original to Sandra Sue McQuay, Esq. A copy of any errata should
12  be sent to each party of record present at the deposition.
13
14         WITNESS INSTRUCTIONS
15  After reading the transcript of your deposition, please note any
16  change or correction and the reason on the errata/signature
17  page. DO NOT make any notations on the transcript itself. If
18  necessary, continue the format on a separate page.
19
20  PLEASE SIGN AND DATE the errata/signature page (before a notary
21  if requested) and return it to your counsel.
22
23
24

FARMER ARSENAULT BROCK LLC

**EXHIBIT P**



Mary Graci, Ocean Marine Claim, New York City
T. J. Donohue, Tech. Claim, Long Grove, B-8
John Kimberly, Tech. Claim, Long Grove, B-8
R. W. Boncher, Tech. Claim, Long Grove, B-8



**Date**    11-8-83

**To**    Klaus Lemhoefer, Div. Claim, Summit

**From**    J. L. Noe, Tech. Claim, Long Grove

**Previous Comm.**

**Regarding**    399 LM 106125-Z
DIAMON V. JENNY C, INC.

**RECEIVED**
KEMPER GROUP

NOV 11 1983

OCEAN MARINE CLAIMS
NEW YORK

We have encountered some difficulty with Charter Security
Life Insurance Company (New York) who issued the annuity
policy. The settlement agreement was to establish a fully
paid annuity contract for a sum plus 3% compounded annually,
added annually to be paid during the term of a plaintiff's
life and in no event for less than 20 years. Mr. Hughes,
plaintiff's attorney, made the arrangement with broker
Mr. Foley of Dean Witter Reynolds, Inc., Boston, Massachusetts
and according to him, was quoted a premium of $175,000 to
meet that requirement. Mr. Foley and I had telephone communication
in April 1983 at which time he confirmed what Mr. Hughes told
me. The premium was paid, and the policy was issued and was
correct. Thereafter, Charter Security declared that a mistake
had been made and issued a replacement policy for a term of
20 years certain, only. I rejected it. Charter Security tried
to persuade me that their position was correct, and again they
issued a replacement policy declaring the original policy to
be null and void. Again, I rejected it and declared the
original policy to be valid and enforceable. In the meantime,
Mr. Hughes threatened Mr. Foley with an errors and omissions
claim, and Mr. Foley, on advice of counsel, has nothing further
to say.

I am now dealing with Charter Security's counsel in Jacksonville,
Florida, who has asked for a copy of the settlement agreement.
I hope they will be persuaded to honor the original policy, and
if additional premium must be paid, this will be arranged be-
tween Charter Security and Mr. Foley of Dean Witter Reynolds.
If not, Mr. Hughes may file an action for declaratory judgment.

In the meantime, plaintiff is receiving his benefits and will
continue to do so for at least the 20 year certain term. I
think this will ultimately work out.

JLN:es

Mary Graci  NOV 11 1983

**EXHIBIT Q**

VOLUME: 1
PAGES: 1 - 94
EXHIBITS: See Index

ORIGINAL

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
DENNIS DIMON,                                 )
                              Plaintiff, )
                                              )
             vs.                              )
                                              )        C.A. No.
METROPOLITAN LIFE INSURANCE COMPANY,          )        05-11073 WGY
KEMPER INSURANCE COMPANY, MORGAN              )
STANLEY DW, INC., MICHAEL B. LATTI,           )
LATTI ASSOCIATES and LATTI & ANDERSON, )
LLP,                                          )
                              Defendants. )
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION of KATHERINE DIMON, a Witness called by and on
behalf of the Defendants, taken pursuant to the applicable
Federal Rules of Civil Procedure, before Vincent Martino,
a Notary Public within and for the Comm. Of Massachusetts,
held at the Law Offices of Ciapciak & Associates, PC, 99
Access Road, Norwood, MA 02062 on Monday, August 7, 2006,
commencing at 11:30 a.m.

COPLEY COURT REPORTING
101 Tremont Street
Boston, Masssachusetts 02108
(617) 423-5841

