UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

DENNIS DIMON,                                )
                                             )
                                             )
            Plaintiff,                       )
                                             )
    v.                                       )
                                             )  Civil Action No. 05-11073 REK
                                             )
METROPOLITAN LIFE INSURANCE CO.,             )
KEMPER INSURANCE CO., MORGAN                 )
STANLEY DW, INC., MICHAEL B. LATTI,          )
LATTI ASSOCIATES, and LATTI & ANDERSON)
LLP,                                         )
                                             )
                                             )
            Defendants.                      )
_____    )

## MICHAEL B. LATTI, LATTI ASSOCIATES, AND LATTI & ANDERSON LLP'S MOTION FOR SUMMARY JUDGMENT AGAINST DENNIS DIMON
### [Statement of Material Facts and Memorandum in Support Thereof Included]

### INTRODUCTION

Michael B. Latti, Latti Associates, and Latti & Anderson (collectively hereafter,

"Latti Associates") move this court to enter summary judgment in their favor on all

counts of the Complaint brought against them by Dennis Dimon. Specifically, Dennis

Dimon's claim against Latti Associates for legal malpractice is premature because Mr.

Dimon cannot establish on the facts before this Court that Latti Associates' alleged

negligence was the proximate cause of any damages suffered by him. The underlying

dispute concerning whether Mr. Dimon is entitled to lifetime payments pursuant to a

previous settlement agreement must be resolved before any potential damages caused by

Latti Associates' alleged negligence can exist. Since Mr. Dimon cannot establish the

essential element of causation as to Latti Associates, Latti Associates is entitled to summary judgment. Further, if mere notice that co-defendant MetLife intended to cease annuity payments in 2003 caused Mr. Dimon's cause of action against Latti Associates to accrue, then his claims are barred by the applicable statute of limitations.

## STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1

In 1981 Latti Associates[1] brought a suit in United States District Court for the District of Rhode Island on behalf of Dennis Dimon for personal injuries suffered while working aboard the Jenny C., a vessel owned by Jenny C. Inc. Complaint in Dennis Jay Dimon v. Jenny C., Inc., C.A. No. 81-0063, D. RI, attached as <u>Exhibit A</u>. Latti Associates obtained a favorable jury verdict in February of 1983 in an amount in excess of the applicable liability insurance, and subsequently settled the case for a lump sum payment and a lifetime annuity. <u>See</u> Transcript of May 3, 1983 hearing in the United States District Court for the District of Rhode Island ("May 3, 1983 Hearing Transcript"), pp. 1, 6, attached as <u>Exhibit B</u>.

Pursuant to that settlement agreement, on April 19, 1983 Dennis Jay Dimon executed a General Release in which he agreed to release all claims against Jenny C. Inc. in exchange for "payment of Two Hundred Fifty Thousand and No/100 ($250,000) Dollars and the establishment of a fully paid annuity contract for my benefit with Charter Life Insurance Company[2], to pay [Dennis Jay Dimon] One Thousand Four Hundred Fifty

---

[1] We will use Latti Associates when referring to the defendant Latti entities in this motion for simplicity and clarity. By doing so, Latti & Anderson LLP does not concede that it is a successor entity to Latti Associates or Michael B. Latt

[2] Charter Life Security was the name of the company who issued the annuity in question. Defendant Metropolitan Life Insurance Co.'s ("MetLife") counsel has stipulated that MetLife is legally responsible for Charter Life Security's conduct in this case. Deposition of Barbara Fasman, pp. 20, attached as <u>Exhibit C</u>.

and No/100 ($1,450.00) Dollars per month for one year following the execution of that

contract and thereafter, such monthly sum increased at the rate of three (3%) percent per

year, compounded annually, to be paid to [Dennis Jay Dimon] during the term of [his]

life, and in no event for less than twenty (20) years...." See General Release, attached as

Exhibit D.  Jenny C., Inc.'s liability insurer was defendant Kemper Insurance Co.

("Kemper").[3]  Kemper acknowledges that this General Release accurately reflects the

terms of the settlement agreement between Mr. Dimon and Jenny C. Inc. Mensie Dep. pp.

217-18, attached as Exhibit E.

After the settlement agreement was reached, a *guardian ad litem* was appointed

on behalf of Mr. Dimon and a hearing was convened by Judge Petine in the District of

Rhode Island on May 3, 1983 to ensure that Mr. Dimon understood the terms of the

settlement.  May 3, 1983 Hearing Transcript, pp. 2, attached as Exhibit B.  At the

hearing, the *guardian ad litem*, a Rhode Island attorney named Leonard Decof, testified

that "[t]he settlement, as it was agreed upon, provided for a payment, a cash payment, of

$250,000; and in addition to that, a structured settlement of $1450.45 per month

guaranteed for 20 years but which would continue for the life of the plaintiff." Id, pp. 6.

This testimony concerning the terms of the settlement is consistent with the General

Release and accurately states the terms of the settlement arrived at by the parties.  Guy

Wells, W. Slater Allen, and Jerome B. Spunt, attorneys representing Jenny C. Inc. and its

insurance companies, participated in the *guardian ad litem's* review of the settlement and

---

For simplicity and clarity, Charter Life Security and MetLife will both be referred to as MetLife throughout this Motion.

[3] The actual name of the insurance company that insured Jenny C. Inc., and whose name appears on the documentation from 1983, is American Motorists Insurance Company.  American Motorists Insurance Company is a part of the named defendant Kemper Insurance Co.  Deposition of William R. Mensie ("Mensie Dep."), pp. 243-44, attached as Exhibit E  For simplicity and clarity, American Motorists and Kemper Insurance Co. will both be referred to as Kemper throughout this Motion.

were all present at this hearing. Id., pp. 9 and caption page noting appearances. In fact, the insurance companies represented by Mr. Allen and Mr. Wells paid the *guardian ad litem's* fee. Id., pp. 20. The *guardian ad litem* and the court concluded that Mr. Dimon did understand the nature of the settlement and was entering into it upon his free will. Id., pp. 18-19, 21.

Pursuant to the settlement agreement, Kemper applied for and received an annuity policy from MetLife providing for "[m]onthly payments in the amount of $1,450.45, increasing 3% annually, commencing on June 6, 1983, for a period of 240 months certain and life thereafter." Mensie Dep., pp. 223-25, attached as Exhibit E. The policy issued by MetLife is dated June 17, 1983. A copy of the June 17, 1983 Single Premium Deferred Annuity is attached as Exhibit F. Again, the payment terms of this annuity were consistent with, and met Kemper's obligations concerning, the settlement agreement between Mr. Dimon and Jenny C. Inc. See Mensie Dep., pp. 239-40, attached as Exhibit E.

Payments began under the settlement agreement in June of 1983. Approximately a month later, MetLife contacted Dean Witter Reynolds (the broker who apparently brokered the sale of the annuity from MetLife to Kemper) indicating that, due to a clerical error, the annuity purchased by Kemper for Mr. Dimon stated incorrect payment terms. July 14, 1983 letter to Kurt Snyder from Barbara Boehm, attached as Exhibit G.[4] Specifically, MetLife claimed that the payment term for the annuity payments should have read 240 months (or 20 years) only, and not 240 months certain and life thereafter. Id. Kemper then responded with a letter of its own indicating that MetLife's change in

---

[4] By citing this letter and the numerous that come after between the predecessor entities of the co-defendants concerning the dispute over the "clerical error", Latti Associates does not concede that such letters are admissible as to them at trial, but will reserve that argument for a later time.

4

the annuity terms was not acceptable, and that Kemper considered the original annuity calling for lifetime payments enforceable.  August 12, 1983 letter to Robert A. Foley from John L. Noe, attached as Exhibit H.  During the next several months MetLife and Kemper traded correspondence concerning this issue; MetLife claiming that the annuity was for 240 months only, and Kemper maintaining that it considered the original annuity for life to be the enforceable agreement between the parties.  See September 26, 1983 letter to John L. Noe from Robert Ligouri, attached as Exhibit I;  October 10, 1983 letter to Robert Ligouri from John L. Noe, attached as Exhibit J; October 14, 1983 letter to John L. Noe from Barbara Boehm, attached as Exhibit K.  In what appears to be the final letter of this exchange[5], John Noe of Kemper explicitly rejected MetLife's changed terms, and stated that Kemper will retain the original annuity and considers it valid and enforceable.  October 12, 1983 letter to Barbara Boehm from John L. Noe, attached as Exhibit L.  There was no further correspondence between MetLife and Kemper concerning this issue.

Roger Hughes, a partner of Latti Associates at that time, was apparently carbon copied on some but not all of the letters between Kemper and MetLife, though Mr. Hughes does not recall seeing these letters.  Deposition of Roger Hughes ("Hughes Dep."), pp. 32, 34-35, and 39-40, attached as Exhibit M.  Michael B. Latti also does not recall seeing copies of the letters that Roger Hughes was apparently copied on, nor did he have knowledge of the dispute between Kemper and MetLife concerning the term of the annuity until this litigation arose.  Deposition of Michael B. Latti ("Latti Dep."), pp. 90-91, attached as Exhibit N.

---

[5] The final letter is dated October 12, 1983, but this appears to be in error because it directly references Barbara Boehm's October 14, 1983 letter.

5

The Dimons allege that they were not aware of the dispute over the term of the annuity in 1983. In September of 1999, however, the Dimons did become aware that MetLife considered this annuity to be 240 months only, and that the final annuity payment would be made May 5, 2003. Specifically, sometime prior to September 1999 the Dimons were contacted by the bank with whom they were applying for a mortgage and told that there was an issue with the annuity, which they had identified as income during the application process. Deposition of Katherine Dimon ("K. Dimon Dep.") pp. 10, 83-84, attached as Exhibit O. According to Mrs. Dimon, a gentleman from the bank informed the Dimons that he called MetLife concerning the annuity, and MetLife "said that it wasn't for life, it was only twenty years…" Id., pp. 84. Shortly thereafter, Teresa Thorp of MetLife sent a letter to the Dimons dated September 24, 1999, confirming that the final annuity payment would be May 5, 2003. September 24, 1999 letter from Teresa Thorp to Dennis Dimon, attached as Exhibit P. Mr. Dimon admitted to receiving this letter and that it informed him that annuity payments would cease on May 5, 2003. Plaintiff Dennis Dimon's Response to Defendant, Metropolitan Life Insurance Company's First Set of Requests for Admission, Nos. 5-6, attached as Exhibit Q. When questioned about receiving this letter at his deposition, Mr. Dimon testified as follows:

> Q:      So, when you learned in September of 1999 that the final payment on your annuity was going to be in May of 2003, what did you do with that information?

> A:      Like I said before, I thought it was a mistake, and I said they didn't know, I told my wife they don't know what they're talking about, you know. It wasn't no signed document, you know, nothing was ever said, so, I just blew it off.

D. Dimon Dep., pp. 100-01, attached as <u>Exhibit R</u>. Consistent with his testimony, Mr. Dimon did not take any action at that time upon learning that the final annuity payment would be on May 5, 2003.

When Mr. Dimon did not receive an annuity payment in June of 2003 his wife contacted MetLife. K. Dimon Dep., pp. 36, attached as <u>Exhibit O</u>. In response, MetLife sent a letter confirming its position that the annuity had been for 20 years and the final payment was made on May 5, 2003. June 9, 2003 letter from Sandy Franklin to Dennis Dimon, attached as <u>Exhibit S</u>. Thereafter, Mr. Dimon sought legal advice and filed the current lawsuit on May 23, 2005.

During the 20 years between the settlement of the Jenny C. case and MetLife ceasing payments to Mr. Dimon in June of 2003, Mr. Dimon and his family contacted Latti Associates only once. <u>See</u> D. Dimon Dep., pp. 153-55, attached as <u>Exhibit R</u>.

## ARGUMENT

Latti Associates is entitled to summary judgment on the legal malpractice claim brought by Dennis Dimon because Mr. Dimon cannot, as a matter of law, establish that any alleged negligence he has attributed to Latti Associates has proximately caused him any damages. Specifically, until the underlying dispute concerning the enforcement of the settlement agreement in the Jenny C. Inc. case and the resulting annuity is resolved, Mr. Dimon's claim of damages caused by Latti Associates' alleged failure to inform him of, and to take action on, the information that MetLife considered the annuity to be for 20 years only is speculative, and his malpractice action is, therefore, premature. Further, in so far as Mr. Dimon's claim against Latti Associates is based on their failure to provide

for a lifetime annuity as part of the settlement, that claim is barred by the statute of limitations because Mr. Dimon was on notice in September of 1999 that the annuity was for 20 years only.

## I.      Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if the pertinent evidence is such that a rational factfinder could resolve the issue in favor of either party, and a fact is "material" if it "has the capacity to sway the outcome of the litigation under the applicable law." Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir.1995).

The moving party bears the burden of showing the Court that no genuine issue of material fact exists. Id. Once the movant has made the requisite showing, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Though the Court views all facts and draws all reasonable inferences in the light most favorable to the nonmoving party, the nonmovant still bears the "burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe." Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir.2003).

**II.    Dennis Dimon cannot establish that Latti Associates' alleged negligence caused him any damages, and therefore his legal malpractice action is premature and summary judgment in Latti Associates' favor is appropriate.**

"To prevail on a claim of negligence by an attorney, a client must demonstrate that the attorney failed to exercise reasonable care and skill in handling the matter for which the attorney was retained, that the client has incurred a loss, *and that the attorney's negligence is the proximate cause of the loss*." Colucci v. Rosen, Goldberg, Slavet, Levenson & Wekstein, *P.C.*, 25 Mass.App.Ct. 107, 111 (1987) (internal citations omitted) (emphasis added). Mr. Dimon cannot succeed on an action for malpractice against Latti Associates unless he establishes that the alleged negligence of Latti Associates has caused him to be denied the lifetime payments due him under the settlement agreement in the Jenny C. Inc. case. Since the underlying dispute as to whether or not Mr. Dimon can enforce the settlement agreement has not yet been resolved, Latti Associates' alleged negligence has not yet caused any damages to Mr. Dimon. Since he cannot prove the essential element of causation, Mr. Dimon's claims against Latti Associates cannot succeed as a matter of law, and summary judgment for Latti Associates is appropriate.

When an attorney's negligence is related to the handling of an underlying dispute, it is premature to bring a legal malpractice action until that underlying dispute has been resolved because the alleged negligence cannot yet have caused any damages. In Wehringer v. Powers & Hall, P.C., 874 F.Supp. 425 (D. Mass. 1995) the plaintiff brought a legal malpractice action alleging that the defendants' failure to take certain actions on his behalf in an ongoing dispute constituted negligence. The District of Massachusetts granted the defendants' motion to dismiss on the grounds that the plaintiff could not

9

establish that the defendants' alleged negligence caused him any damages because the underlying dispute had not yet been resolved. Id. at 428. The court stated that "[a]t the time the plaintiff filed his complaint in the instant case, his cause of action for legal malpractice had not yet accrued, as the underlying suit was still pending... Therefore, accepting as true plaintiff's allegation that the defendant acted negligently in ceasing to provide professional services, plaintiff may not press his claim for damages without proof that he probably would have succeeded in his underlying lawsuit. However, [the plaintiff] cannot offer such proof until the underlying lawsuit has been resolved." Id., at 427-28.

The District Court's decision in Wehringer was subsequently upheld by the First Circuit. See Wehringer v. Power and Hall, P.C., 1995 WL 536047 (1st Cir.1995). On appeal, the plaintiff argued that even before the outcome of the underlying case is decided, he has suffered harm by the defendant attorney's failure to amend the complaint and add a now time barred claim against a defendant in the underlying action. Id., at *1. The First Circuit rejected that argument concluding that "even if [defendant attorney] was negligent in failing to amend the complaint prior to the running of the statute of limitations, [the plaintiff] has suffered no loss therefrom unless the claim probably would have succeeded. Until the underlying lawsuit is completed, [the plaintiff] cannot offer such proof. Therefore, the complaint fails to allege harm as the proximate result of [the defendant attorney's] alleged negligence in failing to amend the complaint." Id., at *2.

Just as in Wehringer, Mr. Dimon's legal malpractice claim against Latti Associates has not accrued because Mr. Dimon cannot establish that Latti Associates' alleged negligence caused any damages until the underlying dispute is resolved. Mr.

10

Dimon alleges that Latti Associates was negligent in not informing him in 1983 that MetLife only intended to make annuity payments for 20 years and not for life, and/or for not taking action on his behalf in response to such information. The only way that Latti Associates' conduct caused him any harm, therefore, is if Mr. Dimon was entitled to lifetime payments under the original settlement agreement, but that he will be unable to collect such payments due to Latti Associates' negligence. See Collucci, supra. at 113 (holding that the plaintiff in a malpractice action based on the negligence of an attorney in an underlying dispute "must show that, *but for the attorney's failure*, the client probably would have been successful in the prosecution of the litigation giving rise to the malpractice claim.") (emphasis added). Until there are facts sufficient to establish that Latti Associates' conduct has impaired Mr. Dimon's right to recover the full value of the settlement agreement, Mr. Dimon's claim of harm is speculative and this malpractice action is premature. See Derosier v. White, 1995 WL 809721, at *3 (Mass. Super. Feb. 10, 1995) (Rup, J.) (granting summary judgment in favor of a defendant attorney when plaintiff failed to show "that if he were to obtain a favorable judgment [in the underlying dispute], the defendant's acts or omission would prevent him from recovering on such judgment", making his claim of damages "speculative", and thus his malpractice claim "premature.") (citing Wheringer, supra.).

Further, not only are there insufficient facts at present to establish a claim of damages against Latti Associates, it appears that such facts will not exist in the future either. There appears to be no dispute that the settlement agreement in the underlying litigation provided for lifetime payments to Mr. Dimon. Contrary to instances where a settlement provides for a single premium amount intended for the purchase of an annuity,

11

the underlying settlement in this case explicitly indicates that payments are to be made to

Mr. Dimon for a period of no less than 20 years, and then for his life thereafter. These

express terms are contained in the General Release executed by Mr. Dimon, they were

read into the record at the settlement hearing, and these lifetime payments were

acknowledged by Kemper's 30(b)(6) deponent. See General Release, attached as <u>Exhibit</u>

<u>E</u>; May 3, 1983 Hearing Transcript, pp. 6, attached as <u>Exhibit B</u>; Mensie Dep. pp. 217-

18, attached as <u>Exhibit D</u>. This settlement agreement was breached in June of 2003 when

the required payments ceased, and Mr. Dimon subsequently brought this action for

enforcement within the requisite six year limitations period. MASS. GEN. LAWS ANN.

ch. 260, § 2 (2006) ("Actions of contract … shall, except as otherwise provided, be

commenced only within 6 years next after the cause of action accrues.")[6]. Therefore, the

only question in this litigation is whether the lifetime payments are to be made to Mr.

Dimon by Kemper directly, or whether MetLife must make the payments to Mr. Dimon

pursuant to the annuity it sold to Kemper in 1983. If it is established that the MetLife

annuity requires lifetime payments, then MetLife must make such payments to Mr.

