UNITES STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                    )
DENNIS DIMON,                                       )
Plaintiff,                                          )
                                                    )
vs.                                                 )          CIVIL ACTION NO. 05-11073 MEL
                                                    )
METROPOLITAN LIFE                                   )
INSURANCE COMPANY, KEMPER                           )
INSURANCE COMPANY, and                              )
MICHAEL B. LATTI, LATTI                             )
ASSOCIATES, LATTI & ANDERSON                        )
LLP,                                                )
        Defendants.                                 )
_____)

**PLAINTIFF, DENNIS DIMON'S, OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff, Dennis Dimon ("Dimon"), respectfully requests this court deny Defendants'

motions for summary judgment and instead, grant the summary judgment requested by Dimon.

*See* Document No.s 54 and 55 – each of which is incorporated herein by reference.

As reasons therefore, Dimon states as follows:

NOTE: For the court's convenience, Dimon submits this single Memorandum of
Law in support of his opposition to all three motions for summary judgment
waged against his rights.

**<u>CORPORATE BACKGROUND INFORMATION</u>**

A significant portion of the events leading to this litigation took place in the 1981 – 1983. At

that time, the corporate parties were known by other corporate names. The following is a list of

what the parties were known as in 1981 – 1983 and what they are referred to now:

| BEFORE | NOW |
|---|---|
| Charter Security Life Insurance Company | Metropolitan Life Insurance Company ("**Metropolitan**") |
| American Motorists Insurance Company | Kemper Insurance Company ("**Kemper**") |
| Latti Associates and Michael B. Latti | Latti & Anderson ("**Latti**") |

## I.    FACTS

Dimon has filed his Statement of Undisputed Material Facts separately (Document No. 55) and has incorporated the same *supra*.  Dimon has also responded to each of the Defendants' Statements of Fact and incorporates each by reference.  *See* Document No.s <mark>XX, XX, XX</mark>.  In an effort against unnecessary redundancy, Dimon directs this court's attention to the brief summary of facts set forth in Dimon's motion at Document No. 54, pp. 2-5.

## II.    LAW AND ARGUMENT

Unfortunately, none of the Defendants recognize or bring to this court's attention the fact that Dimon is a Jones Act seaman nor do they frame the appropriate and unique context by which this court should chart its analysis of those facts and the proper and applicable law that strongly suggest summary judgment in Dimon's favor.

DIMON IS A "WARD OF THE ADMIRALTY"

At pp. 6-7 of his motion (Document No. 54), Dimon concisely set forth both the historical and the immediate importance of Dimon's status and the treatment that Congress and the courts have established and upheld from day one of the Jones Act's implementation.  Since Dimon again hopes to avoid redundancy by choosing not to reiterate what has been expressly incorporated by reference *supra*, Dimon stresses the importance of the prism through which this court's analysis should be viewed and respectfully requests that this court review the reasons that

"[T]he maritime law by inveterate tradition has made the ordinary seaman a member of a favored class.  He is a 'ward of the admiralty.'"  *See* <u>Doyle v. Huntress</u>, 419 F.3d 3, 9 (1st Cir. 2005) *quoting* <u>Isbrandtsen Co. v. Johnson</u>, 343 U.S. 779, 782-783 (1952) ("Whenever congressional legislation in aid of seamen has been considered here since 1872, the Court has emphasized that such legislation is largely remedial and calls for liberal interpretation in favor of the seamen.").

Pursuant to Congress and the U.S. Supreme Court, this court has a duty to consider the law applicable to these matters in <u>Dimon's</u> favor.  This court should take interest in the fact that counsel for Attorney Latti and Latti Associates, a well-known Proctor in Admiralty and Admiralty Firm respectively, has been permitted by his clients to avoid this fact and argue that "land-based common law" apply.  Where Metropolitan and Kemper may be said to have a small measure of excuse and might possible be permitted to blame a "lack of research", it is inconceivable that anyone should be permitted, on Latti's behalf, to urge this court to follow the two non-admiralty cases cited at page 8 of their motion.  As Latti himself, and his firm are well aware, seamen deserve better.  Dimon did when Latti represented him in 1983 and he still does.  It is on this basis that Dimon hopes this court finds similar outrage at counsel's effort to guide this court away from the law.

As stated at 8 of Dimon's motion (Document No. 54), **the Standard for Summary Judgment applicable to Jones Act seamen is different than the common law standard**.  Therefore, Dimon respectfully requests this court apply this correct and appropriate law as Congress and the courts have intended.

BRIEF RE-INTRODUCTION[1]

The matter brought to the court for summary judgment is quite simple:

- A jury awarded $710,000.00 to Dimon

- Subsequent to the jury award and on May 4, 1983, the parties agreed to $250,000.00 cash and an annuity for life with twenty years guaranteed to be paid at a rate of $1,450.45 per month with a guaranteed increase of 3 percent per *annum*.

- The agreement was approved by:

  o Dimon,
  o The court-appointed Guardian Ad Litem ("GAL"), and
  o The court;

- More than two months later, on July 14, 1983, Metropolitan, without Plaintiff's, GAL's, or the court's consent, unilaterally altered the agreement <u>grossly</u> in their favor;

- The Defendants allowed twenty years to pass and then <u>surprised</u> Plaintiff by enforcing the unilaterally-altered agreement.


Where the Defendants' negligence is easily identified, the math involved is *even simpler*:

- The Jury awarded:               $710,000.00.

- The parties subsequently agreed to:   $250,000.00 cash and an annuity for life with twenty years guaranteed to be paid at a rate of $1,450.45 per month with a guaranteed increase of 3 percent per *annum* for 596.4 months.

- The alteration forced:           A cap of 240 months certain – NOT LIFE.


Clearly, 240 months is more favorable to the Defendants than the 596.4 months originally agreed to.  And just as clearly, 240 months could not be *more contrary* to Dimon's

---

[1] Though the following section was set forth at 8-10 of Dimon's Motion (Document No. 54), it is brief and bears restatement herein so that this court may have the proper context of the issue involved readily at hand.

interests.[2]  Therefore, <u>NO</u> collection of eight reasonable individuals will weigh the evidence now before the court towards <u>any</u> outcome other than:

1. The Defendants' each had actual notice of Metropolitan's improper alteration.

2. The Defendants' did not approach Dimon, GAL, or the court because <u>none</u> would have assented.

3. Because 240 months ≠ 596.4 months (@ 3% compounded annually), 240 months is <u>not</u> the agreement that was prepared, presented to and approved by Dimon, GAL and the court.

4. 240 months is <u>grossly</u> contrary to Dimon's interests and would rob him of 356.4 months (@ 3% compounded annually).

5. Because Dimon, GAL and the court did not consent to the revised agreement, it is unenforceable as a matter of fact and law and Dimon is entitled to the lump sum present value payment of all future shortfalls and attorneys fees and either double or treble damages, as this court may find, pursuant to M.G.L. Ch. 176D and 93A.


<u>APPLICABLE LAW</u>

<u>DIMON'S ACTION IS GOVERNED BY FEDERAL GENERAL MARITIME LAW</u>

Kemper wrongfully misguides this court toward the application of New York state law. It is a well-entrenched federal practice that maritime contracts are settled within the framework of the General Maritime Law.  As so aptly stated by Justice Story in his much-acclaimed decision in <u>DeLovio v. Boit</u>:

---

[2] It should be noted that Dimon took the settlement in lieu of the full and superior jury award out of concern for the vessel owner's livelihood.  Where the vessel's policy may have been limited to the value of the vessel, the vessel could have been seized from the owner and sold at action.  *See* May 3, 1983 Hearing Transcript at 18, Exhibit A.

On the whole, I am, without the slightest hesitation, ready to pronounce, that the delegation of cognizance of 'all civil cases of admiralty and maritime jurisdiction' to the courts of the United States comprehends all maritime contracts, torts, and injuries.  The latter branch is necessarily bounded by locality; the former extends over all contracts, (wheresoever they may be made or executed, or whatsoever may be the form of the stipulations,) which relate to the navigation, business or commerce of the sea.  *See* 2 Gall. 398, 7 F.Cas. 418, 444 (C.C.Mass. 1815) (*overruled on other grounds*) *see also* Nacirema Operating Co. v. Johnson, 396 U.S. 212, 216 (1969) (*quoting* DeLovio at 444).

