UNITES STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DENNIS DIMON,<br>Plaintiff,<br><br>vs.<br><br>METROPOLITAN LIFE<br>INSURANCE COMPANY, KEMPER<br>INSURANCE COMPANY,<br>MORGAN STANLEY DW, INC., and<br>MICHAEL B. LATTI, LATTI<br>ASSOCIATES, LATTI & ANDERSON<br>LLP,<br>      Defendants. | CIVIL ACTION NO. 05-11073 NG |

**PLAINTIFF, DENNIS DIMON'S, FURTHER BRIEFING SUBMITTED PURSUANT TO THE COURT'S SEPTEMBER 26, 2007 ORDER**

KEMPERS RESPONSIBILITY TO DIMON UNDER THE ORIGINAL CONTRACT BETWEEN KEMPER AND THE BOAT OWNER OF THE F/V JENNY C

     The appropriate choice of law when viewing the specific relationship between Jenny C, Inc. ("Jenny C") and Kemper is Rhode Island since, presumably, Jenny C entered into an insurance contract with Kemper in Rhode Island. However, insurance contract law is substantially universal and need not be specifically addressed here.

     Mr. Dimon was injured aboard Jenny C which had a primary insurance contract with The Home Insurance Company. Jenny C also maintained an excess policy on Jenny C with Kemper for events over and above the coverage of the primary insurance. After the jury trial and judgment in the underlying case, it became clear that the primary insurance would not satisfy the judgment or the amounts being discussed to settle the matter prior to post trial motions. As a result, the proceeds of the Kemper excess insurance policy were attached and settlement

1

negotiations subsequently successful in settling the matter within Kemper's excess policy limits. It should be noted that Kemper did not seek a Declaratory Judgment for a decision on whether they were responsible for payment. It is apparent and presumed that Kemper had decided that the incident/injuries were covered by the excess policy and therefore agreed to pay.

"Seamen's releases and settlement agreements are governed by principles of federal maritime law." Schoenbaum, 1 Admiralty & Mar. Law § 6-17 (4th ed. West (current through the 2007 update)) *citing to* Borne v. A & P Boat Rentals No. 4, Inc., 780 F.2d 1254, 1256 (5th Cir. 1986) ("Because Borne alleged causes of action under general maritime law and the Jones Act, federal law governs his challenge of the validity or enforceability of his settlement agreement with [the vessel owner]"). Therefore, the relationship between Jenny C, Kemper and ultimately Mr. Dimon, is subject only to the federal Admiralty Law where no one state's law shall abrogate. Mr. Dimon was a member of the crew of the F/V JENNY C and was hurt aboard the vessel. Mr. Dimon settled his claims with Jenny C, at which point, Kemper's obligation to indemnify was triggered. Kemper required Mr. Dimon's release of their assured to protect Jenny C's interests. Since Mr. Dimon is a seaman, his release is a *de facto* Seaman's Release. Without rehashing our previous motions, it has been held that, "[l]egislation for the benefit of seamen is to be construed liberally in their favor." *See* Doyle v. Huntress, 419 F.3d 3 (1st Cir. 2005) *quoting* McMahon v. United States, 342 U.S. 25, 27 (1951), *see also* Isbrandtsen Co. v. Johnson, 343 U.S. 779, 782 (1952) ("Whenever congressional legislation in aid of seamen has been considered here since 1872, the Court has emphasized that such legislation is largely remedial and calls for liberal interpretation in favor of the seamen.").

KEMPER'S DUTIES WERE NOT DISCHARGED BY ISSUING THE $175,000 CHECK

When Kemper negotiated a settlement with Mr. Dimon following the Jury Trial they entered into a contract with a seaman. Though Dimon will not here "re-hash" the wardship background given in its prior motions, it is important for the briefing requested here to point out that "[t]he wardship theory has, as was recognized by the courts below, marked consequence on the treatment given seamen's releases. Such releases are subject to [the] careful scrutiny [of this court]." Garrett v. Moore-McCormack Co., 317 U.S. 239, 247-248 (1942).

