# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **DENNIS DIMON,** | ) |
| | ) |
|        **Plaintiff,** | ) |
| | ) |
| VS. | ) |
| | )    **C. A. No:  05-11073 NG** |
| **METROPOLITAN LIFE** | ) |
| **INSURANCE COMPANY AND** | ) |
| **KEMPER INSURANCE COMPANY,** | ) |
| | ) |
|        **Defendants.** | ) |

### METROPOLITAN LIFE INSURANCE COMPANY'S
### TRIAL BRIEF

Defendant Metropolitan Life Insurance Company (hereinafter "MetLife"),

pursuant to Local Rule 16.5(F), submits its Trial Brief.

MetLife has no liability to Dennis Dimon (hereinafter "Mr. Dimon").  It paid, and

Mr. Dimon received, 240 monthly payments per the terms of the Supplementary

Agreement that Dean Witter Reynolds negotiated on behalf of Mr. Dimon (by his former

counsel) and American Motorists Life Insurance Company (now Kemper Insurance

Company) paid for.  MetLife is not obligated to make any additional payments as neither

Mr. Dimon nor Kemper Insurance Company (hereinafter "Kemper") applied or paid for

anything other then a 20-year certain Annuity.

Additionally, Mr. Dimon faces insurmountable evidentiary issues that render his

case suspect.  No party has presented an admissible, complete document that could

reasonably purport to be a contract upon which Mr. Dimon could rely for his claim

against MetLife for breach of contract.  More troubling from an evidentiary perspective is

that Mr. Dimon cannot prove damages against MetLife.  He has presented no expert

testimony regarding life expectancy nor has he identified any table or credible source

document that could provide the jury with a current life expectancy estimate for him.  He

cannot be awarded compensation for lifetime payments when there is no valid estimate of

what his "lifetime" might be.  Mr. Dimon has also failed to secure any witness or

document that would prove what the replacement cost of a lifetime annuity would be for

a person of his age with the terms that he and Kemper agreed to in the General Release

(hereinafter "Seaman's Release").

## I.    INTRODUCTION

In 2005, 22 years after the events that gave rise to this suit, Mr. Dimon sued

Defendants upon theories of professional malpractice, breach of contract, negligent

misrepresentation, negligence and breach of fiduciary duties.  The remaining claim

against MetLife sounds in contract, specifically Mr. Dimon asserts that MetLife breached

an alleged Annuity Contract that provided him with payments that were guarantied for 20

years, and for his lifetime thereafter.   There is no evidence at all that MetLife and Mr.

Dimon entered into any contract.  Further, MetLife complied with the only document that

can be found a contract, the Supplementary Agreement, and paid Mr. Dimon over

$467,000.  In total, Mr. Dimon received over $717,000.00 in compensation from Kemper

and MetLife combined. Thus, the remaining claim is really a claim for misrepresentation

regarding the term of years, and should already have been dismissed based upon the

Statute of Repose and Statute of Limitations.  Mr. Dimon's Complaint alleges that "[t]he

plaintiff and the defendant entered into a contract whereby the defendant was to provide a

lifetime annuity guaranteed for twenty (20) years…."  Complaint at 10, ¶64.  No contract

was ever entered into between Mr. Dimon and MetLife.  Mr. Dimon's claim must fail as a matter of law as he has never presented any evidence that such a contract existed.

The alleged 20 year, life thereafter Annuity is part of the relief Mr. Dimon asserts he is entitled to under a Seaman's Release (hereinafter "Seaman's Release") he signed. There has been no evidence presented by any party that MetLife, or its predecessor Charter Security Life Insurance Company (New York) (hereinafter "Charter" or "MetLife"), knew of the Seaman's Release or any of the proceedings in the <u>Dimon v. Jenny "C.", Inc.</u> matter when considering the Application submitted by Kemper.   In regards to MetLife's defenses, it is irrelevant as there is no evidence that the information was available to it during the application process and before the clerical error was discovered.

This case must be viewed in terms of spheres of knowledge.  In one sphere you have Mr. Dimon, Kemper, Morgan Stanley and Latti Associates.  In that sphere, all of the information regarding the <u>Dimon v. Jenny "C.", Inc.</u> litigation, settlement and terms of the proposed annuity is known to those parties within the sphere.  In the second sphere, you have Charter.  It is uncontroverted that Charter had no knowledge of the terms agreed to between the players in the first sphere when it received the Application and prior to its discovery of the clerical error.  The only document that Charter had was the Application submitted by Kemper that requested a 20-year Annuity.  This Application complied with the terms of the 20 year certain Annuity Quote Charter provided to Morgan Stanley per the letter from Robert Liguori to John Noe, dated September 26, 1983.  This assertion, made contemporaneously with the events in question, cast serious doubt on the veracity of the document which Mr. Dimon and Kemper have attempted to attribute to MetLife.

