UNITES STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                        )
DENNIS DIMON,                           )
Plaintiff,                              )
                                        )
vs.                                     )    CIVIL ACTION NO. 05-11073 NG
                                        )
METROPOLITAN LIFE                       )
INSURANCE COMPANY and KEMPER            )
INSURANCE COMPANY,                      )
                                        )
        Defendants.                     )
_____)

**PLAINTIFF, DENNIS DIMON, AND DEFENDANT, KEMPER INSURANCE
COMPANY'S, JOINT OPPOSITION TO METROPOLITAN LIFE INSURANCE
COMAPANY'S MOTION IN LIMINE (DOCUMENT 136) REGARDING THE DEAN
WITTER REYNOLDS QUOTATION**

Dimon and Kemper Insurance Company ("Kemper") jointly oppose Metropolitan Life

Insurance Company's ("MetLife") Motions in Limine, <u>Document No. 136</u> seeking to exclude the

"Dean Witter Reynolds Quotation" **and** <u>Documents No. 135, 137, and 139</u>.  The parties offer the

following in support of their opposition:

**<u>BRIEF INTRODUCTION</u>**

As argued *infra*, the Charter Security Life Proposal ("Proposal") satisfies the Best

Evidence Rule, the test for authenticity, and is exempt from the hearsay rule.

Therefore:

1.  the Proposal should be admitted into evidence; and

2.  the Defendant's Motion in Limine should be denied.

## FACTUAL BACKGROUND

On April 8, 1983, Charter Life presented the Proposal to Mr. Dimon's lawyers (through broker Dean Witter) for a "life annuity 20-year certain under a structured annuity settlement of $1,450.45 per month for the first year and it would increase 3% per year as follows. . ." (Document 136-2 at 2)  The Proposal then sets forth the resulting monthly payments over fifty years time.  *See* id.

Within a week of receiving the Proposal, Plaintiff's lawyers held settlement discussions with Kemper, which discussions were recounted in a memorandum dated April 18, 1983.  *See* April 18, 1983 Memorandum.  During these settlement discussions, Plaintiff's lawyers advised Kemper that they had secured from Charter Life a $175,000 premium quote for an annuity that would provide the exact payments set forth in the Proposal (i.e., $1,450.45 per month, increasing 3% annually, guaranteed for 20 years and then for life).  *See* April 18, 1983 Memorandum.

On April 19, 1983, Plaintiff signed a General Release, which provided as follows: "[Plaintiff]…, in consideration of the payment of Two Hundred Fifty Thousand and No/100 ($250,000.00) Dollars and the establishment of a fully paid annuity contract for my benefit with Charter Life Insurance Company, to pay me One Thousand Four Hundred Fifty and No/100 ($1,450) Dollars per month for one year following the execution of that contract and thereafter, such monthly sum increased at the rate of three (3%) percent per year, compounded annually, to be paid to me during the term of my life, and in no event for less than twenty (20) years…."  *See* General Release.

On May 3, 1983, a hearing was held before the court, during which Leonard DeCof, Esq. (who had been appointed by the court as guardian ad litem for Plaintiff), testified as to the terms of the annuity and the settlement.  Mr. DeCof testified, *inter alia*, that he had reviewed the

general release, the annuity proposal, and the annuity application (among other documents) at length. *See* Hearing Transcript at 4-5. Mr. DeCof testified that the $175,000 lump sum was being used to purchase an annuity that would make the exact payments that are set forth in the Charter Life Proposal (i.e., payments in the amount of "$1,450.45 per month guaranteed for 20 years but which would continue for the life of the plaintiff"). Id. at 6-8.

The $175,000 annuity premium was paid to Charter Life, and on June 17, 1983, Charter Life issued the requisite lifetime annuity ("Annuity") (Document 137-2 at 11). The Annuity provides, *inter alia*, that Charter Life will pay to Plaintiff the exact monthly payments as set forth in the Charter Life Proposal, to wit:  monthly payments in the amount of "$1,450.45 each, increasing 3% annually, commencing June 6, 1983, for a period of 240 months certain and life thereafter." Id. On or about June 6, 1983, Charter Life began making monthly payments to Plaintiff under the Annuity.


