## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DENNIS DIMON<br>　　　　Plaintiff<br><br>　　v.<br><br>METROPOLITAN LIFE<br>INSURANCE COMPANY, KEMPER<br>INSURANCE COMPANY,<br>MORGAN STANLEY DW, INC.,<br>MICHAEL B. LATTI, LATTI<br>ASSOCIATES, LATTI & ANDERSON<br>LLP,<br>　　　　Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 05-11073-NG

### ORDER

AND NOW, this _____ day of _____, 2008, upon consideration of Defendant Kemper Insurance Company's ("Kemper's") Motion *in Limine* to preclude certain exhibits identified by Defendant Metropolitan Life Insurance Company ("MetLife") and any testimony or other evidence relating thereto, and any response thereto, it is hereby ORDERED that Kemper's Motion is GRANTED;

AND IT IS FURTHER ORDERED that MetLife shall not be permitted to offer into evidence the following:

1.　　A purported copy of an annuity application identified by MetLife as Exhibit G in the Joint Pre-Trial Memorandum, and/or any testimony or other evidence relating thereto; and

2.　　A purported copy of a "Supplementary Agreement" identified by MetLife as Exhibit H in the Joint Pre-Trial Memorandum, and/or any testimony or other evidence relating thereto.

BY THE COURT:

_____

J.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DENNIS DIMON<br>　　　　Plaintiff<br><br>　　　v.<br><br>METROPOLITAN LIFE<br>INSURANCE COMPANY, KEMPER<br>INSURANCE COMPANY,<br>MORGAN STANLEY DW, INC.,<br>MICHAEL B. LATTI, LATTI<br>ASSOCIATES, LATTI & ANDERSON<br>LLP,<br>　　　　Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 05-11073-NG |

## DEFENDANT KEMPER INSURANCE COMPANY'S MOTION IN LIMINE TO PRECLUDE CERTAIN EXHIBITS IDENTIFIED BY DEFENDANT METROPOLITAN LIFE INSURANCE COMPANY

### I.    Background

Defendant Kemper Insurance Company ("Kemper") hereby moves to preclude certain

exhibits identified by Defendant Metropolitan Life Insurance Company ("MetLife") in the Joint

Pre-Trial Memorandum, and any testimony or other evidence relating thereto, as follows:

- A purported copy of an annuity application identified by MetLife as Exhibit G; and
- A purported copy of a "Supplementary Agreement" identified by MetLife as Exhibit H.

### II.    Argument

#### A.    A Purported Copy of An Annuity Application Identified by MetLife

Kemper objects to the admissibility of a purported copy of an annuity application

identified by MetLife, on the grounds of authenticity, the best evidence rule, and

relevance/materiality.  A copy of the annuity application identified by MetLife is attached hereto

as Exhibit "A."

First, this document completely fails to meet the standards applicable to authentication under Fed. R. Evid. 901. This document presents as a copy of an altered version of the MetLife annuity application that was signed and submitted by Kemper, with the primary modifications being handwriting in boxes 14 and 15 of the application. MetLife's own Rule 30(b)(6) witness, Barbara Fasman, cannot vouch for the authenticity of this document, and admits as follows: (a) she has no idea who typed the typewritten information contained in this document, when that information was typed, or who provided that information; (b) she has no idea who inserted the handwriting contained in this document; (c) she has no idea whose handwriting it is; (d) she has no idea when the handwriting was inserted; (e) she has no idea if the handwriting was there when the application was signed; and (f) she has no idea what document the handwritten reference to "Quote Number SO113" refers to. See relevant portions of the deposition transcript of Barabara Fasman ("Fasman Dep."), a true and correct copy of which is attached hereto as Exhibit "A-1", at 22:9-27:3. Further, in the face of Ms. Fasman's "blank slate" testimony and the extreme suspicions regarding authenticity that it engenders, Kemper has offered uncontroverted documentary and testimonial evidence that the original application (i.e., without any handwriting) was the application signed by Mr. John Noe of Kemper, and that the handwriting on the modified application was added after the original application had been submitted by Mr. Noe. See the Annuity Application submitted by John Noe, a true and correct copy of which is attached hereto as Exhibit "A-2"; see also the October 10, 1983 correspondence from John Noe, a true and correct copy of which is attached hereto as Exhibit "A-3" (Mr. Noe stating that "…Sections 14 and 15 of the application that I signed were blank. The entries now appearing were filled in after I returned the signed application."). Because MetLife's Rule 30(b)(6) witness cannot vouch for this document, and because MetLife has admitted that it has no idea

- 2 -

from whence the handwriting on this document came (and Kemper's uncontroverted evidence demonstrates that the handwriting was not present on the original application that it signed), MetLife's proffered document utterly fails to meet the standards applicable to authentication.

Second, admission into evidence of this purported copy of the application would violate Rule 1002's requirement that "[t]o prove the content of a writing…the original writing…is required…." See Fed. R. Evid. 1002. Under Rule 1003, a duplicate is admissible to the same extent as an original unless a genuine question is raised as to its authenticity. See Fed. R. Evid. 1003. As set forth above, the testimony of MetLife's own Rule 30(b)(6) witness discredits the authenticity of this purported application, to say nothing of the undisputed evidence set forth by Kemper.

Third, this document is, in any event, not relevant or material to any issue in the case. See Fed. R. Evid. 401. Its existence certainly does not tend to show that MetLife issued an annuity contract that was payable for twenty years only. Moreover, the uncontroverted documentary and testimonial evidence is that this modified application is in any event entirely consistent with a life annuity for 20 years certain. See the Annuity, a true and correct copy of which is attached hereto as Exhibit "A-4", at pp. 1, 8, and Supplementary Agreement; see also relevant portions of the deposition transcript of William Mensie, a true and correct copy of which is attached hereto as Exhibit "A-5", at 245:3-246:2; 255:22-256:14; 275:5-20. This document's introduction into evidence therefore could only serve to confuse the issues and the jury. See Fed. R. Evid. 403.

**B.    A Purported Copy of A "Supplementary Agreement" Identified by MetLife**

Kemper objects to the admissibility of a purported copy of a "Supplementary Agreement" identified by MetLife on the grounds of both authenticity and relevance. A copy of the "Supplementary Agreement" identified by MetLife is attached hereto as Exhibit "B."

First, this stray, one-page document does not even approach meeting the standards applicable to authentication under Fed. R. Evid. 901, for at least the following reasons: (a) it presents on its face as a fragment of a document; (b) it is not signed by anyone; (c) it is not dated; (d) even MetLife's own Rule 30(b)(6) witness, Barbara Fasman, couldn't vouch for it - she admitted that she had no idea either who filled it out, or when it was filled out (see Fasman Dep., Exhibit "A-1", at 31:21-33:25); (e) because the document is not dated, Ms. Fasman admitted that she has no idea when the document was issued or created (see Fasman Dep. at 68:18-23; 85:16-17); (f) it purports to call itself a "Supplementary Agreement," but it is not even attached to any contract that it would purport to supplement; and (g) whatever it is, it certainly is not a contract in itself, bereft as it is of any general provisions, signature, date, or other indicia of a contract. Rule 901(a) provides that "[t]he requirement of authentication or identification as condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." See Fed. R. Evid. 901(a). Whatever MetLife is claiming that this extraordinarily suspicious document is, it falls woefully short of meeting the standards applicable to authentication under the Federal Rules.

Second, and in any event, this document is not relevant to any issue in the case. See Fed. R. Evid. 401. For what purpose is if offered? It certainly does not show that MetLife issued an annuity contract that was payable for twenty years only, because it is manifestly not an annuity contract. Its introduction into evidence therefore could only serve to mislead the jury. See Fed. R. Evid. 403.

## III.    Conclusion

For the foregoing reasons, Kemper respectfully requests that the Court preclude the

above-described exhibits identified by MetLife and any testimony or other evidence relating

thereto.

Respectfully submitted,

KEMPER INSURANCE COMPANY

by its attorneys,

_____/s/ Kevin L. Golden_____
DRINKER BIDDLE & REATH LLP
Timothy O'Driscoll (Admitted Pro Hac Vice)
Kevin L. Golden (Admitted Pro Hac Vice)
DRINKER BIDDLE & REATH LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996
(215) 988-2700

Local Counsel
Kevin S. Murphy (BBO #638335)
Anthony B. Fioravanti (BBO #664823)
YURKO SALVESEN & REMZ, P.C.
One Washington Mall, 11th Floor
Boston, MA 02108-2603
(617) 723-6900

Dated: May 14, 2008

## Certification of Service

I hereby certify that a true and accurate copy of the foregoing document was filed via
the ECF system and will be served electronically through that system upon Counsel of Record
on May 14, 2008.

_____/s/ Kevin L. Golden_____
Kevin L. Golden

**Black Ink**

**83A08153**

**ANNUITY APPLICATION**

CHARTER SECURITY LIFE INSURANCE COMPANY, NEW YORK, 720 FIFTH AVENUE, NEW YORK, N.Y. 10019

| | |
|---|---|
| Name of Annuitant (please print)  ☒ Male  ☐ Female | 9. Type of Contract  Single Premium Deferred Annuity |
| Dennis J. Dixon | 10. Single Premium Amount  $ 175,000. |
| Date and Place of Birth | 11. Maturity Age  ☐ 65  ☐ 70½  ☐ Other Immediate |
| 12/9/59  So. Kingstown, RI | 6/15/83 |
| Residence (No., Street, City, State and Zip Code) | 12. Will this annuity replace or change any existing life insurance or annuity contract? ☐ Yes  ☒ No |
| Laurel Lane, West Kingston, RI  02892 | (if yes, give name of company, policy number, and plan of life insurance or annuity.) |
| Business Address (include Name of Employer) | |
| | |
| Mail Notices to  ☐ Residence  ☐ Business  ☐ Owner | |
| Social Security No.  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 | |
| Owner (if other than Proposed Annuitant) | 13. Is this contribution for a tax qualified plan? ☐ Yes  ☒ No  If so, contract will be issued with a limitation on transferability to conform with IRS regulations. (Check appropriate box for type of qualified plan.) |
| Name:  American Motorists Insurance Co. | ☐ I.R.A. Rollover      ☐ Corporate pension |
| Relationship: | ☐ T.S.A. Exchange        or profit sharing plan |
| Address: | ☐ H.R. 10 Exchange    ☐ Terminal Funding |
| Social Security Tax Payer I.D. No.  36-0727430 | ☐ H.R. 10                  ☐ Other |
| ☐ Contingent Owner | 14. Special Requests  *Immediate Annuity* *20 yr Certain - 3% increasing* *$175,000 = 1456.45 per month first (?) = ?* |
| Beneficiary and Relationship | 15. Amendments and Corrections (For Home Office use only) |
| Primary:  Katerine I. Dixon | *Quote Number 83113* |
| Contingent:  Jessica I. Dixon - Daughter  Rebecca Lee Dixon - Daughter | |

The undersigned represent(s), to the best of his (her) knowledge and belief, that the foregoing statements and answers are complete, true, and correctly recorded and agree(s) to be bound by statements and answers made or to be made in this application. The undersigned further expressly agree(s) as follows:

This application and any policy issued in consequence of shall constitute the entire contract. No agent is authorized to make or modify contracts, to waive any of the company's rights or requirements or to bind the Company by making or receiving any promise, representation or information, unless the same be in writing, submitted to the Company, and made a part of such policy.

2. Acceptance of any contract(s) issued on the basis of the application shall constitute a ratification and acceptance of any change, correction, addition or amendment noted by the "Company" in the "Amendments and Corrections" section above, except that in those jurisdictions where it is required any change in amount or benefits shall require a written consent by the Proposed Annuitant and by the Applicant if other than the Proposed Annuitant.

| | |
|---|---|
| at Syracuse NY this 4th day of May  19 83 | Signature of Annuitant  _Dennis J. Dixon_ |
| _Curt B. Gordon_      621-61 | Applicant if other than Annuitant  X _American M..._ |
| Agent Signature (1)      Code | |
| _J. E. Snider_ | By _John S. ...  ..._ |
| Please Print Name of Agent (1) | Signature and Title |
| | _Dean Witter Reynolds_ |
| Agent Signature (2)      Code | Please Print Name of General Agency |
| Please Print Name of Agent (2) | 000010 |

## In The Matter Of:

*Dennis Dimon  v.*
*Met Life Insurance Co., et al.*

---

*Barbara Fasman*
*Vol. 1, May 10, 2006*

---

*Greenhouse Reporting, Inc.*
*Computerized Litigation Support*
*363 Seventh Avenue*
*20th Floor*
*New York, NY  10001*
*(212) 279-5108    FAX: (212) 279-5431*

Original File BF051006.V1, 94 Pages
Min-U-Script® File ID: 3923061621

## Word Index included with this Min-U-Script®

Dennis Dimon v.
Met Life Insurance Co., et al.

