UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DENNIS DIMON<br>　　　　Plaintiff | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-11073-NG |
| | ) | |
| METROPOLITAN LIFE | ) | |
| INSURANCE COMPANY, KEMPER | ) | |
| INSURANCE COMPANY, | ) | |
| MORGAN STANLEY DW, INC., | ) | |
| MICHAEL B. LATTI, LATTI | ) | |
| ASSOCIATES, LATTI & ANDERSON | ) | |
| LLP, | ) | |
| 　　　　Defendants | ) | |

## ORDER

AND NOW, this ____ day of _____, 2008, upon consideration of Defendant

Kemper Insurance Company's ("Kemper's") Motion *in Limine* to preclude testimony by Barbara

Fasman related to the pricing and underwriting of annuities in 1983, and any response thereto, it

is hereby ORDERED that Kemper's motion is GRANTED, and it is further ORDERED that

Barbara Fasman is precluded from offering any testimony at trial relating to the pricing and

underwriting of annuities in 1983.

BY THE COURT:

_____
　　　　　　　　　　　　　　　　　　　　　　　　　　J.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| DENNIS DIMON | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-11073-NG |
| | ) | |
| METROPOLITAN LIFE | ) | |
| INSURANCE COMPANY, KEMPER | ) | |
| INSURANCE COMPANY, | ) | |
| MORGAN STANLEY DW, INC., | ) | |
| MICHAEL B. LATTI, LATTI | ) | |
| ASSOCIATES, LATTI & ANDERSON | ) | |
| LLP, | ) | |
| Defendants | ) | |

**DEFENDANT KEMPER INSURANCE COMPANY'S MOTION IN LIMINE
TO PRECLUDE TESTIMONY FROM BARBARA FASMAN ON
THE PRICING AND UNDERWRITING OF ANNUITIES IN 1983**

I.      **Background**

Defendant Kemper Insurance Company ("Kemper") hereby moves to preclude any

testimony from Barbara Fasman, identified as Witness "2" by Defendant Metropolitan Life

Insurance Company ("MetLife") in the Joint Pre-Trial Memorandum, on the pricing and

underwriting of annuities in 1983.

At her deposition, Ms. Fasman, an actuarial consultant, made reference to alleged

information regarding the pricing and underwriting of annuities in 1983. See relevant portions of

the deposition transcript of Barbara Fasman ("Fasman Dep."), a true and correct copy of which is

attached hereto as Exhibit "A." Ms. Fasman testified that her alleged information on this subject

was obtained from unidentified people in MetLife's "quote unit." See Fasman Dep. at 80:23-

81:4. Ms. Fasman testified that she did not perform any of the alleged pricing calculations

herself, but rather, "had them done." Id. at 81:19-22. Significantly, Ms. Fasman admitted that

she does not know what the annuity rates charged or pricing assumptions utilized by Charter

Security Life Insurance Company ("Charter Life") were in 1983, and therefore could not attempt

to price any annuity issued by Charter Life.[1] Id. at 87:18-88:7. Ms. Fasman also admitted that

she does not know and therefore could not take into account Mr. Dimon's life expectancy, which

is the key factor in accurately pricing life annuities. See Fasman Dep. at 82:2-25. Ms. Fasman

further admitted that, for purposes of the annuity pricing that the "quote unit" performed, "[t]here

was nothing specifically changed to reflect anything about Mr. Dimon." See Fasman Dep. at

82:2-9.

Under this Court's Order, MetLife's deadline to designate trial experts and to "disclose

the information contemplated by Fed. R. Civ. P. 26(a)(2)(B)" was September 1, 2006. MetLife

has not disclosed Ms. Fasman as an expert witness, and has not provided an written expert report

or any of the other information required by Fed. R. Civ. P. 26(a)(2)(B).

## II.    Argument

Kemper objects to any testimony from Barbara Fasman, MetLife's Rule 30(b)(6) witness,

on the pricing and underwriting of annuities in 1983, for four separate and independent reasons.

First, the rates and pricing assumptions that Met Life (or any other life insurance

company) may have utilized for annuities in 1983 is completely irrelevant to the issue of whether

the annuity that Charter Life in fact issued is a life annuity. Furthermore, Ms. Fasman admitted

that she has no idea what rates or pricing assumptions Charter Life itself or any other life

insurance company may have utilized in 1983 (not that this information would be relevant

either), and that different life insurance companies charge different rates and use different pricing

assumptions due to various factors. See Fasman Dep. at 87:10-88:19. Any testimony by Ms.

---

[1] In 1983, MetLife and Charter Life were entirely separate and unrelated companies.

Fasman on this subject would be irrelevant and immaterial to any issue in the case, and could

only operate to prejudice Kemper and Plaintiff, confuse the issues, and mislead the jury. See

Fed. R. Evid. 401 and 402.

Second, such testimony clearly would constitute hearsay under Rule 801(c), because the

alleged information testified to by Ms. Fasman on this subject was obtained by Ms. Fasman from

unidentified people in MetLife's "quote unit." See Fasman Dep. at 80:23-81:4. Ms. Fasman

further admitted that she did not perform any of the alleged calculations herself, but rather, "had

them done." Id. at 81:19-22. Under Rule 802, such testimony is to be excluded. See Fed. R.

Evid. 801(c) and 802.

Third, Ms. Fasman, who is an actuarial consultant, was never identified as an expert, and

no expert opinion from Ms. Fasman was ever provided by MetLife. Rule 702 provides as

follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training or education, may testify
> thereto in the form of an opinion or otherwise....

Clearly, the pricing and underwriting of annuities in 1983 constitutes "technical or other

specialized knowledge" within the ambit of Rule 702 such that MetLife would have had to

designate Ms. Fasman as a purported expert during the course of discovery if she were to testify

as to this subject at trial "in the form of opinion or otherwise." See, e.g., Schlier v. Kaiser

Found., 876 F.2d 174, 179 (D.C. Cir. 1989) (discounting future wages to present value requires

expert testimony). Under this Court's Order, MetLife's deadline to designate Ms. Fasman as a

trial expert and to "disclose the information contemplated by Fed. R. Civ. P. 26(a)(2)(B)" was

September 1, 2006. MetLife neither disclosed Ms. Fasman as an expert witness, nor provided

an written expert report or any of the other information required by Fed. R. Civ. P. 26(a)(2)(B).

