## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DENNIS DIMON )<br>Plaintiff )<br> )<br>v. )<br> )<br>METROPOLITAN LIFE )<br>INSURANCE COMPANY, KEMPER )<br>INSURANCE COMPANY, )<br>MORGAN STANLEY DW, INC., )<br>MICHAEL B. LATTI, LATTI )<br>ASSOCIATES, LATTI & ANDERSON )<br>LLP, )<br>Defendants ) | Civil Action No. 05-11073-NG |

### TRIAL BRIEF OF DEFENDANT KEMPER INSURANCE COMPANY

Defendant Kemper Insurance Company ("Kemper") hereby submits its Trial Brief in connection with this matter.

### I.  FACTS

The law firm of Latti Associates (including partners Michael Latti and Roger Hughes) were Plaintiff's lawyers in connection with the personal injury lawsuit captioned <u>Dennis Dimon v. The Jenny C., Inc.</u>, C.A. No. 81-0063 (District of Rhode Island) (the "Underlying Action"). Kemper was the excess insurer for The Jenny C., the defendant in the Underlying Action, with a excess policy limit of $400,000.

On April 8, 1983, Charter Security Life Insurance Company ("Charter Life") made a "Proposal" (the "Charter Life Proposal") to Plaintiff's lawyers (through Plaintiff's broker, Dean Witter) for a "Life Annuity 20 Year Certain Under A Structured Annuity Settlement Of $1,450.45 Per Month For The First Year And It Would Increase 3% Per Year As Follows...." The Charter Life Proposal then sets forth the resulting monthly payments over fifty years time.

Within a week of the transmission of the Charter Life Proposal, Plaintiff's lawyers held

settlement discussions with Kemper, which discussions were recounted in a memorandum dated

April 18, 1983. During these settlement discussions, Plaintiff's lawyers, Michael Latti and

Roger Hughes, advised Kemper that they had secured from Charter Life a $175,000 premium

quote for an annuity that would provide the following payments: $1,450.45 per month,

increasing 3% annually, guaranteed for 20 years and then for life. Plaintiff's lawyers requested,

in settlement of the Underlying Action, that Kemper pay them a lump sum in the amount of

$175,000 so that Plaintiff's lawyers could obtain this annuity, and that Kemper (along with the

primary carrier also pay a separate lump sum payment in the amount of $250,000. Plaintiff's

lawyers also requested that Kemper be the nominal owner of the annuity, for tax purposes.[1]

Kemper agreed.

On April 13, 1983, Kemper issued a check payable to Charter Life in the amount of

$175,000. On April 13, 1983, Kemper also issued a check payable to Plaintiff and his lawyers in

the amount of $176,326.33, with the primary carrier contributing the balance of the $250,000

lump sum. On April 19, 1983, a Settlement Sheet was prepared by Plaintiff's lawyers, which

provided that the settlement amount was "$425,000...$175,000 Annuity...$250,000 Up-front."

Also on April 19, 1983, Plaintiff signed a General Release, which provided as follows:

"[Plaintiff]..., in consideration of the payment of Two Hundred Fifty Thousand and No/100

($250,000.00) Dollars and the establishment of a fully paid annuity contract for my benefit with

Charter Life Insurance Company, to pay me One Thousand Four Hundred Fifty and No/100

---

[1] Plaintiff has testified that Mr. Latti arranged for the annuity because Mr. Latti told Plaintiff that if Plaintiff had taken just a cash payment, that Plaintiff would "wind up paying an awful lot of taxes on it." Based on Mr. Latti's advice to Plaintiff, Plaintiff "decided to go with the plan that [Mr. Latti] came up with." Mr. Latti told Plaintiff that Mr. Latti had "looked into other options and [Mr. Latti] felt the one he gave [Plaintiff] was the best that he could find." Mr. Latti also told Plaintiff that Plaintiff was only expected to live until the age of 50, based on Plaintiff's family history and the doctors' evaluation thereof.

- 2 -

($1,450.00) Dollars per month for one year following the execution of that contract and thereafter, such monthly sum increased at the rate of three (3%) percent per year, compounded annually, to be paid to me during the term of my life, and in no event for less than twenty (20) years, the receipt whereof is hereby acknowledged, do hereby remise, release, and quitclaim unto Jenny C., Inc. all and any such claims, rights, choses and actions of every manner and kind which I ever had...without limiting the generality hereof....I understand that this is a full and final settlement. I further certify that this release is fully understood by me and is entirely satisfactory....THIS IS A FINAL RELEASE." Plaintiff's lawyer, Roger Hughes, also signed the General Release, and represented that he read and explained its contents to Plaintiff.

On May 3, 1983, a hearing was held before the court, during which Leonard DeCof, Esq. (who had been appointed by the court as guardian ad litem for Plaintiff), testified as to the terms of the annuity and the settlement. Mr. DeCof testified, *inter alia*, that he had reviewed the general release, the annuity proposal, and the annuity application (among other documents) at length. Mr. DeCof testified that the settlement was in the total amount of $425,000, and that Plaintiff's lawyers had asked Kemper for the $175,000 and that Plaintiff's lawyers "would purchase an annuity for the Plaintiff on the market at the best rate that they could get it...." Mr. DeCof testified that the $175,000 was in fact being used by Plaintiff's lawyers to purchase an annuity that would make payments in the amount of "$1,450.45 per month guaranteed for 20 years but which would continue for the life of the plaintiff." Mr. DeCof also testified that it was possible to obtain an even higher annuity payout for a premium of $175,000, but that such annuity would have been issued by a company that was not as highly rated as Charter Life. The court approved the settlement.