VOLUME: 1
PAGES: 1 - 94
EXHIBITS: See Index

ORIGINAL

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
*****************************************
DENNIS DIMON,                            )
                           Plaintiff,  )
                                         )
         vs.                             )
                                         )        C.A. No.
METROPOLITAN LIFE INSURANCE COMPANY,     )     05-11073 WGY
KEMPER INSURANCE COMPANY, MORGAN         )
STANLEY DW, INC., MICHAEL B. LATTI,      )
LATTI ASSOCIATES and LATTI & ANDERSON,   )
LLP,                                     )
                          Defendants.  )
*****************************************
```

DEPOSITION of KATHERINE DIMON, a Witness called by and on
behalf of the Defendants, taken pursuant to the applicable
Federal Rules of Civil Procedure, before Vincent Martino,
a Notary Public within and for the Comm. Of Massachusetts,
held at the Law Offices of Ciapciak & Associates, PC, 99
Access Road, Norwood, MA 02062 on Monday, August 7, 2006,
commencing at 11:30 a.m.

COPLEY COURT REPORTING
101 Tremont Street
Boston, Masssachusetts 02108
(617) 423-5841

1    on the above contract?

2        A.    Yes.

3        Q.    Did you ever call MetLife or Charter Security on

4    behalf of Mr. Dimon?

5        A.    Yes, I did.

6        Q.    Did he ask you to make those calls?

7        A.    Yes.

8        Q.    He authorized you to speak on his behalf when you

9    made those calls?

10       A.    Yes.

11       Q.    Do you recall why you called them prior to

12   September 24, 1999?

13       A.    Yes.

14       Q.    Why did you call them?

15       A.    Because there was a problem. The bank called us and

16   they told us that the life insurance that we were using for

17   collateral to get the loan said that it would end in 2003.

18   That's it.

19       Q.    Okay. When you say the bank, you are referring to

20   Citizens Bank?

21       A.    No, I'm talking about Newport Federal.

22       Q.    Who are they?

23       A.    That was the first bank we had, then we had

24   Citizens Bank.

25       Q.    Did Citizens Bank acquire Newport Federal?

1      A.    We refinanced.

2      Q.    So the loan you applied for in 2004 was a

3    refinance?

4      A.    Yes.

5      Q.    And who did you refinance with?

6      A.    The same bank, Citizens Bank.

7      Q.    So in 1999 when you purchased Holly Ridge, you used

8    Citizens Bank or a different bank?

9      A.    No, a different bank.

10      Q.    What bank was that?

11      A.    The one in Newport, Newport Federal.

12      Q.    Then you refinanced with Citizens Bank?

13      A.    Yes.

14      Q.    Then you refinanced a second time with Citizens

15    Bank?

16      A.    Yes.

17      Q.    So total for the Holly Ridge property, all of your

18    mortgage documents should either be with Newport Federal or

19    Citizens Bank?

20      A.    Yes.

21      Q.    And your recollection today is that you still have

22    some of those documents?

23      A.    Yes.

24      Q.    Now was it Newport Federal who called you and

25    alerted you sometime in 1999 or thereabouts that there was

1    a dispute or an issue with the collateral and the annuity?

2        A.    Yes.

3        Q.    That was prior to you receiving that letter of

4    September 24, 1999?

5        A.    I don't recall the dates.

6        Q.    Do you have access to any documents that would help

7    you recall the dates?

8        A.    Yes, I think so. I have a lot of problems getting

9    to them because I have to climb in the little cubbyhole

10   thing and I have a bad knee.

11       Q.    Do you know someone who could climb in there for

12   you?

13       A.    I have been trying.

14       Q.    Do you know who at Newport Federal you were dealing

15   with?

16       A.    Yes, Don -- I forgot what his last name was. It was

17   N-a-z-i-l or something like that. The first name was Don.

18       Q.    Do you know if that was short for Donald?

19       A.    Yes.

20       Q.    Do you ever go to Newport Federal any more?

21       A.    No.

22       Q.    But as far as you know they are still in business?

23       A.    They are, yes.

24       Q.    Do you know who from Newport Federal called you to

25   tell you about ---

1    A.    It was Don.

2    Q.    About the annuity being used for collateral.

3    A.    It was Don because he was handling our loan.

4    Q.    Did the question about the annuity cause the loan

5    to be cancelled or stopped in any way?

6    A.    No.

7    Q.    So the mortgage still went through?

8    A.    Yes.

9    Q.    And it still went through with Newport Federal?

10   A.    Yes.

11   Q.    Even though there was this dispute about ---

12   A.    It wasn't really a dispute. He questioned it and I

13   told him they were quacks and they didn't know what they

14   were talking about.

15   Q.    Who were the quacks?

16   A.    The insurance company.

17   Q.    They are the ones that didn't know what they were

18   talking about?

19   A.    Right, because I told them it was supposed to be a

20   lifetime thing for my husband.

21   Q.    In response to your discussion with the individual

22   from Newport Federal, did you ever call MetLife and ask

23   them?

24   A.    No, because I kind of like blew it off because they

25   were making some kind of mistake or something. I know I

1    should have called.

2        Q.    Are you positive you didn't call?

3        A.    I don't think so.

4        Q.    But you may have called?

5        A.    I don't remember.

6        Q.    If you look at what has been marked Exhibit 1, you

7    see where it explains or sets out the terms of the annuity

8    and ---

9        A.    Yes.

10       Q.    You see where it says you receive monthly payments

11   until the final payment on 5-5-2003?

12       A.    Yes.

13       Q.    You see the next line it says the monthly payments

14   begin on 6-5-1983?

15       A.    Yes.

16       Q.    And increase three percent annually?

17       A.    Yes.

18       Q.    Okay. Do you have any reason to dispute that part

19   of it?

20            MR. KEANE: What part of it actually?

21       Q.    The part beginning with the monthly payments begin

22   on 6-5-1983 and increase three percent annually. Do you

23   have any reason to dispute that?

24       A.    No.

25       Q.    Where it says to figure payments in the remaining

1   years increase the payment three percent each June, do you

2   see where it says that?

3       A.   Yes.

4       Q.   Did you ever attempt to figure out what the

5   payments for the remaining years were going to be?

6       A.   No. I don't even recall this letter.

7       Q.   Assuming your husband admitted in the request for

8   admissions that we sent him that he received that letter

9   marked Exhibit 1, you have no reason to believe that he

10  lied about that, right?

11      A.   Absolutely not.

12      Q.   So his testimony being that he actually received

13  that letter, would it be fair to say that you would have

14  read it to him if he received it?

15      A.   Yes.

16      Q.   When was the first time that you recall becoming

17  aware that there was a dispute about the terms of this

18  annuity?

19      A.   When we applied for our loan at Newport Federal in

20  1999.

21      Q.   Any time before that did you know?

22      A.   None that I recall.

23      Q.   In light of the letters that were sent to Latti

24  Associates, would it be fair to say that you could have

25  known as early as 1983 there was a dispute?

1        MR. KEANE: Objection. You can answer it.

2        THE WITNESS: I don't think so.

3    Q.    If you had received all those letters back and

4    forth between the insurance company saying it is twenty

5    years, it is life, it is twenty years, wouldn't that have