Dimon. If it is established that the MetLife annuity was, in fact, only for 20 years, that

does not absolve Kemper of its obligation to provide lifetime payments pursuant to the

terms of the settlement agreement. Since Mr. Dimon's claims against Kemper and

MetLife are not time barred, Latti Associates' alleged negligence in not informing Mr.

---

[6] The limitations period for Mr. Dimon's claim of breach of the annuity did not begin to run in 1983 when
MetLife informed Kemper that it believed the annuity was for 20 years and not for life because
Massachusetts has long not recognized anticipatory repudiation as breach of a contract. See Daniels v.
Newton, 114 Mass. 530 (1874). Further, the facts indicate that Mr. Dimon was not aware of MetLife's
position until, at the earliest, September of 1999, so even if MetLife's apparent repudiation did cause a
breach of contract action to accrue, it did so only then. And finally, even if Mr. Dimon were precluded
from seeking recovery in contract from MetLife on the annuity, there was never an indication that Kemper
did not intend to fulfill its obligations to Mr. Dimon under the settlement agreement until payments actually
ceased in 2003. Therefore, Mr. Dimon's claim against Kemper for breach of contract is not time barred
even if MetLife's repudiation in 1983 caused a claim to accrue against MetLife.

Dimon of the dispute between Kemper and MetLife concerning the payment terms of the annuity cannot have impaired Mr. Dimon's ability to proceed against them, and therefore, cannot have caused any damages as a matter of law.

### III.   If The Malpractice Action Against Latti Associates Accrued Merely By Notice That Metlife Intended Payments To Cease After May Of 2003, It Is Barred By The Statute Of Limitations.

At the latest, Mr. Dimon was on notice in September that his annuity payments would cease in May of 2003. Therefore, in so far as Mr. Dimon's claim against Latti Associates for legal malpractice accrued upon notice that the payments to Mr. Dimon would cease (again, Latti Associates maintains that such a claim has not yet accrued), that claim is barred by the three year statute of limitations applicable to legal malpractice actions.

The statute of limitations in actions for attorney malpractice is three years. MASS. GEN. LAWS ANN. ch. 260, § 4 (2006). "The statute of limitations applicable to a legal malpractice claim begins to run when a client 'knows or reasonably should know that he or she has sustained appreciable harm as a result of the lawyer's conduct.'" Vinci v. Byers, 65 Mass.App.Ct. 135, 138-39 (2005), quoting Williams v. Ely, 423 Mass. 467, 473 (1996). If Mr. Dimon alleges that his claim against Latti Associates accrued upon notice from MetLife that it intended to cease payments, then the statute of limitations began running in September of 1999 when the Dimons were made aware that the final annuity payment would be May of 2003. As Mr. Dimon testified at his deposition, he did nothing in response to that information and, in fact, "blew it off." D. Dimon Dep., pp. 100-01, attached as Exhibit R. Therefore, the three year limitations period expired in

September of 2002, approximately 2 ½ years before Mr. Dimon filed this lawsuit, and

Mr. Dimon's claims against Latti Associates are time barred.

## CONCLUSION

Based on the foregoing, Michael B. Latti, Latti Associates, and Latti & Anderson

LLP are entitled to summary judgment on the claims brought in the instant action by

Dennis Dimon.

## Request for Hearing

Michael B. Latti, Latti Associates, and Latti & Anderson LLP request a hearing

on this Motion for Summary Judgment.

> MICHAEL B. LATTI, LATTI
> ASSOCIATES, and LATTI & ANDERSON
> LLP,
>
> By their attorneys,
>
> _____
> J. Owen Todd (BBO #499480)
> John E. (Jed) DeWick (BBO #654723)
> Todd & Weld LLP
> 28 State Street, 31st Floor
> Boston, MA 02109
> (617) 720-2626

## Rule 7.1 Certification

I hereby certify that I have conferred with counsel for plaintiffs prior to filing this
motion and was unable to resolve the issues herein.

UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

81-0063

| | | |
|---|---|---|
| * * * * * * * * * * * | | |

DENNIS JAY DIMON,           *

            Plaintiff        *

vs.                          *

JENNY C., INC.,              *

            Defendant        *

* * * * * * * * * * *

PLAINTIFF'S COMPLAINT

Now comes the plaintiff in the above-entitled action and says:

COUNT I

First:    The plaintiff is a resident of Kenyon in the State of Rhode Island a seaman and, at all times hereinafter referred to, a member of the crew of the F/V JENNY C.

Second:    The defendant is Jenny C., Inc. duly organized under the laws of the State of Rhode Island with a principal place of business in Pt. Judith, Narragansett within the District of Rhode Island, and, at all times hereinafter referred to, owned, operated and controlled the F/V JENNY C.

Third:    On or about January 24, 1981        the plaintiff was in the employ of the defendant as a seaman on the F/V JENNY C.

Fourth:    On or about January 24, 1981        while the said   JENNY C                        was in navigable waters,                and while the plaintiff was in the exercise of due care in the performance of his duties, he sustained severe and painful personal injuries

Fifth:    The injuries sustained by the plaintiff were not caused by any fault on his part, but were caused by the fault of the defendant, its agents or servants, as follows:

(a)    Failure to use due care to provide and maintain a seaworthy vessel with safe and proper appliances.

(b)    Failure to use due care to make reasonable and periodic inspection of the said vessel, its equipment and appliances.

(c)    Failure to use due care to furnish the plaintiff with a reasonably safe place in which to perform his work.

(d)   Failure and negligence of fellow employees.

(e)   Failure and negligence in other respects that will be shown at the trial.

**Sixth:**   As a result of the said injuries, the plaintiff has suffered great pain of body and anguish of mind, lost a great deal of time from his usual work, incurred medical and hospital expenses, and has suffered and will suffer other damages as will be shown at the trial, all in the sum of ONE MILLION ($1,000,000.00) DOLLARS.

**Seventh:**   This cause of action is brought under the Merchant Marine Act of 1920, commonly called the Jones Act.

WHEREFORE, the plaintiff demands judgment against the defendant in the sum of ONE MILLION ($1,000,000.00) DOLLARS together with costs and interest.

## COUNT II

**First:**   The plaintiff reiterates all the allegations set forth in paragraphs "First", "Second", "Third" and "Fourth" of Count I.

**Second:**   The injuries sustained by the plaintiff were due to no fault of his, but were caused by the unseaworthiness of the defendant's vessel.

**Third:**   As a result of the said injuries, the plaintiff has suffered great pain of body and anguish of mind, lost a great deal of time from his usual work, incurred medical and hospital expenses, and has suffered and will suffer other damages as will be shown at the trial, all in the sum of ONE MILLION ($1,000,000.00) DOLLARS.

**Fourth:**   This cause of action is brought under the General Maritime Law for Unseaworthiness and is for the same cause of action as Count I.

WHEREFORE, the plaintiff demands judgment against the defendant in the sum of ONE MILLION ($1,000,000.00) DOLLARS together with costs and interest.

## COUNT III

**First:**   The plaintiff reiterates all the allegations set forth in paragraphs "First", "Second", "Third" and "Fourth" of Count I.

**Second:**   As a result of his injuries, the p-aintiff incurred expenses for his maintenance and cure and will continue to do so all to his damage in the sum of TWO HUNDRED THOUSAND ($200,000.00) DOLLARS

WHEREFORE, the plaintiff demands judgment against the defendant in the sum of TWO HUNDRED THOUSAND ($200,000.00) DOLLARS    together with costs and interest; and, in addition, an award for attorney's fees incurred by the defendant's wilful and persistent failure to make prompt payment of maintenance and cure during the period of the plaintiff's disability.

The plaintiff hereby demands a trial by jury on all the issues raised in Counts I, II and III.

By his attorneys,

Michael B. Latti
Latti Associates
95 Commercial Wharf
Boston, Massachusetts    02110
Tel: (617) 523-1000

Laurent L. Rousseau
Moore, Virgadamo & Lynch, Ltd.
112 Bellevue Avenue
Newport, Rhode Island 02840

1           IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF RHODE ISLAND

3

4   DENNIS J. DIMON        )

5

6          vs.            )            C.A. 81-0063

7

8   JENNY C., INC.         )

9

10

11

12

13   PROCEEDINGS HELD ON MAY  3, 1983 IN THE ABOVE-CAPTIONED CASE

14   IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE

15   ISLAND BEFORE SENIOR JUDGE RAYMOND J. PETTINE.

16

17

18

19   APPEARANCES:

20   ROGER E. HUGHES, JR., ESQUIRE--------FOR THE PLAINTIFF

21   GUY WELLS, ESQUIRE-------------------FOR THE DEFENDANT

22   W. SLATER ALLEN, ESQUIRE

23   JEROME B. SPUNT, ESQUIRE

24

25

1    <u>MORNING SESSION, MAY 3, 1983</u>

2    THE COURT:  I realize the plaintiff is not here,

3    but I have such an exacting schedule today, I just got

4    to keep on time, or otherwise, everything's going to fall

5    all along the line.  So, I think we better just go ahead.

6    All right, Mr. Decof, would you mind taking the stand

7    and giving a report to the Court please?

8    MR. DECOF:  Yes, your Honor.

9    THE COURT:  We may have to have this typed.

10   L E O N A R D   D E C O F  was duly sworn.

11   THE COURT:  All right.  Would you be kind enough to

12   trace the history of this case, as you understand it,

13   starting with my first contact with you and placing it

14   on the record?

15   MR. DECOF:  Yes, your Honor.  On April 20, 1983

16   I received a telephone call from Senior Judge Pettine

17   asking me if I would be willing to serve as a guardian

18   ad litem in a case which was somewhat disturbing to him.

19   He told me basically that the case was an admiralty case,

20   a Jones Act case, in which the plaintiff was a seaman who

21   got injured, had lost an eye, that he had received a

22   verdict which totaled more than $700,000 before a jury,

23   that the parties had agreed to a settlement, and that

24   at a hearing before the Court, the plaintiff responded

25   to questioning from his attorney as to whether or not he

understood he would have no more right of action against
anyone, if he accepted the settlement, but that when the
Court put some questions to him, he failed to understand
the questions or failed to reply to them in a way which
showed that he understood and more disturbing, informed
the Court that he was unable to read.  He couldn't read
the release, and because he was unable to read, the Court
felt that a guardian ad litem should be appointed to
report back to the Court as to whether or not this
plaintiff was capable of understanding the consequences
of the settlement and asked me if I would be willing to
undertake this task.

I instructed the Court that I had one matter pending
with one of the attorneys involved.  I didn't know if it
would be a conflict or not, and that I would discuss that
with the attorney involved, see if he had any objection.
And I did.  I discussed it with the attorney involved.
He had no objection.  He felt there was no conflict.  I
felt there was no conflict.  It was just a matter where
we were on opposite sides of the case; and I, therefore,
instructed the Court that I would be willing to undertake
this task.  My understanding was that none of the
attorneys had any objection to my appointment as guardian
ad litem; and I, therefore, told Judge Pettine that I
would undertake this task.

1          Do you want me to continue further, Judge?

2          THE COURT:  Yes.

3          MR. DECOF:  Following that, on April - I informed

4     the Court on April 22, 1983 that I would undertake -

5     accept the Court's appointment as guardian.  On April 25,

6     1983, I held my first conference with the attorneys

7     involved, Roger  Hughes, Slater Allen, Guy Wells, and

8     with the plaintiff, Dennis Dimon, his wife, Cathy Dimon,

9     and his mother, Mrs. Louis Dimon.

10         I outlined to all of the parties, all of the

11    attorneys, what I understood my function to be, that my

12    function was to review the file, to review the basic

13    facts of the case, and to assess the posture of the

14    case so that I could inform the plaintiff of all of the

15    ramifications of the settlement and determine that he

16    understood what he was doing, if he agreed to accept the

17    settlement.

18         In order to be able to do this, I instructed all

19    the parties that it was not my function to evaluate the

20    case.  It had not yet been heard on the motion for new

21    trial or on the defendant's motion to limit liability

22    under Section 183 of the 46 U.S. Code.  But I told all

23    the parties it was not my function to evaluate the case,

24    but I would inform the plaintiff of all of the various

25    options, and I had to know the background of everything

1    that was happening so that I could make sure he was aware

2    of all of the ramifications.   I accordingly --

3         THE COURT:   What's on your mind, Mr. Allen?

4         MR. ALLEN:   Your Honor, may the record now show

5    that the plaintiff is in court?

6         THE COURT:   Yes.   All right.

7         MR. DECOF:   I accordingly did some research on

8    46 U.S. Code 688 and 46 U.S. Code 183.   After the first

9    conference that I had, all of the parties understood the

10   position that I was in, and the plaintiff understood.

11   I was careful to inform the plaintiff that the Court

12   wanted me to do this, to make sure that he was protected,

13   and that he understood the nature, the full nature, of

14   everything that he was doing.

15        Subsequent to that, I requested the following

16   documents from the attorneys, and I did receive all

17   these documents, and I did review them:   The complaint

18   in the case, the answer in the case, the interrogatories

19   to the jury, the medical reports concerning the plaintiff,

20   the deposition of Dr. Levin who was the plaintiff's

21   opthamologist, the insurance policies of the Kemper and

22   the Home, the expenditures of the Home Insurance Company

23   for maintenance, counsel fees, and so forth itemized,

24   financial statements of the vessel the Jenny C, the

25   school records of the plaintiff, the psychological reports

1   of the plaintiff, the appraisal of the Jenny C, the

2   structured settlement proposal, the general releases,

3   the application for annuity which was made for the

4   plaintiff, and I'll explain all these, and the release

5   of the defendant, Jenny C, from the notice provisions of

6   the plaintiff with reference to seizure of the vessel.

7   Plaintiff's attorneys had properly filed a notice which

8   prevented the Jenny C being sold so that it could be

9   seized to satisfy a judgment, if that became necessary.

10       I did receive all of these documents, and I reviewed

11  them all at length.  I also reviewed and researched the

12  plaintiff's and defendant's memorandum concerning the

13  motion to limit liability of the defendants under 46 U.S.

14  Code 183 (a), and I did this not so that I could make

15  a decision on it, but so that I could inform the plaintiff

16  of the significance of it, and I came to an opinion

17  myself as to whether or not the limit of liability

18  would - whether the defendants would be successful.

19       In researching this, I did determine that the

20  defendants properly and timely set this up in their

21  answer so that defense wasn't necessary, but my opinion

22  was, and I informed the plaintiff of this later on,

23  that the plaintiff would probably prevail on this issue

24  because I felt that under 183 (a) there was privity or

25  knowledge in the sense that under the cases, Coryell

6

1    v. Phillips. And Peace and various other cases, the Cleveco

2    and especially the China Union Lines case, that the

3    condition that the plaintiff complained of which

4    made the vessel unseaworthy was something which the

5    owner knew about or if he had inspected properly

6    would have found out.

7       I state this because I want to inform the Court

8    that I informed the plaintiff that I thought he would

9    prevail on this, and he understood this, and he still

10   wants to take the settlement.

11      Now, following my research I had further conferences

12   with the various attorneys, and I had a meeting, another

13   meeting in my office on April 28, 1983 with Dennis Dimon,

14   the plaintiff, Cathy Dimon, his wife, his mother,

15   Mrs. Dimon, and Roger  Hughes, his attorney.  In the

16   intervening days, I had determined what the present value

17   of the structured settlement was by consultations with

18   actuaries, and I had also determined the availability of

19   annuity policies.  The settlement, as it was agreed upon,

20   provided for a payment, a cash payment, of $250,000; and

21   in addition to that, a structured settlement of $1450.45

22   per month guaranteed for 20 years but which would continue

23   for the life of the plaintiff.  The plaintiff, by the

24   way, was born on December 9, 1959.  His life expectancy

25   is 49.7 years, and he is married, and he has two children.

1    Now, this structured settlement would -- The structured

2    payments would increase by three percent each year, and

3    I instructed the plaintiff in the second conference that

4    we had that this three percent per year was not - did not

5    keep up with the cost of living index which ordinarily

6    raises seven percent per year.  He understood this, and

7    his mother, who is an intelligent woman, understood it,

8    and in fact, she immediately replied to me, but that

9    they had the advantage that there would be no income tax

10   paid, and all this money he received would be tax free.

11        At any rate, in - I questioned Mr. Hughes carefully

12   about the present value of this structured portion of

13   the settlement because there are many different present

14   values.  I know from my experience that different

15   discount rates can be used and different companies will

16   give different amounts for the same amount of money.

17   Mr. Hughes had told me that when the settlement was

18   originally offered, I think he acted with care and expertis

19   by the way in this matter, when the - or his office

20   did, when the settlement was originally offered, the

21   structured settlement, Mr. Hughes asked the defendants

22   what it was costing them to pay for this structured

23   settlement, and they told him $175,000.  He then asked

24   that they allow him the $175,000, and his office would

25   purchase an annuity policy for the plaintiff on the market

1    at the best rate that they could get it; and I checked out

2    the annuity policy and found that this is a very solid

3    and good return for $175,000 with reference to the

4    stature of the company that's involved. I did find out

5    and I instructed the plaintiff and his wife and mother

6    and Mr. Hughes, that it was possible to get a little bit

7    higher payments for the same $175,000, as a matter of

8    fact, rather than $1450.45 per month for the first year,

9    they could possibly get payments of up to as high as

10   $1550 a month but that this - these would be with a

11   company that was not quite as highly rated as the company

12   that's being used. They understood this, and their

13   choice was to have the security of the company that was

14   that was used.

15       And so, the opinion that I came to, after consul-

16   tations with the experts, was that the $175,000 was the

17   present value, a fair present value, of the settlement,

18   the structured portion of the settlement, and that the

19   annuity purchased for it was a good solid annuity with

20   a solid company at market rates.

21       Now, I instructed the plaintiff and his wife and

22   mother when we met with them that the verdict was $710,000,

23   and he understood that, the contributory negligence was

24   found to be - comparative negligence, 12 and 1/2 percent

25   with 8 and 1/2 percent interest for two years. The total

came to $720,650.  The -- I determined from the insurance
policies from Mr. Allen and from Mr. Wells that there
were two insurance companies involved here.  The Home
Indemnity which was the primary carrier had originally
$100,000 coverage, and under the provisions of the policy,
they had paid certain payments out for maintenance of
the plaintiff and for attorneys' fees and so forth which
brought - which under the policy could be deducted from
their coverage, and therefore, brought the amount that
they had available to contribute to the settlement down
to roughly $76,000.

The -- Mr. Allen -- That was the Home Indemnity.
And Mr. Allen's company, the American Motors, Kemper,
had a limit of liability of $400,000.  So, between the
two insurance companies, there was $476,000 available
for contribution to the settlement.