Notwithstanding the U.S. Supreme Court's reaffirmation of Justice Story's words, they are still very much alive and well in more recent cases such as Nehring v. Steamship M/V Point Vail, where the Eleventh Circuit, in a well-written opinion that is on-point, recognized that "[t]he test we apply in deciding whether the subject matter of a contract is necessary to the operation, navigation, or management of a ship afloat is a test of reasonableness, not of absolute necessity." *See* 901 F.2d 1044, 1048 (11th Cir. 1990) *citing to* 7A Moore's Federal Practice ¶ .230[2], at 2762 (1988) *and*, *generally*, Id. ¶ [4], at 2781-2872, *and* 1 Benedict on Admiralty § 184, at 12-11 to -22 (1989).  In Nehring, the court disagreed with the appellant's contention that "an obligation to make contributions to union plans does not give rise to any in personam right that is recognizable in a court of admiralty."  *See* Nehring, at 1048.  The Nehring court's analysis follows:

We have found no cases directly on point holding that agreements such as those upon which the Seafarers Trust Funds rely in bringing their claims for contribution relate to the operation, navigation or management of a ship and therefore are within the court's admiralty jurisdiction . . .  One author has noted that when courts have extended admiralty jurisdiction beyond its traditional parameters, they have done so in two basic ways, of which the first applies here. "[W]here a party has contractually undertaken some activity which, standing alone, would not be an admiralty matter, but has undertaken that activity in conjunction with an indisputable maritime contract, the Courts have included the ordinarily non-maritime activity in admiralty jurisdiction."  [*citing to* Bridwell, Admiralty Contract Jurisdiction and Contract Liens under American Law 6, reprinted in 1988 Southeastern Admiralty Law Institute Program Materials].  This statement accurately describes our determination that admiralty jurisdiction exists in this case.  Standing alone, [appellant's] obligation to make trust fund

contributions is not an admiralty matter.   Taken in conjunction with the employment of the represented crewmembers, however, the obligation becomes subject to admiralty jurisdiction.

Like <u>Nehring</u>, "[defendants' obligation to make [annuity payments] is not an admiralty matter.  Taken in conjunction with the employment of the represented crewmember, [Dimon,] however, the obligation becomes subject to admiralty jurisdiction."

<u>LATTI COMMITTED LEGAL MALPRACTICE</u>

Latti cannot side-step his responsibilities to Dimon by hiding behind a strategy of "no harm, no foul."  Had Latti done his duty as Dimon's counsel and fought, <u>or in the least</u> *notified* him that Metropolitan was unilaterally altering his agreement and effectively setting the stage to rob him of 356.4 months of the settlement that had become his livelihood and/or that Kemper was going along with it, Dimon would not have been forced to face the shock, emotional distress and legal battle that he is currently involved in.  Dimon also would not have been without funds since the Defendants' June 2003 breach.

Notwithstanding the fact that Dimon has already suffered *monetary* and *emotional* <u>damages</u> that WOULD have been avoided had Latti done his duty, it is wrongful to suggest that the "chicken must precede the egg."  There has never been a case that even suggests that a plaintiff must successfully sue each successive link in a chain of defendants – each before the other may be joined.  Such a post flies in the face of joinder and a plaintiff's duty to bring all claims at the time they are known or face the possibility of estoppel and/or *res judicata*.

In fact, had Latti continued his quote from the matter of <u>Colucci v. Rosen, Goldberg, Slavet, Levenson & Wekstein, P.C.</u>, he would defeated his attempt to misguide this court through a wrongfully placed "<u>Palsgraf</u>" analysis.  "If the attorney acts with a proper degree of attention, with reasonable care, and to the best of his skill and knowledge, he will not be held responsible.

Some allowance must always be made for the imperfection of human judgment." *See* <u>Colucci</u>, 25 Mass.App.Ct. 107, 111, 515 N.E.2d 891 (1987) *quoting* <u>Stevens v. Walker & Dexter</u>, 55 Ill. 151, 153 (1870) *see also* <u>Gilbert v. Williams</u>, 8 Mass. 51, 56 (1811).  Where Latti's failure to read and/or act upon several month's worth of mail and failure to defend and/or contact his client cannot be considered "the imperfection of human judgment" neither can his failed duty be granted a perverse "sanctuary" within the allegation that Dimon has not yet been damaged.

The remaining case law relied upon by Latti is even more inapposite than those distinguished *supra*.  Where Latti properly cites to <u>Wehringer v. Powers & Hall, P.C.</u> (at page 9) for the notion that a legal malpractice action cannot be brought until the underlying dispute has been fully adjudicated (*see* 874 F.Supp. 425, 428 (D.Mass. 1995)), his own Statement of Material Facts (at page 2) states that there had been "a favorable jury verdict in February of 1983" and a "subsequent[] settle[ment] for a lump sum payment and a lifetime annuity."  This court should not be misguided by a *pro se* litigant's attempt to sue his lawyer before he was done doing his job.  *See* <u>Id</u>. at 427-428.  Here, Latti is presumed to have *thought* his job was finished upon receipt of his contingent fee so he ignored and/or failed to act upon the communications that bluntly spelled out the manner in which Metropolitan had decided to unilaterally alter the agreement that LATTI had put together with Kemper and Judge Petine.

There is no way that a jury comprised of eight reasonable individuals will be able to find anything less than but for Latti's failure, in combination with the acts and omissions of Metropolitan and Kemper, Dimon would not have been made to suffer and become damaged both emotionally and economically.

DIMON'S CLAIMS ARE NOT TIME BARRED

Where Latti correctly states that the statute of limitation is three years and where Dimon was made aware of the Defendants' negligence and/or breach in June 2003 and filed his Complaint on May 23, 2005, he was well within the time allotted for the filing of his claims.

| May 23, 2005 – June 5, 2003 = 1 year, 13 days → **well within any of the applicable limitations** |

Further, Dimon directs this court's attention to his motion (Document No. 54) at pp. 13-18 wherein ALL of the applicable statutes of limitations were fully briefed and placed into the proper context of the Federal Doctrine of Fraudulent Concealment.

METROPOLITAN AND THE APPLICABILITY OF M.G.L. Ch. 175, § 181

Metropolitan's actions from which the instant action primarily arises were so egregious and distasteful that the feeling is only enhanced by their only strategy – attempting to hide behind statutes of limitations where it is clear that none have been violated. Plaintiff respectfully refers this court's attention to Dimon's motion (Document No. 54) at pages 13-18.

The Statute of Limitation for the Tort of Misrepresentation related to the fraudulently altered annuity is set forth by M.G.L. Ch. 175, § 181 which states that "the holder of an annuity . . . may recover . . . in an action brought within two years after the date of issue. . ."

*See* Mass.Gen.Laws Ch. 175, § 181 which states in pertinent part:

No company, no officer or agent thereof . . . shall make, issue, circulate or use, or cause or permit to be made, issued, circulated or used, any written or oral statement misrepresenting the terms of any . . . annuity . . . issued or to be issued by any company, or the benefits or privileges promised thereunder. No company, no officer or agent thereof . . . shall make to any person . . . holding any annuity . . . any written or oral misrepresentation or misleading representation in respect to the terms, benefits or privileges of . . . any annuity . . . or any written or oral incomplete or misleading comparison of any such policy or contract or of any of the terms, benefits or privileges thereof with . . . any of the terms, benefits or privileges thereof, in order to induce or which tends to induce such person to lapse, forfeit or surrender the . . . contract held by him, or to alter or convert it into, or to exchange it for, any other such policy or contract. Whoever violates any provision of this section shall be punished by a fine of not more than one thousand dollars or by imprisonment for not more than six months.
* * *

> [T]he holder of any annuity . . . who was induced to procure it by any action in violation of this section by an officer or agent of the company issuing or executing it may recover from such company . . . in an action brought within two years after the date of issue thereof.