The settlement to be scrutinized here is a seaman's release which required that Mr. Dimon release Jenny C, Kemper's assured, of any future liability. Pursuant to this contract, Kemper was required to pay a lump sum of $425,000.00 broken down into a cash payment of $250,000.00 and a lifetime annuity to be acquired with the remaining $175,000.00. This agreement between the parties was represented to Judge Pettine of the Rhode Island District Court by Leonard DeCoff a Guardian Ad Litem appointed by Judge Pettine[1]. At the Guardian Ad Litem hearing, the interests of Kemper were represented by Attorney Jerome B. Spunt.

The annuity agreed upon by the parties was for life, twenty years certain. Kemper argues that they were only required to "establish" this annuity. Black's Law Dictionary defines establish as, *vb*. 1. To settle, make, or fix firmly; to enact permanently. Black's Law Dictionary (8th ed. 2004), establish.

If Kemper had permanently "established" an annuity for life, Mr. Dimon would not be in the position he now finds himself. A brief present-day survey of the express terms of the release reveals that Kemper has not upheld its end of the bargain whereby it was to provide two things specifically: 1) cash; and 2) a life annuity. Mr. Dimon, on the other hand, did uphold his end

---

[1] Judge Pettine was concerned that Mr. Dimon was not capable of understanding the terms of the settlement and took the extra step of appointing a Guardian Ad Litem to protect the interest of Mr. Dimon.

3

whereby he released Jenny C from all liability in consideration therefore.  As stated by the U.S. Supreme Court:

> The analogy suggested by Justice Story . . . between seamen's contracts and those of fiduciaries and beneficiaries remains, under the prevailing rule treating seamen as wards of admiralty, a close one.  Whether the transaction under consideration is a contract, sale, or gift between guardian and ward or between trustee and cestui, the burden of proving its validity is on the fiduciary.  He must affirmatively show that no advantage has been taken; and his burden is particularly heavy where there has been inadequacy of consideration."  Garrett, 317 U.S. at 247 *referring to* Harden v. Gordon, 2 Mason 541, 11 F.Cas. 480 and 485 (C.C.Me. 1823).

Where Dimon's surrender of his claims against Jenny C. were described to him as a "trade" or in consideration of receiving the two items listed *supra*, it would be illogical to say that the consideration given by Dimon would be adequate for either 240 months (20 years) or 596.4 months (life) of payments.

Furthermore, Kemper was represented by counsel at the Guardian Ad Litem hearing where a Federal Judge "stamped his approval" on the agreement.  Kemper knew that the proffered changes to the agreement would materially alter their contract with Mr. Dimon and the understanding of the court.  Kemper after entering into a Seaman's Release with Mr. Dimon, had the duty to seek the intervention of Judge Pettine when they became aware of the changes.  They can not throw up their hands in 1983 and hope it all works out in 2003.  This can not be more evident then by the ability of the defendants in this matter to hide behind the Statute of Limitations issue.  Kemper did nothing in 1983 then raised the Statute of Limitations after the triggering event (twenty years only) occurred.

CONTRACTUAL RELATIONSHIPS BETWEEN:

Kemper and Jenny C

The relationship that exists between Kemper and Jenny C is that of insurer and insured. The insurance relationship is primarily one of contract with the insurance policy the principal source of the parties obligations. Insurers such as Kemper have two distinct duties: 1) the duty to "pay on behalf of" the policy holder all sums the insured becomes "legally obligated to pay as damages" because of injury or damage to which the insurance applies. This is commonly referred to as the duty to indemnify; and 2) the duty to defend. Although the record is not clear it appears Kemper did not participate in the defense of Jenny C but certainly indemnified Jenny C for what Jenny C was "legally obligated to pay as damages."

Each party to the insurance contract has delineated duties to which they must comply. It is undisputed that Jenny C complied with its duties. What is in dispute is the behavior of Kemper as indemnifior for Jenny C.

Kemper is the excess insurer of Jenny C. Attorney Jerome B. Spunt, as excess insurance counsel for Kemper, negotiated the settlement on behalf of Jenny C and entered into a seaman's release for the terms agreed upon by the parties.

Kemper and Metlife

Kemper and Metlife entered into an agreement to provide a life annuity for the benefit of Mr. Dimon. Metlife was the Annuity Company and Kemper was the Applicant and provider of funds for the 20 year certain and life thereafter annuity which was agreed upon by the parties prior to Mr. Dimon releasing his rights against Jenny C. Kemper, pursuant to their seaman's

release with Mr. Dimon, was supposed to provide a fully paid life annuity whereby Metlife was supposed to pay Dimon for the term of his life with twenty years certain.