## II.   ISSUES TO BE TRIED

The followings issues are some of the major issues to be tried:

1.   Is there a contract at all as no contract has been produced?

No party has produced a complete, authenticated contract that would impose an obligation of lifetime payments on MetLife. In the absence of a contract, MetLife cannot be charged with the alleged obligation of lifetime payments as asserted by Mr. Dimon.

2.   If there is a contract, what were the terms of the contract?

MetLife's position is that it met any obligation it had to Mr. Dimon. Under the terms of the Supplementary Agreement, Mr. Dimon was entitled to payments for 20 years (240 months) and nothing more. He received those payments. Although Mr. Dimon may have desired different terms, there is no evidence supporting the proposition that his desire was ever communicated to MetLife prior to the issuance of the Annuity.

3.   Was there a meeting of the minds such that a contract was formed?

The evidence is clear that Mr. Dimon and Kemper reached a meeting of the minds between themselves as to what type of annuity Mr. Dimon was to receive. However, they never communicated that to MetLife and there was never a meeting of the minds between Kemper and MetLife regarding the terms of the Annuity purchased by Kemper. Because of the lack of an original contract, and because of the ambiguity as to the term of years as to any "reformed" contract, the Court must instruct the jury on the issue of the "meeting of the minds."

4.   What were Kemper's duties under the Seaman's Release?

Kemper's duties under the Seaman's Release were, *inter alia*, to establish an annuity that provided Mr. Dimon, or his beneficiary, with payments for 20 years and for the remainder of his life thereafter. The Annuity applied for by Kemper was a 20-year certain Annuity with no lifetime component. In fact, even before the check was delivered to Latti Associates, Kemper's employee John Noe expressed his doubts regarding the purchase price of $175,000.00 noting that he "checked with two brokers and was unable to come anywhere near this pay-out for $175,000 cost." Kemper Exhibit 2.

5.   Did Kemper breach the Seaman's Release by failing to procure a lifetime Annuity for Mr. Dimon?

Kemper knew that it failed to "establish" the required annuity when its own employee recognized that he was "unable to come anywhere near" the product required by the terms of the Seaman's Release for the purchase price it paid. Although it tried to "wash its hands" after the clerical error was discovered, it had failed its obligations to Mr. Dimon. Those obligations went beyond a blanket denial and rejection of an alleged change to the Annuity, which is what Kemper tried to do in this case.

6.    What were the terms of the Supplementary Agreement purchased for the $175,000.00?

As evidenced by the testimony of Barbara Fasman and Kemper's Exhibit 2, the purchase price paid by Kemper could not have funded an annuity product with lifetime terms. In John Noe's words, for the $175,000 purchase price, he could not "come anywhere near this payout." MetLife's witness confirmed this fact as well. The only logical result is that the purchase price was for a certain period product and not a lifetime product.

7.    If a contract exists, was it breached by MetLife?

Assuming, *arguendo*, that a contract existed, MetLife did not breach it. MetLife was obligated to pay Mr. Dimon 240 payments. That is just what MetLife did. It fulfilled the terms of the contract and did not breach it.

8.    If there was a contract, to whom was the obligation of performance owed?

There is no contract between MetLife and Mr. Dimon. Mr. Dimon was owed 240 monthly payments from MetLife, which were to increase by three percent each year. He received that and, as such, is not entitled to any further compensation from MetLife. Kemper, on the other hand, breached the Seaman's Release and because it stood in the shoes of the Jenny "C.", Inc., Kemper has almost strict liability.

9.    What was the contractual relationship between MetLife and Mr. Dimon, if any?

There was no contractual relationship between Mr. Dimon and MetLife.

10.    If MetLife did breach a contract, when did the breach occur?

Assuming, again *arguendo*, that there was a contract between MetLife and Kemper that provided a lifetime benefit to Mr. Dimon, that contact was breached, if at all, in 1983. Per Attorney Hans Hailey, Mr. Dimon's own

expert, "the breach occurred in 1983." As such, Mr. Dimon's claim is barred by the applicable Statute of Repose and Statute of Limitations periods.

11.    Although styled a breach of contract, was the wrong complained of really a misrepresentation?

Mr. Dimon's claim for breach of contract can best be seen as a misrepresentation. Under Massachusetts law, the label used by a Plaintiff does not control. Mr. Dimon has alleged that MetLife provided a quote for a lifetime Annuity, issued a lifetime Annuity and then changed the term of the Annuity to a 20-year certain product. It was the alleged quote that enticed Mr. Dimon to choose the MetLife product. Therefore, from Mr. Dimon's perspective he was tricked into purchasing a product that was not what it was represented to be. That is a claim of misrepresentation. That misrepresentation is subject to the two year Statute of Repose contained in M.G.L. Ch. 175, §181. Mr. Dimon's remaining claim is barred by application of law.