## LAW AND ARGUMENT

### Authenticity

Under Fed.R.Evid. 901, "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Under Rule 901, the court's determination of authenticity is merely a preliminary evaluation, and leaves the ultimate decision on genuineness to the jury. United States v. Caldwell, 776 F.2d 989, 1002-3 (11th Cir. 1985).

Clearly, there is no authenticity issue in connection with the Proposal. Fed.R.Evid. 901(b)(8) states in pertinent part that a document is authentic if it is "in such condition as to create no suspicion concerning its authenticity, was in a place where it, if authentic, would likely

be, and which has been in existence twenty years or more at the time it is offered." Fed.R.Evid. 901(b)(8). The Proposal is dated April 8, 1983, and is therefore more than 20 years old. Indeed, Mr. Dimon has testified that he personally received the Proposal from his attorney 25 years ago, has kept it in his personal files ever since – and has relied upon its contents. *See* Dimon's Deposition at 89-90, 157-159, Exhibit A, Mrs. Dimon's Deposition at 42, 86-88, Exhibit B, *and* Latti's deposition at 71 (Document 58-3 at 13).

It should be further emphasized that MetLife's argument that Charter Life did not issue the annuity proposal is extraordinarily far-fetched; the circumstantial evidence that Charter Life issued the proposal is overwhelming. For example, to accept MetLife's argument that Charter Life had nothing to do with the proposal, one would have to accept all of the following:

- Most significantly, MetLife would have the finder of fact believe that Charter Life had nothing to do with the proposal, despite the fact that the proposal mirrors exactly - (i.e., exact amounts *to the penny*, exact percentage increases, exact number of years certain and for life) - the terms of the Annuity that Charter Life actually issued two months later. This strains all credulity.

- That the proposal – although allegedly made by an entirely different company - coincidentally was made through the same broker and sent to the same plaintiff's attorney as were involved with the actual Annuity issued by Charter Life two months later.

- That an entirely different company coincidentally made a proposal for an annuity that has exactly the same terms (i.e., exact amounts *to the penny*, exact percentage increases, exact number of years certain and for life) as the annuity proposal that Mr. Dimon's lawyers told Kemper that Charter Life made, and that not only Dean Witter, but also the

drafters of the General Release and the Guardian ad Litem, all somehow conspired to ascribe the annuity proposal to Charter Life.

Where "identification of physical evidence and its connection to a particular defendant may be shown through either circumstantial or testimonial evidence," the circumstantial evidence offered here is simply overwhelming.  *See* U.S. v. Brewer, 630 F.2d 795, 802 (10th Cir. 1980); *see also* Caldwell, *supra*, 426 F.2d at 1003 (circumstantial evidence, such as date of execution and consistency with contemporaneous documents, more than sufficiently demonstrate authenticity).

MetLife makes much of the fact that the Proposal refers to "Charter Security Life Insurance Company of New Jersey", instead of "Charter Security Life Insurance Company of New York."  However, this distinction is immaterial for at least two reasons:

- First, the law is clear that "[w]hether the contents of the document correctly identify the defendant goes to its weight and is a matter for the trier of fact; it is not relevant to the threshold determination of its admissibility."  U.S. v. Kairys, 782 F.2d 1374, 1379 (7th Cir. 1986) *citing to* U.S. v. Koziy, 728 F.2d 1314, 1322 (11th Cir. 1984); *see also* U.S. v. Demjanjuk, 367 F.3d 623, 631 (6th Cir. 2004).

- Second, and in any event, MetLife has admitted that "MetLife is responsible legally for anything that Charter might have done or didn't do in this case," and therefore cannot now argue that MetLife is not responsible for the alleged actions of a separate subsidiary *of the same corporation* that it bought in its entirety in 1985.  *See* Admission of James J. Ciapciak made during the Rule 30(b)(6) Deposition of MetLife at 20, Exhibit C.  Because Mr. Ciapciak, as counsel for MetLife, is "one authorized to make a statement on the

subject," and because Dimon is "offering the statement against the party that made it," this is an admission of a party opponent pursuant to Fed.R.Evid. 801(d)(2). MetLife cannot now "pass the buck" to a subsidiary that was subsumed in *their* purchase of the Charter Security Life Insurance Companies.