Barbara Fasman
Vol. 1, May 10, 2006

| Page 1 |
| --- |

[1]
[2] UNITED STATES DISTRICT COURT
    DISTRICT OF MASSACHUSETTS
[3]
[4] DENNIS DIMON,
              Plaintiff,
[5]        -against-
[6] MET LIFE INSURANCE CO., KEMPER INSURANCE
    CO., MORGAN STANLEY D.W., INC., MICHAEL B.
[7] LATTI, LATTI ASSOCIATES and LATTI &
    ANDERSON, LLP
[8]              Defendants.
[9]
[10]        May 10, 2006
              10:00 a.m.
[11]
[12]
[13]
[14]    Deposition of Met Life Insurance Co.
[15] by Barbara Fasman, 30(b)(6) witness, held at
[16] the offices of Met Life, One Met life Plaza,
[17] 27-01 Queens Plaza North, Long Island City,
[18] New York, before Vicky Galitsis, a Certified
[19] Shorthand Reporter and Notary Public of the
[20] State of New York.
[21]
[22]
[23]
            GREENHOUSE REPORTING, INC.
[24]    363 Seventh Avenue - 20th Floor
        New York, New York  10001
[25]         (212) 279-5108

Page 2

[1]
[2] APPEARANCES:
[3]
[4] THE KAPLAN BOND GROUP
        Attorneys for the Plaintiff
[5]    88 Black Falcon Avenue
        Boston, Massachusetts  02210
[6] BY:  BRIAN KEANE, ESQ.,
              of Counsel
[7] (Appearing Telephonically)
[8]
[9]
[10] CIAPCIAK & ASSOCIATES, P.C.
        Attorneys for the Defendant
[11]    Met Life Insurance Co.
        99 Access Road
[12]    Norwood, Massachusetts  02062
    BY:   JAMES J. CIAPCIAK, ESQ.
[13]
            -and-
[14]
        Alvin Pasternack, Esq.
[15]    Associate General Counsel,
        Law Department
[16]    One MetLife Plaza
        27-01 Queens Plaza North
[17]    Long Island City, New York  1101
[18]
[19]
        DRINKER BIDDLE & REACH, ESQS.
[20]    Attorneys for the Defendant
        Kemper Insurance Co.
[21]    One Logan Square
        18th and Cherry Streets
[22]    Philadelphia, Pennsylvania  19103
    BY:  TIMOTHY O'DRISCOLL, ESQ.,
[23]            of Counsel
        (Appearing Telephonically)
[24]
[25]

Barbara Fasman
Vol. 1, May 10, 2006

Dennis Dimon  v.
Met Life Insurance Co., et al.

---

Page 3

[1]
[2] APPEARANCES: (Continued.)
[3]
[4] SULLIVAN WEINSTEIN & McQUAY, ESQS.
     Attorneys for the Defendants
[5]    Morgan Stanley D.W., Inc.
       Two Park Plaza
[6]    Boston, Massachusetts 02116
     BY:  SANDRA SUE McQUAY, ESQ.
[7] (Appearing Telephonically)
[8]
        8
[9] TODD & WELD, ESQS.
     Attorneys for the Defendants
[10]   Michael B. Latti, Latti Associates
       and Latti & Anderson, LLP
[11]   28 State Street
       Boston, Massachusetts 02104
[12] BY:  JED DeWICK, ESQ.
       of Counsel
[13] (Appearing Telephonically)
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

Page 4

[1]                   B. Fasman
[2] (Exhibits 1 through 21 were
[3] pre-marked for identification.)
[4] BARBARA FASMAN,
[5] stating an address of One MetLife
[6] Plaza, 27-01 Queens Plaza North,
[7] Long Island City, New York 11101
[8] having been first duly sworn by a
[9] Notary Public of the State of New
[10] York, was examined and testified as
[11] follows:
[12]           EXAMINATION BY MS. McQUAY:
[13]    Q: Ms. Fasman, this is Sue McQuay.
[14] As I indicated already, I represent the
[15] defendant Morgan Stanley. Because we are
[16] conducting this deposition today by telephone
[17] as a request of your counsel, because we are
[18] doing this over the telephone, it's
[19] particularly important that you speak up and
[20] we'll try to do the same so that we can hear
[21] each other clearly.
[22]    It's also very important that you
[23] let me finish my question and I accordingly
[24] will try to let you finish your answer so we
[25] don't talk across each other.

---

Page 5

[1]                   B. Fasman
[2]    Further if you have any questions
[3] or you don't understand a question that I'm
[4] asking you, please let me know and I will try
[5] to rephrase, is that clear?
[6]    A: Yes.
[7]    Q: Now, is it Ms. Fasman? What is
[8] your address, please?
[9]    A: Mrs. Fasman.
[10]   Q: Okay, Mrs. Fasman. What is your
[11] address, please?
[12]   A: Met Life at One Met Life Plaza,
[13] 2701 Queens Plaza North, Long Island City
[14] New York, 11101.
[15]   Q: Am I correct in understanding
[16] that you work for Met Life?
[17]   A: I do work for Met Life.
[18]   Q: What is your position with Met
[19] Life?
[20]   A: My title is consultant.
[21]   Q: I'm sorry?
[22]   A: My title is consultant.
[23]   Q: Titlist?
[24]   A: My title is consultant.
[25]   Q: Your title is consultant, okay.

---

Page 6

[1]                   B. Fasman
[2] And what are your duties and responsibilities
[3] as a consultant for Met Life?
[4]    A: I support our Corporate Customer
[5] Relations Department and our Administrative
[6] Offices with regard to annuity questions and
[7] complaints. I also do calculations of various
[8] technical amounts as requested.
[9]    Q: Would you explain what you mean
[10] when you say you do calculations of various
[11] technical amounts when requested?
[12]   A: Present values of benefits,
[13] interest calculations, any mathematical
[14] calculation that the administrative offices
[15] are not able to handle.
[16]   Q: When you say that your title at
[17] Met Life is consultant, am I correct in
[18] understanding that you are in fact an employee
[19] of Met Life?
[20]   A: Yes.
[21]   Q: How long have you been with Met
[22] Life?
[23]   A: 25 years.
[24]   Q: When did you begin work?
[25]   A: I began work at Met Life in

---

Page 19

**B. Fasman**

[1]
[2] A: Okay.
[3]    (Exhibit 1, Annuity Application
[4] was introduced for identification.)
[5]    Q: Can you describe to me what this
[6] document is?
[7]    A: This document appears to be an
[8] annuity application.
[9]    Q: And is this one of the documents
[10] that you reviewed in preparation for today's
[11] deposition?
[12]    A: Yes, it is.
[13]    Q: Does this appear to be a form of
[14] annuity application that was used by Charter
[15] Security Life Insurance Company?
[16]    A: Yes.
[17]    Q: Okay. What is the relationship
[18] between Metropolitan Life and Charter Security
[19] Life Insurance Company?
[20]    MR. CIAPCIAK: Objection. Are
[21] you looking for a legal relationship?
[22] She wasn't educated on —
[23]    MS. McQUAY: I'm not looking for
[24] a legal relationship.
[25]    Q: Is it your understanding that

Page 20

**B. Fasman**

[1]
[2] Charter Security was acquired by or in some
[3] other fashion became a part of Met Life?
[4]    MR. CIAPCIAK: Sue, perhaps I can
[5] get to the point here.
[6]    MS. McQUAY: Sure.
[7]    MR. CIAPCIAK: If you're asking
[8] whether Met Life is responsible legally
[9] for anything that Charter might have
[10] done or didn't do in this case, Met
[11] Life is responsible.
[12]    MS. McQUAY: I won't belabor the
[13] issue then.
[14]    MR. CIAPCIAK: Great.
[15]    Q: Ms. Fasman, directing your
[16] attention to Exhibit 1, at the top of the
[17] document there appears a number 83A08153, do
[18] you see that?
[19]    A: Yes.
[20]    Q: To what does that refer?
[21]    A: To my understanding that refers
[22] to the number of the annuity that Charter
[23] sold, the contract number.
[24]    Q: Okay. How did you derive that
[25] understanding?

Page 21

**B. Fasman**

[1]
[2]    A: I really don't know.
[3]    Q: You don't know how you came to
[4] have that understanding?
[5]    A: No, I really don't know.
[6]    MR. CIAPCIAK: Perhaps I can
[7] help. Did you know at one time and
[8] you've forgotten or —
[9]    THE WITNESS: I'm sure I knew at
[10] one time. I mean, I'm sure someone
[11] told me that is what a Charter
[12] number looks like, but I don't
[13] remember.
[14]    Q: You don't remember whether you
[15] were told that, and if you were, who told you?
[16]    A: Right, although it is noted on at
[17] least one of the letters as a policy number,
[18] but I'm not sure that's the first time I was
[19] aware of it being that.
[20]    Q: Okay, so you don't know, other
[21] than what's reflected in the document, you
[22] don't know on what basis you believe that to
[23] be a Charter security policy number?
[24]    A: Right.
[25]    Q: Again directing your attention to

Page 22

**B. Fasman**

[1]
[2] Exhibit 1, the application form contains
[3] information that was typed in, do you agree?
[4]    A: Yes.
[5]    Q: For example, there is the name of
[6] the annuitant, Dennis Dimon, his date and
[7] place of birth and so forth?
[8]    A: Yes.
[9]    Q: Okay. Now, all the information
[10] that was typed in on the application form,
[11] Exhibit 1, who typed it in?
[12]    A: I have no idea.
[13]    Q: Do you know if somebody at
[14] Charter Security typed it in?
[15]    A: I do not.
[16]    Q: Would that be the normal
[17] procedure in your understanding?
[18]    A: I don't know what the normal
[19] procedure was.
[20]    Q: Okay. Do you know when that
[21] information was typed in?
[22]    A: No, I don't.
[23]    Q: Do you know who provided the
[24] information that was typed in?
[25]    A: No.

Dennis Dimon  v.
Met Life Insurance Co., et al.

Barbara Fasman
Vol. 1, May 10, 2006

---

**Page 23**

**B. Fasman**

[1]
[2] Q: Now, directing your attention
[3] again to Exhibit 1, there is on the form a
[4] paragraph 14 with the heading, "Special
[5] Requests," do you see that?
[6] A: Yes.
[7] Q: And then in the space for that
[8] paragraph 14, Special Requests, there appears
[9] to be some handwriting, do you see that?
[10] A: Yes, I do.
[11] Q: Do you know who inserted that
[12] handwriting that appears in that space?
[13] A: No, I don't.
[14] Q: Do you know whose handwriting it
[15] is?
[16] A: No.
[17] Q: Do you know when it was inserted?
[18] A: No, I don't know that either.
[19] Q: Do you know if it was there when
[20] the application form was signed?
[21] A: No.
[22] Q: Do you know anyone at Met Life
[23] who would have such knowledge?
[24] A: No, I don't.
[25] Q: Directing your attention again to

---

**Page 24**

**B. Fasman**

[1]
[2] Exhibit 1, there is a paragraph 15 that bears
[3] the title, "Amendments And Corrections (For
[4] Home Office Use Only)," do you see that?
[5] A: Yes.
[6] Q: And that space also contains some
[7] handwriting?
[8] A: Yes.
[9] Q: Do you know who inserted that
[10] handwriting?
[11] A: No, I don't.
[12] Q: It says, For Home Office Use
[13] Only, correct?
[14] A: Yes.
[15] Q: Do you understand that that
[16] refers to the home office of Charter Security?
[17] MR. CIAPCIAK: Are you asking if
[18] she has personal knowledge of that?
[19] Q: Is that what you infer from
[20] looking at the application form?
[21] A: Yes.
[22] Q: So looking at the application
[23] form, your understanding of the document where
[24] it says, For Home Office Use Only in space 15
[25] that would be — that refers to the home

---

**Page 25**

**B. Fasman**

[1]
[2] office of Charter Security, correct?
[3] A: Yes, that notation is my
[4] understanding.
[5] Q: Okay. And would that indicate to
[6] you that the handwriting there was inserted by
[7] someone at Charter Security?
[8] A: No, actually not.
[9] Q: Do you have any reason to believe
[10] that was not the case?
[11] A: I don't have any reason to
[12] believe it's not the case.
[13] Q: Do you know when the handwriting
[14] in space 15 was inserted?
[15] A: No.
[16] Q: The handwriting in space 15 says,
[17] "Quote Number", and that appears to be — can
[18] you read the number?
[19] A: It appears to be S0113.
[20] Q: And to what does that refer?
[21] A: I don't know.
[22] Q: Has Met Life made a search of its
[23] files for a copy of any such document?
[24] A: Yes.
[25] Q: Have you been able to find any

---

**Page 26**

**B. Fasman**

[1]
[2] such document?
[3] A: No.
[4] Q: Do you know what was contained in
[5] any such document?
[6] A: No.
[7] Q: Do you know what the quote
[8] reference there consisted of?
[9] A: Can you please clarify the
[10] question?
[11] Q: It refers to Quote Number S0113
[12] as you already testified. It refers to a
[13] quote, do you know what if anything that quote
[14] consisted of?
[15] A: No, I don't.
[16] Q: Do you have any understanding
[17] about the practices or procedures of Charter
[18] Security back at the time in terms of
[19] ascribing numbers to any quotes that it gave
[20] out?
[21] A: No, I don't have any knowledge of
[22] that.
[23] Q: Do you have any knowledge or
[24] understanding of what procedures Charter
[25] Security followed back at the time in terms of

---

Page 27

*B. Fasman*

[1]
[2] giving out quotes?
[3]　A: No.
[4]　Q: I would like to direct your
[5] attention next, Mrs. Fasman, to what has been
[6] marked as Exhibit 2.
[7]　(Exhibit 2, Supplemental
[8] Agreement, was introduced for
[9] identification.)
[10]　A: Okay.
[11]　Q: Would you describe what this
[12] document is?
[13]　A: It appears to be a supplementary
[14] agreement number SC1126.
[15]　Q: What in your understanding is a
[16] supplementary agreement?
[17]　A: It's an agreement that describes
[18] the benefits that are provided.
[19]　Q: Provided by what?
[20]　A: The agreement.
[21]　Q: When you say it describes the
[22] benefits provided by the agreement, what
[23] agreement are you referring to?
[24]　A: Well, whatever has been applied
[25] for and requested this describes what it is