Kemper and Plaintiff would be extremely prejudiced if MetLife were permitted to circumvent

the rules and requirements applicable to expert testimony by offering Ms. Fasman to testify at

trial as to expert issues under the guise of being a mere fact witness.  Any testimony by Ms.

Fasman on this subject therefore should be precluded.

Fourth, even assuming (contrary to fact) that MetLife had otherwise complied with the

Federal Rules and this Court's Orders applicable to expert witnesses, the requirements of Rule

702 plainly would not be met by Ms. Fasman's testimony.  Rule 702 requires that "(1) the

testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable

principles and methods, and (3) the witness has applied the principles and methods reliably to the

facts of the case."  See Fed. R. Evid. 702.  In Ms. Fasman's case, it is clear that none of these

requirements has been met.  In the brief portions of her deposition in which she testified

regarding alleged annuity pricing in 1983, Ms. Fasman admitted, for example, that she does not

know what the annuity rates charged or pricing assumptions utilized by Charter Life were in

1983, and therefore cannot attempt to price any annuity issued by Charter Life.  Id. at 87:18-

88:7.  Ms. Fasman also admitted that she does not know and therefore could not take into

account Mr. Dimon's life expectancy, which is the key factor in accurately pricing life annuities.

See Fasman Dep. at 82:2-25.  (In fact, Mr. Dimon's life expectancy in 1983 was only 49.7

years.[2])  Indeed, Ms. Fasman admitted that, for purposes of the annuity pricing that the "quote

unit" performed, "[t]here was nothing specifically changed to reflect anything about Mr.

Dimon."  See Fasman Dep. at 82:2-9 (emphasis added).  Clearly, Ms. Fasman's testimony would

---

[2] See relevant portions of the deposition transcript of Dennis Dimon, a true and correct copy of which is attached
hereto as Exhibit "B", at 94:8-95-1; 161:8-162:18.

- 4 -

not be based on sufficient facts or reliable principles or methods, nor would it have reliable application to the facts of this case.

## III.   Conclusion

For the foregoing reasons, Kemper respectfully requests that the Court preclude any testimony at trial from Barbara Fasman on the pricing and underwriting of annuities in 1983.

Respectfully submitted,

KEMPER INSURANCE COMPANY

by its attorneys,

_____/s/ Kevin L. Golden_____
DRINKER BIDDLE & REATH LLP
Timothy O'Driscoll (Admitted Pro Hac Vice)
Kevin L. Golden (Admitted Pro Hac Vice)
DRINKER BIDDLE & REATH LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996
(215) 988-2700

Local Counsel
Kevin S. Murphy (BBO #638335)
Anthony B. Fioravanti (BBO #664823)
YURKO SALVESEN & REMZ, P.C.
One Washington Mall, 11th Floor
Boston, MA 02108-2603
(617) 723-6900

Dated: May 14, 2008

### Certification of Service

I hereby certify that a true and accurate copy of the foregoing document was filed via the ECF system and will be served electronically through that system upon Counsel of Record on May 14, 2008.

_____/s/ Kevin L. Golden_____
Kevin L. Golden

# In The Matter Of:

*Dennis Dimon  v.*

*Met Life Insurance Co., et al.*

---

*Barbara Fasman*

*Vol. 1, May 10, 2006*

---

*Greenhouse Reporting, Inc.*

*Computerized Litigation Support*

*363 Seventh Avenue*

*20th Floor*

*New York, NY  10001*

*(212) 279-5108    FAX: (212) 279-5431*

*Original File BF051006.V1, 94 Pages*
*Min-U-Script® File ID: 3923061621*

**Word Index included with this Min-U-Script®**

Dennis Dimon v.
Met Life Insurance Co., et al.

Barbara Fasman
Vol. 1, May 10, 2006

Page 1

[1]
[2] UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
[3]
[4] DENNIS DIMON,
            Plaintiff,
[5]       -against-
[6] MET LIFE INSURANCE CO., KEMPER INSURANCE
CO., MORGAN STANLEY D.W., INC., MICHAEL B.
[7] LATTI, LATTI ASSOCIATES and LATTI &
ANDERSON, LLP
[8]           Defendants.
[9]
[10]          May 10, 2006
              10:00 a.m.
[11]
[12]
[13]
[14]      Deposition of Met Life Insurance Co.
[15] by Barbara Fasman, 30(b)(6) witness, held at
[16] the offices of Met Life, One Met life Plaza,
[17] 27-01 Queens Plaza North, Long Island City,
[18] New York, before Vicky Gafitsis, a Certified
[19] Shorthand Reporter and Notary Public of the
[20] State of New York.
[21]
[22]
[23]
          GREENHOUSE REPORTING, INC.
[24]    363 Seventh Avenue - 20th Floor
          New York, New York 10001
[25]          (212) 279-5108

Page 2

[1]
[2] APPEARANCES:
[3]
[4] THE KAPLAN BOND GROUP
          Attorneys for the Plaintiff
[5]       88 Black Falcon Avenue
          Boston, Massachusetts 02210
[6] BY:   BRIAN KEANE, ESQ.,
                  of Counsel
[7] (Appearing Telephonically)
[8]
[9]
[10] CIAPCIAK & ASSOCIATES, P.C.
          Attorneys for the Defendant
[11]      Met Life Insurance Co.
          99 Access Road
[12]      Norwood, Massachusetts 02062
       BY:   JAMES J. CIAPCIAK, ESQ.
[13]
          -and-
[14]
          Alvin Pasternack, Esq.
[15]      Associate General Counsel,
          Law Department
[16]      One MetLife Plaza
          27-01 Queens Plaza North
[17]      Long Island City, New York 1101
[18]
[19]
       DRINKER BIDDLE & REACH, ESQS.
[20]      Attorneys for the Defendant
          Kemper Insurance Co.
[21]      One Logan Square
          18th and Cherry Streets
[22]      Philadelphia, Pennsylvania 19103
       BY:   TIMOTHY O'DRISCOLL, ESQ.,
[23]              of Counsel
       (Appearing Telephonically)
[24]
[25]

Barbara Fasman
Vol. 1, May 10, 2006

Dennis Dimon v.
Met Life Insurance Co., et al.