- 3 -

On or about May 3, 1983, Kemper delivered the $175,000 check to Plaintiff's lawyers, and signed and returned the Charter Life annuity application that had been provided to Kemper. The annuity application required an annuity premium in the amount of $175,000.

On June 6, 1983, the court approved a Stipulation of Dismissal with prejudice of the Underlying Action.

On June 17, 1983, Charter Life issued and delivered the requisite life annuity (the "Annuity"). The Annuity provides that "[t]his contract is issued on the basis of the application and receipt of the Single Premium payment in advance" and that "[t]he Single Premium payment for this contract was paid in advance." The Annuity provides that it is issued under "Option 2: Life Income," that Charter Life will pay Plaintiff a "lifetime monthly income," that monthly payments will continue "as long as [Plaintiff] lives," and that Charter Life will pay Plaintiff "monthly payments of $1,450.45 each, increasing 3% annually, commencing June 6, 1983, for a period of 20 years certain and life thereafter." These terms conformed to the terms of the Charter Life Proposal. On or about June 5, 1983, Charter Life began making monthly payments to Plaintiff under the Annuity.

Charter Life subsequently attempted to unilaterally change the terms of the Annuity, by way of correspondence sent to Plaintiff's broker and to Kemper, but Kemper, by reply correspondence, refused to agree to any such change.[2] At that time, Kemper further took the affirmative step of advising Plaintiff of Charter Life's unilateral and rejected attempt to change the terms of the Annuity, by copy of said correspondence to Plaintiff's lawyers.

---

[2] While these letters themselves and any competent statements made therein are not hearsay, a number of statements made in the letters sent by Charter Life are inadmissible because they constitute hearsay, lack foundation, and/or violate the best evidence rule.

Charter Life did not at any time offer to return the $175,000 premium that Kemper paid for the Annuity.

After paying the $175,000 premium in May 1983, Kemper had no further obligations in connection with the Annuity, and indeed, under the terms of the Annuity, the only obligation to be fulfilled after 1983 was Charter Life's obligation to make the required monthly payments to Plaintiff for life. Charter Life (whose relevant line of business was subsequently acquired by MetLife) did so until 2003, and then stopped.

After November 1983, the next time that Kemper had any involvement with the Annuity or anything else related to the subject matter of this lawsuit was when this lawsuit was filed in May 2005.

## II.    WITNESSES[3]

Kemper reserves the right to present the following testimony at trial, by way of the indicated witnesses' deposition testimony:

(1)    Dennis Dimon
151 Holly Ridge Road
W. Kingston, RI 02892

(2)    William Mensie
1 Kemper Drive K-8
Long Grove IL 60049-0001

(3)    Michael B. Latti, Esquire
26 Surfpoint Road
York, ME 03909

(4)    Barbara Fasman
200 Park Avenue
New York, NY 10166-0188

---

[3] By correspondence dated May 2, 2008 (via facsimile and first class mail), Kemper's counsel advised counsel for Plaintiff and MetLife that Kemper was reserving the right to use the following witnesses' deposition testimony, the transcripts of which were provided to all parties in 2005 and 2006.

Kemper also reserves the right to call any witnesses listed by Plaintiff or MetLife, and to supplement prior to trial if necessary.

## III.    EXHIBITS[4]

Kemper reserves the right to use the following exhibits at trial:

1.    A copy of a proposal for a life annuity, dated April 8, 1983, prepared by Charter Security Life Insurance Company;

2.    A copy of a memorandum, dated April 18, 1983, from John L. Noe to Klaus Lemhoefer;

3.    A copy of a general release, dated April 19, 1983, signed by Dennis Jay Dimon;

4.    A copy of a settlement sheet prepared on or about April 19, 1983, by Latti & Associates;

5.    A copy of check number 250-0-008-584, issued by the Kemper Group, in the amount of $176,326.33;

6.    A copy of check number 250-0-008-585, issued by the Kemper Group, in the amount of $175,000.00;

7.    A copy of correspondence, dated May 3, 1983, from W. Slater Allen, Jr., to Mr. Jesus LaTorre;

8.    A copy of the transcript of proceedings held on May 3, 1983 before the Honorable Judge Raymond J. Pettine, in the United States District Court for the District of Rhode Island, in a matter captioned *Dennis J. Dimon v. Jenny C., Inc.*;

9.    A copy of an annuity application signed by John L. Noe on or about May 4, 1983;

10.    A copy of a court-ordered Stipulation of Dismissal with Prejudice, signed on June 6, 1983 by the Honorable Judge Raymond J. Pettine, in

---

[4] By correspondence dated May 2, 2008 (via facsimile and first class mail), Kemper's counsel advised counsel for Plaintiff and MetLife that Kemper was reserving the right to use Exhibit Nos. 15 through 22, below. All of the documents described in Exhibit Nos. 15 through 22 were produced during discovery in 2005 and 2006 by either Kemper or MetLife.

the United States District Court for the District of Rhode Island, in a
matter captioned *Dennis J. Dimon v. Jenny C., Inc.*;