6    alerted you to the fact there was a dispute?

7    A.    I don't think so because our lawyer was taking care

8    of that stuff.

9    Q.    And when you say our lawyer, who was that?

10   A.    Mr. Latti.

11   Q.    So was it Mr. Latti's responsibility to do

12   something about that or let you know about that?

13       MR. DEWICK: Objection.

14       THE WITNESS: Yes, I would think so.

15   Q.    And it is your testimony here today he didn't?

16   A.    No, or I probably wouldn't be here if he did.

17   Q.    Why wouldn't you be here if he did?

18   A.    Because then we would understand there was a

19   problem somewhere along the way, either they would still be

20   continuing the money so we wouldn't have to be here.

21   Q.    You think if you had learned in 1983 there was a

22   dispute, you would have done something way back then?

23   A.    I imagine my lawyer would.

24   Q.    But if he had told you personally or your husband

25   that there was a dispute, would you have waited twenty

1    A.    Not that I remember.

2    Q.    Do you know how many times you attempted to get in

3    touch with Kemper?

4    A.    Probably once.

5    Q.    Do you know when this was?

6    A.    It was in 2003.

7    Q.    Probably around June or July of 2003?

8    A.    Probably.

9    Q.    You think you only tried to contact them once,

10   correct?

11   A.    Yes.

12   Q.    Do you recall if you happened to speak with anyone

13   at Kemper?

14   A.    No, I don't recall.

15   Q.    Did you ever attempt to contact Kemper back in

16   1983?

17   A.    Not that I know of.

18   Q.    Did you ever attempt to contact Kemper at any time

19   other than that time in 2003?

20   A.    Not that I remember.

21        MR. GOLDEN: That's all I have.

22        MR. LEBLANC: Thank you very much. Actually we will

23   suspend the deposition at this point subject to Mr. Keane's

24   objection.

25                          (Whereupon at 4:55 p.m., the

1                                    Deposition was Adjourned.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                                    CERTIFICATE

5

6    COMMONWEALTH OF MASSACHUSETTS

7    NORFOLK, SS.

8

9         I, Vincent R. Martino, Shorthand Reporter and

10   Notary Public within and for the Commonwealth of

11   Massachusetts, do hereby Certify:

12        That KATHERINE I. DIMON, the witness whose

13   deposition is hereinbefore set forth, was duly sworn by me

14   and that such deposition is a true record of the testimony

15   given by the said witness to the best of my skill and

16   ability.

17        IN WITNESS WHEREOF, I have hereunto set my hand and

18   Notarial Seal this 11th day of August, 2006.

19

20   _____

21                          Vincent R. Martino

22                          Shorthand Reporter

23

24

25

**EXHIBIT R**

**Best Quality**

September 24, 1999

DENNIS DIMON
P O BOX 56
WEST KINGSTON  RI 02892 0056

RE: CONTRACT # SCIW1126

Dear Mr. Dimon,

We received a call from Katheryn Dimon requesting information on the above contract. This contract was issued as a structured settlement on 5/5/1983. The owner of this contract is the American Motor Insurance Company. You receive monthly payments until the final payment on 5/5/2003. The monthly payments began on 6/5/1983 and increase 3% annually. This is programmed into the computer to increase 3% annually. I do not have specific payment amounts. To figure payments for the remaining years, increase the payment 3% each June 5.

If you have any questions, please call our Customer Service Center at 1-800-835-7775.

Sincerely,

*Teresa Thorp*

Teresa Thorp
Annuity Benefits

000036

**EXHIBIT S**

LEXSEE 2000 MASS. APP. DIV. 261



Cited
As of: Jan 02, 2007

**Judith B. Grande vs. PFL Life Insurance Co.**

[NO NUMBER IN ORIGINAL]

STATE OF MASSACHUSETTS, APPELLATE DIVISION, NORTHERN
DISTRICT

*2000 Mass. App. Div. 261; 2000 Mass. App. Div. LEXIS 96*

**September 27, 2000, Decided**

**PRIOR HISTORY:** [**1] Opinion dismissing plaintiff's appeal. Action heard in the Ayer Division by Kilmartin, J.

**DISPOSITION:** Entry of summary judgment for defendant PEL Life Insurance Company affirmed. Appeal dismissed.

**COUNSEL:** Robert C. Moran for the plaintiff.

Stephen A. Roach for the defendant.

**JUDGES:** Merrick, P.J., Coven & Curtin, JJ.

**OPINION BY:** Coven

**OPINION:**

[*261] Coven, J. This is an action to recover for the defendant's alleged breach of contract, conversion and G.L.c. 93A unfair and deceptive acts in its sale of a life insurance policy to plaintiff Judith B. Grande ("Grande"). Grande claimed that the defendant's salesman represented that the policy was an annuity. Summary judgment was entered for the defendant, and Grande has appealed pursuant to Dist./Mun. Cts. R. A. D. A., Rule 8C.

The record indicates that on July 1, 1994, Grande met with one of defendant PFL Life Insurance

Company's ("PFL") agents at her home and purchased a policy. Grande alleges that she contracted to buy, and the agent described, an annuity toward which she was to make monthly contributions of $ 500.00 until whatever time she decided to retire, that PFL would invest whatever contributions she had decided to make, and that she would begin [**2] to receive periodic distributions when she reached age sixty-five. At her deposition, Grande could not provide any information about interest rates, tax benefits, investment choices, precise maturity dates, pay-out sums or any other essential terms of the alleged annuity. n1 Grande also signed on July 1, 1994 a number of documents which included a Disclosure of Benefits form, an Application for Life Insurance, and an Authorization to Obtain and Disclose medical information. None of the documents she signed contained a single reference to an annuity. All of the documents she signed pertained to life insurance.

n1 Her lack of information did not result from an unfamiliarity with insurance products or investment terms. It was undisputed that Grande has a Masters in Business Administration; was self-employed as a marketing consultant with annual earnings of $ 125,000.00; owned, with her husband, real estate, stocks and mutual funds valued at close to a million dollars; had invested in several real estate limited partnerships; and had a Keogh plan, an IRA, other life insurance

policies and an annuity.

[**3]

On July 6, 1994, PFL issued life insurance policy no. 7-242005506 to Grande. She claimed that she never received the policy or a copy thereof.

Approximately one year later, on August 22, 1995, Grande sent a letter to PFL informing it that she was discontinuing her monthly payments of $ 500.00 because she intended to retire on October 5, 1995. PFL responded that her letter constituted a cancellation of her policy, and that her insurance protection would terminate on September 6, 1995, without any further liability. Grande immediately asked PFL not to cancel the policy until she "straightened things out." She conceded that, after reading the documents she had signed in 1994, it was clear that she had purchased a life insurance policy and not an annuity. Grande continued, however, to make [*262] monthly $ 500.00 payments for another year, through September, 1996.

Grande filed this action on February 25, 1997 to recover damages in the amount of the total monthly payments she had made, plus reasonable attorney's fees. PFL filed an answer denying the complaint allegations, and a counterclaim in quantum meruit for the value of the life insurance coverage Grande had enjoyed for two [**4] years.