I also requested financial statements concerning
the defendant, Jenny C, so that I could advise the
plaintiff as to his possibility of collecting any excess
against the defendant.  And Mr. Spunt who represents the
Jenny C Incorporated, which is a Rhode Island corporation,
furnished me financial statement and a certificate of
his that that - this was an accurate financial statement.
As a matter of fact, he furnished me a - copies of the
corporate tax return of the corporation, Jenny C

1    Corporation, which revealed that the only asset of the

2    corporation was this vessel; and the vessel, I also asked

3    for and received an appraisal by a maritime expert of

4    the value of this vessel, and the value was some $105,000.

5        The tax -- I'm sorry.  I thought I heard something.

6    The tax return of the defendant, Jenny C, showed that

7    this vessel was carried on the books at about - if you give

8    me one moment.

9        (P A U S E)

10       The tax return indicated - corporate tax return of

11   the Jenny C Inc. on schedule L indicated that the

12   depreciable asset which was the vessel was carried on

13   the books at $105,855, and less accumulated depreciation

14   carried on the books at $62,705.  I advised the

15   defendant - rather, the plaintiff of this; and in our

16   conference, I advised the plaintiff also of the

17   supplementary proceedings process and what would happen

18   if he sustained his judgment through appeal and proceeded

19   to try to get execution against the vessel.  The plaintiff

20   very promptly stated to me that he didn't want to go

21   against the owner of the vessel who was a Mr. Gary

22   Champlin.  He said he was very friendly with the Champlin

23   family.  They've been very nice to him, and he said - I

24   can quote him verbatim, he wouldn't want to take away

25   anybody's livelihood, and he was very strong about this.

1     I discussed the plaintiff's medical history at

2     length with him and his personal history.  He went to

3     the South Rose Elementary School to the sixth grade.  He

4     went to South Kingstown Junior High School to the eighth

5     grade at which time he left, and he went to work.  His

6     subjects were shop, woodworking, machine shop, so forth,

7     English, Science, Math.  He failed everything in the

8     eighth grade excepting Mathematics, and he stated to me

9     that he got an A in Math.  He couldn't pass anything

10    which required reading because he was unable to read.

11        I asked from his mother his psychological records,

12    and she presented me with this folder which have rather

13    voluminous records of psychological testing and reports

14    by the South Kingstown School Department, by Dr. Denhoff

15    of the Child Development Center, by Madeline Sullivan

16    who's a school psychologist, there are various educational

17    evaluations, various test forms.  And I reviewed these.

18    These revealed that the plaintiff, Dennis Dimon, has

19    average intelligence.  His I.Q. on a verbal scale was 87

20    which is dull normal.  His -- On a performance scale,

21    his I.Q. was 110 which is high average.  And on his

22    overall full scale I.Q. was 98 which is listed as average.

23    And all of the psychologists and doctors state  that it

24    is average.

25        Dr. Denhoff found that the plaintiff had a cerebral

1   dysfunction and integrative language disturbance.

2   Various other psychologists have found things in this area

3   which would mean he had a perceptual handicap.  His

4   mother has stated to me, although the records don't

5   state this in these words, but his mother has stated to

6   me that when she took him to the University of Rhode

7   Island for testing, they told her that he had borderline

8   dyslexia.  And the sum and substance of all of these

9   reports were that he is a person who has average intel-

10  ligence but has a dysfunction with reference to reading,

11  and he has not been able to learn to read, and that's

12  why he gave so much concern to this Court.

13          I did find in talking with him that he understood

14  readily the things that I said to him; and as he was -

15  he was much better than average in Mathematics as his

16  school records show.

17          Now, when I had the conference with the plaintiff,

18  his mother, and his - and his wife, I spoke with him

19  first while the attorney was present, and then I asked

20  the attorney to leave, and I told everybody that I wanted

21  to be able to state to the Court that I talked with the

22  plaintiff and his mother and his wife outside the

23  presence of his attorney so that he could reply to my

24  questions with no pressure, with no fear of embarassing

25  anybody.  I asked him if he was satisfied with the

services that the attorneys performed, and he said that
he was.  I asked him if he had any complaints or any
questions that he wanted to raise with me.  At this time,
his mother had one question.  She was of the understanding
that after the settlement was made, that the insurance
company would still pay for some cosmetic surgery to
Dennis' left eye.  I called in Mr. Hughes, and he stated
categorically this was not so, that once this was done,
there was no more comeback against the company.  I --
Dennis stated that he understood this.  I told him that
from what I had gathered this surgery could cost five to
$10,000.  Asked him if he understood this.  He said he
did, and he still wanted to go forward with the settlement.

Again, speaking with him outside the presence of
his attorney, I discussed the settlement sheet, and the
attorney's fees.  Now, the plaintiff had originally
signed an agreement with the attorney's firm for a
one-third contingent fee.  And by the way, I asked why
this firm in Boston was selected, and the plaintiff's
mother told me that she had - she looked for an admiralty
firm, a firm that specializes in admiralty.  She talked
with a number of people in the area who had cases, found
out that this was a good firm.  I say this to the Court
because it was a sophisticated choice that was made.
This is an admiralty firm.  I know them to specialize in

1   this, and they're very familiar with the admiralty work.

2       The one-third contingency fee had been agreed to,

3   and this fee would have come out to a little bit more

4   than the $141,485.47 that the attorneys are charging.

5   But they had agreed with Dennis that he would receive

6   out of the $250,000 in cash $100,000.  So, they modified

7   their fee down by several hundred dollars in order to

8   allow $100,000 balance to come to the plaintiff.  So

9   that of the $250,000 up front, once the attorneys'

10  costs are reimbursed to them for medical records,

11  depositions, and witness fees and so forth, and these

12  costs were quite modest, I thought, for a case of this

13  size, and Dr. Levin's bills were paid, and the attorney's

14  fees of $141,485.47 which were modified down from

15  $141,666.66 were deducted,  the total bills and expenses

16  came to $150,000, and the plaintiff will receive $100,000

17  in cash.  Although it has no part of this case, the

18  plaintiff understands that there is an IRS lien of

19  $4679.35 which he will have to pay from his proceeds

20  which will bring his proceeds down to $95,320.65.

21      I advised the plaintiff and his family of the pros

22  and cons.  I told them that they had a judgment in excess

23  of $700,000, that once the settlement of $425,000 was

24  accepted, there would be no comeback whether there were

25  further hospitalizations or whatever.  I discussed with

1    the plaintiff Dr. Levin's resume of his condition which

2    states that, in effect, that he has a tearing eye which

3    will always be subject to infection, that he will need

4    one or two more operations, that he has some problems

5    with depth perception which could make it difficult or

6    dangerous to work with sharp objects at close range; and

7    asked him how he was doing.  He told me he has been

8    working on another vessel since the accident, and he

9    intends to continue working as a fisherman.

10        I told him that there would be a hearing in which

11   Judge Watson would decide whether or not the liability

12   in this case would be limited to the value of the vessel,

13   and that although I hadn't researched it as carefully

14   as I'm sure the Judge would, that my opinion, after my

15   research, was that he would prevail on this because of

16   what I said before, the privity or knowledge that could

17   be attributed to the owner of the vessel.

18        I also told him what the appeal process was.  I

19   advised him, in my opinion, as to how long an appeal

20   would take before the First Circuit, and the outside

21   possibility of appeal to the United States Supreme Court.

22        The main thing I want to state to the Court is

23   that he understood what I was saying to him, and I took

24   care to point out the down side or the dark side of all

25   the settlement so that he could make an informed judgment,

and he told me that this structured settlement is more money than he has ever earned as a fisherman, and he will still be able to work as a fisherman.  I asked him what he was going to do with the $100,000, and he stated to me that he was going to buy a house for himself and his family, he was going to make a modest down payment, that he had a modest house near the University of Rhode Island he was going to buy for $77,000, he was going to make a small down payment, and get a mortgage and put the rest of it in the bank.  He also wanted very much the annuity because that would be something that would keep coming to him and would be a guarantee against his spending the money in an improvident way.

The earnings that he had made as a fisherman reported on his income tax in 1980 were roughly $11,000, in 1979 roughly $8,000, and in 1982 roughly $12,000.  So, the amount he is receiving on the settlement is more than he has ever earned as a fisherman.

I went over the copy of the settlement sheet with the plaintiff in detail, and he told me he had already gone over it with his attorneys, and he understood it and was satisfied with all the expenses and the legal fees.

I determined one other thing, your Honor, well, several other things, but what's important here is I

1  asked about whether or not there were any hospital liens,

2  Blue Cross liens, or subrogation of any kind which would

3  take away from the amount of money that would be coming

4  to the plaintiff; and I determined that there is no Blue

5  Cross, there is no hospitalization, there's no subrogation

6  of any kind so that this sum of $95,320.65 he will have

7  net to him after he pays the Internal Revenue lien.

8      One final thing I found out from Mr. Hughes that

9  the price or the terms of this annuity which he has

10  gotten a commitment for will change on May 6, 1983.  We

11  can't tell whether the terms will be better or they will

12  be worse.  The -- Mr. Hughes got an opinion from the

13  insurance people that they will probably be worse.  This

14  is because of the fluctuating interest rates.  But if

15  the contract -- excuse me.  I think I said May 6, 1983.

16  If the contract is purchased on or before May 6, 1983,

17  then that amount that I have discussed with the Court

18  will be available.

19      In sum, your Honor, I did not attempt to advise

20  the plaintiff one way or another whether he should accept

21  this settlement.  The plaintiff is an adult.  I understood

22  my function to be to determine whether or not he understood

23  the terms of the settlement.  I think that I exercised

24  an excess of caution and went maybe farther than I had

25  to, but I wanted to do this, to go into the plaintiff's

PENGAD CO., BAYONNE, N.J.  07002  ·  FORM 740

background, to go into the law of the case so that I
could tell him what, in my opinion, would be all the
downside risks of the settlement and make sure that he
understood these; and although I wasn't in any attempt
trying to evaluate the prospects on appeal, I did want
to tell him what could happen, that he could prevail on
the motion to limit liability, that he could prevail on
the motion - I thought he probably would prevail on that,
that he could prevail on the motion for new trial, that
he could prevail on appeal, and he could come out with a
judgment in excess of $700,000 plus accumulated interest;
and he understood this.  I also told him the possibilities
on the other side.  The -- That -- And if he did want -
prevail on his judgment, that all he could get from the
companies would be some $476,000 and would then have to
proceed against the corporation the vessel at forced
sale, might bring anywhere from fifty to $100,000.  He
would still come up short.

But as I said, he was very adamant about the fact
that he did not want to go against the corporation. He
did not want to deprive Mr. Champlin of his right to earn
a living.  And the bottom line is that, in my opinion,
he understood the things that I was saying to him despite
the fact that he has this reading disability and cannot
read - can't read the releases or whatever.  He is aware

1   of what's happening, and it is his choice and his free

2   choice to accept this settlement.

3       THE COURT:  Any questions of Mr. Decof?

4       MR. ALLEN:  No, your Honor.

5       MR. HUGHES:  No, your Honor.

6       THE COURT:  All right, no questions.  Let me say

7   this, Mr. Decof, I certainly appreciate what you've

8   done for this Court.  I must be candid and say I didn't

9   quite know what my jurisdiction was in this matter.

10  Counsel requested that I take it upon myself to evaluate

11  the settlement offer, and I really still don't know

12  whether that's within the jurisdiction of the Court; but

13  I've assumed the responsibility for whatever it's worth.

14      To begin with, I place on the record I consider

15  the report that you have just rendered an exhaustive

16  report detailing every element of the case which was

17  done in a highly professional manner and could only be

18  done of a man of your caliber and your experience in

19  this area of the law.  Certainly, I think we ought to

20  place on the record that Mr. Decof is a leading member

21  of the Rhode Island Bar and who has, in addition, an

22  enviable reputation that extends well beyond the State.

23  It would not be inappropriate for me to ask you to submit

24  to the Court - I don't want to give you added work, but

25  if you have one, I would think you have one all made up,

1    a curriculum vitae of yours that's all typed.  I would

2    like to --

3         MR. DECOF:  Yes, your Honor, be happy to do that.

4         THE COURT:  I would like to file your curriculum

5    vitae with the records of this case so that if it's

6    ever reviewed, they'll know the kind of person who has

7    rendered this report.

8         Now, also, I want to straighten out your fee at

9    this time.  Are you prepared to state what your fee is?

10        MR. DECOF:  Yes, your Honor.  I notified the parties

11   that the Court had instructed me to present a bill for

12   my services in rendering this report, and my original

13   understanding was that this would be paid by the

14   plaintiff.  However, Mr. Allen and Mr. Wells advised

15   that their insurance companies will pay this fee so that

16   the plaintiff will - will not have any more money coming

17   out of his area of settlement.  I told Mr. Allen roughly

18   what my fee would be last Friday.  But I have prepared

19   a bill which did not include this morning, but it came

20   to 18.5 hours at $150 an hour which is, I think, a

21   reasonable fee, and this Court has held to be a reason-

22   able fee.  It's less than I ordinarily charge per hour,

23   which comes to $2775.

24        THE COURT:  Okay.

25        MR. DECOF:  We have another hour that came here.

I'm not going to make an issue out of that.

THE COURT:  Well, since they asked for this hearing, I feel at liberty to say I order that that fee be paid and be part of this order of the Court; and I assume that will be paid in 48 hours, and not 48 months.

MR. ALLEN:  Your Honor, probably take about a week to get it back from New York.

THE COURT:  Well, let's say within one week, all right?  All right, I feel every avenue has been explored to insure that this plaintiff has the capacity and does indeed understand this settlement.  Certainly, we can say that he's made an informed judgment to accept the offer; and as far as the Court is concerned, I can do no more than say he apparently knows what he is doing, and which is about as far as the Court can go. I do not believe you expected the Court to go any further than that. Am I correct?

MR. ALLEN:  Yes, your Honor.

THE COURT:  Okay.  I might just add that there was some thought originally when I first saw this man as to whether or not he had the capacity to handle $100,000 in cash money which would be turned over to him.  That certainly is a lot of money.  I do not believe it's within the province of this Court to try - even attempt to impress a trust upon it.  He knows what's he's doing.

1    He's an adult.  He's married, and I can only hope that

2    they use discretion because once that money's gone, it's

3    gone forever.  It better be used wisely and carefully.

4         All right, I thank you very much, and I thank you

5    again, Mr. Decof.  I certainly appreciate the responsi-

6    bility that you assumed, and I must say again as usual

7    you did it magnificently.

8         MR. DECOF:  Thank you, your Honor.

9                   (A D J O U R N E D)

10              * * * * * * * * * *

1

2          I, Joseph A. Fontes, Official Court Reporter for the

3   United States District Court for the District of Rhode Island,

4   appointed pursuant to the provisions of Title 28, United States

5   Code, Section 753, do hereby certify that the foregoing is a

6   full, true and correct transcript of proceedings had in the

7   within-entitled and numbered cause on the date hereinbefore

8   set forth; and I do further certify that the foregoing

9   transcript has been prepared by me or under my direction.

10

11

12

13                                              (Court Reporter)

14

15

16

17

18

19

20

21

22

23

24

25

1

1

2   UNITED STATES DISTRICT COURT

    DISTRICT OF MASSACHUSETTS

3   ------------------------------------x

4   DENNIS DIMON,

                    Plaintiff,

5           -against-

6   MET LIFE INSURANCE CO., KEMPER INSURANCE

    CO., MORGAN STANLEY D.W., INC., MICHAEL B.

7   LATTI, LATTI ASSOCIATES and LATTI &

    ANDERSON, LLP

8                   Defendants.

9   ------------------------------------x

10                  May 10, 2006

                    10:00 a.m.

11

12

13

14          Deposition of Met Life Insurance Co.

15   by Barbara Fasman, 30(b)(6) witness, held at

16   the offices of Met Life, One Met life Plaza,

17   27-01 Queens Plaza North, Long Island City,

18   New York, before Vicky Galitsis, a Certified

19   Shorthand Reporter and Notary Public of the

20   State of New York.

21

22

23

              GREENHOUSE REPORTING, INC.

24        363 Seventh Avenue - 20th Floor

            New York, New York  10001

25              (212) 279-5108

20

```
 1                        B. Fasman
 2   Charter Security was acquired by or in some
 3   other fashion became a part of Met Life?
 4              MR. CIAPCIAK:  Sue, perhaps I can
 5         get to the point here.
 6              MS. McQUAY:  Sure.
 7              MR. CIAPCIAK:  If you're asking
 8         whether Met Life is responsible legally
 9         for anything that Charter might have
10         done or didn't do in this case, Met
11         Life is responsible.
12              MS. McQUAY:  I won't belabor the
13         issue then.
14              MR. CIAPCIAK:  Great.
15         Q.    Ms. Fasman, directing your
16   attention to Exhibit 1, at the top of the
17   document there appears a number 83A08153, do
18   you see that?
19         A.    Yes.
20         Q.    To what does that refer?
21         A.    To my understanding that refers
22   to the number of the annuity that Charter
23   sold, the contract number.
24         Q.    Okay.  How did you derive that
25   understanding?
```

GENERAL RELEASE

Dennis Jay Dimon, now or formerly of the Town of Charlestown, State of Rhode Island, in consideration of the payment of Two Hundred Fifty Thousand and No/100 ($250,000.00) Dollars and the establishment of a fully paid annuity contract for my benefit with Charter Life Insurance Company, to pay me One Thousand Four Hundred Fifty and No/100 ($1,450.00) Dollars per month for one year following the execution of that contract and thereafter, such monthly sum increased at the rate of three (3%) percent per year, compounded annually, to be paid to me during the term of my life, and in no event for less than twenty (20) years, the receipt whereof is hereby acknowledged, do hereby remise, release, and quitclaim unto Jenny C. Inc. all and any such claims, rights, choses, and actions of every manner and kind which I have ever had, which I have now, or which I may have in the future from the beginning of the world to the date of these presents more specifically, without limiting the generality hereof all and every claim arising out of an injury suffered by me aboard the fishing vessel Jenny C. owned by Jenny C. Inc. on January 24, 1981, and all my rights, claims, and choses asserted or involved in the complaint or libel filed in the United States District Court for the District of Rhode Island under the name and style Dennis Jay Dimon vs. Jenny C. Inc., civil action No. 81-0063.



Exhibit
HO
9-8-06      JB

K-0063

I understand the nature and extent of my injury and that I will never be cured. I understand that this is a full and final settlement. I further certify that this release is fully understood by me and is entirely satisfactory.

IN WITNESS WHEREOF, Dennis Jay Dimon has set his hand this *19th* day of April, 1983.

THIS IS A FINAL RELEASE.

_Dennis Jay Dimon_
Dennis Jay Dimon

On April 19, 1983 I read the above two pages to the plaintiff and explained its contents to him.