Like all the other Statutes of Limitations, "The federal doctrine of fraudulent concealment operates to toll the statute of limitations '**where a plaintiff has been injured by fraud and 'remains in ignorance of it without any fault or want of diligence or care on his part**.'''" See Salois v. Dime Sav. Bank of New York, FSB, 128 F.3d 20, 25 (1st Cir. 1997) (emphasis added) *quoting* Holmberg v. Armbrecht, 327 U.S. 392, 397 (1946) *quoting* Bailey v. Glover, 88 U.S. (21 Wall.) 342, 348 (1874); *see also* Maggio v. Gerard Freezer & Ice Co., 824 F.2d 123, 127 (1st Cir. 1987).   As stated at 13 of Dimon's motion, even under state law, "[i]f a person liable to a personal action fraudulently conceals the cause of such action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action."  *See* Mass.Gen.Laws Ch. 260, § 12.  Therefore, Metropolitan's reliance upon M.G.L. Ch. 175, § 181 is not wise.


KEMPER BREACHED THEIR CONTRACT WITH DIMON

Kemper was notified by Metropolitan regarding their unilateral alteration of the court-approved settlement.  Kemper even grumbled about it.  What Kemper failed to do was contact Dimon and/or Latti and/or the court and notify and/or challenge Metropolitan's actions whereby they definitively altered a promise made by Kemper in settlement of a claim that Dimon had against their insured.  Kemper cannot dispute Metropolitan's actions over several month's correspondence and then hide its head in the sand in an effort to dodge the presumed legal costs it would have to incur if they had properly challenged Metropolitan's actions.  Kemper is attempting to capitalize upon the actions of a third party and insulate itself by claiming

"plausible deniability."  The parties entered into a deal that was blessed by a United States District Court.  NONE should be permitted to hide behind another or each other's deceit.


## KEMPER'S ACTS AND/OR OMISSIONS SATISFY THE ELEMENTS OF NEGLIGENT MISREPRESENTATION

Though Dimon denies that New York law is applicable here, it is much the same as any other state's law regarding negligent misrepresentation.  Therefore, even applying the law provided by Kemper, summary judgment for Dimon is warranted.  I.e. taking Kemper's own words at page 14 of their motion:

1. [Kemper] had a duty, as a result of a special relationship [as a settling authority that entered into a court-approved settlement contract], to give correct information [i.e. alert the other parties to the agreement and/or the court that "the thing had changed" when Metropolitan had made their "edit"];

2. [Kemper's omission to act once notified by Metropolitan was] a false representation that he or she should have known was incorrect;

3. the [settlement agreement] was known by [Kemper] to be desired by [Dimon and the court] for a serious purpose;

4. [Dimon] relied upon it; and

5. [Dimon] reasonably relied upon it to his detriment.


Though state law may "supplement" areas where the federal maritime law is silent, it is more likely that Rhode Island law would apply in this regard.  In Rhode Island, "a prima facie case of negligent misrepresentation requires that plaintiff "establish the following elements:

'(1) a misrepresentation of a material fact;

(2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its truth or falsity or must make the representation under circumstances in which he ought to have known of its falsity;

(3) the representor must intend the representation to induce another to act on it; and

(4) injury must result to the party acting in justifiable reliance on the misrepresentation.'"

*See* Francis v. American Bankers Life Assur. Co. of Florida, 861 A.2d 1040, 1046 (D.R.I. 2004) *quoting* Zarrella v. Minnesota Mut. Life Ins. Co., 824 A.2d 1249, 1257 (D.R.I. 2003) *quoting* Mallette v. Children's Friend and Service, 661 A.2d 67, 69 (D.R.I. 1995).  Just like the "New York" analysis proposed by Kemper, they KNEW of the falsity enacted by Metropolitan when they contacted Kemper back in 1983.  Dimon didn't know until 2003.  Therefore, Kemper's omission which they knew to be "false" (they disputed it with Metrpolitan) "induced" and "result[ed in Dimon's] justifiable reliance on the misrepresentation" that he had a "Life Annuity" – a misrepresentation that Kemper constructively admits to in its Statement of Facts at page 4 *compared to* page 5-6 where Kemper outlines their recognition of Metropolitan's deceit.


## **CONCLUSION**

As stated *supra*, our First Circuit has ruled that "[w]here the agreement is made, as here, under the eyes of the court, it is a most solemn undertaking, requiring the lawyers, as officers of the court, to make every reasonable effort to carry it through to a successful conclusion."  *See* Warner, 513 F.2d at 682.  NONE of the Defendants carried Dimon's court-sanctioned settlement annuity "through to a successful conclusion."

As made clear by the evidence presented both here and in Dimon's Statement of Undisputed Facts, the Defendants have individually, jointly and severally taken unfair advantage of Dimon, who, as a seaman, is this court's "ward."  In accordance with our First Circuit's ruling in Doyle v. Huntress, this court has a duty to treat Dimon "with favor" for, in addition to his inclusion in the class deemed "ignorant and helpless, and so in need of protection against himself as well as others", this court must also take into account his "perceptual handicap" and

intellectual status of "dull normal."  That such a ward, after being granted the protections of a court approval, was ever taken advantage of should cause any "reasonable person" <u>and this court</u> GREAT incense.

Through Fraud, Forgery, Deceit and a general failure to comply with any and all requisite duties be they legal, ethical, or human, the Defendants have caused Dimon to suffer a great financial loss, severe anxiety and have forced him into the present litigation in violation of M.G.L. Ch. 176D.  In light of the evidence and law set forth herein and the M.G.L. Ch. 93A, § 9 letters Dimon sent Kemper and Metropolitan on December 7, 2006, by the time this motion is ripe for adjudication, this court will have all the tools necessary to rule on a plethora of violations, either on the pleadings or *sua sponte*.

Quite basically, and as set forth *supra*, since there are no genuine issues as to any material facts, Dimon is entitled to a judgment as a matter of law against all Defendants on all counts inclusive of those set forth *supra* that may be added by way of a Rule 15(b) amendment to conform to the evidence.  *See* Fed.R.Civ.P. 15(b).[3]

Therefore, since the absence of evidentiary support for the Defendants' case would not lead reasonable persons presented with the same facts and inferences to differ as to their opinions, this matter, in its entirety, is a question for the judge.  *See* <u>McDermott</u>, 498 U.S. at 356 *and* <u>Villanueva</u>, 930 F.2d at 128.

---

[3] "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings . . . as may be necessary to cause them to conform to the evidence . . ."  *See* Fed.R.Civ.P. 15(b).

### III.    <u>DAMAGES</u>

Where a Defendant has purchased a "settlement annuity" and then breaches that annuity, the injured party may be made whole, not by the purchase of yet another annuity, but by a lump sum present value payment of all future shortfalls along with payment of any reasonable attorneys' fees allowed by statute. *See* <u>Massie v. U.S.</u>, 226 F.3d 1318, 1322 (Fed. Cir. 2000).

Therefore, Dimon may collect the lump sum present value payment of all future shortfalls and attorneys fees with either double or treble damages, as this court may find, pursuant to M.G.L. Ch. 176D and 93A.  Upon satisfaction of the thirty-day rule associated with the above-referenced 93A Letters, Dimon shall seek to amend his Complaint to add a count under M.G.L. Ch. 93A and 176D.  In addition, Dimon shall seek to include, pursuant to Fed.R.Civ.P. 15(b) *supra*, additional counts for claims raised here as well as a count for General Maritime Law Punitive Damages.


Respectfully submitted,


 /s/Brian Keane_____
DAVID B. KAPLAN, B.B.O. No. 258540
BRIAN KEANE, B.B.O. No. 656717
THE KAPLAN/BOND GROUP
88 Black Falcon Avenue, Suite 301
Boston, MA 02210
(617) 261-0080


Dated: February 5, 2007

I hereby certify that a true copy of the above document was served upon each attorney of record by ECF on February 5, 2007.