Dimon is not a third-party beneficiary *per se* of the Kemper-Metlife contract

"Construction of an insurance contract is generally a question of law." See <u>Foisy v. Royal Maccabees Life Ins. Co.</u>, 356 F.3d 141, 147 (1st Cir. 2004) *citing to* <u>Ruggerio Ambulance Serv. v. Nat'l Grange Mut. Ins. Co.</u>, 430 Mass. 794, 797, 724 N.E.2d 295, 298 (2000). The life annuity contract at issue establishes that Dimon is not a third-party beneficiary *per se*. On the Application, Dimon signed as and is named "Annuitant," his wife and two daughters are named as primary and contingent beneficiaries (respectively), and Kemper signed as and is named "Applicant."

Therefore, as to the Metlife-Kemper life annuity contract, Dimon is a "creditor beneficiary":

> ***creditor beneficiary***. A third-party beneficiary of a contract who is owed a debt that is to be satisfied by another party's performance under the contract. Black's Law Dictionary (8th ed. 2004), creditor beneficiary.

Where the remainder of what Kemper "owed" Mr. Dimon net of the lump sum payment, establishes Mr. Dimon as a creditor of Kemper and where Kemper contracted with Metlife to pay that debt, Mr. Dimon became a creditor beneficiary of the Kemper-Metlife life annuity contract.

According to Professor Corbin, "If the promisee in a contract contemplates the present or future existence of a duty or liability to a third party and enters into the contract with the expressed intent that the performance contracted for is to satisfy and discharge that duty or liability, the third party is a creditor beneficiary" and they are entitled to enforce the contract. *See* <u>Choate, Hall & Stewart v. SCA Services, Inc.</u>, 378 Mass. 535, 543-544, 392 N.E.2d 1045, 1050 (1979) *quoting* 4 Corbin, <u>Contracts</u> § 787 at 95 (1951). "Because of the inherent justness

6

of permitting the third party creditor beneficiary to sue either the promisor or the promisee, the courts long ago instinctively recognized the creditor's interest in the promise at the heart of a creditor beneficiary contract." 13 Williston on Contracts § 37:7 (4th ed.).

"One simple illustration rather neatly distinguishes between and identifies each category of third party beneficiary. Suppose that Brown conveys a ranch to Smith for $15,000 to be paid as follows: $5,000 to Brown's wife as a token of Brown's affection for her, $5,000 to Jones to whom Brown is indebted in that amount, and $5,000 to a life insurance company to purchase an annuity payable to Brown during his life. Mrs. Brown is a donee beneficiary; Jones is a creditor beneficiary; and the life insurance company is an incidental beneficiary." Id. Under Williston's illustration Metlife (the insurance co.) is an incidental beneficiary to the Dimon-Kemper release and, according to Corbin *supra*, Dimon as annuitant is a creditor beneficiary to the Kemper-Metlife agreement.

DIMON WAS PERMITTED TO WAIT UNTIL ACTUAL BREACH BEFORE FILING SUIT AND WAS NOT REQUIRED TO FILE UPON IMPUTED INFORMATION OF AN ANTICIPATORY BREACH

Where "one party to a contract cannot by himself rescind it . . ." (Roehm v. Horst, 178 U.S. 1, 13 (1900)) it also holds true that mere threats or words of breach do not, under the facts of our case, make it a breach. It may be said that a breach is like a balloon, it is either popped or not – it can never be constructively popped.

An anticipatory repudiation stems from the words or conduct of the promisor **unequivocally** indicating that he cannot or will not perform when the time comes. The four Metlife letters stating that the corpus of the annuity had changed from life to twenty years certain

is arguably an unequivocal indication that the "life" annuity will not be performed for life. This court appears to have correctly applied the precept that Metlife's unequivocal notice of its repudiation to Latti was imputed to Dimon. As such, this is a case of an anticipatory repudiation, where the nonrepudiating party, Dimon, had four alternatives:

1. Treat the anticipatory repudiation as a total repudiation and sue immediately;
2. Suspend performance and wait to sue until the performance date;
3. Treat the repudiation as an offer to rescind and treat the contract as discharged; or
4. Ignore the repudiation and urge the promisor to perform.