## III.    TRIAL WITNESSES

MetLife will call the following witness during its case in chief:

1.    Barbara Fasman
C/o James J. Ciapciak, Esq.

2.    Dennis J. Dimon
C/o Brian Keane, Esq.

3.    Michael Latti, Esq.
C/o Jed DeWick, Esq.

4.    William Mensie
C/o Timothy O'Driscoll, Esq.

5.    Hans Hailey, Esq.
C/o Brian Keane, Esq.

MetLife reserves the right to call any witness listed by it, or any other party, in the

Joint Pre-Trial Memorandum as circumstances require and as the evidence develops.

## IV.    EVIDENTIARY ISSUES AT TRIAL

The most important evidentiary issues at trial will be Mr. Dimon's inability to prove damages to any degree of certainty.  He has no expert regarding his life expectancy or the cost of a replacement Annuity.  He has failed to identify any source document or table that could provide a valid or credible estimate of his life expectancy.

Additionally, it is anticipated that the parties will attempt to introduce two documents will be of critical importance at trial, but neither of which are admissible under the Rules of Evidence.

Mr. Dimon will not be able to present any evidence of his damages against MetLife.  Mr. Dimon asserts that he has been damaged by MetLife's alleged breach of a lifetime Annuity.  He will not be able to establish his alleged damages unless he can present evidence of either his current life expectancy or the replacement cost of a similar product.  He has not offered any expert testimony on either of these subjects nor has he identified any documents that could support "lifetime" damages.

The first document that should be excluded is a Proposal by Charter Security Life Insurance Company (New Jersey), not MetLife or its predecessor.  This document is printed on Morgan Stanley stationary.  It is also contradicted by correspondence written in 1983 noting that MetLife's proposal was for a 20-year certain Annuity.  There is no way to authenticate this alleged "Proposal" nor is there a way to attribute it to MetLife.

The second document of importance is the alleged annuity contract.  The document itself is replete with evidentiary problems on its face.  There are missing pages, no indication of who the annuitant was or even who purchased the product.  There is no

witness who can testify where this document was created. This document will be of limited evidentiary value and MetLife will oppose its introduction at trial.

MetLife seeks exclusion of both of the above-noted documents as they cannot be authenticated, are misleading and prejudicial and, with respect to the Charter Security Life Insurance Company (New Jersey) quote, are completely irrelevant.

Also, because no contract has been produced, the parties seek to introduce letters circulated in 1983 regarding the terms of any reformed contract. Each party has objected to the other's letters; either they all may come into evidence or none do.

These, and other, evidentiary issues are more fully addressed in the Motions in *Limine* which are filed contemporaneously with this Trial Brief, which are:

1.    Motion in Limine to Deem Admitted That Dean Witter Reynolds is now Morgan Stanley;

2.    Motion in Limine to Admit Evidence of Annuity Payments made during the Twenty-Year Certain Period;

3.    Motion in Limine to Preclude Transcript of the 1983 Hearing;

4.    Motion in Limine Regarding Dean Witter Reynolds' Quotation;

5.    Motion in Limine to Preclude a Document Purported to be an Annuity Contract;

6.    Motion in Limine to Deem Admitted Dates of Notice to Parties;

7.    Motion in Limine to Deem Admitted that Charter Security Life Insurance Company (New York) is now Metropolitan Life Insurance Company;

8.    Motion in Limine to Deem Admitted that American Motorists Insurance Company is now Kemper Insurance Company;

9.    Motion in Limine to Deem Admitted that Kemper Insurance Company stands in the shoes of Jenny C., Inc.;

10.   Motion in Limine to Preclude Expert Testimony Regarding Damages;

11.    Motion in Limine to Deem Admitted that the Jones Act Applies Only to Kemper Insurance Company;

12.    Motion in Limine to Preclude Evidence or Testimony of Intentional or Knowing Misrepresentation;

13.    Motion in Limine to Limit or Offset Any Damages Award;

14.    Motion in Limine to Preclude Testimony at Trial from John L. Noe;

15.    Motion in Limine to Preclude the New York Times Articles Identified by Plaintiff in the Joint Pretrial Brief;

16.    Motion in Limine to Preclude Evidence of Dennis Dimon's 1981 Incident;

17.    Motion in Limine to Preclude Evidence of Cost of a Replacement Annuity;

18.    Motion In Limine to Preclude Kemper's Late Identification of Trial Witnesses and Trial Exhibits;

19.    Motion in Limine to Amend to Add Jenny C., Inc. if Kemper's Damages are Limited;

20.    Motion in Limine to Deem Admitted That It Was Not a Party and Had No Involvement with the 1983 Action; and

21.    Motion in Limine to Preclude Testimony from Mensie on Which he Asserted Lack of Knowledge or Memory

22.    Motion in Limine Precluding Handwriting Testimony;

23.    Motion in Limine Regarding Morgan Stanley and Latti;

24.    Motion in Limine to Preclude Inadmissible Documents;

25.    Motion in Limine to Preclude Evidence of Damages Against MetLife.

MetLife reserves the right to assert additional Motions in Limine as the evidence is produced.