**<u>Hearsay</u>**

The authentication requirements for ancient documents are precisely the same as the requirements for proving they are excepted from the hearsay rule. Therefore, a document authenticated as an ancient document under Rule 901(b)(8) is also automatically excepted from the hearsay rule. *See,* e.g. <u>Martha Graham Sch. And Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.</u>, 380 F.3d 624, 643 (2d Cir. 2004) (two letters accepted as ancient documents and ruled to be excepted from the hearsay rule). "When a document is shown to have been in existence for 20 years or more and has been properly authenticated, Rule 803(16) provides an exception to the hearsay rule for statements contained in the document. Fed.R.Evid. 803(16). The exception is based on the assumption that the age of the ancient document justifies its admission as an exception to the hearsay rule. *See* Moore's Federal Rules Pamphlet, <u>Part 2: Federal Rules of Evidence</u>, § 803.6[16], 822 (2008) *citing to e.g.*, <u>Compton v. Davis Oil Co.</u>, 607 F.Supp. 1221, 1228 (D.Wyo. 1985) *see also* <u>Threadgill v. Armstrong World Industries, Inc.</u>, 928 F.2d 1366*,* 1375 (3rd Cir. 1991), <u>George v. Celotex Corp.</u>, 914 F.2d 26, 30 (2d Cir. 1990), *and* <u>U.S. v. Osyp Firishchak</u>, 468 F.3d 1015, 1021 (7th Cir. 2006).

In addition, the actual statements of Charter Life within the Proposal constitute admissions by party-opponent MetLife under Rule 801(d)(2)(A). Also, such statements are non-

hearsay under Rule 801(c) because, as a proposal, it is an "out-of-court statement offered as evidence of legally operative verbal conduct." <u>See</u> Note to Rule 801(c).

**The Best Evidence Rule**

In the past 25 years people with knowledge have died, pertinent documents have been lost or destroyed in the "9/11" tragedy, and therefore, the best evidence available is the duplicate of the proposal that Dimon has maintained during that same span of time in his possession. Because the authenticity of the duplicate Proposal is not in question (argued *supra*) and because admission of the duplicate is not unfair, the Proposal is admissible under Fed.R.Evid. 1003.

**CONCLUSION**

As argued *supra*, the Proposal satisfies the Best Evidence Rule, the test for authenticity, and is exempt from the hearsay rule.

Therefore:

1. the Proposal should be admitted into evidence; and

2. the Defendant's Motion in Limine should be denied.

WHEREFORE, Dennis Dimon respectfully requests that this Court deny MetLife's Motion in Limine seeking to exclude the annuity quotation.

Respectfully submitted,
Dennis Dimon,
By his attorneys,


 _/s/Brian Keane_____
DAVID B. KAPLAN, B.B.O. No. 258540
BRIAN KEANE, B.B.O. No. 656717
THE KAPLAN/BOND GROUP
88 Black Falcon Avenue, Suite 301
Boston, MA 02210
(617) 261-0080



 _/s/ Timothy O'Driscoll_____
Timothy O'Driscoll, Esq.
Drinker, Biddle and Reath, LLP
One Logan Square
18th and Cherry Streets
Philladelphia, PA 19103
(215) 988-2700



Dated: May 13, 2008

I hereby certify that a true copy of the above document was served upon each attorney of record by ECF on May 13, 2008.