Page 28

*B. Fasman*

[1]
[2] and it summarizes it in a document.
[3]　Q: Okay. Is if fair to say that the
[4] supplementary agreement form describes the
[5] benefits that have been applied for and
[6] provided by the annuity policy?
[7]　A: Yes.
[8]　MR. CIAPCIAK: I object to form.
[9] Do you call it an annuity policy? Just
[10] the terms used there, Sue, I just want
[11] to make sure. She kind of hesitated
[12] there.
[13]　Q: Do you have some problem with the
[14] term annuity policy?
[15]　A: No, I'm okay with that.
[16]　Q: Okay.
[17]　MR. CIAPCIAK: Thank you.
[18]　Q: Now this Exhibit 2, is this a
[19] former document that was used by Charter
[20] Security?
[21]　A: I don't know. It appears to be.
[22]　Q: You have no reason to believe
[23] otherwise?
[24]　A: Right.
[25]　Q: The number at the top of the

Page 29

*B. Fasman*

[1]
[2] document Exhibit 2, SC1126, do you see that?
[3]　A: Yes.
[4]　Q: What does that number refer to?
[5]　A: I don't know. That was one of
[6] the questions I was trying to find out. But
[7] it is referred to in one of the other
[8] exhibits.
[9]　Q: Okay. If I understood you
[10] correctly, there was a policy number, the
[11] annuity policy number 83A08153, correct?
[12]　A: Yes.
[13]　Q: And that was the actual annuity
[14] policy that was issued in your understanding?
[15]　A: Yes, it is.
[16]　Q: And am I correct in understanding
[17] you don't know why this supplementary
[18] agreement Exhibit 2 has a different number?
[19]　A: That's right.
[20]　Q: Does that seem unusual to you in
[21] your experience?
[22]　A: Yes.
[23]　Q: And in what way is it unusual in
[24] your experience?
[25]　A: Well, it appears there's two

Page 30

*B. Fasman*

[1]
[2] contract numbers although they are not of the
[3] same form so I really don't know what it
[4] means, so —
[5]　Q: Is it usual in your experience
[6] that the annuity policy and the supplementary
[7] agreement will have the same number?
[8]　A: It actually depends.
[9]　Q: On what?
[10]　A: On the administrative procedures
[11] of the company.
[12]　Q: Based on your experience, is it
[13] usual that the numbers are the same?
[14]　A: It depends, it really depends on
[15] what contract it is that's being dealt with.
[16] At Met Life we have some where the contract
[17] number continues, and we have some where we
[18] issue a supplementary agreement with a new
[19] contract number.
[20]　Q: Okay. But in your experiences,
[21] in what circumstances is there a new contract
[22] number assigned?
[23]　MR. CIAPCIAK: I object to form.
[24] Go ahead.
[25]　A: It depends on how the contract

Dennis Dimon  v.
Met Life Insurance Co., et al.

Barbara Fasman
Vol. 1, May 10, 2006

---

Page 31

**B. Fasman**

[1]
[2] was drafted.
[3]   **Q:** Again I would ask, in your
[4] experience, in what circumstances is a new
[5] contract number assigned?
[6]   **A:** I really don't know how to
[7] explain it other than to say depending on what
[8] the terms of the original contract are, and
[9] what the new contract looks like there may be
[10] a new number. If they're put on different
[11] administrative systems there may be a new
[12] number. I really don't know how to be more
[13] specific.
[14]   **Q:** Am I correct in understanding,
[15] however, that in your experience a different
[16] contract number is assigned only in
[17] circumstances where there is a new and
[18] separate contract that's issued?
[19]   **MR. CIAPCIAK:** I object to form.
[20]   **A:** Yes.
[21]   **Q:** Okay. Now with regard to
[22] Exhibit 2, who filled out this form?
[23]   **A:** I don't know.
[24]   **Q:** Would you expect that this was
[25] filled out by someone at Charter Security?

---

Page 32

**B. Fasman**

[1]
[2]   **A:** I would expect that's true.
[3]   **Q:** Okay. Do you know when it was
[4] filled out?
[5]   **A:** No, I don't.
[6]   **Q:** Do you have any understanding at
[7] all about when it was filled out?
[8]   **A:** The date at the top appears to be
[9] May 4th, 1983, but I'm not sure if that's when
[10] it was filled out.
[11]   **Q:** I don't see a date on my copy?
[12]   **A:** Well —
[13]   **Q:** Am I missing — where do you see
[14] the date?
[15]   **A:** There is a blank line and the top
[16] of it, it's sort of like scratched through
[17] where there is the fill-in number directly
[18] under number SC1126, there are 2 black lines
[19] where it's scratched out a little bit.
[20]   **Q:** Yeah.
[21]   **A:** So the bottom of the numbers
[22] before the line looks like 19 and then there
[23] is a line and it looks like an 8, and I guess
[24] I'm guessing it's a 3. And the other piece is
[25] a short month, and then it looks like a 4 to

---

Page 33

**B. Fasman**

[1]
[2] me, as best as I can guess, and a comma.
[3]   **Q:** On the copy that we were
[4] provided, I see where you are referring to,
[5] but that is actually quite illegible and it
[6] appears to have been scratched out, is that
[7] the same on your copy?
[8]   **A:** Yes.
[9]   **Q:** Other than trying to decipher
[10] what's been scratched out in those blanks, do
[11] you have any understanding about when this
[12] form was filled out?
[13]   **A:** No, I don't.
[14]   **Q:** Whatever dates may have been
[15] inserted there, if at all, you don't know when
[16] they were put there, correct?
[17]   **A:** That's right.
[18]   **Q:** Again with reference to
[19] Exhibit 2, was there another agreement issued
[20] by Charter Security prior to this one as far
[21] as Dennis Dimon was concerned?
[22]   **A:** There is in the other exhibits,
[23] it refers to other supplementary — other
[24] agreements, but I don't know if that was prior
[25] or after this one.

---

Page 34

**B. Fasman**

[1]
[2]   **Q:** Okay. When you say the other
[3] exhibits you are referring to the other
[4] exhibits or documents that have been produced
[5] by Met Life and that have been marked as
[6] exhibits in this deposition?
[7]   **A:** Yes.
[8]   **Q:** Okay. Directing your attention
[9] to Exhibit 3, can you describe what this
[10] document is?
[11]   (Exhibit 3, a letter to Kurt
[12] Snyder from B. Boehm dated July 14,
[13] 1983 was introduced for
[14] identification.)
[15]   **A:** This appears to be a letter from
[16] Barbara Boehm to Kurt Snyder of Dean Witter
[17] Reynolds.
[18]   **Q:** Who is Barbara Boehm?
[19]   **A:** According to the letter she was
[20] the vice president of Charter Security Life.
[21]   **Q:** Does she still work for Charter
[22] Security or Met Life?
[23]   **A:** Not as far as I know.
[24]   **Q:** Have you tried to determine
[25] whether or not that's the case?

---

Page 67

**B. Fasman**

[1]
[2]  **A:** There is another letter.
[3]   **MR. CIAPCIAK:** I am going ask her
[4]  to refer to exhibit numbers.
[5]  **A:** There is another letter,
[6]  Exhibit 8, which has a October 14th date on
[7]  it —
[8]  **Q:** Yes.
[9]  **A:** — to Mr. Noe.
[10]  **Q:** Yes.
[11]  **A:** Which would appear to have been
[12]  dated after Mr. Noe's letter of October 12th.
[13]  However the October 12th letter also refers to
[14]  the October 14th letter, so I'm not sure what
[15]  was done after the October 12th letter.
[16]  **Q:** Okay. Other than the —
[17]  **MR. O'DRISCOLL:** Can we go off
[18]  the record for a moment, I think I have
[19]  something, just an observation that
[20]  might be helpful to the questioning.
[21]  **MS. McQUAY:** Certainly.
[22]   (Discussion off the record.)
[23]  **Q:** Mrs. Fasman, other than the
[24]  handwritten reference to 20-year certain in
[25]  paragraph 14 of Exhibit 1, did Charter

Page 68

**B. Fasman**

[1]
[2]  Security, so far as you know, have any other
[3]  basis for it's assertions that the original
[4]  annuity contract that it issued to Kemper for
[5]  20-year certain and life thereafter was
[6]  mistaken?
[7]  **MR. CIAPCIAK:** I object to the
[8]  form. Other than the other exhibit?
[9]  **MS. McQUAY:** No, no.
[10]  **Q:** Other than that reference to
[11]  20-year certain in paragraph 14 in Exhibit 1,
[12]  does Charter Security have any other basis in
[13]  your understanding for its assertion that the
[14]  original annuity contract for 20-year certain
[15]  and life thereafter was mistaken?
[16]  **A:** Well, we have the application and
[17]  then we have this supplementary agreement.
[18]  **Q:** The supplementary agreement
[19]  was — I believe the document suggests were
[20]  issued sometime after the original contract,
[21]  correct?
[22]  **A:** Since it's not dated I'm not sure
[23]  when it was issued.
[24]  **Q:** Let me ask you this, tell me in
[25]  your understanding as far as Met Life is

Page 69

**B. Fasman**

[1]
[2]  concerned, what was the basis, the factual
[3]  basis on which Charter Security took the
[4]  position that the original annuity contract
[5]  issued to Kemper for 20-year certain and life
[6]  thereafter was mistaken?
[7]  **MR. CIAPCIAK:** I object to form.
[8]  Go ahead.
[9]  **A:** The basis was the application
[10]  which requested immediate annuity 20-year
[11]  certain.
[12]  **Q:** Anything else?
[13]  **MR. CIAPCIAK:** She's looking at
[14]  exhibits, so hang on.
[15]  **A:** Well, we don't have a copy of it.
[16]  There was a quotation down that Mr. Liguori
[17]  refers to in his letter indicating that that
[18]  was what the quote was, a 20-year certain
[19]  only.
[20]  **Q:** Anything else?
[21]  **A:** Nothing prior to the issue of the
[22]  original contract.
[23]  **Q:** Have you completed your answer?
[24]  **A:** Yes.
[25]  **Q:** Just to make sure, as far as Met

Page 70

**B. Fasman**

[1]
[2]  Life is concerned in this case, other than
[3]  what you have testified to just now, is there
[4]  any other basis upon which Met Life contends
[5]  that the original annuity contract issued for
[6]  20-year certain and life thereafter was
[7]  mistaken?
[8]  **MR. CIAPCIAK:** I object to form.
[9]  **A:** Other than the exhibits, no, this
[10]  is what we have.
[11]  **Q:** Okay. Now, did Charter Security
[12]  or Met Life ever offer to return Kemper's
[13]  money to it if there was a mistake here?
[14]  **A:** I don't know.
[15]  **Q:** Do you have any reason to believe
[16]  that they did?
[17]  **A:** I don't have any reason to
[18]  believe they did or didn't.
[19]  **Q:** You don't know one way or another
[20]  what happened, correct?
[21]  **A:** That's right.
[22]  **Q:** Did Charter Security or Met Life
[23]  ever do anything to try to resolve this matter
[24]  after this exchange of letters in October of
[25]  1983?

**Barbara Fasman**
**Vol. 1, May 10, 2006**

**Dennis Dimon** v.
**Met Life Insurance Co., et al.**

---

Page 83

**B. Fasman**

[1]
[2]    **Q:** You mentioned earlier in your
[3] testimony a woman by the name of Teresa
[4] Mannino, is that right?
[5]    **A:** Yes.
[6]    **Q:** Who told you that Ms. Mannino
[7] would have information regarding Charter
[8] Security Life?
[9]    **MR. CIAPCIAK:** I object to form.
[10]    **A:** I just, well, my counsel
[11] mentioned her but. But I happened to have
[12] worked very closely with her.
[13]    **Q:** Was Ms. Mannino a former employee
[14] of Charter Security Life?
[15]    **A:** No, she was not.
[16]    **Q:** Do you know approximately when
[17] Met Life took over Charter Security Life?
[18]    **A:** In the mid '80s, I believe.
[19]    **Q:** You mentioned that this annuity
[20] application was an immediate annuity. Can you
[21] tell me what that means?
[22]    **A:** Generally, an immediate annuity
[23] refers to an annuity which provides a stream
[24] of payments, the first of which is made within
[25] a year of the purchase date.