---

Page 3

[1]
[2]    APPEARANCES: (Continued.)
[3]
[4]    SULLIVAN WEINSTEIN & McQUAY, ESQS.
        Attorneys for the Defendants
[5]        Morgan Stanley D.W., Inc.
        Two Park Plaza
[6]        Boston, Massachusetts 02116
        BY:   SANDRA SUE McQUAY, ESQ.
[7]    (Appearing Telephonically)
[8]
        8
[9]    TODD & WELD, ESQS.
        Attorneys for the Defendants
[10]       Michael B. Latti, Latti Associates
        and Latti & Anderson, LLP
[11]       28 State Street
        Boston, Massachusetts 02104
[12]   BY:   JED DeWICK, ESQ.
               of Counsel
[13]   (Appearing Telephonically)
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

Page 4

[1]                        B. Fasman
[2]   (Exhibits 1 through 21 were
[3]   pre-marked for identification.)
[4]   BARBARA FASMAN,
[5]   stating an address of One MetLife
[6]   Plaza, 27-01 Queens Plaza North,
[7]   Long Island City, New York 11101
[8]   having been first duly sworn by a
[9]   Notary Public of the State of New
[10]  York, was examined and testified as
[11]  follows:
[12]              EXAMINATION BY MS. McQUAY:
[13]   Q: Ms. Fasman, this is Sue McQuay.
[14]  As I indicated already, I represent the
[15]  defendant Morgan Stanley. Because we are
[16]  conducting this deposition today by telephone
[17]  as a request of your counsel, because we are
[18]  doing this over the telephone, it's
[19]  particularly important that you speak up and
[20]  we'll try to do the same so that we can hear
[21]  each other clearly.
[22]      It's also very important that you
[23]  let me finish my question and I accordingly
[24]  will try to let you finish your answer so we
[25]  don't talk across each other.

---

Page 5

[1]                        B. Fasman
[2]      Further if you have any questions
[3]  or you don't understand a question that I'm
[4]  asking you, please let me know and I will try
[5]  to rephrase, is that clear?
[6]      A: Yes.
[7]      Q: Now, is it Ms. Fasman? What is
[8]  your address, please?
[9]      A: Mrs. Fasman.
[10]     Q: Okay, Mrs. Fasman. What is your
[11] address, please?
[12]     A: Met Life at One Met Life Plaza,
[13] 2701 Queens Plaza North, Long Island City
[14] New York, 11101.
[15]     Q: Am I correct in understanding
[16] that you work for Met Life?
[17]     A: I do work for Met Life.
[18]     Q: What is your position with Met
[19] Life?
[20]     A: My title is consultant.
[21]     Q: I'm sorry?
[22]     A: My title is consultant.
[23]     Q: Titlist?
[24]     A: My title is consultant.
[25]     Q: Your title is consultant, okay.

---

Page 6

[1]                        B. Fasman
[2]  And what are your duties and responsibilities
[3]  as a consultant for Met Life?
[4]      A: I support our Corporate Customer
[5]  Relations Department and our Administrative
[6]  Offices with regard to annuity questions and
[7]  complaints. I also do calculations of various
[8]  technical amounts as requested.
[9]      Q: Would you explain what you mean
[10] when you say you do calculations of various
[11] technical amounts when requested?
[12]     A: Present values of benefits,
[13] interest calculations, any mathematical
[14] calculation that the administrative offices
[15] are not able to handle.
[16]     Q: When you say that your title at
[17] Met Life is consultant, am I correct in
[18] understanding that you are in fact an employee
[19] of Met Life?
[20]     A: Yes.
[21]     Q: How long have you been with Met
[22] Life?
[23]     A: 25 years.
[24]     Q: When did you begin work?
[25]     A: I began work at Met Life in

---

Barbara Fasman
Vol. 1, May 10, 2006

Dennis Dimon v.
Met Life Insurance Co., et al.

Page 75

[1]                          B. Fasman
[2]    Q: Okay. And Exhibit 13 that you
[3] referenced, this is a letter to Mr. Dimon from
[4] Met Life in July of 2003?
[5]    A: Yes.
[6]    Q: This came from Met Life's files?
[7]    A: Yes, it did.
[8]    Q: And in this case you again state
[9] you're unable to provide him with a contract,
[10] correct?
[11]    A: Yes, we do.
[12]    Q: You give him an explanation as to
[13] why you can't?
[14]    A: Yes, we explain it was a contract
[15] issued as a settlement from another company.
[16]    Q: Yes. But any where, do you tell
[17] him why you can't give him a copy?
[18]    A: It eludes to the fact that
[19] American Motorists is the person who took out
[20] the contract.
[21]    Q: Okay. One final bit of
[22] housekeeping in this assessment, during the
[23] course of your testimony you referred to what
[24] has previously been marked as Exhibit 8 for
[25] the deposition. I don't believe we've

Page 76

[1]                          B. Fasman
[2] formerly introduced it so I would like to do
[3] so now. Directing your attention to
[4] Exhibit 8, can you describe the document,
[5] please?
[6]    (Exhibit 8, a letter from John L.
[7] Noe from B. Boehm dated October 14,
[8] 1983 was introduced for
[9] identification.)
[10]    A: This is a letter from Barbara
[11] Boehm to Mr. Noe dated October 14th, 1983.
[12]    Q: This was a document that came
[13] from Met Life's files?
[14]    A: Yes, it was.
[15]    MS. McQUAY: Thank you, I have no
[16] further questions.
[17]          EXAMINATION BY MR. DeWICK:
[18]    Q: Hi, Mrs. Fasman, this is Jed
[19] DeWick. I just have one question. You
[20] indicated earlier that part of your duties are
[21] to perform calculations with respect to
[22] annuities, is that correct?
[23]    A: Calculations in general, yes.
[24]    Q: Okay. Have you personally
[25] performed any calculations with respect to the

Page 77

[1]                          B. Fasman
[2] annuity in question here?
[3]    A: I did do some calculations to see
[4] different costs.
[5]    Q: Can you please just describe the
[6] calculations you did and what you found?
[7]    A: I did a calculation to see what a
[8] 20-year certain annuity with the 3 percent
[9] increase annually would cost using Met Life
[10] pricing assumptions from 1983, May 1983. And
[11] that would have cost $1,450 per month starting
[12] — as the starting amount, and that would have
[13] cost about $180,000. And to compare that to
[14] what the pricing was with the Charter annuity.
[15]    And I did other calculations as
[16] well.
[17]    Q: Let me just ask you what you
[18] meant there when you said the Charter annuity.
[19] What were the terms of the annuity that you
[20] are referring to when you say Charter annuity?
[21]    A: 20-year certain in life with a
[22] 3 percent increase annually starting — well,
[23] that one was 14 — 1,450.45 per month. But
[24] the quotes I did was $1,450.
[25]    Q: Did you do a calculation of what