11. A copy of a Single Premium Deferred Annuity, issued on or about
June 17, 1983, by Charter Security Life;

12. A copy of a memorandum, dated August 26, 1983, from Mary Graci to
R.W. Bonoher;

13. A copy of a memorandum, dated November 8, 1983, from John L. Noe
to Klaus Lemhoefer;

14 Any pleadings that have been filed by any current or former party to
this lawsuit (including but not limited to Plaintiff's Expert Witness Disclosures
and attached report, filed on Nov. 22, 2006);

15. A copy of the 3-page curriculum vitae of Leonard Decof, Esq., filed in May 1983
in the matter captioned *Dennis J. Dimon v. Jenny C., Inc.*;

16. A copy of a memo, dated July 18, 1983, from John L. Noe to Jesus LaTorre;

17. A copy of a memo, dated July 22, 1983, from Jesus LaTorre to Klaus Lemhoefer;

18. A copy of a memo, dated August 16, 1983, from Klaus Lemhoefer to Mary Graci;

19. A copy of a memo, dated August 26, 1983, from Mary Graci to File;

20. A copy of the Complaint filed by Plaintiff on or about February 9, 1981, in the
United States District Court for the District of Rhode Island, in the matter
captioned *Dennis J. Dimon v. Jenny C., Inc.*;

21. A copy of a correspondence, dated September 13, 2004, from David B. Kaplan to
MetLife; and

22. A copy of a correspondence, dated September 28, 2004, from David B. Kaplan to
MetLife.

Kemper also reserves the right to use any and all exhibits listed by Plaintiff or MetLife,

to supplement prior to trial if necessary, and to use additional documents for rebuttal.

## IV.   **LEGAL ISSUES**

Kemper has several dispositive legal defenses, as set forth below. The main issue to be tried, however, is whether MetLife issued a life annuity. On this issue, Kemper and Plaintiff should prevail.

**A.** **The Annuity Issued By MetLife Is Plainly A Life Annuity With Twenty Years Certain, And It Cannot Be "Rescinded" Or "Reformed" By MetLife**

**1.** **Choice of Law**

In determining which state's laws applies, the question is resolved by using the choice of law analysis of the forum state. The Travelers Indem. Co. of Illinois v. Wolverine Corp., No. 03-10164, 2005 U.S. Dist. LEXIS 31651, at *2 (D. Mass. Dec. 8, 2005) (citing Reicher v. Berkshire Life Ins. Co. of Am., 360 F.3d 1, 4 (1st Cir. 2004)). Massachusetts courts look to consider what state has the most significant relationship to the issue at hand. The Travelers Indemnity Co., 2005 U.S. Dist. LEXIS 31651, at * 4 (citing Reicher, F.3d at 5).

The state of New York clearly is the state that has the most significant relationship to the Annuity. Charter Life had, and MetLife has its principal place of business in New York, New York. Charter Life was the issuer of the Annuity. Charter Life signed the Annuity in New York, New York. MetLife is the entity that (1) was responsible for making the Annuity payments for 20 years, (2) was responsible for ceasing to make the Annuity payments, and (3) is alleged to have breached the Annuity. The state of New York is the situs of the Annuity corpus. In addition, the Annuity was brokered by and delivered to a New York broker (i.e., Dean Witter). The state of New York plainly is the state that has the most significant relationship to the Annuity, and New York law therefore governs any issues relating to the Annuity.

Kemper respectfully requests that the Court make a determination on this choice of law issue.

- 8 -

**2.    The Annuity Issued By Charter Life Is A Life Annuity With Twenty Years Certain**

Kemper has in its possession a copy of the Annuity that MetLife issued in 1983, and the Annuity is unequivocally for life with 20 years certain.  On this incontrovertible point, the Annuity speaks for itself.  At the top of page one, centered and in bold print, the Annuity expressly provides that it has been issued under "**Option 2.  Life Income.**"  In the first paragraph on page one, the Annuity further provides that "[MetLife] will pay a <u>lifetime monthly income</u> to the Annuitant if living on the Annuity Date."  In the second paragraph on page one, the Annuity further provides that "[MetLife] will make the first monthly payment on the Annuity Date; payments after the first will be on that same date of the month <u>as long as the Annuitant lives</u>."  The Annuity further provides, as its second to last page, a "Supplementary Agreement" that confirms the exact monthly payments to be made to Plaintiff.  Under the column heading entitled "Manner of Payment," MetLife specifies that MetLife will make monthly payments to Plaintiff in the amount of "$1,450.45 each, increasing 3% annually, commencing June 6, 1983, <u>for a period of 240 months certain and life thereafter</u>."

Indeed, MetLife admitted that it had issued a life annuity with 20 years certain when it subsequently attempted to change the terms of the Annuity to provide for payments for "20 years only."

The Annuity is plainly a life annuity.[5]

**3.    The Annuity Cannot Be "Rescinded" Or "Reformed"**

---

[5] Of course, even assuming (contrary to fact) that the terms of the Annuity issued by MetLife were somehow not clear, any ambiguity would be interpreted against MetLife and in favor of Plaintiff and Kemper.  <u>See</u> <u>67 Wall Street Co. v. Franklin Nat'l Bank</u>, 333 N.E.2d 184, 187 (N.Y. 1975) (stating that "in cases of doubt or ambiguity, a contract must be construed most strongly against the party who had no voice in the selection of its language" <u>citing</u> 4 Williston, Contracts, §621; 10 NY Jur, Contracts, § 233); <u>see also</u> <u>Fed. Ins. Co. v. Raytheon Co.</u>, 426 F.3d 491, 497 (1st Cir. 2005).