In March, 1999, PFL filed a motion for judgment on the pleadings on the grounds, *inter alia*, that Grande's claims were time-barred by the *G.L.c. 175, § 181* two year statute of limitations. After hearing, the court elected to treat the motion as one for summary judgment under *Mass. R. Civ. P., Rule 56*, and notified the parties of their right to submit any additional materials. *Mass. R. Civ. P., Rule 12(c)*. See generally *Bell v. Zoning Board of Appeals of Gloucester, 429 Mass. 551, 555, 709 N.E.2d 815 (1999)*. On September 3, 1999, the court allowed PFL's summary judgment motion, and dismissed all of Grande's claims as well as PFL's counterclaim. In his memorandum of decision, the motion judge noted that Grande, "a sophisticated, educated MBA graduate with extensive business experience," had sought to avoid the *G.L.c. 175, § 181* limitations bar by characterizing her misrepresentation claim as one for breach of contract, and that the evidence she advanced was insufficient to raise a material issue warranting a trial on any claim.

1. The record before us was an appropriate one for the entry of summary judgment on statute [**5] of limitations grounds on Grande's claims for breach of contract and conversion. *Fidler v. E.M. Parker Co., 394 Mass. 534, 546, 476 N.E.2d 595 (1985); Malapanis v. Shirazi, 21 Mass. App. Ct. 378, 383, 487 N.E.2d 533 (1986)*. PFL satisfied its initial Rule 56 burden of establishing, on the basis of undisputed facts, that Grande's claims were barred by the two year statute of limitations set forth in *G.L.c. 175, § 181*. The statute provides, in pertinent part:

> No company, no officer or agent thereof and no insurance broker or insurance adviser shall make, issue, circulate or use, or cause or permit to be made, issued, circulated or used, any written or oral statement misrepresenting the terms of any policy of insurance or any annuity or pure endowment contract issued or to be issued by any company. ... The insured under any policy of life or endowment insurance or the holder of any annuity ... who was induced to procure it by an action in violation of this section by an officer or agent of the company issuing or executing it may recover from such company all premiums paid on such policy or contract ... in an action brought within two years after [**6] the date of the issue thereof.

Although Grande's first claim is for breach of contract, it is the "gravamen of [her] complaint" which dictates the applicable statute of limitations. *Pagliuca v. Boston, 35 Mass. App. Ct. 820, 823, 626 N.E.2d 625 (1994)*. Grande admitted in her deposition, and her attorney's G.L.c. 93A demand letter further indicated, that her claim against PFL arose solely out of the alleged misrepresentations by PFL's agent who supposedly advised her of the terms of an annuity in selling her a life insurance policy. n2 Grande could not "escape the consequences" of the *G.L.c. 175, § 181* shorter statute of limitations for PFL's alleged misrepresentations "merely by labeling [her] claim as contractual." *Fall River Hous. Auth. v. H.V. Collins Co., 414 Mass. 10, 15 n.6, 604 N.E.2d 1310 (1992)*. See also *Hendrickson v. Sears, 365 Mass. 83, 85, 310 N.E.2d 131 (1974)*. Therefore, pursuant to § 181, Grande's cause of action accrued on July 6, 1994. Given the applicable two

Case 1:05-cv-11073-NG    Document 60-20    Filed 01/02/2007    Page 4 of 5

Page 3

2000 Mass. App. Div. 261, *262; 2000 Mass. App. Div. LEXIS 96, **6

year limitations period, Grande's February 25, 1997 complaint was filed too late.

n2 Grande's attorney's letter accused PFL of "misrepresentations, half truths and outright lies."

[**7]

Once PFL satisfied its burden of proving that Grande's "contract" claim was filed after the expiration of the statute of limitations, the Rule 56 burden shifted to Grande to set forth specific facts which would "take her claim outside the statute." *McGuinness* [*263] *v. Cotter, 412 Mass. 617, 620, 591 N.E.2d 659 (1992).* Grande asserted only that she did not receive a copy of the insurance policy issued by PFL and was thus prevented from discovering that she had purchased life insurance rather than an annuity. Under the "discovery rule," an action which is based on an "inherently unknowable" wrong does not accrue for statute of limitations purposes "until the injured party knows or in the exercise of reasonable diligence should know the factual basis for the cause of action." *Puritan Medical Center, Inc. v. Cashman, 413 Mass. 167, 175, 596 N.E.2d 1004 (1992); Frank Cooke, Inc. v. Hurwitz, 10 Mass. App. Ct. 99, 106, 406 N.E.2d 678 (1980).* However, the limitations period is not tolled unless the basis of the plaintiff's claim was "inherently unknowable" or incapable of being discovered through the exercise of ordinary diligence. *Melrose Hous. Auth. v. New Hampshire Ins. Co., 24 Mass. App. Ct. 207, 212, 507 N.E.2d 787 (1987).* [**8]

As a matter of law, the nature of the insurance contract Grande purchased and thus PFL's misrepresentations concerning the same were not "inherently unknowable." See *Kent v. Dupree, 13 Mass. App. Ct. 44, 47, 429 N.E.2d 1041 (1982)* (misrepresentation not "inherently unknowable" when it was apparent on the basis of express terms of written document given to plaintiff's attorney). The Disclosure of Benefits and Application forms Grande completed with PFL's agent on July 1, 1994 were clearly labeled "Life Insurance." Grande had access to these forms before the life insurance policy was ever issued, but neglected to read them. She conceded that when she later reviewed the forms, it was clear that she had contracted for life insurance rather than an annuity. The basis of Grande's "contract" claim could have been discovered, therefore, through the exercise of reasonable diligence as early as July 1, 1994. Thus the statute of limitations was not

tolled, Grande's cause of action accrued on July 6, 1994 when the policy was issued pursuant to *G.L.c. 175, § 181,* and the two year period for commencing suit expired prior to the filing of her complaint.

2. Grande [**9] contends that she is entitled to at least a trial on the merits on her claim for conversion because that claim is governed by the longer three year statute of limitations set forth in *G.L.c. 260, § 2A.* See *Patsos v. First Albany Corp., 48 Mass. App. Ct. 266, 270 n.6, 719 N.E.2d 882 (1999).* Section 19 of G.L.c. 260 expressly provides, however, that "if a special provision is otherwise made relative to the limitation of any action, any provision of this chapter inconsistent therewith shall not apply." See generally *Maltz v. Smith Barney, Inc., 427 Mass. 560, 563, 694 N.E.2d 840 (1998).* The two year limitations period of *G.L.c. 175, § 181* is a "special provision" which governs this action for the reasons outlined above, and thus the three year conversion statute of limitations does not apply. Grande's conversion claim alleges that PFL misappropriated her $ 13,550.00 in contributions to what she believed was an annuity, and converted the money to premiums for a life insurance policy. Once again, the gravamen of Grande's claim is the alleged misrepresentation by PFL's agent that the insurance product [**10] she purchased was an annuity. The conversion claim is thus barred by *G.L.c. 175, § 181.*

Even if the claim had been timely filed, Grande failed to advance evidence of the elements of conversion sufficient to permit a trial of her claim. The tort of conversion requires a wrongful exercise of dominion or control over the personal property of another by one who has no right of possession at the time. *Third Nat'l Bank of Hampden County v. Continental Ins. Co., 388 Mass. 240, 244, 446 N.E.2d 380 (1983); Abington Nat'l Bank v. Ashwood Homes, Inc., 19 Mass. App. Ct. 503, 507, 475 N.E.2d 1230 (1985).* "The action cannot be maintained without proof that the defendant either did some positive wrongful act with the intention to appropriate the property to himself or to deprive the rightful owner of it, or destroyed the property." *Spooner v. Manchester, 133 Mass. 270, 273 (1882).* The record herein is devoid of any facts suggesting that PFL exercised any wrongful control over the monthly payments voluntarily made by Grande, or took any action with respect to such payments other than providing her with the life insurance coverage which the [**11] documents establish that she purchased. Further, upon receiving Grande's notice that she was discontinuing [*264] monthly payments, PFL