Roger E. Hughes of
LATTI ASSOCIATES

K-0064

```
 1
 2                 IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 3                          EASTERN DIVISION
 4
 5    DENNIS DIMON,                  )        COPY
                                     )
 6              Plaintiffs,          )
                                     )
 7        vs.                        ) C.A. No:   05-11073 WGY
                                     )
 8    METROPOLITAN LIFE INSURANCE,   )
      KEMPER INSURANCE COMPANY,      )
 9    MORGAN STANLEY DW, INC.,       )
      MICHAEL B. LATTI, LATTI        )
10    ASSOCIATES, and LATTI &        )
      ANDERSON LLP,                  )
11                                   )
                Defendants.          )
12
13
14              The telephonic deposition of WILLIAM R.
15    MENSIE, called by the Defendant Metropolitan Life
16    Insurance for examination, pursuant to Notice, and
17    pursuant to the Rules of Civil Procedure for the United
18    States District Courts pertaining to the taking of
19    depositions, taken before Joanne M. Brogan, a Certified
20    Shorthand Reporter and a Notary Public in and for the
21    County of Cook and State of Illinois, at One Kemper
22    Drive, Long Grove, Illinois, on Thursday, 7th day of
23    September, 2006, at the hour of 9:00 o'clock a.m.
24
```

3-06
-11073 WGY

William R. Mensie

Page 216

1   asked for a copy of the settlement agreement?
2       A   Yes.
3       Q   Okay   Does that lead you to believe, sir, that
4   there was some hard copy of a settlement agreement in the
5   Jenny C matter?
6       A   Taking in its actual context of this
7   memorandum, yes, it does lead me to -- either that or the
8   fact that I have seen a hard copy of the settlement
9   agreement leads me to believe there was a settlement
10  agreement.
11      Q   You have seen a hard copy of a settlement
12  agreement?
13      A   I seem to recall having seen a settlement
14  agreement, yes.
15      Q   Has that been produced by Kemper in this case?
16      A   My understanding is yes.
17      Q   Can you direct me to -- my attention to what
18  constitutes that settlement agreement among the documents
19  that Kemper has produced, which I believe are all in the
20  room with you?
21          MR. O'DRISCOLL:  Yes, they're in the room, Sue
22  Are you asking the witness now to go through the
23  documents?
24          MS. McQUAY:  If he believes that they contain
                PRECISE REPORTING SERVICE, P C

Page 217

1   I may be mistaken, but I'd like him to identify for me
2   what among these documents he believes constitutes the
3   settlement agreement
4           MR. O'DRISCOLL:  The witness has in front of
5   him a document titled General Release
6   BY MS. McQUAY:
7       Q   All right.  Is your testimony, sir, that the
8   document entitled General Release, which bears the Bates
9   stamp No. K-0063 and K-0064, constitutes the settlement
10  agreement?
11          MR. O'DRISCOLL:  I don't know that the witness
12  has testified to that
13          MS. McQUAY:  I'm asking him if that is his
14  testimony
15          THE WITNESS:  This is the agreement that I'm
16  reading from the paragraph in the memorandum when asked
17  the question, this was the agreement that I recall asking
18  read.
19  BY MS. McQUAY:
20      Q   Did you see anything else in any of the Kemper
21  documents that you believe -- other than this general
22  release that you believe constituted the settlement
23  agreement?
24      A   Not that I recall.
                PRECISE REPORTING SERVICE, P.C.

23      Q   And down further in the next paragraph he, Mr
24  Noe, goes on to say that Charter Security's counsel has
            PRECISE REPORTING SERVICE, P C

Dimon vs. Metropolitan Life
9-8-06
William R. Mensie
C.A. No.: 05-11073 WGY

Page 218

1    Q   It's your understanding or belief that when
2   there is a reference to a settlement agreement it is
3   referring to this general release, K-0063 to 0064; is
4   that correct?
5    A   Looking back on it retrospectively, this is the
6   document I thought they were referring to, yes.
7    MS. McQUAY: Could we have this document, the
8   general release, marked as the next exhibit, please.
9        (Exhibit No. 10 was marked for
10        identification.)
11   BY MS McQUAY:
12    Q   In fact, sir, directing your attention to the
13   document produced by Kemper bearing the Bates stamp No.
14   K-0007, would you place that document in front of you,
15   please.
16    MR. O'DRISCOLL: Mr. Mensie has the document in
17   front of him.
18   BY MS McQUAY:
19    Q   In fact that document reflects that Mr. Noe was
20   asking that he be sent a copy of the settlement
21   agreement, does it not?
22    MR. O'DRISCOLL: Forgive me. I apologize
23   Exhibit 6, K-0125, is that what you're asking about now?
24    MS McQUAY: No, it's K-0007, K-7

PRECISE REPORTING SERVICE, P.C.

Page 219

1    MR. O'DRISCOLL: Okay. Now we're on K-007
2    MS McQUAY: Yes.
3   BY MS. McQUAY:
4    Q   Do you have that document in front of you, sir?
5    MR. O'DRISCOLL: Now he does. That's the first
6   time we referred to this today I believe.
7    MS McQUAY: All right.
8   BY MS McQUAY:
9    Q   In that Kemper document Mr. Noe asked Ms. Graci
10   to send him a copy of the settlement agreement, does he
11   not?
12    A   Yes.
13    Q   And down at the bottom of the document there's
14   a handwritten notation sent 7-26-83 release and
15   proceedings 5-3-83 before Judge Pettine, do you see that?
16    A   Yes.
17    Q   Do you see that, sir?
18    A   Yes.
19    Q   And does that further reinforce your belief
20   that the settlement agreement that is being referred to
21   in the Kemper documents is the general release?
22    A   I'd like to -- well, in order to answer your
23   question the person who interpreted this memo, that Mary
24   Graci, not only did she send the release, but she also

PRECISE REPORTING SERVICE, P.C.

Page 220

1   sent the proceedings.
2    Q   Before Judge Pettine?
3    A   Before Judge Pettine. Now, I don't recall if
4   within that document there was also settlement release
5   language.
6    Q   Okay. But am I correct in understanding that
7   you have seen nothing in any Kemper documents
8   constituting a settlement agreement other than the
9   general release and perhaps language within the
10   proceedings before Judge Pettine; is that correct?
11    A   That's -- I'm sorry. That would be my
12   recollection at this time.
13    Q   Okay. Thank you, sir. Now, going back to the
14   general release which has been marked as Exhibit 10, in
15   that general release Mr. Dimon releases all of his claims
16   in the Jenny C matter, does he not?
17    A   To the best of my understanding. That's
18   certainly what my understanding was, that there was an
19   intent to do.
20    Q   And in return for releasing all of his claims
21   in the Jenny C matter, that general release recites the
22   fact that he was to receive $250,000 cash payment,
23   correct?
24    A   Correct.

PRECISE REPORTING SERVICE, P.C.

Page 221

1    Q   And in addition he was to receive in return for
2   release of those claims a fully paid annuity contract for
3   his benefit with Charter Life Insurance Company to pay
4   him $1,450 per month for one year following the execution
5   of that contract and thereafter such monthly sum
6   increased at the rate of 3 percent per year, compounded
7   annually, to be paid to him during the term of his life
8   and in no event for less than 20 years, correct?
9    A   Correct.
10    Q   Was such an annuity contract issued and
11   provided to Kemper for Mr. Dimon's benefit?
12    MR. O'DRISCOLL: I'm sorry. I didn't get that
13   question, but if I could just ask Joanne to read it back
14   instead of asking you to
15    (Record read as follows: Was such an
16    annuity contract issued and provided
17    to Kemper for Mr. Dimon's benefit?)
18    MR. O'DRISCOLL: Provided to Kemper for
19   Mr. Dimon's benefit?
20    MS McQUAY: Yes
21    MR. O'DRISCOLL: I'll object to the question as
22   compound
23   BY MS McQUAY:
24    Q   Mr Mensie?

PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                                    William R. Mensie
9-8-06
C.A. No : 05-11073 WGY

---

Page 222

1    MR. O'DRISCOLL: Well, if I may object to the
2    form of the question  It's a compound question  You're
3    asking at least two questions in there
4        THE WITNESS: To the extent that I understand
5    the question it was represented by Charter that the
6    monies that Kemper paid to Charter would comply with the
7    release requirements.
8    BY MS. McQUAY:
9    Q   And what form did Charter make that
10   representation?
11   A   The distribution of at least what I could seem
12   to see was -- I seem to recall was there was actually a
13   policy that was issued.
14   Q   That was my question: Did in fact Charter
15   issue a policy that conformed to the requirements that
16   resided here in the general release, Exhibit 10?
17   A   Yes.
18   Q   Okay  And did Kemper receive a copy of that
19   policy?
20   A   It seems -- yes.
21   Q   All right  And is that what you have referred
22   to and others have referred to from time to time as the,
23   quote, original policy issued by Charter?
24   A   Yes.
         PRECISE REPORTING SERVICE, P.C.

---

Page 223

1    Q   Is a copy of that original policy issued by
2    Charter among the documents that Kemper has produced?
3    A   I believe they have been produced, yes.
4    Q   Would you identify, please, for the record what
5    you believe to be the annuity policy issued by Charter
6    that complied with requirements set forth in the general
7    release?
8        MR. O'DRISCOLL: The witness has in front of
9    him a document marked K-0010
10   BY MS. McQUAY:
11   Q   And is that a multiple page document?
12   A   Yes.
13   Q   And what is the end -- would you give us the
14   range of Bates stamp numbers comprising that document,
15   please
16   A   Yes, I will.  One moment, please.  It's K-0010
17   through K-0020.
18       MS. McQUAY: Would you mark that as Exhibit 11,
19   please
20       (Exhibit No  11 was marked for
21        identification )
22       THE REPORTER: Okay, it's marked
23   BY MS. McQUAY:
24   Q   And just so the record is entirely clear, do
         PRECISE REPORTING SERVICE, P C.

---

Page 224

1    you understand, Mr Mensie, that it is your testimony on
2    behalf of Kemper that this Exhibit 11 constituted an
3    annuity policy issued by Charter Security that comported
4    with requirements recited in the general release, Exhibit
5    10?
6        MR. O'DRISCOLL: May the witness review the
7    document first
8        MS. McQUAY: Okay
9        MR. O'DRISCOLL: If you need the opportunity,
10   William.
11       THE WITNESS: I believe this is a document I
12   reviewed previously and that it is in fact what my
13   understanding was looking back on the record as the
14   policy that was issued by Charter to comply with the
15   requirements of the general release
16   BY MS. McQUAY:
17   Q   And does in fact in your view -- this annuity
18   policy that was issued by Charter, did it in fact meet
19   the requirements recited in the general release?
20   A   I seem to recall having read that it did, and
21   in fact it says that: "Monthly payments in the amount of
22   $1,450.45, increasing 3 percent annually, commencing on
23   June 6, 1983, for a period 240 months certain and life
24   thereafter" is contained in the document.
         PRECISE REPORTING SERVICE, P.C.

---

Page 225

1    Q   Are you directing your attention in particular
2    to page K-0019 of the annuity policy issued by Charter?
3    A   Yes.
4    Q   And therein it states up at the top, and I'm
5    quoting now: "The undersigned surrenders said policies
6    to the insurance company and concurrently herewith
7    revokes any beneficiary designation and any election of
8    settlement heretofore made under said policy"?
9    A   Yes, it does read there.
10   Q   And then it goes on to recite, as you have
11   read, that the payee, the primary payee, Dennis Dimon, is
12   to receive monthly payments in the amount of $1,450.45,
13   increasing 3 percent annually, commencing on June 6,
14   1983, for a period of 240 months certain and life
15   thereafter?
16   A   Yes.
17   Q   Okay  Now, directing your attention to page
18   K-0015 of Exhibit 11, that page sets forth various
19   settlement options, does it not?
20   A   Yes.  It's titled Settlement Options.
21   Q   Do you see that, Mr Mensie?
22   A   Yes.  It's titled Settlement Options.
23   Q   Yes  And on the page it lays out various
24   options; option 11 being limited payments  Do you see
         PRECISE REPORTING SERVICE, P C

9-8-06

Dimon vs. Metropolitan Life

William R. Mensie

C.A. No.: 05-11073 WGY

## Page 238

1 exhibits, and the witness has Exhibit 6 in front of him,
2 Sue.
3 BY MS. McQUAY:
4 Q. In Exhibit 6, sir, Mr. Noe, this is November of
5 1983, he says in his memo that he is now dealing with
6 Charter Security's counsel in Jacksonville, Florida. He
7 has asked for a copy of the settlement agreement. Do you
8 see that, sir?
9 A. Yes.
10 Q. Do you know -- well, strike that.
11    What was the nature of Mr. Noe's dealings
12 with Charter Security's counsel in Jacksonville, Florida
13 at that point?
14 A. As the memo outlines he was -- the counsel for
15 Charter had requested a copy of the settlement agreement,
16 and that's as far as I could glean from the information
17 that I reviewed.
18 Q. Do you know what came from Mr. Noe's dealings
19 with Charter Security's counsel in Jacksonville, Florida?
20 A. I do not.
21 Q. Do you know what further transpired between
22 them after November 8, 1983?
23 A. I don't recall seeing any further
24 communications or any communications relative to counsel
PRECISE REPORTING SERVICE, P.C.

## Page 239

1 in Jackson, Florida [sic.].
2 Q. Are you able to describe what if any further
3 steps Kemper took after this date, November 1983, to
4 insure that the policy they had received from Charter
5 would continue to be honored?
6 A. I couldn't -- I didn't see evidence of
7 anything. I'm not sure that Kemper could have taken any
8 other steps, but I didn't see anything that suggested
9 that Mr. Noe or anyone else on Kemper's behalf had taken
10 further steps.
11 Q. So as far as you are aware, after November
12 1983, it just simply continued to be Kemper's position
13 that the original policy issued was valid and enforceable
14 and should be honored, correct?
15 A. That is correct.
16 Q. Now, you testified yesterday, because I wrote
17 this down in my notes, you testified yesterday,
18 Mr. Mensie, that you did not believe there was much of a
19 dispute here. Could you explain that, please.
20    MR. O'DRISCOLL: I'm sorry, Sue. Could you
21 give more context to that?
22    MS. McQUAY: I'm not sure I can. Let's see if
23 I can.
24 BY MS. McQUAY:
PRECISE REPORTING SERVICE, P.C.

## Page 240

1 Q. Well, let me just ask it this way: Now, it was
2 Kemper's position back in 1983, certainly as of November
3 1983, that the policy issued by Charter was in fact what
4 was required under the settlement agreement and in fact
5 was a valid and enforceable contract, correct?
6 A. Yes.
7 Q. Has that continued to be Kemper's position
8 today?
9 A. Yes.
10    MS. McQUAY: Thank you, sir. I have nothing
11 further.
12    MR. DeWICK: This is Jed DeWick. I just have a
13 couple if I may.
14       CROSS EXAMINATION
15 BY MR. DeWICK:
16 Q. Mr. Mensie, again my name is Jed DeWick. I
17 represent the Latti entities in this action.
18    First of all, I believe you touched in
19 general on this subject, but I just wanted to get it a
20 little clearer on the record. You obviously were not
21 with Kemper in 1983, correct?
22 A. Correct.
23 Q. And you were not personally involved with the
24 settlement of this Dimon verse Jenny C matter, correct?
PRECISE REPORTING SERVICE, P.C.

## Page 241

1 A. Correct.
2 Q. And you were not involved in any aspect in the
3 obtaining of the annuity that was part of that
4 settlement, correct?
5 A. That's correct.
6 Q. So your knowledge of this entire matter is
7 based in part upon your review of all the documents that
8 have been produced in this litigation, correct?
9 A. That is correct.
10 Q. As well as in part based on your experience in
11 the insurance industry?
12 A. Yes, sir.
13 Q. And as well as your knowledge in general of
14 Kemper's policies and procedures, correct?
15 A. Correct.
16 Q. And you have not had any discussions with
17 anyone who had firsthand knowledge of the underlying
18 settlement agreement, correct?
19 A. That is correct.
20 Q. And you do not know of anyone that is still
21 employed by Kemper who has such firsthand knowledge, do
22 you?
23 A. I do not.
24 Q. Are you a lawyer, Mr. Mensie?
PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life      9-8-06      William R. Mensie
C.A. No : 05-11073 WGY

---

Page 242

1   A   No.
2   Q   Do you have any legal training at all?
3   A   Other than as it relates to claim handling.
4   Q   Could you just expand on that. What training
5 do you have, legal training do you have, as it relates to
6 claim handling?
7   A   A working knowledge of the law necessary to
8 handle claims that I'm charged with handling.
9   Q   Is that the law of liability, if you could just
10 be a little bit more --
11   A   Basic principles of -- basic legal principles
12 and understanding of the process and systems.
13   Q   And when you say "basic legal principles,"
14 again do you mean --
15   A   Principles of negligence, torts, contracts.
16   Q   Negligence, torts, contracts?
17   A   Negligence or torts, and I said contracts is
18 what I said, an understanding of, you know, the parties
19 of a contract.
20   Q   And so when you say you have a working
21 knowledge of it, have you had specific training, or is
22 this training you've acquired through performance of your
23 job over the years?
24   A   Performance of the job.
     PRECISE REPORTING SERVICE, P.C.

---

Page 243

1   Q   So there has been no formal training?
2   A   You know, I've attended training courses, I've
3 attended continuing education courses and things of that
4 nature over the years.
5   Q   And those courses dealt with what you spoke of,
6 legal principles with respect to torts?
7   A   Yes, sir.
8   Q   When you testified earlier that Kemper had no
9 involvement in obtaining the quote from Charter Life for
10 the life annuity, again that is based on your review of
11 all the documents in this litigation?
12   A   That's correct.
13   Q   So you have no firsthand knowledge that they
14 had no such involvement; is that correct?
15   A   No independent knowledge, that is correct.
16   Q   In all your years of experience with annuities
17 have you ever encountered an incident such as this one
18 where an after annuity contract issued, the issuing
19 company claimed that there had been a clerical error with
20 regard to the terms?
21   A   No.
22   Q   You testified yesterday that American Motorists
23 Company still exists?
24   A   Yes.
     PRECISE REPORTING SERVICE, P.C.

---

Page 244

1   Q   They are a part of the Kemper Group?
2   A   Yes.
3   Q   And the Kemper Group is not -- and correct me
4 if I'm wrong obviously, the Kemper Group is not an entity
5 unto itself, but it is a trade name under which certain
6 entities operate; is that correct?
7   A   That is correct.
8   Q   So in your capacity here testifying on behalf
9 of Kemper, are you also testifying on behalf of each
10 insurance company insofar as they operate under the
11 Kemper trade name?
12   A   With respect to American Motorists, yes.
13      MR. DeWICK: Thank you very much. I have
14 nothing further.
15      CROSS EXAMINATION
16 BY MR. KEANE:
17   Q   Mr. Mensie, my name is Brian Keane. I just
18 have a few questions as well. I represent the Plaintiff
19 Dennis Dimon in this matter.
20   A   Yes, sir.
21   Q   If I could have you look at Exhibit 11. Do you
22 have that in front of you?
23      MR. O'DRISCOLL: I'm just getting it for him,
24 Brian.
     PRECISE REPORTING SERVICE, P.C.