 /s/Brian Keane_____

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **DENNIS DIMON,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **VS.** | ) | |
| | ) | **C. A. NO: 05-1 1073 MEL** |
| **METROPOLITAN LIFE INSURANCE** | ) | |
| **COMPANY, KEMPER INSURANCE** | ) | |
| **COMPANY, MORGAN STANLEY DW, INC.,** | ) | |
| **MICHAEL B. LATTI, LATTI ASSOCIATES,** | ) | |
| **and LATLT & ANDERSON LLP,** | ) | |
| **Defendants.** | ) | |

### PLAINTIFF'S RESPONSE TO THE DEFENDANT, METROPOLITAN LIFE INSURANCE COMPANY'S L.R. 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Plaintiff, Dennis Dimon ("Dimon"), was injured in 1981 while serving as a member of the crew aboard the **F/V JENNY C.** See EXHIBIT "A" at ¶ 10.

Response 1.

    Plaintiff does not contest this fact.

2. At the time of the injury, Dimon was employed by Jenny C. Inc., a company organized under the laws of the State of Rhode Island. See EXHIBIT "B" at Count I, ¶2 and ¶ 3.

Response 2

    Plaintiff does not contest this fact.

3. At the time of Dimon's injury, Jenny C., Inc., owned, operated and controlled the F/V JENNY C. See EXHIBIT "B" at Count I, ¶ 2.

Response 3

    Plaintiff does not contest this fact.

4. In 1981, Dimon brought a personal injury action against Jenny C., Inc. seeking compensation for his injuries. See EXHIBIT "B".

Response 4

Plaintiff does not contest this fact.

5.  American Motorists Insurance Company ("American Motorists") was the excess insurance carrier for Jenny C., Inc. when Dimon was injured.  See Exhibit # 8 and # 9 to W. Mensie Dep. Tr.; W. Mensie Dep. Tr. at 68:2-8 attached hereto and collectively referred to as EXHIBIT "U".

Response 5

Plaintiff does not contest this fact

6.  American Motorists was part of the Kemper Group, and is now Kemper Insurance Company. See EXHIBIT "A" at ¶ 17; See also EXHIBIT "F".

Response 6

Plaintiff does not contest this fact.

7.  The case wherein Dimon sued the vessel's owner was captioned: Dimon v. Jenny C., Inc., C.A. 81-0063; and was filed in the United States District Court for the District of Rhode Island. See EXHIBIT "B".

Response 7

Plaintiff does not contest this fact.

8.  In Dimon v. JENNY C., Inc., Dimon was represented by counsel from the firm of Latti Associates. See EXHIBIT "N" at 25:6-2 1.

Response 8

Plaintiff does not contest this fact.

9.  From 1982 through 1984, Michael Latti and Roger Hughes were partners at Latti Associates. Joseph Flannery also worked at Latti Associates. See EXHIBIT "N" at 6:23 - 7:7; See also EXHIBIT "O" at 7: 10-1 2.

Response 9

Plaintiff does not contest this fact.

10. Joseph Flannery was primarily responsible for handling the Dimon v. Jenny C., Inc., litigation on behalf of Latti Associates. See EXHIBIT "N" at 26:4-9; 31:7-22.

Response 10

    Testimony in this matter indicates that Joseph Flannery, Roger Hughes and Michael Latti worked on the <u>Dimon v. Jenny C., Inc.</u> litigation.

11. After jury verdict was rendered in February of 1983, <u>Dimon v. Jenny C. Inc.</u> was reassigned within Latti Associates to Roger Hughes. <u>See</u> EXHIBIT "N" at 31:21-22.

Response 11

    Testimony in this matter indicates that Joseph Flannery, Roger Hughes and Michael Latti worked on the <u>Dimon v. Jenny C. Inc.</u> litigation.

12. Roger Hughes was Dimon's counsel of record in 1983. Michael B. Latti, Latti Associates, and Latti & Anderson LLP's Initial Disclosures at ¶ 3, attached hereto as EXHIBIT **"V";** <u>See also</u> Stipulation and Release, attached hereto and referred collectively as EXHIBIT "W".

Response 12

    Testimony in this matter indicates that Joseph Flannery, Roger Hughes and Michael Latti worked on the <u>Dimon v. Jenny C. Inc.</u> litigation.

13. There is no evidence that Latti Associates, Michael Latti or Roger Hughes ever withdrew as Dimon's counsel of record.

Response 13

    Plaintiff does not contest this fact.

14. On or about April 19, 1983, after the verdict was rendered, the parties to <u>Dimon v. Jenny C., Inc</u>. reached a settlement. ***See*** EXHIBIT "C".

Response 14

    Plaintiff does not contest this fact.

15. As the result of the settlement Dimon received a lump sum payment and applied for an annuity entitling him to monthly payments for twenty years.<u>See</u> EXHIBIT "D"; <u>See also</u> Correspondence from MetLife to Dimon dated June 9,2003 attached hereto as EXHIBIT "E"**.**

Response 15

The settlement agreement reached by the parites consisted of a total settlement of $425,000.00 consisting of a lump sum payment of $250,000.00. The remaining $175,000.00 was used to fund an annuity which was guaranteed for 20 years and would continue for the life of the plaintiff. (Copy of May 3, 1983 Hearing before Judge Raymond J. Petine, attached as Plaintiff's Exhibit "A" to its material statements of fact).

16. Charter Security Life Insurance Company ("Charter") issued the annuity contract to Dimon. The corrected contract was lost. <u>See</u> EXHIBIT "F".

Response 16

Charter Security Life Insurance Company did issue the annuity contract to Dimon. There is a dispute as to what happened to what is purported to be a corrected contract.

17. Charter was neither a party to, nor involved in the trial, settlement or post-trial proceedings of <u>Dimon v. Jenny C., Inc</u>.

Response 17

Charter was notified on all correspondence concerning the post-trial proceedings.

18. Charter is now Metropolitan Life Insurance Company ("MetLife"). <u>See</u> EXHIBIT "A".

Response 18

Plaintiff does not contest this fact.

19. MetLife was neither a party to, nor involved in the trial, settlement or post-trial proceedings of <u>Dimon v. Jenny C**., Inc**</u>.

Response 19

MetLife through its predecessor in interest, Charter Security and Life Insurance Company, was involved in all correspondence regarding settlement or post-trial proceedings.

20. Dean Witter Reynolds, Inc. ("Dean Witter") was the agency that took the application for Dimon's annuity. <u>See</u> EXHIBIT "D".

Response 20

Plaintiff does not contest this fact.

21. Dean Witter is now Morgan Stanley DW, Inc. <u>See</u> EXHIBIT "A" at ¶ 18.

Response 21

    Plaintiff does not contest this fact.

22. Annuity Application was submitted to Charter dated May 4, 1983. <u>See</u> EXHIBIT "D".

Response 22

    Plaintiff does not contest this fact.

23. American Motorists was the Applicant on the Annuity Application submitted to Dean Witter Reynolds. <u>See</u> EXHIBIT "D".

Response 23

    Plaintiff does not contest this fact.

24. The Annuity Application was signed by Dimon as the Annuitant. <u>See</u> EXHIBIT "D".

Response 24

    Mr. Dimon did sign an Annuity Application; however, there is a dispute as to what was filled in on the Application that Mr. Dimon signed.

25. The Annuity Application was signed by John Noe on behalf of American Motorists as the Owner of the annuity. <u>See</u> EXHIBIT "D".

Response 25

    Mr. Noe did sign and Annuity Application; however there is a dispute as to what was filled in on the Application with Mr. Noe signed.

26. The Annuity Application was signed by Kurt Snyder on behalf of Dean Witter as the agent. <u>See</u> EXHIBIT "D".

Response 26

    Mr. Snyder did sign  the Annuity Application; however, it is disputed as to what was filled in on the Application when Mr. Snyder signed.

27. Roger Hughes of Latti Associates was identified in letters exchanged between Charter, American Motorists and Dean Witter as the person who provided

information regarding the terms of the annuity. <u>See</u> EXHIBIT "F"; <u>See also</u> EXHIBIT "G" and "H".