The U.S. Supreme Court has spoken on this issue and stated that:

> Its real operation appears to be to give the promisee the right of electing either to treat the declaration as *brutum fulmen* [empty thunder], and, holding fast to the contract, to wait till the time for its performance has arrived, or to act upon it and treat it as a final assertion by the promisor that he is no longer bound by the contract, and a wrongful renunciation of the contractual relation into which he has entered. But such declaration only becomes a wrongful act if the promisee elects to treat it as such. If he does so elect, it becomes a breach of contract, and he can recover upon it as such.

Roehm v. Horst, 178 U.S. 1, (1900) *see also* Central Trust Co. of Illinois v. Chicago Auditorium Ass'n, 240 U.S. 581, 589 (1916) ("It is no longer open to question . . . that, as a rule, where a party bound by an executory contract repudiates his obligations or disables himself from performing them before the time for performance, the promisee has *the option* to treat the contract as ended, so far as further performance is concerned, and maintain an action at once for the damages occasioned by such anticipatory breach.") (emphasis added) *and* Renner Co. v. McNeff Bros., 102 F.2d 664, 666 (6th Cir. 1939) ("Appellant therefore had an option either to sue immediately or to wait for the time set for performance.") *citing to* Roehm 178 U.S. at 10.

      Of the four alternatives, Dimon could not avail himself of 1, 3 or 4 because his "imputed" knowledge was not actual. As such, Dimon's only available option (no. 2) was to wait for actual breach to occur and only then seek redress of his damages.

CHOICE OF LAW ON THE DIMON-KEMPER-METLIFE CONTRACT

In addition to the U.S. Supreme Court authority set forth in Roehm, *supra*, New York and Rhode Island recognize that the same choices are available to a promisee where an anticipatory repudiation/breach has occurred.

Massachusetts

"Although the doctrine of anticipatory breach, so-called, is widely accepted, it is clear that Massachusetts is among the small minority of jurisdictions which will not entertain an action for damages for the anticipatory breach of a contract." J. K. Welding Co. v. W. J. Halloran Steel Erection Co., 178 F.Supp. 584, 589 (D.C.R.I. 1959) *citing to* Porter v. Supreme Council American Legion of Honor, 183 Mass. 326, 67 N.E. 238, 239 (1903) (held: 'We regard it as settled in this commonwealth that where a contract is to be performed at a certain time, or on the happening of a certain event, a declaration by one party that he will not perform it when the time comes does not give a present right of action.').

New York

Under New York law, "[w]hen confronted with an anticipatory repudiation, the non-repudiating party has two mutually exclusive options. He may (a) elect to treat the repudiation as an anticipatory breach and seek damages for breach of contract, thereby terminating the contractual relation between the parties, or (b) he may continue to treat the contract as valid and await the designated time for performance before bringing suit." Lucente v. International Business Machines Corp., 310 F.3d 243, 258 (2d Cir. 2002) *citing to* Inter-Power of New York, Inc. v. Niagara Mohawk Power Corp., 259 A.D.2d 932, 686 N.Y.S.2d 911, 913 (3d Dep't 1999);

Rachmani Corp. v. 9 East 96th Street Apartment Corp., 211 A.D.2d 262, 629 N.Y.S.2d 382, 384 (1st Dep't 1995); *see also* Apex Pool Equipment Corp. v. Lee, 419 F.2d 556, 562 (2d Cir. 1969).

Rhode Island

     Rhode Island also recognizes the doctrine of anticipatory breach set forth by the U.S. Supreme Court in cases such as Roehm and Central Trust Co. of Illinois. *See* Eagle Cornice Co., Inc. v. Mast Const., Inc., **(**Not Reported in A.2d), 1987 WL 859854 (R.I.Super., 1987) *citing to* J. K. Welding Co., 178 F.Supp. at 589-590, *supra*.

Respectfully submitted,

 /s/Brian Keane_____
DAVID B. KAPLAN, B.B.O. No. 258540
BRIAN KEANE, B.B.O. No. 656717
THE KAPLAN/BOND GROUP
88 Black Falcon Avenue, Suite 301
Boston, MA 02210
(617) 261-0080

Dated: October 15, 2007

> I hereby certify that a true copy of the above document was served upon each attorney of record by ECF on October 15, 2007.
>
>  /s/Brian Keane_____