## V.     STATEMENT TO BE READ TO JURY

MetLife requests that the following statement be read to the Jury prior to presentation of evidence:

Dennis Dimon is a commercial fisherman who lives and works in Rhode Island. He was injured while working on a fishing boat called the Jenny "C." in 1981.  Mr. Dimon sued the owner of the boat for compensation for his injuries.  He was represented in that case by a law firm called Latti Associates.

Kemper Insurance Company was one of the insurance companies that insured the Jenny "C." owners in the event that they were sued, as in the case of Mr. Dimon. Kemper and another insurance company who is not a party to this case were responsible for paying any compensation that was owed to Mr. Dimon.

Mr. Dimon settled his case for a lump sum payment of cash and certain payments over time using a financial product called an annuity.  An annuity is the terms for an agreement for payments over time, in this case monthly payments, for a specific time period.

The terms of the Annuity agreed to between Mr. Dimon, Kemper Insurance Company and Latti Associates were that Mr. Dimon or his estate would receive monthly payments for 20 years guarantied (whether he was living or not), and then for the rest of his life.  Latti Associates contacted Dean Witter Reynolds, a brokerage firm, to see what terms could be obtained for the available funds.

An insurance company named Charter Security Life Insurance Company (New York) submitted a quote in response to Dean Witter Reynolds' request.  The terms of the Annuity applied for and issued are in dispute between the parties.  Charter (New York)

was not involved in or a party to the Dimon v. Jenny "C.", Inc. suit.  Charter committed a

clerical error in a document called a "Supplementary Agreement" but immediately

corrected that error and informed all involved parties of the correction.  The dispute

regarding the corrected annuity was not resolved at that time.  Charter, as it had agreed to

do, made monthly payments to Mr. Dimon until May, 2003, when it made the final

payment.

## VI.    TRIAL EXHIBITS

a.  A copy of correspondence, dated July 14, 1983, from Barbara Boehm to Mr. Kurt Snyder;

b.  A copy of correspondence, dated August 12, 1983, from John L. Noe to Mr. Robert A. Foley;

c.  A copy of correspondence, dated September 26, 1983, from Robert Liguori to Mr. John L. Noe;

d.  A copy of correspondence, dated October 10, 1983, from John L. Noe to Robert Liguori;

e.  A copy of correspondence, dated October 14, 1983, from Barbara Boehm to Mr. John Noe;

f.  A copy of correspondence, dated October 12, 1983, from John L. Noe to Ms. Barbara Boehm;

g.  A copy of an annuity application signed by John L. Noe and Dennis Dimon on or about May 4, 1983;

h.  A copy of the Supplementary Agreement issued by Charter Security Life Insurance Company to Dennis Dimon indicating a "240 Month" Term;

i.  A copy of correspondence, dated September 24, 1999, from Teresa Thorp to Dennis Dimon;

j.  A copy of correspondence, dated July 9, 2003, from Sandy Franklin to Dennis Dimon; and

k.  A copy of an additional correspondence, dated July 9, 2003, from Sandy Franklin to Dennis Dimon.

l.   Any pleadings filed in the present case, deposition testimony from any witness as well as admissions or statements of counsel in open Court.

## VII.   CONCLUSION

MetLife has no further liability to Mr. Dimon.  It paid him 240 months of payments, which is all that it was obligated to do.  It did not breach a contract with Mr. Dimon.  However, if a jury somehow finds that MetLife breached the Supplementary Agreement contract, then it is entitled to indemnification and/or contribution from Morgan Stanley, the Latti Defendants and/or Kemper.

Defendant,
METROPOLITAN LIFE INSURANCE
COMPANY
By its Attorneys,


_____/s/ James J. Ciapciak_____
James J. Ciapciak, BBO # 552328
Peter LeBlanc, BBO # 645305
CIAPCIAK & ASSOCIATES, P.C.
99 Access Road
Norwood, MA 02062
Tel: (781) 255-7401
Fax: (781) 255-7402


## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing document was filed via the ECF system and will be served electronically through that system upon Counsel of Record on May 13, 2008.

_/s/ James J. Ciapciak_____
James J. Ciapciak