 _/s/Brian Keane_____

1

VOLUME:  I
PAGES:  1 through 172
EXHIBITS:  See Index

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-11073 WGY

* * * * * * * * * * * * * * * * * * * * * * * * * *
DENNIS DIMON,                          )
                    Plaintiff,         )
                                       )
      VS.                              )
                                       )
METROPOLITAN LIFE INSURANCE            )
COMPANY, KEMPER INSURANCE              )
COMPANY, MORGAN STANLEY DW             )
INC., MICHAEL B. LATTI,                )
LATTI ASSOCIATES, and                  )
LATTI & ANDERSON LLP,                  )
                    Defendants.        )
* * * * * * * * * * * * * * * * * * * * * * * * * *

**DEPOSITION OF DENNIS J. DIMON**, a witness
called on behalf of the Defendant, taken pursuant
to the Provisions of the Federal Rules of Civil
Procedure, before Julie A. Healey, a Certified
Shorthand Reporter, Registered Professional
Reporter, and Notary Public in and for the
Commonwealth of Massachusetts, at the offices of
Ciapciak & Associates, P.C., 99 Access Road,
Norwood, Massachusetts, on June 29, 2006,
commencing at 11:25 a.m.

COPLEY COURT REPORTING
101 Tremont Street
Boston, Massachusetts 02108

89

1    wife's writing if you saw it?

2         A.   Not right offhand, no, but I know some of

3    it, and the letters in there, I know she don't

4    write like that.

5         Q.   Okay, and referring to the third page of

6    Exhibit 15, there's some handwriting next to the

7    numbers on the bottom, do you see where that

8    handwriting is?

9         A.   The numbers that's been wrote out?

10        Q.   Yes.

11        A.   Yeah.

12        Q.   Do you know who wrote those out?

13        A.   No.

14        Q.   Okay.  Where did you get this document?

15        A.   From Latti, from Mr. Latti.

16        Q.   Okay.  When you got this document, is

17   this the actual document you got from Mr. Latti or

18   is it a copy of that document?

19        A.   It's a copy.

20        Q.   How was the document you got from

21   Mr. Latti different than this?

22        A.   There wasn't any difference.

23        Q.   It had all the same writings?

24        A.   All except for this stamp (indicating),

90

1    I'm not sure what that stamp was there for, so,

2    that stamp wasn't there and the writing up in the

3    corner there, you know, Carolyn Latti, that wasn't

4    there.  It was just basic numbers and what it said

5    on the form itself.

6        Q.    Were these numbers written in the lower

7    right-hand corner?

8        A.    Yeah, those were there, yeah.

9        Q.    Okay.

10            MS. McQUAY:  For the record, could

11    you identify the stamp that he's referring to on

12    the document?

13            MR. LeBLANC:  Yes, for the record,

14    I'll identify the stamp that is mostly illegible,

15    I believe it says it may be a certification as to

16    the correctness of the copy with it signed and

17    then what looks like the letter D.

18            MS. McQUAY:  And for the record, that

19    is the stamp that he testified was not there when

20    he got the document?

21            MR. LeBLANC:  That's my

22    understanding.

23            THE WITNESS:  Correct.

24

157

```
 1        Q.    Okay.   Well, you testified earlier that

 2   5, 6, 7, and 9, that you do not recall receiving

 3   any of those at the time.

 4        A.    Right.

 5        Q.    Is that correct?

 6        A.    That's correct.

 7        Q.    Do you have any reason to believe that

 8   you did not receive them?

 9        A.    No.

10        Q.    Where were you living at the time, during

11   this time period, the summer through the fall of

12   1983?

13        A.    In Greenwood Drive.

14        Q.    And that was your mailing address as

15   well?

16        A.    Yes, it was.

17        Q.    And I'm sorry, was that West Kingston?

18        A.    No, that was in Peacedale.

19             MR. DeWICK:   Just give me a moment.

20   BY MR. DeWICK:

21        Q.    Mr. Dimon, you testified earlier you

22   received this document, and I'm referring to page

23   3 of Exhibit 15, you received this document minus

24   the stamp from Mr. Latti is your recollection?
```

158

1     A.    From himself, yes.

2     Q.    And do you remember when you received

3     that from him?

4     A.    The day that we signed the contract for

5     this policy.

6     Q.    And have we seen the contract for this

7     policy?

8     A.    No.

9     Q.    And did you receive a copy of that signed

10    contract?

11    A.    Nothing.

12    Q.    Do you know --

13    A.    This (indicating) is the only paper I

14    received at that time.