Page 84

**B. Fasman**

[1]
[2]    **Q:** As you look at Exhibit 1, can you
[3] tell me the purchase date of that annuity?
[4]    **A:** I can tell you the application
[5] date.
[6]    **Q:** Did you give me the date?
[7]    **A:** I said, I can tell you the
[8] application date.
[9]    **Q:** I was waiting for that, I
[10] apologize. What is that date?
[11]    **A:** May 4th, 1983.
[12]    **Q:** You mentioned earlier something
[13] called a quotation sheet. What is that?
[14]    **A:** Typically in the industry when an
[15] a immediate annuity is being sold there is a
[16] quotation done to show how much benefit can be
[17] provided for a single premium or how much a
[18] specific benefit costs.
[19]    **Q:** You testified earlier that you do
[20] not have a quotation sheet for Mr. Dimon's
[21] annuity, is that right?
[22]    **A:** That's right.
[23]    **Q:** If you look at Exhibit 1 again,
[24] and you look down on the bottom right side, it
[25] says signature of annuitant. Can you read

Page 85

**B. Fasman**

[1]
[2] that name?
[3]    **A:** It appears to be Dennis Dimon.
[4]    **Q:** And you testified earlier that
[5] there was an annuity application and there
[6] also was a supplementary agreement. And I
[7] think you testified that the supplementary
[8] agreement basically explained what the annuity
[9] would be, is that right?
[10]    **MR. CIAPCIAK:** Objection.
[11]    **A:** I think that's what I said. It
[12] would explain the payments.
[13]    **Q:** Can you tell me the timing or the
[14] difference in timing for the annuity
[15] application and the supplementary agreement?
[16]    **A:** I don't know when the
[17] supplementary agreement was produced.
[18]    **Q:** I am asking a question based on
[19] your experience. Is the supplementary
[20] agreement usually offered after the annuity
[21] application?
[22]    **A:** Generally, the annuity
[23] application is taken, and then a contract is
[24] issued subsequent to the annuity application
[25] being taken.

Page 86

**B. Fasman**

[1]
[2]    **Q:** I believe you testified you do
[3] not have the actual contract for Mr. Dimon's
[4] annuity, is that right?
[5]    **MR. CIAPCIAK:** Objection.
[6]    **A:** I don't have the contract, right.
[7] But I have the application and the
[8] supplementary agreement, that's what I have.
[9] To me the supplementary agreement is the
[10] contract and it explains what the terms are.
[11]    **MR. KEANE:** If you would just
[12] give me one minute.
[13]    **Q:** Mrs. Fasman, that's all I have,
[14] thank you.
[15]    **MS. McQUAY:** Tim, do you have any
[16] questions?
[17]    **MR. O'DRISCOLL:** No, I have no
[18] questions.
[19]    **MS. McQUAY:** I have just a couple
[20] further Mrs. Fasman.
[21]    **BY MS. McQUAY:**
[22]    **Q:** Just a couple of questions about
[23] these calculations that you asked to be done
[24] back in August of 2005.
[25]    **A:** Yes.

**CHARTER SECURITY LIFE INS  NCE COMPANY, NEW YORK, 720 FI    AVENUE, NEW YORK, N.Y. 10019**

| | |
|---|---|
| **1. Name of Annultant (please print)** ☒ Male ☐ Female<br><br>Dennis J. Diamon | **9. Type of Contract** Single Premium Deferred Annuity |
| | **10. Single Premium Amount** $ 175,000. |
| **2. Date and Place of Birth**<br><br>12/9/59  So. Kingstown, RI | **11. Maturity Age** ☐ 65 ☐ 70½ ☐ Other: Immediate<br>6/15/83 |
| **3. Residence (No., Street, City, State and Zip Code)**<br><br>Laurel Lane, West Kingston, RI  02892 | **12.** Will this annuity replace or change any existing life insurance or annuity contract? ☐ Yes ☒ No<br>(If yes, give name of company, policy number, and plan of life insurance or annuity.) |
| **4. Business Address (include Name of Employer)** | |
| **5. Mail Notices to** ☐ Residence ☐ Business ☐ Owner | |
| **6. Social Security No.** ▌ | |
| ●Owner (if other than Proposed Annultant)<br><br>Name:  American Motorists Insurance Co.<br><br>Relationship:<br><br>Address:<br><br>Social Security Tax Payer I.D. No.  36-0727430<br><br>☐ **Contingent Owner** | **13.** Is this contribution for a tax qualified plan? ☐ Yes ☒ No<br>If so, contract will be issued with a limitation on transferability to conform with IRS regulations. (Check appropriate box for type of qualified plan.)<br>☐ I.R.A. Rollover ☐ Corporate pension<br>☐ T.S.A. Exchange    or profit sharing plan<br>☐ H.R. 10 Exchange ☐ Terminal Funding<br>☐ H.R. 10 ☐ Other |
| | **14. Special Requests** |
| **8. Beneficiary and Relationship**<br>Primary:  Katerine I. Diamon<br><br>Contingent:  Jessica I. Diamon – Daughter<br>Rebecca Lee Diamon – Daughter | **15. Amendments and Corrections** (For Home Office use only) |

The undersigned represent(s), to the best of his (her) knowledge and belief, that the foregoing statements and answers are complete, true, and correctly recorded and agree(s) to be bound by all statements and answers made or to be made in this application. The undersigned further expressly agree(s) as follows:
1. This application and any policy issued in consequence thereof shall constitute the entire contract. No agent is authorized to make or modify contracts, to waive any of the Company's rights or requirements or to bind the Company by making or receiving any promise, representation or informa-

tion, unless the same be in writing, submitted to the Company and made a part of such policy.
2. Acceptance of any contract(s) issued on the basis of the application shall constitute a ratification and acceptance of any change, correction, addition or amendment noted by the "Company" in the "Amendments and Corrections" section above, except that in those jurisdictions where it is required any change in amount or benefits shall require a written consent by the Proposed Annultant and by the Applicant if other than the Proposed Annultant.

Dated at _____ this_____ day of_____ 19____

_____
Agent Signature (1)                Code

_____
Please Print Name of Agent (1)

_____
Agent Signature (2)                Code

**Signature of Annultant** _____

**Applicant if other than Annultant** ___ X _AMERICAN MOTORISTS INSURANCE_

By _John L. Noe_ – HOME OFFICE CLAIM
Signature and Title

_____
Please Print Name of General Agency

_____
General Agent Code

AP-109    **Please Print Name of Agent (2)**



**Lumbermens Mutual Casualty Company • American Motorists Insurance Company**
**American Manufacturers Mutual Insurance Company • American Protection Insurance Company**

Long Grove, IL 60049 - 312|540-2000



RECEIVED
* OCT 13 1983
B. BOEHM

October 10, 1983

Mr. Robert Liguori, Counsel
Charter Security Life Insurance
  Company (New York)
720 Fifth Avenue
New York, New York  10019

Dear Mr. Liguori:

DENNIS DIMON
CHARTER SECURITY POLICY: 83A08153
OUR FILE NO: 399 LM 106125-Z

In reply to your September 26, 1983, Sections 14 and 15
of the application that I signed were blank.  The entries
now appearing were filled in after I returned the signed
application.

The original annuity policy received was for a term of
240 months certain and life thereafter as ordered and
agreed upon between Mr. Hughes and Mr. Foley.  Your agent,
Mr. Foley further confirmed this to me by telephone in
April, 1983.  May I suggest you contact him to verify
this?

I intend to retain the original policy in our files and
consider it to be valid and enforceable.

Very truly yours,

AMERICAN MOTORISTS INSURANCE COMPANY

John L. Noe
Home Office Claim

JLN:ml

cc: Mr. Robert A. Foley
    Dean Witter Reynolds, Inc.
    One Boston Place
    Boston, MA  02108

    Mr. Roger Hughes
    Latti Assoc., Attorneys
    30-31 Union Wharf
    Boston, MA  02109

cc: Ms. Barbara Boehm
    Vice President
    Policyowner Service Dept.
    Charter Security Life
      Insurance Co. (New York)
    720 Fifth Avenue
    New York, NY  10019

000029

NY



**Charter Security Life Insurance Company (New York)**
720 Fifth Avenue • New York, New York 10019

| .0 75 | 14 | 7 49 | 19 | 5.97 | 24 |
| 9 83 | 15 | 7.10 | 20 | 5.75 | 25 |

### OPTION 2.   LIFE INCOME*

We will pay a lifetime monthly income to the Annuitant if living on the Annuity Date. The basis for this amount of income is explained in this contract.

Unless you make an alternate election, we will make the first monthly payment on the Annuity Date; payments after the first will be on that same date of the month as long as the Annuitant lives. Unless you make an alternate election, we guarantee 120 monthly payments; they will be continued to the Beneficiary if the Annuitant dies before receiving them. Payments will be made by check to the Annuitant or Beneficiary. We reserve the right to require proof that the payee is living on payment dates.

We will pay the benefit explained in this contract if the Annuitant dies before the Annuity Date. It will be paid to the Beneficiary when we receive acceptable proof of death.

*The Beneficiary and Owner are as named in the application if not later changed.*

Notice of ten-day right to examine contract: This contract may be cancelled within ten days after its receipt. The steps to follow are:

Return the contract with a written notice to us or to the agent through whom you purchased the contract. If you return the contract directly to us, use the address of our Home Office shown on the top of this page. If return is through the agent, obtain a receipt.

We will return all payments made for this contract after we receive it. As soon as the contract is delivered or mailed to us, it will be deemed void from its beginning.

Read this contract carefully. It is a legal contract between you and us.

Secretary                                                                 President

## SINGLE PREMIUM DEFERRED ANNUITY

Monthly Life Annuity With Ten Years Certain Payable At Annuity Date
Benefit in Event of Death is Payable Prior To Annuity Date
Optional Life Annuities at Annuity Date — Optional Annuity Date
Non-Participating

RA-104
11/82

# TABLE OF CONTENTS

| Item | Page No. |
|---|---|

Face Page . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1
Schedule Page . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3
Table of Guaranteed Contract Values . . . . . . . . . . . . . . . . . . . . . . . . .4
Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5
General Provisions
    Basis of Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5
    Entire contract; changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5
    Premium payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5
    Issue date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5
    Incontestability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5
    Misstatement of age or sex . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5
    Ownership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
    Change of ownership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
    Assignment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
    Beneficiary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
    Conformance to statutes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
Interest Rates
    Declared Interest Rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
    Guaranteed Interest Rates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
Joint Annuitant
    Definition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
    Annuity Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
    Deferral of Annuity Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
    Benefit In Event of Death . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
    Separate Annuities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
Non-Forfeiture Provisions
    Accumulation Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7
    Cash surrenders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7
    Benefit in Event of Death . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7
    Annual statement of values . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7
    Normal settlement; annuity date . . . . . . . . . . . . . . . . . . . . . . . . . .7
    Change in annuity option or date . . . . . . . . . . . . . . . . . . . . . . . . . .7
    Benefits payable to beneficiary . . . . . . . . . . . . . . . . . . . . . . . . . . .7
    Minimum payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7



Settlement Options
    Option 1, limited payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8
    Option 2, life income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8
    Option 3, joint life income with two-thirds to survivor . . . . . . . . . . . .8
    Rate basis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8
    Settlement option tables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

# DEFINITIONS

This is what we mean when we use these words or phrases:

**"We," "us"** and **"our"** refer to Charter Security Life Insurance Company (New York).

**"You"** and **"yours"** refer to the Owner named in the application.

The **"Accumulation Interest Rate"** is the annual effective interest rate which we use to credit interest to the Single Premium less any Partial Surrenders.

The **"Accumulation Value"** is the value of the contract before the charge, if any, for withdrawing funds.

The **"Annuitant"** is the person who is to receive annuity payments.

The **"Beneficiary"** receives the benefits, if any, due at the Annuitant's death.

A **"Contingent Owner,"** if named, becomes the Owner if the Annuitant survives the Owner.

**"Contract Years"** are measured from the Issue Date.

The **"Declared Interest Rate"** is the Accumulation Interest Rate which we declare and guarantee for the Effective Period.

The **"Effective Period"** is the period during which the Accumulation Value will accrue interest at the Declared Interest Rate.

The **"Owner"** owns and controls this contract.

A **"Partial Surrender"** is a surrender of part of the Accumulation Value.

The **"Surrender Charge"** is the charge for withdrawing funds. It is equal to the Surrender Charge Percentage times the amount of Accumulation Value surrendered. The Surrender Charge Percentages are shown on the Schedule Page. Refer to NONFORFEITURE PROVISIONS; the Surrender Charge applies only under certain conditions.

The **"Surrender Interest Rate"** is the Declared Interest Rate below which the Surrender Charge is waived for 60 days. Refer to NONFORFEITURE PROVISIONS.

The **Surrender Value"** is the Accumulation Value less the Surrender Charge.

**"Survive"** refers to the continued life of a person or legal existence of an entity other than a person.

# GENERAL PROVISIONS

**BASIS OF CONTRACT:** This contract is issued on the basis of the application and receipt of the Single Premium payment in advance.

**ENTIRE CONTRACT; CHANGES:** This contract, the attached application, and any endorsements make up the entire contract. All statements in the application are representations and not warranties.

No agent can change this contract or waive any of its terms. Changes can be made only by written endorsement signed by one of our officers.

**PREMIUM PAYMENT:** The Single Premium payment for this contract was paid in advance. If the check or other instrument is not honored for payment, this contract is deemed void from the beginning.

**ISSUE DATE:** This contract takes effect on its Issue Date which is shown on the Schedule Page.

**INCONTESTABILITY:** This contract is incontestable from its issue date.

**MISSTATEMENT OF AGE OR SEX:** We will require proof of age before we make payments to the Annuitant or any Beneficiary. If age or sex is misstated, we will pay the amount due at the true age or sex. In case of age or sex correction after payments start, we will:

(1) In case of underpayment, pay the full amount due the payee with the next payment due.

(2) in case of overpayment, deduct the amount due us from future payments; deductions will be spread over the payment period.

RA-104
11/82

Page 5

**OWNERSHIP:** You have all rights under this contract during the Annuitant's lifetime, subject to:

(1) the rights of any assignee of record with us;

(2) the rights of any irrevocable Beneficiary;

(3) any restricted ownership endorsement;

(4) the change of ownership provision.