Page 78

[1]                          B. Fasman
[2] the 20-year certain in life thereafter annuity
[3] would approximately be?
[4]    A: I did a calculation of a 20-year
[5] certain in life annuity where during the first
[6] 20 years there was a 3 percent annual
[7] increase, and after that the amount was flat
[8] for life. And the cost of that was $270,900.
[9]    Q: And you are speaking of, when you
[10] say the cost, you are talking about a one time
[11] premium?
[12]    A: A single premium, yes. Using
[13] May '83 rate, 1983 rates.
[14]    Q: Do any document exist that
[15] reflect these calculations?
[16]    A: I took some notes.
[17]    Q: Are you in possession of these
[18] notes?
[19]    A: Yes, I am.
[20]    Q: Did you refer to any document
[21] when you were making this calculation?
[22]    MR. CIAPCIAK: I object on form.
[23]    A: I had requested from my attorney
[24] quotes to get these numbers.
[25]    Q: Can you repeat that? I didn't

Case 1:05-cv-11073-NG    Document 162-2    Filed 05/14/2008    Page 5 of 7

Dennis Dimon v.                                                        Barbara Fasman
Met Life Insurance Co., et al.                                        Vol. 1, May 10, 2006

Page 79

[1]                    B. Fasman
[2] catch it.
[3]    A: I had request from my attorney
[4] quotes from our annuity area to get these
[5] numbers.
[6]    Q: Your attorney, you mean Met Life?
[7]    MR. CIAPCIAK: That would be me.
[8]    Q: In-house?
[9]    A: Yes.
[10]    Q: Is the document that you referred
[11] to and the notes you took, these documents are
[12] still in your possession?
[13]    A: The notes are in my possession.
[14]    Q: What about the documents you
[15] referred to, do you know where those are?
[16]    MR. CIAPCIAK: I object to the
[17] form. What document are you referring
[18] to? The source? Or —
[19]    MR. DeWICK: Whatever documents
[20] Mrs. Fasman reviewed to make these
[21] calculations.
[22]    MR. CIAPCIAK: Okay, so the
[23] source of that.
[24]    A: I have the answers. I never
[25] physically got documents that had quotes or

Page 80

[1]                    B. Fasman
[2] anything other than the numbers.
[3]    Q: You just received the figures
[4] verbally?
[5]    A: No, I got an e-mail with them.
[6]    Q: Do you still have that e-mail?
[7]    MR. CIAPCIAK: You know what, I
[8] am going to instruct her not to answer.
[9] The e-mail was from counsel.
[10]    Q: Okay.
[11]    MR. CIAPCIAK: I think what you
[12] are looking for is the source of the
[13] number. I don't want to mislead you
[14] here. Are you looking for what she
[15] looked at to get those numbers?
[16]    MR. DeWICK: Yes, I'm just trying
[17] to figure out basically —
[18]    MR. CIAPCIAK: That you may
[19] answer.
[20]    MR. DeWICK: Just to make sure
[21] that I covered the universe of
[22] information that was considered.
[23]    A: I called our quote unit and asked
[24] them to do quotes using 1983 numbers —
[25] assumptions and to get the single premium for

Page 81

[1]                    B. Fasman
[2] the annuities that we just discussed, using my
[3] 1983 rates. And they ran their computer
[4] program and gave me back the answers.
[5]    Q: I have nothing further. Thank
[6] you.
[7]        EXAMINATION BY MR. KEANE:
[8]    Q: Mrs. Fasman, My name is Brian
[9] Keane and I represent Dennis Dimon. I just
[10] have a couple of questions. Again, I know you
[11] heard this from attorney McQuay, but if you
[12] don't understand a question please let me know
[13] and I will rephrase it.
[14]    Going back to the information you
[15] were just giving, when did you do these
[16] calculations?
[17]    A: I requested them, I believe it
[18] was August of 2005.
[19]    Q: That's when you did the
[20] calculations in August of 2005?
[21]    A: I didn't do the calculations. I
[22] had them done.
[23]    Q: That they be done in August of
[24] 2005?
[25]    A: Yes.

Page 82

[1]                    B. Fasman
[2]    Q: What did you use in terms of life
[3] expectancy for Mr. Dimon when you did these
[4] calculations?
[5]    A: We did a standard life
[6] assumption. I don't know what is in — I
[7] don't know what's built into the program.
[8] There was nothing specifically changed to
[9] reflect anything about Mr. Dimon.
[10]    Q: Is the life expectancy a big
[11] factor in determining those types of numbers?
[12]    A: It is a big factor in determining
[13] the cost of a life annuity, yes.
[14]    Q: Wouldn't you need to have more
[15] information about Mr. Dimon to determine his
[16] life expectancy to come to a premium price?
[17]    A: For the purpose of this analysis
[18] what we were doing was, what it would have
[19] cost, an estimate of what it would have cost
[20] from Met Life to purchase, to provide the
[21] annuity, the 20-year certain annuity and the
[22] 20-year certain in life annuity in 1983. And
[23] at that time I have no reason to understand
[24] that there was special pricing done for
[25] Mr. Dimon.

Page 83

[1]                       *B. Fasman*
[2]     **Q:** You mentioned earlier in your
[3] testimony a woman by the name of Teresa
[4] Mannino, is that right?
[5]     **A:** Yes.
[6]     **Q:** Who told you that Ms. Mannino
[7] would have information regarding Charter
[8] Security Life?
[9]     **MR. CIAPCIAK:** I object to form.
[10]    **A:** I just, well, my counsel
[11] mentioned her but. But I happened to have
[12] worked very closely with her.
[13]    **Q:** Was Ms. Mannino a former employee
[14] of Charter Security Life?
[15]    **A:** No, she was not.
[16]    **Q:** Do you know approximately when
[17] Met Life took over Charter Security Life?
[18]    **A:** In the mid '80s, I believe.
[19]    **Q:** You mentioned that this annuity
[20] application was an immediate annuity. Can you
[21] tell me what that means?
[22]    **A:** Generally, an immediate annuity
[23] refers to an annuity which provides a stream
[24] of payments, the first of which is made within
[25] a year of the purchase date.