While MetLife now appears to be attempting to suggest that there was no "meeting of the minds" and that therefore no annuity contract was ever formed, the undisputed evidence renders this suggestion absurd. This is not a case where it possibly could be found that no contract ever existed. Preliminarily, MetLife actually issued an unambiguous life annuity. Because the Annuity is unambiguous, a contract was formed, whatever unexpressed intention MetLife may have had. See Hunt, Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1278 (2nd Cir. 1989). Moreover, MetLife retained the $175,000 consideration that it was paid, and MetLife made payments to Plaintiff for 20 years. That a contract was formed, there can be no question.

In any event, the remedy for an alleged lack of a "meeting of minds" on a contract would be a claim for rescission. See, e.g., Schultz v. Hourihan, 656 N.Y.S.2d 526 (N.Y. App. Div. 1997); Melia v. Riina, 612 N.Y.S.2d 506, 508 (N.Y. App. Div. 1994), appeal dismissed, 648 N.E.2d 795 (N.Y. 1995); Brauer v. Central Trust Co., 433 N.Y.S.2d 304, 307 (N.Y. App. Div. 1980), appeal denied, 52 N.Y.2d 703 (N.Y. 1981). However, MetLife has made no claim for rescission; Kemper does not consent to the trial of any such claim; and any attempt by MetLife to amend its answer to assert such a claim would suffer fatally from undue delay and prejudice to Kemper and Plaintiff. Moreover, rescission is legally unavailable to MetLife as a matter of law, for a number of separate and independent reasons, including the following:[6]

- Any claim for rescission would be long time-barred. See Zavaglia v. Gardner, 666 N.Y.2d 671 (N.Y. App. Div. 1997). Under CPLR 213(6), MetLife had 6 years from 1983 to file any claim for rescission, and MetLife did not do so.[7]

---

[6] See also Kemper's Motion in Limine to Preclude Any Evidence in Purported Support of, or Any Reference to "Rescission" or "Reformation" of the Annuity Contract.

[7] The 6 year statute of limitations under CPLR 213 governs breach of contract actions as well as actions in equity. See U.S. v. Schmitt, 999 F.Supp. 317, 364 (E.D.N.Y. 1998), aff'd, 28 Fed. Appx. 63 (2d Cir. 2002).

- MetLife has proffered no competent evidence of any mistake on even its own part. Moreover, not only is there no evidence that Kemper or plaintiff intended an annuity that would pay for 20 years only, but all of the evidence is directly contrary – i.e., that Kemper and Plaintiff plainly intended the Annuity to be for life. And MetLife has not pled, nor is there any evidence of fraud, as would be required to rescind a contract for unilateral mistake. Travelers Indem. Co. v. CDL Hotels, 322 F. Supp. 2d 482, 498 (S.D.N.Y. 2004); Sudul v. Computer Outsourcing Serv., 917 F.Supp. 1033, 1044 (S.D.N.Y. 1996); D'Antoni v. Goff, 383 N.Y.S.2d 117, 118 (N.Y. App. Div. 1976) ("Unilateral mistake as a gravamen for rescission or reformation requires a showing of fraud"); see also Federal Jury Practice and Instructions, 5th Ed., § 126.05 (rescission requires showing of fraud).

- MetLife never returned the Annuity premium, and there is no right to rescission unless the consideration is returned. See, e.g., Ladenburg Thalmann & Co. v. Imaging Diagnostic Sys., 176 F. Supp. 2d 199, 204 (S.D.N.Y. 2001); In re: Domestic Fuel Corp., 79 B.R. 184, 193 (S.D.N.Y. 1987) (even if the right of rescission exists it cannot be exercised without a return or an offer to return all benefits).

- MetLife could not possibly demonstrate as part of its prima facie case that it made any rescission claim promptly, as it would be required to do in order to rescind. Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank, 850 F. Supp. 1199, 1211 (S.D.N.Y. 1994), aff'd, 57 F.3d 146 (2d Cir. 1995); see also Federal Jury Practice and Instructions, 5th Ed., § 126.05 (rescission requires showing that claim was brought within a reasonable time of learning of the fraud).

- MetLife ratified the contract by both retaining the premium, and exercising dominium over the Annuity corpus by making annuity payments for decades. Banque Arabe Et Internationale D'Investissement, 850 F. Supp. at 1212 (where a party engages in acts inconsistent with disaffirmance, such as acceptance of benefits under the contract or the exercise of dominion over the subject matter of the transaction, he will lose the right to rescind); Brown v. City of S. Burlington, 393 F.3d 337, 344-45 (2d Cir. 2004) (in order to avoid a finding of ratification where consideration has been paid, it is essential that the consideration be tendered back within a reasonable time).

- MetLife would be estopped from rescinding the contract, for the reason (among others) that MetLife retained the premium. See In re New York, 436 N.Y.S.2d 52, 53-54 (N.Y. App. Div. 1981) (having accepted the agreement's benefits, and never having challenged the agreement by appropriate legal proceedings, plaintiff was estopped from attacking the validity of the agreement).