2000 Mass. App. Div. 261, *264; 2000 Mass. App. Div. LEXIS 96, **11

promptly advised her that the life insurance policy would be canceled without any additional liability, per her request. Given the absence of any specific facts demonstrating Grande's ability to establish a threshold case of conversion, therefore, PFL would have been entitled to summary judgment on this complaint count even if *G.L.c. 175, § 181* were inapplicable.

3. Grande's G.L.c. 93A claim is based on PFL's alleged violations of *G.L.c. 176D, § 3(1)(a)* (misrepresentation of insurance policy terms) and PFL's undisputed violation of the disclosure requirements of *211 CMR 31.05* (failure to provide life insurance Buyer's Guide and Policy Summary). Grande has, however, advanced no authority for the proposition that violations of *G.L.c. 176D, § 3(1)* or *211 CMR 31.05* may *per se* form the basis of an action pursuant to G.L.c. 93A. There is nothing in the Insurance Solicitation Regulations in question which references G.L.c. 93A, or which makes a violation of its provisions [**12] an unfair and deceptive act. Chapter 176D creates no private right of action for any violation of its provisions. See *Ryan v. Fallon Community Health Plan, Inc., 921 F. Supp. 34, 38 (D. Mass. 1996); Pariseau v. Albany Intern. Corp., 822 F. Supp. 843, 845 (D. Mass. 1993)*. Sections 6 and 7 afford the Commissioner of Insurance the exclusive authority to enforce G.L.c. 176D requirements.

Further, following the decision in *Dodd v. Commercial Union Ins. Co., 373 Mass. 72, 365 N.E.2d 802 (1977)*, which held that "c. 176D does not bar application of c. 93A to unfair or deceptive insurance acts or practices," *Id. at 78*, the Legislature amended *G.L.c. 93A, § 9* to make violations of *G.L.c. 176D, § 3(9)* actionable under G.L.c. 93A. See *Van Dyke v. St. Paul Fire & Marine Ins. Co., 388 Mass. 671, 675, 448 N.E.2d 357 (1983)*. The Legislature specified § 3(9) of G.L.c. 176D, and did not include violations of § 3(1) or any other section of that statute. Ordinary canons of construction dictate that a court will not "read into [a] statute a provision which the Legislature did not [**13] see fit to put there, whether the omission came from inadvertence or set purpose." *General Elec. Co. v. Department of Environmental Protec., 429 Mass. 798, 803, 711 N.E.2d 589 (1999)*, quoting from *King v. Viscoloid Co., 219 Mass. 420, 425, 106 N.E. 988 (1914)*. See also *Sterilite Corp. v. Continental Cas. Co., 397 Mass. 837, 839 n.3, 494 N.E.2d 1008 (1986); Mitchell v. Mitchell, 312 Mass. 154, 161, 43 N.E.2d 783 (1942)*. We conclude, therefore, that there is no individual cause of action for an insurer's violations of *G.L.c. 176D, § 3(1)* or *211 CMR 31.05* under G.L.c. 93A.

As violations of the insurance statutes and regulations in question amount to misrepresentations by an insurer, they may instead form the basis for a *G.L.c. 175, § 181* action. Section 3(1)(a) of G.L.c. 176D makes it an unfair or deceptive act for an insurer to "misrepresent the benefits, advantages, conditions or terms of any insurance policy." This statutory language tracks the specific terms of *G.L.c. 175, § 181*, which is expressly applicable to actions based on "any written or oral statement misrepresenting the [**14] terms of any policy of insurance or any annuity." PFL's violation of *211 CMR 31.05(1)(a)* in failing to provide Grande with the life insurance Buyer's Guide and Policy Summaries mandated by the regulation also amounted to misrepresentation. Pursuant to *211 CMR 31.07*, the "failure of an insurer to provide or deliver a Buyer's Guide or a Policy Summary as provided in § 5 shall constitute an omission which *misrepresents the benefits, advantages, conditions or terms of an insurance policy* [emphasis supplied]." n3 Again, however, a *G.L.c. 175, § 181* action must be brought within two years of the date of the issuance of the insurance policy. Grande's claims are time-barred.

> n3 Compare *211 CMR 34.08(3)* which expressly renders the failure to comply with regulatory requirements for the replacement of life insurance or an annuity "an unfair method of competition and unfair or deceptive acts or practices in the business of insurance." Based on the specific terms of § 34.08(3), it has been held that non-compliance with § 34.00 *et seq.* constitutes a per se violation of G.L.c. 93A which may be the basis for a private cause of action by a consumer pursuant to that statute. *Mayer v. Cohen-Miles Ins. Agency, Inc., 48 Mass. App. Ct. 435, 439, 722 N.E.2d 27 (2000)*.

[**15]

[*265]  The trial court's entry of summary judgment for defendant PFL Life Insurance Company is affirmed. Appeal dismissed.

So ordered.

# EXHIBIT T

# Law Offices of Hans R. Hailey
### Attorneys at Law
225 Friend Street, 5th Floor
Boston, Massachusetts 02114

hhailey@erols.com          (617) 723-4010  Fax (617) 720-6012          www.haileylaw.com

Hans R. Hailey
Gene R. Charny

November 10, 2006

Brian Keane, Esquire
The Kaplan/Bond Group
85 Black Falcon Avenue, Suite 301
Boston, Massachusetts 02210

RE:  *Dimon v. Michael Latti, Latti Associates, Latti & Anderson LLP, Metropolitan Life
     Ins. Co., Kemper Ins. Co. And Morgan Stanley, DW, Inc.*
     U.S.D.C. Civil Action No. 05-11073-REK

Dear Mr. Keane:

    Thank you for inviting me to serve as an expert witness.  More specifically, you
would like me to address the issue of whether the representation of Dennis Dimon by
Latti Associates was negligent because of its failure to insure that Mr. Dimon's annuity
was limited to twenty years and did not continue for the rest of his life.  My short answer
is that Latti Associates was indeed negligent.

    Let me start by listing the materials I reviewed, all of which you provided.

## MATERIALS CONSIDERED:

1.   Charter Security Life Insurance Company annuity application;
2.   Supplementary Agreement;
3.   Letter from Barbara Boehm to Kurt Snyder dated July 14, 1983;
4.   Letter from John Noe to Robert Foley dated August 12, 1983;
5.   Letter from Robert Liguori to John Noe dated September 26, 1983;
6.   Letter from John Noe to Robert Liguorl dated October 10, 1983;
7.   Letter from John Noe to Barabara Boehm dated October 12, 1983;
8.   Letter from Barbara Boehm to John Noe dated October 14, 1983;

Brian Keane, Esquire
November 10, 2006
Page Two


9.     A settlement sheet from Latti and Associates date of settlement on April 19, 1983;

10.    A transcript of the Guardian Ad Litem hearing dated May 3. 1983;

11.    A proposal by Charter Security Life Insurance Company of New Jersey dated April 8, 1983;

12.    The docket from the U.S District Court for the District of Rhode Island for Docket No. 81-0063;

13.    Letter from David B. Kaplan to Roger E. Hughes, Esq. Dated December 2, 2005;

14.    Letter from Sandra Sue McQuay to Roger E. Hughes Jr., Esq. Dated April 13, 2006;

15.    The Subpoena in a civil case from the U.S. District Court, case number: 05-11073;

16.    Deposition of Roger E. Hughes, Jr. Dated May 10, 2006; and

17.    Deposition of Michael B. Latti dated July 25, 2006.


FACTS:

The facts upon which my opinions are based begin with Mr. Dimon's loss of an eye. Latti Associates, as it was known in 1983, represented him in a claim against the Jenny C., Inc. Latti Associates concentrated in representing plaintiffs in personal injury claims. The claim was handled pursuant to a written contingent fee agreement. Suit was filed in the U.S. District for the District of Rhode Island and went to trial in February 1983.