---

Page 245

1      THE WITNESS: Yes, sir.
2 BY MR. KEANE:
3   Q   I just wanted to follow up on some of the
4 questions Attorney McQuay was asking. If you turn to
5 page K-0015, it looks like Attorney McQuay was asking you
6 questions about the highlighted and capital section "with
7 certain period." Is your understanding that that
8 section of the settlement options falls under option 2,
9 life income, down below on the left side?
10   A   Yes.
11   Q   And if you turn to K-0010 at the beginning of
12 Exhibit 11, at about a quarter of the way down it says:
13 Option 2 Life Income with a star. Do you see that?
14   A   Which paragraph are you referring to?
15   Q   It's about a quarter of the way down on the
16 document. It's below the numbers, and it says: "Option
17 2 Life Income" with a star
18   A   Yes, I see it.
19   Q   Now, does that relate to what's on page K-0015
20 in regards to Option 2, life income?
21   A   I would think so. I don't see any other option
22 2s in the policy.
23   Q   And therefore this policy issued by Charter
24 Security Life would be for the life of the person for who
     PRECISE REPORTING SERVICE, P.C.



NY

Charter Security Life Insurance Company (New York)
720 Fifth Avenue • New York, New York 10019

|     |     |      |     |      |     |
|-----|-----|------|-----|------|-----|
| 0 75 | 14 | 7 49 | 19 | 5 97 | 24 |
| 9 83 | 15 | 7 10 | 20 | 5 75 | 25 |

OPTION 2.   LIFE INCOME*

We will pay a lifetime monthly income to the Annuitant if living on the Annuity Date. The basis for this amount of income is explained in this contract.

Unless you make an alternate election, we will make the first monthly payment on the Annuity Date; payments after the first will be on that same date of the month as long as the Annuitant lives. Unless you make an alternate election, we guarantee 120 monthly payments; they will be continued to the Beneficiary if the Annuitant dies before receiving them. Payments will be made by check to the Annuitant or Beneficiary. We reserve the right to require proof that the payee is living on payment dates.

We will pay the benefit explained in this contract if the Annuitant dies before the Annuity Date. It will be paid to the Beneficiary when we receive acceptable proof of death.

The Beneficiary and Owner are as named in the application if not later changed.

Notice of ten-day right to examine contract: This contract may be cancelled within ten days after its receipt. The steps to follow are:

   Return the contract with a written notice to us or to the agent through whom you purchased the contract. If you return the contract directly to us, use the address of our Home Office shown on the top of this page. If return is through the agent, obtain a receipt.

We will return all payments made for this contract after we receive it. As soon as the contract is delivered or mailed to us, it will be deemed void from its beginning.

Read this contract carefully. It is a legal contract between you and us.

Secretary

President

## SINGLE PREMIUM DEFERRED ANNUITY

Monthly Life Annuity With Ten Years Certain Payable At Annuity Date
Benefit in Event of Death is Payable Prior To Annuity Date
Optional Life Annuities at Annuity Date — Optional Annuity Date
Non-Participating



Exhibit
# 11
9-8-06 JB

RA-104
11/82

# TABLE OF CONTENTS

Item                                            Page No.

Face Page ............................................................1
Schedule Page ........................................................3
Table of Guaranteed Contract Values .................................4
Definitions ..........................................................5
General Provisions
   Basis of Contract .................................................5
   Entire contract; changes ..........................................5
   Premium payment ...................................................5
   Issue date ........................................................5
   Incontestability ..................................................5
   Misstatement of age or sex ........................................5
   Ownership .........................................................6
   Change of ownership ...............................................6
   Assignment ........................................................6
   Beneficiary .......................................................6
   Conformance to statutes ...........................................6
Interest Rates
   Declared Interest Rate ............................................6
   Guaranteed Interest Rates .........................................6
Joint Annuitant
   Definition ........................................................6
   Annuity Date ......................................................6
   Deferral of Annuity Date ..........................................6
   Benefit In Event of Death .........................................6
   Separate Annuities ................................................6
Non-Forfeiture Provisions
   Accumulation Value ................................................7
   Cash surrenders ...................................................7
   Benefit in Event of Death .........................................7
   Annual statement of values ........................................7
   Normal settlement; annuity date ...................................7
   Change in annuity option or date ..................................7
   Benefits payable to beneficiary ...................................7
   Minimum payments ..................................................7



Settlement Options
   Option 1, limited payments ........................................8
   Option 2, life income .............................................8
   Option 3, joint life income with two-thirds to survivor ...........8
   Rate basis ........................................................8
   Settlement option tables ..........................................9

K-0011

**NY**

# DEFINITIONS

This is what we mean when we use these words or phrases:

**"We," "us"** and **"our"** refer to Charter Security Life Insurance Company (New York).

**"You"** and **"yours"** refer to the Owner named in the application.

The **"Accumulation Interest Rate"** is the annual effective interest rate which we use to credit interest to the Single Premium less any Partial Surrenders.

The **"Accumulation Value"** is the value of the contract before the charge, if any, for withdrawing funds.

The **"Annuitant"** is the person who is to receive annuity payments.

The **"Beneficiary"** receives the benefits, if any, due at the Annuitant's death.

A **"Contingent Owner,"** if named, becomes the Owner if the Annuitant survives the Owner.

**"Contract Years"** are measured from the Issue Date.

The **"Declared Interest Rate"** is the Accumulation Interest Rate which we declare and guarantee for the Effective Period.

The **"Effective Period"** is the period during which the Accumulation Value will accrue interest at the Declared Interest Rate.

The **"Owner"** owns and controls this contract.

A **"Partial Surrender"** is a surrender of part of the Accumulation Value.

The **"Surrender Charge"** is the charge for withdrawing funds. It is equal to the Surrender Charge Percentage times the amount of Accumulation Value surrendered. The Surrender Charge Percentages are shown on the Schedule Page. Refer to NONFORFEITURE PROVISIONS; the Surrender Charge applies only under certain conditions.

The **"Surrender Interest Rate"** is the Declared Interest Rate below which the Surrender Charge is waived for 60 days. Refer to NONFORFEITURE PROVISIONS.

The **Surrender Value"** is the Accumulation Value less the Surrender Charge.

**"Survive"** refers to the continued life of a person or legal existence of an entity other than a person.

# GENERAL PROVISIONS

**BASIS OF CONTRACT:** This contract is issued on the basis of the application and receipt of the Single Premium payment in advance.

**ENTIRE CONTRACT; CHANGES:** This contract, the attached application, and any endorsements make up the entire contract. All statements in the application are representations and not warranties.

No agent can change this contract or waive any of its terms. Changes can be made only by written endorsement signed by one of our officers.

**PREMIUM PAYMENT:** The Single Premium payment for this contract was paid in advance. If the check or other instrument is not honored for payment, this contract is deemed void from the beginning.

**ISSUE DATE:** This contract takes effect on its Issue Date which is shown on the Schedule Page.

**INCONTESTABILITY:** This contract is incontestable from its issue date.

**MISSTATEMENT OF AGE OR SEX:** We will require proof of age before we make payments to the Annuitant or any Beneficiary. If age or sex is misstated, we will pay the amount due at the true age or sex. In case of age or sex correction after payments start, we will:

(1) In case of underpayment, pay the full amount due the payee with the next payment due.

(2) in case of overpayment, deduct the amount due us from future payments; deductions will be spread over the payment period.

K-0012

RA-104
11/82

## GI⸱⸱        ?ROVISIONS
(Continued)

**OWNERSHIP:** You have all rights under this contract during the Annuitant's lifetime, subject to:

(1) the rights of any assignee of record with us;

(2) the rights of any irrevocable Beneficiary;

(3) any restricted ownership endorsement;

(4) the change of ownership provision.

**CHANGE OF OWNERSHIP:** During the Annuitant's lifetime, you may name a new Owner. If you are a natural person other than the Annuitant, you may name or change a Contingent Owner. A Contingent Owner becomes Owner only by surviving you.

Notice of the change must be sent to our Home Office; it must be signed and dated by you. We are not liable for any actions we take before we receive and file the notice at our Home Office.

Change of ownership:

(1) voids any Contingent Ownership;

(2) does not affect the Beneficiary.

**ASSIGNMENT:** You may assign all rights, privileges and benefits provided by this contract. We are not bound by an assignment until we receive and file a signed copy at our Home Office. We are not responsible for the validity of assignments.

**BENEFICIARY:** You may change the Beneficiary during the Annuitant's lifetime; an irrevocable Beneficiary may be changed only by that Beneficiary's written consent. Notice of the change must be sent to our Home Office; it must be signed and dated by you. It takes effect on the date it is signed. We are not liable for any actions we take before we receive and file the notice at our Home Office.

A Beneficiary's interest is effective if that Beneficiary:

(1) survives the Annuitant by 15 days; or

(2) survives until we receive proof of the Annuitant's death.

We will pay the proceeds in this order unless this contract is assigned at the time of the Annuitant's death:

(1) We will pay the designated Beneficiaries who survive the Annuitant.

(2) If no Beneficiary survives, we will pay the Annuitant's estate.

No Beneficiary can change your previous choice of a settlement option.

To the extent permitted by law, no payment we make will be subject to the claims of any creditors.

**CONFORMANCE TO STATUTES:** Any annuity, Surrender Value or benefit in event of death payable under this contract is not less than the minimum benefit required by any statute of the state in which this contract is delivered.

### INTEREST RATES

**DECLARED INTEREST RATE.** We declare an Accumulation Interest Rate, and Effective Period, on the Issue Date. They are shown on the Schedule Page. Prior to the expiration of the Effective Period, we will declare a new Accumulation Interest Rate and Effective Period. We will notify you of declared Accumulation Interest Rates and effective periods in writing.

**GUARANTEED INTEREST RATES:** We guarantee that the Accumulation Interest Rates will be at least as great as the Guaranteed Interest Rates shown on the Schedule Page.

### JOINT ANNUITANT

If you designate two persons as joint annuitants in the application, these rules will be in effect:

**Definition:** The term "Annuitant" means the joint annuitants or the survivor of them, as the case may be.

**Annuity Date:** The Annuity Date will be:

(1) the Contract Anniversary following the 65th birthday of the older joint annuitant; or

(2) ten years from the Issue Date if the issue age of the older joint annuitant is more than 55 Years; or

(3) the date specified in the application.

**Deferral of Annuity Date:** The Annuity Date may not be deferred to a date beyond the 85th birthday of the older joint annuitant.

**BENEFIT IN EVENT OF DEATH:** We will not pay any benefit upon the death, before the Annuity Date, of the first of the joint annuitants to die. Instead, the contract will remain in force as to the surviving joint annuitant. If one joint annuitant dies before the Annuity Date, the latest permitted Annuity Date will become the 85th birthday of the remaining joint annuitant or, if later, ten years after the Issue Date. If both joint annuitants die before the Annuity Date, we will pay the benefit to the Beneficiary.

**Separate annuities:** At your request, we will apply the Accumulation Value to provide separate annuities for each joint annuitant, if both are living on the Annuity Date. You must make this request in writing at least 30 days before the Annuity Date. For this purpose, you must specify a division of the Accumulation Value into two portions. These portions may but need not be of equal size. You must specify the annuity option for each joint annuitant. You are not required to choose the same annuity option for both joint annuitants.

In addition to these three options, you may choose any other form of annuity agreed upon by us.

Except with our consent, settlement options will not be available to:

(1) an assignee; or

(2) any other than a natural person receiving proceeds in his or her own right

Page 6

K-0013

**ACCUMULATION VALUE:** The Accumulation Value at any time is the Single Premium you paid, less any Partial Surrenders and Surrender Charges, accumulated at the Accumulation Interest Rates.

**CASH SURRENDERS:** You may surrender all or part of the Accumulation Value before annuity payments begin.

We have a Surrender Charge in effect for the first seven years after the Issue Date, but only if:

(1) there is more than one surrender within a Contract Year, or

(2) the surrender exceeds the Allowable Portion of the Accumulation Value. The Allowable Portion is shown on the Schedule Page.

On the first surrender in a Contract Year, the Surrender Charge applies only to the amount in excess of the Allowable Portion of the Accumulation Value.

If an Accumulation Interest Rate is less than the Surrender Interest Rate, you may surrender this contract without a Surrender Charge provided you notify us within 60 days of the effective date of the Accumulation Interest Rate. After 60 days, any Surrender Charge in effect will be reinstated. However, you will not forfeit your right to surrender this contract without a Surrender Charge should a future Accumulation Interest Rate be below the Surrender Interest Rate.

If you surrender the entire Accumulation Value, the amount we pay you, added to any prior amounts we paid you for Partial Surrenders, will not be less than the Single Premium you paid us.

We may defer payment of cash surrenders for not more than six months.

**BENEFIT IN EVENT OF DEATH:** We will pay the Accumulation Value to the Beneficiary if:

(1) the Annuitant dies before the Annuity Date; and

(2) you have not specified a settlement option.

The amount paid will be the Accumulation Value as of the date of death accumulated at the Accumulation Interest Rate to the date of payment by us. It will be paid when we receive acceptable proof of death. No Surrender Charge will apply.

**ANNUAL STATEMENT OF VALUES:** As of each contract anniversary on or before the Annuity Date, we will send you a statement which shows the:
(1) Accumulation Value; and

(2) Surrender Value; and

(3) Monthly life annuity with ten years certain which can be provided on the Annuity Date by the current Accumulation Value; and

(4) Declared Interest Rate.

**NORMAL SETTLEMENT; ANNUITY DATE:** The Accumulation Value will be used to provide a life annuity as shown on the Schedule Page if:

(1) the Annuitant is living on the Annuity Date; and

(2) you have not made an alternate election.

The Annuity Date will be:

(1) the contract anniversary following the Annuitant's 65th birthday; or

(2) ten years from the Issue Date if the Issue Age is more than 55 years; or

(3) the date specified in the application.

**CHANGE IN ANNUITY OPTION OR DATE:** You may defer the Annuity Date; deferral may not be to a date beyond the Annuitant's 85th birthday. After five years from the Issue Date, you may:

(1) Advance the Annuity Date (but not to a date earlier than the date of the request); or

(2) elect to begin payments under a settlement option.

Written request must be made:

(1) during the Annuitant's lifetime;

(2) at least 30 days before the Annuity Date; and

(3) at least 30 days before any settlement option date.

**BENEFITS PAYABLE TO BENEFICIARY:** During the Annuitant's lifetime, you may choose a settlement option rather than a lump sum death benefit. The Beneficiary may make this choice after the Annuitant's death if:

(1) you have not done so; and

(2) payments have not begun.

**MINIMUM PAYMENTS:** We will not make periodic payments of less than $20.00; for lesser amounts due, we will change the frequency of payments. This provision applies to payments we make to the Annuitant or to any Beneficiary.

Page 7

# SETTLEMENT OPTIONS

If you elect an annuity option by death, surrender or annuitization, the Accumulation Value of this contract may be applied under any of the options set forth below, provided that:

(1) In the event of surrender, the option is elected on or prior to the surrender date.

(2) In the event of death, the option is elected within 30 days of the date on which we notify the Beneficiary that proceeds are payable.

At the time payments under a settlement option begin, we will pay the greater of

(1) the amount guaranteed under this contract; or

(2) the amount that would be provided by the application of the Accumulation Value to purchase a single premium immediate annuity offered by us to the same class of annuitants, or

(3) an amount determined by more favorable rates which we then offer.

**OPTION 1, LIMITED PAYMENTS:** Equal payments for a set time, not more than 30 years. Any excess interest we declare will be paid yearly.

**OPTION 2, LIFE INCOME:**
**LIFE ANNUITY.** Equal monthly payments as long as the payee lives.

**WITH CERTAIN PERIOD.** Equal monthly payments for five, ten, or twenty years (the certain period), as elected, and thereafter for the remaining lifetime of the payee.

**WITH INSTALLMENT REFUND.** Equal monthly payments until the sum of such payments equals the proceeds settled under this option (at which time the installment refund period ends) and thereafter for the remaining lifetime of the payee.

**OPTION 3, JOINT LIFE INCOME WITH TWO-THIRDS TO SURVIVOR:** Payment of equal monthly (or less frequent) installments during the joint lifetime of the payee and another person. After the death of either the payee or the joint payee, the amount of each installment shall be reduced to two-thirds of the original amount and payments shall continue during the entire remaining lifetime of the survivor.

**Rate basis:** The monthly installments guaranteed under this contract are based on:

(1) the 1937 Standard Annuity Table,

(2) 3½% interest, and

(3) age nearest birthday.

## SETTLEMENT OPTION TABLES

### GUARANTEED MONTHLY INSTALLMENTS UNDER OPTIONS 1, 2 OR 3
(Monthly installments are shown for each $1,000 of net proceeds applied.
The ages shown are ages nearest birthday when the first monthly installment is payable.)