Response 27

 Plaintiff does not contest this fact.

28. On May 5, 1983, Charter issued the Annuity Contract. <u>See</u> EXHIBIT "E".

Response 28

 On May 5, 1983, Charter issued an Annuity Contract, it is disputed what the terms of the Annuity Contract were.

29. In a letter dated July 14, 1983, Barbara Boehm of Charter wrote to Kurt Snyder of Dean Witter asserting that a clerical error had been made in that the term of the annuity had been "incorrectly typed as 240 months certain and life thereafter instead of 240 months only." <u>See</u> EXHIBIT "I".

Response 29

 Plaintiff does not contest that the letter written by Barbara Boehm on July 14, 1983 to Kurt Synder exists, the Plaintiff does contest that clerical error. <u>See</u> Single Premium Deferred Annuity attached as Exhibit "H" to Plaintiff's Statements of Fact.

30. The July 14, 1983 letter from Barbara Boehm to Kurt Snyder states that "[a]s outlined in our telephone conversation . . ." indicating that there was at least one communication regarding the clerical error prior to July 14, 1983. <u>Id.</u>

Response 30

 The plaintiff does not contest the contents of the July 14, 1983 letter.

31. On August 12, 1983, John Noe, on behalf of American Motorists, sent a letter to Robert Foley of Dean Witter. <u>See</u> EXHIBIT "F".

Response 31

 Plaintiff does not contest this fact

32. John Noe's August 12, 1983 letter was carbon copied to Barbara Boehm of Charter and Roger Hughes of Latti Associates. <u>Id.</u>

Response 32

Plaintiff does not contest this fact

33. The address used on the various correspondences between Charter, American Motorists and Dean Witter between July 14, 1983 and October 14, 1983 was the correct address for Latti Associates during the relevant time period. <u>See</u> EXHIBIT "N" at 32:16-1 8); <u>See also</u> EXHIBIT "O" at 42:22 - 43:1.

Response 33

Plaintiff does not contest this fact.

34. Latti Associates did not experience any problems with mail delivery between July 14, 1983 and October 14, 1983. <u>See</u> EXHIBIT "N" at 32:19 - 33:14; <u>See also</u> EXHIBIT "O" at 43.2-11.

Response 34

Plaintiff does not contest this fact.

35. Neither Michael Latti nor Roger Hughes have a specific memory regarding receiving the letters regarding the dispute as to the terms of the Annuity.

Response 35

Plaintiff does not contest this fact.

36. In September of 1999, Katherine Dimon ("Mrs. Dimon"), on behalf of her husband, Dimon, contacted MetLife seeking information on the terms of the Annuity. <u>See</u> EXHIBIT "Q" at 10:3 -18.

Response 36

Plaintiff does not contest this fact.

37. On September 24, 1999, MetLife wrote a letter to Dimon in response to Mrs. Dimon's inquiry confirming that Dimon would receive "monthly payments until the final payment on 5/5/2003." <u>See</u> EXHIBIT "R".

Response 37

There is no indication that the letter referred to as a September 24, 1999 communication was sent from MetLife.  The letter contained in Plaintiff's file does not have a letterhead, nor does it indicate what company sent the letter.

38. In 1999, Dimon's bank notified him and Mrs. Dimon that the Annuity was only for twenty years certain, not for life. <u>See</u> EXHIBIT "Q" at 67:24 - 68:2.

Response 38

    Mrs. Dimon did have a conversation with bank; however, her memory as with regard to the length of the Annuity is disputed.

39. All annuity payments were paid to Dimon for the term of 240 months. <u>See</u> EXHIBIT "E" and "M" at 10:7-14.

Response 39

    Annuity payments were paid to Mr. Dimon for a period of 240 months in violation of the agreement to pay for life thereafter.

40. MetLife paid Dimon the final payment on the Annuity on or about May 5, 2003. <u>See</u> EXHIBIT "E".

Response 40

    A payment was made to Mr. Dimon on May 5, 2003.  This payment was not the last payment and should not have been the last payment pursuant to the agreement between the parties in 1983.

                Plaintiff,
                By his attorney,


                __/s/ Brian Keane_____
                BRIAN KEANE, BBO #656717
                The Kaplan/Bond Group
                88 Black Falcon Avenue, Ste. 301
                Boston, MA 02210
                (617) 261-0080

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

DENNIS DIMON,                          )
     Plaintiff,                    )
                                   )
VS.                                    )
                                   )    **C. A. NO: 05-1 1073 REK**
METROPOLITAN LIFE INSURANCE            )
COMPANY, KEMPER INSURANCE              )
COMPANY, MORGAN STANLEY DW, INC.,      )
MICHAEL B. LATTI, LATTI ASSOCIATES,    )
 and LATTI & ANDERSON LLP,            )
     Defendants.                   )

**PLAINTIFF'S RESPONSE TO THE DEFENDANT, LATTI & ASSOCIATES L.R.
56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

1. In 1981 Latti Associates[1] brought a suit in United States District Court for the District of Rhode Island on behalf of Dennis Dimon for personal injuries suffered while working aboard the Jenny C., a vessel owned by Jenny C. Inc. Complaint in Bennis Jay Dimon v. Jenny C., Inc., C.A. No. 81-0063, D.RI, attached as <u>Exhibit A</u>. Latti Associate s obtained a favorable jury verdict in February o f1983 in an amount in excess of the applicable liability insurance, and subsequently settled the case for a lump sum payment and a lifetime annuity. <u>See</u> Transcript of May 3, 1983 hearing in the United States District Court for the District of Rhode Island ("May 3, 1983 Hearing Transcript"), pp.1, 6, attached as <u>Exhibit B</u>.

Response 1.

     Plaintiff does not contest this paragraph.

2. Pursuant to that settlement agreement, on April 19, 1983 Dennis Jay Dimon executed a General Release in which he agreed to release all claims against Jenny C. Inc. in exchange for "payment of Two Hundred Fifty Thousand and No/100 ($250,000) Dollars and the establishment of a fully paid annuity contract for my benefit with Charter Life Insurance Company[2], to pay [Dennis Jay Dimon] One Thousand Four Hundred Fifty and No/100 ($1,450.00) Dollars per month for one year following the execution of that contract and thereafter, such monthly sum increased at the rate of three (3%) percent per year, compounded annually, to be paid to [Dennis Jay Dimon] during the terms of [his] life, and in no event for less than twenty (20) years…" <u>See</u> General Release attached as Exhibit D. Jenny C., Inc.'s liability insurer was defendant Kemper Insurance Co ("Kemper").[3] Kemper

acknowledges that this General Release accurately reflects the terms of the settlement agreement between Mr. Dimon and Jenny C., Inc. Mensie Dep. pp. 217-18, attached as <u>Exhibit</u> <u>E</u>.

Response 2

Plaintiff does not contest this paragraph. However, he does state that the annuity contract was paid for with $175,000 out of the total Global Settlement.

3. After the settlement agreement was reached, a *guardian ad litem,* was appointed on behalf of Mr. Dimon and a hearing was convened by Judge Petine in the District of Rhode Island on May 3, 1983 to ensure that Mr. Dimon understood the terms of the settlement. May 3, 1983 Hearing Transcript, pp.2, attached as <u>Exhibit</u> <u>B</u>. At the hearing, the *guardian ad litem*, a Rhode Island attorney named Leonard Decof, testified that "[t]he settlement, as it was agreed upon, provided for a payment, a cash payment, of $250,000; and in addition tot hat, a structured settlement of $1,450.45 per month guaranteed for 20 years but which would continued for the life of the plaintiff." <u>Id</u>. pp. 6. This testimony concerning the terms of the settlement is consistent with the General Release and accurately states the terms of the settlement arrived at by the parties. Guy Wells, W. Slater Allen, and Jerome B. Spunt, attorneys representing Jenny C., Inc. and its insurance companies, participated in the *guardian ad litem's* review of the settlement and were all present at this hearing. <u>Id</u>., pp. 9 and caption page noting appearances. In fact, the insurance companies represented by Mr. Allen and Mr. Wells Paid the *guardian ad litem's* fee. <u>Id</u>., pp. 20. The *guardian ad litem* and the court concluded that Mr. Dimon did understand the nature of the settlement and was entering into it upon his free will. <u>Id</u>., pp. 18-19, 21.