15    Q.    Do you know where the signed copy of the

16    annuity went after you signed it?

17    A.    No.

18    Q.    Who else was in the room when you signed

19    it?

20    A.    My wife, and I'm not sure if one of his

21    associates was there too, I'm not sure.

22    Q.    So, your wife, yourself, Mr. Latti?

23    A.    Right.

24    Q.    And perhaps one of his associates?

159

1          A.    I think so.

2          Q.    Anyone else?

3          A.    No, not that I know of.

4          Q.    And do you recall, you don't recall the

5     date that that was signed, do you?

6          A.    No, not right off.

7          Q.    But you recall it was the same day that

8     he showed you page 3 --

9          A.    Yeah.

10         Q.    -- let me finish, it's hard for her, it's

11    impossible for her to write both of us at the same

12    time, actually.

13         A.    Sorry.

14         Q.    Not hard, impossible.  You signed the

15    annuity the same day you received page 3 of

16    Exhibit 5, the proposal from Mr. Latti; is that

17    correct?

18         A.    Right.

19         Q.    And do you know whether that

20    was -- strike that.

21              Do you recall how long before you began

22    to receive payments that you signed the annuity

23    contract, how much time elapsed between the

24    signing and receiving your first payment?

COPY

VOLUME: 1
PAGES: 1 - 94
EXHIBITS: See Index

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

*****************************************
DENNIS DIMON,                            )
                          Plaintiff,  )
                                         )
          vs.                            )
                                         )          C.A. No.
METROPOLITAN LIFE INSURANCE COMPANY,  )          05-11073 WGY
KEMPER INSURANCE COMPANY, MORGAN         )
STANLEY DW, INC., MICHAEL B. LATTI,   )
LATTI ASSOCIATES and LATTI & ANDERSON, )
LLP,                                     )
                          Defendants.  )
*****************************************

DEPOSITION of KATHERINE DIMON, a Witness called by and on
behalf of the Defendants, taken pursuant to the applicable
Federal Rules of Civil Procedure, before Vincent Martino,
a Notary Public within and for the Comm. Of Massachusetts,
held at the Law Offices of Ciapciak & Associates, PC, 99
Access Road, Norwood, MA 02062 on Monday, August 7, 2006,
commencing at 11:30 a.m.

COPLEY COURT REPORTING
101 Tremont Street
Boston, Masssachusetts 02108
(617) 423-5841

1      Q.    In handwriting?

2      A.    Yes.

3      Q.    Do you know what those numbers represent?

4      A.    I think it is supposed to be how much you collect a

5   year. I'm not sure.

6      Q.    Okay. Do you know if that stamp that is difficult

7   to read right on top, do you know what that signature is or

8   whose signature that is?

9      A.    No.

10     Q.    Does that look like a D to you?

11     A.    Yes, it does.

12     Q.    Could that be Mr. Dimon's signature?

13     A.    It doesn't look like his D.

14     Q.    Do you know if he received this document, Page 3 of

15   Exhibit 10, do you recall if you received that in 1983 or

16   more recently?

17     A.    In 1983.

18     Q.    Do you know if you received this before or after

19   the settlement?

20     A.    I think after.

21     Q.    And where were you when you received this?

22     A.    I don't recall.

23     Q.    Do you know if you were in Boston for a meeting

24   with Mr. Latti or someplace else?

25     A.    I would say Boston.

1    DIRECT EXAMINATION BY MR. DEWICK:

2        Q.    If you could go to Exhibit 10, Ms. Dimon. I think

3    it is Exhibit 10. The four page Exhibit.

4        A.    Okay.

5        Q.    Are you there?

6        A.    Yes.

7        Q.    Could you look at the second page for me.

8        A.    Okay.

9        Q.    Make it the third page. I believe you testified

10   earlier that you received that from Mr. Latti and then you

11   later testified that you think you received that from Mr.

12   Latti?

13       A.    Yes.

14       Q.    Was that your testimony today?

15       A.    Yes.

16       Q.    Do you actually recall receiving this from Mr.

17   Latti?

18       A.    I was there but like I said I don't know which

19   lawyer presented it.