**CHANGE OF OWNERSHIP:** During the Annuitant's lifetime, you may name a new Owner. If you are a natural person other than the Annuitant, you may name or change a Contingent Owner. A Contingent Owner becomes Owner only by surviving you.

Notice of the change must be sent to our Home Office; it must be signed and dated by you. We are not liable for any actions we take before we receive and file the notice at our Home Office.

Change of ownership:

(1) voids any Contingent Ownership;

(2) does not affect the Beneficiary.

**ASSIGNMENT:** You may assign all rights, privileges and benefits provided by this contract. We are not bound by an assignment until we receive and file a signed copy at our Home Office. We are not responsible for the validity of assignments.

**BENEFICIARY:** You may change the Beneficiary during the Annuitant's lifetime; an irrevocable Beneficiary may be changed only by that Beneficiary's written consent. Notice of the change must be sent to our Home Office; it must be signed and dated by you. It takes effect on the date it is signed. We are not liable for any actions we take before we receive and file the notice at our Home Office.

A Beneficiary's interest is effective if that Beneficiary:

(1) survives the Annuitant by 15 days; or

(2) survives until we receive proof of the Annuitant's death.

We will pay the proceeds in this order unless this contract is assigned at the time of the Annuitant's death:

(1) We will pay the designated Beneficiaries who survive the Annuitant.

(2) If no Beneficiary survives, we will pay the Annuitant's estate.

No Beneficiary can change your previous choice of a settlement option.

To the extent permitted by law, no payment we make will be subject to the claims of any creditors.

**CONFORMANCE TO STATUTES:** Any annuity, Surrender Value or benefit in event of death payable under this contract is not less than the minimum benefit required by any statute of the state in which this contract is delivered.

### INTEREST RATES

**DECLARED INTEREST RATE.** We declare an Accumulation Interest Rate, and Effective Period, on the Issue Date. They are shown on the Schedule Page. Prior to the expiration of the Effective Period, we will declare a new Accumulation Interest Rate and Effective Period. We will notify you of declared Accumulation Interest Rates and effective periods in writing.

**GUARANTEED INTEREST RATES:** We guarantee that the Accumulation Interest Rates will be at least as great as the Guaranteed Interest Rates shown on the Schedule Page.

### JOINT ANNUITANT

If you designate two persons as joint annuitants in the application, these rules will be in effect:

**Definition:** The term "Annuitant" means the joint annuitants or the survivor of them, as the case may be.

**Annuity Date:** The Annuity Date will be:

(1) the Contract Anniversary following the 65th birthday of the older joint annuitant; or

(2) ten years from the Issue Date if the issue age of the older joint annuitant is more than 55 Years; or

(3) the date specified in the application.

**Deferral of Annuity Date:** The Annuity Date may not be deferred to a date beyond the 85th birthday of the older joint annuitant.

**BENEFIT IN EVENT OF DEATH:** We will not pay any benefit upon the death, before the Annuity Date, of the first of the joint annuitants to die. Instead, the contract will remain in force as to the surviving joint annuitant. If one joint annuitant dies before the Annuity Date, the latest permitted Annuity Date will become the 85th birthday of the remaining joint annuitant or, if later, ten years after the Issue Date. If both joint annuitants die before the Annuity Date, we will pay the benefit to the Beneficiary.

**Separate annuities:** At your request, we will apply the Accumulation Value to provide separate annuities for each joint annuitant, if both are living on the Annuity Date. You must make this request in writing at least 30 days before the Annuity Date. For this purpose, you must specify a division of the Accumulation Value into two portions. These portions may but need not be of equal size. You must specify the annuity option for each joint annuitant. You are not required to choose the same annuity option for both joint annuitants.

In addition to these three options, you may choose any other form of annuity agreed upon by us.

Except with our consent, settlement options will not be available to:

(1) an assignee; or

(2) any other than a natural person receiving proceeds in his or her own right.

**ACCUMULATION VALUE:** The Accumulation Value at any time is the Single Premium you paid, less any Partial Surrenders and Surrender Charges, accumulated at the Accumulation Interest Rates.

**CASH SURRENDERS:** You may surrender all or part of the Accumulation Value before annuity payments begin.

We have a Surrender Charge in effect for the first seven years after the Issue Date, but only if:

(1) there is more than one surrender within a Contract Year, or

(2) the surrender exceeds the Allowable Portion of the Accumulation Value. The Allowable Portion is shown on the Schedule Page.

On the first surrender in a Contract Year, the Surrender Charge applies only to the amount in excess of the Allowable Portion of the Accumulation Value.

If an Accumulation Interest Rate is less than the Surrender Interest Rate, you may surrender this contract without a Surrender Charge provided you notify us within 60 days of the effective date of the Accumulation Interest Rate. After 60 days, any Surrender Charge in effect will be reinstated. However, you will not forfeit your right to surrender this contract without a Surrender Charge should a future Accumulation Interest Rate be below the Surrender Interest Rate.

If you surrender the entire Accumulation Value, the amount we pay you, added to any prior amounts we paid you for Partial Surrenders, will not be less than the Single Premium you paid us.

We may defer payment of cash surrenders for not more than six months.

**BENEFIT IN EVENT OF DEATH:** We will pay the Accumulation Value to the Beneficiary if:

(1) the Annuitant dies before the Annuity Date; and

(2) you have not specified a settlement option.

The amount paid will be the Accumulation Value as of the date of death accumulated at the Accumulation Interest Rate to the date of payment by us. It will be paid when we receive acceptable proof of death. No Surrender Charge will apply.

**ANNUAL STATEMENT OF VALUES:** As of each contract anniversary on or before the Annuity Date, we will send you a statement which shows the:

(1) Accumulation Value; and

(2) Surrender Value; and

(3) Monthly life annuity with ten years certain which can be provided on the Annuity Date by the current Accumulation Value; and

(4) Declared Interest Rate.

**NORMAL SETTLEMENT; ANNUITY DATE:** The Accumulation Value will be used to provide a life annuity as shown on the Schedule Page if:

(1) the Annuitant is living on the Annuity Date; and

(2) you have not made an alternate election.

The Annuity Date will be:

(1) the contract anniversary following the Annuitant's 65th birthday; or

(2) ten years from the Issue Date if the Issue Age is more than 55 years; or

(3) the date specified in the application.

**CHANGE IN ANNUITY OPTION OR DATE:** You may defer the Annuity Date; deferral may not be to a date beyond the Annuitant's 85th birthday. After five years from the Issue Date, you may:

(1) Advance the Annuity Date (but not to a date earlier than the date of the request); or

(2) elect to begin payments under a settlement option.

Written request must be made:

(1) during the Annuitant's lifetime;

(2) at least 30 days before the Annuity Date; and

(3) at least 30 days before any settlement option date.

**BENEFITS PAYABLE TO BENEFICIARY:** During the Annuitant's lifetime, you may choose a settlement option rather than a lump sum death benefit. The Beneficiary may make this choice after the Annuitant's death if:

(1) you have not done so; and

(2) payments have not begun.

**MINIMUM PAYMENTS:** We will not make periodic payments of less than $20.00; for lesser amounts due, we will change the frequency of payments. This provision applies to payments we make to the Annuitant or to any Beneficiary.

# SETTLEMENT OPTIONS

If you elect an annuity option by death, surrender or annuitization, the Accumulation Value of this contract may be applied under any of the options set forth below, provided that:

(1) In the event of surrender, the option is elected on or prior to the surrender date.

(2) In the event of death, the option is elected within 30 days of the date on which we notify the Beneficiary that proceeds are payable.

At the time payments under a settlement option begin, we will pay the greater of

(1) the amount guaranteed under this contract; or

(2) the amount that would be provided by the application of the Accumulation Value to purchase a single premium immediate annuity offered by us to the same class of annuitants, or

(3) an amount determined by more favorable rates which we then offer.

**OPTION 1, LIMITED PAYMENTS:** Equal payments for a set time, not more than 30 years. Any excess interest we declare will be paid yearly.

**OPTION 2, LIFE INCOME:**
**LIFE ANNUITY.** Equal monthly payments as long as the payee lives.

**WITH CERTAIN PERIOD.** Equal monthly payments for five, ten, or twenty years (the certain period), as elected, and thereafter for the remaining lifetime of the payee.

**WITH INSTALLMENT REFUND.** Equal monthly payments until the sum of such payments equals the proceeds settled under this option (at which time the installment refund period ends) and thereafter for the remaining lifetime of the payee.

**OPTION 3, JOINT LIFE INCOME WITH TWO-THIRDS TO SURVIVOR:** Payment of equal monthly (or less frequent) installments during the joint lifetime of the payee and another person. After the death of either the payee or the joint payee, the amount of each installment shall be reduced to two-thirds of the original amount and payments shall continue during the entire remaining lifetime of the survivor.

**Rate basis:** The monthly installments guaranteed under this contract are based on:

(1) the 1937 Standard Annuity Table,

(2) 3½% interest, and

(3) age nearest birthday.

# SETTLEMENT OPTION TABLES

## GUARANTEED MONTHLY INSTALLMENTS UNDER OPTIONS 1, 2 OR 3

(Monthly installments are shown for each $1,000 of net proceeds applied.
The ages shown are ages nearest birthday when the first monthly installment is payable.)

### OPTION 1.  INSTALLMENTS FOR A SPECIFIED PERIOD

| Years | Installment |
|---|---|
| 1 | $84.65 |
| 2 | 43.65 |
| 3 | 29.19 |
| 4 | 22.27 |
| 5 | 18.12 |
| 6 | 15.35 |
| 7 | 13.38 |
| 8 | 11.90 |
| 9 | 10.75 |
| 10 | 9.83 |
| 11 | 9.09 |
| 12 | 8.46 |
| 13 | 7.94 |
| 14 | 7.49 |
| 15 | 7.10 |
| 16 | 6.76 |
| 17 | 6.47 |
| 18 | 6.20 |
| 19 | 5.97 |
| 20 | 5.75 |
| 21 | 5.56 |
| 22 | 5.39 |
| 23 | 5.24 |
| 24 | 5.08 |
| 25 | 4.96 |
| 26 | 4.84 |
| 27 | 4.73 |
| 28 | 4.63 |
| 29 | 4.53 |
| 30 | 4.45 |

### OPTION 2.  LIFE INCOME*

| Issue Age Male | Issue Age Female | Life | 5 Years Certain | 10 Years Certain | 20 Years Certain | Installment Refund |
|---|---|---|---|---|---|---|
| 34 | 39 | 4.11 | 4.10 | 4.08 | 4.00 | 3.98 |
| 35 | 40 | 4.16 | 4.15 | 4.13 | 4.04 | 4.03 |
| 36 | 41 | 4.20 | 4.20 | 4.18 | 4.08 | 4.07 |
| 37 | 42 | 4.27 | 4.26 | 4.23 | 4.12 | 4.12 |
| 38 | 43 | 4.33 | 4.32 | 4.29 | 4.16 | 4.16 |
| 39 | 44 | 4.39 | 4.38 | 4.34 | 4.21 | 4.21 |
| 40 | 45 | 4.45 | 4.44 | 4.40 | 4.26 | 4.27 |
| 41 | 46 | 4.52 | 4.51 | 4.47 | 4.30 | 4.32 |
| 42 | 47 | 4.59 | 4.58 | 4.53 | 4.35 | 4.37 |
| 43 | 48 | 4.67 | 4.65 | 4.60 | 4.40 | 4.43 |
| 44 | 49 | 4.75 | 4.73 | 4.67 | 4.45 | 4.49 |
| 45 | 50 | 4.83 | 4.81 | 4.75 | 4.50 | 4.56 |
| 46 | 51 | 4.92 | 4.89 | 4.82 | 4.56 | 4.62 |
| 47 | 52 | 5.01 | 4.98 | 4.90 | 4.61 | 4.69 |
| 48 | 53 | 5.10 | 5.07 | 4.99 | 4.66 | 4.76 |
| 49 | 54 | 5.20 | 5.17 | 5.07 | 4.72 | 4.84 |
| 50 | 55 | 5.31 | 5.27 | 5.17 | 4.77 | 4.91 |
| 51 | 56 | 5.42 | 5.38 | 5.26 | 4.83 | 4.99 |
| 52 | 57 | 5.54 | 5.49 | 5.36 | 4.89 | 5.08 |
| 53 | 58 | 5.66 | 5.61 | 5.46 | 4.94 | 5.17 |
| 54 | 59 | 5.79 | 5.73 | 5.56 | 5.00 | 5.26 |
| 55 | 60 | 5.93 | 5.87 | 5.67 | 5.05 | 5.35 |
| 56 | 61 | 6.08 | 6.00 | 5.79 | 5.10 | 5.45 |
| 57 | 62 | 6.23 | 6.14 | 5.90 | 5.15 | 5.56 |
| 58 | 63 | 6.39 | 6.29 | 6.02 | 5.21 | 5.67 |
| 59 | 64 | 6.56 | 6.45 | 6.15 | 5.28 | 5.78 |
| 60 | 65 | 6.74 | 6.62 | 6.28 | 5.31 | 5.90 |
| 61 | 66 | 6.93 | 6.79 | 6.41 | 5.35 | 6.03 |
| 62 | 67 | 7.13 | 6.97 | 6.55 | 5.39 | 6.16 |
| 63 | 68 | 7.35 | 7.16 | 6.69 | 5.43 | 6.29 |
| 64 | 69 | 7.57 | 7.36 | 6.83 | 5.47 | 6.44 |
| 65 | 70 | 7.81 | 7.58 | 6.98 | 5.51 | 6.59 |
| 66 | 71 | 8.06 | 7.79 | 7.12 | 5.54 | 6.75 |
| 67 | 72 | 8.33 | 8.03 | 7.27 | 5.57 | 6.91 |
| 68 | 73 | 8.62 | 8.26 | 7.42 | 5.60 | 7.08 |
| 69 | 74 | 8.92 | 8.52 | 7.58 | 5.63 | 7.26 |
| 70 | 75 | 9.24 | 8.78 | 7.73 | 5.65 | 7.46 |
| 71 | 76 | 9.59 | 9.06 | 7.88 | 5.67 | 7.66 |
| 72 | 77 | 9.95 | 9.34 | 8.03 | 5.69 | 7.86 |
| 73 | 78 | 10.33 | 9.63 | 8.18 | 5.70 | 8.08 |
| 74 | 79 | 10.74 | 9.94 | 8.32 | 5.71 | 8.32 |
| 75 | 80 | 11.19 | 10.27 | 8.46 | 5.72 | 8.56 |
| 76 | 81 | 11.66 | 10.59 | 8.60 | 5.73 | 8.81 |
| 77 | 82 | 12.15 | 10.93 | 8.73 | 5.73 | 9.09 |
| 78 | 83 | 12.67 | 11.27 | 8.86 | 5.74 | 9.37 |
| 79 | 84 | 13.25 | 11.63 | 8.97 | 5.74 | 9.67 |
| 80 | 85 | 13.85 | 11.99 | 9.08 | 5.75 | 9.98 |
| 81 | 86 | 14.49 | 12.36 | 9.18 | 5.75 | 10.32 |
| 82 | 87 | 15.17 | 12.74 | 9.28 | 5.75 | 10.66 |
| 83 | 88 | 15.92 | 13.11 | 9.36 | 5.75 | 11.03 |