Page 84

[1]                       *B. Fasman*
[2]     **Q:** As you look at Exhibit 1, can you
[3] tell me the purchase date of that annuity?
[4]     **A:** I can tell you the application
[5] date.
[6]     **Q:** Did you give me the date?
[7]     **A:** I said, I can tell you the
[8] application date.
[9]     **Q:** I was waiting for that, I
[10] apologize. What is that date?
[11]    **A:** May 4th, 1983.
[12]    **Q:** You mentioned earlier something
[13] called a quotation sheet. What is that?
[14]    **A:** Typically in the industry when an
[15] a immediate annuity is being sold there is a
[16] quotation done to show how much benefit can be
[17] provided for a single premium or how much a
[18] specific benefit costs.
[19]    **Q:** You testified earlier that you do
[20] not have a quotation sheet for Mr. Dimon's
[21] annuity, is that right?
[22]    **A:** That's right.
[23]    **Q:** If you look at Exhibit 1 again,
[24] and you look down on the bottom right side, it
[25] says signature of annuitant. Can you read

Page 85

[1]                       *B. Fasman*
[2] that name?
[3]     **A:** It appears to be Dennis Dimon.
[4]     **Q:** And you testified earlier that
[5] there was an annuity application and there
[6] also was a supplementary agreement. And I
[7] think you testified that the supplementary
[8] agreement basically explained what the annuity
[9] would be, is that right?
[10]    **MR. CIAPCIAK:** Objection.
[11]    **A:** I think that's what I said. It
[12] would explain the payments.
[13]    **Q:** Can you tell me the timing or the
[14] difference in timing for the annuity
[15] application and the supplementary agreement?
[16]    **A:** I don't know when the
[17] supplementary agreement was produced.
[18]    **Q:** I am asking a question based on
[19] your experience. Is the supplementary
[20] agreement usually offered after the annuity
[21] application?
[22]    **A:** Generally, the annuity
[23] application is taken, and then a contract is
[24] issued subsequent to the annuity application
[25] being taken.

Page 86

[1]                       *B. Fasman*
[2]     **Q:** I believe you testified you do
[3] not have the actual contract for Mr. Dimon's
[4] annuity, is that right?
[5]     **MR. CIAPCIAK:** Objection.
[6]     **A:** I don't have the contract, right.
[7] But I have the application and the
[8] supplementary agreement, that's what I have.
[9] To me the supplementary agreement is the
[10] contract and it explains what the terms are.
[11]    **MR. KEANE:** If you would just
[12] give me one minute.
[13]    **Q:** Mrs. Fasman, that's all I have,
[14] thank you.
[15]    **MS. McQUAY:** Tim, do you have any
[16] questions?
[17]    **MR. O'DRISCOLL:** No, I have no
[18] questions.
[19]    **MS. McQUAY:** I have just a couple
[20] further Mrs. Fasman.
[21]                   **BY MS. McQUAY:**
[22]    **Q:** Just a couple of questions about
[23] these calculations that you asked to be done
[24] back in August of 2005.
[25]    **A:** Yes.

**Dennis Dimon v.**
**Met Life Insurance Co., et al.**

**Barbara Fasman**
**Vol. 1, May 10, 2006**

Page 87

*B. Fasman*

[1]
[2]    **Q:** Am I correct in understanding
[3] that you supplied certain assumptions that
[4] should be used including the amount the
[5] annuity should payout each month, the age of
[6] the annuitant and so forth?
[7]    **MR. CIAPCIAK:** I object to form.
[8]    **Q:** Is that correct?
[9]    **A:** I did, yes.
[10]    **Q:** Okay. And you asked that someone
[11] calculate what the premium would be based on
[12] such assumptions using Met Life's rates for
[13] 1983?
[14]    **A:** Yes.
[15]    **Q:** Now, do different companies have
[16] different rates?
[17]    **A:** Yes.
[18]    **Q:** Do you know what Charter
[19] Security's rates were back in 1983?
[20]    **A:** No, I don't.
[21]    **Q:** All right. So using your
[22] calculation you were not using whatever rates
[23] Charter Security might have been using,
[24] correct?
[25]    **MR. CIAPCIAK:** Objection.

Page 88

*B. Fasman*

[1]
[2]    **A:** Right, I don't know what they
[3] were using so I couldn't use them. But I
[4] can't say that we didn't use them. They could
[5] have been the same coincidentally.
[6]    **Q:** You just don't know?
[7]    **A:** Right.
[8]    **Q:** What are some of the factors that
[9] effect the variability of the different rates
[10] charged by different companies?
[11]    **A:** The assumptions with regard to
[12] life expectancy, interest, expenses.
[13]    **Q:** Life expectancy and what else?
[14]    **A:** Interest, expenses, taxes,
[15] gender. I can't think of anything else
[16] offhand.
[17]    **Q:** So different companies use
[18] different assumptions regarding those items?
[19]    **A:** They can, yes.
[20]    **Q:** Okay. And in terms of expenses,
[21] to the extent that that's a variable, does
[22] that depend upon the — are you referring to
[23] the different expenses of different companies?
[24]    **A:** I am referring to what
[25] expenses — I guess it's the expenses of

Page 89

*B. Fasman*

[1]
[2] different companies. It's what expenses they
[3] billed into the single premium so that they
[4] can continue to service the annuity going
[5] forward.
[6]    **MS. McQUAY:** I have no further
[7] questions.
[8]    **MR. DeWick:** I have no further
[9] questions.
[10]    (Time noted is 11:50 a.m.)

Page 90

*B. Fasman*

[1]
[2]    I, the witness herein, having read
[3] the foregoing testimony do hereby
[4] certify it to be a true and correct
[5] transcript, subject to the corrections,
[6] if any, shown on the attached page.

[11]    **BARBARA FASMAN**

[16]    Subscribed and sworn to
[17] before me this_____day
[18] of_____, 2006.

1

VOLUME:  I
PAGES:  1 through 172
EXHIBITS:  See Index


UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-11073 WGY


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
DENNIS DIMON,                    )
                    Plaintiff,   )
                                 )
     VS.                         )
                                 )
METROPOLITAN LIFE INSURANCE )
COMPANY, KEMPER INSURANCE   )
COMPANY, MORGAN STANLEY DW  )
INC., MICHAEL B. LATTI,      )
LATTI ASSOCIATES, and        )
LATTI & ANDERSON LLP,        )
                    Defendants. )
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


     **DEPOSITION OF DENNIS J. DIMON,** a witness
called on behalf of the Defendant, taken pursuant
to the Provisions of the Federal Rules of Civil
Procedure, before Julie A. Healey, a Certified
Shorthand Reporter, Registered Professional
Reporter, and Notary Public in and for the
Commonwealth of Massachusetts, at the offices of
Ciapciak & Associates, P.C., 99 Access Road,
Norwood, Massachusetts, on June 29, 2006,
commencing at 11:25 a.m.