- It would be impossible to place the parties back in the status quo circa April 1983, as would be required to effect a rescission. See Banque Arabe Et Internationale D'Investissement, 850 F. Supp. at 1212 ("rescission is a remedy through which a party seeks to disaffirm the contract and return to the status that existed before the transaction was executed.").

- Furthermore, MetLife would need to prove its entitlement to rescission by "clear, positive, and convincing evidence." "Reformation and rescission have both been limited both substantively and procedurally to avoid the danger that a party, having agreed to a written contract that turns out to be disadvantageous, will falsely claim the existence of a different contract. Procedurally, there is a heavy presumption that a deliberately prepared and executed written instrument manifests the true intention of the parties, and a correspondingly high order of evidence is required to overcome that presumption" and attempt to reform or rescind a contract - i.e., "clear, positive, and convincing evidence." Travelers Indem. Co., 322 F.Supp.2d at 495-496; Winmar Co. v. Teachers Ins. & Annuity Ass'n of Am., 870 F. Supp. 524, 535-536 (S.D.N.Y. 1994).

For each of the above reasons and more, rescission of the Annuity contract is not a viable option for MetLife, as a matter of law.

MetLife also had suggested that it is entitled to "reformation" of the Annuity, on the grounds that an unidentified person at MetLife allegedly made some sort of mistake that somehow caused MetLife to issue a life annuity. However (as in the case of any attempted claim for rescission), MetLife has filed no claim for reformation; Kemper does not consent to the trial of any such claim; and any attempt by MetLife to amend its answer to assert such a claim would suffer fatally from undue delay and prejudice to Kemper and Plaintiff. Moreover, reformation also would be legally unavailable to MetLife for many of the same reasons that rescission would be legally unavailable (as well as additional reasons), including the following:

- Any claim for reformation would be long time-barred. See Wallace v. 600 Partners Co., 658 N.E.2d 715, 717 (N.Y. 1995). Under CPLR 213(6), MetLife had 6 years from 1983 to file any action for reformation, and MetLife did not do so.[8]

- Reformation may be granted only in two circumstances: "where there has been a (1) mutual mistake; or (2) unilateral mistake coupled with fraudulent concealment by the

---

[8] It is noted that, in the absence of a claim for reformation, courts "may as a matter of interpretation carry out the intention of a contract by transposing, rejecting or supplying words to make the meaning of the contract more clear. However, such an approach is appropriate only in those limited instances where some absurdity has been identified or the contract would otherwise be unenforceable...." See Wallace, 86 N.Y.2d at 547-48, 658 N.E.2d at 717 (internal citations omitted). In this case, reforming the contract to MetLife's preference obviously would involve not merely "as a matter of interpretation...supplying certain words to make meaning of the contract more clear"; rather, it would involve re-writing the contract so as to completely change the parties' rights and obligations to MetLife's benefit. Moreover, the contract as written is obviously not "absurd" or "unenforceable."

knowing party." <u>Mina Inv. Holdings Ltd. v. Lefkowitz</u>, 16 F. Supp. 2d 355, 363 (S.D.N.Y. 1998) (citations omitted). First, MetLife has proffered no competent evidence of any mistake on even its own part. Moreover, not only is there no evidence that Kemper or Plaintiff intended an annuity that would pay for 20 years only, but all of the evidence is directly contrary – i.e., that Kemper and Plaintiff plainly intended the Annuity to be for life. And MetLife has not pled, nor is there any evidence of fraud, as would be required to reform a contract for unilateral mistake. <u>Travelers Indem. Co.</u>, 322 F.Supp.2d at 498; <u>Sudul</u>, 917 F.Supp. at 1044; <u>D'Antoni</u>, 383 N.Y.S.2d at 118 ("unilateral mistake as a gravamen for rescission or reformation requires a showing of fraud").

- "The proponent of a reformation claim must demonstrate in no uncertain terms, not only that that mutual mistake or fraud exists, <u>but also exactly what was really agreed upon between the parties</u>." <u>See</u> <u>Winmar, supra</u>, 870 F.Supp. at 535 (emphasis added). Here, as set forth above, there is no competent evidence that MetLife itself made a mistake, let alone evidence of any mutual mistake or fraud. Moreover, not only is there no evidence that Kemper or Plaintiff agreed to an annuity that would pay for 20 years only, but all of the evidence is directly contrary – i.e., that Kemper and Plaintiff unequivocally intended the Annuity to be for life.

- MetLife would be estopped from reforming the contract, for the reason (among others) that MetLife retained the consideration for the contract. <u>See</u> <u>In re New York</u>, 436 N.Y.S.2d 52, 53-54 (N.Y. App. Div. 1981) (having accepted the agreement's benefits, and never having challenged the agreement by appropriate legal proceedings, plaintiff was estopped from attacking the validity of the agreement).

For each of these reasons and more, the remedies of reformation and rescission are unavailable to MetLife as a matter of law. Therefore, on the central issue of whether MetLife issued a life annuity, Plaintiff and Kemper should prevail.

If Plaintiff and Kemper do not prevail on this issue, it is submitted that Kemper still should prevail for the following reasons.

**B.    Kemper Fulfilled Its Agreement With Plaintiff**

The evidence is that, during settlement negotiations in mid-April 1983, Plaintiff's lawyers asked Kemper for $175,000 so that they could purchase the Charter Life life annuity for which they had obtained a quote, and Kemper agreed. Kemper issued the requisite check, and (as the nominal owner) signed the Charter Life application sent to it – just as Kemper had been asked to do by Plaintiff's lawyers. Kemper therefore fulfilled its agreement with Plaintiff.