Joseph Flannery, a limited partner in Latti Associates, represented Dimon at trial and secured a judgment in excess of $700,000. As a result of post trial motions filed by the defendant, a settlement was reached in April, 1983. Mr. Flannery had by that time left the firm and Roger Hughes, also a partner in the firm, undertook Mr. Dimon's representation.

A release was signed and Judge Pettine held an initial hearing to approve the settlement. Being uneasy about the ability of Mr. Dimon to appreciate the settlement fully and to agree to it voluntarily, he asked attorney Leonard Decof to serve as guardian ad litem. In May 1983, a hearing was held and Mr. Decof report to Judge Pettine the details of the settlement and that Mr. Dimon fully comprehended the settlement and was happy to accept it.

The settlement was for an immediate payment of $250,000 and monthly payments

Brian Keane, Esquire
November 10, 2006
Page Three

for the rest of his life, with a guaranteed minimum of 20 years of payments. The payments were to be in the initial amount of $1,450 per month and were to increase by three per cent each year. A "Proposal By Charter Security Life Insurance Company of New Jersey" indicated the monthly payments would increase to $6,173.43 by the 50th year. Mr. Dimon was 23 years old at the time of this settlement and had a life expectancy of 49.7 years. The settlement had a total value of $425,000, which was almost as much as the insurance coverage available.

Based on this settlement, Latti Associates received a fee of $141,485.47, plus reimbursement of the expenses it advanced. About $200 was shaved off the fee to accommodate Mr. Dimon's hope to recover $100,000 of the $250,000 due immediately.

American Motorists Insurance Company, part of the Kemper Group, insured the defendant. It purchased the annuity from Charter Security Life Insurance Company through Robert Foley at Dean Witter Reynolds, Inc. American Motorists was the owner of the policy.

An annuity contract was sent to Mr. Foley in June, 1983. As provided by the settlement, the annuity was to pay Mr. Dimon monthly for the rest of his life and guaranteed payments for at least twenty years.

A month later, the fun began. Barbara Boehm, of Charter Security, wrote to Kurt Snyder of Dean Witter. In a curt letter, she said simply that a "clerical error" had been made in issuing the annuity for life, that it should have been limited to twenty years. She sent a new annuity contract and asked that the earlier contract be returned.

That triggered letters between Charter Security and American Motorists. Roger Hughes was sent a copy of each letter; those copies were mailed to the proper address. American Motorists took the position that the initial annuity was valid and refused to return that policy as requested. Unfortunately, Charter Security took a different position and terminated payments after twenty years.

There was no further correspondence after last of these letters, which is dated October 14, 1983.

Missing in the correspondence and the depositions is any reference to any action taken by Latti Associates. They never communicated, by phone or by letter, any

Brian Keane, Esquire
November 10, 2006
Page Four

insistence on compliance with the terms of the settlement. They apparently never communicated with their client that there was an issue with the annuity.

Neither Mr. Hughes nor Mr. Latti have any memory of taking any action to enforce the terms of the settlement. According to Mr. Hughes, even though his appearance was never withdrawn, he wouldn't have done anything in these circumstances; he accepted it as a dispute between two insurance companies. He would have intervened only if the insurance company didn't pay what it was obligated to pay.

Mr. Latti had very much the same mind set. However, he believed that he was powerless to take any action because, in his opinion, Massachusetts does not accept the doctrine of anticipatory breach, meaning that no action could be maintained before the time for performance had passed. Accordingly, he had no duty to take any action to enforce the contract (the settlement).

OPINIONS:

By failing to take any action to enforce the terms of the settlement, Latti Associates[1] breached it's duty to its client, served its client in a manner below the standard of care of the average qualified personal injury attorney and may have violated the present version of the Rules of Professional Conduct.

Having undertaken to represent Dimon and for so long as Latti Associates did represent him, it was obligated to represent him zealously and not neglect his claim. Both Mr. Hughes and Mr. Latti acknowledged in their depositions that it was their job to obtain as much money for their client as possible.

Having negotiated a settlement, the duty of Latti Associates was to ensure that the settlement terms were fulfilled. More specifically, by the settlement Mr. Dimon released his claims in exchange for a lifetime annuity (along with a present cash payment). Indeed, Latti Associates took its full fee based on the settlement. When the controversy

---

[1] By "Latti Associates," I mean Mr. Hughes and Mr. Latti, the two partners of the firm in 1983. I express no opinion about whether the present day version of that firm is responsible for the acts of the prior partners. Of course, however, as partners, Mr. Latti and Mr. Hughes are responsible for each other's acts.

Brian Keane, Esquire
November 10, 2006
Page Five

arose over whether the annuity would be limited to twenty years, Latti Associates had the duty to take those steps reasonably necessary to ensure that the annuity would continue for life. By accepting the controversy as one simply between two insurance companies and having failed to do anything, Latti Associates breached both its legal and contractual duty to its client. The result was that the annuity payments ended after twenty years.

The duty to its client was also breached by having failed to inform Mr. Dimon of the dispute. An attorney has a duty to keep his clients informed of important developments in the client's case. The dispute being unknown to Mr. Dimon, he lost his opportunity to insist the dispute be resolved (or hire new counsel to do so) and thereby avoid the interruption in his annuity.

The standard practice of personal injury attorneys often includes services after the settlement of a client's claim. Often, for example, a lien, such as a Medicare lien, needs to be negotiated, or judicial approval of a settlement needs to be obtained. These services are part of the job a personal injury attorney accepts. Moreover, an additional fee is not charged; payment for such services is included in the contingent fee charged. Having done nothing when the controversy arose, Latti Associates' services (post settlement) fell below the standard of the average qualified personal injury attorney.

As a further matter, the failure to intercede in the controversy may have violated the Professional Rules of Conduct, or, more particularly the Disciplinary Rules in effect in 1983. Disciplinary Rule 2-110 provided in part:

> "a lawyer shall not withdraw from employment
> until he has taken reasonable steps to avoid foreseeable
> prejudice to the rights of his client, including giving due
> notice to his client, allowing time for employment of other
> counsel, delivering to the client all papers and property to
> which the client is entitled, and complying with applicable
> laws and rules."

Dimon was prejudiced by Latti Associates' termination of services at the time that the controversy arose. The prejudice was very foreseeable. Mr. Dimon did not receive the benefit of his bargain and his annuity terminated.

As a final matter, I'd like to address Mr. Latti's concern that there would have

Brian Keane, Esquire
November 9, 2006
Page Six