### OPTION 1.   INSTALLMENTS FOR A SPECIFIED PERIOD

| Years | Installment | Years | Installment | Years | Installment | Years | Installment | Years | Installment | Years | Installment |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | $84 65 | 6 | $15 35 | 11 | $9 09 | 16 | $6 76 | 21 | $5 56 | 26 | $4 84 |
| 2 | 43 05 | 7 | 13 38 | 12 | 8 46 | 17 | 6 47 | 22 | 5 39 | 27 | 4 73 |
| 3 | 29 19 | 8 | 11 90 | 13 | 7 94 | 18 | 6 20 | 23 | 5 24 | 28 | 4 63 |
| 4 | 22 27 | 9 | 10 75 | 14 | 7 49 | 19 | 5 97 | 24 | 5 09 | 29 | 4 53 |
| 5 | 18 12 | 10 | 9 83 | 15 | 7 10 | 20 | 5 75 | 25 | 4 96 | 30 | 4 45 |

### OPTION 2.   LIFE INCOME*

| Issue Age Male | Female | Life | 5 Years Certain | 10 Years Certain | 20 Years Certain | Installment Refund | Issue Age Male | Female | Life | 5 Years Certain | 10 Years Certain | 20 Years Certain | Installment Refund |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 34 | 39 | 4 11 | 4 10 | 4 08 | 4 00 | 3 98 | 59 | 64 | 6 56 | 6 45 | 6 15 | 5 28 | 5 78 |
| 35 | 40 | 4 16 | 4.15 | 4 13 | 4 04 | 4 03 | 60 | 65 | 6 74 | 6 62 | 6 28 | 5 31 | 5 90 |
| 36 | 41 | 4 21 | 4 20 | 4 18 | 4 08 | 4 07 | 61 | 66 | 6 93 | 6 79 | 6 41 | 5 35 | 6 03 |
| 37 | 42 | 4 27 | 4 26 | 4 23 | 4 12 | 4 12 | 62 | 67 | 7 13 | 6 97 | 6 55 | 5 39 | 6 16 |
| 38 | 43 | 4 33 | 4 32 | 4 29 | 4 16 | 4 16 | 63 | 68 | 7 35 | 7 16 | 6 69 | 5 43 | 6 29 |
| 39 | 44 | 4 39 | 4 38 | 4 34 | 4 21 | 4 21 | 64 | 69 | 7 57 | 7 36 | 6 83 | 5 47 | 6 44 |
| 40 | 45 | 4 45 | 4.44 | 4 40 | 4 26 | 4 27 | 65 | 70 | 7 81 | 7 58 | 6 98 | 5 51 | 6 59 |
| 41 | 46 | 4 52 | 4 51 | 4 47 | 4 30 | 4 32 | 66 | 71 | 8 06 | 7 79 | 7 12 | 5 54 | 6 75 |
| 42 | 47 | 4 59 | 4 58 | 4 53 | 4 35 | 4 37 | 67 | 72 | 8 33 | 8 03 | 7 27 | 5 57 | 6 91 |
| 43 | 48 | 4 67 | 4 65 | 4 60 | 4 40 | 4 43 | 68 | 73 | 8 62 | 8 26 | 7 42 | 5 60 | 7 08 |
| 44 | 49 | 4 75 | 4 73 | 4 67 | 4 45 | 4 49 | 69 | 74 | 8 92 | 8 52 | 7 58 | 5 63 | 7 26 |
| 45 | 50 | 4 83 | 4 81 | 4 75 | 4 50 | 4 56 | 70 | 75 | 9 24 | 8 78 | 7 73 | 5 65 | 7 46 |
| 46 | 51 | 4 92 | 4 89 | 4 82 | 4 56 | 4 62 | 71 | 76 | 9 59 | 9 06 | 7 88 | 5 67 | 7 66 |
| 47 | 52 | 5 01 | 4 98 | 4 90 | 4 61 | 4 69 | 72 | 77 | 9 95 | 9 34 | 8 03 | 5 69 | 7 86 |
| 48 | 53 | 5 10 | 5 07 | 4 99 | 4 66 | 4 76 | 73 | 78 | 10 33 | 9 63 | 8 18 | 5 70 | 8 08 |
| 49 | 54 | 5 20 | 5 17 | 5 07 | 4 72 | 4 84 | 74 | 79 | 10 74 | 9 94 | 8 32 | 5 71 | 8 32 |
| 50 | 55 | 5 31 | 5 27 | 5 17 | 4 77 | 4 91 | 75 | 80 | 11 19 | 10 27 | 8 46 | 5 72 | 8 56 |
| 51 | 56 | 5 42 | 5 38 | 5 26 | 4 83 | 4 99 | 76 | 81 | 11 66 | 10 59 | 8 60 | 5 73 | 8 81 |
| 52 | 57 | 5 54 | 5 49 | 5 36 | 4 89 | 5 08 | 77 | 82 | 12 15 | 10 93 | 8 73 | 5 73 | 9 09 |
| 53 | 58 | 5 66 | 5 61 | 5 46 | 4 94 | 5 17 | 78 | 83 | 12 67 | 11 27 | 8 86 | 5 74 | 9 37 |
| 54 | 59 | 5 79 | 5 73 | 5 56 | 5 00 | 5 26 | 79 | 84 | 13 25 | 11 63 | 8 97 | 5 74 | 9 67 |
| 55 | 60 | 5 93 | 5 87 | 5 67 | 5 05 | 5 35 | 80 | 85 | 13 85 | 11 99 | 9 08 | 5 75 | 9 98 |
| 56 | 61 | 6 08 | 6 00 | 5 79 | 5 10 | 5 45 | 81 | 86 | 14 49 | 12 36 | 9 18 | 5 75 | 10 32 |
| 57 | 62 | 6 23 | 6 14 | 5 90 | 5 15 | 5 56 | 82 | 87 | 15 17 | 12 74 | 9 28 | 5 75 | 10 66 |
| 58 | 63 | 6 39 | 6 29 | 6 02 | 5 21 | 5 67 | 83 | 88 | 15 92 | 13 11 | 9 36 | 5 75 | 11 03 |

### OPTION 3.   JOINT AND TWO-THIRDS TO SURVIVOR*

Age of Other Payee.    Age of Annuitant (Male, age on first line. Female age on second line)

| M | 55 | 56 | 57 | 58 | 59 | 60 | 61 | 62 | 63 | 64 | 65 | 66 | 67 | 68 | 69 | 70 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| F | 60 | 61 | 62 | 63 | 64 | 65 | 66 | 67 | 68 | 69 | 70 | 71 | 72 | 73 | 74 | 75 |
| 55 / 60 | $5 53 | $5 59 | $5 65 | $5 71 | $5 78 | $5 84 | $5 91 | $5 98 | $6 05 | $6 11 | $6 18 | $6 25 | $6 32 | $6 39 | $6 46 | $6 53 |
| 56 / 61 | 5 59 | 5 65 | 5 72 | 5 78 | 5 85 | 5 92 | 5 99 | 6 06 | 6 13 | 6 20 | 6 27 | 6 34 | 6 42 | 6 49 | 6 56 | 6 64 |
| 57 / 62 | 5 65 | 5 72 | 5 78 | 5 85 | 5 92 | 5 99 | 6 07 | 6 14 | 6 21 | 6 29 | 6 36 | 6 44 | 6 51 | 6 59 | 6 67 | 6 74 |
| 58 / 63 | 5 71 | 5 78 | 5 85 | 5 92 | 6 00 | 6 07 | 6 14 | 6 22 | 6 30 | 6 37 | 6 45 | 6 53 | 6 61 | 6 69 | 6 77 | 6 85 |
| 59 / 64 | 5 78 | 5 85 | 5 92 | 6 00 | 6 07 | 6 15 | 6 23 | 6 30 | 6 38 | 6 47 | 6 55 | 6 63 | 6 71 | 6 80 | 6 88 | 6 96 |
| 60 / 65 | 5 84 | 5 92 | 5 99 | 6 07 | 6 15 | 6 23 | 6 31 | 6 39 | 6 47 | 6 56 | 6 64 | 6 73 | 6 82 | 6 90 | 6 99 | 7 08 |
| 61 / 66 | 5 91 | 5 99 | 6 07 | 6 14 | 6 23 | 6 31 | 6 39 | 6 48 | 6 56 | 6 65 | 6 74 | 6 83 | 6 92 | 7 01 | 7 11 | 7 20 |
| 62 / 67 | 5 98 | 6 06 | 6 14 | 6 22 | 6 30 | 6 39 | 6 48 | 6 57 | 6 66 | 6 75 | 6 84 | 6 94 | 7 03 | 7 13 | 7 22 | 7 32 |
| 63 / 68 | 6 05 | 6 13 | 6 21 | 6 30 | 6 38 | 6 47 | 6 56 | 6 66 | 6 75 | 6 85 | 6 94 | 7 04 | 7 14 | 7 24 | 7 34 | 7 44 |
| 64 / 69 | 6 11 | 6 20 | 6 29 | 6 37 | 6 47 | 6 56 | 6 65 | 6 75 | 6 85 | 6 95 | 7 05 | 7 15 | 7 25 | 7 36 | 7 47 | 7 57 |
| 65 / 70 | 6 18 | 6 27 | 6 36 | 6 45 | 6 55 | 6 64 | 6 74 | 6 84 | 6 94 | 7 05 | 7 15 | 7 26 | 7 37 | 7 48 | 7 59 | 7 70 |
| 66 / 71 | 6 25 | 6 34 | 6 44 | 6 53 | 6 63 | 6 73 | 6 83 | 6 94 | 7 04 | 7 15 | 7 26 | 7 37 | 7 49 | 7 60 | 7 72 | 7 84 |
| 67 / 72 | 6 32 | 6 42 | 6 51 | 6 61 | 6 71 | 6 82 | 6 92 | 7 03 | 7 14 | 7 25 | 7 37 | 7 49 | 7 61 | 7 73 | 7 85 | 7 97 |
| 68 / 73 | 6 39 | 6 49 | 6 59 | 6 69 | 6 80 | 6 90 | 7 01 | 7 13 | 7 24 | 7 36 | 7 48 | 7 60 | 7 73 | 7 85 | 7 98 | 8 11 |
| 69 / 74 | 6 46 | 6 56 | 6 66 | 6 77 | 6 88 | 6 99 | 7 11 | 7 22 | 7 34 | 7 47 | 7 59 | 7 72 | 7 85 | 7 98 | 8 11 | 8 25 |
| 70 / 75 | 6 53 | 6 64 | 6 74 | 6 85 | 6 96 | 7 08 | 7 20 | 7 32 | 7 44 | 7 57 | 7 70 | 7 84 | 7 97 | 8 11 | 8 25 | 8 39 |

*Figures for ages not shown will be furnished on request

Page 9

K-0016

## GENERAL PROVISIONS

**1. DEFINITIONS:**

The following terms are defined solely for the purpose of interpreting and administering this Agreement:

TERMINATION shall mean maturity of a policy as a result of, (a) the death of the Insured, or (b) endowment, or (c) surrender of such policy for its cash value, or (d) final amounts payable after termination of Family Income payments.

NET PROCEEDS, when applicable to the termination date, shall be the net amount payable under a policy on the termination date, excluding, however, any unearned premiums paid in advance thereunder.

NET PROCEEDS, when applicable to any time other than the termination date, shall be the single sum which equals (a) the then commuted value of the remainder of the death benefit of a policy containing a Family Income provision, or (b) the then commuted value of any installments certain not yet due under Options A or B, or (c) the amount then held under Options C or D, including any unpaid accrued interest thereon, as the case may be.

CHILDREN, if not designated by name, shall include only the lawful and legally ado d sons and daughters of the primary payee and not grandchildren or other descendants. This classification is available only the primary payee was the Insured hereunder.

BY REPRESENTATION shall mean succeeding, by reason of the death of a parent, to net proceeds which would have been apportioned to or further held for such parent, had he lived.

ESTATE OF SURVIVOR shall mean the executors or administrators of the last survivor of the payees designated in preceding Sections of the same Table.

OPTION shall mean the corresponding Option appearing in the policy under the heading "Optional Modes of Settlement" to be attached hereto. If the policy does not contain said "Optional Modes of Settlement", this Agreement shall constitute a request to add hereto "Optional Modes of Settlement" corresponding to that contained in policies which the Company is now issuing.

POLICY shall mean annuity contract when such meaning is applicable; and masculine pronouns shall include the feminine.

**2. PAYMENTS UNDER A TABLE:**

(a) If there is more than one Table, each Table shall be considered separately in construing the provisions of this Agreement.

(b) Payment of the net proceeds under a Table shall be in accordance with the first Section thereof in which there is a payee surviving, and at the death of the last survivor of the payees designated in such Section, payment of any remaining net proceeds shall be in accordance with the next succeeding Section in which there is a then surviving payee, and so on from Section to Section until payment shall have been made of the entire net proceeds under such Table.

(c) In order to be entitled to receive payments provided for him under a Section, a payee must be living on their respective due dates.

(d) If a Section of a Table designates two or more payees but does not designate as payees by representation the children of deceased children of the primary payee, payment of net proceeds under such Section shall be as follows:

If such Section does not provide for division of net proceeds into separate shares, such payees who are living at the time of each payment shall share the payments under such Section and such shares shall be equal unless otherwise expressly provided therein;

If such Section provides for division of net proceeds into separate shares, one such share, payable as provided in such Section, shall be for each such payee who is living at the death of the last survivor of the payees designated in preceding Sections, and such shares shall be equal unless otherwise expressly provided therein. At the subsequent death of a payee designated in such Section, any net proceeds then held for such payee shall be paid to any then surviving payees of such Section in single sums proportionate to their original shares.

(e) If a Section of a Table designates as payees by representation the children of deceased children of the primary payee, payment of net proceeds under such Section shall be as follows:

Net proceeds at the death of the last survivor of the payees designated in preceding Sections shall be divided into equal separate shares, one share, payable as provided in such Section, for each then surviving designated child of the primary payee, if any, and one share, payable in equal single sums, to the then surviving children, if any, of each deceased designated child of the primary payee;

At the subsequent death of a child of the primary payee, any net proceeds then held for such child shall be paid in equal single sums to his then surviving children, if any, otherwise such net proceeds shall be divided into equal separate shares, one share, payable in one sum, to each then surviving designated child of the primary payee, if any, and one share, payable

**3. PRIVILEGES:**

(a) If a payee designated in a Section of a Table is given in such Section a privilege of withdrawal or commutation, such payee may, subject to any limitations with respect thereto stated in such Section and upon written notice to the Insurance Company accompanied by this Agreement, make withdrawals in amounts of not less than $100.00 each from any net proceeds held for him in such Section under Options C or D, or, as the case may be, elect to receive the commuted value of any installments certain or share therein payable to him in such Section under Options A or B, but under Option B only if the right to installments for life has expired with the primary payee.

Wherever the following appear herein ............. they shall be read as:

| Option A | Option 3 |
| Option B | Option 4 |
| Option C | Option 1 |
| Option D | Option 2 |

K–0017

(b) If a primary payee designated in Section 1 of a Table is given in such Section the privilege of substituting payment under another Option:

The amount to be applied under such other Option shall be the net proceeds held for such payee in Section 1 at the time such privilege is exercised, but such privilege shall not be available when such net proceeds are less than $1000.

A primary payee may make only one such substitution and must be by written notice accompanied by this Agreement.

## 4. OPTION PAYMENTS ALTERED OR TERMINATED:

After thirty full years following the termination date of a policy, no Option payments shall be made under any Section of a Table. ~~and the net share of the net proceeds then held for a primary payee under any section of a table~~ shall be less than $1,000, then such share shall be immediately paid in one sum. If net proceeds held for a payee under Option C be reduced by withdrawals to less than $1,000, then such net proceeds shall be immediately paid in one sum.

If the Option payments for the fractional part of a year shall amount to less than $10.00 each, the Company will pay at such intervals as will make each payment amount to at least $10.00. If a Section of a Table provides for Option D installments and the sum of one year's tabular installments shall be less than 5% of the net proceeds applied under that Option, then the Company shall increase each such tabular installment by the amount necessary to achieve such percentage, any provision of said Option for a different percentage notwithstanding.

## 5. RELIANCE ON AFFIDAVITS:

Before permitting or taking any action provided by this Agreement which is contingent upon the death or survival of any payee, the Company shall be furnished with due proof thereof. As to any facts relating to any payee, including dates of birth and death, and identity, the Company may rely upon any affidavit or other written evidence deemed satisfactory to it, and is hereby released from all liability in relying and acting upon the statements contained therein.

## 6. EFFECT OF CHANGES OF BENEFICIARY AND EXERCISE OF PRIVILEGES UNDER THIS AGREEMENT:

If allowed by the statutes of the state of residence, the primary payee may, without the consent of a secondary payee, (a) change the designation of contingent beneficiaries, and (b) freely exercise the privileges contained in Section 1 of any Table herein. In the absence of an enabling statute, the consent of the secondary payee (s) shall be required for the exercise of all such rights.

## 7. PAYMENT TO MINORS:

Any proceeds due and payable to any minor payee hereunder shall be paid to the legally appointed guardian of such minor except to the extent that provision is made by statute for payment directly to a minor.

Dated   CHARTER SECURITY LIFE INSURANCE COMPANY (NY) this   SEVENTEENTH

day of _____ JUNE _____ , 19 83 

CHARTER SECURITY LIFE INSURANCE COMPANY
(NEW YORK)

REGISTRAR
VICE PRESIDENT

K-0018

## SUPPLEMENTARY AGREEMENT

### (No __SC1126__)

Due to termination, as of __May 5,__ _____ 19 __83__ of Policy No(s) __ 83A08153 _____ issued
by    Charter Security Life Insurance Company (New York)    on the life of __ Dennis J. Dimon _____
the undersigned hereby requests that the aggregate net proceeds payable under said pol _____) as of the termination date be paid
to the payees designated in, and in the order and manner provided in, the following Tabl     Tables and in the General Provisions
of this Agreement.

The undersigned surrenders said policy(s) to the Insurance Company and, concurrently herewith, revokes any beneficiary designa-
tion and any election of settlement heretofore made under the said policy(s).

| PAYEES | MANNER OF PAYMENT | PRIVILEGES |
|---|---|---|
| TABLE I | | |
| SECTION ONE - PRIMARY PAYEE | | |
| Dennis Dimon<br>Laurel Lane<br>West Kingston, RI 02892 | Monthly payments in the amount of $1,450.45, increasing 3% annually, commencing on June 6, 1983, for a period of 240 months certain and life thereafter. | |
| SECTION TWO-CONTINGENT PAYEE | | |
| Katherine I. Dimon,  Wife | In the same manner as the Primary Payee, for the period certain. | |

(SEE OTHER SIDE FOR ANY COMPANY ENDORSEMENTS)

SUP-100

# Charter Security Life Insurance Company (New York)

**ENDORSEMENT**

This amendment is attached to and forms part of the policy.

The Annual Statement of Values provision on Page 7 is hereby amended as follows:

The words "As of each contract anniversary" are replaced with the words "At least once each year".

_(signature)_

President

RA-104E1
4/84

K-0020



**Charter Security Life**

Charter Security Life Insurance Company (New York)
720 Fifth Avenue
New York, New York 10019
Telephone 212-397-2350

<u>CERTIFIED MAIL RETURN RECEIPT REQUESTED</u>

July 14, 1983

Mr. Kurt Snyder
Dean Witter Reynolds
111 E. Onondaga Street
Syracuse, New York  13202

RE:  Dennis Dimon
     Policy #83A08153
     NSC 1126

Dear Kurt:

As outlined in our telephone conversation, due to a clerical error the option indicated on the above supplementary contract for Dennis Dimon was incorrectly typed as 240 months certain and life thereafter instead of 240 months only.

Enclosed is a new contract correctly stating the option elected.  Please be advised that the former contract mailed to Robert Foley is null and void.  I would appreciate it if you will return that contract to my attention.

Thank you for your cooperation and again, my apologies for this oversight

Sincerely,

Barbara Boehm, Vice President
Policyowner Service Department

BAB:aw

Enc.



EXHIBIT
3

000021



Lumbermens Mutual Casualty Company • American Motorists Insurance Company
American Manufacturers Mutual Insurance Company • American Protection Insurance Company

Long Grove, IL 60049 · 312 540-2000

August 12, 1983

Mr. Robert A. Foley
Dean Witter Reynolds, Inc.
One Boston Place
Boston, Massachusetts  02108

Dear Mr. Foley:

DENNIS DIMON
CHARTER SECURITY POLICY NO: 83 A 0B153
OUR FILE NO: 399 LM 106125-Z

I received the replacement policy issued by Charter
Security Life Insurance Company (New York) changing
the terms of the annuity from 240 months certain and
life thereafter to 240 months certain only.

I am advised by Mr. Hughes of Lattie Associates that your
quotation was to provide an annuity which would pay
$1,450.45 per month for the first year increasing annually
at a rate of 3% compounded annually for 240 months certain
and life thereafter for a single premium of $175,000.
This was the benefit to be provided under the terms of a
general release and settlement agreement approved by
Judge Pettine of the United States District Court for the
District of Rhode Island.

The agreed upon premium was paid and a policy issued which
is now in the files of the contract owner, American Motorists
Insurance Company, providing benefits required by the release,
settlement agreement and court order.  I consider the original
annuity contract valid and enforceable and will retain it
in our files.