Response 3

Plaintiff does not contest this paragraph.

4. Pursuant to the settlement agreement, Kemper applied for and received an annuity policy from MetLife providing for "[m]onthly payments in the amount of $1,450.45, increasing 3% annually, commencing on June 6, 1983, for a period of 240 months certain and life thereafter." Mensie Dep., pp. 223-25, attached as <u>Exhibit E</u>. The policy issued by MetLife is dated June 17, 1983. A copy of the June 17, 1983 Single Premium Deferred Annuity is attached as <u>Exhibit F</u>. Again, the payment terms of this annuity were consistent with, and met Kemper's oblicationc concerning, the settlement agreement between Mr. Dimon and Jenny C. Inc. <u>See</u> Mensie Dep., pp. 239-40, attached as <u>Exhibit E</u>. The policy issued by MetLife is dated June 17, 1983. A copy of the June 17, 1983 Single Premium Deferred Annuity is attached as <u>Exhibit F</u>. Again, the payment terms of this annuity were consistent with, and met Kemper's obligations concerning, the

settlement agreement between Mr. Dimon and Jenny C. Inc. See Mensie Dep., pp.239-40, attached as Exhibit E.

Response 4

Plaintiff does not contest this paragraph.

5.  Payments began under the settlement agreement in June of 1983. Approximately a month later, MetLife contacted Dean Witter Reynolds (the broker who apparently brokered the sale of the annuity from MetLife to Kemper) indicating that, due to a clerical error, the annuity purchased by Kemper for Mr. Dimon stated incorrect payment terms. July 14, 1983 letter to Kurt Snyder from Barbara Boehm, attached as Exhibit G.[4] Specifically, MetLife claimed that the payment term for the annuity payments should have read 240 months (or 20 years) only, and not 240 months certain and life thereafter. Id. Kemper then responded with a letter of its own indicating that MetLife's change in the annuity terms was not acceptable, and that Kemper considered the original annuity calling got lifetime payments enforceable. August 12, 1983 letter to Robert A. Foley from John L. Noe, attached as Exhibit H. During the next several months MetLife and Kemper traded correspondence concerning this issue; MetLife claiming that the annuity was for only 240 months only, and Kemper maintaining that it considered the original annuity for life to be the enforceable agreement between the parties. See September 26, 1983 letter to John L. Noe from Robert Ligouri, attached as Exhibit I; October 10, 1983 letter to Robert Ligouri from John L. Noe, attached at Exhibit J; October 14, 1983 letter to John L. Noe from Barbara Boehm, attached as Exhibit K. In what appears to be the final letter of this exchange[5], John Noe of Kemper explicitly rejected MetLife's changed terms, and stated that Kemper will retain the original annuity and considers it valid and enforceable. October 12, 1983 letter to Barbara Boehm from John L. Noe, attached as Exhibit L. There was no further correspondence between MetLife and Kemper concerning this issue.

Response 5

Plaintiff does not contest the individual statements of fact regarding the correspondence after June of 1983.

6.  Roger Hughes, a partner of Latti Associates at that time, was apparently carbon copied on some but not all of the letters between Kemper and MetLife, though Mr. Hughes does not recall seeing those letters. Deposition of Roger Hughes ("Hughes Dep."), pp. 32, 34-35, and 39-40, attached as Exhibit M. Michael B. Latti also does not recall seeing copies of the letters that Roger Hughes was apparently copied on, nor did he have knowledge of the dispute between Kemper and MetLife concerning the term of the annuity until this litigation arose. Deposition of Michael B. Latti ("Latti Dep"), pp. 90-91, attached as Exhibit N.

Response 6

Testimony in this matter indicates that Mr. Hughes and Mr. Latti were copied on all letters between all parties in this matter following the settlement agreement.

7. The Dimonds allege that they were not aware of the dispute over the term of the annuity in 1983. In September of 1999, however, the Dimons did become aware that MetLife considered this annuity to be 240 months only, and that the final annuity payment would be made May 5, 2003. Specifically, sometime prior to September 1999 the Dimons were contacted by the bank with whom they were applying for a mortgage and told that there was an issue with the annuity, which they had identified as income furing the application process. Deposition of Katherine Dimon ("K. Dimon Dep.") pp. 10, 83-84, attached as Exhibit O. According to Mrs. Dimon, a gentleman from the abnk informed the Dimons that he called MetLife concerning the annuity, and MetLife "said that it wasn't for life, it was only for twenty years…" <u>Id</u>., pp. 84. Shortly thereagfter, Teresa Thorp of MetLife sent a letter to the Dimons dated September 24, 1999, confirming that the final annuity payment would be May 5, 2003. September 24, 1999 letter from Teresa THrop to Dennis Dimon, attached as Exhibit P. Mr. Dimon admitted to receiving this letter and that it informed him that annuity payments would cease on May 5, 2003. Plaintiff Dennis Dimon's Response to Defendant, Metropolitan Life Insurance Company's First Set of Requests for Admission, Nos. 5-6, attached as Exhibit Q. When questioned about receiving this letter at his deposition, Mr. Dimon testified as follows:

Q.    So, when you learned in September of 1999 that the final payment on your annuity was going to be in May of 2003, what did you do with that information?

A.    Like I said before, I thought it was a mistake, and I said they didn't know, I told my wife they don't know what they're talking about, you know. It wasn't no signed document, you know, nothing was ever said, so I just blew it off.

D.Dimon Dep., pp.100-01, attached as Exhibit R. Consistent with his testimony, Mr. Dimon did not take any action at that time upon learning that the final annuity payment would be on May 5, 2003.

Response 7

Plaintiff was not aware of the dispute over the term of the annuity in 1983. The Plaintiff disputes that Mr. Dimon became aware n 1999 of any contrary language regarding the annuity that Mr. Dimon received in 1983. Plaintiff could not make out who the correspondence was from as MetLife was not identified on the copy of the letter received by the Dimons. Mr. and Mrs. Dimon had not been informed

by any party to this litigation, including Mr. Latti or Kemper that there was a problem with the annuity and that it would be shorter than what was agreed to by Juge Pettine of the Federal District Court of Rhode Island. Mr. Dimon did not know who the letter was from and was certain that the letter was mistaken as he appeared at the hearing in from of Judge Petine in 1983 to discuss the settlement agreement which did provide for monies to be paid to him for the rest of his life. Mr. Dimon was not made aware of the discontinuance of his for life annuity until the final payment on May 5, 2003.

8. When Mr. Dimon did not receive an annuity payment in June of 2003 his wife contacted MetLife. K. Dimon Dep., pp. 36, attached as <u>Exhibit O</u>. In response, MetLife sent a letter confirming its position that the annuity had been for 20 years and the final payment was made on May 5, 2003. June 9, 2003 letter from Sandy Franklin to Dennis Dimon, attached as <u>Exhibit S</u>. Thereafter, Mr. Dimon sought legal advice and filed current lawsuit May 23, 2005.

Response 8

Mr. Dimon also contacted Carolyn Latti of Latti and Anderson looking for Mr. Latti. Mr. Dimon was informed that Latti and Anderson no longer had his file and could do nothing for him regarding his case. Mr. Dimon did seek legal advice after the discontinuance of his for life annuity.

9. During the 20 years between the settlement of the Jenny C. case and MetLife ceasing payments to Mr. Dimon in June of 2003, Mr. Dimon and his family contacted Latti Associates only once. <u>See</u> D. Dimon Dep., pp. 153-55, attached as <u>Exhibit R</u>.

Response 9

Mr. Dimon does not dispute that he contacted Latti and Associates only one time during the period of 1983-2003 because he thought there was no problem with his annuity.