20       Q.    You recall a lawyer in Mr. Latti's office giving

21   you this specific document?

22       A.    Yes.

23       Q.    You don't recall which lawyer that was?

24       A.    No.

25       Q.    Do you recall where this took place?

```
 1      A.   It had to have been in Boston.

 2      Q.   But you don't remember?

 3      A.   No.

 4      Q.   Do you remember when it happened?

 5      A.   It was after the case was all over.

 6      Q.   After the trial?

 7      A.   Yes.

 8      Q.   After the trial was over?

 9      A.   Yes.

10      Q.   After the settlement had been reached?

11      A.   Yes.

12      Q.   Do you recall being in Court in Rhode Island?

13      A.   Yes.

14      Q.   With your husband?

15      A.   Yes.

16      Q.   In which your settlement was discussed or your

17 husband's settlement was discussed in front of a Judge, do

18 you recall that?

19      A.   Yes.

20      Q.   Do you recall if you received this document after

21 that or before that hearing?

22      A.   After.

23      Q.   If you could just turn to the next page, please.

24      A.   Okay.

25      Q.   I believe you testified earlier this information
```

1    here at the bottom, we had the understand -- I believe that

2    is supposed to be understanding -- that my wife was to

3    collect this check up to twenty years if anything happened

4    to me and I was to collect for fifty years.

5         I believe you testified earlier that information

6    came from Mr. Latti?

7    A.    His office, yes.

8    Q.    Do you recall the conversation in which that

9    information was given to you?

10   A.    No.

11   Q.    Do you recall when that conversation took place?

12   A.    I know we received all this stuff after the Court

13   hearing.

14   Q.    When you say this stuff, what do you mean exactly?

15   A.    What do you call it, the Charter Life Insurance

16   Company papers in here.

17   Q.    Are you telling me that when you said you received

18   this information contained in Page 4 of Exhibit 10 from Mr.

19   Latti, you are referring to -- you gleaned this information

20   from the previous page, Page 3?

21        MS. MCQUAY: Objection as to form.

22        THE WITNESS: I'm a little confused.

23        MR. DEWICK: That was an awful question. You should

24   have been confused.

25   Q.    Did you receive this information on Page 4 in a

1

# CERTIFIED COPY

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

------------------------------------x

DENNIS DIMON,

                 Plaintiff,

      -against-

MET LIFE INSURANCE CO., KEMPER INSURANCE

CO., MORGAN STANLEY D.W., INC., MICHAEL B.

LATTI, LATTI ASSOCIATES and LATTI &

ANDERSON, LLP

               Defendants.

------------------------------------x

              May 10, 2006

              10:00 a.m.

     Deposition of Met Life Insurance Co.
by Barbara Fasman, 30(b)(6) witness, held at
the offices of Met Life, One Met life Plaza,
27-01 Queens Plaza North, Long Island City,
New York, before Vicky Galitsis, a Certified
Shorthand Reporter and Notary Public of the
State of New York.

       GREENHOUSE REPORTING, INC.

     363 Seventh Avenue - 20th Floor

      New York, New York  10001

        (212) 279-5108

20

1                    B. Fasman

2  Charter Security was acquired by or in some

3  other fashion became a part of Met Life?

4              MR. CIAPCIAK:  Sue, perhaps I can

5         get to the point here.

6              MS. McQUAY:  Sure.

7              MR. CIAPCIAK:  If you're asking

8         whether Met Life is responsible legally

9         for anything that Charter might have

10        done or didn't do in this case, Met

11        Life is responsible.

12             MS. McQUAY:  I won't belabor the

13        issue then.

14             MR. CIAPCIAK:  Great.

15        Q.    Ms. Fasman, directing your

16  attention to Exhibit 1, at the top of the

17  document there appears a number 83A08153, do

18  you see that?

19        A.    Yes.

20        Q.    To what does that refer?

21        A.    To my understanding that refers

22  to the number of the annuity that Charter

23  sold, the contract number.

24        Q.    Okay.  How did you derive that

25  understanding?