### OPTION 3.  JOINT AND TWO-THIRDS TO SURVIVOR*

Age of Annuitant (Male, age on first line. Female age on second line.)

| Age of Other Payee M/F | 55/60 | 56/61 | 57/62 | 58/63 | 59/64 | 60/65 | 61/66 | 62/67 | 63/68 | 64/69 | 65/70 | 66/71 | 67/72 | 68/73 | 69/74 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 55/60 | 5.53 | 5.59 | 5.65 | 5.71 | 5.78 | 5.84 | 5.91 | 5.98 | 6.05 | 6.11 | 6.18 | 6.25 | 6.32 | 6.39 | 6.46 |
| 56/61 | 5.59 | 5.65 | 5.72 | 5.78 | 5.85 | 5.92 | 5.99 | 6.06 | 6.13 | 6.20 | 6.27 | 6.34 | 6.42 | 6.49 | 6.56 |
| 57/62 | 5.65 | 5.72 | 5.78 | 5.85 | 5.92 | 5.99 | 6.07 | 6.14 | 6.21 | 6.29 | 6.36 | 6.44 | 6.51 | 6.59 | 6.67 |
| 58/63 | 5.71 | 5.78 | 5.85 | 5.92 | 6.00 | 6.07 | 6.14 | 6.22 | 6.30 | 6.37 | 6.45 | 6.53 | 6.61 | 6.69 | 6.77 |
| 59/64 | 5.78 | 5.85 | 5.92 | 6.00 | 6.07 | 6.15 | 6.23 | 6.30 | 6.38 | 6.47 | 6.55 | 6.63 | 6.71 | 6.80 | 6.88 |
| 60/65 | 5.84 | 5.92 | 5.99 | 6.07 | 6.15 | 6.23 | 6.31 | 6.39 | 6.47 | 6.56 | 6.64 | 6.73 | 6.82 | 6.90 | 6.99 |
| 61/66 | 5.91 | 5.99 | 6.06 | 6.14 | 6.22 | 6.31 | 6.39 | 6.48 | 6.56 | 6.65 | 6.74 | 6.83 | 6.92 | 7.01 | 7.11 |
| 62/67 | 5.98 | 6.06 | 6.14 | 6.22 | 6.30 | 6.39 | 6.48 | 6.57 | 6.66 | 6.75 | 6.84 | 6.94 | 7.03 | 7.13 | 7.22 |
| 63/68 | 6.05 | 6.13 | 6.21 | 6.30 | 6.38 | 6.47 | 6.56 | 6.66 | 6.75 | 6.85 | 6.94 | 7.04 | 7.14 | 7.24 | 7.34 |
| 64/69 | 6.11 | 6.20 | 6.29 | 6.37 | 6.47 | 6.56 | 6.65 | 6.75 | 6.85 | 6.95 | 7.05 | 7.15 | 7.25 | 7.36 | 7.47 |
| 65/70 | 6.18 | 6.27 | 6.36 | 6.45 | 6.55 | 6.64 | 6.74 | 6.84 | 6.94 | 7.05 | 7.15 | 7.26 | 7.37 | 7.48 | 7.59 |
| 66/71 | 6.25 | 6.34 | 6.44 | 6.53 | 6.63 | 6.73 | 6.83 | 6.94 | 7.04 | 7.15 | 7.26 | 7.37 | 7.49 | 7.60 | 7.72 |
| 67/72 | 6.32 | 6.42 | 6.51 | 6.61 | 6.71 | 6.82 | 6.92 | 7.03 | 7.14 | 7.25 | 7.37 | 7.49 | 7.61 | 7.73 | 7.85 |
| 68/73 | 6.39 | 6.49 | 6.59 | 6.69 | 6.80 | 6.90 | 7.01 | 7.13 | 7.24 | 7.36 | 7.48 | 7.60 | 7.73 | 7.85 | 7.98 |
| 69/74 | 6.46 | 6.56 | 6.67 | 6.77 | 6.88 | 6.99 | 7.11 | 7.22 | 7.34 | 7.47 | 7.59 | 7.72 | 7.85 | 7.98 | 8.11 |
| 70/75 | 6.53 | 6.64 | 6.74 | 6.85 | 6.96 | 7.08 | 7.20 | 7.32 | 7.44 | 7.57 | 7.70 | 7.84 | 7.97 | 8.11 | 8.25 |

*Figures for ages not shown will be furnished on request.

## GENERAL PROVISIONS

### I. DEFINITIONS:

The following terms are defined solely for the purpose of interpreting and administering this Agreement:

TERMINATION, shall mean maturity of a policy as a result of, (a) the death of the Insured, or (b) endowment, or (c) surrender of such policy for its cash value, or (d) final amounts payable after termination of Family Income payments.

NET PROCEEDS, when applicable to the termination date, shall be the net amount payable under a policy on the termination date, excluding, however, any unearned premiums paid in advance thereunder.

NET PROCEEDS, when applicable to any time other than the termination date, shall be the single sum which equals (a) the then commuted value of the remainder of the death benefit of a policy containing a Family Income provision, or (b) the then commuted value of any installments certain not yet due under Options A or B, or (c) the amount then held under Options C or D, including any unpaid accrued interest thereon, as the case may be.

CHILDREN, if not designated by name, shall include only the lawful and legally ado  d sons and daughters of the primary payee and not grandchildren or other descendants. This classification is available only   the primary payee was the Insured hereunder.

BY REPRESENTATION shall mean succeeding, by reason of the death of a parent, to net proceeds which would have been apportioned to or further held for such parent, had he lived.

ESTATE OF SURVIVOR shall mean the executors or administrators of the last survivor of the payees designated in preceding Sections of the same Table.

OPTION shall mean the corresponding Option appearing in the policy under the heading "Optional Modes of Settlement" to be attached hereto. If the policy does not contain said "Optional Modes of Settlement", this Agreement shall constitute a request to add hereto "Optional Modes of Settlement" corresponding to that contained in policies which the Company is now issuing.

POLICY shall mean annuity contract when such meaning is applicable; and masculine pronouns shall include the feminine.

### 2. PAYMENTS UNDER A TABLE:

(a) If there is more than one Table, each Table shall be considered separately in construing the provisions of this Agreement.

(b) Payment of the net proceeds under a Table shall be in accordance with the first Section thereof in which there is a payee surviving, and at the death of the last survivor of the payees designated in such Section, payment of any remaining net proceeds shall be in accordance with the next succeeding Section in which there is a then surviving payee, and so on from Section to Section until payment shall have been made of the entire net proceeds under such Table.

(c) In order to be entitled to receive payments provided for him under a Section, a payee must be living on their respective due dates.

(d) If a Section of a Table designates two or more payees but does not designate as payees by representation the children of deceased children of the primary payee, payment of the proceeds under such Section shall be as follows:

If such Section does not provide for division of net proceeds into separate shares, such payees who are living at the time of each payment shall share the payments under such Section and such shares shall be equal unless otherwise expressly provided therein;

If such Section provides for division of net proceeds into separate shares, one such share, payable as provided in such Section, shall be for each such payee who is living at the death of the last survivor of the payees designated in preceding Sections, and such shares shall be equal unless otherwise expressly provided therein. At the subsequent death of a payee designated in such Section, any net proceeds then held for such payee shall be paid to any then surviving payees of such Section in single sums proportionate to their original shares.

(e) If a Section of a Table designates as payees by representation the children of deceased children of the primary payee, payment of net proceeds under such Section shall be as follows:

Net proceeds at the death of the last survivor of the payees designated in preceding Sections shall be divided into equal separate shares, one share, payable as provided in such Section, for each then surviving designated child of the primary payee, if any, and one share, payable in equal single sums, to the then surviving children, if any, of each deceased designated child of the primary payee;

At the subsequent death of a child of the primary payee, any net proceeds then held for such child shall be paid in equal single sums to his then surviving children, if any, otherwise such net proceeds shall be divided into equal separate shares, one share, payable in one sum, to each then surviving designated child of the primary payee, if any, and one share, payable

### 3. PRIVILEGES:

(a) If a payee designated in a Section of a Table is given in such Section a privilege of withdrawal or commutation, such payee may, subject to any limitations with respect thereto stated in such Section and upon written notice to the Insurance Company accompanied by this Agreement, make withdrawals in amounts of not less than $100.00 each from any net proceeds held for him in such Section under Options C or D, or, as the case may be, elect to receive the commuted value of any installments certain or share therein payable to him in such Section under Options A or B, but under Option B only if the right to installments for life has expired with the primary payee.

Wherever the following appear herein.............. they shall be read as:

| | |
|---|---|
| Option A | Option 3 |
| Option B | Option 4 |
| Option C | Option 1 |
| Option D | Option 2 |

# SUPPLEMENTARY AGREEMENT

### (No. SC1126 )

Due to termination, as of ___May 5,_____ 19_83__, of Policy No(s) ___83A08153_____ issued
by      **Charter Security Life Insurance Company (New York)**      on the life of  ___Dennis J. Dimon_____,
the undersigned hereby requests that the aggregate net proceeds payable under said policy(s) as of the termination date be paid
to the payees designated in, and in the order and manner provided in, the following Tables and in the General Provisions
of this Agreement.

The undersigned surrenders said policy(s) to the Insurance Company and, concurrently herewith, revokes any beneficiary designa-
tion and any election of settlement heretofore made under the said policy(s).

| PAYEES | MANNER OF PAYMENT | PRIVILEGES |
|---|---|---|
| **TABLE I**<br><br>SECTION ONE - PRIMARY PAYEE<br><br>Dennis Dimon<br>Laurel Lane<br>West Kingston, RI 02892 | Monthly payments in the amount of $1,450.45, increasing 3% annually, commencing on June 6, 1983, for a period of 240 months certain and life thereafter. | |
| SECTION TWO-CONTINGENT PAYEE<br><br>Katherine I. Dimon,  Wife | In the same manner as the Primary Payee, for the period certain. | |

**(SEE OTHER SIDE FOR ANY COMPANY ENDORSEMENTS)**

SUP-100

(b) If a primary payee designated in Section 1 of a Table is given in such Section the privilege of substituting payment under another Option:

The amount to be applied under such other Option shall be the net proceeds held for such payee in Section 1 at the time such privilege is exercised, but such privilege shall not be available when such net proceeds are less than $1000.

A primary payee may make only one such substitution and must be by written notice accompanied by this Agreement.

## 4. OPTION PAYMENTS ALTERED OR TERMINATED:

After thirty full years following the termination date of a policy, no Option payments shall be made under any Section of a ~~Table. Any net proceeds shall be paid in one sum.~~ If the ~~payee's separate share~~ of net proceeds at the death of the last survivor of the primary payees designated in Section 1 shall be less than $1,000, then such share shall be immediately paid in one sum. If net proceeds held for a payee under Option C be reduced by withdrawals to less than $1,000, then such net proceeds shall be immediately paid in one sum.

If the Option payments for the fractional part of a year shall amount to less than $10.00 each, the Company will pay at such intervals as will make each payment amount to at least $10.00. If a Section of a Table provides for Option D installments and the sum of one year's tabular installments shall be less than 5% of the net proceeds applied under that Option, then the Company shall increase each such tabular installment by the amount necessary to achieve such percentage, any provision of said Option for a different percentage notwithstanding.

## 5. RELIANCE ON AFFIDAVITS:

Before permitting or taking any action provided by this Agreement which is contingent upon the death or survival of any payee, the Company shall be furnished with due proof thereof. As to any facts relating to any payees, including dates of birth and death, and identity, the Company may rely upon any affidavit or other written evidence deemed satisfactory to it, and is hereby released from all liability in relying and acting upon the statements contained therein.