COPLEY COURT REPORTING
101 Tremont Street
Boston, Massachusetts 02108


COPLEY COURT REPORTING, INC.
(617) 423-5841

DIMON v. METLIFE, et al.                                   DENNIS J. DIMON, 6/29/06

**Page 2**

1 APPEARANCES:

2 THE KAPLAN/BOND GROUP
  BY: Brian Keane, Esq.
3 88 Black Falcon Avenue, Suite 301
  Boston, Massachusetts 02210
4 Counsel for the Plaintiff

5

6 CIAPCIAK & ASSOCIATES, P.C.
  BY: Peter M. LeBlanc, Esq.
7 99 Access Road
  Norwood, Massachusetts 02062
8 Counsel for the Defendant,
  Metropolitan Life Insurance Company
9

10
11 SULLIVAN WEINSTEIN & McQUAY, P.C.
  BY: Sandra Sue McQuay, Esq.
  Two Park Plaza
12 Boston, Massachusetts 02116-3902
  Counsel for the Defendant,
13 Morgan Stanley DW, Inc.

14

15 TODD & WELD, LLP
  BY: John E. DeWick, Esq.
16 28 State Street
  Boston, Massachusetts 02109
17 Counsel for the Defendants,
  Michael B. Latti, Latti Associates,
18 and Latti & Anderson LLP

19

20 DRINKER, BIDDLE & REATH, LLP (VIA TELEPHONE)
  BY: Timothy J. O'Driscoll, Esq.
21 One Logan Square
  18th and Cherry Streets
22 Philadelphia, Pennsylvania 19103-6969
  Counsel for the Defendant,
23 Kemper Insurance Company

24

**Page 3**

         INDEX

1
2 Witness        Direct Cross Redirect Recross

3 DENNIS J. DIMON

4 (By Mr. LeBlanc)  5      164
  (By Mr. DeWick)        148
5 (By Ms. McQuay)            160
  (By Mr. O'Driscoll)        163

6

7

8

9

10        EXHIBITS

11 Exhibit No.              Page

12
   1  Complaint            124
13
   2  Annuity Application  110
14
   3  Supplementary Agreement  126
15    No. SC1126

16   5  Letter dated 8/12/83   112

17   6  Letter dated 9/26/83   115

18   7  Letter dated 10/10/83  118

19   9  Letter dated 10/12/83  118

20  11  Letter dated 9/24/99   96

21  12  Telephone Log          101

22  13  Letter dated 6/9/03    128

23

24

**Page 4**

1             EXHIBITS

2 Exhibit No.              Page

3
   14  Handwritten Note      17
4      dated 6/19/03

5  15  Fax dated 6/12/03      66

6  17  Letter dated 9/13/04   103

7  18  Letter dated 9/28/04   104

8  20  Note dated 11/16/04    120

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 5**

1                 PROCEEDINGS

2           DENNIS J. DIMON, having been

3 satisfactorily identified and duly sworn by the

4 Notary Public, was examined and testified as

5 follows:

6                 DIRECT EXAMINATION

7 BY MR. LeBLANC:

8     Q.    For the record, my name is Peter LeBlanc,

9 I'm representing Metropolitan Life Insurance

10 Company, and Mr. Dimon, have you been introduced

11 to everyone else in the room?

12    A.    Yes.

13    Q.    And do you understand that Mr. Timothy

14 O'Driscoll is on the phone and he represents

15 Kemper Life Insurance?

16    A.    Yeah.

17    Q.    Okay, let's begin here. Mr. Dimon, can

18 you state your full --

19          MR. LeBLANC: Actually, Counsel, if

20 everyone would like to enter into any

21 stipulations, waive notary, sign within thirty

22 days?

23          MR. KEANE: Can he have forty-five

24 days, would that be okay?

**Page 6**

1          MR. LeBLANC: Forty-five days, sure.

2          MR. KEANE: Waive notary.

3          MR. LeBLANC: And reserve objections

4 except as to form and motions to strike until

5 trial.

6          MR. KEANE: Fine.

7          MR. LeBLANC: Everyone agrees?

8          MR. DeWICK: Yes.

9          MR. LeBLANC: Mr. O'Driscoll, did you

10 hear the stipulations?

11          MR. O'DRISCOLL: Yes.

12          MR. LeBLANC: Do you agree?

13          MR. O'DRISCOLL: Yes.

14          MR. LeBLANC: Thank you.

15 BY MR. LeBLANC:

16    Q.    Mr. Dimon, can you tell us what your full

17 name is?

18    A.    Dennis Jay Diamond.

19    Q.    And can you spell your middle name?

20    A.    J-A-Y.

21    Q.    Now, have you ever gone by any other

22 name?

23    A.    No.

24    Q.    Okay, and what is your home address?

**Page 7**

1     A.    151 Holly Ridge Road, West Kingston.

2     Q.    Is that the address you also get your

3 mail at?

4     A.    No, it's P.O. Box 56, West Kingston.

5          MR. O'DRISCOLL: Forgive me, Tim

6 O'Driscoll, would it be possible for the witness

7 to move closer to the telephone? I can barely

8 hear him.

9          MR. LeBLANC: We can try to move the

10 telephone closer to him and see if that works.

11          MR. O'DRISCOLL: Thank you.

12 BY MR. LeBLANC:

13    Q.    Mr. Dimon, can you repeat your last

14 answer, please?

15    A.    My Post Office Box is 56, West Kingston.

16    Q.    Okay, and that's Rhode Island?

17    A.    Yes, Kingston.

18    Q.    How long have you been receiving mail at

19 the P.O. Box?

20    A.    Um, about four years now.

21    Q.    Okay. Before you opened the P.O. Box,

22 where did you receive your mail?