- 13 -

Assuming (all evidence to the contrary) that the Annuity is not a life annuity, then Plaintiff's recourse is against his lawyers and/or his broker in connection with the Underlying Action.

Of course, even assuming that Kemper was itself obligated to establish a life annuity for plaintiff, Kemper in fact did so (as set forth in Section IV(A), above).

## C.   The Statute Of Limitations Bars Plaintiff's Claim Against Kemper

The purpose of the statute of limitations is to protect litigants from having to defend stale claims, regardless of their merits, and its provisions are mandatory.  See, e.g., Am. Pipe & Constr. Co. v. Utah, 414 U.S. 538, 554 (1974) (The theory behind the statute of limitations is "that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them.").

Preliminarily, Plaintiff has admitted that his alleged cause of action against Kemper accrued in 1983.  Even absent such admissions, however, the law is clear:  a cause of action for breach of contract accrues at the time of the breach itself, even if damages do not occur until later, and even if plaintiff is not aware of the occurrence of the wrong.  See, e.g., Gail Frances, Inc. v. Alaska Diesel Elec., Inc., 62 F. Supp. 2d 511, 515 (D.R.I. 1999) (citing Blue Ribbon Beef Co., Inc. v. Napolitano, 696 A.2d 1225 (R.I. 1997); Ely-Cruikshank Co., Inc. v. Bank of Montreal, 81 N.Y.2d 399, 402, 615 N.E.2d 985, 986-87 (N.Y. 1993).  Kemper's contractual obligation was to indemnify The Jenny C. for the loss incurred in the settlement of the Underlying Action, by paying the two lump sums in 1983.  If Kemper breached that obligation, then the alleged cause of action for breach necessarily accrued at the time of indemnity, in April 1983.

Indeed, any alleged wrongful conduct on the part of Kemper could only have occurred in 1983, since that was the last time (prior to the filing of this lawsuit in 2005) that Kemper had any involvement whatsoever with the Annuity or anything else related to the subject matter of this lawsuit. Indeed, this is true even if one assumes that Kemper had an obligation to actually secure the Annuity. See T&N PLC v. Fred S. James & Co., 29 F.3d 57, 58-60 (2nd Cir. 1994) (where defendant had contract with plaintiff to secure insurance policies containing certain terms, and plaintiff did not file suit until it learned that the policies allegedly did not contain the correct terms, plaintiff's suit was time-barred because its alleged cause of action accrued when the allegedly deficient policies were applied for and issued eight years earlier); St. George Hotel Assocs. v. Shurkin, 12 A.D.3d 359, 786 N.Y.S.2d 56, 57 (N.Y. App. Div. 2004) (where plaintiff claimed that defendant breached their contract by allegedly failing to secure the correct type of insurance policy, plaintiff's breach of contract claim accrued when the allegedly incorrect policy was procured from and issued by the third-party issuer); Int'l Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc., 29 Mass. App. Ct. 215, 221-23, 560 N.E.2d 122, 126-27 (1990).[9]

For these reasons, Kemper respectfully submits that Kemper is entitled to judgment as a matter of law on statute of limitations grounds.

### D.    In Any Event, Any Damages Against Kemper Would Be Limited

In any event, any damages against Kemper necessarily would be limited to the amount of the remainder of the limits of The Jenny C.'s excess policy with Kemper, which amount is $48,673.67. Clauson v. New Eng. Ins. Co., 254 F.3d 331, 339 (1st Cir. 2001) ("the insurance

---

[9] It is noted that, while knowledge of the alleged wrong is not necessary to begin the running of the statute of limitations for a breach of contract claim, Plaintiff did in fact have such knowledge, by virtue of his lawyers' receipt of the August, September, and October 1983 correspondence from Kemper and MetLife. See Levin v. Berley, 728 F.2d 551 (1st Cir. 1984) (the knowledge of an attorney is imputed to the client for statute of limitations purposes); Veal v. Geraci, 23 F.3d 722, 725 (2nd Cir. 1994) (same).

policy governs the obligations the insurer owes to its insured, thus limiting an insurer's total

liability on a judgment against its insured to the contractual limits contained in that policy");

Factory Mut. Liab. Ins. Co. v. Cooper, 262 A.2d 370, 372 (R.I. 1970) (liability of insurer to

personal injury claimant that had obtained judgment against insurer's tortfeasor-insured was

restricted to policy limits).

## V.    MOTIONS IN LIMINE

Kemper has filed the following Motions in Limine:

- Motion in Limine to Preclude Any Evidence in Purported Support of, or Any Reference to "Reformation" or "Rescission" of the Annuity Contract;

- Motion in Limine to Preclude Certain Exhibits Identified by Defendant Metropolitan Life Insurance Company; and

- Motion in Limine to Preclude Testimony from Barbara Fasman on the Pricing and Underwriting of Annuities in 1983.

## VI.    PROPOSED JURY INSTRUCTIONS

Kemper has attached as Exhibit "A" hereto Kemper's proposed jury instructions.

Kemper reserves the right to supplement these proposed jury instructions during trial.