been nothing he could do in 1983, that Mr. Dimon would have to wait until the annuity terminated because of the defense based on the doctrine of anticipatory breach. The concern is unfounded. That doctrine has sufficient exceptions to allow an action to enforce the settlement agreement. See, e.g. c. 106, §2-610. More to the point, this was a written settlement agreement and such agreements are enforceable even if unwritten. *Peters v. Wallach*, 366 Mass. 622, 628 (1975). More concretely, the controversy involved an actual breach of the contract in 1983. Charter Security initially provided a written annuity contract for life, but then disowned that contract and replaced it with one limited to twenty years. That breach was enforceable in 1983.

FEE SCHEDULE:

Services will simply be billed at the rate of $420 per hour. No retainer will be required and there will be no minimum charge for testimony at a deposition or trial.

PRIOR TESTIMONY:

I have not testified at deposition or at trial in the prior four years, with the exception of my testimony at the trial of the 93A/176D claim in *Bobick v. U.S.F. & G. et al*, Suffolk Superior Court No. 94-5753B. My testimony was not as an expert, but rather involved my handling of the underlying tort claims.

Very truly yours,

Hans R. Hailey

Hans R. Hailey

HRH/at
Enclosure: Resume

# EXHIBIT U

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DENNIS DIMON,                        )      **ORIGINAL**
                                     )
            Plaintiffs,              )
                                     )
    vs.                              )  C.A. No:   05-11073 WGY
                                     )
METROPOLITAN LIFE INSURANCE,         )
KEMPER INSURANCE COMPANY,            )
MORGAN STANLEY DW, INC.,             )
MICHAEL B. LATTI, LATTI              )
ASSOCIATES, and LATTI &              )
ANDERSON LLP,                        )
                                     )
            Defendants.              )


        The telephonic deposition of **WILLIAM R.
MENSIE**, called by the Defendant Metropolitan Life

Insurance for examination, pursuant to Notice, and

pursuant to the Rules of Civil Procedure for the United

States District Courts pertaining to the taking of

depositions, taken before Joanne M. Brogan, a Certified

Shorthand Reporter and a Notary Public in and for the

County of Cook and State of Illinois, at One Kemper

Drive, Long Grove, Illinois, on Thursday, 7th day of

September, 2006, at the hour of 9:00 o'clock a.m.

1    I'm not sure which party it was.

2        Q    And when did you -- did you review that

3    communication recently?

4        A    It was by email.  So it was instantly reviewed

5    and discarded.  I mean it was a simple communication.

6    We're trying to expedite getting this material to him,

7    and the person took it upon themselves to advise him that

8    the file was enroute.

9        Q    And when did you see that communication?

10       A    It would have been last week I believe.

11       Q    Okay.  Mr. Mensie, during our break did you

12   review any documents other than the document I requested

13   you find?

14       A    In order to find that document I had to look

15   through other documents.

16       Q    Did you go anyplace during the break?

17       A    I went -- yes.

18       Q    Okay.  Other than conferences with counsel and

19   what I suspect might have been a trip to the restroom,

20   did you go back to your office?

21       A    I did not.

22       Q    Office at Kemper?

23       A    I did not.

24       Q    Okay.  Now, with reference to the Dimon versus

1    agree to any suspension of the deposition.  There's been

2    no cause whatsoever shown for that, and that should

3    suffice.

4              MR. LeBLANC:  Thank you all.  Thank you, Mr.

5    Mensie.

6              THE REPORTER:  Do you do signature?

7              MR. O'DRISCOLL:  Yes.

8              THE REPORTER:  He needs to read?

9              MR. O'DRISCOLL:  Yes.

10             MR. LeBLANC:  Let's go off record but take care

11   of some housekeeping issues, can we all agree to that?

12                       (Discussion held off the record.)

13                       (Witness excused.)

14

15

16

17

18

19

20

21

22

23

24

1          I have read the foregoing transcript of my
deposition taken on September 7 and 8, 2006, and

2    _____It is a true and correct transcript of my
deposition given on the day and date aforesaid.

3          (or)
_____I wish to make the following changes to my

4    deposition:

5

Page _____ Line _____ Change _____

6                          Reason _____

7
Page _____ Line _____ Change _____

8                          Reason _____

9
Page _____ Line _____ Change _____

10                         Reason _____

11
Page _____ Line _____ Change _____

12                         Reason _____

13
Page _____ Line _____ Change _____

14                         Reason _____

15
Page _____ Line _____ Change _____

16                         Reason _____

17

18
                          _____
19                        William R. Mensie

20
Subscribed and sworn to

21   before me this _____ day
of _____, 2006.

22

23   _____
     (Seal)      Notary Public

24

1

2      STATE OF ILLINOIS   )
                           ) SS.
3      COUNTY OF C O O K   )

4

5              I, JOANNE M. BROGAN, CSR, RPR, a notary

6      public in and for the County of Cook and State of

7      Illinois, do hereby certify that **WILLIAM R. MENSIE**, was

8      by me first duly sworn to testify to the truth, the whole

9      truth, and nothing but the truth, and that the above

10     deposition was recorded stenographically by me and

11     reduced to computer-aided transcription by me.

12              I FURTHER CERTIFY that the foregoing

13     transcript of the said deposition is a true, correct, and

14     complete transcript of the testimony given by the said

15     witness at the time and place specified hereinbefore.

16              I FURTHER CERTIFY that I am not a

17     relative or employee or attorney or counsel of any of the

18     parties, nor a relative or employee of such attorney or

19     counsel, or financially interested directly or indirectly

20     in this action.

21

22

23

24

1

2          I FURTHER CERTIFY that my certificate

3    annexed hereto applies to the original and typed

4    transcripts only, signed and certified transcripts only.

5    I assume no responsibility for the accuracy of any

6    reproduced copies not made under my control or direction.

7          IN WITNESS WHEREOF, I have hereunto set my

8    hand and affixed my seal of office at Chicago, Illinois,

9    this 28th day of September, 2006.

10

11   _____
     Certified Shorthand Reporter
12   Registered Professional Reporter
     Notary Public, Cook County, Illinois
13   C.S.R. No. 084-002353

14

15

16                    OFFICIAL SEAL
                      JOANNE M BROGAN
17          NOTARY PUBLIC - STATE OF ILLINOIS
            MY COMMISSION EXPIRES:07/29/09

18

19

20

21

22

23

24

JEROME B. SPUNT
ATTORNEY AT LAW
II PARK ROW
PROVIDENCE, RHODE ISLAND 02903
———
(401) 274-4044

March 10, 1983

W. Slater Allen, Jr., Esq.
155 Westminster Street
Providence, Rhode Island 02903

Re:  Dennis Dimon v. Jenny C., Inc.

Dear Mr. Allen:

On behalf of Jenny C., Inc., I want to write you formally as
attorney for American Motorists Insurance Company (Kemper Group)
to register my distress at the current status of the case and the
failure of your company to make reasonable efforts to settle the
matter within the policy limits.  This is, in substance, what I
said to you informally in our phone conversation yesterday.

As you know, plaintiff demanded $90,000 before trial began,
and by my letter of January 19, 1983 I put Home Indemnity Company
on notice that I saw a risk of a verdict in exesss of $500,000
and that Home would be liable for breach of its duties to the
insured in failing to compromise the case in the event of judg-
ment over the policy limits.  I understand that you gave Home
similar notice.

We are now faced with a jury verdict of in exesss of $720,000.