EXHIBIT
4



RECEIVED
AUG 17 1983
B. BOEHM

000025

Mr. Robert A. Foley
August 12, 1983
-2-

I intended to return the replacement contract issued by
Barbara Boehm of Charter Security, but it was lost with
my briefcase on August 11, 1983.


Very truly yours,

AMERICAN MOTORISTS INSURANCE COMPANY


John L. Noe
Home Office Claim

JLN:bw

cc:  Ms. Barbara Boehm
     Vice President
     Charter Security Life Insurance Company
     (New York)
     720 Fifth Avenue
     New York City, New York   10019

     Mr. Roger Hughes
     Lattie Associates, Attorneys
     30-31 Union Wharf
     Boston, MA  02109



**Charter
Security
Life**

Charter Security Life Insurance Company (New York)
720 Fifth Avenue
New York, New York 10019
Telephone 212-397-2350

September 26, 1983

Mr. John L. Noe
Home Office Claim
American Motorists
Insurance Company
Long Grove, Illinois 60049



**EXHIBIT**

5

Re: Dennis Dimon - Policy No. 83 A 08153
Your File No. 399 LM 106125-Z

Dear Mr. Noe:

I am in receipt of your letter to Barbara Boehm, Vice
President of Charter Security Life Insurance Company (New York
("CSL(NY)"), regarding the annuity policy (Policy No. 83 A 08153)
issued by CSL(NY) to Dennis Dimon.

According to information you received from Mr. Hughes of
Lattie Associates, Robert Foley of Dean Witter Reynolds, Inc.,
allegedly offered to provide Mr. Dimon with a CSL(NY) annuity
which would pay $1,450.45 per month for the first year increasing
annually at a rate of 3% compounded annually for 240 months
certain and life thereafter based on a single premium of
$175,000.00.

Contrary to the information you received from Mr. Hughes,
there is nothing to indicate that anything other than a single
premium immediate annuity with a 20 year (i.e., 240 months)
certain period was applied for. As you can see from the attached
copy of Mr. Dimon's application, which American Motorists
Insurance Company signed as applicant, a 20 year certain policy
was applied for. I have also attached for your reference, a copy
of a quotation sheet from CSL(NY) to Mr. Foley which clearly
shows that CSL(NY)'s quote was based on the issuance of a certain
period annuity without a life option. As previously explained by
Ms. Boehm in her letter to Mr. Kurt Snyder of Dean Witter
Reynolds dated July 14, 1983 (see enclosed copy), the option
indicated on the Supplementary Contract originally sent to Dean
Witter Reynolds on June 17, 1983 for delivery to your office was
incorrectly typed as a 240 month certain and life thereafter
annuity instead of 240 months only. Again, on behalf of CSL(NY),
I apologize for this oversight.

A Member of Charter Insurance Group, Inc.

000027

Mr. John L. Noe
Page 2
September 26, 1983


Based on the foregoing, CSL(NY) guarantees to continue to
pay Mr. Dimon under the terms of his policy a $1,450.45 monthly
annuity during the first policy year, which will increase
annually at a rate of 3% compounded annually for 240 months
certain. No payments will be made beyond the expiration of the
240 month period. Accordingly, the original Supplementary
Contract mailed to Robert Foley and in your possession is null
and void. I would appreciate your returning that contract to:

> Barbara Boehm
> Vice President
> Policyowner Service Department
> Charter Security Life
> Insurance Company (New York)
> 720 Fifth Avenue
> New York, New York 10019

By copy of this letter, I am instructing Ms. Boehm to send
to your attention a correct copy of the Supplementary Contract
for Dennis Dimon which you stated was lost with your briefcase on
August 11, 1983.

If I can be of any further assistance in this matter, please
do not hesitate to contact me at the above address.

> Very truly yours,


> Robert Liguori
> Counsel

RL/spf
Enclosures

cc: Ms. Barbara Boehm

> Mr. Robert A. Foley
> Dean Witter Reynolds, Inc.
> One Boston Place
> Boston, Massachusetts 02108

> Mr. Roger Hughes
> Lattie Associates, Attorneys
> 30-31 Union Wharf
> Boston, MA 02109

Lumbermens Mutual Casualty Company • American Motorists Insurance Company
American Manufacturers Mutual Insurance Company • American Protection Insurance Company

Long Grove, IL 60049 · 312/540-2000

October 10, 1983

Mr. Robert Liguori, Counsel
Charter Security Life Insurance
    Company (New York)
720 Fifth Avenue
New York, New York    10019

*RECEIVED*
*OCT 15 1983*
*B. BOEHM*

Dear Mr. Liguori:

DENNIS DIMON
CHARTER SECURITY POLICY: 83A08153
OUR FILE NO: 399 LM 106125-Z

In reply to your September 26, 1983, Sections 14 and 15
of the application that I signed were blank.  The entries
now appearing were filled in after I returned the signed
application.

The original annuity policy received was for a term of
240 months certain and life thereafter as ordered and
agreed upon between Mr. Hughes and Mr. Foley.  Your agent,
Mr. Foley further confirmed this to me by telephone in
April, 1983.  May I suggest you contact him to verify
this?

I intend to retain the original policy in our files and
consider it to be valid and enforceable.

Very truly yours,

AMERICAN MOTORISTS INSURANCE COMPANY

John L. Noe
Home Office Claim

JLN:ml

EXHIBIT
6

cc: Mr. Robert A. Foley
    Dean Witter Reynolds, Inc.
    One Boston Place
    Boston, MA  02108

    Mr. Roger Hughes
    Latti Assoc., Attorneys
    30-31 Union Wharf
    Boston, MA  02109

cc: Ms. Barbara Boehm
    Vice President
    Policyowner Service Dept.
    Charter Security Life
        Insurance Co. (New York)
    720 Fifth Avenue
    New York, NY  10019

000029



**Charter
Security
Life**

Charter Security Life Insurance Company of New York
720 Fifth Avenue
New York, New York 10019
Telephone 212-307-2350

October 14, 1983

Mr. John L. Noe
Home Office Claim
American Motorists Insurance Company
Long Grove, IL  60049

> Re:  Dennis Dimon
>      Contract No.  83A08153
>      Your File No.  399LM10612 -Z

Dear Mr. Noe:

As was indicated in Mr. Robert Ligouri's letter of September 26, 1983, we are
enclosing a corrected Supplementary Contract in regards to Mr. Dimon's Single
Premium Immediate Annuity.  This contract has been updated to reflect monthly
payments for a period of 240 months only.

Please see that the original Supplementary Contract, which was mailed to
Robert Foley, is returned to me, as that contract is no longer valid.

Please accept our apologies for any inconvenience this matter has caused you

Sincerely,

Barbara Boehm, Vice President
Policyowner Service Department

BAB/cg

Enclosure

EXHIBIT

8

000023

A Member of Charter Insurance Group, Inc.




**Lumbermens Mutual Casualty Company • American Motorists Insurance Company**
**American Manufacturers Mutual Insurance Company • American Protection Insurance Company**

Long Grove, IL 60049 · 312|540-2000

October 12, 1983

Ms. Barbara Boehm, Vice President
Policyowner Service Department
Charter Security Life Insurance Company (New York)
720 Fifth Avenue
New York, New York  10019

Dear Ms. Boehm:

RE:  DENNIS DIMON
     CONTRACT NO. 83408153
     OUR FILE NO. 399 LM 156125 Z

In reponse to your October 14, 1983 I reject and return
herewith the Supplementary Agreement and General Provisions
attached thereto. The original annuity policy will be re-
tained in the files of American Motorists Insurance
Company and considered valid and enforceable.

Very truly yours,

AMERICAN MOTORISTS INSURANCE COMPANY

John L. Noe
Home Office Claims

JLN/lz



EXHIBIT

7

cc:  Mr. Roger Hughes
     Latti Associates, Attorneys
     30-31 Union Wharf
     Boston, MA  02109

cc:  Mr. Robert A. Foley
     Dean Witter Reynolds, Inc.
     One Boston Place
     Boston, MA  02108

000024

Exhibits:  22 - 25        Volume 1, Pages 1 - 84

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-11073-REK

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DENNIS DIMON

        Plaintiff

vs.

METROPOLITAN LIFE INSURANCE

COMPANY, et al.

        Defendants

(Complete caption on next page.)

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF ROGER E. HUGHES, JR.

Wednesday, May 10, 2006, 2:01 p.m.

Sullivan, Weinstein & McQuay, P.C.

2 Park Plaza, Suite 610

Boston, Massachusetts


- - - - - - - - Reporter:  David A. Arsenault, RPR - - - - - - -

darsenault@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415, Boston, Mass. 02109

617.728.4404   fax 617.728.4403

9 (Pages 30 to 33)

Roger E. Hughes, Jr.
Volume 1 - May 10, 2006

30

1　Q. That may have been the last time?
2　A. That may have been the last time.
3　Q. But it was your practice back at this
4　period of time in the year 1983 time frame to
5　consult with Professor Weckstein regarding what kind
6　of stream of payments could be achieved for a
7　certain amount of money?
8　A. Correct.
9　Q. I show you what has been marked as Exhibit
10　24.
11　　　MS. McQUAY: Tim, for your information,
12　it is the document entitled Proposal by Charter
13　Security Life Insurance Company.
14　Q. Is this one of the documents that
15　Mr. Kaplan provided to you for your review?
16　A. Yes.
17　Q. And do you have any recollection of this
18　document?
19　A. Well, I have a recollection that I've seen
20　it in the last six to nine months. Before that I
21　had no recollection of this document.
22　Q. So when you say you've seen it, you've seen
23　it because Mr. Kaplan gave it to you.
24　A. Correct.

31

1　Q. But prior to the time that he gave it to
2　you, you don't remember seeing it?
3　A. I don't remember seeing it. It doesn't
4　mean I didn't see it.
5　Q. It doesn't ring any bells with you. It
6　doesn't refresh your memory?
7　A. It doesn't refresh my memory.
8　Q. Do you have any recollection of having
9　talked with anyone at Dean Witter about getting a
10　proposal for annuity in the Dimon matter?
11　A. I don't.
12　Q. Do you have any recollection of having
13　obtained proposals from any source regarding an
14　annuity in the Dimon matter?
15　A. I have no independent recollection.
16　Q. I'm going to show you what has previously
17　been marked as Exhibit 4 in this case, which I will
18　represent to you is a copy of a letter that was
19　produced from the files of Metropolitan Life, and
20　ask you if you have seen Exhibit 4 before.
21　A. No.
22　Q. This was not one of the documents that
23　Mr. Kaplan gave to you?
24　A. I don't believe so. It is not.

32

1　Q. Directing your attention to Exhibit 4, you
2　are shown on the letter as being copied. Do you see
3　that?
4　A. I do see that.
5　Q. Do you have any recollection one way or
6　another whether you've seen a copy of Exhibit 4 back
7　at the time?
8　A. I've never seen that document, as far as I
9　recall.
10　Q. Even though it is copied to you, you don't
11　remember seeing it?
12　A. I don't remember seeing it.
13　Q. Do you have a recollection? Are you
14　certain that you did not, or do you just not know
15　one way or the other?
16　A. I would say I never saw it.
17　Q. And why do you say you never saw it?
18　A. Because in looking at it, it indicates that
19　there were discussions regarding -- let me read it.
20　Q. By all means.
21　　　(Pause.)
22　A. Just reading this letter, the substance is
23　so strange that I think I would remember it.
24　Q. In what way is the substance so strange

33

1　that you think you would remember it?
2　A. It talks about somebody, Mr. Noe, intending
3　to return the replacement contract, but it was lost
4　with my briefcase on August 11th. That to me is
5　strange, but this whole case is strange. Anyway....
6　Q. Other than the reference that he lost
7　something in his briefcase, is there anything else
8　in this letter that strikes you as being so strange
9　that you think you would remember it?
10　A. Because he says he was advised by me about
11　the quotation. I don't know -- I don't remember the
12　name John Noe or No-ee, however he pronounces his
13　name. It looks to me like the address is in
14　Illinois.
15　Q. So you don't remember having any
16　conversation with Mr. Noe?
17　A. No.
18　Q. Do you remember having any conversation
19　with anyone at the settlement insurance company?
20　A. I don't. But I'm not saying it didn't
21　happen.
22　Q. You expected you would have had
23　conversations with someone at the settling insurance
24　company?

10 (Pages 34 to 37)

Roger E. Hughes, Jr.
Volume 1 - May 10, 2006

34

1    A   I'm not sure, because I'm not sure whether
2  this case was settled before I appeared at the
3  settlement conference.  At that time in 1983 Joe
4  Flannery and an associate David Ansel left the firm.
5  I can tell you from looking at the docket entries
6  that Mr. Flannery in the docket entries has a
7  telephone number which is different from the
8  telephone number for Latti & Associates.  I don't
9  know, but it may be that the case was settled by Mr.
10 Flannery.
11      Q.  When did Mr. Flannery leave Latti &
12 Associates?
13      A.  Roughly March, April 1983.
14      Q.  So you think it is possible, you're not
15 sure, but you think it is possible that Mr. Flannery
16 tried and settled this case and you sort of picked
17 up the pieces as it were?
18      A.  I think that's possible, yeah.
19      Q.  Do you know where Mr. Flannery is now?
20      A.  He's deceased.
21      Q.  Let me now show you what has been marked as
22 Exhibit 5 in this case.  Take a moment to review
23 that, if you need to, and tell me if you've seen
24 that before today.

35

1    A   This is a copy of the letter that I
2  received from Mr. Kaplan.
3      Q.  Now, you are shown as having also been sent
4  a copy of this letter back at the time, back in
5  1983, are you not?
6      A.  Yes.
7      Q.  Did you receive a copy back then?
8      A.  I don't remember seeing it.
9      Q.  Do you know whether or not you did or you
10 just don't remember?
11      A.  I don't believe I saw it.
12      Q.  Why do you believe you did not?
13      A.  Because I don't remember it.
14      Q.  With all due respect, you haven't
15 remembered a number of things that you believe you
16 did see.
17      A.  Correct.
18      Q.  Is there some reason other than the fact
19 that you don't recall seeing this to lead you to
20 believe that you didn't get it?
21      A.  Because of the office procedures at Latti &
22 Associates.  The mail would come in.  The mail was
23 separated by the office manager, reviewed by Mike
24 Latti, and then given to the individual attorneys.

36

1  Not everything was given to the individual
2  attorneys.
3      Q.  Are you telling us that every piece of mail
4  that came in was reviewed by Mr. Latti before it was
5  given to the addressee?
6      A.  My memory is that he would quickly scan
7  everything.  It doesn't mean he would review
8  interrogatories or depositions.  But Mr. Latti was
9  in control.
10      Q.  Did you have experiences with Mr. Latti
11 where he did not give you correspondence that was
12 addressed to you?
13      A.  How would I know?
14      Q.  So you don't know one way or the other?
15      A.  I don't know.
16      Q.  When you say he didn't give everything to
17 individual attorneys, on what do you base that?
18      A.  Because I knew with respect to settlements
19 of cases, not everything would go to the attorney.
20 We would do the legwork and paperwork and settle the
21 case.  From that moment on it became an
22 administrative matter and it was no longer
23 information that was provided to the individual
24 attorneys.

37

1      Q.  Now, you were a partner in this firm at the
2  time?
3      A.  Yes, ma'am.
4      Q.  Notwithstanding that, Mr. Latti would not
5  necessarily give you every mail that was addressed
6  to you?
7      A.  There are partners and there are partners.
8      Q.  Would you explain that, please, just for
9  the record?
10      A.  I was a partner but a very minor partner.
11 And therefore I was not given the opportunity to see
12 all of the information that came into the firm.  I
13 was there for only two years as a partner when I had
14 enough and left.
15      Q.  Now, you testified that it was Mr. Latti's
16 practice that once a case was settled, from that
17 point forward he controlled the flow of information?
18      A.  No, not that he controlled the flow of
19 information.  But the paperwork that related to when
20 the checks would come in, the individual attorneys
21 wouldn't get to see the checks.  The checks weren't
22 made out to Roger Hughes.  They were made out to
23 Latti & Associates.  So you wouldn't get to see
24 that.  Other things were happening in the firm at

FARMER ARSENAULT BROCK LLC

Roger E. Hughes, Jr.
Volume 1 - May 10, 2006

---

**38**

1  the time. The office manager had some substance
2  problems. So there are other things going on.
3      Q. Drug problems or alcohol problems?
4      A. Alcohol problems.
5      Q. And this officer manager opened the mail?
6      A. Yes.
7      Q. In your experience, because of her alcohol
8  problems or other reasons, was it your experience
9  that she sometimes opened the mail and didn't
10  distribute it?
11      A. There was a criminal case against Kathy
12  Foster. She was convicted of embezzling funds from
13  the firm. Part of the testimony in the case was
14  that she would not provide all of the material to
15  Mr. Latti of the information that came into the firm
16  regarding cases.
17      Q. Now, with respect to Exhibits 4 and 5 that
18  you said you don't recall seeing, those two letters
19  don't relate to settlement funds proper, do they?
20      A. They relate to a settlement.
21      Q. But what I'm driving at, since they don't
22  enclose funds, do you nonetheless believe that
23  either Mr. Latti or Ms. Foster would not necessarily
24  provide you with copies of those letters even though

---

**39**

1  they were addressed to you?
2      A. I'm not saying that they were deliberately
3  not shown to me. What I'm saying is I don't
4  remember ever seeing them and I don't believe I ever
5  saw them. That's what I'm saying.
6      Q. And you are suggesting that one of the
7  reasons you may not have seen them is because either
8  Mr. Latti or Ms. Foster didn't give them to you?
9      A. I'm suggesting that the case was over as
10  far as my role and involvement was concerned.
11  That's why I wouldn't get it.
12      Q. You said that's why you wouldn't get it.
13  Was it the practice of the firm once you settled the
14  case that the money had been paid, you didn't get
15  information relating to the case?
16      A. Again, I don't know if I settled the case.
17  Once the case was settled, and clearly this case was
18  settled, the settlement was approved by the court.
19  I don't know, for whatever reason, but I don't
20  remember ever seeing these documents.
21      Q. Let me show you what has been marked as
22  Exhibit 6 and ask you if you've seen that before
23  today.
24      A. I've never seen this before either.

---

**40**

1      Q. That was not one of the documents that
2  Mr. Kaplan gave you to look at?
3      A. No.
4      Q. You are shown on Exhibit 6 as being a
5  recipient?
6      A. I am.
7      Q. But you have no recollection of having
8  received it?
9      A. No.
10      Q. Do you have any reason to believe that you
11  did not receive Exhibit 6, despite the fact that you
12  are an addressee?
13      A. Other than the fact I don't remember it,
14  and the office procedure I referred to. I just
15  don't recall seeing this document.
16      Q. I want to show you now what has been marked
17  as Exhibit 1 in this case and ask if you've seen
18  that before.
19      A. That was also provided to me by Mr. Kaplan.
20      Q. And this is an annuity application. Is
21  that what you understand it to be?
22      A. That's what it says on the top.
23      Q. Before Mr. Kaplan gave this to you in the
24  last six months or so, a year?