Plaintiff,
By his attorney,


  /s/ Brian Keane_____
BRIAN KEANE, BBO #656717
The Kaplan/Bond Group
88 Black Falcon Avenue, Ste. 301
Boston, MA 02210
(617) 261-0080

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSE'ITS (BOSTON)

| | |
|---|---|
| **DENNIS DIMON,** | ) |
| **Plaintiff,** | ) |
| | ) |
| **VS.** | ) |
| | )    **C. A. NO: 05-1 1073 MEL** |
| **METROPOLITAN LIFE INSURANCE** | ) |
| **COMPANY, KEMPER INSURANCE** | ) |
| **COMPANY, MORGAN STANLEY DW, INC.,** | ) |
| **MICHAEL B. LATTI, LATTI ASSOCIATES,** | ) |
| **and LATLT & ANDERSON LLP,** | ) |
| **Defendants.** | ) |

### PLAINTIFF'S RESPONSE TO THE DEFENDANT, KEMPER INSURANCE COMPANY'S STATEMENT OF UNDISPUTED MATERIAL FACTS

1. In January 1981, Plaintiff was injured while serving as a crew member of the Jenny C. Inc. & Plaintiff's Complaint ("Compl.") at ¶10 (attached to supporting Memorandum of Law as Exhibit A).

Response 1.

    Plaintiff does not contest this fact.

2. Plaintiff subsequently commenced a personal injury lawsuit styled <u>Dennis Jay Dimon v. Jenny C.. Inc</u>, No. 81-0063, in the United States District Court for the District of Rhode Island (the "Underlying Action"). <u>See</u> Transcript of Guardian Ad Litem Hearing ("Guardian Hrg.*")* (attached to supporting Memorandum of Law as Exhibit B).

Response 2.

    Plaintiff does not contest this fact.

3. As his legal counsel in the Underlying Action, Plaintiff retained and was represented by the law firm of Latti Associates. <u>See</u> Compl. at ¶ 12; Deposition Transcript of-Michael B. Latti ('Latti Dep.") at 24:23-25:14, 26:16-18, 31:7-22 (attached to supporting Memorandum of Law as Exhibit C). Michael Latti, Esq. ('Mr. Latti") of Latti Associates, and Roger Hughes, Esq. ("Mr. Hughes"), formerly of Latti Associates, acted as Plaintiff's lawyers in the Underlying Action. <u>See</u> Latti Dep. at 24:23-25:14. (Latti Associates, Mr. Latti, and Mr. Hughes are referred to collectively herein as "Plaintiff's lawyers.")

Response 3.
    Plaintiff does not contest the fact that he was represented by Latti and Associates, including Michael B. Latti and Roger Hughes. Plaintiff does contend that Joseph Flannery was also a lawyer at the time of the initial trial in this matter.

4.  The Underlying Action ultimately proceeded to trial, where Plaintiff was awarded a verdict in the amount of $710,000. <u>See</u> Compl. at ¶ 11.

Response 4.

   Plaintiff does not contest this fact.

5.  Following the verdict in the Underlying Action, Plaintiff's lawyers agreed to a settlement of the Underlying Action with the defendant, the defendant's primary insurer, and Kemper, which was the defendant's excess insurer. <u>See</u> Guardian Hrg. at 1:20-23, 9:3-14; Deposition Transcript of William Mensie ("Mensie Dep.") at ex. 5 (attached to supporting Memorandum of Law as Exhibit D).

Response 5.

   Plaintiff does not contest this fact.

6.  The terms of the settlement agreement were negotiated with Plaintiff's lawyers in April, 1983. <u>See</u> Guardian Hrg. at 7:ll-8:14,13:14-14:20,16:19-23;Mensie Dep. at ex. 5.

Response 6.

   Plaintiff does not contest this fact.

7.  The settlement agreement provided that the primary insurer and Kemper would pay to Plaintiff a lump sum in the amount of $250,000. The settlement agreement further provided, upon Plaintiff's lawyers' insistence, that Kemper would pay an additional lump sum in the amount of $175,000 so that Plaintiffs lawyers could purchase an annuity to fund a stream of future periodic payments for Plaintiff. <u>See</u> Guardian Hrg. at 6:19-20, 7:23-8:4; Mensie Dep. at 79:18-80:11 and at ex. 5.

Response 7.

   Plaintiff states that the lump sum was for $425,000 with an agreed upon $175,000 going to purchase and fund an annuity for 20 years certain life thereafter.

8.  Specifically, Plaintiff's lawyers advised that they were able to purchase, for a premium of $l75,000, an annuity that would pay out a stream of periodic payment as follows: $1,450 per month for life, with a 3 % increase compounded annually, and 20 years certain. <u>See</u> Guardian Hrg. at 6:20-23, 7:23-8:4; Mensie Dep. at ex. 5. Plaintiffs lawyers stated that they had obtained this annuity quote from Charter Security Life Insurance Company ("Charter Security Life") through Plaintiff's lawyers' broker, Dean Witter, Inc. ("Dean Witter'). <u>See</u> Latti Dep. at 71:2-11; Mensie Dep. at ex. 6.

Response 8.

   Plaintiff does not contest this fact.

9.  On or about April 19, 1983, Plaintiff signed a "General Release" memorializing the terms of the settlement and the payments due to Plaintiff, specifically, a lump sum payment of $250,000, and $1,450 per month for life, with a 3% increase compounded annually, and 20 years certain. <u>See</u> Mensie Dep. at 220:13-221-9, and at ex. 10.

Response 9.

   Plaintiff does not contest this fact.

10.  The "General "Release" provided that the monthly payments would be paid from a "fully paid annuity contract for [Plaintiff's] benefit with Charter [Security] Life [.]" <u>See</u> Mensie Dep. at ex. 10.

Response 10.

   Plaintiff does not contest this fact.

11.  Plaintiff's lawyers prepared a "settlement sheet" detailing the total amount of the cash payment that Plaintiff would receive following deductions for fees and costs, and also noting that the cost of the annuity was $175,000. <u>See</u> Latti Dep. at ex. 1.

Response 11.

   Plaintiff does not contest this fact.

12.  On or about April 22, 1983, in order to ensure that Plaintiff had a full understanding of the terms of this settlement, the court in the Underlying Action appointed one Leonard DcCof ("Mr. Decof as guardian ad litem for Plaintiff. <u>See</u> Guardian Hrg. at 1:15-18, 2:24-25, 3:3-5.

Response 12.

   Plaintiff does not contest this fact.

13.  On May 3, 1983, Mr. DeCof appeared before the court in the Underlying Action in order to testify as to the background and terms of the settlement. Id. at 1:1,1:6-7, 1:15-2:12, 6:19-23, 7:21-8:25, 13:16-18,14:2-15:9, 16:19-23.

Response 13.

   Plaintiff does not contest this fact.

14.  Mr. Decof testified that the settlement provided, at the insistence of Plaintiff's lawyers, that the defendants would pay Plaintiff's lawyers the sum of $l75,000 so that Plaintiff's lawyers could purchase an annuity of their choice. <u>Id</u>. at 7:ll-8:20. The court approved the settlement. <u>Id</u>. at 2l:9-16.

Response 14.

Plaintiff states that the lump sum was for $425,000 with an agreed upon $175,000 going to purchase and fund an annuity for 20 years certain life thereafter.

15. On or about May 4,1983, an annuity application from Charter Security Life was signed by Kemper. <u>See</u> Mensie Dep. at ex. 2.

Response 15.

    Plaintiff does not contest this fact.

16. The annuity application required an annuity premium in the amount of $175,000. See Mensie Dep. at ex. 2.

Response 16.

    Plaintiff does not contest this fact.

17. As payment for the annuity premium and in settlement of the Underlying Action, Kemper issued check number 250-0-008-585, made payable to Charter Security Life in the amount of $175,000 (the "Settlement Check"), and Kemper's counsel delivered the Settlement Check to Plaintiff's lawyer. <u>See</u> the Settlement Check (attached to supporting Memorandum of Law as Exhibit E); Correspondence to Kemper dated May 3, 1983 (attached to supporting Memorandum of Law as Exhibit F).