## 6. EFFECT OF CHANGES OF BENEFICIARY AND EXERCISE OF PRIVILEGES UNDER THIS AGREEMENT:

If allowed by the statutes of the state of residence, the primary payee may, without the consent of a secondary payee, (a) change the designation of contingent beneficiaries, and (b) freely exercise the privileges contained in Section 1 of any Table herein. In the absence of an enabling statute, the consent of the secondary payee (s) shall be required for the exercise of all such rights.

## 7. PAYMENT TO MINORS:

Any proceeds due and payable to any minor payee hereunder shall be paid to the legally appointed guardian of such minor except to the extent that provision is made by statute for payment directly to a minor.

Dated    CHARTER SECURITY LIFE INSURANCE COMPANY (NY) this    SEVENTEENTH

day of    JUNE    , 19 83 .

CHARTER SECURITY LIFE INSURANCE COMPANY
(NEW YORK)

REGISTRAR
VICE PRESIDENT

# Charter Security Life Insurance Company (New York)

**ENDORSEMENT**

This amendment is attached to and forms part of the policy.

The Annual Statement of Values provision on Page 7 is hereby amended as follows:

The words "As of each contract anniversary" are replaced with the words "At least once each year".



President

RA-104E1
4/84

```
 1

 2                 IN THE UNITED STATES DISTRICT COURT

               FOR THE NORTHERN DISTRICT OF ILLINOIS

 3                       EASTERN DIVISION

 4

 5    DENNIS DIMON,                    )
                                       )
 6              Plaintiffs,            )
                                       )
 7        vs.                          ) C.A. No:  05-11073 WGY
                                       )
 8    METROPOLITAN LIFE INSURANCE,     )
      KEMPER INSURANCE COMPANY,        )
 9    MORGAN STANLEY DW, INC.,         )
      MICHAEL B. LATTI, LATTI          )
10    ASSOCIATES, and LATTI &          )
      ANDERSON LLP,                    )
11                                     )
                Defendants.            )
12

13

14              The telephonic deposition of WILLIAM R.

15    MENSIE, called by the Defendant Metropolitan Life

16    Insurance for examination, pursuant to Notice, and

17    pursuant to the Rules of Civil Procedure for the United

18    States District Courts pertaining to the taking of

19    depositions, taken before Joanne M. Brogan, a Certified

20    Shorthand Reporter and a Notary Public in and for the

21    County of Cook and State of Illinois, at One Kemper

22    Drive, Long Grove, Illinois, on Thursday, 7th day of

23    September, 2006, at the hour of 9:00 o'clock a.m.

24
```

Dimon vs. Metropolitan Life                9-8-06                      William R. Mensie
                              C.A. No.: 05-11073 WGY

Page 2

1  APPEARANCES:
2
3     THE KAPLAN/BOND GROUP
      By MR. BRIAN KEANE  (present telephonically)
4     88 Black Falcon Avenue, Suite 301
      Boston, Massachusetts 02210
5     (617)261-0080
         appeared on behalf of the Plaintiff;
6
7     CIAPCIAK & ASSOCIATES, P.C.
      By MR. PETER M. LeBLANC  (present telephonically)
8     99 Access Road
      Norwood, Massachusetts 02062
9     (781)255-7401
         appeared on behalf of Defendant
10       Metropolitan Life Insurance Company;
11
      SULLIVAN WEINSTEIN & McQUAY, P.C.
12    By MS. SANDRA SUE McQUAY  (present telephonically)
      Two Park Plaza
13    Boston, Massachusetts 02116-3902
      (617)348-4355
14       appeared on behalf of Defendant
         Morgan Stanley DW, Inc.;
15
16    TODD & WELD, LLP
      By MR. JOHN E. DeWICK  (present telephonically)
17    28 State Street
      Boston, Massachusetts 02109
18    (617)624-4803
         appeared on behalf of Defendants
19       Michael B. Latti, Latti Associates and
         Latti & Anderson LLP;
20
21    DRINKER BIDDLE & REATH, LLP
      By MR. TIMOTHY J. O'DRISCOLL
22    One Logan Square, 18th and Cherry Streets
      Philadelphia, Pennsylvania 19103-6969
23    (215)988-2865
         appeared on behalf of Defendant
24       Kemper Insurance Company.
         PRECISE REPORTING SERVICE, P.C.

Page 3

1      I N D E X
2        WILLIAM R. MENSIE
3           PAGES
4
   MR. LeBLANC:
5
      DIRECT EXAMINATION         4 - 214
6     REDIRECT EXAMINATION       253 - 274
      FURTHER REDIRECT EXAMINATION   276 - 278
7
   MS. McQUAY:
8
      CROSS EXAMINATION          214 - 240
9
   MR. DeWICK:
10
      CROSS EXAMINATION          240 - 244
11    RECROSS EXAMINATION        274 - 275
12  MR. KEANE:
13    CROSS EXAMINATION          244 - 252
14
15
16        INDEX TO EXHIBITS
   EXHIBIT NO.  DESCRIPTION       PAGE
17
      1   October 10, 1983 Letter     53
18    2   Application             80
      3   Annuity Application     83
19    4   Annuity Application     86
      5   April 18, 1983 Memorandum   127
20    6   November 8, 1983 Memorandum   132
      7   August 12, 1983 Letter    196
21    8   March 10, 1983 Jerome B. Spunt  199
          Letter
22    9   March 10, 1983 Medway Marine   204
          Letter
23    10  General Release         218
      11  Single Premium Deferred Annuity  223
24
      PRECISE REPORTING SERVICE, P.C.

Page 4

1          MR. LeBLANC:  Do counsel want to enter into the
2  usual stipulation waiving the notary that's required in
3  Illinois and reserving objections except as to form until
4  trial?
5          MR. O'DRISCOLL:  That's fine with me.
6          MR. DeWICK:  I'm fine with those stipulations.
7          MR. KEANE:  I'm fine with those stipulations as
8  well.
9          MR. LeBLANC:  Has the witness been sworn?
10         (Witness sworn.)
11             WILLIAM R. MENSIE,
12  called as a witness on behalf of the Defendant
13  Metropolitan Life Insurance, having been first duly
14  sworn, was examined and testified as follows:
15             DIRECT EXAMINATION
16  BY MR. LeBLANC:
17    Q   This is Peter LeBlanc.  State your full name
18  for the record, sir.
19    A   William Randolph Mensie.
20    Q   Spell your last name, please.
21    A   M-e-n-s-i-e.
22    Q   Are you an employee of Kemper Insurance?
23    A   I am.
24    Q   Okay.  And what's your position with Kemper?
      PRECISE REPORTING SERVICE, P.C.

Page 5

1     A   Liability claim consultant.
2     Q   Okay.  And what does that mean?  What do you
3  do?
4     A   I handle claims, liability claims, from the
5  Long Grove office facility.
6     Q   Okay.  And can you tell me a little bit about
7  what a liability claim might be?
8     A   A claim where a third party has instituted an
9  action against a Kemper insured.
10    Q   Okay.  And does that also involve when third
11  parties institute actions against Kemper itself?
12    A   It could.
13    Q   Okay.  What do you understand the allegations
14  made against Kemper in this case to be?
15    A   I understand -- stood that an action was
16  initiated against Kemper alleging misrepresentation and
17  breach of contract.
18    Q   Okay.  Do you understand that you're here to
19  testify on behalf of Kemper Insurance?
20    A   Yes.
21    Q   And that you're testifying as the
22  representative of Kemper Insurance?
23    A   Yes.
24    Q   How long have you been employed with Kemper?
      PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life
9-8-06
William R. Mensie
C.A. No.: 05-11073 WGY

Page 242

1    A    No.
2    Q    Do you have any legal training at all?
3    A    Other than as it relates to claim handling.
4    Q    Could you just expand on that. What training
5 do you have, legal training do you have, as it relates to
6 claim handling?
7    A    A working knowledge of the law necessary to
8 handle claims that I'm charged with handling.
9    Q    Is that the law of liability, if you could just
10 be a little bit more --
11    A    Basic principles of -- basic legal principles
12 and understanding of the process and systems.
13    Q    And when you say "basic legal principles,"
14 again do you mean --
15    A    Principles of negligence, torts, contracts.
16    Q    Negligence, torts, contracts?
17    A    Negligence or torts, and I said contracts is
18 what I said, an understanding of, you know, the parties
19 of a contract.
20    Q    And so when you say you have a working
21 knowledge of it, have you had specific training, or is
22 this training you've acquired through performance of your
23 job over the years?
24    A    Performance of the job.

PRECISE REPORTING SERVICE, P.C.

Page 243

1    Q    So there has been no formal training?
2    A    You know, I've attended training courses, I've
3 attended continuing education courses and things of that
4 nature over the years.
5    Q    And those courses dealt with what you spoke of,
6 legal principles with respect to torts?
7    A    Yes, sir.
8    Q    When you testified earlier that Kemper had no
9 involvement in obtaining the quote from Charter Life for
10 the life annuity, again that is based on your review of
11 all the documents in this litigation?
12    A    That's correct.
13    Q    So you have no firsthand knowledge that they
14 had no such involvement; is that correct?
15    A    No independent knowledge, that is correct.
16    Q    In all your years of experience with annuities
17 have you ever encountered an incident such as this one
18 where an after annuity contract issued, the issuing
19 company claimed that there had been a clerical error with
20 regard to the terms?
21    A    No.
22    Q    You testified yesterday that American Motorists
23 Company still exists?
24    A    Yes.

PRECISE REPORTING SERVICE, P.C.

Page 244

1    Q    They are a part of the Kemper Group?
2    A    Yes.
3    Q    And the Kemper Group is not -- and correct me
4 if I'm wrong obviously, the Kemper Group is not an entity
5 unto itself, but it is a trade name under which certain
6 entities operate; is that correct?
7    A    That is correct.
8    Q    So in your capacity here testifying on behalf
9 of Kemper, are you also testifying on behalf of each
10 insurance company insofar as they operate under the
11 Kemper trade name?
12    A    With respect to American Motorists, yes.
13        MR. DeWICK:  Thank you very much. I have
14 nothing further.
15                 CROSS EXAMINATION
16 BY MR. KEANE:
17    Q    Mr. Mensie, my name is Brian Keane. I just
18 have a few questions as well. I represent the Plaintiff
19 Dennis Dimon in this matter.
20    A    Yes, sir.
21    Q    If I could have you look at Exhibit 11. Do you
22 have that in front of you?
23        MR. O'DRISCOLL:  I'm just getting it for him,
24 Brian.

PRECISE REPORTING SERVICE, P.C.

Page 245

1        THE WITNESS:  Yes, sir.
2 BY MR. KEANE:
3    Q    I just wanted to follow up on some of the
4 questions Attorney McQuay was asking you. If you turn to
5 page K-0015, it looks like Attorney McQuay was asking you
6 questions about the highlighted and capital section "with
7 certain period." Is it your understanding that that
8 section of the settlement options falls under option 2,
9 life income, down below on the left side?
10    A    Yes.
11    Q    And if you turn to K-0010 at the beginning of
12 Exhibit 11, at about a quarter of the way down it says:
13 Option 2. Life Income with a star. Do you see that?
14    A    Which paragraph are you referring to?
15    Q    It's about a quarter of the way down on the
16 document. It's below the numbers, and it says: "Option
17 2. Life Income" with a star.
18    A    Yes, I see it.
19    Q    Now, does that relate to what's on page K-0015
20 in regards to Option 2, life income?
21    A    I would think so. I don't see any other option
22 2s in the policy.
23    Q    And therefore this policy issued by Charter
24 Security Life would be for the life of the person for who

PRECISE REPORTING SERVICE, P.C.

Dimon vs. Metropolitan Life                9-8-06                William R. Mensie
                              C.A. No.: 05-11073 WGY

Page 246

1  it was issued for; is that correct?
2      A   It represents to be so.
3      Q   If you'd look at page K-0018 of Exhibit 11.
4  The signature, can you tell me what that signature says?
5      A   Reads Barbara Boehm.
6      Q   And does it say that Barbara Boehm is from
7  Charter Life Insurance Company?
8      A   Yes, it does.
9      Q   Can you tell me the date that is typed just
10  above that area?
11     A   17th June, 1983.
12     Q   Is it your understanding June 17th, 1983, is
13  after the settlement hearing in front of Judge Pettine in
14  this matter?
15     A   Yes.
16     Q   And that's because the settlement hearing
17  actually took place on June 3rd, 1983, correct?
18     A   I recall that it was before the policy was
19  issued. My reading was and that was consistent with the
20  record. It was consistent with the record the policy --
21  the record in the hearing that was being represented to
22  the court for the approval of the settlement, and then
23  this document were consistent.
24     Q   Okay. On Exhibit 11, if you could look at
                      PRECISE REPORTING SERVICE, P.C.

Page 247

1  K-0019.
2      A   Yes, sir.
3      Q   The settlement agreement, correct?
4      A   Yes.
5      Q   Who would have filled that out?
6      A   It appears to me this was filled out by
7  Charter.
8      Q   Now, for this annuity contract, the Charter
9  Security Life annuity contract, it was Kemper's money
10  from the excess coverage for the Point Judith Fishermen's
11  Association, it was actually Kemper's money, the $175,000
12  from that policy of insurance, that went to fund this
13  annuity, correct?
14     A   It was money paid out by Kemper is my
15  understanding, yes.
16     Q   And as a matter of fact, Kemper became part
17  owner of that annuity contract, correct?
18     A   That was my understanding, yes.
19     Q   You testified, and I just wanted to follow up
20  with you, you were actually adjusting this claim on
21  behalf of the specific claim that we're here for today on
22  behalf of Kemper, correct?
23     A   Correct.
24     Q   You testified yesterday you were talking about
                      PRECISE REPORTING SERVICE, P.C.