23    A.    Right, at my other house that I had on

24 Greenwood Drive in Peacedale.

DIMON v. METLIFE, et al.                                    DENNIS J. DIMON, 6/29/06

**92**

1    A.  Yeah.
2    Q.  Okay.  Do you know who wrote the body of
3 this letter, this portion here (indicating) in the
4 middle?
5    A.  Um, I think Fred Benson did, I'm not
6 sure.
7    Q.  Okay, and other than your signature which
8 you put on this document and your wife's signature
9 which she put on the document, is it your
10 understanding or belief that all of the rest of
11 this writing may have been Fred Benson's?
12    A.  I think so, I think so.
13    Q.  Okay.  Now, if Mr. Benson wrote this or
14 any other party wrote this, would you have had
15 someone read it to you before you signed it?
16    A.  I don't remember it right offhand.
17    Q.  Do you recall signing a lined piece of
18 paper with nothing on it?
19    A.  No.
20    Q.  So, do you dispute that this document is
21 a document that you signed?
22    A.  I'm just saying I don't remember it right
23 offhand, let's put it that way.
24    Q.  Okay, and I'll read it to you with

**93**

1 respect, it says "Charter Security Life Insurance
2 Company."  Do you know who they are?
3    A.  Yeah.
4    Q.  Okay, and who are they?
5    A.  That was the first insurance company that
6 had taken the policy.
7    Q.  And when you say the policy?
8    A.  Annuity or whatever you want to call it
9 there.
10    Q.  Okay, and I'll read from the document,
11 "We had the understand that my wife was to collect
12 this check up to twenty year.  If nothing happened
13 to me and I was to collect it for fifty years."
14           MS. McQUAY:  I think you misread it
15 actually, I think it says "If anything happened to
16 me."
17           MR. LeBLANC:  "If anything," I'm
18 sorry, then I'll correct that.
19 BY MR. LeBLANC:
20    Q.  "If anything happened to me and I was to
21 collect it for fifty years."  Does that ring a
22 bell to you?
23    A.  Not really.
24    Q.  Was it your understanding in 2003 that

**94**

1 your wife was to collect the check for twenty
2 years?
3    A.  Yeah.
4    Q.  And that if --
5    A.  Okay, yeah.
6    Q.  And if nothing happened to you --
7    A.  Right, right.
8    Q.  -- how long were you supposed to collect
9 the check?
10    A.  Well, all right, now I know where the
11 letter came from, if I can remember now, that is
12 what they had given me a life expectancy to the
13 age of fifty.
14         The way they had based that on the way I
15 was, you know, the business I was in and down
16 through the families on the male side of my
17 family, that they never really lived over the age
18 of fifty, that and I was a heavy smoker and stuff
19 like that at that time, that the doctors had gave
20 me a life expectancy of fifty years because of my
21 livelihood and stuff like that, and I remember
22 saying that to somebody.
23         I think it was Fred Benson, I'm not sure,
24 so, he might have wrote that in there, I'm not

**95**

1 sure.
2    Q.  Okay.  So --
3    A.  I know we sent a letter to somebody at
4 one time, I can't remember exactly who.  It's been
5 a little while and so much has been going on, you
6 know, but I know he writ to somebody, let's put it
7 that way.
8    Q.  And he is Mr. Benson?
9    A.  Right, Mr. Benson, right.
10    Q.  And did he do that on your behalf?
11    A.  Right.
12           MR. LeBLANC:  We'll take a half-hour
13 then.
14           (A lunch break was taken.)
15           MR. LeBLANC:  We'll go back on
16 record.  Just to confirm, Mr. O'Driscoll, do we
17 still have you down there?
18           MR. O'DRISCOLL:  Yes.
19           MR. LeBLANC:  Okay.
20 BY MR. LeBLANC:
21    Q.  Mr. Dimon, we're back on record, and I
22 would like to show you Exhibit No. 11.
23           MR. LeBLANC:  I'd like that marked as
24 11.

**96**

1           (Exhibit No. 11, Letter dated
2 9/24/99, marked for identification.)
3           MR. LeBLANC:  And for the record,
4 we've marked as Exhibit 11 a letter dated
5 September 24th, 1999 addressed to Dennis Dimon by
6 Teresa Thorp.
7 BY MR. LeBLANC:
8    Q.  Mr. Dimon, have you ever seen this
9 document before?
10    A.  No, I don't even know what it is.
11    Q.  Okay.  I'll read the first paragraph, it
12 says "We received a call from Katherine Dimon
13 requesting information on the above contract.
14 This contract was issued as a structured
15 settlement on 5/5/1983."
16         Do you know what contract they're
17 referring to?
18    A.  No, not right offhand.
19    Q.  Okay.  Was your settlement annuity that
20 you received issued on 5/5/1983?
21    A.  It could have been, like I said, I'm not
22 too good with dates and stuff like that.
23    Q.  Okay, and I'll skip down a sentence, "You
24 received monthly payments," the copy is kind of

**97**

1 bad, "You," some word, "monthly payments until the
2 final payment on 5/5/2003."
3         Now, what does that mean to you, the
4 final payment on 5/5/2003?
5    A.  Like I said, I thought it was a mistake.
6    Q.  Okay, but you admitted in your request
7 for production or request for admissions that we
8 sent you and you signed that you received this
9 letter?
10    A.  Yeah, yeah, I think so.
11    Q.  Okay, and in September of 1999, P.O. Box
12 56 was your mailing address?
13    A.  Yeah.
14    Q.  Okay.  Was that where you were receiving
15 your checks?
16    A.  Yeah.
17    Q.  Okay.  So, would it be fair to say that
18 you did receive this letter as you admitted?
19    A.  I'm, I think so.  Like I said, there's so
20 many papers, I don't remember all of them, let's
21 put it that way.
22    Q.  Okay.  Now, why did your wife, Kathy,
23 request information regarding the annuity in 1999?
24    A.  Because I asked her to.  The only other