Respectfully submitted,

KEMPER INSURANCE COMPANY

by its attorneys,

_____/s/ Kevin L. Golden_____
DRINKER BIDDLE & REATH LLP
Timothy O'Driscoll (Admitted Pro Hac Vice)
Kevin L. Golden (Admitted Pro Hac Vice)
DRINKER BIDDLE & REATH LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996
(215) 988-2700

Local Counsel

- 16 -

Kevin S. Murphy (BBO #638335)
Anthony B. Fioravanti (BBO #664823)
YURKO SALVESEN & REMZ, P.C.
One Washington Mall, 11th Floor
Boston, MA 02108-2603
(617) 723-6900

Dated: May 14, 2008

## Certification of Service

I hereby certify that a true and accurate copy of the foregoing document was filed via the ECF system and will be served electronically through that system upon Counsel of Record on May 14, 2008.

/s/ Kevin L. Golden
Kevin L. Golden

## <u>Kemper Proposed Jury Instruction No. 1</u>

Before the trial began, the parties filed written statements with the court describing their claims and defenses.  The statements are known as pleadings.  In their pleadings, the parties have admitted certain facts as follows.

[Admissions to be Supplied.]

You will take these admitted facts to be true for purposes of this case.

<u>Federal Jury Practice and Instructions</u>, 5th Ed., § 101.46  Admissions in Pleadings

**Kemper Proposed Jury Instruction No. 2**

You should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life. Kemper is entitled to the same fair trial as a private individual. All persons, including Kemper, and other organizations stand equal before the law, and are to be treated as equals.

Federal Jury Practice and Instructions, 5th Ed., § 103.12  All Persons Equal Before the Law –
Organizations

## Kemper Proposed Jury Instruction No. 3

Unless you are otherwise instructed, the evidence of the case consists of the sworn testimony of the witnesses regardless of who called the witness, all exhibits received in evidence regardless of who may have produced them, and all facts and events that may have been admitted or stipulated to.

Statements and arguments by the lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statement, closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence. However, when the lawyers on both sides stipulate or agree on the existence of a fact, you must, unless otherwise instructed, accept the stipulation and regard that fact as proved.

<u>Federal Jury Practice and Instructions</u>, 5th Ed., § 103.30  Evidence in the Case

## **Kemper Proposed Jury Instruction No. 4**

A corporation may act only through natural persons as its agents or employees.   In general, any agents or employees of a corporation may bind the corporation by their acts and declarations made while acting within the scope of their authority delegated to them by the corporation or within the scope of their duties as employees of the corporation.

<u>Federal Jury Practice and Instructions</u>, 5th Ed., § 103.31   Consideration of the Evidence - Corporate Party's Agents and Employees

**Kemper Proposed Jury Instruction No. 5**

If a lawyer asks a witness a question that contains an assertion of fact, you may not consider the assertion as evidence of the fact.  The lawyer's questions and statements are not evidence.

<u>Federal Jury Practice and Instructions</u>, 5th Ed., § 103.34  Questions Not Evidence

## Kemper Proposed Jury Instruction No. 6

Plaintiff, Dennis Dimon, has the burden in a civil action, such as this, to prove every essential element of his claim by a preponderance of the evidence. If he should fail to establish any essential element of his respective claims against Kemper or MetLife, by a preponderance of the evidence, the you must find for Kemper or MetLife as to that claim.

The defendants have the burden of establishing the essential elements of certain affirmative defenses. I will explain this later.

"Establish by a preponderance of the evidence" means to prove that something is more likely so than not so. In other words, a preponderance of the evidence means such evidence as, when considered and compared with the evidence opposed to it, has more convincing force, and produces in your minds belief that what is sought to be proved is more likely true than not true. This standard does not require proof to an absolute certainty, since proof to an absolute certainty is seldom possible in any case.

In determining whether any fact in issue has been proved by a preponderance of the evidence you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

Federal Jury Practice and Instructions, 5th Ed., § 104.01  Preponderance of the Evidence

## Kemper Proposed Jury Instruction No. 7

Generally speaking, there are two types of evidence that are generally presented during a trial—direct evidence and circumstantial evidence. "Direct evidence" is the testimony of a person who asserts or claims to have actual knowledge of a fact, such as eyewitness. "Indirect or circumstantial" evidence is proof of a chain of facts and circumstances indicating the existence or nonexistence of a fact.

As a general rule, the law makes no distinction between the weight or value to be given to either direct or circumstantial evidence. Nor is a greater degree of certainty required of circumstantial evidence. You are simply required to find the facts in accordance with the preponderance of all the evidence in the case, both direct and circumstantial.

Federal Jury Practice and Instructions, 5th Ed., § 104.05  "Direct" and "Circumstantial" Evidence – Defined

### Kemper Proposed Jury Instruction No. 8

You are to consider only the evidence in the case. However, you are not limited to the statements of the witnesses. In other words, you are not limited to what you see and hear as the witnesses testify. You may draw from the facts that you find have been proved such reasonable inferences as seem justified in light of your experience.

"Inferences" are deductions or conclusions that reason and common sense lead you to draw from facts established by the evidence in the case.

<u>Federal Jury Practice and Instructions</u>, 5th Ed., § 104.20  "Inferences" Defined

## Kemper Proposed Jury Instruction No. 9

The weight of the evidence is not necessarily determined by the number of witnesses testifying to the existence or nonexistence of any fact. You may find that the testimony of a small number of witnesses as to any fact is more credible than the testimony of a larger number of witnesses to the contrary.