The assets of the corporation representing, substantially, the life
savings of my clients, Gary Champlin and his father Leon F. Champlin,
may well have to be taken to satisfy this judgment.

Joseph Flannery, plaintiff's counsel, has taken the position
that "he does not want to bid against himself", and in the absence
of a responsible indication of a willingness to negotiate on the
part of defendant, has stuck to his original post-verdict settlement
proposal which he first made to you on February 10, 1983, that is,
that plaintiff would now be willing to accept $600,000 prior to the
hearing on  limitation of liability.  Jack Wells has advised me that
Home Indemnity Company will now, of course, contribute the balance
of its policy, and we would expect any proposal by your company to
be conditioned on that.

You told me, when we talked yesterday, that neither Jack Wells
nor Joe Flannery have put any proposals in writing, and you are not
disposed to make any suggestions to your company until they do so.
I implore you not to stand on ceremony.  There is a realistic chance



Exhibit
#8

9-8-06

K-0114

W. Slater Allen, Jr., Esq.
-2-
March 10, 1983

the case can be settled within the $500,000 aggregate policy limits, and the $600,000 demand by plaintiff should be regarded, realistically, only as his opening proposal, which has been left unresponded to for one month.

Your company, I believe, has an obligation to the insured to make responsible efforts to eliminate the risk of ultimate judgment being entered for $720,000 or more. If you feel that others have made mistakes in the past, that is no reason to suspend efforts for a sensible solution at this time.

I feel, further, that your company has an obligation to affirmatively make a proposal, within the policy limits, for settlement at this time. It is more than likely that Mr. Flannery will respond with a demand within the policy limits.

We fully understand and appreciate the question that exists as between American Motorists and Home Indemnity as to Home's obligation to share in payment of amounts in excess of its policy limits, and Jack Wells advises, as you know, that this matter can be left open and would not be prejudiced in any way by your company's payment.

In my opinion, if your company does not alter its position as outlined above, it, in addition to Home Indemnity Company, will be liable to the insured for judgment in excess of the policy limits.

Very truly yours,

JEROME B. SPUNT

JBS:ilb
cc: Guy J. Wells, Esq.
     Gary Champlin



# MEDWAY MARINE
## CORPORATION

OCEAN & INLAND MARINE INSURANCE

P.O. BOX 2385
PROVIDENCE, RHODE ISLAND 02906
TELEPHONE (401) 861 - 6800 - TELEGRAMS: SMITHINC
TELEX - 92 - 7751

March 10, 1983

W. Slater Allen, Esq.
Booth and Brodsky
515 Howard Building
Providence, RI  02903

RE:  Fishing Vessel Jenny C

Dear Mr. Allen:

No Protection and Indemnity insurance in excess of the limit
of liability in the American Motorists Insurance Company
excess policy was in effect through this agency on the date
of the accident in the case on which you are acting as counsel
for the Kemper Insurance Group.

Yours very truly,

MEDWAY MARINE CORPORATION

Carleton I. Fisher
Vice President

CIF:rw



Exhibit
#9
9-8-06  JB

K-0116

*A Subsidiary of Morton Smith, Inc.*



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DENNIS DIMON,<br><br>                    Plaintiff,<br><br>        v.<br><br>METROPOLITAN LIFE INSURANCE CO.,<br>KEMPER INSURANCE CO., MORGAN<br>STANLEY DW, INC.MICHAEL B. LATTI,<br>LATTI ASSOCIATES, and LATTI &<br>ANDERSON LLP,<br><br>                    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 05-11073 REK<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MICHAEL B. LATTI, LATTI ASSOCIATES, AND LATTI & ANDERSON LLP'S INITIAL DISCLOSURES PURSUANT TO RULE 26(a)

Defendants Michael B. Latti, Latti Associates, and Latti & Anderson LLP (referred to hereafter collectively as "Latti") hereby submit their initial disclosures pursuant to Federal Rule of Civil Procedure 26(a).

(A)     The following individuals are likely to have discoverable information that Latti may use to support its claims or defenses.

        1.      Michael Latti
                26 Surfpoint Road
                York, ME 03909

        2.      Carolyn Latti
                Latti & Anderson LLP
                30-31 Union Wharf
                Boston, MA 02109

3.    Roger Hughes
      Hughes & Associates
      46 Accord Park Drive
      Norwell, MA 02061
      (781) 681-5100

      Roger Hughes was the Latti Associates attorney who represented Dennis Dimon
      in <u>Dimon v. Jenny C., Inc.</u> and who negotiated the structured settlement at issue.

4.    Leonard Decof
      One Smith Hill
      Providence, RI 02903
      (401) 272-1110

      Leonard Decof served as Mr. Dimon's *guardian ad litem* in connection with the
      settlement of <u>Dimon v. Jenny C., Inc.</u>

5.    Dennis Dimon

      Dennis Dimon is the plaintiff in this matter.

6.    Kathy Dimon

      Upon information and belief, Dennis Dimon's wife participated in discussions
      regarding the terms of the underlying settlement in question during the time that
      the settlement was being negotiated and approved by the court.

7.    Janice Dimon

      Upon information and belief, Dennis Dimon's mother participate in discussion
      regarding the terms of the underlying settlement in question during the time that
      the settlement was being negotiated and approved by the court.

Latti reserves the right to incorporate all witnesses identified by any other party in its
initial disclosure.

**(B)**    Attached at **Exhibit A** are copies of documents and things in Latti's possession, custody,
or control that Latti may use to support its claims or defenses.

Latti reserves the right to support its claims or defenses using any document identified or
produced by any other party in its initial disclosures.

**(C)**    Latti does not presently claim damages but reserves its right to do so at a later date,
including but not limited to indemnification.

**(D)** Attached at **Exhibit B** is a copy of an insurance agreement that may available to satisfy part or all of a judgment against Latti.


MICHAEL B. LATTI, LATTI
ASSOCIATES, LATTI & ANDERSON
LLP

By their attorneys,


J. Owen Todd (BBO #499480)
John E. DeWick (BBO #654723)
Todd & Weld LLP
28 State Street, 31st Floor
Boston, MA 02109
(617) 720-2626


Dated: 11/21/05


CERTIFICATE OF SERVICE

i hereby certify that a true copy of the above document
was served upon the attorney of record for each other
party by mail/hand on __11/21/05__

3

**EXHIBIT W**

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF RHODE ISLAND

DENNIS JAY DIMON          )
                          )
VS.                       )          Civil Action No. 81-0063-W
                          )
JENNY C., INC.            )

STIPULATION

In the above entitled cause it is agreed that the following entry be made:

Dismissed with prejudice, no costs.  This stipulation is executed in one original and four counter parts, all of which constitute a single document.

APPROVED:

_____
United States District Judge

6/6/89

_____
Plaintiff's Attorney

_____
Defendant's Attorney

_____
Defendant's Attorney

_____
Defendant's Attorney

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


DENNIS JAY DIMON  )
                  )
VS.               )        C.A. No. 81-0063-W
                  )
JENNY C., INC.    )


RELEASE

Pursuant to the settlement of this action, plaintiff hereby releases and discharges defendant Jenny C., Inc. from its agreement dated February 17, 1983, respecting transfer of the vessel Jenny C. or other corporate assets.


                          DENNIS DIMON
                          By his attorney


May 3,
~~April 19,~~ 1983        LATTI ASSOCIATES
                          30-31 Union Wharf
                          Boston, MA 02109