---

**41**

1      A. Yeah.
2      Q. Before Mr. Kaplan gave that to you to look
3  at, had you seen it before?
4      A. I don't believe so.
5      Q. You see that that annuity application was
6  signed by your client, Dennis Dimon?
7      A. I see that.
8      Q. You don't believe that you would have seen
9  it or reviewed it before he signed it?
10      A. I don't. I assume if I was -- well, I know
11  I was at that hearing. Maybe I saw it then. That
12  was the day before this is dated. It says dated in
13  Syracuse, New York, this 4th day of May 1983. I
14  don't know when Mr. Dimon signed it. I can't tell.
15  I don't know.
16      Q. You just don't have any memory?
17      A. I don't have any memory one way or the
18  other.
19      Q. Did you ever see a copy of the annuity
20  policy that was issued as part of this settlement?
21      A. Other than this, Exhibit 1, no.
22      Q. Which is an application, correct?
23      A. It says application.
24      Q. I'm asking about an annuity policy, did you

---

1

1

2          COPLEY COURT REPORTING, INC.
                 101 Tremont Street
3            Boston, Massachusetts 02108
                  (617) 423-5841

4

        DATE:  August 8, 2006
5

        TO:   John E. DeWick, Esq.
6             Todd & Weld, LLP
              28 State Street
7             Boston, Massachusetts 02109

8       RE:   Dennis Dimon v. MetLife, et al.

9             DEPOSITION OF MICHAEL B. LATTI

10      Dear Attorney DeWick:

11          Enclosed herewith is your copy of the
        transcript of the deposition of Michael B. Latti,
12      Volume I, Pages 1-123, taken on July 25, 2006 in
        the above-referenced case.  Please arrange to
13      have the witness read the transcript and sign the
        signature page.  Any corrections to be made to
14      the deposition are to be made separately on the
        enclosed errata sheet and signed by the witness.
15      Once completed, please forward a copy of the
        signature page and errata sheet to all counsel of
16      record.  Corrections should not be made directly
        to the transcript.
17          Thank you for your cooperation.  If you have
        any questions, you may contact me at the
18      above-listed telephone number.

19

20                          Very truly yours,

21

                            Julie A. Healey
22

23

24      CC:   Counsel of Record
              File

90

1      that is an assumption you're making.  I cannot

2      answer your question because that is not part of

3      the evidence.

4           Q.   Okay.  Would it be fair to say it's

5      difficult for you to answer many of my questions

6      or some of my questions because of the time lapse

7      between when the events occurred and today?

8                MR. DeWICK:  Objection.

9      BY MR. LeBLANC:

10          A.   No, no, no.

11          Q.   So, you would have no way of knowing if

12     you received these letters if I asked you the

13     questions in 1983 as opposed to asking you now in

14     2006?

15               MR. DeWICK:  Objection.

16     BY MR. LeBLANC:

17          A.   I said that I have no knowledge of

18     receiving the letters, none.  Whether it was then

19     or now, I still have no knowledge.  I never saw

20     those letters until litigation was commenced.  I

21     never received those letters.

22               I was never told anything of a dispute

23     between insurance companies, Metropolitan and

24     Kemper, except when litigation occurred or shortly

91

1    before when Kaplan called me, I learned there was

2    a problem in February '05.

3         Q.   Okay.  So, your testimony here today is

4    you don't know if you received them, but you know

5    for a fact that you never discussed any of the

6    information contained in these letters with any

7    person back in 1983?

8         A.   My testimony stands as it is.  I have

9    testified continuously.

10        Q.   Do you think it's more difficult to

11   prosecute an action due to a lapse of time?

12             MR. DeWICK:  Objection.

13   BY MR. LeBLANC:

14        A.   It depends on the action, what the facts

15   are and what the circumstances are.  Some cases

16   yes, others no.

17        Q.   In this case?

18        A.   No.  That a lapse of time, he had no

19   choice but to bring the suit when he was wronged

20   because an anticipatory breach is a valid defense.

21             We couldn't bring the suit for twenty

22   years no matter what way you look at it, and he

23   waited for the twentieth year, and then he came to

24   an attorney to represent him, so, I don't, so, to

COPY

VOLUME: 1
PAGES: 1 - 94
EXHIBITS: See Index

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
*************************************
DENNIS DIMON,                           )
                          Plaintiff,  )
                                        )
          vs.                           )
                                        )          C.A. No.
METROPOLITAN LIFE INSURANCE COMPANY,    )       05-11073 WGY
KEMPER INSURANCE COMPANY, MORGAN        )
STANLEY DW, INC., MICHAEL B. LATTI,     )
LATTI ASSOCIATES and LATTI & ANDERSON,  )
LLP,                                    )
                          Defendants.  )
*************************************
```

DEPOSITION of KATHERINE DIMON, a Witness called by and on
behalf of the Defendants, taken pursuant to the applicable
Federal Rules of Civil Procedure, before Vincent Martino,
a Notary Public within and for the Comm. Of Massachusetts,
held at the Law Offices of Ciapciak & Associates, PC, 99
Access Road, Norwood, MA 02062 on Monday, August 7, 2006,
commencing at 11:30 a.m.

COPLEY COURT REPORTING
101 Tremont Street
Boston, Masssachusetts 02108
(617) 423-5841

1    on the above contract?

2       A.   Yes.

3       Q.   Did you ever call MetLife or Charter Security on

4    behalf of Mr. Dimon?

5       A.   Yes, I did.

6       Q.   Did he ask you to make those calls?

7       A.   Yes.

8       Q.   He authorized you to speak on his behalf when you

9    made those calls?

10      A.   Yes.

11      Q.   Do you recall why you called them prior to

12    September 24, 1999?

13      A.   Yes.

14      Q.   Why did you call them?

15      A.   Because there was a problem. The bank called us and

16    they told us that the life insurance that we were using for

17    collateral to get the loan said that it would end in 2003.

18    That's it.

19      Q.   Okay. When you say the bank, you are referring to

20    Citizens Bank?

21      A.   No, I'm talking about Newport Federal.

22      Q.   Who are they?

23      A.   That was the first bank we had, then we had

24    Citizens Bank.

25      Q.   Did Citizens Bank acquire Newport Federal?

1    call them in 1999?

2        A.    I have no reason to believe I didn't call them.

3        Q.    Okay.

4        A.    I just don't remember.

5              MR. LEBLANC: I have asked that a letter dated June

6    9, 2003 to Dennis Dimon from Sandy Franklin be marked as

7    Exhibit 8.

8        Q.    Would you take a look at that document, please.

9        A.    Okay.

10       Q.    Do you recall receiving that document?

11       A.    Yes.

12       Q.    When did you receive this document?

13       A.    It says June 9.

14       Q.    Do you see the first line in this letter is in

15   response to a phone call received from Katherine Dimon?

16       A.    Yes.

17       Q.    Is that you?

18       A.    That's me.

19       Q.    Do you recall that you called MetLife?

20       A.    Yes.

21       Q.    And why did you call them?

22       A.    Because they stopped paying my husband his

23   insurance.

24       Q.    Do you see where it says since your annuity

25   contract has expired, we are unable to provide you with a

1    A.    Yes.

2    Q.    And in that connection, you applied for a mortgage

3    loan for the new home you were buying, correct?

4    A.    Yes.

5    Q.    And you applied for that mortgage loan from Newport

6    Federal Bank?

7    A.    Yes.

8    Q.    As part of your mortgage loan application from

9    Newport Federal Bank, you offered as collateral your

10   husband's annuity policy, correct?

11   A.    Yes.

12   Q.    Which you described to your loan officer at Newport

13   Federal Bank as being a lifetime annuity for your husband,

14   correct?

15   A.    Yes.

16   Q.    Now if I understood correctly at some point the

17   loan officer at Newport Federal, this fellow Don, called

18   you and said that it was not a lifetime annuity policy

19   after all?

20   A.    Yes.

21   Q.    Can you tell me to the best you can recall what did

22   he tell you? Was it a telephone conversation?

23   A.    Yes.

24   Q.    What did he tell you in that conversation?

25   A.    He said he called the life insurance people which I

1    think was MetLife and they said that it wasn't for life, it
2    was only twenty years and I told him I said they don't know
3    what they are talking about because it is supposed to be
4    lifetime.

5        Q.    Okay.

6        A.    I said it's twenty years for me and the kids if my
7    husband happens to pass away between 1983 and 2003. He goes
8    oh, and that was the end of it.

9        Q.    And this was a phone conversation between you and
10   him?

11       A.    Yes.

12       Q.    I think you testified that you closed on your new
13   house in October of 1999?

14       A.    Yes.

15       Q.    So this telephone conversation that you had with
16   the loan officer at Newport Federal would have been before
17   that, before you closed on your house in October, 1999?

18       A.    Yes.

19       Q.    You just can't recall how long before that?

20       A.    Right.

21       Q.    Did you report that telephone conversation to your
22   husband?

23       A.    Yes.

24       Q.    It was kind of an important conversation?

25       A.    Yes.

September 24 1999


DENNIS DIMON
P O BOX 56
WEST KINGSTON RI 02892 0056

RE: CONTRACT # SCRW1126

Dear Mr. Dimon,

We received a call from Katheryn Dimon requesting information on the above
contract. This contract was issued as a structured settlement on 5/5/1983. The
owner of this contract is the American Motor Insurance Company. You receive
monthly payments until the final payment on 5/5/2003. The monthly payments
began on 6/5/1983 and increase 3% annually. This is programmed into the
computer to increase 3% annually. I do not have specific payment amounts. To
figure payments for the remaining years, increase the payment 3% each June 5.

If you have any questions, please call our Customer Service Center at 1-800-635-
7775.

Sincerely,

*Teresa Thorp*

Teresa Thorp
Annuity Benefits

000033

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DENNIS DIMON,<br><br>   Plaintiff,<br><br>VS.<br><br>METROPOLITAN LIFE<br>INSURANCE COMPANY, KEMPER<br>INSURANCE COMPANY,<br>MORGAN STANLEY DW, INC.,<br>MICHAEL B. LATTI, LATTI<br>ASSOCIATES, and LATTI &<br>ANDERSON, LLP,<br><br>   Defendants. | C. A. No: 05-11073 REK |

## PLAINTIFF DENNIS DIMON'S RESPONSE TO DEFENDANT, METROPOLITAN LIFE INSURANCE COMPANY'S FIRST SET OF REQUESTS FOR ADMISSION

### REQUESTS FOR ADMISSIONS

1. Admit that your signature on the Annuity Application, attached hereto as Exhibit "A", is your genuine signature.

**Response 1**

Although the copy attached as Exhibit "A" is mostly illegible I believe it is my signature.

2. Admit that Katherine Dimon is your wife and has been your wife since at least 1983.

**Response 2**

Admitted.

3.    Admit that Katherine Dimon has contacted MetLife regarding your annuity contract.

**Response 3**

Admitted.

4.    Admit that you received your annuity checks by mail.

**Response 4**

Admitted.

5.    Admit that you received a letter from Teresa Thorp of MetLife, dated September 24, 1999, attached hereto as Exhibit "B".

**Response 5**

Admitted.

6.    Admit that the letter attached as Exhibit "B" informed you that your final payment would be May 5, 2003.

**Response 6**

I admit that the letter attached as Exhibit "B" incorrectly stated that my payments would cease on May 5, 2003.

7.    Admit that the document attached hereto as Exhibit "C" is a true and accurate copy of a letter from you to MetLife dated June 19, 2003.

**Response 7**

Admitted.

8.    Admit that you received a letter from Sandy Franklin of MetLife, dated July 9, 2003, attached hereto as Exhibit "D".

**Response 8**

Admitted.

9.     Admit that the reference to "Exhibit #2" in the letter from David Kaplan to
       MetLife, dated September 13, 2004 and attached hereto as Exhibit "E", is
       incorrect in that there was no Exhibit #2 attached to that letter.

**Response 9**

       I cannot admit or deny this statement.

10.    Admit that you were represented by Latti Associates in the <u>Dimon v. Jenny C.</u>
       matter.

**Response 10**

       Admitted.

SIGNED UNDER THE PENALTIES OF PERJURY.

Dated: _4-24-06_                          _Dinni Dim_
                                          Dennis Dimon

**CERTIFICATE OF SERVICE**
I hereby certify that a true copy of the above document
was served upon the attorney of record for each party
by mail (by hand) on _5/9/06_ .

1

VOLUME:  I
PAGES:  1 through 172
EXHIBITS:  See Index


UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-11073 WGY


* * * * * * * * * * * * * * * * * * * * * * * * *
DENNIS DIMON,                      )
                    Plaintiff,     )
                                   )
      VS.                          )
                                   )
METROPOLITAN LIFE INSURANCE        )
COMPANY, KEMPER INSURANCE          )
COMPANY, MORGAN STANLEY DW         )
INC., MICHAEL B. LATTI,            )
LATTI ASSOCIATES, and              )
LATTI & ANDERSON LLP,              )
                    Defendants.    )
* * * * * * * * * * * * * * * * * * * * * * * * *




     **DEPOSITION OF DENNIS J. DIMON**, a witness
called on behalf of the Defendant, taken pursuant
to the Provisions of the Federal Rules of Civil
Procedure, before Julie A. Healey, a Certified
Shorthand Reporter, Registered Professional
Reporter, and Notary Public in and for the
Commonwealth of Massachusetts, at the offices of
Ciapciak & Associates, P.C., 99 Access Road,
Norwood, Massachusetts, on June 29, 2006,
commencing at 11:25 a.m.




COPLEY COURT REPORTING
101 Tremont Street
Boston, Massachusetts 02108

100

1      on my first house.

2          Q.    Are you still paying off that mortgage?

3          A.    Oh, yeah.

4          Q.    And how long do you have left?

5          A.    I don't know.  I had to refinance, so, I

6      can't remember exactly.  I think we went for a

7      thirty-year I think.

8          Q.    And what did you do with this letter when

9      you received it?

10         A.    This letter here, I'm not sure.  My wife,

11     like I say, my wife takes care of a lot of the

12     paperwork and stuff like that.

13             She puts it in a file, or you know, if

14     it's a paper that the bank needed to see, then we,

15     you know, gave it to the bank for them, you know,

16     for them to go through.

17         Q.    And do you know for a fact whether or not

18     this was given to the bank in support of your

19     application for a mortgage?

20         A.    Not right offhand, no.

21         Q.    Do you know anyone who would know that?

22         A.    My wife would be the only one.

23         Q.    So, when you learned in September of 1999

24     that the final payment on your annuity was going

101

1    to be in May of 2003, what did you do with that

2    information?

3        A.    Like I said before, I thought it was a

4    mistake, and I said they didn't know, I told my

5    wife they don't know what they're talking about,

6    you know.  It wasn't no signed document, you know,

7    nothing was ever said, so, I just blew it off.

8        Q.    Okay.

9                MR. LeBLANC:  Can you mark this as

10   Exhibit 12, please.

11               (Exhibit No. 12, Telephone Log,

12   marked for identification.)

13   BY MR. LeBLANC:

14       Q.    Mr. Dimon, I'm going to show you what's

15   been marked as Exhibit 12.  Have you ever seen

16   this document before?

17       A.    No.

18       Q.    Okay.  I'm going to read from the

19   document where it says "From Tulsa Teleservices"

20   and the subject is "Call to 1-800-Met-5000 annuity

21   payouts."

22               The date on the document is 06/05/03, the

23   insured name is Dennis Dimon, and the caller name

24   is Katherine Dimon.

153

1    A.    Yes, true.

2    Q.    They did not come through any other third

3    party?

4    A.    No.

5    Q.    For example, they didn't come through

6    Latti Associates?

7    A.    Right.

8    Q.    After the Jenny C. case settled and you

9    began receiving the checks, did you have any

10   contact after that point with anyone from Latti or

11   Latti & Associates?

12   A.    Very brief, yeah, nothing as far as

13   discussing on how much, you know, what was going

14   on with the money itself.

15   Q.    When did that contact occur?

16   A.    Um, just when simple things would come

17   up, like, one time when it changed hands, it was,

18   it was kind of late and stuff like that, it was,

19   like, almost two months late, something like that,

20   and we had to call up and find out what was going

21   on then, you know, because we always tried to keep

22   track of it to find out what was going on.

23        You know, there were brief, they were

24   just brief, you know.

154

1          Q.    So, there was a time when the payments

2      from the insurance company were two months late?

3          A.    Yeah, generally when it changed hands,

4      that's the way I took it, you know.

5          Q.    But do you recall a specific instance

6      when the payments were two months late?

7          A.    Just one that I know of, yeah.

8          Q.    And do you recall generally when that

9      happened, what year, how long after the annuity

10     issued?

11         A.    No, I can't remember right offhand, no,

12     exactly when.

13         Q.    Was it closer in time to when the annuity

14     issued or closer in time to when the annuity

15     stopped paying, do you know that?

16         A.    It was when the annuity was first going

17     on, it was, like, maybe, I would say a year after

18     it had started.

19         Q.    Okay, and when the payments were two

20     months late, you contacted Latti Associates at

21     that point?

22         A.    Right.

23         Q.    And do you recall who you spoke to

24     directly?

155

1         A.    No, I don't.

2         Q.    And what did you ask them to do at that

3    time, if anything?

4         A.    Well, I asked them if they could find out

5    what was going on and stuff like that, and they

6    did get back to me at one time and said that it

7    was on its way, that it was in the mail.

8              They didn't specify exactly what had

9    happened or anything else like that, they just

10   said, you know, that it was on its way.

11        Q.    Okay.  Other than that time where the

12   payments were two months late, were there other

13   times that you contacted Latti Associates?

14        A.    No.

15        Q.    So, that the next time you contacted them

16   after that was in June of '03 when the payments

17   stopped; is that correct?

18        A.    Basically, yeah.

19        Q.    Well, are there any other times that you

20   can recall between --

21        A.    Not that I can recall, no.

22        Q.    To your knowledge, did anyone on your

23   behalf, your wife or your mother or anyone else,

24   contact Latti Associates during that time?

July 9, 2003


DENNIS DIMON
PO BOX 56
WEST KINGSTON RI  02892 0056


Dear Mr. Dimon,

We are unable to provide you with a contract. Annuities such as this one were issued due to a settlement from some other company, in your case, it was American Motorist Insurance Company. The company issued the settlement terms and the annuity was set up in accordance to the payment schedule.

This annuity, in accordance with the terms set by American Motorist Insurance Company, provided you with monthly payments for a total of 20 years. The payments increased by 3% each year in June. The first payment was on June 5, 1983. The final payment was on May 5, 2003.

Unfortunately, I do not have any additional information to provide you with.

If you have any questions, please call the customer service center at 1-800-635-7775.



Sincerely,

*Sandy Franklin*

Sandy Franklin
Annuity Payout Specialist III
Annuity Administration Operations


000030