Response 17.

    Plaintiff is not aware of the transaction of the check being sent to Mr. Dimon's attorneys and therefore this is disputed

18. On or about June 17, 1983, Charter Security Life signed and issued a single premium deferred annuity contract (the "Annuity"). <u>See</u> Mensie Dep. at ex. 11. The Annuity provides that the "Single Premium payment for this contract was paid in advance." <u>Id</u>. at ex. 11, p. 5.

Response 18.

    Plaintiff does not contest this fact.

19. As the annuity issuer, Charter Security Life became obligated to make the Annuity payments to Plaintiff (i.e., the annuitant). <u>Id</u>. at ex. 11, pp. 1,5.

Response 19.

    Plaintiff does not contest this fact.

20. The Annuity provides that it is a "Lifetime Annuity" and that "[Charter Security Life] will pay a lifetime monthly income to the Annuitant if living on the Annuity Date." <u>Id</u>. at ex. 11,p. 1.

Response 20.

    Plaintiff does not contest this fact.

21. The Annuity also included a "Supplementary Agreement" further specifying that Plaintiff would receive monthly payments of $1,450.45 each, increasing 3% annually, commencing June 6, 1983, for a period of 240 months certain and life thereafter." Id. at ex. 11.

Response 21.

    Plaintiff does not contest this fact.

22. On July 14, 1983 - approximately one month after Charter Security Life issued the Annuity and began making payments to Plaintiff in accordance therewith - Barbara Boehm of Charter Security Life sent correspondence to Kurt Snyder of Dean Witter, claiming that "due to a clerical error the option indicated on the above supplementary contract for [Plaintiff] was incorrectly typed as 240 months certain and life thereafter instead of 240 months only. Enclosed is a new contract…" See Deposition Transcript of Barbara Fasman ("Fasman Dep.") at ex. 3 (attached to supporting Memorandum of Law as Exhibit G).

Response 22.

    Plaintiff does not contest this fact.

23. Mr. Snyder forwarded a copy of this correspondence to John Noe of Kemper, and on August 12, 1983, by correspondence to Robert Foley of Dean Mr. Noe responded to Charter Security Life's attempt to change the terms of the Annuity, as follows:

> "I received the replacement policy issued by Charter Security Life Insurance (New York) changing the terms of the annuity from 240 months certain and life thereafter to 240 months certain only.
>
> I am advised by Mr. Hughes of Lattie [sic] Associates that your quotation was to provide an annuity which would pay $1,450.45 per month for the first year increasing annually at a rate of 3% compounded annually for 240 months certain and life thereafter for a singe premium of $l75,000.00. This was the benefit to be provided under the terms of a general release and settlement agreement approved by Judge Pettine of the United States District Court for the District of Rhode Island.
>
> The agreed upon premium was paid and a policy issued which is now in the files of the contract owner, [Kemper], providing benefits required by the release, settlement agreement and court order. I consider the original annuity contract valid and enforceable and will retain it in our files…

See Fasman Dep. at ex. 4. Mr. Noe sent copies of this correspondence to Plaintiff's lawyer, Mr. Hughes, and to Ms. Boehm at Charter Security Life. Id.

Response 23.

Plaintiff does not contest this fact.

24. On September 26, 1983, Robert Ligouri of Charter Security Life sent correspondence to Mr. Noe, claiming that the Annuity was "incorrectly typed" for "240 month certain and life thereafter...instead of 240 months only", and that "the original supplementary contract". was "null and void." See Fasman Dep. at ex. 5. Plaintiff's lawyer, Mr. Hughes, was sent a copy of this correspondence as well (as was Mr. Foley of Dean Witter). Id.

Response 24.

Plaintiff does not contest this fact.

25. On October 10, 1983, Mr. Noe replied to Mr. Ligouri, and again refused to change the terms of the Annuity. See Fasman Dep. at ex. 6. Specifically, Mr. Noe advised that Kemper "intend[s] to retain the original policy in [its] files and consider[s] it to be valid and enforceable." Id. Mr. Noe also sent a copy of this correspondence to Plaintiff's lawyer Mr.Hughes (as well as to Mr. Foley). Id.

Response 25.

Plaintiff does not contest this fact.

26. On October 14, 1983, Ms. Boehm sent correspondence to Mr. Noe enclosing a "corrected" supplementary agreement to "reflect monthly payments for a period of 240 months only." See Fasman Dep. at Ex. 8. By reply correspondence, Mr. Noe again refused to change the terms of the Annuity and stated as follows:

> In response to your October 14, 1983 I reject and return herewith the Supplementary Agreement and General Provisions attached thereto. The original annuity policy will be retained in the files of [Kemper] and considered valid and enforceable."

See Fasman Dep. Ex. 7. Kemper also sent a copy of this correspondence to Plaintiff's lawyer, Mr. Hughes (as well as to Mr. Foley). Id.

Response 26.

Plaintiff does not contest this fact.

27. In 1983, Plaintiff himself had no contact whatsoever with Kemper. See Deposition Transcript of Dennis J. Dimon ("Dimon Dep.") at 1l7:20-ll8:ll (attached to supporting Memorandum of Law as Exibbit H). Of the parties to the

instant lawsuit, the only parties with which Plaintiff had any contact in 1983 were Plaintiff's lawyers. Id.[1]

Response 27.

At the time of the settlement negotiations in 1983 Plaintiff was represented by counsel. His counsel was in contact with all parties to the settlement negotiation.

28. On May 23, 2005, Plaintiff filed the instant lawsuit, naming as defendants Mr. Latti, Latti Associates, Latti & Anderson LLP, Metropolitan Life, Morgan Stanley, and Kemper. See Compl.

Response 28.

The plaintiff does not contest this fact.

29. Kemper did not receive any communications from Plaintiff, Plaintiff's lawyers, Metropolitan Life, or any other person or entity, relating to the Annuity, from 1983 until the filing of this lawsuit on May 23,2005.

Response 29.

Prior to the violation of the settlement negotiations Plaintiff was not required to inform any of the parties of appending or potential lawsuit. The only parties aware of the violation were all Defendants.

30. Plaintiff alleges Breach of Contact against Kemper (Count Twelve). Id. Specifically, the Complaint avers that "[Kemper] was to provide a lifetime annuity guaranteed for twenty (20) years... but breached this contract by altering the terms of the agreement after the contract was signed and approved by the court and for failing to perform the contract." Id. at ¶¶ 72, 73.

Response 30.

Plaintiff does not contest this fact.

31. Plaintiff also alleges Negligent Misrepresentation against Kemper (Count Thirteen). Id. Specifically, the Complaint avers that "[Kemper] negligently misrepresented the terms of contract, stating that the contract was for life, guaranteed for twenty years," and that Plaintiff "relied on the representation of counsel and [Kemper] as manifested in the original contract approved by the court and suffered financial losses as a result of [Kemper's] negligent misrepresentation in altering the contract." Id. at ¶¶ 77, 78.

Response 31.

Plaintiff does not contest this fact.

32. On November 22, 2006, Plaintiff proffered an expert report in this matter which purports to allocate liability among the defendants. See Plaintiff's proffered Expert Report ("Plaintiffs Expert Report") (attached to supporting Memorandum of Law as Exhibit I). Plaintiff's Expert Report does not reference Kemper. See Id. Plaintiff's Expert Report asserts that the alleged breach of the Annuity occurred in 1983. Id. at p. 7.

Response 32.

Plaintiff's proffered expert was with regard to the legal malpractice in this matter and was solely based upon the alleged negligence of the Latti Associates. With regard to Kemper's negligence and breaches, they were required and had a duty to inform the Court of the attempted changes being made to the Court ordered Settlement Agreement in this matter.

Respectfully submitted,

   /s/ Brian Keane
BRIAN KEANE, BBO #656717
The Kaplan/Bond Group
88 Black Falcon Avenue, Ste. 301
Boston, MA 02210
                                                    (617)
261-0080

Dated: February 5, 2007