Page 248

1  Mr. Noe, and we were referring to some of the documents
2  of the letters going back between Charter Security, Mr.
3  Noe, and you said that -- the testimony was that
4  something looked unusual to you with regard to Mr. Noe's
5  signature. Can you elaborate for me what you meant by
6  that?
7      A   The -- I was being asked to compare certain
8  documents. It was the application and the signatures
9  that while one was clear, the other was not. However,
10  just the lines just struck me as suspect in that, you
11  know, how often do people sign documents in the same
12  space which it appeared to me; and as I testified, I'm
13  not a handwriting expert or anything, but it just struck
14  me as odd to see that the signatures appeared to be
15  matched up; and I think the inference was that he had
16  signed both documents at different times.
17     Q   You also testified yesterday in regard to talking about
18  the changes that were made by Charter, you described
19  those changes as unilateral or that they did something
20  unilaterally. What did you mean by that?
21     A   Well, the fact that they took it upon
22  themselves to modify a contract that they had issued and
23  abide by the terms that they had framed versus that which
24  had been represented to the court that existed, and the
                      PRECISE REPORTING SERVICE, P.C.

Page 249

1  parties to that agreement were not in agreement with them
2  in doing so. So they just took it upon themselves to
3  continue to make these payments when at least in their
4  understanding they were suggesting the terms were not as
5  they wanted them to be.
6      Q   What do you think that Charter Security Life
7  should have done in this situation?
8      A   I think they're obligated -- if they were in
9  fact cancelling the original agreement, I think they were
10  obligated to refund the money.
11     Q   And that would be refunded to Kemper?
12     A   That would have been a refund to Kemper.
13     Q   If you could look at what's been marked as
14  Exhibit 2.
15         MR. O'DRISCOLL: Okay. Let me just get that
16  for Mr. Mensie.
17         MR. DeWICK: I'm sorry. Brian, what document
18  was that Bates labeled?
19         MS. McQUAY: K-107.
20         THE WITNESS: Okay.
21  BY MR. KEANE:
22     Q   If you look at Exhibit 2, in box 12, I'll read
23  it to you: "Will this annuity replace or change any
24  existing life insurance or annuity contract?" And the
                      PRECISE REPORTING SERVICE, P.C.

| Page 254 | Page 256 |
|---|---|
| 1   Q   And if you look at Exhibit 2, is there anything<br>2  on that application that indicates a lifetime annuity was<br>3  applied for?<br>4   A   Again, I don't see anything on Exhibit 2<br>5  indicating life.<br>6   Q   Okay. If we refer back to Exhibit 3, in box 9<br>7  it says: Type of contract single premium immediate<br>8  annuity. Do you see where it says that?<br>9   A   Box 9 it says: Type of contract single premium<br>10  deferred annuity. Deferred is marked off and above it is<br>11  handwritten immediate.<br>12   Q   Okay. Was there any indication in any of your<br>13  review of the documents in the claim file in this case<br>14  that Kemper intended to apply for a deferred annuity?<br>15   A   I don't recall seeing those terms in the<br>16  documents that I recall at this time.<br>17   Q   Now, in your experience in the insurance and<br>18  annuity industry, the term 20 year certain, does that<br>19  imply a lifetime annuity, just those words?<br>20     MR. O'DRISCOLL: When read in conjunction with<br>21  the contract?<br>22     MR. LeBLANC: No, on the application, 20 year<br>23  certain, does that mean lifetime?<br>24     THE WITNESS: Certain -- go ahead. I'm sorry.<br>      PRECISE REPORTING SERVICE, P.C. | 1  20 year certain, that's what was applied for, wasn't it,<br>2  Mr. Mensie?<br>3     MR. O'DRISCOLL: Are you asking him what was<br>4  applied for or what it says in the box?<br>5     MR. LeBLANC: What it says in the box.<br>6     THE WITNESS: Thank you for clarifying that. I<br>7  just read what it says in the box. The certain period as<br>8  signified by definition of the contract is outlined in a<br>9  previous question that had been asked of me where I think<br>10  it was one of the exhibits that, titled settlement<br>11  options, I think the company defines certain period to<br>12  the extent that it talks about a specific period of time<br>13  which that 20 year would be as elected and thereafter for<br>14  the remaining lifetime of the payee.<br>15  BY MR. LeBLANC:<br>16   Q   Okay. Would you agree with me at the time the<br>17  application was made that no contract existed?<br>18     MR. O'DRISCOLL: Object to the form. When you<br>19  say "at the time the application was made," that's not<br>20  clear to me; but if the witness can answer it.<br>21     MR. LeBLANC: To the extent that I can<br>22  understand the question and can answer it, there was a --<br>23  the actual -- my reading of the material suggested that<br>24  there in fact hadn't been a -- there had been a meeting<br>      PRECISE REPORTING SERVICE, P.C. |
| **Page 255** | **Page 257** |
| 1     MR. O'DRISCOLL: Well, to the extent that you<br>2  can answer.<br>3     THE WITNESS: To the extent that I can answer<br>4  this is that the certain signifies a specified period.<br>5  BY MR. LeBLANC:<br>6   Q   And what on the application in Exhibit 3 is the<br>7  specified period?<br>8   A   In the handwritten document are you speaking of<br>9  in section 14?<br>10   Q   I'm speaking of Exhibit 3, what is the certain<br>11  period represented in that application?<br>12   A   The application in section 14 is handwritten<br>13  immediate annuity 20 year certain, 3 percent interest,<br>14  175,000, I think that's an equal sign, 1,450.45 per<br>15  month, and I cannot decipher what that last portion is.<br>16   Q   But the 20 year certain annuity is being<br>17  applied for per the terms of this application; isn't that<br>18  correct?<br>19     MR. O'DRISCOLL: Object to the form of the<br>20  question. Are you asking now in conjunction with the<br>21  rest of the contract?<br>22     MR. LeBLANC: I'm asking in the annuity<br>23  application, the document that Mr. -- that we marked as<br>24  Exhibit 3 and Mr. Mensie I hope has in front of him says<br>      PRECISE REPORTING SERVICE, P.C. | 1  of the minds with respect to --<br>2  BY MR. LeBLANC:<br>3   Q   Mr. Mensie, that's not what I asked you.<br>4     MR. O'DRISCOLL: The witness is trying to<br>5  answer the question.<br>6     MR. LeBLANC: The witness is answering his own<br>7  question.<br>8  BY MR. LeBLANC:<br>9   Q   The question is: Did a contract exist as of<br>10  the time this application was made?<br>11     MR. O'DRISCOLL: Between what parties?<br>12     MR. LeBLANC: An annuity contract.<br>13     MR. O'DRISCOLL: Well, I'll object on a few<br>14  grounds. First of all, you're asking Mr. Mensie for a<br>15  legal opinion, and he's testifying here as a fact witness<br>16  as Kemper's representative.<br>17     MR. LeBLANC: I'm asking him if factually a<br>18  contract existed as of the time the application was<br>19  submitted.<br>20     MR. O'DRISCOLL: Well, you know, I would<br>21  continue in my objection. The existence of a contract<br>22  and when exactly it exists is the subject of case law,<br>23  not for Mr. Mensie's testimony.<br>24  BY MR. LeBLANC:<br>      PRECISE REPORTING SERVICE, P.C. |

Dimon vs. Metropolitan Life                9-8-06                William R. Mensie
C.A. No.: 05-11073 WGY

| Page 274 | Page 276 |
|---|---|
| 1   Q   You sent it to your attorney? | 1        FURTHER REDIRECT EXAMINATION |
| 2   A   I sent it to my attorney in the form that I | 2   BY MR. LeBLANC: |
| 3   received it, and there were documents within that review, | 3   Q   Mr. Mensie, box 14 of Exhibit 3, does the term |
| 4   within my initial review, that were not in date sequence | 4   "the certain period" appear anywhere in box 14? |
| 5   order. | 5        MR. O'DRISCOLL: Box 14 of Exhibit 3. |
| 6   Q   Do you recall what those documents were? | 6        THE WITNESS: In Exhibit 3 it reads: Immediate |
| 7   A   No, I do not. | 7   annuity, 20 year certain. |
| 8        MR. LeBLANC: I have no further questions; | 8   BY MR. LeBLANC: |
| 9   although I am reserving the right to suspend. | 9   Q   But not the certain period? |
| 10        MR. O'DRISCOLL: I have no questions.  Does | 10   A   It does not read the certain period. |
| 11   anyone else? | 11   Q   Okay.  So you're making the leap of faith |
| 12        MS. McQUAY: No. | 12   between box 14 and K-0015 that the certain period and |
| 13        MR. DeWICK: I have one actually.  This is Jed | 13   certain mean the same thing; isn't that true? |
| 14   DeWick. | 14        MR. O'DRISCOLL: Objection to the form.  You |
| 15        RECROSS EXAMINATION | 15   may answer. |
| 16   BY MR. DeWICK: | 16        THE WITNESS: No.  My leap was actually my |
| 17   Q   Mr. Mensie, back to Exhibit 3 where it | 17   recollection of what -- how it read in Exhibit K-0015, |
| 18   indicates about 14 immediate annuity, 20 year certain? | 18   it's in parentheses the certain period.  So the person |
| 19   A   Yes, sir. | 19   authoring box 14 may have been classifying the certain |
| 20   Q   You referenced a document earlier that was -- | 20   period to be reflective of what the actual contract says, |
| 21   you testified was part of the annuity contract and that | 21   so it was actually the reverse.  I was going from the |
| 22   that's Bates labeled K-0015. | 22   contract itself by what was being asked of me earlier |
| 23        MR. O'DRISCOLL: I'm going to hand that to the | 23   trying to define what they were suggesting here in box |
| 24   witness if that's okay. | 24   14. |
|        PRECISE REPORTING SERVICE, P.C. |        PRECISE REPORTING SERVICE, P.C. |

| Page 275 | Page 277 |
|---|---|
| 1        MR. DeWICK: Yes, please, hand both of them if | 1   BY MR. LeBLANC: |
| 2   you will, Exhibit 3 as well as that page. | 2   Q   Okay.  And you would agree with me that the day |
| 3        THE WITNESS: Oh, yes. | 3   is -- |
| 4   BY MR. DeWICK: | 4   A   Whoever the author was of this handwritten |
| 5   Q   Just so we're clear here, the portion on Bates | 5   document. |
| 6   labeled K-0015 indicates option 2, life annuity.  Do you | 6   Q   The day you're referring to is someone from |
| 7   see that? | 7   1983, right? |
| 8   A   Yes. | 8   A   This document was -- appears that this dates |
| 9   Q   And then in the next column it says with | 9   back to 1983, yes. |
| 10   certain period, and it describes what with certain period | 10   Q   And you don't know who wrote that? |
| 11   means? | 11        MR. O'DRISCOLL: Who wrote what? |
| 12   A   Yes. | 12        MR. LeBLANC: Who wrote certain in box 14. |
| 13   Q   And then we see on box 14 of Exhibit 3 that it | 13        THE WITNESS: I do not know the identity of the |
| 14   indicates in the special request box immediate annuity, | 14   author of what appears in the special remarks section. |
| 15   20 year certain? | 15   BY MR. LeBLANC: |
| 16   A   That's correct. | 16   Q   Okay.  When you say "special remarks," do you |
| 17   Q   Referencing those two documents, is it fair to | 17   mean special requests? |
| 18   say that this application is applying for a life annuity | 18   A   I'm sorry.  Special requests, yes. |
| 19   with a 20 year certain period? | 19   Q   So you're speculating as to what they may have |
| 20   A   It appears to be so, yes. | 20   been thinking but have no basis of knowledge for that; |
| 21        MR. DeWICK: I don't have anything further. | 21   isn't that true? |
| 22   Thank you. | 22   A   My knowledge is only based upon my |
| 23        MR. O'DRISCOLL: Anyone else? | 23   interpretation of what it says. |
| 24        MR. LeBLANC: I do. | 24   Q   Okay.  But you testified earlier that the |
|        PRECISE REPORTING SERVICE, P.C. |        PRECISE REPORTING SERVICE, P.C. |

# SUPPLEMENTARY AGREEMENT

(No. SC1126.)

In consideration of the surrender of Policy No(s) issued by Charter Security Life Insurance Company (New York) on the life of Dennis Dimon the undersigned hereby requests that the aggregate net proceeds payable under said policy(s) as of the termination date be paid to the payees designated in, and in the order and manner provided in, the following Table or Tables and in the General Provisions of this Agreement.

The undersigned surrenders said policy(s) to the Insurance Company and, concurrently herewith, revokes any beneficiary designation and any election of settlement heretofore made under the said policy(s).

| PAYEES | MANNER OF PAYMENT | PRIVILEGES |
|---|---|---|
| **TABLE I** | | |
| SECTION ONE - PRIMARY PAYEE | | |
| Dennis Dimon<br>Laurel Lane<br>West Kingston, RI 02892 | Monthly payments in the amount of $1,450.45, increasing 3% annually, for a period of 240 months only. | |
| SECTION TWO-CONTINGENT PAYEE | | |
| Katherine I. Dimon, wife | In the same manner as the Primary Payee, for the specified period. | |

000020