DIMON v. METLIFE, et al.                                    DENNIS J. DIMON, 6/29/06

|  | 158 |
|---|---|
| 1 | A.   From himself, yes. |
| 2 | Q.   And do you remember when you received |
| 3 | that from him? |
| 4 | A.   The day that we signed the contract for |
| 5 | this policy. |
| 6 | Q.   And have we seen the contract for this |
| 7 | policy? |
| 8 | A.   No. |
| 9 | Q.   And did you receive a copy of that signed |
| 10 | contract? |
| 11 | A.   Nothing. |
| 12 | Q.   Do you know -- |
| 13 | A.   This (indicating) is the only paper I |
| 14 | received at that time. |
| 15 | Q.   Do you know where the signed copy of the |
| 16 | annuity went after you signed it? |
| 17 | A.   No. |
| 18 | Q.   Who else was in the room when you signed |
| 19 | it? |
| 20 | A.   My wife, and I'm not sure if one of his |
| 21 | associates was there too, I'm not sure. |
| 22 | Q.   So, your wife, yourself, Mr. Latti? |
| 23 | A.   Right. |
| 24 | Q.   And perhaps one of his associates? |

|  | 159 |
|---|---|
| 1 | A.   I think so. |
| 2 | Q.   Anyone else? |
| 3 | A.   No, not that I know of. |
| 4 | Q.   And do you recall, you don't recall the |
| 5 | date that that was signed, do you? |
| 6 | A.   No, not right off. |
| 7 | Q.   But you recall it was the same day that |
| 8 | he showed you page 3 -- |
| 9 | A.   Yeah. |
| 10 | Q.   -- let me finish, it's hard for her, it's |
| 11 | impossible for her to write both of us at the same |
| 12 | time, actually. |
| 13 | A.   Sorry. |
| 14 | Q.   Not hard, impossible.  You signed the |
| 15 | annuity the same day you received page 3 of |
| 16 | Exhibit 5, the proposal from Mr. Latti; is that |
| 17 | correct? |
| 18 | A.   Right. |
| 19 | Q.   And do you know whether that |
| 20 | was -- strike that. |
| 21 |      Do you recall how long before you began |
| 22 | to receive payments that you signed the annuity |
| 23 | contract, how much time elapsed between the |
| 24 | signing and receiving your first payment? |

|  | 160 |
|---|---|
| 1 | A.   Not really, but it didn't seem like a |
| 2 | very long time.  I can't tell exactly how much |
| 3 | time in between. |
| 4 | Q.   Are you able to estimate?  Only if you |
| 5 | are able. |
| 6 | A.   I would say within a couple of weeks |
| 7 | maybe. |
| 8 | Q.   And after, in June of 2003, when your |
| 9 | wife contacted Mr. Latti's daughter to ask whether |
| 10 | she had documents regarding the settlement, after |
| 11 | that contact where she said that no such document, |
| 12 | that they did not have documents in their |
| 13 | possession any longer, was there any further |
| 14 | contact with Latti's office after that? |
| 15 | A.   Not as far as I know, not from myself. |
| 16 | Q.   Okay. |
| 17 |      MR. DeWICK:  I have nothing further, |
| 18 | thank you. |
| 19 |      MS. McQUAY:  Just a couple of |
| 20 | questions, Mr. Dimon. |
| 21 |      RECROSS EXAMINATION |
| 22 | BY MS. McQUAY: |
| 23 | Q.   I believe you testified that you were |
| 24 | born in December of 1959? |

|  | 161 |
|---|---|
| 1 | A.   Right. |
| 2 | Q.   Which makes you, you'll be this December, |
| 3 | what, forty-seven years old? |
| 4 | A.   Yeah. |
| 5 | Q.   My math is right, you'll be forty-seven |
| 6 | in December? |
| 7 | A.   Yeah. |
| 8 | Q.   Okay.  So, now, you testified I believe |
| 9 | that, if I heard you correctly, that you were told |
| 10 | that and I think you used the word they used a |
| 11 | life expectancy of fifty for you in coming up with |
| 12 | this annuity policy? |
| 13 | A.   Yes, correct. |
| 14 | Q.   Would you tell me more about that, who |
| 15 | told you that a life expectancy of fifty was used |
| 16 | in coming up with this annuity policy? |
| 17 | A.   Well, the doctors in Boston Ear & Eye |
| 18 | Infirmary and stuff like, there was a few |
| 19 | specialists and stuff like that, and I guess they |
| 20 | were trying to base it on, you know, the life |
| 21 | expectancy of the family, stuff like that, and |
| 22 | they wanted to know, you know, like, when my |
| 23 | father passed away, and well, he didn't pass away |
| 24 | then but my grandfathers and down the family tree. |

|  | 162 |
|---|---|
| 1 | Q.   So, someone took a look at your medical |
| 2 | records? |
| 3 | A.   Right. |
| 4 | Q.   And based on your medical records, it's |
| 5 | your understanding that a decision was arrived at |
| 6 | that you would have a life expectancy of only |
| 7 | about fifty years? |
| 8 | A.   Right. |
| 9 | Q.   Which means you've got three years to go, |
| 10 | let's hope you do better than they estimated. |
| 11 | A.   Well, it's sometime I guess. |
| 12 | Q.   Who told you that in fact they had |
| 13 | determined and that were using a life expectancy |
| 14 | of fifty years in connection with this annuity |
| 15 | policy? |
| 16 | A.   I'm pretty sure it was Latti. |
| 17 | Q.   Latti told you that? |
| 18 | A.   Yes. |
| 19 | Q.   Okay. |
| 20 |      MS. McQUAY:  I have no further |
| 21 | questions, thank you. |
| 22 |      MR. KEANE:  Nothing. |
| 23 |      MR. LeBLANC:  Mr. O'Driscoll, do you |
| 24 | have any questions? |

|  | 163 |
|---|---|
| 1 |      MR. O'DRISCOLL:  Just a few. |
| 2 |      RECROSS EXAMINATION |
| 3 | BY MR. O'DRISCOLL: |
| 4 | Q.   Good afternoon, Mr. Dimon, my name is Tim |
| 5 | O'Driscoll. |
| 6 | A.   Hello. |
| 7 | Q.   Mr. Dimon, have you ever had any |
| 8 | discussions with anyone at American Motorist |
| 9 | Insurance Company regarding your annuity payments? |
| 10 | A.   Not that I can recollect, no. |
| 11 | Q.   Have you ever had any correspondence with |
| 12 | anyone at American Motorist Insurance Company |
| 13 | regarding your annuity payments? |
| 14 | A.   No. |
| 15 | Q.   Have you ever had any contact at all with |
| 16 | anyone at American Motorist Insurance Company |
| 17 | regarding your annuity payments? |
| 18 | A.   My wife did a couple of times, but that |
| 19 | was way before they changed hands. |
| 20 | Q.   Before who changed hands, sir? |
| 21 | A.   Before, it went from American Motors to |
| 22 | whatever it is now, I can't remember what it is |
| 23 | now, or they went out of business or whatever they |
| 24 | did, I'm not sure. |