You are not bound to decide any issue of fact in accordance with the testimony of any number of witnesses that does not produce in your minds belief in the likelihood of truth, as against the testimony of a lesser number of witnesses or other evidence producing such belief in your minds.

The test is not which side brings the greater number of witnesses or takes the most time to present its evidence, but which witnesses and which evidence appeal to you minds as being most accurate and otherwise trustworthy.

<u>Federal Jury Practice and Instructions</u>, 5th Ed., § 104.54  Number of Witnesses

## Kemper Proposed Jury Instruction No. 10

During the trial, certain testimony has been presented by way of deposition.    The deposition consisted of sworn, recorded answers to questions asked of the witness in advance of the trial by one or more of the attorneys for the parties to the case.    The testimony of a witness who, for some reason is not present to testify from the witness stand may be presented in writing under oath.    Such testimony is entitled to the same consideration and is to be judged as to the credibility, and weighed, and otherwise considered by you, insofar as possible, in the same way as if the witness had been present and had testified from the witness stand.

<u>Federal Jury Practice and Instructions</u>, 5th Ed., § 105.02  Use of Depositions as Evidence

### Kemper Proposed Jury Instruction No. 11

The law does not require any party to call as witnesses all persons who may have been present at any time or place involved in the case, or who may appear to have some knowledge of the matters in issue at this trial. Nor does the law require any party to produce as exhibits all papers and things mentioned in the evidence in the case.

<u>Federal Jury Practice and Instructions</u>, 5th Ed., § 105.11  All Available Witnesses or Evidence Need Not Be Produced

## Kemper Proposed Jury Instruction No. 12

Regardless of the outcome of plaintiff's action against MetLife and Kemper, Plaintiff still has the right to proceed with a lawsuit against his lawyers in the underlying action (i.e., Michael B. Latti and Latti Associates).

**Kemper Proposed Jury Instruction No. 13**

A claim that the contract sued upon is invalid must be proven by the defendant by demonstrating facts. It is not sufficient merely to create confusions and suggest doubts as to validity.

Robert S. Hunter, <u>Federal Trial Handbook:  Civil</u>, 4th Ed., § 19:9.

## Kemper Proposed Jury Instruction No. 14

If you find that the terms of the annuity issued by MetLife were unclear or ambiguous, any ambiguity should be construed against MetLife and in favor of plaintiff.

67 Wall Street Co. v. Franklin Nat'l Bank, 333 N.E.2d 184, 187 (N.Y. 1975) (stating that "in cases of doubt or ambiguity, a contract must be construed most strongly against the party who had no voice in the selection of its language" citing 4 Williston, Contracts, §621; 10 NY Jur, Contracts, § 233); Fed. Ins. Co. v. Raytheon Co., 426 F.3d 491, 497 (1st Cir. 2005).

**Kemper Proposed Jury Instruction No. 15**

If you find that MetLife issued a life annuity, then you must find that Kemper is not liable for breach of contract.

## Kemper Proposed Jury Instruction No. 16

Plaintiff is charged with the knowledge of his attorneys. In plaintiff's underlying action against The Jenny C., plaintiff's attorneys included Michael Latti, Roger Hughes, and the law firm of Latti Associates.

Levin v. Berley, 728 F.2d 551 (1st Cir. 1984) (the knowledge of an attorney is imputed to the client for statute of limitations purposes); Veal v. Geraci, 23 F.3d 722, 725 (2nd Cir. 1994) (same).

## **Kemper Proposed Jury Instruction No. 17**

Kemper asserts as a defense that the statute of limitations bars plaintiff's claim against Kemper. A statute of limitations is a law that provides that a suit is barred if a plaintiff does not bring it within a specified period of time. The theory behind the statute of limitations is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them. Kemper has the burden of proving by a preponderance of the evidence that plaintiff's claim is barred by the statute of limitations. A claim for breach of contract accrues at the time of the breach itself, even if damages do not occur until later, and even if plaintiff does not have knowledge of the alleged wrong constituting breach. If you find that plaintiff's claim for breach of contract against Kemper accrued in 1983, then your verdict must be in favor of Kemper.

Am. Pipe & Constr. Co. v. Utah, 414 U.S. 538, 554 (1974); Gail Frances, Inc. v. Alaska Diesel Elec., Inc., 62 F. Supp. 2d 511, 515 (D.R.I. 1999) (citing Blue Ribbon Beef Co., Inc. v. Napolitano, 696 A.2d 1225 (R.I. 1997); Ely-Cruikshank Co., Inc. v. Bank of Montreal, 81 N.Y.2d 399, 402, 615 N.E.2d 985, 986 (N.Y. 1993).

## <u>Kemper Proposed Jury Instruction No. 18</u>

Plaintiff has the burden of proving each of the essential elements of his breach of contract claim against Kemper by a preponderance of the evidence. The essential elements of breach of contract claim are as follows: (1) the formation of an agreement by an offer, acceptance, and consideration; (2) performance by one party; (3) breach of the agreement by the other party; and (4) damages. If you find that plaintiff has failed to prove any of the essential elements of his breach of contract claim against Kemper, then your verdict must be in favor of Kemper.

Constructive Hands, Inc. v. Baker, 446 F. Supp. 2d 88, 93 (N.D.N.Y. 2006) (citations omitted); Federal Jury Practice and Instructions, 5th Ed., § 104.01  Preponderance of the Evidence